**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| AILEEN MULLIN, | ) Case No.: |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT WILKIE, SECRETARY, | ) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) |
| Et al. | ) |
| Defendant. | ) |
| | ) Date Action Filed: November 16, 2020 |

COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Aillen Mullin, by and through her undersigned counsel, and brings this action for damages against the Defendant, Robert Wilkie, as Secretary of the U.S. DEPARTMENT OF VETERANS AFFAIRS ("VA"), and alleges as follows:

SUMMARY OF THE ACTION

1. This is a civil rights action brought by a disabled VA employee who was seriously injured at the workplace as a result of the agency's failure to accommodate her disabilities, and who has been discriminated against by the VA because of her disabilities and retaliated against for her complaints about this discrimination and reporting/opposing violations of rules and regulations concerning the reasonable accommodation process, and use of the Equal Employment Opportunity process, through violations of policy meant to ensure timely processing of accommodations, and subjected Plaintiff to a Hostile Work Environment through delays/denials, and frustration of requests for reasonable accommodations.

2. As a result of this intentional discrimination and retaliation, Ms. Mullin is seeking all

available remedies, including back pay and benefits, and other compensatory damages, as well as her attorney's fees and expenses.

## JURY TRIAL DEMAND

3. Under Fed. R. Civ. P. 38 (b), Plaintiff hereby demand trial by jury on all issues triable to a jury.

## JURISDICTION

4. This action arises under Sections 501 and 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, *et seq*., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1341 (federal question) and 1343 (civil rights).

## PARTIES AND VENUE

5. Plaintiff, Aileen Mullin, is a citizen of the United States and is a resident of Pinellas County, Florida. Plaintiff is an employee of the Agency, employed as a Veterans Service Representative ("RVSR") (GS-0996-12) at the Rating Veterans Benefits Administration ("VBA"), /St. Petersburg Regional Benefits Office ("Regional Office"), Station 317, Building 46 5900 Bay Pines Blvd, Bay Pines Blvd (RO 317) in Bay Pines, Pinellas County, Florida. Plaintiff is informed and believes, and alleges that at all times relevant herein, Agency/Defendant was responsible in some manner for the occurrences, offenses, and injuries alleged in this complaint. Plaintiff will further amend this Complaint, if needed, to show or correct for true names and capacities, and facts, when the same have been ascertained. See Exhibit 1-Hiring Documentation, See Exhibit 2-RVSR Promotion Memo, See Exhibit 3-Bay Pines Campus Map, See Exhibit 4-Regional Office Trip Pack.

6. All of Plaintiff's claims arise under Federal Law.

7. Plaintiff has exhausted the required administrative remedies per the Equal Employment Opportunity Commission decision dated August 18, 2020. Pursuant to 29 C.F.R. §1614.407(b), Plaintiff is authorized to file this civil action in an appropriate U.S. District Court.

8. Defendant, Robert Wilkie, is sued in his official capacity as the current Secretary of the U.S. Department of Veterans Affairs, an agency of the United States, and Plaintiff's employer.

9. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. 1981a, and Defendant is subject to the personal jurisdiction of this Court in the Middle District of Florida because Defendant maintains facilities and business operations in this District, and all or most of the events and issues giving rise to this action occurred in this District at the VA St. Petersburg Regional Office at the Bay Pines VAMC, in Bay Pines, FL. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f).

10. From 2009 through 2016, Plaintiff's chain of command included the following individuals: Veterans Service Center Coach (VSC) Milli Cabana; VSC Gerri Robion; VSC Charles Ellis; VSC Tom Vernon; VSC Mike Palmer; VSC Ulysee McBurrough; VSC James Beauchamp; VSC John Ustick; VSC James Correa; VSC Adela Nicholson; Assistant Veterans Service Center Coach (AVSC) Pam Adams; AVSC John Ustick; AVSC Veronica Collins; AVSC James Cartner; AVSC Missy Neser; Assistant Veterans Service Center Manager (AVSCM) Anthony Milons; AVSCM Collette Burges; AVSCM Christine Moorby; AVSCM Jeffrey Huffman; AVSCM Larry Brown; Veterans Service Center Manager (VSCM) Sandra L. Smith, Assistant Director of the St. Petersburg Regional Office (Assistant Director), Scott Post; Assistant Director Suzanne Nuziata; Director of the St. Petersburg Regional Office (Director), Barry Barkera; Director Kerrie Witty; St. Petersburg Regional Office Human Resources Director/Manager (HRM), Bonnie Wax.

11. Venue is proper in this judicial district under 42 U.S.C. Section 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2); as Plaintiff is employed by the Agency at Pinellas County, Florida, where the alleged

offenses and injuries occurred, and plaintiff's employment records are maintained by the Agency in this judicial district.

## FACTUAL ALLEGATIONS

12. In 2008, Defendant's facility on the Bay Pines campus was facing multi-million-dollar repairs to the building that houses the Florida St Petersburg Veterans Benefits Administration (VBA) Regional Office Building, and a number of Veterans Service Organizations. The repairs were needed due to problems with the original construction of the building dating back to 1998, and to fix all damage done by of years of extensive water intrusion, which resulted in unsafe levels of microbial contamination due to the faulty construction of the RO 317. See Exhibits 5-24.

13. Plaintiff began her employment with the agency on February 9, 2009, starting as a GS 7 Step 1, VSR trainee, in good health. She was initially assigned to the Files Warehouse on the third floor (RO317 Floor Plan Location File Area) for one week, then assigned to the PAST Team that was located on the second floor (RO317 Location #1) of the building at the St Petersburg Regional Office, RO 317. See Exhibit 25.

14. Ms. Mullin was consistently working to advance her career, and experienced immense satisfaction from working on veterans' claims as a VSR and after being promoted on May 9, 2011 to a Rating Veterans Service Representative (RVSR), continued to excel as much as she could until her career was impeded due to the Agency's failure to accommodate her.

15. Ms. Mullin volunteered for special projects and was given additional responsibilities which afforded her remarkable opportunities to become a subject matter expert for new VA processes that were being implemented. The most noteworthy were being selected as point of contact (POC) VSR for Nation's Priority Gulf War on Terrorism (PGWOT) initiative (2010);

Granted higher level Security access (Sensitive 6) (23010); POC and trainer for new Disability Benefits Questionnaires (DBQs) program (2010); Assignment to the Team (D1BC) that was tasked with reviewing, developing, and adjudicating Veterans' cases that fell under the Nehmer v. Department of Veterans Affairs, the class action lawsuit brought on behalf of Vietnam Veterans exposed to Agent Orange (2011). See Exhibit 26-29.

16. By April 26, 2009, Plaintiff was released from training, and assigned to STREAM 3, located on the third floor of the building RO317, working for Thomas Vernon. See Exhibit 25 at location #2.

17. By May 2009, within weeks after being assigned to STREAM 3 on the third floor of RO317, Plaintiff's health began to deteriorate and she started having trouble focusing, experienced bouts of dizziness, and her speaking became increasingly difficult and painful. See Exhibit 30-Medical Documentation from 2009-2010

18. Shortly after she was reassigned to the third floor of RO 317 in April 2009, Ms. Mullin's symptoms increased in number, complexity and intensity and her disabilities substantially limited her ability to speak, swallow, walk, breath, think, see, and often resulted in trouble breathing, ranging from chest tightness, wheezing, to asthmatic attacks, dysphonia, hoarseness, throat pain, difficulty swallowing, coughing, hypersensitivity reactions, ear pain, nose bleeds, and anxiety, that required medical care, hospitalization, and occasionally an EMS response at the work location. See Exhibit 31-OWCP Acceptance Letters. It was determined that these symptoms were onset due to her exposure to various triggers and airborne stimuli at the work location.

19. By March 16, 2012, Plaintiff was diagnosed with breast cancer, and by 2013, due to the Agency's failure to timely consider or assess appropriate reasonable accommodations (RAs) for

Plaintiff's conditions, she developed additional disabilities of Irritable Bowel Syndrome (IBS), and iritis.

20. Plaintiff's conditions were caused by building exposure and Agency's failure to accommodate her which also resulted in an aggravation of a previously diagnosed condition and development of conditions that were caused by (secondary to) the disabilities that resulted from the building exposure and failure to accommodate her. *Id.*

21. On November 27, 2009, Ms. Mullin received notice via a memorandum that she would be reassigned to the Public Contact Unit, effective January 4, 2010. The Public Contact Unit was an incoming Call Center that was staffed by approximately 25 VSRs. Most callers were veterans, their dependents, and representatives. In this role, an employee's production standards were dependent on the number of phone calls they could respond to every day. In Plaintiff's case, to not meet the required production goal, would have been grounds for termination (without cause) as she had not yet satisfied her probationary period. See Exhibit 32.

22. Due to the respiratory limitations Ms. Mullin was facing because of her disabilities most of the verbal communication she was required to do as part of her duties on the Public Contact/Phone Unit were substantially impacted and were glaringly obvious to Defendant and the Responsible Management Officials (RMOs) who witnessed her trying to communicate verbally on a daily basis. See Exhibits 30, 33, and 34.

23. As a new hire, Ms. Mullin attempted to avoid taking time off from work. However, when given the opportunity for time away from the building, her good health returned, and her symptoms would subside. Initially she would recover when was away from the building on weekends, holidays, sick leave, etc. But upon returning to the building, her symptoms increased in number, complexity and intensity, substantially impairing her from major life activities and

performance of her essential functions as a VSR. The longer Ms. Mullin was away from the building, the healthier she would become. With extended periods away from the building she become symptom fee. See Exhibit 30 and Exhibit 33.

24. From May 2009 through January 2015, Ms. Mullin was never given any clear direction from her supervisors on the steps she needed to take to obtain reasonable accommodations for her disabilities. This resulted in her developing additional disabilities and having the severe symptoms she suffered from were exacerbated due to the Agency's failure to provide effective reasonable accommodations. See Exhibit 35.

25. After months of trying to navigate the process for requesting RAs, on or around December 29, 2009, and again on or around January 4, 2010, Ms. Mullin provided medical documentation from her treating physician outlining her medical restrictions and functional limitations to her supervisor, (VSC)Jim Correa, Human Resources Specialist (HRS) Virginia Lopez, and HRS Megan Tarver, who also forwarded this documentation to Human Resources Manager (HRM) Bonnie Wax. See Exhibit 30.

26. However, rather than engage in any interactive process or communications as part of Ms. Mullin's request for accommodations based on the medical documentation she submitted, her supervisor VSC Jim Correa, repeatedly stated "[y]ou have to make your points and meet your standards" in response to her pleas with him for answers as to what she should do to find a way to work with the symptoms she was suffering from. From January 4, 2010 through February 1, 2010, Agency required Plaintiff to remain on the Phone Unit, and meet production standards, despite knowing that Plaintiff's voice disability impaired her ability to speak and be understood, as noted by her doctors, and observed by her peers and supervisors. *Id.*

27. Per her doctor's letters that were provided to HR and her supervisors, Ms. Mullin was incapable of speaking with veterans over the phone, should minimize communicating verbally with her co-workers. *Id.*

28. On January 26, 2010, in response to Plaintiff's need for accommodations and the medical documentation she provided, HRM Bonnie Wax, stated that Ms. Mullin was not entitled to any reasonable accommodations under the ADA Amendments Act (ADAAA) and forced Ms. Mullin to continue working in the Public Contact Phone Unit role until February 29, 2010. *Id.* at 4.

29. From November 2009 until February 29, 2010, Agency declined to provide any RAs to Ms. Mullin and failed to engage in any interactive process in violation of the Rehabilitation Act of 1973, as amended. Prior to denying Ms. Mullin's RA request on January 6, 2010, HRM made no effort to engage in any interactive process with Plaintiff or to speak with the Designated Management Official ("DMO") as is required by Agency policy regarding any RAs for her disabilities.

30. Agency caused Ms. Mullin incredible anxiety when management required her to stay "on production" while knowing that failure to do her job would be grounds for termination, and during the time she was required to work on the Phone Unit until February 29, 2010, she was forced to take multiple days of sick leave, until she was reassigned.

31. Ms. Mullin performed her job duties well and consistently received favorable annual performance evaluations and was granted within grade promotions from 2009-2015. See Exhibit 36. Despite her excellent job performance, because of her disabilities she was repeatedly denied opportunities for overtime, and she was also repeatedly denied her requests for reasonable accommodation for her disabilities.

32. However in late 2011, the potential for advancement that Ms. Mullin was pursuing within the VA came to a halt when she was once again assigned back to Room 222, which had been converted to a training room, from a phone unit, and to experience life threatening aggravation of asthma as well as debilitating dysphonia with neck pain, hoarseness with throat pain, difficulty swallowing, nose bleeds, due to her exposure to airborne microbial matter- in her work environment.

33. On or around September 2, 2011, Defendant had an investigative study conducted on RO317, which indicated the presence of significantly elevated and concentrated microbial life, including Penicillium/aspergillus species in the indoor air samples that were collected. The presence of this highly concentrated microbial life was also collected from visibly damaged ceiling tiles, which revealed heavy Penicillium species and heavy Aspergillus species, and Air-O-Cell concentrations revealed significantly elevated Penicillium/aspergillus species. See Exhibit 9.

34. The report noted that elevated humidity levels may allow building components, furnishings and files to become wet resulting in material degradation, microbial growth and odor problems and recommended that any persons who may have pre-existing health issues (i.e. immunocompromised, asthma, or other respiratory ailments) or may have an allergy to Penicillium species should be relocated to another location. *Id.*

35. During this time, another employee that was hired with Plaintiff and worked in the same building, was forced to tender her resignation as a direct result of health issues she was experiencing as result of exposure to multiple airborne molds in the second and third floor of RO317. See Exhibits 34.

36. At least once a week from on or about October 10, 2011, until on or about May 7, 2012, Ms. Mullin would communicate either in email or verbally to her first and second level supervisors, Michael Palmer and James Cartner, that she was having severe difficulty breathing and that her symptoms associated with her disabilities were getting worse. Various members of HR, including HRM Wax and Director Kerrie Witty, also were also aware that Ms. Mullin and other employees were experiencing serious health conditions issues as a result of the work location. See Exhibit 37.

37. During this time, Ms. Mullin suffered from numerous severe asthma flareups that resulted in the need for Emergency Medical Services (EMS) to be called, due to the Agency's failure to accommodate her disabilities. This resulted in her being forced to take a substantial amount of sick leave/annual leave, exhausting her leave balances and requiring her to seek leave donations from peers, or risk willingly exposing herself to the poor air quality and environment that was contributing to the exacerbation of her symptoms to include trouble breathing, ranging from chest tightness, wheezing, to asthmatic attacks, dysphonia, hoarseness, throat pain, difficulty swallowing, coughing, hypersensitivity reactions, ear pain, nose bleeds, and anxiety. *Id.*

38. Rather than ever provide Ms. Mullin with the appropriate paperwork or explain the steps on how to formalize her RA requests, or inform her that there was a formal process she could engage in with her supervisor and HR to obtain RAs for her conditions, the agency failed to abide by its regulatory process for processing an employee's RA requests or engage in any meaningful discussions pertaining to her RA request, and instead ignored Ms. Mullin's pleas for help accommodating her disabilities, forcing her to use up most of her annual and sick leave.

39. On or around November 11, 2011, the Regional Office's construction proposal confirmed that there had been, and there continued to be extensive water intrusion in the VA Regional Office building. See Exhibit 9.

40. On November 28, 2011, Ms. Mullin was denied access to attend any training on mold mitigation by HRM Wax. See Exhibit 38.

41. From October 2011 through January 2012, Ms. Mullin made make multiple requests to her supervisor's asking that they assist in relocating her or to change her schedule so that she could limit the number of consecutive days that she was forced to be in the building that was aggravating and causing her symptoms. However, management declined to provide any RAs to Ms. Mullin and failed to engage in any interactive process, in conjunction with HR, in violation of the Rehabilitation Act of 1973, as amended. See Exhibit 35 at 3.

42. On or around January 5, 2012, VCS Michael Palmer met with Ms. Mullin and informed her that weekly trainings for RVSRs were going to be held on Tuesdays, Wednesdays, and Thursdays and that they needed her to change her compressed day off from Wednesday to either Monday or Friday so that she so that she could come in on and not miss weekly trainings. Ms. Mullin reiterated to Mr. Palmer how the proposed schedule change did not address her health concerns and he suggested that she get a portable oxygen tank and a mask to address her health concerns. *Id.*

43. On or around January 6, 2012, Ms. Mullin reported to VCS Michael Palmer via email that she was having a severe asthma attack resulting in serious breathing issues due to the area she was working in. *Id.*

44. On or around January 8-9, 2012, Ms. Mullin again informed her supervisors (Michael Palmer and James Cartner) that her symptoms were being severely exacerbated anytime she was

in the building for more than two consecutive days at a time, and she again requested RAs as she was unable to be in the current work environment for four days in a row without suffering a severe onset of her symptoms that would often require medical treatment and occasionally hospitalization or EMS being called. *Id.* and See Exhibit 39.

45. In her January 8, 2012, RA Request, Ms. Mullin suggested to her supervisors, an effective accommodation of relocating her workstation outside of the second floor east quadrant to an area she was previously assigned, or if they would consider allowing her to telework so that she could avoid putting herself in the environment where she would have a severe asthmatic reaction again resulting in the need form EMS, but she was told that there was nothing else they could do and that she should consider wearing a mask. See Exhibit 40.

46. On or around January 10, 2012, Ms. Mullin again requested from HR and her managers that she be moved out of the training room due to her medical conditions and the asthmatic exacerbations she was encountering. She was supposed to be assigned to another part of the building by January 11, 2012. See Exhibit 41.

47. On January 10, 2012, Director Kerrie Witty notified all employees that the Emergency Volunteer Team (EMERT) that was created to help usher EMS to the location of an injured employee during medical emergencies due to the complexity of the building, was dissolved effective immediately and informed all employees that in cases of medical emergency employees should contact 911 and inform their supervisor.

48. On January 10, 2012 AFGE Local President Valorie Reilly, issued a memo to Director Kerrie Witty addressing the Agency's continued refusal to allow Plaintiff to participate in mold training that was previously scheduled on November 28, 2011. AFGE President Reilly notified the Director of the duration and severity of the building's mold and air quality problems, and

sited specific studies and issues with the Agency's inadequate communication of relevant building related information to AFGE and other employees. See Exhibit 38.

49. Despite Ms. Mullin's multiple requests to be assigned to a different work location, Agency again failed to grant her any RAs or timely process her requests, which resulted in her suffering from a severe asthmatic attack and aggravation of her symptoms on January 12, 2012. During this incident, Ms. Mullin was met by a colleague (Shapiro) to assist her as she was having difficulty breathing and attempted to contact HR for help but did not get response. At around 2:10 pm, Ms. Mullin was escorted to the VA Police at the Regional Office by her colleague who then responded to Ms. Mullin's medical conditions and contacted EMS to administer care, as she was unable to breath, appeared confused, and was suffering from severe anxiety. See Exhibit 42.

50. Approximately five minutes later, at 2:15 pm, Director Witty was notified via an email that 911 had been called to respond to Ms. Mullin's medical status, that Ms. Mullin was not to be assigned to the second floor of RO317 any longer due to her respiratory condition, and also acknowledged that she was already supposed to be relocated. See Exhibit 41.

51. Upon arrival, the ambulance and fire rescue had difficulty getting to Ms. Mullin's location due to the complexity in Bay Pines campus and building setup where she was located. A prompt response from EMS was further frustrated by the recent dissolution of the EMERT emergency volunteer team that would have been in the position to assist EMS get to an injured employee in the quickest manner possible. Ms. Mullin's asthma attack was so severe that EMS was unable to get it under control using two rescue inhalers and multiple medications administered through a nebulizer, and she had to be taken to the hospital. See Exhibit 43.

52. On or around January 13, 2012, Ms. Mullin had a meeting with HRS Tamanique Clark, and AFGE representative Carol Allard, to discuss the facts of the agency's failure to accommodate her medical conditions to date and how Ms. Mullin could be effectively accommodated to avoid another exacerbation of her symptoms like the one that occurred on January 12, 2012, which required hospitalization and an EMS response. In this meeting it was agreed upon that Ms. Mullin would be assigned to another part of the building and arrangements for the move were to take place immediately after the meeting, that an air quality study would be conducted on RO 317 second floor, and that an air purifier would be provided for her new assigned location.

53. On January 17, 2012, Ms. Mullin met with VSCM Sandy Smith and her AFGE representatives to discuss the RA of reassigning Ms. Mullin that was discussed with HR previously. See Exhibit 44.

54. On or around January 17, 2012, Plaintiff was assigned to a workstation located in an open-concept work area on the third floor of RO317, that contained approximately 125 open cubicles. An air purifier was also supposed to be provided to Ms. Mullin at this time, but the agency failed to timely order or process that aspect of her request. *Id.*

55. On or about January 31, 2012, after experiencing another severe onset of her symptoms including pain in her eyes and throat, difficulty swallowing, dysphonia, and tightness in her chest, that required her to leave work for the second time since being reassigned to the third floor, Plaintiff notified her supervisors, HRS Clarke, and her AFGE representatives that the accommodation she was provided was ineffective and that maybe providing the air purifier that HR said would be given as part of the accommodation might help and should be provided expeditiously.

56. On or around February 2, 2012, Ms. Mullin was finally provided with a Honeywell Air Purifier 16200, but it was not an effective purifier for the space she was assigned to, as the purifier issued to her was designed for a small closed room, and not an open space cubicle that is comparable to a football field like the one she was assigned to. Additionally, the air purifier issued to her was not designed to treat or mitigate the elevated concentrations of microbial contaminants known to the agency to be present in her work environment.

57. On February 2, 2012, Plaintiff informed AVSM Larry Brown that the air purifier was ineffective as an accommodation and requested AVSM Brown's permission to work from home as an accommodation. He responded that was a decision that needed to be made by VSCM Smith in conjunction with HR. Plaintiff then informed AVSCM Brown, that she would like to discuss other RA possibilities, including re-assignment/transferring to another position within the VA, or outside the RO 317 building. See Exhibit 45.

58. On or around February 19, 2012, Ms. Mullin's AFGE representatives sent a memo to the Agency, requesting additional RAs for her conditions as she was still suffering from her symptoms. Ms. Mullin specifically sought to be placed on administrative leave until an appropriate accommodation could be provided.

59. On or around February 28, 2012, Ms. Mullin reported to Supervisor McBurrough that she was again having problems with her lungs and breathing as a result of where she was assigned.

60. On or around March 6, 2012, Human Resources received Ms. Mullin's submission of her FMLA Application and documentation from her doctor detailing the urgent need for reasonable accommodations to include that she be allowed to work from home with periodic trips to the work site, and that she must be able to leave immediately from the workplace if she developed an asthmatic reaction at the job site.

61. On or around March 11, 2012, Ms. Mullin voiced her concerns to her supervisor, Ulyssee McBurrough and HRS Clarke about having to go the second floor in RO317 again to take an annual certification exam that was required for RVSRs the following week and requested an RA to take the test in another part of the building. The last time Ms. Mullin was assigned to the second floor area it caused a severe aggravation her disabilities and required EMS to be called when she was unable to breath due to exposure in to microbial contaminants on the second floor of RO317 from January 12, 2012. However, rather than process Ms. Mullin's RA request to take the certification exam in another location, she was informed that she had to ask for another RA formally to process her request despite HR having prior knowledge of the her disabilities, previous medical documentation on file, and knowledge of the need for RA any time she was going to be working on the second floor. See Exhibit 46.

62. In her email from March 12, 2012, Ms. Mullin informed HR and her supervisors that she suffered from two severe asthmatic attacks in the last five days that required bed rest over the weekend for her to fully recover. *Id.*

63. On or around March 12, 2012, Ms. Mullin's AFGE representative, Casey Crump emailed Director Witty and Sandra Smith on her behalf again requesting telework as an RA and requested that her RAs requests be expedited as Agency appeared to be unduly delaying the processing of Ms. Mullin's requests given the Director's and HR's firsthand knowledge of serious impact exposing Ms. Mullin to the second floor of RO317 could have on her health and disabilities. *Id.*

64. On March 12 and March 13, 2012, Director Witty emailed HRM Wax and VSCM Smith asking for a status on Ms. Mullin's RA requests. Director Witty also specified to HRM Wax that the agency should consider grant the accommodation of working from home for Ms. Mullin

based on what her doctor has recommended, and that she be allowed to take the certification test in an empty office in HR, but that she Ms. Mullin needed to be made aware of those arrangements. *Id.*

65. On or around March 13, 2012, Ms. Mullin emailed HRS Clarke to again clarify if her RA request for her to take the certification exam scheduled for March 15, 2012 in another location outside of the second floor could be approved. *Id.*

66. On or around March 14, 2012, Ms. Mullin emailed with her supervisor VSC McBurrough regarding her concerns about not being accommodated timely to give her enough time to prepare for the certification examination. *Id.*

67. On March 14, 2012 Ms. Mullin's FMLA application was approved but HR informed her that she would need to resubmit a request for RA if she was seeking RAs separate from the FMLA that she requested, even though Agency had previous medical documentation on file related to her prior RA requests for the same disabilities.

68. On or around March 15, 2012, Ms. Mullin's AFGE representative Casey Crump emailed Assistant Director Scott Posti inquiring about accommodating Plaintiff and the status of testing that was supposed to be done in RO317. See Exhibit 47.

69. In response to Ms. Mullin's Representative's request for information pertaining to RO317 Air Quality Testing, the Agency informed Mr. Crump that due to budget constraints the areas [Room 222 and Stream 1] had not been evaluated. The response was received from the Chief of Support Services Division, Mercedes Bravo, on March 15, 2012.

70. On or around March 15 and 16, 2012, HRM Wax notified Ms. Mullin's supervisors, Jerry Huffman and Sandra Smith, and Director Witty that the agency would not be granting Ms. Mullin's RA request but instead would give her a temporary workplace adjustment, and went on

to state that “we ran our strategy by regional counsel yesterday. Expect concurrence on the temp workplace adjustment tomorrow.” See Exhibit 46.

71. On March 20, 2012, Ms. Mullin was denied an effective accommodation by agency and agency failed to state any reason why it could not grant the effective accommodation that Ms. Mullin was seeking in the form of 100% telework. There was no interactive discussions or meetings with Ms. Mullin prior to the decision being made. Instead of provide an RA, HRM and Director Witty provided what they referred to as a temporary workplace adjustment of telework for Mondays, Wednesdays, and Fridays, with Ms. Mulling being required to report to work at the Regional Office on Tuesdays and Thursdays, and documented on a VA Form 0857f, but the approval for three days of telework was not effective in meeting the needs of Ms. Mullin or in line with what her doctor recommended on the documentation she provided.

72. The accommodation approved on the 0875f was ineffective and unrelated to Ms. Mullin’s disabilities as it failed to address the barriers created by the functional limitations that existed because the Agency was still requiring her to work inside RO317 on Tuesday and Thursdays, which resulted in a severe exacerbation of her symptoms on numerous occasions requiring hospitalization and medical treatment.

73. Ms. Mullin informed her supervisors, HR, and the Director that the accommodation offered was only not effective and unrelated to her disabilities as it still required her to enter and work on site for two days a week which would undoubtable cause a flare up of her disabilities.

74. On or around March 23, 2012, Ms. Mullin submitted an application for FMLA associated with her breast cancer diagnosis and on April 9, 2012 Agency approved Plaintiff’s application.

75. On or around May 3, 2012, Ms. Mullin learned from AFGE Casey Crump, that HRM Wax was attempting to direct blame on Ms. Mullin’s respiratory illness on her breast cancer

diagnosis rather than the building and environment she was working in and that HRM Bonnie Wax was disclosing sensitive information related to Ms. Mullin's medical conditions and procedures to her co-workers and others that were not authorized to receive such protected information. She also was informed that her request for advance sick leave submitted on March 23, 2012, had not been approved or acted on yet by HRM Wax and that her new FMLA application was not going to be approved until additional medical information had obtained.

76. Prior to going out on leave for her cancer surgery, Ms. Mullin attempted to clarify specifically what additional medical information she needed to provide for her FMLA and her leave transfer recipient application, as she feared being marked Absent Without Leave (AWOL) for the time she would need to be out due to exhausting her annual and sick leave balances in association with the agency's failure to accommodate her in the previous two years. HRS Clarke informed Ms. Mullin that she would need to provide excessive details regarding the tumor she was having removed, despite knowing that Ms. Mullin would not have access to this information until pathology was completed after her surgery.

77. On or around May 4, 2012, Ms. Mullin underwent a partial mastectomy and removal of sentinel lymph nodes. Upon coming out of anesthesia, based on her fear of the Agency marking her as AWOL, Ms. Mullin asked her mother and friend/colleague from Bay Pines if they could assist her in having the VA communicate with someone at Moffitt Hospital about her FMLA and voluntary leave application.

78. On Thursday May 10,2012, Ms. Mullin requested a meeting with Director Witty and her Union representatives. On May 11, 2012, she had a phone call with Director Witty, HRS Clarke, VSCM Sandy Smith, AVSCM Jerry Huffman, and her AFGE representative Casey Crump, requesting that specific attention be brought to processing her advanced sick leave application

that had been pending without a decision for over a month and that HRM Bonnie Wax stop violating Ms. Mullin's privacy rights through sharing her medical information with unauthorized personnel.

79. On or around May 20, 2012, Ms. Mullin notified HRS Clarke and her supervisor that she was going to undergo a second cancer surgery and preemptively requested what she needed to provide in terms of documentation for advanced leave and FMLA relating to second surgery. Nothing was ever provided from Agency and no response was given from HRS Clarke.

80. On or around May 20, 2012, Ms. Mullin underwent a second cancer surgery.

81. On or about May 30, 2012, Ms. Mullin notified VSC McBurough that she was being mistreated by HRM Wax and others that were responsible for not timely processing her RA requests, unnecessarily delaying the processing of her requests voluntary/advanced leave and FMLA, as well as misplacing her sensitive RA medical records.

82. On or around June 3, 2012, Ms. Mullin reported to her supervisors that she feared Agency was going to try to fire her as a result of the problems she was having with HRM Wax and Director Witty pertaining to her RAs and attempts to obtain her voluntary leave.

83. On or around June 4, 2012, Ms. Mullin was made aware that the leave donation forms that were submitted from her colleagues were not credited to her or and appeared to have been misplaced by HR.

84. On or around June 5, 2012, Ms. Mullin contacted the Agency's Office of Resolution Management (ORM) to file an EEOC Complaint.

85. On or around June 5, 2012, after requesting that HR contact Ms. Mullin through her AFGE representative, HRM Wax emailed Ms. Mullin directly while she was on medical leave.

86. On or around June 13, 2012, Ms. Mullin requested and had a meeting with Director Witty, AVSCM Jerry Huffman, VSCM Sandy Smith, and AFGE VP Keith Pryor, AFGE Steward Ted Smith to discuss and hopefully resolve issues relating to her RA requests and modifications to her existing RAs that she would need due to her cancer treatment offering solutions that would allow her to continue to serve veterans such as working 100% telework; the oversight of the processing of her leave donations; oversight of any HR actions as it pertained to Ms. Mullin; and address the hostility she was being subjected to by HR and the executive leadership team.

87. In the meeting Director Witty almost immediately brought up the recent EEOC Complaint that Ms. Mullin filed and how HRM Wax felt she was being targeted by the Union. Director Witty also stated that she read and approved the email that Ms. Wax sent directly to Ms. Mullin on June 5, while she was on medical leave after being instructed to communicate through her representative while she was out being treated for cancer. *Id.*

88. During this meeting with the Director, Ms. Mullin brought up the RAs that she would need in conjunction with her cancer treatment, but limit her exposure to the building while receiving chemotherapy due to her compromised immune system and history of severe asthma attacks.

89. At the conclusion of this meeting, Director Witty explained that "we do not believe in giving accommodations" stating that if she granted Ms. Mullin one then they would have to give accommodations to every employee that came in with a doctor's note.

90. This caused Ms. Mullin to breakdown and plead with Director Witty asking that she at least assign someone to oversee her leave donations because the forms that her peers had submitted kept being misplaced and not processed by HR, but Director Witty denied this request.

91. On multiple dates after meeting with Director Witty, from June 14, 2012 through June 29, 2012, Ms. Mullin's requests for leave under the leave transfer program were delayed and from

June 16, 2012, August 11, 2012, August 16, 2012, August 25, 2012, and September 8, 2012, Ms. Mullin's advanced sick leave was not processed in a timely fashion, leaving her with substantially less salary for multiple weeks and to question if she would be receiving a pay check each week.

92. On or around August 24, 2012 the Department of Labor issued a decision accepting that Ms. Mullin's asthma and chronic sinusitis were work related injuries dating back to when she was first injured in May 2009.

93. On or around August 31, 2012 through September 14, 2012, while out on extended leave, Ms. Mullin received an email to her personal account from the Office of Personnel Management (OPM) informing her that she had refused to respond to requests for a investigation for a security clearance that was necessary for a promotion that she was up for. OPM had made multiple attempts to contact Ms. Mullin for the investigation via her governmental email address and also carbon copied the Regional Office HR on these emails, but HR failed to inform either Ms. Mullin, her Union representative, that OPM was attempting to get in contact with and failed to inform OPM that Ms. Mullin was out on extended medical leave due to her cancer treatment

94. During the time Ms. Mullin was undergoing cancer treatment from May 2012 through January 3, 2013, she attempted to work as much as she could, as she was experiencing financial hardship because of HR's failure to timely process her voluntary leave donations from other employees or process her requests for advanced leave. See Exhibit 48.

95. On or around September 17, 2012, Ms. Mullin discovered that she was no longer able to access the web-based training system, Training Management System (TMS), that she needed to use to complete training that was required of her position. She made multiple attempts to resolve the issue with the TMS Point of Contact but the system would not allow her access to complete

necessary training which is tied to the agency's failure to keep Ms. Mullin in a paid status while she was out on extended medical leave. See Exhibit 49 at 15.

96. As of December 2012, Agency developed a paperless claims system for processing claims in an entirely digital format that was being implemented across the nation which would allow RVSRs like Ms. Mullin to access information needed for her job online rather than relying on paper records.

97. On or around December 4, 2012, on a half day that Ms. Mullin was working on site at the Regional Office, she had another asthma attack resulting in her suffering from severe respiratory distress. She exited the building upon noticing pain in her lungs that did not go away for days. *Id.*

98. Two days later, Ms. Mullin went to work onsite again on a Thursday, and within a few hours she was unable to speak, experiencing severe headaches and pain in her face, and her sinuses began to bleed. HRS Clarke happened to be in the area so Ms. Mullin approached her and was permitted to leave the work place to seek medical treatment. During her treatment Ms. Mullin's medical providers advised that she should not return to the building for work unless appropriate and effective accommodations were provided. *Id.*

99. On or around December 12, 2012, after having months of issues with getting the leave that was donated to her by her peers through leave transfer program, AFGE on behalf of Ms. Mullin, requested a detailed audit of all of Ms. Mullin's pay periods for 2012 to be ran but HR did failed to respond.

100. On Wednesday, January 2, 2013, Ms. Mullin returned to work following her cancer treatment. Her work schedule consisted of telework for three days a week, but she was still required to report to the office once or twice a week. During the month of January 2013, Ms.

Mullin reported to the office approximately 24 hours and suffered severe asthmatic reactions each time she came into the office.

101. On January 15, 2013, Ms. Mullin emailed her supervisor VSC McBurrough to let him know she was suffering from an asthmatic reaction and needed to leave the work site before any EMS intervention was necessary. That same day, AFGE representative John Smith contacted HRM Wax on behalf of Ms. Mullin stating that she suffered an asthmatic reaction resulting in her having to leave the building due to the exposure she had when she was working in the building that day.

102. On or around January 17, 2013, Plaintiff emailed her supervisors, VSC McBorough, and Veronica Collins, informing them that due to the flare up she suffered from as a result of coming into the office two days prior she was still not recovered enough to come back again. That same day, AFGE representative John Smith contacted HRM Wax on behalf of Ms. Mullin stating per her medical provider she was not recovered enough to come into work.

103. On or around January 23, 2013, AFGE representative John Smith contacted HRM Wax via email on behalf of Ms. Mullin stating that the last time Ms. Mullin entered the building she began having a flare up within two hours and that she needed additional RAs so that she could perform the duties of her position without exacerbating her conditions.

104. On January 26, 2013, Ms. Mullin was seen by her doctor who deemed that it was no longer safe for her to enter the building without a respirator and further noted that she should minimize her time in the building she was assigned to. See Exhibit 50.

105. On January 28, 2013, Ms. Mullin notified her supervisor, VSC McBurrough, along with her AFGE representatives, via email that based on her most recent doctor's visit that she was

requesting to further minimize her time in the building for her safety and that she would need to wear a respirator anytime she was in the building. *Id.*

106. On January 31, 2013, Ms. Mullin requested a meeting with HRS Clark and her AFGE representatives that took place outside by the picnic tables located by RO 317, as Ms. Mullin was not able to conduct the meeting indoors in RO 317 due to her disabilities. During this meeting Ms. Mullin discussed with HRS Clarke how the accommodations she had were not effective and that she needed to further limit her time in the building and offered solutions for how the agency might accommodate her. The parties planned on meeting the next day to finalize the RAs that Ms. Mullin had requested, but later that evening Ms. Clarke called Ms. Mullin and informed her in a sarcastic manner and that all her RA requests were being denied, and refused to discuss telework or restructuring marginal tasks so that Ms. Mullin could be accommodated effectively any further. *Id.* and See Exhibit 40 at 15-16.

107. This caused Ms. Mullin to breakdown as she feared that the agency's failure to accommodate her would ultimately result in her termination. Later that night she started to develop terrible abdominal pain, and which resulted with her being hospitalized for the next seven days due to gastrointestinal distress that resulted in uncontrollable bleeding. See at Exhibit 40 at 16.

108. On February 5, 2013, while she was in the hospital, Ms. Mullin called HRS Clarke to again attempt to discuss the accommodations that she would need to return to work, to which HRS Clarke responded in a sarcastic and demeaning manner and informed Ms. Mullin that her denials were sent to the General Counsel to be formalized, and that there was nothing else to be done. This again resulted in Ms. Mullin having another mental breakdown while she was in the hospital, hooked up to IV fluids and medication. *Id.* and Exhibit 51.

109. On or around February 7, 2013, Ms. Mullin met with HRS Clarke, her supervisor VSC McBorrough and her AFGE representatives to discuss any additional RAs that she may be able to use to perform her duties while working on site. *Id.*

110. On or around February 19, 2013, Ms. Mullin's AFGE representatives sent HRM Wax a memorandum detailing Ms. Mullin's history of her disabilities and flare ups she had suffered from since January 2013, and requested that she be placed on Administrative Leave until appropriate accommodations could be provided. *Id.* at 5-6.

111. On February 20, 2013, an entirely different HRS, Phillip Works, responded to Ms. Mullin's request from her representatives, stating that the Director has granted Ms. Mullin authorized absence for her tour of duty from Thursday, February 21, 2013 through Monday, February 25, 2013 so that Ms. Mullin could provide additional medical documentation needed to continue processing her RA request. *Id.* at 9.

112. Agency failed to maintain the confidentiality of Ms. Mullin's reasonable accommodation requests and related documentation as Philip Works was not identified to Plaintiff as being the HR official designated for processing her RA. Additionally, Agency failed to ensure Ms. Mullin's records pertaining to her requests for reasonable accommodations were maintained in accordance with the applicable agency procedures and rules, and requested additional medical documentation without issuing the necessary paperwork that is required per policy.

113. On or around February 27, 2013, Ms. Mullin had another meeting with HRS Clarke, VSC McBurrough, and her AFGE representatives in which it was reiterated to HR that her doctor recommended that she not be exposed to the building, and a modification was approved to limit Ms. Mullin to work on site for four hours twice a week with a respirator. *Id.* at 16.

114. On February 28, 2013, Ms. Mullin received her annual performance appraisal which stated that she was not on track for her within grade step increase.

115. Beginning in March 2013, Ms. Mullin was frequently ridiculed and laughed at by co-workers that were shocked at the sight of her wearing her respirator while working in the building.

116. On or around March 23, 2013, Director Witty was notified that Ms. Mullin amended her EEOC complaint with new issues.

117. On or around March 28, 2013, Ms. Mullin wrote to Congresswoman Kathy Castor (FL-14) representative disclosing the issues she was encountering at the Regional Office pertaining to the building issues and RA issues. See Exhibit 52 at 1-2.

118. On or around March 28, 2013, the Department of Labor updated Ms. Mullin's workers compensation claims to include dysphonia as an additional accepted injury.

119. On or around March 29, 2013, HR delayed in the processing of Ms. Mullin's FMLA application that was submitted on February 22, 2013 and failed to timely notify her of the status of the application after a month. *Id.* at 5.

120. On or around March 29, 2013, Ms. Mullin was issued a negative appraisal rating on her monthly performance evaluation. This negative rating was directly related issues and barriers the agency created for Ms. Mullin by failing to timely process and provide effective accommodations. *Id.* at 3.

121. Ms. Mullin was also notified on around March 29, 2013 by her VSC McBurrough, that her RA of allowing her to work four hours in the office and four hours from home for the days she was onsite that was initially approved since March 2012 by her first and second level

supervisors, and HRS Clarke was being rescinded, and that she would be required to work 8 hours, twice a week on site in RO 317. *Id.* at 6-8.

122. On April 1, 2013, Director Witty was notified that Ms. Mullin had again amended her EEO complaint. Later that day, Ms. Mullin received an email from HMS Clarke stating that RA modifications that were in place since March 20, 2012 of allowing her to work four hours in the office and four hours from home for the two days she was onsite in RO 317 was never approved and therefore not allowed. *Id.*

123. On or around April 3, 2013, faced with the realty that she would likely have another severe asthmatic attack that would require EMS intervention as a result of having to come back to work eight hours on site in RO 317 for two days a week, and knowing that the Regional Office still did not have the Emergency Volunteer Team in operation, Ms. Mullin met with the VA Police Sergeant and her supervisor, VSC McBorrough to work out an emergency plan of action in case she experienced a sudden onset asthma attack. *Id.* at 12 and 21.

124. On or around April 15, 2013, Ms. Mullin received an email from HRS Clarke providing another denial of Ms. Mullin's effective RAs and HRS Clarke also informed Ms. Mullin that her LRAC duties were being transferred to Matthew Correa. *Id.* at 12-19.

125. The RAs provided were still ineffective as Ms. Mullin was still being required to come into the office for one day a week to work in person at RO 317, which would undoubtably cause her disabilities to flare up and affect her ability to perform her duties. On April 16, 2013, Ms. Mullin emailed her Supervisors VSC McBurrough and VSC Huffman detailing the issues with the RA that was offered by HR the day before. See Exhibit 52.

126. On April 18, 2013, Ms. Mullin filed an amendment to her EEOC complaint with ORM to include hostile work environment including 26 discrete events.

127. On or around April 19, 2013, Ms. Mullin received another RA determination from Director Witty, providing telework for Mondays, Tuesdays, Wednesdays, Thursdays, and Fridays. She was also required to report to the St Petersburg Regional Office on Fridays at the beginning of her tour and her coach or his designee would meet her outside the Regional Office to provide work and pick up her work, but this RA did not address Ms. Mullin's request for adjusting her marginal duties. *Id.*

128. On or around May 1, 2013, Ms. Mullin filed a complaint with the DOL and OSHA of alleged safety or health hazards under complaint number 815625.

129. On or around May 1, 2013, Ms. Mullin was issued an unacceptable rating on her monthly performance evaluation from VSC McBurrough.

130. On or around May 2, 2013, Ms. Mullin requested another RA to modify the marginal duties of her position to allow her to focus on essential functions and provide her with opportunities for more access to meetings with Decision Review Officers (DRO).

131. On May 9, 2013, OHSA conducted an unannounced site inspection regarding the indoor Air Quality at RO 317 in response to Ms. Mullin's DOL and OSHA complaint.

132. On or around May 15, 2013, Ms. Mullin received another determination on her most recent RA request from Director Witty in which more barriers were created for her RA instead of addressing her request to remove marginal duties associated with her position, and she was also required to work more hours in RO 317 on one day a week.

133. On or around May 16, 2013, Ms. Mullin was denied the opportunities to work overtime that her peers were eligible for and mandated to work per the Secretary. See Exhibit 53 at 1-2.

134. On or around May 22, 2013, EEO Manager Bettie Bookhart attempted to interfere with Ms. Mullin's family member accompanying her to a mediation session.

135. On or around June 11-12, 2013, Ms. Mullin contacted HRS Correa to discuss her latest RA request and request for more face to face interactions with DROs.

136. On or around July 5, 2013 and July 9, 2013, Ms. Mullin emailed HRS Correa requesting additional RAs for training and printer access. On July 10, 2013, HRS Correa responded to her RA requests stating they were working on the request. *Id.* at 19-20.

137. On August 16, 2013, Ms. Mullin filed an additional EEOC Complaint with ORM relating to the agency's failure to approve her RAs, for disability discrimination, and reprisal.

138. On August 23, 2013, Ms. Mullin received an approval of her latest RA requests in the form 0875f issued to her by HR, signed by Director Witty, permitting Ms. Mullin to work solely in the VBMS paperless system, which adjusted some of her marginal duties. However, Ms. Mullin was never provided adequate training on how to utilize the new VBMS system until October 1, 2013 and was forced to train herself on the system. *Id.* at 23-39.

139. On or around September 19, 2013, did not have her an RA relating to the mandatory certification exam certified which caused her additional stress prior to beginning the certification.

140. On or around October 8, 2013, Ms. Mullin reported to her immediate supervisor, James Beauchamp, that she was not receiving the appropriate amount of work and rating claims required to meet her monthly proficiency requirements or be rated fully successful as a rating specialist.

141. On or around November 12, 2013, Ms. Mullin reported technical issues that she was experiencing with her accommodations to her supervisor Mr. Beauchamp, and about the issues she encountered with HR in processing her RAs from January 2012 through mid 2013, but did not receive any helpful response back.

142. On or around December 19, 2013, Ms. Mullin received notice that she did not pass her mandatory certification exam as a result of her RAs not being processed timely to ensure that she would be able to take the certification on the day it was being offered.

143. On or around January 9, 2014 Ms. Mullin was denied her Within Grade Increase for her position due to being on a LWOP status during the previous year.

144. On or around January 8, 2014, Ms. Mullin was denied a request for “official time” to work on her EEOC case in accordance with 29 CFR §1614.605. This occurred multiple times throughout January and the applicable time period.

145. On or around March 27, 2014, Ms. Mullin notified her supervisor Jim Beauchamp, that she was never given the same training opportunities as her peers prior to taking the certification exam.

146. On or around April 2, 2014, unlike her peers, Ms. Mullin began to have her workload micromanaged by her supervisor.

147. On or around April 29, 2014, Ms. Mullin filed another EEOC complaint regarding the hostile work environment and harassment that she was being subjected to by management. She also requested RAs in the form having her supervisor limit the number of emails per day, that were coming to her directly from him, as she was receiving almost 50 emails a day from him to respond to, and this would interfere with her productivity and negatively impacting her FMLA-related anxiety condition.

148. On or around May 1, 2014, HRS Correa made a threat against Ms. Mullin’s employment during set up for a national, mandatory certification test, when he stated that her "poor" performance it was only a matter of time before something happened.

149. On or around May 27, 2014, Ms. Mullin did not receive timely notice of test preparation given by DROs for the national, mandatory, 6-hour certification test for Rating Specialists due to an oncology appointment.

150. On or around June 24, 2014, Ms. Mullin was informed by her supervisor, James Beauchamp, that she would no longer be able to have her AFGE representative present with her during her monthly meeting with management.

151. On or around July 23, 2014, Ms. Mullin was experiencing issues with her medical bills not being covered by the DOL or agency for the treatment she received prior to her OWCP claim being approved.

152. On or around January 2015, the agency refused to inform Ms. Mullin if she would be issued continuation of pay for her accepted OWCP issues.

153. On or around April 13, 2015, Ms. Mullin went to a meeting in an open area at the ground level of RO 317, where she regularly met with official from work, during this meeting she started having respiratory issues and chest pains which she reported to her supervisor, Tom Vernon.

154. On April 14, 2015, the day after the meeting, Ms. Mullin had a call with her supervisor, Mr. Vernon regarding how to address the injuries Ms. Mullin suffered from the previous day but was given misinformation about what paperwork to submit.

a. Need emails from 4/14/2015

155. Throughout April 2015, Ms. Mullin lost out on multiple weeks of pay due to the Agency's failure to provide appropriate guidance regarding her OWCP injury from April 13, 2015.

156. On or around October 26, 2015, the DOL OWCP issued a decision that Ms. Mullin's dysphonia and Post Traumatic Stress Disorder were accepted as being work related going back to May of 2009.

157. On or around February 2, 2017, the DOL OWCP issued a decision that Ms. Mullin's major depressive disorder was accepted as being work related going back to May 2009.

158. On or around June 12, 2019, Ms. Mullin was issued a notice of a Position Review from Chief of HR, Maurice Sloan.

**Count No. 1**
**Violations of the REHABILITATION ACT OF 1973**
**29 U.S.C. §701 et. seq.**
**(Disability Discrimination)**

159. The allegations in paragraphs 1-159 are realleged as if set forth fully herein.

160. Defendant, an Agency of the Federal Government, is subject to the Rehabilitation Act of 1973, 29 U.S.C. §701 et seq., under sections 501 and 504.

161. Section 501 of the Rehabilitation Act prohibits federal executive branch agencies from discriminating against people with disabilities in any employment practices, including hiring, promotions, training, firing, pay, or benefits. 29 U.S.C. § 791.

162. Plaintiff is a disabled person whose physical impairments substantially limits her major life activities.

163. As an RVSR, Plaintiff was qualified for the positions she held at the St Petersburg Regional Office.

164. Defendant knew of Plaintiff's disabilities shortly after being hired because her disabilities developed and were observed by RMOs employed by Defendant.

165. Pursuant to 29 U.S.C. § 791(f) and 42 U.S.C. § 12203(a), Defendant has violated Section 501 of the Rehabilitation Act by:

a. Failing to provide effective reasonable accommodations for Plaintiff;
b. failing to engage in interactive discussions as part of Plaintiff's reasonable accommodation requests;
c. unduly delaying the processing of Plaintiff's RA requests;
d. requiring unnecessary medical documentation for Plaintiff's RA requests for disabilities that were already known and documented with Defendant;
e. treating Plaintiff overly critically as compared to other employees to the point of harassment, creating a hostile and abusive work environment for her based on her requests for RAs;
f. violating Plaintiff's Privacy rights by disclosing sensitive medical information relating to her disabilities to personnel that did not have a need to know.

166. As a direct and proximate result of Defendant's violations of Section 501 of the Rehabilitation Act, Plaintiff, Ms. Mullin has been damaged. Such damages include, but are not limited to loss of pay; loss of benefits; past and future medical costs and expenses; payment of attorneys' fees and legal costs; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment, and severe emotional distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

167. Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a, Plaintiff prays for relief as set forth below.

**Count No. 2**
**Violations of the REHABILITATION ACT OF 1973**
**29 U.S.C. §701 et. seq.**
**(Failure to Accommodate)**

168. The allegations in paragraphs 1-165 are realleged as if set forth fully herein.

169. Plaintiff notified her employer of her disabilities and requested accommodations on multiple occasions from 2009-2015.

170. Plaintiff was provided multiple inadequate accommodations in response to her multiple requests for RAs with respect to her disabilities.

171. As a direct and proximate result of Defendant's violations of Section 501 of the Rehabilitation Act, Plaintiff, Ms. Mullin has been damaged. Such damages include, but are not limited to loss of pay; loss of benefits; past and future medical costs and expenses; payment of attorneys' fees and legal costs; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment, and severe emotional distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

172. Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a, Plaintiff prays for relief as set forth below.

**Count No. 3**
**Violations of the REHABILITATION ACT OF 1973**
**29 U.S.C. §701 et. seq.**
**(Privacy Violations)**

173. The allegations in paragraphs 1-165 are realleged as if set forth fully herein.

174. Plaintiff notified her employer of her disabilities and requested accommodations on multiple occasions from 2009-2015.

175. Plaintiff provided various medical documentation to Defendant throughout 2009-2015 for the purposes of her Family and Medical Leave Act (FMLA) applications and RA requests.

176. Defendant violated Plaintiff's privacy rights by failing to store her sensitive medical information securely and disclosing her sensitive medical information to personnel that did not have a need to know.

177. As a direct and proximate result of Defendant's violations of Section 501 of the Rehabilitation Act, Plaintiff, Ms. Mullin has been damaged. Such damages include, but are not limited to loss of pay; loss of benefits; past and future medical costs and expenses; payment of attorneys' fees and legal costs; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment, and severe emotional distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

178. Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a, Plaintiff prays for relief as set forth below.

**Count No. 4**
**Retaliation in Violation of Title VII**
**42 U.S.C. §§ 2000e, et seq.**
**(Hostile Work Environment)**

179. The allegations in paragraphs 1-167 are realleged as if set forth fully herein.

180. Section 504 of the Rehabilitation Act of 1973 prohibit discrimination based on an individual's disability and retaliation for the exercise of the rights it protects, including engaging in or participating in EEOC protected processes.

181. Defendant is liable for the retaliation alleged herein including, but not limited to, paragraphs 1 through 159, which actions all adversely affected the terms and conditions of Plaintiff's employment in violation of the Rehabilitation Act.

182. Defendant is also liable for subjecting Ms. Mullin to a hostile work environment and disparate treatment in retaliation for the exercise of rights protected under this Section.

183. As a direct and proximate result of Defendant's unlawful and retaliatory acts in violation of Title VII of the Civil Rights Act, Plaintiff, Ms. Mullin has been damaged. Such damages include, but are not limited to loss of pay; loss of benefits; past and future medical costs and expenses; payment of attorneys' fees and legal costs; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment, and severe emotional distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

184. Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELEIF

WHEREFORE, Ms. Mullin respectfully requests that the Court enter judgment in her favor and award her the following relief:

a) An Order declaring that Defendant violated Ms. Mullin's rights under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and restraining and enjoining Defendant from further violations;

b) Enter injunctive relief ordering Defendant to retroactively promote plaintiff to a GS-12 or a comparable position within the agency to make her whole for the unlawful denial of her reasonable accommodation requests, and to provide effective, civil rights training for all managerial employees at the Medical Center in the St. Petersburg Regional Office, at Bay Pines VAMC on the requirements of all applicable laws prohibiting employment discrimination because of disability and unlawful retaliation against employees for complaining about unlawful disability discrimination;

c) Award plaintiff back pay for lost wages and benefits and prejudgment interest thereon and promotion to positions wrongfully denied, or, in lieu thereof, front pay for future lost wages and benefit;

d) Compensatory damages in an amount to be determined at trial to compensate Ms. Mullin for the emotional pain, embarrassment, humiliation, mental anguish, medical costs, future medical costs, inconvenience, career loss, loss of professional reputation and career opportunities, and loss of quality of life caused by Defendant's unlawful actions;

e) Any and all accrued Thrift Savings Plan benefits;

f) Award Plaintiff her full costs and reasonable attorney's fees; and

g) Award such further relief as may be deemed just and appropriate.

Dated: November 16, 2020

Respectfully submitted,

**/s/James Solomon**
James Solomon
Solomon, Maharaj & Kasimati, P.A.
601 N. Ashley Drive, Suite 1100-192
Tampa, FL 33602
Office: (813) 497-7650
James@smkfirm.com
FL BAR No. 0127439

Attorney for Plaintiff Aileen Mullin