# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.

CASE NO.: 8:20-cv-026970-VMC-AEP

DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
_______________________________/

DEPOSITION OF
AILEEN MULLIN, VOL. I

Taken on Behalf of the Defendant

DATE TAKEN: December 31, 2021

TIME: 9:14 a.m. - 4:19 p.m.

PLACE: U.S. ATTORNEY'S OFFICE
400 North Tampa Street
First Floor
Tampa, Florida

Examination of the witness taken before:
Debbie E. Askins, FPR
Notary Public

Pages 1 - 233



Page 2

**APPEARANCES FOR THE PLAINTIFF**
**James Solomon, Esquire**
**Daniel Maharaj, Esquire**
Solomon, Maharaj & Kasimati, P.A.
601 North Ashley Drive, Suite 1100-192
Tampa, Florida 33602
james@smkfirm.com
daniel@smkfirm.com
813-497-7650

**APPEARANCES FOR THE DEFENDANT**
**David P. Sullivan, AUSA**
Office of United State's Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
David.Sullivan3@usdoj.gov
813-274-6000

I N D E X


| Deposition of Aileen Mullin, Vol. I | PAGE |
|---|---|
| Direct Examination By Mr. Sullivan | 5 |
| Certificate of Oath | 230 |
| Certificate of Reporter | 231 |
| Read & Sign Letter to Witness | 232 |
| Errata Sheet (to be forwarded upon execution) | 233 |




Page 3

PLAINTIFF'S EXHIBIT INDEX


| No. Description | Page |
|---|---|
| ***NONE MARKED*** | |


DEFENDANT'S EXHIBIT INDEX


| No. Description | Page |
|---|---|
| Defendant's Exhibit No. 1 (Plaintiff's Supplemental Answers to Defendant's Requests for Production) | 57 |
| Defendant's Exhibit No. 2 (Investigative Report/EEO Complaint, VA 011470-495) | 49 |
| Defendant's Exhibit No. 3 (Dept of Veterans Affairs/Office of Resolution Management Counselor Report) | 52 |
| Defendant's Exhibit No. 4 (1/26/10 Memorandum, B. Wax to A. Mullin, VA 11684) | 73 |
| Defendant's Exhibit No. 5 (Emails, Pages 153 to 173) | 108 |
| Defendant's Exhibit No. 6 (1/31/12 email from A. Mullin to various recipients, VA 0012) | 131 |
| Defendant's Exhibit No. 7 (2/6/12 email from A. Mullin to various recipients, VA 0013) | 146 |
| Defendant's Exhibit No. 8 (3/12/12 email from A. Mullin to various recipients, VA 0021) | 151 |
| Defendant's Exhibit No. 9 (3/14/12 email from U. McBurrough to A. Mullin, VA 011716) | 155 |
| Defendant's Exhibit No. 10 (Email chain, VA 011719-722) | 160 |
| Defendant's Exhibit No. 11 (Email chain, Pgs 166-173 and 171-173) | 173 |
| Defendant's Exhibit No. 12 (Approval of Accommodation Request, VA 0024) | 176 |




Page 4

DEFENDANT'S EXHIBIT INDEX (cont'd)


| No. Description | Page |
|---|---|
| Defendant's Exhibit No. 13 (FMLA, VA 009953-9956) | 191 |
| Defendant's Exhibit No. 14 (3/2/12 note, Allergy Assoc 041) | 195 |
| Defendant's Exhibit No. 15 (2/19/13 memo from J. Smith to B. Wax, VA 010965-967) | 203 |

**WHEREUPON,**
**AILEEN MULLIN,**
acknowledged having been duly sworn to tell the truth and testified upon her oath as follows:
**THE WITNESS:** I do.
**DIRECT EXAMINATION**
**BY MR. SULLIVAN:**
**Q.** All right. Good morning, Ms. Mullin. We just met. And as I introduced myself before, my name is David Sullivan. I am the Assistant United States Attorney who is working on your case. Have you ever been deposed before?
**A. Yes.**
**Q.** Okay. How many times?
**A. Well, actually it depends on the definition of deposed. Like I sat before a Social Security judge and testified. I don't know if that's legally a deposition.**
**Q.** Okay.
**A. And I gave an affidavit at the Office of Resolution Management. So I assume that's one in the same.**
**Q.** Okay. When was your testimony in front of a Social Security judge, ball park, if you would?
**A. 2018, I think.**





**Q.** And what was that in relation to?
**A. The same disability that-- the same disabilities that are on the-- for the Workmen's Comp. conditions.**
**Q.** And are you getting Social Security related to that?
**A. Yes, I am.**
**Q.** Okay. So a couple things. Since it sounds like you've given testimony under oath before, but maybe not at a deposition, let me kind of just set the table for you and give you some ground rules.
So I'm here to ask questions obviously. You'll be giving answers. You have your attorneys here with you and, Debbie, who you've met, is the court reporter. She's going to be transcribing everything that we're saying to each other. It will help her a great deal and make her life easier if we do a few things.
The first is, let's try to let each other finish. You know, so I'll let you finish your answer before I start my next question. And if you can let me finish my question before you start answering, that goes a long way. Can you do that for me?
**A. Yes. Just let you know, sometimes there's lagging in my articulation.**
**Q.** Okay.





**A. So it may appear that I'm done.**
**Q.** Okay. And if I cut you off at any point, you know, just start talking again and put your hand up and let me know and I'll let you finish.
**A. Okay.**
**Q.** One thing I'll say is thumbs up, uh-huhs, huh-uhs, head nodding, that sort of thing don't come through clearly on the transcript. So if you can give verbal answers, you know, yeses, nos, that sort of thing, that's helpful too.
**A. Okay. Yes.**
**Q.** If at any point you don't understand my question, if it doesn't make sense, if you couldn't hear me through my mask or, you know, any time you didn't get the question, don't be shy. Ask me to repeat it, ask me to rephrase it, I'll be happy to do so. Okay?
**A. Yes. Thank you.**
**Q.** I said this before we went on the record, but again, if at any point you need a break, you need to use the rest room, you need some water, just let me know. I'm happy to accommodate. Okay?
**A. Thank you.**
**Q.** Very good. And the only thing I'll ask of you in that situation is if there's a question pending, I'll just ask you to answer it before we go off the record, okay?





**A. Understood.**
**Q.** So you gave an oath this morning. Do you understand what that oath means?
**A. Yes.**
**Q.** And is there any reason you can't give full, accurate and honest testimony today?
**A. Possibly the full. The full might be a problem.**
**Q.** Okay. And that's because of your voice issues?
**A. Voice and breathing.**
**Q.** Okay. And I think you're probably suggesting that, you know, we might need to cut things short today because of those issues?
**A. Yes.**
**Q.** Okay.
**A. When the breathing becomes an issue, the oxygen saturation goes down and my mental processing is even more impaired. So that's. . .**
**Q.** So are you saying then that you might not remember things or you might not be able to give accurate testimony based on your oxygen and breathing issues?
**A. That could be a reason. That could be a reason, yes.**

Q. Okay.
A. **Not a definite. We may be fine. But that is sometimes, yes.**
Q. And when that sort of thing is happening, do you feel it coming? Do you notice it or is it sort of after the fact you realize--
A. **No. It's usually before. I'm having a hard time finding words and things like the that.**
Q. Well, if during today's depo you find yourself, you know, wandering into that territory and you're feeling that kind of way, just let your attorneys know, let me know and, you know, we'll figure out, what, if anything, we need to do. Because obviously, you know, we want this to be a safe and healthy environment for you. Okay?
A. **(Nods head)**
Q. Are you on any drugs today that impair your memory or anything like that?
A. **I'm on many medications.**
Q. Sure.
A. **And yes, some of them, especially the antihistamine kind of medicines-- actually, no. Just about all of them have an effect on the brain.**
Q. Okay. And do you know that any of them in particular have an effect on your memory?





A. **I don't know. If they do, I can't remember it right now.**
Q. Okay. Well, that's all good enough. So let's sort of dive in with some easy stuff. I want to just understand your timeline of work at the VA. So can you just tell me when you started working there?
A. **February 2009.**
Q. Okay. In what capacity?
A. **I was hired as a VSR, a Veterans Service Representative.**
Q. Okay. And we're just going to go big picture here. So how long were you a VSR?
A. **I have a-- I don't-- I went from VSR through the promotions to RVSR, but I think that happened in-- If I just think something should I say it or just say I'm not sure?**
Q. If you're not sure, I'd rather you say that you're not sure.
A. **I'm not sure. It was within the first three years, but I'm not sure.**
Q. Okay. And are you still working at the VA?
A. **I'm still employed by them.**
Q. Okay. You're still employed. Are you still actually going into work or doing work?
A. **No, I am not.**





Q. And how long have you been employed, but not working?
A. **April 2005.**
Q. April--
A. **No. 2015.**
Q. Okay. And what-- you know, what is your status, if there's a name for it that says you're employed but not working? Are you on extended leave? Are you on--
A. **Workmen's Compensation.**
Q. Okay. So you said you were promoted to an RVSR. What does that acronym stand for?
A. **It's a Rating Veterans Service Representative.**
Q. And you were in that role it sounds like for around three, maybe four years?
A. **Actually, I still am. I'm still considered a Rating Veterans Service Representative.**
Q. Okay. But you were working as a Ratings-- as a Rating Veterans Service Representative for three or four years ball park?
A. **Ball park. Ball park. It's just I can't remember the date of promotion, yes.**
Q. Okay. So let's start with the VSR. And I'm sorry. Remind me again what that stands for one more





time?
A. **Veterans Service Representative.**
Q. Tell me what your duties were as a Veterans Service Representative?
A. **The end game was to find any way to legally get veterans benefits for their disabilities or their pensions. So it was from the point of a claim came into existence, to the development of the claim, evidence gathering and assessments, ordering medical examinations, getting service medical records, private medical records, researching status within service.**
**Like if someone served in Vietnam, find records, indications they were there. Create a case that could be handed to a Rating Service Veterans Representative in a complete case so that they could make the decision as to whether to grant, deny, and at what percentage the compensation would be at.**
Q. And I'm particularly interested, or will be, in the differences between a VSR and an RVSR. And based on what you've just said, it sort of sounds like the VSR does maybe the grunt work and gathers all of the information and then passes that onto the RVSR, who's the person who's ultimately making the decision?
A. **Those roles have changed repeatedly by the Office of Resolution-- by the VACO, VA Central Office.**

They're always trying to change those roles. But initially that was what it was.

The RVSR, at that point, their responsibility was first to make sure that the VSR had completed all of their responsibilities. When I started, it was the VSRs who reviewed the medical records and ordered all the examinations based on the medical records.

Q. When you started, it was the--
A. The VSR.
Q. The VSR--
A. The VSR would make sure the records were in place to hand to the RVSR who would take the knowledge of law and medicine to decide if an exam was appropriate, and if so, which ones. The opinions, they would draft the opinion requests and things like that.
Q. So did that-- did those roles change while you were still working as an RVSR?
A. I don't remember.
Q. Okay.
A. I don't remember. No. We were still doing the-- we were still-- we did the exams, ordered the exams, and then we did the file records, the medical record file records.
Q. And when you say we--
A. RVSRs.





Q. Okay. So the VSRs are for the most part gathering the raw materials that are passed onto the RVSR who's doing the analytical thinking and making a determination. I know that might be simplifying it, but--
A. Yeah. Just a tad.
Q. Yeah?
A. Yeah. Yes. The RVS-- the VSR was-- a lot of it was research-based. Like we had a Priority GY (phonetic) team. So they would have to know about the different conflicts and different exposures. So they-- a VSR needed to be learned in those kind of things. Or Nehmer which was like the big white-- Blue Water review for via-- Veterans of the Vietnam War. They need to be learned on those things. So that's the bulk of what their knowledge had to be.
Q. Okay. So just to orient you, I want to talk about RVSR and sort of the day-to-day, you know, practice, what you were actually doing, both in terms of, you know, the big picture, were analyzing stuff and making decisions, but also kind of nuts and bolts, you know. Where do you get the claims, where do you have to go to get the data, that sort of thing. So can you walk me through maybe just a day in the life of an RVSR?
A. That also changed. And it depended where in





the country you worked or what you were allowed to do.
Q. Okay. So I want to know specifically about the day in the life of an RVSR in St. Petersburg at the Bay Pines VA.
A. When?
Q. When you were an RVSR.
A. It depended on which-- it depended on what team I was working on and what they would allow. When I started, we all worked with the paper claims files. This is before everything became scanned.
Q. Okay. So let's start with sort of that. Let's just focus in on when you started when the claims were all done in paper.
A. Yeah. We would receive the Veterans what they called a C-file, their claims file, which is their complete record and archival documents that were organized in a specific manner so that no matter how you opened it, who opened it, they knew the DD214 was on this side, the service medical records were here, and all the different layers.

And I guess the first thing we would do is make sure that all the claimed conditions were addressed, were-- all the conditions that the Veteran was asking for had actually been developed and were in front of you would be the first step.





Q. And that development is what was done by the VSR--
A. VSR, yes. So first of all, it was to make sure that they didn't miss any of the conditions. That would be the No. 1-- No. Let me back up. First you had to verify that there was service-- that they made sure the service, that there was-- anything other than dishonorable discharge, which is all computer-based or in the DD214s.

Then you would check to make sure that the claims were actually-- because they could be a narrative. VCAA was a law that was written that said our responsibility, to take care of our Veterans. So if the Veteran would write in a claim they used to say on the back of a bar napkin, it didn't matter. We could accept it. But you'd have to read it. And if he was talking about an old injury, you have to accept that as a claim.
Q. Uh-huh.
A. It doesn't have to be formal. So it was my responsibility first to make sure that whatever document there had been reviewed so that everything was the developed so he didn't miss out-- he or she didn't miss out on anything in the claims.
Q. So if I understand what you're saying, you sort of needed to review everything to ensure that the--

you know, to determine the scope of the claim, all the different claims, and that each of them had been developed appropriately by the VSR?
A. **Yes.**
Q. Okay. When you're doing that, are you on-- And this is when you started I'm asking about. Are you on a computer? Do you have a stack of papers? Are there filing cabinets? You know, where are you going to get this information to review?
A. **Well, we first-- we had the computer. And the files were kept in a warehouse on the third floor of the building. And there were a set staff that was given a list of claims, files. And they would bring out what you needed to be working on.**
**So I would request from what they called a WHIP (phonetic). It was a-- you were given-- you were assigned-- we were all assigned digits which were the last two numbers-- I believe it was the last two numbers-- of the claims file. There was a VSR. We both were assigned a digit. I would have a WHIP, which was a workload which I would manage. Like if I saw something that's been out too long or if it's complex, this WHIP would have this information, or if there's something that could be gotten out easily. And I would request those files and they would be brought to me.**





Q. By whom?
A. **I can't remember the name of the position.**
Q. But there was a specific position whose job it was to bring you the files?
A. **(Nods head)**
Q. And when--
A. **Or bring them to my area. It wouldn't be to my desk. It's to an area.**
Q. And when we say the files?
A. **Yes.**
Q. Can you give me a sense-- and I assume it's different for every Veteran.
A. **Yes.**
Q. But can you give me a sense of the volume of paper? Are we talking boxes? Are we talking about--
A. **It varies as much as the snowflakes do. It could be someone who-- there's just this burnt orange folder and there's nothing in it but a DD214.**
Q. Uh-huh.
A. **Or you could have someone who's spent their entire lives in the service and had been very sick and there could be eight very thick volumes.**
Q. And when you say--
A. **It didn't-- it varied as much as. . . Yeah.**
Q. So I take it at the sort of narrow end, it





could just be a sheet of paper.
A. **A file. It would always be a C-file.**
Q. And then on other the end of the spectrum, it sounds like you're saying-- you said eight very thick volumes. Are we talking boxes?
A. **Not boxes.**
Q. File folders?
A. **They're all in the same standard file folder which can only hold so much paper. (Indicating)**
Q. And you're holding your hands up.
A. **And I'm going how many inches is that? (Indicating)**
Q. Yeah.
A. **That's about-- I don't know how many inches. I mean--**
Q. We'll call it three.
A. **About three inches. That's as much as it holds.**
Q. Okay.
A. **So it would never be more than whatever that is. (Indicating)**
Q. Okay. So you go through the file, whether it's just a manila folder or eight volumes?
A. **Yes.**
Q. You determine the scope. You ensure that





each claim has been developed. And then what is it that you do as an RVSR when you started working at the VA?
A. **Is to review medical records. Because the goal is to be able to get an exam for the Veteran. You want them to be able to get an exam.**
Q. When you say an exam--
A. **In order to receive compensation, there either has to be an injury in-service or a medical opinion saying that the injury is related to service. And it's the VA exam that will-- examiner who will describe the limitations. And it's with-- those limitations will come into play a bit later in this conversation.**
Q. Okay.
A. **But in order to assure a Veteran gets a proper opinion, my responsibility is to tab these medical records for every-- you know, say it was, I don't know, right ear pain, every incidence, every chance-- every time you saw an ear visit, you make sure that's tabbed and noted in the opinion.**
**And if another claim is breathing, every incident of that notation in their service medical records, the examiner needs to know that. In their records that talk about their service, we need to go through that and tab-- and look for, especially when it**

**comes to these conditions having to do with the Gulf War, Vietnam, Korea, anything to do with asbestos exposure, is to look at their positions and where they were and locate that so I can say if someone has breathing, they worked as a machinist in this boatyard after World War II and tie it to the fact that asbestos was used on that. So I can tell the examiner the event in-service was the fact that he was-- he could have been exposed.**

Q. May I interrupt you just briefly?

**A. Yes.**

Q. And again, this is just partly me understanding the process. So the VSR is the gatherer of the information?

**A. Yes.**

Q. The RVSR then takes it and really goes-- dives into the medical records and files. And it seems like you are picking out the important pieces of information that you're then to some extent passing onto the examiner, who I assume is a medical professional?

**A. Yes.**

Q. Okay. And they are ultimately making the decision that the Vet will or not get some benefits?

**A. (Shakes head) That decision comes back to the RVSR. The medical person has no say or authority. They can just offer an opinion on it.**





Q. Okay. The ultimately the RVSR is making that call?

**A. Yes.**

Q. But they may pass the file to the examiner to get the appropriate medical opinions necessary to justify your ultimate decision?

**A. It is the RVSR's responsibility to do that. It's the examiner's responsibility to look at the file. But there's no expectation that they will go through it the way it would be necessary.**

Q. Which is why the RVSR tabs it and --

**A. Who's ever doing the-- who's ever ordering the medical opinion is responsible.**

Q. And we've been going for a couple minutes. Let me just check in with you. Are you doing okay?

**A. Thanks for asking. I'm all right.**

Q. So once you've gone through the record, tabbed the appropriate information, if necessary, obtained an opinion from the examiner, what happens next?

**A. Well, and then before it goes to them, we have to draft a document that explains to the examiner that this Veteran is claiming compensation and lists the injuries. Then we will define for each of those injuries the events that happened or the exposure or whatever it is. And we ask them if it's as least as likely as not or**





**is it definitely due to service? Is it secondary to another-- there's a narrative of questions and answers, some open-ended questions and other check boxes. That goes over to the examiner.**

Q. Okay. So it sounds like it--

**A. Oh. And we also choose the exams that need to done.**

Q. By the examiner?

**A. Yes.**

Q. So you go through-- you, the RVSR-- And this is again when you started at the VA.

**A. Uh-huh.**

Q. You go through the claims file, you go the through the records, you identify the scope, you make sure it's been developed appropriately, you tab and identify all these sort of relevant pieces of the record. And then it sounds like you create a digest basically for the examiner saying these are the claims, this is the evidence in the record that supports it, and then you prompt them with the appropriate questions that need to be answered for the Veteran to ultimately get a benefit from that?

**A. In a nutshell.**

Q. Which is all I'm doing. I just want to understand--





**A. Yeah. That's it in a nutshell.**

Q. Okay. So after all that has occurred and you've received an opinion back from the examiner, what would you do next as an RVSR when you started at the VA?

**A. This is when law and regulation would kick in. This is when you have the challenges as far as the clarity of the opinion that you received. Is the exam complete? Have they all been done? Has the doctor addressed all that was required of him? As a result of this, are additional tests required?**

**So the completeness of what you receive-- also, in the meantime, you're trying to follow it to make sure the exam is being done and, you know. But that's the big part, is this exam what I need to make my decision.**

Q. Uh-huh. And assuming that the exam is and you don't need to order other exams or develop the record anymore, what happens then?

**A. In a clear, clean case, uncomplicated case, you can take this information and use what you what we refer to as the rating table, which is-- I think it's regulation, law. I'm not sure what it is-- that defines the degree of disability by percent for the disability. Its existence, if it just exists due to service, most conditions it gives a zero percent. But then the Veteran**

**for the rest of his life has it if it increases. He doesn't need to go-- he or she doesn't need to go through processing again.**

**Or you'll look at the rating schedule and decide, is it between these percentages and this pending on the symptomatology or like the degree of the measure of movement, is he / she able to bend their arm more than X amount of degrees? Is their vision more impaired than X? Has the diabetes reached the point of having to take medication? And we marry that-- those two pieces information to decide-- that's how the decision is made.**

Q. Okay. So once the decision's made-- and I guess let me back up. Before the decision's made where you are ordering-- potentially ordering exams, getting more records, how is this being-- how are those things being communicated to the people you're working with? Are you sending emails? Do you have to send, you know, forms to someone for a signature to, you know, approve something--

**A. Not at that-- not at that point. We would have a-- like I said, it was a WHIP. It's basically an Excel spreadsheet initially. And most of the supervisors, you would submit that or go over that with your coach. They're called coaches.**

Q. Uh-huh. What's a coach do?





**A. That's a good question. Coaches assign work. They do leave and attendance. They do not coach in terms of assisting in-- assisting RVSRs and VSRs with their jobs themselves. They manage people and the files. They don't-- they don't coach.**

Q. Meaning they don't assist the RVSRs with the sort of substantive decision making that they're actually doing?

**A. Correct.**

Q. Okay. They're more project managers who are making sure that the trains are moving on time?

**A. Wonderful analogy, yes. They don't have a support function.**

Q. Did anyone support the RVSRs when you started working at the VA?

**A. Yes.**

Q. Who were those people?

**A. Depending on the team, but they were two positions, which are-- well, actually three. They were Super Senior VSRs, DROs, which is a Decision Review Officer. Those are the two biggest supports.**

Q. Okay.

**A. Also, a big support would be the Veterans Service Officers.**

Q. Okay. Why don't we start with the Super





Senior VSRs.

**A. Uh-huh.**

Q. Tell me what they do.

**A. I don't know enough about their position to tell you.**

Q. Did you work them at all when you were an RVSR?

**A. Mostly with training, they would do trainings on the teams. And they would specialize, like the subject area experts on different things.**

Q. Different things like you were talking about before--

**A. Yes, yes. Like if there had been changes. There's just many categories and types of claims. So if you have someone who-- like we had a specialist with military sexual trauma.**

Q. Okay.

**A. So that would be your go-to person on--**

Q. So the Super Senior VSRs would be kind of subject matter experts on discreet claim types--

**A. Yes.**

Q. --or issue types?

**A. Yes. Yes.**

Q. And by the way, you're doing a fine job with this. But again, try and let me finish the question. It





just makes Debbie's life--

**A. My apologies.**

Q. That's okay.

**A. Yes.**

Q. And I'll do the same throughout. I mean no offense by it. It's just how people talk normally. All right. DROs, Decision Review Officers, what did they do?

**A. They were the gold. They were the people with all the knowledge and the expertise on everything rating, everything having to do with rating decisions. They were what-- would you call them? Like the brain center. So if-- when things were complex, they were the ones who-- they would insist you would come with the facts.**

**They didn't give you the answers, but they could tell you where to go find them. Like this is where in the law this is. This is how you-- they helped with interpretation of the law and regulation was the big part of what they did was the interpretation of law and regulation.**

Q. So it sounds like DROs would collaborate with the RVSRs on the ratings that they were working on in situations where they were complex?

**A. That was one of their functions.**

Q. Uh-huh.

A. **When I started, they were available to us, but the agency tried to limit that access.**
Q. And did you ever work with a DRO?
A. **Oh, yes.**
Q. When you would work with DROs, just mechanically, would they come to your desk and look at the claim file with you? Would you schlep the claim file over to them? Did they need to look at the claim file? You know, how is this collaboration-- how does it work in practice?
A. **Rarely would you go to them.**
Q. Uh-huh.
A. **I mean, rarely would they come to you. You would go to them. You would have-- carry the C-file with you. You would have your questions marked and tabbed, fill in as many blanks as you can, propose your-- state the clarity you were seeking and what you had done up to that point to attempt to gain it on your own. And then they would take it and say, okay. From here, this is how we would look at it.**
Q. Okay. And Veterans Service Officers I think were the third type of support personnel that you mentioned to me.
A. **Those are like the POAs. They are the American Legion, Veterans of Foreign Wars, those--**





**there's always an office, a wing-- many, many offices where these men and women worked in our building. And if a Veteran had chosen a certain organization, I would have the legal authority-- that would be part of the claims folder, this person has chosen American Legion.**
**I could go to the American Legion VSO and say I have Debbie's claim here and I just don't understand what she's talking about here. And I could have the VSR send a letter and do all these things, or could you give them a call and get clarity on that. Or if I-- we sent them a form and they're already 10 days late, the Agency is looking to deny their claims because they didn't-- can you give them a call? Do you have a way to contact them? If I did it, I'd have to go through this formal process.**
Q. Okay. So it sounds like then that the Veterans Service Officers were folks from organizations that the Veteran had identified as a point of contact for the Agency to reach out to?
A. **And for them-- yes. And their job was to advocate and try to get these things through.**
Q. Okay. So you mentioned coaches. Who did you report to as an RVSR?
A. **Coach.**
Q. To the coach? And how--
A. **Assistant coach, coach. Both of those roles**





**were there, but I usually worked with coaches.**
Q. And who did they report to?
A. **Assistant Service Center Manager would be the next up in the chain of command.**
Q. Who was that when you were just starting as an RVSR?
A. **I don't remember.**
Q. Okay. Do you remember anyone who served in that role while you were working as an RVSR?
A. **Yes. Jerry Huffman, Larry Brown, Collette Burgess. There were many more. I don't know-- they're not-- I'm not retrieving their names.**
Q. And who were the coaches you worked for? And I understand there might be many, but can you just tell me who you recall working for?
A. **Well, the men I worked for the longest because we-- they changed people's teams all the time. But my-- after training, my first coach was Tom, Thomas Vernon.**
Q. I'm sorry. What's his last name?
A. **Vernon, V-E-R-N-O-N.**
Q. Thank you.
A. **He was also my coach in 2015 as well. I was back with him. When I was working on the Nehmer Project, he was on-- I think he was my coach then. Ulyssee**





**McBurrough. Please don't ask me to spell it.**
Q. I know that one. I can get it to Debbie.
A. **Yeah. Beauchamp, James Beauchamp. Dale Eckholm (phonetic). I'm struggling.**
Q. And that's fine if that's all you can remember.
A. **At this moment, that's all I can retrieve.**
Q. Okay. So you mentioned some type of coaches--
A. **(Gesturing)**
Q. Yes.
A. **I just need a minute.**
Q. Do you want to take a break?
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 9:57 a.m.)**
**(On the record at 9:58 a.m.)**
**MR. SULLIVAN:** All right. Go back on the record.
Q. **(By Mr. Sullivan)** Okay. So Ms. Mullin, we had been talking about some of the other folks you worked with when you were an RVSR. And I think what I was asking was, was there a Service Center Manager-- you mentioned an Assistant Service Manager, Larry Brown, Collette Burgess. Was there a Service Center Manager that you ultimately--

A. **Sandy Smith. Sandra Smith, but she went by Sandy. And she was the Service Center Manager up until 2015, but then took a different position, but she had always been--**
Q. And now I understand that-- Let me ask you this. Are you a member of any unions?
A. **Yes.**
Q. What union are you member of?
A. **American Federation of Government Employees, AFGE.**
Q. And how long have you been a member?
A. **Since shortly after being hired.**
Q. So some time after 2009?
A. **Yes.**
Q. Have you ever had a role in the Union?
A. **Yes.**
Q. If you understand what I'm asking?
A. **Yes.**
Q. What was your role?
A. **I was a steward was the one formal role I had.**
Q. Did you have any informal roles?
A. **Yes. I assisted the health committee. The health committee--**
Q. There was like a union health committee?





A. **Yeah.**
Q. And how did you assist them?
A. **Mostly research.**
Q. When was that?
A. **We started in 2009. 2009.**
Q. When were you-- I didn't ask you this. When were you a steward?
A. **I don't remember right now. I don't remember right now.**
Q. Okay. Ball park, do you think it was around the time you started or was it later in your tenure?
A. **Later in my tenure.**
Q. Okay. Who else worked at the AFGE or had union roles when you were. . .
A. **While I was a RVSR, Valorie Reilly has always been the president. At different times it was Keith Pryor was assistant president, Casey Crump was Chief Steward. Javier Soto-- I don't know if he was a chief steward or assistant or vice president. John Smith, Carol Allard, Beth O'Halloran, Tedd Smith. Tedd would be with two D's.**
Q. And Javier was a chief or assistant steward?
A. **No. I don't know if he was a vice president. I don't know if he was a vice president or chief steward.**
Q. And John Smith was a steward?





A. **Steward.**
Q. Carol Allard?
A. **Steward.**
Q. And Beth O'Halloran?
A. **Steward. A lot of stewards.**
Q. Was Casey Crump always the Chief Steward--
A. **I don't know.**
Q. When you were a steward, who did you report to? Who was the Chief Steward, if you remember?
A. **I don't remember. I don't remember differentiating people and their roles.**
Q. Okay. Tell me a little bit about the union work and the interaction with the folks here that you've mentioned to me so far that were a union--
A. **You need to narrow that question down. That's really broad.**
Q. What would you as a union steward do?
A. **Initially attend a training on how to be a steward. That was a must with them. I became a steward shortly before I got very, very sick. So it interfered with my opportunity to represent other employees. So I never had the opportunity to do-- I could advise someone, I could advise, but I couldn't represent. I wasn't capable of it.**
Q. And when you got very sick, are you referring





to your cancer diagnosis?
A. **No. Before that. It was the breathing.**
Q. Okay.
A. **No. It was the-- it was the ability to communicate verbally.**
Q. Okay. And when-- and I just need a ball park because you said you became a steward shortly before that?
A. **I think so.**
Q. When about do you think that was?
A. **I just-- I don't think I should answer that because it's all sorts of different scenarios that I'm seeing in my mind's eye. So I don't think I should answer that because I'm just not sure. Like I remember filling out the form, I remember faxing it, I remember why-- I remember all these different things, but I don't know a time.**
Q. Would it have been-- So I understand you were diagnosed with cancer in 2012?
A. **Yes.**
Q. So you would have become a steward before that?
A. **Yes.**
Q. And based on what you said about the breathing, it's likely even well before 2012 that you

became a steward?
**A. I don't know.**
Q. Okay. What was your relationship like with Valorie Reilly, the union president?
**A. Frustrating.**
Q. How so?
**A. I'm just trying to pull a word. She gave lip service to many things, but didn't pull through and get things done. She was a grand idea person, but not an implementation one.**
Q. Would you say you two were friends?
**A. No. Friendly, yes. Did I care for her, yes. Friends, no.**
Q. So you were friendly with her, but not friends?
**A. Correct.**
Q. Okay.
**A. Yeah. I had compassion for her as well.**
Q. How about Keith Pryor? Before we move to Keith, would you say Valorie Reilly was someone that you would confide in, you know, the problems you were having or challenges you were facing personally at work?
**A. Not personally. I mean, not outside of work. I guess I don't know. Can you elaborate on that question?**





Q. Yeah. I mean, is she someone that you would go to and say, I'm having this kind of issue at work, either I'm not getting the support I need or I'm having breathing issues or I'm having medical issues of this kind?
**A. Yeah. She knew every detail of my medical and the health in the building. I shared all of that with her, how it interfered with getting my job-- the problems with HR, yes.**
Q. You said how you were getting your job?
**A. No. Interfered with me doing my job.**
Q. Okay. Keith Pryor, tell me about him.
**A. Keith Pryor, he was a man of integrity, a strong, but soft-spoken personality. He was former Navy, a good man and an advocate.**
Q. An advocate for?
**A. He believed in the purpose of the AFGE.**
Q. And is he still someone that you would confide in like you were doing with Valorie Reilly about your medical issues, the HR issues you were having, things like that?
**A. Differently though.**
Q. Differently in what way?
**A. I was more relaxed with my communication. He didn't frustrate me. He would also probably go in the**





**friend category.**
Q. Okay. So it sounds like maybe with Mrs. Reilly, it was a more standoffish, professional relationship, whereas with Mr. Pryor, it was professional, but you also have that friend component as well?
**A. Yeah. Valorie Reilly kept that, I am president role in the air at all times.**
Q. And Mr. Pryor didn't have those same sort of airs about them?
**A. He doesn't carry himself through life like that.**
Q. And did you keep him informed of all the details of your medical issues and HR problems you were having?
**A. Not to the degree I did with Valorie.**
Q. And what about Casey Crump? How was your relationship with him?
**A. Casey Crump was actually one of my instructors when I went into RVSR training. Casey Crump is not a warm and fuzzy man. He was a Decision Review Officer and brass tacks kind of guy.**
Q. Did you ever work with him? Was he a Decision Review Officer you worked with as an RVSR?
**A. I don't think so, no. He taught us when I**





**went into class. No, I don't think so. I may have, but I don't remember.**
Q. And friends, friendly? Like your relationship, how would you characterize it?
**A. I don't know if you can be that with Casey. I mean, it's a one-liner and a laugh, but not friendly.**
Q. And is he someone that you would have kept informed of the details of your medical issues or RVSR issues or anything like that?
**A. Val was the one I know I would have mentioned it if I saw fit if it came up in a meeting, yes. But no, he's not someone I confided in.**
Q. Okay. What about Javier Soto?
**A. Great deal of respect for Javier Soto.**
Q. Would you say he's someone that you would have confided in or communicated with about your-- the details of your medical issues or HR problems or anything like that?
**A. I would never speak to him like deeply personally. He's a very almost traditional male that-- he's just kind of like an old-school traditional man, like you would not go into too much-- more detail than is necessary to communicate something.**
Q. Okay. And what about John Smith?
**A. John Smith was-- he's the one who represented**

**me through the beginning-- the beginning with Office of Resolution Management and came to my meetings when I'd have monthly evaluations. He was a friend, too, when I got sick.**
Q. How so?
A. **I got cancer. He did the walk for miles, when they do that walk around the-- to fundraise awareness and funds. And he did that in my name and he was supportive and things like that.**
Q. So after you were diagnosed with cancer, I think you went on leave, either sick leave or FMLA or something like that?
A. **No.**
Q. No?
A. **(Shakes head)**
Q. Did you continue working while you had cancer?
A. **I'm really having a little anxiety response right now.**
**COURT REPORTER:** I'm sorry. What did you say?
A. **I'm having an anxiety response to that question and processing an answer to that question.**
Q. Okay.
A. **Because that is loaded full of abuse, denial**





**of accommodations. I could work. The doctor said I could work, but if I-- I couldn't go in the building. This is my meeting with the Director when I asked for accommodations so I could work. I would do anything. And she said no. This is a loaded question.**
Q. So just so we're clear, the question is whether you continued working.
A. **Intermittently.**
Q. Okay. And--
A. **Yeah.**
Q. Do you need to take a break?
A. **Yes, please.**
**MR. SULLIVAN:** Okay. Let's go off the record.
**(Off the record at 10:18 a.m.)**
**(On the record at 10:21 a.m.)**
**MR. SULLIVAN:** Let's go back on the record.
Q. **(By Mr. Sullivan)** So we were talking a little bit before about your cancer diagnosis. And I understand you were subsequently treated with chemotherapy?
A. **Yes.**
Q. And did you have some surgeries related to your cancer?
A. **Yes.**





Q. Did you let any of your colleagues know what was going on?
A. **Yes.**
Q. And I guess to be more specific, did you tell any of your colleagues that you had cancer?
A. **At what stage are you talking?**
Q. Well, how about when you-- Can you tell me when you were initially diagnosed?
A. **I think it was March-- yeah. March 2012.**
Q. When you were diagnosed with cancer, did you let any of your colleagues at the VA know about that diagnosis?
A. **I told the Service Center Manager.**
Q. And that was Sandy Smith?
A. **Yes.**
Q. Did you tell anyone else?
A. **A co-worker I had become friends with.**
Q. Who was that?
A. **Mary Jo Shapiro.**
Q. And did you tell anyone else when you were diagnosed with cancer?
A. **I don't remember.**
Q. You had mentioned before that you had told Valorie Reilly every detail of your medical and health issues. Do you think that would have included your





cancer diagnosis?
A. **Did you say I told Valorie Reilly every detail?**
Q. That's what my notes of what you said before were.
A. **Oh. If I did, that's not-- ever detail as far as the building, those details, but not about my health.**
Q. Okay. Would you have told her about your cancer?
A. **I don't know.**
Q. What about Keith Pryor--
A. **Not initially. Not initially. None of them did.**
Q. Okay. Did there become a time when you did tell your colleagues? And let's just focus on the Union. Your colleagues in the Union, did you tell them about your cancer at some point?
A. **Let me just think for a second.**
Q. Uh-huh.
A. **I don't remember telling them.**
Q. Is it possible that you did and you just don't remember or are you saying that you--
A. **I can't imagine that I would have. I can't imagine under what circumstances I would have discussed**

**anything that intimate with them early on.**
Q. And what about later on?
A. **Later on when I needed donations for-- I needed leave donations. My leave had been used up because of the building illnesses and I had to get-- I had to ask for leave donations. And then everyone in the RO knew because it went out by email.**
Q. Do you know when that was?
A. **No.**
Q. So I want to-- I'd like to understand which individuals at the VA you are alleging have either retaliated against you or discriminated against you based on your disabilities. So can you just sort of give me the list of people that you think fall into those categories?
A. **Bonnie Wax would be first.**
Q. Okay.
A. **Kerrie Witty.**
Q. Did Bonnie Wax-- was she a discrimination because of a disability or retaliation?
A. **Both.**
Q. Both. And what about Kerrie Witty?
A. **Both.**
Q. Okay. Anyone else?
A. **James Beauchamp, Michael Palmer, Matt Correa,**





**Tamanique Clarke, VA Secretary McDonnough, Deputy Director of VBA, Allison Hickey, Southern Area Director, his name is not coming right now. Michael Palmer, a coach. What's his name? The coach in charge of the phone unit. His name is not with me right now.**
Q. Okay. Anyone else that you can think of?
A. **Not at this moment. There are more people, but they're not-- I'm seeing faces and I'm not getting the names attached to them.**
Q. Okay. Well, if, you know, during the course of today's depo and when we meet again on Tuesday, if a name connects to one of those faces, just kind of let me know and say, by the way, one of the folks that I think discriminated against me.
A. **Okay.**
Q. So let me go through the list again. There was Bonnie Wax, Kerrie Witty, James Beauchamp. Was he a--
A. **Coach.**
Q. And are you alleging that he's retaliated against you or discriminated against you on the basis of your disability or both?
A. **Both.**
Q. Okay. And what about Michael Palmer?
A. **Disability.**





Q. So you're not alleging that Michael Palmer retaliated against you for any reason?
A. **Not according to my understanding of retaliation.**
Q. Okay. And what's your understanding of retaliation?
A. **That I was-- at the moment, my memory of what that is is that due to engaged in protected activities, that an action was taken or an inaction was taken.**
Q. Okay. You mentioned Matt Correa.
A. **Both.**
Q. Tammi Clarke?
A. **Both.**
Q. VA Secretary McDonnough?
A. **Gee. That's tough. I definitely would say the retaliation aspect of it. But the fact that he knew I was disabled would put it into the medical. He was very aware of it. So was Hickey.**
Q. Is Hickey someone you think both retaliated and discriminated against you?
A. **Absolutely.**
Q. The Southern Area Director that you mentioned?
A. **Yes. What is his name?**
Q. It's okay if you don't remember his name





right now.
A. **All right.**
Q. Is he one who was one, the other or both?
A. **Both.**
Q. And what about--
A. **Christine Moorby, service-- Assistant Service Center Manager, Christine Moorby. Both.**
Q. She is both?
A. **Yes.**
Q. What about the coach in charge of the phone unit?
A. **Disability.**
Q. Okay. Anyone else you can think of right now?
A. **Not at the moment.**
**MR. SULLIVAN:** Can we go off the record, please?
**(Off the record at 10:32 a.m.)**
**(On the record at 10:33 a.m.)**
**MR. SULLIVAN:** Okay. We can go back on.
Q. **(By Mr. Sullivan)** I would like to mark an exhibit I would like to show you, Ms. Mullin. So I'm handing your attorney a copy.
**MR. SULLIVAN:** Debbie, do you have stickers?

**COURT REPORTER:** I probably did not bring any. Hold on. Let me see. I've just got-- they're not Government stickers. They're just regular stickers.

**MR. SULLIVAN:** Just regular ones would be fine.

**COURT REPORTER:** I can either give them to you or--

**MR. SULLIVAN:** I can do it. Save you the trouble.

**COURT REPORTER:** Thank you.

**MR. SULLIVAN:** Your hands are going to be busy enough.

**COURT REPORTER:** Thanks.

**(Defendant's Exhibit No. 2 was marked for identification)**

**Q.** **(By Mr. Sullivan)** So I am handing you what I've marked as Exhibit 2, which is a document that bears the Bates label VA 011470.

**MR. SOLOMON:** And I apologize. Do we have an Exhibit 1?

**MR. SULLIVAN:** Not yet.

**MR. SOLOMON:** Okay.

**Q.** **(By Mr. Sullivan)** And it goes through VA 011495. Have you seen this document before?





**A.** **I don't know. Just a second. (Perusing)**

**THE WITNESS:** Do you have a copy of this?

**MR. SOLOMON:** Yes.

**A.** **(Perusing) Yes.**

**Q.** You recognize this?

**A.** **Yes.**

**Q.** And can you tell me what it is?

**A.** **My understanding of what it is was kind of a summary of what the investigator, John Henley, had pulled together as a result of his investigation.**

**Q.** Okay.

**A.** **My understanding of what that is.**

**Q.** Uh-huh. And you see at the top it's titled Investigative Report In the Matter of the EEO Complaint of Discrimination of?

**A.** **Yeah.**

**Q.** And then it lists your name?

**A.** **Yes.**

**Q.** And there's a case number here that ends in 413?

**A.** **Yes.**

**Q.** And it references a formal Complaint that was filed on September 18th, 2012?

**A.** **Yes.**

**Q.** Are you familiar-- Well, do you recall





filing a Complaint with the EEO around that time, September of 2012?

**A.** **I don't remember the date. And I think that's-- I think that's actually incorrect, the first Complaint.**

**Q.** Do you remember the first time you filed a Complaint with the EEO was?

**A.** **I remember what the Complaint was. And it was 2012. And it was between my first and second meeting with the Director. And that's why I think it was a couple months earlier than that.**

**Q.** Okay. Now, are you familiar with the substance of that Complaint that you first filed that you're referencing was a couple months before?

**A.** **I think it was couple months before, yes.**

**Q.** Okay. Substantively, does this Investigative Report contain the various allegations that you had brought to the EEO investigator at that time? And if you'll look on Page 3 and 4, there's a-- I'm sorry-- 2, 3 and 4, there's a list of 29 allegations?

**A.** **Yes.**

**Q.** Do you see that?

**A.** **Yes.**

**Q.** Are those the allegations that you first brought to the EEO?





**A.** **There were only two initially. There were only two Complaints.**

**Q.** And subsequently did you amend your Complaint to include more sort of factual allegations?

**A.** **A number of times.**

**Q.** Okay. And is this the-- and when I say this, I mean, Exhibit 2. Does this contain all of the allegations that you brought from when you first spoke to the EEO investigator through the various amendments?

**A.** **No.**

**Q.** Okay. What is missing?

**A.** **I can't answer that just off the top of my head.**

**Q.** Okay. Well, why don't you-- That's fine.

**A.** **I could supply it, but I don't have it.**

**Q.** That's fine. Let me ask you this. Well, let me mark another exhibit. This is going to be Exhibit 3.

**(Defendant's Exhibit No. 3 was marked for identification)**

**Q.** **(By Mr. Sullivan)** I'm handing you what's been marked as Exhibit 3. (Tendering)

**A.** **(Perusing)**

**Q.** It's a document-- a three-page document Bates stamped VA 011504 through VA 011506.

**A.** **Uh-huh.**

Q. Is the name-- and I might be butchering this-- Deogory (phonetic) Harris?
**A. Gregory Harris. He was initial-- he was D. Gregory.**
Q. D. Gregory?
**A. Yeah. He was the original person I spoke with.**
Q. He was the EEO counselor that you initially contacted?
**A. Yes.**
Q. And if you see there's a date sort of three-quarters of the way down where it says-- or the second table it says, Notification of Procedural Rights. In the top row it says Initial Contact. And it's dated June 5th, 2012?
**A. That's closer to correct than September 18th.**
Q. Okay. So you initially reached out to an EEO counselor on June 5th, 2012 or thereabouts?
**A. That sounds right to me.**
Q. Okay. Prior to speaking to Mr. Harris at that time, had you reached out to any other EEO counselors?
**A. (No response)**
Q. I can ask that--
**A. Yeah, please.**





Q. Was your conversation with Mr. Harris in June of 2012 the first conversation you had with an EEO counselor about any claims of harassment or discrimination?
**A. At the ORM, at the Office of Resolution Management. I had spoken to-- at our regional office, but I don't know if she was a counselor. Her name was Bettie Bookhart. She was like the EEO liaison there.**
Q. Okay. And you spoke to her before you spoke to Mr. Harris?
**A. Yes.**
Q. And was it about the same issues that you raised with Mr. Harris or something different?
**A. Something different.**
Q. What was that conversation about?
**A. Reasonable accommodations.**
Q. When did that conversation occur?
**A. Long before this. I don't know. I don't know.**
Q. Okay. And are the accommodations that you discussed with Ms. Bookhart, are any of those accommodations referenced in the investigative report that ends in 413, which is Exhibit 2?
**A. I don't know. I know they're part of the ROI, but I don't know if it's in there. I know they're**





**in the Complaint-- I know it's in the Complaint that you received. I know it's in the original ROI.**
Q. Okay.
**A. And it is encompassed in this. Not bulleted in this, but it's encompassed.**
Q. Okay. And encompassed-- what were the accommodations that you discussed with Ms. Bookhart that are encompassed in Exhibit 2?
**A. Any reasonable accommodation that could get me out of the building or moved to a different part of the building that had been newly renovated or somewhere else on the VA campus, another job working for VBA or VA there on campus.**
Q. Okay. And you don't remember when you were requested that accommodation?
**A. No, I don't.**
Q. And who did you request it of? Who did you speak to about that?
**A. I didn't request her. I asked for her advice on it. And it was Bettie Bookhart.**
Q. So you asked Bookhart for advice about asking for an accommodation?
**A. Yes.**
Q. And did you ever ask for that accommodation?
**A. Yes.**





Q. Okay. And the accommodation that you requested, that's why you're saying it's encompassed in Exhibit 2 because substantively it's touched on?
**A. Uh-huh.**
Q. Okay. Back to Exhibit 3, the report with Mr. Harris. So you spoke with Ms. Bookhart and you spoke with Mr. Harris. Did you speak with any other EEO counselors prior to your conversation to Mr. Harris?
**A. Not that I remember.**
Q. Okay. You can put those to the side if you like.
**A. (Complies)**
Q. All right. I am going to--
**A. Are these for me to keep?**
Q. You can just put them to the side.
**A. Okay.**
Q. We're going to give those to the court reporter at the end of the day.
**A. Okay.**
Q. But I may ask you to refer back to them at some point.
**A. Okay. But these are not my copies. My attorneys have my copies?**
Q. They have copies for you. And I'm happy to send you guys electronic copies later on.

Okay. I am handing you what has been marked as Exhibit 1, long-awaited Exhibit 1. (Tendering)

**MR. SULLIVAN:** I'm sorry. I don't have a copy for you, Dan.

**MR. MAHARAJ:** That's okay.

**A. (Perusing)**

**(Defendant's Exhibit No. 1 was marked for identification)**

**Q. (By Mr. Sullivan)** Take a look at that--

**A. I've got to see what it is.**

**Q.** And let me know if you've seen it before?

**A. (Perusing) I don't know that I've read this-- I don't know that I've read all of this, no. I've seen it. I just-- I don't remember going through it.**

**Q.** Okay.

**A. I don't remember.**

**Q.** If you turn to Page 3 of Exhibit 1?

**A. Yeah.**

**Q.** It's titled Plaintiff's Supplemental Answers to Defendant's Interrogatories-- Requests for Interrogatories.

**A. Yes.**

**Q.** And what follows are answers to questions. And your attorneys have given me a form that you've signed under penalty of perjury that says that you've





read these and you've sworn everything in them is true and accurate to the best of your knowledge.

**A. Yes.**

**Q.** Okay. So do you think you've read these and everything contained within is true and accurate to the best of your knowledge?

**A. I've read everything that's come between us and I've never seen an inaccuracy. And this-- the final draft of this-- I think I've seen every-- I think I've seen every draft along the way. I don't know if that makes sense. And I've never seen anything that was inaccurate or not my own words in anything produced.**

**Q.** Okay. I just want to make sure that-- because we're going to be talking about some of these answers and I just want to make sure that--

**A. Oh, yeah. Oh, yeah.**

**Q.** --these are your answers and you've sworn to their accuracy.

**A. Yes, yes. Absolutely.**

**Q.** Very good.

**A. I'm just looking at some of the typing on them and I'm going, I don't remember the spacing on that part, things like that.**

**Q.** Okay. Could you turn to Page 17 of Exhibit 1 for me?





**A. (Complies)**

**Q.** And you see where it says RFI 3? Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in Count 2 of the Complaint.

**A. Yes.**

**Q.** And then below that in bold, there are responses. And what follows is several pages of your response.

**A. Yes.**

**Q.** Okay. So I want to talk to you about some of-- some of your responses here. So your first response reads, On or around January 4th, 2010, Agency required Plaintiff to report to the Phone Union on the 2nd floor, Room 222 of RO317 without any accommodations for her speaking issues in accordance with her medical documentation. So implicit in that response is that you had requested an accommodation?

**A. Yes.**

**Q.** Can you tell me when you requested an accommodation related to speaking issues?

**A. The day I received the notice. I don't have the date with me. It's in the records. The day I received notice that I was being assigned to the phone unit, I immediately went to my coach/supervisor, Tom**





**Vernon.**

**Q.** And what did you talk to him about?

**A. I said, What do I do? I can't do this job.**

**Q.** And what did he say?

**A. First he says, I don't know, Aileen. Let me see what I can do. Because at that point I had already missed work. There were already medical notes about the laryngitis and everything. And he came back. And over time it was, there was nothing he could do. You know, bring more medical notes to Human Resources. But at the end of the day, there's nothing I can do. This has to go through Human Resources.**

**Q.** So Mr. Vernon said there was nothing that he could do, but he referred you to Human Resources?

**A. No. He kept saying, I'm still working on it. I don't know who he was speaking with. I don't know how he was advocating for me. He would advocate for me.**

**Q.** And you provided him with medical documentation?

**A. I had been doing it along, yeah.**

**Q.** And when you say all along, you mean from the time you got your note about going on the phone unit or prior--

**A. No, no, no. Prior to that. Prior to that.**

**Q.** And why were you giving him medical

documentation?
A. **I had such severe laryngitis and speak ability-- speech was so challenging that the doctor documented it.**
Q. Okay.
A. **Because I was having such difficulty speaking.**
Q. And did you--
A. **And that interfered with my job.**
Q. And did you request an accommodation prior to the phone unit request?
A. **Was it before or after that? No. I think it was after that would be the next one, I think.**
Q. Well, I'm asking if there's anything prior to request related to the phone unit. Did you make any accommodation requests before that?
A. **I can't remember the timeline. It could be in here. Can I look in here?**
Q. No. Let's not--
A. **Hang on. Let me just think on it for just a second. I'm just trying to go through the series of coaches, because I remember which coach I spoke to. So let me think about what I was doing for a job. Phone unit, that was the end of 2009-- It would have to be after the phone unit because I was with a different**





**coach.**
Q. Okay. So at this point as we sit here right now, you don't recall making any reasonable accommodation requests prior to the one that you made to Tom Vernon some time before January 4th, 2010?
A. **There was one.**
Q. Okay. What was that?
A. **When I was hired, we all-- everyone in the group had to work in the files warehouse. Everybody had to do a few days in there. And I let them know about my concern for my back and standing for too long. So that was the first time I had ever mentioned any limitations.**
Q. Okay. So you mentioned a limitation to them?
A. **Yes.**
Q. Did you request an accommodation?
A. **I didn't know what the word was then.**
Q. Okay. Did you request--
A. **I don't remember ever using the word accommodation.**
Q. Did you request that you be relieved of that duty?
A. **No. I didn't know what the duties were. I just let them know going into the warehouse that that was a consideration that we just had to have.**
Q. And did you tell them that you couldn't do





something in the warehouse because of your back?
A. **No. Because I didn't know what they did in the warehouse.**
Q. Okay. And did the agency do anything for you or did they just say to go in the warehouse?
A. **Yes. They had me go in the warehouse, but they had me in a position. There was-- a lot of the work could be sitting down and things like that, yes.**
Q. So they accommodated you?
A. **Yes, they did.**
Q. Okay. Let's go back to Tom Vernon in the phone unit. Did the Agency accommodate-- Well, let me ask you this first directly. You've raised your hand in sort of exclamation. What do you need to tell me?
A. **I talked to Bettie before I went to the phone unit because as a result of that conversation, I was afraid to ask for accommodation.**
Q. Why were you afraid to ask for accommodations as a result of your conversation with Bettie Bookhart?
A. **Because I had heard rumors about being careful about saying anything about the building making people sick, from co-workers. So when I asked her what her thoughts on me asking for accommodations to work elsewhere in a different building, her response was, Well, that's within your rights to do so. I can't say**





**that it is wise to do so.**
Q. And did she explain why she didn't think it was?
A. **No. No. She didn't elaborate at all.**
Q. And did you infer?
A. **I don't know if she said why or good idea or if its-- you know, I'm not sure. Please don't quote me on that.**
Q. And did you have an understanding of why she felt like it was not wise or a good thing to do?
A. **I just think-- I took it as meaning what she's saying is supporting everything that I had heard through my co-workers.**
Q. Which was what?
A. **You get a target on the back if you mention the building, being sick related to the building, which is why I was afraid to ask for accommodations in the phone unit.**
Q. When your co-workers-- Well, first, who were these co-workers?
A. **Just to tell you their roles--**
Q. I'm asking for their names and their roles.
A. **Okay. Well, they're people who worked into the old building hat moved into the new one.**
Q. And the old building is?

**A. It was someplace downtown because the RO317 was newly built and people became-- started talking of being sick after being moved into the new building. And I have to get back to you on the names. I can see the faces. And two of them were Decision Review Officers. The other one was a VSR. And I can see all three of their faces, but I have to get back with you with the names.**
Q. And what did they tell you about what would happen if you requested an accommodation?
**A. Well, we never used the word accommodation. None of us knew this word, accommodation.**
Q. Okay.
**A. That while you're on a probationary period, it's very easy to get rid of you. If you become a problem, if you make noise, it's easy to get rid of you, that there had been-- and they gave me scenarios of people who have asked for help. And then all the sudden they started having a problem with their production, meeting their production numbers and things like that.**
Q. And what kind of requests for help did those other people make?
**A. Anything. They came with reports saying they were sick. There's something wrong. I'm sick now. They reported being sick in the building. They didn't say, I**





**want an accommodation for.**
Q. Uh-huh.
**A. It was bigger and more desperate than that. They didn't have the answers.**
Q. They being the. . .
**A. Sick people.**
Q. So what your co-workers whose names you can't remember told you--
**A. At this moment. I do-- I see their faces and I can get the names back to you.**
Q. Okay. So the co-workers, whose names you can't remember--
**A. At this moment.**
Q. If you let me ask my question, please.
**A. My apologies.**
Q. So your co-workers, whose names you do not presently remember, what they told you was that if you ask for help and suggested that the building was causing medical issues, the Agency would target you or retaliate against you by suggesting that performance issues were a problem for you?
**A. Almost correct.**
Q. Okay.
**A. They didn't say if you ask for help. They said if you mentioned it at all.**





Q. So they didn't specifically say that asking for help or an accommodation, even though no one used those words, would result in any kind of retaliation. It was if you mentioned the building causing medical issues, you would be retaliated against?
**A. (Nods head)**
Q. Okay.
**A. I would be opening myself up to retaliation.**
Q. Okay. And I think you said-- I think I heard you say uh-huh after my last question, but I just-- I want to make sure that was correct.
**A. Can you reask--**
Q. That was a long question. What your co-workers told you was that if you mentioned the building and being sick, you would be targeted by management?
**A. I could open myself up to being. They didn't confirm it. They said you're opening yourself up to being.**
Q. And did they tell you that others had been targeted by management?
**A. Yes.**
Q. Okay. And then when you spoke to Bettie Bookhart, she confirmed what those other co-workers had told you?





**A. My interpretation of what she said confirmed what I had been told.**
Q. And after those conversations, you were nervous about asking for any help or informing anyone at the VA that you thought the building was causing health problems?
**A. No.**
Q. No?
**A. I was afraid of Human Resources finding out that I was having problems.**
Q. Why were you afraid of Human Resources specifically?
**A. Because by that time, I had firsthand knowledge of what they had done to two other employees who asked for help because they were sick of the building.**
Q. And when you say, what they had done--
**A. What Human Resources response was to-- or lack of response was to.**
Q. And what was the response or lack of response?
**A. They can't-- one of them was-- I believe this is in writing in the file. That new employees aren't eligible for reasonable accommodations-- relocation or reasonable accommodations. The second one was**

**non-response, no action.**
Q. And who were the individuals that you had gained this-- who were the individuals who--
A. **Jo Russell is the first one.**
Q. Okay.
A. **Barbara Zeh came after that. Her last name, Barbara, Z-E-H, is the last name. And I have to look back to see who the third one was.**
Q. Okay.
A. **This was all firsthand. These were people I'm talking to and dealing with.**
Q. And they raised their health issues with HR and HR did nothing for them basically?
A. **Through the Union. It was brought through the Union, and the Union to HR.**
Q. Okay.
A. **Correct. It did nothing.**
Q. And did the-- did HR do anything to retaliate against Ms. Russell or Ms. Zeh?
A. **Yes. They forced them to-- forced them to leave their jobs in that building. They had left the federal employment.**
Q. Ms. Russell and Ms. Zeh left their jobs?
A. **Yes.**
Q. Were they terminated?





A. **No.**
Q. Were they--
A. **They had doctors notes saying they cannot come in this building. The Agency said you have to be in this building. The doctor says you go in the building, you're going to die.**
Q. Okay.
A. **So is that a termination? Is that a forced out? I'm sure legally-- well, take that the way you want it.**
Q. So it sounds like Ms. Russell and Ms. Zeh either resigned or quit or left under their own accord?
**MR. SOLOMON:** Objection.
Q. **(By Mr. Sullivan)** You can answer.
A. **No.**
Q. So they weren't terminated, but they stopped working there?
A. **They were not terminated.**
Q. And they stopped working at the VA?
A. **Upon medical determination.**
Q. Okay. So other than-- Do you know whether they, they being Ms. Russell or Ms. Zeh, requested any sorts of accommodations be made?
A. **Both of them.**
Q. What did they request?





A. **Relocation to different buildings, relocation to different sites.**
Q. Okay. And the Agency denied those requests?
A. **Correct.**
Q. Did anyone from HR or the Agency say anything that led you to conclude that Ms. Russell and Ms. Zeh were being discriminated against because of disabilities?
A. **And retaliation both.**
Q. So my question is whether you're aware of anything that HR or anyone else at the Agency said that led you to conclude that Ms. Russell and Ms. Zeh were being discriminated against because of their disability?
A. **Oh, jeez. I don't think I understand that. Can you break that down again?**
Q. Yes. It sounds like what you're saying is Ms. Russell and Ms. Zeh were discriminated against?
A. **Yes.**
Q. Because of disabilities they may have had?
A. **Yes.**
Q. And what I'm asking is, are you aware of any statements made by HR or the Agency that led you to that conclusion?
A. **Just the written documents. I don't know what they said, but just the written documents.**
Q. Denying--





A. **Sean Koehler. The third one was Sean Koehler. Female, Sean Koehler.**
Q. So other than the documents denying Ms. Russell and Ms. Zeh's requests, you're not aware of any statements made by HR or the Agency that would have led you to believe that they were discriminated against?
A. **Nothing other than hearsay. I don't have first-- I've don't have first-- I've never spoken to HR about--**
**COURT REPORTER:** You've never spoken to? I'm sorry.
**THE WITNESS:** My apologies.
**COURT REPORTER:** That's okay.
A. **Let's try that one again.**
Q. You were saying-- I was asking whether you had heard anything that led you to your conclusion that Ms. Russell and Ms. Zeh were discriminated against. And you said nothing that isn't hearsay.
A. **I heard it directly from them. Sean Koehler, I was working with in the same-- okay. Sean Koehler and I were on the same team, in the same unit, and I was told by her-- not through HR, but by her directly. Jo Russell and I were all hired in the same team. We had lunch together. We had meals together. We had developed a friendship. That was all what I heard from-- what HR was**

**doing was through her and the documents.**
**Barbara Zeh had been my mentor and had become a friend. She was also a Super Senior. And I witnessed it, I watched it, and I read about it. She's someone else who's wearing a mask and carrying oxygen.**
Q. And when you say you witnessed it and you watched it, the it is just the Agency not taking the action that Ms. Zeh or Ms. Russell had requested?
A. **In part, yeah. That's part of it.**
Q. Okay. What else? And what's the other part?
A. **I watched them suffer.**
Q. Okay. But what I'm asking about is anything from the Agency's aside, from HR, anything that they did or said that led you to the conclusion that what they did was the result of discrimination?
A. **I don't know how else to answer that other than what these three employees said and copies of their HR Complaints and the letters from HR and the EEO Complaints and the Workmen's Comp. I don't know how else to answer that.**
Q. Okay. Now, we were talking before about a request you made related to speaking issues and not wanting to be put on the phone unit, right? Do you recall that?
A. **(Nods head)**





Q. Was that request-- and I think what you had testified to was that you did make an accommodation request?
A. **Make it clear, I don't remember using the word accommodation. I'm just going to be really clear on that.**
Q. Understood.
A. **I stated first to Tom Vernon, what am I going to do? I can't do this job. I can't speak. How am I going to answer the phone?**
Q. Okay. And did he understand that you were asking to be relieved of that duty?
A. **I didn't know that that-- I wasn't asking to be relieved of the duty. I didn't know if there was another way that we-- was there something else on the phone unit I could do other than be on the phone. Could I be a paper pusher? Could I lick envelopes? I didn't know what else could be done. I did not request to be relieved of that duty.**
Q. Okay. So--
A. **I didn't know what to do.**
Q. Okay. And what did the Agency ultimately do? Did they relieve you of that responsibility?
A. **What it did-- first, the next step when they wouldn't change it, I came back after holiday, I went to**





**the new coach, the new coach, the new coach, and said, I don't know what to do. I can't answer the phones. And his response, well, you've got to find a way to make your point somehow.**
Q. Who was that couch?
A. **It's in our list of-- I can't-- I can see his face. You have his name.**
Q. Okay.
A. **And I'm like, how am I going to make my points when I can't talk on the phone? He says, well, you're going to have to find a way to do it. Once again, I'm on probation. Don't make your points. You can be terminated.**
Q. At that point, had you suggested that the building was causing your health issues?
A. **No.**
Q. Okay.
A. **I had already figured it out. But did HR know I was saying that stuff? Absolutely not.**
Q. Did your coaches know you were saying that?
A. **Yeah. I had talked to Tom about it.**
Q. Okay. And ultimately the Agency relieved you of working on the phone unit, right?
A. **No.**
Q. They didn't?





A. **Oh. There was a group of us that got rotated out, a number of weeks in, you know. I was rotated out with them. I was never relieved of my responsibility to make my points and meet production and do a job that required that.**
Q. Was your rotation on the phone unit rescheduled?
A. **No.**
Q. It wasn't? So you don't recall being reassigned to Pre-Decision Team 1 as of February 1st, 2010?
A. **Yes.**
Q. Okay. And was that before the end of your rotation on the phone unit?
A. **When I was assigned to the phone unit, I don't know that there was an end date designated for my time on the phone unit.**
Q. Let me hand you what's been marked as Exhibit 4. (Tendering)
**(Defendant's Exhibit No. 4 was marked for identification)**
A. **(Perusing)**
Q. Which is a one-page document bearing the Bates No. VA 011684.
A. **Uh-huh.**

Q. And this is a memorandum from Human Resources Manager dated January 26, 2010, correct?
**A. Yes.**
Q. And it's addressed to you?
**A. Uh-huh.**
Q. And it mentions in the first paragraph that you provided documentation indicating you had a temporary medical condition that impaired your ability to speak?
**A. That's what this documents says.**
Q. Okay. And is that--
**A. It's false.**
Q. That's false?
**A. Completely.**
Q. Okay. Tell me why that's false?
**A. There's no such document that ever said that I had a temporary medical condition.**
Q. Was there a document that said you needed to be on voice rest for a certain period of time?
**A. That's an incomplete statement.**
Q. How so?
**A. Nothing said it was going to be-- resolve. It was-- said voice rest till I was seen and evaluated again. This is patently false.**
Q. Okay.
**A. There is nothing anywhere in the medical**





**records HR had. There was a continuum of medical documents from doctors.**
Q. Okay. And in Paragraph 2 it says, in recognition of your current medical limitations, The Veterans Service Center will reschedule your rotation in the phone unit to a later date. That's what it says?
**A. Yeah. That's what she wrote.**
Q. And is that what was done?
**A. I was no longer a VSR, so I would not be put in a VSR position in a phone unit. I was promoted beyond that.**
Q. You were promoted by January 26, 2010?
**A. No. When they said I'd be-- I would be-- wait a minute. Can you ask your question again?**
Q. Yeah. I was just asking if your rotation on the phone unit was rescheduled to a later date?
**A. It couldn't be because I was no longer a VSR.**
Q. I don't understand.
**A. Okay.**
Q. You asked for an accommodation?
**A. No.**
Q. So that you didn't have to be put on the phone unit?
**A. No. This is the second time I'm saying this. I never said I didn't want to be put on the phone unit,**





**ever. I said I couldn't do the job.**
Q. Okay. Exhibit 1, Page 17, the very last paragraph.
**A. Yeah.**
Q. On January 18th, 2010 Plaintiff again made an RA request. What's your understanding of what R-A stands for?
**A. You mean, just what is it the acronym for it or what is the--**
Q. Yeah. What is this an acronym for.
**A. Reasonable accommodation.**
Q. Okay. On January 18th, 2010 Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation. Did I read that right so far? And then skip down a couple lines.
**A. You asked me if you read that--**
Q. She needs to be on voice rest--
**A. You asked me if you read that-- you asked me if you-- you didn't wait for an answer on that.**
Q. Did I read that correct?
**A. I think that was a rhetorical question and unnecessary, but yes, you did read that correctly.**
Q. Okay. And then a couple sentences down, She needs to be a voice rest, no telephone work/conversation work.





**A. Yeah.**
Q. Okay. So did you make an accommodation request not to be on the phone unit?
**A. No.**
Q. What did you request?
**A. I'm going to-- Okay. This is-- we're going to come up three times.**
Q. Okay.
**A. I never asked not to be put on the phone unit.**
Q. Okay. What did you ask for?
**A. To be clear on it.**
Q. Did you ask for anything?
**A. I never used the word reasonable accommodation.**
Q. I'm not asking if you used the word reasonable accommodation. I'm asking if you asked for anything related to the phone unit?
**A. No.**
Q. Okay.
**A. I informed them of what I was incapable of doing. I didn't ask. I informed.**
Q. And it was never your intent to request a reasonable accommodation at that time, right?
**A. I didn't know what the word meant at that**

**period in time.**
Q. But it was never your intent to request an accommodation related to the phone unit?
**MR. SOLOMON:** Objection.
**A. I'm going to say it again. You're using accommodation, which is a word I didn't know.**
Q. So take a look at Exhibit 4--
**MR. SOLOMON:** Can we take a break for just a minute off the record here?
**MR. SULLIVAN:** I'd like to finish with this document before we take a break.
**MR. SOLOMON:** Okay.
Q. **(By Mr. Sullivan)** So if you take a look at Exhibit 4, the memorandum.
**MR. MAHARAJ:** (Indicating)
Q. **(By Mr. Sullivan)** Which your attorney is pointing to.
**MR. SULLIVAN:** Thank you, Dan.
Q. **(By Mr. Sullivan)** At the very bottom you see some handwriting?
**A. Yeah.**
Q. Is that your handwriting?
**A. Yes, it is.**
Q. Okay. Please note that when I submitted medical document it was not intention to request





accommodations. That's what you wrote?
**A. Yes.**
Q. Okay. So my question is, did you intend to request an accommodation related to your time on the phone unit?
**A. I didn't know what the word reasonable accommodation was. In the subject of this note is what I wrote this answer to. Okay? This is what this was, was this. (Indicating) In that note from the doctor, it didn't say accommodation. None of us knew what this word was.**
Q. Okay.
**A. When I wrote this word, it was to inform them, okay? What I didn't know about RAs, accommodation, let's also say reasonable accommodation, in this document, I didn't have knowledge of this. I gave them information. Did I know that if they had me stuff envelopes that was legally an accommodation? I didn't know that that would have-- there was no other position. I didn't know the laws. I didn't know any of that. When I gave that information, did I think maybe it could lead to a conversation of what other things can be done? Did I know that was an accommodation? No. Did I think there could be a conversation so that I could work? Yes.**
Q. Okay.





**A. I never asked to get off the phone unit.**
Q. Okay. And notwithstanding the fact that you never asked to get off the phone unit, the Agency rescheduled your time on the phone unit, right?
**A. They delayed, delayed reassigning me from the phone unit. They delayed it. They had knowledge and they delayed. Someone who couldn't speak and they knew it was a requirement of the job that I speak, which I didn't know there was nothing else, they knew it.**
**COURT REPORTER:** You didn't know it was-- I'm sorry?
**A. The ability to speak, that they there would nothing else I could do other than speak. They were aware of that.**
**MR. SOLOMON:** Mrs. Mullen, when she asks you a question, it's to restate exactly what you said because she's misunderstood what you said, not for clarification on your answer.
**THE WITNESS:** My apologies.
**MR. SOLOMON:** And now that I've answered, forgot exactly what the--
**THE WITNESS:** It's just that-- that's fine. With the masks, you know, we don't get to see your mouth. So when she's speaking sometimes and she cuts herself off or it trails





off, that's kind of just what it was. But I got it when she replied. I know what she said now.
**MR. SOLOMON:** Yeah. If obviously, for a future reference, if he asks you a further question, it's for clarification on your answer. If she asks you, it's to repeat verbatim what you said because she didn't understand it.
**THE WITNESS:** Okay. I can try to bring a shield going forward so you can see my lips.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** Okay. So I think we can move on from this exhibit in just one second, but I want to make sure we've agreed on the facts of how it resolved, which is that you were on the phone unit for some period of time, correct?
**A. Yes.**
Q. And you informed maybe before or at least during your time on the phone unit, you informed your coach that you had medical issues that made it difficult for you to speak and you provided medical documentation; is that correct?
**A. It's incomplete, but correct.**
Q. Okay.

Page 85

**A. It's incomplete.**
Q. And then subsequently, the Agency took you off the phone unit, correct?
**A. After a long delay. They delayed. They knew it. My supervisors knew I couldn't communicate on the phone. Everyone witnessed it, everyone was aware of it and they delayed and delayed and delayed.**
Q. How long was that delay?
**A. I guess from the first notice in December until February 1st.**
Q. Well, this memo is dated-- okay. Effective February 1st is what you're referring to?
**A. Yes.**
Q. Okay.
**A. And this is dated January 26th and they had notice of this back in December. So from December to February 1st they delayed it and they delayed it and they delayed it.**
Q. And they is?
**A. The person who signed this document, which is Bonnie Wax.**
Q. Okay. And do you have any reason to believe that Mrs. Wax's decision that's memorialized in Exhibit 4 or the delay that you've referenced associated with her making that decision was based on an intent to



Page 86

discriminate against you?
**A. Yes.**
Q. Because of your disability?
**A. Absolutely.**
Q. Why do you say that?
**A. I had a disability. She had the control over whether to accommodate it and allow me to support me to do my job. She made the choice that could interfere with my ability to do my job.**
Q. Did she say anything to you that made you believe she was discriminating against you because of your disability when she delayed the issuance of Exhibit 4?
**A. Okay. I'm going to say this a second time. I'm sure we'll say a number of times. I have never had a conversation with Bonnie Wax. I've never had an email exchanged with her. I've received her emails. I've never exchanged.**
Q. Okay.
**A. I've never instant messaged this woman.**
Q. Did you become aware of any statements that she had made, even if it wasn't directly, that led you to believe that her decision memorialized in Exhibit 4 was somehow based on her intent to discriminate against you based on your disability?



Page 87

**A. Yes. Going back all the way back to the previous things we had said about the other conversations with Barbara Zeh, Sean Koehler, Jo Russell. The fact that my coach couldn't find a way to get me to go here, go here. Yes, those are all the things that supported my belief that I would be and I was being discriminated against based on my health.**
Q. Okay. And is there anything that you heard from Mrs. Wax or through someone else from Mrs. Wax that suggested to you that her decision memorialized in Exhibit 4 was somehow based on an intent to retaliate against you?
**A. No. Not at that point, no.**
Q. Okay.
**MR. SULLIVAN:** Yeah. We can take that break now, James, if you still--
**MR. SOLOMON:** Yeah. And I think we should take a like a five-minute comfort break. And before that-- And are we off the record?
**COURT REPORTER:** Not yet.
**MR. SOLOMON:** Okay.
**COURT REPORTER:** Tell me when you want to be off the record.
**MR. SOLOMON:** Okay. Off the record, please.



Page 88

**COURT REPORTER:** Are we off the record?
**MR. SULLIVAN:** That's fine.
**COURT REPORTER:** Okay. Thanks. Go ahead.
**(Off the record at 11:27 a.m.)**
**(On the record at 11:46 a.m.)**
**MR. SULLIVAN:** Okay. Back on the record.
Q. **(By Mr. Sullivan)** Ms. Mullin, I want to draw you back to Exhibit 1, if I could.
**A. Uh-huh.**
Q. And now I'm looking at Page 18.
**A. (Perusing)**
Q. And at the top it mentions July 7, 2010. And it says, Plaintiff reported to her first and second level supervisors that her respiratory health problems only occurred when she was at work, and that she suspected it was either the building or was reacting-- or she was reacting to the Veterans' claims files as they are archival. She requested an RA to be assigned to the part of the building that was the recently renovated or that she be allowed to work in the Orlando Outbased Office. Who did you-- who were the first and second level supervisors you made that report and request to?
**A. Supervisor was Dale Eckholm (phonetic), Assistant Coach. I can see her face. The Assistant**

**Coach-- and she's actually the one who responded in an email. I can't get her name right now.**
Q. Is it Veronica Collins maybe?
A. **Yes. No, no. It wasn't Veronica Collins.**
Q. No.
A. **(No response)**
Q. Okay. Well, so how did you make this request? Was it verbally?
A. **Yeah. I sat down with them. I sat down with them and talked about-- shared with them what I had learned about when I was out of the building and things like that and just throwing out ideas as far as different things we could try. It was a conversation about different things that we could try, experiment with.**
Q. Okay. And how did they respond to that request?
A. **They were going to bring it up. They would bring it higher. And they brought it to-- I just mentioned her name to you as one of the ABSMs.**
Q. Christine Moorby?
A. **No.**
Q. No?
A. **It was earlier than that. Can you read those back to me? Collette Burgess.**
Q. Collette Burgess? And so Mr. Eckholm and the





second person who's not Veronica Collins brought it to Collette Burgess?
A. **I assume so because Collette came to.**
Q. Okay. And what did Collette say?
A. **Well, I shared again my thoughts and suggestions and on, you know, things that we could try through process of elimination.**
Q. Uh-huh.
A. **She was great. She was receptive. You know, we'll get back to you on it.**
Q. Okay. And did they?
A. **No. I was-- I never heard back on any of the RA requests. I was told I had to file for Workmen's Comp.**
Q. Who told you that?
A. **It was in an email from-- we have this email on record. It was an email from the Assistant Coach.**
Q. And it told you that you had to apply for Workmen's Comp.?
A. **Yes. And they attached the Workmen's Comp. application on it. And there was no conversation after that.**
Q. Okay.
A. **I didn't know if I needed Workmen's Comp. I didn't know what Workmen's Comp. had to do with it. We**





**were just still trying to explore, figure it out.**
Q. Okay. And so are you saying that this request and the lack of response was a denied reasonable accommodation request?
A. **Yes. As time went on, I understood the process that was what that was.**
Q. Okay. And are you saying that this July 7th, 2010, or around then, incident is also disability discrimination?
A. **Yes.**
Q. And why do you say that?
A. **Because I needed an accommodation due to my disability in order to be able to do my job and not to suffer.**
Q. Okay.
A. **And I wasn't even allowed a conversation over it. I also think this is-- this is the beginning of the retaliation for making complaints about the building.**
Q. Before we move to the retaliation.
A. **Sorry.**
Q. Is there anything other than the denial of your request and the Agency's decision not to accommodate you that makes you believe that it was an instance of disability discrimination?
A. **I'm not-- I don't understand the question.**





**Try it again.**
Q. I mean, there were presumably any number of reasons that the Agency could deny a request like this, right? We don't have space. There's nothing else we can do. And some of them could be legitimate.
A. **Uh-huh.**
Q. There are also reasons that are not permissible like we are rejecting this request because of your disability.
A. **Uh-huh.**
Q. And so what I'm asking is, what makes you believe that this request was rejected because of your disability?
A. **Okay. I want to answer this. I knew why it was because the disability I was talking about was being caused by their building.**
**COURT REPORTER:** I'm sorry. Could you say that again?
A. **I was claiming that it was their building that causing a disability.**
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** Uh-huh. Are you saying that the disability that you had-- that you were claiming to have had is the reason that they denied this request?
A. **I don't know. I don't know. I don't think**

in total. That's not the sole reason.
Q. It's not the sole reason--
A. I don't know that it is the sole reason. I don't know that that's the sole reason.
Q. But do you believe that it is part of the reason--
A. Yes--
Q. --that they denied the request?
A. Yes.
Q. And what you believe is that they denied the request in part because of your disability?
A. Yes.
Q. But you don't believe that it is solely because of your disability?
A. Oh, no. It had to do with the disability.
Q. You don't believe it is solely because of your disability? There are other reasons that they denied the request?
A. Oh, jeez. I'm not really quite understanding what you're asking me.
Q. Why do you think they denied the request for an accommodation?
A. In gross terms is that I believe that people who were sick, they try to get rid of people who were sick, put them in a position they can't work. People who





were burdensome, nonproductive, the disability themselves, people that are disabled caused problems, whatever. I was a person with a disability.
And then on top of that, I was saying that this disability-- I didn't know for sure at that point-- but was most likely due to my time spent in the building. So it was-- I was disability (ad verbum), so it was a drain on the system as far as production and numbers and sick time used and stuff like that.
And then combined with the fact that I was a member of the Union. I was saying-- I was raising flags about the building.
Q. Okay.
A. Is that closer to what--
Q. I think so. So it sounds like you're giving me multiple reasons that this request was denied. One is the disability.
A. Uh-huh.
Q. Another is you were raising issues about the building causing your disability.
A. Uh-huh.
Q. And then you also mentioned the Union.
A. Yeah. I was part of the union.
Q. Okay. Now, as to the first reason, the disability?





A. Uh-huh.
Q. Other than the denial of your request, is there anything you can point to, something someone said, something that you heard, something that you saw written, that makes you believe that the Agency's decision was related to or was because of your disability?
A. Go back to the things that I had mentioned before, Barbara Zeh, Sean Koehler and Jo Russell.
Q. Okay. Anything specific to you?
A. What do you mean?
Q. Well, you're referencing--
A. Or can you give me an example?
Q. Yeah. You're referencing things that happened to other people.
A. With disabilities.
Q. And I'm asking is there a reason-- is there anything specific to you that makes you believe that this was because of your disability?
A. I think it was-- like I had like an asthma attack, a bad one, had to get out of the building and get to my specialist. And they said I had to stop and put my request in the computer system. That was cause for discipline.
Q. So you were disciplined for not requesting leave before you took it?





A. If I hadn't. I had to stop and not get my emergency care as quickly as I-- I couldn't leave the building, as soon as I said out to get out to the doctor, until I stopped and went back and put something in the computer system.
Q. Okay. And you had-- other than that, is there anything else that informs your belief-- And let me start that over. Other than what you told me about, Ms. Russell and Ms. Zeh, and other than not being able to leave before you put in your leave request, is there anything else that makes you believe that this July 7th, 2010 incident referenced in Exhibit 1 on Page 18 is related to your disability?
A. Yes.
Q. What?
A. The fact they wouldn't talk to me about it.
Q. Okay.
A. The fact this was met with silence. No one would talk to me.
Q. Okay. Anything else?
A. I have to think about it. But right now, that's all I have.
Q. Okay. And you mentioned that you also thought this decision was made because of you were raising red flags about the building making you sick,

correct?
A. **I believe that contributed, yes.**
Q. Okay. Why did you believe that?
A. **Based on the reasons I gave you with the previous answers. That--**
Q. Okay. Based on what had happened with Ms. Russell and Ms. Zeh?
A. **And the other people I'm going to get you the names to who described what happened when the people moved from the old building into the new building.**
Q. Okay.
A. **And the reports that had already-- there were (ad verbum) a building-related report that someone got their hands on that was being circulated that showed the mold contaminations and all the things that were going on that existed in the exact places we were working. So there was confirmation that they knew there was-- conditions existed as a result of extensive water intrusion. And they actually knew of the biological growth and things like that and air quality issues.**
Q. Okay.
A. **So they had that as fact. And then they-- so I knew that as a fact. It was in a report, which I believe-- I know you guys have too. And that refusing to talk, refusing to accommodate, refusing to help.**





Q. Okay. I want you to jump down two paragraphs, December 7th, 2011.
A. **Uh-huh.**
Q. It says, Plaintiff requested an RA by way of a change in work station and/or to have her compressed day off changed from Tuesday to Wednesday to the limit the consecutive days in the office to see if that helped with her conditions.
A. **Uh-huh.**
Q. Who did you make that request to?
A. **My supervisor.**
Q. Who was that?
A. **I made it from a different of number ones. I don't remember exactly who it was on December 2011. Oh. Mike Palmer and James. . . James. . .**
Q. Cartner?
A. **That one.**
**COURT REPORTER:** Jane or James?
**THE WITNESS:** James, James Cartner.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** And how did you make that request, via email, a conversation?
A. **I just asked him what do you think? Why don't we try this? And they said, okay. Try it. Here. Fill out this form. I filled out the form. And I said,**





**all right. Let's give this a try.**
Q. What form are you referring to?
A. **It's an official form for a change of schedule. I don't know the name of the form or the number of the form.**
Q. And was that request granted?
A. **Yes. That request did not involve Human Resources. It was done through the Veterans Service Center.**
Q. And that request was granted, correct?
A. **Yes.**
Q. Okay. And do you specifically remember what part of the request was granted? Did they change your compressed off day or did they move you to a different location?
A. **Changed the compressed workday.**
Q. Okay.
A. **But also in that same time frame, it was a big, huge open room and I was allowed to move my desk from-- like from where I'm sitting to where you are sitting.**
Q. Okay.
A. **Like a distance from an air vent. I was permitted to do that.**
Q. Okay. So around that time, associated with





this request?
A. **Yeah, with these conversations. With these conversations.**
Q. Okay. So what about January 6th, 2012? It says you notified Michael Palmer that you were having an asthmatic episode and that you had to take leave. And then it says, as Agency had still not accommodated her since making her requests in December 2011. Now, I thought you just told me that the accommodation was made?
A. **No.**
Q. So what accommodation is this paragraph in Exhibit 1 on Page 18 referring to where it says, as Agency still had not accommodated her since making her requests in December 2011?
A. **December of 2011, I informed my Coach and my Assistant Coach that since returning from Baltimore and training and being assigned to this room, I was getting sicker and sicker. That was my request or reasonable accommodation, whatever that was going to look like. So whatever it needed to be, so that I could breathe and speak.**
**One of the things-- that was in December. One of the things that we tried was moving the desk. One of the things that we tried was changing the compressed work schedule to see if one day in between without exposure**

**would relieve the symptoms enough so that I could work during those days.**
Q. Uh-huh. And did moving your desk or changing your compressed off day help?
A. **No. I shouldn't say that. Briefly moving away from the air vent for a short period, I did feel-- I did feel some relief. I did feel some relief getting away from that. It didn't last, but I did get a degree of relief. The day in between didn't change. I'd get in and I'd get sick.**
Q. Do you remember the Agency doing any work on the air conditioning system around that time?
A. **Always, yeah.**
Q. And did those changes help your symptoms at all?
A. **A bit. I thought they did, yeah. I thought they did a little bit.**
Q. The HVAC changes improved your symptoms some?
A. **Some. It was a little bit, yeah.**
Q. And did that have any impact on your production as a RVSR--
A. **Very briefly. Very briefly. It didn't last.**
Q. And what sort of impact was that?
A. **I could concentrate. I could stay in the room. I didn't have to take sick leave. I didn't have**





**to leave the building to get-- take my nebulizer in the car. Mostly it's I could think and I could be present, like physically present.**
Q. So in December of 27 (ad verbum), you requested some accommodations, maybe not explicitly, but you had conversations with Michael Palmer and James Cartner--
A. **Yeah.**
Q. --about accommodating you. And they did that by moving your desk and by changing your compressed off day and by doing some work on the HVAC system; is that right?
A. **Now, the first two. I don't know if the work on the HVAC was RA-related at all. I don't know if that wasn't just maintenance.**
Q. Okay. But the first two--
A. **Were my suggestions and they agreed to them.**
Q. Okay.
A. **This was not their suggestions. They were my suggestions and they agreed to them.**
Q. So back to Page 18 where it says, the Agency had still not accommodated her since making her requests, what requests are you referring to there that weren't accommodated?
A. **Any request that would be effective in**





**allowing me to do my job.**
Q. Did you tell Mr. Cartner or Mr. Palmer that the change to your compressed workday or the move of your desk were ineffective?
A. **Did I specifically say moving my desk from X to Y isn't effective? I don't remember saying that specifically. I don't think it needed to be said because I was still sitting there using a nebulizer at my desk. I don't-- the necessity to say it.**
Q. You assumed they could see it?
A. **They were sitting as far away as you are, so yes.**
Q. Yes, you assumed they could see it?
A. **And they-- every time they spoke to me, which was everyday, they heard a voice even worse than this. So I can assume they heard me. I can assume when each time I took leave and they approved it, when I emailed and said, I've got to get out of here. I'm not (ad verbum) worse, and they signed the Authorization to Leave. When I said I had to go outside, I can't breathe, when I would say that, I can assume they knew I couldn't breath and the accommodation was not effective.**
Q. Okay. So you had previously had a conversation with them where you had some suggestions and you were kind of working with them to figure out what to





do?
A. **Ongoing, yeah.**
Q. Did you have any conversations subsequently about, hey, maybe these aren't working. Let's think of something else?
A. **No. Because they had never thought of anything. They had never offered up anything, anything. I kept-- Nothing. I continued going to them with ideas, including getting me out of that room, working from home, assigning me somewhere else, yes.**
Q. When did you come to them with those suggestions?
A. **I'll say this was-- I want to say it was the beginning-- it was before January 12th, 2012.**
Q. All right. I want to ask you about this bottom paragraph, January 8th, 2012.
A. **Yeah.**
Q. Where it says you made another RA request. And I'm sort of paraphrasing here.
A. **Yeah.**
Q. Of Mr. Palmer and Cartner via email. And you requested that your compressed off day be changed or to have your work station changed. And you suggested working from home is a possibility. And then there was some reference to a nebulizer. Was that requested

granted?
**A. Okay. So what this says, and it inaccurately states, is that on January 8th I made another request of my supervisors, Mike Palmer and James Cartner via email requesting that my compressed day be changed or to have my work station changed to another area outside the 2nd floor, east quadrant, which is the room I was assigned in. I also suggested the possibility of working from home and said I would bring in my nebulizer to work as a precaution in case I suffered another episode. Prior to that, I was taking my nebulizer out to the car, which I had witnesses who could tell you about that, including the police. I also requested a private place I could use the nebulizer because I had used it at the desk. And it was humiliating to be there amongst my peers using a nebulizer. But I couldn't make it out to the car anymore.**
**Q.** Okay. And was that request granted?
**A. No. I asked him to help me find someplace else I can safely do that somewhere else.**
**Q.** And--
**A. I was denied that. I asked for a work station outside the second quadrant. I was denied that.**
**Q.** Now, your work station was moved in January of 2012, right?





**A. My work station is moved, like I said, like from where I'm sitting to where you're sitting, whatever number of feet that is. Yeah. You can maybe just say three yards or something.**
**Q.** Okay. What is VBIT1?
**A. VBIT1, that's just the name of the-- a team. That's how they started naming teams.**
**Q.** Okay. And did you get transferred to VBIT1 in January of 2012?
**A. I was assigned to the team, but not moved to that team.**
**Q.** Okay. So when you were assigned to VBIT1, did you change your work station?
**A. No.**
**Q.** Okay. So with regard to this January 8, 2012 request.
**A. Uh-huh.**
**Q.** Were you subsequently-- was your work station subsequently changed?
**A. Yeah. After they had to take me out by ambulance.**
**Q.** Which was on January 12th?
**A. Yeah.**
**Q.** So five days later-- five days after you made the request--





**A. No. No.**
**Q.** --your work station was changed?
**A. No.**
**Q.** That's not true?
**A. No. It's just inaccurate.**
**Q.** Okay. How is it inaccurate?
**A. This was not the first time I had talked to them about this. This is the first time I put it in a writing formal format. This is a conversation that has been going on since December.**
**Q.** I'm asking about this request you made in January of 2012. January 8th via email you made a request to have your work station changed, is that correct, among other things?
**A. One of many times. This is one of many times. I did ask on January 8th. Again, I asked.**
**Q.** Okay. And then by January 13th, your work station had been moved?
**A. After a two-month delay, multiple experiences with the police, a hospital emergency treatment out, they allowed me to leave the room. Yes, they reassigned me to another place after two months, multiple sick leaves, multiple requests, multiples attempts, completely not engaging in any interactive process, yes. They allowed me to leave that room.**





**Q.** That wasn't quite the question. The question was the timing of that allowing you to-- or transferring you to a different work station. So it's correct that you were transferred to a different work station as of January 13th, 2012?
**A. After two months, yes. After two months of asking, yes.**
**Q.** Okay. I'm going to hand you what's been marked as Exhibit 5. (Tendering)
**(Defendant's Exhibit No. 5 was marked for identification)**
**A. (Perusing)**
**MR. SULLIVAN:** That's a 5. Pardon my chicken scratch.
**Q. (By Mr. Sullivan)** Can you turn to the second page of this document? It's at the top and the header is Page 154 of 173.
**A. (Perusing)**
**THE WITNESS:** Help me out here, please.
**MR. MAHARAJ:** (Indicating)
**THE WITNESS:** Thank you.
**Q. (By Mr. Sullivan)** We were talking about a December 7th request that you made to your supervisor. Is this email that request that we were just talking about?

**A. Can you ask me the question again?**
Q. If you look back at Exhibit 1?
**A. Yes.**
Q. And you see there's a reference to December 7th where you requested a change of work station and/or to have your compressed day off changed?
**A. Uh-huh.**
Q. Is this email the request that you're referring to?
**A. No.**
Q. It's not?
**A. This is just a per our conversation documentation documenting a conversation that I had.**
Q. I understand. So you had a conversation and then you followed up with this email?
**A. Yeah.**
Q. Okay. To memorialize that conversation?
**A. Yeah.**
Q. And then if you go back down to the bottom of Exhibit 1, which refers to January 8th?
**A. (Complies)**
Q. And you talk about an email request that you made, is that the one, two, three, fourth page of Exhibit 5?
**A. (Perusing)**





Q. The header is Page 156 of 173.
**MR. MAHARAJ:** (Indicating)
**A. This was actually sent twice. Yes. This is memorializing the efforts I had made and the best of my ability the communications and begging and pleading I had done with them.**
Q. Okay. I guess the question is, is the email you're referring to in your interrogatory different than the email that I've got in front of you in Exhibit 5?
**A. I have to say I'm starting to have a hard time focusing.**
Q. Okay.
**A. Can we take-- stop. Just for a brief-- I'm not going anywhere.**
Q. Can you just answer the question?
**A. I don't think I can. I'm not understanding it.**
**MR. SULLIVAN:** Okay. Let's go off the record.
**(Off the record at 12:18 p.m.)**
**(On the record at 12:19 p.m.)**
**MR. SULLIVAN:** Back on the record.
Q. **(By Mr. Sullivan)** So I think the question, Ms. Mullin-- and I'm sorry to have so much paper in front of you. But you've got Exhibit 1?





**A. Okay.**
Q. And on the bottom of that on Page 18 it makes a reference to January-- a January 8th, 2012 email to Michael Palmer and James Cartner. And all I'm asking is, if you look back now at the email that's apart of Exhibit 5, the header is Page 156 of 173, there's a January 8th, 2012 email to Michael Palmer and James Cartner. Is the email in Exhibit 5 the email you're referring to in your interrogatory response?
**A. I believe it is. I believe-- I believe it is the one.**
**Can I say something else about something?**
Q. Please.
**A. You had talked about you mentioned this--**
**THE WITNESS:** What number is this?
**MR. MAHARAJ:** (Indicating)
**A. The email, December 7, James Cartner, when I talked about the consecutive days at the end, P.S. For the record, the days I have had to leave before the end of my tour, due to the severity of my symptoms, were October 18 and November 29. And I don't know why I wrote that, but it had to have been significant to be in this email.**
Q. Okay. And staying in Exhibit 5, and I'm looking at the January 8th email still.





**A. Okay.**
Q. There are just of a couple of things I wanted to ask you about in the one, two, three, fourth paragraph that starts, as for our upcoming trainings, do you see that one?
**MR. MAHARAJ:** (Indicating)
**A. Yeah.**
Q. And in the third line there, it says, However, I am unable to work four days in a row in the current environment. Can you just explain that to me?
**A. I couldn't stay in the building four days in a row. I couldn't be exposed four days in a row.**
Q. And is that what you communicated to Mr. Palmer and Mr. Cartner in this email is that four days in a row was too much?
**A. Yes. I reiterated it here.**
Q. Okay. And if you look in that second paragraph that starts, I changed my schedule?
**A. (Complies)**
Q. Is that consistent with what we talked about earlier about your requests to change your compressed off day being granted?
**A. Yes, right.**
Q. It also notes that the plant engineer took steps and dealt with HVAC system issues?

A. **Yes.**
Q. And upon those changes, you noted improvement to your respiratory symptoms and marked increase in your production?
A. **Right.**
Q. And that is consistent with what we talked about before, right?
A. **Yes.**
Q. Now, can you flip to the last page of Exhibit 5, which is at the top-- I'll get a stapler next time we're on break. The top is Page 158 of 173 that I'm referring you to.
A. **Right.**
Q. And if you look at the bottom email here, on January 9th you send an email to Valorie Reilly and Keith Pryor.
A. **Yes.**
Q. You're just letting them know about this email that you had sent the night before? I'm sorry. It says, Good morning, Mike. Did you send that to Mike in the morning?
A. **No. I sent it on-- I sent it I think it was the night before, I think.**
Q. Okay. It looks like you sent it on January 8th at 9:58 p.m.?





A. **Yeah. Yeah.**
Q. Okay. And then the next morning you followed up with Valorie and Keith?
A. **Yeah.**
Q. Okay. And what I want to ask you is in the second paragraph you say, I assume there will be fallout and need to know how to proceed. Now, why did you assume there would be fallout?
A. **Can you read the complete sentence for me, the whole thing, both sentences?**
Q. I'm sorry?
A. **All right. I assume there will be a fallout and need to know how to proceed, especially if they deem it necessary for me to go the HR, Human Resources, route. As you both know, I don't think it's what will be appropriate since there are so many people having issues. So can you ask your question again?**
Q. Yeah. My question was just why did you assume there would be fallout?
A. **Everything I had already told you. Everything I had already reported about the problems with Human Resources and people needing accommodations.**
Q. And that problem is Human Resources not granting accommodations to people?
A. **Not just that. People falling by the**





**wayside, people-- by that time, one of my classmates had to return I think it was to Yugoslavia for a dying father. And they tried to say her paper work wasn't right and that she was AWOL. So by then, I had seen even more things coming out of Human Resources. And with time, I could list them.**
Q. Well, I mean, now is sort of the time to know the things that were informing your thinking.
A. **No. I can't think clearly now and I think I need to go home.**
Q. Okay.
A. **I have to go home.**
**MR. SULLIVAN:** Why don't we go off the record?
**(Off the record at 12:26 p.m.)**
**(On the record at 1:21 p.m.)**
**MR. SULLIVAN:** All right. Let's go back on the record.
Q. **(By Mr. Sullivan)** All right. Ms. Mullin, back on the record here this afternoon. I would like to direct you yet again to Exhibit 1.
**MR. MAHARAJ:** (Tendering)
Q. **(By Mr. Sullivan)** And we're going to be on Page 19.
**MR. SULLIVAN:** And Dan, you're probably





not going to need any of those, other than Exhibit 1, for a while.
**MR. MAHARAJ:** Uh-huh.
**MR. SULLIVAN:** Just don't lose them because Debbie's going to want them.
Q. **(By Mr. Sullivan)** Okay. So Ms. Mullin, we had been talking about conversations that you were having in December of 2011, January of 2012 with Messrs. Palmer and Cartner about things like your-- moving your compressed off day, changing your work station. And we were talking last about a January 8th email that you had sent to them.
Now, I understand after that email you had a meeting with Tammi Clarke from HR; is that right?
A. **Yes.**
Q. Can you tell me about that meeting?
A. **I wanted to correct something.**
Q. Okay.
A. **The conversation actually started at the end of October. That conversation started at the end of the October.**
Q. Oh. I see. Something that I had said just now?
A. **Yeah.**
Q. Okay. Understood.

**A. And then you said the thing-- you just asked me about the thing meeting with Tammi Clarke?**
Q. Yeah. There was a meeting you had with her on January 10th, 2012?
**A. Yes.**
Q. Tell me about that meeting.
**A. I haven't thought about that in a while. She seemed to be familiar with the situation I was in. From what she said, I assumed that Mike Palmer had forwarded my latest email. That was what I understood.**
Q. Okay. Let's start with who was at the meeting.
**A. Carol Allard, my Union representative.**
**COURT REPORTER:** Carol?
**THE WITNESS:** Allard, A-L-L-A-R-D.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** Okay. So Ms. Allard was there, Ms. Clarke.
**A. Ms. Clarke.**
Q. Yourself?
**A. That's it. The three of us.**
Q. Okay. Did you make any requests for accommodations during that meeting?
**A. I don't remember.**
Q. You don't remember?





**A. I don't-- I don't remember.**
Q. Okay. What do you remember about the meeting?
**A. I remember it being far more comfortable than I expected it to be. I remember being told that I was going to be allowed to go be with my team.**
Q. Where was your team?
**A. On the 3rd floor. I don't know the wing. But I would actually be able to be assigned to the 3rd floor.**
Q. And what floor had you been working on?
**A. The 2nd floor.**
Q. Okay. And did Ms. Clarke tell you when you would be allowed to go work with your team on the 3rd floor?
**A. Whether she said it specifically, I remember Carol's follow-up email she did. It was supposed to be the next time I returned to work that it would already be in place, that I could-- that everything would be done and dusted.**
Q. And so you remember Carol saying that in a follow-up email?
**A. No. I just-- my memories from a conversation aren't as clear as I remember reading. Carol did a follow-up email right away, you know, one of those**





**per-our-conversation ones. I remember when I came back on the 12th that I was surprised and scared that nothing had been done and that I had to go back into that room.**
Q. Okay. So I just want to make sure I understand what you said.
**A. Okay.**
Q. You don't have a specific recollection of requesting an accommodation during that January 10th, 2012 meeting?
**A. No. I don't.**
Q. Okay.
**A. My clearest memory of it was how comfortable and supported I felt during the conversation.**
Q. But you do remember that Carol sent a follow-up email afterward?
**A. Yes. Yes. And I remember reading it, thinking I was going to be safe and everything's okay. The word that were said, I don't know. The memory of the feeling was very clear.**
Q. And then you said when you got to work again, the next time you were at the office was January 12th?
**A. Yeah.**
Q. And then you felt surprised and scared?
**A. I was terrified.**
Q. Did you communicate with anyone on the 12th





about that?
**A. Yeah. I emailed Tammi Clarke right away. I told my-- and I told-- I remember going to the front of the room, but I don't remember who was sitting at the desk. I don't remember if it was Palmer or James Cartner that was sitting at the desk.**
Q. And did you talk to them?
**A. Yes. And said, I'm not supposed to be in the room. I'm supposed to be able to be out of the room. And they haven't started the PC data move, which is moving the-- uploading the information to another work station.**
Q. That process had not been started when you arrived on January 12th, 2012?
**A. Right. And they hadn't assigned me a desk in the new location, like my-- the Coach up there didn't know I was coming. Nothing had been put in place, nothing.**
Q. Okay. And what happened after that?
**A. By then the asthma always started very quickly. It started so quickly. It triggered very-- in the weeks that led up to it, it-- really, really quickly. And I wanted to get out of the room. And I had asked Palmer to help me find someplace I can go and use the nebulizer.**

I told Palmer, I said, I've got to get out of the room. I can't breathe. I've got to find someplace to use this. I exited the door. And I had heard about there being a mother's room, a nursing room, somewhere in the newly-renovated part of the building, which I had never been in, but I knew there was a private place in there.

And it was-- it was behind a secure door. There was Loan Guarantee (phonetic) in that area, people I don't normally deal with. So I had to use my swipe card to get into this other part. I ran into one of the-- I think she was-- she was like an Assistant Director of some sort. I can't remember her name at the moment. And she says, Can I help you? Can I help you? I said, I need to find the mother's room. I need to use my nebulizer.

So I went in there-- so I had already used the inhalers I had, the rescue inhalers I had. There were two medications that I could use in the nebulizer. I put the first one in, the Albuterol-based one. And I wasn't getting better and I wasn't getting better. And I remember knowing, knowing that I would die if the second one wouldn't work.

And so I reached out to my friend, Mary Shapiro. She came to me and I said, Mary, I have to use





this one, but I don't want to be alone. I don't want to be alone. And we left the nursing room, rounded the corner to the right and the right and someone ushered us into a conference room such as this one.

Q. Can I ask why you left the nursing room?

A. Mary Jo wanted to get me closer in case we needed to get an ambulance, like we didn't know how to identify where we were. It was a closed door. It was dark. You know what I mean? So it was only a matter of steps to-- because Mary Jo said, Is it time to call the ambulance? And I told her, Yes. We need to do that.

Q. Was that before or after you used the second medication?

A. Before.

Q. Can I just ask you one question to back up?

A. Yeah.

Q. And I don't mean to be insensitive when I ask this--

A. Yeah.

Q. So I don't want you to take it that way.

A. Okay.

Q. Other than your sort of desire to have privacy when you were using the nebulizer, was there any reason that you couldn't just use it at your desk on the 2nd floor?





A. Yeah. Because I knew that being in this room was killing me. I had to get out of that room.

Q. Okay.

A. And actually, I have to say, I had already been in touch with Tammi. Mary Jo wasn't the first person I contacted. I first reached out-- I can't remember if it was first or second. But I reached out to Tammi Clarke as well as Valorie Reilly, the Union president.

Q. And how did you reach out to them?

A. Val, I called, because I remember speaking with her and her telling me that she was busy on a conference call. And I remember I'm telling her, I'm dying. I can't breathe. I need help. I need help.

Q. Okay.

A. I can't help you. I'm on a conference call. Calling Tammi, and I don't remember the contents of that call, other than I told her and I told her where it was.

Q. You told her that you were having trouble breathing?

A. I said, I can't breathe. I can't breathe. I'm down in-- I was still in the mother's room. Because as Mary Jo and I left the mother's room rounding the corner, Tammi came in from the security door. And this is when I went into the conference room to use the last





of the medications.

Q. So you called Tammi from the mother's room?

A. Yeah.

Q. And then as you were exiting the mother's room, you saw her in the hallway on the way to the conference room that you went to?

A. Yeah.

Q. Okay. And you don't remember what you spoke to Tammi about on the phone other than just telling her what was going on?

A. I told her-- I told her, I can't breathe. I think I'm dying. I can't breathe. I can't breathe.

Q. And do you have any recollection of what Ms. Clarke said in response?

A. Yeah. I'm going to talk to-- I don't know if she said my supervisor. I think it was the word supervisor she used.

Q. Okay. So she told you she was going to let her supervisors know?

A. Yeah.

Q. And then shortly after that call, you saw her in the hallway heading towards--

A. Yeah, somewhere. I know I was with Mary Jo when I saw her. And Mary Jo's goal and my goal was just me out of the building as fast as we can. That was the

goal was to get me-- so the security at the front desk, this man named Mario, had already helped me a number of times. He was familiar with my medical situation.

So we wanted-- because we didn't know-- I wanted to call 911. Mary Jo wanted to call 911. But we didn't know how to explain to emergency services where in the building I was. How could they access me behind closed doors? I had absolutely no idea to get-- how to get help. The day prior, the Agency had disbanded this team they had, they called it the EMER team, who always responded to emergencies in the building. And they would like usher ambulances and things like that. And that had been disbanded. There was no way of letting anybody know. I didn't know how to tell anybody where I was.

So we're on the 2nd floor. Mary Jo got me out of the elevator. And as soon as Mario said it, she goes, Do you need the ambulance? I said yes. And I think you got the transcript of that phone call. We just had to get me out of the building. We just had to get me out of the building. That's all I could think about. And that's what Mary Jo what was thinking was getting me out of the building.

Q. Okay. And do you remember when you went back to work after that incident, the next day that you went back to work?





A. It wasn't the next day.

Q. I'm sorry. I'm asking when was the next day that you went back to work.

A. Oh. I think it was the day after that. I had a day off.

Q. So if you look at Page 19 of Exhibit 1?

A. Yeah.

Q. There's a paragraph about January 10. And then there's a paragraph that starts January 23rd, 2012. Do you see that?

A. Second paragraph.

Q. Yes. It begins January 23. It says, January 23, 2012 was the next time Plaintiff entered the work building. Does that sound right to you or do you think you went back to work before that?

A. No. It was the first time I entered the work building and within two hours developed the sinus pain, bleeding and the asthma, all of that stuff. That was the first time that like all of everything happened.

Q. So is that to say that--

A. The thing is January-- this might be just a typo. This says January 13. I don't know what it is.

Q. Okay. Do you know the next time you went in the building after January 12th?

A. No. I'm not sure. Because I know I had a





day off and I think I had a compressed day off. And then I don't know if it was weekend. So the answer to that is I don't know.

Q. Okay. The next time you did return to the building, had your work station been moved?

A. Yes.

Q. Where had it been moved to?

A. Well, the next time I was in the building, I was actually brought to Sandy Smith's office by Carol Allard. And she didn't even know I was coming. This is HR told me to report to her and Sandy Smith wasn't expecting me. She had no idea what I was-- she didn't-- it's not like she didn't know I was there. No one told her to expect me. HR didn't tell her to expect me.

Q. Okay.

A. And she assigned me to-- there was a seat for me on VBIT1. And she herself and Assistant Service Center Manager Larry Brown walked me to the new desk on the 3rd floor.

Q. Okay. So the first time you returned to the building after the January 12th incident, you met with Sandy Smith and you were given a new work station on the 3rd floor in VBIT1?

A. Yes.

Q. Okay. Now, I think I understand that you're





generally alleging that that move to VBIT1 took longer than it was supposed to, correct?

A. Well, yeah. I was assigned to them in January, so yeah. Yes. It was-- I mean, no. It was I think October I was assigned to them?

Q. Let me ask the question better.

A. Okay.

Q. Because I used to think VBIT1 was a physical location and now I know that's not true.

A. Yeah. VBIT1 is a team that was assigned to a specific location. Sorry.

Q. You had been assigned to the 2nd floor even though you were a part of VBIT1?

A. Correct.

Q. And then the-- then you were transferred to a seat on the 3rd floor with the rest of VBIT1's team members?

A. Yes.

Q. Okay. And I understand that on January 10th, at the very least you have a recollection of Carol Allard sent you an email saying you were getting moved?

A. Yes.

Q. And is your allegation that the move that was apparently agreed to on January 10th and completed shortly after January 12th I think? Are you saying that

it took too long for the Agency to do that?
A. **No. That's not what I'm saying at all, no.**
Q. Okay.
A. **I'm saying that what took too long was for the Agency to accommodate from the first time I-- from the first time when I said, please let's look at leaving this building or putting me in another part of the building. So it was a continuum. It wasn't this two days. I mean, you could say it was from the very beginning when I said, can you assign me somewhere else? And then it's just getting worse and worse and worse. And when I get back from Baltimore, and in that room, it was so extreme.**
**So the accommodation request started. It was never satisfied. It was repeated when I got back from Baltimore. So no, it wasn't on January 12th. That was request wasn't January 12th. That may have been when HR addressed it, but that had nothing to do with my request. That's when they addressed it.**
Q. When did you make the request?
A. **I made the request to-- the conversation when I asked-- the initial one was when I asked and spoke with Burgess, Collette Burgess, and I was given the Workers' Compensation form. So that was the request.**
Q. And what specifically was the request that





you made to Collette Burgess?
A. **To assign me to a different building, a different location, even Orlando. I told her that my parents would even give me their time-share out there and I could live out there during the week. Or assign me to a part of the building that was newly renovated. Relocate me or reassign me somewhere.**
Q. Okay. Do you remember earlier we talked about meeting with the D. Gregory Harris, the EEO counselor?
A. **Yeah.**
Q. Did you tell him about the request you made to Collette Burgess?
A. **Can we refer back to a document?**
Q. Yeah. What document do you want to look at?
**THE WITNESS:** That one right there on the top. (Indicating) No. That one. No.
Q. **(By Mr. Sullivan)** Here. Hold on. I've got the stamped exhibits. I've got the Investigative Report. I've got the report from the counselor.
A. **That one.**
Q. (Tendering)
A. **Okay. And if you open that and if you'd look--**
Q. And just for the record, that's Exhibit 3.





And you want us to look at what?
A. **If you could look at Page 2 and what my claims were. We weren't talking about anything to do with the building at this point.**
Q. Okay.
A. **All of my-- D. Gregory-- I came in and I just talked to him about Bonnie Wax discussing my breast cancer with someone who didn't have the authority, and Bonnie Wax saying that asthma was caused by breast cancer. And about Bonnie Wax not giving the Union my medical records in totality. I wasn't bringing up any of this at this point. I didn't want to bring up any of this at this point.**
Q. Okay. I'm going to hand you what's been marked as Exhibit 6. (Tendering)
**(Defendant's Exhibit No. 6 was marked for identification)**
A. **(Perusing)**
Q. Which, for the record, is a one-page email, Bates stamped VA 0012. Do you recognize this document, Ms. Mullin?
A. **Yes, I do.**
Q. Can you tell me what it is?
A. **I guess from what I know now, this was me notifying God and country that my accommodations weren't**





**working and that my symptoms-- and giving me specific symptoms.**
Q. So this is an email that you sent to Larry Brown, Ulyssee McBurrough, James Cartner, Tammi Clarke, Carol Allard and Valorie Reilly?
A. **Yes.**
Q. Okay.
A. **Subject status of health.**
Q. Okay. And this is sent January 31st, 2012?
A. **Yeah.**
Q. And it says, Yesterday for the second time since the move to VBIT1, the severity of my symptoms reached a level that I had to leave work. (Symptoms include pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest.) Last week Tammi mentioned attempting to get an air purifier for my work station. I think it would be a prudent to do so without delay. Thank you for your support, Aileen. Note: Tammi, the Workmen's Comp. form is completed and is being sent for review. As soon as it's returned, I'll get it to you.
So had you-- prior to this email?
A. **Uh-huh.**
Q. Had you told anyone at the VA that your symptoms had caused you to leave work since you had been

moved to the 3rd floor?
A. **Yeah. Ulyssee McBurrough.**
Q. Okay. When did you tell him that?
A. **I don't know the dates. Without having a document to refer to, I don't know.**
Q. And do you know whether that was a conversation or an email?
A. **It would definitely be a conversation. I don't know if it was an email as well. Oh. But it also could be-- it could be in the ETA leave request, but I'm not sure. But there are three places where people--**
Q. Do you remember the content of that conversation that you had with Ulyssee McBurrough?
A. **The specific content, no.**
Q. Okay. Do you remember the general content?
A. **Yeah. I can't breathe.**
Q. Okay.
A. **I'm dying. Yeah, I can't breathe. I can't breathe.**
Q. Is that all?
A. **I can't speak.**
Q. Is there anything else that you generally remember about that conversation?
A. **No. Other than I have to get out of here. I have to get out of here.**





Q. In this email you specifically requested an air purifier for your work station; is that right?
A. **No. I'm reminding Tammi that she had mentioned it. I had never requested it. She had mentioned it.**
Q. Okay. But you did say you thought it would be a prudent-- I think it would a prudent to do so without delay.
A. **Yeah.**
Q. Meaning to get the air purifier?
A. **Yeah.**
Q. And you don't read that as a request for an air purifier?
A. **No. I just mentioned something from her that she suggested. I didn't. She suggested it. And not even that had been done yet. So it was polite me trying to say, get off the stick. So all of this was not a request. This was a reminder. As in the request to be moved from Room 222 on the 2nd floor, didn't happen, I saw this as another thing that just didn't happen. So I was trying to politely say-- remind them.**
Q. To give you an air purifier?
A. **No. That's something they suggested, not me. They said we're going to move you. We'll put in air purifier in the area.**





Q. Okay.
A. **That was part of the accommodation. They said-- I never requested it. They said it. They didn't do it. I reminded them they didn't do it. That was-- never ever did I request an air purifier.**
Q. Including in this email you're not requesting an air purifier?
A. **No. I'm just reminding them that they didn't do it. I'm trying to politely remind them you didn't do it.**
Q. Was the hope by reminding them that they would give you an air purifier?
A. **Yeah.**
Q. I'm sorry?
A. **Yes.**
Q. Yes.
A. **Yeah. And actually, now that I think about it, am I really sure about? I'm not really sure.**
Q. Okay.
A. **Because when I saw the cubicle and that it was open air, that there was no way-- I didn't see what kind of air purifier they could give me if I was sitting in that-- like at that point, I didn't know what kind of air purifier they could give me to work in an open air area. So my expectations were low. I was desperate.**





**I'd take anything. No.**
Q. And in this email you don't mention anything about moving your work station, right?
A. **Not at this point, no.**
Q. And in this email that you sent on January 31st, 2012, which again for the record is Exhibit 6 here, you didn't mention anything about working from home?
A. **Yes. I had already asked to work at home.**
Q. That was actually not the question, Ms. Mullin. In this email, Exhibit 6, that you sent on January 31st, 2012, did you mention anything about or request permission to work from home?
A. **The subject of this email is not about working from home.**
Q. Okay. Again, not responsive to the question directly. Have you read this email, Exhibit 6?
A. **Yes.**
Q. Anywhere in this email do you mention working from home?
A. **No. That's not the subject of this email.**
Q. I want to go back to the January 10th meeting with Tammi Clarke. You don't have to--
A. **Okay.**
Q. And then the issues that you suffered on January 12th, the breathing issues?

A. (Nods head)
Q. Do you have any reason to believe that the delay from the time you made that request to the date that it actually happened, which was some time after January 12th, do you have any reason to believe that that was motivated by an intent to discriminate against you for your disability?
A. Okay. I didn't make a request on the 10th. Palmer forwarded an email to them. Michael Palmer forwarded an email to them. I made a request from Palmer, to Palmer, a number of them over time. So on the 10th I went in looking for solutions. I didn't request anything in particular. I did not request a specific accommodation.
Q. And I understand that you came out of that meeting on the 10th expecting solutions were going to happen.
A. Yeah.
Q. And then they did not happen as quickly as you expected, right?
A. When I left the meeting on the 10th, the only expectation I had is that Human Resources would do what they said they would do. That was my only expectation. It's not that it didn't happen fast enough because fast enough would have been a year earlier. It has nothing to





do with fast enough.
Q. Did Human Resources ultimately do what you expected them to do?
A. No.
Q. No?
A. No.
Q. What did you expect them to do when you walked out of that meeting on January 10th?
A. I thought there would be continuing conversation and dialogue to see how I was. So no, they did not do what I expected them to do.
Q. And are you alleging that their actions related to that meeting and subsequent to the move to the 3rd floor were motivated by an intent to discriminate against you because of your disability?
A. I'll have to think about that. I don't know if that one goes into the-- more into the hostile work environment based on disability. Yeah. I did (ad verbum) claim the work was-- the illness was due to the building.
COURT REPORTER: I'm sorry. Say that again.
A. That it was related to my illnesses that it was claimed to be caused by the building. So legally I'm not sure how to break that down. From a lay position, I





guess I would say, yes, that's why it happened.
Q. Because of your disability?
A. Disability, yes.
Q. And why do you believe that?
A. Because if it was not discriminatory, there would have been a conversation. It would have been seen that it was effective. They would have conversed with my coaches, my immediate supervisors. They wouldn't be making unilateral discussions without asking me about effectiveness and things like that.
So I believe it was based on discrimination because I was not any part of any conversation or discussion as far as what's working, is it working, effectiveness. There was no two-way conversation. They made unilateral decisions. Human Resources made unilateral decisions.
Q. Besides that, is there any other reason you believe that Human Resources' actions related to that January 10th meeting were based on an intent to discriminate against you--
A. Yes.
Q. --because of your disability?
A. Yeah, yeah.
Q. Why?
A. Not acknowledging, validating, documenting





it, that they wanted me disability to go away.
Q. They wanted your disability to do--
A. To be not be of record. That I wasn't given the tools I needed to do my job. I wasn't given effective accommodations that were needed for me to do my job. And that happened because of my disabilities. My production was affected, the number of hours, the amount of sick leave I had to use. Am I not getting the law right here?
Q. I mean, you're not an attorney and I'm not necessarily asking you legal questions. I'm just asking you why you believe these actions were based on someone's intent to discriminate against you. Did anyone at HR ever say, we don't like people with disabilities?
A. Wow. I almost said something really politically incorrect. No. I haven't heard things like that since-- you know, until Trump came into office. I never-- I hadn't heard people put things like that in blatant statements for people to hear.
Q. Okay.
A. Prejudice, people owning prejudice verbally, no. The closest you could see that, you could see it in Bonnie Wax's deposition when she leans towards the gray area of saying insulting things about me and the disability and people who have disabilities and use

leave. But did anyone stand up and say, I don't like disabled people?

I can tell you I was sitting in an exam-- sitting, taking a certification exam, the guy in front of me, Doug Crosby, he sits down. We're all sitting. Bonnie Wax comes charging in the back door, takes his chair away. I'm sitting there, what do you mean? What are you doing? That's not an authorized accommodation. He's a disabled veteran.

He said, Bonnie, you issued this chair. I don't have record of it. You have record of it? No, I don't have record of it. Here's your choice. You either give me that chair back to take that exam or you take the chair-- if you want to take the exam, you have to do it in a different chair. I'm taking that chair away from you or you don't take the exam.

So did she say-- did she announce his prejudice against disabled people? Gulf War Veteran, a little tiny woman, Post Traumatic Stress Disorder, sexual abuse, she would ask Bonnie Wax-- she asked for an accommodation that her back be against the wall because male voices coming up against her-- behind her flipped her out. She was denied that accommodation. She had security called on this little Veteran, Gulf War Veteran, because she flipped out. Did Bonnie Wax say she doesn't





disabled people? Yeah, I guess you could say she did it all the time.

Q. You guess you could say that she discriminated against disabled people all the time? Is that what you're--

A. No. I'm going to take that. That was said out of emotion and I shouldn't have said that--

Q. Now I have to ask you about this. Do you know why Bonnie Wax took that gentleman's chair away?

A. No idea what would motivate a woman-- and he did produce the paper work afterwards and she was found wrong. Why would she take the chair away from a disabled person? I don't know what would motivate a person to do such a thing, other than a discriminatory act. That's a discriminatory-- it takes someone's wheelchair away is discrimination.

Q. It was a wheelchair?

A. No. It's a parallel. This man needed his chair to sit. He was in so much pain. Why would someone take a chair away from someone unless they're disabled (ad verbum)?

Q. And just so we're clear?

A. Yeah.

Q. Do you know Bonnie Wax did that?

A. Absolutely not. She never said to me, I'm





mean. I'm doing this because I don't like disabled people. Nope. Never heard her utter those words.

Q. Okay. And what the small Veteran that you said asked to be up against--

A. And her name (crosstalk)

COURT REPORTER: I'm sorry. I'm sorry. I'm sorry. You've just got to wait. I didn't get either of you.

Q. (By Mr. Sullivan) You need to wait for me to finish my question, Ms. Mullin.

A. Okay.

Q. With regard to her, do you know why Bonnie Wax denied that accommodation request?

A. No. Bonnie Wax did not say to me, I don't like disabled Veterans.

Q. Ms. Mullin?

A. Yeah.

Q. The question was, do you know why Bonnie Wax denied that particular accommodation request?

A. What do you mean by know? How would I know something?

Q. Do you know why Mrs. Wax denied that accommodation request?

A. I don't know if we know anything unless it's in black and white or someone states it to you clearly.





Q. Okay.

A. Okay? So I-- you're asking me a question I can't answer.

Q. Because you don't know, correct?

A. Give me a moment here. How do we know anything? Okay. We know things-- we can make educated assumptions. Can I make an educated assumption about this? Absolutely. Can I know it as if it was a spoken word to me? No. Can I say-- because it was documented? No. Can I make an educated assumption? Yes. According to my educated assumption, I would say I know that she is prejudiced against people with disabilities. Is that satisfactory to you?

Q. Your answer is your answer. Whether or not they're satisfactory to me is sort of irrelevant. And there was a third example that you identified and now it's escaped me.

A. Oh. A woman in my training class who had to travel overseas to take care of a father that was dying. And she did all the paper work. And she gets an email while she was overseas saying that she had been deemed AWOL, that her family medical leave had not been approved, and she literally had to come back because of fear of being terminated. But I can go on with many other stories.

Q. Okay. Who made that decision? Who determined she was AWOL?
A. **It was-- I don't know who made the final decision on that. I don't know if it was Michael Palmer and Human Resources. I don't know.**
Q. Okay. So you don't know who made the decision, but you do you know that it was motivated by a desire to discriminate against folks with a disability?
A. **I don't know if that one was based on disability.**
Q. Okay.
A. **That could-- just hostile work environment. Oh. But we do know about what happened to Barbara Zeh and the other three women I told you about.**
Q. You know that their requests weren't approved?
A. **Yeah.**
Q. But you don't know why they weren't approved?
A. **Oh. It's docu-- well, on some of them, it's documented because they say don't give reasonable accommodations to new hires--**
Q. Who said that?
A. **The email is actually from someone within Human Resources.**
Q. Do you know who?





A. **No, I don't know. I believe all those records are-- they're with your records. I don't know.**
Q. I'm going to give you what's been marked as Exhibit 7. (Tendering)
**(Defendant's Exhibit No. 7 was marked for identification)**
A. **(Perusing)**
Q. Which, for the record, is another one-page email Bates stamped VA 0013. Do you recognize this document?
A. **Yes.**
Q. This an email that you sent to Tammi Clarke and other on February 6th, 2012?
A. **Yes.**
Q. With the subject air purifier?
A. **Yes.**
Q. And you sent this February 6, 8:26 a.m., correct?
A. **Yes.**
Q. And you say, Good Morning All, Just for the record and at risk of sounding ungrateful, I don't think the air purifier is going to have the effect we hoped for. I read the specs and discovered that it's meant to be used in a small room, 10X10, and not designed for an open cubicle area comparable to a large open area. For





now, I have it running full force and my fingers are crossed. At the time you sent this email, had you determined from running the air purifier that it wasn't going to work?
A. **Had I made a determination? Yeah. I think politely that's what I was trying to tell them. I was trying to tell them that it's not working. This was me trying to politely let them know what they're doing-- what they called an accommodation wasn't effective for the place they assigned me to.**
Q. Okay.
A. **They didn't assign me to a 10X10 closed room. They assigned me to an open air room. So I was just kind of pussyfooting around because I'm afraid of these people.**
Q. Uh-huh.
A. **And trying to gently let them know it's not working. Once again, of my fear of them.**
Q. Okay. So you don't say, this air purifier is not working, right?
A. **Oh, no. I didn't find it to say that specific sentence. I think that would have been insulting.**
Q. And what you think-- what you said was, I don't think the air purifier is going to have the effect





we hoped for, right?
A. **Uh-huh.**
Q. And you told them that you were running it full force and your fingers are crossed?
A. **Uh-huh.**
Q. I need verbal yes or nos, please.
A. **Yes.**
Q. Did you follow-up with anyone on this email afterwards--
A. **Yes.**
Q. --to let them know that the air purifier was or wasn't working?
A. **Yes.**
Q. Who did you tell?
A. **Ulyssee McBurrough and AVSO Larry Brown.**
Q. When did you tell them that?
A. **I don't know the dates. If you give them to me under review, I can tell you. But I supplied you with-- the attorney to send you those documents.**
Q. And you don't say anything about reassignment or transfer in this email, correct?
A. **Correct. That was not the subject of this email.**
Q. And nor do you say anything about working from home?

**A. No. That wasn't the subject of this email. I also-- please note I didn't mention reassignment in this one either as with the last one. I didn't mention reassignment. I didn't mention working from home in this email.**
Q. Okay. Is there anything else you want to note about that email?
**A. I don't think so. Let me think about it. This was given to Human Resources as well as the VSC and the Union. So Human Resources as well as my chain of command.**
Q. And you didn't ask for any sort of accommodation in that email, correct?
**A. I believe I did. I was hoping to. I was hoping to communicate that, yes.**
Q. What were you hoping to communicate?
**A. That I would like an effective-- I wanted to find an effective-- I needed something that was effective.**
Q. Do you recall taking a certification exam in March of 2012?
**A. I don't-- March of 2012? I didn't take it I don't think.**
Q. Okay. Do you recall asking for an accommodation so you could take a certification exam?





**A. The first thing comes to mind is I couldn't believe they didn't already give it to me, that they would send me back into the same part of the building. That was my biggest thing is, oh, my God. They're going to send me right back again.**
Q. Okay. So did you ask to take the certification exam somewhere else?
**A. Yes. Yeah. Yeah.**
Q. And when did you make that request?
**A. I don't know.**
Q. Okay. And did the Agency provide for you to take the exam in a location that was appropriate?
**A. Again, not timely. They did not because they didn't afford me the opportunity that everyone else who takes the exam has, which is to set up their computers, set up their rating schedules and set everything up. So no, they didn't. They didn't.**
Q. Did the Agency give you a spot on the 3rd floor to take the exam?
**A. But that wasn't an accommodation. They gave me a room. They didn't give me an accommodation to take a test. They gave me a space. They didn't give me an accommodation to take the certification exam.**
Q. Did you ask for that specific accommodation or did you ask for a specific location to take the test?





**A. The assumption would be they are the one who does the setup. They would know. They're the ones responsible for the setup. They knew what was needed as an accommodation. I did not tell them how to do their job.**
Q. Okay.
**A. That was not for me to do.**
Q. The Agency provided you a room to take-- a room just for you to take the certification test and you chose not to, right?
**A. No.**
Q. Okay. I'm handing you what's been marked as Exhibit 8. (Tendering)
**(Defendant's Exhibit No. 8 was marked for identification)**
**A. (Perusing)**
Q. Which, for the record, is Bates stamped VA 0021.
**A. Oh. Let me clarify what I just said. No. You had actually made two statements and I was only saying no to one of those statements.**
Q. Okay. Which one were you saying no to?
**A. Can you repeat the question?**
Q. Okay. Do you recognize this document, Exhibit 8?





**A. (Perusing) I don't think this is the whole document, but I do recognize this. I just don't know that it was the whole document.**
Q. Do you think there's more to this email that you sent to Tammi Clarke--
**A. Something in my head is telling me that there's something else, but I do remember this. But no, I think there's more to this.**
Q. More meaning more--
**A. There was more dialogue.**
Q. Subsequently?
**A. Yeah. There was more to this.**
Q. Okay. So in this email that you sent on March 12th, 2012 at 7:21 a.m. in the second paragraph here you say, I'm concerned about being in Room 215 for Wednesday's certification exam. I know it's a stretch, but can I take the test in another part of the building, Human Resources, the Director's office or front office Just throwing it out there. Do you see that?
**A. Oh, yeah.**
Q. Okay. So you would agree with me then that you specifically requested to take the certification exam in a different part of the building?
**A. Yes. I wanted to take the exam and I wanted the accommodations to take the exam. I didn't ask to**

**just be-- I wanted to take the exam in another room. I didn't want my body to be just put in another room. I wanted the tools to take the exam. I didn't want just be somewhere else.**

Q. Were you provided a computer to take the exam? What tools were you missing that you asked for?

**A. The computer the day ahead of time needed to be set up with the-- all the applications that everybody uses, which is access to the-- you know, pre-records and all these different applications we need to take the test. All of that is on done the day prior to the exam.**

Q. Okay.

**A. So no, I was-- I didn't ever ask-- when I asked help to be able to take my exam, I never asked for just any computer in any of these particular rooms, no. I asked-- No. No.**

**And to go on with this one, I also reported that just the prior Thursday I had gone into an Assistant Veterans Center Service office to use my nebulizer. And in the last five days, Wednesday I had an asthma attack. I had to be escorted by the police in a different rooms. And Thursday, another attack while in VBIT1. Friday, I was in-- had complete bed rest, chest pains, to a lesser degree breathing. Saturday, partial bedrest, pain gone, breathing more free. Sunday, symptom free. So that was**





**all the things that happened in the five days prior to me sending this email.**

Q. Sending this email, Exhibit 8, where you asked to take a certification exam in a few different parts of the building?

**A. No. First, the primary thing I did was state I am concerned about being in 215 for Wednesday's certification exam. No. The primary thing was to state my concern and my fear. The second thing was I threw out suggestions as far as alternate possibilities, ideas as to how I could safely take the exam.**

**MR. SOLOMON:** And just judging on the voice here, I think maybe we're headed towards another five-minute break sometime soon if you--

**MR. SULLIVAN:** Okay. I'm just about to wrap up I think certification exam. And once we do that, take a break. Is that all right with everyone?

**THE WITNESS:** Makes sense.

Q. **(By Mr. Sullivan)** All right. I'm going to hand you what's been marked as Exhibit 9. (Tendering)

**(Defendant's Exhibit No. 9 was marked for identification)**

**A. (Perusing)**





Q. It's a one-page document Bates stamped VA 011716. Do you recognize this document, Ms. Mullin?

**A. Yes. And I will say it's completely out of context.**

Q. So did you meet with Ulyssee McBurrough on the morning of March 14th?

**A. I'm going to read it aloud. So this is-- the last one was March 12th is when I asked for the accommodation.**

Q. Uh-huh.

**A. And then this is two days later. I still hadn't been given access to the computer. And this is to my boss and his boss.**

Q. This is to you, correct?

**A. Oh. From McBurrough confirming a conversation I had had with him and an email I had with him discussing my fear of being alive, living or dying. This email is just to confirm you decided not to take the RVSR certification test. We met this morning to talk about the RVSR certification test. I reminded you that the test is today and informed you the test location is on the 3rd floor. You stated early this morning that you do not wish to take the RVSR certification. Your desire is to receive a resolution as to the problems you are having with work accommodations. You have stated that**





**you are not concerned with test and that you are concerned with living and not dying. Therefore, you have decided not to take the RVSR certification today. Also, I have set up a meeting for you to discuss this matter with Jerry today.**

**I believe if you look at my leave reports, you'll see how much time I missed and my breathing problems that existed between the date that I asked to go in another room, which I never-- that this-- whatever. Yeah. That's what it says.**

Q. Does it accurately summarize the conversation you had with Mr. McBurrough that morning?

**A. No. There's quite a bit missing from it.**

Q. All right. Tell me what's missing.

**A. I talked to him about the-- the biggest thing is that was in the building. I couldn't breathe. And so at that point, if I'm in here and I was already working on the 3rd floor, that the asthma attacks were getting worse and more severe. So at that point, I was literally more concerned that I would die and that took priority for me over an exam. Previously I sent-- communicated to him before this that they haven't even let me set up my computer yet.**

Q. You sent him an email saying that?

**A. I think it was a verbal on that.**

Q. Okay.
A. **But we did talk about it because he knew I needed-- everyone needs their-- everyone, everyone who takes the cert test, I don't care what position you have, you have to set your computer up before the test.**
**And what else-- there's something else that's missing from this.**
Q. Please tell me.
A. **There's an email that you have between me and Tammi when I said something about, I wish you had told me about this earlier. It was about the delay in notifying me about the accommodation. And you guys have that email.**
Q. In that email do you tell Tammi, I wish you had allowed me to go in and set up the computer to the best of my ability?
A. **It's in another email. Not in this one. You have the other one.**
Q. Is that what that email says?
A. **No. That one doesn't say it. Like I said, that's an incomplete record. That was just one part of the conversation.**
Q. The email that you sent to Tammi?
A. **Yeah.**
Q. Do you mention not being able to set up your





computer?
A. **No. It didn't need to be said. She knew it.**
Q. She knew it?
A. **Yeah.**
Q. It didn't have to be said?
A. **Yes. That was her responsibility.**
Q. The Human Resources, is that on the 3rd floor?
A. **Yeah.**
Q. And the Director's office, that's on the 3rd floor?
A. **3rd floor.**
Q. And the front office?
A. **3rd floor.**
Q. Okay. And those are the three places you identified in Exhibit 8, that email of where you would be willing to take the certification exam?
A. **Those locations of which I suggested, because those are the ones I knew of. They were my suggestions because I knew of them.**
Q. Okay.
A. **All had private areas that you could close the door.**
Q. And then the Agency had set up a space for you in a vacant office in the Director's office on the





3rd floor?
A. **Yeah. Yes.**
Q. Thank you. Do you want to take a break?
A. **(Nods head)**
**MR. SULLIVAN:** Okay. Let's go off the record.
**(Off the record at 2:20 p.m.)**
**(On the record at 2:25 p.m.)**
Q. **(By Mr. Sullivan)** This one is Exhibit 9?
A. **Yes.**
Q. What do you want?
A. **So what's missing from this and from the exhibit before that is the fundamental accommodation that I was denied was to have a workplace in which I could breathe.**
Q. Uh-huh.
A. **So that one was the first one to get denied. So in all of those, the precursor, the fundamental in all of these is they didn't-- it had to do with breathing. And they didn't take care of that accommodation. And then the-- not the timely, for the certification, setup and things like that. But the fundamental one was missing.**
Q. Okay. I think I gave you or was going to give you Exhibit 10. (Tendering)





**(Defendant's Exhibit No. 10 was marked for identification)**
A. **(Perusing)**
Q. This is a document Bates stamped VA 0011719 through VA 011722. And it's been stapled for your convenience this time.
A. **I don't know if this helps.**
Q. So this is an email chain mostly between you and Tammi Clarke about the certification test?
A. **Yeah.**
Q. I'm to direct you to the second page of the exhibit, which is VA 011721, which you may notice is slightly out of order.
A. **Uh-huh.**
Q. But I believe the email chain flows appropriately. There's a March 13th email that you sent to Tammi Clarke where it references a conversation the two of you had. Do you see that?
A. **The one that's 11:47 a.m.?**
Q. You know what? It probably makes more sense to start there. Tammi Clarke emails you and says, I must have missed that part of the email. I wished we had talked about this when we met yesterday. Maybe this is the thing you were trying to remember to talk about. Do you remember having a conversation with Ms. Clarke on the

12th?
A. **No.**
Q. You don't remember that?
A. **But I think we could refer to it with the next email because it. . .**
Q. Yeah. And in response you say, I wish we had too, but we covered many important subjects when we met. My tour ends at 3:30 and then I'm scheduled to meet with Jim. And truth be told, I don't know if I'm going to make it that long. Pain a seeping back into my chest.
A. **Oh, yeah. I do remember that.**
Q. Do you recall the important subjects that you and Ms. Clarke had spoken about?
A. **No.**
Q. No, okay. And do you see in Tammi's email 11:47 email where she says, I think we'll be able to work something out. What time do you leave today? Was she referring to work out an accommodation related to the certification test?
A. **11:47. No.**
Q. You don't know that she's referring to the certification?
A. **No. I don't know that she is.**
Q. Okay. With the subject line of the email BRVSR Test 3/14/12, computer setup?





A. **Yes. Because we said-- in there it says that we covered many important subjects. So I don't--**
Q. That's after--
A. **Oh. You're talking about the first one?**
Q. Yes, ma'am. The 11:47 email.
A. **(Perusing) So where's the email I sent prior to that?**
Q. There's one below this from 10:59 which appears to copy and paste the email that you sent to Tammi and Bo on the 12th?
A. **Oh. Yes. So this would be the precursor to it, right?**
Q. Right. Where you're talking about the certification test.
A. **Okay.**
Q. And then Tammi says, I think we'll be able to work something out. And was your understanding that she was referring to your request to take the test on the 3rd floor?
A. **No.**
Q. What do you think she was talking about?
A. **I don't know. I assume I was talking to her about my-- the pain in my chest and my breathing and things like that.**
Q. Okay.





A. **Those were important conversations. As we see from future ones, the important-- it was the breathing that was important to me.**
Q. Okay. And in the email on the first page, the bottom email, 12:21 p.m. you see Tammi says, I'm trying to work very quickly on this because I want to ensure your safety. You indicated that HR and the Director's office and the front office would suffice as testing locations. Are you saying that you can safely test/work in these location on the 3rd floor of the building?
A. **Interesting wording, wasn't it?**
Q. Why interesting?
A. **Because she knew I couldn't attest to anywhere that would be safe. I could not say-- I am not-- I could not ever say I can safely test/work in these locations on the 3rd floor. I was still exploring where I could work. So this was-- and this is the kind of-- this is the kind of harassment-- not harassment. I don't know if that's the right word, but that was out of line because I had never implied that's where-- that's what I was saying was safe. There's nothing. . .**
Q. But these were the specific locations that you identified in your email asking to have an accommodation related to the certification test, right?





A. **Yes. These are locations I mentioned as possibilities in the-- my trying to engage in the interactive process. I just mentioned those as possibilities.**
Q. Okay.
A. **Never ever anywhere did I say or is it written that I said, I can safely test and work in these locations. Nowhere will you ever say I said that. I didn't imply it.**
Q. And in response to her email the next day on March 14th, 11:42 you say, Thank you for your effort. I really wish we could have been in touch yesterday.
A. **Yeah. Always polite.**
Q. Yeah. So was that sincere, or no?
A. **No. I really wish we had.**
Q. Okay. Did you say anything about I wish you had given me the opportunity to set up my computer far enough in advance to take the test?
A. **Well, can we-- am I permitted to go into this document?**
Q. Well, you can do whatever you want, but I'd like you to answer my question.
A. **Well, you've answered your own question.**
Q. I don't believe so.
A. **Yeah. Well, actually you did. Because if**

**you look at the last two pages right in there, it talks about-- it's all laid out. And it's from Tammi Clarke about being down and getting a computer setup. It's there. You have that. This is a requirement. You don't have an accommodation if you don't have this part of it. Never mind the breathing part. But to take the certification test, this is part of the requirement.**
**Q.** Okay. So my question was just about your email response on VA 011719, which is the first page of Exhibit 10, in your March 14th, 2012 email at 11:42, my question was, did you say anything to Tammi about how you wish you could have been allowed to set up your computer far enough in advance to take the certification test?
**A. I don't know if I said it to her or Bo, Ulyssee, my boss.**
**Q.** Okay. But you definitely didn't say it to her in this email?
**A. Let me read this. Let me read this one, this one at 1:07 p.m.**
**Q.** Well, that's from Tammi. I'm asking about the email that you sent.
**A. Well, I'm just seeing if she--**
**MR. SOLOMON:** Objection.
**THE WITNESS:** What?
**Q. (By Mr. Sullivan)** You can answer.





**MR. SOLOMON:** You can answer it.
**A. Me too. I tried to contact you yesterday about your request to test in Human Resources, the Director's Office or the VSC front office. With that sentence, please note that she never called my cell phone or my home phone and the Agency already knew I had left. I wasn't in the building. So that's misstatement.**
**I wanted to confirm that it would be safe for you to test on the 3rd floor and inform you that we had granted you a temporary workplace adjustment. A special (ad verbum) workstation was set up for you in a vacant (ad verbum) Director's office on the 3rd floor. I was later informed by your supervisor that you had left at 1:00 p.m. so I was unable to reach you. She had spoken to me on the phone before.**
**In your absence, we took action on your behalf to ensure that everything was ready for you walk in and take the test in a location you specifically identified as an appropriate for your condition. Another false statement because they could not set up my computer. I'm the only one who could. So that was a bogus statement right there again.**
We were informed by your supervisor this morning that you decided not to take the test. So although the temporary workplace adjustment was not





used, I thought you should know that we took extraordinary measures to ensure that you could take the test if you choose to.
I also take this as hostile work environment. I call this discriminatory to say that for them to not make me go back into the place that it made me sick, set me up in another room. Just give me a room. They considered that extraordinary measures. There is so much-- that is just so loaded. And this is very typical of them to say, well, we allowed you this. That was extraordinary. So this is full of-- I don't know what the right legal words-- pretext, whatever it is. No.
**Q.** So did Ms. Clarke and the VA set up a special testing workstation for you in a vacant office on the 3rd floor?
**A. No.**
**Q.** They didn't do that?
**A. No. They gave a room and put a computer in it. They did not set up a testing site. No, they did not.**
**Q.** Could you have taken the certification test in the room they gave you?
**A. I don't know that I couldn't. I mean, if I had been given ample time to set up, if I was able to breathe. You know, I mean if I was breathing.**





**Q.** Uh-huh.
**A. Which I had not been doing for the last-- I've had asthma attacks for days leading up to this. There is a possibility, yes, if they let me know ahead of time and I could have set it up. What I had envisioned when I said-- the original one is I could take the air purifiers into a closed area, have the time-- set up the computer ahead of time per their own email. And yeah, given the time and if it had been communicated to me, maybe I could have, yeah. Get the air purifiers running for a day and two, stuff like that, yeah, there's a possibility.**
**Q.** Did you ask for any of that?
**A. For what?**
**Q.** Time to set up the air purifier, time to set up the computer to your liking, did you ask for any of that when you requested the room on the 3rd floor to take the test?
**MR. SOLOMON:** Objection. You can answer.
**A. Why would I do what they said I should do? Why would I ask can I please do what you say I should do? Can I please do what I'm supposed to do?**
**Q.** So you didn't ask?
**MR. SOLOMON:** Objection. You can answer.
**MR. SULLIVAN:** What's the basis of

objection?

**MR. SOLOMON:** Well, just a little vague here too as far as-- as far as are we just doing the email or are we talking about did she ask in general? And then when you say, did she ask-- I believe earlier she provided testimony that she asked to take the test and she explained in her testimony that asking to take the test includes with it an ask to set up the computer. It's all baked in together. It becomes a little bit convoluted. I'm just objecting because it's also been asked and answered.

**MR. SULLIVAN:** Sure.

Q. **(By Mr. Sullivan)** So you can answer the question.

A. **Okay. Did I ask them again for the same accommodation over and over again, over and over again, with this incident? No. No, I didn't. I did not go to that redundancy.**

Q. Did you ever ask to have the air purifier set up in advance and run in the room that you had asked to take the test in?

A. **I don't know. I don't remember.**

Q. You don't remember?





A. **I don't remember.**

Q. And you so took Ms. Clarke's email that she sent at 1:07 as not sincere? You thought she was being sarcastic maybe when she wrote extraordinary measures?

A. **The way I read this, I don't believe she wrote it. I believe Bonnie Wax wrote this.**

Q. Why do you believe Bonnie Wax wrote this?

A. **If you compare it to the tone of other things she writes, the tone is very similar. I don't think of-- in my dealings with Tammi, she had been compassionate and kind. And I don't see her coming up with-- and also, I don't want to say she's not too bright. She's a very bright woman for her position. But her coming up with this, well, you asked for this around this, you said you were safe, it took-- this is crafted by someone. If you look at her other writings and her depositions, this is not her-- this doesn't look like something Tammi Clarke would be able to write on her own.**

Q. Okay. So you believe Bonnie Wax wrote this email?

A. **Oh. I would say someone other than Tammi Clarke did.**

Q. Well, you've just said a moment ago Bonnie Wax was who you thought?

A. **Yeah. Because she's the first person that**





**comes to mind.**

Q. Who else might have written this email?

A. **Matt Correa. Matt Correa maybe. I would think possibly one of the two of them.**

Q. Now, you said before that-- Well, never mind. We've covered this. You made a separate request for an accommodation around this time, correct?

A. **I don't remember. I don't know what you're referring to.**

Q. Page 20, Exhibit 1.

**MR. MAHARAJ:** (Indicating)

A. **Page 20. Thank you.**

Q. At the bottom there's a paragraph about March 13, 2012.

A. **(Perusing)**

Q. Do you see that?

A. **Uh-huh. I'm reading it. I'm having a bit of a-- Yeah. Go ahead, please.**

Q. Okay. Do you remember having any conversations with Sandy Smith around March 13th, 2012 where you requested to be allowed to work from home?

A. **I don't remember.**

Q. How well do you know Sandy Smith?

A. **How well do I know Sandy Smith? I don't know. She's someone I respected, you know. Not someone**





**you sit down and have tea with. She was a JAG officer in the Navy, so she kind of had an air to her that-- like I felt I could tell her when I had breast cancer, she's the only person I told. I felt that that was kind of a business thing to share because my work would affect what she produced for Veterans. I felt she was approachable with that fact.**

Q. Uh-huh.

A. **But I wouldn't-- I would have fact-based communication with her I guess, yeah. I don't know how-- she was approachable. I felt she was reasonable.**

Q. Okay. Did you feel like she was honest?

A. **How much trouble do I get in if I say as honest as an attorney can be?**

Q. If that's your answer, that's your answer.

A. **That's my answer. She's a chain of command, was in the military. She was as honest as anyone who's had a position of authority in the military.**

Q. Have you ever known her to lie about anything?

A. **At this moment I can't-- I can't-- I think there was one thing that nagging at the back of my head, this one thing. But that's all I can remember at this point.**

Q. And what's that one thing?

A. **I can't remember. I can't remember what it was.**
Q. Okay.
A. **But there was something that I remember just being shocked going, she what? But I don't remember what it was.**
Q. Okay. So if Sandy Smith had written an email about the conversations that you had around March 13th, 2012, do you think it would be accurate?
**MR. SOLOMON:** Objection.
A. **I don't know. I wouldn't-- I don't know.**
Q. Okay.
A. **Like she'd always been an ally. She tried to get me accommodated. She tried to work with me. There was adversarial relationship between her and Bonnie Wax and that was a problem. So she-- Sandy tried to help me be able to do my job.**
Q. Okay. I'm going to give you what's marked as Exhibit 11. (Tendering)
**MR. MAHARAJ:** (Tendering)
**MR. SULLIVAN:** Thank you, Dan.
A. **(Perusing)**
Q. Six-page document, come in the header is Page 166 of 173 to 171 of 173. And what I want you to look at first is Page 169 of 173.





A. **All right.**
Q. And there's a March 13th email from Sandy Smith to Jerry Huffman and Sandy Smith that she sent at 2:55. Do you see that?
A. **Yes, sir.**
Q. And it says, I will meet again with Bonnie tomorrow to review medical documentation discuss granting accommodation request. She wants to WAH and only be in office on Tuesdays and Fridays. For test tomorrow, she did not want to take RVSR cert test in Room 215 and had asked for HR or VSCFO Office. HR has prepared a computer in empty in HR for her use. Employee needs to be aware of this accommodation. Thanks, Sandy.
Does that first sentence accurately summarize the accommodation request you made to Sandy Smith?
A. **I never had a conversation-- I never had a conversation with Sandy Smith.**
Q. Okay. Does that--
A. **Conversations would have happened with Ulyssee or Jerry Huffman.**
Q. Okay. And does that accurately reflect the accommodation request that you made around March 13th, 2012?
A. **I don't know. I don't think so. I don't think so. I don't know.**





Q. Okay. You don't know or you don't think so?
A. **Can I think on that for a second?**
Q. Sure.
A. **I would never have said, I want to be in the building on Tuesdays and Fridays.**
Q. Okay. So you think this email is wrong?
A. **No. I don't think it's wrong. I believe that's her understanding of what someone else said to her. No. I believe it's right.**
Q. And does it accurately reflect the accommodation request you made on or around March 13th, 2012?
A. **Do you mean I-- a request I repeated. I didn't make it then. I repeated it then.**
Q. Okay.
A. **During that week some time of-- I was saying it all the time. So was it specific to the week of March 13th? I don't know.**
Q. Okay. And I'm asking specifically whether you asked to work at home and be in the office on Tuesdays and Fridays?
A. **I don't have any memory of that. I don't remember saying I want to be in the office on Tuesdays and Fridays. I don't know.**
Q. Okay. And shortly after this email on March





13th, you were given permission to work from home, correct?
A. **I don't remember the date on it.**
Q. Does March 20th sound right?
A. **Yeah, 21st actually if I think about it. I just a visual. Yeah, the 20th or the 21st.**
Q. I'm sorry. What exhibit number are you holding, Ms. Mullin? I forgot to mark mine.
**MR. MAHARAJ:** 11.
Q. **(By Mr. Sullivan)** All right. Let me show you what's marked as Exhibit 12. (Tendering)
**(Defendant's Exhibit No. 12 was marked for identification)**
A. **(Perusing) So we're not going to go over any of the other things in here? (Indicating)**
Q. We might, but I just want to nail this down first.
A. **(Perusing)**
Q. Okay. Do you see-- Exhibit 12, it's a document labeled Bates VA 0024 and it's a form-- VA Form 0857f titled Approval of Accommodation Request.
A. **Uh-huh.**
Q. Have you seen this before?
A. **Oh, yes.**
Q. And this is a form allowing you to work from

home Mondays, Wednesdays and Thursdays and requires you to report to work at the St. Petersburg Regional Office on Tuesdays and Fridays?
A. **Yes.**
Q. And is that the accommodation that Sandra Smith said you had requested?
A. **Yes.**
Q. Okay. And this was dated-- signed by Kerrie Witty on March 20th, 2012?
A. **Yeah. Kerrie Witty as DMO on 3/20 of 2012.**
Q. And di the Agency allow you to start working from home Mondays, Wednesdays and Thursdays around this time in 2021--
A. **Yes.**
Q. Okay.
A. **This is not a reasonable accommodation.**
Q. This is not a reasonable accommodation?
A. **Absolutely not.**
Q. Okay. This is the accommodation that you requested?
A. **No. I didn't.**
Q. You didn't request this?
A. **No.**
Q. Didn't you just tell me when we were looking at Sandra Smith's email that you weren't sure whether you





had asked for that?
A. **I know I never said I want to come on Tuesdays-- on two days a week. I never said I wanted to enter that building two days a week.**
Q. Okay.
A. **That's contrary to what my doctors wrote.**
Q. What did your doctors write?
A. **Oh. Do you have that as the exhibit?**
Q. Well, I want to know what you think your doctors wrote.
**MR. SOLOMON:** Objection.
A. **Limit the time in the building with complete air-- if she's got to be in it, a complete air purification system. Don't go in the building.**
Q. Well, was it limit time in the building or don't go in the building--
A. **Limit. One of it was limit with the explanation that going in the building causes X issue and Y issue. And if symptoms were to occur, she to leave the building immediately.**
Q. Okay.
A. **Which is not part of this accommodation. So this is not-- this is a stab at something they're calling an accommodation, which no one ever spoke to me about. There's no interactive process. This is unilateral.**





**This DMO I never spoke to about this part of the thing. I don't know what this is, but it was not a reasonable accommodation specific to my illnesses or my medical documents. So I don't know what that is.**
Q. Do you remember you had an email between you Tammi Clarke where you discussed many important issues?
A. **Uh-huh.**
Q. And it was right around the same time. Are these the issues that were being discussed?
A. **As I said, I don't know.**
Q. Okay. So there was some interactive process, right? You were having a conversation with HR about what--
A. **No. This is the DMO. I didn't have-- had any conversation with the DMO on this.**
Q. But you did speak with Tammi Clarke?
A. **About many, many, many, many, many things, yeah.**
Q. Including this?
A. **I don't know. No. I never said I want to be in the building. I'll be fine if I come in two days a week. I never said that to anybody. I never contradicted my doctors, say I don't have asthma on Tuesdays and Thursdays or whatever it is. The building doesn't make me sick on those days.**





Q. Well, your doctor just said to limit your time in the building, right?
A. **If you want to pull just that sentence out.**
Q. Okay.
A. **You want to take that sentence out of context, to the average man, I guess it would that make sense.**
Q. To the average?
A. **The average man, the average person, if they heard just that. But it's out of context.**
Q. Okay. I want you to go back to Exhibit 11 for me here and turn to the Page 168 of 173?
A. **(Complies) Oh. Jeez, Louise.**
Q. Do you see that page?
A. **Yes, sir.**
Q. And I want to ask you about this email from Kerrie Witty at the top that she sent at 11:44. And it says, Apparently the employee submitted medical documentation and a RA request yesterday or last Friday. Tammi has it and I think you should go review it and determine if we need to let her work from home as an accommodation since her physician states that as the accommodation she needs. If she's still a trainee, we can make another decision, but I don't want this one to sit like the ones before. Do you know what-- did you

ever speak to Ms. Witty about this email?
A. **No.**
Q. Do you know what she was referring to when she said, I don't want this to sit like the ones before?
A. **No.**
Q. Okay. Do you recall submitting medical documentation and an RA request on March 12th or the previous Friday?
A. **I don't remember specific dates. I know there was one drafted on the 9th I think.**
Q. March 9th?
A. **I didn't do an RA request. I remember turning in an FMLA application.**
Q. Okay.
A. **Which my understanding was that would suffice as an RA, the need for a reasonable accommodation.**
Q. What was that understanding based upon?
A. **No. I'm going to reword that. As reconfirmation that the RA that had already been defined and requested for-- I don't know it had been a year by then. It just reconfirmed on the FMLA application.**
Q. Okay.
A. **I'm starting to get brain-- I'm starting to get fuzzy.**
Q. I'm sorry?





A. **How much longer? I'm getting a little punchy.**
**MR. SOLOMON:** Do you want to take your blood oxygen and confirm that's okay?
**MR. SULLIVAN:** Let's can go off the record and you can take your oxygen here.
**(Off the record at 2:57 p.m.)**
**(On the record at 3:07 p.m.)**
**MR. SULLIVAN:** All right. Let's go back on the record.
A. **And I have something to add.**
Q. You have something to add. Okay. Please add away.
**THE WITNESS:** We ready?
**COURT REPORTER:** Yes.
A. **I know what the Tuesday, Thursday was now.**
Q. Okay.
A. **I closed my eyes and rested for a minute. RVSRs that were allowed to work at home, people-- RVSRs were allowed to work at home. But they had a procedure that they all had to come in on Tuesdays and Fridays. So this was-- that's where this came from is I hadn't reached the tenure I guess as an RVSR to be qualified to work at home. And this is what-- this is the experienced RVSR's schedule. So that's what this was.**





**So for anyone to talk about working at home, this was the work-at-home schedule. So that's how everybody referred to it. This one wasn't specific to me. It was what everybody did.**
Q. Did you ask to be allowed to do what everybody else did?
A. **No.**
Q. What did you ask for?
A. **To work at home.**
Q. Period?
A. **Yeah.**
Q. To never come into the office?
A. **No. I just said work from home. Just work from home or in a different location, a different site or work from home. I would move I told them. I actually interviewed in Boston and was offered a job. I was ready to go.**
Q. Why didn't you take it?
A. **Because when I got back from-- that was over a Christmas holiday. I came back and it's when I ended up with the trip to the emergency room, the breathing and the battle became worse and then I was diagnosed with cancer. And I couldn't fight my way through all of the battles.**
Q. When were you offered the job, over





Christmas?
A. **Yeah. I was up seeing family up there. And I knew-- someone in St. Petersburg knew someone in Boston.**
Q. At the Boston VA?
A. **Yes. Because I already knew. I was trying to find a way not to be-- to get out of the building. Like I knew they weren't looking at relocating me. I was trying to find a way to relocate myself.**
Q. Okay. When you were home in Boston over the holidays, you interviewed for that job?
A. **I didn't know it was an interview. I just went in and introduced myself, like I set up the time. It wasn't an interview. I just went in and, hey, can I scope this out?**
Q. And then they offered you a job on the spot?
A. **I got an email when-- I think it was when I got home that said, let us know when you want to make the move.**
Q. Wow.
A. **I think you have-- I actually think you guys have that email too.**
Q. And was it-- what kind of position was it?
A. **RVSR.**
Q. So you were offered a position as an RVSR in

Boston somewhere, December 2011, January 2012?

**A. Right before all this stuff happened, yeah. I couldn't get up there fast enough. See, and that's when we went back and I went back into Room 222 and got sicker, sicker. I couldn't-- I had a hard time getting through the days, never mind to. . .**

Q. Okay. So before you gave us those additions, you were telling me that you had submitted some FMLA paper work on March 9th I think you said?

**A. It's just my daughter's birthday. That's the only the reason it's standing out. So it could be around then.**

Q. Somewhere around then?

**A. Yeah.**

Q. And you felt like that was I think you said sufficient to-- did that count as the request for an accommodation in your mind?

**A. No. I think it was just more evidence of the need to have an RA was (ad verbum) needed.**

Q. Okay.

**A. It was more of, she needs an RA is what it was.**

Q. Okay. So I want to bring you back to Exhibit 11.

**A. No. It wasn't the need for an RA. It was--**





**because the doctor didn't know those terms either. It was a need to get me out of the building, which we know what it means (ad verbum), an RA.**

Q. And specifically I want to ask you about Page 167 of 173. There's an email from Casey Crump to Kerrie Witty, yourself, Sandra Smith and Valorie Reilly?

**A. Yeah.**

Q. Well, I'll give you a minute to read it to yourself. I don't want to read the whole thing into the record. Just let me know when you've read it.

**A. Can you read into the record, please?**

Q. The exhibit is part of the record. So there's really no--

**MR. SOLOMON:** And David, your copy, does it also have the missing text on the left?

**MR. SULLIVAN:** Yeah. It looks like it's a little cut off here.

**MR. SOLOMON:** Is that also true of the electronic copy or is that just the paper copies--

**MR. SULLIVAN:** I believe it's the electric copy is like this.

**MR. SOLOMON:** Okay.

Q. **(By Mr. Sullivan)** If you have any trouble reading anything because of what's gone on the left,





just let--

**A. I remember this date.**

Q. So the first question I'm to going to ask when you're done reading is whether Mr. Crump's email accurately summarizes events from around that time?

**A. Pretty close, yeah.**

Q. Is there anything you think he's missing or got wrong?

**A. Well, something he didn't write in this.**

Q. Which is?

**A. We were walking to the Sandy's area. And he said to Ulyssee McBurrough and to-- there was someone else there.**

**COURT REPORTER:** I'm sorry. I'm sorry. It's not just you. It's just out there.

**A. We were walking and he, Casey, said, what you people don't understand is Aileen is no longer going to be-- is not going to be working in this building one way or another. She going to get an accommodation or she's going to go out in a body bag.**

Q. Who did Casey Crump say that to?

**A. It was to me. And I think it was Bo McBurrough that was with us. So I remember reading this saying, man, I wish he'd put that in there too.**

Q. You said Bo McBurrough?





**A. Ulyssee, Ulyssee.**

Q. Yeah. I just want to make sure Bo is his nickname?

**A. Yes.**

Q. So it says, Aileen is working with HR to obtain an accommodation to work at home.

**A. Uh-huh.**

Q. You had been working with HR at that point?

**A. It says working-- I wouldn't say I was working with him. That's his wording, not mine.**

Q. Okay. So when I asked if what he wrote was accurate and you said mostly, you mentioned that he had left out something. Now you're saying that this is not accurate?

**A. No. Okay. Let's rewind. I didn't know the legal way we were approaching this document. Let's start this whole line of questioning again. Is this-- you asked me if this thing was accurate. Is his verbiage specific and precise? No, it is not. He used synonyms which I would not have used.**

Q. Uh-huh.

**A. Such as, Aileen is working with. He would have-- he could-- I think Aileen has been in touch with. He says working with. I would-- I guess, legally, that would make this inaccurate just that word alone. So I**

**guess this is an inaccurate document. I don't know. Legally, I mean, this is the gist of what it was.**
Q. Okay. Is there anything else that you think he's not accurately conveying in his--
A. **I have to read it now word for word for word.**
Q. I thought that's what you were doing before.
A. **I did--**
Q. But if you didn't, please go ahead.
A. **No. I wasn't pulling this apart sentence for sentence, but now let's do that sentence for sentence. This is addressed the Kerrie. First sentence--**
Q. Hold on. Hold on. Hold on. Do you remember when we started?
A. **Yeah.**
Q. I'm asking the questions. You're giving me answers.
A. **All right.**
Q. Okay. So if you want to go through this sentence by sentence, you can do that later on your own time. So you disagree with his statement that Aileen is working with HR. You think that's inaccurate?
A. **No. I believe my thought-- my understanding of the word working is communicating with.**
Q. Okay. Now, in the next line down he mentions a statement from her doctor. Which doctor is he





referring to here, if you know?
A. **I could only assume. I don't know for a fact.**
Q. Okay. If you were assuming, which doctor would you assume?
A. **The allergist immunologist.**
Q. Do you know his or her name?
A. **Klemawesch.**
**COURT REPORTER:** I'm sorry. One more time.
**THE WITNESS:** Klemawesch, K-L-E-M-E-W-I-S-C-H, I believe.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** And he says that you have a statement from your doctor which extremely limits the time she should be in the office. Is that an accurate summary of what your doctor had said?
A. **Can you ask me that question again, please?**
Q. Yeah. Does Mr. Crump's statement about your doctor's statement, that it accurate-- I'm sorry. Extremely limits the time she should be in the office, is that accurate?
A. **I don't know. I have to look at the document.**
Q. Okay. That's perfectly fine. And in the





next sentence, there's a reference to completing the required paper work. What paper work was he referring to?
A. **Wait a minute. This must be expedited and request a representative from HR dedicated to completing the required paper work as soon as possible. I don't know.**
Q. Okay. And then down below he says, Sandy, I understand Aileen has already spoken to you. Does this sort of refresh your recollection that you had spoken to Sandy about these issues around this time?
A. **No. Not specific to March 12th.**
Q. Okay. Exhibit 12, I hope.
**MR. SOLOMON:** 13.
**MR. MAHARAJ:** The Approval Form was 12.
**MR. SULLIVAN:** Thank you. Can I have that back or can you--
**MR. MAHARAJ:** Yeah. I can mark that.
**MR. SULLIVAN:** Thanks, guys.
**MR. MAHARAJ:** No problem.
**(Defendant's Exhibit No. 13 was marked for identification)**
Q. **(By Mr. Sullivan)** Lucky No. 13, Ms. Mullin. (Tendering)
A. **(Perusing)**





Q. And I can just put another sticker over it if it's messy.
A. **No. It makes sense to me. Now I understand.**
Q. What do you understand?
A. **The sequence and who had the documents when and where the RA-- it's all in there.**
Q. Okay.
A. **So a lot of your questions are answered in there. Oiy-yo-yo.**
Q. Is this the FMLA paper work that you were referring to?
A. **Yes.**
Q. Exhibit 13?
A. **Yes.**
Q. Bates stamped 009953 through 56?
A. **Yes.**
Q. And it looks like it was filled out by Stephen. . .
A. **Klemawesch.**
Q. Klemawesch, thank you. And now I see there's a date written at the top here. Is that your handwriting?
A. **Yes.**
Q. Do you know if that's the date you turned this in or if that's just the date the doctor gave it to

you?
A. **No. No. That wasn't the date. That wasn't the date. I'm not sure why I wrote-- I don't remember why I wrote 3/2. Oh. No. I think I just messed up when I was-- the last page.**
Q. So you're pointing at the signature line of 9956.
A. **Yeah.**
Q. And the date there.
A. **Yeah. I just don't know when--**
Q. Can you read that because if you can, I'll be really impressed.
A. **Stephen Klemawesch, M.D., 3 Mar, M-A-R, 12.**
Q. Okay.
A. **And I just think when I flipped it over, I think I may have-- like when I was dating my pages, I think that may have just--**
Q. Okay. So this is the date. 3/3/2012 is the date Dr. Klemawesch signed this?
A. **According to this, yes.**
Q. According to his--
A. **Yes.**
Q. And do you know when you gave this FMLA paper work to HR?
A. **No. I believe-- and I don't know why I think**





**it. I'm not sure. I'm not sure.**
Q. Okay. Before you had said March 9th.
A. **But I don't know why I think it was March 9th.**
Q. Okay. On Page 54 and 55, there's some little stars and arrows. Is that your handwriting?
A. **Yes.**
Q. Okay. I want to draw your attention to 9955 at the bottom where it says Additional Information.
A. **Yes.**
Q. And since you're such an expert and wizard at reading doctor's handwriting, which actually makes sense given your job as a-- I recommend the patient be allowed to work from home with periodic trips to the work site as required. When at the work site, limit exposure to the building. Consider installing a total building air purifier, dehumidification system. Patient must be allowed to leave immediately from the workplace if she develops asthma. Did I read that right?
A. **Well done.**
Q. Okay.
A. **I mean yes.**
Q. Thank you. I was just about to make sure. Okay. I'm handing you now what's marked as Exhibit-- will be marked as Exhibit 14. (Tendering)





**(Defendant's Exhibit No. 14 was marked for identification)**
A. **(Perusing) And if you want any help reading any of the other-- anything else on here, I'd be happy to help with that.**
Q. I appreciate that.
A. **I was also a middle school teacher. So it gives me all sorts of ability to read things that are illegible.**
Q. Okay. Exhibit 14 is two pages Bates stamped Allergy Associates 041, 042.
A. **Uh-huh.**
Q. Allergy Associates is the practice where Dr. Klemawesch works?
A. **Correct. Yes.**
Q. Okay. Do you want to help me decipher this note?
A. **Continues to have a problem at work. Brought a nebulizer to work. She requested-- requested a move, but wasn't moved. I can't read that.**
Q. At first is how I read that.
A. **It could well be, yes. Had an attack that led to 911 call and trip to St. Pete General. Since. . .**
Q. I read that as, since that was moved to a different floor?





A. **Sounds good. I concur. She still has symptoms in that area. Can't work more than four days without having asthma.**
Q. And then if you flip the page.
A. **(Complies) They gave her a room sized air purifier, but she works in a large room-- large open area. Would like to apply for FMLA. Work home I think.**
Q. Work at home?
A. **I think so. I'm not sure what that symbol is. It's a medical symbol. Limited exposure to work site. HFFT PRN, C-L-E-S-T. What do you think the next one is?**
Q. Yeah. I'm not sure about that.
A. **Okay. The next sentence, end, something something wheeze. P dash-- Oh. This is the plan. Will fill out--**
Q. Forms for FMLA.
A. **3/3, copies of FMLA papers in chart.**
Q. Okay.
A. **You really need to try to figure out what that one-- where it says I think it was like C-L-E-S-T.**
Q. Closest maybe?
A. **Something that-- what's right next to it?**
Q. Almost like caregivers is how I read it.
**MR. SOLOMON:** I thought it was cough and

then another word.
**THE WITNESS:** Oh. Cough. We'll go for cough.
**MR. MAHARAJ:** Chest is the first word. Chest, hyphen, cough something, rest.
**THE WITNESS:** Oh, yeah. Chest, cough, something.
**MR. SOLOMON:** Cough. And that's also a C with a line over it. I just Googled it. It was a medical abbreviation for the word with. So it's cough, C with a line over it. I think with resp, maybe like respiratory?
**THE WITNESS:** Yeah.
A. **So that goes-- that fills the blank up above it where it says, FMLA, work from home with limited exposure to work site.**
**MR. SULLIVAN:** All right. Good work, everybody.
**THE WITNESS:** Teamwork.
**MR. SULLIVAN:** It takes a village.
Q. **(By Mr. Sullivan)** Anything in this note that you think is inaccurate?
**MR. SOLOMON:** Objection.
A. **I don't know. It's his medical thing.**
Q. Okay. You were at this medical appointment





presumably?
A. **Yeah. But I don't. . .**
Q. Do you have any recollection of meeting with Dr. Klemawesch?
A. **Klemawesch.**
Q. On March 2nd, 2012?
A. **March 3rd, my birthday I'll have you. That's what I was doing.**
Q. Just below your name, March-- what's the stamp?
A. **Oh. It is the 2nd. This is how I brought in my birthday. My apologies. I was wrong.**
Q. That's okay. Your birthday is right up here in the corner to be fair.
A. **I don't remember this appointment specifically.**
Q. Okay.
A. **No.**
Q. So you don't have any recollection of what was said between you and the doctor--
A. **No. I saw him very regularly, so I don't really know.**
Q. So you mentioned that the March 20th accommodation was ineffective in your view?
A. **Yes.**





Q. Okay. And can you just tell me one more time why that is?
A. **Because I needed to breathe on Tuesdays and Thursdays. There were no workplace adjustments or anything put in place for those days that they were requiring me to go in the building. And also-- is why. It doesn't address Tuesdays and Fridays. I still needed to breathe on Tuesdays and Fridays. And speak. Breathe and speak.**
Q. Okay. Back to Exhibit 1, if you can, the thick one. And I'm looking at Page 21.
A. **(Complies)**
Q. In the middle there's a paragraph that starts, Rather than?
A. **Uh-huh.**
Q. And I just want to ask you about the last sentence in that paragraph. The requirement of forcing Plaintiff to work in the building for two days a week continued until April 2013 despite medical evidence that suggested she needed to be given full time telework. What medical evidence are you referring to there?
A. **Let me read it. I've got to read the whole thing. (Perusing)**
**I'm not 100 percent sure on this one.**
Q. Uh-huh.





A. **But I think it was also-- it was documents from Massachusetts General, my primary. I think there may have been a document from my oncologist and the FMLA document and another opinion I think written by Klemawesch. I think by April of '13, the Agency had all of those.**
Q. Okay.
A. **That's interesting.**
Q. So it seems like around March of 2012, things kind of go quiet. And it's my understanding that around that time is when you started dealing with your breast cancer. Is that generally right?
A. **So in March-- that's when the doctors' appointments started. So the lump was identified then. And so going into March and April was all-- I didn't know that you have an oncologist, an oncology surgeon, an oncology radiologist. It was going into the world of cancer.**
Q. Uh-huh. So I want to ask you then about the next paragraph here in Exhibit 1, Page 21. On or around January 5th (ad verbum), 2013.
A. **Uh-huh.**
Q. Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building

and that she needed to get out of the building for the time being.
A. **Uh-huh.**
Q. Plaintiff requested an RA to have less time in the building and to the avoid suffering-- Sorry. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthma attack. When did you make that request?
A. **It wasn't a specific request. To go into it, I had no pay. I had no income. So during radiation, I had to go in the building because I had no money. I had to return to work. I had to return to work. Sometimes when I got there, I don't think I was still bald then, I got sick quickly. And what Bo, his boss, Jerry Huffman, Sandy Smith, Kerrie Witty were all aware of is they followed the accommodation, but they didn't-- they allowed me to leave the building when I became symptomatic.**
Q. Uh-huh.
A. **Which becomes a problem later when Bonnie Wax finds out. So what they would allow me to do was to go in. And as soon as the voice would go, the breathing got tight, they helped me skedaddle out of the-- so I don't know how it actually came to be, but that's what we were doing. I'm not really sure.**





Q. When they would let you skedaddle, as you say, when you started to have symptoms, how-- were you meant to skedaddle home and get back to work?
A. **Yes. I would go back and return to work, yes.**
Q. Okay.
A. **I would return to work from home.**
Q. And who did you say agreed to that with you?
A. **I don't know if it's agreed to. Was aware of, was in arrangement with. I don't know that anybody agreed to it. It's just how this accommodation was being made to work. We were doing the best we could with this. (Indicating)**
**And it still left me horribly, horribly sick every time I step foot in. But Ulyssee McBurrough, his boss, Jerry Huffman, mostly it was HR's Tammi Clarke. Because there are times Tammi actually helped me get out of the building. Later she would deny any of this, but everybody-- it was not a secret.**
**MR. SOLOMON:** And just for the record, when she said this, I believe she held up Exhibit 12.
**THE WITNESS:** Yes. I'm sorry. Exhibit 12. Thank you.
Q. **(By Mr. Sullivan)** We were talking about John





Smith earlier.
A. **Yeah. Yes.**
Q. And he was someone that you had said was honest and trustworthy and sort of a standup guy?
A. **I don't think I ever used honest and trustworthy.**
Q. I'm paraphrasing.
A. **Yeah. He was a good man. He supported me as a steward, as a person. He worked very hard with Human Resources and stuff to find other locations on the VA campus.**
Q. Uh-huh.
A. **Within the building, he did a lot of brainstorming to other-- you know, different locations.**
Q. All right.
A. **I guess the word for it was he was compassionate.**
Q. Okay. I'm going to give you what I've marked as Exhibit 15. (Tendering)
**(Defendant's Exhibit No. 15 was marked for identification)**
A. **(Perusing)**
Q. It's a three-page document. It appears to be a letter, a memo from John Smith to Bonnie Wax dated February 19th, 2013 Bates stamped 010965 through 967.





A. **(Perusing)**
Q. And just let me know when you're finished reading.
A. **I'm not going to-- I'll go back to what's referred to, but I'm finding myself getting upset reading this.**
Q. Okay.
A. **If you want to point out paragraphs in it, but I-- it's not good for me to go over every detail.**
Q. Okay. Well, that's going to be a problem because I'm going to ask you whether this is an accurate summary of events.
A. **There are too many details in this to say it was accurate or inaccurate. I would have to cross reference each date and things like that. There's just too much in it for me to make a blanket statement. I could address each date if we-- if it made sense to, but not the overall document, no.**
Q. Well, what I'm asking for is for you to read the whole document and tell me if there are any specific details that you think are wrong.
A. **Oh. This is going-- I'd have to do the word for word thing because I made that mistake with Casey Crump's and I made a mistake, one word.**
Q. So read it to yourself. And whenever you see

something that you think is inaccurate, you know, let's talk about it. You can point that out to me.
A. **We got-- I can't do this now. I'm telling you my heart rate's going up. This can't be done right now. If you can do something else first, I'm game. But this is not good for me right now.**
Q. Okay. What would be good for you right now?
A. **I don't know what your next question is. But to read over what she did to me right now--**
**MR. SOLOMON:** Why don't we take a--
A. **--is not good.**
**MR. SOLOMON:** Why don't take a three-minute--
A. **You've already gone through a lot of these dates. You've already seen them. You've read them.**
**MR. SULLIVAN:** Okay. Let's go off the record. But before we do, let's just note that the witness--
**THE WITNESS:** Sorry.
**MR. SULLIVAN:** --threw the document across the room.
**THE WITNESS:** I didn't mean to flip that way. I'm sorry. I didn't-- No. I didn't throw it across the room. It slid across the table. That was inaccurate and I apologized





right away. I didn't mean to do that. I didn't throw it across the room.
**MR. SOLOMON:** Are we off--
**MR. SULLIVAN:** Yeah. Let's take a break. Whatever you guys need?
**MR. SOLOMON:** Are we off the record?
**COURT REPORTER:** Off the record.
**MR. SOLOMON:** Thanks.
**(Off the record at 3:40 p.m.)**
**(On the record at 3:47 p.m.)**
**MR. SULLIVAN:** Let's go back on the record.
**COURT REPORTER:** Okay. Go ahead. Thank you.
A. **I can't answer your question--**
**COURT REPORTER:** Can, CAN?
**THE WITNESS:** Cannot.
**COURT REPORTER:** Okay. Thank you.
A. **Without having the records to refer back to. There are too many details in this for me to answer with a blanket statement about the contents of this document. There are just-- there could be any number of things being off by a date or on by a date. There are just too many things that I don't have the emails or the records of when I called in sick or anything. So I would-- I**





**can't. I can't.**
Q. Okay. So let's break it up a little bit.
A. **Yeah.**
Q. And I'll ask you about specific things.
A. **Yeah.**
Q. And I'll ask you if you think they're accurate.
A. **Okay.**
Q. And you can tell me yes or no or I don't know.
A. **All right.**
Q. And all those answers are perfectly fine, okay?
A. **Yeah.**
Q. So maybe the first thing I should ask is, were you involved in writing this at all?
A. **Yes.**
Q. Okay. You and Mr. Smith worked together to draft this?
A. **And Valorie Reilly and my mother proofread it.**
Q. How long were you guys working on this letter?
A. **I have no memory. A lot of it I think-- I remember a lot of it was just cut and paste out of the**





**emails we had already sent.**
Q. Okay. So there's the second full paragraph starting, The following is a synopsis of recent events?
A. **Uh-huh.**
Q. And it finishes by saying that you returned-- Sorry. That you finished your treatment for breast cancer in late December 2012. Does that sound like about the time where you finished your breast cancer treatment?
A. **I don't remember.**
Q. Okay.
A. **But I think-- I don't know. I don't remember. I think so.**
Q. The first bullet says you returned to work on January 2nd, 2013. Do you know if that's accurate?
A. **I don't know what I was returning from. It could be-- it could be accurate.**
Q. Okay. And I guess you and John Smith and Valorie Reilly and your mom all worked on this together. And I presume you sort of took care to present accurate information to Mrs. Wax?
A. **No one would intentionally misrepresent.**
Q. Okay. And you certainly didn't do that when you and Mr. Smith and the others wrote this document, correct?
A. **To what? Attempted to misrepresent?**

Q. Yeah. I'm saying you did not try to misrepresent anything--
A. **No. We didn't try. If there was any misrepresentation, it was not intentional.**
Q. Okay.
A. **My mother's role is she was an English teacher, so she did grammatical.**
Q. Thursday, January 17th, 2013 Ms. Mullin was seen by her primary care physician who advised further limiting her exposure to the building until a workup by a specialist was completed.
A. **Yeah.**
Q. Do you know who your primary care physician was that--
A. **Bridgid Levoir.**
**COURT REPORTER:** Bridgid?
**THE WITNESS:** Bridgid Levoir, L-E-V-O-I-R.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** And does summary of what Dr. Levoir advised, is that accurate to the best of your recollection?
A. **To the best of my recollection.**
Q. Did you pass along Dr. Levoir's recommendations to the VA at some point?





A. **Yes.**
Q. Who did you pass it onto?
A. **I don't remember specifically who I handed it to.**
Q. Okay. Do you know when?
A. **No. I don't remember the specific date that I handed it to them.**
Q. Okay. January 23rd, 2012 it says, Within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. Did you tell the VA-- anyone at the VA about that on the 23rd?
A. **I don't know. I'd have to review the records and my email records.**
Q. Okay.
A. **If you'd like me to look at the records, I'd be happy to.**
Q. That's okay. I don't think we're going to have all those here. January 26th, 2013 it says, Ms. Mullin was seen by the medical specialist who deemed it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. What specialist was that, if you remember?
A. **Klemawesch.**
Q. Okay. So if I understand-- And is this





accurate to the best of your recollection, this statement about what Dr. Klemawesch advised?
A. **I don't remember exactly. I don't remember his exact words.**
Q. Okay. But one of the things he said, according to this at least, which is Exhibit 15 again for the record, is that it was not safe for you to enter the building without a respirator?
A. **Yeah.**
Q. Do you remember him giving you that specific advice?
A. **No.**
Q. Okay. Now, on Monday, January 28th, 2013 it says, Ms. Mullin informed the Agency of her worsening reaction to being in the building and of the doctors' orders?
A. **Uh-huh.**
Q. The doctors' orders that that bullet point is referring to, are those the orders of Dr. Levoir and Dr. Klemawesch?
A. **I don't know. I don't remember without looking at the record. I need to look at the record.**
Q. January 29th, Ms. Mullin had numerous conversations with the Human Resource Specialist attempting to determine how a respirator would be





attained. Do you recall having conversations with anyone at HR on January 29th, 2013?
A. **I don't remember having oral conversations about that.**
Q. Do you remember having any other kind of conversation?
A. **Yes. And them wanting to know exactly what specs and me saying I don't-- and it was oral. She wouldn't put it in writing. I said we need to do know what the contaminants are in order to know what exact respirator needs to be used. I asked her to contact my doctor to find out. I told her we need to know exactly what I was being exposed to in order to determine the type of respirators needed. And to the best of my recollection, there's an email that supports that.**
Q. Okay. So it sounds like after you got the order or the advice from Dr. Klemawesch, you communicated that to HR that you needed a respirator. And then there was some conversation about figuring out how to identify what respirator was appropriate?
A. **Yes.**
Q. And was that Tammi Clarke you were having those conversation--
A. **Yes.**
Q. --or conversations with?

A. Yes.
Q. And if I can just ask you to please wait until I finish the question.
A. My apologies.
Q. That's okay. Wednesday, January 30th, it says, Ms. Mullin requested a meeting with the HR specialist, her immediate supervisor, and AFGE representative. Do you know who that HR specialist was?
A. Tammi Clarke.
Q. And your immediate supervisor?
A. Ulyssee McBurrough.
Q. And your AFGE rep I assume is John Smith?
A. I would only have to assume. I don't know for sure right now.
Q. You don't remember?
A. No. It's in my notes, but I-- if I could refer back to the notes, but I don't have clear memory on that.
Q. And it says, Discussions at the meeting included Ms. Mullin's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Ms. Mullin wished to believe that collaboratively a plan could be worked out. Aid with marginal with job functions such as assistance retrieving documents from the printer and moving the





files were suggested by Ms. Mullin. The group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job.
A. (Nods head)
Q. So it sounds like you spoke with Tammi Clarke on the 29th and then you met with her, Ulyssee McBurrough and an AFGE rep the next day, and you had planned to speak again the next day.
A. (Nods head)
Q. Is that right?
A. Yes.
Q. And were there any other topics of conversation that occurred during that January 30th meeting that aren't mentioned in Mr. Smith's letter here?
A. I'd have to refer back to the record.
Q. Okay. But you don't have any recollection that you can tell me about?
A. We had discussed different things, like in the area where they call QRT, where the DRO's sit, they had a small boot -- insulated booth where they did recordings. And we had discussed using that because we could get the air purifiers in a small space and I'd be close to mentors and Decision Review Officers. That was one of the things that was discussed. And we actually looked at the space.





Q. Okay. So there was-- it's like a private room I guess?
A. Yeah. It's like a recording studio the size of a closet.
Q. And you went there with Ms. Clarke and Mr. McBurrough and you looked at it on the 30th?
A. I don't remember which day we looked at it. I can't remember which day we looked at it.
Q. And it sounds like one of the things you discussed was the potential to have you work there and then put air purifiers there?
A. Well, and also, well, we'd need to coordinate with the Decision Review Officers so-- when they were recording trainings and stuff like that. We discussed the details of how and when that space could be used. And we talked about the containment of the air and how it would be easier to identify if there were problems, what the problems in the air in that room would be. We just talked about exploring possibilities of making that space work.
Q. Okay.
A. We talked about doing exams over at-- you know, we share the campus with the hospital. And early in my testimony, I described the process of ordering exams is to set me up to do exam requests, that kind of





thing, over on the hospital campus outside the building.
Q. Okay. Is there anything else you remember discussing?
A. Not at this moment.
Q. Is it accurate where Mr. Smith said, Ms. Mullin voiced her belief that collaboratively a plan could be worked out?
A. Yes. Ms. Mullin believed that collaboratively and working with-- HR at that point seemed-- they engaged in the interactive process. They finally engaged. And it seemed to be-- it appeared 100 percent to be collaborative and we were all on the same page we were going to make it work. Yes, I left that meeting believing that.
Q. So I want to jump down to the paragraph that says, as Ms. Mullin had witnessed. Do you see that?
MR. MAHARAJ: (Indicating)
A. So we're not going to do the paragraph after that?
Q. Not right now I don't think.
A. I think it's important.
Q. Okay.
A. So as Ms. Mullin had witnessed such treatment of other disabled employees, she realized her job was in jeopardy. Yeah. Without the previous paragraph, that's

**out of context it. She became extremely alarmed and distraught.**
Q. Okay. So just the context is there, the previous paragraph, and I'm paraphrasing here, says that same afternoon, so January the 30th, HR informed you that your request for modifications to your accommodation was denied?
A. **Yes.**
Q. Without the benefit of further conversation.
A. **Yeah.**
Q. Okay. And once that happened, you realized your job was in jeopardy?
A. **Yeah.**
Q. Why did you-- I'm sorry. Was that yeah you said?
A. **Yes.**
Q. Why did you feel your job was in jeopardy?
A. **Because the-- everything that-- one of the things Tammi had talked about was-- How do I know my job was in jeopardy? Because when they went-- when HR, VSC, everybody went from this, we can work this out, there's all these things to explore, to you will not receive any modifications, which meant I still had to come in the building on those days, and they knew that that would-- medically what that would do to me.**





**At that point I'm like, if they stick with that, I lose my job. I'm either going to have to quit or I'm not going to meet production. But at that point, it's like they don't want to engage in the interactive process, a term I didn't know at that time. They didn't want to talk to me. They didn't want to talk to my bosses. They didn't want to find a way for me to help service the Veterans. They were done with me. I was so blind-sided.**
Q. Okay. So it sounds like you realized your job was in jeopardy-- We'll scratch that. I understand. Is there any other reason that you felt like your job was in jeopardy at that point?
A. **Oh. Just cumulative for all the times before that, things that interfered with me meeting my production standards. How the breathing problems interfered with me doing my job. You know, all the things that had already-- I keep fighting through to try to keep my job and keep my position and be successful at what I did, but I couldn't do them.**
**So I had already had to fight really hard to be able to keep serving Veterans. And this is the last straw. They had complete control over whether or not I breathe or I don't. And when this was their decision, when they let me know that. Because to do my job, I had**





**to breathe. And the job was done and they had complete control over that. And that's when I knew that. . . If they weren't willing to work with an accommodation, I couldn't do my job without them.**
Q. And did you think that decision that you were informed of on January 30th, that your request to modify your accommodation was going to be denied, did you believe that that was retaliation?
A. **Well, I have to say-- and I don't agree with all the working in that, the modifications. And I don't know exactly if I agree with all of that.**
Q. Okay. Well, let's try and take out some of the wording then. Around January 30th.
A. **Yeah.**
Q. HR told you that you were not going to get an accommodation that you had asked for?
A. **That we had discussed. No. I didn't ask for it. Things that we had-- nothing that we had discussed was going to be arranged.**
Q. Okay. And just, again, so we're on the same page, those were things like using QRT room, putting in air purifiers, maybe letting you go to the hospital for the exam--
A. **Yeah. Relocating me to a different location.**
Q. For certain--





A. **For whatever, just whatever. Finding work for me to do from a different location.**
Q. Okay. That's what was discussed?
A. **Yeah. Finding work for me to do outside that building. I don't know all the job titles and things. Like I was open to anything that they could transfer me to outside the building.**
Q. Okay. So I don't think you had mentioned that before. I understood that you had said that they might let you do part of your job as an RSVR--
A. **RVSR.**
Q. RVSR, sorry.
A. **No. Don't apologize.**
Q. At the hospital, specifically the piece related to requesting exams for the Veterans.
A. **That was one of the suggestions we threw it.**
Q. Okay.
A. **It was something-- well, it was one of many things that were discussed, options.**
Q. And I think what you just said though was that there was conversation about giving you a completely different job outside of that building?
A. **No. I had already said that if there's position that I can do to serve Veterans, I'm open to it. I'll talk about-- I was willing to talk about-- No. I**

**wasn't willing. I tried to talk about.**
Q. Was that something you discussed on or around January 30th?
A. **Again, I had done it before. I had done with Larry Smith. That's of record. Of record. I know it's Larry Smith's conversation. But yeah, I would do anything they wanted me to do.**
Q. Okay. And that same day after those conversations, you're told by HR, actually, no. We're not going to do any of that. Is that right?
A. **Yeah.**
Q. Did you believe or do you believe that that decision from HR was discrimination?
A. **Yes.**
Q. Because of your disability?
A. **Yes.**
Q. And did you also feel like that decision from HR was retaliation?
A. **Yes.**
Q. For EEO activity?
A. **More than that.**
Q. For what?
A. **More of it-- a lot of had to-- well, filing a Workmen's Compensation claim, the EEO process, definitely Union involvement because-- and I think it's in the**





**documents many places. Valorie Reilly and Kerrie Witty had-- they were brutal with each other. Valorie Reilly had undermined Bonnie Wax getting a job transfer and things like that. This is in the record over and over again. I think I was part of the fallout of that. So I think there was-- that retaliation was part of that.**
Q. Was there anything said by anyone in HR or from the Agency around that time that caused you to connect the dots between HR's decision and retaliation for any of those things?
A. **(No response.)**
Q. You're saying HR's decision was retaliation for my Union activity, for my EEO activity, for all that stuff, right?
A. **Yeah.**
Q. I'm asking is there anything that anyone said around then that led you to that conclusion?
A. **Yes.**
Q. Okay.
A. **Yeah, a long history of it. I mean, that could-- very long history of it. We could go-- well, first of all, the fact that they would stop this conversation. I have complete control. We're going to have it. That's it.**
Q. Okay.





A. **You're disabled. We know you need this. We're contacting GC. You're done.**
Q. Did anyone actually say that to you?
A. **Tammi Clarke did.**
Q. She said, you're disabled--
A. **No, no. She didn't.**
Q. We're stopping this. We're contacting GC. We're done?
A. **Like I said, not until Trump did I ever hear anyone say those things out loud, such prejudiced statements.**
Q. Okay. So you never heard anyone make a prejudiced statement about your disability?
A. **Yes, I did.**
Q. Who?
A. **Those are the comments that in Bonnie Wax's deposition.**
Q. Okay. Anyone besides Bonnie Wax? Did anyone else besides Bonnie Wax ever make a prejudiced statement about your disability?
A. **Yes, yes, yes.**
Q. Who?
A. **Bonnie Wax-- the people who handled the building maintenance who decided it was really the archival documents that asthma really wasn't an issue,**





**Bonnie Wax saying that the cancer was caused by-- I mean, the asthma was caused by my breast cancer.**
Q. Who are these people?
A. **I don't know if I'm answering your questions or not.**
Q. No. I mean, you sort of are. I want to know if anyone's ever said anything that led you to believe that all the bad things that were happening to you were because of your disability? And you said Bonnie Wax in her depo.
A. **Okay. Wait, wait, wait. I'm processing what you just said. Your question was-- just repeat it. I'm processing slowly, so just to try to say it again for me.**
Q. Have you ever heard or heard of someone making a statement that caused you to believe that the bad things that were happening to you that we've been talking about today were the result of discriminatory intent against you based on your disabilities?
A. **Yes.**
Q. Okay. Tell me about the statement.
A. **Can I-- I'll just-- I'd like to focus on Bonnie's.**
Q. Well, first tell me the people and then we'll go through each person's statements? How about that? So there's Bonnie Wax. Who else?

**A. Matt Correa.**
Q. Okay. Who else?
**A. Those are the two biggest that are-- I'm telling you I'm not thinking clearly now. I'm not at my fullest in this deposition right now. I can't give you a complete answer because that's the best as I can do.**
Q. I understand. And if that's the case, then I don't want to continue anymore today because I don't--
**A. Right.**
Q. --want to waste anyone's time.
**A. Right.**
Q. So just so the record is clear, at this moment you don't feel that you're able to give full and accurate testimony?
**A. Correct.**
Q. Okay.
**A. No. I can't give-- pull from my memory a long list of names and specifics. I can give accurate testimony to smaller pieces of information. I can't retrieve a list-- I can't retrieve a list of names right now.**
Q. Okay. So if I ask you to tell me everyone who had said something that made you believe that you were being discriminated against because of your disability, you couldn't give me that list of names?





**A. No. I could start with one and give you the details on it and then try to move to another. I can't just--**
Q. Okay. So Bonnie Wax--
**A. --give it in the way you were asking me.**
Q. Bonnie Wax was the first person you mentioned. Are you able right now to tell me about statements that Bonnie Wax has made related to your disability?
**A. Yes. It would be helpful to have her deposition in front of me. But what I can, from memory-- actually, yeah. That my EEO Complaint-- I filed an EEO Complaint because of her conflict with Valorie Reilly and the Union. That's the reason I filed my EEO Complaint and I was going after was the words that the Director used, is that I was going after her based upon.**
Q. Okay.
**A. When I-- the opportunity became available to learn more about the mold and implications in the building, there were supposed to be a training. It would be for-- but no. I was told I was chosen to do that.**
Q. Who told you that?
**A. Valorie Reilly and Keith Pryor chose me to do it, to be part of it. Bonnie Wax went to-- Bonnie Wax wrote it says memo and details and found ways to make**





**sure-- to prevent me from having training about air problems in the building.**
Q. Uh-huh.
**A. Disability, EEO involvement-- I mean, AFGE involvement, both of those in that scenario and-- okay. The first one I talked about was I was-- EEO and the Union--**
**MR. SOLOMON:** I'm not sure if she's--
**MR. SULLIVAN:** Yeah. Hold on.
**MR. SOLOMON:** I'm not sure if she's--
**MR. SULLIVAN:** Do you have an objection to anything?
**MR. SOLOMON:** Yeah. I'm just going to object because at this point, based on her answers, I'm not sure if she's fully understanding the question. I have concerns about her ability to answer questions.
**MR. SULLIVAN:** Okay.
**A. So I'll just stop then. I appreciate that.**
Q. I don't disagree. But you said you think you can give me just Bonnie Wax. So let's at least try one more time. And if it's not working, we'll stop. Okay?
**A. Okay.**
Q. So let me ask you a real direct question. Can you tell me about a statement that Bonnie Wax made





that led you to believe that you were being discriminated against because of your disability?
**A. In her deposition she referred to me needing leave donations as getting food stamps. In her deposition she talked about-- when asked about hostile work environment and harassment, she talked about me-- said things along the lines of, well, she can just be like that.**
**When asked if she was asked (ad verbum), she lied in her deposition saying that they had met with me and explained to me the different aspects. I had never met with her. There was something else that really annoyed me on that. In her deposition she referred to hearsay at least, I don't know, a dozen times and told elaborate stories about my health or my body, my reactions, interactions and all based on hearsay. She wove-- she crafted responses that weren't based on fact about my disability.**
Q. Okay. Is there anything else you can think of?
**A. I think we should stop right now.**
**MR. SULLIVAN:** Okay. Let's finish for the day and we'll pick up on Tuesday.
**MR. SOLOMON:** Off the record.
**MR. SULLIVAN:** Off the record.

STIPULATION.

It is hereby stipulated and agreed by and between counsel present at this deposition and by the deponent that the reading and signing of this deposition is not waived.

**(This deposition was adjourned at 4:19 p.m. to be continued on Tuesday, January 4th, 2022 at 10:00 a.m.)**





CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, Debbie E. Askins, FPR, Notary Public, State of Florida, certify that **Aileen Mullin** personally appeared before me on December 31, 2021 and was duly sworn.

Signed this 17th day of January, 2022.

DEBBIE E. ASKINS, FPR
Notary Public, State of Florida
My Commission No. HH 110711
Expires: 05/13/2025

Notary Public State of Florida
Deborah E Askins
My Commission HH 110711
Expires 05/13/2025





CERTIFICATE OF REPORTER

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, DEBBIE E. ASKINS, FPR, do hereby certify that I was authorized to and did stenographically report the deposition of Aileen Mullin; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 231, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 17th day of January, 2022.

Debbie E. Askins, FPR
Notary Public, State of Florida





UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.
CASE NO.: 8:20-cv-026970-VMC-AEP
DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
_______________________________________/

IN RE: Deposition of: Aileen Mullin, Vol. I
TAKEN: 12/31/2021

DATE SENT TO WITNESS: 1/17/2022

TO: Aileen Mullin
c/o James Solomon, Esq. (james@smkfirm.com)

The referenced transcript has been completed and awaits reading and signing.
Please arrange to read and sign the transcript. The transcript (Vol. I) is 230 pages long, and you should allow yourself sufficient time.
The original of this deposition has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties as listed below.
Thank you.

_______________________________________________
Debbie E. Askins, Professional Court Reporter

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com

**ERRATA SHEET - DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES**

**IN RE: Aileen Mullin v. Denis McDonnough, Sec. U.S. Department of Veterans Affairs**
Case No. 8:20-cv-026970-VMC-AEP
**Deposition of Aileen Mullin, Vol. I, 12/31/2021**
REPORTED BY: Debbie E. Askins, FPR

**Page Line Change Reason**

___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________________________
_____ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________
___ _____ ____________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

__________________________ __________________________
**Date** **Aileen Mullin**

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com

## '

**'13** [1] - 200:5

## 0

**0011719** [1] - 160:4
**0012** [2] - 3:14, 131:20
**0013** [2] - 3:16, 146:9
**0021** [2] - 3:18, 151:18
**0024** [2] - 3:24, 176:20
**009953** [1] - 192:15
**009953-9956** [1] - 4:3
**010965** [1] - 203:25
**010965-967** [1] - 4:6
**011470** [1] - 49:19
**011470-495** [1] - 3:7
**011495** [1] - 49:25
**011504** [1] - 52:24
**011506** [1] - 52:24
**011684** [1] - 76:24
**011716** [2] - 3:20, 155:2
**011719** [1] - 165:9
**011719-722** [1] - 3:21
**011721** [1] - 160:12
**011722** [1] - 160:5
**041** [2] - 4:4, 195:11
**042** [1] - 195:11
**05/13/2025** [1] - 230:16
**0857f** [1] - 176:21

## 1

**1** [24] - 1:22, 3:4, 16:5, 49:21, 57:2, 57:7, 57:17, 58:24, 76:10, 79:2, 88:9, 96:12, 100:12, 109:2, 109:20, 110:25, 115:21, 116:2, 126:6, 171:10, 199:10, 200:20, 231:7
**1/17/2022** [1] - 232:10
**1/26/10** [1] - 3:10
**1/31/12** [1] - 3:13
**10** [6] - 3:21, 30:11, 126:8, 159:25, 160:1, 165:10
**100** [2] - 199:24, 216:11
**108** [1] - 3:11
**10:00** [1] - 229:8
**10:18** [1] - 42:15
**10:21** [1] - 42:16
**10:32** [1] - 48:18
**10:33** [1] - 48:19
**10:59** [1] - 162:8
**10th** [11] - 117:4, 119:8, 128:19, 128:24, 136:21, 137:8, 137:12, 137:16, 137:21, 138:8, 139:19
**10X10** [2] - 146:24, 147:12
**11** [5] - 3:22, 173:19, 176:9, 180:11, 185:24
**1100-192** [1] - 2:3
**110711** [1] - 230:15
**11684** [1] - 3:10
**11:27** [1] - 88:5
**11:42** [2] - 164:11, 165:10
**11:44** [1] - 180:17
**11:46** [1] - 88:6
**11:47** [4] - 160:19, 161:16, 161:20, 162:5
**12** [9] - 3:24, 176:11, 176:12, 176:19, 191:13, 191:15, 193:13, 202:22, 202:24
**12/31/2021** [2] - 232:9, 233:3
**12:18** [1] - 110:20
**12:19** [1] - 110:21
**12:21** [1] - 163:5
**12:26** [1] - 115:15
**12th** [19] - 104:14, 106:22, 119:2, 119:21, 119:25, 120:14, 126:24, 127:21, 128:25, 129:16, 129:17, 136:25, 137:5, 152:14, 155:8, 161:1, 162:10, 181:7, 191:12
**13** [7] - 4:2, 126:22, 171:14, 191:14, 191:21, 191:23, 192:13
**131** [1] - 3:13
**13th** [10] - 107:17, 108:5, 160:16, 171:20, 173:8, 174:2, 174:22, 175:11, 175:18, 176:1
**14** [4] - 4:4, 194:25, 195:1, 195:10
**146** [1] - 3:15
**14th** [3] - 155:6, 164:11, 165:10
**15** [4] - 4:5, 203:19, 203:20, 211:6
**151** [1] - 3:17
**153** [1] - 3:12
**154** [1] - 108:17
**155** [1] - 3:19
**156** [2] - 110:1, 111:6
**158** [1] - 113:11
**160** [1] - 3:21
**166** [1] - 173:24
**166-173** [1] - 3:23
**167** [1] - 186:5
**168** [1] - 180:12
**169** [1] - 173:25
**17** [2] - 58:24, 79:2
**171** [1] - 173:24
**171-173** [1] - 3:23
**173** [11] - 3:12, 3:22, 108:17, 110:1, 111:6, 113:11, 173:24, 173:25, 180:12, 186:5
**176** [1] - 3:24
**17th** [3] - 209:8, 230:11, 231:11
**18** [6] - 88:11, 96:12, 100:12, 102:21, 111:2, 111:21
**18th** [4] - 50:23, 53:16, 79:5, 79:12
**19** [2] - 115:24, 126:6
**191** [1] - 4:2
**195** [1] - 4:4
**19th** [1] - 203:25
**1:00** [1] - 166:14
**1:07** [2] - 165:19, 170:3
**1:21** [1] - 115:16
**1st** [4] - 76:10, 85:10, 85:12, 85:17

## 2

**2** [11] - 3:6, 49:15, 49:18, 51:19, 52:7, 54:23, 55:8, 56:3, 59:4, 78:3, 131:2
**2/19/13** [1] - 4:6
**2/6/12** [1] - 3:15
**20** [2] - 171:10, 171:12
**2005** [1] - 11:3
**2009** [5] - 10:7, 33:13, 34:5, 61:24
**2010** [10] - 59:13, 62:5, 76:11, 77:2, 78:12, 79:5, 79:12, 88:13, 91:8, 96:12
**2011** [7] - 98:2, 98:14, 100:8, 100:14, 100:15, 116:8, 185:1
**2012** [45] - 36:19, 36:25, 43:9, 50:23, 51:2, 51:9, 53:15, 53:18, 54:2, 100:4, 104:14, 104:16, 105:25, 106:9, 106:15, 107:12, 108:5, 111:3, 111:7, 116:8, 117:4, 119:9, 120:14, 126:9, 126:13, 132:9, 136:6, 136:11, 146:13, 149:21, 149:22, 152:14, 165:10, 171:14, 171:20, 173:9, 174:23, 175:12, 177:9, 177:10, 185:1, 198:6, 200:9, 208:7, 210:8
**2013** [8] - 199:19, 200:21, 203:25, 208:14, 209:8, 210:18, 211:13, 212:2
**2015** [3] - 11:5, 31:23, 33:3
**2018** [1] - 5:25
**2021** [3] - 1:12, 177:13, 230:9
**2022** [3] - 229:8, 230:11, 231:11
**203** [1] - 4:5
**20th** [4] - 176:4, 176:6, 177:9, 198:23
**21** [2] - 199:11, 200:20
**215** [3] - 152:15, 154:7, 174:10
**21st** [2] - 176:5, 176:6
**222** [3] - 59:15, 134:19, 185:4
**23** [2] - 126:12, 126:13
**230** [2] - 2:14, 232:14
**231** [2] - 2:15, 231:7
**232** [1] - 2:16
**233** [2] - 1:22, 2:17
**23rd** [3] - 126:9, 210:8, 210:11
**26** [2] - 77:2, 78:12
**26th** [2] - 85:15, 210:18
**27** [1] - 102:4
**28th** [1] - 211:13
**29** [2] - 51:20, 111:21
**29th** [3] - 211:23, 212:2, 214:6
**2:20** [1] - 159:7
**2:25** [1] - 159:8
**2:55** [1] - 174:4
**2:57** [1] - 182:7
**2nd** [10] - 59:14, 105:6, 118:12, 122:25, 125:15, 128:12, 134:19, 198:6, 198:11, 208:14

## 3

**3** [11] - 3:8, 51:19, 52:17, 52:18, 52:21,

56:5, 57:17, 59:2, 130:25, 193:13
**3/12/12** [1] - 3:17
**3/14/12** [2] - 3:19, 161:25
**3/2** [1] - 193:4
**3/2/12** [1] - 4:4
**3/20** [1] - 177:10
**3/3** [1] - 196:18
**3/3/2012** [1] - 193:18
**30th** [7] - 213:5, 214:13, 215:6, 217:5, 219:6, 219:13, 221:3
**31** [2] - 1:12, 230:9
**31st** [3] - 132:9, 136:6, 136:11
**3200** [1] - 2:8
**33602** [2] - 2:3, 2:8
**3:07** [1] - 182:8
**3:30** [1] - 161:8
**3:40** [1] - 206:9
**3:47** [1] - 206:10
**3rd** [24] - 118:8, 118:9, 118:14, 127:19, 127:23, 128:16, 133:1, 138:14, 150:18, 155:22, 156:18, 158:7, 158:10, 158:12, 158:14, 159:1, 162:18, 163:10, 163:17, 166:9, 166:12, 167:14, 168:17, 198:7

## 4

**4** [11] - 3:10, 51:19, 51:20, 76:19, 76:20, 81:7, 81:14, 85:23, 86:13, 86:23, 87:11
**400** [2] - 1:15, 2:8
**413** [2] - 50:20, 54:23
**49** [1] - 3:6
**4:19** [2] - 1:13, 229:6
**4th** [3] - 59:13, 62:5, 229:7

## 5

**5** [11] - 2:13, 3:11, 108:9, 108:10, 108:13, 109:24, 110:9, 111:6, 111:8, 111:24, 113:10
**52** [1] - 3:8
**54** [1] - 194:5
**55** [1] - 194:5
**56** [1] - 192:15
**57** [1] - 3:4
**5th** [3] - 53:15, 53:18, 200:21

## 6

**6** [7] - 3:13, 131:15, 131:16, 136:6, 136:10, 136:16, 146:17
**601** [1] - 2:3
**6th** [2] - 100:4, 146:13

## 7

**7** [5] - 3:15, 88:13, 111:17, 146:4, 146:5
**73** [1] - 3:10
**7:21** [1] - 152:14
**7th** [5] - 91:7, 96:11, 98:2, 108:23, 109:5

## 8

**8** [7] - 3:17, 106:15, 151:13, 151:14, 151:25, 154:3, 158:16
**813-274-6000** [1] - 2:9
**813-497-7650** [1] - 2:5
**8:20-cv-026970-VMC-AEP** [3] - 1:5, 232:5, 233:3
**8:26** [1] - 146:17
**8th** [10] - 104:16, 105:3, 107:12, 107:16, 109:20, 111:3, 111:7, 111:25, 113:25, 116:11

## 9

**9** [4] - 3:19, 154:22, 154:23, 159:9
**911** [3] - 125:5, 195:23
**967** [1] - 203:25
**9955** [1] - 194:8
**9956** [1] - 193:7
**9:14** [1] - 1:13
**9:57** [1] - 32:15
**9:58** [2] - 32:16, 113:25
**9th** [6] - 113:15, 181:10, 181:11, 185:9, 194:2, 194:4

## A

**A-L-L-A-R-D** [1] - 117:15
**a.m** [13] - 1:13, 32:15, 32:16, 42:15, 42:16, 48:18, 48:19, 88:5, 88:6, 146:17, 152:14, 160:19, 229:8
**abbreviation** [1] - 197:10
**ability** [9] - 36:4, 61:3, 77:8, 83:12, 86:9, 110:5, 157:16, 195:8, 227:17
**able** [18] - 8:22, 20:4, 20:5, 25:7, 91:13, 96:9, 118:9, 120:9, 153:14, 157:25, 161:16, 162:16, 167:24, 170:18, 173:17, 218:22, 225:13, 226:7
**absence** [1] - 166:16
**ABSMs** [1] - 89:19
**absolutely** [8] - 47:21, 58:19, 75:19, 86:4, 125:8, 142:25, 144:8, 177:18
**abuse** [2] - 41:25, 141:20
**accept** [2] - 16:15, 16:17
**access** [4] - 29:2, 125:7, 153:9, 155:12
**accommodate** [6] - 7:21, 63:12, 86:7, 91:22, 97:25, 129:5
**accommodated** [6] - 63:9, 100:7, 100:13, 102:22, 102:24, 173:14
**accommodating** [1] - 102:9
**Accommodation** [2] - 3:24, 176:21
**accommodation** [94] - 55:9, 55:15, 55:22, 55:24, 56:1, 59:18, 59:21, 61:10, 61:16, 62:3, 62:15, 62:19, 63:17, 65:10, 65:11, 65:12, 66:1, 67:2, 74:2, 74:5, 78:20, 79:11, 80:2, 80:15, 80:17, 80:24, 81:3, 81:6, 82:4, 82:7, 82:10, 82:14, 82:15, 82:18, 82:23, 91:4, 91:12, 93:22, 100:9, 100:11, 100:19, 103:22, 119:8, 129:14, 135:2, 137:14, 141:8, 141:21, 141:23, 143:13, 143:19, 143:23, 147:9, 149:13, 149:25, 150:20, 150:21, 150:23, 150:24, 151:4, 155:9, 157:12, 159:13, 159:20, 161:18, 163:25, 165:5, 169:18, 171:7, 174:8, 174:13, 174:15, 174:22, 175:11, 177:5, 177:16, 177:17, 177:19, 178:22, 178:24, 179:3, 180:22, 180:23, 181:16, 185:17, 187:19, 188:6, 198:24, 201:16, 202:11, 217:6, 219:3, 219:7, 219:16
**accommodations** [23] - 42:1, 42:4, 54:16, 54:20, 54:22, 55:7, 59:15, 63:18, 63:23, 64:17, 68:24, 68:25, 70:23, 82:1, 102:5, 114:22, 114:24, 117:23, 131:25, 140:5, 145:21, 152:25, 155:25
**accord** [1] - 70:12
**accordance** [1] - 59:16
**according** [5] - 47:3, 144:10, 193:20, 193:21, 211:6
**accuracy** [1] - 58:18
**accurate** [22] - 8:7, 8:22, 58:2, 58:5, 173:9, 188:12, 188:14, 188:18, 190:16, 190:20, 190:22, 204:11, 204:14, 207:7, 208:14, 208:16, 208:19, 209:21, 211:1, 216:5, 225:14, 225:18
**accurately** [6] - 156:11, 174:14, 174:21, 175:10, 187:5, 189:4
**acknowledged** [1] - 5:3
**acknowledging** [1] - 139:25
**acronym** [3] - 11:12, 79:8, 79:10
**act** [2] - 59:3, 142:14
**Act** [1] - 59:4
**action** [6] - 47:9, 69:1, 73:8, 166:16, 231:10, 231:10
**actions** [3] - 138:12, 139:18, 140:12
**activities** [1] - 47:8
**activity** [3] - 221:20, 222:13
**ad** [12] - 94:7, 97:13, 102:4, 103:18, 138:18, 142:21, 166:11, 166:12, 185:19, 186:3, 200:21, 228:9
**add** [3] - 182:11, 182:12
**addition** [1] - 210:9
**Additional** [1] - 194:9
**additional** [2] - 24:10, 79:14
**additions** [1] - 185:7
**address** [2] - 199:7, 204:17
**addressed** [6] - 15:22, 24:9, 77:4, 129:18, 129:19, 189:11
**adjourned** [1] - 229:6
**adjustment** [2] - 166:10, 166:25
**adjustments** [1] - 199:4
**advance** [3] - 164:18, 165:13, 169:22
**adversarial** [1] - 173:15

**advice** [4] - 55:19, 55:21, 211:11, 212:17
**advise** [2] - 35:22, 35:23
**advised** [3] - 209:9, 209:21, 211:2
**advocate** [4] - 30:20, 38:15, 38:16, 60:17
**advocating** [1] - 60:17
**AFFAIRS** [2] - 1:7, 232:7
**Affairs** [1] - 233:2
**Affairs/Office** [1] - 3:8
**affect** [1] - 172:5
**affected** [1] - 140:7
**affidavit** [1] - 5:20
**afford** [1] - 150:14
**AFGE** [7] - 33:10, 34:13, 38:17, 213:7, 213:12, 214:7, 227:4
**afraid** [6] - 63:17, 63:18, 64:17, 68:9, 68:11, 147:14
**afternoon** [2] - 115:20, 217:5
**afterwards** [2] - 142:11, 148:9
**agency** [2] - 29:2, 63:4
**Agency** [33] - 30:11, 30:18, 59:13, 63:12, 66:19, 70:4, 71:3, 71:5, 71:10, 71:21, 72:5, 73:7, 74:22, 75:22, 83:3, 85:2, 92:3, 100:7, 100:13, 101:11, 102:21, 125:9, 129:1, 129:5, 150:11, 150:18, 151:8, 158:24, 166:6, 177:11, 200:5, 211:14, 222:8
**Agency's** [3] - 73:13, 91:22, 95:5
**aggravated** [1] - 210:10
**ago** [1] - 170:23
**agree** [3] - 152:21, 219:9, 219:11
**agreed** [8] - 84:15, 102:17, 102:20, 128:24, 202:8, 202:9, 202:11, 229:2
**ahead** [7] - 88:4, 153:7, 168:4, 168:8, 171:18, 189:8, 206:13
**Aid** [1] - 213:24
**Aileen** [16] - 2:12, 60:5, 132:18, 187:17, 188:5, 188:22, 188:23, 189:20, 191:9, 230:8, 231:6, 232:9, 232:11, 233:2, 233:3, 233:23
**AILEEN** [4] - 1:3, 1:10, 5:2, 232:3
**air** [40] - 39:8, 97:20, 99:23, 101:6, 101:12, 132:16, 134:2, 134:10, 134:13, 134:22, 134:24, 135:5, 135:7, 135:12, 135:21, 135:22, 135:24, 146:15, 146:22, 147:3, 147:13, 147:19, 147:25, 148:11, 168:6, 168:10, 168:15, 169:21, 172:2, 178:13, 194:16, 196:5, 214:22, 215:11, 215:16, 215:18, 219:22, 227:1
**airs** [1] - 39:10
**alarmed** [1] - 217:1
**Albuterol** [1] - 121:20
**Albuterol-based** [1] - 121:20
**alive** [1] - 155:17
**Allard** [8] - 34:20, 35:2, 117:13, 117:15, 117:17, 127:10, 128:20, 132:5
**allegation** [1] - 128:23
**allegations** [5] - 51:17, 51:20, 51:24, 52:4, 52:8
**alleged** [1] - 59:4
**alleging** [5] - 45:11, 46:20, 47:1, 128:1, 138:12
**allergist** [1] - 190:6
**allergy** [1] - 195:13
**Allergy** [2] - 4:4, 195:11
**Allison** [1] - 46:2
**allow** [5] - 15:8, 86:7, 177:11, 201:21, 232:15
**allowed** [18] - 15:1, 88:21, 91:16, 99:19, 107:21, 107:24, 118:6, 118:14, 157:15, 165:12, 167:10, 171:21, 182:19, 182:20, 183:5, 194:13, 194:18, 201:17
**allowing** [4] - 103:1, 108:2, 176:25, 214:2
**ally** [1] - 173:13
**almost** [4] - 40:20, 66:22, 140:15, 196:24
**alone** [3] - 122:1, 122:2, 188:25
**aloud** [1] - 155:7
**alternate** [1] - 154:10
**ambulance** [4] - 106:21, 122:7, 122:11, 125:17
**ambulances** [1] - 125:12
**amend** [1] - 52:3
**amendments** [1] - 52:9
**American** [4] - 29:25, 30:5, 30:6, 33:9
**amount** [2] - 25:8, 140:7
**ample** [1] - 167:24
**analogy** [1] - 26:12
**analytical** [1] - 14:3
**analyzing** [1] - 14:20
**announce** [1] - 141:17
**annoyed** [1] - 228:13
**answer** [34] - 6:19, 7:25, 36:11, 36:14, 41:23, 52:12, 70:14, 73:16, 73:20, 74:10, 75:2, 79:19, 82:8, 83:18, 84:7, 92:14, 110:15, 127:2, 144:3, 144:14, 164:22, 165:25, 166:1, 168:19, 168:24, 169:15, 172:15, 172:16, 206:15, 206:20, 225:6, 227:17
**answered** [5] - 23:21, 83:20, 164:23, 169:13, 192:8
**answering** [2] - 6:21, 224:4
**Answers** [2] - 3:5, 57:19
**answers** [12] - 6:13, 7:9, 23:2, 28:15, 57:23, 58:15, 58:17, 66:4, 97:5, 189:16, 207:12, 227:15
**antihistamine** [1] - 9:22
**anxiety** [2] - 41:18, 41:22
**apart** [2] - 111:5, 189:9
**apologies** [6] - 28:2, 66:15, 72:12, 83:19, 198:12, 213:4
**apologize** [2] - 49:20, 220:13
**apologized** [1] - 205:25
**appear** [1] - 7:1
**APPEARANCES** [2] - 2:1, 2:6
**appeared** [2] - 216:11, 230:8
**application** [3] - 90:21, 181:13, 181:21
**applications** [2] - 153:8, 153:10
**apply** [2] - 90:18, 196:7
**appointment** [2] - 197:25, 198:15
**appointments** [1] - 200:14
**appreciate** [2] - 195:6, 227:19
**approachable** [2] - 172:6, 172:11
**approaching** [1] - 188:16
**appropriate** [8] - 13:13, 22:5, 22:18, 23:20, 114:16, 150:12, 166:19, 212:20
**appropriately** [3] - 17:3, 23:15, 160:16
**Approval** [3] - 3:24, 176:21, 191:15
**approve** [1] - 25:18
**approved** [4] - 103:17, 144:23, 145:16, 145:18
**April** [5] - 11:3, 11:4, 199:19, 200:5, 200:15
**archival** [3] - 15:16, 88:19, 223:25
**area** [15] - 18:7, 18:8, 27:10, 105:6, 121:9, 134:25, 135:25, 140:24, 146:25, 168:7, 187:11, 196:2, 196:7, 214:19
**Area** [2] - 46:2, 47:22
**areas** [1] - 158:22
**arm** [1] - 25:7
**arrange** [1] - 232:14
**arranged** [1] - 219:19
**arrangement** [1] - 202:10
**arrived** [1] - 120:14
**arrows** [1] - 194:6
**articulation** [1] - 6:24
**asbestos** [2] - 21:2, 21:6
**Ashley** [1] - 2:3
**aside** [1] - 73:13
**Askins** [5] - 1:18, 230:7, 231:14, 232:18, 233:4
**ASKINS** [2] - 230:14, 231:5
**aspect** [1] - 47:16
**aspects** [1] - 228:11
**assessments** [1] - 12:9
**assign** [5] - 26:1, 129:10, 130:2, 130:5, 147:12
**assigned** [19] - 17:17, 17:20, 59:24, 76:15, 88:19, 100:17, 105:7, 106:10, 106:12, 118:9, 120:15, 127:16, 128:3, 128:5, 128:10, 128:12, 147:10, 147:13
**assigning** [1] - 104:10
**assist** [2] - 26:6, 34:2
**assistance** [2] - 213:21, 213:24
**Assistant** [10] - 5:10, 32:23, 48:6, 88:25, 90:17, 100:16, 121:12, 127:17, 153:18
**assistant** [5] - 30:25, 31:3, 34:17, 34:19, 34:22
**assisted** [1] - 33:23
**assisting** [2] - 26:3
**Assoc** [1] - 4:4
**associated** [2] - 85:24, 99:25
**Associates** [2] - 195:11, 195:13
**assume** [16] - 5:21, 18:11, 21:19, 90:3,

103:16, 103:21, 114:6, 114:7, 114:12, 114:19, 162:22, 190:2, 190:5, 213:12, 213:13
**assumed** [3] - 103:10, 103:13, 117:9
**assuming** [2] - 24:16, 190:4
**assumption** [4] - 144:7, 144:10, 144:11, 151:1
**assumptions** [1] - 144:7
**assure** [1] - 20:15
**asthma** [14] - 95:19, 120:20, 126:18, 131:9, 153:20, 156:18, 168:3, 179:23, 194:19, 196:3, 201:7, 210:10, 223:25, 224:2
**asthmatic** [1] - 100:6
**attached** [2] - 46:9, 90:20
**attack** [5] - 95:20, 153:20, 153:22, 195:22, 201:7
**attacks** [2] - 156:18, 168:3
**attained** [1] - 212:1
**attempt** [1] - 29:18
**attempted** [1] - 208:25
**attempting** [2] - 132:16, 211:25
**attempts** [1] - 107:23
**attend** [1] - 35:18
**attendance** [1] - 26:2
**attention** [1] - 194:8
**attest** [1] - 163:14
**Attorney** [2] - 2:7, 5:11
**attorney** [7] - 48:23, 81:16, 140:10, 148:19, 172:14, 231:9, 231:10
**ATTORNEY'S** [1] - 1:14
**attorneys** [4] - 6:13, 9:11, 56:23, 57:24
**AUSA** [3] - 2:7, 232:20, 233:24
**authority** [4] - 21:24, 30:4, 131:8, 172:18
**Authorization** [1] - 103:19
**authorized** [2] - 141:8, 231:6
**available** [2] - 29:1, 226:18
**average** [4] - 180:6, 180:8, 180:9
**avoid** [2] - 201:5, 201:7
**AVSO** [1] - 148:15
**awaited** [1] - 57:2
**awaits** [1] - 232:13
**aware** [10] - 47:18, 71:9, 71:20, 72:4, 83:14, 85:6, 86:21, 174:12, 201:15, 202:9
**awareness** [1] - 41:8
**AWOL** [3] - 115:4, 144:22, 145:2

## B

**bad** [3] - 95:20, 224:8, 224:16
**bag** [1] - 187:20
**baked** [1] - 169:10
**bald** [1] - 201:13
**ball** [6] - 5:24, 11:21, 11:22, 34:10, 36:6
**Baltimore** [3] - 100:16, 129:12, 129:16
**bar** [1] - 16:15
**Barbara** [6] - 69:6, 69:7, 73:2, 87:3, 95:8, 145:13
**based** [28] - 8:23, 12:19, 13:7, 14:9, 16:8, 36:24, 45:12, 79:13, 85:25, 86:24, 86:25, 87:7, 87:11, 97:4, 97:6, 121:20, 138:18, 139:11, 139:19, 140:12, 145:9, 172:9, 181:17, 224:18, 226:16, 227:14, 228:16, 228:17
**basis** [2] - 46:21, 168:25
**Bates** [12] - 49:19, 52:23, 76:24, 131:20, 146:9, 151:17, 155:1, 160:4, 176:20, 192:15, 195:10, 203:25
**battle** [1] - 183:22
**battles** [1] - 183:24
**Bay** [1] - 15:4
**bearing** [1] - 76:23
**bears** [1] - 49:18
**Beauchamp** [4] - 32:3, 45:25, 46:17
**became** [9] - 15:10, 35:19, 36:7, 37:1, 65:2, 183:22, 201:17, 217:1, 226:18
**become** [6] - 36:21, 43:17, 44:15, 65:15, 73:2, 86:21
**becomes** [3] - 8:18, 169:11, 201:20
**bed** [1] - 153:23
**bedrest** [1] - 153:24
**begging** [1] - 110:5
**beginning** [5] - 41:1, 91:17, 104:14, 129:10
**begins** [1] - 126:12
**Behalf** [1] - 1:11
**behalf** [1] - 166:16
**behind** [3] - 121:8, 125:7, 141:22
**belief** [3] - 87:6, 96:7, 216:6
**below** [5] - 59:7, 162:8, 191:8, 198:9, 232:16
**bend** [1] - 25:7
**benefit** [2] - 23:21, 217:9
**benefits** [2] - 12:6, 21:22
**best** [10] - 58:2, 58:6, 110:4, 157:16, 202:12, 209:21, 209:23, 211:1, 212:14, 225:6
**Beth** [2] - 34:20, 35:4
**better** [3] - 121:21, 128:6
**Bettie** [5] - 54:8, 55:20, 63:15, 63:19, 67:23
**between** [14] - 12:19, 25:5, 51:9, 58:7, 100:25, 101:9, 156:8, 157:9, 160:8, 173:15, 179:5, 198:20, 222:9, 229:2
**beyond** [1] - 78:10
**big** [7] - 10:11, 14:13, 14:20, 24:14, 26:23, 28:18, 99:19
**bigger** [1] - 66:3
**biggest** [4] - 26:21, 150:4, 156:15, 225:3
**biological** [1] - 97:19
**birthday** [4] - 185:10, 198:7, 198:12, 198:13
**bit** [10] - 20:12, 35:12, 42:20, 101:16, 101:17, 101:19, 156:13, 169:11, 171:17, 207:2
**black** [1] - 143:25
**blank** [1] - 197:14
**blanket** [2] - 204:16, 206:21
**blanks** [1] - 29:16
**blatant** [1] - 140:19
**bleeding** [2] - 126:18, 210:9
**blind** [1] - 218:9
**blind-sided** [1] - 218:9
**blood** [1] - 182:4
**Blue** [1] - 14:13
**Bo** [6] - 162:10, 165:14, 187:22, 187:25, 188:2, 201:14
**boatyard** [1] - 21:5
**body** [3] - 153:2, 187:20, 228:15
**bogus** [1] - 166:21
**bold** [1] - 59:7
**bolts** [1] - 14:21
**Bonnie** [41] - 45:16, 45:19, 46:17, 85:21, 86:16, 131:7, 131:9, 131:10, 140:23, 141:6, 141:10, 141:20, 141:25, 142:9, 142:24, 143:12, 143:14, 143:18, 170:6, 170:7, 170:19, 170:23, 173:15, 174:6, 201:20, 203:24, 222:3, 223:16, 223:18, 223:19, 223:23, 224:1, 224:9, 224:25, 226:4, 226:6, 226:8, 226:24, 227:21, 227:25
**Bonnie's** [1] - 224:22
**Bookhart** [8] - 54:8, 54:21, 55:7, 55:20, 55:21, 56:6, 63:19, 67:24
**boot** [1] - 214:20
**booth** [1] - 214:20
**boss** [5] - 155:13, 165:15, 201:14, 202:16
**bosses** [1] - 218:7
**Boston** [5] - 183:16, 184:4, 184:5, 184:10, 185:1
**bottom** [8] - 81:19, 104:16, 109:19, 111:2, 113:14, 163:5, 171:13, 194:9
**boxes** [4] - 18:15, 19:5, 19:6, 23:3
**brain** [3] - 9:23, 28:11, 181:23
**brainstorming** [1] - 203:14
**brass** [1] - 39:22
**break** [15] - 7:19, 32:13, 42:11, 71:14, 81:8, 81:11, 87:16, 87:18, 113:11, 138:25, 154:14, 154:18, 159:3, 206:4, 207:2
**breast** [7] - 131:7, 131:9, 172:3, 200:11, 208:6, 208:8, 224:2
**breath** [1] - 103:22
**breathe** [20] - 100:20, 103:20, 121:2, 123:14, 123:21, 124:11, 124:12, 133:16, 133:18, 133:19, 156:16, 159:15, 167:25, 199:3, 199:8, 218:24, 219:1
**breathing** [21] - 8:12, 8:18, 8:23, 20:21, 21:4, 36:2, 36:25, 38:4, 123:20, 136:25, 153:24, 153:25, 156:7, 159:19, 162:23, 163:3, 165:6, 167:25, 183:21, 201:22, 218:16
**Bridgid** [3] - 209:15, 209:16, 209:17
**brief** [1] - 110:13

**briefly** [4] - 21:9, 101:5, 101:22
**bright** [2] - 170:12, 170:13
**bring** [11] - 17:13, 18:4, 18:7, 49:1, 60:10, 84:10, 89:17, 89:18, 105:9, 131:12, 185:23
**bringing** [1] - 131:11
**broad** [1] - 35:16
**brought** [10] - 17:25, 51:18, 51:25, 52:8, 69:14, 89:18, 90:1, 127:9, 195:18, 198:11
**Brown** [5] - 31:10, 32:23, 127:18, 132:4, 148:15
**brutal** [1] - 222:2
**BRVSR** [1] - 161:25
**building** [111] - 17:12, 30:2, 38:7, 42:2, 44:7, 45:5, 55:10, 55:11, 63:21, 63:24, 64:16, 64:24, 64:25, 65:3, 65:25, 66:18, 67:4, 67:15, 68:5, 68:16, 69:21, 70:4, 70:5, 75:15, 88:17, 88:20, 89:11, 91:18, 92:16, 92:19, 94:6, 94:12, 94:20, 95:20, 96:3, 96:25, 97:10, 97:13, 102:1, 112:11, 121:5, 124:25, 125:7, 125:11, 125:19, 125:20, 125:22, 126:14, 126:17, 126:24, 127:5, 127:8, 127:21, 129:7, 129:8, 130:2, 130:6, 131:4, 138:20, 138:24, 150:3, 152:17, 152:23, 154:5, 156:16, 163:11, 166:7, 175:5, 178:4, 178:12, 178:14, 178:15, 178:16, 178:18, 178:20, 179:21, 179:24, 180:2, 184:7, 186:2, 187:18, 194:16, 199:6, 199:18, 200:25, 201:1, 201:5, 201:7, 201:11, 201:17, 202:18, 203:13, 209:10, 210:20, 210:22, 211:8, 211:15, 213:21, 213:22, 216:1, 217:24, 220:5, 220:7, 220:22, 223:24, 226:20, 227:2
**building-related** [1] - 97:13
**buildings** [1] - 71:1
**built** [1] - 65:2
**bulk** [1] - 14:15
**bullet** [2] - 208:13, 211:18
**bulleted** [1] - 55:4
**burdensome** [1] - 94:1
**Burgess** [9] - 31:11, 32:24, 89:24, 89:25, 90:2, 129:23, 130:1, 130:13
**burnt** [1] - 18:17
**business** [1] - 172:5
**busy** [2] - 49:13, 123:12
**butchering** [1] - 53:1
**BY** [2] - 5:7, 233:4

## C

**C-file** [3] - 15:15, 19:2, 29:14
**C-L-E-S-T** [2] - 196:11, 196:21
**c/o** [1] - 232:12
**cabinets** [1] - 17:8
**campus** [5] - 55:12, 55:13, 203:11, 215:23, 216:1
**CAN** [1] - 206:16
**cancer** [23] - 36:1, 36:19, 41:6, 41:10, 41:17, 42:20, 42:24, 43:5, 43:10, 43:21, 44:1, 44:10, 44:18, 131:8, 131:10, 172:3, 183:23, 200:12, 200:18, 208:7, 208:8, 224:1, 224:2
**cannot** [2] - 70:3, 206:17
**capable** [1] - 35:24
**capacity** [1] - 10:8
**car** [3] - 102:2, 105:11, 105:16
**card** [1] - 121:11
**care** [9] - 16:13, 37:12, 96:2, 144:19, 157:4, 159:20, 208:19, 209:9, 209:13
**careful** [1] - 63:21
**caregivers** [1] - 196:24
**Carol** [10] - 34:20, 35:2, 117:13, 117:14, 118:21, 118:24, 119:14, 127:9, 128:20, 132:5
**Carol's** [1] - 118:17
**carry** [2] - 29:14, 39:11
**carrying** [1] - 73:5
**Cartner** [13] - 98:16, 98:19, 102:7, 103:2, 104:21, 105:4, 111:4, 111:8, 111:17, 112:14, 116:9, 120:5, 132:4
**case** [9] - 5:11, 12:13, 12:15, 24:19, 50:19, 105:10, 122:6, 225:7
**Case** [1] - 233:3
**CASE** [2] - 1:5, 232:5
**Casey** [10] - 34:17, 35:6, 39:17, 39:19, 39:20, 40:5, 186:5, 187:16, 187:21, 204:23
**categories** [2] - 27:14, 45:15
**category** [1] - 39:1
**caused** [9] - 92:16, 94:2, 131:9, 132:25, 138:24, 222:8, 224:1, 224:2, 224:15
**causes** [1] - 178:18
**causing** [6] - 66:18, 67:4, 68:5, 75:15, 92:20, 94:20
**CC** [2] - 232:20, 233:24
**cell** [1] - 166:5
**Center** [10] - 31:3, 32:22, 32:24, 33:2, 43:13, 48:7, 78:5, 99:9, 127:18, 153:19
**center** [1] - 28:12
**Central** [1] - 12:25
**cert** [2] - 157:4, 174:10
**certain** [3] - 30:3, 77:18, 219:25
**certainly** [1] - 208:22
**CERTIFICATE** [2] - 230:1, 231:1
**Certificate** [2] - 2:14, 2:15
**certification** [25] - 141:4, 149:20, 149:25, 150:7, 150:23, 151:9, 152:16, 152:22, 154:4, 154:8, 154:17, 155:19, 155:20, 155:23, 156:3, 158:17, 159:21, 160:9, 161:19, 161:22, 162:14, 163:25, 165:7, 165:13, 167:21
**certify** [2] - 230:8, 231:5
**CERTIFY** [1] - 231:8
**chain** [7] - 3:21, 3:23, 31:4, 149:10, 160:8, 160:15, 172:16
**chair** [10] - 141:7, 141:10, 141:13, 141:14, 141:15, 142:9, 142:12, 142:19, 142:20
**challenges** [2] - 24:6, 37:22
**challenging** [1] - 61:3
**chance** [1] - 20:18
**Change** [1] - 233:5
**change** [11] - 13:1, 13:16, 74:25, 98:5, 99:3, 99:13, 101:9, 103:3, 106:13, 109:5, 112:21
**changed** [14] - 12:24, 14:25, 31:17, 98:6, 99:16, 104:22, 104:23, 105:5, 105:6, 106:19, 107:2, 107:13, 109:6, 112:18
**changes** [4] - 27:13, 101:14, 101:18, 113:2
**CHANGES** [1] - 233:1
**changing** [4] - 100:24, 101:3, 102:10, 116:10
**characterize** [1] - 40:4
**charge** [2] - 46:4, 48:10
**charging** [1] - 141:6
**chart** [1] - 196:18
**check** [3] - 16:10, 22:15, 23:3
**chemotherapy** [1] - 42:21
**Chest** [1] - 197:5
**chest** [6] - 132:15, 153:23, 161:10, 162:23, 197:4, 197:6
**chicken** [1] - 108:14
**chief** [3] - 34:18, 34:22, 34:24
**Chief** [3] - 34:17, 35:6, 35:9
**choice** [2] - 86:8, 141:12
**choose** [2] - 23:6, 167:3
**chose** [2] - 151:10, 226:23
**chosen** [3] - 30:3, 30:5, 226:21
**Christine** [3] - 48:6, 48:7, 89:20
**Christmas** [2] - 183:20, 184:1
**circulated** [1] - 97:14
**circumstances** [1] - 44:25
**claim** [14] - 12:7, 12:8, 16:14, 16:17, 17:1, 20:1, 20:21, 27:20, 29:7, 29:8, 30:7, 138:19, 221:24
**claimed** [2] - 15:22, 138:24
**claiming** [3] - 22:22, 92:19, 92:23
**claims** [17] - 14:22, 15:9, 15:12, 15:15, 16:11, 16:23, 17:2, 17:13, 17:19, 23:13, 23:18, 27:14, 30:4, 30:12, 54:3, 88:18, 131:3
**clarification** [2] - 83:18, 84:6
**clarify** [1] - 151:19
**clarity** [3] - 24:7, 29:17, 30:10
**Clarke** [31] - 46:1, 47:12, 116:14, 117:2, 117:18, 117:19, 118:13, 120:2, 123:8, 124:14, 132:4, 136:22, 146:12, 152:5, 160:9, 160:17, 160:21, 160:25, 161:13, 165:2, 167:13, 170:17, 170:22, 179:6, 179:16, 202:16, 212:22, 213:9, 214:5, 215:5, 223:4
**Clarke's** [1] - 170:2
**class** [2] - 40:1, 144:18
**classmates** [1] - 115:1

**clean** [1] - 24:19
**clear** [10] - 24:19, 42:6, 74:4, 74:5, 80:12, 118:24, 119:19, 142:22, 213:17, 225:12
**clearest** [1] - 119:12
**clearly** [4] - 7:8, 115:9, 143:25, 225:4
**close** [3] - 158:22, 187:6, 214:23
**closed** [5] - 122:8, 125:8, 147:12, 168:7, 182:18
**closer** [3] - 53:16, 94:14, 122:6
**closest** [2] - 140:22, 196:22
**closet** [1] - 215:4
**co** [10] - 43:17, 63:22, 64:13, 64:19, 64:20, 66:7, 66:11, 66:16, 67:14, 67:24
**co-worker** [1] - 43:17
**co-workers** [9] - 63:22, 64:13, 64:19, 64:20, 66:7, 66:11, 66:16, 67:14, 67:24
**coach** [22] - 25:24, 25:25, 26:2, 26:5, 30:23, 30:24, 30:25, 31:18, 31:23, 31:25, 46:4, 46:19, 48:10, 61:22, 62:1, 75:1, 84:21, 87:4
**Coach** [8] - 88:25, 89:1, 90:17, 100:15, 100:16, 120:16, 200:23, 200:24
**coach/supervisor** [1] - 59:25
**coaches** [9] - 25:24, 26:1, 30:21, 31:1, 31:13, 32:9, 61:22, 75:20, 139:8
**collaborate** [1] - 28:21
**collaboration** [1] - 29:9
**collaborative** [1] - 216:12
**collaboratively** [3] - 213:23, 216:6, 216:9
**colleagues** [5] - 43:1, 43:5, 43:11, 44:16, 44:17
**Collette** [10] - 31:10, 32:24, 89:24, 89:25, 90:2, 90:3, 90:4, 129:23, 130:1, 130:13
**Collins** [4] - 89:3, 89:4, 90:1, 200:24
**combined** [1] - 94:10
**comfort** [1] - 87:18
**comfortable** [2] - 118:4, 119:12
**coming** [8] - 9:5, 46:3, 115:5, 120:17, 127:10, 141:22, 170:11, 170:13
**command** [3] - 31:4, 149:11, 172:16
**comments** [1] - 223:16
**Commission** [1] - 230:15
**committee** [3] - 33:23, 33:24, 33:25
**communicate** [6] - 36:5, 40:23, 85:5, 119:25, 149:15, 149:16
**communicated** [6] - 25:16, 40:16, 112:13, 156:21, 168:9, 212:17
**communicating** [1] - 189:23
**communication** [2] - 38:24, 172:10
**communications** [1] - 110:5
**Comp** [8] - 6:3, 73:19, 90:14, 90:19, 90:20, 90:24, 90:25, 132:19
**comparable** [1] - 146:25
**compare** [1] - 170:8
**compassion** [1] - 37:18
**compassionate** [2] - 170:10, 203:17
**Compensation** [3] - 11:10, 129:24, 221:24
**compensation** [3] - 12:17, 20:7, 22:22
**Complaint** [15] - 3:7, 50:14, 50:22, 51:1, 51:5, 51:7, 51:8, 51:13, 52:3, 55:1, 59:5, 226:12, 226:13, 226:14
**complaints** [1] - 91:18
**Complaints** [3] - 52:2, 73:18, 73:19
**complete** [11] - 12:15, 15:16, 24:8, 114:9, 153:23, 178:12, 178:13, 218:23, 219:1, 222:23, 225:6
**completed** [5] - 13:4, 128:24, 132:19, 209:11, 232:13
**completely** [4] - 77:13, 107:23, 155:3, 220:21
**completeness** [1] - 24:11
**completing** [2] - 191:1, 191:5
**complex** [3] - 17:22, 28:12, 28:23
**Complies** [7] - 56:12, 59:1, 109:21, 112:19, 180:13, 196:5, 199:12
**component** [1] - 39:5
**compressed** [13] - 98:5, 99:14, 99:16, 100:24, 101:4, 102:10, 103:3, 104:22, 105:5, 109:6, 112:21, 116:10, 127:1
**computer** [23] - 16:8, 17:7, 17:10, 95:22, 96:5, 153:5, 153:7, 153:15, 155:12, 156:23, 157:5, 157:15, 158:1, 161:25, 164:17, 165:3, 165:12, 166:20, 167:18, 168:8, 168:16, 169:10, 174:11
**computer-based** [1] - 16:8
**computers** [1] - 150:15
**concentrate** [1] - 101:24
**concern** [2] - 62:11, 154:9
**concerned** [5] - 152:15, 154:7, 156:1, 156:2, 156:20
**concerns** [1] - 227:16
**conclude** [2] - 71:6, 71:11
**conclusion** [4] - 71:22, 72:16, 73:14, 222:17
**concur** [1] - 196:1
**condition** [3] - 77:8, 77:16, 166:19
**conditioning** [1] - 101:12
**conditions** [8] - 6:4, 15:22, 15:23, 16:4, 21:1, 24:25, 97:18, 98:8
**conference** [5] - 122:4, 123:13, 123:16, 123:25, 124:6
**confide** [2] - 37:21, 38:19
**confided** [2] - 40:12, 40:16
**confirm** [4] - 67:18, 155:18, 166:8, 182:4
**confirmation** [1] - 97:17
**confirmed** [2] - 67:24, 68:1
**confirming** [1] - 155:15
**conflict** [1] - 226:13
**conflicts** [1] - 14:11
**connect** [1] - 222:9
**connected** [1] - 231:10
**connects** [1] - 46:12
**consecutive** [2] - 98:7, 111:18
**consider** [1] - 194:16
**consideration** [1] - 62:24
**considered** [2] - 11:17, 167:8
**consistent** [2] - 112:20, 113:6
**constitutes** [1] - 59:3
**cont'd** [1] - 4:1
**Contact** [1] - 53:14
**contact** [4] - 30:13, 30:17, 166:2, 212:11
**contacted** [2] - 53:9, 123:6
**contacting** [2] - 223:2, 223:7
**contain** [2] - 51:17, 52:7
**contained** [1] - 58:5
**containment** [1] - 215:16
**contaminants** [1] - 212:10
**contaminations** [1] - 97:15
**contend** [1] - 59:3
**content** [3] - 133:12, 133:14, 133:15
**contents** [2] - 123:17, 206:21
**context** [5] - 155:4, 180:6, 180:10, 217:1, 217:3
**continue** [2] - 41:16, 225:8
**continued** [4] - 42:7, 104:8, 199:19, 229:7
**continues** [1] - 195:18
**continuing** [1] - 138:9
**continuum** [2] - 78:1, 129:8
**contradicted** [1] - 179:23
**contrary** [1] - 178:6
**contributed** [1] - 97:2
**control** [4] - 86:6, 218:23, 219:2, 222:23
**convenience** [1] - 160:6
**conversation** [52] - 20:13, 54:1, 54:2, 54:15, 54:17, 56:8, 63:16, 63:19, 82:22, 82:24, 86:16, 89:13, 90:21, 91:16, 98:22, 103:24, 107:9, 109:12, 109:13, 109:14, 109:17, 116:19, 116:20, 118:23, 119:1, 119:13, 129:21, 133:7, 133:8, 133:13, 133:23, 138:10, 139:6, 139:12, 139:14, 155:16, 156:11, 157:22, 160:17, 160:25, 174:16, 174:17, 179:12, 179:15, 212:6, 212:19, 212:23, 214:13, 217:9, 220:21, 221:6, 222:23
**conversations** [16] - 68:3, 87:2, 100:2, 100:3, 102:6, 104:3, 116:7, 163:1, 171:20, 173:8, 174:19, 211:24, 212:1, 212:3, 212:25, 221:9
**conversed** [1] - 139:7
**conveying** [1] - 189:4
**convoluted** [1] - 169:11
**coordinate** [1] - 215:12
**copies** [7] - 56:22, 56:23, 56:24, 56:25, 73:17, 186:20, 196:18
**copy** [7] - 48:23, 50:2, 57:4, 162:9, 186:14, 186:19, 186:22
**corner** [3] - 122:3, 123:24, 198:14
**Correa** [5] - 45:25, 47:10, 171:3, 225:1

**correct** [31] - 26:9, 37:16, 53:16, 66:22, 67:11, 69:17, 71:4, 77:2, 79:20, 84:17, 84:23, 84:24, 85:3, 97:1, 99:10, 107:14, 108:3, 116:17, 128:2, 128:14, 144:4, 146:18, 148:21, 148:22, 149:13, 155:14, 171:7, 176:2, 195:15, 208:24, 225:15
**correctly** [1] - 79:22
**couch** [1] - 75:5
**cough** [6] - 196:25, 197:3, 197:5, 197:6, 197:8, 197:11
**Cough** [1] - 197:2
**counsel** [3] - 229:3, 231:9, 231:10
**Counselor** [1] - 3:9
**counselor** [6] - 53:8, 53:18, 54:3, 54:7, 130:10, 130:20
**counselors** [2] - 53:22, 56:8
**count** [1] - 185:16
**Count** [1] - 59:4
**country** [2] - 15:1, 131:25
**cOUNTY** [1] - 230:5
**COUNTY** [1] - 231:4
**couple** [8] - 6:8, 22:14, 51:11, 51:14, 51:15, 79:15, 79:23, 112:2
**course** [1] - 46:10
**court** [2] - 6:14, 56:17
**Court** [1] - 232:18
**COURT** [33] - 1:1, 41:20, 49:1, 49:7, 49:11, 49:14, 72:10, 72:13, 83:10, 84:12, 87:20, 87:22, 88:1, 88:3, 92:17, 92:21, 98:18, 98:20, 117:14, 117:16, 138:21, 143:6, 182:15, 187:14, 190:9, 190:13, 206:7, 206:13, 206:16, 206:18, 209:16, 209:19, 232:1
**covered** [3] - 161:7, 162:2, 171:6
**crafted** [2] - 170:15, 228:17
**create** [2] - 12:13, 23:17
**Crosby** [1] - 141:5
**cross** [1] - 204:14
**crossed** [2] - 147:2, 148:4
**crosstalk** [1] - 143:5
**Crump** [7] - 34:17, 35:6, 39:17, 39:19, 39:20, 186:5, 187:21
**Crump's** [3] - 187:4, 190:19, 204:24
**cubicle** [2] - 135:20, 146:25
**cumulative** [1] - 218:14
**current** [2] - 78:4, 112:10
**cut** [4] - 7:2, 8:14, 186:17, 207:25
**cuts** [1] - 83:25

## D

**D's** [1] - 34:21
**Dale** [2] - 32:3, 88:24
**Dan** [4] - 57:4, 81:18, 115:25, 173:21
**Daniel** [3] - 2:2, 232:21, 233:25
**daniel@smkfirm.com** [3] - 2:4, 232:21, 233:25
**dark** [1] - 122:9
**dash** [1] - 196:15
**data** [2] - 14:23, 120:10
**DATE** [2] - 1:12, 232:10
**date** [24] - 11:23, 51:3, 53:11, 59:23, 76:16, 78:6, 78:16, 137:3, 156:8, 176:3, 187:2, 192:21, 192:24, 192:25, 193:2, 193:3, 193:9, 193:18, 193:19, 204:15, 204:17, 206:23, 210:6
**Date** [1] - 233:23
**dated** [6] - 53:14, 77:2, 85:11, 85:15, 177:8, 203:24
**DATED** [1] - 231:11
**dates** [4] - 133:4, 148:17, 181:9, 205:15
**dating** [1] - 193:16
**daughter's** [1] - 185:10
**David** [5] - 2:7, 5:10, 186:14, 232:20, 233:24
**david.sullivan3@usdoj.gov** [2] - 232:20, 233:24
**David.Sullivan3@usdoj.gov** [1] - 2:9
**day-to-day** [1] - 14:18
**days** [26] - 30:11, 62:10, 98:7, 101:2, 106:24, 111:18, 111:19, 112:9, 112:11, 112:12, 112:15, 129:9, 153:20, 154:1, 155:11, 168:3, 178:3, 178:4, 179:21, 179:25, 185:6, 196:2, 199:5, 199:18, 217:24
**DD214** [2] - 15:18, 18:18
**DD214s** [1] - 16:9
**deal** [3] - 6:17, 40:14, 121:10
**dealing** [2] - 69:11, 200:11
**dealings** [1] - 170:10
**dealt** [1] - 112:25
**DEBBIE** [2] - 230:14, 231:5
**debbie** [1] - 1:18
**Debbie** [7] - 6:14, 32:2, 48:24, 230:7, 231:14, 232:18, 233:4
**Debbie's** [3] - 28:1, 30:7, 116:5
**December** [19] - 1:12, 85:9, 85:16, 98:2, 98:14, 100:8, 100:14, 100:15, 100:22, 102:4, 107:10, 108:23, 109:4, 111:17, 116:8, 185:1, 208:7, 230:9
**decide** [3] - 13:13, 25:5, 25:11
**decided** [4] - 155:18, 156:3, 166:24, 223:24
**decipher** [1] - 195:16
**Decision** [8] - 26:20, 28:7, 39:21, 39:24, 65:5, 76:10, 214:23, 215:13
**decision** [25] - 12:16, 12:23, 21:22, 21:23, 22:6, 24:15, 25:11, 26:7, 85:23, 85:25, 86:23, 87:10, 91:22, 95:5, 96:24, 145:1, 145:4, 145:7, 180:24, 218:24, 219:5, 221:13, 221:17, 222:9, 222:12
**decision's** [2] - 25:12, 25:13
**decisions** [4] - 14:21, 28:10, 139:15, 139:16
**declare** [1] - 233:21
**dedicated** [1] - 191:5
**deem** [1] - 114:13
**deemed** [2] - 144:21, 210:19
**deeply** [1] - 40:19
**DEFENDANT** [1] - 2:6
**Defendant** [3] - 1:7, 1:11, 232:7
**DEFENDANT'S** [2] - 3:3, 4:1
**defendant's** [1] - 3:4
**Defendant's** [30] - 3:5, 3:6, 3:8, 3:10, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:22, 3:24, 4:2, 4:4, 4:5, 49:15, 52:18, 57:7, 57:20, 76:20, 108:10, 131:16, 146:5, 151:14, 154:23, 160:1, 176:12, 191:21, 195:1, 203:20
**define** [1] - 22:23
**defined** [1] - 181:19
**defines** [1] - 24:22
**definite** [1] - 9:2
**definitely** [5] - 23:1, 47:15, 133:8, 165:16, 221:24
**definition** [1] - 5:15
**degree** [5] - 24:23, 25:6, 39:16, 101:8, 153:24
**degrees** [1] - 25:8
**dehumidification** [1] - 194:17
**delay** [8] - 85:4, 85:8, 85:24, 107:19, 132:18, 134:8, 137:3, 157:11
**delayed** [12] - 83:5, 83:6, 83:7, 85:4, 85:7, 85:17, 85:18, 86:12
**denial** [3] - 41:25, 91:21, 95:2
**denied** [18] - 71:3, 91:3, 92:24, 93:8, 93:10, 93:18, 93:21, 94:16, 105:22, 105:23, 141:23, 143:13, 143:19, 143:22, 159:14, 159:17, 217:7, 219:7
**Denis** [1] - 233:2
**DENIS** [2] - 1:6, 232:6
**deny** [4] - 12:16, 30:12, 92:3, 202:18
**denying** [2] - 71:25, 72:3
**Deogory** [1] - 53:2
**Department** [1] - 233:2
**depended** [3] - 14:25, 15:7
**depo** [3] - 9:9, 46:11, 224:10
**deponent** [1] - 229:3
**deposed** [2] - 5:12, 5:16
**Deposition** [2] - 2:12, 232:9
**deposition** [16] - 5:18, 6:10, 140:23, 223:17, 225:5, 226:11, 228:3, 228:5, 228:10, 228:13, 229:3, 229:4, 229:6, 231:6, 232:15, 233:3
**DEPOSITION** [1] - 1:9
**depositions** [1] - 170:16
**Dept** [1] - 3:8
**DEPT** [2] - 1:7, 232:7
**Deputy** [1] - 46:1
**describe** [1] - 20:11
**described** [2] - 97:9, 215:24
**Description** [3] - 3:1, 3:3, 4:1
**designated** [1] - 76:16
**designed** [1] - 146:24
**desire** [3] - 122:22, 145:8, 155:23
**desk** [16] - 18:8, 29:6, 99:19, 100:23, 101:3, 102:10, 103:4, 103:5, 103:8,

105:14, 120:5, 120:6, 120:15, 122:24, 125:1, 127:18
**desperate** [2] - 66:3, 135:25
**despite** [1] - 199:19
**detail** [6] - 38:6, 40:22, 43:24, 44:3, 44:6, 204:9
**details** [10] - 39:14, 40:8, 40:17, 44:7, 204:13, 204:21, 206:20, 215:15, 226:2, 226:25
**determination** [3] - 14:4, 70:20, 147:5
**determine** [5] - 17:1, 19:25, 180:21, 211:25, 212:13
**determined** [2] - 145:2, 147:3
**develop** [1] - 24:17
**developed** [8] - 15:24, 16:22, 17:3, 20:1, 23:15, 72:24, 126:17, 210:9
**development** [2] - 12:8, 16:1
**develops** [1] - 194:19
**di** [1] - 177:11
**diabetes** [1] - 25:9
**diagnosed** [6] - 36:19, 41:10, 43:8, 43:10, 43:21, 183:22
**diagnosis** [4] - 36:1, 42:20, 43:12, 44:1
**dialogue** [2] - 138:10, 152:10
**die** [3] - 70:6, 121:22, 156:20
**differences** [1] - 12:19
**different** [41] - 14:11, 15:20, 17:2, 18:12, 27:10, 27:11, 33:3, 34:16, 36:12, 36:16, 54:13, 54:14, 55:10, 61:25, 63:24, 71:1, 71:2, 89:12, 89:14, 98:13, 99:14, 108:3, 108:4, 110:8, 130:2, 130:3, 141:15, 152:23, 153:10, 153:21, 154:4, 183:14, 195:25, 203:14, 214:18, 219:24, 220:2, 220:22, 228:11
**differentiating** [1] - 35:11
**differently** [2] - 38:22, 38:23
**difficult** [1] - 84:21
**difficulty** [2] - 61:6, 132:14
**digest** [1] - 23:17
**digit** [1] - 17:20
**digits** [1] - 17:17
**direct** [3] - 115:21, 160:11, 227:24
**DIRECT** [1] - 5:6
**Direct** [1] - 2:13
**directly** [5] - 63:13, 72:19, 72:22, 86:22, 136:16
**Director** [7] - 42:3, 46:2, 47:22, 51:10, 121:13, 226:15
**Director's** [6] - 152:18, 158:10, 158:25, 163:8, 166:4, 166:12
**disabilities** [11] - 6:3, 12:6, 45:13, 71:7, 71:18, 95:15, 140:6, 140:14, 140:25, 144:12, 224:18
**disability** [54] - 6:2, 24:23, 45:20, 46:22, 46:25, 48:12, 71:12, 86:3, 86:6, 86:12, 86:25, 91:8, 91:13, 91:24, 92:9, 92:13, 92:15, 92:20, 92:23, 93:11, 93:14, 93:15, 93:17, 94:1, 94:3, 94:5, 94:7, 94:17, 94:20, 94:25, 95:6, 95:18, 96:13, 137:7, 138:15, 138:18, 139:2, 139:3, 139:22, 140:1, 140:2, 140:25, 145:8, 145:10, 221:15, 223:13, 223:20, 224:9, 225:25, 226:9, 227:4, 228:2, 228:18
**disabled** [14] - 47:17, 94:2, 141:2, 141:9, 141:18, 142:1, 142:4, 142:12, 142:20, 143:1, 143:15, 216:24, 223:1, 223:5
**disagree** [2] - 189:20, 227:20
**disbanded** [2] - 125:9, 125:13
**discharge** [1] - 16:8
**discipline** [1] - 95:23
**disciplined** [1] - 95:24
**discovered** [1] - 146:23
**discreet** [1] - 27:20
**discriminate** [7] - 86:1, 86:24, 137:6, 138:14, 139:20, 140:13, 145:8
**discriminated** [13] - 45:12, 46:14, 46:21, 47:20, 71:7, 71:12, 71:16, 72:6, 72:17, 87:6, 142:4, 225:24, 228:1
**discriminating** [1] - 86:11
**Discrimination** [1] - 50:15
**discrimination** [8] - 45:19, 54:4, 73:15, 91:9, 91:24, 139:11, 142:16, 221:13
**discriminatory** [5] - 139:5, 142:14, 142:15, 167:5, 224:17
**discuss** [3] - 156:4, 174:7, 214:2
**discussed** [15] - 44:25, 54:21, 55:7, 179:6, 179:9, 214:18, 214:21, 214:24, 215:10, 215:14, 219:17, 219:18, 220:3, 220:19, 221:2
**discussing** [3] - 131:7, 155:17, 216:3
**discussion** [1] - 139:13
**Discussions** [1] - 213:19
**discussions** [1] - 139:9
**dishonorable** [1] - 16:8
**Disorder** [1] - 141:19
**distance** [1] - 99:23
**distraught** [1] - 217:2
**DISTRICT** [4] - 1:1, 1:1, 232:1, 232:1
**dive** [1] - 10:4
**dives** [1] - 21:16
**DIVISION** [2] - 1:2, 232:2
**DMO** [4] - 177:10, 179:1, 179:14, 179:15
**DO** [1] - 233:1
**doctor** [16] - 24:8, 42:1, 61:3, 70:5, 82:9, 96:3, 180:1, 186:1, 189:25, 190:4, 190:15, 190:17, 192:25, 198:20, 212:12
**doctor's** [2] - 190:20, 194:12
**doctors** [6] - 70:3, 78:2, 178:6, 178:7, 178:10, 179:23
**doctors'** [3] - 200:13, 211:15, 211:18
**docu** [1] - 145:19
**document** [40] - 16:20, 22:21, 49:18, 49:25, 52:23, 76:23, 77:15, 77:17, 81:11, 81:25, 82:16, 85:20, 108:16, 130:14, 130:15, 131:20, 133:5, 146:10, 151:24, 152:2, 152:3, 155:1, 155:2, 160:4, 164:20, 173:23, 176:20, 188:16, 189:1, 190:24, 200:3, 200:4, 203:23, 204:18, 204:20, 205:20, 206:21, 208:23, 233:21
**documentation** [10] - 59:17, 60:19, 61:1, 77:7, 79:14, 84:22, 109:13, 174:7, 180:19, 181:7
**documented** [3] - 61:4, 144:9, 145:20
**documenting** [2] - 109:13, 139:25
**documents** [14] - 15:16, 71:23, 71:24, 72:3, 73:1, 77:9, 78:2, 148:19, 179:4, 192:5, 200:1, 213:25, 222:1, 223:25
**donations** [4] - 45:3, 45:4, 45:6, 228:4
**done** [28] - 7:1, 15:13, 16:1, 23:7, 24:8, 24:13, 29:17, 37:9, 68:14, 68:17, 74:18, 78:8, 82:22, 99:8, 110:6, 118:19, 119:3, 134:16, 153:11, 187:4, 194:20, 205:4, 218:8, 219:1, 221:4, 223:2, 223:8
**door** [6] - 121:3, 121:8, 122:8, 123:24, 141:6, 158:23
**doors** [1] - 125:8
**dots** [1] - 222:9
**Doug** [1] - 141:5
**down** [20] - 8:19, 35:15, 53:12, 63:8, 71:14, 79:15, 79:23, 89:9, 98:1, 109:19, 123:22, 138:25, 141:5, 165:3, 172:1, 176:16, 189:24, 191:8, 216:15
**downtown** [1] - 65:1
**dozen** [1] - 228:14
**Dr** [9] - 193:19, 195:14, 198:4, 209:21, 209:24, 211:2, 211:19, 211:20, 212:17
**draft** [5] - 13:14, 22:21, 58:9, 58:10, 207:19
**drafted** [1] - 181:10
**drain** [1] - 94:8
**draw** [2] - 88:8, 194:8
**Drive** [1] - 2:3
**DRO** [1] - 29:3
**DRO's** [1] - 214:19
**DROs** [4] - 26:20, 28:7, 28:21, 29:5
**drugs** [1] - 9:17
**due** [7] - 23:1, 24:24, 47:8, 91:12, 94:6, 111:20, 138:19
**duly** [2] - 5:3, 230:9
**during** [11] - 9:9, 46:10, 84:20, 101:2, 117:23, 119:8, 119:13, 130:5, 175:16, 201:10, 214:13
**dusted** [1] - 118:20
**duties** [2] - 12:3, 62:22
**duty** [4] - 62:21, 74:12, 74:14, 74:19
**dying** [7] - 115:2, 123:14, 124:12, 133:18, 144:19, 155:17, 156:2
**dysphonia** [1] - 132:15

## E

**ear** [2] - 20:18, 20:19
**early** [3] - 45:1, 155:22, 215:23
**easier** [2] - 6:17, 215:17

**easily** [1] - 17:24
**east** [1] - 105:7
**easy** [3] - 10:4, 65:15, 65:16
**Eckholm** [3] - 32:4, 88:24, 89:25
**educated** [4] - 144:6, 144:7, 144:10, 144:11
**EEO** [22] - 50:14, 51:1, 51:7, 51:18, 51:25, 52:9, 53:8, 53:17, 53:21, 54:2, 54:8, 56:7, 73:18, 130:9, 221:20, 221:24, 222:13, 226:12, 226:14, 227:4, 227:6
**effect** [4] - 9:23, 9:25, 146:22, 147:25
**effective** [10] - 85:11, 102:25, 103:6, 103:22, 139:7, 140:5, 147:9, 149:17, 149:18, 149:19
**effectiveness** [2] - 139:10, 139:14
**effort** [1] - 164:11
**efforts** [1] - 110:4
**eight** [3] - 18:22, 19:4, 19:23
**either** [12] - 20:8, 38:3, 41:11, 45:11, 49:7, 70:12, 88:17, 141:12, 143:8, 149:3, 186:1, 218:2
**elaborate** [3] - 37:24, 64:4, 228:15
**electric** [1] - 186:22
**electronic** [2] - 56:25, 186:19
**elevator** [1] - 125:16
**eligible** [1] - 68:24
**elimination** [1] - 90:7
**elsewhere** [1] - 63:24
**email** [120] - 3:13, 3:15, 3:17, 3:19, 45:7, 86:16, 89:2, 90:16, 90:17, 98:22, 104:21, 105:4, 107:12, 108:24, 109:8, 109:15, 109:22, 110:7, 110:9, 111:3, 111:5, 111:7, 111:8, 111:17, 111:23, 111:25, 112:14, 113:14, 113:15, 113:19, 116:11, 116:13, 117:10, 118:17, 118:22, 118:25, 119:15, 128:21, 131:19, 132:3, 132:22, 133:7, 133:9, 134:1, 135:6, 136:2, 136:5, 136:10, 136:13, 136:16, 136:18, 136:20, 137:9, 137:10, 144:20, 145:23, 146:9, 146:12, 147:2, 148:8, 148:21, 148:23, 149:1, 149:5, 149:7, 149:13, 152:4, 152:13, 154:2, 154:3, 155:16, 155:18, 156:24, 157:9, 157:13, 157:14, 157:17, 157:19, 157:23, 158:16, 160:8, 160:15, 160:16, 160:22, 161:5, 161:15, 161:16, 161:24, 162:5, 162:6, 162:9, 163:4, 163:5, 163:24, 164:10, 165:9, 165:10, 165:17, 165:21, 168:8, 169:4, 170:2, 170:20, 171:2, 173:7, 174:2, 175:6, 175:25, 177:25, 179:5, 180:16, 181:1, 184:17, 184:22, 186:5, 187:4, 210:13, 212:15
**Email** [2] - 3:21, 3:23
**emailed** [2] - 103:17, 120:2
**emails** [5] - 25:17, 86:17, 160:21, 206:24, 208:1
**Emails** [1] - 3:12
**EMER** [1] - 125:10
**emergencies** [1] - 125:11
**emergency** [4] - 96:2, 107:20, 125:6, 183:21
**emotion** [1] - 142:7
**employed** [4] - 10:22, 10:23, 11:1, 11:8
**employee** [4] - 174:12, 180:18, 231:9, 231:9
**Employees** [1] - 33:9
**employees** [5] - 35:21, 68:14, 68:23, 73:17, 216:24
**employment** [1] - 69:22
**empty** [1] - 174:12
**encompassed** [5] - 55:4, 55:5, 55:6, 55:8, 56:2
**end** [13] - 12:5, 18:25, 19:3, 56:18, 60:11, 61:24, 76:13, 76:16, 111:18, 111:19, 116:19, 116:20, 196:14
**ended** [2] - 23:3, 183:20
**ends** [3] - 50:19, 54:23, 161:8
**engage** [2] - 164:2, 218:4
**engaged** [3] - 47:8, 216:10, 216:11
**engaging** [1] - 107:24
**engineer** [1] - 112:24
**English** [1] - 209:6
**ensure** [5] - 16:25, 19:25, 163:7, 166:17, 167:2
**enter** [3] - 178:4, 210:20, 211:7
**ENTER** [1] - 233:1
**entered** [2] - 126:13, 126:16
**entire** [1] - 18:21
**envelopes** [2] - 74:17, 82:18
**environment** [6] - 9:14, 112:10, 138:18, 145:12, 167:4, 228:6
**envisioned** [1] - 168:5
**episode** [2] - 100:6, 105:10
**Errata** [1] - 2:17
**errata** [1] - 232:16
**ERRATA** [1] - 233:1
**escaped** [1] - 144:17
**escorted** [1] - 153:21
**especially** [3] - 9:21, 20:25, 114:13
**Esq** [5] - 232:12, 232:20, 232:21, 233:25, 233:25
**Esquire** [2] - 2:1, 2:2
**ETA** [1] - 133:10
**evaluated** [1] - 77:22
**evaluations** [1] - 41:3
**event** [1] - 21:7
**events** [4] - 22:24, 187:5, 204:12, 208:3
**everyday** [1] - 103:15
**evidence** [5] - 12:8, 23:19, 185:18, 199:19, 199:21
**exact** [3] - 97:16, 211:4, 212:10
**exactly** [7] - 83:16, 83:21, 98:14, 211:3, 212:7, 212:12, 219:11
**exam** [38] - 13:13, 20:4, 20:5, 20:6, 20:10, 24:7, 24:13, 24:14, 24:16, 141:3, 141:4, 141:13, 141:14, 141:16, 149:20, 149:25, 150:7, 150:12, 150:15, 150:19, 150:23, 152:16, 152:22, 152:24, 152:25, 153:1, 153:3, 153:6, 153:11, 153:14, 154:4, 154:8, 154:11, 154:17, 156:21, 158:17, 215:25, 219:23
**Examination** [2] - 1:18, 2:13
**EXAMINATION** [1] - 5:6
**examinations** [2] - 12:9, 13:7
**examiner** [11] - 20:10, 20:23, 21:7, 21:19, 22:4, 22:19, 22:21, 23:4, 23:8, 23:18, 24:3
**examiner's** [1] - 22:8
**example** [2] - 95:12, 144:16
**exams** [8] - 13:21, 13:22, 23:6, 24:17, 25:14, 215:22, 215:25, 220:15
**Excel** [1] - 25:22
**exchanged** [2] - 86:17, 86:18
**exclamation** [1] - 63:14
**execution** [1] - 2:17
**exhibit** [11] - 48:22, 52:17, 79:2, 84:14, 159:13, 160:12, 176:7, 178:8, 186:12, 192:13, 202:24
**EXHIBIT** [3] - 3:1, 3:3, 4:1
**Exhibit** [94] - 3:4, 3:6, 3:8, 3:10, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:22, 3:24, 4:2, 4:4, 4:5, 49:15, 49:18, 49:21, 52:7, 52:17, 52:18, 52:21, 54:23, 55:8, 56:3, 56:5, 57:2, 57:7, 57:17, 58:24, 76:19, 76:20, 81:7, 81:14, 85:23, 86:13, 86:23, 87:11, 88:9, 96:12, 100:12, 108:9, 108:10, 109:2, 109:20, 109:24, 110:9, 110:25, 111:6, 111:8, 111:24, 113:10, 115:21, 116:2, 126:6, 130:25, 131:15, 131:16, 136:6, 136:10, 136:16, 146:4, 146:5, 151:13, 151:14, 151:25, 154:3, 154:22, 154:23, 158:16, 159:9, 159:25, 160:1, 165:10, 171:10, 173:19, 176:11, 176:12, 176:19, 180:11, 185:24, 191:13, 191:21, 194:24, 194:25, 195:1, 195:10, 199:10, 200:20, 202:22, 203:19, 203:20, 211:6
**exhibits** [1] - 130:19
**existed** [3] - 97:16, 97:18, 156:8
**existence** [2] - 12:8, 24:24
**exists** [1] - 24:24
**exited** [1] - 121:3
**exiting** [1] - 124:4
**expect** [3] - 127:14, 138:7
**expectation** [3] - 22:9, 137:22, 137:23
**expectations** [1] - 135:25
**expected** [4] - 118:5, 137:20, 138:3, 138:11
**expecting** [2] - 127:12, 137:16
**expedited** [1] - 191:4
**experienced** [1] - 182:24
**experiences** [1] - 107:19
**experiment** [1] - 89:14

**expert** [1] - 194:11
**expertise** [1] - 28:9
**experts** [2] - 27:10, 27:20
**Expires** [1] - 230:16
**explain** [3] - 64:2, 112:10, 125:6
**explained** [2] - 169:8, 228:11
**explains** [1] - 22:21
**explanation** [1] - 178:18
**explicitly** [1] - 102:5
**explore** [2] - 91:1, 217:22
**exploring** [2] - 163:17, 215:19
**exposed** [3] - 21:8, 112:12, 212:13
**exposure** [8] - 21:2, 22:24, 100:25, 194:15, 196:10, 197:16, 209:10, 213:22
**exposures** [1] - 14:11
**extended** [1] - 11:8
**extensive** [1] - 97:18
**extent** [1] - 21:18
**extraordinary** [4] - 167:2, 167:8, 167:11, 170:4
**extreme** [1] - 129:13
**extremely** [3] - 190:15, 190:21, 217:1
**eye** [1] - 36:13
**eyes** [2] - 132:14, 182:18

## F

**face** [2] - 75:7, 88:25
**faces** [5] - 46:8, 46:12, 65:5, 65:7, 66:9
**facing** [1] - 37:22
**fact** [16] - 9:6, 21:6, 21:7, 47:16, 83:2, 87:3, 94:10, 96:16, 96:18, 97:22, 97:23, 172:7, 172:9, 190:3, 222:22, 228:17
**fact-based** [1] - 172:9
**facts** [3] - 28:14, 84:15, 233:21
**factual** [1] - 52:4
**fair** [1] - 198:14
**fall** [1] - 45:14
**falling** [1] - 114:25
**fallout** [5] - 114:6, 114:8, 114:12, 114:19, 222:5
**false** [5] - 77:11, 77:12, 77:14, 77:23, 166:19
**familiar** [4] - 50:25, 51:12, 117:8, 125:3
**family** [2] - 144:22, 184:2
**far** [14] - 24:6, 35:14, 44:7, 79:15, 89:12, 94:8, 103:11, 118:4, 139:13, 154:10, 164:17, 165:13, 169:3
**fast** [5] - 124:25, 137:24, 138:1, 185:3
**father** [2] - 115:3, 144:19
**faxing** [1] - 36:15
**fear** [4] - 144:24, 147:18, 154:9, 155:17
**February** [8] - 10:7, 76:10, 85:10, 85:12, 85:17, 146:13, 146:17, 203:25
**federal** [1] - 69:22
**Federation** [1] - 33:9
**feet** [1] - 106:3
**felt** [9] - 64:10, 119:13, 119:23, 172:3, 172:4, 172:6, 172:11, 185:15, 218:12
**female** [1] - 72:2
**few** [3] - 6:17, 62:10, 154:4
**fight** [2] - 183:23, 218:21
**fighting** [1] - 218:18
**figure** [4] - 9:12, 91:1, 103:25, 196:20
**figured** [1] - 75:18
**figuring** [1] - 212:19
**file** [19] - 13:22, 13:23, 15:15, 17:19, 19:2, 19:7, 19:8, 19:22, 22:4, 22:8, 23:13, 29:7, 29:8, 29:14, 68:23, 90:13
**filed** [5] - 50:23, 51:6, 51:13, 226:12, 226:14
**files** [11] - 15:9, 17:11, 17:13, 17:25, 18:4, 18:9, 21:16, 26:4, 62:9, 88:18, 214:1
**filing** [3] - 17:8, 51:1, 221:23
**fill** [3] - 29:16, 98:25, 196:16
**filled** [2] - 98:25, 192:17
**filling** [1] - 36:15
**fills** [1] - 197:14
**final** [2] - 58:8, 145:3
**finally** [1] - 216:11
**financially** [1] - 231:10
**fine** [11] - 9:2, 27:24, 32:5, 49:6, 52:14, 52:16, 83:23, 88:2, 179:21, 190:25, 207:12
**fingers** [2] - 147:1, 148:4
**finish** [9] - 6:19, 6:21, 7:4, 27:25, 81:10, 143:10, 213:3, 228:22
**finished** [3] - 204:2, 208:6, 208:8
**finishes** [1] - 208:5
**first** [67] - 6:18, 10:19, 13:4, 15:21, 15:25, 16:3, 16:5, 16:20, 17:10, 31:18, 45:16, 51:4, 51:6, 51:9, 51:13, 51:24, 52:8, 54:2, 59:12, 60:5, 62:12, 63:13, 64:19, 69:4, 72:8, 74:8, 74:24, 77:6, 85:9, 88:14, 88:22, 94:24, 102:13, 102:16, 107:7, 107:8, 121:20, 123:5, 123:6, 123:7, 126:16, 126:19, 127:20, 129:5, 129:6, 150:1, 154:6, 159:17, 162:4, 163:4, 165:9, 170:25, 173:25, 174:14, 176:17, 187:3, 189:11, 195:21, 197:4, 205:5, 207:15, 208:13, 222:22, 224:23, 226:6, 227:6
**First** [1] - 1:15
**firsthand** [2] - 68:13, 69:10
**fit** [1] - 40:11
**five** [6] - 87:18, 106:24, 153:20, 154:1, 154:14
**five-minute** [2] - 87:18, 154:14
**flags** [2] - 94:11, 96:25
**flip** [3] - 113:9, 196:4, 205:22
**flipped** [3] - 141:22, 141:25, 193:15
**Floor** [1] - 1:15
**floor** [33] - 17:11, 59:14, 105:7, 118:8, 118:10, 118:11, 118:12, 118:15, 122:25, 125:15, 127:19, 127:23, 128:12, 128:16, 133:1, 134:19, 138:14, 150:19, 155:22, 156:18, 158:8, 158:11, 158:12, 158:14, 159:1, 162:19, 163:10, 163:17, 166:9, 166:12, 167:15, 168:17, 195:25
**FLORIDA** [4] - 1:1, 230:4, 231:3, 232:1
**Florida** [6] - 1:16, 2:3, 2:8, 230:8, 230:15, 231:14
**flows** [1] - 160:15
**FMLA** [12] - 4:3, 41:11, 181:13, 181:21, 185:8, 192:10, 193:23, 196:7, 196:17, 196:18, 197:15, 200:3
**focus** [3] - 15:12, 44:16, 224:21
**focusing** [1] - 110:11
**folder** [4] - 18:18, 19:8, 19:23, 30:5
**folders** [1] - 19:7
**folks** [5] - 30:16, 32:20, 35:13, 46:13, 145:8
**follow** [6] - 24:12, 118:17, 118:22, 118:25, 119:15, 148:8
**follow-up** [5] - 118:17, 118:22, 118:25, 119:15, 148:8
**followed** [3] - 109:15, 114:2, 201:16
**following** [1] - 208:3
**follows** [3] - 5:4, 57:23, 59:8
**food** [1] - 228:4
**foot** [1] - 202:15
**FOR** [2] - 2:1, 2:6
**force** [2] - 147:1, 148:4
**forced** [3] - 69:20, 70:8
**forcing** [1] - 199:17
**foregoing** [2] - 231:7, 233:21
**Foreign** [1] - 29:25
**forgot** [2] - 83:21, 176:8
**Form** [2] - 176:20, 191:15
**form** [13] - 30:11, 36:15, 57:24, 98:25, 99:2, 99:3, 99:4, 99:5, 129:24, 132:19, 176:20, 176:25
**formal** [5] - 16:19, 30:14, 33:20, 50:22, 107:9
**format** [1] - 107:9
**former** [1] - 38:14
**forms** [2] - 25:18, 196:17
**forward** [1] - 84:11
**forwarded** [6] - 2:17, 117:9, 137:9, 137:10, 232:15, 232:16
**four** [7] - 11:16, 11:21, 112:9, 112:11, 112:12, 112:14, 196:2
**fourth** [2] - 109:23, 112:3
**FPR** [6] - 1:18, 230:7, 230:14, 231:5, 231:14, 233:4
**frame** [1] - 99:18
**free** [2] - 153:25
**Friday** [3] - 153:22, 180:19, 181:8
**Fridays** [8] - 174:9, 175:5, 175:21, 175:24, 177:3, 182:21, 199:7, 199:8
**friend** [5] - 39:1, 39:5, 41:3, 73:3, 121:24
**friendly** [4] - 37:12, 37:14, 40:3, 40:6
**friends** [5] - 37:11, 37:13, 37:15, 40:3,

43:17
**friendship** [1] - 72:25
**front** [12] - 5:23, 15:24, 110:9, 110:24, 120:3, 125:1, 141:4, 152:18, 158:13, 163:8, 166:4, 226:11
**frustrate** [1] - 38:25
**frustrating** [1] - 37:5
**full** [10] - 8:6, 8:8, 41:25, 147:1, 148:4, 167:11, 199:20, 208:2, 225:13
**fullest** [1] - 225:5
**fully** [1] - 227:15
**function** [1] - 26:13
**functions** [2] - 28:24, 213:24
**fundamental** [3] - 159:13, 159:18, 159:22
**fundraise** [1] - 41:7
**funds** [1] - 41:8
**FURTHER** [1] - 231:8
**future** [2] - 84:5, 163:2
**fuzzy** [2] - 39:21, 181:24

## G

**gain** [1] - 29:18
**gained** [1] - 69:3
**game** [2] - 12:5, 205:5
**gatherer** [1] - 21:12
**gathering** [2] - 12:9, 14:2
**gathers** [1] - 12:21
**GC** [2] - 223:2, 223:7
**gee** [1] - 47:15
**General** [2] - 195:23, 200:2
**general** [2] - 133:15, 169:5
**generally** [3] - 128:1, 133:22, 200:12
**gentleman's** [1] - 142:9
**gently** [1] - 147:17
**Gesturing** [1] - 32:10
**gist** [1] - 189:2
**given** [16] - 6:9, 17:12, 17:16, 57:24, 127:22, 129:23, 140:3, 140:4, 149:9, 155:12, 164:17, 167:24, 168:9, 176:1, 194:13, 199:20
**go-to** [1] - 27:18
**goal** [4] - 20:4, 124:24, 125:1
**God** [2] - 131:25, 150:4
**gold** [1] - 28:8
**Googled** [1] - 197:9
**Government** [2] - 33:9, 49:3
**grammatical** [1] - 209:7
**grand** [1] - 37:9
**grant** [1] - 12:16
**granted** [7] - 99:6, 99:10, 99:13, 105:1, 105:18, 112:22, 166:10
**granting** [2] - 114:24, 174:7
**gray** [1] - 140:23
**great** [3] - 6:16, 40:14, 90:9
**Gregory** [5] - 53:3, 53:4, 53:5, 130:9, 131:6
**gross** [1] - 93:23
**ground** [1] - 6:11
**group** [3] - 62:9, 76:1, 214:1
**growth** [1] - 97:20
**grunt** [1] - 12:21
**Guarantee** [1] - 121:9
**guess** [18] - 15:21, 25:13, 37:24, 43:4, 85:9, 110:7, 131:24, 139:1, 142:1, 142:3, 172:10, 180:6, 182:23, 188:24, 189:1, 203:16, 208:17, 215:2
**Gulf** [2] - 21:1, 141:24
**gulf** [1] - 141:18
**guy** [3] - 39:22, 141:4, 203:4
**guys** [7] - 56:25, 97:24, 157:12, 184:21, 191:19, 206:5, 207:22
**GY** [1] - 14:9

## H

**hallway** [2] - 124:5, 124:22
**hand** [7] - 7:3, 13:12, 63:13, 76:18, 108:8, 131:14, 154:22
**handed** [3] - 12:14, 210:3, 210:7
**handing** [6] - 48:23, 49:17, 52:20, 57:1, 151:12, 194:24
**handled** [1] - 223:23
**hands** [3] - 19:10, 49:12, 97:14
**handwriting** [5] - 81:20, 81:22, 192:22, 194:6, 194:12
**hang** [1] - 61:20
**happy** [5] - 7:16, 7:21, 56:24, 195:4, 210:16
**harassment** [4] - 54:3, 163:19, 228:6
**hard** [5] - 9:7, 110:10, 185:5, 203:9, 218:21
**Harris** [10] - 53:2, 53:3, 53:20, 54:1, 54:10, 54:13, 56:6, 56:7, 56:8, 130:9
**hat** [1] - 64:24
**he/she** [1] - 25:7
**head** [14] - 7:7, 9:16, 18:5, 21:23, 41:15, 52:13, 67:6, 73:25, 137:1, 152:6, 159:4, 172:22, 214:4, 214:9
**headed** [1] - 154:13
**header** [4] - 108:16, 110:1, 111:6, 173:23
**heading** [1] - 124:22
**health** [13] - 33:23, 33:24, 33:25, 38:7, 43:24, 44:8, 68:5, 69:12, 75:15, 87:7, 88:15, 132:8, 228:15
**healthy** [1] - 9:14
**hear** [3] - 7:13, 140:19, 223:9
**heard** [19] - 63:20, 64:12, 67:9, 72:16, 72:19, 72:25, 87:8, 90:12, 95:4, 103:15, 103:16, 121:3, 140:16, 140:18, 143:2, 180:10, 223:12, 224:14
**hearsay** [4] - 72:7, 72:18, 228:14, 228:16
**heart** [1] - 205:4
**held** [1] - 202:21
**help** [26] - 6:16, 65:18, 65:21, 66:18, 66:24, 67:2, 68:4, 68:15, 97:25, 101:4, 101:14, 105:19, 108:19, 120:24, 121:14, 123:14, 123:16, 125:9, 153:14, 173:16, 195:3, 195:5, 195:16, 218:7
**helped** [5] - 28:17, 98:7, 125:2, 201:23, 202:17
**helpful** [2] - 7:10, 226:10
**helps** [1] - 160:7
**Henley** [1] - 50:9
**hereby** [2] - 229:2, 231:5
**herself** [2] - 83:25, 127:17
**HFFT** [1] - 196:11
**HH** [1] - 230:15
**Hickey** [3] - 46:2, 47:18, 47:19
**higher** [1] - 89:18
**HILLSBOROUGH** [2] - 230:5, 231:4
**himself** [1] - 39:11
**hired** [4] - 10:9, 33:12, 62:8, 72:23
**hires** [1] - 145:21
**history** [2] - 222:20, 222:21
**hold** [7] - 19:9, 49:2, 130:18, 189:12, 227:9
**holding** [2] - 19:10, 176:8
**holds** [1] - 19:18
**holiday** [2] - 74:25, 183:20
**holidays** [1] - 184:11
**home** [37] - 104:9, 104:24, 105:9, 115:10, 115:12, 136:7, 136:8, 136:12, 136:14, 136:19, 148:25, 149:4, 166:6, 171:21, 175:20, 176:1, 177:1, 177:12, 180:21, 182:19, 182:20, 182:24, 183:1, 183:2, 183:9, 183:13, 183:14, 183:15, 184:10, 184:18, 188:6, 194:14, 196:7, 196:8, 197:15, 202:3, 202:7
**honest** [6] - 8:7, 172:12, 172:14, 172:17, 203:4, 203:5
**hope** [2] - 135:11, 191:13
**hoped** [2] - 146:22, 148:1
**hoping** [3] - 149:14, 149:15, 149:16
**horribly** [2] - 202:14
**hospital** [5] - 107:20, 215:23, 216:1, 219:22, 220:14
**hostile** [4] - 138:17, 145:12, 167:4, 228:5
**hours** [3] - 126:17, 140:7, 210:9
**HR** [48] - 38:9, 38:20, 39:14, 40:17, 69:12, 69:13, 69:15, 69:18, 71:5, 71:10, 71:21, 72:5, 72:8, 72:22, 72:25, 73:13, 73:18, 75:18, 78:1, 114:14, 116:14, 127:11, 127:14, 129:17, 140:13, 163:7, 174:11, 174:12, 179:12, 188:5, 188:8, 189:21, 191:5, 193:24, 212:2, 212:18, 213:6, 213:8, 216:9, 217:5, 217:20, 219:15, 221:9, 221:13, 221:18, 222:7
**HR's** [3] - 202:16, 222:9, 222:12
**Huffman** [5] - 31:10, 174:3, 174:20, 201:14, 202:16
**huge** [1] - 99:19

**huh-uhs** [1] - 7:7
**huhs** [1] - 7:6
**Human** [25] - 60:10, 60:12, 60:14, 68:9, 68:11, 68:18, 77:1, 99:7, 114:14, 114:22, 114:23, 115:5, 137:22, 138:2, 139:15, 139:18, 145:5, 145:24, 149:9, 149:10, 152:18, 158:7, 166:3, 203:9, 211:24
**humiliating** [1] - 105:15
**HVAC** [4] - 101:18, 102:11, 102:14, 112:25
**hyphen** [1] - 197:5

## I

**idea** [5] - 37:9, 64:6, 125:8, 127:12, 142:10
**ideas** [3] - 89:12, 104:8, 154:10
**identification** [14] - 49:16, 52:19, 57:8, 76:21, 108:11, 131:17, 146:6, 151:15, 154:24, 160:2, 176:13, 191:22, 195:2, 203:21
**identified** [6] - 30:17, 144:16, 158:16, 163:24, 166:18, 200:14
**identify** [6] - 23:14, 23:16, 59:2, 122:8, 212:19, 215:17
**II** [1] - 21:5
**illegible** [1] - 195:9
**illness** [1] - 138:19
**illnesses** [3] - 45:5, 138:23, 179:3
**imagine** [2] - 44:24, 44:25
**immediate** [3] - 139:8, 213:7, 213:10
**immediately** [3] - 59:25, 178:20, 194:18
**immunologist** [1] - 190:6
**impact** [2] - 101:20, 101:23
**impair** [1] - 9:17
**impaired** [3] - 8:20, 25:8, 77:8
**implementation** [1] - 37:10
**implications** [1] - 226:19
**implicit** [1] - 59:17
**implied** [1] - 163:21
**imply** [1] - 164:9
**important** [9] - 21:17, 161:7, 161:12, 162:2, 163:1, 163:2, 163:3, 179:6, 216:21
**impressed** [1] - 193:12
**improved** [1] - 101:18
**improvement** [1] - 113:2
**IN** [2] - 232:9, 233:2
**in-service** [2] - 20:8, 21:7
**inaccuracy** [1] - 58:8
**inaccurate** [10] - 58:12, 107:5, 107:6, 188:25, 189:1, 189:21, 197:22, 204:14, 205:1, 205:25
**inaccurately** [1] - 105:2
**inaction** [1] - 47:9
**incapable** [1] - 80:21
**inches** [3] - 19:11, 19:14, 19:17
**incidence** [1] - 20:18
**incident** [6] - 20:22, 91:8, 96:12, 125:24, 127:21, 169:19
**include** [2] - 52:4, 132:14
**included** [2] - 43:25, 213:20
**includes** [1] - 169:9
**including** [4] - 104:9, 105:12, 135:6, 179:19
**income** [1] - 201:10
**incomplete** [4] - 77:19, 84:24, 85:1, 157:21
**incorrect** [2] - 51:4, 140:16
**increase** [1] - 113:3
**increases** [1] - 25:1
**INDEX** [3] - 3:1, 3:3, 4:1
**indicated** [1] - 163:7
**Indicating** [14] - 19:9, 19:12, 19:21, 81:15, 82:9, 108:20, 110:2, 111:16, 112:6, 130:17, 171:11, 176:15, 202:13, 216:17
**indicating** [1] - 77:7
**indications** [1] - 12:13
**individuals** [3] - 45:11, 69:2, 69:3
**ineffective** [2] - 103:4, 198:24
**infer** [1] - 64:5
**inform** [2] - 82:13, 166:9
**informal** [1] - 33:22
**information** [13] - 12:22, 17:9, 17:23, 21:13, 21:18, 22:18, 24:20, 25:11, 82:17, 82:21, 120:11, 208:20, 225:19
**Information** [1] - 194:9
**informed** [13] - 39:13, 40:8, 80:21, 80:22, 84:19, 84:20, 100:15, 155:21, 166:13, 166:23, 211:14, 217:5, 219:6
**informing** [2] - 68:4, 115:8
**informs** [1] - 96:7
**inhalers** [2] - 121:18
**initial** [2] - 53:3, 129:22
**Initial** [1] - 53:14
**injuries** [2] - 22:23
**injury** [3] - 16:17, 20:8, 20:9
**insensitive** [1] - 122:17
**insist** [1] - 28:13
**installing** [1] - 194:16
**instance** [1] - 91:23
**instant** [1] - 86:20
**instructors** [1] - 39:20
**insulated** [1] - 214:20
**insulting** [2] - 140:24, 147:23
**integrity** [1] - 38:13
**intend** [1] - 82:3
**intent** [10] - 80:23, 81:2, 85:25, 86:24, 87:11, 137:6, 138:14, 139:19, 140:13, 224:18
**intention** [1] - 81:25
**intentional** [1] - 209:4
**intentionally** [1] - 208:21
**interaction** [1] - 35:13
**interactions** [1] - 228:16
**interactive** [6] - 107:24, 164:3, 178:25, 179:11, 216:10, 218:4
**interested** [2] - 12:18, 231:10
**interesting** [3] - 163:12, 163:13, 200:8
**interfere** [1] - 86:8
**interfered** [6] - 35:20, 38:8, 38:11, 61:9, 218:15, 218:17
**intermittently** [1] - 42:8
**interpretation** [3] - 28:18, 28:19, 68:1
**Interrogatories** [2] - 57:20, 57:21
**interrogatory** [2] - 110:8, 111:9
**interrupt** [1] - 21:9
**interview** [2] - 184:12, 184:14
**interviewed** [2] - 183:16, 184:11
**intimate** [1] - 45:1
**introduced** [2] - 5:9, 184:13
**intrusion** [1] - 97:19
**investigation** [1] - 50:10
**Investigative** [4] - 3:7, 50:14, 51:16, 130:19
**investigative** [1] - 54:22
**investigator** [3] - 50:9, 51:18, 52:9
**involve** [1] - 99:7
**involved** [1] - 207:16
**involvement** [3] - 221:25, 227:4, 227:5
**irrelevant** [1] - 144:15
**issuance** [1] - 86:12
**issue** [6] - 8:18, 27:22, 38:2, 178:18, 178:19, 223:25
**issued** [1] - 141:10
**issues** [32] - 8:11, 8:15, 8:23, 38:4, 38:20, 39:14, 40:8, 40:9, 40:17, 43:25, 54:12, 59:16, 59:21, 66:19, 66:20, 67:4, 69:12, 73:22, 75:15, 84:21, 94:19, 97:20, 112:25, 114:16, 136:24, 136:25, 179:6, 179:9, 191:11, 200:25

## J

**JAG** [1] - 172:1
**James** [20] - 2:1, 32:3, 45:25, 46:17, 87:16, 98:15, 98:18, 98:19, 102:6, 105:4, 111:4, 111:7, 111:17, 120:5, 132:4, 232:12, 232:20, 233:25
**james@smkfirm.com** [4] - 2:4, 232:12, 232:20, 233:25
**Jane** [1] - 98:18
**January** [73] - 59:13, 62:5, 77:2, 78:12, 79:5, 79:12, 85:15, 100:4, 104:14, 104:16, 105:3, 105:24, 106:9, 106:15, 106:22, 107:12, 107:16, 107:17, 108:5, 109:20, 111:3, 111:7, 111:25, 113:15, 113:24, 116:8, 116:11, 117:4, 119:8, 119:21, 120:14, 126:8, 126:9, 126:12, 126:21, 126:22, 126:24, 127:21, 128:4, 128:19, 128:24, 128:25, 129:16, 129:17, 132:9, 136:5, 136:11, 136:21, 136:25, 137:5, 138:8, 139:19, 185:1, 200:21, 208:14, 209:8, 210:8, 210:18, 211:13, 211:23, 212:2, 213:5, 214:13, 217:5, 219:6, 219:13, 221:3, 229:7, 230:11, 231:11

**Javier** [4] - 34:18, 34:22, 40:13, 40:14
**Jeez** [1] - 180:13
**jeez** [2] - 71:13, 93:19
**jeopardy** [6] - 216:25, 217:12, 217:17, 217:20, 218:11, 218:13
**Jerry** [6] - 31:10, 156:5, 174:3, 174:20, 201:14, 202:16
**Jim** [1] - 161:9
**Jo** [13] - 43:19, 69:4, 72:22, 87:3, 95:8, 122:6, 122:10, 123:5, 123:23, 124:23, 125:5, 125:15, 125:21
**Jo's** [1] - 124:24
**job** [45] - 18:3, 27:24, 30:19, 38:8, 38:10, 38:11, 55:12, 60:3, 61:9, 61:23, 74:9, 76:4, 79:1, 83:8, 86:8, 86:9, 91:13, 103:1, 140:4, 140:6, 151:5, 173:17, 183:16, 183:25, 184:11, 184:16, 194:13, 213:24, 214:3, 216:24, 217:12, 217:17, 217:19, 218:2, 218:11, 218:12, 218:17, 218:19, 218:25, 219:1, 219:4, 220:5, 220:10, 220:22, 222:3
**jobs** [3] - 26:4, 69:21, 69:23
**John** [9] - 34:19, 34:25, 40:24, 40:25, 50:9, 202:25, 203:24, 208:17, 213:12
**judge** [2] - 5:16, 5:24
**judging** [1] - 154:12
**July** [3] - 88:13, 91:7, 96:11
**jump** [2] - 98:1, 216:15
**June** [3] - 53:15, 53:18, 54:1
**justify** [1] - 22:5

## K

**Kasimati** [1] - 2:2
**keep** [6] - 39:13, 56:14, 218:18, 218:19, 218:22
**Keith** [9] - 34:16, 37:19, 37:20, 38:12, 38:13, 44:12, 113:15, 114:3, 226:23
**kept** [5] - 17:11, 39:7, 40:7, 60:15, 104:8
**Kerrie** [10] - 45:18, 45:22, 46:17, 177:8, 177:10, 180:17, 186:6, 189:11, 201:15, 222:1
**kick** [1] - 24:5
**killing** [1] - 123:2
**kind** [29] - 6:10, 9:11, 9:22, 14:12, 14:21, 27:19, 38:2, 38:5, 39:22, 40:21, 46:12, 50:8, 65:21, 67:3, 84:1, 103:25, 135:22, 135:23, 147:13, 163:18, 163:19, 170:11, 172:2, 172:4, 184:23, 200:10, 201:7, 212:5, 215:25
**Klemawesch** [14] - 190:8, 190:11, 192:19, 192:20, 193:13, 193:19, 195:14, 198:4, 198:5, 200:5, 210:24, 211:2, 211:20, 212:17
**KLEMEWISCH** [1] - 190:12
**knowing** [2] - 121:22
**knowledge** [8] - 13:12, 14:16, 28:9, 58:2, 58:6, 68:14, 82:16, 83:6
**known** [1] - 172:19
**Koehler** [7] - 72:1, 72:2, 72:19, 72:20, 87:3, 95:8
**Korea** [1] - 21:2

## L

**L-E-V-O-I-R** [1] - 209:18
**label** [1] - 49:19
**labeled** [1] - 176:20
**lack** [3] - 68:19, 68:20, 91:3
**lagging** [1] - 6:24
**laid** [1] - 165:2
**large** [3] - 146:25, 196:6
**Larry** [7] - 31:10, 32:23, 127:18, 132:3, 148:15, 221:5, 221:6
**laryngitis** [2] - 60:8, 61:2
**last** [22] - 17:18, 31:20, 67:10, 69:6, 69:7, 79:2, 101:8, 101:22, 113:9, 116:11, 123:25, 132:15, 149:3, 153:20, 155:8, 165:1, 168:2, 180:19, 193:5, 199:16, 218:22
**late** [2] - 30:11, 208:7
**latest** [1] - 117:10
**laugh** [1] - 40:6
**law** [8] - 13:13, 16:12, 24:5, 24:22, 28:17, 28:18, 28:19, 140:8
**laws** [1] - 82:20
**lay** [1] - 138:25
**layers** [1] - 15:20
**lead** [1] - 82:21
**leading** [1] - 168:3
**leans** [1] - 140:23
**learn** [1] - 226:19
**learned** [3] - 14:12, 14:15, 89:11
**least** [6] - 22:25, 84:19, 128:20, 211:6, 227:21, 228:14
**leave** [31] - 11:8, 26:2, 41:11, 45:4, 45:6, 69:21, 95:25, 96:2, 96:10, 100:6, 101:25, 102:1, 103:17, 107:21, 107:25, 111:19, 132:13, 132:25, 133:10, 140:8, 141:1, 144:22, 156:6, 161:17, 178:19, 194:18, 201:17, 228:4
**Leave** [1] - 103:20
**leaves** [1] - 107:22
**leaving** [1] - 129:6
**led** [12] - 71:6, 71:11, 71:21, 72:6, 72:16, 73:14, 86:22, 120:22, 195:23, 222:17, 224:7, 228:1
**left** [14] - 69:21, 69:23, 70:12, 122:2, 122:5, 123:23, 137:21, 166:6, 166:13, 186:15, 186:25, 188:13, 202:14, 216:13
**legal** [4] - 30:4, 140:11, 167:12, 188:16
**legally** [7] - 5:17, 12:5, 70:9, 82:18, 138:24, 188:24, 189:2
**Legion** [3] - 29:25, 30:5, 30:6
**legitimate** [1] - 92:5
**less** [2] - 201:4, 201:6
**lesser** [1] - 153:23
**Letter** [1] - 2:16
**letter** [4] - 30:9, 203:24, 207:23, 214:14
**letters** [1] - 73:18
**letting** [3] - 113:18, 125:13, 219:22
**level** [3] - 88:14, 88:22, 132:13
**Levoir** [4] - 209:15, 209:17, 209:21, 211:19
**Levoir's** [1] - 209:24
**liaison** [1] - 54:8
**lick** [1] - 74:17
**lie** [1] - 172:19
**lied** [1] - 228:10
**life** [6] - 6:17, 14:24, 15:3, 25:1, 28:1, 39:11
**likely** [3] - 22:25, 36:25, 94:6
**limit** [8] - 29:2, 98:6, 178:12, 178:15, 178:17, 180:1, 194:15
**limitation** [1] - 62:13
**limitations** [4] - 20:11, 20:12, 62:12, 78:4
**limited** [2] - 196:10, 197:15
**limiting** [1] - 209:10
**limits** [2] - 190:15, 190:21
**line** [8] - 112:8, 161:24, 163:21, 188:17, 189:24, 193:6, 197:9, 197:11
**Line** [1] - 233:5
**liner** [1] - 40:6
**lines** [2] - 79:15, 228:7
**lip** [1] - 37:7
**lips** [1] - 84:11
**list** [10] - 17:13, 45:14, 46:16, 51:20, 75:6, 115:6, 225:18, 225:20, 225:25
**listed** [1] - 232:16
**lists** [2] - 22:22, 50:17
**literally** [2] - 144:23, 156:19
**live** [1] - 130:5
**lives** [1] - 18:21
**living** [2] - 155:17, 156:2
**loaded** [3] - 41:25, 42:5, 167:9
**Loan** [1] - 121:9
**locate** [1] - 21:3
**location** [13] - 99:15, 120:16, 128:9, 128:11, 130:3, 150:12, 150:25, 155:21, 163:10, 166:18, 183:14, 219:24, 220:2
**locations** [8] - 158:18, 163:9, 163:17, 163:23, 164:1, 164:8, 203:10, 203:14
**long-awaited** [1] - 57:2
**longest** [1] - 31:16
**look** [32] - 20:25, 21:3, 22:8, 25:4, 29:6, 29:8, 29:20, 51:19, 57:9, 61:18, 69:7, 81:7, 81:13, 100:19, 109:2, 111:5, 112:17, 113:14, 126:6, 129:6, 130:15, 130:24, 131:1, 131:2, 156:6, 165:1, 170:16, 170:17, 173:25, 190:23, 210:15, 211:22
**looked** [4] - 214:25, 215:6, 215:7, 215:8
**looking** [9] - 30:12, 58:21, 88:11, 111:25, 137:12, 177:24, 184:8, 199:11, 211:22

**looks** [3] - 113:24, 186:16, 192:17
**lose** [2] - 116:4, 218:2
**loud** [1] - 223:10
**Louise** [1] - 180:13
**low** [1] - 135:25
**lucky** [1] - 191:23
**lump** [1] - 200:14
**lunch** [1] - 72:23
**lung** [1] - 210:10

## M

**M.D** [1] - 193:13
**ma'am** [1] - 162:5
**machinist** [1] - 21:5
**MAHARAJ** [16] - 57:5, 81:15, 108:20, 110:2, 111:16, 112:6, 115:22, 116:3, 171:11, 173:20, 176:9, 191:15, 191:18, 191:20, 197:4, 216:17
**Maharaj** [4] - 2:2, 2:2, 232:21, 233:25
**maintenance** [2] - 102:15, 223:24
**male** [2] - 40:20, 141:22
**man** [10] - 38:13, 38:15, 39:21, 40:21, 125:2, 142:18, 180:6, 180:9, 187:24, 203:8
**manage** [2] - 17:21, 26:4
**management** [2] - 67:16, 67:21
**Management** [4] - 3:9, 5:21, 41:2, 54:6
**Manager** [9] - 31:3, 32:22, 32:23, 32:24, 33:2, 43:13, 48:7, 77:2, 127:18
**managers** [1] - 26:10
**manila** [1] - 19:23
**manner** [1] - 15:17
**Mar** [1] - 193:13
**MAR** [1] - 193:13
**March** [33] - 43:9, 149:21, 149:22, 152:14, 155:6, 155:8, 160:16, 164:11, 165:10, 171:13, 171:20, 173:8, 174:2, 174:22, 175:11, 175:17, 175:25, 176:4, 177:9, 181:7, 181:11, 185:9, 191:12, 194:2, 194:3, 198:6, 198:7, 198:9, 198:23, 200:9, 200:13, 200:15
**marginal** [1] - 213:24
**Mario** [2] - 125:2, 125:16
**mark** [4] - 48:21, 52:17, 176:8, 191:18
**MARKED** [1] - 3:2
**marked** [30] - 29:15, 49:15, 49:18, 52:18, 52:21, 57:1, 57:7, 76:18, 76:20, 108:9, 108:10, 113:3, 131:15, 131:16, 146:3, 146:5, 151:12, 151:14, 154:22, 154:23, 160:1, 173:18, 176:11, 176:12, 191:21, 194:24, 194:25, 195:1, 203:18, 203:20
**marry** [1] - 25:10
**Mary** [12] - 43:19, 121:24, 121:25, 122:6, 122:10, 123:5, 123:23, 124:23, 124:24, 125:5, 125:15, 125:21
**mask** [2] - 7:14, 73:5
**masks** [1] - 83:23
**Massachusetts** [1] - 200:2
**materials** [1] - 14:2
**Matt** [5] - 45:25, 47:10, 171:3, 225:1
**Matter** [1] - 50:14
**matter** [5] - 15:17, 16:15, 27:20, 122:9, 156:4
**McBurrough** [17] - 3:19, 32:1, 132:4, 133:2, 133:13, 148:15, 155:5, 155:15, 156:12, 187:12, 187:23, 187:25, 200:24, 202:15, 213:11, 214:6, 215:6
**McDonnough** [5] - 1:6, 46:1, 47:14, 232:6, 233:2
**meals** [1] - 72:24
**mean** [31] - 19:15, 28:5, 29:13, 37:23, 38:1, 40:6, 52:7, 60:21, 79:8, 92:2, 95:10, 115:7, 122:9, 122:17, 128:4, 129:9, 140:10, 141:7, 143:1, 143:20, 167:23, 167:25, 175:13, 189:2, 194:22, 205:22, 206:1, 222:20, 224:1, 224:6, 227:4
**meaning** [4] - 26:6, 64:11, 134:10, 152:9
**means** [2] - 8:4, 186:3
**meant** [4] - 80:25, 146:23, 202:3, 217:23
**meantime** [1] - 24:12
**measure** [1] - 25:6
**measures** [3] - 167:2, 167:8, 170:4
**mechanically** [1] - 29:6
**medical** [55] - 12:9, 12:10, 13:6, 13:7, 13:22, 15:19, 20:3, 20:8, 20:16, 20:22, 21:16, 21:19, 21:24, 22:5, 22:13, 38:4, 38:6, 38:20, 39:14, 40:8, 40:17, 43:24, 47:17, 59:16, 60:7, 60:10, 60:18, 60:25, 66:19, 67:4, 70:20, 77:8, 77:16, 77:25, 78:1, 78:4, 79:14, 81:25, 84:21, 84:22, 125:3, 131:11, 144:22, 174:7, 179:3, 180:18, 181:6, 196:10, 197:10, 197:24, 197:25, 199:19, 199:21, 210:19
**medically** [1] - 217:25
**medication** [2] - 25:10, 122:13
**medications** [3] - 9:19, 121:19, 124:1
**medicine** [1] - 13:13
**medicines** [1] - 9:22
**meet** [7] - 46:11, 76:4, 155:5, 161:8, 174:6, 214:2, 218:3
**meeting** [27] - 40:11, 42:3, 51:9, 65:20, 116:14, 116:16, 117:2, 117:3, 117:6, 117:12, 117:23, 118:3, 119:9, 130:9, 136:21, 137:16, 137:21, 138:8, 138:13, 139:19, 156:4, 198:3, 213:6, 213:19, 214:14, 216:14, 218:15
**meetings** [1] - 41:2
**member** [4] - 33:6, 33:8, 33:11, 94:11
**members** [1] - 128:17
**memo** [4] - 4:6, 85:11, 203:24, 226:25
**Memorandum** [1] - 3:10
**memorandum** [2] - 77:1, 81:14
**memorialize** [1] - 109:17
**memorialized** [3] - 85:23, 86:23, 87:10
**memorializing** [1] - 110:4
**memories** [1] - 118:23
**memory** [10] - 9:18, 9:25, 47:7, 119:12, 119:18, 175:22, 207:24, 213:17, 225:17, 226:11
**men** [2] - 30:2, 31:16
**mental** [1] - 8:19
**mention** [9] - 64:15, 136:2, 136:7, 136:11, 136:18, 149:2, 149:3, 149:4, 157:25
**mentioned** [30] - 29:23, 30:21, 32:8, 32:23, 35:14, 40:10, 43:23, 47:10, 47:23, 62:12, 62:13, 66:25, 67:4, 67:14, 89:19, 94:22, 95:7, 96:23, 111:14, 132:16, 134:4, 134:5, 134:14, 164:1, 164:3, 188:12, 198:23, 214:14, 220:8, 226:7
**mentions** [3] - 77:6, 88:13, 189:24
**mentor** [1] - 73:2
**mentors** [1] - 214:23
**messaged** [1] - 86:20
**messed** [1] - 193:4
**Messrs** [1] - 116:8
**messy** [1] - 192:2
**met** [10] - 5:9, 6:14, 96:18, 127:21, 155:19, 160:23, 161:7, 214:6, 228:10, 228:12
**Michael** [10] - 45:25, 46:3, 46:24, 47:1, 100:5, 102:6, 111:4, 111:7, 137:9, 145:4
**MIDDLE** [2] - 1:1, 232:1
**middle** [2] - 195:7, 199:13
**might** [11] - 8:8, 8:14, 8:21, 8:22, 14:4, 31:14, 53:1, 126:21, 171:2, 176:16, 220:10
**Mike** [5] - 98:15, 105:4, 113:20, 117:9
**miles** [1] - 41:6
**military** [3] - 27:16, 172:17, 172:18
**mind** [6] - 150:1, 165:6, 171:1, 171:6, 185:6, 185:17
**mind's** [1] - 36:13
**mine** [2] - 176:8, 188:10
**minimize** [2] - 210:21, 213:22
**minute** [9] - 32:12, 78:14, 81:9, 87:18, 154:14, 182:18, 186:8, 191:4, 205:13
**minutes** [1] - 22:14
**misrepresent** [3] - 208:21, 208:25, 209:2
**misrepresentation** [1] - 209:4
**miss** [3] - 16:4, 16:22
**missed** [3] - 60:7, 156:7, 160:22
**missing** [9] - 52:11, 153:6, 156:13, 156:14, 157:7, 159:12, 159:23, 186:15, 187:7
**misstatement** [1] - 166:7
**mistake** [2] - 204:23, 204:24
**misunderstood** [1] - 83:17
**modifications** [3] - 217:6, 217:23, 219:10
**modify** [1] - 219:6
**mold** [2] - 97:15, 226:19

**mom** [1] - 208:18
**moment** [12] - 32:7, 46:7, 47:7, 48:15, 66:9, 66:13, 121:14, 144:5, 170:23, 172:21, 216:4, 225:13
**Monday** [1] - 211:13
**Mondays** [2] - 177:1, 177:12
**money** [1] - 201:11
**month** [1] - 107:19
**monthly** [1] - 41:3
**months** [6] - 51:11, 51:14, 51:15, 107:22, 108:6
**Moorby** [3] - 48:6, 48:7, 89:20
**Morning** [1] - 146:20
**morning** [11] - 5:8, 8:3, 113:20, 113:21, 114:2, 155:6, 155:19, 155:22, 156:12, 166:24, 214:2
**most** [4] - 14:1, 24:24, 25:22, 94:6
**mostly** [6] - 27:8, 34:3, 102:2, 160:8, 188:12, 202:16
**mother** [1] - 207:20
**mother's** [7] - 121:4, 121:15, 123:22, 123:23, 124:2, 124:4, 209:6
**motivate** [2] - 142:10, 142:13
**motivated** [3] - 137:6, 138:14, 145:7
**mouth** [1] - 83:24
**move** [16] - 37:19, 84:14, 91:19, 99:14, 99:19, 103:3, 120:10, 128:1, 128:23, 132:12, 134:24, 138:13, 183:15, 184:19, 195:19, 226:2
**moved** [15] - 55:10, 64:24, 65:3, 97:10, 105:24, 106:1, 106:10, 107:18, 127:5, 127:7, 128:21, 133:1, 134:19, 195:20, 195:24
**movement** [1] - 25:7
**moving** [10] - 26:11, 100:23, 101:3, 101:5, 102:10, 103:5, 116:9, 120:11, 136:3, 213:25
**MR** [102] - 5:7, 32:14, 32:17, 42:13, 42:17, 48:16, 48:20, 48:24, 49:5, 49:9, 49:12, 49:20, 49:22, 49:23, 50:3, 57:3, 57:5, 70:13, 81:4, 81:8, 81:10, 81:12, 81:15, 81:18, 83:15, 83:20, 84:4, 87:15, 87:17, 87:21, 87:24, 88:2, 88:7, 108:13, 108:20, 110:2, 110:18, 110:22, 111:16, 112:6, 115:13, 115:17, 115:22, 115:25, 116:3, 116:4, 154:12, 154:16, 159:5, 165:23, 166:1, 168:19, 168:24, 168:25, 169:2, 169:14, 171:11, 173:10, 173:20, 173:21, 176:9, 178:11, 182:3, 182:5, 182:9, 186:14, 186:16, 186:18, 186:21, 186:23, 191:14, 191:15, 191:16, 191:18, 191:19, 191:20, 196:25, 197:4, 197:8, 197:17, 197:20, 197:23, 202:20, 205:10, 205:12, 205:16, 205:20, 206:3, 206:4, 206:6, 206:8, 206:11, 216:17, 227:8, 227:9, 227:10, 227:11, 227:13, 227:18, 228:22, 228:24, 228:25
**Mullen** [1] - 83:15
**MULLIN** [4] - 1:3, 1:10, 5:2, 232:3
**Mullin** [39] - 2:12, 3:10, 3:13, 3:15, 3:17, 3:19, 5:8, 32:19, 48:22, 88:8, 110:24, 115:19, 116:6, 131:21, 136:10, 143:10, 143:16, 155:2, 176:8, 191:23, 209:8, 210:19, 211:14, 211:23, 213:6, 213:22, 214:1, 214:3, 216:6, 216:8, 216:16, 216:23, 230:8, 231:6, 232:9, 232:11, 233:2, 233:3, 233:23
**Mullin's** [1] - 213:20
**multiple** [4] - 94:16, 107:19, 107:22, 107:23
**multiples** [1] - 107:23
**must** [4] - 35:19, 160:21, 191:4, 194:17

## N

**nagging** [1] - 172:22
**nail** [1] - 176:16
**name** [25] - 5:9, 11:7, 18:2, 31:20, 41:8, 46:3, 46:4, 46:5, 46:12, 47:24, 47:25, 50:17, 53:1, 54:7, 69:6, 69:7, 75:7, 89:2, 89:19, 99:4, 106:6, 121:13, 143:5, 190:7, 198:9
**named** [1] - 125:2
**names** [13] - 31:12, 46:9, 64:22, 65:4, 65:8, 66:7, 66:10, 66:11, 66:16, 97:9, 225:18, 225:20, 225:25
**naming** [1] - 106:7
**napkin** [1] - 16:15
**narrative** [2] - 16:11, 23:2
**narrow** [2] - 18:25, 35:15
**Navy** [2] - 38:14, 172:2
**nebulizer** [13] - 102:1, 103:8, 104:25, 105:9, 105:11, 105:14, 105:16, 120:25, 121:16, 121:19, 122:23, 153:19, 195:19
**necessarily** [1] - 140:11
**necessary** [5] - 22:5, 22:10, 22:18, 40:23, 114:14
**necessity** [1] - 103:9
**need** [47] - 7:19, 7:20, 8:14, 9:13, 14:14, 20:24, 23:6, 23:20, 24:14, 24:17, 25:2, 29:8, 32:12, 35:15, 36:6, 38:3, 42:11, 63:14, 114:7, 114:13, 115:10, 116:1, 121:15, 122:11, 123:14, 125:17, 143:9, 148:6, 153:10, 158:2, 180:21, 181:16, 185:19, 185:25, 186:2, 196:20, 206:5, 211:22, 212:9, 212:12, 213:20, 215:12, 223:1
**needed** [25] - 14:12, 16:25, 17:14, 45:3, 45:4, 77:17, 90:24, 91:12, 100:20, 103:7, 122:7, 140:4, 140:5, 142:18, 149:18, 151:3, 153:7, 157:3, 185:19, 199:3, 199:7, 199:20, 201:1, 212:14, 212:18
**needing** [2] - 114:22, 228:3
**needs** [8] - 20:23, 79:17, 79:24, 157:3, 174:12, 180:23, 185:21, 212:11
**Nehmer** [2] - 14:13, 31:24
**nervous** [1] - 68:4
**never** [51] - 19:20, 35:22, 40:19, 58:8, 58:11, 65:11, 72:8, 72:10, 76:3, 78:25, 80:9, 80:14, 80:23, 81:2, 83:1, 83:3, 86:15, 86:16, 86:18, 86:20, 90:12, 104:6, 104:7, 121:6, 129:15, 134:4, 135:3, 135:5, 140:18, 142:25, 143:2, 153:14, 156:9, 163:21, 164:6, 165:6, 166:5, 171:5, 174:16, 175:4, 178:2, 178:3, 179:1, 179:20, 179:22, 183:12, 185:6, 223:12, 228:11
**new** [11] - 64:24, 65:3, 68:23, 75:1, 97:10, 120:16, 127:18, 127:22, 145:21
**newly** [4] - 55:11, 65:2, 121:5, 130:6
**newly-renovated** [1] - 121:5
**next** [29] - 6:20, 22:19, 24:4, 31:4, 61:13, 74:24, 113:10, 114:2, 118:18, 119:21, 125:24, 126:1, 126:2, 126:13, 126:23, 127:4, 127:8, 161:5, 164:10, 189:24, 191:1, 196:11, 196:14, 196:23, 200:20, 205:8, 214:2, 214:7, 214:8
**nickname** [1] - 188:3
**night** [2] - 113:19, 113:23
**NO** [2] - 1:5, 232:5
**noise** [1] - 65:16
**non** [1] - 69:1
**non-response** [1] - 69:1
**NONE** [1] - 3:2
**none** [3] - 44:13, 65:12, 82:10
**nonproductive** [1] - 94:1
**normally** [2] - 28:6, 121:10
**North** [3] - 1:15, 2:3, 2:8
**nos** [2] - 7:9, 148:6
**NOT** [1] - 233:1
**Notary** [4] - 1:19, 230:7, 230:15, 231:14
**notation** [1] - 20:22
**note** [11] - 4:4, 60:22, 81:24, 82:7, 82:9, 149:2, 149:7, 166:5, 195:17, 197:21, 205:17
**Note** [1] - 132:19
**noted** [2] - 20:20, 113:2
**notes** [8] - 44:4, 60:7, 60:10, 70:3, 112:24, 213:16, 213:17, 231:8
**Nothing** [1] - 104:8
**nothing** [20] - 18:18, 60:9, 60:11, 60:13, 69:13, 69:17, 72:7, 72:18, 77:21, 77:25, 83:9, 83:13, 92:4, 119:2, 120:17, 120:18, 129:18, 137:25, 163:22, 219:18
**notice** [6] - 9:5, 59:22, 59:24, 85:9, 85:16, 160:12
**Notification** [1] - 53:13
**notified** [1] - 100:5
**notifying** [2] - 131:25, 157:11
**notwithstanding** [1] - 83:2
**November** [1] - 111:21
**nowhere** [1] - 164:8
**number** [14] - 50:19, 52:5, 76:2, 86:15, 92:2, 98:13, 99:5, 106:3, 111:15,

125:2, 137:11, 140:7, 176:7, 206:22
**numbers** [4] - 17:18, 17:19, 65:20, 94:8
**numerous** [1] - 211:23
**nursing** [3] - 121:4, 122:2, 122:5
**nuts** [1] - 14:21
**nutshell** [2] - 23:23, 24:1

## O

**O'Halloran** [2] - 34:20, 35:4
**Oath** [1] - 2:14
**OATH** [1] - 230:1
**oath** [4] - 5:4, 6:9, 8:3, 8:4
**object** [1] - 227:14
**objecting** [1] - 169:12
**objection** [10] - 70:13, 81:4, 165:23, 168:19, 168:24, 169:1, 173:10, 178:11, 197:23, 227:11
**obtain** [1] - 188:6
**obtained** [1] - 22:19
**obviously** [3] - 6:12, 9:13, 84:4
**occur** [2] - 54:17, 178:19
**occurred** [3] - 24:2, 88:16, 214:13
**October** [4] - 111:21, 116:20, 116:21, 128:5
**OF** [11] - 1:1, 1:7, 1:9, 230:1, 230:4, 230:5, 231:1, 231:3, 231:4, 232:1, 232:7
**offense** [1] - 28:6
**offer** [1] - 21:25
**offered** [5] - 104:7, 183:16, 183:25, 184:16, 184:25
**OFFICE** [1] - 1:14
**Office** [10] - 2:7, 5:20, 12:25, 41:1, 54:5, 88:21, 166:4, 174:11, 177:2
**office** [24] - 30:1, 54:6, 98:7, 119:21, 127:9, 140:17, 152:18, 153:19, 158:10, 158:13, 158:25, 163:8, 166:4, 166:12, 167:14, 174:9, 175:20, 175:23, 183:12, 190:16, 190:21
**Officer** [3] - 26:21, 39:22, 39:24
**officer** [1] - 172:1
**Officers** [7] - 26:24, 28:7, 29:21, 30:16, 65:5, 214:23, 215:13
**offices** [1] - 30:1
**official** [1] - 99:3
**oiy** [1] - 192:9
**oiy-yo-yo** [1] - 192:9
**old** [5] - 16:17, 40:21, 64:24, 64:25, 97:10
**old-school** [1] - 40:21
**ON** [1] - 233:1
**once** [7] - 22:17, 25:12, 75:11, 147:18, 154:17, 217:11, 232:16
**oncologist** [2] - 200:3, 200:16
**oncology** [2] - 200:16, 200:17
**One** [1] - 190:9
**one** [112] - 5:21, 7:6, 11:25, 28:24, 32:2, 33:20, 37:10, 39:19, 40:6, 40:10, 40:25, 46:12, 46:13, 48:3, 61:13, 62:4, 62:6, 64:24, 65:6, 67:2, 68:22, 68:25, 69:4, 69:8, 72:1, 72:14, 76:23, 84:14, 89:1, 89:19, 94:16, 95:20, 96:18, 98:17, 100:22, 100:23, 100:25, 107:15, 109:23, 111:11, 112:3, 112:5, 115:1, 118:25, 121:11, 121:20, 121:23, 122:1, 122:4, 122:15, 127:13, 129:22, 130:16, 130:17, 130:21, 131:19, 138:17, 145:9, 146:8, 149:3, 151:1, 151:21, 151:22, 153:17, 155:1, 155:8, 157:17, 157:18, 157:20, 157:21, 159:9, 159:17, 159:22, 160:19, 162:4, 162:8, 165:18, 165:19, 166:21, 168:6, 171:4, 172:22, 172:23, 172:25, 178:17, 178:24, 180:24, 181:10, 183:3, 187:18, 196:12, 196:21, 199:1, 199:11, 199:24, 204:24, 208:21, 211:5, 214:24, 215:9, 217:18, 220:16, 220:18, 226:1, 227:6, 227:21
**one-liner** [1] - 40:6
**one-page** [4] - 76:23, 131:19, 146:8, 155:1
**ones** [10] - 13:14, 28:13, 49:5, 98:13, 119:1, 151:2, 158:19, 163:2, 180:25, 181:4
**ongoing** [1] - 104:2
**open** [12] - 23:3, 67:17, 99:19, 130:23, 135:21, 135:24, 146:25, 147:13, 196:6, 220:6, 220:24
**open-ended** [1] - 23:3
**opened** [2] - 15:18
**opening** [2] - 67:8, 67:18
**opinion** [10] - 13:15, 20:9, 20:16, 20:20, 21:25, 22:13, 22:19, 24:3, 24:7, 200:4
**opinions** [2] - 13:14, 22:5
**opportunity** [5] - 35:21, 35:22, 150:14, 164:17, 226:18
**options** [2] - 214:2, 220:19
**oral** [2] - 212:3, 212:8
**orange** [1] - 18:17
**order** [8] - 20:7, 20:15, 24:17, 91:13, 160:13, 212:10, 212:13, 212:17
**ordered** [2] - 13:6, 13:21
**ordering** [7] - 12:9, 22:12, 25:14, 215:24, 232:16, 232:16
**orders** [3] - 211:16, 211:18, 211:19
**organization** [1] - 30:3
**organizations** [1] - 30:16
**organized** [1] - 15:17
**orient** [1] - 14:17
**original** [4] - 53:6, 55:2, 168:6, 232:15
**Orlando** [2] - 88:21, 130:3
**ORM** [1] - 54:5
**Outbased** [1] - 88:21
**outside** [8] - 37:23, 103:20, 105:6, 105:23, 216:1, 220:4, 220:7, 220:22
**overall** [1] - 204:18
**overseas** [2] - 144:19, 144:21
**own** [7] - 29:18, 58:12, 70:12, 164:23, 168:8, 170:18, 189:19
**owning** [1] - 140:21
**oxygen** [5] - 8:19, 8:23, 73:5, 182:4, 182:6

## P

**P.A** [1] - 2:2
**p.m** [16] - 1:13, 110:20, 110:21, 113:25, 115:15, 115:16, 159:7, 159:8, 163:5, 165:19, 166:14, 182:7, 182:8, 206:9, 206:10, 229:7
**P.S** [1] - 111:18
**PAGE** [1] - 2:12
**page** [18] - 52:23, 76:23, 108:16, 109:23, 113:9, 131:19, 146:8, 155:1, 160:11, 163:4, 165:9, 173:23, 180:14, 193:5, 196:4, 203:23, 216:13, 219:21
**Page** [29] - 3:1, 3:3, 4:1, 51:19, 57:17, 58:24, 79:2, 88:11, 96:12, 100:12, 102:21, 108:17, 110:1, 111:2, 111:6, 113:11, 115:24, 126:6, 131:2, 171:10, 171:12, 173:24, 173:25, 180:12, 186:5, 194:5, 199:11, 200:20, 233:5
**Pages** [2] - 1:22, 3:12
**pages** [6] - 59:8, 165:1, 193:16, 195:10, 231:7, 232:14
**pain** [9] - 20:18, 126:17, 132:14, 142:19, 153:24, 161:10, 162:23, 210:9, 210:10
**pains** [1] - 153:23
**Palmer** [23] - 45:25, 46:3, 46:24, 47:1, 98:15, 100:5, 102:6, 103:2, 104:21, 105:4, 111:4, 111:7, 112:14, 116:8, 117:9, 120:5, 120:24, 121:1, 137:9, 137:11, 145:4
**paper** [17] - 15:9, 15:13, 18:15, 19:1, 19:9, 74:17, 110:24, 115:3, 142:11, 144:20, 185:9, 186:19, 191:2, 191:6, 192:10, 193:23
**papers** [2] - 17:7, 196:18
**paragraph** [20] - 77:6, 79:3, 100:11, 104:16, 112:3, 112:18, 114:6, 126:8, 126:9, 126:11, 152:14, 171:13, 199:13, 199:17, 200:20, 208:2, 216:15, 216:18, 216:25, 217:4
**Paragraph** [1] - 78:3
**paragraphs** [2] - 98:2, 204:8
**parallel** [1] - 142:18
**paraphrasing** [3] - 104:19, 203:7, 217:4
**pardon** [1] - 108:13
**parents** [1] - 130:4
**park** [6] - 5:24, 11:21, 11:22, 34:10, 36:6
**part** [37] - 14:1, 24:14, 28:18, 30:4, 54:24, 55:10, 58:23, 73:9, 73:10, 88:19, 93:5, 93:11, 94:23, 99:13, 121:5, 121:11, 128:13, 129:7, 130:6, 135:2, 139:12, 150:3, 152:17, 152:23, 157:21, 160:22, 165:5, 165:6, 165:7, 178:22, 179:1, 186:12, 220:10, 222:5, 222:6, 226:24

**partial** [1] - 153:24
**particular** [4] - 9:25, 137:13, 143:19, 153:15
**particularly** [1] - 12:18
**parties** [2] - 231:9, 232:16
**parties'** [1] - 231:9
**partly** [1] - 21:11
**parts** [1] - 154:5
**party** [1] - 232:16
**pass** [3] - 22:4, 209:24, 210:2
**passed** [1] - 14:2
**passes** [1] - 12:22
**passing** [1] - 21:18
**paste** [2] - 162:9, 207:25
**patently** [1] - 77:23
**patient** [2] - 194:13, 194:17
**pay** [1] - 201:10
**PC** [1] - 120:10
**peers** [1] - 105:15
**penalties** [1] - 233:21
**penalty** [1] - 57:25
**pending** [2] - 7:24, 25:5
**pensions** [1] - 12:7
**people** [46] - 25:16, 26:4, 26:17, 28:6, 28:8, 35:11, 45:14, 46:7, 63:22, 64:23, 65:2, 65:18, 65:22, 66:6, 69:10, 93:23, 93:24, 93:25, 94:2, 95:14, 97:8, 97:9, 114:16, 114:22, 114:24, 114:25, 115:1, 121:9, 133:11, 140:14, 140:18, 140:19, 140:21, 140:25, 141:2, 141:18, 142:1, 142:4, 143:2, 144:12, 147:15, 182:19, 187:17, 223:23, 224:3, 224:23
**people's** [1] - 31:17
**per** [3] - 109:12, 119:1, 168:8
**per-our-conversation** [1] - 119:1
**percent** [4] - 24:23, 24:25, 199:24, 216:12
**percentage** [1] - 12:17
**percentages** [1] - 25:5
**perfectly** [2] - 190:25, 207:12
**perform** [1] - 214:3
**performance** [1] - 66:20
**period** [6] - 65:14, 77:18, 81:1, 84:17, 101:6, 183:10
**periodic** [1] - 194:14
**perjury** [2] - 57:25, 233:21
**permissible** [1] - 92:8
**permission** [2] - 136:12, 176:1
**permitted** [2] - 99:24, 164:19
**person** [17] - 12:23, 21:24, 27:18, 30:5, 37:9, 53:6, 85:20, 90:1, 94:3, 123:6, 142:13, 170:25, 172:4, 180:9, 203:9, 226:6
**person's** [1] - 224:24
**personality** [1] - 38:14
**personally** [4] - 37:22, 37:23, 40:20, 230:8
**personnel** [1] - 29:22
**Perusing** [19] - 50:1, 57:6, 76:22, 88:12, 108:12, 108:18, 109:25, 146:7, 151:16, 152:1, 154:25, 160:3, 162:6, 173:22, 191:25, 195:3, 199:23, 203:22, 204:1
**perusing** [7] - 50:4, 52:22, 57:12, 131:18, 171:15, 176:14, 176:18
**Pete** [1] - 195:23
**Petersburg** [3] - 15:3, 177:2, 184:3
**Pgs** [1] - 3:23
**Phone** [1] - 59:14
**phone** [44] - 46:5, 48:10, 59:24, 60:22, 61:11, 61:15, 61:23, 61:25, 63:12, 63:15, 64:18, 73:23, 74:10, 74:16, 75:10, 75:23, 76:6, 76:14, 76:15, 76:17, 78:6, 78:10, 78:16, 78:23, 78:25, 80:3, 80:9, 80:18, 81:3, 82:5, 83:1, 83:3, 83:4, 83:6, 84:16, 84:20, 85:3, 85:6, 124:9, 125:18, 166:5, 166:6, 166:15
**phones** [1] - 75:2
**phonetic** [4] - 14:10, 53:2, 88:24, 121:9
**phonetic)** [2] - 17:16, 32:4
**physical** [1] - 128:8
**physically** [1] - 102:3
**physician** [3] - 180:22, 209:9, 209:13
**pick** [1] - 228:23
**picking** [1] - 21:17
**picture** [2] - 10:11, 14:20
**piece** [1] - 220:14
**pieces** [4] - 21:17, 23:16, 25:10, 225:19
**Pines** [1] - 15:4
**PLACE** [1] - 1:14
**place** [9] - 13:12, 105:13, 107:22, 118:19, 120:17, 121:6, 147:10, 167:6, 199:5
**places** [4] - 97:16, 133:11, 158:15, 222:1
**plaintiff** [1] - 201:6
**Plaintiff** [11] - 1:4, 59:14, 79:5, 79:12, 88:14, 98:4, 126:13, 199:18, 200:23, 201:4, 232:4
**PLAINTIFF** [1] - 2:1
**PLAINTIFF'S** [1] - 3:1
**Plaintiff's** [2] - 3:5, 57:19
**plan** [3] - 196:15, 213:23, 216:6
**planned** [1] - 214:7
**plant** [1] - 112:24
**play** [1] - 20:12
**pleading** [1] - 110:5
**POAs** [1] - 29:24
**point** [36] - 7:2, 7:12, 7:19, 12:7, 13:3, 25:9, 25:20, 29:18, 30:17, 44:18, 56:21, 60:6, 62:2, 75:4, 75:14, 87:13, 94:5, 95:3, 131:4, 131:12, 131:13, 135:23, 136:4, 156:17, 156:19, 172:24, 188:8, 204:8, 205:2, 209:25, 211:18, 216:9, 218:1, 218:3, 218:13, 227:14
**pointing** [2] - 81:17, 193:6
**points** [3] - 75:10, 75:12, 76:4
**police** [3] - 105:13, 107:20, 153:21
**polite** [2] - 134:16, 164:13
**politely** [4] - 134:21, 135:9, 147:6, 147:8
**politically** [1] - 140:16
**position** [16] - 18:2, 18:3, 27:4, 33:3, 63:7, 78:10, 82:19, 93:25, 138:25, 157:4, 170:13, 172:18, 184:23, 184:25, 218:19, 220:24
**positions** [2] - 21:3, 26:19
**possibilities** [4] - 154:10, 164:2, 164:4, 215:19
**possibility** [4] - 104:24, 105:8, 168:4, 168:12
**possible** [2] - 44:22, 191:6
**possibly** [2] - 8:8, 171:4
**Post** [1] - 141:19
**potential** [1] - 215:10
**potentially** [1] - 25:14
**practice** [3] - 14:19, 29:10, 195:13
**pre** [1] - 153:9
**Pre** [1] - 76:10
**Pre-Decision** [1] - 76:10
**pre-records** [1] - 153:9
**precaution** [1] - 105:10
**precise** [1] - 188:19
**precursor** [2] - 159:18, 162:11
**prejudice** [3] - 140:21, 141:18
**prejudiced** [4] - 144:12, 223:10, 223:13, 223:19
**prepared** [1] - 174:11
**present** [4] - 102:2, 102:3, 208:19, 229:3
**presently** [1] - 66:17
**president** [8] - 34:16, 34:17, 34:19, 34:23, 34:24, 37:4, 39:8, 123:9
**presumably** [2] - 92:2, 198:1
**presume** [1] - 208:19
**pretext** [1] - 167:12
**pretty** [1] - 187:6
**prevent** [1] - 227:1
**previous** [5] - 87:2, 97:5, 181:8, 216:25, 217:4
**previously** [2] - 103:23, 156:21
**primary** [5] - 154:6, 154:8, 200:2, 209:9, 209:13
**printer** [1] - 213:25
**Priority** [1] - 14:9
**priority** [1] - 156:20
**privacy** [1] - 122:23
**private** [5] - 12:10, 105:13, 121:6, 158:22, 215:1
**PRN** [1] - 196:11
**probation** [1] - 75:12
**probationary** [1] - 65:14
**problem** [10] - 8:9, 65:16, 65:19, 66:21, 114:23, 173:16, 191:20, 195:18, 201:20, 204:10
**problems** [15] - 37:21, 38:9, 39:14,

40:17, 68:6, 68:10, 88:15, 94:2, 114:21, 155:24, 156:8, 215:17, 215:18, 218:16, 227:2
**Procedural** [1] - 53:13
**procedure** [1] - 182:20
**proceed** [2] - 114:7, 114:13
**process** [13] - 21:12, 30:14, 90:7, 91:6, 107:24, 120:13, 164:3, 178:25, 179:11, 215:24, 216:10, 218:5, 221:24
**processing** [5] - 8:19, 25:3, 41:23, 224:11, 224:13
**produce** [1] - 142:11
**produced** [2] - 58:12, 172:6
**Production** [1] - 3:5
**production** [9] - 65:19, 65:20, 76:4, 94:8, 101:21, 113:4, 140:7, 218:3, 218:16
**Professional** [1] - 232:18
**professional** [3] - 21:19, 39:3, 39:5
**project** [1] - 26:10
**Project** [1] - 31:24
**promoted** [3] - 11:11, 78:10, 78:12
**promotion** [1] - 11:23
**promotions** [1] - 10:14
**prompt** [1] - 23:20
**proofread** [1] - 207:20
**proper** [1] - 20:16
**propose** [1] - 29:16
**protected** [1] - 47:8
**provide** [1] - 150:11
**provided** [6] - 60:18, 77:7, 84:22, 151:8, 153:5, 169:6
**prudent** [3] - 132:17, 134:7
**Pryor** [9] - 34:17, 37:19, 38:12, 38:13, 39:4, 39:9, 44:12, 113:16, 226:23
**Public** [4] - 1:19, 230:7, 230:15, 231:14
**pull** [4] - 37:7, 37:8, 180:3, 225:17
**pulled** [1] - 50:9
**pulling** [1] - 189:9
**punchy** [1] - 182:2
**purification** [1] - 178:14
**purifier** [21] - 132:16, 134:2, 134:10, 134:13, 134:22, 134:25, 135:5, 135:7, 135:12, 135:22, 135:24, 146:15, 146:22, 147:3, 147:19, 147:25, 148:11, 168:15, 169:21, 194:17, 196:6
**purifiers** [5] - 168:7, 168:10, 214:22, 215:11, 219:22
**purpose** [1] - 38:17
**pusher** [1] - 74:17
**pussyfooting** [1] - 147:14
**put** [25] - 7:3, 47:17, 56:10, 56:15, 73:23, 78:9, 78:22, 78:25, 80:9, 93:25, 95:21, 96:4, 96:10, 107:8, 120:17, 121:19, 134:24, 140:18, 153:2, 167:18, 187:24, 192:1, 199:5, 212:9, 215:11
**putting** [2] - 129:7, 219:21

**Q**

**QRT** [2] - 214:19, 219:21
**quadrant** [2] - 105:7, 105:23
**qualified** [1] - 182:23
**quality** [1] - 97:20
**quarters** [1] - 53:12
**questioning** [1] - 188:17
**questions** [11] - 6:12, 23:2, 23:3, 23:20, 29:15, 57:23, 140:11, 189:15, 192:8, 224:4, 227:17
**quickly** [8] - 96:2, 120:21, 120:22, 137:19, 163:6, 201:14, 213:21
**quiet** [1] - 200:10
**quit** [2] - 70:12, 218:2
**quite** [3] - 93:19, 108:1, 156:13
**quote** [1] - 64:7

**R**

**RA** [20] - 79:6, 79:13, 88:19, 90:13, 98:4, 102:14, 104:18, 180:19, 181:7, 181:12, 181:16, 181:19, 185:19, 185:21, 185:25, 186:3, 192:6, 201:4, 201:6
**RA-related** [1] - 102:14
**radiation** [1] - 201:10
**radiologist** [1] - 200:17
**raised** [3] - 54:13, 63:13, 69:12
**raising** [3] - 94:11, 94:19, 96:25
**ran** [1] - 121:11
**rarely** [2] - 29:11, 29:13
**RAs** [1] - 82:14
**rate's** [1] - 205:4
**rather** [1] - 10:17
**Rather** [1] - 199:14
**rating** [5] - 24:21, 25:4, 28:10, 150:16
**Rating** [4] - 11:13, 11:18, 11:20, 12:14
**ratings** [1] - 28:22
**Ratings** [1] - 11:19
**raw** [1] - 14:2
**RE** [2] - 232:9, 233:2
**reach** [3] - 30:18, 123:10, 166:14
**reached** [8] - 25:9, 53:17, 53:21, 121:24, 123:6, 123:7, 132:13, 182:23
**reacting** [2] - 88:17, 88:18
**reaction** [1] - 211:15
**reactions** [1] - 228:16
**Read** [1] - 2:16
**read** [41] - 16:16, 57:12, 57:13, 58:1, 58:4, 58:7, 73:4, 79:14, 79:16, 79:18, 79:20, 79:22, 89:23, 114:9, 134:12, 136:16, 146:23, 155:7, 165:18, 170:5, 186:8, 186:9, 186:10, 186:11, 189:5, 193:11, 194:19, 195:8, 195:20, 195:21, 195:24, 196:24, 199:22, 204:19, 204:25, 205:9, 205:15, 232:14, 233:21
**reading** [12] - 118:24, 119:16, 171:17, 186:25, 187:4, 187:23, 194:12, 195:3, 204:3, 204:5, 229:4, 232:13
**reads** [1] - 59:13
**ready** [3] - 166:17, 182:14, 183:16
**real** [1] - 227:24
**realize** [1] - 9:6
**realized** [3] - 216:24, 217:11, 218:10
**really** [21] - 21:15, 35:16, 41:18, 74:5, 93:19, 120:22, 135:18, 140:15, 164:12, 164:15, 186:13, 193:12, 196:20, 198:22, 201:25, 218:21, 223:24, 223:25, 228:12
**reask** [1] - 67:12
**Reason** [1] - 233:5
**reason** [20] - 8:6, 8:24, 8:25, 47:2, 85:22, 92:24, 93:1, 93:2, 93:3, 93:4, 93:6, 94:24, 95:16, 122:24, 137:2, 137:5, 139:17, 185:11, 218:12, 226:14
**reasonable** [19] - 54:16, 55:9, 62:3, 68:24, 68:25, 79:11, 80:14, 80:17, 80:24, 82:6, 82:15, 91:3, 100:18, 145:20, 172:11, 177:16, 177:17, 179:2, 181:16
**reasons** [5] - 92:3, 92:7, 93:17, 94:16, 97:4
**reassign** [1] - 130:7
**reassigned** [2] - 76:10, 107:21
**reassigning** [1] - 83:5
**reassignment** [3] - 148:20, 149:2, 149:4
**receive** [5] - 15:14, 20:7, 24:11, 155:24, 217:22
**received** [7] - 24:3, 24:7, 55:2, 59:22, 59:24, 86:17, 232:16
**recent** [1] - 208:3
**recently** [1] - 88:20
**receptive** [1] - 90:9
**recipients** [3] - 3:13, 3:15, 3:17
**recognition** [1] - 78:4
**recognize** [6] - 50:5, 131:20, 146:9, 151:24, 152:2, 155:2
**recollection** [11] - 119:7, 124:13, 128:20, 191:10, 198:3, 198:19, 209:22, 209:23, 211:1, 212:15, 214:16
**recommend** [1] - 194:13
**recommendations** [1] - 209:25
**reconfirmation** [1] - 181:19
**reconfirmed** [1] - 181:21
**record** [77] - 7:18, 8:1, 13:23, 15:16, 22:17, 23:16, 23:19, 24:17, 32:14, 32:15, 32:16, 32:18, 42:14, 42:15, 42:16, 42:18, 48:16, 48:18, 48:19, 81:9, 87:19, 87:23, 87:24, 88:1, 88:5, 88:6, 88:7, 90:17, 110:19, 110:20, 110:21, 110:22, 111:19, 115:14, 115:15, 115:16, 115:18, 115:20, 130:25, 131:19, 136:6, 140:3, 141:11, 141:12, 146:8, 146:21, 151:17, 157:21, 159:6, 159:7, 159:8, 182:6, 182:7, 182:8, 182:10, 186:10, 186:11, 186:12, 202:20, 205:17, 206:6, 206:7, 206:9, 206:10, 206:12, 211:7, 211:22,

214:15, 221:5, 222:4, 225:12, 228:24, 228:25, 231:7
**recording** [2] - 215:3, 215:14
**recordings** [1] - 214:21
**records** [27] - 12:10, 12:13, 13:6, 13:7, 13:11, 13:22, 13:23, 15:19, 20:3, 20:17, 20:23, 20:24, 21:16, 23:14, 25:15, 59:23, 78:1, 131:11, 146:2, 153:9, 206:19, 206:24, 210:12, 210:13, 210:15
**red** [1] - 96:25
**redundancy** [1] - 169:20
**refer** [8] - 24:21, 56:20, 130:14, 133:5, 161:4, 206:19, 213:17, 214:15
**reference** [6] - 84:5, 104:25, 109:4, 111:3, 191:1, 204:15
**referenced** [4] - 54:22, 85:24, 96:12, 232:13
**references** [2] - 50:22, 160:17
**referencing** [3] - 51:14, 95:11, 95:13
**referred** [5] - 60:14, 183:3, 204:5, 228:3, 228:13
**referring** [19] - 35:25, 85:12, 99:2, 100:12, 102:23, 109:9, 110:8, 111:9, 113:12, 161:18, 161:21, 162:18, 171:9, 181:3, 190:1, 191:2, 192:11, 199:21, 211:19
**refers** [1] - 109:20
**reflect** [2] - 174:21, 175:10
**refresh** [1] - 191:10
**refusing** [3] - 97:24, 97:25
**regard** [2] - 106:15, 143:12
**Regional** [1] - 177:2
**regional** [1] - 54:6
**regular** [2] - 49:4, 49:5
**regularly** [1] - 198:21
**regulation** [4] - 24:5, 24:22, 28:18, 28:20
**Rehabilitation** [1] - 59:4
**Reilly** [18] - 34:15, 37:4, 37:20, 38:19, 39:3, 39:7, 43:24, 44:2, 113:15, 123:8, 132:5, 186:6, 207:20, 208:18, 222:1, 222:2, 226:13, 226:23
**reiterated** [1] - 112:16
**rejected** [1] - 92:12
**rejecting** [1] - 92:8
**related** [21] - 6:5, 20:9, 42:23, 59:21, 61:15, 64:16, 73:22, 80:18, 81:3, 82:4, 95:6, 96:13, 97:13, 102:14, 138:13, 138:23, 139:18, 161:18, 163:25, 220:15, 226:8
**relation** [1] - 6:1
**relationship** [5] - 37:3, 39:4, 39:18, 40:4, 173:15
**relative** [2] - 231:8, 231:9
**relaxed** [1] - 38:24
**relevant** [1] - 23:16
**relief** [3] - 101:7, 101:9
**relieve** [2] - 74:23, 101:1
**relieved** [6] - 62:20, 74:12, 74:14, 74:19, 75:22, 76:3
**relocate** [2] - 130:7, 184:9
**relocating** [2] - 184:8, 219:24
**relocation** [3] - 68:24, 71:1
**remember** [111] - 8:22, 10:1, 11:23, 13:18, 13:20, 18:2, 31:7, 31:8, 32:6, 34:8, 35:9, 35:10, 36:14, 36:15, 36:16, 40:2, 43:22, 44:21, 44:23, 47:25, 51:3, 51:6, 51:8, 55:14, 56:9, 57:14, 57:16, 58:22, 61:17, 61:22, 62:18, 66:8, 66:12, 66:17, 74:4, 98:14, 99:12, 101:11, 103:6, 117:24, 117:25, 118:1, 118:2, 118:4, 118:5, 118:16, 118:21, 118:24, 119:1, 119:14, 119:16, 120:3, 120:4, 120:5, 121:13, 121:22, 123:7, 123:11, 123:13, 123:17, 124:8, 125:23, 130:8, 133:12, 133:15, 133:23, 152:7, 160:24, 160:25, 161:3, 161:11, 169:24, 169:25, 170:1, 171:8, 171:19, 171:22, 172:23, 173:1, 173:4, 173:5, 175:23, 176:3, 179:5, 181:9, 181:12, 187:2, 187:23, 189:12, 193:3, 198:15, 207:25, 208:9, 208:12, 210:3, 210:6, 210:23, 211:3, 211:10, 211:21, 212:3, 212:5, 213:15, 215:7, 215:8, 216:2
**remind** [3] - 11:25, 134:21, 135:9
**reminded** [2] - 135:4, 155:20
**reminder** [1] - 134:18
**reminding** [3] - 134:3, 135:8, 135:11
**renovated** [4] - 55:11, 88:20, 121:5, 130:6
**rep** [2] - 213:12, 214:7
**repeat** [4] - 7:15, 84:7, 151:23, 224:12
**repeated** [3] - 129:15, 175:13, 175:14
**repeatedly** [1] - 12:24
**rephrase** [1] - 7:16
**replied** [1] - 84:2
**Report** [4] - 3:9, 50:14, 51:17, 130:19
**report** [13] - 30:22, 31:2, 35:8, 54:22, 56:5, 59:14, 88:23, 97:13, 97:23, 127:11, 130:20, 177:2, 231:6
**Report/EEO** [1] - 3:7
**reported** [6] - 65:25, 88:14, 114:21, 153:17, 200:23, 233:4
**reporter** [2] - 6:15, 56:18
**Reporter** [2] - 2:15, 232:18
**REPORTER** [32] - 41:20, 49:1, 49:7, 49:11, 49:14, 72:10, 72:13, 83:10, 84:12, 87:20, 87:22, 88:1, 88:3, 92:17, 92:21, 98:18, 98:20, 117:14, 117:16, 138:21, 143:6, 182:15, 187:14, 190:9, 190:13, 206:7, 206:13, 206:16, 206:18, 209:16, 209:19, 231:1
**reports** [3] - 65:23, 97:12, 156:6
**represent** [2] - 35:21, 35:23
**Representative** [7] - 10:10, 11:14, 11:18, 11:20, 12:2, 12:4, 12:15
**representative** [3] - 117:13, 191:5, 213:8
**represented** [1] - 40:25
**Request** [2] - 3:24, 176:21
**request** [102] - 17:15, 17:24, 55:17, 55:19, 61:10, 61:11, 61:15, 62:15, 62:17, 62:20, 70:25, 73:22, 74:1, 74:3, 74:18, 79:6, 79:13, 80:3, 80:5, 80:23, 81:2, 81:25, 82:4, 88:23, 89:8, 89:16, 91:3, 91:4, 91:22, 92:3, 92:8, 92:12, 92:24, 93:8, 93:11, 93:18, 93:21, 94:16, 95:2, 95:22, 96:10, 98:10, 98:22, 99:6, 99:7, 99:10, 99:13, 100:1, 100:18, 102:25, 104:18, 105:3, 105:18, 106:16, 106:25, 107:11, 107:13, 108:23, 108:24, 109:8, 109:22, 129:14, 129:17, 129:18, 129:20, 129:21, 129:24, 129:25, 130:12, 133:10, 134:12, 134:18, 135:5, 136:12, 137:3, 137:8, 137:10, 137:12, 137:13, 143:13, 143:19, 143:23, 150:9, 162:18, 166:3, 171:6, 174:8, 174:15, 174:22, 175:11, 175:13, 177:22, 180:19, 181:7, 181:12, 185:16, 191:5, 201:8, 201:9, 217:6, 219:6
**requested** [29] - 55:15, 56:2, 59:18, 59:20, 65:10, 70:22, 73:8, 88:19, 98:4, 102:5, 104:22, 104:25, 105:13, 109:5, 134:1, 134:4, 135:3, 152:22, 168:17, 171:21, 177:6, 177:20, 181:20, 195:19, 201:4, 201:6, 213:6, 231:7
**requesting** [5] - 95:24, 105:5, 119:8, 135:6, 220:15
**requests** [16] - 13:15, 61:16, 62:4, 65:21, 71:3, 72:4, 90:13, 100:8, 100:14, 102:22, 102:23, 107:23, 112:21, 117:22, 145:15, 215:25
**Requests** [2] - 3:5, 57:20
**required** [7] - 24:9, 24:10, 59:13, 76:5, 191:2, 191:6, 194:15
**requirement** [4] - 83:8, 165:4, 165:7, 199:17
**requires** [1] - 177:1
**requiring** [1] - 199:6
**reschedule** [1] - 78:5
**rescheduled** [3] - 76:7, 78:16, 83:4
**rescue** [1] - 121:18
**research** [2] - 14:9, 34:3
**research-based** [1] - 14:9
**researching** [1] - 12:11
**resigned** [1] - 70:12
**resolution** [1] - 155:24
**Resolution** [5] - 3:8, 5:21, 12:25, 41:2, 54:5
**resolve** [1] - 77:21
**resolved** [1] - 84:16
**Resource** [1] - 211:24
**Resources** [23] - 60:10, 60:12, 60:14, 68:9, 68:11, 68:18, 77:1, 99:8, 114:14, 114:22, 114:23, 115:5, 137:22, 138:2, 139:15, 145:5, 145:24, 149:9, 149:10,

152:18, 158:7, 166:3, 203:10
**Resources'** [1] - 139:18
**resp** [1] - 197:12
**respect** [1] - 40:14
**respected** [1] - 171:25
**respirator** [7] - 210:21, 211:8, 211:25, 212:11, 212:18, 212:20, 213:20
**respirators** [1] - 212:14
**respiratory** [4] - 88:15, 113:3, 197:12, 200:25
**respond** [1] - 89:15
**responded** [2] - 89:1, 125:11
**response** [21] - 41:18, 41:22, 53:23, 59:9, 59:12, 59:17, 63:24, 68:18, 68:19, 68:20, 68:21, 69:1, 75:3, 89:6, 91:3, 111:9, 124:14, 161:6, 164:10, 165:9, 222:11
**responses** [3] - 59:8, 59:12, 228:17
**responsibilities** [1] - 13:5
**responsibility** [9] - 13:3, 16:13, 16:20, 20:16, 22:7, 22:8, 74:23, 76:3, 158:6
**responsible** [2] - 22:13, 151:3
**responsive** [1] - 136:15
**rest** [9] - 7:20, 25:1, 77:18, 77:22, 79:17, 79:24, 128:16, 153:23, 197:5
**restate** [1] - 83:16
**rested** [1] - 182:18
**restrictions** [1] - 79:13
**result** [8] - 24:9, 50:10, 63:16, 63:19, 67:3, 73:15, 97:18, 224:17
**retaliate** [3] - 66:19, 69:18, 87:11
**retaliated** [5] - 45:12, 46:20, 47:2, 47:19, 67:5
**retaliation** [14] - 45:20, 47:4, 47:6, 47:16, 67:3, 67:8, 71:8, 91:18, 91:19, 219:8, 221:18, 222:6, 222:9, 222:12
**retrieve** [3] - 32:7, 225:20
**retrieving** [2] - 31:12, 213:25
**return** [6] - 115:2, 127:4, 201:12, 202:4, 202:7
**returned** [5] - 118:18, 127:20, 132:20, 208:5, 208:13
**returning** [2] - 100:16, 208:15
**Review** [7] - 26:20, 28:7, 39:21, 39:24, 65:5, 214:23, 215:13
**review** [10] - 14:13, 16:25, 17:9, 20:3, 132:20, 148:18, 174:7, 180:20, 210:12, 231:6
**reviewed** [2] - 13:6, 16:21
**rewind** [1] - 188:15
**reword** [1] - 181:18
**RFI** [1] - 59:2
**rhetorical** [1] - 79:21
**rid** [3] - 65:15, 65:16, 93:24
**Rights** [1] - 53:13
**rights** [1] - 63:25
**risk** [1] - 146:21
**RO** [1] - 45:7
**RO317** [2] - 59:15, 65:1
**ROI** [2] - 54:25, 55:2
**role** [7] - 11:15, 31:9, 33:15, 33:19, 33:20, 39:8, 209:6
**roles** [9] - 12:24, 13:1, 13:16, 30:25, 33:22, 34:14, 35:11, 64:21, 64:22
**room** [53] - 7:20, 99:19, 100:17, 101:25, 104:9, 105:7, 107:21, 107:25, 119:3, 120:4, 120:9, 120:23, 121:2, 121:4, 121:15, 122:2, 122:4, 122:5, 123:1, 123:2, 123:22, 123:23, 123:25, 124:2, 124:5, 124:6, 129:12, 146:24, 147:12, 147:13, 150:21, 151:8, 151:9, 153:1, 153:2, 156:9, 167:7, 167:18, 167:22, 168:17, 169:22, 183:21, 196:5, 196:6, 205:21, 205:24, 206:2, 215:2, 215:18, 219:21
**Room** [5] - 59:15, 134:19, 152:15, 174:10, 185:4
**rooms** [2] - 153:15, 153:21
**rotated** [2] - 76:1, 76:2
**rotation** [4] - 76:6, 76:14, 78:5, 78:15
**rounded** [1] - 122:2
**rounding** [1] - 123:23
**route** [1] - 114:14
**row** [5] - 53:14, 112:9, 112:12, 112:15
**RSVR** [1] - 220:10
**rules** [1] - 6:11
**rumors** [1] - 63:20
**run** [1] - 169:22
**running** [4] - 147:1, 147:3, 148:3, 168:10
**Russell** [16] - 69:4, 69:19, 69:23, 70:11, 70:22, 71:6, 71:11, 71:16, 72:4, 72:17, 72:22, 73:8, 87:3, 95:8, 96:9, 97:7
**RVS** [1] - 14:8
**RVSR** [38] - 10:14, 11:12, 12:19, 12:22, 13:3, 13:12, 13:17, 14:2, 14:18, 14:24, 15:3, 15:6, 20:2, 21:15, 21:24, 22:1, 22:11, 23:10, 24:4, 27:7, 30:22, 31:6, 31:9, 32:21, 34:15, 39:20, 39:24, 40:8, 101:21, 155:19, 155:20, 155:23, 156:3, 174:10, 182:23, 184:24, 184:25, 220:11
**rVSR** [1] - 220:12
**RVSR's** [2] - 22:7, 182:25
**RVSRs** [7] - 13:25, 26:3, 26:6, 26:14, 28:22, 182:19

## S

**safe** [8] - 9:14, 119:17, 163:15, 163:22, 166:8, 170:15, 210:20, 211:7
**safely** [6] - 105:20, 154:11, 163:9, 163:16, 164:7, 214:3
**safety** [1] - 163:7
**Sandra** [4] - 33:1, 177:5, 177:25, 186:6
**sandy** [1] - 33:1
**Sandy** [18] - 33:2, 43:14, 127:9, 127:11, 127:22, 171:20, 171:23, 171:24, 173:7, 173:16, 174:2, 174:3, 174:13, 174:15, 174:17, 191:8, 191:11, 201:15
**Sandy's** [1] - 187:11
**sarcastic** [1] - 170:4
**sat** [3] - 5:16, 89:9
**satisfactory** [2] - 144:13, 144:15
**satisfied** [1] - 129:15
**saturation** [1] - 8:19
**Saturday** [1] - 153:24
**Save** [1] - 49:9
**saw** [10] - 17:21, 20:19, 40:11, 95:4, 124:5, 124:21, 124:24, 134:20, 135:20, 198:21
**scanned** [1] - 15:10
**scared** [2] - 119:2, 119:23
**scenario** [1] - 227:5
**scenarios** [2] - 36:12, 65:17
**schedule** [6] - 25:4, 99:4, 100:25, 112:18, 182:25, 183:2
**scheduled** [1] - 161:8
**schedules** [1] - 150:16
**schlep** [1] - 29:7
**school** [2] - 40:21, 195:7
**scope** [4] - 17:1, 19:25, 23:14, 184:15
**scratch** [2] - 108:14, 218:11
**Sean** [7] - 72:1, 72:2, 72:19, 72:20, 87:3, 95:8
**seat** [2] - 127:16, 128:16
**Sec** [1] - 233:2
**second** [26] - 44:19, 50:1, 51:9, 53:13, 61:21, 68:25, 78:24, 84:14, 86:14, 88:14, 88:22, 90:1, 105:23, 108:15, 112:17, 114:6, 121:22, 122:12, 123:7, 126:11, 132:11, 152:14, 154:9, 160:11, 175:2, 208:2
**secondary** [1] - 23:1
**secret** [1] - 202:19
**Secretary** [2] - 46:1, 47:14
**SECRETARY** [2] - 1:6, 232:6
**secure** [1] - 121:8
**Security** [3] - 5:16, 5:24, 6:5
**security** [3] - 123:24, 125:1, 141:24
**see** [43] - 49:2, 50:13, 51:22, 53:11, 57:10, 59:2, 60:6, 65:4, 65:6, 66:9, 69:8, 75:6, 81:19, 83:24, 84:11, 88:25, 98:7, 100:25, 103:10, 103:13, 109:4, 112:4, 116:22, 126:10, 135:21, 138:10, 140:22, 152:19, 156:7, 160:18, 161:15, 163:2, 163:5, 170:11, 171:16, 174:4, 176:19, 180:14, 185:3, 192:20, 204:25, 216:16
**seeing** [4] - 36:13, 46:8, 165:22, 184:2
**seeking** [1] - 29:17
**seeping** [1] - 161:10
**send** [8] - 25:17, 30:9, 56:25, 113:15, 113:20, 148:19, 150:3, 150:5
**sending** [3] - 25:17, 154:2, 154:3
**Senior** [4] - 26:20, 27:1, 27:19, 73:3
**sense** [10] - 7:13, 18:11, 18:14, 58:11, 154:20, 160:20, 180:7, 192:3, 194:12, 204:17

**SENT** [1] - 232:10
**sent** [30] - 30:10, 110:3, 113:19, 113:22, 113:24, 116:12, 119:14, 128:21, 132:3, 132:9, 132:20, 136:5, 136:10, 146:12, 146:17, 147:2, 152:5, 152:13, 156:21, 156:24, 157:23, 160:16, 162:6, 162:9, 165:21, 170:3, 174:3, 180:17, 208:1
**sentence** [16] - 114:9, 147:22, 166:5, 174:14, 180:3, 180:5, 189:9, 189:10, 189:11, 189:19, 191:1, 196:14, 199:17
**sentences** [2] - 79:23, 114:10
**separate** [1] - 171:6
**September** [3] - 50:23, 51:2, 53:16
**sequence** [1] - 192:5
**series** [1] - 61:21
**serve** [1] - 220:24
**served** [2] - 12:12, 31:8
**Service** [21] - 10:9, 11:13, 11:18, 11:20, 12:2, 12:4, 12:14, 26:24, 29:21, 30:16, 31:3, 32:22, 32:23, 32:24, 33:2, 43:13, 48:6, 78:5, 99:8, 127:17, 153:19
**service** [16] - 12:10, 12:11, 15:19, 16:6, 16:7, 18:21, 20:8, 20:9, 20:22, 20:24, 21:7, 23:1, 24:24, 37:8, 48:6, 218:8
**services** [1] - 125:6
**serving** [1] - 218:22
**set** [29] - 6:10, 17:12, 150:15, 150:16, 153:8, 156:4, 156:22, 157:5, 157:15, 157:25, 158:24, 164:17, 165:12, 166:11, 166:20, 167:6, 167:13, 167:19, 167:24, 168:5, 168:7, 168:15, 169:9, 169:21, 184:13, 214:1, 215:25
**setup** [5] - 151:2, 151:3, 159:21, 161:25, 165:3
**several** [1] - 59:8
**severe** [2] - 61:2, 156:19
**severity** [2] - 111:20, 132:12
**sexual** [2] - 27:16, 141:19
**Shakes** [2] - 21:23, 41:15
**Shapiro** [2] - 43:19, 121:25
**share** [3] - 130:4, 172:5, 215:23
**shared** [3] - 38:7, 89:10, 90:5
**sheet** [1] - 19:1
**Sheet** [1] - 2:17
**SHEET** [1] - 233:1
**shield** [1] - 84:11
**shocked** [1] - 173:5
**short** [2] - 8:14, 101:6
**shortly** [6] - 33:12, 35:20, 36:7, 124:21, 128:25, 175:25
**show** [2] - 48:22, 176:10
**showed** [1] - 97:14
**shy** [1] - 7:15
**sick** [27] - 18:21, 35:20, 35:25, 41:4, 41:11, 63:22, 64:16, 65:3, 65:24, 65:25, 66:6, 67:15, 68:15, 93:24, 93:25, 94:9, 96:25, 101:10, 101:25, 107:22, 140:8, 167:6, 179:25, 201:14, 202:14, 206:25
**sicker** [4] - 100:18, 185:5
**side** [3] - 15:19, 56:10, 56:15
**sided** [1] - 218:9
**Sign** [1] - 2:16
**sign** [1] - 232:14
**signature** [2] - 25:18, 193:6
**signed** [6] - 57:25, 85:20, 103:19, 177:8, 193:19, 230:11
**significant** [1] - 111:22
**signing** [2] - 229:4, 232:13
**silence** [1] - 96:18
**similar** [1] - 170:9
**simplifying** [1] - 14:4
**sincere** [2] - 164:14, 170:3
**sinus** [2] - 126:17, 210:9
**sit** [6] - 62:2, 142:19, 172:1, 180:25, 181:4, 214:19
**site** [6] - 167:19, 183:14, 194:14, 194:15, 196:11, 197:16
**sites** [1] - 71:2
**sits** [1] - 141:5
**sitting** [14] - 63:8, 99:20, 99:21, 103:8, 103:11, 106:2, 120:4, 120:6, 135:22, 141:3, 141:4, 141:5, 141:7
**situation** [3] - 7:24, 117:8, 125:3
**situations** [1] - 28:23
**six** [1] - 173:23
**six-page** [1] - 173:23
**size** [1] - 215:3
**sized** [1] - 196:5
**skedaddle** [3] - 201:23, 202:1, 202:3
**skip** [1] - 79:15
**slid** [1] - 205:24
**slightly** [1] - 160:13
**slowly** [1] - 224:13
**small** [4] - 143:3, 146:24, 214:20, 214:22
**smaller** [1] - 225:19
**Smith** [30] - 4:6, 33:1, 34:19, 34:20, 34:25, 40:24, 40:25, 43:14, 127:11, 127:22, 171:20, 171:23, 171:24, 173:7, 174:3, 174:15, 174:17, 177:6, 186:6, 201:15, 203:1, 203:24, 207:18, 208:17, 208:23, 213:12, 216:5, 221:5
**Smith's** [4] - 127:9, 177:25, 214:14, 221:6
**snowflakes** [1] - 18:16
**Social** [3] - 5:16, 5:24, 6:5
**soft** [1] - 38:14
**soft-spoken** [1] - 38:14
**sole** [4] - 93:1, 93:2, 93:3, 93:4
**solely** [2] - 93:13, 93:16
**SOLOMON** [39] - 49:20, 49:23, 50:3, 70:13, 81:4, 81:8, 81:12, 83:15, 83:20, 84:4, 87:17, 87:21, 87:24, 154:12, 165:23, 166:1, 168:19, 168:24, 169:2, 173:10, 178:11, 182:3, 186:14, 186:18, 186:23, 191:14, 196:25, 197:8, 197:23, 202:20, 205:10, 205:12, 206:3, 206:6, 206:8, 227:8, 227:10, 227:13, 228:24
**Solomon** [5] - 2:1, 2:2, 232:12, 232:20, 233:25
**solutions** [2] - 137:12, 137:16
**someone** [35] - 12:12, 18:17, 18:20, 21:4, 25:18, 27:15, 35:22, 37:20, 38:1, 38:18, 40:7, 40:12, 40:15, 47:19, 73:4, 83:7, 87:9, 95:3, 97:13, 122:3, 131:8, 142:19, 142:20, 143:25, 145:23, 170:15, 170:21, 171:25, 175:8, 184:3, 187:12, 203:3, 224:14
**someplace** [4] - 65:1, 105:19, 120:24, 121:2
**sometime** [1] - 154:14
**sometimes** [4] - 6:23, 9:3, 83:25, 201:12
**somewhere** [11] - 55:11, 104:10, 105:20, 121:4, 124:23, 129:10, 130:7, 150:7, 153:4, 185:1, 185:13
**soon** [6] - 96:3, 125:16, 132:20, 154:14, 191:6, 201:22
**Sorry** [2] - 201:5, 208:6
**sorry** [30] - 11:25, 31:20, 41:20, 51:19, 57:3, 72:11, 83:11, 91:20, 92:17, 110:24, 113:19, 114:11, 126:2, 128:11, 135:14, 138:21, 143:6, 143:7, 176:7, 181:25, 187:14, 190:9, 190:20, 202:23, 205:19, 205:23, 217:14, 220:12
**sort** [29] - 7:7, 7:9, 9:4, 9:5, 10:4, 12:20, 14:18, 14:23, 15:11, 16:25, 18:25, 23:16, 26:7, 39:9, 45:13, 52:4, 53:11, 63:14, 101:23, 104:19, 115:7, 121:13, 122:22, 144:15, 149:12, 191:10, 203:4, 208:19, 224:6
**sorts** [3] - 36:12, 70:23, 195:8
**Soto** [3] - 34:18, 40:13, 40:14
**sound** [3] - 126:14, 176:4, 208:7
**sounding** [1] - 146:21
**sounds** [18] - 6:8, 11:15, 12:20, 19:4, 23:5, 23:17, 28:21, 30:15, 39:2, 53:19, 70:11, 71:15, 94:15, 196:1, 212:16, 214:5, 215:9, 218:10
**Southern** [2] - 46:2, 47:22
**space** [7] - 92:4, 150:22, 158:24, 214:22, 214:25, 215:15, 215:19
**spacing** [1] - 58:22
**speaking** [8] - 53:20, 59:16, 59:21, 60:16, 61:7, 73:22, 83:24, 123:11
**special** [2] - 166:10, 167:13
**specialist** [7] - 27:15, 95:21, 209:11, 210:19, 210:22, 213:7, 213:8
**Specialist** [1] - 211:24
**specialize** [1] - 27:9
**specific** [25] - 15:17, 18:3, 43:4, 95:9, 95:17, 119:7, 128:11, 132:1, 133:14, 137:13, 147:22, 150:24, 150:25, 163:23, 175:17, 179:3, 181:9, 183:3, 188:19, 191:12, 201:9, 204:20, 207:4,

210:6, 211:10
**specifically** [16] - 15:2, 67:1, 68:12, 99:12, 103:5, 103:7, 118:16, 129:25, 134:1, 152:22, 166:18, 175:19, 186:4, 198:16, 210:3, 220:14
**specifics** [1] - 225:18
**specs** [2] - 146:23, 212:8
**spectrum** [1] - 19:3
**speech** [1] - 61:3
**spell** [1] - 32:1
**spent** [2] - 18:20, 94:6
**spoken** [9] - 38:14, 54:6, 72:8, 72:10, 144:8, 161:13, 166:14, 191:9, 191:10
**spot** [2] - 150:18, 184:16
**spreadsheet** [1] - 25:22
**St** [4] - 15:3, 177:2, 184:3, 195:23
**stab** [1] - 178:23
**stack** [1] - 17:7
**staff** [1] - 17:12
**stage** [1] - 43:6
**stamp** [1] - 198:10
**stamped** [10] - 52:24, 130:19, 131:20, 146:9, 151:17, 155:1, 160:4, 192:15, 195:10, 203:25
**stamps** [1] - 228:4
**stand** [2] - 11:12, 141:1
**standard** [1] - 19:8
**standards** [1] - 218:16
**standing** [2] - 62:11, 185:11
**standoffish** [1] - 39:3
**stands** [2] - 11:25, 79:6
**standup** [1] - 203:4
**stapled** [1] - 160:5
**stapler** [1] - 113:10
**stars** [1] - 194:6
**start** [12] - 6:20, 6:21, 7:3, 11:24, 15:11, 26:25, 96:8, 117:11, 160:21, 177:11, 188:16, 226:1
**started** [27] - 10:6, 13:5, 13:8, 15:9, 15:12, 17:6, 20:2, 23:11, 24:4, 26:14, 29:1, 34:5, 34:11, 65:2, 65:19, 106:7, 116:19, 116:20, 120:10, 120:13, 120:20, 120:21, 129:14, 189:13, 200:11, 200:14, 202:2
**starting** [5] - 31:5, 110:10, 181:23, 208:3
**starts** [4] - 112:4, 112:18, 126:9, 199:14
**STATE** [2] - 230:4, 231:3
**state** [3] - 29:16, 154:6, 154:8
**State** [3] - 230:7, 230:15, 231:14
**State's** [1] - 2:7
**statement** [16] - 77:19, 166:20, 166:21, 189:20, 189:25, 190:15, 190:19, 190:20, 204:16, 206:21, 211:1, 223:13, 223:19, 224:15, 224:20, 227:25
**statements** [9] - 71:21, 72:5, 86:21, 140:19, 151:20, 151:21, 223:11, 224:24, 226:8
**States** [1] - 5:10
**states** [3] - 105:3, 143:25, 180:22
**STATES** [2] - 1:1, 232:1
**station** [21] - 98:5, 104:23, 105:6, 105:23, 105:24, 106:1, 106:13, 106:18, 107:2, 107:13, 107:18, 108:3, 108:4, 109:5, 116:10, 120:12, 127:5, 127:22, 132:17, 134:2, 136:3
**status** [3] - 11:7, 12:11, 132:8
**stay** [2] - 101:24, 112:11
**staying** [1] - 111:24
**stenographic** [1] - 231:8
**stenographically** [1] - 231:6
**step** [3] - 15:25, 74:24, 202:15
**Stephen** [2] - 192:18, 193:13
**steps** [2] - 112:25, 122:10
**steward** [16] - 33:20, 34:7, 34:19, 34:22, 34:24, 34:25, 35:1, 35:3, 35:8, 35:17, 35:19, 36:7, 36:21, 37:1, 203:9
**Steward** [4] - 34:18, 35:5, 35:6, 35:9
**stewards** [1] - 35:5
**stick** [2] - 134:17, 218:1
**sticker** [1] - 192:1
**stickers** [3] - 48:25, 49:3, 49:4
**still** [27] - 10:21, 10:22, 10:23, 11:17, 13:17, 13:20, 13:21, 38:18, 60:15, 87:16, 91:1, 100:7, 100:13, 102:22, 103:8, 111:25, 123:22, 155:11, 163:17, 180:23, 196:1, 199:7, 201:13, 202:14, 217:23
**stipulated** [1] - 229:2
**stop** [7] - 95:21, 96:1, 110:13, 222:22, 227:19, 227:22, 228:21
**stopped** [3] - 70:16, 70:19, 96:4
**stopping** [1] - 223:7
**stories** [2] - 144:25, 228:15
**straw** [1] - 218:23
**Street** [2] - 1:15, 2:8
**Stress** [1] - 141:19
**stretch** [1] - 152:16
**strong** [1] - 38:14
**struggling** [1] - 32:4
**studio** [1] - 215:3
**stuff** [11] - 10:4, 14:20, 75:19, 82:17, 94:9, 126:18, 168:11, 185:2, 203:10, 215:14, 222:14
**subject** [10] - 27:10, 27:20, 82:7, 132:8, 136:13, 136:20, 146:15, 148:22, 149:1, 161:24
**subjects** [3] - 161:7, 161:12, 162:2
**submit** [1] - 25:23
**submitted** [4] - 79:14, 81:24, 180:18, 185:8
**submitting** [1] - 181:6
**subsequent** [1] - 138:13
**subsequently** [7] - 42:21, 52:3, 85:2, 104:3, 106:18, 106:19, 152:11
**substance** [1] - 51:13
**substantive** [1] - 26:7
**substantively** [2] - 51:16, 56:3
**successful** [1] - 218:19
**sudden** [1] - 65:18
**suffer** [2] - 73:11, 91:14
**suffered** [3] - 105:10, 136:24, 200:25
**suffering** [2] - 201:5, 201:7
**suffice** [2] - 163:8, 181:15
**sufficient** [2] - 185:16, 232:15
**suggested** [11] - 66:18, 75:14, 87:10, 104:23, 105:8, 134:15, 134:23, 158:18, 199:20, 214:1
**suggesting** [2] - 8:13, 66:20
**suggestions** [9] - 90:6, 102:17, 102:19, 102:20, 103:24, 104:12, 154:10, 158:19, 220:16
**Suite** [2] - 2:3, 2:8
**SULLIVAN** [47] - 5:7, 32:14, 32:17, 42:13, 42:17, 48:16, 48:20, 48:24, 49:5, 49:9, 49:12, 49:22, 57:3, 81:10, 81:18, 87:15, 88:2, 88:7, 108:13, 110:18, 110:22, 115:13, 115:17, 115:25, 116:4, 154:16, 159:5, 168:25, 169:14, 173:21, 182:5, 182:9, 186:16, 186:21, 191:16, 191:19, 197:17, 197:20, 205:16, 205:20, 206:4, 206:11, 227:9, 227:11, 227:18, 228:22, 228:25
**Sullivan** [40] - 2:7, 2:13, 5:10, 32:19, 42:19, 48:21, 49:17, 49:24, 52:20, 57:9, 70:14, 81:13, 81:16, 81:19, 84:13, 88:8, 92:22, 98:21, 108:15, 108:22, 110:23, 115:19, 115:23, 116:6, 117:17, 130:18, 143:9, 154:21, 159:9, 165:25, 169:15, 176:10, 186:24, 190:14, 191:23, 197:21, 202:25, 209:20, 232:20, 233:24
**summarize** [2] - 156:11, 174:14
**summarizes** [1] - 187:5
**summary** [4] - 50:9, 190:17, 204:12, 209:20
**Sunday** [1] - 153:25
**Super** [4] - 26:20, 26:25, 27:19, 73:3
**supervisor** [10] - 88:24, 98:11, 108:23, 124:16, 124:17, 166:13, 166:23, 200:23, 213:7, 213:10
**supervisors** [7] - 25:23, 85:5, 88:15, 88:23, 105:4, 124:19, 139:8
**Supplemental** [2] - 3:5, 57:19
**supplied** [1] - 148:18
**supply** [1] - 52:15
**support** [7] - 26:13, 26:14, 26:23, 29:22, 38:3, 86:7, 132:18
**supported** [3] - 87:5, 119:13, 203:8
**supporting** [1] - 64:12
**supportive** [1] - 41:9
**supports** [3] - 23:19, 26:21, 212:15
**supposed** [6] - 118:17, 120:8, 120:9, 128:2, 168:22, 226:20
**surgeon** [1] - 200:16
**surgeries** [1] - 42:23
**surprised** [2] - 119:2, 119:23

**suspected** [1] - 88:16
**swallowing** [1] - 132:15
**swipe** [1] - 121:10
**sworn** [4] - 5:3, 58:1, 58:17, 230:9
**symbol** [2] - 196:9, 196:10
**symptom** [1] - 153:25
**symptomatic** [1] - 201:18
**symptomatology** [1] - 25:6
**symptoms** [13] - 101:1, 101:14, 101:18, 111:20, 113:3, 132:1, 132:2, 132:12, 132:13, 132:25, 178:19, 196:2, 202:2
**synonyms** [1] - 188:19
**synopsis** [1] - 208:3
**system** [8] - 94:8, 95:22, 96:5, 101:12, 102:11, 112:25, 178:14, 194:17

## T

**tab** [3] - 20:16, 20:25, 23:15
**tabbed** [3] - 20:19, 22:18, 29:15
**table** [4] - 6:10, 24:21, 53:13, 205:25
**tabs** [1] - 22:11
**tacks** [1] - 39:22
**tad** [1] - 14:6
**TAKEN** [2] - 1:12, 232:9
**talks** [1] - 165:1
**Tamanique** [1] - 46:1
**Tammi** [42] - 47:12, 116:14, 117:2, 120:2, 123:5, 123:8, 123:17, 123:24, 124:2, 124:9, 132:4, 132:16, 132:19, 134:3, 136:22, 146:12, 152:5, 157:10, 157:14, 157:23, 160:9, 160:17, 160:21, 162:10, 162:16, 163:5, 165:2, 165:11, 165:20, 170:10, 170:17, 170:21, 179:6, 179:16, 180:20, 202:16, 202:17, 212:22, 213:9, 214:5, 217:19, 223:4
**Tammi's** [1] - 161:15
**TAMPA** [2] - 1:2, 232:2
**Tampa** [5] - 1:15, 1:16, 2:3, 2:8, 2:8
**target** [2] - 64:15, 66:19
**targeted** [2] - 67:15, 67:21
**taught** [1] - 39:25
**tea** [1] - 172:1
**teacher** [2] - 195:7, 209:7
**team** [15] - 14:10, 15:8, 26:18, 72:21, 72:23, 106:6, 106:10, 106:11, 118:6, 118:7, 118:14, 125:10, 128:10, 128:16
**Team** [1] - 76:10
**teams** [3] - 27:9, 31:17, 106:7
**teamwork** [1] - 197:19
**Tedd** [2] - 34:20
**telephone** [1] - 79:24
**telework** [1] - 199:20
**temporary** [4] - 77:7, 77:16, 166:10, 166:25
**Tendering** [17] - 52:21, 57:2, 76:19, 108:9, 115:22, 130:22, 131:15, 146:4, 151:13, 154:22, 159:25, 173:19, 173:20, 176:11, 191:24, 194:25, 203:19
**tenure** [3] - 34:11, 34:12, 182:23
**term** [1] - 218:5
**terminated** [5] - 69:25, 70:16, 70:18, 75:13, 144:24
**termination** [1] - 70:8
**terms** [4] - 14:19, 26:2, 93:23, 186:1
**terrified** [1] - 119:24
**territory** [1] - 9:10
**test** [33] - 150:22, 150:25, 151:9, 152:17, 153:11, 155:19, 155:20, 155:21, 156:1, 157:4, 157:5, 160:9, 161:19, 162:14, 162:18, 163:25, 164:7, 164:18, 165:7, 165:13, 166:3, 166:9, 166:18, 166:24, 167:3, 167:21, 168:18, 169:7, 169:9, 169:23, 174:9, 174:10
**Test** [1] - 161:25
**test/work** [2] - 163:10, 163:16
**testified** [3] - 5:4, 5:17, 74:2
**testimony** [9] - 5:23, 6:9, 8:7, 8:23, 169:6, 169:8, 215:24, 225:14, 225:19
**testing** [3] - 163:9, 167:14, 167:19
**tests** [1] - 24:10
**text** [1] - 186:15
**THE** [27] - 2:1, 2:6, 5:5, 50:2, 72:12, 83:19, 83:22, 84:10, 98:19, 108:19, 108:21, 111:15, 117:15, 130:16, 154:20, 165:24, 182:14, 190:11, 197:2, 197:6, 197:13, 197:19, 202:23, 205:19, 205:22, 206:17, 209:17
**themselves** [2] - 26:4, 94:2
**thereabouts** [1] - 53:18
**therefore** [1] - 156:2
**thick** [3] - 18:22, 19:4, 199:11
**thinking** [5] - 14:3, 115:8, 119:17, 125:21, 225:4
**third** [6] - 17:11, 29:22, 69:8, 72:1, 112:8, 144:16
**Thomas** [1] - 31:18
**thoughts** [2] - 63:23, 90:5
**three** [20] - 10:19, 11:16, 11:20, 19:16, 19:17, 26:19, 52:23, 53:12, 65:6, 73:17, 80:7, 106:4, 109:23, 112:3, 117:21, 133:11, 145:14, 158:15, 203:23, 205:13
**three-minute** [1] - 205:13
**three-page** [2] - 52:23, 203:23
**three-quarters** [1] - 53:12
**threw** [3] - 154:9, 205:20, 220:16
**throat** [1] - 132:14
**throughout** [1] - 28:5
**throw** [2] - 205:24, 206:2
**throwing** [2] - 89:12, 152:19
**thumbs** [1] - 7:6
**Thursday** [4] - 153:18, 153:22, 182:16, 209:8
**Thursdays** [4] - 177:1, 177:12, 179:24, 199:4
**tie** [1] - 21:6
**tight** [1] - 201:23
**tightness** [1] - 132:15
**TIME** [1] - 1:13
**time-share** [1] - 130:4
**timeline** [2] - 10:5, 61:17
**timely** [2] - 150:13, 159:21
**timing** [1] - 108:2
**tiny** [1] - 141:19
**titled** [3] - 50:13, 57:19, 176:21
**titles** [1] - 220:5
**TO** [1] - 232:10
**today** [9] - 8:7, 8:14, 9:17, 155:21, 156:3, 156:5, 161:17, 224:17, 225:8
**today's** [2] - 9:9, 46:11
**together** [6] - 50:10, 72:24, 169:10, 207:18, 208:18
**Tom** [6] - 31:18, 59:25, 62:4, 63:11, 74:8, 75:21
**tomorrow** [2] - 174:7, 174:9
**tone** [2] - 170:8, 170:9
**took** [16] - 33:3, 64:11, 85:2, 95:25, 103:17, 112:24, 128:1, 129:1, 129:4, 142:9, 156:20, 166:16, 167:1, 170:2, 170:15, 208:19
**tools** [3] - 140:4, 153:3, 153:6
**top** [11] - 50:13, 52:12, 53:14, 88:13, 94:4, 108:16, 113:10, 113:11, 130:17, 180:17, 192:21
**topics** [1] - 214:12
**total** [2] - 93:1, 194:16
**totality** [1] - 131:11
**touch** [3] - 123:5, 164:12, 188:23
**touched** [1] - 56:3
**tough** [1] - 47:15
**tour** [2] - 111:20, 161:8
**towards** [3] - 124:22, 140:23, 154:13
**traditional** [2] - 40:20, 40:21
**trails** [1] - 83:25
**trainee** [1] - 180:23
**training** [8] - 27:8, 31:18, 35:18, 39:20, 100:17, 144:18, 226:20, 227:1
**trainings** [3] - 27:8, 112:4, 215:14
**trains** [1] - 26:11
**transcribing** [1] - 6:15
**TRANSCRIPT** [1] - 233:1
**transcript** [7] - 7:8, 125:18, 231:7, 231:7, 232:13, 232:14, 232:14
**transfer** [3] - 148:21, 220:6, 222:3
**transferred** [3] - 106:8, 108:4, 128:15
**transferring** [1] - 108:2
**trauma** [1] - 27:16
**Traumatic** [1] - 141:19
**travel** [1] - 144:19
**treated** [1] - 42:21
**treatment** [4] - 107:20, 208:6, 208:8, 216:23
**tried** [9] - 29:2, 100:23, 100:24, 115:3, 166:2, 173:13, 173:14, 173:16, 221:1
**triggered** [1] - 120:21

**trip** [2] - 183:21, 195:23
**trips** [1] - 194:14
**trouble** [4] - 49:10, 123:19, 172:13, 186:24
**true** [7] - 58:1, 58:5, 107:4, 128:9, 186:18, 231:7, 233:22
**Trump** [2] - 140:17, 223:9
**trustworthy** [2] - 203:4, 203:6
**truth** [2] - 5:3, 161:9
**try** [21] - 6:18, 27:25, 30:20, 72:14, 84:10, 89:13, 89:14, 90:6, 92:1, 93:24, 98:24, 99:1, 196:20, 209:1, 209:3, 218:18, 219:12, 224:13, 226:2, 227:21
**trying** [17] - 13:1, 24:12, 37:7, 61:21, 91:1, 134:16, 134:21, 135:9, 147:6, 147:7, 147:8, 147:17, 160:24, 163:6, 164:2, 184:6, 184:9
**Tuesday** [5] - 46:11, 98:6, 182:16, 228:23, 229:7
**Tuesdays** [11] - 174:9, 175:5, 175:21, 175:23, 177:3, 178:3, 179:24, 182:21, 199:3, 199:7, 199:8
**turn** [4] - 57:17, 58:24, 108:15, 180:12
**turned** [1] - 192:24
**turning** [1] - 181:13
**twice** [1] - 110:3
**two** [37] - 17:18, 25:10, 26:18, 26:21, 34:21, 37:11, 52:1, 52:2, 65:5, 68:14, 98:1, 102:13, 102:16, 107:19, 107:22, 108:6, 109:23, 112:3, 121:19, 126:17, 129:8, 139:14, 151:20, 155:11, 160:18, 165:1, 168:11, 171:4, 178:3, 178:4, 179:21, 195:10, 199:18, 210:8, 225:3
**two-month** [1] - 107:19
**two-way** [1] - 139:14
**type** [3] - 29:22, 32:8, 212:14
**types** [3] - 27:14, 27:20, 27:22
**typical** [1] - 167:9
**typing** [1] - 58:21
**typo** [1] - 126:22

## U

**U.S** [4] - 1:7, 1:14, 232:7, 233:2
**uh-huhs** [1] - 7:6
**uhs** [1] - 7:7
**ultimate** [1] - 22:6
**ultimately** [8] - 12:23, 21:21, 22:1, 23:21, 32:25, 74:22, 75:22, 138:2
**Ulyssee** [14] - 31:25, 132:4, 133:2, 133:13, 148:15, 155:5, 165:15, 174:20, 187:12, 188:1, 202:15, 213:11, 214:6
**unable** [2] - 112:9, 166:14
**uncomplicated** [1] - 24:19
**under** [5] - 6:9, 44:25, 57:25, 70:12, 148:18
**Under** [1] - 233:21
**undermined** [1] - 222:3
**understood** [6] - 8:2, 74:7, 91:5, 116:25, 117:10, 220:9
**ungrateful** [1] - 146:21
**unilateral** [4] - 139:9, 139:15, 139:16, 178:25
**union** [8] - 33:8, 33:25, 34:14, 35:12, 35:14, 35:17, 37:4, 94:23
**Union** [17] - 33:15, 44:16, 44:17, 59:14, 69:14, 69:15, 94:11, 94:22, 117:13, 123:8, 131:10, 149:10, 221:25, 222:13, 226:14, 227:7
**unions** [1] - 33:6
**unit** [36] - 46:5, 48:11, 59:25, 60:22, 61:11, 61:15, 61:24, 61:25, 63:12, 63:16, 64:18, 72:21, 73:23, 74:16, 75:23, 76:6, 76:14, 76:15, 76:17, 78:6, 78:10, 78:16, 78:23, 78:25, 80:3, 80:10, 80:18, 81:3, 82:5, 83:1, 83:3, 83:4, 83:6, 84:16, 84:20, 85:3
**United** [2] - 2:7, 5:10
**UNITED** [2] - 1:1, 232:1
**unless** [2] - 142:20, 143:24
**unnecessary** [1] - 79:22
**up** [72] - 7:3, 7:6, 16:5, 19:10, 25:13, 29:17, 31:4, 33:2, 40:11, 45:4, 67:8, 67:17, 67:18, 80:7, 89:17, 104:7, 109:15, 114:3, 118:17, 118:22, 118:25, 119:15, 120:16, 120:22, 122:15, 131:11, 131:12, 141:1, 141:22, 143:4, 148:8, 150:15, 150:16, 153:8, 154:17, 156:4, 156:22, 157:5, 157:15, 157:25, 158:24, 164:17, 165:12, 166:11, 166:20, 167:7, 167:13, 167:19, 167:24, 168:3, 168:5, 168:7, 168:15, 168:16, 169:9, 169:22, 170:11, 170:13, 183:21, 184:2, 184:13, 185:3, 193:4, 197:14, 198:13, 202:21, 205:4, 207:2, 215:25, 228:23
**upcoming** [1] - 112:4
**uploading** [1] - 120:11
**upset** [1] - 204:5
**uses** [1] - 153:9
**usher** [1] - 125:12
**ushered** [1] - 122:3
**utter** [1] - 143:2

## V

**V-E-R-N-O-N** [1] - 31:21
**VA** [49] - 3:7, 3:10, 3:14, 3:16, 3:18, 3:20, 3:21, 3:24, 4:3, 4:6, 10:5, 10:21, 12:25, 15:4, 20:2, 20:10, 23:11, 24:4, 26:15, 43:11, 45:11, 46:1, 47:14, 49:19, 49:24, 52:24, 55:12, 68:5, 70:19, 76:24, 131:20, 132:24, 146:9, 151:17, 155:1, 160:4, 160:5, 160:12, 165:9, 167:13, 176:20, 184:5, 203:10, 209:25, 210:11
**vacant** [3] - 158:25, 166:11, 167:14
**VACO** [1] - 12:25
**vague** [1] - 169:2
**Val** [2] - 40:10, 123:11
**validating** [1] - 139:25
**Valorie** [19] - 34:15, 37:4, 37:20, 38:19, 39:7, 39:16, 43:24, 44:2, 113:15, 114:3, 123:8, 132:5, 186:6, 207:20, 208:18, 222:1, 222:2, 226:13, 226:23
**varied** [1] - 18:24
**varies** [1] - 18:16
**various** [5] - 3:13, 3:15, 3:17, 51:17, 52:9
**VBA** [2] - 46:2, 55:12
**VBIT1** [12] - 106:5, 106:6, 106:8, 106:12, 127:17, 127:23, 128:1, 128:8, 128:10, 128:13, 132:12, 153:22
**VBIT1's** [1] - 128:16
**VCAA** [1] - 16:12
**vent** [2] - 99:23, 101:6
**verbal** [3] - 7:9, 148:6, 156:25
**verbally** [3] - 36:5, 89:8, 140:21
**verbatim** [1] - 84:8
**verbiage** [1] - 188:18
**verbum** [12] - 94:7, 97:13, 102:4, 103:19, 138:19, 142:21, 166:11, 166:12, 185:19, 186:3, 200:21, 228:9
**verify** [1] - 16:6
**Vernon** [7] - 31:19, 31:21, 60:1, 60:13, 62:4, 63:11, 74:8
**Veronica** [4] - 89:3, 89:4, 90:1, 200:24
**Vet** [1] - 21:22
**veteran** [1] - 141:9
**Veteran** [14] - 15:23, 16:14, 18:12, 20:4, 20:15, 22:22, 23:21, 24:25, 30:3, 30:17, 141:18, 141:24, 143:3
**VETERANS** [2] - 1:7, 232:7
**veterans** [2] - 12:2, 12:6
**Veterans** [24] - 3:8, 10:9, 11:13, 11:18, 11:20, 12:3, 12:14, 14:14, 15:14, 16:13, 26:23, 29:21, 29:25, 30:16, 78:5, 99:8, 143:15, 153:19, 172:6, 218:8, 218:22, 220:15, 220:24, 233:2
**Veterans'** [1] - 88:18
**via** [5] - 14:14, 98:22, 104:21, 105:4, 107:12
**vice** [3] - 34:19, 34:23, 34:24
**Vietnam** [3] - 12:12, 14:14, 21:2
**view** [1] - 198:24
**village** [1] - 197:20
**violation** [1] - 59:3
**vision** [1] - 25:8
**visit** [1] - 20:19
**visual** [1] - 176:6
**voice** [10] - 8:10, 8:12, 77:18, 77:22, 79:13, 79:17, 79:24, 103:15, 154:13, 201:22
**voiced** [1] - 216:6
**voices** [1] - 141:22
**VOL** [1] - 1:10
**Vol** [4] - 2:12, 232:9, 232:14, 233:3

**volume** [1] - 18:14
**volumes** [3] - 18:22, 19:5, 19:23
**vs** [2] - 1:5, 232:5
**VSC** [3] - 149:9, 166:4, 217:20
**VSCFO** [1] - 174:11
**VSO** [1] - 30:6
**VSR** [22] - 10:9, 10:12, 10:13, 11:24, 12:19, 12:20, 13:4, 13:9, 13:10, 13:11, 14:8, 14:12, 16:2, 16:3, 17:3, 17:19, 21:12, 30:8, 65:6, 78:9, 78:10, 78:17
**VSRs** [6] - 13:5, 14:1, 26:3, 26:20, 27:1, 27:19

## W

**WAH** [1] - 174:8
**wait** [9] - 78:14, 79:19, 143:7, 143:9, 191:4, 213:2, 224:11
**waived** [1] - 229:5
**walk** [4] - 14:23, 41:6, 41:7, 166:17
**walked** [2] - 127:18, 138:8
**walking** [2] - 187:11, 187:16
**wall** [1] - 141:21
**wandering** [1] - 9:10
**wants** [1] - 174:8
**War** [5] - 14:14, 21:1, 21:5, 141:18, 141:24
**warehouse** [7] - 17:11, 62:9, 62:23, 63:1, 63:3, 63:5, 63:6
**warm** [1] - 39:21
**Wars** [1] - 29:25
**waste** [1] - 225:10
**watched** [3] - 73:4, 73:7, 73:11
**water** [2] - 7:20, 97:18
**Water** [1] - 14:13
**Wax** [40] - 3:10, 4:6, 45:16, 45:19, 46:17, 85:21, 86:16, 131:7, 131:9, 131:10, 141:6, 141:20, 141:25, 142:9, 142:24, 143:13, 143:14, 143:18, 170:6, 170:7, 170:19, 170:24, 173:15, 201:20, 203:24, 208:20, 222:3, 223:18, 223:19, 223:23, 224:1, 224:9, 224:25, 226:4, 226:6, 226:8, 226:24, 227:21, 227:25
**wax** [3] - 87:9, 143:22
**Wax's** [2] - 140:23, 223:16
**wax's** [1] - 85:23
**ways** [1] - 226:25
**wayside** [1] - 115:1
**wearing** [1] - 73:5
**Wednesday** [3] - 98:6, 153:20, 213:5
**Wednesday's** [2] - 152:16, 154:7
**Wednesdays** [2] - 177:1, 177:12
**week** [8] - 130:5, 132:16, 175:16, 175:17, 178:3, 178:4, 179:22, 199:18
**weekend** [1] - 127:2
**weeks** [2] - 76:2, 120:22
**wheelchair** [2] - 142:15, 142:17
**wheeze** [1] - 196:15
**whereas** [1] - 39:4
**WHEREUPON** [1] - 5:1
**WHIP** [4] - 17:16, 17:20, 17:22, 25:21
**white** [2] - 14:13, 143:25
**whole** [7] - 114:10, 152:1, 152:3, 186:9, 188:17, 199:22, 204:20
**willing** [4] - 158:17, 219:3, 220:25, 221:1
**wing** [2] - 30:1, 118:8
**wise** [2] - 64:1, 64:10
**wish** [9] - 155:23, 157:10, 157:14, 161:6, 164:12, 164:15, 164:16, 165:12, 187:24
**wished** [2] - 160:22, 213:22
**Witness** [1] - 2:16
**witness** [2] - 1:18, 205:18
**WITNESS** [26] - 5:5, 50:2, 72:12, 83:19, 83:22, 84:10, 98:19, 108:19, 108:21, 111:15, 117:15, 130:16, 154:20, 165:24, 182:14, 190:11, 197:2, 197:6, 197:13, 197:19, 202:23, 205:19, 205:22, 206:17, 209:17, 232:10
**witnessed** [5] - 73:3, 73:6, 85:6, 216:16, 216:23
**witnesses** [1] - 105:12
**Witty** [10] - 45:18, 45:22, 46:17, 177:9, 177:10, 180:17, 181:1, 186:6, 201:15, 222:1
**wizard** [1] - 194:11
**woman** [5] - 86:20, 141:19, 142:10, 144:18, 170:13
**women** [2] - 30:2, 145:14
**wonderful** [1] - 26:12
**word** [29] - 37:7, 62:16, 62:18, 65:11, 65:12, 74:5, 80:14, 80:16, 80:25, 81:6, 82:6, 82:10, 82:13, 119:18, 124:16, 144:9, 163:20, 188:25, 189:5, 189:23, 197:1, 197:4, 197:10, 203:16, 204:22, 204:23, 204:24
**wording** [3] - 163:12, 188:10, 219:13
**words** [7] - 9:8, 58:12, 67:3, 143:2, 167:12, 211:4, 226:15
**work-at-home** [1] - 183:2
**work/conversation** [1] - 79:24
**workday** [2] - 99:16, 103:3
**worker** [1] - 43:17
**workers** [9] - 63:22, 64:13, 64:19, 64:20, 66:7, 66:11, 66:16, 67:14, 67:24
**Workers'** [1] - 129:23
**workload** [1] - 17:21
**Workmen's** [10] - 6:3, 11:10, 73:19, 90:13, 90:19, 90:20, 90:24, 90:25, 132:19, 221:24
**workplace** [5] - 159:14, 166:10, 166:25, 194:18, 199:4
**works** [2] - 195:14, 196:6
**workstation** [2] - 166:11, 167:14
**workup** [1] - 209:10
**world** [1] - 200:17
**World** [1] - 21:5
**worse** [7] - 103:15, 103:19, 129:11, 156:19, 183:22
**worsening** [1] - 211:14
**wove** [1] - 228:17
**wow** [2] - 140:15, 184:20
**wrap** [1] - 154:17
**write** [4] - 16:14, 170:18, 178:7, 187:9
**WRITE** [1] - 233:1
**writes** [1] - 170:9
**writing** [4] - 68:23, 107:9, 207:16, 212:9
**writings** [1] - 170:16
**written** [9] - 16:12, 71:23, 71:24, 95:4, 164:7, 171:2, 173:7, 192:21, 200:4
**wrote** [17] - 78:7, 82:1, 82:8, 82:13, 111:21, 170:4, 170:6, 170:7, 170:19, 178:6, 178:10, 188:11, 193:3, 193:4, 208:23, 226:25

## Y

**yards** [1] - 106:4
**year** [2] - 137:25, 181:20
**years** [3] - 10:20, 11:16, 11:21
**yeses** [1] - 7:9
**Yesterday** [1] - 132:11
**yesterday** [4] - 160:23, 164:12, 166:2, 180:19
**yo** [2] - 192:9
**yourself** [7] - 9:10, 67:18, 117:20, 186:6, 186:9, 204:25, 232:15
**Yugoslavia** [1] - 115:2

## Z

**Zeh** [16] - 69:6, 69:19, 69:23, 70:11, 70:22, 71:6, 71:11, 71:16, 72:17, 73:2, 73:8, 87:3, 95:8, 96:9, 97:7, 145:13
**ZEH** [1] - 69:7
**Zeh's** [1] - 72:4
**zero** [1] - 24:25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.

CASE NO.: 8:20-cv-026970-VMC-AEP

DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
_______________________________/

DEPOSITION OF
AILEEN MULLIN, VOL. II

Taken on Behalf of the Defendant

DATE TAKEN: January 4, 2022

TIME: 10:09 a.m. - 4:07 p.m.

PLACE: U.S. ATTORNEY'S OFFICE
400 North Tampa Street
First Floor
Tampa, Florida

Examination of the witness taken before:
Debbie E. Askins, FPR
Notary Public

Pages 234 - 387





APPEARANCES FOR THE PLAINTIFF
James Solomon, Esquire
Daniel Maharaj, Esquire
Solomon, Maharaj & Kasimati, P.A.
601 North Ashley Drive, Suite 1100-192
Tampa, Florida 33602
james@smkfirm.com
daniel@smkfirm.com
813-497-7650

APPEARANCES FOR THE DEFENDANT
David P. Sullivan, AUSA
Office of United State's Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
David.Sullivan3@usdoj.gov
813-274-6000

I N D E X


| Deposition of Aileen Mullin, Vol. II | PAGE |
|---|---|
| Direct Examination By Mr. Sullivan (cont'd) | 238 |
| Certificate of Oath | 384 |
| Certificate of Reporter | 385 |
| Read & Sign Letter to Witness | 386 |
| Errata Sheet (to be forwarded upon execution) | 387 |






PLAINTIFF'S EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| ***NONE MARKED*** | | |


DEFENDANT'S EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| Defendant's Exhibit No. 16 | (5/7/12 Memo from U. McBurrough to VSC, VA 012055) | 243 |
| Defendant's Exhibit No. 17 | (6/27/12 email chain, VA 011996-997) | 245 |
| Defendant's Exhibit No. 18 | (3/23/12 FMLA form, VA 011953-956) | 251 |
| Defendant's Exhibit No. 19 | (5/7/12 FMLA form, VA 011949-952) | 254 |
| Defendant's Exhibit No. 20 | (5/3/12 email from C. Crump to A. Mullin, VA 0025) | 261 |
| Defendant's Exhibit No. 21 | (6/29/12 email, VA 012019) | 263 |
| Defendant's Exhibit No. 22 | (2/5/13 email from T. Clarke to A. Mullin, VA 011637) | 280 |
| Defendant's Exhibit No. 23 | (1/28/13 email from A. Mullin to various recipients, VA 43-44) | 298 |
| Defendant's Exhibit No. 24 | (1/29/13 email from A. Mullin to various recipients, VA 010964) | 304 |
| Defendant's Exhibit No. 25 | (1/31/13 email from A. Mullin to T. Clarke, VA 0111679) | 306 |
| Defendant's Exhibit No. 26 | (2/5/13 email from A. Mullin to T. Clarke, VA 010970) | 313 |
| Defendant's Exhibit No. 27 | (2/20/13 email from P. Works to various recipients, VA 0010969) | 323 |
| Defendant's Exhibit No. 28 | (2 letters dated 4/12/13 from S. Klemawesch to Dept of Labor, VA 010020-22) | 329 |






DEFENDANT'S EXHIBIT INDEX (cont'd)


| No. | Description | Page |
|---|---|---|
| Defendant's Exhibit No. 29 | (Doctor's note, Allergy Assoc 045-46) | 332 |
| Defendant's Exhibit No. 30 | (2/27/13 Approval for Accommodation Req., VA 011018) | 335 |
| Defendant's Exhibit No. 31 | (Email chain, VA 011666-669) | 342 |
| Defendant's Exhibit No. 32 | (4/15/13 Approval for Accommodation Req., VA 011740) | 347 |
| Defendant's Exhibit No. 33 | (4/19/13 Approval for Accommodation Req., VA 011015) | 353 |
| Defendant's Exhibit No. 34 | (8/27/13 Approval for Accommodation Req., VA 011017) | 358 |
| Defendant's Exhibit No. 35 | (Emails, VA 010991-998) | 370 |
| Defendant's Exhibit No. 36 | (2013-4 Challenge Training Class Schedule) | 376 |
| Defendant's Exhibit No. 37 | (3/2/12 Notice of Occupational Disease and Claim for Compensation, VA 011686-688) | 379 |

**WHEREUPON,**

**AILEEN MULLIN,**

previously having been duly sworn to tell the truth and testified upon her oath as follows:

**DIRECT EXAMINATION (cont'd)**

**BY MR. SULLIVAN:**

Q. Good morning, Ms. Mullin. How are you?
**A. I'm not feeling as well as I was on Friday, but I'm here, so I'm glad to be here.**
Q. Well, we appreciate you coming.
**A. Okay.**
Q. You're reaching out towards the exhibits.
**A. I don't know if I'm supposed-- they're supposed to be in front of me or not.**
Q. They are. And I'm going to be asking you to refer to them throughout the day. And I think, in fact, I'm going to ask you to grab Exhibit 1 for me, if you can.
**A. (Complies)**
Q. And while you're doing that, you swore an oath before your deposition started last Friday. Do you recall that?
**A. Yes.**
Q. And do you understand that oath is ongoing? You haven't sworn a new one this morning, but you're





still under oath today?
**A. Yes, sir.**
Q. Okay. And before we started last week, we just talked about, you know, your ability to give accurate, you know, full testimony. And one of the things that you said is that there are times where you start to feel bad and you're concerned that affects your memory. Do I have that generally right?
**A. Yeah. Memory and cognitive processing, yeah.**
Q. Okay. And you know, just like on Friday, if at some point during your depo today you start to feel like you're at a place where you're not giving, you know, accurate testimony or, you know, cognitively you're not all there, just let us know. And again, we're happy to accommodate and take brakes and do anything like that, okay?
**A. Thank you for saying that.**
Q. Of course. Okay. You have Exhibit 1 in front of you?
**A. Yes, I do.**
Q. And I'd like you to turn to Page 10 for me, if you could.
**A. (Complies)**
Q. And just let me know when you're there.
**A. I'm at Page 10.**





Q. Okay. Do you see the first full paragraph at the top starting, On or around May 3rd?
**A. Yes.**
Q. So it makes reference to a request for advanced sick leave that was denied in May of 2012. Can you tell me about that request and the denial that you reference here?
**A. Just a moment. I'm going to read it.**
Q. Yes, please.
**A. (Perusing) Yes. Okay. What was the question?**
Q. Can you tell me about the denial of advanced sick leave that's referenced in that paragraph?
**A. Speaking with Human Resources, this is before breast surgery, I was told that I needed additional information, details about the cancer. And details-- like I said, I couldn't give them until after the removal of the tumor because the information didn't exist yet.**
Q. Okay. So your response to-- on Page 10 of Exhibit 1?
**A. Yeah.**
Q. Let me ask you this. Do you recall when you made this request?
**A. No.**
Q. For advanced sick leave?





**A. No.**
Q. Okay. Do you recall making the request at all?
**A. Yes.**
Q. Okay. Tell me the form of the request, whether email, verbal.
**A. I don't remember.**
Q. Okay. Do you remember how much leave you requested?
**A. No, I don't.**
Q. Do you recall who you made the request to, whether it was your supervisor or HR?
**A. I don't. I don't remember.**
Q. So your response says that the request was denied. And is it a request to be granted advanced sick leave to use or was it a request for, you know, I want two hours of advanced sick leave on X date, if you understand the distinction I'm asking you about?
**A. And there's a third thing, which is the application to be eligible for advanced sick leave.**
Q. Okay. And I think that's-- what I was thinking of was the first thing. Just the application to be allowed to used advanced sick leave at all?
**A. For that specific-- related to that illness.**
Q. That illness being?

**A. The cancer.**
Q. Okay. So is this request that you're saying was denied, was it a request to be allowed to use sick leave or was it a discreet specific request to use sick leave?
**A. To be eligible to.**
Q. Yes, to be eligible.
**A. To be eligible to. For them-- to be established as someone who could receive.**
Q. And that request you made, did you ever get a formal written decision on it?
**A. I don't remember how I learned that I was eligible for it. I don't know. I don't remember.**
Q. At some point did you become eligible to used advanced sick leave?
**A. Yes.**
Q. Okay. So in your answer where you said you were notified that the request was denied?
**A. Yes.**
Q. Your understanding is that subsequently that request was approved?
**A. Yes.**
Q. Okay. And in the interim between learning of the denial and having your request approved, were there any times where you tried to use sick leave, but were





denied?
**A. I wasn't denied use of sick leave.**
Q. Okay. I am going to show you--
**A. Wait. Can you-- will you ask me that again?**
Q. Between the two dates, where you say you learned your request to be allowed to use advanced sick leave was denied and the date on which you subsequently learned that your request to be allowed to use advanced sick leave was approved, were there any times where you tried to use sick leave and had that denied by management?
**A. I don't know the answer to that.**
Q. Okay.
**A. I don't know the answer to that.**
Q. Okay. So I'm handing you what's been marked as Exhibit 16. (Tendering)
**(Defendant's Exhibit No. 16 was marked for identification)**
**A. (Perusing)**
Q. It is a one-page document Bates numbered VA 012055.
**A. Uh-huh.**
Q. Do you recognize this document?
**A. Yes, I do.**
Q. Okay. And is this the memorandum approving





you or stating that you are allowed to used advanced sick leave?
**A. Just a second. One second. (Perusing)**
Q. And what's the date on this document?
**A. The date this document was originated was May 7, 2012.**
Q. Okay. When you seemed very intentional in your choice of the word originated. Why do you say that?
**A. Because there are no dates next to when any of this was, these signatures were put on here. So I don't-- I don't know.**
Q. So your understanding then is the document was created presumably Ulyssee McBurrough on May 7, 2012, right?
**A. Yes.**
Q. But what you're saying is you're not sure when all the signatures happened and the approval had been completed?
**A. Correct.**
Q. Okay. Did you subsequently learn when approval had been completed?
**A. I don't remember learning when it was completed.**
Q. Did you ever ask anyone in HR to let you know when that request had been approved and completed?





**A. The request was not made to HR.**
Q. So you did ask to find out whether this request to be allowed to use advanced sick leave, you did ask when it was approved?
**A. Yes, but not of HR.**
Q. And did HR ever provide you that answer?
**A. I never asked HR.**
Q. Right. But my question is, did HR ever provide you with that information?
**A. Not to the best of my knowledge. I don't know. I just have to say I don't know.**
Q. I'm going to hand you what's been marked as Exhibit 17, which is a two-page document, Bates stamped VA 011996 through 97. (Tendering)
**(Defendant's Exhibit No. 17 was marked for identification)**
**A. (Perusing)**
Q. Take a minute to look at this email and let me know if you've seen it before.
**A. (Perusing) Okay. I reviewed it.**
Q. Okay. So this is an email chain that starts with Phillip Works emailing Valorie Reilly on June 27th, 2012, correct?
**A. Yes. Yes.**
Q. And then Ms. Reilly forwards that email to

you?
A. **Yes.**
Q. And then you forward it to someone else?
A. **Yes.**
Q. Okay. Do you remember receiving this email?
A. **No.**
Q. Okay. And do you see in Mr. Works' email at the bottom of Page 011996?
A. **Yes.**
Q. Where he says the Director approved the requested 80 hours on May 10th, 2012?
A. **Yes.**
Q. Okay. And does that refresh your memory about when your request to be allowed to used advanced sick leave was granted?
A. **No.**
Q. Okay. Do you have any reason to dispute what Mr. Works says here?
A. **I would have to look at the leave statements to show when it was actually there.**
Q. Okay.
**COURT REPORTER:** When or whether?
**THE WITNESS:** When.
A. **When it actually-- Yeah, when.**
Q. So you'd have to look at the leave statements





to be sure. But as you sit here today without referencing any documents, do you have any reason to believe that Mr. Works' email is inaccurate with regards to the date of approval?
**MR. SOLOMON:** Objection. You can answer.
A. **Yeah. I have pause to question whether that date's correct.**
Q. And why is that?
A. **The previous acts and delays of FMLA coming out of HR.**
**MR. SOLOMON:** Do you mind if I provide my basis here?
**MR. SULLIVAN:** Yes. I don't need your basis.
**MR. SOLOMON:** Okay.
Q. **(By Mr. Sullivan)** So previous actions, what are you referring to?
A. **Processing, getting the FMLA approval through the-- through HR and getting signatures, that the timing of this, the fact that I had Valorie Reilly involved in it, the questioning of the type of tumor I had in my breast.**
Q. Did Mr. Works' question the type of tumor you had?
A. **Mr. Works is Human Resources.**





Q. Okay. Did Mr. Works question the type of tumor you had?
A. **Not to me directly.**
Q. Did he question it to somebody else?
A. **I don't know.**
Q. Okay. Did someone from HR question the type of tumor you had?
A. **Yes.**
Q. Who was that?
A. **Kerrie Witty-- No, no. Tamanique Clarke.**
Q. And when did she request it?
A. **I'd have to look back on the date.**
Q. Okay. Did she question that directly to you or through someone else?
A. **Directly to me.**
Q. Okay. Was it a phone call, a face-to-face conversation?
A. **Face-to-face.**
Q. Where did the conversation happen?
A. **In Human Resources.**
Q. And that was related to your FMLA application?
A. **No. Leave donations.**
**COURT REPORTER:** I'm sorry?
**THE WITNESS:** FMLA approval for breast





cancer and the leave donations.
Q. **(By Mr. Sullivan)** For your voluntary leave transfer?
A. **Specific to the breast cancer-- the FMLA application specific to the breast cancer.**
Q. Do you know when you submitted the FMLA application specific to the breast cancer?
A. **I don't know the date. I'd have to see the record.**
Q. Do you know how you submitted it?
A. **How I submitted it?**
Q. Yeah. Did you ask verbally? Did you fill out some forms?
A. **Oh. The FMLA application was completed by the-- one of my oncologists.**
Q. Okay. And did they hand that off to you to give to HR? Did they send it directly to HR? How did that work?
A. **I don't remember.**
Q. And was that FMLA application approved?
A. **Yes.**
Q. Do you know how long after you requested-- Sorry. Do you know how long after you submitted the application it was approved?
A. **No. But it was not approved prior to me to**

Page 250

going to breast-- No. Strike that. The day before my breast surgery, I didn't have it in hand. That's why I went to her office, to get the approval-- copy of the approval of the FMLA.

She said she couldn't give it to me. It hadn't been approved. They needed more medical documentation. This is the day before the surgery.

Q. Was this surgery done inpatient or outpatient?

A. Outpatient.

Q. So did you have to stay in the hospital after the surgery at all?

A. No.

Q. So we went down this path that I asked you if you doubted Mr. Works' statement that the request for advanced sick leave was approved on May 10th. And you had mentioned previous actions and delays. Is there anything else that caused you doubt in Mr. Works' email?

A. Yeah. Well, I never had dealings with Mr. Works. And once again, I suspected he was not the originator of the contents of this.

Q. You don't think Mr. Works--

A. He shouldn't even have been part of this circle in Human Resources. There were other people handling it.



Page 251

Q. Okay.

A. And I just don't know why-- I don't why he'd have a familiarity. I don't know why he'd have anything to do with this.

Q. Okay. But my question is less about why Mr. Works was involved, but whether you doubt the information he transmitted. And you said just now you don't think he wrote this email?

A. I suspect that he may not have.

Q. Okay. Who do you think wrote it?

A. Bonnie Wax, general counsel, someone else.

Q. And why do you believe that?

A. Well, mostly-- the biggest reason is I've never had any dealings with Mr. Works before. I mean, there have been a few things, but not to do with this. And I have no idea why he was able to get in and have all that information or why he would have it or where he'd access it.

Q. I'm handing you what's been marked as Exhibit 18. It's a document Bates stamped VA 001953 through 56. (Tendering)

(Defendant's Exhibit No. 18 was marked for identification)

A. (Perusing) Uh-Huh.

Q. Can you tell me, is this your FMLA



Page 252

application related to your breast cancer that you were just talking about?

A. Yes.

Q. When you submitted this-- well, I guess you said before you weren't sure how it was submitted. When this application was submitted, do you know whether it included any other medical documents with it or if everything substantive related to your cancer was contained in Exhibit 18?

A. Based on the fax information on the top of the page, which says it was Page 2 of 10 faxed on the 3rd of March, and I believe that is the-- HR's fax number, the 727-319-7750. Oh. It is. You see it right here at the top line. (Indicating)

Q. Uh-huh.

A. So based on that, they received the-- they were faxed-- HR was faxed 10 pages on the 22nd of March.

Q. Did you send that fax that you're referencing?

A. I don't have any memory of sending this.

Q. Okay. And on the very last page, 011956.

A. Uh-huh.

Q. There's a signature. Is that your doctor's signature?

A. (Perusing)



Page 253

Q. Or one of your medical provider's signatures?

A. I can't read the first signature.

Q. Okay.

A. The second was For Jeffrey Paonessa who was one of my oncologists.

Q. And what's the date?

A. 3/23/12.

Q. Okay. So based on that date, you still think that this was submitted to HR on March 22nd?

A. No. I'm not saying that. I'm saying this is faxed that. That's what the date that the fax is, yes.

Q. Right. And is it possible that HR had faxed some documents to your doctor to fill out for you?

A. I have no idea.

Q. Okay. So you really don't know what that HR phone number or fax number and date stamp, where that comes from, right?

A. Huh? Excuse me? Can you repeat that or reword that?

Q. Yeah. That date stamp you pointed me to, you don't know whether that is the result of HR sending a fax to your doctor or your doctor sending a fax to HR, right?

A. No. I don't know.

Q. Okay. And what I'd asked you before was whether any other medical documents were submitted with

this FMLA request. And I'm not sure you gave me an answer one way or the other.
A. **I don't know.**
Q. Okay. That's totally fine.
A. **I just need a brief moment, please.**
Q. Sure. Take your time.
A. **(Nods head)**
Q. Do you want to take a short moment, Ms. Mullin?
A. **I think I'm all right. I'll let you know.**
Q. Please do. I'm handing your attorney what's been marked as Exhibit 19, which for the record is a document Bates labeled 011949 through 0011952. (Tendering)
**(Defendant's Exhibit No. 19 was marked for identification)**
A. **(Perusing)**
Q. Do you recognize that document, Ms. Mullin?
A. **I recognize this document.**
Q. Can you tell me what it is?
A. **(No response.)**
Q. Well, maybe let me ask it differently. Is this a subsequent FMLA application that you submitted?
A. **Yes. In response-- letting my oncologist know that they wouldn't accept the first FMLA. So prior**





**to surgery, I let her know and I had my mother and my friend, Mary Shapiro, find the people who did this kind of paper work at Moffitt. Because before my surgery, they hadn't accepted the last one and I was afraid they would charge me with being AWOL. And I was afraid because they still couldn't give the type of tumor and the grade or anything because the biopsy results weren't back yet, which was the information I was told HR required.**
Q. So if I understand what you just said, it sounds like you're the previous FMLA application that was Exhibit 18, you're saying that was denied?
A. **Denied by nonresponse.**
**COURT REPORTER:** Denied by nonresponse?
**THE WITNESS:** Nonresponse.
**COURT REPORTER:** Thank you.
Q. **(By Mr. Sullivan)** And you mentioned being afraid of getting charged AWOL?
A. **Yeah.**
Q. Did that ever happen?
A. **Nope. No, it did not.**
Q. You laughed right as you were answering that. Why did you--
A. **I laugh because there were so many times it could have happened. Like if my village, like my mother**





**and Moffitt and these people around me, weren't one step ahead of the game and weren't aware of what HR was up to, that in a lot of ways it felt like, okay, it was one more time they found another way. But they weren't able to charge me with anything.**
Q. And your belief is that HR was looking for reasons to charge you AWOL?
A. **This was just-- this was a piece of discrimination against me because I was disabled.**
Q. I understand that you--
A. **Wait a minute. Say that again then I'll-- I'm sorry. Say it again.**
Q. I think the question was, it's your belief that HR was looking for reasons to charge you AWOL?
A. **I don't know if they were looking for them. I believe they might have been opportunists. I don't know if they were looking for them.**
Q. If opportunity had presented itself to HR, you believe that they would have pounced on that to charge you AWOL?
A. **I don't know that they would have pounced on it. I think they would have used it strategically.**
Q. How so?
A. **I don't know if I can really describe that.**
Q. Do you think they would have charged you AWOL





if the opportunity had presented itself?
**MR. SOLOMON:** Okay.
Q. **(By Mr. Sullivan)** You can answer.
**MR. SOLOMON:** You can answer.
**THE WITNESS:** Sorry.
A. **Yes, I do.**
Q. And just so I understand, I think based on what you said before, HR never actually charged you AWOL?
A. **Correct.**
Q. So I was asking you about Exhibit 19, the second FMLA application. Do you know whether you or your doctors provided any additional medical information to HR beyond what's contained in Exhibit 19 in support of your FMLA application?
A. **This application?**
Q. Yes, ma'am.
A. **Not the other one. This one specifically?**
Q. Yes.
A. **I don't know the answer to that.**
Q. Okay. Did you submit any other FMLA applications related to your cancer in 2013 besides Exhibit 18 and Exhibit 9?
A. **I don't think-- I don't know. I don't think so. I don't know.**
Q. So I understand around this time in May of

2013 Bonnie Wax had a conversation with Casey Crump about you and your cancer and your medical issues. Do you know the conversation I'm talking about?
A. **Yes, sir.**
Q. And how did you become aware of that conversation?
A. **It was the same day that I was told-- it was the day before the surgery. It was the same day I was told HR wouldn't grant my-- couldn't grant my FMLA and stuff.**
Q. Okay. How did you become aware of that conversation between--
A. **Oh. I was sitting at my cubicle--**
Q. Sorry. If you'd just let me finish the question. That's okay. How did you become aware of the conversation that occurred between Mrs. Wax and Mr. Crump around May 2013?
A. **Casey emailed me as well as spoke with me.**
Q. When did he speak with you?
A. **When did he speak with me? I don't-- I don't know the time.**
Q. Do you know the date?
A. **I don't remember the date off the top of my head.**
Q. And can you tell me the substance of that





conversation?
A. **(No response.)**
Q. If you remember.
A. **I can. I can.**
Q. Take as much time as you need.
A. **The way that I remember the conversation was that Bonnie appeared to be relieved that the breathing problems I was having, the respiratory problems, were because of the tumor in my breast and not the building.**
Q. Okay. Do you remember anything else about the conversation you had with Mr. Crump about his conversation with Mrs. Wax?
A. **Not at this moment.**
Q. And was this a phone conversation or in person?
A. **As I remember, it was in person. I can't say 100 percent, but I think I could see his face.**
Q. Did Mr. Crump tell you how Mrs. Wax came about getting the information that she had relayed to him?
A. **No. Not to the best of my recollection.**
Q. And do you know where Mrs. Wax got the information that she relayed to Mr. Crump?
A. **To the best of my knowledge, it was my FMLA application.**





Q. Why do you stay that?
A. **Wait a minute. Can you ask me the question again?**
Q. Yeah. Do you know where Mrs. Wax got the information that she relayed to Mr. Crump in May of 2015?
A. **I can only suppose. I don't have any definitive information on that.**
Q. Okay. Had you ever told Mrs. Wax about your cancer?
A. **I've never spoken to Mrs. Wax. I did not tell her about my cancer.**
Q. Did you tell anyone else in HR about your cancer?
A. **(No response.)**
Q. Or let me ask it this way. Beside the FMLA applications you submitted, in particular Exhibit 18, which was the March 23rd application, did you tell anyone else in HR about your cancer diagnosis?
A. **Did I tell anybody else in HR besides the FMLA-- the FMLA application, which was back in March? I don't have any memory of talking to anyone else.**
Q. Had you told anyone else at the VA about your cancer diagnosis prior to this email from Mr. Crump?
A. **Yes.**
Q. Who did you tell?





A. **I'm not really-- you asked me this the other day and I thought about it on the way home. Sandy Smith, who was the Veterans Service Center Manager, Mary Jo Shapiro, who I was hired with. And the day I was diagnosed, a friend called me to make sure I got home safely because of my breathing. His name is Greg Jordan. And I just ended up telling him that because he called right after I got the call from oncologist. Did I tell anybody else? I probably told Dr. Natalie Kennedy. Mary Jo, Natalie and I were friends. I don't know who I could have told before the-- before the 23rd of March?**
Q. I would say before the-- let's say the 1st of May. Is that when your surgery was?
A. **Oh, my God. I don't know. Oh. Before my surgery?**
Q. Yes.
A. **So between March and May?**
Q. Yes.
A. **Oh, yeah. I'm sure I talked to people between March and May. I don't know who. I don't know under what circumstances.**
Q. Okay. I'm going the handled you what's opinion marked as Exhibit 20, which for the record is VA 0025. (Tendering)
**(Defendant's Exhibit No. 20 was marked**

for identification)
A. (Perusing)
Q. Is this the email that Casey Crump sent you relaying his conversation with Mrs. Wax?
A. **Yeah. I'm familiar with that. Oh. Was that-- did you ask me that?**
Q. The question was a little more specific than whether you're familiar. Is that the email that we've been talking about that you said Casey had emailed me and we had a conversation. And I just want to make sure that was the email you were referring to.
A. **This is the email I was referring to.**
**Are we finished with this document now? (Indicating)**
Q. That email?
A. **Yeah.**
Q. Yeah. You can put that in the stack.
A. **(Complies)**
Q. So I understand that at some point after applying for FMLA you sought to be entered into the Voluntary Leave Transfer Program. Does that sound right?
A. **At the beginning-- again, after what, when?**
Q. Well, let me get that. Did you apply to be a part of the Voluntary Leave Transfer Program in 2012?
A. **Yes.**





Q. And was that request approved?
A. **Yes.**
Q. And after being accepted into the program, did you ask the VA to send an email solicitation to other employees asking them to donate leave for you?
A. **I don't remember specifically asking that because it was kind of the protocol of what happened.**
Q. Okay. Did you give the VA permission to solicit leave donations on your behalf?
A. **I'm sure I did, yeah.**
Q. And did you give the VA permission to explain in that solicitation what your-- what medical conditions you were dealing with?
A. **I don't know how to answer this question. These are multiple applications. So with one of the applications, yes, I did.**
Q. Okay.
A. **I don't remember which one. But yes, I did with one of them.**
Q. I'm going to hand you Exhibit 21, which for the record is a one-page document Bates stamped 012019. (Tendering)
**(Defendant's Exhibit No. 21 was marked for identification)**
A. **(Perusing documents)**





Q. Do you recognize that document?
A. **I recognize this document.**
Q. And is this the email notification that the VA sent out asking for your fellow employees to donate leave to you and others?
A. **I don't know if this is the one.**
Q. Do you not know because you think there might be others?
A. **No. Because it just doesn't say who it was sent to.**
Q. Okay. Do you recognize who it's from?
A. **From Human Resources.**
Q. Okay. And I appreciate what you're saying. There's no To on this. Although based on the header, it looks like at least Bonnie Wax received this, correct?
A. **On June 29th, yeah. Or she had it then, yeah.**
Q. And do you know if at some point the VA sent out an email like this to all employees?
A. **To the best of my knowledge, yes.**
Q. Do you know when that happened?
A. **I can only assume.**
Q. And what would your assumption be?
A. **That it was on or about June 29th, 2012.**
Q. So we were talking about Mrs. Wax's





conversation with Mr. Crump before this.
A. **Am I finished with this?**
Q. You are, yes. Can you tell me how, if the all, Mrs. Wax's conversation with Mr. Crump about your cancer and your health issues harmed you?
A. **It still harms me.**
Q. And how did it harm you?
A. **I had cancer and I just had to get things in order so I could treat my cancer. And Bonnie had to interject her issues around the building and defending the building and she-- my surgery, the first one, I went under anesthesia worried about Bonnie Wax and what she was going to do to me. I came out of anesthesia that way.**
**I spent more time crying and concerned. At times I had no pay, nothing, and I never knew if I'd get paid. The anxiety-- what the anxiety did to my body and my brain and her callousness. It was breast cancer. I think before we're going to (unintelligible) with the breast cancer stuff, I think we should take a break. I'll finish one though. I understand.**
Q. Yeah. That's absolutely fine. So is there any other way that the conversation between Mrs. Wax and Mr. Crump harmed you or affected you?
A. **Did the conversation between-- it distracted**

**me from caring for myself. It distracted me from honoring my body and focusing on healing and health.**
Q. Anything else?
A. **At this moment, I can't think of anything else.**
Q. Okay. Do you want to take a break?
A. **Oh, God. Yes. Can you tell me are we almost done with the breast cancer questions?**
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 10:58 a.m.)**
**(On the record at 11:20 a.m.)**
**MR. SULLIVAN:** So back on the record.
Q. **(By Mr. Sullivan)** Ms. Mullin, do you still have Exhibit 1 in front of you there?
A. **Yes, sir.**
Q. So I'd like you to turn to Page 11 for me, if you could.
A. **(Complies) I'm on Page 11.**
Q. Okay. The first full paragraph says, Following this meeting. And then that's the paragraph I want to direct you to. Do you see that one?
A. **Yes. Just a moment. I'm going to read that one. (Perusing)**
**I've read the paragraph.**
Q. Okay. So I want to ask you about the last





sentence where it mentions, From August 11th to August 25th, Plaintiff's request for advanced sick leave were not processed promptly resulting in a loss of pay for Plaintiff while she was undergoing cancer treatment.
A. **(Nods head)**
Q. Can you just-- can you tell me about those requests and sort of flesh out what's going on here and what you're referencing in that answer?
A. **Can you reword that question?**
Q. Yeah. I mean, do you recall making any requests for had advanced sick leave around this time?
A. **Yes.**
Q. Around August 11th to August 25th of 2012?
A. **I'm not sure about that week in particular, but yes, I do remember.**
Q. So what's the process for requesting advanced sick leave like?
A. **It would go through my coach, supervisor at that time was Ulyssee McBurrough. And what he did with it, I'm not sure what the process is.**
Q. And did you provide him with a form or some documentation or was it just a verbal request?
A. **I don't remember that. I don't remember the answer to that. I mean, for those specific dates, I don't know.**





Q. And what would the general process have been, if there was one?
A. **(Perusing)**
Q. For requesting advanced sick leave at that time?
A. **I don't recollect. I don't remember what the process was. At this moment, I don't.**
Q. And so your answer says that the requests were not processed promptly. Does that imply that they were eventually processed and granted?
A. **(Perusing) Can you say that again, please?**
Q. Yeah. Were the requests for advanced sick leave that you reference on Page 11 of Exhibit 1, were they ultimately granted?
A. **I don't know if they were all granted. I don't know.**
Q. You said you don't know if all were granted. Do you know if some were granted?
A. **Yes, absolutely.**
Q. And some were granted?
A. **Some were granted, yes, sir.**
Q. And some from that time period of August 11th to August 25th?
A. **I can't be specific as to that time period.**
Q. Do you know how many hours you had requested





in that time period?
A. **No. I don't remember how many hours I requested during that time period.**
Q. And do you know who was responsible for deciding whether or not you could be granted advanced sick leave? Who was the ultimate decision maker on those requests?
A. **I think there were a number of people involved who had to do the approval. It was my understanding is there were a number of people-- administrators that were involved.**
Q. Okay. So do you know who caused your request to be delayed?
A. **I don't know the individual that caused it.**
Q. Do you know how long they were delayed?
A. **I can't be specific to how long they were delayed. Without looking back on the record, I can't.**
Q. So I understand that your August 25th, 2012 paycheck or a paycheck right around there, you got no money; is that right?
A. **I'm not sure of the date, but yes, there was no money.**
Q. And do you know if the VA subsequently gave you retroactive pay for that time period?
A. **I don't know right now. I have record of it,**

but **I don't know off the top of my head.**
Q. You don't know whether they paid you?
A. **No, I don't.**
Q. Do you have Exhibit 2 there in front of you?
A. **Yes, I do.**
Q. Can you turn to Page 17 for me, please?
A. **(Complies) Yes. I'm looking at Page 17.**
Q. Okay. Do you see No. 23? On August 26, 2012 the complainant's request for the leave under the leave transfer program was not processed.
A. **I see that.**
Q. Okay. Can you tell me about that allegation?
A. **Not looking at it out of context, according to this, whatever happened on August 16th, the leave-- that request or some request having to do with August 16th was not processed I guess on August 16th-- on or about August 16th.**
Q. Okay.
A. **But I can't remember.**
Q. Do you remember anything about that leave request that's referenced here on Page 17 of Exhibit 2?
A. **Not without looking at the record, I don't.**
Q. So you have no independent recollection--
A. **Of August 16th, no, I don't.**
Q. Just let me ask it again.





A. **Okay.**
Q. So you have no independent recollection of the leave request that's referenced in No. 23 on Page 17 of Exhibit 2?
A. **I'm going to read the rest of this to see if it helps my memory.**
Q. Please. Well, can you answer the question before-- you know, right now in this moment, do you have any independent recollection?
A. **Of that specific date, no, I don't.**
Q. Of that-- of the request from that date?
A. **Not specific to that date.**
Q. Okay. Please read the rest though and see if that jogs your memory.
A. **(Perusing) Yeah. I've read it now. It doesn't help me remember anything specific to that date.**
Q. Okay. So do you know if that request that's referenced here was ever approved?
A. **Not without looking at the record. Not off the top of my head.**
Q. Do you know who would have been responsible for processing that request?
A. **As I said a little while ago, my understanding is it would go through the supervisor, Ulyssee McBurrough, and I don't know where it went from**





**there. I don't know what the process in the upper administration in Human Resources.**
Q. So you don't know if it ever even made it to Human Resources?
A. **I couldn't answer that without looking at the record to see whose signature's on it.**
Q. So you have no independent memory of whether or not this request made its way from you through Mr. McBurrough to anyone else at the VA?
A. **Correct. Without looking at the record, I cannot attest to it one way or the other.**
Q. Okay. Can you turn to Page 18--
A. **In this same document?**
Q. --of Exhibit 2? Yes, in that same document.
A. **(Complies)**
Q. And I want to ask you about No. 26.
A. **(Perusing)**
Q. So 26 says on, February 6, 2013, TC-- Does that stand for Tamanique Clarke, TC?
A. **Yes, sir.**
Q. TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied, and she was advised that the





denial notice was forwarded to General Counsel. Can you give me your recollection of the events referenced in No. 26 here?
A. **Can you make that a tighter question? Because it's a long story, and I know you don't want a long story. I'm not sure what-- do you want my recollections of them?**
Q. All right. Why don't you start with this references a conversation you had with Ms. Clarke on February 6th? Tell me what you remember specifically about that conversation.
A. **I can't-- I just broke my mask.**
Q. Okay. Do you have a backup?
A. **Yes. Just a moment.**
**MR. SULLIVAN:** Yeah. Let's go off the record while you take care of that.
**(Off the record at 11:32 a.m.)**
**(On the record at 11:33 a.m.)**
**MR. SULLIVAN:** Let's go back on the record.
Q. **(By Mr. Sullivan)** Okay. So I think the question was, can you tell me your recollection of that February 6th, 2013 conversation with Tamanique Clarke that's referenced in No. 26 of Exhibit 2, which is on Page 18, otherwise stamped VA 011487.

A. **My understanding is you're asking if I have a recollection of having a conversation?**

Q. Let's start with that. Do you?

A. **Yes, I can. I can't attest to the fact that it was actually February 6, but it would be on or about then.**

Q. Okay. And tell me what you recall that conversation-- what you recall about that conversation.

A. **It was in the hospital. And I was trying to find out what the difference between the essential functions were and marginal functions to understand how we could come up with an effective accommodation. And I-- she told me that the Agency was going to General Counsel.**

**And she said that-- I'm paraphrasing here. I'm not sure if she said the word was insignificant. But to paraphrase, she said, Ms. Mullin, you think that parts of your job are insignificant or below you or something like that and someone else should do your job-- those jobs. But the essential function is-- the job was the entire job process.**

**And when I say this thing about her sarcastic manner, it was the-- you think, you think that there are parts of your job, like I said, are below you, aren't meaningful and somebody else should do was what I was**





**referring to in the sarcastic part.**

Q. Okay. So No. 26 also references a request to modify her existing accommodation. Do you see that?

A. **Yes.**

Q. What modifications had you requested at that time?

A. **It wasn't one specific modification. There had just been discussion about a number of modifications that we could explore. So it was not-- it was a broad, just to modify my duties.**

Q. Did you make a specific demand for any particular modification at that time, February 6th or thereabouts of 2012?

A. **No. I never demanded anything. Demand would not be a word. . .**

Q. That might be too strong then. Did you ever request?

A. **A specific accommodation?**

Q. A specific modification?

A. **Modification? No. I suggested.**

Q. And tell me what you suggested?

A. **We talked about this Friday, but I'll try to go over it.**

Q. Okay.

A. **But at this point, I was still working paper**





**claims files. So this is prior to them letting me work on the paperless claims and modifications to prevent from going into the building at all were like if I came to work with the files, is the reading would already been done. Everything would be done with the file. And from home, I could print the decision or the exams. So those were already in the building.**

**So we have someone just pick up the files, meet me outside in my car, take the whole cart. Whatever documents were germane to that file, which I would identify, a person would scan it in, do that, do the physical part of the movement of the paper file, the marrying of the documents and the movement of them.**

Q. So if I understand at least one of the suggestions you had made was to have someone help you with the process of marrying the work you had done from home and getting that to be included in the physical file that resided at the VA building?

A. **That's a good way of describing it, yes.**

Q. Okay. Had you been doing that process yourself previously?

A. **Yes. Yes, I was doing that process myself previously.**

Q. And at that point, I believe you were working three days at home and coming into the office on two





days. Does that sound right?

A. **That sounds right. I can't say 100 percent, but I think that was right.**

Q. And on the two days that you were coming into the office?

A. **Uh-huh.**

Q. Were you doing-- is that what you were doing, the process of marrying the output that you generated at home to the physical file?

A. **That would be one of the things that I did.**

Q. Okay. What else were you doing on your days in the office?

A. **If my coach wanted to do my monthly evaluation. If I wanted to have conversation with the Decision Review Officer, I would schedule it for then.**

Q. Uh-huh.

A. **But that was the big-- that was the bulk what I did was the marrying and made sure that the mail was with the file or whatever it printed out there was with the file, the buck (phonetic) slip was it on to be passed onto the next location. To the best of my memory, this is what I was doing at that point.**

Q. Okay. So if I understand then what you're saying is, on the days when you were in the office-- and you know, contextually, this is around February of 2013.

On the two days you were in the office every week, you were doing the process of marrying documents that you generated to the file?
A. **Uh-huh.**
Q. You would do your monthly evaluation with your supervisor and you would also have conversations with Decision Review Officers about questions that you had about the claims that you were working on?
A. **Well, that's almost correct except for it's-- the first one you said, which was marrying and getting the files, the next step, that was a different one. All the other ones were just ors. I didn't necessarily have a monthly evaluation when I was there. I didn't necessarily meet with a Decision Review Officer when I was there. So those may or may not have been.**
Q. Okay.
A. **The one thing that did happen was the-- like I said, this is before the paperless claims.**
Q. Right.
A. **This is when we had the files that I described earlier, the historical record.**
Q. And how much time would you spend doing that marrying process that we're talking about when you were in-- I assume it's different depending on how many claims you generated-- or decisions you generated rather.





A. **I have to honest. I never thought about this. I never thought about-- in the context of like minutes or hours. I've never thought about it.**
Q. Okay.
A. **All that part wasn't complex, so-- but I don't know-- I don't know.**
Q. And I definitely get that it's not complex, but it seems like it could have been a little tedious.
A. **What do you mean by tedious?**
Q. Just sort of lots of discreet tasks that don't necessarily require a lot of brain power, but you know--
A. **No. It's not a lot of discreet tasks because I can only work so many files. Like if I-- I don't remember what the days off were. But like if-- you know, if I had to come in on Wednesday, it would only be the files that I worked the two days prior. So it may only be paper work relating to two files.**
Q. Uh-huh.
A. **And it's-- the printer-- it was printed right there to the team. So it could be literally-- like a rating decision could be like six pages that was printed once or an exam. So it would only require one or the other. So yeah, it was not-- I hate to say anything we do with the VA is tedious, but it was-- it was just**





**matching the file with the document. I don't know if I answered your question there.**
Q. No. I just wanted to get an understanding for the process, so that was helpful. I'm going to hand you what's been marked as Exhibit 22, which is a one-page document bearing the Bates stamp VA 011637. (Tendering)
**(Defendant's Exhibit No. 22 was marked for identification)**
A. **Am I finished with No. 2 right now, Exhibit 2?**
Q. Yeah. You can return it to the stack.
A. **(Complies)**
Q. So you can take a minute to read this.
A. **Yes, please.**
Q. My understanding of Exhibit 22 is that it is an exchange between you and Ms. Clarke about the essential functions of the in-office process and-- which I think is what we were talking about, this like marrying documents. Is that generally correct?
A. **Just one-- just one second.**
Q. Of course.
A. **(Perusing) Okay. I've read the document.**
Q. Okay. Do you recognize this document?
A. **Yes, sir.**
Q. Is this an email that Tamanique Clarke sent





to you on February 5th, 2013?
A. **To my private email address, yes.**
Q. Okay. So this second paragraph starting, Upon returning to the building, it lists a number of steps that seem like the process for marrying your at home work to the physical files in the VA. Is that fair?
A. **That's what she's attempting to say in here.**
Q. Okay.
A. **It's not an honest-- yes. That what she's attempting to say there.**
Q. Okay. So you said you don't think it's honest.
A. **I shouldn't say honest. That's the wrong word.**
Q. Okay. Accurate?
A. **(No response.)**
Q. How about this? Why don't we just walk through--
A. **Yeah. But can you hang on? I'm trying to retrieve a word.**
Q. Yeah.
A. **Exaggerated.**
Q. Exaggerated, okay. So the first sentence of the second paragraph of Exhibit 2 says, Upon returning to the building, files must be covered back into the

building. What does it mean to cover a file into the building?
A. **Every file has a-- like a UPC code on it and the scanner has to be-- they scan it. You're scanning the UPC code.**
Q. So it's essentially like checking the book back into the library?
A. **Yes.**
Q. Okay. And was that something that you would do when you were an RVSR in the office around February of 2013?
A. **Was that something that I would do when I went into the building? Yes.**
Q. Okay. So the next sentence she writes, Next, the printed rating decisions must be retrieved from the work at home printer location along with any mail from the IPC. What is the IPC, if you remember?
A. **I don't remember what the acronym is for.**
Q. Okay. And where was the work at home printer located?
A. **My recollection was that there were two of them. And. . .**
Q. If you don't--
A. **When you say located-- no. I can see it. I'm just not sure how you explain like-- I don't know**





**what do you mean by location.**
Q. Yeah. Where in the building is it?
A. **Oh. On the 3rd floor in the work area for the Veterans Service Center where we do the claims.**
Q. And when you were working in the office as an RVSR, around this time, February of 2030, is that something you were responsibile for doing?
A. **My recollection is we would print from home and the-- you would print from home and that someone else was designated to retrieve the documents from the printer and put them in a file. So if you had 100 people working from home, by the printer, there was a file cabinet. So the-- I would go in and take the stuff out.**
Q. So you would print from home. It would go to the work from home printer and then someone would essentially organize all the documents that had been sent to the work-from-home printer?
A. **Yes. That's my recollection.**
Q. And then you would go and retrieve your documents that had been organized by that person?
A. **Yes.**
Q. Do you know what person would have done that, what role, what title?
A. **No, I don't. And files would be separated, not by my name. It was by digit. I think I explained to**





**you everything is done by a terminal digits on the C-file, the last three digits on the C-file.**
Q. So you would go and retrieve the files that had been organized based on the digits that you were working on?
A. **Yes, sir.**
Q. The next sentence says, Any additional documents such as CAPRI records must be printed and placed into the files when in the office. You know, just generally, what's CAPRI?
A. **CAPRI are the records having to do with VA exams. Those are part of the exam process.**
Q. Is that something you could have accessed from home?
A. **Yes.**
Q. Why does it say that they must be printed and placed in-- and placed into the files when in the office?
A. **Well, they do have to be printed. First of all, I don't know who wrote this. But all that needed was a comma, because it did have to be printed.**
Q. Okay.
A. **And put into that file.**
Q. So they could have been printed from home, but they had to be attached to the physical file in the office?





A. **Yeah. Again, with that file, yeah.**
Q. And is that something you were responsible for, getting the CAPRI documents that you had printed and--
A. **Married the file.**
Q. Marrying them to the file?
A. **Yes.**
Q. So the next sentence says, The printed documents are then reviewed and corrections/misprints are made while in the office. Do you know what that's referring to?
A. **No, I don't.**
Q. Would you review documents that you had printed?
A. **Always.**
Q. And did you ever have to make corrections or fix misprints?
A. **Oh. I'm sure I did, yeah.**
Q. Okay. And is that something that you would have done while you were in the office around this time?
A. **You know what? I've got to think about that. I said obviously did, but I didn't think it was through. That was more of a knee jerk because we always have problems with printers and pages missing. So I have to-- I have to think more before I answer that question again.**

Q. But regardless, you were responsible for ensuring that the documents that you were handing off to the next person had been-- were accurate and had been printed in a way that was legible?

**A. The documents that were going to get married with the file had to be legible on all the pages there, things like that, yes.**

Q. The next sentence says, Any associated mail is also added to the files. What kind of mail would you be getting for a claims file?

**A. Medical records, correspondence from the Veteran or their family, returned mail.**

Q. And that was your responsibility as an RVSR to marry that mail to the file?

**A. See, my memory was that that mail was already married with the file. And it was only a rare-- on a rare occasion would some random thing come in while I had the file. See, when files are in the warehouse, when mail comes in, they would get married into the file.**

**So if I took a file home on Friday afternoon, the likelihood that something-- when I scanned the file in-- when you scan it, it tells you if there's any outstanding mail anywhere or if anybody's looking for it. So very rarely-- on a rare occasion, it would show that there was a piece of mail.**





Q. On those rare occasions when you would cover a file in and you would get the notification that there was mail?

**A. Uh-huh.**

Q. Whose responsibility was it to make sure that the mail had been married to the file?

**A. Whoever was holding it. That would be me. Whoever holds the fire.**

Q. Okay. The next sentence says, Your files must be taken to the 2nd floor for second signature review to determine if corrections are needed. Who would be doing second signature review--

**A. Again, I don't know who wrote this. I don't know who wrote this because that's also. . .**

Q. Is that something you had to do, get second signatures on your decisions?

**A. Yes. I was still on second signature review on February 5th, 2013.**

Q. Who would you have to go to for second signature review?

**A. It was no one in particular. One of the QRT, the quality control people.**

Q. And so assuming that no corrections-- Well, let's assume corrections were needed. QRT said fix X, Y and Z.





**A. Uh-huh.**

Q. Were you responsible for making those corrections?

**A. Yes.**

Q. And if no corrections were needed, this suggests that the file is printed blue at that time. What does it mean to print something blue?

**A. The final copy of it is printed and it just happens to be on a blue piece of paper.**

Q. And when we say it, and this email refers to file, is it the decision that you were generating--

**A. My apologies. If the decision was correct, you hit the final print. And the final print, you just always made sure it was in-- on blue paper.**

Q. Okay. Any files printed blue need to be signed, dated and sent back for second signature reviews and delivered to the POA table for Service Officer review. What is a POA table?

**A. Wait a minute. (Perusing) Corrections needed, printed blue. Any files printed blue needed to be signed, dated and sent back for second-- Wait a minute. Reading those sentences together, I'm not understanding what she's talking about.**

Q. Okay.

**A. Or whoever wrote this was talking about. I**





**can tell you the POA is the Power of Attorney, the Veterans Service Officers.**

Q. Why don't you just tell me without the email, once you were printing your final decision blue?

**A. Uh-huh.**

Q. What did you do next?

**A. I'd sign it, the second signature would sign it, and it would be put on the POA table.**

Q. So this does read weird to me too. Would it make more sense if this email read: Any files printed blue need to be signed, dated, and sent back for second signature and delivered to the POA table?

**A. It sounds like whoever's doing the second signature brought it back to the POA table. I don't know what she's saying on this one.**

Q. Okay.

**A. Or whoever wrote it. I don't know what they're talking about.**

Q. Okay. But your recollection of the process is once something was printed blue, you would take it to get a second signature, right?

**A. I don't remember if I took it for the second signature or if it went on the second signature table that they came and picked up. I don't remember that part.**

Q. Well, putting aside whether you were physically carrying it for second signature to that signer or just putting it somewhere, you had to get it to the appropriate location?

**A. The next step was definitely to get to the next appropriate place, which would be whoever did second signature. Most frequently it would be Decision Review Officer.**

Q. And then from there, a decision-- a signed decision would go to the POA table?

**A. Correct.**

Q. But you're not sure whether you would take it there or the second signer would take it there--

**A. Yeah. I'm not clear if I took it to the-- for signature. I'm not clear on if-- I don't-- just my memory is not there-- I did any of that moving or if it just-- that department came and picked up what was on their table. So I don't. . .**

Q. Examination requests must be entered into CAPRI and buck slips must be added to the file. What's a buck slip?

**A. All that's already done at home. The buck slip just-- it's the routing slip. It was a yellow piece of paper that just said where-- what the file was, who has it, where is it going and the reason. It was a**





**handwritten yellow piece of paper. And that was done at home before getting back. That was always done at home.**

Q. You had those yellow pieces of paper at home?

**A. Yes.**

Q. And the purpose of the buck slip was to transfer the file that you had been working on to wherever it needed to go for the examination to be done?

**A. And whatever key information you wanted the next party to have. It was communication tool.**

Q. Understood. And you were responsible for filling out the buck slip, but not necessarily in the office is what you've said.

**A. Can you say that again, please?**

Q. Yeah. You filled out the buck slips. The RVSR would fill out the buck slips, but you could do that at home.

**A. Anyone could fill out a buck slip.**

Q. Well, whose responsibility was it?

**A. Whoever had it. When I had it, my responsibility. I had the-- if the file was moving, if something had to happen with it, so it wasn't always the case. But if next steps were happening, I would fill out a buck slip.**

Q. Okay. Then the email says, The file needs to be covered out to the examination facility and delivered





to the IPC. And that, I assume from what you've said before, is just scanning the file so that, you know, goes to the next person?

**A. Yeah. Yes.**

Q. And I assume in some instances it would be going to an examination facility. But in others, it might be going back to the warehouse or someplace else?

**A. Yes. It could be going anywhere, yeah.**

Q. And that was your responsibility to cover it out to the next spot?

**A. Was it my responsibility? Yes. It was everyone at the VA's responsibility. Any time they moved something, they had to do that--**

Q. But when you were the one moving it, it was your responsibility?

**A. Yeah.**

Q. Next, more files are gathered and covered out to yourself to take home.

**A. Uh-huh.**

Q. That sounds like you just would gather more files, sign them out to be able to take it to work on at home?

**A. They'd be waiting for me somewhere, yes. And I put it in my cart, scan them, head out.**

Q. And that was your responsibility as a RVSR at





that time to sign the files out to yourself to take home to work on?

**A. Yes. Before I was-- were paperless, that was. And as it says in here, whoever wrote this said that that was all essential.**

Q. Right.

**A. Yes.**

Q. It also says, this whole process described in this second paragraph of Exhibit 2 can take the average work-at-home rating specialist three to five hours or more depending on the number of files to be processed. Do you think that's an accurate assessment of time?

**A. Absolutely not. I have no clue where she-- whoever originated the document came up with that.**

Q. On average for you, how long would this process take?

**A. I've never thought about the duration.**

Q. Okay. So you don't know how long this process that we've just been talking about--

**A. No. I had--**

Q. --would take for you to do as an RVSR in February of 2013?

**A. It would never take three hours.**

Q. How long would it take?

**A. I'd have to think about it. Like right now**

**what I'm doing is I'm walking in the front door of the VA. It in my mind, I'm going through the steps.**
**Q.** Okay.
**A. Off loading the documents, through security at the elevator, scanning them all is literally just minutes, literally.**
**If was-- on a rare occasion, there would be mail. That could can tack on-- and if the mail wasn't already at my desk. Because quite often mail was at my desk if I was-- had mail. I may not even have to go look for the mail. So the mail would be there. But say I had to go somewhere else to look for it, maybe tack on 15 minutes.**
**Go to the printer, get my documents, leave the room to say hello people who are walking around, maybe 15 minutes. Getting back to the desk and making sure everything I printed was there, which was usually just done by-- you know, just knowing it's-- you know, it says Page 1 of 5, just making sure all five pages are there.**
**If that goes smoothly-- I wasn't rating many cases at that point. So it could be just two or three cases, so that's not long.**
**Q.** How long do you think that part would take?
**A. 15 minutes to be on the outside. Yes, I guess. Probably, if that, yeah.**





**Q.** And keep walking yourself through the process after confirming everything was printed.
**A. Okay. In the case if it needed-- the Veteran-- Okay. If what was there and printed was an exam, I'd attach it to the file. You already had a buck slip on it saying the file need it to go to James A. Haley or wherever it is, and scan it out to James A. Haley. So five, 10 minutes I guess, just, you know, to verify the documents were right.**
**Q.** Is that per decision or--
**A. No. This isn't decisions. This was just-- this was for exams.**
**Q.** Okay. Per file that required an exam?
**A. Correct.**
**Q.** Okay. So if you had two or three, that process would take five--
**A. Let's say 10--**
**Q.** 15 to 30 minutes?
**A. Yes. That's probably better.**
**Q.** Okay. And if there was no exam?
**A. Take that off the table completely then, that time frame on it. So if it wasn't that and it needed-- so if I picked up the decision, which was white, I'd have to scan it out to the table that would go down for second signature review. The buck slip would already be on it,**





**you know, whatever, to QRT for second signature review and I'd put it on the table.**
**Q.** How long would that take?
**A. There weren't too many decisions. So same as with the exams, I guess, in five minutes or something. So it would just be marrying a piece of paper. Probably less than the-- no less than the exams. It would be less than the exam.**
**Q.** So a few minutes per claim file?
**A. Yeah. You could say five minutes, 10 minutes at the most just to make sure everything was-- all the pages were there.**
**Q.** So five or 10 minutes per claim file or in total?
**A. Per claim file.**
**Q.** Understood.
**A. If I was there and there was a claim waiting for me saying the second signature was approved, that would be at my desk and I would-- be in the computer-- I'd already be in the computer because I was scanning the files in. Then I'd-- I would go in the computer, open the file, open the claim, and print it in blue. And then it had to go to the QRT table. And I don't really-- I'm not really clear on that one right now. I'm kind of skidding on black-- black ice here in my head.**





**COURT REPORTER:** I'm sorry. Kind of?
**THE WITNESS:** Skidding on black ice.
**Q. (By Mr. Sullivan)** Okay. Do you remember how long that process would take if something--
**A. Same.**
**Q.** --ready for a second signature and you were printing it blue for the next person for to review?
**A. 10 minutes maybe.**
**Q.** Per file or for all the files?
**A. Per file. What's germane is how many files was I actually producing at that time.**
**Q.** How many files were producing--
**A. I'd have to look at the Aspen records to know that.**
**Q.** Do you have a ball park number offhand?
**A. No, I don't.**
**Q.** Could it have been-- Are we talking dozens of files?
**A. No. No. No.**
**Q.** A handful of files?
**A. Yes.**
**Q.** Okay. And is that sort of the end of your process once you pass something along for the second signature?
**A. Yeah. I'm missing the piece right now about**

**how it got there to the decision review table. Right now I'm not recollecting that part.**
Q. Okay. I think you can put that document to the side.
A. **(Complies) I'm feeling tired.**
**MR. SULLIVAN:** Okay. Let's go off the record.
**(Off the record at 12:12 p.m.)**
**(On the record at 1:15 p.m.)**
**MR. SULLIVAN:** Well, let's go back on the record.
Q. **(By Mr. Sullivan)** All right. Ms. Mullin, welcome back. We're going to sort of move onto a slightly different topic, although in the same time frame we were talking about before. So I'm handing you what's been marked as Exhibit 23. (Tendering)
**(Defendant's Exhibit No. 23 was marked for identification)**
A. **Should I keep this document out, Exhibit 1?**
Q. Keep it handy, but we're not going to be talking about it right this second.
A. **Okay. (Perusing)**
Q. And Exhibit 23 is Bates stamped VA 0043 through 44. And it is a January 28th, 2013 email from Aileen Mullin to Ulyssee McBurrough, John Smith, Casey





Crump and others. Take a look to review-- take a look at this document and let me know if you recognize it.
A. **(Perusing) I familiarized myself with the document, 23.**
Q. Is this document, Exhibit 23, an email that you sent to folks on January 28th, 2013?
A. **Yes, sir.**
Q. There are just a few things I want to ask you about. In the first large paragraph starting, Because of the severity.
A. **Uh-huh.**
Q. You mention, I went back to the specialist? Second paragraph.
A. **The doctor advised-- or because of the severity. Okay. I'm sorry. My apologies.**
Q. And you see where it says, I went back to the specialist?
A. **Yeah.**
Q. Is that Dr. Klemawesch?
A. **I believe so, yes.**
Q. Okay. And the next paragraph, the Doctor, Dr. Klemawesch, advised that I further minimize my time in the building and that for me to safely work in the building, I will need to wear a mask similar to those used by people who work in auto body shops and industrial





cleanup operations. That mask that you're referring to in that sentence, is that a respirator?
A. **It's the actual-- at that point, I don't think we knew what kind of mask it should be.**
Q. What do you mean?
A. **Different masks filter different particles.**
Q. Okay.
A. **And we didn't know which respirator and filters were appropriate for whatever I was being exposed to.**
Q. So--
A. **I believe on this date, it was-- yeah, go ahead. My apologies.**
Q. You can finish.
A. **At that point, we didn't know what kind of respirator. I needed one, but I-- we didn't know what kind.**
Q. Okay. So at this point on January 28th, 2013 when you're sending the email that's marked as Exhibit 23, you knew you needed a respirator, but you weren't clear as to the specific type of respirator you needed?
A. **Correct.**
Q. And when you went to see Dr. Klemawesch prior to this-- prior to writing this email, he prescribed you





a respirator, right?
A. **I believe it said respirator, yes.**
Q. Okay. He gave you a prescription for a breathing apparatus?
A. **Yes. Yes.**
Q. Okay. And what did you do with that prescription? Did you fill it?
A. **No.**
Q. What did you do with it?
A. **My memory is that I brought it to work. I'm not 100 percent sure.**
Q. Okay. Why did you bring it to work?
A. **Because I would need them to try to get one for me.**
Q. Did the prescription you had-- Sorry. You needed work to get you the respirator?
A. **Yeah. I thought that was the appropriate course was for them to do it.**
Q. Did anybody tell you that was the appropriate course?
A. **I don't remember.**
Q. Okay. So a few paragraphs down after the kind of hash-marked sentences.
A. **Uh-huh.**
Q. You say, I can't do this own my own. Do you

see that?
A. **Yeah.**
Q. And you say, I need your help in identifying/implementing reasonable accommodations. I trust that if we put our heads together there's a way for me to safely be a successful RVSR. Do you see that?
A. **Yes.**
Q. So in this email you make that statement. Is it fair to say that you were not requesting or demanding any sort of specific accommodation at this point in time?
A. **Correct. I was still putting our heads together.**
Q. You were working with HR to try and figure out what an appropriate accommodation would be?
A. **I'm not sure if this one I was talking about HR or not when I said put our heads together.**
Q. A fair point. So this email goes to Mr. McBurrough and then it looks like Union representatives.
A. **Yeah. Kelly was the AFGE District Vice President or something.**
Q. And do you recall having conversations with any of the folks on this email subsequent to sending it about what would be an appropriate accommodation?
A. **Yeah. As I had covered a couple of questions**





**ago.**
Q. And did you all come up with an accommodation that you all thought would have been reasonable and appropriate?
A. **We came up with a number of ideas and suggestions, not nothing-- not a specific.**
Q. And can you remind me if you've told me already what those suggestions were?
A. **Reassign me someplace outside the building, have-- I don't know if this is-- I don't know. See, this is in January. So I'm not-- I have to look at the timeline to know what we were discussing as of January. And I'm not really sure what-- I know we-- working at home and being reassigned. But as of January, I don't remember what we were talking about in January.**
Q. Okay. So as you sit here now, you don't have a specific recollection of what you and the people on the distribution list here in Exhibit 23 had identified as suggested accommodations that would have been reasonable and effective?
A. **Yeah. And working some elsewhere else other than within the building or complete work-- or working at home.**
Q. Did you ever--
A. **Or I don't know. Maybe this is when also--**





**could have been by then we were talking about the paperless claims that wouldn't require me to come into the building at all. I'm not sure if that was by January of 2013.**
Q. Okay. I'm handing you what's been marked as Exhibit 24. This is a document Bates stamped 010964. Do you recognize this document? (Tendering)
**(Defendant's Exhibit No. 16 was marked for identification)**
A. **(Perusing) I can't say I specifically remember this email.**
Q. Okay. Who is this email, Exhibit 24, who's listed as the author as it's being from?
A. **Yeah. It's from me.**
Q. Okay. And it's sent on January 29th, 2013?
A. **Yes, it is.**
Q. To Ulyssee McBurrough, Casey Crump, John Smith, Tamanique Clarke and Walter Ingram?
A. **Yes.**
Q. And the subject is working things out?
A. **Yes.**
Q. Okay. And you write, Hi you guys, Tammi and I are doing what we can to figure out some of the details as to how these accommodations can be worked out. Now, you're writing this email just the next day after you had





sent Exhibit 23, right?
A. **Uh-huh.**
Q. And the subject, working things out, did you write that subject?
A. **Yes.**
Q. Okay.
A. **Yes.**
Q. And do you recall what you and Tammi were doing? You're saying we're-- Tammi and I are doing what we can. Do you recall what you were doing?
A. **Not looking at this document alone in isolation, no, I don't. In isolation, I don't.**
Q. Okay. Do you have any independent recollection of having conversations with Ms. Clarke on or around January 29, 2013?
A. **Oh, yeah. Yes. We saw each other regularly. She'd be in my area and things like that.**
Q. Well, but I'm asking not whether you saw her regularly, but whether you remember having any conversations with her around this time?
A. **Not based on this document, no, I don't.**
Q. I'm not asking about the document. I'm asking about your independent recollection.
A. **No. I don't remember January 29th, 2013. I don't remember.**

Q. Okay. Do you recall any of the details that you might have been discussing with Ms. Clarke around at that time?
A. **No. I remember calling the Department of Labor and asking them for input as well as for ideas for accommodations. Are you available to meet, I don't remember that. We need help with some of the details. I don't remember.**
Q. Do you remember what you needed help with?
A. **No. Not at this moment. But I could tell I was working from home because of the fact that I had files packed up and ready to go and it was the end of the day at 4:30 in the afternoon.**
Q. You can tell that just from looking at the email?
A. **Well, the PS says the files are packed up and ready to go and it was 4:34 in the afternoon. So it would have been--**
Q. Okay. You can put that to the side. I'm handing you what's been marked as Exhibit 25, which is a document Bates stamped 011679. (Tendering)
**(Defendant's Exhibit No. 25 was marked for identification)**
A. **(Perusing) Thank you.**
Q. Let me when you've had a chance to read this





document.
A. **(Perusing) I've read it.**
Q. Do you recall sending this email?
A. **No, not specifically.**
Q. Okay. But you are listed as the author?
A. **Yes.**
Q. And you sent to it Tamanique Clarke, Ulyssee McBurrough and John Smith?
A. **Yeah. I remember writing it. I don't remember sending it. Yes. Yes, I wrote it.**
Q. Okay. And the subject line is Respirator?
A. **Yes.**
Q. And you write, For the doctors to find the specs for an appropriate respirator, they now need to know how the device will be used. Which doctors are you referring to?
A. **Klemawesch.**
Q. Had you seen Klemawesch from-- since the email you wrote on the 28th?
A. **I don't know the answer to that.**
Q. Okay. And then your next sentence you write, This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table again, more info is needed. What do you mean that now that that's off the table?





A. **The accommodations.**
Q. What accommodations?
A. **January 31st, 2013. Accommodations that would limit my time exposed in the building.**
Q. Okay. Had you made a specific demand for any accommodations as of January 31st, 2013--
A. **I never demanded any accommodations, no.**
Q. Had you made a specific request for any accommodations as of January 31st, 2013?
A. **Yeah. Work at home or relocation.**
Q. Okay. And when did you make those demands?
A. **I never made demands.**
Q. When did you make the request to work from home?
A. **I'm just going through the timeline in my head here. At this moment, my first memory of saying work at home specifically was to Mike Palmer. And that would have been the fall or winter of 2011.**
Q. Had you requested to be allowed to work from home in 2013 prior to writing this email?
A. **Yes.**
Q. Okay. When did you do that?
A. **2011.**
Q. My question is, in 2013 prior to writing this email, had you requested to be allowed to work from home?





A. **This says January 31st. I don't know that in between the first of the year and the 31st-- I don't know if I said something in that period.**
Q. Okay. And what about in that same time frame, the month of January 2013, prior to writing this email, Exhibit 25, did you specifically request to be reassigned?
A. **I don't remember during that month I had requested that.**
Q. Do you remember making that request at the end of 2012 or some time around this email when you say that your accommodations requested were off the table?
A. **I'm sorry. Can you say that again?**
Q. Yeah. So you say, This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table, more info is needed.
A. **Yes.**
Q. Do you remember making any specific request for accommodations around this time, even in December, November, the end of 2012?
A. **I'm not clear on the timeline.**
Q. Okay.
A. **I think I know which-- what it was, but I just can't be-- I'm not confident enough on the dates to**

**answer that.**
Q. Well, give me your best recollection. What accommodations are you referring to in this email, Exhibit 25?
**A. Being able to limit my exposure to the building on the days that I went into the building. Then when I became symptomatic, like-- to leave the building. But again, I'm not positive that was January of 2013.**
Q. Okay. Two paragraphs down starting, Can you please, do you see that?
**A. Yeah.**
Q. So you say--
**A. Yes.**
Q. --Can you please email us the, quote, essential functions, unquote, I've been denied accommodations for. It's info needed for the specialists to make an informed recommendation. Did Dr. Klemawesch ask you to ask this question?
**A. I don't know. I don't remember. (Perusing)**
Q. And the Agency--
**A. Oh, oh, oh.**
Q. Please.
**A. Yeah. Essential function was not a word I use with any of my doctors. But what did I need time wise in the building is what it was referring to. And I**





**was just-- not using--**
Q. You were translating this for purposes of the people on the email?
**A. Yes, sir.**
Q. Okay. And the Agency did-- and Ms. Clarke in particular, did provide you with what the Agency viewed as the essential functions, correct? That was the email we saw earlier, Exhibit 2.
**A. Can you tell me what the date on that one was?**
Q. February 5th, I believe.
**A. If that's February 5th, that would be in response-- February 5th of 2013, I believe that's the response to this one.**
Q. And then you say, I would like for all of us to brainstorm options as to where in the building I can work. That will save the complete humiliation and distraction I'll have to contend with.
**A. Uh-huh.**
Q. So it looks like at this point you're still-- or have at least started to work with HR, Ms. Clarke, to help figure out what would be reasonable?
**A. As far as the mask, they never worked with me on it, identifying what kind of mask and what was in the building. At this point before I had to wear a mask,**





**they didn't give me that information of what the appropriate-- so we did--**
Q. Well, the VA wouldn't have been able to tell you what mask would have been appropriate, right?
**A. No. But they could get-- they 100 percent could tell us what was in the air, what--**
Q. Do you ask for that here?
**A. Not in this email.**
Q. Okay. What you do ask for is the essential functions that they think you'll be required to do, right? And how long it would be anticipated that you'll need the respiratory protection?
**A. Yes. Because I got the nonresponse as far as what I needed to protect myself against.**
Q. Okay. When did you make that request to figure out what you needed to protect yourself against?
**A. I'd have to look at the record.**
Q. Okay. But you don't know when you made that request, but you're certain that you had not received a response by the time of this email?
**A. No. Not 100 percent.**
Q. Okay. So you're not sure if you had made that request when you wrote this email that is Exhibit 25?
**A. You're absolutely correct. Without looking**





**at the record, you're absolutely right.**
Q. I'm handing you what's been marked as Exhibit 26, which for the record is a one-page document Bates numbered 010970. (Tendering)
**(Defendant's Exhibit No. 26 was marked for identification)**
**A. (Perusing)**
Q. Let me know when you've had a moment to review this document.
**A. Yeah. Very clear memories of this.**
Q. So this is an email chain between you and Tamanique Clarke that also cc's Ulyssee McBurrough and John Smith?
**A. Sent from my personal email address, yes.**
Q. Okay. So it sounds like you and Ms. Clarke had conversations on the morning of February 5th, 2013?
**A. Yes. I was in the hospital, yes.**
Q. Okay. Do you recall-- and if you look at this first email in the chain that you sent at 12:15 where you reference a telephone conversation this morning, do you recall what you and Ms. Clarke spoke about?
**A. Yes.**
Q. Okay. Tell me.
**A. That I was so upset that all the**

**conversations that I thought we were working together to get-- to find a reasonable accommodation, that that was all just a show. And then I got so upset that I started-- I had anxiety. I started bleeding from my gut. I had been hospitalized because she had-- because she went from having this conversation with me, we're all brainstorming. And she called me and told me that they were taking the RA request to General Counsel to have it denied.**

Q. Can I ask, at that point do you know if you had made a specific request for an accommodation?

A. **No. We're still talking about options.**

Q. Do you know what options you were suggesting at that point?

A. **Not without looking at the record, I don't. I don't know which ones we were floating those last two weeks.**

Q. Okay. Do you recall asking to be relieved of your responsibilities that were sort of outlined in Exhibit 22, the email where Ms. Clarke set forth her view of the essential functions?

A. **And if I remember right, correct me if I'm wrong, please, that was on February 7th?**

Q. That email was on February 5th.

A. **No. The ones where she gave the essential**





**functions.**

Q. Let me take a look and we can be sure. And if you have the copy over there, you're welcome to look at it.

A. **Oh, yeah.**

Q. I see that as sent on February 5th at 12:09.

A. **February 5th.**

Q. 12:09 p.m. So shortly before you wrote the first email in the chain of Exhibit 26.

A. **(Perusing)**

Q. Okay.

A. **Can we get back to the question now?**

Q. Yeah. Do you know if at this point when you're emailing Ms. Clarke on February 5th at 12:15, do you know whether you had requested to be relieved of the in-office duties that she had set forth in Exhibit 22?

A. **No. It was discussed as an option. I didn't ask to be relieved. It was just one of the things we floated and we were waiting to hear back from Workmen's Comp. and stuff like that. No. It was just floated.**

Q. So at that point you had floated as a possibility being relieved of those in-office duties that Ms. Clarke wrote about in Exhibit 22?

A. **Correct.**

Q. And do you recall--





A. **Oh.**

Q. Please.

A. **No. I don't know if it was me or if it was John Smith. I'm not sure who came up with that idea.**

Q. Okay. But that was something discussed between you, your union representatives, and HR?

A. **Yes. That was one of them, yeah.**

Q. And so that morning of February 5th, did Ms. Clarke call you to let you know that a denial-- that your request was being denied?

A. **I don't know if was the night before or if it was this day.**

Q. Well, your email says, In our conversation this morning.

A. **Yeah. But I don't know if the first time she called and told me was the night before.**

Q. Okay. But some time before writing this email, Ms. Clarke and you spoke and she indicated that your request was being denied?

A. **I remember her saying, we're taking this General Counsel. And my assumption was the General Counsel was to deny me the accommodations.**

Q. And Ms. Clarke explains as much in the next email in the chain, correct?

A. **Right. And what she said, I have no**





**recollection of her saying anything, you had asked for a copy of what was being denied. And I explained that we have a formal denial process and that this is being sent to General Counsel for review.**

Q. That's what Ms. Clarke wrote.

A. **And I don't remember her ever explaining any process of things that were being sent for review.**

Q. So based on what you've said so far, it sounds like at this point when you're having this email exchange on February 5th, 2013, you hadn't made a specific request of the VA for any particular accommodation?

A. **I thought we were still engaged in the interactive process. We were--**

Q. I don't think that quite answers the question.

A. **My apologies. Say it again, please.**

Q. On this date, February 5th, 2013, when you're having this exchange that's reflected in Exhibit 26, your recollection is that you had not made a specific request of any particular accommodation from the Agency?

A. **Correct.**

Q. You were discussing possibilities still?

A. **Correct.**

Q. And the Agency through Ms. Clarke decided to

deny-- end the process and deny the request?
**A. Correct.**
Q. Okay. Did you ever receive a written denial?
**A. No.**
Q. Okay. And did you and Ms. Clarke--
**A. Oh. I'm not sure. I'm not sure.**
Q. And let me make the question better. Did you ever receive a specific denial related to the request that was being made in February of 2013?
**A. I'm trying to synthesize this so that I can not get into story time. You're saying the word denied. So I don't know that the word denied was-- that actual word was used--**
Q. Is there a word you remember being used?
**A. --in the response.**
**COURT REPORTER:** I'm sorry. Your question.
Q. **(By Mr. Sullivan)** Is there a word you remember being used?
**COURT REPORTER:** Thank you.
**A. No. I don't remember the specific word.**
Q. Okay. Do you remember the gist of what was said even if you don't remember the specific word?
**A. It was never granted, so it couldn't be denied. I remember her-- I almost-- I think I was-- I**





**can see it in writing.**
Q. I think you're thinking of something else.
**A. Oh. Later on. Oh. Okay. No. My timeline is a mush then.**
Q. Okay.
**A. Sorry.**
Q. Which is fine. This isn't a memory test.
**A. Thank you for saying that.**
Q. If you don't know--
**A. Yeah, yeah.**
Q. Just so the record's clear, you don't have any specific recollection of this request that was made on or around February 5th, 2013 being denied?
**A. There wasn't a specific request. So it couldn't be denied because it wasn't.**
Q. No request was ever made, so nothing could have been denied?
**A. (Nods head) Yes. I think that's a safe way of putting it.**
Q. Okay. The top email you know-- you thank Ms. Clarke for getting back to you and say, I'm physically unable to continue this discussion at the present time. When I am released from the hospital and sufficiently recovered, I will contact you. Did you and Ms. Clarke have any further conversations about the





accommodations that were being considered around this time?
**A. While I was still in the hospital?**
Q. Just at any point in the future.
**A. About these specific ones in this letter?**
Q. Yes.
**A. I don't remember if they were specific to this.**
Q. Okay. Do you remember last week when we were speaking and I showed you a memo from John Smith?
**A. Yes.**
Q. Do you know if that memo is related to the requests that were being considered and discussed in Exhibit 26?
**A. Not without referring back to the document.**
Q. Okay. Do you feel comfortable referring back to that document?
**A. Yes, sir. Thank you for asking.**
Q. Of course.
**A. What number is it?**
Q. It's Exhibit 15.
**A. (Perusing)**
Q. And if it's helpful, I can direct you to a very specific part of it so you don't have to read through the whole thing.





**A. Thanks.**
Q. So Exhibit 15 is three pages. And if you look on the second page?
**A. (Complies)**
Q. Okay. You see sort of in the middle indented there are three bullet points?
**A. Okay. So you want me to look at the middle of the page where it's indented?**
Q. Yes. And you'll see the date, February 5th.
**A. Okay.**
Q. While in the hospital, Ms. Mullin spoke to the HR specialist who informed her that her denied request for modified accommodation was sent to General Counsel for review. That's referring to Ms. Clarke's email-- or the email exchange between you and Ms. Clarke that is Exhibit 26 that we were just looking at?
**A. I believe so, yeah.**
Q. And the conversation that that exhibit, Exhibit 26, references?
**A. I believe so.**
Q. Okay. And then the next bullet point, February 6th, notes Ms. Mullin was discharged from the hospital after treatment for sinusitis and gastrointestinal conditions. Her doctor required her to remain out of work for an additional two weeks and to

avoid stressful situations during her recovery.
**A. That sounds about right.**
Q. Okay. And the next paragraph notes that you are now scheduled to return to work on the 21st. And it says, As the decision on the modified accommodation for Workers' Compensation illnesses is premature and has not been adequately resolved, we ask that Ms. Mullin be placed on administrative leave until a reasonable modification can be put in place. That will give Ms. Mullin the ability to safely perform her job.
**A. Yes. That's what the paragraph says.**
Q. So based on that paragraph, would you agree that the conversations that you and Ms. Clarke were having on February 5th are being continued or were being continued in-- when Mr. Smith sent this memo?
**A. Yes. According to this paragraph, I would believe that.**
Q. And this is a paragraph that you collaborated on, right?
**A. Yeah. I don't have a clear memory of it, but I know I collaborated and I read it and was part of it. So I trust that it's accurate.**
Q. Okay. And do you know if the Agency granted you that administrative leave that you requested?
**A. I don't remember. It's in the record, but**





**I'd need to look at it.**
Q. I'm handing you what been marked as Exhibit 27.
**(Defendant's Exhibit No. 27 was marked for identification)**
**A. Just hold on one second. Let me reassemble these.**
Q. That's what you pay Dan the big bucks for.
**A. Oh. That's why you get the big bucks. I had lunch.**
Q. All right. I've handed you what's been marked as Exhibit 27, which for the record is a document Bates stamped VA 010969. (Tendering)
**A. (Perusing) I've familiarized myself with the document.**
Q. Okay. This is an email from Phillip Works sent on February 20th, 2013 to John Smith, yourself, Tamanique Clarke and Bonnie Wax, correct?
**A. (Perusing documents) Yes.**
Q. And the subject line is February 20th Request for AA?
**A. Yes.**
Q. The memo that we just looked at from Mr. Smith where he requested you be placed on leave, is that what this email is referring to?





**A. I believe so. Is that the date on the document?**
Q. I should have had you keep that one close at hands.
**A. 16 is the exhibit.**
Q. It's Exhibit 15 and it see it dated as February 19th, 2013. Regardless, in Mr. Smith's memo he requests you be placed on administrative leave.
**A. Yes. Yes.**
Q. Okay. And this is management's response to that request, right?
**A. Yes. That could be considered that. Was I out of the hospital yet?**
Q. I don't know. So the first line, Unfortunately I've not been able to reach Mr. Smith by phone to discuss the letter delivered to Human Resources at approximately 3:20 this afternoon. You would agree this is management's response to Mr. Smith's memo?
**A. I don't know who it's from. It's on this man, Mr. Works' email. I don't know who it's from.**
Q. Okay.
**A. I don't consider him management, so I don't know who it is. And I don't know who wrote this.**
Q. This is the Agency's response to Mr. Smith's memo?





**A. (Gesturing)**
Q. You're shrugging your shoulders. You need to state a verbal answer for the record.
**A. I'll continue thinking about it. Is this the response to that letter? This could be a response to something in that letter.**
Q. Okay. The second paragraph, However, the Director has granted Ms. Mullin authorized absence for her regularly scheduled tours of duty, Thursday, February 21st, 2013 through Monday, February 25th, 2013. Does that refresh your memory that you were in fact granted the authorized absence that Mr. Smith requested?
**A. I don't think that's how he requested it. It's a sentence that addresses authorized absence. I don't even know if I was out of the hospital yet, so I don't know. Maybe that is.**
Q. Okay. Mr. Smith's memo requested administrative leave.
**A. (Perusing)**
Q. Let's keep--
**A. What purpose?**
**MR. MAHARAJ:** (Tendering)
**THE WITNESS:** (Perusing)
**A. Okay. So Mr. Smith asked for administrative leave until reasonable modifications could be put in**

**place that will give Ms. Mullin the ability to safely perform her job. In the response, I guess it's a denial-- I guess it might be considered a denial of that request to have an accommodation in place that could keep me safe. So it wasn't-- I didn't need authorized absence. I needed a resolution to it. So I would say this is-- and this is-- Yeah. So I guess that's a denial of what-- of Mr. Smith's request.**

Q. Okay. So in this email, Mr. Works lets you know that the Director has granted you authorized absence from the 21st of February through the 25th of February, correct?

A. **Thursday, Friday and Monday, three days.**

Q. Was that a yes?

A. **According to this email, Mr. Works says that the Director would authorize Thursday-- Thursday, Friday and Monday.**

Q. Okay. And he writes, This time is being provided to allow an opportunity for Ms. Mullin to gather any additional medical documentation needed in support of her request for reasonable accommodation and then submit her revised request on Tuesday, February 26th. Do you recall being given that time to gather additional medical documentation?

A. **I don't know what medical documentation he's**





**referring to in this one.**

Q. Okay. Do you recall being given that time to gather additional medical documentation?

A. **No. Because I don't know that I got this email because I wasn't at work. I mean, I may have afterwards, but I don't. . .**

Q. Okay. He notes, One possible resolution raised earlier in this process was the use of a respirator. However, to date, the Agency has not received further information regarding the specifications of that device. Did you ever provide the Agency with specifications for the respirator you required?

A. **No. We couldn't identify-- we couldn't identify the specs on it. I asked them to reach out to my doctor.**

Q. You asked the Agency to reach out to your doctor?

A. **Yeah. I had asked them for the air quality to find out what was there and I asked them to call my doctor.**

Q. Who did you ask?

A. **I don't remember specifically. It might be in one of the emails that you guys have.**

Q. Now, in one of the emails we saw that you asked to know how much time you had to spend in the





building, right?

A. **That was one of them, yeah.**

Q. And the Agency provided you with that information?

A. **No, they didn't.**

Q. They didn't?

A. **Oh. Wait a minute. Wait, wait, wait. Wait a minute. I was thinking about when she-- I was thinking about when she did the-- whoever wrote the one about the entire job being one essential function and that the average RVSR needed three to five hours a day to do-- I don't-- Is that what we're talking about?**

Q. Yeah. That didn't provide you the time that you were required to be spent in the building?

A. **I'm having a hard time.**

Q. Okay. Do you remember asking the VA for the essential functions of your job so that you would know how long you would be required to be in the building on your days in the office. Do you remember that?

A. **Yeah. I was trying to force a conversation, yes.**

Q. And then Ms. Clarke told you how long they thought you would have to be in the building on the days that you were in the office, correct?

A. **They stated the average number of hours an**





**RVSR needs to be in the building.**

Q. Okay. After the VA gave you that information, do you recall having any further conversations with your doctor about what respirator would have been appropriate?

A. **No. Because we still didn't know what was in the air.**

Q. Okay.

A. **I believe he wrote they should have an entire building air filtration system and dehumidification system.**

Q. He being Dr. Klemawesch?

A. **Yes.**

Q. I'm giving you what's marked as Exhibit 28, which for the record is a two-page document Bates stamped 010020 through 22. (Tendering)

**(Defendant's Exhibit No. 28 was marked for identification)**

A. **(Perusing)**

Q. So this appears to be two letters from Dr. Klemawesch to the Department of Labor, both dated April 12th, 2013. And on the page that ends 22?

A. **(Perusing documents) Yes.**

Q. Dr. Klemawesch notes, The accommodations I am referring to are improvements in the indoor air

environment that will prevent the onset and aggravation of her asthma, sinusitis and vocal cord dysfunction.

**A. Wait a minute. What page are you reading?**

Q. The one ending 22.

**A. 22? And where does it say that?**

Q. The very last sentence.

**MR. MAHARAJ:** (Indicating)

**THE WITNESS:** Thank you.

Q. **(By Mr. Sullivan)** I don't know if this what you were referring to just now, but I thought I'd show it to you while we were talking about.

**A. Yeah. I don't know if this is-- I don't know if he hadn't written it before. Something I remember seeing something in handwriting, but this would be. . .**

Q. Okay. In both of these letters Dr. Klemawesch recommends that you not return to your office at the VA until appropriate accommodations can be made?

**A. Yeah.**

Q. And in one of them he notes the air purifier machine provided is not sufficient?

**A. Uh-huh. Yes.**

Q. Okay. So in this opinion, this letter, Dr. Klemawesch basically says that you shouldn't be going back into the VA, into the building there?





**A. Without appropriate accommodations.**

Q. Okay. And what accommodations would have been appropriate at this time?

**A. If memory serves me, leaving the building as soon as I became symptomatic, even felt an inkling of a breathing challenge.**

Q. So in the letter he says, the improvements-- the accommodations I'm referring to are improvements in the indoor environment that would prevent the onset of your symptoms. Did he ever recommend specific ways to make those improvements?

**A. No.**

Q. Okay.

**A. Wait a minute. Not to the best of my knowledge.**

Q. At any point did your-- And was it still the case through 2015 that you weren't supposed to enter the building unless the indoor environment was such that you wouldn't have symptoms?

**A. Oh. That's too broad a statement. I'm not-- Can you say that again, please?**

Q. Yes. So in 2013 Dr. Klemawesch says you shouldn't go into the building unless the environment is such that you won't have symptoms. I'm summarizing that. That's the gist of what he says in this letter,





Exhibit 28.

**A. I can't say. I can't say.**

Q. Okay. I'm going to hand you what's been marked as Exhibit 29. And we'll take a brief handwriting reading exercise. (Tendering)

**(Defendant's Exhibit No. 29 was marked for identification)**

**A. (Perusing)**

Q. And for the record, this document is Bates stamped Allergy Associates 045 through 46.

**A. (Perusing)**

Q. Okay. Ms. Mullin, if you look at the page with the sticker on it and you look on the left side, you see stamps with a date. One is June 27th, 2012 and then January 26th, 2013?

**A. Yes, I see those.**

Q. Okay. Can you-- and we can do this together. But can you read the handwriting next to the January 2013 sticker stamp?

**A. Doing well with her breast cancer therapy. Has returned to work. Has returned to work. They continue to allow her to work at home. Still has to go in for something periods.**

Q. Brief periods maybe?

**A. I don't see a P. It looks like an M.**





Q. A P? Brief, B-R-I-E-F?

**A. I don't see that. I'm not arguing. I just don't--**

Q. Sure.

**A. My middle schoolteacher is failing me. This causes. . . This causes. . .**

Q. Maybe sinus symptoms?

**A. (Perusing)**

Q. And it's okay if you don't know.

**A. (Perusing)**

Q. Okay. Ms. Mullin, will you flip to the next page?

**A. I see the word air filtration and-- I don't know what the word after the air filtration. And it looks like S minus one or plus 5. Minus 1, 15? I'm not sure. HEENT increased something. The something about my chest.**

Q. I think the next page is a little more legible.

**A. Can write letter something. Oh. Reference getting something help when at work to decrease time there. RX for respirator to use.**

Q. Is RX prescription?

**A. Prescription.**

Q. Okay.

**A. 2 February 2013 at Saint-- S and A, St. Anthony's. Sinus is bleeding. Something pain. Rectal bleeding. Something pain. Abdominal pain. Rectal bleeding.**
**2/26/13. Someone else's handwriting. Dr. K will write letter to employer when she gives us employee's name and address. RTG were the initials.**
**4/12/13. Letter written, copy in chest, RTG.**
**Q.** Okay. So this letter that we were looking at before Exhibit 28 dated April 12th, 2013, do you think that's the letter being referenced?
**A. It would make sense, yes. You guys are all going too much about me. Are we done with that?**
**Q.** Yes.
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 2:15 p.m.)**
**(On the record at 2:16 p.m.)**
**MR. SOLOMON:** Can you just note that it wasn't until the second time that Ms. Mullin was directed to the second page that we actually discussed it and we remained reading through the handwriting on the first page. I think that's it. We can off the record.
**MR. SULLIVAN:** We can go off.
**(Off the record at 2:16 p.m.)**





**(On the record at 2:37 p.m.)**
**MR. SULLIVAN:** So let's go back on the record.
**Q. (By Mr. Sullivan)** Okay. Ms. Mullin, back on the record here. We have been talking generally about conversations related to accommodation, discussions that were going on in January, February of 2013.
**A. Yes.**
**Q.** Just to reorient us. Agreed?
**A. Thank you.**
**Q.** So I am handing you what has been marked as Exhibit 30, which for the record is a single page document Bates stamped 011018. (Tendering)
**(Defendant's Exhibit No. 30 was marked for identification)**
**A. (Perusing)**
**Q.** Can you take a look at this document and tell me if you recognize it?
**A. (Perusing) No. I don't recognize this.**
**Q.** You don't recognize this?
**A. No, I don't.**
**Q.** Okay. At the bottom do you see the signature? Who is the signatory on this document?
**A. I don't know who-- somebody signed it for Kerrie Witty.**





**Q.** Okay.
**A. I can't make out the initials on the left--**
**Q.** On the left there you're referring to?
**A. Yeah.**
**Q.** And the date is February 27th, 2013?
**A. Yes.**
**Q.** And the form is a VA Form 0857f. And it's titled Approval of Accommodation Request. Do you see that?
**A. Yes.**
**Q.** Okay. And so this says that your request was made to enable you to perform the essential functions of your position?
**A. Excuse me a second. Where are you reading from?**
**Q.** I'm in the box with the three boxes, one of which is checked.
**MR. MAHARAJ:** (Indicating)
**Q. (By Mr. Sullivan)** Your lawyer is pointing to it.
**A. Oh. I see.**
**Q.** Okay. Do you see where I was reading from now?
**A. Yes, I do.**
**Q.** In the box below it says, You requested the following accommodation. Aileen Mullin, modifications to your current approved accommodation to work from home three days per week. Now, this document doesn't list what the specific modifications you were seeking were. Do you know if by this time, February 27th, 2013, you had made a specific request for any particular accommodations or modifications to your prior accommodations?





**A. We had discussed-- we had discussions. Nothing specific.**
**Q.** Okay. So you hadn't made a specific request at that point?
**A. No.**
**Q.** And this says-- if you go to the next box down, there's a box that's x'd in. As we discussed during our meetings, it appears that a more effective accommodation would be. And then it says, to move your desk to the old POW suite where your supervisor, Ulyssee McBurrough, is located. Your current air purifier will be placed in your new work space and a second larger air purifier will be placed in the suite as well. Your computer will be set up to print to the printer located inside of the old suite so that you do not have to walk outside of the suite to collect the documents you print. You indicated that you will obtain the respirator prescribed by your physician and wear it while inside the

building. Do you recall the Agency providing you with those changes to your working conditions?
A. **I can say I have no memory of ever receiving this document ever.**
Q. Okay.
A. **Ever. (Unintelligible) my heart rate, but let's see. To move your desk. . .(Perusing)**
Q. So why don't we just break it down?
A. **Yeah.**
Q. On or around-- and before I say this, at the bottom of that box that I was just reading from it said, This accommodation will be provided by 3/5/2013. Do you see that?
A. **I see that.**
Q. And the asterisk notes that it's a projected date. So do you recall the Agency moving your desk to the old POW suite on or around March 25th, 2013?
A. **I have no idea on the date. I was-- I did get located-- I didn't know it was a POW suite.**
Q. Do you know what POW refers to?
A. **Prisoner of war.**
Q. Okay. Did you get placed in a suite where Mr. McBurrough was located around that time?
A. **Was I in a suite? No. It wasn't a suite.**
Q. Did you get-- Okay. Where was it?





A. **It was a series of cubicles with doors for supervisors. And at the front of it-- in the front of this area was like a reception/secretary's desk kind of thing. And I was put in this area that was like the secretary's area.**
Q. Okay. Was that near Mr. McBurrough?
A. **He was-- he was in one of the cubicles-- supervisor's cubicles.**
Q. Okay. And in that secretary's area where you were placed, did the Agency move-- provide you with two air purifiers?
A. **I don't recollect that.**
Q. Okay. Do you recollect them actually providing you with a third air purifier at some point?
A. **No, I don't.**
Q. Okay. Do you recall being--
A. **It doesn't mean they didn't. I just don't recollect it.**
Q. I understand.
A. **Okay.**
Q. Do you recall having a computer to set up to print to a printer located inside of that where you were sitting or where the supervisor's were sitting?
A. **No, I do not.**
Q. Okay. And do you recall obtaining a





respirator to wear?
A. **I did not-- You said you indicated that you will obtain a respirator. I did not. That's false.**
Q. Okay. Did you ever obtain a respirator?
A. **Yes.**
Q. And do you know if it was around March 5th of 2013?
A. **It could very well have been.**
Q. Now--
A. **And this last sentence was patently false.**
Q. Which part?
A. **Where she-- whoever wrote this said, and wear it while inside the building.**
Q. You never agreed to do it?
A. **I never talked to them. I never had that conversation with them at all.**
Q. About wearing a respirator inside the building?
A. **Yep. Never had a conversation with them.**
Q. I thought we had just looked at some back and forth--
A. **Emails with them--**
Q. --with Tammi Clarke--
A. **Yeah.**
Q. --and people about obtaining a respirator?





A. **Yes.**
Q. But you never had a conversation about actually wearing it?
A. **Correct.**
Q. Okay. You said you've never seen this document, but you're familiar with some of the changes to your work environment that it references, right?
A. **Correct.**
Q. Okay. Were those changes that the VA provided for you on or around March 5th of 2013 effective for accommodating your disabilities?
A. **Initially.**
Q. Okay. How long did that effectiveness last?
A. **I'd have to look at the-- how long, I'd have to look at the timeline.**
Q. Okay.
A. **Until they said that I had to stay in the building for a complete tour. When I started working over there with Bo, I would leave the building when I became symptomatic. I'd get my things done and I'd leave the building. It was working while that was going on. I never got into a full blown asthma attack in the building or anything. So I did what I do and then I went home and went to work.**
**Another thing, these were unilateral**

**discussions made by them. This was never any part of the conversations that we had had with-- that I was part of, this moving to the POW suite, the printer part or air-- the air purifiers that they chose. I was not part of any of that conversation.**

Q. All right. I'm going to hand you what's been marked as Exhibit 13, which for the record is a document Bates stamped VA 011666. It goes through 011669. (Tendering)

**(Defendant's Exhibit No. 31 was marked for identification)**

A. **(Perusing) Yes, sir.**

Q. It's a sort of lengthy email chain. And I'd like to first ask you about the top email that you sent on April 3rd.

A. **Oiy, yo, yo.**

Q. And I think you will have some context because you just made reference to something in here. So if you can read that top email and I'll ask you some question and then we can go through the rest, if that works for you.

A. **Can we start at the beginning of it or do we need to start at the end of the chain?**

Q. I just want to start at the end of the chain.

A. **Okay.**





Q. But we can-- we'll discuss the whole thing.

A. **Okay.**

Q. And let me direct you specifically.

A. **Uh-huh.**

Q. So you see you write this email starting, Hi gentlemen, and then you sign it, Aileen. And then the paragraph below that starting, the four hours twice a week modification, that's what I want to ask you about.

So you write, The four hours twice a week modification to the existing accommodation was working. I may have been felt better coming into the building than when I left if but at least I was able to stay out of the emergency room and doctor's office. Yes, the modification that, and this is underlined in bold, Tammi, John and I agreed to was effective with a few exclamation points.

And we were just talking about the modification that the Agency provided on-- on or around March 5th and you said that it was effective for a while. Do you remember that?

A. **Yes.**

Q. Okay. And I just want to connect the dots here. I believe that that modification is what you're referring to in this April 3rd, 2013 email?

A. **But what I'm stuck on is that four hours**





**twice a week because I don't where that accommodation page is. And I also don't-- have no memory of being able to stay in there for four hours. I'm not saying that I couldn't. But I don't have any memory of being able to stay in that suite for four hours, if that makes any sense.**

Q. Sure.

A. **Okay.**

Q. Okay. So why don't you read the rest of this email chain?

A. **Okay.**

Q. But what I'm curious is whether there's some other modification-- whether there's another modification that you're referring to in this first-- in this April 3rd email.

A. **(Perusing) There's something missing here.**

Q. Show me.

A. **Well, if you look at the bottom of 666?**

Q. Uh-huh.

A. **Toward after the line across the document, it says, A kind man once advised me to pick my battles, there's-- I don't know what that's attached to. I know who I wrote it to, but it doesn't seem to be here.**

Q. Okay.

A. **Let me keep reading. (Perusing)**





**Okay. So at the top of that Page 667, that-- not in line with the bottom of 666.**

**COURT REPORTER:** I'm sorry. Could you say that again?

**THE WITNESS:** Top of 667 is not in line with how Page 666 ends.

**COURT REPORTER:** Thank you.

Q. **(By Mr. Sullivan)** I want to ask you a question about 666 again, if I can.

A. **Sure.**

Q. So you make this reference to the four hours twice a week modification. That's actually different than the February 27th modification you had just been looking at right, Exhibit 30?

A. **Yeah. We're missing one of these.**

Q. This Exhibit 30 doesn't say anything about four hours twice a week, right?

A. **Right. There's something missing. There's one of these missing.**

Q. Okay. I just want to make sure we got it for the record.

A. **Yeah.**

Q. Exhibit 30 doesn't say anything about four hours twice a week.

A. **Yes. I agree.**

Q. And you mentioned that you agreed to this modification with Tammi and John?
**A. I didn't agree with it. They were all aware of it and they all knew how it was working.**
Q. You write, yes, the modification that Tammi, John and I agreed to was effective. What modification were you referring to?
**A. Leaving the building when I became symptomatic and working from home.**
Q. And was that an agreement to work four hours twice a week?
**A. I don't remember if it was four hours or until I became symptomatic. I don't remember which.**
Q. Did the Agency ever give you a form like Exhibit 30 to memorialize that agreement?
**A. I believe they did. Oh. No, no. Do you mean till I became symptomatic?**
Q. Yeah. Did the Agency ever give you a VA Form 0857f memorializing the agreement that you reference as the modification that Tammi, you and John agreed to?
**A. I'm afraid I don't remember right now.**
Q. You don't remember?
**A. Right now I don't. I'm not saying they did or they didn't. I just-- I don't remember right now.**
Q. Okay. But at least as of April 3rd, 2013, it





seems that being in the building for four hours twice a week was effective?
**A. Yes, I wrote that and I don't think it's right.**
Q. You don't--
**A. I think I was-- in hindsight, in hindsight, it was not effective for any stipulated period of time to say my body could handle it. So I don't know-- I was so thankful to have this and my understanding and relief that I wasn't in hospitals, I considered that effective. So I think. . .**
Q. So I want to show you. . .
**A. This is-- just so you know, this has all sorts of cut and pastes out of chronological order as far as who what wrote when.**
Q. Did you do that cutting and pasting?
**A. I may have.**
Q. Okay. I'm going to show you what's been marked as Exhibit 32. (Tendering)
**(Defendant's Exhibit No. 32 was marked for identification)**
**A. (Perusing)**
Q. And tell me if I'm wrong, but I believe that's a document Bates stamped VA 011740?
**A. Yes, sir.**





Q. Okay. So this is another VA Form 0857f titled Approval of Accommodation Request, right?
**A. Yes, sir.**
Q. And this one is signed as Kerrie Witty, but it looks like there's some initials in the-- on the side again?
**A. I believe that's Sandy Smith. It looks like SS.**
Q. Okay. And this one, Exhibit 32, is dated April 15th, 2013?
**A. Yes, sir.**
Q. And it says that the request was made to enable to you perform the essential functions of your position.
**A. Uh-huh.**
Q. And it says you requested the following accommodation, work from home Mondays, Tuesdays, Wednesdays and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00 a.m. to 11 a.m. At 11:00 a.m. you may leave the building to report home and complete the remainder of your tour from home. And it says, this will be provided as of April 15th, 2013, right?
**A. It just said, continued below. I just finished reading that. Okay. Now, what was your**





**question? My apologies.**
Q. The document indicates that this accommodation was being provided as of April 15th, 2013?
**A. Yes. It was never requested, but this is the date they did this.**
Q. Okay. And do you recall being provided with that accommodation, being allowed to work from home Monday, Tuesday, Wednesday and Thursday with a half day on-- a half day in the office on Friday?
**A. Do I remember that happening?**
Q. Yeah.
**A. No, not clearly. What I remember is, like I remember thinking, so I don't need to breathe from 7:00 a.m. till 11:00 a.m. on Fridays is what I remember from this document.**
Q. Okay. This was issued on-- or at least is dated April 15th, 2013?
**A. Yes.**
Q. And that's just 12 days after the email that you wrote in Exhibit 31, correct?
**A. Can you ask me that question again, please?**
Q. Yeah. This Exhibit 32 is dated April 15th, 2013.
**A. Yeah.**
Q. And Exhibit 31 is dated April 3rd, 2013.

A. **Yes.**
Q. So this accommodation, Exhibit 32, was issued within a couple weeks of your April 3rd, 2013?
A. **Did you say my email requesting an accommodation on the 3rd--**
Q. I didn't say that.
A. **Oh. All right.**
Q. I just within a couple weeks of your April 3rd, 2013 email.
A. **Yeah. Yeah. These letters-- this doc-- whatever this thing is on Exhibit 32 was drafted 12 days after. . .**
Q. Exhibit 31.
A. **Exhibit 31, yeah.**
Q. And so you would agree then that Exhibit 32 was drafted 12 days after you informed Ulyssee McBurrough, Jerry Huffman, Sandra Smith, among others, that it was effective for you to be in the office for four hours twice a week?
A. **Yes. As I said in response to your previous question--**
Q. Well, can you answer the question I just asked first?
A. **Say it again. I'm sorry.**
Q. Yeah. You would agree with me that





Exhibit 32 came within 12 days of you informing the Agency that it was effective for you to be in the office for four hours two days a week?
A. **Yes. That was my mistake wording it that way. Yes. Absolutely I wrote that. And I was in error writing that, yes.**
Q. Okay. Did you tell anyone at the time that you were wrong when you wrote that?
A. **Yes. Oh. Not that I wrote that. But I did say-- but I did talk about leaving when I became symptomatic. I don't-- not the four hour part. Discussed the symptomatic part.**
Q. Okay. Do you recall--
A. **Oh. And the thing is, the four hours had to do with more that I was allowed to be-- work from home and not have to take sick leave or annual leave and things like that. My apologies. I answered too much. I'm sorry.**
Q. That's okay. So what you told the Agency in Exhibit 31, that it was effective for you to work four hours in the office and then four hours at home on those days?
A. **(No response.)**
Q. I can ask that better if that didn't make sense to you.





A. **(No response.)**
Q. And I will, okay?
A. **Please.**
Q. In Exhibit 31, that April 3rd email, you indicated that it was an effective accommodation for you to work from home for three days and then on the other two days work four hours in the office and four hours at home?
A. **Yes.**
Q. Okay.
A. **Sorry it took so long to get around to that.**
Q. A bad question can do that. And so you can understand then why on April 15th when Kerrie Witty, it sounds like through Sandy Smith, issued an accommodation that they thought would be effective for you?
A. **No.**
Q. This was in fact a better deal than the one you said was effective just two weeks prior?
A. **No.**
**MR. SOLOMON:** Objection.
A. **There's no deals. There's no deal. And this is what-- there was no deal. The accommodation-- I was always supposed to limit my time in the building and when I became symptomatic, I was supposed to leave. So it was maybe the worst of-- it was the worse-- which was the**





**worst of two evils. So it just had to do with the degree of-- you know, which is the worst of two evils.**
Q. Do you recall receiving this accommodation form, Exhibit 32?
A. **I don't remember the day I received or anything. I remember having it. I do remember having it.**
Q. And did you tell anyone with the Agency that you didn't think that would be an effective accommodation?
A. **Yes.**
Q. And at that time, did you specifically request a different accommodation be put in place?
A. **I'd have to look. I don't remember the timeline. I don't know if that's when I said, please let me work paperless claims. And I'm not sure if that was-- when you're looking at the timeline, I'm just not sure.**
Q. Okay. I'm going to show you what's marked as Exhibit 33, which is a document Bates stamped VA 011015. (Tendering)
**(Defendant's Exhibit No. 33 was marked for identification)**
A. **(Perusing)**
Q. And this is yet another Form 0857f, Approval of Accommodation Request, correct?

A. **Yes, sir.**
Q. Okay. And this one is also signed by Kerrie Witty?
A. **Yes.**
Q. And dated April 19th, 2013?
A. **Yes.**
Q. Just four days after the previous accommodation form?
A. **Yes.**
Q. And this one indicates that you are permitted to work from Monday, Tuesday, Wednesday, Thursday and Friday, correct?
A. **Yes.**
Q. And then on Fridays, you are required to report to the Regional Office at the beginning of your tour where your coach or his designee will you meet outside to provide your work and pick up your work.
A. **Yes.**
Q. Okay. Do you recall being granted this accommodation?
A. **Yes.**
Q. Okay. And was this accommodation effective?
A. **Almost.**
Q. Okay.
A. **It was expected-- well, it didn't give me**





**everything I needed as an RVSR to do my job.**
Q. What did it not give you?
A. **The collaborative part, meeting with the mentor or the DRO to look at the files.**
Q. At this time as of April 13th, 2013, had you made a specific request of the VA to be given that one-on-one time with the DRO to look at files?
A. **No. I didn't realize it was a problem on April 19th.**
Q. And after you received this accommodation, that is Exhibit 33, did you raise that issue with anyone at the Agency, about face time with the DROs?
A. **Face time and printing training material, yes, I did. There may have been more things that I mentioned too. But definitely those two.**
Q. And did the Agency accommodate those requests?
A. **After a long, drawn out battle.**
Q. Okay. What would have been the appropriate accommodation when you requested the ability to have face time with your DRO?
A. **Let me work VBMS work. I'll be paperless and we can look at the same claim at the same time on the computer. We didn't need to meet each other at all.**
Q. Okay. Do you know if the Agency was capable





of providing VMBS or VBM?
A. **V, Victor, B, boy, M-S.**
Q. Okay. Do you know if the Agency was able provide VBMS in April of 2013?
A. **I am like 98 percent sure that the VA had already rolled it out and was being used in the country.**
Q. Okay. Do you recall making a specific request to work in the VBMS system exclusively?
A. **No. Oh. Yes, I did. Not on 4/19.**
Q. Do you remember when it was?
A. **No.**
Q. And did the Agency grant that request when it was made?
A. **Not immediately.**
Q. How long do you think it took?
A. **I don't remember.**
Q. Okay. So we've gone through a couple different accommodation forms here.
A. **Yes, sir.**
Q. Do you know who was responsible for granting these requests that we've been looking at?
A. **Kerrie Witty always signed as the DMO.**
Q. Okay.
A. **I don't know who's actually guiding (phonetic) it.**





Q. You don't know?
A. **No.**
Q. But you do know the documents are signed by Kerrie Witty?
A. **Unless noted otherwise.**
Q. So it looks like Kerrie Witty granted an accommodation for you-- two accommodations for you in April 2013? I'm looking at Exhibit 32 and 33 here.
A. **She wrote it on an accommodation form. It was written on an accommodation form. It was on that piece of paper like it was in the beginning.**
Q. And along with those pieces of paper came changes in your working conditions, right?
A. **Yes.**
Q. And Ms. Witty also--
A. **There were definitely changes in the work conditions.**
Q. I'm sorry?
A. **Yes, definitely changes in work conditions.**
Q. And Ms. Witty also granted you an accommodation in February of 2013? I'm hooking at Exhibit 30.
A. **Oh. Witty you mean?**
Q. I'm sorry. What did I say?
A. **Wax.**

Q. Okay. Yeah. Ms. Witty granted you an accommodation in February of 2013 as well?
**A. No, she-- it was temporary. It was a workplace adjustment. It was not an accommodation.**
Q. Okay. She granted changes to your working conditions.
**A. Unrelated to my illness, yes. Unrelated to my medical needs and what was the need for it. And that one on Page 30, if you remember, I never seen it. So I don't know--**
Q. You never saw it, but you told me just a minute ago that you recalled some of the conditions--
**A. Some of the things. Some of the things that-- yeah.**
Q. I'm going to show you what's marked as Exhibit 34, which is a on-page document Bates stamped VA 011017. (Tendering)
**(Defendant's Exhibit No. 34 was marked for identification)**
**A. (Perusing)**
Q. Do you recognize this document?
**A. Yes, I do.**
Q. So is this an Accommodation of Approval Form granting you the ability to work solely in the VBMS paperless system?





**A. Okay. Please ask me the question again.**
Q. Is this document, Exhibit 34, an Accommodation of Approval granting you the-- allowing you to work solely in the VBMS paperless system?
**A. Yes. Yes.**
Q. And had you made a specific request for this accommodation?
**A. Yes.**
Q. And then the Agency granted it for you?
**A. At some point, yeah.**
Q. Okay. You say at some point. Are you inferring--
**A. I don't know how long it was between the time I asked and it was available and they did it. I don't remember.**
Q. Do you remember their being an unreasonable delay between the request and the approval?
**A. I have no memory whatsoever on that. And by the way, it wasn't a request. It was another suggestion. It was just another suggestion as far as something that may work. You know what I mean?**
Q. A suggestion that the Agency granted?
**A. Yes, they did.**
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 3:14 p.m.)**





**(On the record at 3:28 p.m.)**
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, we're back on the record. We've mostly been talking about 2012, 2013 so far. I would like to ask you about some things from 2014. Now, do you recall around September 25th of 2014 being selected to attend a meeting with the VA secretary?
**A. Yes. The date I'm not-- I can't attest to, but yes, I do remember being. . .**
Q. But generally in the fall of 2014?
**A. Yes.**
Q. Okay. Where was that meeting to be held, if you recall?
**A. Within the Regional Office in the wing that-- part of the building I had gotten sick in, 2012.**
Q. Okay. So around that-- as of that time, let's call it September of 2014, had your doctor's advice changed at all with regard to whether or not you were permitted to go into the Regional Office?
**A. No, it did not.**
Q. Okay. So at that point in time you still weren't-- you know, according to your doctor's advice, you still weren't-- or shouldn't be going into the Regional Office unless the air quality was such that you wouldn't have any symptoms?





**A. Yes.**
Q. Okay. Now, did you ask for an accommodation to be able to attend that meeting?
**A. Well, the first one I asked for was to attend virtually.**
Q. To attend?
**A. Virtually.**
Q. Okay. Who did you make that request to?
**A. Matt Correa was involved by then. Did I ask Matt directly? I don't know if I asked him directly.**
Q. Okay. And what was the response from Matt or whomever in the Agency that got back to you about that request for an accommodation?
**A. That Secretary McDonnough didn't-- said no when they asked him if we could use a VANTS line, that's what we were using back then, V-A-N-T-S, a VANTS line to allow me to part-- he said the Secretary himself said he wouldn't permit that.**
Q. Okay. Did you make any other alternative accommodation requests?
**A. I think Matt brought up the oxygen next. And so I did discuss that with him.**
Q. The oxygen? What do you mean by the oxygen?
**A. Having an oxygen-- having the use of oxygen.**
Q. And would that have been an effective

accommodation?
**A. Probably not.**
Q. And you said Matt brought it up. Did you specifically request that the Agency provide you with oxygen for-- to allow you attend that meeting?
**A. In time. Because Valorie Reilly said that that's something that VBA could get because it's relationship with the Veterans-- VHA, the Veterans Hospital Administration. So that was Valorie's input on that one.**
Q. Okay. And do you know-- did the Agency provide you with the oxygen to--
**A. No, no, no, no.**
Q. Did the Agency provide you with the oxygen that you eventually requested?
**A. No. No, they did not.**
Q. Okay. Do you know if there were any further conversations between the Agency and you or your representatives regarding accommodation requests related to the Secretary's visit?
**A. Yes.**
Q. Okay. Can you tell me about those?
**A. Valorie Reilly, AFGE President, was in communication with someone at HR. I don't-- it could even have been the Director. I'm not really 100 percent**





**sure. And the two of them-- the two of them, without including me, came up with a different plan.**
Q. And what plan was that?
**A. That I was going meet-- do a handshake and meet the Secretary as he was walking out to his car after the. . .**
Q. Okay. And did the Agency provide you with the opportunity to meet the Secretary while he was on his way to the car?
**A. I told the Director directly that's not what I wanted. That wasn't the accommodation. I didn't want to meet the man. I wanted to hear him. And yeah, she-- she set that up.**
Q. And do you know if Ms. Reilly indicated to the Agency whether that is something that you would have been okay with?
**A. If I remember, yes, she did. From what I remember, yes, she did.**
Q. Do you know if between the time that Ms. Reilly indicated that that would be an appropriate alternative and the time you actually met the Secretary whether you or Ms. Reilly informed anyone at the Agency that, no, in fact this is not acceptable or appropriate?
**A. I told Valorie.**
Q. When did you tell her that?





**A. I don't-- I don't remember. I think it was-- it was after she told me that I get to do this thing and meet the Secretary and--**
Q. Did you tell anyone-- I'm sorry. I interrupted you.
**A. And I just-- I told her that, no, he has a new Secretary. He has a plan, he has a vision and things he wants to do. That's the part I want to hear. But that was that.**
Q. Do you know if Ms. Reilly communicated that to anyone in HR or at the VA?
**A. No. I don't know.**
Q. Did you directly communicate that to anyone in HR or at the VA?
**A. Not prior to meeting. I said it to Director Witty moments before the Secretary came out.**
Q. And what was her response to that?
**A. She called me ungrateful.**
Q. Did she say anything else?
**A. Oh, yeah. She had a lot to say, but that's what stood out to me because we got into a tete-a-tete.**
Q. Okay. What else do you recall her saying?
**A. No one else got to meet the Secretary. You're lucky you get to meet the Secretary and that I was ungrateful.**





Q. Did she say anything about your disability?
**A. Not that I remember.**
Q. Did she say anything about your requests for accommodation?
**A. Not that I remember.**
Q. Did she say anything about your EEO activity?
**A. Not on the sidewalk that day. Not that I remember. I don't know that she said anything about it that day.**
Q. Okay. Did she make comments about your EEO activity at another time?
**A. Oh, yes.**
Q. Okay. Tell me about those.
**A. Well, the first one was the clearest, was 2012. Right before I filed the first EEO complaint. I had a request-- I requested a meeting with the Secretary-- I mean, with Kerrie Witty. And then some things went wrong after that. We had a second meeting after it was like-- like two days after the surgery.**
Q. So you had two meetings--
**A. I had two meetings with--**
Q. --with Director Witty?
**A. And asking for her help with Bonnie Wax.**
Q. Just ball park time frame, it sounds like May, June?

A. **May into June of 2012.**
Q. Okay.
A. **So it would have to be-- my father's birthday was around the surgery. So it was end of May, beginning of June.**
Q. And so you had two meetings with Director Witty around that time?
A. **Yes, sir.**
Q. And did she make comments about any of your EEO activity then?
A. **Second meeting.**
Q. Okay. Tell me about the comments.
A. **The first meeting went so swimmingly well. The second one, I walked in and she had a very-- she appeared very angry, very different than the last time I spoke with her. And she said, you filed an EEO Complaint? And I'm like, yes. The last time we met, I asked you to help with Bonnie and getting my forms and getting the signatures. And she-- her treatment-- something along the lines, her treatment of me got even worse.**
Q. Who said that?
A. **I did. To the-- what's the words for not-- those aren't the words verbatim.**
Q. You were paraphrasing.





A. **Paraphrasing. And I said, yeah. But the EEO complaint can just go away. All I want is her to apologize for talking about my breast cancer and the building and I want someone else to look after my HR-- oversee my HR related things.**
Q. When you say HR related things?
A. **Getting approvals for FMLA, leave donations, the things that needed to be processed.**
Q. And did you ask for those to be-- to have Bonnie Wax excluded from those or to have HR--
A. **Just have someone doing oversight. Have someone else doing oversight over--**
Q. Of those processes?
A. **Yeah.**
Q. Okay.
A. **She said no and you're going to have to deal with her sooner or later. She accused me of being on a witch hunt on behalf of the AFGE. Second meeting I knew I had to have chemotherapy. And I asked her if I could have an accommodation, please, that would prevent me from having to come in the building just during my chemotherapy when my immune system was going to be compromised.**
**I gave her some details, like my dad can drive up to the building with me so I don't have to lift**





**anything. I remember saying, I'll stuff envelopes if you want to. I'll do anything I can. Please don't-- don't make me come in the building. And she said no.**
**And I don't know if it was before or after she said no that she made the statement that I was part of this AFGE witch hunt against Bonnie Wax. I'm not sure if it was before or after.**
**What was your question again?**
Q. I think I-- I'm not even sure at this point. Was there anything else that Director Wax said during that meeting about your EEO activity?
A. **Director Witty?**
Q. I'm sorry. Director Witty. Was there anything else that Director Witty said during that meeting about your EEO activity?
A. **I have to say at this moment, I don't remember. She hit with me-- with it as soon as I got in the room. There were statement s-- there were other people in the room who will give a statement to that. But right now, that's all I have.**
Q. Besides that comment from the second meeting that you had with Director Witty around June of 2012, are you aware of any other comments she's made about your EEO activity?
A. **Verbally? I'm not aware of any verbal**





**statements she made about the EEO.**
Q. What do you mean by verbal?
A. **I'm not aware of her making-- like that's a statement she made directly to me.**
Q. Are you aware of any written-- or any verbal statements that she made to anyone else about your EEO activity?
A. **No.**
Q. Are you aware of any written statements or verbal statements that she made to anyone about anyone's EEO activity?
A. **Valorie Reilly and Keith Pryor talked other co-workers, who I couldn't know who they were, who were in the midst of EEO battles with the Director.**
Q. Okay.
A. **Because of things Bonnie had done.**
Q. But are you aware any comments, statements, written or verbal, that Director Witty made about those co-workers' EEO activities?
A. **I'm not aware of any-- no. I'm not aware of anything else the Director said.**
Q. Okay. I'm going to show you what's been marked as Exhibit--
A. **At this moment I should say. At this moment, there's not.**

Q. --as Exhibit 35. This is a document Bates stamped VA 010991 through 998. (Tendering)

**(Defendant's Exhibit No. 35 was marked for identification)**

A. **(Perusing)**

Q. This is related to your accommodation requests regarding the Secretary's visit.

A. **(Perusing) Yeah. That backfired.**

Q. I'm sorry?

A. **Something backfired when they're talking about trying to prevent me from meeting the Secretary.**

Q. Can you point me to whatever you're referring to?

A. **Yes. The bottom of 992 when she talks about preventing me from being in his meeting, the Secretary's meeting.**

Q. Okay. You're referring to the September 30th, 2014 email that Valorie Reilly sent at 4:38 p.m.?

A. **Yes.**

Q. And what specific language are you talking about?

A. **Oh. My apologies. The very last paragraph.**

Q. Where it says, Ms. Mullin's RA is for an OWCP respiratory condition and presumably the purpose of the denial is to prevent her from meeting the Secretary?





A. **If you go up just two lines above this about, Rather than offering alternatives to this disabled employee, the response that there is a short leave time shows a demonstrative lack of consideration for the uniqueness of the situation: The Agency's top leader visiting the Regional Office for the first time. Ms. Mullin's RA is for OWCP respiratory condition and presumably the purpose of the denial is to prevent her from meeting the Secretary.**

Q. Why do you think the VA, the Regional Office, would have wanted to prevent you from meeting with the Secretary?

A. **Because I was very outspoken about the-- I was very outspoken about people becoming ill with respiratory diseases. I was verbal about Kerrie Witty. I was verbal of the chain of command. And it was Valorie's belief that the last thing in the world they'd want would be me in a room with a group of other people to witness and say something to the Secretary about what was going on in the building. I must say she was probably because I did end up mentioning it to him when I was on the sidewalk.**

Q. You did?

A. **Yes.**

Q. And Director Witty hear you make that





comment?

A. **Yes. Oh. Wait a minute. No. Wait a second. They walked out the door. Kerrie said, I'd like to introduce you to one of our employees, Aileen Mullin. We started chatting a bit. Then I put my elbow on his arm and I said, Secretary McDonnough, if you don't mind stepping into my office for a moment. And I ushered him a few yards away.**

Q. Uh-huh.

A. **To speak privately with him.**

Q. So Director Witty did not hear the substance of the conversation that you had with Secretary McDonnough?

A. **Oh. No. I wasn't within earshot of anyone.**

Q. And did Director Witty or anyone else at the VA do anything after that that made you think you were being retaliated against for your comments to the Secretary?

A. **Yes.**

Q. What did they do?

A. **They still made it hard for me to work there. They made me fight for anything that would make an accommodation effective. It was just a battle after battle for every inch of what was needing-- needed to make accommodations effective. They assigned me to a**





**brutal coach. I don't know if she did that. I don't think she had that much control. But most of all, it was just battling anything, any accommodation. No, not accommodation. Every time I reported what I needed to do my job, they battled me on it. I had to bleed for every absolutely everything.**

Q. Can you give me an example?

A. **Yeah. When I started the training-- May I show you something?**

Q. No.

A. **Okay.**

Q. Tell me what you were telling me.

A. **When they decided that I was going to work at home and that I could face time with my mentor, Decision Review Officer.**

Q. Uh-huh.

A. **And we were still on the paper claims. And I just said he has to be able to see these. This doesn't work. And they said, no, we're going to give you a camera and a headset. And what they gave me was like this broken, old-- the covers for the ear pieces were disintegrating with age, the headset that we used to use, the phone unit was long since defunct.**

**And I'm like, no. We need-- according to your-- how this place runs, the Decision Review Officer**

**needs to see it. And it was battle, battle, battle. And then they--**

Q. And did you request a specific accommodation at that time?

**A. I told them to do to my job, I need to be-- in order to do my job, I need to be-- everyone needs to sit with the Decision Review Office to go over files, period.**

Q. Okay.

**A. I made them aware of why what we were doing was ineffective.**

Q. Can I ask, was this after you were working in the VMBS system?

**A. No. Prior to that.**

Q. Okay.

**A. And this was also prior to VBMS was training, they had me going home. A great deal of our training had-- is medical. It has to do with the body system. And everybody had handouts and printouts and things that they could use and reference and use in the future and things like that. And I'm saying I need a printer at home so I can do the same training as everybody else. Battle, battle, battle, battle, battle.**

Q. Did the Agency provide you a printer?

**A. After I bled on the table, I bled on the**





**floor, yes. They made me pay dearly for that.**

Q. How did they make you pay dearly?

**A. Because they knew it was needed and they wouldn't-- they, just like everything along the way, wouldn't do it in a timely fashion.**

Q. Do you know how long it took them to provide the printer after you made a specific request for it?

**A. After the training had already started. I don't know the timeline. I don't know the timeline, but it was after I started needing it.**

Q. Do you know how long it took the Agency to provide the printer after you requested it?

**A. Do I remember? No, I don't remember the specifics on that.**

Q. But they did provide with you a printer?

**A. Going back to the beginning of this question, we had to talk about everything--**

Q. Well, can you answer the question?

**A. Yes. Yes. Yes, they did. Yes, they did.**

Q. Okay. Do you recall going to Challenge Training in around 2013 or 2014 maybe?

**A. Yes.**

Q. Was that the second time you had been to Challenge Training?

**A. Yes.**





Q. Why did you go to Challenge Training a second time?

**A. Why did I go?**

Q. Uh-huh.

**A. Can you ask me that another way?**

Q. Did you request to go to Challenge Training for a second time?

**A. Yes.**

Q. And did the Agency grant that request?

**A. Yes.**

Q. Do you recall the various things you were trained on at Challenge Training?

**A. Not specifically, no.**

Q. Let me show you what is marked as Exhibit 36? (Tendering)

**MR. MAHARAJ:** (Nods head)

**(Defendant's Exhibit No. 36 was marked for identification)**

**A. (Perusing)**

Q. And you'll see this document does not have Bates stamps. And that's because it's a part of the production that was provided to your lawyers today. Do you recognize this?

**A. (Perusing) Do I recognize this specific document? No. But the gist of it, yes.**





Q. Does it look like the schedule of classes that you attended during your second visit to Challenge Training?

**A. I don't know.**

Q. Okay. Do you remember when you went to Challenge Training for the second time?

**A. Yes.**

Q. You do?

**A. Yes.**

Q. Was it June and July?

**A. I don't remember the dates.**

Q. Okay. So you remember going, but you don't remember the dates that you attended?

**A. Correct.**

Q. Okay. Did you receive any VMBS training while at Challenge Training?

**A. We were introduced to it, yes.**

Q. And tell me about that introduction.

**A. VBMS was and is a very complex, strong tool that integrates originally, you know, different information that comes from different parts of the government. And it's something that could take a long time for anybody to master. But they did teach us how to do a basic rating in, like how to bring in paragraphs and write, you know, a claim, write a basic decision in that.**

**The beginning of this training-- I think this was actually for-- this was for VSRs, not RVSRs.**
Q. This being the document?
**A. Oh. I'm sorry. The document you just handed me, Exhibit 36.**
Q. What's the title of the document at the very top?
**A. RVSR IWT Session. TMS Curriculum. Oh. Wait a minute. So this was the TMS curriculum. I did live training. I'm not really sure what this is.**
Q. Okay. So this may not be the schedule from your training, but we haven't really been talking about this specifically.
**A. Well, there's a reason I said that.**
Q. Okay. Tell me.
**A. And it goes in here I think is-- the first week I think was for VSRs, then RVSRs came in. Because the first thing, like records management, mail handling, establishing Veterans status, that's all things that would be done by the VSR, people who were just starting.**
Q. And then the RVSR training was-- started the second week is what you're saying?
**A. Yes.**
Q. Okay.
**A. And the thing-- I didn't know how to do some**





**of these things in the VBMS. The RVSRs learned how to do it, but I did not learn how to do it.**
Q. Okay. So just so we're clear, you do recall receiving some training on VBMS while you were participating in Challenge for the second time?
**A. Yes.**
Q. Okay. Did you get any-- Well, never mind. Okay. I'm going to show you another exhibit. This is marked as Exhibit 37, which for the record is a document Bates stamped VA 011686 through 688. (Tendering)
**(Defendant's Exhibit No. 37 was marked for identification)**
**A. (Perusing)**
Q. It's a Department of Labor Form titled Notice for Occupational Disease and Claim for Compensation?
**A. Yes, it is.**
Q. And at the very bottom right corner it says, Form CA-2?
**A. Yes, it is.**
Q. Is that your signature at the bottom of the first page?
**A. Yes, it is.**
Q. Okay. And the third-- the second and third pages appear to be just written text. Is this an attachment to the CA-2 form?





**A. In response to No. 15-- No. 12 and 15.**
Q. I see. So on the first page ending 686, there's Question 12. And your response to it says, see attached. On then on Question 15 it also says, see attached. And so Pages 687 and 688 are the responses being referenced on 686?
**A. Yes, sir.**
Q. Okay.
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 4:03 p.m.)**
**(On the record at 4:04 p.m.)**
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, I appreciate your time today. And pursuant an agreement that we've made with you and your lawyers, we are going to pick up this deposition for a third and final day on Friday at 1:30 p.m. And that's also-- that concludes today. But just remember that you're still under oath. This deposition is ongoing. So please don't have any substantive conversations with anyone about your testimony, about your answers. And we will pick up on Friday.
**A. Yes. May I ask a question?**
Q. You may.
**A. We've been referring to Document 1 a lot, those two documents.**





Q. Uh-huh.
**A. Should I have copies of those or--**
Q. So your attorneys have copies of those.
**MR. SOLOMON:** We have copies of everything.
Q. **(By Mr. Sullivan)** And that actually raises a very good question. So maybe I could just do one more thing with you before we go.
**A. Yes, sir.**
Q. And it would require you to get back into Exhibit 1. And let me just jump to the page. And it is really just a bit of homework. And you being a former teacher, I know you'll appreciate the homework assignment.
**A. What's the page?**
Q. So we're looking at Exhibit 1. And I would like to direct you to Page 64.
**A. (Perusing)**
Q. And do you see there's a bold RFI-14?
**A. I see RFI-14.**
Q. And then below that, a response?
**A. Yes.**
Q. In your response, which you have verified under oath as being true and accurate, you make a sort of general reference to events listed in your response to

RFI's 1, 3, 4 and 5. And this RFI-14 asks for-- asks you to identify discriminatory, retaliatory or offensive comments, statements, remarks made by any VA employees, and specifically remarks that support your claims for retaliation, for discrimination.

**A.** Okay.

**Q.** And then below your answer, there's some more substantive responses. I do not want to have to go through line by line all of your responses to 1, 3, 4 and 5. So if between now and Friday, you can just put some thought to any comments of this kind that RFI-14 is asking about, I think that would be helpful and streamline things for Friday.

**THE WITNESS:** Okay. You'll explain this to me later?

**MR. SOLOMON:** (Nods head.)

**THE WITNESS:** All right. Because I'm not fully comprehending what you said.

**MR. SULLIVAN:** That's totally fine.

**THE WITNESS:** Okay.

**MR. SULLIVAN:** So that's all. I don't have anything else for today. And I look forward to speaking with on Friday.

Off the record.





S T I P U L A T I O N

It is hereby stipulated and agreed by and between counsel present at this deposition and by the deponent that the reading and signing of this deposition is not waived.

(This deposition was adjourned at 4:07 p.m. to be continued on Friday, January 7, 2022 at 1:00 p.m.)





CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, Debbie E. Askins, FPR, Notary Public, State of Florida, certify that Aileen Mullin personally appeared before me on January 4, 2022 and was duly sworn.

Signed this 18th day of January, 2022.

DEBBIE E. ASKINS, FPR
Notary Public, State of Florida
My Commission No. HH 110711
Expires: 05/13/2025





CERTIFICATE OF REPORTER

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, DEBBIE E. ASKINS, FPR, do hereby certify that I was authorized to and did stenographically report the deposition of Aileen Mullin; that a review of the transcript was requested; and that the foregoing transcript, pages 234 through 387, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 18th day of January, 2022.

Debbie E. Askins, FPR
Notary Public, State of Florida

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.

CASE NO.: 8:20-cv-026970-VMC-AEP

DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
______________________________________/

IN RE: Deposition of: Aileen Mullin, Vol. II
TAKEN: 1/4/2022

DATE SENT TO WITNESS: 1/18/2022

TO: Aileen Mullin
c/o James Solomon, Esq. (james@smkfirm.com)

The referenced transcript has been completed and awaits reading and signing.

Please arrange to read and sign the transcript. The transcript (Vol. II) is 150 pages long (pgs 234-387) and you should allow yourself sufficient time.

The original of this deposition has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties as listed below.

Thank you.

Debbie E. Askins
_____________________________________________
Debbie E. Askins, Professional Court Reporter

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com

**ASKINS COURT REPORTING, INC.**
813.966.7936 d_askins@tampacourtreporting.net



**ERRATA SHEET - DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES**

**IN RE: Aileen Mullin v. Denis McDonnough, Sec. U.S. Department of Veterans Affairs**
Case No. 8:20-cv-026970-VMC-AEP
**Deposition of Aileen Mullin, Vol. II, 1/4/2022**
REPORTED BY: Debbie E. Askins, FPR

| **Page** | **Line** | **Change** | **Reason** |
|---|---|---|---|
| ___ | _____ | ______________________ | ______ |
| ___ | _____ | ______________________ | ______ |
| ___ | _____ | ______________________ | ______ |
| ___ | _____ | ______________________ | _____ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ______________________ | ______ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ____________________________________________ | |
| _____ | _____ | ______________________ | _ |
| ___ | _____ | ______________________ | __ |
| ___ | _____ | ______________________ | ____ |
| ___ | _____ | ______________________ | __ |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________ ___________________________
**Date** **Aileen Mullin**

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com

**ASKINS COURT REPORTING, INC.**
813.966.7936 d_askins@tampacourtreporting.net

## 0

**0010969** [1] - 236:23
**0011952** [1] - 254:13
**001953** [1] - 251:20
**0025** [2] - 236:11, 261:24
**0043** [1] - 298:23
**010020** [1] - 329:16
**010020-22** [1] - 236:25
**010964** [2] - 236:18, 304:6
**010969** [1] - 323:13
**010970** [2] - 236:21, 313:4
**010991** [1] - 370:2
**010991-998** [1] - 237:12
**011015** [2] - 237:9, 353:19
**011017** [2] - 237:10, 358:17
**011018** [2] - 237:4, 335:13
**0111679** [1] - 236:19
**011487** [1] - 273:25
**011637** [2] - 236:14, 280:6
**011666** [1] - 342:8
**011666-669** [1] - 237:6
**011669** [1] - 342:8
**011679** [1] - 306:21
**011686** [1] - 379:10
**011686-688** [1] - 237:15
**011740** [2] - 237:7, 347:24
**011949** [1] - 254:13
**011949-952** [1] - 236:9
**011953-956** [1] - 236:8
**011956** [1] - 252:21
**011996** [2] - 245:14, 246:8
**011996-997** [1] - 236:6
**012019** [2] - 236:12, 263:21
**012055** [2] - 236:5, 243:21
**045** [1] - 332:10
**045-46** [1] - 237:3
**05/13/2025** [1] - 384:16
**0857f** [4] - 336:7, 346:19, 348:1, 353:24

## 1

**1** [13] - 238:17, 239:18, 240:20, 266:14, 268:13, 294:19, 298:19, 333:15, 380:24, 381:11, 381:16, 382:1, 382:9
**1/18/2022** [1] - 386:10
**1/28/13** [1] - 236:15
**1/29/13** [1] - 236:17
**1/31/13** [1] - 236:19
**1/4/2022** [2] - 386:9, 387:3
**10** [10] - 239:21, 239:25, 240:19, 252:11, 252:17, 295:8, 295:17, 296:10, 296:13, 297:8
**100** [7] - 259:17, 277:2, 283:11, 301:11, 312:5, 312:21, 362:25
**10:09** [1] - 234:13
**10:58** [1] - 266:10
**10th** [2] - 246:11, 250:16
**11** [4] - 266:16, 266:18, 268:13, 348:20
**1100-192** [1] - 235:3
**110711** [1] - 384:15
**11:00** [2] - 348:20, 349:14
**11:20** [1] - 266:11
**11:32** [1] - 273:17
**11:33** [1] - 273:18
**11th** [3] - 267:1, 267:13, 268:22
**12** [6] - 349:19, 350:11, 350:16, 351:1, 380:1, 380:3
**12:09** [2] - 315:6, 315:8
**12:12** [1] - 298:8
**12:15** [2] - 313:19, 315:14
**12th** [2] - 329:22, 334:10
**13** [1] - 342:7
**13th** [1] - 355:5
**15** [11] - 294:12, 294:15, 294:24, 295:18, 320:21, 321:2, 324:6, 333:15, 380:1, 380:4
**150** [1] - 386:14
**15th** [6] - 348:10, 348:23, 349:3, 349:17, 349:22, 352:13
**16** [5] - 236:4, 243:16, 243:17, 304:8, 324:5
**16th** [5] - 270:14, 270:16, 270:17, 270:24
**17** [7] - 236:6, 245:13, 245:15, 270:6, 270:7, 270:21, 271:3
**18** [9] - 236:7, 251:20, 251:22, 252:9, 255:12, 257:22, 260:16, 272:12, 273:25
**18th** [2] - 384:11, 385:11
**19** [5] - 236:9, 254:12, 254:15, 257:10, 257:13
**19th** [3] - 324:7, 354:5, 355:9
**1:00** [1] - 383:8
**1:15** [1] - 298:9
**1:30** [1] - 380:16
**1st** [1] - 261:12

## 2

**2** [13] - 236:24, 252:11, 270:4, 270:21, 271:4, 272:14, 273:24, 280:9, 280:10, 281:24, 293:9, 311:8, 334:1
**2/20/13** [1] - 236:22
**2/26/13** [1] - 334:5
**2/27/13** [1] - 237:4
**2/5/13** [2] - 236:14, 236:21
**20** [3] - 236:10, 261:23, 261:25
**2011** [2] - 308:18, 308:23
**2012** [19] - 240:5, 244:6, 244:13, 245:23, 246:11, 262:24, 264:24, 267:13, 269:18, 270:8, 275:13, 309:11, 309:21, 332:14, 360:4, 360:15, 365:15, 366:1, 368:22
**2013** [64] - 257:21, 258:1, 258:17, 272:18, 273:23, 277:25, 281:1, 282:11, 287:18, 293:22, 298:24, 299:6, 300:18, 304:4, 304:15, 305:15, 305:24, 308:3, 308:6, 308:9, 308:20, 308:24, 309:5, 310:8, 311:13, 313:16, 317:10, 317:18, 318:9, 319:13, 323:17, 324:7, 325:10, 329:22, 331:22, 332:15, 332:18, 334:1, 334:10, 335:7, 336:5, 337:5, 338:17, 340:7, 341:10, 343:24, 346:25, 348:10, 348:23, 349:3, 349:17, 349:23, 349:25, 350:3, 350:9, 354:5, 355:5, 356:4, 357:8, 357:21, 358:2, 360:4, 375:21
**2013-4** [1] - 237:13
**2014** [6] - 360:5, 360:6, 360:10, 360:17, 370:18, 375:21
**2015** [2] - 260:5, 331:17
**2022** [5] - 234:12, 383:7, 384:9, 384:11, 385:11
**2030** [1] - 283:6
**20th** [2] - 323:17, 323:20
**21** [3] - 236:12, 263:20, 263:23
**21st** [3] - 322:4, 325:10, 326:11
**22** [11] - 236:13, 280:5, 280:7, 280:15, 314:20, 315:16, 315:23, 329:16, 329:22, 330:4, 330:5
**22nd** [2] - 252:17, 253:9
**23** [11] - 236:15, 270:8, 271:3, 298:16, 298:17, 298:23, 299:4, 299:5, 300:20, 303:18, 305:1
**234** [2] - 234:22, 385:7
**234-387** [1] - 386:14
**238** [1] - 235:13
**23rd** [2] - 260:17, 261:11
**24** [3] - 236:17, 304:6, 304:12
**243** [1] - 236:4
**245** [1] - 236:6
**25** [6] - 236:19, 306:20, 306:22, 309:6, 310:4, 312:24
**251** [1] - 236:7
**254** [1] - 236:9
**25th** [8] - 267:2, 267:13, 268:23, 269:18, 325:10, 326:11, 338:17, 360:6
**26** [14] - 236:20, 270:8, 272:16, 272:18, 273:3, 273:24, 275:2, 313:3, 313:5, 315:9, 317:19, 320:14, 321:16, 321:19
**261** [1] - 236:10
**263** [1] - 236:12
**26th** [2] - 326:22, 332:15
**27** [4] - 236:22, 323:3, 323:4, 323:12
**27th** [5] - 245:22, 332:14, 336:5, 337:5, 345:13
**28** [5] - 236:24, 329:14, 329:17, 332:1, 334:10
**280** [1] - 236:13
**28th** [4] - 298:24, 299:6, 300:18, 307:19
**29** [4] - 237:2, 305:15, 332:4, 332:6
**298** [1] - 236:15
**29th** [4] - 264:16, 264:24, 304:15, 305:24
**2:15** [1] - 334:16
**2:16** [2] - 334:17, 334:25
**2:37** [1] - 335:1

**2nd** [1] - 287:10

## 3

**3** [2] - 382:1, 382:9
**3/2/12** [1] - 237:15
**3/23/12** [2] - 236:8, 253:7
**3/5/2013** [1] - 338:12
**30** [10] - 237:4, 295:18, 335:12, 335:14, 345:14, 345:16, 345:23, 346:15, 357:22, 358:9
**304** [1] - 236:17
**306** [1] - 236:19
**30th** [1] - 370:18
**31** [8] - 237:5, 342:10, 349:20, 349:25, 350:13, 350:14, 351:20, 352:4
**313** [1] - 236:20
**31st** [5] - 308:3, 308:6, 308:9, 309:1, 309:2
**32** [11] - 237:7, 347:19, 347:20, 348:9, 349:22, 350:2, 350:11, 350:15, 351:1, 353:4, 357:8
**3200** [1] - 235:8
**323** [1] - 236:22
**329** [1] - 236:24
**33** [5] - 237:8, 353:19, 353:21, 355:11, 357:8
**332** [1] - 237:2
**335** [1] - 237:4
**33602** [2] - 235:3, 235:8
**34** [4] - 237:10, 358:16, 358:18, 359:2
**342** [1] - 237:5
**347** [1] - 237:7
**35** [3] - 237:11, 370:1, 370:3
**353** [1] - 237:8
**358** [1] - 237:10
**36** [4] - 237:13, 376:14, 376:17, 378:5
**37** [3] - 237:14, 379:9, 379:11
**370** [1] - 237:11
**376** [1] - 237:13
**379** [1] - 237:14
**384** [1] - 235:14
**385** [1] - 235:15
**386** [1] - 235:16
**387** [3] - 234:22, 235:17, 385:7
**3:14** [1] - 359:25
**3:20** [1] - 324:17
**3:28** [1] - 360:1
**3rd** [12] - 240:2, 252:11, 283:3, 342:15, 343:24, 344:15, 346:25, 349:25, 350:3, 350:5, 350:9, 352:4

## 4

**4** [4] - 234:12, 382:1, 382:9, 384:9
**4/12/13** [2] - 236:24, 334:8
**4/15/13** [1] - 237:7
**4/19** [1] - 356:9
**4/19/13** [1] - 237:9
**400** [2] - 234:15, 235:8
**43-44** [1] - 236:16
**44** [1] - 298:24
**46** [1] - 332:10
**4:03** [1] - 380:10
**4:04** [1] - 380:11
**4:07** [2] - 234:13, 383:6
**4:30** [1] - 306:13
**4:34** [1] - 306:17
**4:38** [1] - 370:18

## 5

**5** [4] - 294:19, 333:15, 382:1, 382:10
**5/3/12** [1] - 236:11
**5/7/12** [2] - 236:5, 236:9
**56** [1] - 251:21
**5th** [19] - 281:1, 287:18, 311:11, 311:12, 311:13, 313:16, 314:24, 315:6, 315:7, 315:14, 316:8, 317:10, 317:18, 319:13, 321:9, 322:14, 340:6, 341:10, 343:19

## 6

**6** [2] - 272:18, 274:5
**6/27/12** [1] - 236:6
**6/29/12** [1] - 236:12
**601** [1] - 235:3
**64** [1] - 381:17
**666** [4] - 344:18, 345:2, 345:6, 345:9
**667** [2] - 345:1, 345:5
**686** [2] - 380:2, 380:6
**687** [1] - 380:5
**688** [2] - 379:10, 380:5
**6th** [4] - 273:10, 273:23, 275:12, 321:22

## 7

**7** [3] - 244:6, 244:13, 383:7
**727-319-7750** [1] - 252:13
**7:00** [2] - 348:20, 349:13
**7th** [1] - 314:23

## 8

**8/27/13** [1] - 237:10
**80** [1] - 246:11
**813-274-6000** [1] - 235:9
**813-497-7650** [1] - 235:5
**8:20-cv-026970-VMC-AEP** [3] - 234:5, 386:5, 387:3

## 9

**9** [1] - 257:22
**97** [1] - 245:14
**98** [1] - 356:5
**992** [1] - 370:14
**998** [1] - 370:2

## A

**a.m** [10] - 234:13, 266:10, 266:11, 273:17, 273:18, 348:20, 349:14
**AA** [1] - 323:21
**abdominal** [1] - 334:3
**ability** [5] - 239:4, 322:10, 326:1, 355:20, 358:24
**able** [12] - 251:16, 256:4, 292:21, 310:5, 312:3, 324:15, 343:12, 344:2, 344:4, 356:3, 361:3, 373:18
**absence** [5] - 325:8, 325:12, 325:14, 326:6, 326:10
**absolutely** [7] - 265:22, 268:19, 293:13, 312:25, 313:1, 351:5, 373:6
**accept** [1] - 254:25
**acceptable** [1] - 363:23
**accepted** [2] - 255:4, 263:3
**access** [1] - 251:18
**accessed** [1] - 284:13
**accommodate** [2] - 239:15, 355:16
**accommodating** [1] - 341:11
**accommodation** [61] - 272:23, 272:25, 274:12, 275:3, 275:18, 302:10, 302:14, 302:24, 303:2, 314:2, 314:11, 317:12, 317:21, 321:13, 322:5, 326:4, 326:21, 335:6, 337:1, 337:2, 337:16, 338:12, 343:10, 344:1, 348:17, 349:3, 349:7, 350:2, 350:5, 352:5, 352:14, 352:22, 353:3, 353:10, 353:13, 354:8, 354:20, 354:22, 355:10, 355:20, 356:18, 357:7, 357:9, 357:10, 357:21, 358:2, 358:4, 359:7, 361:2, 361:13, 361:20, 362:1, 362:19, 363:11, 365:4, 367:20, 370:6, 372:23, 373:3, 373:4, 374:3
**Accommodation** [9] - 237:4, 237:7, 237:9, 237:10, 336:8, 348:2, 353:25, 358:23, 359:3
**accommodations** [27] - 302:4, 303:19, 304:24, 306:6, 307:23, 308:1, 308:2, 308:3, 308:6, 308:7, 308:9, 309:12, 309:16, 309:20, 310:3, 310:16, 316:22, 320:1, 329:24, 330:17, 331:1, 331:2, 331:8, 337:6, 337:7, 357:7, 372:25
**according** [5] - 270:13, 322:16, 326:15, 360:22, 373:24
**accurate** [7] - 239:5, 239:13, 281:15, 286:3, 293:12, 322:22, 381:24
**accused** [1] - 367:17
**acronym** [1] - 282:18
**action** [2] - 385:10, 385:10
**actions** [2] - 247:16, 250:17
**activities** [1] - 369:19
**activity** [8] - 365:6, 365:11, 366:10, 368:11, 368:15, 368:24, 369:7, 369:11
**acts** [1] - 247:9
**actual** [2] - 300:3, 318:12
**added** [2] - 286:9, 290:20

**additional** [7] - 240:15, 257:12, 284:7, 321:25, 326:20, 326:23, 327:3
**address** [3] - 281:2, 313:14, 334:7
**addresses** [1] - 325:14
**adequately** [1] - 322:7
**adjourned** [1] - 383:6
**adjustment** [1] - 358:4
**administration** [1] - 272:2
**Administration** [1] - 362:9
**administrative** [5] - 322:8, 322:24, 324:8, 325:18, 325:24
**administrators** [1] - 269:11
**advanced** [20] - 240:5, 240:12, 240:25, 241:15, 241:17, 241:20, 241:23, 242:15, 243:6, 243:8, 244:1, 245:3, 246:14, 250:16, 267:2, 267:11, 267:16, 268:4, 268:12, 269:5
**advice** [2] - 360:17, 360:22
**advised** [4] - 272:25, 299:14, 299:22, 344:21
**Affairs** [1] - 387:2
**AFFAIRS** [2] - 234:7, 386:7
**affected** [1] - 265:24
**affects** [1] - 239:7
**AFGE** [4] - 302:20, 362:23, 367:18, 368:6
**afraid** [4] - 255:4, 255:5, 255:18, 346:21
**afternoon** [4] - 286:20, 306:13, 306:17, 324:17
**afterwards** [1] - 327:6
**age** [1] - 373:22
**Agency** [38] - 274:13, 310:20, 311:5, 311:6, 317:21, 317:25, 322:23, 327:9, 327:11, 327:16, 328:3, 338:1, 338:16, 339:10, 343:18, 346:14, 346:18, 351:2, 351:19, 353:8, 355:12, 355:16, 355:25, 356:3, 356:12, 359:9, 359:22, 361:12, 362:4, 362:11, 362:14, 362:18, 363:7, 363:15, 363:22, 374:24, 375:11, 376:9
**Agency's** [2] - 324:24, 371:5
**aggravation** [1] - 330:1
**ago** [3] - 271:23, 303:1, 358:12
**agree** [6] - 322:12, 324:17, 345:25, 346:3, 350:15, 350:25
**agreed** [7] - 335:9, 340:14, 343:15, 346:1, 346:6, 346:20, 383:2
**agreement** [4] - 346:10, 346:15, 346:19, 380:13
**ahead** [2] - 256:2, 300:13
**Aileen** [12] - 235:12, 298:25, 337:1, 343:6, 372:4, 384:8, 385:6, 386:9, 386:11, 387:2, 387:3, 387:23
**AILEEN** [4] - 234:3, 234:10, 238:2, 386:3
**air** [15] - 312:6, 327:18, 329:7, 329:10, 329:25, 330:20, 333:13, 333:14, 337:18, 337:19, 339:11, 339:14, 342:3, 342:4, 360:24
**allegation** [1] - 270:12
**Allergy** [2] - 237:3, 332:10
**allow** [5] - 326:19, 332:22, 361:17, 362:5, 386:15
**allowed** [11] - 241:23, 242:3, 243:6, 243:8, 244:1, 245:3, 246:14, 308:19, 308:25, 349:7, 351:15
**allowing** [1] - 359:3
**almost** [4] - 266:7, 278:9, 318:25, 354:23
**alone** [1] - 305:11
**alternative** [2] - 361:19, 363:21
**alternatives** [1] - 371:2
**anesthesia** [2] - 265:12, 265:13
**angry** [1] - 366:15
**annual** [1] - 351:16
**answer** [22] - 242:17, 243:12, 243:14, 245:6, 247:5, 254:2, 257:3, 257:4, 257:19, 263:14, 267:8, 267:24, 268:8, 271:7, 272:5, 285:25, 307:20, 310:1, 325:3, 350:22, 375:18, 382:7
**answered** [2] - 280:2, 351:17
**answering** [1] - 255:22
**answers** [2] - 317:15, 380:20
**Anthony's** [1] - 334:2
**anticipated** [1] - 312:11
**anxiety** [3] - 265:17, 314:4
**apologies** [7] - 288:12, 299:15, 300:13, 317:17, 349:1, 351:17, 370:22
**apologize** [1] - 367:3
**apparatus** [1] - 301:4
**appear** [1] - 379:24
**APPEARANCES** [2] - 235:1, 235:6
**appeared** [3] - 259:7, 366:15, 384:8
**application** [18] - 241:20, 241:22, 248:22, 249:5, 249:7, 249:14, 249:20, 249:24, 252:1, 252:6, 254:23, 255:11, 257:11, 257:14, 257:15, 259:25, 260:17, 260:20
**applications** [4] - 257:21, 260:16, 263:15, 263:16
**apply** [1] - 262:23
**applying** [1] - 262:20
**appreciate** [4] - 238:10, 264:13, 380:13, 381:13
**appropriate** [18] - 290:4, 290:6, 300:9, 301:17, 301:19, 302:14, 302:24, 303:4, 307:14, 312:2, 312:4, 329:5, 330:17, 331:1, 331:3, 355:19, 363:20, 363:23
**Approval** [9] - 237:4, 237:7, 237:9, 237:10, 336:8, 348:2, 353:24, 358:23, 359:3
**approval** [9] - 244:17, 244:21, 247:4, 247:18, 248:25, 250:3, 250:4, 269:9, 359:17
**approvals** [1] - 367:7
**approved** [15] - 242:21, 242:24, 243:9, 244:25, 245:4, 246:10, 249:20, 249:24, 249:25, 250:6, 250:16, 263:1, 271:18, 296:18, 337:2
**approving** [1] - 243:25
**April** [21] - 329:22, 334:10, 342:15, 343:24, 344:14, 346:25, 348:10, 348:23, 349:3, 349:17, 349:22, 349:25, 350:3, 350:8, 352:4, 352:13, 354:5, 355:5, 355:9, 356:4, 357:8
**area** [6] - 283:3, 305:17, 339:3, 339:4, 339:5, 339:9
**arguing** [1] - 333:2
**arm** [1] - 372:6
**arrange** [1] - 386:14
**Ashley** [1] - 235:3
**aside** [1] - 290:1
**ASKINS** [2] - 384:14, 385:5
**Askins** [5] - 234:18, 384:7, 385:14, 386:18, 387:4
**Aspen** [1] - 297:13
**assessment** [1] - 293:12
**assigned** [1] - 372:25
**assignment** [1] - 381:14
**Assoc** [1] - 237:3
**associated** [1] - 286:8
**Associates** [1] - 332:10
**assume** [5] - 264:22, 278:24, 287:24, 292:1, 292:5
**assuming** [1] - 287:23
**assumption** [2] - 264:23, 316:21
**asterisk** [1] - 338:15
**asthma** [2] - 330:2, 341:22
**attach** [1] - 295:5
**attached** [4] - 284:24, 344:22, 380:4, 380:5
**attachment** [1] - 379:25
**attack** [1] - 341:22
**attempting** [2] - 281:7, 281:10
**attend** [5] - 360:6, 361:3, 361:4, 361:6, 362:5
**attended** [2] - 377:2, 377:13
**attest** [3] - 272:11, 274:4, 360:8
**Attorney** [2] - 235:7, 289:1
**attorney** [3] - 254:11, 385:9, 385:10
**ATTORNEY'S** [1] - 234:14
**attorneys** [1] - 381:3
**August** [13] - 267:1, 267:13, 268:22, 268:23, 269:18, 270:8, 270:14, 270:15, 270:16, 270:17, 270:24
**AUSA** [3] - 235:7, 386:20, 387:24
**author** [2] - 304:13, 307:5
**authorize** [1] - 326:16
**authorized** [6] - 325:8, 325:12, 325:14, 326:5, 326:10, 385:6
**auto** [1] - 299:25
**available** [2] - 306:6, 359:14
**average** [4] - 293:9, 293:15, 328:11, 328:25
**avoid** [1] - 322:1
**awaits** [1] - 386:13
**aware** [14] - 256:2, 258:5, 258:11, 258:15, 346:3, 368:23, 368:25, 369:3,

369:5, 369:9, 369:17, 369:20, 374:10
**AWOL** [7] - 255:5, 255:18, 256:7, 256:14, 256:20, 256:25, 257:8

## B

**backfired** [2] - 370:8, 370:10
**backup** [1] - 273:13
**bad** [2] - 239:7, 352:12
**ball** [2] - 297:15, 365:24
**based** [9] - 252:10, 252:16, 253:8, 257:7, 264:14, 284:4, 305:21, 317:8, 322:12
**basic** [2] - 377:24, 377:25
**basis** [2] - 247:12, 247:14
**Bates** [21] - 243:20, 245:13, 251:20, 254:13, 263:21, 280:6, 298:23, 304:6, 306:21, 313:4, 323:13, 329:15, 332:9, 335:13, 342:8, 347:24, 353:19, 358:16, 370:1, 376:21, 379:10
**battle** [10] - 355:18, 372:23, 372:24, 374:1, 374:23
**Battle** [1] - 374:23
**battled** [1] - 373:5
**battles** [2] - 344:21, 369:14
**battling** [1] - 373:3
**bearing** [1] - 280:6
**became** [8] - 310:7, 331:5, 341:20, 346:8, 346:13, 346:17, 351:10, 352:24
**become** [4] - 242:14, 258:5, 258:11, 258:15
**becoming** [1] - 371:14
**beginning** [7] - 262:22, 342:22, 354:15, 357:11, 366:4, 375:16, 378:1
**Behalf** [1] - 234:11
**behalf** [2] - 263:9, 367:18
**belief** [3] - 256:6, 256:13, 371:17
**below** [8] - 274:18, 274:24, 336:25, 343:7, 348:24, 381:21, 382:7, 386:16
**beside** [1] - 260:15
**best** [7] - 245:10, 259:21, 259:24, 264:20, 277:21, 310:2, 331:14
**better** [5] - 295:19, 318:7, 343:11, 351:24, 352:17
**between** [20] - 242:23, 243:5, 258:12, 258:16, 261:17, 261:20, 265:23, 265:25, 274:10, 280:16, 309:2, 313:11, 316:6, 321:15, 359:13, 359:17, 362:18, 363:19, 382:10, 383:2
**beyond** [1] - 257:13
**big** [3] - 277:17, 323:8, 323:9
**biggest** [1] - 251:13
**biopsy** [1] - 255:7
**birthday** [1] - 366:3
**bit** [2] - 372:5, 381:12
**black** [3] - 296:25, 297:2
**bled** [2] - 374:25
**bleed** [1] - 373:5
**bleeding** [4] - 314:4, 334:2, 334:3, 334:4
**blown** [1] - 341:22
**blue** [12] - 288:6, 288:7, 288:9, 288:14, 288:15, 288:20, 289:4, 289:11, 289:20, 296:22, 297:7
**Bo** [1] - 341:19
**body** [5] - 265:17, 266:2, 299:25, 347:8, 374:18
**bold** [2] - 343:14, 381:19
**Bonnie** [12] - 251:11, 258:1, 259:7, 264:15, 265:9, 265:12, 323:18, 365:23, 366:18, 367:10, 368:6, 369:16
**book** [1] - 282:6
**bottom** [8] - 246:8, 335:22, 338:11, 344:18, 345:2, 370:14, 379:17, 379:20
**box** [5] - 336:16, 336:25, 337:13, 337:14, 338:11
**boxes** [1] - 336:16
**boy** [1] - 356:2
**brain** [2] - 265:18, 279:11
**brainstorm** [1] - 311:16
**brainstorming** [1] - 314:7
**brakes** [1] - 239:15
**break** [3] - 265:20, 266:6, 338:8
**breast** [15] - 240:15, 247:22, 248:25, 249:4, 249:5, 249:7, 250:1, 250:2, 252:1, 259:9, 265:18, 265:20, 266:8, 332:20, 367:3
**breathe** [1] - 349:13
**breathing** [4] - 259:7, 261:6, 301:4, 331:6
**brief** [4] - 254:5, 332:4, 332:24, 333:1
**BRIEF** [1] - 333:1
**bring** [2] - 301:12, 377:24
**broad** [2] - 275:9, 331:20
**broke** [1] - 273:12
**broken** [1] - 373:21
**brought** [4] - 289:14, 301:10, 361:21, 362:3
**brutal** [1] - 373:1
**buck** [12] - 277:20, 290:20, 290:21, 290:22, 291:5, 291:11, 291:14, 291:15, 291:17, 291:23, 295:5, 295:25
**bucks** [2] - 323:8, 323:9
**building** [52] - 259:9, 265:10, 265:11, 276:3, 276:7, 276:18, 281:4, 281:25, 282:1, 282:2, 282:13, 283:2, 299:23, 299:24, 303:9, 303:22, 304:3, 308:4, 310:6, 310:7, 310:25, 311:16, 311:25, 328:1, 328:14, 328:18, 328:23, 329:1, 329:10, 330:25, 331:4, 331:18, 331:23, 338:1, 340:13, 340:18, 341:18, 341:19, 341:21, 341:22, 343:11, 346:8, 347:1, 348:21, 352:23, 360:15, 367:4, 367:21, 367:25, 368:3, 371:20
**bulk** [1] - 277:17
**bullet** [2] - 321:6, 321:21
**BY** [2] - 238:6, 387:4

## C

**C-file** [2] - 284:2
**c/o** [1] - 386:12
**CA-2** [2] - 379:18, 379:25
**cabinet** [1] - 283:12
**callousness** [1] - 265:18
**camera** [1] - 373:20
**cancer** [24] - 240:16, 242:1, 249:1, 249:4, 249:5, 249:7, 252:1, 252:8, 257:21, 258:2, 260:9, 260:11, 260:13, 260:18, 260:23, 265:5, 265:8, 265:9, 265:18, 265:20, 266:8, 267:4, 332:20, 367:3
**cannot** [1] - 272:11
**capable** [1] - 355:25
**CAPRI** [4] - 284:8, 284:10, 285:3, 290:20
**cAPRI** [1] - 284:11
**car** [3] - 276:9, 363:5, 363:9
**care** [1] - 273:16
**caring** [1] - 266:1
**carrying** [1] - 290:2
**cart** [2] - 276:9, 292:24
**case** [3] - 291:22, 295:3, 331:17
**CASE** [2] - 234:5, 386:5
**Case** [1] - 387:3
**cases** [2] - 294:21, 294:22
**Casey** [6] - 258:1, 258:18, 262:3, 262:9, 298:25, 304:17
**caused** [3] - 250:18, 269:12, 269:14
**causes** [2] - 333:6
**CC** [2] - 386:20, 387:24
**cc's** [1] - 313:12
**Center** [2] - 261:3, 283:4
**certain** [1] - 312:19
**Certificate** [2] - 235:14, 235:15
**CERTIFICATE** [2] - 384:1, 385:1
**CERTIFY** [1] - 385:8
**certify** [2] - 384:8, 385:5
**chain** [12] - 236:6, 237:6, 245:21, 313:11, 313:19, 315:9, 316:24, 342:13, 342:23, 342:24, 344:10, 371:16
**Challenge** [10] - 237:13, 375:20, 375:24, 376:1, 376:6, 376:12, 377:2, 377:6, 377:16, 379:5
**challenge** [1] - 331:6
**chance** [1] - 306:25
**Change** [1] - 387:5
**changed** [1] - 360:18
**changes** [7] - 338:2, 341:6, 341:9, 357:13, 357:16, 357:19, 358:5
**CHANGES** [1] - 387:1
**charge** [5] - 255:5, 256:5, 256:7, 256:14, 256:20
**charged** [3] - 255:18, 256:25, 257:8
**chatting** [1] - 372:5
**checked** [1] - 336:17

**checking** [1] - 282:6
**chemotherapy** [2] - 367:19, 367:22
**chest** [2] - 333:17, 334:8
**choice** [1] - 244:8
**chose** [1] - 342:4
**chronological** [1] - 347:14
**circle** [1] - 250:24
**circumstances** [1] - 261:21
**claim** [7] - 296:9, 296:13, 296:15, 296:17, 296:22, 355:23, 377:25
**Claim** [2] - 237:15, 379:15
**claims** [11] - 276:1, 276:2, 278:8, 278:18, 278:24, 283:4, 286:10, 304:2, 353:16, 373:17, 382:4
**Clarke** [34] - 236:14, 236:19, 236:21, 248:10, 272:19, 273:9, 273:23, 280:16, 280:25, 304:18, 305:14, 306:2, 307:7, 311:5, 311:21, 313:12, 313:15, 313:21, 314:20, 315:14, 315:23, 316:9, 316:18, 316:23, 317:5, 317:25, 318:5, 319:21, 319:25, 321:15, 322:13, 323:18, 328:22, 340:23
**Clarke's** [1] - 321:14
**Class** [1] - 237:13
**classes** [1] - 377:1
**cleanup** [1] - 300:1
**clear** [9] - 290:14, 290:15, 296:24, 300:21, 309:22, 313:10, 319:11, 322:20, 379:3
**clearest** [1] - 365:14
**clearly** [1] - 349:12
**close** [1] - 324:3
**clue** [1] - 293:13
**co** [2] - 369:13, 369:19
**co-workers** [1] - 369:13
**co-workers'** [1] - 369:19
**coach** [4] - 267:18, 277:13, 354:16, 373:1
**code** [2] - 282:3, 282:5
**cognitive** [1] - 239:9
**cognitively** [1] - 239:13
**collaborated** [2] - 322:18, 322:21
**collaborative** [1] - 355:3
**collect** [1] - 337:23
**comfortable** [1] - 320:16
**coming** [5] - 238:10, 247:9, 276:25, 277:4, 343:11
**comma** [1] - 284:20
**command** [1] - 371:16
**comment** [2] - 368:21, 372:1
**comments** [8] - 365:10, 366:9, 366:12, 368:23, 369:17, 372:17, 382:3, 382:11
**Commission** [1] - 384:15
**communicate** [1] - 364:13
**communicated** [1] - 364:10
**communication** [2] - 291:9, 362:24
**Comp** [1] - 315:20
**Compensation** [3] - 237:15, 322:6, 379:15
**complainant** [1] - 272:21
**complainant's** [2] - 270:9, 272:24
**complaint** [2] - 365:15, 367:2
**Complaint** [1] - 366:17
**complete** [4] - 303:22, 311:17, 341:18, 348:21
**completed** [6] - 244:18, 244:21, 244:23, 244:25, 249:14, 386:13
**completely** [1] - 295:21
**complex** [3] - 279:5, 279:7, 377:19
**Complies** [9] - 238:19, 239:23, 262:18, 266:18, 270:7, 272:15, 280:12, 298:5, 321:4
**comprehending** [1] - 382:18
**compromised** [1] - 367:23
**computer** [6] - 296:19, 296:20, 296:21, 337:21, 339:21, 355:24
**concerned** [2] - 239:7, 265:15
**concludes** [1] - 380:16
**condition** [2] - 370:24, 371:7
**conditions** [8] - 263:12, 321:24, 338:2, 357:13, 357:17, 357:19, 358:6, 358:12
**confident** [1] - 309:25
**confirming** [1] - 295:2
**connect** [1] - 343:22
**connected** [1] - 385:10
**consider** [1] - 324:22
**consideration** [1] - 371:4
**considered** [5] - 320:1, 320:13, 324:12, 326:3, 347:10
**cont'd** [3] - 235:13, 237:1, 238:5
**contact** [1] - 319:24
**contained** [2] - 252:9, 257:13
**contend** [1] - 311:18
**contents** [1] - 250:21
**context** [3] - 270:13, 279:2, 342:17
**contextually** [1] - 277:25
**continue** [3] - 319:22, 325:4, 332:22
**continued** [4] - 322:14, 322:15, 348:24, 383:7
**control** [2] - 287:22, 373:2
**conversation** [35] - 248:17, 248:19, 258:1, 258:3, 258:6, 258:12, 258:16, 259:1, 259:6, 259:11, 259:12, 259:14, 262:4, 262:10, 265:1, 265:4, 265:23, 265:25, 273:9, 273:11, 273:23, 274:2, 274:8, 277:14, 313:20, 314:6, 316:13, 321:18, 328:20, 340:16, 340:19, 341:2, 342:5, 372:12
**conversations** [13] - 278:6, 302:22, 305:14, 305:20, 313:16, 314:1, 319:25, 322:13, 329:4, 335:6, 342:2, 362:18, 380:19
**copies** [3] - 381:2, 381:3, 381:4
**copy** [5] - 250:3, 288:8, 315:3, 317:2, 334:8
**cord** [1] - 330:2
**corner** [1] - 379:17
**Correa** [1] - 361:9
**correct** [30] - 244:19, 245:23, 247:7, 257:9, 264:15, 272:10, 278:9, 280:19, 288:12, 290:11, 295:14, 300:23, 302:11, 311:7, 312:25, 314:22, 315:24, 316:24, 317:22, 317:24, 318:2, 323:18, 326:12, 328:24, 341:4, 341:8, 349:20, 353:25, 354:12, 377:14
**corrections** [6] - 285:16, 287:11, 287:23, 287:24, 288:3, 288:5
**Corrections** [1] - 288:19
**corrections/misprints** [1] - 285:9
**correspondence** [1] - 286:11
**counsel** [4] - 251:11, 383:3, 385:9, 385:10
**Counsel** [7] - 273:1, 274:14, 314:8, 316:21, 316:22, 317:4, 321:14
**country** [1] - 356:6
**COUNTY** [1] - 385:4
**cOUNTY** [1] - 384:5
**couple** [4] - 302:25, 350:3, 350:8, 356:17
**course** [5] - 239:18, 280:21, 301:18, 301:20, 320:19
**COURT** [11] - 234:1, 246:22, 248:24, 255:14, 255:16, 297:1, 318:16, 318:20, 345:3, 345:7, 386:1
**Court** [1] - 386:18
**cover** [3] - 282:1, 287:1, 292:9
**covered** [4] - 281:25, 291:25, 292:17, 302:25
**covers** [1] - 373:21
**created** [1] - 244:13
**Crump** [14] - 236:11, 258:1, 258:16, 259:11, 259:18, 259:23, 260:5, 260:23, 262:3, 265:1, 265:4, 265:24, 299:1, 304:17
**crying** [1] - 265:15
**cubicle** [1] - 258:13
**cubicles** [3] - 339:1, 339:7, 339:8
**curious** [1] - 344:12
**current** [2] - 337:2, 337:18
**Curriculum** [1] - 378:8
**curriculum** [1] - 378:9
**cut** [1] - 347:14
**cutting** [1] - 347:16

## D

**dad** [1] - 367:24
**Dan** [1] - 323:8
**Daniel** [3] - 235:2, 386:21, 387:25
**daniel@smkfirm.com** [3] - 235:4, 386:21, 387:25
**date** [31] - 241:17, 243:7, 244:4, 244:5, 247:4, 248:12, 249:8, 253:6, 253:8, 253:11, 253:16, 253:20, 258:22, 258:23, 269:21, 271:10, 271:11, 271:12, 271:16, 300:12, 311:9, 317:18, 321:9, 324:1, 327:9, 332:14, 336:5, 338:16, 338:18, 349:5, 360:8

**Date** [1] - 387:23
**DATE** [2] - 234:12, 386:10
**date's** [1] - 247:7
**dated** [12] - 236:24, 288:16, 288:21, 289:11, 324:6, 329:21, 334:10, 348:9, 349:17, 349:22, 349:25, 354:5
**DATED** [1] - 385:11
**dates** [6] - 243:5, 244:9, 267:24, 309:25, 377:11, 377:13
**David** [3] - 235:7, 386:20, 387:24
**david.sullivan3@usdoj.gov** [2] - 386:20, 387:24
**David.Sullivan3@usdoj.gov** [1] - 235:9
**days** [23] - 276:25, 277:1, 277:4, 277:11, 277:24, 278:1, 279:15, 279:17, 310:6, 326:13, 328:19, 328:23, 337:3, 349:19, 350:11, 350:16, 351:1, 351:3, 351:22, 352:6, 352:7, 354:7, 365:19
**deal** [5] - 352:17, 352:21, 352:22, 367:16, 374:17
**dealing** [1] - 263:13
**dealings** [2] - 250:19, 251:14
**deals** [1] - 352:21
**dearly** [2] - 375:1, 375:2
**debbie** [1] - 234:18
**DEBBIE** [2] - 384:14, 385:5
**Debbie** [4] - 384:7, 385:14, 386:18, 387:4
**December** [1] - 309:20
**decided** [2] - 317:25, 373:13
**deciding** [1] - 269:5
**decision** [14] - 242:11, 269:6, 276:6, 279:22, 288:11, 288:12, 289:4, 290:9, 290:10, 295:10, 295:23, 298:1, 322:5, 377:25
**Decision** [7] - 277:15, 278:7, 278:14, 290:7, 373:14, 373:25, 374:7
**decisions** [5] - 278:25, 282:15, 287:16, 295:11, 296:4
**declare** [1] - 387:21
**decrease** [1] - 333:21
**DEFENDANT** [1] - 235:6
**Defendant** [3] - 234:7, 234:11, 386:7
**DEFENDANT'S** [2] - 236:3, 237:1
**Defendant's** [43] - 236:6, 236:7, 236:9, 236:10, 236:12, 236:13, 236:15, 236:17, 236:19, 236:20, 236:22, 236:24, 237:2, 237:4, 237:5, 237:7, 237:8, 237:10, 237:11, 237:13, 237:14, 243:17, 245:15, 251:22, 254:15, 261:25, 263:23, 280:7, 298:17, 304:8, 306:22, 313:5, 323:4, 329:17, 332:6, 335:14, 342:10, 347:20, 353:21, 358:18, 370:3, 376:17, 379:11
**defendant's** [1] - 236:4
**defending** [1] - 265:10
**definitely** [5] - 279:7, 290:5, 355:15, 357:16, 357:19
**definitive** [1] - 260:7
**defunct** [1] - 373:23
**degree** [1] - 353:1
**dehumidification** [1] - 329:10
**delay** [1] - 359:17
**delayed** [3] - 269:13, 269:15, 269:17
**delays** [2] - 247:9, 250:17
**delivered** [4] - 288:17, 289:12, 291:25, 324:16
**demand** [3] - 275:11, 275:14, 308:5
**demanded** [2] - 275:14, 308:7
**demanding** [1] - 302:9
**demands** [2] - 308:11, 308:12
**demonstrative** [1] - 371:4
**denial** [13] - 240:6, 240:12, 242:24, 273:1, 316:9, 317:3, 318:3, 318:8, 326:3, 326:8, 370:25, 371:8
**denied** [24] - 240:5, 241:15, 242:3, 242:18, 243:1, 243:2, 243:7, 243:10, 255:12, 255:13, 255:14, 272:25, 310:15, 314:9, 316:10, 316:19, 317:2, 318:11, 318:12, 318:25, 319:13, 319:15, 319:17, 321:12
**DENIS** [2] - 234:6, 386:6
**Denis** [1] - 387:2
**deny** [3] - 316:22, 318:1
**department** [1] - 290:17
**Department** [4] - 306:4, 329:21, 379:14, 387:2
**depo** [1] - 239:11
**deponent** [1] - 383:3
**DEPOSITION** [1] - 234:9
**Deposition** [2] - 235:12, 386:9
**deposition** [9] - 238:21, 380:15, 380:18, 383:3, 383:4, 383:6, 385:6, 386:15, 387:3
**DEPT** [2] - 234:7, 386:7
**Dept** [1] - 236:25
**describe** [1] - 256:24
**described** [2] - 278:21, 293:8
**describing** [1] - 276:19
**Description** [3] - 236:1, 236:3, 237:1
**designated** [1] - 283:10
**designee** [1] - 354:16
**desk** [8] - 294:9, 294:10, 294:16, 296:19, 337:17, 338:7, 338:16, 339:3
**details** [6] - 240:16, 304:23, 306:1, 306:7, 367:24
**determine** [1] - 287:11
**device** [2] - 307:15, 327:11
**diagnosed** [1] - 261:5
**diagnosis** [2] - 260:18, 260:23
**difference** [1] - 274:10
**different** [12] - 278:11, 278:24, 298:14, 300:6, 345:12, 353:13, 356:18, 363:2, 366:15, 377:20, 377:21
**differently** [1] - 254:22
**digit** [1] - 283:25
**digits** [3] - 284:1, 284:2, 284:4
**DIRECT** [1] - 238:5
**Direct** [1] - 235:13
**direct** [4] - 266:21, 320:23, 343:3, 381:17
**directed** [1] - 334:20
**directly** [9] - 248:3, 248:13, 248:15, 249:17, 361:10, 363:10, 364:13, 369:4
**Director** [18] - 246:10, 325:8, 326:10, 326:16, 362:25, 363:10, 364:15, 365:22, 366:6, 368:10, 368:14, 368:22, 369:14, 369:18, 369:21, 371:25, 372:11, 372:15
**director** [2] - 368:12, 368:13
**disabilities** [1] - 341:11
**disability** [1] - 365:1
**disabled** [2] - 256:9, 371:2
**discharged** [1] - 321:22
**discreet** [3] - 242:4, 279:10, 279:13
**discrimination** [2] - 256:9, 382:5
**discriminatory** [1] - 382:2
**discuss** [4] - 272:22, 324:16, 343:1, 361:22
**discussed** [7] - 315:17, 316:5, 320:13, 334:21, 337:8, 337:14, 351:12
**discussing** [3] - 303:12, 306:2, 317:23
**discussion** [2] - 275:8, 319:22
**discussions** [3] - 335:6, 337:8, 342:1
**Disease** [2] - 237:15, 379:15
**diseases** [1] - 371:15
**disintegrating** [1] - 373:22
**dispute** [1] - 246:17
**distinction** [1] - 241:18
**distracted** [2] - 265:25, 266:1
**distraction** [1] - 311:18
**distribution** [1] - 303:18
**District** [1] - 302:20
**DISTRICT** [4] - 234:1, 234:1, 386:1, 386:1
**DIVISION** [2] - 234:2, 386:2
**DMO** [1] - 356:22
**DO** [1] - 387:1
**doc** [1] - 350:10
**doctor** [9] - 253:13, 253:22, 299:14, 321:24, 327:15, 327:17, 327:20, 329:4
**Doctor** [1] - 299:21
**Doctor's** [1] - 237:3
**doctor's** [4] - 252:23, 343:13, 360:17, 360:22
**doctors** [4] - 257:12, 307:13, 307:15, 310:24
**document** [65] - 243:20, 243:23, 244:4, 244:5, 244:12, 245:13, 251:20, 254:13, 254:18, 254:19, 262:13, 263:21, 264:1, 264:2, 272:13, 272:14, 280:1, 280:6, 280:22, 280:23, 293:14, 298:3, 298:19, 299:2, 299:4, 299:5, 304:6, 304:7, 305:11, 305:21, 305:22, 306:21, 307:1, 313:3, 313:9, 320:15, 320:17, 323:12, 323:15, 324:2, 329:15, 332:9, 335:13, 335:17, 335:23, 337:3, 338:4, 341:6, 342:7,

344:20, 347:24, 349:2, 349:15, 353:19, 358:16, 358:21, 359:2, 370:1, 376:20, 376:25, 378:3, 378:4, 378:6, 379:9, 387:21
**Document** [1] - 380:24
**documentation** [6] - 250:7, 267:22, 326:20, 326:24, 326:25, 327:3
**documents** [26] - 247:2, 252:7, 253:13, 253:25, 263:25, 276:10, 276:13, 278:2, 280:19, 283:10, 283:16, 283:20, 284:8, 285:3, 285:9, 285:13, 286:2, 286:5, 294:4, 294:14, 295:9, 323:19, 329:23, 337:23, 357:3, 380:25
**donate** [2] - 263:5, 264:4
**donations** [4] - 248:23, 249:1, 263:9, 367:7
**done** [17] - 250:8, 266:8, 276:5, 276:16, 283:22, 284:1, 285:20, 290:22, 291:1, 291:2, 291:7, 294:18, 334:13, 341:20, 369:16, 378:20
**door** [2] - 294:1, 372:3
**doors** [1] - 339:1
**dots** [1] - 343:22
**doubt** [2] - 250:18, 251:6
**doubted** [1] - 250:15
**down** [6] - 250:14, 295:24, 301:22, 310:9, 337:14, 338:8
**dozens** [1] - 297:17
**Dr** [12] - 261:9, 299:19, 299:22, 300:24, 310:17, 329:12, 329:21, 329:24, 330:16, 330:24, 331:22, 334:5
**drafted** [2] - 350:11, 350:16
**drawn** [1] - 355:18
**Drive** [1] - 235:3
**drive** [1] - 367:24
**DRO** [3] - 355:4, 355:7, 355:21
**DROs** [1] - 355:12
**duly** [2] - 238:3, 384:9
**duration** [1] - 293:17
**during** [9] - 239:11, 269:3, 309:8, 322:1, 337:15, 367:21, 368:10, 368:14, 377:2
**duties** [3] - 275:10, 315:16, 315:22
**duty** [1] - 325:9
**dysfunction** [1] - 330:2

## E

**ear** [1] - 373:21
**earshot** [1] - 372:14
**EEO** [14] - 365:6, 365:10, 365:15, 366:10, 366:16, 367:1, 368:11, 368:15, 368:23, 369:1, 369:6, 369:11, 369:14, 369:19
**effective** [21] - 274:12, 303:20, 337:15, 341:10, 343:15, 343:19, 346:6, 347:2, 347:7, 347:10, 350:18, 351:2, 351:20, 352:5, 352:15, 352:18, 353:9, 354:22, 361:25, 372:23, 372:25
**effectiveness** [1] - 341:13
**elbow** [1] - 372:5
**elevator** [1] - 294:5
**eligible** [6] - 241:20, 242:6, 242:7, 242:8, 242:13, 242:14
**elsewhere** [1] - 303:21
**Email** [1] - 237:6
**email** [88] - 236:6, 236:11, 236:12, 236:14, 236:15, 236:17, 236:19, 236:21, 236:22, 241:6, 245:18, 245:21, 245:25, 246:5, 246:7, 247:3, 250:18, 251:8, 260:23, 262:3, 262:8, 262:11, 262:12, 262:15, 263:4, 264:3, 264:19, 280:25, 281:2, 288:10, 289:3, 289:10, 291:24, 298:24, 299:5, 300:19, 300:25, 302:8, 302:17, 302:23, 304:11, 304:12, 304:25, 306:15, 307:3, 307:19, 308:20, 308:25, 309:6, 309:11, 310:3, 310:14, 311:3, 311:7, 312:8, 312:20, 312:23, 313:11, 313:14, 313:19, 314:20, 314:24, 315:9, 316:13, 316:18, 316:24, 317:9, 319:20, 321:15, 323:16, 323:25, 324:20, 326:9, 326:15, 327:5, 342:13, 342:14, 342:19, 343:5, 343:24, 344:10, 344:15, 349:19, 350:4, 350:9, 352:4, 370:18
**emailed** [2] - 258:18, 262:9
**emailing** [2] - 245:22, 315:14
**emails** [4] - 237:12, 327:23, 327:24, 340:22
**emergency** [1] - 343:13
**employee** [3] - 371:3, 385:9, 385:9
**employee's** [1] - 334:7
**employees** [5] - 263:5, 264:4, 264:19, 372:4, 382:3
**employer** [1] - 334:6
**enable** [2] - 336:12, 348:13
**end** [9] - 297:22, 306:12, 309:11, 309:21, 318:1, 342:23, 342:24, 366:4, 371:21
**ended** [1] - 261:7
**ending** [2] - 330:4, 380:2
**ends** [2] - 329:22, 345:6
**engaged** [1] - 317:13
**ensuring** [1] - 286:2
**enter** [1] - 331:17
**ENTER** [1] - 387:1
**entered** [2] - 262:20, 290:19
**entire** [3] - 274:21, 328:10, 329:9
**envelopes** [1] - 368:1
**environment** [5] - 330:1, 331:9, 331:18, 331:23, 341:7
**Errata** [1] - 235:17
**errata** [1] - 386:16
**ERRATA** [1] - 387:1
**error** [1] - 351:5
**Esq** [5] - 386:12, 386:20, 386:21, 387:25, 387:25
**Esquire** [2] - 235:1, 235:2
**essential** [14] - 274:10, 274:20, 280:17, 293:5, 310:15, 310:23, 311:7, 312:9, 314:21, 314:25, 328:10, 328:17, 336:12, 348:13
**essentially** [2] - 282:6, 283:16
**established** [1] - 242:9
**establishing** [1] - 378:19
**evaluation** [3] - 277:14, 278:5, 278:13
**events** [2] - 273:2, 381:25
**eventually** [2] - 268:10, 362:15
**evils** [2] - 353:1, 353:2
**exaggerated** [2] - 281:22, 281:23
**exam** [6] - 279:23, 284:12, 295:5, 295:13, 295:20, 296:8
**examination** [4] - 290:19, 291:7, 291:25, 292:6
**EXAMINATION** [1] - 238:5
**Examination** [2] - 234:18, 235:13
**example** [1] - 373:7
**exams** [5] - 276:6, 284:12, 295:12, 296:5, 296:7
**except** [1] - 278:9
**exchange** [4] - 280:16, 317:10, 317:19, 321:15
**exclamation** [1] - 343:15
**excluded** [1] - 367:10
**exclusively** [1] - 356:8
**excuse** [2] - 253:18, 336:14
**execution** [1] - 235:17
**exercise** [1] - 332:5
**exhibit** [5] - 321:18, 324:5, 345:23, 350:13, 379:8
**EXHIBIT** [3] - 236:1, 236:3, 237:1
**Exhibit** [135] - 236:4, 236:6, 236:7, 236:9, 236:10, 236:12, 236:13, 236:15, 236:17, 236:19, 236:20, 236:22, 236:24, 237:2, 237:4, 237:5, 237:7, 237:8, 237:10, 237:11, 237:13, 237:14, 238:17, 239:18, 240:20, 243:16, 243:17, 245:13, 245:15, 251:20, 251:22, 252:9, 254:12, 254:15, 255:12, 257:10, 257:13, 257:22, 260:16, 261:23, 261:25, 263:20, 263:23, 266:14, 268:13, 270:4, 270:21, 271:4, 272:14, 273:24, 280:5, 280:7, 280:10, 280:15, 281:24, 293:9, 298:16, 298:17, 298:19, 298:23, 299:5, 300:20, 303:18, 304:6, 304:8, 304:12, 305:1, 306:20, 306:22, 309:6, 310:4, 311:8, 312:24, 313:3, 313:5, 314:20, 315:9, 315:16, 315:23, 317:19, 320:14, 320:21, 321:2, 321:16, 321:19, 323:3, 323:4, 323:12, 324:6, 329:14, 329:17, 332:1, 332:4, 332:6, 334:10, 335:12, 335:14, 342:7, 342:10, 345:14, 345:16, 346:15, 347:19, 347:20, 348:9, 349:20, 349:22, 349:25, 350:2, 350:11, 350:14, 350:15, 351:1, 351:20, 352:4, 353:4, 353:19, 353:21, 355:11, 357:8, 357:22, 358:16, 358:18, 359:2,

369:23, 370:1, 370:3, 376:14, 376:17, 378:5, 379:9, 379:11, 381:11, 381:16
**exhibits** [1] - 238:12
**exist** [1] - 240:18
**existing** [4] - 272:23, 272:24, 275:3, 343:10
**expected** [1] - 354:25
**Expires** [1] - 384:16
**explain** [3] - 263:11, 282:25, 382:14
**explained** [2] - 283:25, 317:2
**explaining** [1] - 317:6
**explains** [1] - 316:23
**explore** [1] - 275:9
**exposed** [2] - 300:9, 308:4
**exposure** [1] - 310:5

## F

**face** [9] - 248:16, 248:18, 259:17, 355:12, 355:13, 355:20, 373:14
**face-to-face** [2] - 248:16, 248:18
**facility** [2] - 291:25, 292:6
**fact** [7] - 238:16, 247:20, 274:4, 306:11, 325:11, 352:17, 363:23
**facts** [1] - 387:21
**failing** [1] - 333:5
**fair** [3] - 281:6, 302:9, 302:17
**fall** [2] - 308:18, 360:10
**false** [2] - 340:3, 340:10
**familiar** [3] - 262:5, 262:8, 341:6
**familiarity** [1] - 251:3
**familiarized** [2] - 299:3, 323:14
**family** [1] - 286:12
**far** [6] - 311:23, 312:13, 317:8, 347:14, 359:20, 360:4
**fashion** [1] - 375:5
**father's** [1] - 366:3
**fax** [7] - 252:10, 252:12, 252:18, 253:11, 253:16, 253:21, 253:22
**faxed** [5] - 252:11, 252:17, 253:11, 253:12
**February** [43] - 272:18, 273:10, 273:23, 274:5, 275:12, 277:25, 281:1, 282:10, 283:6, 287:18, 293:22, 311:11, 311:12, 311:13, 313:16, 314:23, 314:24, 315:6, 315:7, 315:14, 316:8, 317:10, 317:18, 318:9, 319:13, 321:9, 321:22, 322:14, 323:17, 323:20, 324:7, 325:9, 325:10, 326:11, 326:22, 334:1, 335:7, 336:5, 337:5, 345:13, 357:21, 358:2
**fellow** [1] - 264:4
**felt** [3] - 256:3, 331:5, 343:11
**few** [6] - 251:15, 296:9, 299:8, 301:22, 343:15, 372:8
**fight** [1] - 372:22
**figure** [4] - 302:13, 304:23, 311:22, 312:16
**file** [47] - 276:5, 276:10, 276:12, 276:17, 277:9, 277:19, 277:20, 278:3, 280:1, 282:1, 282:3, 283:11, 283:12, 284:2, 284:22, 284:24, 285:1, 285:5, 285:6, 286:6, 286:10, 286:14, 286:16, 286:18, 286:19, 286:20, 286:21, 287:2, 287:6, 288:6, 288:11, 290:20, 290:24, 291:6, 291:20, 291:24, 292:2, 295:5, 295:6, 295:13, 296:9, 296:13, 296:15, 296:22, 297:9, 297:10
**filed** [2] - 365:15, 366:16
**files** [35] - 276:1, 276:4, 276:8, 278:11, 278:20, 279:14, 279:17, 279:18, 281:6, 281:25, 283:24, 284:3, 284:9, 284:17, 286:9, 286:18, 287:9, 288:15, 288:20, 289:10, 292:17, 292:21, 293:1, 293:11, 296:21, 297:9, 297:10, 297:12, 297:18, 297:20, 306:12, 306:16, 355:4, 355:7, 374:7
**fill** [6] - 249:12, 253:13, 291:15, 291:17, 291:22, 301:7
**filled** [1] - 291:14
**filling** [1] - 291:11
**filter** [1] - 300:6
**filters** [1] - 300:9
**filtration** [3] - 329:10, 333:13, 333:14
**final** [5] - 288:8, 288:13, 289:4, 380:15
**financially** [1] - 385:10
**fine** [4] - 254:4, 265:22, 319:7, 382:19
**finish** [3] - 258:14, 265:21, 300:14
**finished** [4] - 262:13, 265:2, 280:9, 348:25
**fire** [1] - 287:8
**first** [29] - 240:1, 241:22, 253:2, 254:25, 265:11, 266:19, 278:10, 281:23, 284:18, 299:9, 308:16, 309:2, 313:19, 315:9, 316:15, 324:14, 334:22, 342:14, 344:14, 350:23, 361:4, 365:14, 365:15, 366:13, 371:6, 378:16, 378:18, 379:21, 380:2
**First** [1] - 234:15
**five** [8] - 293:10, 294:19, 295:8, 295:16, 296:5, 296:10, 296:13, 328:11
**fix** [2] - 285:17, 287:24
**flesh** [1] - 267:7
**flip** [1] - 333:11
**floated** [3] - 315:19, 315:20, 315:21
**floating** [1] - 314:16
**Floor** [1] - 234:15
**floor** [3] - 283:3, 287:10, 375:1
**FLORIDA** [4] - 234:1, 384:4, 385:3, 386:1
**Florida** [6] - 234:16, 235:3, 235:8, 384:8, 384:15, 385:14
**FMLA** [26] - 236:8, 236:9, 247:9, 247:18, 248:21, 248:25, 249:4, 249:6, 249:14, 249:20, 250:4, 251:25, 254:1, 254:23, 254:25, 255:11, 257:11, 257:14, 257:20, 258:9, 259:24, 260:15, 260:20, 262:20, 367:7
**focusing** [1] - 266:2
**folks** [2] - 299:6, 302:23
**following** [2] - 337:1, 348:16
**Following** [1] - 266:20
**follows** [1] - 238:4
**FOR** [2] - 235:1, 235:6
**force** [1] - 328:20
**foregoing** [2] - 385:7, 387:21
**Form** [7] - 336:7, 346:18, 348:1, 353:24, 358:23, 379:14, 379:18
**form** [11] - 236:8, 236:9, 241:5, 267:21, 336:7, 346:14, 353:4, 354:8, 357:9, 357:10, 379:25
**formal** [2] - 242:11, 317:3
**former** [1] - 381:12
**forms** [3] - 249:13, 356:18, 366:18
**forth** [3] - 314:20, 315:16, 340:21
**forward** [2] - 246:3, 382:23
**forwarded** [4] - 235:17, 273:1, 386:15, 386:16
**forwards** [1] - 245:25
**four** [20] - 343:7, 343:9, 343:25, 344:3, 344:5, 345:11, 345:17, 345:23, 346:10, 346:12, 347:1, 350:19, 351:3, 351:11, 351:14, 351:20, 351:21, 352:7, 354:7
**FPR** [6] - 234:18, 384:7, 384:14, 385:5, 385:14, 387:4
**frame** [4] - 295:22, 298:14, 309:5, 365:24
**frequently** [1] - 290:7
**Friday** [15] - 238:8, 238:21, 239:10, 275:22, 286:20, 326:13, 326:16, 349:9, 354:12, 380:16, 380:21, 382:10, 382:13, 382:23, 383:7
**Fridays** [3] - 348:19, 349:14, 354:14
**friend** [2] - 255:2, 261:5
**friends** [1] - 261:10
**front** [7] - 238:14, 239:19, 266:14, 270:4, 294:1, 339:2
**full** [4] - 239:5, 240:1, 266:19, 341:22
**fully** [1] - 382:18
**function** [3] - 274:20, 310:23, 328:10
**functions** [11] - 274:11, 280:17, 310:15, 311:7, 312:10, 314:21, 315:1, 328:17, 336:12, 348:13
**FURTHER** [1] - 385:8
**future** [2] - 320:4, 374:20

## G

**game** [1] - 256:2
**gastrointestinal** [1] - 321:24
**gather** [4] - 292:20, 326:19, 326:23, 327:3
**gathered** [1] - 292:17
**General** [7] - 273:1, 274:13, 314:8, 316:21, 317:4, 321:13
**general** [3] - 251:11, 268:1, 381:25
**generally** [5] - 239:8, 280:19, 284:10, 335:5, 360:10
**generated** [4] - 277:8, 278:3, 278:25

**generating** [1] - 288:11
**gentlemen** [1] - 343:6
**germane** [2] - 276:10, 297:10
**Gesturing** [1] - 325:1
**gist** [3] - 318:22, 331:25, 376:25
**given** [3] - 326:23, 327:2, 355:6
**glad** [1] - 238:9
**God** [2] - 261:14, 266:7
**government** [1] - 377:22
**grab** [1] - 238:17
**grade** [1] - 255:7
**grant** [4] - 258:9, 356:12, 376:9
**granted** [24] - 241:15, 246:15, 268:10, 268:14, 268:15, 268:17, 268:18, 268:20, 268:21, 269:5, 307:23, 309:15, 318:24, 322:23, 325:8, 325:11, 326:10, 354:19, 357:6, 357:20, 358:1, 358:5, 359:9, 359:22
**granting** [3] - 356:20, 358:24, 359:3
**great** [1] - 374:17
**Greg** [1] - 261:6
**group** [1] - 371:18
**guess** [8] - 252:4, 270:16, 294:25, 295:8, 296:5, 326:2, 326:3, 326:7
**guiding** [1] - 356:24
**gut** [1] - 314:4
**guys** [3] - 304:22, 327:23, 334:12

## H

**Haley** [2] - 295:7, 295:8
**half** [2] - 349:8, 349:9
**hand** [7] - 245:12, 249:16, 250:2, 263:20, 280:4, 332:3, 342:6
**handed** [2] - 323:11, 378:4
**handful** [1] - 297:20
**handing** [10] - 243:15, 251:19, 254:11, 286:2, 298:15, 304:5, 306:20, 313:2, 323:2, 335:11
**handle** [1] - 347:8
**handled** [1] - 261:22
**handling** [2] - 250:25, 378:18
**handouts** [1] - 374:19
**hands** [1] - 324:4
**handshake** [1] - 363:4
**handwriting** [5] - 330:14, 332:4, 332:18, 334:5, 334:22
**handwritten** [1] - 291:1
**handy** [1] - 298:20
**hang** [1] - 281:19
**happy** [1] - 239:14
**hard** [2] - 328:15, 372:21
**harm** [1] - 265:7
**harmed** [2] - 265:5, 265:24
**harms** [1] - 265:6
**hash** [1] - 301:23
**hash-marked** [1] - 301:23
**hate** [1] - 279:24
**head** [11] - 254:7, 258:24, 267:5, 270:1, 271:20, 292:24, 296:25, 308:16, 319:18, 376:16, 382:16
**header** [1] - 264:14
**heads** [3] - 302:5, 302:11, 302:16
**headset** [2] - 373:20, 373:22
**healing** [1] - 266:2
**health** [2] - 265:5, 266:2
**hear** [5] - 315:19, 363:12, 364:8, 371:25, 372:11
**heart** [1] - 338:6
**hEENT** [1] - 333:16
**held** [1] - 360:12
**hello** [1] - 294:15
**help** [9] - 271:16, 276:15, 302:3, 306:7, 306:9, 311:22, 333:21, 365:23, 366:18
**helpful** [3] - 280:4, 320:23, 382:12
**helps** [1] - 271:6
**hereby** [2] - 383:2, 385:5
**HH** [1] - 384:15
**Hi** [2] - 304:22, 343:5
**HILLSBOROUGH** [2] - 384:5, 385:4
**himself** [1] - 361:17
**hindsight** [2] - 347:6
**hired** [1] - 261:4
**historical** [1] - 278:21
**hit** [2] - 288:13, 368:17
**hold** [1] - 323:6
**holding** [1] - 287:7
**holds** [1] - 287:8
**home** [50] - 261:2, 261:5, 276:6, 276:17, 276:25, 277:9, 281:6, 282:16, 282:19, 283:8, 283:9, 283:12, 283:14, 283:15, 283:17, 284:14, 284:23, 286:20, 290:22, 291:2, 291:3, 291:16, 292:18, 292:22, 293:1, 293:10, 303:14, 303:23, 306:11, 308:10, 308:14, 308:17, 308:20, 308:25, 332:22, 337:2, 341:23, 346:9, 348:17, 348:21, 348:22, 349:7, 351:15, 351:21, 352:6, 352:8, 373:14, 374:17, 374:22
**homework** [2] - 381:12, 381:13
**honest** [4] - 279:1, 281:9, 281:12, 281:13
**honoring** [1] - 266:2
**hooking** [1] - 357:21
**Hospital** [1] - 362:9
**hospital** [9] - 250:11, 274:9, 313:17, 319:23, 320:3, 321:11, 321:23, 324:13, 325:15
**hospitalized** [1] - 314:5
**hospitals** [1] - 347:10
**hour** [1] - 351:11
**hours** [27] - 241:17, 246:11, 268:25, 269:2, 279:3, 293:10, 293:23, 328:11, 328:25, 343:7, 343:9, 343:25, 344:3, 344:5, 345:11, 345:17, 345:24, 346:10, 346:12, 347:1, 350:19, 351:3, 351:14, 351:21, 352:7
**HR** [41] - 241:12, 244:24, 245:1, 245:5, 245:6, 245:7, 245:8, 247:10, 247:19, 248:6, 249:17, 252:17, 253:9, 253:12, 253:15, 253:21, 253:22, 255:8, 256:2, 256:6, 256:14, 256:18, 257:8, 257:12, 258:9, 260:12, 260:18, 260:19, 302:13, 302:16, 311:21, 316:6, 321:12, 362:24, 364:11, 364:14, 367:4, 367:5, 367:6, 367:10
**HR's** [1] - 252:12
**Huffman** [1] - 350:17
**Human** [8] - 240:14, 247:25, 248:20, 250:24, 264:12, 272:2, 272:4, 324:16
**humiliation** [1] - 311:17
**hunt** [2] - 367:18, 368:6

## I

**ice** [2] - 296:25, 297:2
**idea** [4] - 251:16, 253:14, 316:4, 338:18
**ideas** [2] - 303:5, 306:5
**identification** [22] - 243:18, 245:16, 251:23, 254:16, 262:1, 263:24, 280:8, 298:18, 304:9, 306:23, 313:6, 323:5, 329:18, 332:7, 335:15, 342:11, 347:21, 353:22, 358:19, 370:4, 376:18, 379:12
**identified** [1] - 303:18
**identify** [4] - 276:11, 327:13, 327:14, 382:2
**identifying** [1] - 311:24
**identifying/implementing** [1] - 302:4
**II** [5] - 234:10, 235:12, 386:9, 386:14, 387:3
**ill** [1] - 371:14
**illness** [3] - 241:24, 241:25, 358:7
**illnesses** [1] - 322:6
**immediately** [1] - 356:14
**immune** [1] - 367:22
**imply** [1] - 268:9
**improvements** [4] - 329:25, 331:7, 331:8, 331:11
**IN** [2] - 386:9, 387:2
**in-office** [3] - 280:17, 315:16, 315:22
**inaccurate** [1] - 247:3
**inch** [1] - 372:24
**included** [2] - 252:7, 276:17
**including** [1] - 363:2
**increased** [1] - 333:16
**indented** [2] - 321:5, 321:8
**independent** [6] - 270:23, 271:2, 271:9, 272:7, 305:13, 305:23
**INDEX** [3] - 236:1, 236:3, 237:1
**indicated** [6] - 316:18, 337:24, 340:2, 352:5, 363:14, 363:20
**indicates** [2] - 349:2, 354:10
**indicating** [1] - 262:14
**Indicating** [3] - 252:14, 330:7, 336:18
**individual** [1] - 269:14
**indoor** [3] - 329:25, 331:9, 331:18
**industrial** [1] - 299:25
**ineffective** [1] - 374:11

**inferring** [1] - 359:12
**info** [3] - 307:24, 309:16, 310:16
**information** [18] - 240:16, 240:18, 245:9, 251:7, 251:17, 252:10, 255:8, 257:12, 259:19, 259:23, 260:5, 260:7, 291:8, 312:1, 327:10, 328:4, 329:3, 377:21
**informed** [4] - 310:17, 321:12, 350:16, 363:22
**informing** [1] - 351:1
**Ingram** [1] - 304:18
**initials** [3] - 334:7, 336:2, 348:5
**inkling** [1] - 331:5
**inpatient** [1] - 250:8
**input** [2] - 306:5, 362:9
**inside** [5] - 337:22, 337:25, 339:22, 340:13, 340:17
**insignificant** [2] - 274:16, 274:18
**instances** [1] - 292:5
**integrates** [1] - 377:20
**intentional** [1] - 244:7
**interactive** [1] - 317:14
**interested** [1] - 385:10
**interim** [1] - 242:23
**interject** [1] - 265:10
**interrupted** [1] - 364:5
**introduce** [1] - 372:4
**introduced** [1] - 377:17
**introduction** [1] - 377:18
**involved** [5] - 247:20, 251:6, 269:9, 269:11, 361:9
**IPC** [3] - 282:17, 292:1
**isolation** [2] - 305:12
**issue** [3] - 307:22, 309:15, 355:11
**issued** [3] - 349:16, 350:2, 352:14
**issues** [3] - 258:2, 265:5, 265:10
**itself** [2] - 256:18, 257:1
**IWT** [1] - 378:8

## J

**James** [6] - 235:1, 295:6, 295:7, 386:12, 386:20, 387:25
**james@smkfirm.com** [4] - 235:4, 386:12, 386:20, 387:25
**January** [25] - 234:12, 298:24, 299:6, 300:18, 303:11, 303:12, 303:14, 303:15, 304:3, 304:15, 305:15, 305:24, 308:3, 308:6, 308:9, 309:1, 309:5, 310:8, 332:15, 332:18, 335:7, 383:7, 384:9, 384:11, 385:11
**Jeffrey** [1] - 253:4
**jerk** [1] - 285:23
**Jerry** [1] - 350:17
**Jo** [2] - 261:3, 261:10
**job** [13] - 274:18, 274:19, 274:20, 274:21, 274:24, 322:10, 326:2, 328:10, 328:17, 355:1, 373:5, 374:5, 374:6
**jobs** [1] - 274:20
**jogs** [1] - 271:14
**John** [11] - 298:25, 304:17, 307:8, 313:13, 316:4, 320:10, 323:17, 343:15, 346:2, 346:6, 346:20
**Jordan** [1] - 261:6
**July** [1] - 377:10
**jump** [1] - 381:11
**June** [9] - 245:22, 264:16, 264:24, 332:14, 365:25, 366:1, 366:5, 368:22, 377:10

## K

**Kasimati** [1] - 235:2
**keep** [7] - 295:1, 298:19, 298:20, 324:3, 325:20, 326:4, 344:25
**Keith** [1] - 369:12
**Kelly** [1] - 302:20
**Kennedy** [1] - 261:9
**Kerrie** [11] - 248:10, 335:25, 348:4, 352:13, 354:2, 356:22, 357:4, 357:6, 365:17, 371:15, 372:3
**key** [1] - 291:8
**kind** [13] - 255:2, 263:7, 286:9, 296:24, 297:1, 300:4, 300:15, 300:17, 301:23, 311:24, 339:3, 344:21, 382:11
**Klemawesch** [13] - 236:24, 299:19, 299:22, 300:24, 307:17, 307:18, 310:17, 329:12, 329:21, 329:24, 330:16, 330:24, 331:22
**knee** [1] - 285:23
**knowing** [1] - 294:18
**knowledge** [4] - 245:10, 259:24, 264:20, 331:15

## L

**labeled** [1] - 254:13
**Labor** [4] - 236:25, 306:5, 329:21, 379:14
**lack** [1] - 371:4
**language** [1] - 370:20
**large** [1] - 299:9
**larger** [1] - 337:19
**last** [15] - 238:21, 239:3, 252:21, 255:4, 266:25, 284:2, 314:16, 320:9, 330:6, 340:10, 341:13, 366:15, 366:17, 370:22, 371:17
**laugh** [1] - 255:24
**laughed** [1] - 255:22
**lawyer** [1] - 336:19
**lawyers** [2] - 376:22, 380:14
**leader** [1] - 371:5
**learn** [2] - 244:20, 379:2
**learned** [4] - 242:12, 243:6, 243:8, 379:1
**learning** [2] - 242:23, 244:22
**least** [6] - 264:15, 276:14, 311:21, 343:12, 346:25, 349:16
**leave** [55] - 240:5, 240:13, 240:25, 241:8, 241:16, 241:17, 241:20, 241:23, 242:4, 242:5, 242:15, 242:25, 243:2, 243:7, 243:9, 243:10, 244:2, 245:3, 246:15, 246:19, 246:25, 248:23, 249:1, 249:2, 250:16, 263:5, 263:9, 264:5, 267:2, 267:11, 267:17, 268:4, 268:13, 269:6, 270:9, 270:14, 270:20, 271:3, 294:14, 310:7, 322:8, 322:24, 323:24, 324:8, 325:18, 325:25, 341:19, 341:20, 348:20, 351:16, 352:24, 367:7, 371:3
**Leave** [2] - 262:21, 262:24
**leaving** [3] - 331:4, 346:8, 351:10
**left** [4] - 332:13, 336:2, 336:3, 343:12
**legible** [3] - 286:4, 286:6, 333:19
**lengthy** [1] - 342:13
**less** [4] - 251:5, 296:7
**Letter** [1] - 235:16
**letter** [12] - 320:5, 324:16, 325:5, 325:6, 330:23, 331:7, 331:25, 333:20, 334:6, 334:8, 334:9, 334:11
**letters** [4] - 236:24, 329:20, 330:15, 350:10
**letting** [2] - 254:24, 276:1
**library** [1] - 282:7
**lift** [1] - 367:25
**likelihood** [1] - 286:21
**limit** [3] - 308:4, 310:5, 352:23
**Line** [1] - 387:5
**line** [11] - 252:14, 307:11, 323:20, 324:14, 344:20, 345:2, 345:5, 361:15, 361:16, 382:9
**lines** [2] - 366:20, 371:1
**list** [2] - 303:18, 337:3
**listed** [4] - 304:13, 307:5, 381:25, 386:16
**lists** [1] - 281:4
**literally** [3] - 279:21, 294:5, 294:6
**live** [1] - 378:9
**loading** [1] - 294:4
**located** [7] - 282:20, 282:24, 337:18, 337:21, 338:19, 338:23, 339:22
**location** [4] - 277:21, 282:16, 283:1, 290:4
**look** [30] - 245:18, 246:19, 246:25, 248:12, 294:10, 294:12, 297:13, 299:1, 303:11, 312:17, 313:18, 315:2, 315:3, 321:3, 321:7, 323:1, 332:12, 332:13, 335:17, 341:14, 341:15, 344:18, 353:14, 355:4, 355:7, 355:23, 367:4, 377:1, 382:22
**looked** [2] - 323:23, 340:20
**looking** [23] - 256:6, 256:14, 256:15, 256:17, 269:17, 270:7, 270:13, 270:22, 271:19, 272:5, 272:10, 286:23, 305:11, 306:14, 312:25, 314:15, 321:16, 334:9, 345:14, 353:17, 356:21, 357:8, 381:16
**looks** [8] - 264:15, 302:18, 311:20, 332:25, 333:15, 348:5, 348:7, 357:6

**loss** [1] - 267:3
**lucky** [1] - 364:24
**lunch** [1] - 323:10

## M

**M-S** [1] - 356:2
**ma'am** [1] - 257:16
**machine** [1] - 330:21
**Maharaj** [4] - 235:2, 235:2, 386:21, 387:25
**MAHARAJ** [4] - 325:22, 330:7, 336:18, 376:16
**mail** [19] - 277:18, 282:16, 286:8, 286:9, 286:12, 286:14, 286:15, 286:19, 286:23, 286:25, 287:3, 287:6, 294:8, 294:9, 294:10, 294:11, 378:18
**maker** [1] - 269:6
**man** [3] - 324:20, 344:21, 363:12
**management** [3] - 243:11, 324:22, 378:18
**management's** [2] - 324:10, 324:18
**Manager** [1] - 261:3
**manner** [2] - 272:22, 274:23
**March** [12] - 252:12, 252:17, 253:9, 260:17, 260:20, 261:11, 261:17, 261:20, 338:17, 340:6, 341:10, 343:19
**marginal** [2] - 272:22, 274:11
**marked** [46] - 243:15, 243:17, 245:12, 245:15, 251:19, 251:22, 254:12, 254:15, 261:23, 261:25, 263:23, 280:5, 280:7, 298:16, 298:17, 300:19, 301:23, 304:5, 304:8, 306:20, 306:22, 313:2, 313:5, 323:2, 323:4, 323:12, 329:14, 329:17, 332:4, 332:6, 335:11, 335:14, 342:7, 342:10, 347:19, 347:20, 353:18, 353:21, 358:15, 358:18, 369:23, 370:3, 376:14, 376:17, 379:9, 379:11
**MARKED** [1] - 236:2
**married** [5] - 285:5, 286:5, 286:16, 286:19, 287:6
**marry** [1] - 286:14
**marrying** [11] - 276:13, 276:16, 277:8, 277:18, 278:2, 278:10, 278:23, 280:18, 281:5, 285:6, 296:6
**Mary** [3] - 255:2, 261:3, 261:10
**mask** [8] - 273:12, 299:24, 300:1, 300:4, 311:23, 311:24, 311:25, 312:4
**masks** [1] - 300:6
**master** [1] - 377:23
**matching** [1] - 280:1
**material** [1] - 355:13
**Matt** [5] - 361:9, 361:10, 361:11, 361:21, 362:3
**McBurrough** [14] - 236:5, 244:13, 267:19, 271:25, 272:9, 298:25, 302:18, 304:17, 307:8, 313:12, 337:18, 338:23, 339:6, 350:17
**McDonnough** [6] - 234:6, 361:14, 372:6, 372:13, 386:6, 387:2
**mean** [17] - 251:14, 267:10, 267:24, 279:9, 282:1, 283:1, 288:7, 300:5, 307:24, 327:5, 339:17, 346:17, 357:23, 359:21, 361:23, 365:17, 369:2
**meaningful** [1] - 274:25
**medical** [14] - 250:6, 252:7, 253:1, 253:25, 257:12, 258:2, 263:12, 286:11, 326:20, 326:23, 326:25, 327:3, 358:8, 374:18
**meet** [12] - 276:9, 278:14, 306:6, 354:16, 355:24, 363:4, 363:5, 363:8, 363:12, 364:3, 364:23, 364:24
**meeting** [21] - 266:20, 355:3, 360:6, 360:12, 361:3, 362:5, 364:15, 365:16, 365:18, 366:11, 366:13, 367:18, 368:11, 368:15, 368:21, 370:11, 370:15, 370:16, 370:25, 371:9, 371:11
**meetings** [4] - 337:15, 365:20, 365:21, 366:6
**memo** [8] - 320:10, 320:12, 322:15, 323:23, 324:7, 324:18, 324:25, 325:17
**Memo** [1] - 236:5
**memorandum** [1] - 243:25
**memorialize** [1] - 346:15
**memorializing** [1] - 346:19
**memories** [1] - 313:10
**memory** [21] - 239:8, 239:9, 246:13, 252:20, 260:21, 271:6, 271:14, 272:7, 277:21, 286:15, 290:16, 301:10, 308:16, 319:7, 322:20, 325:11, 331:4, 338:3, 344:2, 344:4, 359:18
**mention** [1] - 299:12
**mentioned** [4] - 250:17, 255:17, 346:1, 355:15
**mentioning** [1] - 371:21
**mentions** [1] - 267:1
**mentor** [2] - 355:4, 373:14
**met** [2] - 363:21, 366:17
**MIDDLE** [2] - 234:1, 386:1
**middle** [3] - 321:5, 321:7, 333:5
**midst** [1] - 369:14
**might** [7] - 256:16, 264:7, 275:16, 292:7, 306:2, 326:3, 327:22
**Mike** [1] - 308:17
**mind** [4] - 247:11, 294:2, 372:6, 379:7
**minimize** [1] - 299:22
**minus** [2] - 333:15
**minute** [13] - 245:18, 256:11, 260:2, 280:13, 288:19, 288:22, 328:7, 328:8, 330:3, 331:14, 358:12, 372:2, 378:9
**minutes** [13] - 279:3, 294:6, 294:13, 294:16, 294:24, 295:8, 295:18, 296:5, 296:9, 296:10, 296:13, 297:8
**misprints** [1] - 285:17
**missing** [6] - 285:24, 297:25, 344:16, 345:15, 345:18, 345:19
**mistake** [1] - 351:4
**modification** [18] - 275:7, 275:12, 275:19, 275:20, 322:9, 343:8, 343:10, 343:14, 343:18, 343:23, 344:13, 345:12, 345:13, 346:2, 346:5, 346:6, 346:20
**modifications** [7] - 275:5, 275:8, 276:2, 325:25, 337:1, 337:4, 337:7
**modified** [2] - 321:13, 322:5
**modify** [4] - 272:23, 272:24, 275:3, 275:10
**Moffitt** [2] - 255:3, 256:1
**moment** [16] - 240:8, 254:5, 254:8, 259:13, 266:4, 266:22, 268:7, 271:8, 273:14, 306:10, 308:16, 313:8, 368:16, 369:24, 372:7
**moments** [1] - 364:16
**Monday** [5] - 325:10, 326:13, 326:17, 349:8, 354:11
**Mondays** [1] - 348:17
**money** [2] - 269:20, 269:22
**month** [2] - 309:5, 309:8
**monthly** [3] - 277:13, 278:5, 278:13
**morning** [6] - 238:7, 238:25, 313:16, 313:21, 316:8, 316:14
**most** [3] - 290:7, 296:11, 373:2
**mostly** [2] - 251:13, 360:3
**mother** [2] - 255:1, 255:25
**move** [4] - 298:13, 337:16, 338:7, 339:10
**moved** [1] - 292:12
**movement** [2] - 276:12, 276:13
**moving** [5] - 290:16, 291:20, 292:14, 338:16, 342:3
**MR** [28] - 238:6, 247:5, 247:11, 247:13, 247:15, 257:2, 257:4, 266:9, 266:12, 273:15, 273:19, 298:6, 298:10, 325:22, 330:7, 334:15, 334:18, 334:24, 335:2, 336:18, 352:20, 359:24, 376:16, 380:9, 381:4, 382:16, 382:19, 382:21
**Mullin** [36] - 235:12, 236:11, 236:14, 236:15, 236:17, 236:19, 236:21, 238:7, 254:9, 254:18, 266:13, 274:17, 298:12, 298:25, 321:11, 321:22, 322:7, 322:10, 325:8, 326:1, 326:19, 332:12, 333:11, 334:19, 335:4, 337:1, 360:2, 372:4, 380:12, 384:8, 385:6, 386:9, 386:11, 387:2, 387:3, 387:23
**MULLIN** [4] - 234:3, 234:10, 238:2, 386:3
**Mullin's** [2] - 370:23, 371:7
**multiple** [1] - 263:15
**mush** [1] - 319:4
**must** [8] - 281:25, 282:15, 284:8, 284:16, 287:10, 290:19, 290:20, 371:20

## N

**name** [3] - 261:6, 283:25, 334:7
**Natalie** [2] - 261:9, 261:10
**near** [1] - 339:6

**necessarily** [4] - 278:12, 278:14, 279:11, 291:11
**need** [24] - 247:13, 254:5, 259:5, 288:15, 289:11, 295:6, 299:24, 301:13, 302:3, 306:7, 307:14, 310:24, 312:12, 323:1, 325:2, 326:5, 342:23, 349:13, 355:24, 358:8, 373:24, 374:5, 374:6, 374:21
**needed** [29] - 240:15, 250:6, 284:19, 287:11, 287:24, 288:5, 288:20, 291:7, 295:3, 295:22, 300:16, 300:20, 300:22, 301:16, 306:9, 307:24, 309:17, 310:16, 312:14, 312:16, 326:6, 326:20, 328:11, 355:1, 367:8, 372:24, 373:4, 375:3
**needing** [2] - 372:24, 375:10
**needs** [5] - 291:24, 329:1, 358:8, 374:1, 374:6
**never** [28] - 245:7, 250:19, 251:14, 257:8, 260:10, 265:16, 275:14, 279:1, 279:2, 279:3, 293:17, 293:23, 308:7, 308:12, 311:23, 318:24, 340:14, 340:15, 340:19, 341:2, 341:5, 341:22, 342:1, 349:4, 358:9, 358:11, 379:7
**new** [3] - 238:25, 337:19, 364:7
**Next** [1] - 282:14
**next** [29] - 244:9, 277:21, 278:11, 282:14, 284:7, 285:8, 286:3, 286:8, 287:9, 289:6, 290:5, 290:6, 291:9, 291:22, 292:3, 292:10, 292:17, 297:7, 299:21, 304:25, 307:21, 316:23, 321:21, 322:3, 332:18, 333:11, 333:18, 337:13, 361:21
**night** [2] - 316:11, 316:16
**NO** [2] - 234:5, 386:5
**NONE** [1] - 236:2
**nonresponse** [4] - 255:13, 255:14, 255:15, 312:13
**North** [3] - 234:15, 235:3, 235:8
**NOT** [1] - 387:1
**Notary** [4] - 234:19, 384:7, 384:15, 385:14
**note** [2] - 237:3, 334:18
**noted** [1] - 357:5
**notes** [7] - 321:22, 322:3, 327:7, 329:24, 330:20, 338:15, 385:8
**nothing** [4] - 265:16, 303:6, 319:16, 337:9
**Notice** [2] - 237:15, 379:14
**notice** [1] - 273:1
**notification** [2] - 264:3, 287:2
**notified** [1] - 242:18
**November** [1] - 309:21
**number** [12] - 252:12, 253:16, 269:8, 269:10, 275:8, 281:4, 293:11, 297:15, 303:5, 320:20, 328:25
**numbered** [2] - 243:20, 313:4

## O

**Oath** [1] - 235:14
**OATH** [1] - 384:1
**oath** [6] - 238:4, 238:21, 238:24, 239:1, 380:17, 381:24
**objection** [2] - 247:5, 352:20
**obtain** [3] - 337:24, 340:3, 340:4
**obtaining** [2] - 339:25, 340:25
**obviously** [1] - 285:22
**occasion** [3] - 286:17, 286:24, 294:7
**occasions** [1] - 287:1
**Occupational** [2] - 237:15, 379:15
**occurred** [1] - 258:16
**OF** [11] - 234:1, 234:7, 234:9, 384:1, 384:4, 384:5, 385:1, 385:3, 385:4, 386:1, 386:7
**offensive** [1] - 382:2
**offering** [1] - 371:2
**offhand** [1] - 297:15
**Office** [9] - 235:7, 348:19, 354:15, 360:14, 360:19, 360:24, 371:6, 371:10, 374:7
**OFFICE** [1] - 234:14
**office** [27] - 250:3, 276:25, 277:5, 277:12, 277:24, 278:1, 280:17, 282:10, 283:5, 284:9, 284:17, 284:25, 285:10, 285:20, 291:12, 315:16, 315:22, 328:19, 328:24, 330:17, 343:13, 349:9, 350:18, 351:2, 351:21, 352:7, 372:7
**Officer** [6] - 277:15, 278:14, 288:17, 290:8, 373:15, 373:25
**Officers** [2] - 278:7, 289:2
**often** [1] - 294:9
**oiy** [1] - 342:16
**old** [4] - 337:17, 337:22, 338:17, 373:21
**ON** [1] - 387:1
**on-page** [1] - 358:16
**once** [7] - 250:20, 279:23, 289:4, 289:20, 297:23, 344:21, 386:16
**oncologist** [2] - 254:24, 261:8
**oncologists** [2] - 249:15, 253:5
**One** [1] - 327:7
**one** [78] - 238:25, 239:5, 243:20, 244:3, 249:15, 253:1, 253:5, 254:2, 255:4, 256:1, 256:3, 257:17, 263:15, 263:18, 263:19, 263:21, 264:6, 265:11, 265:21, 266:21, 266:23, 268:2, 272:11, 275:7, 276:14, 277:10, 278:10, 278:11, 278:17, 279:23, 280:5, 280:20, 287:21, 289:15, 292:14, 296:24, 300:16, 301:13, 302:15, 311:9, 311:14, 313:3, 315:18, 316:7, 323:6, 324:3, 327:1, 327:23, 327:24, 328:2, 328:9, 328:10, 330:4, 330:20, 332:14, 333:15, 336:16, 339:7, 345:15, 345:19, 348:4, 348:9, 352:17, 354:2, 354:10, 355:7, 358:9, 361:4, 362:10, 364:23, 365:14, 366:14, 372:4, 381:7
**one-on-one** [1] - 355:7
**one-page** [4] - 243:20, 263:21, 280:5, 313:3
**ones** [4] - 278:12, 314:16, 314:25, 320:5
**ongoing** [2] - 238:24, 380:18
**onset** [2] - 330:1, 331:9
**open** [2] - 296:21, 296:22
**operations** [1] - 300:1
**opinion** [2] - 261:23, 330:23
**opportunists** [1] - 256:16
**opportunity** [4] - 256:18, 257:1, 326:19, 363:8
**option** [1] - 315:17
**options** [3] - 311:16, 314:12, 314:13
**order** [3] - 265:9, 347:14, 374:6
**ordering** [2] - 386:16, 386:16
**organize** [1] - 283:16
**organized** [2] - 283:20, 284:4
**original** [1] - 386:15
**originally** [1] - 377:20
**originated** [3] - 244:5, 244:8, 293:14
**originator** [1] - 250:21
**ors** [1] - 278:12
**otherwise** [2] - 273:25, 357:5
**outlined** [1] - 314:19
**outpatient** [2] - 250:9, 250:10
**output** [1] - 277:8
**outside** [5] - 276:9, 294:24, 303:9, 337:23, 354:17
**outspoken** [2] - 371:13, 371:14
**outstanding** [1] - 286:23
**oversee** [1] - 367:5
**oversight** [2] - 367:11, 367:12
**OWCP** [2] - 370:23, 371:7
**own** [2] - 301:25
**oxygen** [8] - 361:21, 361:23, 361:24, 362:5, 362:12, 362:14

## P

**P.A** [1] - 235:2
**p.m** [16] - 234:13, 298:8, 298:9, 315:8, 334:16, 334:17, 334:25, 335:1, 359:25, 360:1, 370:18, 380:10, 380:11, 380:16, 383:7, 383:8
**packed** [2] - 306:12, 306:16
**page** [24] - 243:20, 245:13, 252:11, 252:21, 263:21, 280:5, 313:3, 321:3, 321:8, 329:15, 329:22, 330:3, 332:12, 333:12, 333:18, 334:20, 334:22, 335:12, 344:2, 358:16, 379:21, 380:2, 381:11, 381:15
**PAGE** [1] - 235:12
**Page** [23] - 236:1, 236:3, 237:1, 239:21, 239:25, 240:19, 246:8, 252:11, 266:16, 266:18, 268:13, 270:6, 270:7, 270:21, 271:3, 272:12, 273:25, 294:19, 345:1, 345:6, 358:9, 381:17, 387:5

**pages** [10] - 252:17, 279:22, 285:24, 286:6, 294:19, 296:12, 321:2, 379:24, 385:7, 386:14
**Pages** [2] - 234:22, 380:5
**paid** [2] - 265:17, 270:2
**pain** [3] - 334:2, 334:3
**Palmer** [1] - 308:17
**Paonessa** [1] - 253:4
**paper** [13] - 255:3, 275:25, 276:12, 279:18, 288:9, 288:14, 290:24, 291:1, 291:3, 296:6, 357:11, 357:12, 373:17
**paperless** [8] - 276:2, 278:18, 293:3, 304:2, 353:16, 355:22, 358:25, 359:4
**paragraph** [19] - 240:1, 240:13, 266:19, 266:20, 266:24, 281:3, 281:24, 293:9, 299:9, 299:13, 299:21, 322:3, 322:11, 322:12, 322:16, 322:18, 325:7, 343:7, 370:22
**paragraphs** [3] - 301:22, 310:9, 377:24
**paraphrase** [1] - 274:17
**paraphrasing** [3] - 274:15, 366:25, 367:1
**park** [2] - 297:15, 365:24
**part** [24] - 250:23, 262:24, 275:1, 276:12, 279:5, 284:12, 289:25, 294:23, 298:2, 320:24, 322:21, 340:11, 342:1, 342:2, 342:3, 342:4, 351:11, 351:12, 355:3, 360:15, 361:17, 364:8, 368:5, 376:21
**participating** [1] - 379:5
**particles** [1] - 300:6
**particular** [8] - 260:16, 267:14, 275:12, 287:21, 311:6, 317:11, 317:21, 337:6
**parties** [2] - 385:9, 386:16
**parties'** [1] - 385:9
**parts** [3] - 274:17, 274:24, 377:21
**party** [2] - 291:9, 386:16
**pass** [1] - 297:23
**passed** [1] - 277:20
**pastes** [1] - 347:14
**pasting** [1] - 347:16
**patently** [1] - 340:10
**path** [1] - 250:14
**pause** [1] - 247:6
**pay** [6] - 265:16, 267:3, 269:24, 323:8, 375:1, 375:2
**paycheck** [2] - 269:19
**penalties** [1] - 387:21
**people** [17] - 250:24, 255:2, 256:1, 261:19, 269:8, 269:10, 283:11, 287:22, 294:15, 299:25, 303:17, 311:3, 340:25, 368:19, 371:14, 371:18, 378:20
**per** [8] - 295:10, 295:13, 296:9, 296:13, 296:15, 297:9, 297:10, 337:3
**percent** [7] - 259:17, 277:2, 301:11, 312:5, 312:21, 356:5, 362:25
**perform** [4] - 322:10, 326:2, 336:12, 348:13
**period** [8] - 268:22, 268:24, 269:1, 269:3, 269:24, 309:3, 347:7, 374:8
**periods** [2] - 332:23, 332:24
**perjury** [1] - 387:21
**permission** [2] - 263:8, 263:11
**permit** [1] - 361:18
**permitted** [2] - 354:10, 360:19
**person** [8] - 259:15, 259:16, 276:11, 283:20, 283:22, 286:3, 292:3, 297:7
**personal** [1] - 313:14
**personally** [1] - 384:8
**perusing** [15] - 240:10, 244:3, 245:20, 252:25, 262:2, 263:25, 268:11, 272:17, 280:22, 288:19, 304:10, 323:19, 329:23, 332:11, 370:8
**Perusing** [36] - 243:19, 245:17, 251:24, 254:17, 266:23, 268:3, 271:15, 298:22, 299:3, 306:24, 307:2, 310:19, 313:7, 315:10, 320:22, 323:14, 325:19, 325:23, 329:19, 332:8, 333:8, 333:10, 335:16, 335:19, 338:7, 342:12, 344:16, 344:25, 347:22, 353:23, 358:20, 370:5, 376:19, 376:24, 379:13, 381:18
**Petersburg** [1] - 348:19
**pgs** [1] - 386:14
**Phillip** [2] - 245:22, 323:16
**phone** [5] - 248:16, 253:16, 259:14, 324:16, 373:23
**phonetic** [2] - 277:20, 356:25
**physical** [5] - 276:12, 276:17, 277:9, 281:6, 284:24
**physically** [2] - 290:2, 319:22
**physician** [1] - 337:25
**pick** [5] - 276:8, 344:21, 354:17, 380:15, 380:20
**picked** [3] - 289:24, 290:17, 295:23
**piece** [8] - 256:8, 286:25, 288:9, 290:23, 291:1, 296:6, 297:25, 357:11
**pieces** [3] - 291:3, 357:12, 373:21
**PLACE** [1] - 234:14
**place** [7] - 239:12, 290:6, 322:9, 326:1, 326:4, 353:13, 373:25
**placed** [10] - 284:9, 284:17, 322:8, 323:24, 324:8, 337:19, 337:20, 338:22, 339:10
**Plaintiff** [3] - 234:4, 267:4, 386:4
**PLAINTIFF** [1] - 235:1
**Plaintiff's** [1] - 267:2
**PLAINTIFF'S** [1] - 236:1
**plan** [3] - 363:2, 363:3, 364:7
**plus** [1] - 333:15
**POA** [7] - 288:17, 288:18, 289:1, 289:8, 289:12, 289:14, 290:10
**point** [30] - 239:11, 242:14, 262:19, 264:18, 275:25, 276:24, 277:22, 294:21, 300:3, 300:15, 300:18, 302:10, 302:17, 311:20, 311:25, 314:10, 314:14, 315:13, 315:21, 317:9, 320:4, 321:21, 331:16, 337:11, 339:14, 359:10, 359:11, 360:21, 368:9, 370:12
**pointed** [1] - 253:20
**pointing** [1] - 336:19
**points** [2] - 321:6, 343:16
**position** [2] - 336:13, 348:14
**positive** [1] - 310:8
**possibilities** [1] - 317:23
**possibility** [1] - 315:22
**possible** [2] - 253:12, 327:7
**pounced** [2] - 256:19, 256:21
**POW** [5] - 337:17, 338:17, 338:19, 338:20, 342:3
**power** [1] - 279:11
**Power** [1] - 289:1
**premature** [1] - 322:6
**prescribed** [2] - 300:25, 337:25
**prescription** [5] - 301:3, 301:7, 301:15, 333:23, 333:24
**present** [2] - 319:23, 383:3
**presented** [2] - 256:18, 257:1
**President** [2] - 302:21, 362:23
**presumably** [3] - 244:13, 370:24, 371:8
**prevent** [8] - 276:2, 330:1, 331:9, 367:20, 370:11, 370:25, 371:8, 371:11
**preventing** [1] - 370:15
**previous** [6] - 247:9, 247:16, 250:17, 255:11, 350:20, 354:7
**previously** [3] - 238:3, 276:21, 276:23
**print** [11] - 276:6, 283:8, 283:9, 283:14, 288:7, 288:13, 296:22, 337:21, 337:23, 339:22
**printed** [23] - 277:19, 279:20, 279:22, 282:15, 284:8, 284:16, 284:18, 284:20, 284:23, 285:3, 285:8, 285:14, 286:4, 288:6, 288:8, 288:15, 288:20, 289:10, 289:20, 294:17, 295:2, 295:4
**printer** [16] - 279:20, 282:16, 282:19, 283:10, 283:12, 283:15, 283:17, 294:14, 337:21, 339:22, 342:3, 374:21, 374:24, 375:7, 375:12, 375:15
**printers** [1] - 285:24
**printing** [3] - 289:4, 297:7, 355:13
**printouts** [1] - 374:19
**prisoner** [1] - 338:21
**private** [1] - 281:2
**privately** [1] - 372:10
**problem** [1] - 355:8
**problems** [3] - 259:8, 285:24
**process** [29] - 267:16, 267:20, 268:1, 268:7, 272:1, 274:21, 276:16, 276:20, 276:22, 277:8, 278:2, 278:23, 280:4, 280:17, 281:5, 284:12, 289:19, 293:8, 293:16, 293:19, 295:1, 295:16, 297:4, 297:23, 317:3, 317:7, 317:14, 318:1, 327:8
**processed** [7] - 267:3, 268:9, 268:10, 270:10, 270:16, 293:11, 367:8
**processes** [1] - 367:13
**processing** [3] - 239:9, 247:18, 271:22
**producing** [2] - 297:11, 297:12

**production** [1] - 376:22
**Professional** [1] - 386:18
**Program** [2] - 262:21, 262:24
**program** [2] - 263:3, 270:10
**projected** [1] - 338:15
**promptly** [2] - 267:3, 268:9
**protect** [2] - 312:14, 312:16
**protection** [1] - 312:12
**protocol** [1] - 263:7
**provide** [18] - 245:6, 245:9, 247:11, 267:21, 311:6, 327:11, 328:13, 339:10, 354:17, 356:4, 362:4, 362:12, 362:14, 363:7, 374:24, 375:6, 375:12, 375:15
**provided** [11] - 257:12, 326:19, 328:3, 330:21, 338:12, 341:10, 343:18, 348:22, 349:3, 349:6, 376:22
**provider's** [1] - 253:1
**providing** [3] - 338:1, 339:14, 356:1
**Pryor** [1] - 369:12
**PS** [1] - 306:16
**Public** [4] - 234:19, 384:7, 384:15, 385:14
**purifier** [4] - 330:20, 337:18, 337:20, 339:14
**purifiers** [2] - 339:11, 342:4
**purpose** [4] - 291:5, 325:21, 370:24, 371:8
**purposes** [1] - 311:2
**pursuant** [1] - 380:13
**put** [17] - 244:10, 262:17, 283:11, 284:22, 289:8, 292:24, 296:2, 298:3, 302:5, 302:16, 306:19, 322:9, 325:25, 339:4, 353:13, 372:5, 382:10
**putting** [4] - 290:1, 290:3, 302:11, 319:19

## Q

**QRT** [4] - 287:21, 287:24, 296:1, 296:23
**quality** [3] - 287:22, 327:18, 360:24
**questioning** [1] - 247:21
**questions** [3] - 266:8, 278:7, 302:25
**quite** [2] - 294:9, 317:15
**quote** [1] - 310:14

## R

**RA** [3] - 314:8, 370:23, 371:7
**raise** [1] - 355:11
**raised** [1] - 327:8
**raises** [1] - 381:6
**random** [1] - 286:17
**rare** [5] - 286:16, 286:17, 286:24, 287:1, 294:7
**rarely** [1] - 286:24
**rate** [1] - 338:6
**rather** [1] - 278:25
**Rather** [1] - 371:2
**rating** [5] - 279:22, 282:15, 293:10, 294:20, 377:24
**RE** [2] - 386:9, 387:2
**reach** [3] - 324:15, 327:14, 327:16
**reaching** [1] - 238:12
**Read** [1] - 235:16
**read** [20] - 240:8, 253:2, 266:22, 266:24, 271:5, 271:13, 271:15, 280:13, 280:22, 289:9, 289:10, 306:25, 307:2, 320:24, 322:21, 332:18, 342:19, 344:9, 386:14, 387:21
**reading** [12] - 276:4, 288:22, 330:3, 332:5, 334:21, 336:14, 336:22, 338:11, 344:25, 348:25, 383:4, 386:13
**ready** [3] - 297:6, 306:12, 306:17
**realize** [1] - 355:8
**really** [10] - 253:15, 256:24, 261:1, 296:23, 296:24, 303:13, 362:25, 378:10, 378:12, 381:12
**reason** [5] - 246:17, 247:2, 251:13, 290:25, 378:14
**Reason** [1] - 387:5
**reasonable** [8] - 302:4, 303:3, 303:19, 311:22, 314:2, 322:8, 325:25, 326:21
**reasons** [2] - 256:7, 256:14
**reassemble** [1] - 323:6
**reassign** [1] - 303:9
**reassigned** [2] - 303:14, 309:7
**recalled** [1] - 358:12
**receive** [4] - 242:9, 318:3, 318:8, 377:15
**received** [7] - 252:16, 264:15, 312:19, 327:10, 353:5, 355:10, 386:16
**receiving** [4] - 246:5, 338:3, 353:3, 379:4
**reception/secretary's** [1] - 339:3
**recipients** [3] - 236:15, 236:17, 236:22
**recognize** [15] - 243:23, 254:18, 254:19, 264:1, 264:2, 264:11, 280:23, 299:2, 304:7, 335:18, 335:19, 335:20, 358:21, 376:23, 376:24
**recollect** [4] - 268:6, 339:12, 339:13, 339:18
**recollecting** [1] - 298:2
**recollection** [18] - 259:21, 270:23, 271:2, 271:9, 273:2, 273:22, 274:2, 282:21, 283:8, 283:18, 289:19, 303:17, 305:14, 305:23, 310:2, 317:1, 317:20, 319:12
**recollections** [1] - 273:7
**recommend** [1] - 331:10
**recommendation** [1] - 310:17
**recommends** [1] - 330:16
**record** [53] - 249:9, 254:12, 261:23, 263:21, 266:9, 266:10, 266:11, 266:12, 269:17, 269:25, 270:22, 271:19, 272:6, 272:10, 273:16, 273:17, 273:18, 273:20, 278:21, 298:7, 298:8, 298:9, 298:11, 312:17, 313:1, 313:3, 314:15, 322:25, 323:12, 325:3, 329:15, 332:9, 334:15, 334:16, 334:17, 334:23, 334:25, 335:1, 335:3, 335:5, 335:12, 342:7, 345:21, 359:24, 359:25, 360:1, 360:3, 379:9, 380:9, 380:10, 380:11, 382:24, 385:7
**record's** [1] - 319:11
**records** [5] - 284:8, 284:11, 286:11, 297:13, 378:18
**recovered** [1] - 319:24
**recovery** [1] - 322:1
**rectal** [2] - 334:3, 334:4
**refer** [1] - 238:16
**reference** [10] - 240:4, 240:7, 268:13, 313:20, 333:20, 342:18, 345:11, 346:19, 374:20, 381:25
**referenced** [9] - 240:13, 270:21, 271:3, 271:18, 273:2, 273:24, 334:11, 380:6, 386:13
**references** [4] - 273:9, 275:2, 321:19, 341:7
**referencing** [3] - 247:2, 252:19, 267:8
**referring** [24] - 247:17, 262:11, 262:12, 275:1, 285:11, 300:1, 307:16, 310:3, 310:25, 320:15, 320:16, 321:14, 323:25, 327:1, 329:25, 330:10, 331:8, 336:3, 343:24, 344:14, 346:7, 370:12, 370:17, 380:24
**refers** [2] - 288:10, 338:20
**reflected** [1] - 317:19
**refresh** [2] - 246:13, 325:11
**refused** [1] - 272:22
**regard** [1] - 360:18
**regarding** [3] - 327:10, 362:19, 370:7
**regardless** [2] - 286:1, 324:7
**regards** [1] - 247:3
**Regional** [7] - 348:19, 354:15, 360:14, 360:19, 360:24, 371:6, 371:10
**regularly** [3] - 305:16, 305:19, 325:9
**Reilly** [11] - 245:22, 245:25, 247:20, 362:6, 362:23, 363:14, 363:20, 363:22, 364:10, 369:12, 370:18
**related** [12] - 241:24, 248:21, 252:1, 252:8, 257:21, 318:8, 320:12, 335:6, 362:19, 367:5, 367:6, 370:6
**relating** [1] - 279:18
**relationship** [1] - 362:8
**relative** [2] - 385:8, 385:9
**relayed** [3] - 259:19, 259:23, 260:5
**relaying** [1] - 262:4
**released** [1] - 319:23
**relief** [1] - 347:9
**relieved** [5] - 259:7, 314:18, 315:15, 315:18, 315:22
**relocation** [1] - 308:10
**remain** [1] - 321:25
**remainder** [1] - 348:21
**remained** [1] - 334:21
**remarks** [2] - 382:3, 382:4
**remember** [97] - 241:7, 241:8, 241:13, 242:12, 242:13, 244:22, 246:5, 249:19, 258:23, 259:3, 259:6, 259:10, 259:16, 263:6, 263:18, 267:15,

267:23, 268:6, 269:2, 270:19, 270:20, 271:16, 273:10, 279:15, 282:17, 282:18, 289:22, 289:24, 297:3, 301:21, 303:15, 304:11, 305:19, 305:24, 305:25, 306:4, 306:7, 306:8, 306:9, 307:9, 307:10, 309:8, 309:10, 309:19, 310:19, 314:22, 316:20, 317:6, 318:14, 318:19, 318:21, 318:22, 318:23, 318:25, 320:7, 320:9, 322:25, 327:22, 328:16, 328:19, 330:13, 343:20, 346:12, 346:13, 346:21, 346:22, 346:24, 349:10, 349:12, 349:13, 349:14, 353:5, 353:6, 353:14, 356:10, 356:16, 358:9, 359:15, 359:16, 360:9, 363:17, 363:18, 364:1, 365:2, 365:5, 365:8, 368:1, 368:17, 375:13, 377:5, 377:11, 377:12, 377:13, 380:17
**remind** [1] - 303:7
**removal** [1] - 240:17
**reorient** [1] - 335:9
**repeat** [1] - 253:18
**report** [4] - 348:18, 348:21, 354:15, 385:6
**reported** [2] - 373:4, 387:4
**REPORTER** [10] - 246:22, 248:24, 255:14, 255:16, 297:1, 318:16, 318:20, 345:3, 345:7, 385:1
**Reporter** [2] - 235:15, 386:18
**representatives** [3] - 302:19, 316:6, 362:19
**Req** [4] - 237:4, 237:7, 237:9, 237:10
**Request** [4] - 323:20, 336:8, 348:2, 353:25
**request** [85] - 240:4, 240:6, 240:23, 241:2, 241:5, 241:11, 241:14, 241:15, 241:16, 242:2, 242:3, 242:4, 242:10, 242:18, 242:21, 242:24, 243:6, 243:8, 244:25, 245:1, 245:3, 246:14, 248:11, 250:15, 254:1, 263:1, 267:2, 267:22, 269:12, 270:9, 270:15, 270:21, 271:3, 271:11, 271:17, 271:22, 272:8, 272:24, 275:2, 275:17, 308:8, 308:13, 309:6, 309:10, 309:19, 312:15, 312:19, 312:23, 314:8, 314:11, 316:10, 316:19, 317:11, 317:20, 318:1, 318:8, 319:12, 319:14, 319:16, 321:13, 324:11, 326:4, 326:8, 326:21, 326:22, 336:11, 337:6, 337:10, 348:12, 353:13, 355:6, 356:8, 356:12, 359:6, 359:17, 359:19, 361:8, 361:13, 362:4, 365:16, 374:3, 375:7, 376:6, 376:9
**requested** [24] - 241:9, 246:11, 249:22, 268:25, 269:3, 275:5, 308:19, 308:25, 309:9, 309:12, 315:15, 322:24, 323:24, 325:12, 325:13, 325:17, 336:25, 348:16, 349:4, 355:20, 362:15, 365:16, 375:12, 385:7
**requesting** [4] - 267:16, 268:4, 302:9, 350:4
**requests** [14] - 267:7, 267:11, 268:8, 268:12, 269:7, 290:19, 320:13, 324:8, 355:17, 356:21, 361:20, 362:19, 365:3, 370:7
**require** [4] - 279:11, 279:23, 304:2, 381:10
**required** [9] - 255:9, 295:13, 312:10, 321:24, 327:12, 328:14, 328:18, 348:18, 354:14
**resided** [1] - 276:18
**resolution** [2] - 326:6, 327:7
**resolved** [1] - 322:7
**Resources** [8] - 240:14, 247:25, 248:20, 250:24, 264:12, 272:2, 272:4, 324:16
**Respirator** [1] - 307:11
**respirator** [19] - 300:2, 300:8, 300:16, 300:20, 300:21, 301:1, 301:2, 301:16, 307:14, 327:9, 327:12, 329:4, 333:22, 337:24, 340:1, 340:3, 340:4, 340:17, 340:25
**respiratory** [5] - 259:8, 312:12, 370:24, 371:7, 371:15
**response** [28] - 240:19, 241:14, 254:21, 254:24, 259:2, 260:14, 281:16, 311:13, 311:14, 312:20, 318:15, 324:10, 324:18, 324:24, 325:5, 326:2, 350:20, 351:23, 352:1, 361:11, 364:17, 371:3, 380:1, 380:3, 381:21, 381:23, 381:25
**responses** [3] - 380:5, 382:8, 382:9
**responsibile** [1] - 283:7
**responsibilities** [1] - 314:19
**responsibility** [9] - 286:13, 287:5, 291:18, 291:20, 292:9, 292:11, 292:12, 292:15, 292:25
**responsible** [7] - 269:4, 271:21, 285:2, 286:1, 288:2, 291:10, 356:20
**rest** [4] - 271:5, 271:13, 342:20, 344:9
**restructuring** [1] - 272:22
**result** [1] - 253:21
**resulting** [1] - 267:3
**results** [1] - 255:7
**retaliated** [1] - 372:17
**retaliation** [1] - 382:5
**retaliatory** [1] - 382:2
**retrieve** [4] - 281:20, 283:10, 283:19, 284:3
**retrieved** [1] - 282:15
**retroactive** [1] - 269:24
**return** [3] - 280:11, 322:4, 330:16
**returned** [3] - 286:12, 332:21
**returning** [2] - 281:4, 281:24
**Review** [7] - 277:15, 278:7, 278:14, 290:7, 373:15, 373:25, 374:7
**review** [16] - 285:13, 287:11, 287:12, 287:17, 287:20, 288:18, 295:25, 296:1, 297:7, 298:1, 299:1, 313:9, 317:4, 317:7, 321:14, 385:6
**reviewed** [2] - 245:20, 285:9
**reviews** [1] - 288:16
**revised** [1] - 326:22
**reword** [2] - 253:19, 267:9
**RFI's** [1] - 382:1
**RFI-14** [4] - 381:19, 381:20, 382:1, 382:11
**role** [1] - 283:23
**rolled** [1] - 356:6
**room** [5] - 294:15, 343:13, 368:18, 368:19, 371:18
**routing** [1] - 290:23
**RTG** [2] - 334:7, 334:8
**runs** [1] - 373:25
**RVSR** [12] - 282:10, 283:6, 286:13, 291:15, 292:25, 293:21, 302:6, 328:11, 329:1, 355:1, 378:8, 378:21
**RVSRs** [3] - 378:2, 378:17, 379:1
**RX** [2] - 333:22, 333:23

## S

**safe** [2] - 319:18, 326:5
**safely** [5] - 261:6, 299:23, 302:6, 322:10, 326:1
**Saint** [1] - 334:1
**Sandra** [1] - 350:17
**Sandy** [3] - 261:2, 348:7, 352:14
**sarcastic** [3] - 272:21, 274:22, 275:1
**save** [1] - 311:17
**saw** [5] - 305:16, 305:18, 311:8, 327:24, 358:11
**scan** [6] - 276:11, 282:4, 286:22, 292:24, 295:7, 295:24
**scanned** [1] - 286:21
**scanner** [1] - 282:4
**scanning** [4] - 282:4, 292:2, 294:5, 296:20
**Schedule** [1] - 237:13
**schedule** [3] - 277:15, 377:1, 378:11
**scheduled** [2] - 322:4, 325:9
**schoolteacher** [1] - 333:5
**Sec** [1] - 387:2
**second** [52] - 244:3, 253:4, 257:11, 280:20, 281:3, 281:24, 287:10, 287:12, 287:15, 287:17, 287:19, 288:16, 288:21, 289:7, 289:11, 289:13, 289:21, 289:22, 289:23, 290:2, 290:6, 290:13, 293:9, 295:24, 296:1, 296:18, 297:6, 297:23, 298:21, 299:13, 321:3, 323:6, 325:7, 334:19, 334:20, 336:14, 337:19, 365:18, 366:11, 366:14, 367:18, 368:21, 372:3, 375:23, 376:1, 376:7, 377:2, 377:6, 378:22, 379:5, 379:23
**SECRETARY** [2] - 234:6, 386:6
**secretary** [1] - 360:7
**Secretary** [19] - 361:14, 361:17, 363:5, 363:8, 363:21, 364:3, 364:7, 364:16, 364:23, 364:24, 365:17, 370:11, 370:25, 371:9, 371:12, 371:19, 372:6,

372:12, 372:18
**secretary's** [2] - 339:5, 339:9
**Secretary's** [3] - 362:20, 370:7, 370:15
**security** [1] - 294:4
**See** [1] - 286:18
**see** [46] - 240:1, 246:7, 249:8, 252:13, 259:17, 266:21, 270:8, 270:11, 271:5, 271:13, 272:6, 275:3, 282:24, 286:15, 299:16, 300:24, 302:1, 302:6, 303:10, 310:10, 315:6, 319:1, 321:5, 321:9, 324:6, 332:14, 332:16, 332:25, 333:2, 333:13, 335:22, 336:8, 336:21, 336:22, 338:7, 338:13, 338:14, 343:5, 373:18, 374:1, 376:20, 380:2, 380:3, 380:4, 381:19, 381:20
**seeing** [1] - 330:14
**seeking** [1] - 337:4
**seem** [2] - 281:5, 344:23
**selected** [1] - 360:6
**send** [3] - 249:17, 252:18, 263:4
**sending** [7] - 252:20, 253:21, 253:22, 300:19, 302:23, 307:3, 307:10
**sense** [4] - 289:10, 334:12, 344:6, 351:25
**SENT** [1] - 386:10
**sent** [23] - 262:3, 264:4, 264:10, 264:18, 280:25, 283:16, 288:16, 288:21, 289:11, 299:6, 304:15, 305:1, 307:7, 313:14, 313:19, 315:6, 317:3, 317:7, 321:13, 322:15, 323:17, 342:14, 370:18
**sentence** [12] - 267:1, 281:23, 282:14, 284:7, 285:8, 286:8, 287:9, 300:2, 307:21, 325:14, 330:6, 340:10
**sentences** [2] - 288:22, 301:23
**separated** [1] - 283:24
**September** [3] - 360:5, 360:17, 370:17
**series** [1] - 339:1
**serves** [1] - 331:4
**Service** [4] - 261:3, 283:4, 288:17, 289:2
**Session** [1] - 378:8
**set** [5] - 314:20, 315:16, 337:21, 339:21, 363:13
**severity** [2] - 299:10, 299:15
**Shapiro** [2] - 255:2, 261:4
**SHEET** [1] - 387:1
**Sheet** [1] - 235:17
**shops** [1] - 299:25
**short** [2] - 254:8, 371:3
**shortly** [1] - 315:8
**shoulders** [1] - 325:2
**show** [14] - 243:3, 246:20, 286:24, 314:3, 330:10, 344:17, 347:12, 347:18, 353:18, 358:15, 369:22, 373:9, 376:14, 379:8
**showed** [1] - 320:10
**shows** [1] - 371:4
**shrugging** [1] - 325:2
**sick** [27] - 240:5, 240:13, 240:25, 241:15, 241:17, 241:20, 241:23, 242:3, 242:4, 242:15, 242:25, 243:2, 243:6, 243:9, 243:10, 244:1, 245:3, 246:15, 250:16, 267:2, 267:11, 267:17, 268:4, 268:12, 269:6, 351:16, 360:15
**side** [4] - 298:4, 306:19, 332:13, 348:5
**sidewalk** [2] - 365:7, 371:22
**sign** [6] - 289:7, 292:21, 293:1, 343:6, 386:14
**Sign** [1] - 235:16
**signatory** [1] - 335:23
**signature** [24] - 252:23, 252:24, 253:2, 287:10, 287:12, 287:17, 287:20, 288:16, 289:7, 289:12, 289:14, 289:21, 289:23, 290:2, 290:7, 290:15, 295:25, 296:1, 296:18, 297:6, 297:24, 335:23, 379:20
**signature's** [1] - 272:6
**signatures** [6] - 244:10, 244:17, 247:19, 253:1, 287:16, 366:19
**signed** [10] - 288:16, 288:21, 289:11, 290:9, 335:24, 348:4, 354:2, 356:22, 357:3, 384:11
**signer** [2] - 290:3, 290:13
**signing** [2] - 383:4, 386:13
**similar** [1] - 299:24
**single** [1] - 335:12
**sinus** [2] - 333:7, 334:2
**sinusitis** [2] - 321:23, 330:2
**sit** [3] - 247:1, 303:16, 374:7
**sitting** [3] - 258:13, 339:23
**situation** [1] - 371:5
**situations** [1] - 322:1
**six** [1] - 279:22
**skidding** [2] - 296:25, 297:2
**slightly** [1] - 298:14
**slip** [10] - 277:20, 290:21, 290:23, 291:5, 291:11, 291:17, 291:23, 295:6, 295:25
**slips** [3] - 290:20, 291:14, 291:15
**Smith** [16] - 261:2, 298:25, 304:18, 307:8, 313:13, 316:4, 320:10, 322:15, 323:17, 323:24, 324:15, 325:12, 325:24, 348:7, 350:17, 352:14
**Smith's** [5] - 324:7, 324:18, 324:24, 325:17, 326:8
**smoothly** [1] - 294:20
**solely** [2] - 358:24, 359:4
**solicit** [1] - 263:9
**solicitation** [2] - 263:4, 263:12
**SOLOMON** [9] - 247:5, 247:11, 247:15, 257:2, 257:4, 334:18, 352:20, 381:4, 382:16
**Solomon** [5] - 235:1, 235:2, 386:12, 386:20, 387:25
**someone** [15] - 242:9, 246:3, 248:6, 248:14, 251:11, 274:19, 276:8, 276:15, 283:9, 283:15, 334:5, 362:24, 367:4, 367:11, 367:12
**someplace** [2] - 292:7, 303:9
**somewhere** [3] - 290:3, 292:23, 294:12
**soon** [2] - 331:5, 368:17
**sooner** [1] - 367:17
**sorry** [19] - 248:24, 256:12, 257:5, 258:14, 297:1, 299:15, 309:13, 318:16, 319:6, 345:3, 350:24, 351:18, 352:11, 357:18, 357:24, 364:4, 368:13, 370:9, 378:4
**Sorry** [2] - 249:23, 301:15
**sort** [9] - 267:7, 279:10, 297:22, 298:13, 302:10, 314:19, 321:5, 342:13, 381:24
**sorts** [1] - 347:14
**sought** [1] - 262:20
**sound** [2] - 262:21, 277:1
**sounds** [9] - 255:11, 277:2, 289:13, 292:20, 313:15, 317:9, 322:2, 352:14, 365:24
**space** [1] - 337:19
**speaking** [3] - 240:14, 320:10, 382:23
**specialist** [4] - 293:10, 299:12, 299:17, 321:12
**specialists** [1] - 310:16
**specific** [46] - 241:24, 242:4, 249:4, 249:5, 249:7, 262:7, 267:24, 268:24, 269:16, 271:10, 271:12, 271:16, 275:7, 275:11, 275:18, 275:19, 300:21, 302:10, 303:6, 303:17, 308:5, 308:8, 309:19, 314:11, 317:11, 317:20, 318:8, 318:21, 318:23, 319:12, 319:14, 320:5, 320:7, 320:24, 331:10, 337:4, 337:6, 337:9, 337:10, 355:6, 356:7, 359:6, 370:20, 374:3, 375:7, 376:24
**specifically** [14] - 257:17, 263:6, 273:10, 304:10, 307:4, 308:17, 309:6, 327:22, 343:3, 353:12, 362:4, 376:13, 378:13, 382:4
**specifications** [2] - 327:10, 327:12
**specifics** [1] - 375:14
**specs** [2] - 307:14, 327:14
**spend** [2] - 278:22, 327:25
**spent** [2] - 265:15, 328:14
**spoken** [1] - 260:10
**spot** [1] - 292:10
**SS** [1] - 348:8
**St** [2] - 334:2, 348:19
**stack** [2] - 262:17, 280:11
**stamp** [4] - 253:16, 253:20, 280:6, 332:19
**stamped** [17] - 245:13, 251:20, 263:21, 273:25, 298:23, 304:6, 306:21, 323:13, 329:15, 332:10, 335:13, 342:8, 347:24, 353:19, 358:16, 370:2, 379:10
**stamps** [2] - 332:14, 376:21
**stand** [1] - 272:19
**start** [7] - 239:7, 239:11, 273:8, 274:3, 342:22, 342:23, 342:24
**started** [11] - 238:21, 239:3, 311:21, 314:4, 341:18, 372:5, 373:8, 375:8, 375:10, 378:21

**starting** [7] - 240:2, 281:3, 299:9, 310:9, 343:5, 343:7, 378:20
**starts** [1] - 245:21
**STATE** [2] - 384:4, 385:3
**state** [1] - 325:3
**State** [3] - 384:7, 384:15, 385:14
**State's** [1] - 235:7
**statement** [7] - 250:15, 302:8, 331:20, 368:5, 368:18, 368:19, 369:4
**statements** [8] - 246:19, 246:25, 369:1, 369:6, 369:9, 369:10, 369:17, 382:3
**STATES** [2] - 234:1, 386:1
**stating** [1] - 244:1
**status** [1] - 378:19
**stay** [6] - 250:11, 260:1, 341:17, 343:12, 344:3, 344:5
**stenographic** [1] - 385:8
**stenographically** [1] - 385:6
**step** [3] - 256:1, 278:11, 290:5
**stepping** [1] - 372:7
**steps** [3] - 281:5, 291:22, 294:2
**sticker** [2] - 332:13, 332:19
**still** [21] - 239:1, 253:8, 255:6, 265:6, 266:13, 275:25, 287:17, 302:11, 311:20, 314:12, 317:13, 317:23, 320:3, 329:6, 331:16, 332:22, 360:21, 360:23, 372:21, 373:17, 380:17
**stipulated** [2] - 347:7, 383:2
**stood** [1] - 364:21
**story** [3] - 273:5, 273:6, 318:11
**strategically** [1] - 256:22
**streamline** [1] - 382:13
**Street** [2] - 234:15, 235:8
**stressful** [1] - 322:1
**strike** [1] - 250:1
**strong** [2] - 275:16, 377:19
**stuck** [1] - 343:25
**stuff** [5] - 258:10, 265:20, 283:13, 315:20, 368:1
**subject** [5] - 304:20, 305:3, 305:4, 307:11, 323:20
**submit** [2] - 257:20, 326:21
**submitted** [11] - 249:6, 249:10, 249:11, 249:23, 252:4, 252:5, 252:6, 253:9, 253:25, 254:23, 260:16
**subsequent** [2] - 254:23, 302:23
**subsequently** [4] - 242:20, 243:7, 244:20, 269:23
**substance** [2] - 258:25, 372:11
**substantive** [3] - 252:8, 380:19, 382:8
**successful** [1] - 302:6
**sufficient** [2] - 330:21, 386:15
**sufficiently** [1] - 319:24
**suggested** [3] - 275:20, 275:21, 303:19
**suggesting** [1] - 314:13
**suggestion** [3] - 359:19, 359:20, 359:22
**suggestions** [3] - 276:15, 303:6, 303:8
**suggests** [1] - 288:6
**Suite** [2] - 235:3, 235:8
**suite** [11] - 337:17, 337:20, 337:22, 337:23, 338:17, 338:19, 338:22, 338:24, 342:3, 344:5
**SULLIVAN** [15] - 238:6, 247:13, 266:9, 266:12, 273:15, 273:19, 298:6, 298:10, 334:15, 334:24, 335:2, 359:24, 380:9, 382:19, 382:21
**Sullivan** [20] - 235:7, 235:13, 247:16, 249:2, 255:17, 257:3, 266:13, 273:21, 297:3, 298:12, 318:18, 330:9, 335:4, 336:19, 345:8, 360:2, 380:12, 381:6, 386:20, 387:24
**summarizing** [1] - 331:24
**supervisor** [5] - 241:12, 267:18, 271:24, 278:6, 337:17
**supervisor's** [2] - 339:8, 339:23
**supervisors** [1] - 339:2
**support** [3] - 257:13, 326:20, 382:4
**suppose** [1] - 260:6
**supposed** [5] - 238:13, 238:14, 331:17, 352:23, 352:24
**surgery** [13] - 240:15, 250:2, 250:7, 250:8, 250:12, 255:1, 255:3, 258:8, 261:13, 261:15, 265:11, 365:19, 366:4
**suspect** [1] - 251:9
**suspected** [1] - 250:20
**swimmingly** [1] - 366:13
**swore** [1] - 238:20
**sworn** [3] - 238:3, 238:25, 384:9
**symptomatic** [9] - 310:7, 331:5, 341:20, 346:9, 346:13, 346:17, 351:11, 351:12, 352:24
**symptoms** [5] - 331:10, 331:19, 331:24, 333:7, 360:25
**synthesize** [1] - 318:10
**system** [8] - 329:10, 329:11, 356:8, 358:25, 359:4, 367:22, 374:13, 374:18

**T**

**table** [18] - 288:17, 288:18, 289:8, 289:12, 289:14, 289:23, 290:10, 290:18, 295:21, 295:24, 296:2, 296:23, 298:1, 307:24, 307:25, 309:12, 309:16, 374:25
**tack** [2] - 294:8, 294:12
**TAKEN** [2] - 234:12, 386:9
**talks** [1] - 370:14
**Tamanique** [8] - 248:10, 272:19, 273:23, 280:25, 304:18, 307:7, 313:12, 323:18
**Tammi** [8] - 304:22, 305:8, 305:9, 340:23, 343:14, 346:2, 346:5, 346:20
**TAMPA** [2] - 234:2, 386:2
**Tampa** [5] - 234:15, 234:16, 235:3, 235:8, 235:8
**tasks** [3] - 272:23, 279:10, 279:13
**TC** [3] - 272:18, 272:19, 272:21
**teach** [1] - 377:23
**teacher** [1] - 381:13
**team** [1] - 279:21
**tedious** [3] - 279:8, 279:9, 279:25
**telephone** [1] - 313:20
**temporary** [1] - 358:3
**Tendering** [21] - 243:16, 245:14, 251:21, 254:14, 263:22, 280:6, 298:16, 306:21, 313:4, 323:13, 325:22, 329:16, 332:5, 335:13, 342:9, 347:19, 353:20, 358:17, 370:2, 376:15, 379:10
**tendering** [2] - 261:24, 304:7
**terminal** [1] - 284:1
**test** [1] - 319:7
**testified** [1] - 238:4
**testimony** [3] - 239:5, 239:13, 380:20
**tete** [2] - 364:21
**tete-a-tete** [1] - 364:21
**text** [1] - 379:24
**thankful** [1] - 347:9
**THE** [13] - 235:1, 235:6, 246:23, 248:25, 255:15, 257:5, 297:2, 325:23, 330:8, 345:5, 382:14, 382:17, 382:20
**therapy** [1] - 332:20
**thereabouts** [1] - 275:13
**thinking** [6] - 241:22, 319:2, 325:4, 328:8, 349:13
**third** [5] - 241:19, 339:14, 379:23, 380:15
**three** [13] - 276:25, 284:2, 293:10, 293:23, 294:21, 295:15, 321:2, 321:6, 326:13, 328:11, 336:16, 337:3, 352:6
**throughout** [1] - 238:16
**Thursday** [6] - 325:9, 326:13, 326:16, 349:8, 354:11
**Thursdays** [1] - 348:18
**tighter** [1] - 273:4
**TIME** [1] - 234:13
**timeline** [9] - 303:12, 308:15, 309:22, 319:3, 341:15, 353:15, 353:17, 375:9
**timely** [1] - 375:5
**timing** [1] - 247:19
**tired** [1] - 298:5
**title** [2] - 283:23, 378:6
**titled** [3] - 336:8, 348:2, 379:14
**TMS** [2] - 378:8, 378:9
**TO** [1] - 386:10
**today** [7] - 239:1, 239:11, 247:1, 376:22, 380:13, 380:17, 382:22
**together** [6] - 288:22, 302:5, 302:12, 302:16, 314:1, 332:17
**took** [7] - 286:20, 289:22, 290:14, 352:11, 356:15, 375:6, 375:11
**tool** [2] - 291:9, 377:19
**top** [13] - 240:2, 252:10, 252:14, 258:23, 270:1, 271:20, 319:20, 342:14, 342:19, 345:1, 345:5, 371:5, 378:7
**topic** [1] - 298:14
**total** [1] - 296:14
**totally** [2] - 254:4, 382:19

**tour** [3] - 341:18, 348:22, 354:16
**tours** [1] - 325:9
**toward** [1] - 344:20
**towards** [1] - 238:12
**trained** [1] - 376:12
**training** [12] - 355:13, 373:8, 374:16, 374:17, 374:22, 375:8, 377:15, 378:1, 378:10, 378:12, 378:21, 379:4
**Training** [9] - 237:13, 375:21, 375:24, 376:1, 376:6, 376:12, 377:3, 377:6, 377:16
**transcript** [5] - 385:7, 385:7, 386:13, 386:14, 386:14
**TRANSCRIPT** [1] - 387:1
**Transfer** [2] - 262:21, 262:24
**transfer** [3] - 249:3, 270:10, 291:6
**translating** [1] - 311:2
**transmitted** [1] - 251:7
**treat** [1] - 265:9
**treatment** [4] - 267:4, 321:23, 366:19, 366:20
**tried** [2] - 242:25, 243:10
**true** [3] - 381:24, 385:7, 387:22
**trust** [2] - 302:5, 322:22
**truth** [1] - 238:3
**try** [3] - 275:22, 301:13, 302:13
**trying** [5] - 274:9, 281:19, 318:10, 328:20, 370:11
**Tuesday** [3] - 326:22, 349:8, 354:11
**Tuesdays** [1] - 348:17
**tumor** [7] - 240:18, 247:21, 247:23, 248:2, 248:7, 255:6, 259:9
**turn** [4] - 239:21, 266:16, 270:6, 272:12
**twice** [9] - 343:7, 343:9, 344:1, 345:12, 345:17, 345:24, 346:11, 347:1, 350:19
**two** [32] - 241:17, 243:5, 245:13, 276:25, 277:4, 278:1, 279:17, 279:18, 282:21, 294:21, 295:15, 310:9, 314:16, 321:25, 329:15, 329:20, 339:10, 351:3, 352:7, 352:18, 353:1, 353:2, 355:15, 357:7, 363:1, 365:19, 365:20, 365:21, 366:6, 371:1, 380:25
**two-page** [2] - 245:13, 329:15
**type** [6] - 247:21, 247:23, 248:1, 248:6, 255:6, 300:21

## U

**U.S** [4] - 234:7, 234:14, 386:7, 387:2
**ultimate** [1] - 269:6
**ultimately** [1] - 268:14
**Ulyssee** [9] - 244:13, 267:19, 271:25, 298:25, 304:17, 307:7, 313:12, 337:17, 350:16
**unable** [1] - 319:22
**Under** [1] - 387:21
**under** [6] - 239:1, 261:21, 265:12, 270:9, 380:17, 381:24
**undergoing** [1] - 267:4
**underlined** [1] - 343:14
**understood** [2] - 291:10, 296:16
**Unfortunately** [1] - 324:15
**ungrateful** [2] - 364:18, 364:25
**unilateral** [1] - 341:25
**Unintelligible** [1] - 338:6
**unintelligible** [1] - 265:19
**union** [1] - 316:6
**Union** [1] - 302:18
**uniqueness** [1] - 371:5
**unit** [1] - 373:23
**UNITED** [2] - 234:1, 386:1
**United** [1] - 235:7
**unless** [4] - 331:18, 331:23, 357:5, 360:24
**unquote** [1] - 310:15
**unreasonable** [1] - 359:16
**unrelated** [2] - 358:7
**up** [25] - 256:2, 261:7, 274:12, 276:8, 289:24, 290:17, 293:14, 295:23, 303:2, 303:5, 306:12, 306:16, 316:4, 337:21, 339:21, 354:17, 361:21, 362:3, 363:2, 363:13, 367:25, 371:1, 371:21, 380:15, 380:20
**UPC** [2] - 282:3, 282:5
**upper** [1] - 272:1
**upset** [2] - 313:25, 314:3
**ushered** [1] - 372:7

## V

**VA** [65] - 236:5, 236:6, 236:8, 236:9, 236:11, 236:12, 236:14, 236:16, 236:18, 236:19, 236:21, 236:23, 236:25, 237:4, 237:6, 237:7, 237:9, 237:10, 237:12, 237:15, 243:21, 245:14, 251:20, 260:22, 261:24, 263:4, 263:8, 263:11, 264:4, 264:18, 269:23, 272:9, 273:25, 276:18, 279:25, 280:6, 281:6, 284:11, 294:2, 298:23, 312:3, 317:11, 323:13, 328:16, 329:2, 330:17, 330:25, 336:7, 341:9, 342:8, 346:18, 347:24, 348:1, 353:19, 355:6, 356:5, 358:17, 360:7, 364:11, 364:14, 370:2, 371:10, 372:16, 379:10, 382:3
**VA's** [1] - 292:12
**Valorie** [7] - 245:22, 247:20, 362:6, 362:23, 363:24, 369:12, 370:18
**Valorie's** [2] - 362:9, 371:17
**VANTS** [3] - 361:15, 361:16
**various** [4] - 236:15, 236:17, 236:22, 376:11
**VBA** [1] - 362:7
**VBM** [1] - 356:1
**VBMS** [9] - 355:22, 356:4, 356:8, 358:24, 359:4, 374:16, 377:19, 379:1, 379:4
**verbal** [10] - 241:6, 267:22, 325:3, 368:25, 369:2, 369:5, 369:10, 369:18, 371:15, 371:16
**verbally** [2] - 249:12, 368:25
**verbatim** [1] - 366:24
**verified** [1] - 381:23
**verify** [1] - 295:9
**Veteran** [2] - 286:12, 295:4
**VETERANS** [2] - 234:7, 386:7
**Veterans** [7] - 261:3, 283:4, 289:2, 362:8, 378:19, 387:2
**VHA** [1] - 362:8
**Vice** [1] - 302:20
**Victor** [1] - 356:2
**view** [1] - 314:20
**viewed** [1] - 311:6
**village** [1] - 255:25
**virtually** [2] - 361:5, 361:7
**vision** [1] - 364:7
**visit** [3] - 362:20, 370:7, 377:2
**visiting** [1] - 371:6
**VMBS** [3] - 356:1, 374:13, 377:15
**vocal** [1] - 330:2
**Vol** [4] - 235:12, 386:9, 386:14, 387:3
**VOL** [1] - 234:10
**voluntary** [1] - 249:2
**Voluntary** [2] - 262:21, 262:24
**vs** [2] - 234:5, 386:5
**VSC** [1] - 236:5
**VSR** [1] - 378:20
**VSRs** [2] - 378:2, 378:17

## W

**Wait** [2] - 288:21, 328:7
**wait** [13] - 243:4, 256:11, 260:2, 288:19, 328:7, 330:3, 331:14, 372:2, 378:8
**waiting** [3] - 292:23, 296:17, 315:19
**waived** [1] - 383:5
**walk** [2] - 281:17, 337:22
**walked** [2] - 366:14, 372:3
**walking** [4] - 294:1, 294:15, 295:1, 363:5
**Walter** [1] - 304:18
**wants** [1] - 364:8
**war** [1] - 338:21
**warehouse** [2] - 286:18, 292:7
**Wax** [13] - 251:11, 258:1, 259:22, 260:4, 262:4, 264:15, 265:12, 265:23, 323:18, 365:23, 367:10, 368:6, 368:10
**wax** [6] - 258:16, 259:12, 259:18, 260:8, 260:10, 357:25
**Wax's** [2] - 264:25, 265:4
**ways** [2] - 256:3, 331:10
**wear** [5] - 299:24, 311:25, 337:25, 340:1, 340:12
**wearing** [2] - 340:17, 341:3
**Wednesday** [3] - 279:16, 349:8, 354:11
**Wednesdays** [1] - 348:18
**week** [17] - 239:3, 267:14, 278:1, 320:9, 337:3, 343:8, 343:9, 344:1, 345:12, 345:17, 345:24, 346:11, 347:2,

350:19, 351:3, 378:17, 378:22
**weeks** [5] - 314:17, 321:25, 350:3, 350:8, 352:18
**weird** [1] - 289:9
**welcome** [2] - 298:13, 315:3
**whatsoever** [1] - 359:18
**WHEREUPON** [1] - 238:1
**white** [1] - 295:23
**whoever's** [1] - 289:13
**whole** [4] - 276:9, 293:8, 320:25, 343:1
**wing** [1] - 360:14
**winter** [1] - 308:18
**wise** [1] - 310:25
**witch** [2] - 367:18, 368:6
**WITNESS** [12] - 246:23, 248:25, 255:15, 257:5, 297:2, 325:23, 330:8, 345:5, 382:14, 382:17, 382:20, 386:10
**Witness** [1] - 235:16
**witness** [2] - 234:18, 371:19
**witty** [1] - 357:23
**Witty** [24] - 248:10, 335:25, 348:4, 352:13, 354:3, 356:22, 357:4, 357:6, 357:15, 357:20, 358:1, 364:16, 365:17, 365:22, 366:7, 368:12, 368:13, 368:14, 368:22, 369:18, 371:15, 371:25, 372:11, 372:15
**word** [15] - 244:8, 274:16, 275:15, 281:14, 281:20, 310:23, 318:11, 318:12, 318:13, 318:14, 318:18, 318:21, 318:23, 333:13, 333:14
**wording** [1] - 351:4
**words** [2] - 366:23, 366:24
**work-at-home** [1] - 293:10
**work-from-home** [1] - 283:17
**workers** [1] - 369:13
**Workers'** [1] - 322:6
**workers'** [1] - 369:19
**Workmen's** [1] - 315:19
**workplace** [1] - 358:4
**Works** [5] - 236:22, 245:22, 250:20, 250:22, 323:16
**works** [8] - 246:18, 247:25, 248:1, 251:6, 251:14, 326:9, 326:15, 342:21
**Works'** [3] - 246:7, 250:18, 324:20
**works'** [3] - 247:3, 247:23, 250:15
**world** [1] - 371:17
**worried** [1] - 265:12
**worse** [2] - 352:25, 366:21
**worst** [3] - 352:25, 353:1, 353:2
**write** [11] - 304:22, 305:4, 307:13, 307:21, 333:20, 334:6, 343:5, 343:9, 346:5, 377:25
**WRITE** [1] - 387:1
**writes** [2] - 282:14, 326:18
**writing** [9] - 300:25, 304:25, 307:9, 308:20, 308:24, 309:5, 316:17, 319:1, 351:6
**written** [9] - 242:11, 318:3, 330:13, 334:8, 357:10, 369:5, 369:9, 369:18, 379:24
**wrote** [26] - 251:8, 251:10, 284:19, 287:13, 287:14, 288:25, 289:17, 293:4, 307:10, 307:19, 312:23, 315:8, 315:23, 317:5, 324:23, 328:9, 329:9, 340:12, 344:23, 347:3, 347:15, 349:20, 351:5, 351:8, 351:9, 357:9

**X**

**x'd** [1] - 337:14

**Y**

**yards** [1] - 372:8
**year** [1] - 309:2
**yellow** [3] - 290:23, 291:1, 291:3
**yo** [2] - 342:16
**yourself** [7] - 276:21, 292:18, 293:1, 295:1, 312:16, 323:17, 386:15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.

CASE NO.: 8:20-cv-026970-VMC-AEP

DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
_______________________________/

ZOOM DEPOSITION OF
AILEEN MULLIN, VOL. III

Taken on Behalf of the Defendant

DATE TAKEN: January 7, 2022

TIME: 1:32 a.m. - 3:45 p.m.

PLACE: ALL PARTIES PRESENT REMOTELY

Examination of the witness taken before:
Debbie E. Askins, FPR
Notary Public

Pages 388 - 473





APPEARANCES FOR THE PLAINTIFF

James Solomon, Esquire
Daniel Maharaj, Esquire
Solomon, Maharaj & Kasimati, P.A.
601 North Ashley Drive, Suite 1100-192
Tampa, Florida 33602
james@smkfirm.com
daniel@smkfirm.com
813-497-7650

APPEARANCES FOR THE DEFENDANT

David P. Sullivan, AUSA
Office of United State's Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
David.Sullivan3@usdoj.gov
813-274-6000

I N D E X


| Deposition of Aileen Mullin, Vol. III | PAGE |
|---|---|
| Direct Examination By Mr. Sullivan (cont'd) | 391 |
| Certificate of Oath | 470 |
| Certificate of Reporter | 471 |
| Read & Sign Letter to Witness | 472 |
| Errata Sheet (to be forwarded upon execution) | 473 |






PLAINTIFF'S EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| | ***NONE MARKED*** | |


DEFENDANT'S EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| | Defendant's Exhibit No. 38 (BCBS Payment info) | 403 |
| | Defendant's Exhibit No. 39 (Excel Spreadsheet, VA 010560) | 431 |






**WHEREUPON,**

**AILEEN MULLIN,**

having previously been duly sworn to tell the truth and testified upon her oath as follows:

**DIRECT EXAMINATION (cont'd)**

**BY MR. SULLIVAN:**

Q. Welcome back, Ms. Mullin. How are you doing today?

A. **Doing a bit better. Thanks for asking. How are you.**

Q. I'm very well. Thank you. So this is Part III of your deposition which we started back in 2021. And when we first met downstairs in the lobby of my building and you sat down for your depo, you recall that you took an oath?

A. **Yes, sir.**

Q. And you understand that you're still under oath?

A. **Yes, sir.**

Q. And I'm sure you're looking forward to your first hours in 2022 not being in the middle of an ongoing deposition?

A. **Undeniably, yes. Yes.**

Q. Well, thank you again for taking the time. So I want to start today by just talking about money a

little bit. And I will-- You don't have a copy of Exhibit 1 handy, do you, Ms. Mullin? It's fine if you don't. I can put it up on the screen.
A. **No, no. Just a moment. I think it's in my bag. Just bear with me, all right?**
Q. Sure.
A. **Just one sec.**
**MR. SULLIVAN:** James and Dan, do you have copies or would you like me to share the screen?
**MR. MAHARAJ:** I have the electronic copy.
**MR. SULLIVAN:** Okay.
A. **That was a foolish oversight on my part. I don't have it at the ready.**
Q. That's okay. Do you have it now or do you need it?
A. **I don't.**
Q. Okay. So I will share my screen with you. That's not a problem.
**(Share screen enabled.)**
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, I am showing you what's been previously marked as Exhibit 1. Are you able to make that out or do you need me to zoom in at all?
A. **Yeah. It's all good.**





Q. Okay. And so for the record, this is Page 66 of Exhibit 1. And it's your answer to Interrogatory 19 where I've asked you to set forth the damages that you are claiming in this case?
A. **Yes.**
Q. And so I just want to go through a few of your responses. So let me started at the end actually. Okay. So now we're on Page 68 at the very bottom. And one of the things you list is pecuniary losses for medical payments. And you say this answer will be supplemented by December 15, 2021. I don't think I have received a supplementation for this answer. As you sit here today, do you know what amount you're claiming for pecuniary losses for medical payments?
A. **No, I do not.**
Q. Okay.
**MR. SULLIVAN:** So James, Dan, if this is, you know, something you want to get in the case, you probably ought to produce an answer on that point.
Q. **(By Mr. Sullivan)** Okay. So Ms. Mullin, the next category above this is compensation for damage to credit score due to loss of income from Agency's failure to accommodate resulting in Plaintiff being placed on non-work status. And you claimed $1,000; is that right?





A. **Yes.**
Q. How did you calculate that?
A. **It wasn't a calculation as much as it was just research as far as how the damage was done could be compensated.**
Q. Okay. And so what did you see that-- what did you research that led you to conclude $1,000 would have been an appropriate damage award for that?
A. **I don't know if I can reference the sources I found on the internet, but the searches would have been EEOC damages or recovery credit scores. So that would have been under government sites.**
Q. Okay. What is your credit score?
A. **It's improved. It was highly damaged.**
Q. Okay.
A. **It went very, very low in--**
Q. Okay. What was your credit score when you started working for the VA in 2009?
A. **I'm not sure. I'll see if I can find that.**
Q. Okay. Do you know what it was when you went on non-work status in 2015?
A. **Not without the documents. But I'll try to get back to you on that.**
Q. Do you know if you've produced those documents in this case?





A. **I'm not sure of those particular years. Yes, I've produced credit reports.**
Q. You have produced credit records--
A. **And letters being denied, denied loan.**
**MR. SULLIVAN:** Okay. James, Dan, I don't know that I've seen that produced. So you know, if you want to send me an email after we finish today and let me know where I can find it, that might be helpful.
Q. **(By Mr. Sullivan)** And Ms. Mullin, you said your credit score has improved?
A. **Yes.**
Q. Okay. Has it gone back to what it was prior to 2009?
A. **I don't know the answer to that because I don't know what it was in 2009.**
Q. Do you have any instances where you weren't able to obtain credit because of your score?
A. **Yes.**
Q. Tell me about those.
A. **Decrease in my Home Depot credit card because I needed it for issues with the house. I tried to refinance my house to take money from the house. I was denied that.**
Q. And do you know why you were denied?

**A. Credit score.**
Q. Who told you that?
**A. Some ratings-- well, USAA was one of them. That's who I do my banking with, who I had asked for a loan through. And the other one I believe is Chase handles Home Depot.**
Q. And so with Home Depot, did you cancel your credit card or change an interest payment or something?
**A. No. They denied me an increase.**
Q. An increase in your spending limit?
**A. Yes.**
Q. And they told you that was because of your credit score?
**A. Yes.**
Q. Okay. If you have any letters or documents related to any of that, I'd very much like them.
**A. (Nods head) Okay.**
Q. Okay. So the next category you mention compensation for payments that you missed towards your Public Service Loan Forgiveness Program from April 1st, 2015 to present. And you say the current balance is just a shade under $35,000. Is that the balance of your outstanding loan?
**A. I think it's a little higher now, but it's around that now.**





Q. Okay. And are you asking for $35,000 or are you saying that--
**A. I'm asking the VA to assume that debt, to pay that debt.**
Q. Okay. Had you assumed that debt before you started working at the VA?
**A. Yes.**
Q. Okay. And why do you think the VA should be responsible for that?
**A. In brief, one of the reasons is as a federal employee, they have a loan forgiveness program and for educators and federal employees. And you have to have-- I don't know if it's 20-- there's a number of consecutive payments on time and employment over a period of years. And I'm eligible forgiveness for the loan.**
**When my pay was completely cut off and I had to-- I stopped paying all my bills other than my mortgage and utilities and the car. I went into default with my student loans. So if I were to start paying them back now, I'd have to have 20 months or whatever months-- yeah, I think it's like 76 or something of consecutive on my-- so-- Does that make sense?**
Q. I think what you're saying is, at this point, if you had continued working, you would have been eligible for forgiveness of whatever remained?





**A. Yes. Because I would have continued making on time-- consecutive on time payments.**
Q. Okay. So had you never missed a payment prior to April 1st, 2015?
**A. I don't know the answer to that.**
Q. Have you started paying ever since-- Well, so you don't know whether you've missed a payment before?
**A. The debt goes back to-- I'm old. I think the debt goes back to like 1998. So I can't say between 1998 and April 2015 that I never missed a payment.**
Q. What about from 2009 when you started working at the VA until 2015, had you missed any payments then?
**A. I'll have to verify it, but I don't believe so, no.**
Q. Okay. And just so I understand, this April 1st, 2015, that date is significant and what's pointed out here because that's when you went on leave without pay status or non-work status?
**A. I can't remember how I came up with that date. I have to think about it. It falls in line with when I-- Oh. I know what it fell in line with. It's the last-- I think that was the last full paycheck that I got. And then I-- I didn't get any income I believe until October of that year.**
Q. Okay. And since October of 2015, you've been





getting Worker's Compensation payments, right?
**A. Yes. Since when? I'm sorry. Say that again.**
Q. I think you just said October of that year, so October of 2015?
**A. I think it was October that I received my first check.**
Q. Okay. Have you started making your student loan payments--
**A. No.**
Q. --ever since you--
**A. No.**
Q. Okay. And you've been getting checks since October of 2015?
**A. Yes.**
Q. But you haven't made any payments on your student loan debt?
**A. Correct. It's deferred.**
Q. Since when?
**A. I'd have to get the dates. It's in line with this. With a student loan, when there's no income, you can request deferral.**
Q. Okay.
**A. And when you have no taxable income, you can ask for deferral. I'm eligible for it under those**

**reasons.**
Q. Have you spoken to anyone from the Department of Education about your student loan, your federal student loan?
A. **In what capacity?**
Q. Well, I just-- you know.
A. **I've had many conversations with them, yes.**
Q. Okay. And you're not eligible to pick up and continue making payments?
A. **Yes, I am.**
Q. But you've chosen not to?
A. **Fiscally, it's low on the list of priorities.**
Q. So do you also have private student loan debt?
A. **No.**
Q. Okay. So the compensation for the increase in the student loan interest, which is the next category up, that's the interest on the federal student loan stuff we were just talking about?
A. **Yeah. I owe-- yes. Because everything was paid on time, but because the interest and how all that works out, I owe more now. My debt increased since 2015.**
Q. Okay. Have you produced any documents related to your student loan debt or to these damages that you're claiming?





A. **Yeah. I believe so. I believe so. But if not, I can go right away. But I believe so.**
**MR. SULLIVAN:** Okay. This is another one, Dan, that, you know, if it's out there, it's very well the case I just missed it. So a Bates number will be helpful. And if I don't have it, that's obviously not ideal.
Q. **(By Mr. Sullivan)** I want to ask you now, Ms. Mullin, I'm on Page 67, so the previous page of Exhibit 1?
A. **Uh-huh.**
Q. And I want to ask you for the-- about the category that says Reimbursement For Medical Expenses?
A. **Uh-huh.**
Q. Do you see that? And it says $76,909.63.
A. **Uh-huh.**
Q. Have you paid that much in medical expenses? Is that what you're out of pocket?
A. **This isn't about-- I have not paid 76. It's a substantial amount which Dan will get those numbers. A debt was-- a debt-- going on Workmen's Compensation created a debt situation with Blue Cross Blue Shield.**
**And when I told them about my-- when I told Blue Cross Blue Shield about the Workmen's Compensation, first what they did is they took money away from a number**





**of my doctors and all the sudden I had massive amount of debt.**
Q. Because your doctors were then looking to you for payment?
A. **Yes. Because Blue Cross Blue Shield took the money away from them and for things that medical care they gave me for like the asthma and things like that before Workmen's Comp. was granted. So when Workmen's Comp. was granted, according to Blue Cross Blue Shield or whatever, according to whoever, that-- all that care I received back to 2009 was-- shouldn't have been under Blue Cross Blue Shield.**
Q. It should have been under Worker's Comp. basically?
A. **Or it just became my debt. It just became my debt.**
Q. Did you refer those doctors to Worker's Comp. to see if Worker's Comp. would pay for those (crosstalk)--
A. **I lost all of those doctors. None of them would enroll-- wanted anything to do with federal Workmen's Compensation.**
Q. All of your doctors refused to enroll?
A. **My key doctors, my primary care, Dr. Bridgid Levoir, Dr. Klemawesch dropped me as a patient.**





Q. Okay. So I'm going to show you what I've marked as Exhibit 38, which is a document that your attorneys had produced for me. I thought it was Bates stamped, but it's not. But that's okay.
**(Defendant's Exhibit No. 38 was marked for identification)**
Q. **(By Mr. Sullivan)** And I believe that this is what you refer to in your answer to Interrogatory 19 in Exhibit 1, the BCBS payment info. Have you seen this document before?
A. **Yes.**
Q. Okay. It's a nine page-- nine pages of the PDF here.
A. **Yeah.**
Q. I'm going to go to the last page and the bottom line was the number $76,909.63?
A. **Yes.**
Q. Okay. Is that where you got your answer in exhibit-- or in-- to Interrogatory 19?
A. **That's where that number came from. There's addition-- there's more on top of that.**
Q. Oh. Okay. So I want to ask you-- I'm looking at that column now. I'm back on the first page. And the column that has the $76,000 number is the billed amount, right?

A. **Uh-huh.**
Q. That's the amount that the medical providers billed, but not necessarily what was paid, correct?
A. **Yes.**
Q. Okay. And then the next column over is the paid amount?
A. **Yes.**
Q. And then the final column is the remaining amount. Do you know what the remaining amount is?
A. **Billed amount, paid amount. In this document, I don't know what they mean.**
Q. I don't know either. I was just asking.
A. **No.**
Q. The paid amount is the amount that the insurance company paid to your providers for these services?
A. **I think so, yes. And I don't know if it includes my co-pay, but I think it's just what Blue Cross paid.**
Q. Okay. And so the total that Blue Cross actually paid for these services is $11,498.16?
A. **Can you scroll back up to the top of that column with the headers on it?**
Q. Yeah. Paid amount is the one I was referring you to.





A. **Billed, paid. I don't know. They've got me on this side. Because I don't know if that means like-- I don't know if it considers what they paid as well as what I paid.**
Q. Okay. So back to Exhibit 1, medical expenses. What do you mean by medical expenses here?
A. **And that's what-- this number is much larger now. But medical expenses are the co-pays that came out of my pocket, things that weren't covered by insurance.**
Q. Okay.
A. **Oh. Durable medical equipment, travel to the doctors, a lot of it is--**
Q. If that's the case, Ms. Mullin, then you'd agree with me that this 60,000-- $76,909 amount is not actually reflective of your medical expenses?
A. **Since this document, came a lot more. Yes, there's a lot more.**
Q. Okay. But you'd agree with me that you have not paid anyone $76,000 for these medical services listed in Exhibit 38, right?
A. **That's my debt. It hasn't come out of my pocket yet. That's my debt.**
Q. That's the amount that the medical providers have billed, 76,000?
A. **No.**





Q. And what the insurance company has paid is 11,000, right?
A. **No. Let's go back-- let me go back to the explanation of this. So Blue Cross Blue Shield-- okay. Workmen's Compensation, like let's say it's for asthma. Asthma has many, many diagnostic codes. Workmen's Comp. only covers two diagnostic codes, that's it. Blue Cross Blue Shield looks at the word asthma. But those things aren't covered under Workmen's Comp. It has to be very specific that diagnostic code.**
**So when Blue Cross, Blue Shield pulls these reports, if they see like-- start with the first one. It says, symptoms, insomnia. I don't have-- that's not cover-- Blue Cross Blue Shield sees this as this doctor, Feldman, was wrongly paid-- was overpaid X amount of dollars by Blue Cross Blue Shield because that should have been covered under Workmen's Compensation. It's their responsibility.**
Q. So let me ask you this. Is this document, Exhibit 38, are these the only medical expenses that Blue Cross Blue Shield is looking to recover from you?
A. **To the best of-- at this-- to the best of my knowledge at this moment. I don't know the last-- I don't know how often they run this or what they do.**
Q. Okay. So you would agree with me this was,





for what it's worth, do you see the date on the top corner here?
A. **It looks like November, yeah.**
Q. Of this past year?
A. **Yes.**
Q. Okay. So I just want to make sure that we're on the same page about these. I'm sorry. 76,000 is what the medical providers billed, correct?
A. **My understanding, yeah.**
Q. Okay. And 11,498 is what Blue Cross Blue Shield paid, right?
A. **I believe so.**
Q. Okay. So Blue Cross Blue Shield hasn't paid anyone $76,000?
A. **Hasn't what?**
Q. Paid anyone $76,000.
A. **On this report, right?**
Q. Is there-- you just said this is what Blue Cross Blue Shield was looking to recover?
A. **In this document, yeah. Yeah.**
Q. Is there some other Blue Cross Blue Shield document?
A. **Oh. I just don't know. They always surprise me with these things. I don't know how they come up with them. So I don't know what else is out there.**

Q. So going back to Exhibit 1 then in your answer, you said reimbursement for medical expenses was things like DME, travel, stuff like that. None of those things are actually listed in Exhibit 38, right? Exhibit 38 is, you know, medical treatment, bills for medical treatment.

**A. Right. This is a debt Blue Cross Blue Shield says is mine.**

Q. Okay. So let me-- maybe I can close the loop this way. Reimbursement for medical expenses as you list in Exhibit 1 in your answer to Interrogatory 19.

**A. Uh-huh.**

Q. What you're really saying is reimbursement for the debt that I'll have to pay to Blue Cross Blue Shield?

**A. I would say that this is-- that is the debt that I owe to Blue Cross Blue Shield.**

Q. Okay.

**A. No, no, no, no, no, no, no. That's not what I'm saying. No, no, no. No. Blue Cross Blue Shield will take their money out. What I'm left with was what those doctors are owed.**

Q. Why didn't you submit those payments to Worker's Comp.?

**A. Why I didn't submit?**





Q. Yeah. Why doesn't Worker's Comp. cover those payments?

**A. When I got this report, I start-- I went to each of these doctors to find out why it went like that because they do the billing, I don't. So some of them, like the ones with Michael Newman, I don't know why they were here.**

Q. What kind of doctor is Dr. Newman?

**A. He's my Workmen's Comp. pulmonologist.**

Q. Okay. What about the H. Lee Moffitt Cancer Center?

**A. That should have nothing to do-- Oh. Moffitt Center, they have a department that deals with people who have speech-- you know, if somebody gets throat cancer or something like that, there's a whole wing that has to do. So I went to them for the dysphonia.**

Q. And what about Teekell Taylor Lee, if I'm saying that right?

**A. Lee Teekell Taylor, yeah.**

Q. Lee Teekell Taylor. What kind of doctor is she?

**A. She is-- she's my family doctor. She's a trained cardiothoracic surgeon and now she's my primary doctor. I see her for my Workmen's Comp. conditions as well as she has a file on me that's not Workmen's Comp.**





Q. And what is that file-- what kind of treatment is that for?

**A. Probably, I don't know, like break out in a rash, or you know, when I had complications from cancer treatment or something like that.**

Q. Okay. So those would be things unrelated to any medical issues be that might have arisen to your time at the VA?

**A. Yes, sir.**

Q. So why is that included in what you're looking to recoup from the VA?

**A. Why is that?**

Q. Well, yeah. You've provided this document that says the VA should give you $76,000. And among it are things listed on it are treatments for things you just said are not related to VA health issues, you know, things like cancer, things like your primary care doctor?

**A. No. Can you restate the question again, please?**

Q. No. I think it's fine. I think I understand.

**A. I'm sorry.**

Q. I want to ask you about this next category, Reimbursement for Lost Retirement Benefits, including all accrued TSP benefits and quarterly credits for Social





Security.

**A. Uh-huh.**

Q. And then you list two sub bullets, the first of which is $40,541.26 for loss contributions from 2016 to '21.

**A. Uh-huh.**

Q. And then you say-- you show what you've done in previous years I suppose. So is what you're saying that if you had continued working, you would have contributed this $40,000 to your TSP?

**A. Would I have continued putting $40,000 in my TSP?**

Q. Well, can you just explain this to me, why you're saying you're owed or entitled to $40,000 related to your retirement savings account?

**A. Oh. I don't remember how he said this. Hang on. (Perusing) I don't remember how I did it. So each year the TSP was based on a percentage of my--**

Q. Yeah. You could contribute a percentage of your paycheck to your Thrifts Saving Plan?

**A. Right.**

Q. Okay.

**A. This is what I was able to put in. There's lots of variables since we gave this to you since this. That's when it was done without accommodations. This was**

**my contribution, percentage of an income without-- when I didn't have accommodations and I couldn't work on my full overtime and stuff like that. So I don't know where-- I don't know how I came up with the-- Oh. 40,000? If you add all those up, is that 40,000?**

Q. It looks like it, but. . .

A. **Yeah. Then I believe that's where that 40,000 was.**

Q. Okay. So the 40,000 you contributed while you were working?

A. **Yeah.**

Q. That was just-- some of the money that you were paid, you essentially put into your retirement account?

A. **Yes, sir.**

Q. Okay. So it wasn't in addition to your income while you were working. That was a part of your income that you saved basically?

A. **Yes.**

Q. And you haven't been contributing to your TSP since you went on Worker's Comp.?

A. **When you're on Workmen's Comp. you're not allowed to donate. You can't put money into TSP.**

Q. Okay. So it sounds like then you're asking for $40,000 in addition to the money you've been getting





while on Worker's Comp.

A. **No. And this is not accurate. This is not-- I would want more than this now. But what it is is this is the contribution-- the projected contribution that would have gone from 2016 to 2021. And that's what the number was based on. It was a projection, like if I continued that pattern what it would be over the next-- from 2016 to 221.**

Q. Okay.

A. **But that's not the numbers I'm using now.**

Q. Okay. Were you planning on disclosing the numbers you're using now in this litigation or is that something we're going to learn about at trial?

A. **Oh. Yes. Yes. Absolutely. It's something I'm working on in the middle of the night and stuff, yes. Yes.**

Q. Okay.

A. **Like right away. As soon as I can, yes.**

Q. Okay. If I understand some of your Worker's Comp. files, you are unable to continue working; is that correct?

A. **That's a classic debate. Some of my doctors say if I had the proper medical care, which you can't get under Workmen's Comp., could be a chance I could work if I had the proper medical care. There are other doctors**





**who say that the emotional damage done to me would not allow me to work.**

Q. And what do you say? What's your-- can you work?

A. **I think I'm going to have answer that with a little story.**

Q. Go ahead.

A. **Years ago I had-- I broke both my legs and I couldn't let myself believe I could never walk again. I can't let myself believe there's no way I can work again. I just can't let myself believe that. So is that rational? I can't give you a rational answer to that. I can't allow myself believe I can never be better than I am.**

Q. Have you worked since 2015?

A. **Yeah. I tried to. I went back to the VA. I tried to.**

Q. Okay. When was the last time you worked?

A. **2016-- 2016 I think. 2015, '16, October, yeah.**

Q. And since then, has Worker's Comp. been compensating you as if you were unable to work at all?

A. **Yes.**

Q. Okay. So you asked for one year of front pay? Ms. Mullin, I'm on Page 66.





A. **Right. I don't know if they don't compensate me because I can't return to the type of work that I did. I'm not sure what the compensation is based on.**

Q. Okay. You don't know?

A. **No. I don't.**

Q. All right. You asked for a year of front pay?

A. **Yes.**

Q. I'm kind of curious why it's one year. How did you arrive at one year's worth of front pay?

A. **Originally I thought it was because of retirement age being 62, but I don't think so. I think it's more than one year.**

Q. Okay. So is this another part of your answer that needs to be undated?

A. **Yes.**

Q. Okay.

A. **It will be.**

Q. Will be when?

**MR. SULLIVAN:** I see Dan saying something in his Zoom box.

A. **You see a smile there. I know by Tuesday. We hope we get it to you before Tuesday, but I know the plan is we'll try to get it to you before then.**

Q. Well, not to scold anybody on the record, but

you know.
A. **You can scold us.**
Q. Discovery closes in a week here and you guys are making this very difficult to manage. Okay. So I want to ask you about these various amounts of leave are listed here.
A. **Okay.**
Q. And I'm on Page 66 of Exhibit 1. Are all these leave amounts static or do those need to be updated too?
A. **To the best of my knowledge, those are static.**
Q. Okay. And so explain to me these amounts of annual leave. How did you determine that these amounts are relevant here? Is this all the leave you took in those years?
A. **I have to check, but it shouldn't be, no.**
Q. Okay. So what amount of annual leave is this listing here?
A. **I can supply the spreadsheets based on-- this is when I'd run out of sick leave and I'd have to use annual leave instead of sick leave.**
Q. Okay.
A. **Or it would be sick leave that was-- or annual leave that was advanced to me.**





Q. Okay. So this is leave that you took in the years 2012, 2013, 2014 and 2015?
A. **Yes.**
Q. Okay. And when you took annual leave, were you paid for that?
A. **(No response.)**
Q. When you take annual leave, you're paid for that time?
A. **This was annual leave used for Workmen's Comp. conditions for being sick in the building. This wasn't annual leave I was on vacation.**
Q. I understand that. But my question was, did you get paid when you took this leave?
A. **Yes.**
Q. Okay. And so now you have identified this 439 and a half hours of annual leave that you want to be paid for again?
A. **Yes.**
Q. And again for the sick leave, same thing, these are hours that you took for Worker's Comp. conditions?
A. **Work-related illnesses, yes.**
Q. Okay. And you were paid for the hours that you took?
A. **Yes.**





Q. You were compensated for that sick leave?
A. **Yes.**
Q. And what you're asking for here is to be paid again for taking that time off?
A. **Yes.**
Q. Okay. Do you know offhand, does the VA let you rollover annual leave and sick leave to any set amount?
A. **There is a set amount. I don't remember what it is.**
Q. Okay. What about admin leave? Were you paid for that time?
A. **I believe so, yes.**
Q. Now, leave without pay, obviously you weren't paid when you took that time?
A. **Right.**
Q. Did you work those 1,246 hours when you were on leave without pay?
A. **Can you say that again, please?**
Q. Yeah. Were you working during those 1,200 hours when you were on leave without pay? Did you work those hours?
A. **I have to check, but I think the answer to that is yes. I think some of it-- I think some of them was leave without pay because there was no annual leave**





**or sick leave. And so it's annual leave, sick leave, admin, leave without pay or AWOL. So I was there.**
Q. You were at work taking leave without pay?
A. **There are times that I didn't. I have to-- I have to-- or when I-- there were times when I had cancer and there was no money in the annual leave or sick leave. So in order to get a paycheck, I'd have to borrow against leave without pay. So it's a combination of both. It's a combination of both.**
Q. Oh. So were you getting paid when you took leave without pay?
A. **No.**
Q. So you were-- My understanding of leave without pay is when I'm not at work, but I don't have any annual or sick leave so I don't get paid. Is that your understanding of what--
A. **I used that-- I went through-- I'm sorry. I have to tell you I got distracted by looking at those years and thinking about what I went through in 2012 and 2013. And I was not accurate in that. My apologies.**
**(Screen share disabled.)**
Q. **(By Mr. Sullivan)** that's fine. So you would agree with me that when you were on leave without pay, you were neither working nor being paid?
A. **Yes, yes, yes.**

Q. That's fine. But so I understand what you're saying here is you want to now be paid for those 1,200 hours when you didn't work?
**A. Yes. Yes.**
Q. Okay. And why?
**A. Because I would have had the annual leave or the sick leave to use if they-- if I had been accommodated.**
Q. Okay.
**A. I would have had the annual leave. I would have had the sick leave.**
Q. Not all 1,200 hours though, right?
**A. If they had accommodated me, I would have been able to work and that debt wouldn't have increased. When I went through cancer and I said I could work, but I couldn't go in the building, and they said no. So they created that debt. I could absolutely work and I told them I could work, but they made me going in the building a requirement of the job. So they created that for me.**
Q. Well, they had always made going into the building a requirement of the job, right?
**A. We're not talking about always. I'm talking about those dates.**
Q. At what point did you stop having to go into the job? It was 2013, right?





**A. To the best of my knowledge.**
Q. Right? So why the leave-- the hours included from 2014, 2015?
**A. Can you put-- let me look at that again while you're-- can you share the screen again, please? Do you mind sharing the screen?**
Q. Yeah. I'm sorry. I'm just doing it. There you go.
**(Screen share enabled.)**
**A. No worries. So 2015 is-- it was April when I got the mass exposure, so that explains away 2015. 2014, I'm not sure what was going on in 2014. That may simply have been, again, I was in debt for annual leave and sick leave. I think there may have been a debt, so I didn't have the leave to use is how my memory serves me at the moment. It was just such a huge debt.**
Q. One of the things you ask for here is back pay for the period while you were placed on off-work status.
**A. (Perusing) Back pay (ad verbum) was placed in off-work status, yes.**
Q. But there's no amount listed. Do you know how you-- what you have calculated that amount to be?
**A. How I calculated it?**
**MR. SULLIVAN:** Can we go off the record





for a second?
**(Off the record at 2:15 p.m.)**
**(On the record at 2:17 p.m.)**
**MR. SULLIVAN:** Back on the record.
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, I think we're done with Interrogatory 19 for now. I want to ask you though about Interrogatory 7. So let me pull that up for you.
**(Share screen enabled.)**
Q. **(By Mr. Sullivan)** Okay. So I'm showing you Exhibit 1, Page 29. And it's the Interrogatory No. 7. Do you see that on your screen, Ms. Mullin?
**A. Yes, I do.**
Q. Okay. So I had asked for you to identify the acts that you thought prompted the retaliation and the hostile work environment that you had alleged. And in your response you identified participating in the Complaint process for your various EEOC Complaints. And then you also mention participating in the reasonable accommodation process. We've talked about the reasonable accommodation process that you participated in a lot already, so I don't want to belabor this. But I just want to know when that started and make sure my understanding is consistent with what you're trying to say here. Is that referring to the process that started





back in November of 2009 when you had started letting the agency know about your voice issues?
**A. Yes.**
Q. Okay. In the next sentence you mention that you also contend that any reports you made to management and Director Witty pertaining to harassment as articulated in your answer to Interrogatory 1, I think I'm able to go look at Interrogatory 1 and find out what you're referring to. But I just want to make sure I know what you mean when you say management.
**A. When I say management, I refer to Assistant Coaches, Coaches, Veterans Service Centers managers, Service Center Manager.**
Q. Okay. That's helpful. Thank you. So I--
**A. (Sorry)**
Q. Were you done?
**A. No. I think there's more and I just drew a blank on it, but those are definitely inclusive.**
Q. Okay. But it sounds like pretty much everyone you reported to up through the Director is included in this definition of management?
**A. Yes, sir.**
Q. So you first started engaging in the reasonable accommodation process in November of 2009 or thereabouts when you start letting your coaches and folks

know about your voice issues. And as I recall, you first contacted an EEO counselor around June of 2012. I just want to make sure I understand. You've made a lot of allegations and, you know, you've complained about a lot of things in this case. And I just want to understand which are-- which you are saying are disability discrimination and which you are saying are retaliation. So I'm hoping you can help me draw the Venn diagram of this. So maybe the easiest way to ask it is this way. From November of 2009, which is when you first started engaging in the reasonable accommodation process, are there any of the acts-- any of the acts you've complained about since then after November of 2009, are any of them solely disability discrimination?

**A. I like the Venn diagram thing because is that means that things can fall into both. I appreciate that.**

**Q.** And it's fine if that's the case. I just want to make sure. If the circles are totally overlapping, great. If that's the case, I just need to know.

**A. Well, I could say there are some that were strictly disability related.**

**Q.** Okay.

**A. As in when Mike Palmer, my coach at the end of 2011.**





**Q.** Okay. Why do you say that's strictly disability?

**A. Because I asked specifically for my body and he said, well, why don't-- that's when he said, well, why don't you wear a mask and use oxygen like Barbara Zeh does?**

**Q.** Okay. That interaction with Mike Palmer you think is based solely on disability?

**A. Yes. The fact when-- he even testifies to it, that-- about how he allowed me to use leave when I had to. I got too sick in the building. I think that was disability discrimination. When he wouldn't help me find someplace to privately use the nebulizer.**

**Q.** So my understanding of what you've said in response to Interrogatory 7 is that your request for reasonable accommodation were protected activity that could give rise to retaliation. So if you first started engaging in that protected activity in 2007, wouldn't it be the case that everything-- I'm sorry. 2009, November of 2009. Wouldn't it be the case that everything after that was at least partly motivated by retaliatory animus as opposed to just disability?

**A. I don't think so.**

**Q.** Okay. So you started telling me which ones you think are just disability. And you said Mike Palmer





and that interaction around 2011. Are there any others that you're saying-- any other acts of discrimination that you are saying are solely by reason of your disability?

**A. Yes. It's going to take me a second. We covered it once. But when I asked if I could go be reassigned to-- be reassigned out of the building or reassigned to the part of the building that had been newly renovated.**

**Q.** I seem to recall you had made that request to like Dale Eckholm or Eckland (phonetic) and then Collette Burgess came and talked to you about that. Is that what you're referring to?

**A. Yes. But it was-- I'm drawing a blank on the name of the assistant supervisor that responded in writing to the. . .**

**Q.** And when they responded, I seem to recall you saying that they sent you like a Worker's Comp. form; is that right?

**A. Yeah. They wouldn't-- they wouldn't discuss-- that was the end of the discussion. They wouldn't-- yeah. Yeah. They told me I had to file for Workmen's Compensation.**

**Q.** Okay. So Mike Palmer, that reassignment conversation. Is there anything else, any other act of





discrimination that you suffered solely because of your disability?

**A. Yeah. Another thing that comes to mind is-- I may have to come back to the date. But it was when I got assigned to the phone unit. And I had already had a voice speaking disability for some time.**

**Q.** Uh-huh.

**A. Like before, before I got assigned to the phone unit. And so it was a known disability that would interfere with me making my production in a job that required my voice. I don't think that was retaliatory. I think that was discrimination based on disability.**

**Q.** Okay. So Mike Palmer, the reassignment that you had-- that we just talked about, the phone unit. Is there any other act of discrimination that you suffered solely by reason of your disability?

**A. Well, there was another one involved in that is when I got involved on the phone unit, Jimmy (ad verbum) Correa was the supervisor. And when I pleaded with him telling him I don't know what to do, I can't talk on the phone, and he-- well, his response is, well, you've got to make your point somehow. That was discrimination that was totally disability related.**

**Q.** Okay. Any others that were totally disability related?

Page 428

**A. Yes. And I just can't recall them at this moment. I don't know if this would fall into it. When I-- after I came back from cancer treatment and I had to wear the big respirator, the big industrial respirator. And I was-- I was at the work-at-home printer, which I described to you which had the files that you pick up in a public area.**

**And a co-worker came upon me and started laughing so hard that other people stopped because she couldn't stop laughing. And I was just crushed. And she just says, well, I mean, you have to admit you're never surprised, you know, just to see you looking like that, haven't you taken it a bit kind of thing. That was Beth O'Halloran was her name.**

**Q.** And--

**A. So at that point I think the fact that they thought it was normal for me-- anyone to walk around in a workplace wearing a respirator-- no. I think that was retaliation too. I don't think that was just disability.**

**Q.** Okay. Anything else? Any other act of discrimination that you suffered solely by reason of your disability?

**A. Any action solely on disability? So that would mean pre-- putting the target on my back in 2012. At this moment, I can't remember-- at this moment, I**



Page 429

**can't recollect. I'm sure there are. Without my records, I just-- I can't retrieve them.**

**Q.** So we've mentioned before that you had gone to speak to D. Gregory Harris, who was the EEO counselor?

**A. I called him, yes.**

**Q.** I'm sorry. You communicated with him around June of 2012. Does that sound right?

**A. Yes, it does.**

**Q.** Okay. How did you know to go and contact Mr. Harris?

**A. Barbara Zeh, a co-worker, one of ones who I had told you about that couldn't get accommodations and filed a complaint, she's the one that told me. She was a co-worker.**

**Q.** Do you know when she told you?

**A. No. No. I don't remember the exact date, no.**

**Q.** Okay. Are you at all familiar-- Well, I know you are. You're somewhat familiar with the EEO process at this point, correct?

**A. Yes, sir.**

**Q.** And one of the things that you have to do when you file an EEO Complaint is go and speak to your counselor, right? That's like the first step?

**A. I actually honestly don't remember. I**



Page 430

**thought the first thing was just pick up the phone and make a call.**

**Q.** To a counselor?

**A. Yes.**

**Q.** Sorry. When I say go and speak, I'm implying that it's in person. That's not true.

**A. Oh. All right. Yeah. Because I was thinking, I didn't have to do it in person.**

**Q.** Yes.

**A. Yes, yes.**

**Q.** Okay. So the first step is to talk to the EEO counselor?

**A. Yes.**

**Q.** You know that you have to do that within 45 days of whatever act you're complaining about, right?

**MR. SOLOMON:** Objection. You can answer.

**A. My understanding it was of the most recent one, it had to be-- there had to be-- it didn't have to be a matter of anything, any of them. But yes, there had to be something within the last 45 days.**

**Q.** And I have to take these trainings as a federal worker, so I assume you do too. The VA gives you like EEO trainings that you have to take annually or biannually, correct?

**A. Yes.**



Page 431

**Q.** Okay. And those trainings explain the process for filing EEO Complaints, correct?

**A. I don't know that we had those in 2012. So I don't remember those in 2012. I think we probably did, but. . .**

**Q.** Well, putting aside when you had the training, you know that those trainings, whenever you had them, explained the process for filing an EEO Complaint, correct?

**A. Yeah. Yes.**

**Q.** Okay.

**A. To the best of my recollection, yeah. That would make sense.**

**(Screen share disabled.)**

**Q. (By Mr. Sullivan)** I'm going to show you another exhibit here, which we will mark as Exhibit 39, which for the record is an Excel spreadsheet bearing the Bates number VA 10560. Just bear with me for one second.

**(Defendant's Exhibit No. 39 was marked for identification)**

**(Screen share enabled.)**

**Q. (By Mr. Sullivan)** Okay. Ms. Mullin, let me know when you are able to see this spreadsheet.

**A. I can see it.**

**Q.** Okay. And I'll zoom in when I get to the

pertinent details. So this Excel spreadsheet has-- Well, let me ask you this. Do you know what TMS is an acronym for?
A. **Yes, I do.**
Q. What's it stand for--
A. **Training Management System I believe is what it is.**
Q. And that's the system that the VA-- that VA employees use to do training, correct?
A. **Or to record it. It's done in it or it's recorded in it.**
Q. Okay. And you've used that system before?
A. **Yes, sir.**
Q. Many times I assume?
A. **Yes.**
Q. Okay. So this is a copy of your TMS learning history. And it's got, let's see in total, just for the record, it looks like about 607 rows, which I am led to believe is the total number of trainings that you've taken during your time with the VA.
So we were just talking about the EEO training that you had done. And you said you weren't sure when the VA training-- I'm sorry-- the EEO training happened. So what I'm going to do is you see, if you'll look in Column E--





A. **(Gesturing)**
Q. Are you okay? You were waving at me in the screen.
A. **That's not what I said. I didn't remember the content of it. It's not a matter of when I had it. It was the content of it.**
Q. Okay. Well, I'm going to show you Column E, which is the title of all the trainings. And I'm going to filter that with a text filter for EEO. And so you see here, there's three trainings that show EEO. And it's EEO Complaint Process Logs and-- that's twice. And then there's a Virtual Training for 317 Employees for EEO Complaint Process Training. Do you see that?
A. **Yes, I do.**
Q. And those were completed by you in November of 2014 and then December of 2014, right?
A. **Yes.**
Q. Okay. Just bear with me for one second.
**(Screen share disabled.)**
Q. **(By Mr. Sullivan)** Okay. I'm sharing the screen again.
**(Screen share enabled.)**
Q. **(By Mr. Sullivan)** So this time-- now I'm sharing the screen. This time I've filtered not for the word EEO, but for the word FEAR. Are you familiar with





the No Fear Act?
A. **I can't remember the details of it--**
Q. It's the Federal--
A. **I remember it's the No Fear Act.**
Q. Yeah. The Federal Employee Antidiscrimination Retaliation Act.
A. **Uh-huh.**
Q. And you've received training on the No Fear Act and Workplace Harassment, correct?
A. **Yes.**
Q. And in fact, you received four separate trainings on that Act and the Prevention of Workplace Harassment?
A. **Yes.**
Q. And those trainings happened on April 27th, 2009, or one of them did?
A. **Yes.**
Q. Okay. And then again on March 28th, 2011?
A. **Yes.**
Q. And then March 18th, 2013?
A. **Yes.**
Q. And then again on February 17th, 2015?
A. **Yes.**
Q. Okay. I think I know the answer to this, but do you recall the contents of the No Fear Training that





you received in 2009?
A. **Not the 2009 one, no.**
Q. Okay. And do you recall that that training explained the EEO filing process?
A. **I don't know that it did.**
Q. Okay. Well, you don't recall what's in it at all, right, what was in that training at all?
A. **I remember the later ones.**
Q. Uh-huh.
A. **2009 specific, no.**
Q. Okay. What do you remember about the 2011 training?
A. **Lots of explanations and role playing as far as what was considered or not considered workplace harassment.**
Q. Okay.
A. **Like how to prevent it, how to identify it and things like that.**
Q. And did it explain to employees what they were supposed to do to report harassment, what steps needed to be followed?
A. **I have no memory of that.**
Q. What about posters? There were posters related to the EEO process in the Regional Office, correct?

A. **I would assume so. I can't say one way or the other.**
Q. Okay. And you recall seeing those posters when you were working at the VA or when you started working at the VA in 2009?
**MR. SOLOMON:** Objection. You can answer.
A. **No, I don't.**
Q. Okay. Ms. Mullin, you're aware now, I think, that you have 45 days to report any act of discrimination to your EEO counsel, correct?
**MR. SOLOMON:** Objection. You can answer.
A. **No. I don't remember that it's supposed to be you're supposed to report any within 45 days.**
Q. Okay. What's your understanding about the 45 day--
A. **You only have 45 days to do it.**
Q. Right. From the moment of the discrimination, you have 45 days to report it to your counsel?
**MR. SOLOMON:** Objection. You can answer.
A. **Yeah. You're saying like if something happened to you, you had to report it like it was a necessary reporting. But yeah, there was 45 days.**
Q. Okay. And you knew that back in 2009?
A. **My understanding was that I had to-- that**





**within 45 days I had to file a Complaint for something that happened within 45 days, but it did not preclude anything prior to that if it was the same type of problem. I think he called it discreet acts. I think he called it discreet acts I think is what the-- is how Mr. D. Gregory explained it to me.**
Q. Okay. And so I think, so I understand what you're saying, you knew back in 2009 or-- yeah. You knew back in 2009 that you had 45 days to report discreet acts of discrimination, right?
A. **No, I can't--**
Q. You can't say that?
A. **Huh-uh.**
Q. But you know that now?
**MR. SOLOMON:** Objection. You can answer.
A. **Yeah. I learned later on, yeah.**
Q. Okay. And it's certainly no later than when you met with Mr. D. Gregory-- or with Mr. Harris?
A. **Yes.**
Q. And do you think you knew before that?
A. **Before that day? I'm sure I knew it I before that day.**
Q. Okay. Because they had given you a bunch of trainings on the subject?
A. **No. Because co-workers were talking about**





**it, not because of the training.**
Q. Okay. How long had co-workers been talking about it, as long as they had been filing--
A. **When you say it, what do you mean by it?**
Q. I'm just using like-- I'm just referring to what you were saying. You said co-workers were talking about the 45-day deadline.
A. **No, no, no. That's how I learned about it--**
Q. Right.
A. **--was through people sitting around talking about it, people talking about there being a deadline was through co-workers telling me there was a deadline.**
Q. Okay. And do you recall when you heard co-workers saying that?
A. **It's funny. I can see the faces. I can't remember the dates. I can't remember the dates.**
**MR. SOLOMON:** And to me, it's appearing that the recall is taking a little bit long--
**MR. SULLIVAN:** James, James. I'm sorry. Are you making an objection?
**MR. SOLOMON:** Yeah. I'm saying that--
**MR. SULLIVAN:** Okay. James, there's no question pending. If you want to make an objection the next time I ask a question, you're more than welcome to. But my





understanding of what we're doing here today is taking Ms. Mullin's deposition, not years.
**MR. SOLOMON:** I was just going to suggest a recess for five minutes, but okay.
**MR. SULLIVAN:** Okay.
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, do you need to take a break?
A. **It might be a good idea.**
Q. Okay.
A. **Just one minute.**
**MR. SULLIVAN:** Okay. So let's go off the record and take a five-minute break.
**THE WITNESS:** Thanks.
**MR. SULLIVAN:** Thank you.
**(Off the record at 2:45 p.m.)**
**(On the record at 2:54 p.m.)**
Q. **(By Mr. Sullivan)** Okay. Ms. Mullin, I would like to bring you back to Exhibit 1, if I can, and show you Page 64.
**(Share screen enabled.)**
Q. **(By Mr. Sullivan)** Okay. Can you see that on your screen?
A. **Yes, I can.**
Q. So you remember last time we met, I gave you some homework and I had asked you to help me figure out

which other discriminatory, retaliatory or offensive comments, statements or remarks you might have been referring to from your responses to Interrogatories 1, 3, 4 and 5. Did you do your homework?
**A. Yes, sir.**
Q. Okay. Can you tell me about comments that I'm looking for here?
**A. Yes. I have to just preface it by saying it's going to be challenging to do it off the top of my head versus with the notes. But especially when it comes to, you know, the times and things like that.**
Q. So do you have handwritten notes answering this homework assignment?
**A. I have do have some, yeah.**
Q. Okay. Do they contain all of the discriminatory, retaliatory offensive comments, statements or remarks that I'm looking for?
**A. They're in three different sources, yeah. Some of them in a spreadsheet that I keep. Some them like handwritten notes. I can tell you some though.**
Q. Well, you know, we've been at this for three days. If your attorneys comfortable with it and you want to have her create a new response to this interrogatory and give it to me, I would gladly take that.
**MR. SULLIVAN:** I see you shaking your





head, Dan.
**MR. MAHARAJ:** Yes. I think that would be a suitable option for us, if you're okay with that. We could have that to you, have her put that into a response.
Q. **(By Mr. Sullivan)** I would be more than happy with that with one caveat, which is, if there's anything that I've never heard about before, so not included in your Complaint, not included in your ROIs, not included in your interrogatory responses already, I might at least like to hear just a little bit about it. I don't know how easy it is for you to say, oh, there's a couple new things or not.
**A. I think it's-- they're all pulled from things that you already have.**
Q. Okay. So--
**A. Like affidavits and stuff like that.**
Q. Okay. So I will not belabor this anymore with the understanding that your attorneys will be providing a new verified response to Interrogatory 14 in addition to the one they're going to be providing for Interrogatory 19.
**THE WITNESS:** James?
**MR. SULLIVAN:** Is that right, Dan?
**MR. MAHARAJ:** Yes.





**MR. SULLIVAN:** Okay. So we're all in agreement there and we will spare ourselves some time on this beautiful Friday afternoon.
**A. Oh. That's such a relief. Because the memory's not great and I'm writing it down. I'm like going, okay. How do I remember this? How do I remember this? This a wonderful. This is wonderful.**
Q. I mean, this was why we submit the questions in writing in advance. Okay. Let me take you now to Page 11. There are just a few things that I wanted to ask you about. Okay. This is Page 11 of Exhibit 1 and you write, On or around September 12th, 2012, Plaintiff discovered she had her access removed from the web based training system. Was that TMS?
**A. Yes, it was.**
Q. Okay. Throughout the month of September 2012, Agency failed to promptly rectify the issue so Plaintiff could do any necessary training to get-- excuse me-- to get her to performing her duties as an RVSR. Do you know why you had your access removed?
**A. I learned why it was originally. I did learn that.**
Q. And why was it.
**A. But then it kept repeating after that. I guess from my understanding is that when you're out for**





**extended leave, all the supervisors, everybody, you know, there's a tracking as to whether or not the people in any agency have completed all their training requirements. So it took me out of that list, the notices and things like that. It took me out of the system. That's my understanding what happens.**
Q. Okay. And so it sounds like, based on what you've just said though, the issue persisted--
**A. Yes.**
Q. --after that?
**A. Yes.**
Q. So did you have your access restored and then you lost it again?
**A. Yes.**
Q. When did that happen?
**A. I can't give you the dates, but it's all-- I've reported it all. I think it's all there.**
Q. Okay. Is it in September 12th? Is it on or around September of 2012?
**A. I believe, so yeah.**
Q. And do you know when that issue finally was rectified?
**A. No. Not off the top--**
Q. Was it like this went on for a month or months or years?

A. **No, no, no, no. Because I fought it every time, so no. I don't know if it happened like a half a dozen times it happened to me that I'd go in and do the training, I'd be out of it. I'd have to, you know, try to get back in with it through the chain, yeah.**

Q. Do you know who was responsible for-- Well, let me ask you this. Do you think someone at the Agency took your access away intentionally?

A. **Yeah.**

Q. Okay. Who do you think did that?

A. **I don't know. I don't know.**

Q. Okay. Do you know--

A. **Not people within the Veterans Service Center. Not the people who actually-- I worked for who serve Veterans, not someone within that.**

Q. Who do you think would have done it?

A. **I don't know. I don't know.**

Q. Do you know why they did it?

A. **It could be someone at the Director's level--**

**MR. SOLOMON:** Objection.

Q. **(By Mr. Sullivan)** I'm sorry. Say that again, Ms. Mullin.

A. **It could have been in the Directors realm, Human Resources realm. I don't know.**

Q. Okay. So you don't know who did it. Do you





know why they did it?

**MR. SOLOMON:** Objection.

A. **Do I know why? No. I don't know for a fact why.**

Q. Okay. I'm going to show you Page 16 now, 16 in Exhibit 1. On or around April 29th, 2013 Plaintiff was informed by her supervisor that her performance was not an acceptable level and that she was not on track for the next within grade increase. What supervisor is that referring to?

A. **Right now, I don't know if I was still under Ulyssee McBurrough or if that was Beauchamp by then. I can't remember if-- which one of those it was.**

Q. And do you recall what about your performance they were taking issue with?

A. **I remember it was not accuracy. I know it was not my accuracy. I believe it was the production. I wasn't meeting the production numbers.**

Q. You weren't processing enough claims, I guess?

A. **If my memory serves me, yeah.**

Q. Okay.

A. **I wasn't working fast enough.**

Q. Thank you for speaking English. Lawyers sometimes don't (unintelligible). Okay. And so it says





you were not on track for the next within grade increase. Did you miss that increase at some point?

A. **Yes. It was delayed. I didn't miss it completely. It was delayed.**

Q. Do you know how long it was delayed?

A. **I think about a month.**

Q. Okay.

A. **But this language comes-- that's an exact off of the document.**

Q. The performance appraisal?

A. **Yes.**

Q. And was the performance appraisal wrong? Were you not working fast enough?

A. **No. Well, performance-- performance? No. I don't question the accuracy of the numbers that were there.**

Q. Okay. And so I think you've included this in your answer to the question to Interrogatory 1 asking you to identify all the acts that you contend were in violation of the Rehabilitation Act. Are you saying that this was discrimination?

A. **No, no, no. That wasn't. That was an outcome of the discrimination.**

Q. Okay. And to be clear, the discrimination you're referring to is not granting you accommodations?





A. **And the hostile work environment and harassment, yes.**

Q. All those things made you-- impacted you in such a way that you weren't able to produce enough output for the VA's preferences?

A. **That was an end result of it.**

Q. Okay.

A. **Yes. Yes. And if you look at that document, I believe it says it all on the back of it-- explains it on the back of that document.**

Q. Okay. And when you're saying that document, you mean the performance appraisal for this time period?

A. **Yes, sir. Sorry for not being clear--**

Q. No. That's okay. I was just making sure we're on the same page. On or around-- I'm still on Page 16 and you say, On or around September 19th, 2013 Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified. So this is-- we had talked previously about an exam where you had asked to have a separate room and time to set up the computer. And I want to say that was like in 2012. So this is the following year? Is that what this response is referring to, 2013?

A. **I'm not sure.**

Q. Okay. Do you recall asking for this

accommodation in advance on or around September 19th, 2013?

A. **My understanding was that I didn't have to keep asking for the same accommodation.**

Q. I'm just asking whether you were recall requesting it on or around September 19th, 2013?

A. **No. Long before that, I did, yeah.**

Q. And when you say long before, you mean the previous time we had discussed, I want to say it was like March of 2012?

A. **Yes.**

Q. And your view is that they should have known that you needed the accommodation and that the VA should have given it to you without asking for subsequent certification tests?

A. **That was my understanding, that I-- yeah, I didn't need to keep requesting it.**

Q. Well, what was that understanding based on?

A. **I'm not really sure, but part of it is just common sense.**

Q. Did anyone at the VA tell you that you didn't have to request accommodations for subsequent certification tests?

A. **Well, they didn't tell me I had to either.**

Q. Okay. In the next paragraph, During October





2013 through November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. What requests are you referring to?

A. **Honestly, I don't remember what that specific request was. It had something to do something with James Beauchamp and I don't remember what the exact one was on those dates.**

Q. Do you remember making some requests that would have impacted your workload?

A. **No, no, no. To take it into-- out of VA terms, like as far as what that means, the appropriate workload means a balance of different types of claims is what it means. It doesn't mean the amount of work. It means the varying types of work. And what-- I was not receiving the appropriate variety of work.**

Q. Okay. I understand.

A. **In VA terms, that's what that means.**

Q. So part of the issues that you've had are that you don't feel like you got the experiences to become a rock star RVSR I think is how you phrased it in one of your emails, that you weren't getting the experience that would help you grow in your role?

A. **Yeah. Different times I said that, yeah.**





Q. Okay. And if I understand then what you're saying is you needed different types of claims so you could learn about different types of claim and be able to process different types of claims?

A. **Not actually in that sentence actually.**

Q. Okay. What do you mean in this sentence then? Because that's all I really want to know.

A. **So to be fully successful would mean to meet the production quote. And if you are only receiving complex claims that demand a great deal of time, you don't earn the right number of points. You can't meet your points if all you are-- if someone-- we were always able to manage our own workload. They wouldn't let me do that. And this one supervisor just kept on telling, you have to work this, have to-- so I had no control over what I was working. And they weren't claims that you could rapid fire off in order to get-- meet your production quota.**

Q. What kind of claims were they making you work?

A. **It could be claims that had--**

Q. Hold on. I don't want you to tell me what it could have been. If you don't remember, tell me you don't remember. If you know what types of claims you're referring to in this--





A. **Multi issue claims that-- multi issue-- No. I'm going to say there's too many for me to list for what that is.**

Q. Well--

A. **I don't know how to explain that in like RVSR--**

Q. I'm looking at Exhibit 1 and I'm on Page, what did we say this was, 16?

A. **Yeah.**

Q. And it says, The Agency had failed to accommodate your request that would have impacted your workload. Maybe I should just move it forward, but you don't remember what request this is referring to?

A. **No, I don't. I'm sorry.**

Q. That's fine. So when we were talking previously I think in one of our other sessions, you had mentioned that one of the accommodations that the VA gave you was a cookie cutter accommodation.

**(Screen share disabled.)**

And I think it was specifically the accommodation that let you work three days at home and then two days in the office. Is that an accommodation that the VA regularly gave to people

A. **I think what I said was that wasn't an accommodation at all, that that's something they put on a**

**piece of paper, but it was not an accommodation.**
Q. So from what you had said, and I might have just understood this wrong, was that there were work from home RVSRs and that was the schedule that they were allowed to work?
A. **Yes.**
Q. Okay. And I know you don't think it was an accommodation, but the schedule that the VA gave you that was labeled an accommodation was the same schedule that work-from-home RVSRs were allowed to work?
A. **Yes.**
Q. Okay. And those work-from-home RVSRs, that wasn't an accommodation for them. That was just the schedule that they were given?
A. **As far as I know, yes.**
Q. Well, why were they allowed to work from home?
A. **I think it was-- my understanding was because of experience level as RVSRs I think is what it is.**
Q. Okay. So less experienced RVSRs weren't allowed to work from home and then more experienced RVSRs were?
A. **That was my understanding.**
Q. Did you have any understanding of when an RVSR became sufficiently experienced to work from home?





A. **I may have. I don't remember right now.**
Q. You don't remember.
A. **Not right now, no.**
Q. And so I'm going to ask you a question. And it's going to get to a distinction between the inexperienced RVSRs who weren't allowed to work from home and the experienced ones who were, okay? So if I say experienced RVSRs, that's what I'm referring to is people who could, and inexperienced, people who couldn't.
A. **(Nods head)**
Q. So were you aware-- when you were an RVSR, were you aware of any other-- hold on. Let me get this. You were an inexperienced RVSR, correct?
A. **(Nods head) Comparatively, yes. Yes, yes. For this conversation, I would be-- yeah.**
Q. An inexperienced RVSR means someone who was allowed from home as a matter of course?
A. **From what I understood. From what I understood, yes.**
Q. Did you ever become a sufficiently experienced RVSR such that you could have worked that work-from-home schedule?
A. **Yes.**
Q. When was that?
A. **I don't remember the day.**





Q. Okay.
A. **When I came off second signature. I don't know when that was.**
Q. When you were a baby RVSR, an inexperienced RVSR, were you aware of any other inexperienced RVSRs without disabilities who were allowed to work from home?
A. **Boy. You've got to try to say that one more time.**
Q. Okay. Are you aware of any inexperienced RVSRs who did not have a disability who were permitted to work from home?
A. **Inexperienced RVSR-- yes.**
Q. Without a disability?
A. **Yes.**
Q. Who were permitted to work from home?
A. **Yes.**
Q. Okay. Who were those people?
A. **The first one that comes to mine is Vicky Fernandez.**
Q. And she was allowed to work from home?
A. **Yes.**
Q. What schedule was she given?
A. **I'm not sure what her exact schedule was.**
Q. Okay. Do you know if she had a reasonable accommodation?





A. **My understanding it was not reasonable accommodation related.**
Q. What was your understanding?
A. **An inappropriate relationship with someone in the Director's office.**
Q. What kind of relationship?
A. **They were both married and he got caught receiving fellatio in his office.**
Q. From Vicky Fernandez?
A. **Yes.**
Q. Okay.
A. **And she started working from home shortly thereafter.**
Q. After they got caught?
A. **Yes.**
Q. Okay. Anyone other than Vicky Fernandez?
A. **My heart's beating a little fast right now. That was not an easy one of.**
Q. I'm sorry.
A. **At this moment, I don't recall at this moment. It doesn't mean there aren't, but in this moment, I'm kind of stuck in that scenario. Aye, yi, yi. So was there an accommodation? I can't say for sure. Was she not-- was she still a baby RVSR? Yes.**
Q. She was a baby RVSR and she was working from

home?
A. **Yes.**
Q. But do you know for a fact that she didn't have a disability?
A. **No.**
Q. Okay. So she may have?
A. **Yeah. Sure. Sure.**
Q. And you don't know for certain why she was working from home, but your assumption is that it had something to do with the discipline-- No. I guess discipline's not right. It had something to do with the event you had just described?
A. **Yes. Yes. Yes. It wasn't discipline. It was smoothing things over, yeah.**
Q. What do you mean smoothing things over?
A. **Well, I don't know. Just making things go away, I guess. I don't know why they did it the way they did, meaning the Director's office.**
Q. Did the other party in this incident receive any discipline to your knowledge?
A. **He got moved out of there.**
Q. Out of the Director's office?
A. **Yeah. I believe he got a promotion. I believe he got a promotion.**
Q. Okay.





A. **He ended up in D.C.**
Q. What was his name?
A. **Scott Osti (phonetic).**
Q. Okay.
A. **Does this become part of the government record?**
Q. Does this become what?
A. **Part of the government record?**
Q. It is memorialized on the record that Ms. Askins is taking. I don't expect that this deposition will necessarily become a public document though.
A. **Okay.**
**MR. SULLIVAN:** Let's go off the record.
**(Off the record at 3:20 p.m.)**
**(On the record at 3:26 p.m.)**
**MR. SULLIVAN:** Okay. Let's go back on the record.
Q. **(By Mr. Sullivan)** Ms. Mullin, we talked last year about your Union roles. At any point during your time at the VA and working as a member of the AFGE, did you serve as the AFGE's Union Safety and Health Representative?
A. **No. Not in an official capacity, no.**
Q. Did you ever serve in that role in an





unofficial capacity?
A. **Yes.**
Q. And I recall there was a gentleman by the name of Walter Ingram (phonetic)?
A. **Yeah. He was one of them, yeah.**
Q. One of?
A. **The people on the safety committee.**
Q. Okay. Do you know who the designated Safety and Health Representative was?
A. **Are we talking about when I was denied the mold training?**
Q. Yeah. I mean, that's ultimately what this is getting to, but yeah. At that time, who was the Safety and Health Representative?
A. **Because there were a number of different ones, but if you-- I didn't know there was one designated one. I only know what was written in different correspondence, but I had no knowledge of it.**
Q. Okay. So you didn't even know that that was a thing?
A. **I didn't know there was a designated-- yeah. No. I didn't know.**
Q. Okay. But you were not the designated Safety and Health Representative?
A. **Yeah. I didn't know designation was a thing.**





**Our committee-- I didn't know more than that. I was part of a committee.**
Q. And were you formally a part of the committee or were you informally helping them?
A. **I don't know. Valorie Reilly may have put me on the committee list most likely, but I-- in terms-- how we were perceived by the Agency, I don't know. In our Union, yes.**
Q. Okay. And so you made reference to this mold training that the Agency didn't let you participate in. Can you just tell me about that briefly?
A. **The training or the whole events around the. . .**
Q. I thought there was like a mold training that you wanted to be apart of?
A. **Yes. There was notice that they were going to-- the Union had requested air quality testing that ended-- I mean, education training, which ended up being called mold training. It had to do with air quality training. It ended up being called mold training.**
**And the Union worked hard trying to get different people to come in and speak. And it got as far as this one training that ends up being part of that email exchange and part of the Complaint. And I'm not-- am I answering your question?**

Q. Yeah. Sort of.
A. **Okay. So I was the one who had already studied the air quality studies and knew what was in different parts of the building. And the Union wanted me to as the learned person to be part of the training.**
Q. Okay. And did the Agency allow you to be a part of it?
A. **Oh, no.**
Q. And was that discrimination?
A. **Yes.**
Q. Disability or retaliation?
A. **Retaliation. I would say retaliation because if you look at the letters from the EEO that were going back and forth, the timing of it was exact.**
Q. Exact--
A. **Like when they were receiving letters and Bonnie Wax was writing things about me not being part of the committee and things like that.**
Q. Okay. Besides the timing, is there any other reason that you believed it's-- that the Agency denying you the opportunity to participate in this training is retaliation?
A. **Yes, yes. Because I was a member of the Union and I was advocating for the health and safety of the employees and I made too much noise as a Union member**





**and I filed an EEO complaint.**
Q. And so that's what I'm asking about is that EEO Complaint part. Besides the timing of the Complaint and the subsequent refusal to let you participate in the training, what led you to conclude that you were being retaliated against for the EEO Complaint?
A. **For the EEO part? I couldn't climb-- I wouldn't claim to climb into Bonnie's head and say which part of it was divided up between EEO and Workmen's Comp. or OSHA and things like that. God only knows which part of that was causing her to be so discriminatory.**
Q. But is there anything else besides the timing that led you to conclude that Mrs. Wax was being-- was retaliating against you for your EEO activity?
A. **You know, I don't think I'm really understanding the question. I apologize.**
Q. That's okay. You said you had filed an EEO Complaint and right around that same time is when you were trying to get into the mold training, right?
A. **Can you tell me the date of the mold training letter?**
Q. I want to say it's around Thanksgiving of 2011, like November of 2011?
A. **So if it was November 2011, it did not have to do with Workmen's Compensation.**





Q. Okay.
A. **I mean it didn't have to do with EEO in 2011. It had to do with AFGE. It wasn't the-- it wasn't EEO. So it had to be just because of the AFGE.**
Q. Okay.
A. **By then I was making noise about being sick in the building too. So it could have been-- if you're doing the Venn diagram, it would fall under both.**
Q. Both what?
A. **Disability and retaliation, that harassment discrimination. They didn't want someone to say that they're sick because of the building learning more about why they're are sick due to the building.**
Q. Okay. So I mean, you obviously had a lot of issues with the Agency related to your reasonable accommodation requests. Were you the only one at the VA having this problem or was everyone having a hard time getting accommodations that they wanted?
A. **It's not an everyone, but there was actually a class action filed because there were so many.**
Q. Uh-huh. And you were a member of that?
A. **Yes.**
Q. What happened with that class action?
A. **The attorney didn't file something on time. So for timeliness, it got tossed.**





Q. Okay. And then after it got tossed, you were allowed to continue on alone, correct?
A. **Yeah. It had something to do with the word bifurcation and something like that, but yeah. Yeah.**
Q. And do you recall getting a final Agency decision on that EEO Complaint?
A. **The class action?**
Q. No. The one that-- your portion of the class action that survived after the class action went away?
A. **Yeah. Yes, I mean.**
Q. Okay. Did you ever appeal that?
A. **Yes.**
Q. You did?
A. **Yes.**
**MR. SULLIVAN:** So James and Dan, if you guys have any documents related to an appeal that Ms. Mullin might have taken from her two other EEOs that were consolidated, I'd like to see them.
A. **Is it two consolidated, meaning the original one and then-- the one with 26 claims in it?**
Q. So you had one with 26 claims that we had marked as an exhibit. I think it was Exhibit 2 was the Investigative Report. Yeah, it ends 3413. But then you had another one I believe two complaints that were made

and then consolidated. That might have been a part of that other EEO. Do you know what I'm referring to?
**A. I can't remember the-- I remember the events. I remember what they were, but I don't remember what was combined and what was tossed and accepted.**
Q. Okay. So anyway, I was asking you about RVSRs.
**A. Yes.**
Q. Who had asked for accommodations.
**A. Uh-huh.**
Q. And so what I was asking is were other RVSRs having the same problems that you were getting accommodations or were you sort of an outlier?
**A. I'm drawing a blank on that, and that's wrong. Because I know there were and I know-- I know VSRs, Super Senior VSRs, the VSRs-- at this moment, I can't-- yes, there were. Can I recall at this moment? Black ice.**
Q. And just so we're clear, you recall that people in these different job titles were seeking accommodations and not being given effective accommodations?
**A. I missed the last end of your sentence.**
Q. I'm just trying to see if they were treated like you were or if they were treated differently. Were





they given accommodations, or like you, were they not given effective accommodations?
**A. I'm drawing a blank on it. I know Matt Shear (phonetic) ended up dying. I don't know what his accommodation path was. I know Barbara Zeh was given some accommodations. They weren't timely and she had-- it forced her to into an early medical retirement. I can't give-- I can't retrieve anything else right now.**
Q. Okay. Can you retrieve any RVSRs who asked for accommodations and were given them?
**A. I know another one that wasn't. Oh. Remember I talked about the Gulf War Veteran, the little woman? I don't know if you remember about the military sexual trauma. She asked to be against the back wall. Her name was-- Sandy Brown is her name. It came to me as we-- I left the other day. That's Sandy Brown. She was not given accommodation. I just can't remember right now.**
Q. Okay. So you can't remember whether any RVSRs who sought for-- who sought accommodations were granted them?
**A. At this moment, I just can't remember right now.**
Q. Okay. What about things like applying for advanced sick leave? Were other RVSRs-- were there other





RVSRs who had similar difficulties applying for advanced sick leave?
**A. I don't know anybody else having those difficulties.**
Q. Okay. Do you know of other RVSRs who applied for advanced sick leave and got it without a problem?
**A. Yes.**
Q. Okay.
**A. Actually, there was a woman I used to teach with. And she said, I don't know why they give you such a hard time, Aileen. They gave it to me right away. And if you-- Maura, Maura-- I'll come up with her last name. We talked together and she got cancer after I did.**
**Mary Jo Shapiro, she got cancer after I did. A piece of cake, walk in the park, no problem. So those two I know for a fact were not. . .**
Q. Okay. I wanted to ask you about the VMBS system?
**A. VBMS.**
Q. I'm going to get it eventually. VBMS.
**A. Yes.**
Q. What does it stand for?
**A. Don't remember. Veterans Benefits Management System.**
Q. I feel like I would remember it better if I





could--
**A. Yes, Veterans Benefits. So if you see Veterans--**
Q. It's VB, okay.
**A. VBMS.**
Q. I understand there were difficulties after you started working exclusively in that system.
**A. Oh, yeah. Yes.**
Q. Generally, what were the problems that you were experiencing?
**A. I didn't know how to use it.**
Q. Okay.
**A. I could get into it, but I couldn't get into all the different parts or get it to-- you know, if I wanted to select 60 percent for a service connection for the whatever, left arm, and then add a different percent or look for access where I could find the Veteran's status, I just didn't know how to do it.**
Q. Okay.
**A. I did learn, but I trained myself on it.**
Q. How long do you think it took you to train yourself on all that?
**A. I don't know. Maybe-- I don't know. I was still learning in the end. I'd have to go back in my notes because I kept notes on all that. Because I had**

**to-- I can't remember, but I did keep track of all the-- on what I was training myself on and how I trained myself.**

**Q.** Did you ever ask anyone for additional VBMS training?

**A. I let them know I needed help. I didn't ask for it. I just said I didn't know how to-- I needed-- I didn't know-- I let them know that I had to learn as I went. Did I ask for more specific training? I don't remember saying that specifically. I did let them know that I-- because it affected how fast I could do my production. So I had to let them know about that.**

**Q.** And did anyone do anything to get you extra training?

**A. No. No.**

**Q.** Was that discrimination or retaliation?

**A. I'm trying to look at the Venn diagram. It was definitely discrimination in that the accommodation was in effect (ad verbum) to do the job as an RVSR. So that was the disability portion of it.**

**Q.** Okay.

**A. You gave me the tools, didn't give me what (ad verbum) I needed to use them.**

**Q.** Okay. Well, I never thought this day would come, Ms. Mullin, but I don't have any further questions





for you. I appreciate your time.

**A. I don't know if that's a good thing or a bad thing.**

**MR. SOLOMON:** No questions for now. We would like to reserve the right to read and sign.

**MR. SULLIVAN:** Okay. Let's go off the record.

S T I P U L A T I O N

It is hereby stipulated and agreed by and between counsel present at this deposition and by the deponent that the reading and signing of this deposition is not waived.

(This Zoom deposition was concluded at 3:45 p.m.)





CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, Debbie E. Askins, FPR, Notary Public, State of Florida, certify that **Aileen Mullin** personally appeared before me on January 7, 2022 and was duly sworn.

Signed this 19th day of January, 2022.





DEBBIE E. ASKINS, FPR
Notary Public, State of Florida
My Commission No. HH 110711
Expires: 05/13/2025





CERTIFICATE OF REPORTER

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, DEBBIE E. ASKINS, FPR, do hereby certify that I was authorized to and did stenographically report the Zoom deposition of **Aileen Mullin**; that a review of the transcript was requested; and that the foregoing transcript, pages 388 through 473, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 19th day of January, 2022.



Debbie E. Askins, FPR
Notary Public, State of Florida

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,
Plaintiff,

vs.
CASE NO.: 8:20-cv-026970-VMC-AEP
DENIS McDONNOUGH
SECRETARY
U.S. DEPT. OF VETERANS AFFAIRS,
Defendant.
______________________________________/

IN RE: Zoom Deposition of: Aileen Mullin, Vol. III
TAKEN: 1/7/2022

DATE SENT TO WITNESS: 1/19/2022

TO: Aileen Mullin
c/o James Solomon, Esq. (james@smkfirm.com)

The referenced transcript has been completed and awaits reading and signing.
Please arrange to read and sign the transcript. The transcript (Vol. III, pgs 388-473) is 85 pages long, and you should allow yourself sufficient time.
The original of this deposition has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties as listed below.
Thank you.

Debbie E. Askins
_____________________________________________
Debbie E. Askins, Professional Court Reporter

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com





**ERRATA SHEET - DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES**

**IN RE: Aileen Mullin v. Denis McDonnough, Sec. U.S. Department of Veterans Affairs**
Case No. 8:20-cv-026970-VMC-AEP
**Zoom deposition of Aileen Mullin, Vol. III, 1/7/2022**
REPORTED BY: Debbie E. Askins, FPR

| Page | Line | Change | Reason |
|---|---|---|---|
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| _____ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |
| ___ | _____ | ______________________________ | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

______________________ ___________________________
**Date** **Aileen Mullin**

CC: David P. Sullivan, AUSA; david.sullivan3@usdoj.gov
James Solomon, Esq.; james@smkfirm.com
Daniel Maharaj, Esq.; daniel@smkfirm.com

## $

**$1,000** [2] - 393:25, 394:7
**$11,498.16** [1] - 404:21
**$35,000** [2] - 396:22, 397:1
**$40,000** [4] - 411:10, 411:11, 411:14, 412:25
**$40,541.26** [1] - 411:4
**$76,000** [5] - 403:24, 405:19, 407:14, 407:16, 410:14
**$76,909** [1] - 405:14
**$76,909.63** [2] - 401:15, 403:16

## '

**'16** [1] - 414:19
**'21** [1] - 411:5

## 0

**010560** [1] - 390:7
**05/13/2025** [1] - 470:16

## 1

**1** [18] - 392:2, 392:22, 393:2, 401:10, 403:9, 405:5, 408:1, 408:11, 416:8, 422:11, 423:7, 423:8, 439:18, 440:3, 442:11, 445:6, 446:18, 451:7
**1,200** [3] - 418:20, 420:2, 420:12
**1,246** [1] - 418:17
**1/19/2022** [1] - 472:10
**1/7/2022** [2] - 472:9, 473:3
**10560** [1] - 431:18
**11** [2] - 442:10, 442:11
**11,000** [1] - 406:2
**11,498** [1] - 407:10
**1100-192** [1] - 389:3
**110711** [1] - 470:15
**12th** [2] - 442:12, 443:18
**14** [1] - 441:20
**15** [1] - 393:11
**16** [4] - 445:5, 447:16, 451:8
**17th** [1] - 434:22
**18th** [1] - 434:20
**19** [6] - 393:2, 403:8, 403:19, 408:11, 422:6, 441:22
**1998** [2] - 398:9
**19th** [5] - 447:16, 448:1, 448:6, 470:11, 471:11
**1:32** [1] - 388:13
**1st** [3] - 396:20, 398:4, 398:16

## 2

**2** [1] - 463:23
**20** [2] - 397:13, 397:20
**2007** [1] - 425:18
**2009** [19] - 394:18, 395:14, 395:16, 398:11, 402:11, 423:1, 423:24, 424:10, 424:13, 425:19, 425:20, 434:16, 435:1, 435:2, 435:10, 436:5, 436:24, 437:8, 437:9
**2011** [8] - 424:25, 426:1, 434:18, 435:11, 461:23, 461:24, 462:2
**2012** [12] - 417:2, 419:19, 424:2, 428:24, 429:7, 431:3, 431:4, 442:12, 442:17, 443:19, 447:22, 448:10
**2013** [11] - 417:2, 419:20, 420:25, 434:20, 445:6, 447:16, 447:23, 448:2, 448:6, 449:1
**2014** [6] - 417:2, 421:3, 421:11, 421:12, 433:16
**2015** [17] - 394:21, 396:21, 398:4, 398:10, 398:12, 398:16, 398:25, 399:5, 399:14, 400:22, 414:15, 414:19, 417:2, 421:3, 421:10, 421:11, 434:22
**2016** [5] - 411:4, 413:5, 413:8, 414:19
**2021** [3] - 391:12, 393:11, 413:5
**2022** [5] - 388:12, 391:21, 470:9, 470:11, 471:11
**221** [1] - 413:8
**26** [2] - 463:21, 463:22
**27th** [1] - 434:15
**28th** [1] - 434:18
**29** [1] - 422:11
**29th** [1] - 445:6
**2:15** [1] - 422:2
**2:17** [1] - 422:3
**2:45** [1] - 439:15
**2:54** [1] - 439:16

## 3

**3** [1] - 440:3
**317** [1] - 433:12
**3200** [1] - 389:8
**33602** [2] - 389:3, 389:8
**3413** [1] - 463:24
**38** [7] - 390:5, 403:2, 403:5, 405:20, 406:20, 408:4, 408:5
**388** [2] - 388:20, 471:7
**388-473** [1] - 472:14
**39** [3] - 390:6, 431:16, 431:19
**391** [1] - 389:13
**3:20** [1] - 457:15
**3:26** [1] - 457:16
**3:45** [2] - 388:13, 469:14

## 4

**4** [1] - 440:4
**40,000** [4] - 412:4, 412:5, 412:8, 412:9
**400** [1] - 389:8
**403** [1] - 390:5
**431** [1] - 390:6
**439** [1] - 417:16
**45** [11] - 430:14, 430:20, 436:9, 436:13, 436:14, 436:16, 436:18, 436:23, 437:1, 437:2, 437:9
**45-day** [1] - 438:7
**470** [1] - 389:14
**471** [1] - 389:15
**472** [1] - 389:16
**473** [3] - 388:20, 389:17, 471:7

## 5

**5** [1] - 440:4

## 6

**60** [1] - 467:15
**60,000** [1] - 405:14
**601** [1] - 389:3
**607** [1] - 432:18
**62** [1] - 415:12
**64** [1] - 439:19
**66** [3] - 393:1, 414:25, 416:8
**67** [1] - 401:9
**68** [1] - 393:8

## 7

**7** [5] - 388:12, 422:7, 422:11, 425:15, 470:9
**76** [2] - 397:21, 401:19
**76,000** [2] - 405:24, 407:7

## 8

**813-274-6000** [1] - 389:9
**813-497-7650** [1] - 389:5
**85** [1] - 472:14
**8:20-cv-026970-VMC-AEP** [3] - 388:5, 472:5, 473:3

## A

**a.m** [1] - 388:13
**able** [9] - 392:23, 395:18, 411:23, 420:14, 423:8, 431:23, 447:4, 450:3, 450:13
**absolutely** [2] - 413:14, 420:17
**acceptable** [1] - 445:8
**accepted** [1] - 464:5
**access** [5] - 442:13, 442:20, 443:12, 444:8, 467:17
**accommodate** [3] - 393:24, 449:3, 451:11
**accommodated** [2] - 420:8, 420:13
**accommodation** [23] - 422:20, 422:21, 423:24, 424:11, 425:16, 448:1, 448:4, 448:13, 451:18, 451:21, 451:22, 451:25, 452:1, 452:8, 452:9, 452:13, 454:25, 455:2, 455:23, 462:16, 465:5, 465:17, 468:18
**accommodations** [16] - 411:25, 412:2, 429:12, 446:25, 448:22, 451:17,

462:18, 464:9, 464:13, 464:21, 464:22, 465:1, 465:2, 465:6, 465:10, 465:20
**according** [2] - 402:9, 402:10
**account** [2] - 411:15, 412:14
**accrued** [1] - 410:25
**accuracy** [3] - 445:16, 445:17, 446:15
**accurate** [2] - 413:2, 419:20
**acronym** [1] - 432:3
**act** [5] - 426:25, 427:15, 428:20, 430:15, 436:9
**Act** [6] - 434:1, 434:4, 434:6, 434:9, 434:12, 446:20
**action** [8] - 428:23, 462:20, 462:23, 463:7, 463:9, 471:10, 471:10
**activity** [3] - 425:16, 425:18, 461:14
**acts** [8] - 422:15, 424:12, 426:2, 437:4, 437:5, 437:9, 446:19
**ad** [4] - 421:20, 427:18, 468:19, 468:23
**add** [2] - 412:5, 467:16
**addition** [4] - 403:21, 412:16, 412:25, 441:21
**additional** [1] - 468:4
**admin** [2] - 418:11, 419:2
**admit** [1] - 428:11
**advance** [2] - 442:9, 448:1
**advanced** [4] - 416:25, 465:25, 466:1, 466:6
**advocating** [1] - 460:24
**AFFAIRS** [2] - 388:7, 472:7
**Affairs** [1] - 473:2
**affected** [1] - 468:11
**affidavits** [1] - 441:17
**AFGE** [3] - 457:21, 462:3, 462:4
**AFGE's** [1] - 457:22
**afternoon** [1] - 442:3
**age** [1] - 415:12
**Agency** [10] - 442:17, 444:7, 449:3, 451:10, 459:7, 459:10, 460:6, 460:20, 462:15, 463:5
**agency** [2] - 423:2, 443:3
**Agency's** [1] - 393:23
**ago** [1] - 414:8
**agree** [4] - 405:14, 405:18, 406:25, 419:23
**agreed** [1] - 469:10
**agreement** [1] - 442:2
**ahead** [1] - 414:7
**Aileen** [9] - 389:12, 466:11, 470:8, 471:6, 472:9, 472:11, 473:2, 473:3, 473:23
**AILEEN** [4] - 388:3, 388:10, 391:2, 472:3
**air** [3] - 459:17, 459:19, 460:3
**ALL** [1] - 388:14
**allegations** [1] - 424:4
**alleged** [1] - 422:16
**allow** [4] - 414:2, 414:13, 460:6, 472:15
**allowed** [11] - 412:23, 425:10, 452:5, 452:10, 452:16, 452:21, 453:6, 453:17, 454:6, 454:20, 463:2
**alone** [1] - 463:2
**amount** [22] - 393:13, 401:20, 402:1, 403:25, 404:2, 404:6, 404:9, 404:10, 404:14, 404:24, 405:14, 405:23, 406:15, 416:18, 418:8, 418:9, 421:22, 421:23, 449:15
**amounts** [4] - 416:5, 416:9, 416:13, 416:14
**animus** [1] - 425:21
**annual** [17] - 416:14, 416:18, 416:22, 416:25, 417:4, 417:7, 417:9, 417:11, 417:16, 418:7, 418:25, 419:1, 419:6, 419:15, 420:6, 420:10, 421:13
**annually** [2] - 430:23, 447:17
**answer** [22] - 393:2, 393:10, 393:12, 393:19, 395:15, 398:5, 403:8, 403:18, 408:2, 408:11, 414:5, 414:12, 415:14, 418:23, 423:7, 430:16, 434:24, 436:6, 436:11, 436:20, 437:15, 446:18
**answering** [2] - 440:12, 459:25
**Antidiscrimination** [1] - 434:6
**anyway** [1] - 464:6
**apart** [1] - 459:15
**apologies** [1] - 419:20
**apologize** [1] - 461:16
**appeal** [2] - 463:11, 463:16
**APPEARANCES** [2] - 389:1, 389:6
**appeared** [1] - 470:8
**appearing** [1] - 438:17
**applied** [1] - 466:5
**applying** [2] - 465:24, 466:1
**appraisal** [3] - 446:10, 446:12, 447:12
**appreciate** [2] - 424:16, 469:1
**appropriate** [4] - 394:8, 449:2, 449:13, 449:17
**April** [7] - 396:20, 398:4, 398:10, 398:15, 421:10, 434:15, 445:6
**area** [1] - 428:7
**arisen** [1] - 410:7
**arm** [1] - 467:16
**arrange** [1] - 472:14
**arrive** [1] - 415:10
**articulated** [1] - 423:7
**Ashley** [1] - 389:3
**aside** [1] - 431:6
**Askins** [6] - 388:17, 457:10, 470:7, 471:14, 472:18, 473:4
**ASKINS** [2] - 470:14, 471:5
**assigned** [2] - 427:5, 427:8
**assignment** [1] - 440:13
**assistant** [1] - 426:15
**Assistant** [1] - 423:11
**assume** [4] - 397:3, 430:22, 432:14, 436:1
**assumed** [1] - 397:5
**assumption** [1] - 456:9
**asthma** [4] - 402:7, 406:5, 406:6, 406:8
**Attorney** [1] - 389:7
**attorney** [3] - 462:24, 471:9, 471:10
**attorneys** [3] - 403:3, 440:22, 441:19
**AUSA** [3] - 389:7, 472:20, 473:24
**authorized** [1] - 471:6
**awaits** [1] - 472:13
**award** [1] - 394:8
**aware** [5] - 436:8, 453:11, 453:12, 454:5, 454:9
**AWOL** [1] - 419:2
**Aye** [1] - 455:22

## B

**baby** [3] - 454:4, 455:24, 455:25
**bad** [1] - 469:2
**bag** [1] - 392:5
**balance** [3] - 396:21, 396:22, 449:14
**banking** [1] - 396:4
**Barbara** [3] - 425:5, 429:11, 465:5
**based** [9] - 411:18, 413:6, 415:3, 416:20, 425:8, 427:12, 442:13, 443:7, 448:18
**Bates** [3] - 401:6, 403:3, 431:18
**BCBS** [2] - 390:5, 403:9
**bear** [3] - 392:5, 431:18, 433:18
**bearing** [1] - 431:17
**beating** [1] - 455:17
**Beauchamp** [2] - 445:12, 449:8
**beautiful** [1] - 442:3
**became** [3] - 402:15, 452:25
**become** [5] - 449:22, 453:20, 457:5, 457:7, 457:11
**Behalf** [1] - 388:11
**belabor** [2] - 422:22, 441:18
**below** [1] - 472:16
**Benefits** [3] - 410:24, 466:23, 467:2
**benefits** [1] - 410:25
**best** [5] - 406:22, 416:11, 421:1, 431:12
**Beth** [1] - 428:13
**better** [3] - 391:9, 414:13, 466:25
**between** [4] - 398:9, 453:5, 461:9, 469:10
**biannually** [1] - 430:24
**bifurcation** [1] - 463:4
**big** [2] - 428:4
**billed** [6] - 403:24, 404:3, 404:10, 405:1, 405:24, 407:8
**billing** [1] - 409:5
**bills** [2] - 397:17, 408:5
**bit** [5] - 391:9, 392:1, 428:13, 438:18, 441:11
**black** [1] - 464:18
**blank** [4] - 423:18, 426:14, 464:14, 465:3
**Blue** [40] - 401:22, 401:24, 402:5, 402:9, 402:12, 404:18, 404:20, 406:4, 406:7, 406:8, 406:11, 406:14, 406:16, 406:20, 406:21, 407:10, 407:13,

407:18, 407:19, 407:21, 408:7, 408:14, 408:17, 408:20
**body** [1] - 425:3
**Bonnie** [1] - 460:17
**Bonnie's** [1] - 461:8
**borrow** [1] - 419:7
**bottom** [2] - 393:8, 403:16
**box** [1] - 415:21
**boy** [1] - 454:7
**break** [3] - 410:3, 439:7, 439:12
**Bridgid** [1] - 402:24
**brief** [1] - 397:10
**briefly** [1] - 459:11
**bring** [1] - 439:18
**broke** [1] - 414:8
**Brown** [2] - 465:15, 465:16
**building** [12] - 391:14, 417:10, 420:16, 420:18, 420:21, 425:11, 426:7, 426:8, 460:4, 462:7, 462:12, 462:13
**bullets** [1] - 411:3
**bunch** [1] - 437:23
**Burgess** [1] - 426:12
**BY** [2] - 391:6, 473:4

## C

**c/o** [1] - 472:12
**cake** [1] - 466:15
**calculate** [1] - 394:2
**calculated** [2] - 421:23, 421:24
**calculation** [1] - 394:3
**cancel** [1] - 396:7
**Cancer** [1] - 409:10
**cancer** [8] - 409:14, 410:4, 410:17, 419:5, 420:15, 428:3, 466:13, 466:14
**capacity** [3] - 400:5, 457:24, 458:1
**car** [1] - 397:18
**card** [2] - 395:21, 396:8
**cardiothoracic** [1] - 409:23
**care** [6] - 402:6, 402:10, 402:24, 410:17, 413:23, 413:25
**CASE** [2] - 388:5, 472:5
**case** [10] - 393:4, 393:19, 394:25, 401:5, 405:13, 424:5, 424:17, 424:19, 425:19, 425:20
**Case** [1] - 473:3
**category** [5] - 393:22, 396:18, 400:17, 401:13, 410:23
**caught** [2] - 455:7, 455:14
**causing** [1] - 461:11
**caveat** [1] - 441:7
**CC** [2] - 472:20, 473:24
**Center** [4] - 409:11, 409:13, 423:13, 444:14
**Centers** [1] - 423:12
**certain** [1] - 456:8
**certainly** [1] - 437:17
**CERTIFICATE** [2] - 470:1, 471:1
**Certificate** [2] - 389:14, 389:15
**certification** [3] - 447:18, 448:15, 448:23
**certify** [2] - 470:8, 471:5
**CERTIFY** [1] - 471:8
**chain** [1] - 444:5
**challenging** [1] - 440:9
**chance** [1] - 413:24
**Change** [1] - 473:5
**change** [1] - 396:8
**CHANGES** [1] - 473:1
**Chase** [1] - 396:5
**check** [3] - 399:7, 416:17, 418:23
**checks** [1] - 399:13
**chosen** [1] - 400:11
**circles** [1] - 424:18
**claim** [2] - 450:3, 461:8
**claimed** [1] - 393:25
**claiming** [3] - 393:4, 393:13, 400:25
**claims** [12] - 445:19, 449:14, 450:2, 450:4, 450:10, 450:16, 450:19, 450:21, 450:24, 451:1, 463:21, 463:22
**class** [5] - 462:20, 462:23, 463:7, 463:8, 463:9
**classic** [1] - 413:22
**clear** [3] - 446:24, 447:13, 464:19
**climb** [2] - 461:7, 461:8
**close** [1] - 408:9
**closes** [1] - 416:3
**co** [10] - 404:18, 405:8, 428:8, 429:11, 429:14, 437:25, 438:2, 438:6, 438:12, 438:14
**co-pay** [1] - 404:18
**co-pays** [1] - 405:8
**co-worker** [3] - 428:8, 429:11, 429:14
**co-workers** [5] - 437:25, 438:2, 438:6, 438:12, 438:14
**coach** [1] - 424:24
**Coaches** [2] - 423:12
**coaches** [1] - 423:25
**code** [1] - 406:10
**codes** [2] - 406:6, 406:7
**Collette** [1] - 426:11
**Column** [2] - 432:25, 433:7
**column** [5] - 403:23, 403:24, 404:5, 404:8, 404:23
**combination** [2] - 419:8, 419:9
**combined** [1] - 464:5
**comfortable** [1] - 440:22
**comments** [3] - 440:2, 440:6, 440:16
**Commission** [1] - 470:15
**committee** [6] - 458:7, 459:1, 459:2, 459:3, 459:6, 460:18
**common** [1] - 448:20
**communicated** [1] - 429:6
**Comp** [22] - 402:8, 402:9, 402:13, 402:17, 402:18, 406:6, 406:9, 408:24, 409:1, 409:9, 409:24, 409:25, 412:21, 412:22, 413:1, 413:20, 413:24, 414:21, 417:10, 417:20, 426:18, 461:9
**company** [2] - 404:15, 406:1
**Comparatively** [1] - 453:14
**compensate** [1] - 415:1
**compensated** [2] - 394:5, 418:1
**compensating** [1] - 414:22
**Compensation** [8] - 399:1, 401:21, 401:24, 402:22, 406:5, 406:17, 426:23, 461:25
**compensation** [4] - 393:22, 396:19, 400:16, 415:3
**complained** [2] - 424:4, 424:12
**complaining** [1] - 430:15
**Complaint** [13] - 422:18, 429:23, 431:8, 433:11, 433:13, 437:1, 441:9, 459:24, 461:3, 461:6, 461:18, 463:6
**complaint** [2] - 429:13, 461:1
**complaints** [1] - 463:25
**Complaints** [2] - 422:18, 431:2
**completed** [3] - 433:15, 443:3, 472:13
**completely** [2] - 397:16, 446:4
**complex** [1] - 450:10
**complications** [1] - 410:4
**computer** [1] - 447:21
**conclude** [3] - 394:7, 461:5, 461:13
**concluded** [1] - 469:14
**conditions** [3] - 409:24, 417:10, 417:21
**connected** [1] - 471:10
**connection** [1] - 467:15
**consecutive** [3] - 397:13, 397:21, 398:2
**considered** [2] - 435:14
**considers** [1] - 405:3
**consistent** [1] - 422:24
**consolidated** [3] - 463:18, 463:20, 464:1
**cont'd** [2] - 389:13, 391:5
**contact** [1] - 429:9
**contacted** [1] - 424:2
**contain** [1] - 440:15
**contend** [2] - 423:5, 446:19
**content** [2] - 433:5, 433:6
**contents** [1] - 434:25
**continue** [3] - 400:9, 413:20, 463:2
**continued** [5] - 397:24, 398:1, 411:9, 411:11, 413:7
**contribute** [1] - 411:19
**contributed** [2] - 411:10, 412:9
**contributing** [1] - 412:20
**contribution** [3] - 412:1, 413:4
**contributions** [1] - 411:4
**control** [1] - 450:15
**conversation** [2] - 426:25, 453:15
**conversations** [1] - 400:7
**cookie** [1] - 451:18
**copies** [1] - 392:9
**copy** [3] - 392:1, 392:11, 432:16
**corner** [1] - 407:2
**Correa** [1] - 427:19
**correct** [14] - 399:18, 404:3, 407:8, 413:21, 429:20, 430:24, 431:2, 431:9,

432:9, 434:9, 435:25, 436:10, 453:13, 463:2
**correspondence** [1] - 458:18
**counsel** [5] - 436:10, 436:19, 469:11, 471:9, 471:10
**counselor** [5] - 424:2, 429:4, 429:24, 430:3, 430:12
**cOUNTY** [1] - 470:5
**COUNTY** [1] - 471:4
**couple** [1] - 441:12
**course** [1] - 453:17
**COURT** [2] - 388:1, 472:1
**Court** [1] - 472:18
**cover** [2] - 406:14, 409:1
**covered** [4] - 405:9, 406:9, 406:17, 426:6
**covers** [1] - 406:7
**create** [1] - 440:23
**created** [3] - 401:22, 420:17, 420:19
**credit** [12] - 393:23, 394:11, 394:13, 394:17, 395:2, 395:3, 395:11, 395:18, 395:21, 396:1, 396:8, 396:13
**credits** [1] - 410:25
**Cross** [21] - 401:22, 401:24, 402:5, 402:9, 402:12, 404:18, 404:20, 406:4, 406:7, 406:11, 406:14, 406:16, 406:21, 407:10, 407:13, 407:19, 407:21, 408:7, 408:14, 408:17, 408:20
**crosstalk** [1] - 402:19
**crushed** [1] - 428:10
**curious** [1] - 415:9
**current** [1] - 396:21
**cut** [1] - 397:16
**cutter** [1] - 451:18

## D

**D.C** [1] - 457:1
**Dale** [1] - 426:11
**damage** [4] - 393:22, 394:4, 394:8, 414:1
**damaged** [1] - 394:14
**damages** [3] - 393:3, 394:11, 400:24
**Dan** [9] - 392:8, 393:17, 395:5, 401:4, 401:20, 415:20, 441:1, 441:24, 463:15
**Daniel** [3] - 389:2, 472:21, 473:25
**daniel@smkfirm.com** [3] - 389:4, 472:21, 473:25
**Date** [1] - 473:23
**date** [6] - 398:16, 398:20, 407:1, 427:4, 429:16, 461:20
**DATE** [2] - 388:12, 472:10
**DATED** [1] - 471:11
**dates** [6] - 399:20, 420:23, 438:16, 443:16, 449:9
**David** [3] - 389:7, 472:20, 473:24
**david.sullivan3@usdoj.gov** [2] - 472:20, 473:24
**David.Sullivan3@usdoj.gov** [1] - 389:9
**days** [13] - 430:15, 430:20, 436:9, 436:13, 436:16, 436:18, 436:23, 437:1, 437:2, 437:9, 440:22, 451:21, 451:22
**deadline** [3] - 438:7, 438:11, 438:12
**deal** [1] - 450:10
**deals** [1] - 409:13
**debate** [1] - 413:22
**Debbie** [4] - 470:7, 471:14, 472:18, 473:4
**debbie** [1] - 388:17
**DEBBIE** [2] - 470:14, 471:5
**debt** [25] - 397:3, 397:4, 397:5, 398:8, 398:9, 399:17, 400:14, 400:22, 400:24, 401:21, 401:22, 402:2, 402:15, 402:16, 405:21, 405:22, 408:7, 408:14, 408:16, 420:14, 420:17, 421:13, 421:14, 421:16
**December** [2] - 393:11, 433:16
**decision** [1] - 463:6
**declare** [1] - 473:21
**decrease** [1] - 395:21
**default** [1] - 397:18
**DEFENDANT** [1] - 389:6
**Defendant** [3] - 388:7, 388:11, 472:7
**DEFENDANT'S** [1] - 390:3
**defendant's** [1] - 390:5
**Defendant's** [3] - 390:6, 403:5, 431:19
**deferral** [2] - 399:22, 399:25
**deferred** [1] - 399:18
**definitely** [2] - 423:18, 468:18
**definition** [1] - 423:21
**delayed** [3] - 446:3, 446:4, 446:5
**demand** [1] - 450:10
**denied** [6] - 395:4, 395:24, 395:25, 396:9, 458:10
**Denis** [1] - 473:2
**DENIS** [2] - 388:6, 472:6
**denying** [1] - 460:20
**department** [1] - 409:13
**Department** [2] - 400:2, 473:2
**depo** [1] - 391:14
**deponent** [1] - 469:11
**Deposition** [2] - 389:12, 472:9
**deposition** [10] - 391:12, 391:22, 439:2, 457:11, 469:11, 469:12, 469:14, 471:6, 472:15, 473:3
**DEPOSITION** [1] - 388:9
**Depot** [3] - 395:21, 396:6, 396:7
**DEPT** [2] - 388:7, 472:7
**described** [2] - 428:6, 456:12
**Description** [2] - 390:1, 390:4
**designated** [4] - 458:8, 458:16, 458:21, 458:23
**designation** [1] - 458:25
**details** [2] - 432:1, 434:2
**determine** [1] - 416:14
**diagnostic** [3] - 406:6, 406:7, 406:10
**diagram** [4] - 424:8, 424:15, 462:8, 468:17
**different** [13] - 440:18, 449:14, 449:25, 450:2, 450:3, 450:4, 458:15, 458:17, 459:22, 460:4, 464:20, 467:14, 467:16
**differently** [1] - 464:25
**difficult** [1] - 416:4
**difficulties** [3] - 466:1, 466:4, 467:6
**Direct** [1] - 389:13
**DIRECT** [1] - 391:5
**Director** [2] - 423:6, 423:20
**Director's** [4] - 444:19, 455:5, 456:18, 456:22
**Directors** [1] - 444:23
**disabilities** [1] - 454:6
**disability** [25] - 424:6, 424:14, 424:22, 425:2, 425:8, 425:12, 425:22, 425:25, 426:4, 427:2, 427:6, 427:9, 427:12, 427:16, 427:23, 427:25, 428:19, 428:22, 428:23, 454:10, 454:13, 456:4, 460:11, 462:10, 468:20
**disabled** [4] - 419:21, 431:14, 433:19, 451:19
**discipline** [3] - 456:10, 456:13, 456:20
**discipline's** [1] - 456:11
**disclosing** [1] - 413:11
**discovered** [1] - 442:13
**discovery** [1] - 416:3
**discreet** [3] - 437:4, 437:5, 437:9
**discrimination** [19] - 424:7, 424:14, 425:12, 426:2, 427:1, 427:12, 427:15, 427:23, 428:21, 436:9, 436:18, 437:10, 446:21, 446:23, 446:24, 460:9, 462:11, 468:16, 468:18
**discriminatory** [3] - 440:1, 440:16, 461:11
**discuss** [1] - 426:21
**discussed** [1] - 448:9
**discussion** [1] - 426:21
**distinction** [1] - 453:5
**distracted** [1] - 419:18
**DISTRICT** [4] - 388:1, 388:1, 472:1, 472:1
**divided** [1] - 461:9
**DIVISION** [2] - 388:2, 472:2
**DME** [1] - 408:3
**DO** [1] - 473:1
**doctor** [6] - 406:14, 409:8, 409:20, 409:22, 409:24, 410:17
**doctors** [11] - 402:1, 402:3, 402:17, 402:20, 402:23, 402:24, 405:12, 408:22, 409:4, 413:22, 413:25
**document** [14] - 403:2, 403:10, 404:11, 405:16, 406:19, 407:20, 407:22, 410:13, 446:9, 447:8, 447:10, 447:11, 457:11, 473:21
**documents** [5] - 394:22, 394:25, 396:15, 400:23, 463:16
**dollars** [1] - 406:16
**donate** [1] - 412:23
**done** [9] - 394:4, 411:7, 411:25, 414:1, 422:6, 423:16, 432:10, 432:22, 444:16

**down** [2] - 391:14, 442:5
**downstairs** [1] - 391:13
**dozen** [1] - 444:3
**Dr** [3] - 402:24, 402:25, 409:8
**draw** [1] - 424:8
**drawing** [3] - 426:14, 464:14, 465:3
**drew** [1] - 423:17
**Drive** [1] - 389:3
**dropped** [1] - 402:25
**due** [2] - 393:23, 462:13
**duly** [2] - 391:3, 470:9
**durable** [1] - 405:11
**during** [3] - 418:20, 432:20, 457:20
**During** [1] - 448:25
**duties** [1] - 442:19
**dying** [1] - 465:4
**dysphonia** [1] - 409:16

## E

**early** [1] - 465:7
**earn** [1] - 450:11
**easiest** [1] - 424:9
**easy** [2] - 441:12, 455:18
**Eckholm** [1] - 426:11
**Eckland** [1] - 426:11
**education** [1] - 459:18
**Education** [1] - 400:3
**educators** [1] - 397:12
**EEO** [30] - 424:2, 429:4, 429:19, 429:23, 430:12, 430:23, 431:2, 431:8, 432:21, 432:23, 433:9, 433:10, 433:11, 433:12, 433:25, 435:4, 435:24, 436:10, 460:13, 461:1, 461:3, 461:6, 461:7, 461:9, 461:14, 461:17, 462:2, 462:3, 463:6, 464:2
**EEOC** [2] - 394:11, 422:18
**EEOs** [1] - 463:18
**effect** [1] - 468:19
**effective** [2] - 464:21, 465:2
**either** [2] - 404:12, 448:24
**electronic** [1] - 392:11
**eligible** [4] - 397:15, 397:25, 399:25, 400:8
**email** [2] - 395:7, 459:24
**emails** [1] - 449:23
**emotional** [1] - 414:1
**employee** [3] - 397:11, 471:9, 471:9
**Employee** [1] - 434:5
**employees** [4] - 397:12, 432:9, 435:19, 460:25
**Employees** [1] - 433:12
**employment** [1] - 397:14
**enabled** [6] - 392:20, 421:9, 422:9, 431:21, 433:22, 439:20
**end** [6] - 393:7, 424:24, 426:21, 447:6, 464:23, 467:24
**ended** [5] - 457:1, 459:18, 459:20, 465:4
**ends** [2] - 459:23, 463:24
**engaging** [3] - 423:23, 424:11, 425:18
**English** [1] - 445:24
**enroll** [2] - 402:21, 402:23
**ENTER** [1] - 473:1
**entitled** [1] - 411:14
**environment** [2] - 422:16, 447:1
**equipment** [1] - 405:11
**Errata** [1] - 389:17
**errata** [1] - 472:16
**ERRATA** [1] - 473:1
**especially** [1] - 440:10
**Esq** [5] - 472:12, 472:20, 472:21, 473:25, 473:25
**Esquire** [2] - 389:1, 389:2
**essentially** [1] - 412:13
**event** [1] - 456:12
**events** [2] - 459:12, 464:3
**eventually** [1] - 466:20
**exact** [6] - 429:16, 446:8, 449:8, 454:23, 460:14, 460:15
**exam** [2] - 447:18, 447:20
**EXAMINATION** [1] - 391:5
**Examination** [2] - 388:16, 389:13
**Excel** [3] - 390:7, 431:17, 432:1
**exchange** [1] - 459:24
**exclusively** [1] - 467:7
**excuse** [1] - 442:18
**execution** [1] - 389:17
**exhibit** [3] - 403:19, 431:16, 463:23
**EXHIBIT** [2] - 390:1, 390:3
**Exhibit** [25] - 390:5, 390:6, 392:2, 392:22, 393:2, 401:10, 403:2, 403:5, 403:9, 405:5, 405:20, 406:20, 408:1, 408:4, 408:5, 408:11, 416:8, 422:11, 431:16, 431:19, 439:18, 442:11, 445:6, 451:7, 463:23
**expect** [1] - 457:10
**Expenses** [1] - 401:13
**expenses** [8] - 401:17, 405:6, 405:8, 405:15, 406:20, 408:2, 408:10
**experience** [2] - 449:24, 452:19
**experienced** [6] - 452:20, 452:21, 452:25, 453:7, 453:8, 453:21
**experiences** [1] - 449:21
**experiencing** [1] - 467:10
**Expires** [1] - 470:16
**explain** [5] - 411:13, 416:13, 431:1, 435:19, 451:5
**explained** [3] - 431:8, 435:4, 437:6
**explains** [2] - 421:11, 447:9
**explanation** [1] - 406:4
**explanations** [1] - 435:13
**exposure** [1] - 421:11
**extended** [1] - 443:1
**extra** [1] - 468:13

## F

**faces** [1] - 438:15
**fact** [6] - 425:9, 428:16, 434:11, 445:3, 456:3, 466:16
**facts** [1] - 473:21
**failed** [3] - 442:17, 449:3, 451:10
**failure** [1] - 393:23
**fall** [3] - 424:16, 428:2, 462:8
**falls** [1] - 398:20
**familiar** [3] - 429:18, 429:19, 433:25
**family** [1] - 409:22
**far** [5] - 394:4, 435:13, 449:13, 452:15, 459:22
**fast** [4] - 445:23, 446:13, 455:17, 468:11
**FEAR** [1] - 433:25
**Fear** [4] - 434:1, 434:4, 434:8, 434:25
**February** [1] - 434:22
**federal** [6] - 397:10, 397:12, 400:3, 400:18, 402:21, 430:22
**Federal** [2] - 434:3, 434:5
**Feldman** [1] - 406:15
**fell** [1] - 398:21
**fellatio** [1] - 455:8
**Fernandez** [3] - 454:19, 455:9, 455:16
**few** [2] - 393:6, 442:10
**figure** [1] - 439:25
**file** [6] - 409:25, 410:1, 426:22, 429:23, 437:1, 462:24
**filed** [4] - 429:13, 461:1, 461:17, 462:20
**files** [2] - 413:20, 428:6
**filing** [4] - 431:2, 431:8, 435:4, 438:3
**filter** [2] - 433:9
**filtered** [1] - 433:24
**final** [2] - 404:8, 463:5
**finally** [1] - 443:21
**financially** [1] - 471:10
**fine** [6] - 392:2, 410:20, 419:22, 420:1, 424:17, 451:15
**finish** [1] - 395:8
**fire** [1] - 450:17
**first** [15] - 391:13, 391:21, 399:7, 401:25, 403:23, 406:12, 411:3, 423:23, 424:1, 424:10, 425:17, 429:24, 430:1, 430:11, 454:18
**fiscally** [1] - 400:12
**five** [2] - 439:4, 439:12
**five-minute** [1] - 439:12
**FLORIDA** [4] - 388:1, 470:4, 471:3, 472:1
**Florida** [5] - 389:3, 389:8, 470:8, 470:15, 471:14
**folks** [1] - 423:25
**followed** [1] - 435:21
**following** [1] - 447:22
**follows** [1] - 391:4
**foolish** [1] - 392:13
**FOR** [2] - 389:1, 389:6
**forced** [1] - 465:7
**foregoing** [2] - 471:7, 473:21
**Forgiveness** [1] - 396:20
**forgiveness** [3] - 397:11, 397:15,

397:25
**form** [1] - 426:18
**formally** [1] - 459:3
**forth** [2] - 393:3, 460:14
**forward** [2] - 391:20, 451:12
**forwarded** [3] - 389:17, 472:15, 472:16
**fought** [1] - 444:1
**four** [1] - 434:11
**FPR** [6] - 388:17, 470:7, 470:14, 471:5, 471:14, 473:4
**Friday** [1] - 442:3
**front** [3] - 414:24, 415:6, 415:10
**full** [2] - 398:22, 412:2
**fully** [2] - 449:2, 450:8
**funny** [1] - 438:15
**FURTHER** [1] - 471:8

## G

**generally** [1] - 467:9
**gentleman** [1] - 458:3
**Gesturing** [1] - 433:1
**given** [10] - 437:23, 448:14, 452:14, 454:22, 464:21, 465:1, 465:2, 465:5, 465:10, 465:17
**gladly** [1] - 440:24
**God** [1] - 461:10
**government** [3] - 394:12, 457:5, 457:8
**grade** [2] - 445:9, 446:1
**granted** [3] - 402:8, 402:9, 465:21
**granting** [1] - 446:25
**great** [3] - 424:19, 442:5, 450:10
**Gregory** [3] - 429:4, 437:6, 437:18
**grow** [1] - 449:24
**guess** [4] - 442:25, 445:20, 456:10, 456:17
**Gulf** [1] - 465:12
**guys** [2] - 416:3, 463:16

## H

**half** [2] - 417:16, 444:2
**handles** [1] - 396:6
**handwritten** [2] - 440:12, 440:20
**handy** [1] - 392:2
**hang** [1] - 411:16
**happy** [1] - 441:6
**Harassment** [2] - 434:9, 434:13
**harassment** [5] - 423:6, 435:15, 435:20, 447:2, 462:10
**hard** [4] - 428:9, 459:21, 462:17, 466:11
**Harris** [3] - 429:4, 429:10, 437:18
**head** [6] - 396:17, 440:10, 441:1, 453:10, 453:14, 461:8
**headers** [1] - 404:23
**health** [2] - 410:16, 460:24
**Health** [4] - 457:22, 458:9, 458:14, 458:24
**hear** [1] - 441:11
**heard** [2] - 438:13, 441:8
**heart's** [1] - 455:17
**help** [5] - 424:8, 425:12, 439:25, 449:24, 468:6
**helpful** [3] - 395:9, 401:6, 423:14
**helping** [1] - 459:4
**hereby** [2] - 469:10, 471:5
**HH** [1] - 470:15
**higher** [1] - 396:24
**highly** [1] - 394:14
**HILLSBOROUGH** [2] - 470:5, 471:4
**history** [1] - 432:17
**hold** [2] - 450:22, 453:12
**Home** [3] - 395:21, 396:6, 396:7
**home** [18] - 428:5, 451:21, 452:4, 452:10, 452:12, 452:17, 452:21, 452:25, 453:6, 453:17, 453:22, 454:6, 454:11, 454:15, 454:20, 455:12, 456:1, 456:9
**homework** [3] - 439:25, 440:4, 440:13
**honestly** [2] - 429:25, 449:6
**hope** [1] - 415:23
**hoping** [1] - 424:8
**hostile** [2] - 422:16, 447:1
**hours** [10] - 391:21, 417:16, 417:20, 417:23, 418:17, 418:21, 418:22, 420:3, 420:12, 421:2
**house** [3] - 395:22, 395:23
**huge** [1] - 421:16
**Human** [1] - 444:24

## I

**ice** [1] - 464:18
**idea** [1] - 439:8
**ideal** [1] - 401:7
**identification** [2] - 403:6, 431:20
**identified** [2] - 417:15, 422:17
**identify** [3] - 422:14, 435:17, 446:19
**III** [6] - 388:10, 389:12, 391:12, 472:9, 472:14, 473:3
**illnesses** [1] - 417:22
**impacted** [4] - 447:3, 449:4, 449:11, 451:11
**implying** [1] - 430:5
**improved** [2] - 394:14, 395:11
**IN** [2] - 472:9, 473:2
**inappropriate** [1] - 455:4
**incident** [1] - 456:19
**included** [7] - 410:10, 421:2, 423:21, 441:8, 441:9, 446:17
**includes** [1] - 404:18
**including** [1] - 410:24
**inclusive** [1] - 423:18
**income** [7] - 393:23, 398:23, 399:21, 399:24, 412:1, 412:17, 412:18
**increase** [6] - 396:9, 396:10, 400:16, 445:9, 446:1, 446:2
**increased** [2] - 400:22, 420:14
**INDEX** [2] - 390:1, 390:3
**industrial** [1] - 428:4
**inexperienced** [8] - 453:6, 453:9, 453:13, 453:16, 454:4, 454:5, 454:9, 454:12
**info** [2] - 390:5, 403:9
**informally** [1] - 459:4
**informed** [1] - 445:7
**Ingram** [1] - 458:4
**insomnia** [1] - 406:13
**instances** [1] - 395:17
**instead** [1] - 416:22
**insurance** [3] - 404:15, 405:9, 406:1
**intentionally** [1] - 444:8
**interaction** [2] - 425:7, 426:1
**interest** [4] - 396:8, 400:17, 400:18, 400:21
**interested** [1] - 471:10
**interfere** [1] - 427:10
**internet** [1] - 394:10
**Interrogatories** [1] - 440:3
**Interrogatory** [13] - 393:2, 403:8, 403:19, 408:11, 422:6, 422:7, 422:11, 423:7, 423:8, 425:15, 441:20, 441:22, 446:18
**interrogatory** [2] - 440:23, 441:10
**Investigative** [1] - 463:24
**involved** [2] - 427:17, 427:18
**issue** [6] - 442:17, 443:8, 443:21, 445:15, 451:1
**issues** [7] - 395:22, 410:7, 410:16, 423:2, 424:1, 449:20, 462:15

## J

**James** [13] - 389:1, 392:8, 393:17, 395:5, 438:19, 438:22, 441:23, 449:7, 463:15, 472:12, 472:20, 473:25
**james@smkfirm.com** [4] - 389:4, 472:12, 472:20, 473:25
**January** [4] - 388:12, 470:9, 470:11, 471:11
**Jimmy** [1] - 427:18
**Jo** [1] - 466:14
**job** [6] - 420:19, 420:21, 420:25, 427:10, 464:20, 468:19
**June** [2] - 424:2, 429:7

## K

**Kasimati** [1] - 389:2
**keep** [4] - 440:19, 448:4, 448:17, 468:1
**kept** [3] - 442:24, 450:14, 467:25
**key** [1] - 402:24
**kind** [8] - 409:8, 409:20, 410:1, 415:9, 428:13, 450:19, 455:6, 455:22
**Klemawesch** [1] - 402:25
**knowledge** [5] - 406:23, 416:11, 421:1, 456:20, 458:18
**known** [2] - 427:9, 448:12
**knows** [1] - 461:10

## L

**labeled** [1] - 452:9
**language** [1] - 446:8
**larger** [1] - 405:7
**last** [10] - 398:22, 403:15, 406:23, 414:18, 430:20, 439:24, 457:19, 464:23, 466:12
**laughing** [2] - 428:9, 428:10
**lawyers** [1] - 445:24
**learn** [5] - 413:13, 442:21, 450:3, 467:20, 468:8
**learned** [4] - 437:16, 438:8, 442:21, 460:5
**learning** [3] - 432:16, 462:12, 467:24
**least** [2] - 425:21, 441:10
**leave** [53] - 398:17, 416:5, 416:9, 416:14, 416:15, 416:18, 416:21, 416:22, 416:24, 416:25, 417:1, 417:4, 417:7, 417:9, 417:11, 417:13, 417:16, 417:19, 418:1, 418:7, 418:11, 418:14, 418:18, 418:21, 418:25, 419:1, 419:2, 419:3, 419:6, 419:8, 419:11, 419:13, 419:15, 419:23, 420:6, 420:7, 420:10, 420:11, 421:2, 421:13, 421:14, 421:15, 425:10, 443:1, 465:25, 466:2, 466:6
**led** [4] - 394:7, 432:18, 461:5, 461:13
**Lee** [4] - 409:10, 409:17, 409:19, 409:20
**left** [3] - 408:21, 465:16, 467:16
**legs** [1] - 414:8
**less** [1] - 452:20
**Letter** [1] - 389:16
**letter** [1] - 461:21
**letters** [4] - 395:4, 396:15, 460:13, 460:16
**letting** [2] - 423:1, 423:25
**level** [3] - 444:19, 445:8, 452:19
**Levoir** [1] - 402:25
**likely** [1] - 459:6
**limit** [1] - 396:10
**Line** [1] - 473:5
**line** [4] - 398:20, 398:21, 399:20, 403:16
**list** [7] - 393:9, 400:12, 408:10, 411:3, 443:4, 451:2, 459:6
**listed** [6] - 405:19, 408:4, 410:15, 416:6, 421:22, 472:16
**listing** [1] - 416:19
**litigation** [1] - 413:12
**Loan** [1] - 396:20
**loan** [14] - 395:4, 396:5, 396:23, 397:11, 397:15, 399:9, 399:17, 399:21, 400:3, 400:4, 400:13, 400:17, 400:18, 400:24
**loans** [1] - 397:19
**lobby** [1] - 391:13
**Logs** [1] - 433:11
**look** [7] - 421:4, 423:8, 432:25, 447:8, 460:13, 467:17, 468:17
**looking** [11] - 391:20, 402:3, 403:23, 406:21, 407:19, 410:11, 419:18, 428:12, 440:7, 440:17, 451:7
**looks** [4] - 406:8, 407:3, 412:6, 432:18
**loop** [1] - 408:9
**loss** [2] - 393:23, 411:4
**losses** [2] - 393:9, 393:14
**lost** [2] - 402:20, 443:13
**Lost** [1] - 410:24
**low** [2] - 394:16, 400:12

## M

**Maharaj** [4] - 389:2, 389:2, 472:21, 473:25
**MAHARAJ** [3] - 392:11, 441:2, 441:25
**manage** [2] - 416:4, 450:13
**management** [4] - 423:5, 423:10, 423:11, 423:21
**Management** [2] - 432:6, 466:23
**Manager** [1] - 423:13
**managers** [1] - 423:12
**mandatory** [1] - 447:18
**March** [3] - 434:18, 434:20, 448:10
**mark** [1] - 431:16
**MARKED** [1] - 390:2
**marked** [5] - 392:22, 403:2, 403:5, 431:19, 463:23
**married** [1] - 455:7
**Mary** [1] - 466:14
**mask** [1] - 425:5
**mass** [1] - 421:11
**massive** [1] - 402:1
**Matt** [1] - 465:3
**matter** [3] - 430:19, 433:5, 453:17
**Maura** [2] - 466:12
**McBurrough** [1] - 445:12
**McDonnough** [3] - 388:6, 472:6, 473:2
**mean** [19] - 404:11, 405:6, 423:10, 428:11, 428:24, 438:4, 442:8, 447:12, 448:8, 449:15, 450:6, 450:8, 455:21, 456:15, 458:12, 459:18, 462:2, 462:14, 463:10
**meaning** [2] - 456:18, 463:20
**means** [8] - 405:2, 424:16, 449:13, 449:14, 449:15, 449:16, 449:19, 453:16
**medical** [22] - 393:10, 393:14, 401:17, 402:6, 404:2, 405:5, 405:6, 405:8, 405:11, 405:15, 405:19, 405:23, 406:20, 407:8, 408:2, 408:5, 408:6, 408:10, 410:7, 413:23, 413:25, 465:7
**Medical** [1] - 401:13
**meet** [3] - 450:8, 450:11, 450:17
**meeting** [1] - 445:18
**member** [4] - 457:21, 460:23, 460:25, 462:21
**memorialized** [1] - 457:9
**memory** [3] - 421:15, 435:22, 445:21
**memory's** [1] - 442:5
**mention** [3] - 396:18, 422:19, 423:4
**mentioned** [2] - 429:3, 451:17
**met** [3] - 391:13, 437:18, 439:24
**Michael** [1] - 409:6
**middle** [2] - 391:21, 413:15
**MIDDLE** [2] - 388:1, 472:1
**might** [8] - 395:9, 410:7, 439:8, 440:2, 441:10, 452:2, 463:17, 464:1
**Mike** [5] - 424:24, 425:7, 425:25, 426:24, 427:13
**military** [1] - 465:13
**mind** [2] - 421:6, 427:3
**mine** [2] - 408:8, 454:18
**minute** [2] - 439:10, 439:12
**minutes** [1] - 439:4
**miss** [2] - 446:2, 446:3
**missed** [7] - 396:19, 398:3, 398:7, 398:10, 398:12, 401:5, 464:23
**Moffitt** [2] - 409:10, 409:12
**mold** [7] - 458:11, 459:9, 459:14, 459:19, 459:20, 461:19, 461:20
**moment** [13] - 392:4, 406:23, 421:16, 428:2, 428:25, 436:17, 455:20, 455:21, 455:22, 464:16, 464:17, 465:22
**money** [9] - 391:25, 395:23, 401:25, 402:6, 408:21, 412:12, 412:23, 412:25, 419:6
**month** [3] - 442:16, 443:24, 446:6
**months** [3] - 397:20, 443:25
**mortgage** [1] - 397:17
**most** [2] - 430:17, 459:6
**motivated** [1] - 425:21
**move** [1] - 451:12
**moved** [1] - 456:21
**MR** [35] - 391:6, 392:8, 392:11, 392:12, 393:17, 395:5, 401:3, 415:20, 421:25, 422:4, 430:16, 436:6, 436:11, 436:20, 437:15, 438:17, 438:19, 438:21, 438:22, 439:3, 439:5, 439:11, 439:14, 440:25, 441:2, 441:24, 441:25, 442:1, 444:20, 445:2, 457:14, 457:17, 463:15, 469:4, 469:7
**MULLIN** [4] - 388:3, 388:10, 391:2, 472:3
**Mullin** [26] - 389:12, 391:7, 392:2, 392:21, 393:21, 395:10, 401:9, 405:13, 414:25, 422:5, 422:12, 431:22, 436:8, 439:6, 439:17, 444:22, 457:19, 463:17, 468:25, 470:8, 471:6, 472:9, 472:11, 473:2, 473:3, 473:23
**Mullin's** [1] - 439:2
**multi** [2] - 451:1

## N

**name** [7] - 426:15, 428:14, 457:2, 458:4, 465:15, 466:12
**nebulizer** [1] - 425:13
**necessarily** [2] - 404:3, 457:11
**necessary** [2] - 436:23, 442:18
**need** [6] - 392:16, 392:23, 416:9,

424:19, 439:7, 448:17
**needed** [7] - 395:22, 435:21, 448:13, 450:2, 468:6, 468:7, 468:23
**needs** [1] - 415:15
**never** [7] - 398:3, 398:10, 414:9, 414:13, 428:11, 441:8, 468:24
**new** [3] - 440:23, 441:12, 441:20
**newly** [1] - 426:9
**Newman** [2] - 409:6, 409:8
**next** [11] - 393:22, 396:18, 400:17, 404:5, 410:23, 413:7, 423:4, 438:24, 445:9, 446:1, 448:25
**night** [1] - 413:15
**nine** [2] - 403:12
**NO** [2] - 388:5, 472:5
**noise** [2] - 460:25, 462:6
**non** [3] - 393:25, 394:21, 398:18
**non-work** [3] - 393:25, 394:21, 398:18
**none** [2] - 402:20, 408:3
**NONE** [1] - 390:2
**normal** [1] - 428:17
**North** [2] - 389:3, 389:8
**NOT** [1] - 473:1
**Notary** [4] - 388:17, 470:7, 470:15, 471:14
**notes** [6] - 440:10, 440:12, 440:20, 467:25, 471:8
**nothing** [1] - 409:12
**notice** [1] - 459:16
**notices** [1] - 443:4
**November** [10] - 407:3, 423:1, 423:24, 424:10, 424:13, 425:19, 433:15, 449:1, 461:23, 461:24
**number** [12] - 397:13, 401:6, 401:25, 403:16, 403:20, 403:24, 405:7, 413:6, 431:18, 432:19, 450:11, 458:15
**numbers** [5] - 401:20, 413:10, 413:12, 445:18, 446:15

## O

**O'Halloran** [1] - 428:14
**oath** [3] - 391:4, 391:15, 391:18
**OATH** [1] - 470:1
**Oath** [1] - 389:14
**Objection** [1] - 436:20
**objection** [8] - 430:16, 436:6, 436:11, 437:15, 438:20, 438:24, 444:20, 445:2
**obtain** [1] - 395:18
**obviously** [3] - 401:7, 418:14, 462:14
**October** [8] - 398:24, 398:25, 399:4, 399:5, 399:6, 399:14, 414:19, 448:25
**OF** [11] - 388:1, 388:7, 388:9, 470:1, 470:4, 470:5, 471:1, 471:3, 471:4, 472:1, 472:7
**off-work** [2] - 421:18, 421:21
**offensive** [2] - 440:1, 440:16
**offhand** [1] - 418:6
**Office** [2] - 389:7, 435:24
**office** [5] - 451:22, 455:5, 455:8, 456:18, 456:22
**official** [1] - 457:24
**often** [1] - 406:24
**old** [1] - 398:8
**ON** [1] - 473:1
**once** [2] - 426:6, 472:16
**one** [48] - 392:7, 393:9, 396:3, 396:5, 397:10, 401:4, 404:24, 406:12, 414:24, 415:9, 415:10, 415:13, 421:17, 427:17, 429:11, 429:13, 429:22, 430:18, 431:18, 433:18, 434:16, 435:2, 436:1, 439:10, 441:7, 441:21, 445:13, 449:8, 449:23, 450:14, 451:16, 451:17, 454:7, 454:18, 455:18, 458:5, 458:6, 458:16, 458:17, 459:23, 460:2, 462:16, 463:8, 463:21, 463:22, 463:25, 465:11
**ones** [6] - 409:6, 425:24, 429:11, 435:8, 453:7, 458:16
**ongoing** [1] - 391:21
**opportunity** [1] - 460:21
**opposed** [1] - 425:22
**option** [1] - 441:3
**order** [3] - 419:7, 449:2, 450:17
**ordering** [2] - 472:16, 472:16
**original** [2] - 463:20, 472:15
**originally** [2] - 415:11, 442:21
**OSHA** [1] - 461:10
**Osti** [1] - 457:3
**ought** [1] - 393:19
**ourselves** [1] - 442:2
**outcome** [1] - 446:23
**outlier** [1] - 464:13
**output** [1] - 447:4
**outstanding** [1] - 396:23
**overlapping** [1] - 424:19
**overpaid** [1] - 406:15
**oversight** [1] - 392:13
**overtime** [1] - 412:3
**owe** [3] - 400:20, 400:22, 408:17
**owed** [2] - 408:22, 411:14
**own** [1] - 450:13
**oxygen** [1] - 425:5

## P

**P.A** [1] - 389:2
**p.m** [8] - 388:13, 422:2, 422:3, 439:15, 439:16, 457:15, 457:16, 469:14
**page** [6] - 401:9, 403:12, 403:15, 403:23, 407:7, 447:15
**PAGE** [1] - 389:12
**Page** [15] - 390:1, 390:4, 393:1, 393:8, 401:9, 414:25, 416:8, 422:11, 439:19, 442:10, 442:11, 445:5, 447:16, 451:7, 473:5
**Pages** [1] - 388:20
**pages** [3] - 403:12, 471:7, 472:14
**paid** [33] - 400:21, 401:17, 401:19, 404:3, 404:6, 404:10, 404:14, 404:15, 404:19, 404:21, 404:24, 405:1, 405:3, 405:4, 405:19, 406:1, 406:15, 407:11, 407:13, 407:16, 412:13, 417:5, 417:7, 417:13, 417:17, 417:23, 418:3, 418:11, 418:15, 419:10, 419:15, 419:24, 420:2
**Palmer** [5] - 424:24, 425:7, 425:25, 426:24, 427:13
**paper** [1] - 452:1
**paragraph** [1] - 448:25
**park** [1] - 466:15
**Part** [1] - 391:11
**part** [21] - 392:13, 412:17, 415:14, 426:8, 448:19, 449:3, 449:20, 457:5, 457:8, 459:1, 459:3, 459:23, 459:24, 460:5, 460:7, 460:17, 461:3, 461:7, 461:9, 461:10, 464:1
**participate** [3] - 459:10, 460:21, 461:4
**participated** [1] - 422:21
**participating** [2] - 422:17, 422:19
**particular** [1] - 395:1
**parties** [2] - 471:9, 472:16
**PARTIES** [1] - 388:14
**parties'** [1] - 471:9
**partly** [1] - 425:21
**parts** [2] - 460:4, 467:14
**party** [2] - 456:19, 472:16
**past** [1] - 407:4
**path** [1] - 465:5
**patient** [1] - 402:25
**pattern** [1] - 413:7
**pay** [21] - 397:3, 397:16, 398:18, 402:18, 404:18, 408:14, 414:25, 415:7, 415:10, 418:14, 418:18, 418:21, 418:25, 419:2, 419:3, 419:8, 419:11, 419:14, 419:23, 421:18, 421:20
**paycheck** [3] - 398:22, 411:20, 419:7
**paying** [3] - 397:17, 397:19, 398:6
**Payment** [1] - 390:5
**payment** [6] - 396:8, 398:3, 398:7, 398:10, 402:4, 403:9
**payments** [12] - 393:10, 393:14, 396:19, 397:14, 398:2, 398:12, 399:1, 399:9, 399:16, 400:9, 408:23, 409:2
**pays** [1] - 405:8
**PDF** [1] - 403:13
**pecuniary** [2] - 393:9, 393:14
**penalties** [1] - 473:21
**pending** [1] - 438:23
**people** [14] - 409:13, 428:9, 438:10, 438:11, 443:2, 444:13, 444:14, 451:23, 453:8, 453:9, 454:17, 458:7, 459:22, 464:20
**perceived** [1] - 459:7
**percent** [2] - 467:15, 467:16
**percentage** [3] - 411:18, 411:19, 412:1
**performance** [7] - 445:7, 445:14, 446:10, 446:12, 446:14, 447:12
**performing** [1] - 442:19
**period** [3] - 397:14, 421:18, 447:12

**perjury** [1] - 473:21
**permitted** [2] - 454:10, 454:15
**persisted** [1] - 443:8
**person** [3] - 430:6, 430:8, 460:5
**personally** [1] - 470:8
**pertaining** [1] - 423:6
**pertinent** [1] - 432:1
**Perusing** [1] - 411:17
**perusing** [1] - 421:20
**pgs** [1] - 472:14
**phone** [6] - 427:5, 427:9, 427:14, 427:18, 427:21, 430:1
**phonetic** [3] - 426:11, 458:4, 465:4
**phonetic)** [1] - 457:3
**phrased** [1] - 449:22
**pick** [3] - 400:8, 428:6, 430:1
**piece** [2] - 452:1, 466:15
**PLACE** [1] - 388:14
**placed** [3] - 393:24, 421:18, 421:20
**Plaintiff** [7] - 388:4, 393:24, 442:12, 442:18, 445:6, 449:1, 472:4
**PLAINTIFF** [1] - 389:1
**Plaintiff's** [1] - 447:17
**PLAINTIFF'S** [1] - 390:1
**Plan** [1] - 411:20
**plan** [1] - 415:24
**planning** [1] - 413:11
**playing** [1] - 435:13
**pleaded** [1] - 427:19
**pocket** [3] - 401:18, 405:9, 405:22
**point** [8] - 393:20, 397:23, 420:24, 427:22, 428:16, 429:20, 446:2, 457:20
**pointed** [1] - 398:16
**points** [2] - 450:11, 450:12
**portion** [2] - 463:8, 468:20
**posters** [3] - 435:23, 436:3
**pre** [1] - 428:24
**preclude** [1] - 437:2
**preface** [1] - 440:8
**preferences** [1] - 447:5
**PRESENT** [1] - 388:14
**present** [2] - 396:21, 469:11
**pretty** [1] - 423:19
**prevent** [1] - 435:17
**Prevention** [1] - 434:12
**previous** [3] - 401:9, 411:8, 448:9
**previously** [4] - 391:3, 392:22, 447:19, 451:16
**primary** [3] - 402:24, 409:23, 410:17
**printer** [1] - 428:5
**priorities** [1] - 400:12
**private** [1] - 400:13
**privately** [1] - 425:13
**problem** [5] - 392:19, 437:4, 462:17, 466:6, 466:15
**problems** [2] - 464:12, 467:9
**Process** [2] - 433:11, 433:13
**process** [12] - 422:18, 422:20, 422:21, 422:25, 423:24, 424:11, 429:19, 431:2, 431:8, 435:4, 435:24, 450:4
**processing** [1] - 445:19
**produce** [2] - 393:19, 447:4
**produced** [6] - 394:24, 395:2, 395:3, 395:6, 400:23, 403:3
**production** [6] - 427:10, 445:17, 445:18, 450:9, 450:18, 468:12
**Professional** [1] - 472:18
**Program** [1] - 396:20
**program** [1] - 397:11
**projected** [1] - 413:4
**projection** [1] - 413:6
**promotion** [2] - 456:23, 456:24
**prompted** [1] - 422:15
**promptly** [1] - 442:17
**proper** [2] - 413:23, 413:25
**protected** [2] - 425:16, 425:18
**provided** [1] - 410:13
**providers** [4] - 404:2, 404:15, 405:23, 407:8
**providing** [2] - 441:20, 441:21
**Public** [5] - 388:17, 396:20, 470:7, 470:15, 471:14
**public** [2] - 428:7, 457:11
**pull** [1] - 422:7
**pulled** [1] - 441:14
**pulls** [1] - 406:11
**pulmonologist** [1] - 409:9
**put** [8] - 392:3, 411:23, 412:13, 412:23, 421:4, 441:4, 451:25, 459:5
**putting** [3] - 411:11, 428:24, 431:6

## Q

**quality** [3] - 459:17, 459:19, 460:3
**quarterly** [1] - 410:25
**questions** [3] - 442:8, 468:25, 469:4
**quota** [1] - 450:18
**quote** [1] - 450:9

## R

**RA** [1] - 447:17
**rapid** [1] - 450:17
**rash** [1] - 410:4
**ratings** [1] - 396:3
**rational** [2] - 414:12
**RE** [2] - 472:9, 473:2
**Read** [1] - 389:16
**read** [3] - 469:5, 472:14, 473:21
**reading** [2] - 469:12, 472:13
**ready** [1] - 392:14
**really** [4] - 408:13, 448:19, 450:7, 461:15
**realm** [2] - 444:23, 444:24
**reason** [4] - 426:3, 427:16, 428:21, 460:20
**Reason** [1] - 473:5
**reasonable** [8] - 422:19, 422:20, 423:24, 424:11, 425:16, 454:24, 455:1, 462:15
**reasons** [2] - 397:10, 400:1
**reassigned** [3] - 426:7, 426:8
**reassignment** [2] - 426:24, 427:13
**receive** [1] - 456:19
**received** [7] - 393:12, 399:6, 402:11, 434:8, 434:11, 435:1, 472:16
**receiving** [5] - 449:1, 449:17, 450:9, 455:8, 460:16
**recent** [1] - 430:17
**recess** [1] - 439:4
**recollect** [1] - 429:1
**recollection** [1] - 431:12
**record** [21] - 393:1, 415:25, 421:25, 422:2, 422:3, 422:4, 431:17, 432:10, 432:18, 439:12, 439:15, 439:16, 457:6, 457:8, 457:9, 457:14, 457:15, 457:16, 457:18, 469:8, 471:7
**recorded** [1] - 432:11
**records** [2] - 395:3, 429:2
**recoup** [1] - 410:11
**recover** [2] - 406:21, 407:19
**recovery** [1] - 394:11
**rectified** [1] - 443:22
**rectify** [1] - 442:17
**refer** [3] - 402:17, 403:8, 423:11
**reference** [2] - 394:9, 459:9
**referenced** [1] - 472:13
**referring** [14] - 404:24, 422:25, 423:9, 426:13, 438:5, 440:3, 445:10, 446:25, 447:23, 449:5, 450:25, 451:13, 453:8, 464:2
**refinance** [1] - 395:23
**reflective** [1] - 405:15
**refusal** [1] - 461:4
**refused** [1] - 402:23
**Regional** [1] - 435:24
**regularly** [1] - 451:23
**Rehabilitation** [1] - 446:20
**Reilly** [1] - 459:5
**reimbursement** [3] - 408:2, 408:10, 408:13
**Reimbursement** [2] - 401:13, 410:24
**related** [12] - 396:16, 400:24, 410:16, 411:14, 417:22, 424:22, 427:23, 427:25, 435:24, 455:2, 462:15, 463:16
**relationship** [2] - 455:4, 455:6
**relative** [2] - 471:8, 471:9
**relevant** [1] - 416:15
**relief** [1] - 442:4
**remained** [1] - 397:25
**remaining** [2] - 404:8, 404:9
**remarks** [2] - 440:2, 440:17
**remember** [43] - 398:19, 411:16, 411:17, 418:9, 428:25, 429:16, 429:25, 431:4, 433:4, 434:2, 434:4, 435:8, 435:11, 436:12, 438:16, 439:24, 442:6, 445:13, 445:16, 449:6, 449:8, 449:10, 450:23, 450:24,

451:13, 453:1, 453:2, 453:25, 464:3, 464:4, 465:12, 465:13, 465:17, 465:19, 465:22, 466:23, 466:25, 468:1, 468:10
**REMOTELY** [1] - 388:14
**removed** [2] - 442:13, 442:20
**renovated** [1] - 426:9
**repeating** [1] - 442:24
**report** [9] - 407:17, 409:3, 435:20, 436:9, 436:13, 436:18, 436:22, 437:9, 471:6
**Report** [1] - 463:24
**reported** [3] - 423:20, 443:17, 473:4
**REPORTER** [1] - 471:1
**Reporter** [2] - 389:15, 472:18
**reporting** [1] - 436:23
**reports** [3] - 395:2, 406:12, 423:5
**Representative** [4] - 457:23, 458:9, 458:14, 458:24
**request** [7] - 399:22, 425:15, 426:10, 448:22, 449:7, 451:11, 451:13
**requested** [2] - 459:17, 471:7
**requesting** [2] - 448:6, 448:17
**requests** [4] - 449:4, 449:5, 449:10, 462:16
**required** [2] - 427:11, 447:17
**requirement** [2] - 420:19, 420:21
**requirements** [1] - 443:3
**research** [2] - 394:4, 394:7
**reserve** [1] - 469:5
**Resources** [1] - 444:24
**respirator** [3] - 428:4, 428:18
**responded** [2] - 426:15, 426:17
**response** [8] - 417:6, 422:17, 425:15, 427:21, 440:23, 441:5, 441:20, 447:23
**responses** [3] - 393:7, 440:3, 441:10
**responsibility** [1] - 406:18
**responsible** [2] - 397:9, 444:6
**restate** [1] - 410:18
**restored** [1] - 443:12
**result** [1] - 447:6
**resulting** [1] - 393:24
**retaliated** [1] - 461:6
**retaliating** [1] - 461:14
**Retaliation** [1] - 434:6
**retaliation** [10] - 422:15, 424:7, 425:17, 428:19, 460:11, 460:12, 460:22, 462:10, 468:16
**retaliatory** [4] - 425:21, 427:11, 440:1, 440:16
**Retirement** [1] - 410:24
**retirement** [4] - 411:15, 412:13, 415:12, 465:7
**retrieve** [3] - 429:2, 465:8, 465:9
**return** [1] - 415:2
**review** [1] - 471:6
**rise** [1] - 425:17
**rock** [1] - 449:22
**ROIs** [1] - 441:9
**role** [3] - 435:13, 449:24, 457:25
**roles** [1] - 457:20
**rollover** [1] - 418:7
**room** [1] - 447:20
**rows** [1] - 432:18
**run** [2] - 406:24, 416:21
**RVSR** [14] - 442:19, 449:22, 451:6, 452:25, 453:11, 453:13, 453:16, 453:21, 454:4, 454:5, 454:12, 455:24, 455:25, 468:19
**RVSRs** [17] - 452:4, 452:10, 452:12, 452:19, 452:20, 452:21, 453:6, 453:8, 454:5, 454:10, 464:7, 464:11, 465:9, 465:20, 465:25, 466:1, 466:5

**S**

**Safety** [4] - 457:22, 458:8, 458:13, 458:23
**safety** [2] - 458:7, 460:24
**Sandy** [2] - 465:15, 465:16
**sat** [1] - 391:14
**saved** [1] - 412:18
**Saving** [1] - 411:20
**savings** [1] - 411:15
**scenario** [1] - 455:22
**schedule** [7] - 452:4, 452:8, 452:9, 452:14, 453:22, 454:22, 454:23
**scold** [2] - 415:25, 416:2
**score** [7] - 393:23, 394:13, 394:17, 395:11, 395:18, 396:1, 396:13
**scores** [1] - 394:11
**Scott** [1] - 457:3
**Screen** [6] - 419:21, 421:9, 431:14, 431:21, 433:22, 451:19
**screen** [14] - 392:3, 392:10, 392:18, 392:20, 421:5, 421:6, 422:9, 422:12, 433:3, 433:19, 433:21, 433:24, 439:20, 439:22
**scroll** [1] - 404:22
**searches** [1] - 394:10
**Sec** [1] - 473:2
**sec** [1] - 392:7
**second** [5] - 422:1, 426:5, 431:18, 433:18, 454:2
**SECRETARY** [2] - 388:6, 472:6
**Security** [1] - 411:1
**see** [23] - 394:6, 394:19, 401:15, 402:18, 406:12, 407:1, 409:24, 415:20, 415:22, 422:12, 428:12, 431:23, 431:24, 432:17, 432:24, 433:10, 433:13, 438:15, 439:21, 440:25, 463:19, 464:24, 467:2
**seeing** [1] - 436:3
**seeking** [1] - 464:20
**seem** [2] - 426:10, 426:17
**sees** [1] - 406:14
**select** [1] - 467:15
**send** [1] - 395:7
**Senior** [1] - 464:16
**sense** [3] - 397:22, 431:13, 448:20
**SENT** [1] - 472:10
**sent** [1] - 426:18
**sentence** [4] - 423:4, 450:5, 450:6, 464:23
**separate** [2] - 434:11, 447:20
**September** [7] - 442:12, 442:16, 443:18, 443:19, 447:16, 448:1, 448:6
**serve** [3] - 444:15, 457:22, 457:25
**serves** [2] - 421:15, 445:21
**service** [1] - 467:15
**Service** [4] - 396:20, 423:12, 423:13, 444:13
**services** [3] - 404:16, 404:21, 405:19
**sessions** [1] - 451:16
**set** [4] - 393:3, 418:7, 418:9, 447:21
**sexual** [1] - 465:14
**shade** [1] - 396:22
**shaking** [1] - 440:25
**Shapiro** [1] - 466:14
**share** [10] - 392:9, 392:18, 419:21, 421:5, 421:9, 431:14, 431:21, 433:19, 433:22, 451:19
**Share** [3] - 392:20, 422:9, 439:20
**sharing** [3] - 421:6, 433:20, 433:24
**Shear** [1] - 465:3
**Sheet** [1] - 389:17
**SHEET** [1] - 473:1
**Shield** [19] - 401:22, 401:24, 402:5, 402:9, 402:12, 406:4, 406:8, 406:11, 406:14, 406:16, 406:21, 407:11, 407:13, 407:19, 407:21, 408:7, 408:15, 408:17, 408:20
**shortly** [1] - 455:12
**show** [7] - 403:1, 411:7, 431:15, 433:7, 433:10, 439:18, 445:5
**showing** [2] - 392:22, 422:10
**sick** [21] - 416:21, 416:22, 416:24, 417:10, 417:19, 418:1, 418:7, 419:1, 419:6, 419:15, 420:7, 420:11, 421:13, 425:11, 462:6, 462:12, 462:13, 465:25, 466:2, 466:6
**side** [1] - 405:2
**Sign** [1] - 389:16
**sign** [2] - 469:6, 472:14
**signature** [1] - 454:2
**signed** [1] - 470:11
**significant** [1] - 398:16
**signing** [2] - 469:12, 472:13
**similar** [1] - 466:1
**simply** [1] - 421:12
**sit** [1] - 393:12
**sites** [1] - 394:12
**sitting** [1] - 438:10
**situation** [1] - 401:22
**smile** [1] - 415:22
**smoothing** [2] - 456:14, 456:15
**Social** [1] - 410:25
**solely** [7] - 424:14, 425:8, 426:3, 427:1,

427:16, 428:21, 428:23
**Solomon** [5] - 389:1, 389:2, 472:12, 472:20, 473:25
**SOLOMON** [11] - 430:16, 436:6, 436:11, 436:20, 437:15, 438:17, 438:21, 439:3, 444:20, 445:2, 469:4
**someone** [7] - 444:7, 444:15, 444:19, 450:12, 453:16, 455:4, 462:11
**someplace** [1] - 425:13
**sometimes** [1] - 445:25
**somewhat** [1] - 429:19
**soon** [1] - 413:18
**sorry** [14] - 399:2, 407:7, 410:22, 419:17, 421:7, 423:15, 425:19, 429:6, 430:5, 432:23, 438:19, 444:21, 451:14, 455:19
**Sorry** [1] - 447:13
**sort** [2] - 460:1, 464:13
**sought** [2] - 465:20
**sound** [1] - 429:7
**sounds** [3] - 412:24, 423:19, 443:7
**sources** [2] - 394:9, 440:18
**spare** [1] - 442:2
**speaking** [2] - 427:6, 445:24
**specific** [4] - 406:10, 435:10, 449:6, 468:9
**specifically** [3] - 425:3, 451:20, 468:10
**speech** [1] - 409:14
**spending** [1] - 396:10
**spoken** [1] - 400:2
**spreadsheet** [4] - 431:17, 431:23, 432:1, 440:19
**Spreadsheet** [1] - 390:7
**spreadsheets** [1] - 416:20
**stamped** [1] - 403:4
**stand** [2] - 432:5, 466:22
**star** [1] - 449:22
**start** [5] - 391:25, 397:19, 406:12, 409:3, 423:25
**started** [18] - 391:12, 393:7, 394:18, 397:6, 398:6, 398:11, 399:8, 422:23, 422:25, 423:1, 423:23, 424:10, 425:17, 425:24, 428:8, 436:4, 455:12, 467:7
**STATE** [2] - 470:4, 471:3
**State** [3] - 470:7, 470:15, 471:14
**State's** [1] - 389:7
**statements** [2] - 440:2, 440:17
**STATES** [2] - 388:1, 472:1
**static** [2] - 416:9, 416:12
**status** [7] - 393:25, 394:21, 398:18, 421:19, 421:21, 467:18
**stenographic** [1] - 471:8
**stenographically** [1] - 471:6
**step** [2] - 429:24, 430:11
**steps** [1] - 435:20
**still** [5] - 391:17, 445:11, 447:15, 455:24, 467:24
**stipulated** [1] - 469:10
**stop** [2] - 420:24, 428:10
**stopped** [2] - 397:17, 428:9
**story** [1] - 414:6
**Street** [1] - 389:8
**strictly** [2] - 424:22, 425:1
**stuck** [1] - 455:22
**student** [10] - 397:19, 399:8, 399:17, 399:21, 400:3, 400:4, 400:13, 400:17, 400:18, 400:24
**studied** [1] - 460:3
**studies** [1] - 460:3
**stuff** [5] - 400:18, 408:3, 412:3, 413:15, 441:17
**sub** [1] - 411:3
**subject** [1] - 437:24
**submit** [3] - 408:23, 408:25, 442:8
**subsequent** [3] - 448:14, 448:22, 461:4
**substantial** [1] - 401:20
**successful** [2] - 449:2, 450:8
**sudden** [1] - 402:1
**suffered** [3] - 427:1, 427:15, 428:21
**sufficient** [1] - 472:15
**sufficiently** [2] - 452:25, 453:20
**suggest** [1] - 439:3
**suitable** [1] - 441:3
**Suite** [2] - 389:3, 389:8
**SULLIVAN** [21] - 391:6, 392:8, 392:12, 393:17, 395:5, 401:3, 415:20, 421:25, 422:4, 438:19, 438:22, 439:5, 439:11, 439:14, 440:25, 441:24, 442:1, 457:14, 457:17, 463:15, 469:7
**Sullivan** [22] - 389:7, 389:13, 392:21, 393:21, 395:10, 401:8, 403:7, 419:22, 422:5, 422:10, 431:15, 431:22, 433:20, 433:23, 439:6, 439:17, 439:21, 441:6, 444:21, 457:19, 472:20, 473:24
**Super** [1] - 464:16
**supervisor** [5] - 426:15, 427:19, 445:7, 445:9, 450:14
**supervisors** [1] - 443:1
**supplementation** [1] - 393:12
**supplemented** [1] - 393:11
**supply** [1] - 416:20
**suppose** [1] - 411:8
**supposed** [3] - 435:20, 436:12, 436:13
**surgeon** [1] - 409:23
**surprise** [1] - 407:23
**surprised** [1] - 428:12
**survived** [1] - 463:9
**sworn** [2] - 391:3, 470:9
**symptoms** [1] - 406:13
**System** [2] - 432:6, 466:24
**system** [6] - 432:8, 432:12, 442:14, 443:5, 466:18, 467:7

**T**

**TAKEN** [2] - 388:12, 472:9
**Tampa** [3] - 389:3, 389:8, 389:8
**TAMPA** [2] - 388:2, 472:2
**target** [1] - 428:24
**taxable** [1] - 399:24
**Taylor** [3] - 409:17, 409:19, 409:20
**teach** [1] - 466:9
**Teekell** [3] - 409:17, 409:19, 409:20
**terms** [3] - 449:13, 449:19, 459:6
**testified** [1] - 391:4
**testifies** [1] - 425:9
**testing** [1] - 459:17
**tests** [2] - 448:15, 448:23
**text** [1] - 433:9
**Thanksgiving** [1] - 461:22
**THE** [4] - 389:1, 389:6, 439:13, 441:23
**thereabouts** [1] - 423:25
**thereafter** [1] - 455:13
**they've** [1] - 405:1
**thinking** [2] - 419:19, 430:8
**three** [4] - 433:10, 440:18, 440:21, 451:21
**Thrifts** [1] - 411:20
**throat** [1] - 409:14
**throughout** [1] - 442:16
**TIME** [1] - 388:13
**timeliness** [1] - 462:25
**timely** [1] - 465:6
**timing** [4] - 460:14, 460:19, 461:3, 461:12
**title** [1] - 433:8
**titles** [1] - 464:20
**TMS** [3] - 432:2, 432:16, 442:14
**TO** [1] - 472:10
**today** [5] - 391:8, 391:25, 393:13, 395:8, 439:1
**together** [1] - 466:13
**took** [15] - 391:15, 401:25, 402:5, 416:15, 417:1, 417:4, 417:13, 417:20, 417:24, 418:15, 419:10, 443:4, 443:5, 444:8, 467:21
**tools** [1] - 468:22
**top** [5] - 403:21, 404:22, 407:1, 440:9, 443:23
**tossed** [3] - 462:25, 463:1, 464:5
**total** [3] - 404:20, 432:17, 432:19
**totally** [3] - 424:18, 427:23, 427:24
**towards** [1] - 396:19
**track** [3] - 445:8, 446:1, 468:1
**tracking** [1] - 443:2
**train** [1] - 467:21
**trained** [3] - 409:23, 467:20, 468:2
**training** [34] - 431:7, 432:6, 432:9, 432:22, 432:23, 434:8, 435:3, 435:7, 435:12, 438:1, 442:14, 442:18, 443:3, 444:4, 447:18, 458:11, 459:10, 459:12, 459:14, 459:18, 459:19, 459:20, 459:23, 460:5, 460:21, 461:5, 461:19, 461:20, 468:2, 468:5, 468:9, 468:14
**Training** [3] - 433:12, 433:13, 434:25

**trainings** [10] - 430:21, 430:23, 431:1, 431:7, 432:19, 433:8, 433:10, 434:12, 434:15, 437:24
**transcript** [5] - 471:7, 471:7, 472:13, 472:14, 472:14
**TRANSCRIPT** [1] - 473:1
**trauma** [1] - 465:14
**travel** [2] - 405:11, 408:3
**treated** [2] - 464:24, 464:25
**treatment** [5] - 408:5, 408:6, 410:2, 410:5, 428:3
**treatments** [1] - 410:15
**trial** [1] - 413:13
**tried** [3] - 395:22, 414:16, 414:17
**true** [3] - 430:6, 471:7, 473:22
**truth** [1] - 391:3
**try** [4] - 394:22, 415:24, 444:4, 454:7
**trying** [5] - 422:24, 459:21, 461:19, 464:24, 468:17
**TSP** [6] - 410:25, 411:10, 411:12, 411:18, 412:20, 412:23
**Tuesday** [2] - 415:22, 415:23
**twice** [1] - 433:11
**two** [7] - 406:7, 411:3, 451:22, 463:17, 463:20, 463:25, 466:16
**type** [2] - 415:2, 437:3
**types** [6] - 449:14, 449:16, 450:2, 450:3, 450:4, 450:24

## U

**U.S** [3] - 388:7, 472:7, 473:2
**ultimately** [1] - 458:12
**Ulyssee** [1] - 445:12
**unable** [2] - 413:20, 414:22
**undated** [1] - 415:15
**undeniably** [1] - 391:23
**Under** [1] - 473:21
**under** [11] - 391:17, 394:12, 396:22, 399:25, 402:11, 402:13, 406:9, 406:17, 413:24, 445:11, 462:8
**understood** [3] - 452:3, 453:18, 453:19
**unintelligible)** [1] - 445:25
**Union** [8] - 457:20, 457:22, 459:8, 459:17, 459:21, 460:4, 460:24, 460:25
**unit** [4] - 427:5, 427:9, 427:14, 427:18
**UNITED** [2] - 388:1, 472:1
**United** [1] - 389:7
**unofficial** [1] - 458:1
**unrelated** [1] - 410:6
**up** [20] - 392:3, 398:19, 400:8, 400:18, 404:22, 407:24, 412:4, 412:5, 422:7, 423:20, 428:6, 430:1, 447:21, 457:1, 459:18, 459:20, 459:23, 461:9, 465:4, 466:12
**updated** [1] - 416:9
**USAA** [1] - 396:3
**utilities** [1] - 397:18

## V

**VA** [29] - 390:7, 394:18, 397:3, 397:6, 397:8, 398:12, 410:8, 410:11, 410:14, 410:16, 414:16, 418:6, 430:22, 431:18, 432:8, 432:20, 432:23, 436:4, 436:5, 448:13, 448:21, 449:12, 449:19, 451:17, 451:23, 452:8, 457:21, 462:16
**VA's** [1] - 447:5
**vacation** [1] - 417:11
**Valorie** [1] - 459:5
**variables** [1] - 411:24
**variety** [1] - 449:17
**various** [2] - 416:5, 422:18
**varying** [1] - 449:16
**VB** [1] - 467:4
**VBMS** [4] - 466:19, 466:20, 467:5, 468:4
**Venn** [4] - 424:8, 424:15, 462:8, 468:17
**verbum** [4] - 421:20, 427:19, 468:19, 468:23
**verified** [2] - 441:20, 447:19
**verify** [1] - 398:13
**versus** [1] - 440:10
**Veteran** [1] - 465:12
**Veteran's** [1] - 467:17
**Veterans** [6] - 423:12, 444:13, 444:15, 467:2, 467:3, 473:2
**veterans** [1] - 466:23
**VETERANS** [2] - 388:7, 472:7
**Vicky** [3] - 454:18, 455:9, 455:16
**view** [1] - 448:12
**violation** [1] - 446:20
**Virtual** [1] - 433:12
**VMBS** [1] - 466:17
**voice** [4] - 423:2, 424:1, 427:6, 427:11
**Vol** [4] - 389:12, 472:9, 472:14, 473:3
**VOL** [1] - 388:10
**vs** [2] - 388:5, 472:5
**VSRs** [3] - 464:16

## W

**waived** [1] - 469:13
**walk** [3] - 414:9, 428:17, 466:15
**wall** [1] - 465:14
**Walter** [1] - 458:4
**War** [1] - 465:12
**waving** [1] - 433:2
**Wax** [1] - 460:17
**wax** [1] - 461:13
**wear** [2] - 425:5, 428:4
**wearing** [1] - 428:18
**web** [1] - 442:13
**week** [1] - 416:3
**welcome** [2] - 391:7, 438:25
**WHEREUPON** [1] - 391:1
**whole** [2] - 409:15, 459:12
**wing** [1] - 409:15
**Witness** [1] - 389:16
**WITNESS** [3] - 439:13, 441:23, 472:10
**witness** [1] - 388:16
**Witty** [1] - 423:6
**woman** [2] - 465:13, 466:9
**wonderful** [2] - 442:7
**word** [4] - 406:8, 433:25, 463:3
**work-at-home** [1] - 428:5
**work-from-home** [3] - 452:10, 452:12, 453:22
**work-related** [1] - 417:22
**worker** [4] - 428:8, 429:11, 429:14, 430:22
**Worker's** [12] - 399:1, 402:13, 402:17, 402:18, 408:24, 409:1, 412:21, 413:1, 413:19, 414:21, 417:20, 426:18
**workers** [5] - 437:25, 438:2, 438:6, 438:12, 438:14
**workload** [6] - 449:2, 449:4, 449:11, 449:14, 450:13, 451:12
**Workmen's** [18] - 401:21, 401:24, 402:8, 402:22, 406:5, 406:6, 406:9, 406:17, 409:9, 409:24, 409:25, 412:22, 413:24, 417:9, 426:23, 461:9, 461:25
**workplace** [2] - 428:18, 435:14
**Workplace** [2] - 434:9, 434:12
**works** [1] - 400:22
**worries** [1] - 421:10
**worth** [2] - 407:1, 415:10
**WRITE** [1] - 473:1
**write** [1] - 442:12
**writing** [4] - 426:16, 442:5, 442:9, 460:17
**written** [1] - 458:17
**wrongly** [1] - 406:15

## Y

**year** [10] - 398:24, 399:4, 407:4, 411:18, 414:24, 415:6, 415:9, 415:13, 447:22, 457:20
**year's** [1] - 415:10
**years** [9] - 395:1, 397:14, 411:8, 414:8, 416:16, 417:2, 419:19, 439:2, 443:25
**yi** [2] - 455:22
**yourself** [2] - 467:22, 472:15

## Z

**Zeh** [3] - 425:5, 429:11, 465:5
**zoom** [3] - 392:23, 431:25, 473:3
**Zoom** [4] - 415:21, 469:14, 471:6, 472:9
**ZOOM** [1] - 388:9

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| AILEEN MULLIN,<br><br>Plaintiff,<br><br>v.<br><br>DENIS MCDONNOUGH, SECRETARY,<br>U.S. DEPARTMENT OF VETERANS AFFAIRS,<br>Et al.<br>Defendant. | ) Case No.: 8:20-cv-026970-VMC-AEP |

**PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S REQUESTS FOR PRODUCTIONS**

COMES NOW Plaintiff, Aileen Mullin and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure hereby provides supplemental answers Defendant's Requests for Productions. All responses, objections, general objections, instructions, and similar to Defendant's Requests for Production are incorporated herein.

**SUPPLEMENTAL ANSWERS TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**Request No. 6:** Documents sufficient to show **all phone calls** made by You on **January 12, 2012.**

**Response:** All documents that are identified to the best of our knowledge at this time will are provided in the supplemental production for RFP6.

**Request No. 7:** All documents supporting the amount of damages claimed by Plaintiff in this action.



EXHIBIT
PENGAD 800-631-6989
1

**Response:** Objection notwithstanding, all documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP7.

__Request No. 8:__ **Any and all photographs that were taken of** or taken by Plaintiff that depict Plaintiff engaging in activities related to Plaintiffs' enjoyment of life, including any pictures that were posted, uploaded, or otherwise added to any social networking sites ("SNS") or blogs, including but not limited to Facebook, Twitter, Instagram, Myspace, LinkedIn, or any similar websites posted since January 1, 2015. This includes photographs posted by others in which Plaintiffs have been tagged or otherwise identified therein.

**Response:** All documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP8 and 9.

__Request No. 9:__ Any and all posts m**ade by Plaintiffs on any SNS** that relate to this Action, Plaintiffs' physical capabilities or impairments, Plaintiffs' domestic or international travel or travel plans, Plaintiffs' participation in athletics or recreational activities, Plaintiffs' fitness activities, and Plaintiffs' social and leisure activities.

**Response:** All documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP8 and 9.

# PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S REQUESTS FOR INTERROGATORIES

COMES NOW Plaintiff, Aileen Mullin and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure hereby provides supplemental answers to Defendant's Requests for Interrogatories. All responses, objections, general objections, instructions, and similar from the Plaintiff's Answers to Defendant's Requests for Interrogatories are incorporated herein.

## SUPPLEMENTAL ANSWERS TO REQUESTS FOR INTERROGATORIES

**RFI 1:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in **Count 1** of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Agency failed to accommodate and or abide by the applicable policies in processing Plaintiff's RA request in regards to the handling of incoming Veteran calls and prolonged speaking. The Act occurred over an extended period, with relevant dates provided below. Additional accommodation requests related to asthma/difficulty breathing are subsequently discussed. Such accommodation requests were also over a prolonged period with dates provided below.

After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the

Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation.

Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "....patient has intermittent hoarseness with reflux disease .... Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4.

On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando.

A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed.

On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask. On or around November 28, 2011, HR, Bonnie Wax signed off on a memo denying Plaintiff the ability to participate and receive training in accordance with the Collective Bargaining Agreement between the AFGE and DVA after AFGE Local 1594 Representative Keith Pryor and President Riley requested that Plaintiff be allowed to participate.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions.

On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer.

On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her.

On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clairifcation on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012 which resulted in EMS

being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

January 23, 2012 was the next time Plaintiff entered the work building and within two hours developed sinus pain and bleeding in addition to having her asthma aggravated resulting in lung pain. On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay."

On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and

HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working.

As of February 19, 2012, Agency had still failed to provide Plaintiff with any effective RA for her breathing conditions as described in memo from AFGE to Agency. From February through March 11, 2012, Agency failed to provide any effective RA for Plaintiff which resulted in her taking numerous days of leave to relieve her medical conditions that were aggravated by Agency's failure to provide an effective RA, despite being aware of her need for RAs.

On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed.

On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier.

On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and

she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested.

Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. This was an ineffective RA as it did not address how Plaintiff was to avoid the environmental trigger on the two days she would be required to work in the office. The requirement of forcing Plaintiff to work in the building for two days a week continued until April 2013 despite medical evidence that suggested she needed to be given full time telework.

On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite

Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

On or around May 3, 2012 Plaintiff was notified that her request for advanced sick leave was denied and during the Month of May 2012, HR was not providing Plaintiff or her AFGE representatives with pertinent documentation that she requested pertaining to her health records Agency had on file. On May 31, 2012, Plaintiff was provided an incomplete copy of her personnel files that she and the Union had requested.

On or around June 4, 2012, Plaintiff was informed by a coworker that hours which were donated to Plaintiff for leave were not credited to her.

On or around June 5, 2012, Plaintiff received a lengthy email from HR Bonnie Wax which Plaintiff found to be disturbing as she had specifically requested that Ms. Wax communicate with her AFGE representatives while Plaintiff was undergoing cancer treatment. Instead Ms. Wax ignored the request and contacted Plaintiff individually while she was undergoing her cancer treatment.

On or around June 8, 2012, Plaintiff was informed that other important health/RA documents were missing out of her personnel records. On June 10, 2012, Plaintiff requested a meeting with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith to discuss issues Plaintiff was experiencing with oversight of leave donations, Oversight of HR actions that pertained to her, and to again request that Ms. Wax not communicate with Plaintiff directly. During this meeting, Director Witty brought up the recent EEOC complaint Plaintiff had recently filed with ORM and did respond to any of Plaintiff's requests positively and that she did not understand why Plaintiff was upset that Ms. Wax sent the email to Plaintiff on June 5, 2012. During this meeting additional RAs were discussed for Plaintiff to be able to work while undergoing cancer

treatment that would limit her exposure in the building while being immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

Following this meeting, Ms. Wax treatment towards Plaintiff proceeded to worsen resulting in Plaintiff reporting Ms. Wax for harassment. From June 14-June 29, 2012, Plaintiff's request for leave under the leave transfer program were unreasonably delayed which resulted in Plaintiff not knowing if she would be getting paid during the period she was receiving cancer treatment. From August 11-August 25, 2012, Plaintiff's request for advanced sick leave were not processed promptly resulting in a loss of pay for Plaintiff while she was undergoing cancer treatment.

On August 31, 2012, OPM sent an email to Plaintiff's work email stating that she needed to complete a security investigation and that failure to do so could result in a lapse in her security clearance. However since Plaintiff was out on medical leave, she never received the notice and Agency failed to notify her despite also being on the email from OPM. On September 10, 2012, Plaintiff was notified that she had failed to complete the required investigation that was requested on August 31.

On or around September 12, 2012, Plaintiff discovered she had her access removed from the web based training system. Throughout the month of September 2012, Agency failed to promptly rectify the issue so Plaintiff could do any necessary training to get her to performing her duties as a RVSR.

On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have

less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator to which she also requested as an RA. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further.

Plaintiff reported to the office, approximately 24 total hours, during the month of January 2013. On or around Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Plaintiff suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Plaintiff had been asymptomatic when on leave for breast cancer). On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her

immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation).

On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further.

On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limiter her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process

her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE.

On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

On March 25, 2013, HR Tammi Clarke, emailed Plaintiff accusing her of not protecting her own health. On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day.

On March 29, 2013, Plaintiff also sent an email to HR Clarke expressing concern of the delay in processing her FMLA applications and requesting an update on her pending FMLA applications that were submitted on February 22 and February 23, 2013 as she had not heard anything since submitting them.

On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior.

On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior.

On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could may leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013.

On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to

help with the marginal duties that she would be required to perform in the building. On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

On or around April 29, 2013, Plaintiff was informed by her supervisor that her performance was not an acceptable level and that she was not on track for the next within grade increase.

On May 16, 2013, Plaintiff was informed that she did not qualify for the mandatory overtime that was being offered to RVSRs at the RO. This email was sent from Sandra Smith and Coach McBurrough.

On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied

her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff.

**RFI 2:** Please identify all individuals you contend were similarly situated in all material respects to you, as defined by the Eleventh Circuit, see Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227–28 (11th Cir. 2019), and were treated differently than you. In responding to this interrogatory, identify the individual, his or her supervisor, when the individual was employed by Defendant, how the individual was similarly situated in all material respects to you, and how the individual was treated differently.

**Response:**

Plaintiff is unaware of the specific names and disability status any other comparator employees that meet the definition as provided in *Lewis* at this time. All RVSRs in RO 317 that were provided with a RA would be considered a comparator. Plaintiff will supplement this request if she becomes aware of additional comparator employees.

**RFI 3:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in Count 2 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

On or around January 4, 2010, Agency required Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation.

On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." On January 26, 2010, Agency denied Plaintiff's RA request via a memo from HR.

On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office.

On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor.

On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions.

On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff

notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her.

On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clairifcation on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012 which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

January 23, 2012 was the next time Plaintiff entered the work building and within two hours developed sinus pain and bleeding in addition to having her asthma aggravated resulting in lung pain. On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia

and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay."

On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working.

As of February 19, 2012, Agency had still failed to provide Plaintiff with any effective RA for her breathing conditions as described in memo from AFGE to Agency. From February through March 11, 2012, Agency failed to provide any effective RA for Plaintiff which resulted in her taking numerous days of leave to relieve her medical conditions that were aggravated by Agency's failure to provide an effective RA, despite being aware of her need for RAs.

On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However,

Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested.

Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. This was an ineffective RA as it did not address how Plaintiff was to avoid the environmental trigger on the two days she would be required to work in the office. The requirement of forcing Plaintiff to work in the building for two days a week continued until April 2013 despite medical evidence that suggested she needed to be given full time telework.

On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator to which she also requested as an RA. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by

HR and she was informed that Agency could not grant her RA of limiting her time in the building further.

Plaintiff reported to the office, approximately 24 total hours, during the month of January 2013. On or around Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Plaintiff suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Plaintiff had been asymptomatic when on leave for breast cancer). On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further

discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation).

On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further.

On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request.

On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator.

On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri).

She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays.

On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

**RFI 4:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in Count 3 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

**RFI 5:** Identify each act you contend constitutes retaliation as alleged in Count 4 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around November 28, 2011, HR, Bonnie Wax signed off on a memo denying Plaintiff the ability to participate and receive training in accordance with the Collective Bargaining Agreement between the AFGE and DVA after AFGE Local 1594 Representative Keith Pryor and President Riley requested that Plaintiff be allowed to participate.

On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

On or around May 3, 2012 Plaintiff was notified that her request for advanced sick leave was denied and during the Month of May 2012, HR was not providing Plaintiff or her AFGE representatives with pertinent documentation that she requested pertaining to her health records Agency had on file. On May 31, 2012, Plaintiff was provided an incomplete copy of her personnel files that she and the Union had requested.

On or around June 4, 2012, Plaintiff was informed by a coworker that hours which were donated to Plaintiff for leave were not credited to her.

On or around June 5, 2012, Plaintiff received a lengthy email from HR Bonnie Wax *which* Plaintiff found to be disturbing as she had specifically requested that Ms. Wax communicate with her AFGE representatives while Plaintiff was undergoing cancer treatment. Instead Ms. Wax ignored the request and contacted Plaintiff individually while she was undergoing her cancer treatment.

On or around June 8, 2012, Plaintiff was informed that other important health/RA documents were missing out of her personnel records.

On June 10, 2012, Plaintiff requested a meeting with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith to discuss issues Plaintiff was experiencing with oversight of leave donations, Oversight of HR actions that pertained to her, and to again request that Ms. Wax not communicate with Plaintiff directly. During this meeting, Director Witty brought up the recent EEOC complaint Plaintiff had recently filed with ORM and did respond to any of Plaintiff's requests positively and that she did not understand why Plaintiff was upset that Ms. Wax sent the email to Plaintiff on June 5, 2012. During this meeting additional RAs were discussed for Plaintiff to be able to work while undergoing cancer treatment that would limit her exposure in the building while being immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

From June 14-June 29, 2012, Plaintiff's request for leave under the leave transfer program were unreasonably delayed which resulted in Plaintiff not knowing if she would be getting paid during the period she was receiving cancer treatment.

From August 11-August 25, 2012, Plaintiff's request for advanced sick leave were not processed promptly resulting in a loss of pay for Plaintiff while she was undergoing cancer treatment.

On August 31, 2012, OPM sent an email to Plaintiff's work email stating that she needed to complete a security investigation and that failure to do so could result in a lapse in her security clearance. However since Plaintiff was out on medical leave, she never received the notice and Agency failed to notify her despite also being on the email from OPM. On September 10, 2012, Plaintiff was notified that she had failed to complete the required investigation that was requested on August 31.

On or around September 12, 2012, Plaintiff discovered she had her access removed from the web based training system. Throughout the month of September 2012, Agency failed to promptly rectify the issue so Plaintiff could do any necessary training to get her to performing her duties as a RVSR.

On March 25, 2013, HR Tammi Clarke, emailed Plaintiff accusing her of not protecting her own health.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator.

On March 29, 2013, Plaintiff also sent an email to HR Clarke expressing concern of the delay in processing her FMLA applications and requesting an update on her pending FMLA

applications that were submitted on February 22 and February 23, 2013 as she had not heard anything since submitting them.

On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior.

On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could may leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013.

On or around April 29, 2013, Plaintiff was informed by her supervisor that her performance was not an acceptable level and that she was not on track for the next within grade increase.

On May 16, 2013, Plaintiff was informed that she did not qualify for the mandatory overtime that was being offered to RVSRs at the RO. This email was sent from Sandra Smith and Coach McBurrough.

On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful as her workload was not appropriately modified based on her accommodation request. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken as a result of the failure to accommodate. Between February through April 2014, Plaintiff's supervisor James Beauchamp micromanaged her workload.

**RFI 7:** Identify each act you took that you contend prompted the retaliation and hostile work environment alleged in Count 4 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Objection notwithstanding, Plaintiff responds that her participation in protected EEOC activity to include participating the complaint process for her EEOC complaints under Agency Case Numbers 200I-0317-2014102766; 200I-0317-2015100312; 200I-0317-2012103413, and participating in the reasonable accommodation process forms the basis for her retaliation and hostile work environment claims. Plaintiff also contends that any reports she made to management and Director Witty pertaining to the harassment she was facing as articulated in her supplemental response to RFI 1. Together these are an exhaustive list of the protected activities.

**RFI 9:** Please identify any and all physicians (including medical doctors, doctors of osteopathy, chiropractors, or any other healthcare provider); pharmacists, hospitals, psychologists, psychiatrists, or other mental health counselors or professionals; ministers, counselors, or any other person with whom you consulted or sought treatment or whom you contacted because of any alleged disability identified in response to Interrogatory No. 8. In responding to this interrogatory, for each individual, please set forth the name and business address of the individual and the period of time in which you consulted with, sought treatment, or had contact with the individuals because of any serious health condition identified in **Interrogatory No. 6.**

**Response:**

Plaintiff directs Defendant to the document titled "BCBS OWCP Payment Info For Mullin" in supplemental RFP7, in the folder titled "Medical-Insurance".

**RFI 10:** Please set forth the factual basis for the allegations contained in paragraph 20 of your Complaint. When answering, please identify any disability or condition you contend was caused or aggravated by building exposure and Defendant's failure to accommodate and any medical provider who determined causation.

**Response:**

Plaintiff directs Defendant to the report done on 5/12/2021 by Dr. Ellen J Dutta and the reports done by Dr. Teekell Taylor dated 2/3/2020 in Supplemental RFP 7.

**RFI 11:** Please identify each accommodation that you requested of Defendant for your alleged disabilities, the specific accommodation sought, when you requested the accommodation, the form of your request (i.e., whether verbally or by e-mail, letter, or other writing), to whom you made the request, who responded to your request, when you received the response, and any witnesses to your request for accommodation or Defendant's response.

**Response:**

Objection notwithstanding, Plaintiff directs Defendant to her supplemental responses to RFI 1 and 3, as all of Plaintiff's RA requests made during the relevant time frame are detailed therein. Plaintiff further provides the below, which also includes information that is responsive to RFI 12.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at

Advanced ENTs of Tampa Bay, Trina Espanola, MD: "….patient has intermittent hoarseness with reflux disease …. Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print

from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

The Agency's denial of accommodation was insufficient. Sufficient accommodation would conform with the above medical recommendations limiting prolonged speaking, would provide adequate training for processes undertaken as a result of the accommodation, and would provide adequate access to all necessary systems needed to work from home. For the below-listed accommodations, the primary focus of the requests involves addressing exposure to poor air quality rather than issues more directly related to work load/duties that are detailed above. Though not specified below, ***all remaining accommodations are insufficient to the extent they do not limit the Plaintiff's time on the phone/prolonged speaking, adequate training for alternative processes, and access to alternative processes, as detailed above.***

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed. On or around September 6, 2011, Plaintiff received

notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

The denial of accommodation was insufficient. A sufficient accommodation would have been to move Plaintiff to another duty station where air quality was not a problem. A less sufficient accommodation would be to provide a compressed schedule to limit the consecutive days that Plaintiff spent in Room 222.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director

Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

The agreed upon accommodation was sufficient, but it was not implemented and the failure to implement the accommodation resulted in insufficient accommodation. A sufficient accommodation would be to be relocated to a work station without air quality issues. A less sufficient accommodation would be to modify her compressed schedule and to be provided a private space in which to use her nebulizer.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via

email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

The accommodation was insufficient. A sufficient accommodation would be to allow Plaintiff to work from home or another duty station where air quality was not a problem. A less sufficient accommodation would be to provide air purifier(s) that were appropriately sized for the room.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable

to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

The initial failure to respond to Plaintiff's RA request was insufficient. The evenutal accommodation of three days of telework was insufficient. A sufficient accommodation would not have required Plaintiff to return to a building with poor air quality and would allow Plaintiff a private space to use a nebulizer when necessary. The requirement for Plaintiff to work in a building with poor air quality for two days a week continued until April 2013 despite medical evidence that suggested Plaintiff needed to be given full time telework and/or transfer to a duty station where air quality was not an issue.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not

support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

The accommodation was insufficient. A sufficient accommodation would include limiting exposure to poor air quality, e.g., full time telework or assignment to a different duty station.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous

conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director

Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

The accommodation was insufficient. A sufficient accommodation would minimize exposure to duty stations with poor air quality. Plaintiff was eventually provided with a respirator, which partially addressed her RA requests.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for

wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

The accommodation was insufficient. A sufficient accommodation would limit all exposure to Room 222/poor air quality.

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

The request is insufficient because it does not address work flow/job duty issues. A sufficient accommodation would address the concerns presented in the above paragraph (i).

**RFI 12:** For each accommodation identified in your response to **Interrogatory Number 11,** please state whether the accommodation provided by Defendant, if any, was insufficient. For each accommodation you contend was insufficient, please explain how Defendant's offered accommodation was insufficient, the nature of any alternative accommodation sought, when you informed Defendant the accommodation was insufficient, the form of your request (i.e.,, whether verbally or by e-mail, letter, or other writing), to whom you made the request, who responded to your request, when you received the response, and any witnesses to your request for accommodation or Defendant's response

**Response:**

Objection notwithstanding, Plaintiff directs Defendant to her supplemental responses to RFI 1 and 3, as all of Plaintiff's RA requests made during the relevant time frame are detailed therein. Plaintiff further provides the below, which also includes information that is responsive to RFI 11. As such, the Plaintiff provides the following direct evidence of discrimination in relation to the RA requests.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR

(Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "....patient has intermittent hoarseness with reflux disease .... Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with

Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

The Agency's denial of accommodation was insufficient. Sufficient accommodation would conform with the above medical recommendations limiting prolonged speaking, would provide adequate training for processes undertaken as a result of the accommodation, and would provide adequate access to all necessary systems needed to work from home. For the below-listed accommodations, the primary focus of the requests involves addressing exposure to poor air quality rather than issues more directly related to work load/duties that are detailed above. ***Though not specified below, all remaining accommodations are insufficient to the extent they do not limit the Plaintiff's time on the phone/prolonged speaking, adequate training for alternative processes, and access to alternative processes, as detailed above.***

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller

rather than having her RA request processed. On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not

accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

The denial of accommodation was insufficient. A sufficient accommodation would have been to move Plaintiff to another duty station where air quality was not a problem. A less sufficient accommodation would be to provide a compressed schedule to limit the consecutive days that Plaintiff spent in Room 222.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS

services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

The agreed upon accommodation was sufficient, but it was not implemented and the failure to implement the accommodation resulted in insufficient accommodation. A sufficient accommodation would be to be relocated to a work station without air quality issues. A less sufficient accommodation would be to modify her compressed schedule and to be provided a private space in which to use her nebulizer.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, “Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami

Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

The accommodation was insufficient. A sufficient accommodation would be to allow Plaintiff to work from home or another duty station where air quality was not a problem. A less sufficient accommodation would be to provide air purifier(s) that were appropriately sized for the room.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was

never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

The initial failure to respond to Plaintiff's RA request was insufficient. The evenutal accommodation of three days of telework was insufficient. A sufficient accommodation would not have required Plaintiff to return to a building with poor air quality and would allow Plaintiff a private space to use a nebulizer when necessary. The requirement for Plaintiff to work in a building with poor air quality for two days a week continued until April 2013 despite medical evidence that suggested Plaintiff needed to be given full time telework and/or transfer to a duty station where air quality was not an issue.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not

support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

The accommodation was insufficient. A sufficient accommodation would include limiting exposure to poor air quality, e.g., full time telework or assignment to a different duty station.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous

conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director

Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

The accommodation was insufficient. A sufficient accommodation would minimize exposure to duty stations with poor air quality. Plaintiff was eventually provided with a respirator, which partially addressed her RA requests.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for

wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

The accommodation was insufficient. A sufficient accommodation would limit all exposure to Room222/poor air quality.

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

The request is insufficient because it does not address work flow/job duty issues. A sufficient accommodation would address the concerns presented in the above paragraph (i).

**RFI 13:** Do you contend that there is any direct evidence of discrimination or retaliation as defined by the Eleventh Circuit, see Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020), to support your claims? If so, please provide the factual basis for this belief, including identifying the purported direct evidence, who was involved, when it occurred, and any witnesses to the statement or event.

**Response:**

Objection notwithstanding, the Plaintiff directs Defendant to RFIs 1, 3, 4 and 5. Plaintiff further provides the below.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "....patient has intermittent hoarseness with reflux disease .... Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again

made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman.

On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed. On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before

she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for

a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her

health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these

RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further

conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by

the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be

in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

**RFI 14:** Unless identified in response to Interrogatory No. 13, please identify any discriminatory, retaliatory, or offensive comment, statement, or remark made by any current or former employee of Defendant that you contend supports your claims. In responding to this interrogatory, please set forth each comment, statement, or remark; who made the comment, statement, or remark; when the comment, statement, or remark was made; where the comment, statement, or remark was made or how it was communicated; and any witnesses to the comment, statement, or remark.

**Response:**

Plaintiff responds that the events listed in her response to RFI 1,3,4, and 5 together make up the events that support Plaintiff's claims of discrimination, retaliation, and hostile work environment. Plaintiff also states the following:

Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA

application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

**RFI 15:** Please identify any other evidence of discriminatory or retaliatory intent not otherwise identified in response to Interrogatory Nos. 1-14 that you contend supports your claims of discrimination or retaliation in the Complaint.

**Response:** Plaintiff does not have any additional information other than what is proffered in interrogatories 1-14 at this time. Should additional responsive information become available, Plaintiff will supplement this response.

**RFI 17:** If you have received any income from **alternate employment, self-employment, or from sources other than employment** from January 1, 2009, to the present, please list the following:

a. The name, address, and phone number of every source from which you received income, compensation, gifts, benefits, or other things of value (if the source is an entity other than a single individual, please provide the name of your principal contact at that entity).

b. The total monetary value of the income, compensation, gifts, benefits, or other things of value that you received from each source during the specified year (please state this figure as a gross amount, *i.e.*, without adjustment for taxes or other deductions);

c. The nature of the income, compensation, gifts, benefits, or other things of value that you received from each source (*i.e.*, wages, income from self-employment, gift, etc.);

d. The dates on which amounts were received from each such source (if multiple payments were made on a regular basis, specify the beginning and ending dates of the period, the frequency with which payments were received, *i.e.* monthly, weekly, every two weeks, and any irregularities in the payment cycle).

**Response:**

Plaintiff has not received any income from alternate employment, self-employment, or other sources other than employment from January 1, 2009 to current. Plaintiff will provide a definitive number of wages associated with her OWCP claims by December 15, 2021, as she is waiting on obtaining the necessary records from DOL to verify her total OWCP wages for the

relevant time period.

**RFI 19:** With as much specificity as possible, please set forth **all of your injuries, the exact amount of damages that you claim**, whether as **an affirmative claim or as a setoff**, and **any other relief** that you seek in this action from the court.

> In responding to this interrogatory, please include in your answer: **the count to which the item of damages relates; a statement of the elements of each claim of money damages and the amount being sought with respect to each such element**; any **specific non-monetary relief that you are seeking** in this action; the **category into which each item of damages falls**, i.e., general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the monetary value placed on each category of damage or relief; **the factual basis for each item of damages or relief**; and an **explanation of how you computed each item of damages or relief, including any mathematical formula used.**

**Response:** Plaintiff objects to this interrogatory in that it requests information that will not be fully developed until after additional discvoery is completed. Objection notwithstanding, Plaintiff will supplement this request and states the following damages:

- Backpay for period prior to being put on off work status to include reimbursement of sick leave, annual leave, leave without pay (LWOP), overtime pay, premium pay, holiday pay, holiday leave, step increases, location differential.
    - **Annual-** 145 hours (2012), 109.25 (2013), 148 (2014), 37.25 (2015), =439.5
    - **Sick-** 313.75 (2012), 18 (2015) = 331.75
    - **Admin-** 24.75 (2012), 64 (2013), 16 (2014) = 104.75
    - **LWOP**-224.00 (2012), 182.5 (2013), 109 (2014), 730.5 (2015)= 1246
        - **Total hours thus far: *2,122***
        - **2,122 x current base pay is $43.46/hour= $92,222.12**
        - **With interest estimations, approximately $115,000**
    - **Overtime (TBD)**
- Front pay due to inability to return to work:
    - **1 year at Adjusted Base Pay of $90,405**
- Backpay for the period while Plaintiff was placed on an off work status

- **<u>Has to be offset by OWCP payments (TBD) and supplemented</u>**

- Reimbursement for the loss of creditable service entitlements and eligibilities to Federal Benefits and Programs affected by Plaintiff's LWOP and non-pay status.
- Reimbursement for Plaintiff's copying and mailing expenses related to her OWCP paperwork that she has submitted and requested from 2012 to current
  - **(totaling ~$1000) (See "Mailing Receipts" folder in RFP 7.**
- Reimbursement for any lost retirement benefits, including any and all accrued Thrift Savings Plan benefits and quarterly credits for social security.
  - **$40,541.26 for loss contributions from 2016-2021**
  - Based on TSP Annual TSP Statements in RFP 7.
    - 2009- $2483.36 (amount contributed to TSP)
      2010- $4594
      2011- $5254.90
      2012- $8322.79
      2013- $7290.86
      2014-$8159.52
      2015- $4435.83
- $40,541.26 contributed in 6 years (avg of $6,7568 per year)
  2016- $0
  2017- $0
  2018-$0
  2019-$0
  2020-$0
  2021-$0
- Reimbursement for medical expenses.
  - **$76,909.63 based on "BCBS Payment Info" in RFP 7.**
- Compensation for attorney fees.
  - **~$70,000 (continuing)**
- Compensatory damages not to exceed $300,000 to compensate Plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, future medical costs, inconvenience,

career loss, loss of professional reputation and career opportunities, and loss of quality of life caused by Defendant's unlawful actions, as well as damages for Agency's delay in providing reasonable accommodations which resulted in exacerbation and development of Plaintiff's disabilities

  - Damages are based on an analysis of awards in like cases. The fact patterns examined to determine like cases were those where complainants experienced extreme suffering as a result of respiratory illness, denial of training and similar opportunities, and lowered performance evaluations, over a prolonged period for approximately four years.

- Compensation for the increase in Plaintiff's student loan interest resulting from her non-work status from 4/1/2015 to current totaling
  - **~$7253.**
- Compensation for payments Plaintiff missed towards her Public Service Loan Forgiveness Program from 4/1/2015 to current.
  - **(Current balance of $34,900).**
- Compensation for damage to credit score due to loss of income from agency's failure to accommodate resulting in Plaintiff being placed on non-work status.
  - **$1000**
- Pecuniary losses for medical payments. This answer will be supplemented by December 15, 2021.

Respectfully Submitted,

James Solomon, James@smkfirm.com
Attorney for Plaintiff

**SOLOMON, MAHARAJ & KASIMATI, P.A.**
601 N. Ashley Dr., Suite 1100-192
Tampa, Florida 33602

Office: 813.497.7650
Email: info@smkfirm.com
Web: smkfirm.com

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| AILEEN MULLIN, | ) Case No.: 8:20-cv-026970-VMC-AEP |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DENIS MCDONNOUGH, SECRETARY, | ) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) |
| Et al. | ) |
| Defendant. | ) |
| | ) |
| | ) December 7, 2021 |

**CERTIFICATE OF SERVICE**

I hereby certify that the forgoing Plaintiff's Supplemental Interrogatory Responses was served this 7th day of December 2021 via email.

Respectfully Submitted,

James M Solomon

James Solomon | james@smkfirm.com
Attorney for Plaintiff

**SOLOMON, MAHARAJ & KASIMATI, P.A.**
601 N. Ashley Dr., Suite 1100-192
Tampa, Florida 33602

Office: 813.497.7650
Email: info@smkfirm.com
Web: smkfirm.com

**Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

| | | |
|---|---|---|
| Aileen Mullin<br><br>Complainant<br><br>v.<br><br>Secretary<br>Department of Veterans Affairs<br>810 Vermont Avenue, NW<br>Washington, DC 20420<br>Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORM Case Number:**<br>**200I-0317-2012103413**<br><br>**Formal Complaint Filed**<br>**September 18, 2012** |

Facility: VA Regional Office
St. Petersburg, FL

John Henley, EEO Investigator
Office of Resolution Management (08J)
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

## I. Introduction

Having met all procedural requirements for acceptance with respect to the claims specified hereafter, this complaint was assigned for investigation on February 4, 2013. A desk investigation was held from February 18 through August 28, 2013. The complaint was amended on July 25, 2013, and April 1, 2013. This report is submitted for consideration of the EEO Regional Officer this 31st day of October 2013.

## II. Background

**Aileen Mullin (Disability-Yes; Reprisal-Yes; hereinafter the complainant)** is a Rating Veterans Service Representative at the VA Regional Office, St. Petersburg, FL. Believing her disability and EEO activity were factors in being subjected to numerous events of hostile work environment, advance sick leave denied or not processed; leave under the leave transfer program not processed, and reasonable accommodation request denied, the complainant contacted an EEO Counselor. EEO counseling did not result in a resolution; therefore, the complainant filed a formal complaint on September 18, 2012. (A-5 and A-4)



EXHIBIT
2

## III. Claims and Bases

Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:

1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.

2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.

3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.

4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.

5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clarke (TC) and Union Official Carol Allard (CA).

6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they refused to render aid while she was having a severe asthma attack.

7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since-being reassigned to a different work area.

8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.

9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.

10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.

11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.

12. On May 31, 2012, although a cover sheet that stated *"A copy of all records* personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder." was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.

13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied. *(Discrete Event)*

14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).

15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.

16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.

17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.

18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.

19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.

20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.

21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed. *(Discrete Event)*

22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** *(Discrete Event)*

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** *(Discrete Event)*

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

## IV. Summary and Analysis

### A. Summary

The Responding Management Officials (RMOs) are Bonnie Wax (disability and EEO activity; hereinafter, **RMO/SME Wax**), Human Resources Manager; Tamanique Clarke (disability-none and EEO activity; hereinafter, **RMO/SME Clarke**), Human Resources Specialist; Bettie Bookhart (disability-none and EEO activity; hereinafter, **RMO Bookhart**), EEO Program Manager; Michael Palmer (disability and EEO activity unknown; hereinafter, **RMO Palmer**), Coach; Kerrie Witty (disability-none and EEO activity; hereinafter, **RMO Witty**), Director VA Regional Office, St. Petersburg, Florida.

The **complainant** identified her disabilities as cancer, asthma, and chronic sinus infections. The asthma is life threatening and severe; the cancer is under control and the symptoms are moderate. At the time she filed her complainant she had asthma, sinus infections, vocal cord dysfunction, and breast cancer. As the EEO process continued, she developed insomnia, irritable bowel syndrome (IBS), and iritis, secondary to the IBS. She has problems with sleeping and anxiety, and socially she feels isolated. She has been limited by her disability since October 2011, and she notified the agency in writing and verbally that she had disabilities by submitting medical documentation to the agency around September 2011. She does not know if her

disabilities are permanent or temporary. She could do her job with or without an accommodation. (B-1)

**RMO Wax** is aware of the complainant's disabilities. She learned of her asthma sometime in 2012, around the time the complainant was having the attacks at work. She learned of her diagnosis of cancer about three months later. She did not learn of her chronic sinus issues until probably a year later, but she was not certain of the exact date. (B-2)

**RMO Clarke** affirmed knowledge of the complainant's asthma in January 2012 and cancer around April or May 2012. She learned of the chronic sinusitis when Department of Labor approved the complainant for compensation in August 2012. She is not aware of vocal cord dysfunction, insomnia, irritable bowel syndrome, or iritis. (B-3)

The complainant requested a reasonable accommodation, and she processed the complainant's requests and the requests were granted. RMO Clarke explained that an employee can go directly to Human Resources, through their supervisor, or submit a request online for an accommodation. If medical documentation is needed, it is requested from the employee. If the medical documentation supports the request, the request is granted, unless it requires the removal of the essential functions of the position. If a request cannot be granted exactly as requested, she works with the employee and the division to reach a resolution. (B-3)

RMO Clarks became aware of the complainant's EEO activity on March 15, 2013, when her office received a request for documentation. (B-3)

**RMO Bookhart** became aware of the complainant's disabilities on or about June 6, 2012. As the EEO Program Manager, she is copied on EEO complaints sent to the Director. The complainant did not request a reasonable accommodation through her. (B-4)

**RMO Palmer** was aware only of the complainant's respiratory disability, but he does not recall when he learned of this condition. The complainant did not request a reasonable accommodation from him; however, due to the complainant having a medical episode in the training room, he referred her to Human Resources for possible reasonable accommodation, which is what supervisors are required to do if a reasonable accommodation is required or suspected. He denied knowledge of the complainant's EEO activity. (B-5)

**RMO Witty** stated the complainant shared with her that she had cancer and was undergoing chemotherapy, and that the complainant submitted a reasonable accommodation request. She is aware of the complainant's EEO activity because she is named the Responding Management Official (RMO). (B-6)

***The witnesses testified as follows:***

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace; and on two occasions VA Police had to assist the complainant out of the building.**

The **complainant** said at least 25 times, her asthma got so bad that she had to leave work or get out of the building because she could not breathe. She took shots to help with her breathing, and then returned to the building. On one occasion the complainant was very disoriented, and on another occasion, she had a severe asthma attack that required a coworker to help get the complainant to the police and the police helped her out of the building. (B-1)

**RMO Wax** was not present when the complainant had to leave the building because of respiratory issues, but she heard that the complainant had several emergencies that required immediate care. (B-2)

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**

The **complainant** attested that Barbara Zeh ended up hospitalized because of respiratory reactions in the building, and she had to wear a protective mask. RMO Palmer did not understand why the complainant did not wear a mask as well, and he stated the complainant was the only one sick. The reason RMO Palmer made this remark to the complainant was because she said to him, "Mike take a look around the room, look at the absenteeism rate, listen...to the coughing, look...someone is having an Asthma attack...we have a problem." That is when RMO Palmer said, "No, you're the only person here who has a problem."

Event 1 and Event 2 created a hostile environment for the complainant because she was forced in a room that was causing her problems, and out of fear of losing her job, she did not take proper care of her health. (B-1)

**RMO Wax** was not personally involved, but one of her staff member was. There was a legitimate reason why RMO Palmer was asking that question and it involved the complainant's worker's comp claim. The complainant was told to wear a mask, and RMO Wax's limited understanding of this incident was that RMO Palmer was asking the complainant why she was not following her doctor's instructions. (B-2)

**RMO Palmer** explained that during the period of October 2011 through January 2012, he moved the complainant away from the air conditioning duct at the complainant's request. Additionally, he told the complainant that if she become ill and needed to leave at any time, to inform him and he would address her leave. He also notified his supervisor and Human Resources Management of the complainant's concerns. (B-5)

RMO Palmer did not refuse to help the complainant in any way. He did not say that the complainant was the only one in the room with a problem, and he did not ask the complainant why she did not have a portable oxygen tank or why wasn't she wearing a protective mask. His actions were not to harass the complainant. (B-5)

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.**

The **complainant** attested that based on the AFGE Master Agreement, she was chosen to attend mold hazard training; however, RMO Wax sent a letter saying she could not attend. The complainant believes RMO Wax used a bogus part of the agreement to deny her the right to go to this training. (B-1 and C-15)

**RMO Wax** explained that she did not deny the complainant's request to attend mold hazard training. She said the request to attend the training was not made by the complainant. The request was made by AFGE Local 1594 for two individuals to attend, which included the complainant and Keith Pryor. The Master Agreement, Article 29, section 15(h) allows the agency to train union Health and Safety Representatives on mold removal. AFGE identified the complainant in their request, but the complainant was not their current union officer or on steward listing. The mold removal training is exclusive to the union safety and health representative, and the union had already identified Walter Ingram as their representative by letter in October 2011. Because there were two names on the list, and the agency was obligated to only train one person, the union was asked to clarify the identity of the representative they would like to attend. The complainant was not identified by AFGE; therefore, the union made the final determination as to who would attend. (B-2, C-15)

***Investigator's Note:*** *Event 4, Event 5, and Event 6 are inter-related and are summarized together.*

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, complainant was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clarke (TC) and Union Official Carol Allard (CA).**

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard for her life when they refused to render aid while she was having a severe asthma attack.**

The **complainant** attested that on January 10, 2012, with RMO Clarke and union Official Carol Allard, and she was told that she would be moved to another room because of the medical issues she was having in her present work area; however, when she returned to work on January 12, 2012, she was still in the same room. She started having respiratory issues, and it escalated to where she had to be taken to the emergency room by ambulance. (B-1)

Regarding Event 6, the **complainant** expressed that when she returned to work sometime in February 2012, management made her to stay in the building additional hours. Also, management had not established an emergency care medical plan; she had to do it herself; therefore, she felt management had no regard for her safety and well-being. (B-1)

**RMO Wax** affirmed knowledge of this incident because she manages the worker's compensation program, and RMO Wax confirmed she was aware the complainant was taken by ambulance to the emergency room on January 12, 2012. She explained that during a meeting on January 10, 2012, management agreed to move the complainant to a new work area, but management informed the complainant they needed some time to coordinate the move, particularly since it involved moving her phone, computer, and other equipment. Human Resources and the Veterans Service Center Manager coordinated the complainant's move to another work area, and this task was completed on January 12, 2012; which she does not believe was unreasonable. (B-2)

**RMO Wax** affirmed with certainty that there was no gross negligence on any one's part. The complainant said she was not feeling well, and from her understanding, the complainant went to a private room with a friend to use her nebulizer. RMO Wax explained that people felt helpless because Title 5 employees are not permitted to render emergency medical care because they are not licensed or authorized to do so. When the complainant did not feel better, RMO Clark called 911 and informed the complainant that he called for an ambulance. The complainant told RMO Clarke that she wanted to file a claim, and RMO Clarke walked down and brought the complainant the paperwork to file a claim. (B-2)

**RMO Clarke** responded during the meeting a new work area was agreed upon, but the Agency needed some time to coordinate the move with Human Resources and the Service Center Manager. The agency completed everything on January 12, 2012; therefore, he does not believe that a two day turnaround time is unreasonable. (B-3)

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since-being reassigned to a different work area.**

Regarding this event the **complainant** replied that when management *decided to move* her to another room, the asthma attacks and the Dysphonia continued. She still had to rush out of the building or leave work for the day. (B-1)

According to **RMO Wax** the complainant continued to have problems. She recalls that the complainant sent an e-mail message stating that she had been ill, but she has no personal knowledge of the complainant leaving. RMO Wax asked her staff to do a comparison of leave used both at home and in office and found that both were about equal. Although she was saying that she was having attacks at work, she also had to stay home due to her illness. (B-2)

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

The **complainant** explained that she knew of at least four other people who have respiratory problems and have reported it to management. They are in the same open cubicle area with a Honeywell machine-4. When she told management that the accommodation was not effective, RMO Clarke said, "Well it's like your little bubble." (B-1)

The complainant stated that on several occasions, she requested to work from home as a reasonable accommodation, and to be moved to another work location. Her request was denied and the agency offered an alternative accommodation of a small air purifier, which was not satisfactory. (B-1)

**RMO Wax** explained that the complainant requested an air purifier on January 31, 2012, which management provided to her on February 2, 2012, and there was no reason to believe the accommodation was ineffective. Since management heard nothing further from the complainant, it was reasonable for management to assume the air purifier was still working. There is a little mischaracterization of the size of the space. The air purifier purchased for the complainant was designed to clean the air in an 8- to 100 square feet area. It is only designated to clean the immediate area. It is not intended to clean the whole room. The room the complainant was assigned to was less than 700 square feet, which is much less than the size of a football field. (B-2, C-1)

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied; and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.**

The **complainant** responded this should be 2010 instead of 2012. She never met RMO Wax, and by this point she had already met with RMO Bookhart who told her, "These people don't believe in doing accommodations." RMO Wax sent the complainant an e-mail saying that her medical situation was temporary and it would resolve itself within six weeks. She does not know where RMO Wax got this information because no one from Human Resources ever talked to her, and her doctors were never asked for any information. She knew by law RMO Wax had to address the reasonable accommodation request. (B-1, C-1)

According to **RMO Wax** there is no memo dated February 26, 2012, but there is one dated February 26, 2010, and a doctor's note which states the patient has voice restrictions for a least six weeks. Permanent conditions are defined as lasting six months or more, so at that time the condition had to be permanent. Therefore, it is reasonable for management to assume that six weeks was not permanent in nature, and this was explained to the complainant in the memo. Even with the most generous interpretation of temporary versus permanent, at that time the complainant was still provided a temporary workplace adjustment to meet her medical needs; therefore, she was not harmed in any way. RMO Wax added that words like "chronic," "will never get better," could take years to recover" are associated with permanent conditions, and reasonable accommodation guidelines have changed since 2010. (B-2, C-1)

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.**

The **complainant** stated that she requested an accommodation to take the certification exam, which is computer-based; however, she was not informed until the morning of the test that they had found a new location for her to take the test so she would be able to sit (accommodation) for the exam. Since she was not notified in a timely manner, she did not have time to set things up and prepare for the exam; therefore, she did not get to take the exam. She feels management was hostile and demeaning because she was not appreciative of all the effort they went through to put her in a place where she could breathe. (B-1, C-1)

**RMO Wax** strongly disagreed with this allegation because in VBA, they have a unique process where they actually administer certification exams to the employees. If an employee requests a reasonable accommodation for the certification exam, they have deadlines, and the complainant did not make her request for an accommodation during the certification exam. March 12, 2012, the complainant acknowledged in an e-mail she knew it was a stretch, so management believed she understood that she had missed her deadline for an accommodation. However, the complainant was given an alternative accommodation of testing in a different location, which is what the complainant requested. The complainant said she would bring her air purifier, but on the date of the test, the complainant decided she wanted to test in a different room. (B-1, C-1)

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week; and on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

The **complainant** indicated that on January 10, and January 13, 2012, she was taken out of the workplace in an ambulance. It was not until March 20, 2012, that she was finally granted an accommodation to allow her to work from home, and again the accommodation was not tied to her specific disability, and she was *not given what she* needed for her disability. (B-1)

**RMO Wax** explained that during this time, the complainant never let management know that working from home three days per week was not an effective accommodation. A review of her leave records showed that the complainant was out more while working from home than she was when she was working in the office. Her medical condition was affecting her in the office and at home, so management believes a reasonable person would conclude that the reason for leave was not limited to the work environment. If the complainant had notified the agency that the accommodation was not working, they could have looked for another option. (B-2, C-1)

***Investigator's Note:*** *Event 12 and Event 16 are inter-related and are summarized together.*

**12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete record of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

The **complainant** explained that she asked Human Resources for a copy of her Official Personnel Folder (OPF). She needed her worker's comp record to assist with her reasonable accommodation request, and to respond to the HR's request for more medical information. Weeks passed before she was provided the records and when she received them, some pages were missing (i.e., the accommodation denial letter). This caused a delay in providing the information requested by Human Resources. (B-1)

**RMO Wax** explained that this is a mischaracterization. This incident involved a request from the AFGE local 1594 (which falls under U.S. Code, Title 5, Chapter 71, and the Federal Service Labor Relations Statute) for "all personally identifiable records related to (the complainant)" ... and her staff provided the appropriate materials. Event 21 had not occurred at the time management provided the information to AFGE, and the union's information request is not continuous in nature. (B-2, C-3)

RMO Wax indicated that the facility furnished information in accordance with 5 U.S.C., Chapter 71, the Labor Relations Statute, and the Labor Relations statute is different from Employee Rights. The complainant could have come to Human Resources at anytime and gotten a copy of any document in her folder because all federal employees have a right to look at their records. The union rights are a little different, and it causes Human Resources to have to look through many different systems of records. Management has 14 days to provide the union with copies of records, and if an employee comes to Human Resources and asks to see their records or any documents, they are provided the same day. RMO Wax stated they identified 379 documents that were provided to the union on May 31, 2012. (B-2)

***Investigator's Note:*** *Event 13 and Event 14 are inter-related and are summarized together.*

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.** *(Discrete Event)*

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA)**

The **complainant** attested that she went to Human Resources to make sure her FMLA paperwork was approved. She found out from RMO Clarke that the paperwork for her leave donation, FMLA, and advance sick leave was not accepted and that it did not provide enough information. Human Resources stated they needed to know the diagnosis and when she would be returning to work. (B-1)

**RMO Wax** explained that she did not know about the advance sick leave request because it is handled by the division. The leave policy states that up to 240 hours of advance sick leave can be granted at any one time. The division chief is authorized to approve up to 80 hours, but anything over 80 hours must be approved by the Director. (B-2, C-5, C-7, C-8)

**RMO Wax** affirmed that on March 9, 2012, the complainant submitted medical documentation for FMLA. The medical evidence was reviewed and it was determined that the complainant was eligible for the program. Three days later, on March 14, 2012, the complainant received written notice of approval to use up to 480 hours of leave under FMLA, and it was dated the original date the complainant submitted the medical documentation. So, the complainant was eligible for FMLA from March 9, 2012 to March 8, 2013. The confusion was that the approval was not related to cancer as the complainant disclosed in her EEO complaint. On March 23, 2013, management received additional medical evidence from the complainant regarding cancer. The complainant received notice on April 9, 2013, indicating that her approval for FMLA related to cancer was also approved. So, at the time she had two ongoing approvals for FMLA, and that is where the confusion comes in. Although the complainant submitted new documentation for cancer, her existing FMLA entitlement was still in effect and was never interrupted; therefore, the complainant could use FMLA related to either condition (asthma or cancer), but she was only entitled to a total of 480 hours of FMLA in a 12 month period. (B-2, C-5, C-7, C-8)

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

The **complainant** responded that when she returned to work from breast cancer, Casey Crump told her that RMO Wax remarked to him, "Isn't that interesting about Ms. Mullin with her breast cancer...it was her breast cancer that caused *all the breathing* problems...there was never anything wrong with the building." (B-1)

**RMO Wax** stated this allegation is absolutely false. Her comments were taken completely out of context and twisted into something horrible, when, in reality, they were completely relevant and appropriate to the situation. Mr. Crump came to Human Resources and they were talking about the recent air quality test results showing the building in normal range. During that discussion she made a comment about being glad there was nothing wrong with the building because she works there and breathes the same air too. (B-2)

RMO Wax continued ... Mr. Crump was the complainant's designated representative at the time. She had recently been diagnosed with breast cancer. During her conversation with Mr. Crump and said she was sorry to hear about the cancer diagnosis, and she casually mentioned that (the complainant) may need to provide additional medical documentation. Also during that conversation she commented, "For all we know, not being medical professionals, her breathing problems could have been related to breast cancer and not asthma." She was certainly not insinuating that the complainant didn't have asthma or that the breathing issues were from cancer. She was giving Mr. Crump a hypothetical scenario to help him understand why management needed new medical documentation. (B-2)

**Casey Crump** (disability unknown and EEO activity unknown; hereinafter, **Witness Crump**), is the Chief Steward at the VA Regional Office, St. Petersburg, Florida. He explained that he does not know how RMO Wax got her information, but he assumed that the complainant had discussed her medical situation with RMO Wax. He does not believe RMO Wax was just spreading information to anyone about the complainant's condition, but the complainant was upset and said she did not authorize RMO Wax to discuss her medical condition with anyone. In the same e-mail, Witness Crump affirmed that RMO Wax did make the aforementioned comments. (C-18)

***Investigator's Note:*** *Event 17 and Event 18 are inter-related and are summarized together.*

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

The **complainant** said did not want to deal with RMO Wax because she upsets her, so she asked all correspondence go through the union. RMO Wax sent an e-mail to Valorie Reilly, and copied the complainant on it while she was in the hospital battling cancer and on a day that she was scheduled to have chemotherapy. When she read it, it upset her. (B-1)

The complainant explained that during a meeting, the Director informed the complainant that RMO Wax felt targeted by the union, that she approved RMO Wax's e-mail of June 5, 2012 to the complainant, that she could not understand why the complainant had a problem with the e-mail, and that she (the Director) does not support granting accommodations. (B-1)

**RMO Wax** responded that the complainant sent an e-mail to her coach and copied Mr. Crump, a union steward, but Mr. Crump was not the complainant's designated representative. Her designated representative was Valorie Reilly. The e-mail was sent from Mr. Crump to RMO Witty, and RMO Witty often sends the e-mail to RMO Wax for a response when it involves Human Resources issues. So, she responded to the complainant's e-mail, trying to answer her questions and give her as much assistance as possible. (B-2)

As to the complainant's concern that she sent the e-mail directly to the complainant and not to her representative, RMO Wax stated nothing prevents a management official from responding directly to an employee, especially since she copied the complainant's designated representative, Ms. Riley, on the response. RMO Wax explained that when there is a designated representative, management is required to include the union representative, and she did so in this case. She had no way of knowing the communication with the complainant was off limits. The complainant had sent the e-mail; therefore, she assumed she was well enough to have a response, and there was nothing offensive or inappropriate in her response. The content was professional and pertinent to the complainant asking about her information request and why a copy of the records had not been given to the union. (B-2, C-10)

**RMO Wax** explained that RMO Witty agreed to meet with the complainant on June 12, 2012, to facilitate communication between the parties. During that meeting, the complainant repeatedly complained about RMO Wax, but she felt the complaints had come from the union office; therefore, she told RMO Wax that she felt the union was targeting her (Wax). RMO Wax said that RMO Witty reviewed and approved the e-mail that RMO Wax sent to the complainant and her representative (Event 16) because she felt the union was targeting her, and it was RMO Witty's way of protecting RMO Wax from unfounded accusations from the union. (B-2)

On the issue of RMO Witty making the statement that, "She does not support granting accommodations," RMO Wax said that is categorically false, and that she had never heard RMO Witty say anything about not granting accommodations. She added that RMO Witty has granted numerous accommodations (over 300 accommodations out of 900 employees) during her tenure as Director. (B-2)

**RMO Witty** explained that she met with the complainant to discuss how she could assist her. During the meeting the complainant kept bringing up RMO Wax instead of how she could help the complainant. She reminded the complainant that they were there to talk about how RMO Witty could help her not RMO Wax. RMO Witty told the

complainant that she read RMO Wax's e-mail addressed to the complainant before she sent it and felt it was appropriate. RMO Witty denied saying in a meeting that she did not support granting accommodations, and that she has granted several accommodations in the past. (B-6)

**Jerry E. Huffman** (disability and EEO activity unknown; hereinafter, **Witness Huffman**); VBACMS at the VA Regional Office Columbia, South Carolina, explained that he was in a meeting with the complainant and RMO Witty, and he does not recall RMO Witty making the aforementioned comments. The meeting was because of the complainant's disapproval of the handling of her personal information. (C-18)

**Keith A. Pryor** (disability and EEO activity unknown; hereinafter, **Witness Pryor**); Vice President of AFGE 1594 at the VA Regional Office, St. Petersburg, Florida, said he was representing the complainant in a meeting with the her, Witness Huffman, and Human Resources (he could not recall the exact date) due to mitigating circumstances (currently no access to AFGE Records). He recalls RMO Witty indicating that she "typically does not believe in giving accommodations to employees, and if she did, then she would need to accommodate everyone...who requested an accommodation." Subsequently, the complainant received an accommodation to work at home, but it took several months of negotiations. (B-9)

**Theodore Smith** (disability and EEO activity unknown; hereinafter, **Witness Smith**); RVSR Core 70 at the VA Regional Office St. Petersburg, Florida, said that AFGE was using the complainant's case as a "witch hunt" against RMO Wax. At the time, RMO Witty was reluctant about several issues of reasonable accommodations with regards to file handling and coming into the office less frequently because the complainant was working from home. The complainant's other issues that were a source of consternation for RMO Witty were the complainant's concerns regarding air quality in the building as it had been documented there was moisture, mold, and rodent allergens present. (C-18)

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.**

The **complainant** stated she asked RMO Witty to assign someone other than RMO Wax to handle her donated leave because she was not getting it. RMO Witty was sarcastic and caustic, and the complainant was in tears and tried to end the meeting. She still does not know what happened to her donated leave. (B-1)

**RMO Wax** responded that she was aware of escalating problems regarding the complainant's donated leave. There was some misunderstanding about the Volunteer Leave Transfer Program (VLTP). Human Resources provided copies of the VLTP, but when the complainant raised concerns they conducted an audit a payroll audit, and even though there were a lot of exceptions to the complainant's timecard, they found the complainant's donated leave was processed appropriately. (B-2)

RMO Wax further explained that the complainant had a lot hours entered into the system incorrectly, but there was nothing wrong with her donated leave. The way the program works is the employee first has to meet the requirements of a medical emergency, and then have a zero leave balance, and there are specific limitations on the donated leave that have to be met. Payroll uses what is called a "set aside account" where they set the accruals aside so that when the employee comes off of donated leave they have some leave to use. As for as accountability, is it not necessary because both Human Resources and Payroll are audited on VLTP functions and is watched by a third party. (B-2, C-7)

**RMO Witty** explained that she does not recall any problems with the complainant's donated leave. She submitted a request and RMO Witty approved it. The process is that the employee completes an application for donated leave and provides it to Human Resources Management. It then goes to RMO Witty for approval, and once she approves it, an e-mail is sent to the employee notifying them of who has requested donated leave. To her knowledge, the complainant wanted management to keep sending e-mails asking employees to donate leave to her, which is not something they do for any employee. Management sends the initial e-mail to employee, but it is not their practice to keep sending additional e-mails after that. However, at the complainant's request, management did send subsequent e-mails to employees notifying them the complainant had requested donated leave. (B-6, C-7)

RMO Witty stated that her actions were not to harass or discriminate against the complainant. (B-6)

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

The **complainant** indicated that when a request for leave donation is made, it is supposed to be responded to in a timely fashion. Her leave was known to be urgent, but it was not processed that way. (B-1)

According to **RMO Wax** the complainant's leave was not delayed, but she understood how the complainant could interpret it that way. The complainant submitted her application on June 14, 2012. Her VLTP application was processed and approved on June 20, 2012, which is only four business days. According to the policy, management has 20 calendar days. The complainant had already been approved for the VLTP beginning May 9, 2012, and they usually do not get second and third applications to join the VLTP. Once you are in it, you are in it, so the complainant was eligible to receive donations without interruption. According to the VA Handbook 5011 states it is the employee's responsibility to find donors, but in the complainant's case, management sent out at least three emails asking for donations on her behalf, so she received actually more assistance than other employees. (B-2, C-7)

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.**

The **complainant** explained that the facility's policy for requesting advance sick leave does not allow for transparency. The request originates with the Coach (supervisor) and it has to go through several signatures, but no one has to date their signature. She believes one of the most harassing and horrible things that management did consistently was never allowing her of knowing whether or not there would be a paycheck, if her advance sick leave was approved or not, or if there were or were not leave donations. From August 8-25, 2012, the complainant received no paycheck because management did not do the paperwork in a timely fashion. (B-1, C-7, C-8)

**RMO Wax** testified this is handled at the division level. The division chief can approve up to 80 hours and Director approves anything over 80 hours. The request does come through Human Resources, except to print out a report for the Director. (B-2)

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010 she withdrew her request for an accommodation.**

The **complainant** explained that she did not request an accommodation; therefore, she did not withdraw a request for an accommodation. (B-1)

**RMO Wax** believes this is a misunderstanding because the agency is required and expected to respond to anything that appear to be an accommodation request. In other words, the employee does not have to say, "I want a reasonable accommodation." They could say, "My back is killing me, this chair is hurting me," or they could submit a doctor's note or write something on their leave record that indicates that they have a disability, and the agency is expected to respond. Even though the complainant said she did not request a reasonable accommodation at that time, management was giving her the information on how to apply for an accommodation because she had given management some indication that she had a disability. (B-2)

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.**

Regarding this event, the **complainant** said her leave was not processed because there is no accountability. (B-1)

**RMO Wax** reiterated what she explained under Event 20 ... the complainant was already in the VLTP, so she did not need to keep applying. In this instance it extended until November 9, 2012. There was no harm to the complainant, and she never lost her participation in the program. (B-2, C-7, C-8)

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

According to the **complainant**, OPM had been sending her e-mails, but she was out for cancer treatment. She said the facility knew OPM was trying to get in touch with her because they were copied on every message. She almost did not get her clearance renewed because the facility did not let OPM know she was out on extended leave. (B-1)

Regarding this event **RMO Wax** stated for whatever reason, Office of Personnel Management (OPM) decided to initiate and work on the complainant's background investigation at the time the complainant was battling cancer, and the process is ran outside of RMO Wax's office. The crux of the issue is that it [background check] is required as a condition of employment and if an employee fails to complete their background investigation for any reason, they could lose their position. So, not only did the agency not have any influence over the timing of the background investigation, the agency did not have the ability to extend or change it due to illness. It is the sole authority of OPM. It is the responsibility of the employee to communicate with the background investigator and explain their individual circumstances. (B-2, C-2)

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

The **complainant** indicated that she needed to catch up on training after being out on extended leave, but she could not access the training system. She believes it had to do with the facility not accommodating her. (B-1)

**RMO Wax** attested that it is standard practice that when an employee is in a leave without pay status for more than 31 days, when an employee is deployed with the military, when the employee is out after childbirth or a serious illness, their TMS account is deactivated. Unless it is deactivated for several, TMS system sends constant reminders to the supervisor and the employee to do the training and it appears on national reports whether or not they are in compliance. As soon as the employee returns to work, their account is reactivated. (B-2)

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied, and she was advised that the denial notice was forwarded to General Counsel.**

The **complainant** said she had a meeting with Tamanique Clarke about her reasonable accommodation who informed the complainant that her requests for accommodation had been denied and forwarded to General Counsel to be finalized. (B-1)

According **RMO Wax,** she has no knowledge of RMO Clarke ever making sarcastic comments to anyone, and especially not to the complainant, and she receives mainly praise about RMO Clarke. Also, it her understanding that RMO Clark did not refuse to restructure marginal tasks because this is something management can do; however, management cannot restructure the essential functions, which is what the complainant was asking management to do. The complainant did not want to come into the building at all, and instead having someone collect or distribute her work and bring it back outside to her. RMO Clarke did not refuse to discuss tasks, but that the division had told Human Resources this would be removing an essential function. All reasonable accommodation denials must go through Regional Counsel. The complainant's denial was pulled back and never issued. (B-2, C-11)

**RMO Clarke** denied speaking to the complainant in a sarcastic manner, and she did not refuse to discuss the complainant's request to restructure marginal tasks. She and the complainant spoke on the phone February 5, 2013, and communicated via e-mail. The attached e-mails of February 5, 2013, show there was a willingness to communicate and interact with the complainant on a possible resolution. The complainant's original request was to have someone collect/distribute her work and bring it back outside to her so she did not have to enter the building; however, this would have entailed the removal of an essential function of her position. (B-3, C-11)

RMO Clark affirmed that all reasonable accommodation denials go through Regional Counsel. Before Regional Counsel completed their review, the complainant informed RMO Clarke that she wanted to have another meeting to see if there were any other options to accommodate her. There was no longer a need for Regional Counsel to review the letter, and it was rescinded. A second meeting was held, and a new accommodation was provided. (B-3)

In response to the complainant assertion that RMO Clark told the complainant that her perception of marginal tasks (getting documents from the copier and getting mail from the mail room were, in fact, essential functions of her position. Consequently, the complainant's request was granted on February 27, 2013. RMO Clark said her actions were not to harass the complainant. (B-3)

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

The **complainant** explained that when she was originally granted her reasonable accommodation in March 2012, she was allowed to leave when she got sick and work from home. She was informed by RMO McBurrough that her request for modification to her reasonable accommodation had been rescinded, stating she was never approved to leave when she got sick. She sent an e-mail to RMO Clarke saying, "I'm understanding that my accommodation has been reversed." RMO Clarke e-mails back and said, "No, they were never reversed because you never had them...you were never allowed to do that (to work half days)..." (B-1)

**RMO Wax** attested that there was a misunderstanding regarding Event 27. On February 27, 2013, the complainant was approved to work three days from home and to work two days in the office. The complainant started working half days when she was in the office and started going home between 11:00am and noon. When management learned of this, it was corrected and the complainant was reminded of what her approved accommodation said. (B-2, C-10)

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

According to the **complainant,** RMO Bookhart led her to believe that authorization from the mediator and agency representative were required in order to have a family member accompany her to the mediation. (B-1)

**RMO Bookhart** replied that on May 29, 2013, she received an e-mail from the complainant asking if she was permitted to have two people (a representative and family member) accompany her to mediation. She contacted ORM concerning the complainant's request, and was told that it was the mediator's call because there was nothing in the regulations that prevented a family member from attending the mediation along with a representative. The complainant was able to have a representative and family member attend the mediation. Her actions were not to harass or discriminate against the complainant. (B-4)

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

According to the **complainant,** she exchanged approximately seven e-mails with RMO Bookhart after the mediation was scheduled. If RMO Bookhart's intentions were to assist in preparing her for mediation, she would not have waited until less than 24 hours prior to the mediation to share the resources. (B-1)

Regarding this event, **RMO Bookhart** explained that the mediation logistics, i.e. time, location, etc, were finalized on May 22, 2013. An e-mail dated May 30, 2013, the day prior to the scheduled mediation, was sent to the complainant. Included in the e-mail were two attachments, "Mediation Program Information for Employees and a Mediation Brochure. The e-mail also contained the link for viewing the video, "The Mediation Zone.'" The same training resources were made available to the complainant via e-mail dated June 11, 2012, in preparation for a previous ADR session with the Director. (B-4)

RMO Bookhart stated she is not aware of any specific timeline for providing mediation information. The training resources were made available to the complainant the day prior to mediation because of an oversight on her part, she forgot to send the information sooner. Her actions were not to subject the complainant to harassment or discrimination. (B-4)

**Harassment**

The **complainant** reported to RMO Witty that she believes she was being harassed. She wrote on the back of her performance appraisals that she was being harassed, and that she could not get her job done, which was seen by her coach, RMO Smith, and the service center manager. When RMO Wax talked about her breast cancer and the lung disease, that was the last straw and it's what triggered her reporting the alleged harassment. The complainant stated she delayed reporting the harassment because she was afraid of losing her job, and it did not stop after she reported it, but actually increased. For example, her last evaluation said she was not eligible for the next promotion, and she was not doing her work adequately. For two years she did not get her reasonable accommodation. (B-1)

The complainant indicated that her financials are wrecked because of the harassment and she lives in fear constantly. She has a hard time focusing and concentrating. Her EEO activity made RMO Witty dissatisfied and unhappy with her. So, since the EEO complaint RMO Witty's attitude changed towards her, and everyone who works under RMO Witty started changing how they treated her. The disability is a factor because she is not able to go in and do her job without being accommodated. (B-1)

**RMO Wax** replied that the complainant never told her that she felt harassed in any way or that her actions were offensive. The union came to her, but not the complainant. She acknowledged that the complainant voiced her concern about a hostile work environment, but that was kind of a common theme with the complainant. According to RMO Wax, management was transparent with the complainant; they tried to explain why they were doing things so the complainant would not think it was personally directed at her; and they showed the complainant policies and/or practices to help the complainant understand that management was doing their job and not harassing her. The complainant made her complaints of hostile work environment known in e-mails, and RMO Wax believes the service center manager and supervisors addressed the complainant's concerns appropriately. (B-2)

RMO Wax denied subjecting the complainant to harassment, and she denied discriminating against the complainant. (B-2)

**Review of Documents**

C-1 Reasonable accommodation documentation

C-2 Background investigation documentation

C-3 Regulations and AFGE Articles concerning telework, time and attendance, occupational health, official records

C-4 Department of Veterans' Affairs Leave administration

C-5 Organizational Charts

C-6 Documentation of FMLA

C-7 Documentation of VLTP

C-8 Regional Office Flexi-place Policy

C-9 Apollo Environmental, Inc. air quality test

C-10 Response from Human Resources regarding requests for documentation

C-11 E-mail from RMO Clarke concerning essential functions of position

C-12 Statements from other employees concerning the complainant

C-13 CP's performance appraisals

C-14 Documentation pertaining to salary shortfall

C-15 Denial of mold training

C-16 Memorandum from RMO Wax to Valorie Reilly President of AFGE concerning mold in building

C-17 CP's position descriptions

C-18 Reports of Contact – statements from witnesses.

**Analysis**

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII follows a three-step evidentiary analysis. First, the burden is on the complainant to establish a prima facie case. Second, management has the burden of production to articulate a legitimate, non-discriminatory reason for its actions. Third, once management has articulated a legitimate, non-discriminatory reason for its actions, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is pretext for discrimination.

**Disparate Treatment - Disability**

**Prima Facie**

To establish a prima facie case of disability discrimination under the disparate treatment theory, a complainant must generally show that: (1) the complainant has a disability as defined in EEOC's governing regulations, (2) she is a "qualified individual with a disability"; (3) the employer had knowledge of the disability; and (4) the complainant was subjected to an adverse or unfavorable employment action under circumstances

giving rise to an inference of discrimination due to disability (e.g., treated differently than similarly situated employees who are not disabled or who have different disabilities). According to EEOC's regulations, an individual with a disability means a person who (1) has a physical or mental impairment that substantially limits one or more major life activities, or (2) has a record of such impairment, or (3) is regarded as having such an impairment. Major life activities include, but are not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

**Reasonable Accommodation**

To establish a prima facie case of failure to accommodate a physical or mental disability, the complainant must present evidence that: (1) **he/she** has a physical or mental impairment, (2) the impairment substantially limits one or more major life activities, (3) the disability precludes meeting established criteria of the position, (4) except for the disability, **he/she** is qualified to fill the position, (5) **he/she** requested an accommodation (or management was aware of a disability that was causing workplace problems and that prevented the complainant from requesting accommodation), and (6) there are plausible reasons to believe that the disability could have been accommodated.

The complainant's disabilities are cancer, asthma, and chronic sinus infections. The cancer is under control and the symptoms are moderate. At the time she filed her complainant, she had asthma, sinus infections, vocal cord dysfunction, and breast cancer. She developed insomnia, irritable bowel syndrome (IBS), iritis secondary to the IBS. She has problems with sleeping and anxiety, and is socially affected. Her disability was diagnosed in October 2011and that when her limitations began. She notified the agency in writing and verbally around September 2011. She does not know if her disabilities are permanent or temporary.

Management affirmed knowledge of the complainant's disability

**Reprisal - Prima Facie**

To establish a prima facie case of discrimination due to reprisal, the complainant must show that: (1) she engaged in prior EEO activity (i.e., participation in the EEO complaint process, or some form of opposition to discriminatory practices, or other exercise of EEO rights); and, (2) relevant management officials were aware of the complainant's prior protected activity; and, (3) management effected some action that adversely impacted on the complainant following the protected activity; and, the surrounding facts and circumstances raise an inference of retaliatory motivation, either because: a) the alleged retaliation occurred shortly after the participation (shortly is usually defined in terms of days, weeks, or months, not years), or b) complainant's treatment before engaging in protected activity was different that the treatment after such participation (i.e., complainant's treatment after the protected activity was noticeably worse than before), or c) complainant was treated differently than similarly situated persons who did not participate in protected activities.

In cases where there are no similarly situated employees, a complainant may be able to establish a prima facie case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of causal relationship between membership in the protected class and the adverse action (e.g., statistical evidence of disparities in treatment).

In this case the complainant identified the instant as the subject of reprisal. Management knew of her EEO activity because they were contacted by ORM staff. The complainant believes that after she filed her complaint, management's mistreatment increased or got worse.

**Hostile Work Environment Harassment**

**Prima Facie**

In order to establish a prima facie case of hostile work environment harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on disability and reprisal; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with work performance and/or of creating an intimidating, hostile, or offensive work environment. In cases of harassment by coworkers or other non-supervisors, the complainant must also show, (5) that management failed to take corrective action that was prompt, appropriate, and effective.

In this case the complainant believes that she was subjected to numerous events of hostile work environment/harassment. She believes because of her disabilities she was subjected to harassment and hostile work environment. She cited the 29 incidents summarized above as evidence. The complainant attested that Management knew of her concerns and did nothing that was appropriate or effective.

**Management's Response**

The burden now shifts to management to articulate, a non-discriminatory reason for its actions.

Management denied discriminating against the complainant because of her disability, they denied reprising against her, and they denied subjecting her to hostile work environment/harassment as alleged.

Management was aware the complainant had to be taken to the emergency room by ambulance. Management also stated that Title 5 employees are not allowed to render emergency medical care because they are not licensed to do so; therefore, there was no gross negligence. RMO Palmer denied that he refused to help the complainant while she was experiencing a workplace related respiratory problem. He also denied that he

told the complainant that she was the only one in the room with a problem and he denied asking her why she was not wearing a portable oxygen tank or protective mask.

RMO Wax did not deny the complainant mold training, but rather, AFGE who identified someone other than the complainant to attend this training. Management agreed the new work area was agreed to on January 10, 2012, but it took two days to complete the task on January 12, 2012, which management believes was not unreasonable. When the complainant complained the new worksite was still causing her respiratory problems, the complainant requested an air purifier on January 31, 2012, and management provided it to her on February 2, 1012. Management attested to having no knowledge of the complainant leaving work since being reassigned to the new work area. Management heard nothing from the complainant that the accommodation was ineffective; therefore, management assumed the accommodation was working.

Management testified that the complainant had a doctor's note that stated she was under voice restrictions for at least six weeks, and at the time the law said the condition had to be permanent not temporary, which was defined as six months or more. Management denied the complainant was not advised in a timely manner that her accommodation was granted. In Event 11, management indicated that complainant never let management know that working from home three days was not an effective accommodation. If the complainant had notified management that the accommodation was not effective, management would have looked for another option.

Management said Event 12 is a mischaracterization, and RMO Wax said her staff provided the appropriate materials. Management does not recall denying the complainant's advance sick leave request. Regarding Event 14, the complainant submitted an FMLA request on March 9, 2012, which was reviewed, and on March 14, 2012, the determination was that the complainant met the criteria for the program.

RMO Wax indicated that she did not make any statement about the complainant's medical condition. She said her comments were taken out of context. Management indicated that the complainant was provided with the information requested. Requesting information through the union is different than the complainant coming to HR and requesting the information.

Regarding Event 17, management confirmed that an email was sent to the complainant through the union, and the email was reviewed and approved by RMO Witty. Management denied that RMO Witty made the statement that she does not typically support granting accommodations. RMO Witty acknowledged that she reviewed the e-mail sent by RMO Wax to the union and copied to the complainant and she approved it. Management believes the union was using the complainant's case to target RMO Wax.

Regarding Event 19, management stated that when the complainant complained about her donated leave, management conducted an audit and found the donated leave was processed appropriately. Further, Leave under the VLTP program was not delayed. The complainant submitted her requested VLTP on June 14, 2012, and her request was approved on June 20, 2012. The complainant's request for advance sick was

processed. Management said this is a misunderstanding the facility is required to respond to any request that appear to be for an accommodation. For Event 23, the complainant was already in the VLTP, so she did not need to keep applying. Event 24: Management testified that the facility had nothing to do with employee investigations. They are handled strictly by OPM.

Management explained that it is standard practice to remove employees from the web-based training system. Management denied RMO Clarke spoke to the complainant in a sarcastic manner. Management did not refuse to restructure tasks and they have the authority to restructure secondary tasks; however, management restructure essential functions of a position, and that is what the complainant wanted to do.

Regarding Event 27, management indicated the complainant was approved to work three days at home and two days in the office, but the complainant started working half days when she was in the office. When Management learned of this, they corrected it.

Event 28: RMO Bookhart was not sure whether the complainant could have a representative and family attend the mediation, so she researched it and found out it was a mediator's call, and her family member was allow to attend the mediation along with her representative. She also responded that due to an oversight, she did not provide the complainant information on mediation until the day prior to the mediation.

**Pretext**

Finally, the Complainant must show based on a preponderance of the evidence that the articulated reasons provided by management are merely an attempt to disguise what is pretext. The complainant can show either with direct evidence or discriminatory motive or by showing that the articulated reasons of management are unworthy of belief.

The complainant and management testimonies are in conflict with each other with regard to the reasonable accommodation incidents. The complainant testified that management did not accommodate her or the accommodation was not effective. Management's testimony stated they did accommodate the complainant, but they did not know that the accommodation was not effective. If they had known they would have looked at other options. The complainant said that RMO Witty made the statement that she does not typically support given accommodations, and some of the witnesses support her testimony, and some do not. Management maintains that RMO Witty did not make such a statement.

The information in this report was obtained from witness testimonies and documentation provided by the complainant and/or agency.

John Henley
John Henley, EEO Investigator

10/13/13
Date

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
SOUTHEASTERN OPERATIONS
COUNSELOR REPORT

**CASE NUMBER: 200I-0317-2012103413**
**COUNSELOR NAME: Harris, Deogory**

| | |
|---|---|
| Name of Aggrieved Party: | Ms. Aileen Mullin |
| Home and/or Alternate Address: | 745 Alamanda Way South, St. Petersburg, FL 33705 |
| Home Telephone Number: | 954-263-1510 |
| Cellular/Mobile Number | 954-263-1510 |
| Business Address: | P.O. Box 1437<br>St. Petersburg, FL 33731 |
| Business Telephone Number: | (727) 319-7838 |
| Email Address: | Aileen_mullin@yahoo.com |
| Position Title/Grade: | RVSR / / GS 11 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Employee | X | Former Employee | | Applicant | | | | | |
| VHA | | VBA | X | NCA | | Canteen | | Other | |
| Title 5 | X | Title 38 | | Hybrid T38 | | Full-time | X | Part-time | |
| Probation ary | | Career | X | Career Conditional | | Temporary | | Term | |

| | | |
|---|---|---|
| Name of Facility: | VARO, ST. PETERSBURG | |
| Address of Facility: | P.O. Box 1437<br>St. Petersburg, FL 33731 | |
| Facility Telephone Number: | (727) 319-7838 | |
| Name of Representative: | None | Attorney<br>No |
| Representative's Address: | N/A | |
| Representative's Telephone: | N/A | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 06/05/2012 |
| Initial Interview | | | Date: | 06/06/2012 |
| Rights & Responsibilities/Notices: | UPS/Cert Mail: | 06/07/2012 | Rec'd: | 06/07/2012 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [ ] | Date | N/A |
| Notification to Facility Director | | | Date: | 06/06/2012 |
| ADR offered by facility [ ] MOU [ ]: | YES [X] | NO [ ] | Date: | 06/06/2012 |
| Facility Returned Signed Refusal | YES [ ] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [X] | NO [X] | Date: | 06/06/2012 |
| Settlement (SA) [ ] | Withdrawal (WD) [ NO]: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | UPS/Cert Mail: | 08/30/2012 | Rec'd: | 09/04/2012 |

A-3

EXHIBIT
3

**Case Number: 200I-0317-2012103413**
**Name of Aggrieved Party: Ms. Aileen Mullin**
**Name of Facility: VARO, ST. PETERSBURG**
**Date of Initial Contact: 06/05/2012**

**RMO/WITNESS INFORMATION**

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Bonnie Wax, HR chief, 727-319-5800 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**CLAIM - 1:** Harassment/Hostile Work Environment (Non-Sexual) **Incident Date: 05/03/2012**
**Basis:** Disability - Physical

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely? | X | | |
| Administrative Grievance Filed | | | | | X | |

**Brief Description of Claim**:

a. Ms. Mullin stated on 5/3/2012, she received an email from Mr. Casey Crump, DRO, and Union Stewart, that Ms. Bonnie Wax stated that the tumors in her breast were causing the respiratory problems and not the building;

b. On 5/18/2012, Ms. Mullin stated that Ms. Valarie Riley, Union President requested her HR files and when she received them on the 31 May 2012, several documents/files were missing which were all health related. Ms. Mullin believes the missing documents are directly related to discrimination based on her disability (Physical).

**Resolution Sought**:

-Wants a formal apology for disclosing her information
-Wants the behavior from Ms. Wax to cease and management to address her behavior
- Would like oversight of future encounters of how she is being treated and handled by Ms. Bonnie Wax

**Management's Response**:

Ms. Mullin requested mediation so management was not contacted.

**Informal Documents Requested/Received**:

a. Documentation, if any, showing whether the supervisor or any management Official was made aware of the alleged harassment, e.g., written/verbal complaints;

b. Documentation, if any, of corrective action(s) taken subsequent to the alleged Harassment.

**Case Number: 200I-0317-2012103413**
**Name of Aggrieved Party: Ms. Aileen Mullin**
**Name of Facility: VARO, ST. PETERSBURG**
**Date of Initial Contact: 06/05/2012**

## SUMMARY OF RESOLUTION EFFORTS

Ms. Mullin and management were unable to reach an agreement in mediation, so she decided to file a formal complaint.

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim listed above was the only claim addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by UPS on 08/30/2012 and received on 09/04/2012.

EEO Counselor

9/5/2012
Date

**Department of Veterans Affairs**

# Memorandum

1st Denial of Accommodations

No one in HR discussed this w/ me or my doctor —

It was unsolicited

Date: January 26, 2010

From: Human Resources Manager (25)

Subj: Reasonable Accommodation

To: Aileen Mullin
Veterans Service Representative
St. Petersburg Regional Office

1. On January 6, 2010, you provided documentation indicating that you have a temporary medical condition that impairs your ability to speak, and that the condition is expected to resolve itself within six weeks. Since this is temporary in nature, you are not entitled to an accommodation under the ADA Amendments Act (ADAAA) of 2008, at this time.

2. In recognition of your current medical limitations, the Veterans Service Center (VSC) will reschedule your rotation in the phone unit to a later date. In the interim, you will be reassigned to the Pre-Decision team 1 effective February 1, 2010. In addition, you will be credited for 31 days, which is the number of days you served in the current phone rotation.

3. If you require additional information, please contact Virginia López, Human Resources Specialist, at 727-319-5919.

HR COPY

BONNIE WAX

Received By: [signature] Date: 12/27/09

Please note that when I submitted medical documentation it was not my intention to request accommodations, but for informational purposes. Thank you for your support and consideration. Sincerely, A.

VA 011684

EXHIBIT 4

**Mullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, December 06, 2011 5:14 PM
**To:** Cartner, James, VBASPT
**Subject:** Ceiling tile replacement
**Signed By:** aileen.mullin@va.gov

Hi Jim,

Per our conversation, will you please request that the moisture stained ceiling tile, that's next to the air vent, as well as the surrounding area, be tested for mold spores. I ask out of concern for the many of us that are having respiratory issues such as allergies, asthma and sinusitis.

Thanks,
Aileen

See pictures
RM222

EXHIBIT
5

Case 8:20-cv-02697 Document 1-3 Filed 11/16/20 Page 154 of 173 PageID 815
Exhibit 40

**Mullin, Aileen, VBASPT**

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, December 07, 2011 8:00 AM
**To:** Cartner, James, VBASPT
**Subject:** Finding a way
**Signed By:** aileen.mullin@va.gov

Good morning Jim,
Per yesterday's conversation, I think it would be worth a shot to change workstations in order to see if it brings me any relief.

Another thought is changing my compressed day off from Thursday to Wednesday so I limit the consecutive days I'm in the building. Just a thought.

I hope you know I appreciate the efforts,
Aileen
PS For the records, the days I had to leave before the end of my tour, due to the severity of the symptoms, were October 18 and November 29.

RM 222

Case 8:20-cv-02697 Document 1-3 Filed 11/16/20 Page 155 of 173 PageID 816


## Mullin, Aileen, VBASPT

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, January 06, 2012 1:12 PM
**To:** Palmer, Michael, VBASPT
**Subject:** Gotta go
**Signed By:** aileen.mullin@va.gov

I put in the leave request in for the rest of the day, but if can get the asthma under control I'll head back in later this afternoon.

I hope you know your support is appreciated Mike.

Aileen

Print

1 | 8 | 2012

Subject: Training and asthma

From: Aileen Mullin (aileen_mullin@yahoo.com)

To: michael.palmer2@va.gov;

Cc: james.cartner@va.gov;

Date: Sunday, January 8, 2012 9:58 PM

FORMAL RA Request Attempt At Interactive Process

See page 19

Good morning Mike,

In light of the severity of Friday's asthmatic reaction, I don't believe it would be wise to change my compressed day from Wednesday. (Please know that these respiratory attacks/symptoms aren't triggered when I'm outside of work.)

I changed my schedule in December so I would only be in the building/room for two consecutive days, due to the air quality. Simultaneous to the change in my schedule, building maintenance/plant engineers stepped in and dealt with HVAC system issues. Immediately upon changes to the HVAC system, I noted improvements to my respiratory symptoms and a marked increase in my production.

There's been significant HVAC issues in RBT222 since we returned from Baltimore in September. Thankfully plant engineering took steps, but there are still a number of people in the room having ongoing respiratory related conditions: Chronic coughs, sinus infections, colds, etc. and those of us with asthma may be the most immediatly affected.

As for our upcoming trainings, I understand that new RVSR trainings are proposed to be held on Tuesdays , Wednesdays and Thursdays to accommodate the schedules of others. However, I am unable to work four days in a row in the current environment. I am open to other options as I need be part of this crucial training.

Suggestions for training:

* record sessions so that they are available for anyone who happens to be absent on Wednesday due to annual or sick leave

*conduct trainings on Tuesdays and Thursdays when all are scheduled to be in the classroom

Suggestions for alternative work settings :

- relocate my workstation outside the second floor east quadrant
- consider work from home option

Thank you for your consideration.

Aileen

P.S.

I will be bringing the nebulizer to work as a precaution in case there's another attack as severe as Friday's but I ask that you please assist me in finding a private place to go if another emergency comes up and I have to use it.

**Mullin, Aileen, VBASPT**

**From:** Allard, Carolyn, VBASPT
**Sent:** Monday, January 09, 2012 12:27 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Response needed in reference to health and training challenges
**Signed By:** carolyn.allard@va.gov

Mobile 727-798-1037 (you can always text if you need too)
cdallard1@bellsouth.net

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, January 09, 2012 12:17 PM
**To:** Allard, Carolyn, VBASPT
**Subject:** FW: Response needed in reference to health and training challenges

Mobile: 954-263-1510
am0303@hotmail.com

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, January 09, 2012 7:51 AM
**To:** Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT
**Subject:** Response needed in reference to health and training challenges

d morning Valorie and Keith,

To follow is a copy of the message I sent, this morning, to Mike Palmer and James Cartner. (Note: Last week Mike informed me that trainings will be on Tuesdays, Wednesdays and Thursdays. I had agreed to change my compressed day to either Mondays or Fridays to accommodate but come Friday I had a very serious asthma attack.)

I assume there will be fallout and need to know how to proceed, especially if they deem it necessary for me to go the HR route. As you both know, I don't think it's that will be appropriate since there are so many people having issues.

Aileen

Good morning Mike,
In light of the severity of Friday's asthmatic reaction, I don't believe it would be wise to change my compressed day from Wednesday. (Please know that these respiratory attacks/symptoms aren't triggered when I'm outside of work.)

I changed my schedule in December so I would only be in the building/room for two consecutive days, due to the air quality. Simultaneous to the change in my schedule, building maintenance/plant engineers stepped in and dealt with HVAC system issues. Immediately upon changes to the HVAC system, I noted improvements to my respiratory symptoms and a marked increase in my production.

.ere's been significant HVAC issues in RBT222 since we returned from Baltimore in September. ıkfully plant engineering took steps, but there are still a number of people in the room having ongoing respiratory related conditions: Chronic coughs, sinus infections, colds, etc. and those of us with asthma may be the most severely affected.

As for our upcoming trainings, I understand that new trainings are proposed to be held on Tuesdays ,

1-31-12

**Allard, Carolyn, VBASPT** January

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 31, 2012 7:41 AM
**To:** Brown, Larry, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT; Clarke, Tamanique, VBASPT; Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Status of heath issues
**Signed By:** aileen.mullin@va.gov

Good morning All,

Yesterday, for the second time since the move to VBIT1, the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest.) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be a prudent to do so without delay.

Thank you for your support,

Aileen

Note: Tammie, the Workmens' Comp form is complete and is being sent for review. As soon as its return I'll get it to you.



EXHIBIT
6

**Mullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, February 06, 2012 8:26 AM
**To:** Clarke, Tamanique, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT
**Cc:** Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Air purifier
**Signed By:** aileen.mullin@va.gov

Good morning All,

Just for the record, and at risk of sounding ungrateful, I don't think the air purifier is going to have the effect we hoped for. I read the specs and discovered that its meant to be used in a small room (10' x 10'), and not designed for an open cubical in an area comparable to a large open area.

For now, I have it running full force and my fingers are crossed.

Aileen Mullin
RVSR VBIT1C
VARO 317/ St. Petersburg



EXHIBIT
7

3/12/13
Accommodations

**Clarke, Tamanique, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, March 12, 2012 7:21 AM
**To:** Clarke, Tamanique, VBASPT; McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Subject:** ETA and Certification

Good morning Tammi and Bo,

Thank goodness last week is behind me. Going in to the new week I need to talk to you about a couple of things:

I'm concerned about being in room 215 for Wednesday's certification exam. I know its a stretch, but can I take the test in another part of the building: Human Resources, the Director's Office, or Front Office? Just throwing it out there.......

Tammi, I would like to use COP (continuation of pay) for the time lost but I don't know how to record the time ETA. Can you please advise Bo and me on this one. And hopefully you have the FMLA paperwork and the CA-2 will be to you today.

(Just to let you know, Thursday morning, Millie graciously let me use her office (and stayed with me) when I had another attack and had to use the nebulizer. Her kindness was/is appreciated.)

Last five days in a nutshell:
Wednesday: Severe asthma attack. Escorted from building by police. (My locations: VIBIT1 from 7:10-8:00. Room 230 from 8:00 – 10:00 +/-.)

Thursday: Another asthma attack. (Location: VBIT1 from 7:10 – 10:00.)
Friday: Complete bed rest. Still had pain in chest, a lesser degree of difficulty taking deep breaths, exhaustion.
Saturday: Partial bed rest. Pain gone, breathing more freely.
Sunday: Symptom free.

Aileen

Another VSC witness

EXHIBIT
8

Certification test

Thanks again Bo, I appreciate your efforts,

Sincerely,

Aileen

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Wednesday, March 14, 2012 8:19 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Huffman, Jerry, VBASPT
**Subject:** Certification test

Hello Aileen,

This email is just to confirm that you decided not to take the RVSR certification test today. We met this morning to talk about the RVSR certification test. I reminded you that the test is today, and informed you that the test location is on the 3rd floor. You stated earlier this morning that you do not wish to take the RVSR certification test. Your desire is to receive a resolution as to the problems you are having at work. You have stated that you are not concerned with testing, and that you concerned with living and not dying. Therefore, you have decided not to take the RVSR certification today. Also, I have set up a meeting for you to discuss this matter with Jerry today.

*Ulyssee McBurrough Jr.*
Coach, VBIT 1C
727 319 7313

EXHIBIT
9

**Mullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 1:16 PM
**To:** Crump, Casey, VBASPT
**Subject:** FW: BRVSR Test 3/14/12 (Computer Set-up)
**Signed By:** aileen.mullin@va.gov

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Wednesday, March 14, 2012 1:07 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

Me too. I tried to contact you yesterday about your request to test in Human Resources, the Director's Office or the VSC Front Office. I wanted to confirm that it would be safe for you to test/work on the 3rd floor, and to inform you that we had granted you a temporary workplace adjustment: A special testing workstation was set-up for you in a vacant office in the Director's Office on the 3rd floor. I was later informed by your supervisor that you have left work at 1pm, so I was unable to reach you. In your absence, we took action on your behalf to ensure that everything was ready for you to walk in and take the test in a location you specifically identified as appropriate for your condition. We were informed by your supervisor this morning that you had decided not to test, so although the temporary workplace adjustment was not used, I thought you should know that we took extraordinary measures to ensure you could test if you chose to.

…pe you are feeling better.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 11:42 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

Oh Tammi, thank you for your effort. I really wish we could have been in touch yesterday.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 12:21 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I'm trying to work very quickly on this because I want to ensure your safety. You indicated that HR, the Director's Office, and the VSC Front Office would suffice as testing locations. Are you saying that you can safely test/work in these locations on the third floor of the building?

*Tammi Clarke*
*Human Resources Specialist*
*P… ne: (727) 319-5818*
*… (727) 319-7750*

EXHIBIT
Ex 10

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 12:05 PM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I wish we had too, but we covered many important subjects when we met.... My tour ends at 3:30, and then I'm scheduled to meet with Jim .... And truth be told, I don't know if I'll make it that long: Pain is seeping back into my chest.

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 11:47 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I must have missed that part of the email. I wish we had talked about this when we met yesterday. Maybe this is thing you were trying to remember to talk about.

I think we'll be able to work something out. What time do you leave today?

*T mmi Clarke*
*man Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 10:59 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I did get the e-mail and that's why I sent you and Bo the e-mail yesterday asking if there's an alternate site I can test in:

*"Good morning Tammi and Bo,*

*Th k goodness last week is behind me. Going in to the new week I need to talk to you about a couple of t s:*

*"I'm concerned about being in room 215 for Wednesday's certification exam. I know its a stretch, but can I ake the test in another part of the building: Human Resources, the Director's Office, or Front Office? Just*

*throwing it out there......."*

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 10:48 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** FW: BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You didn't receive this email?

---

**From:** VAVBASPT/RO/HRM
**Sent:** Monday, March 12, 2012 10:52 AM
**Cc:** Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT
**Subject:** BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You are welcome to go down to Room 215 and set up your workspace for the test.

Date: **March 14, 2012**
Location: Room 215
Time: 7:00am - 3:30pm

**Please use the computer labeled with your name.**

Please note that this is for computer setup only. Do not bring your reference materials until the day of the test.

---

On the day of the exam, plan on your work day being from 7:00 am – 3:30 pm.

The exam will consist of two 3 hour sessions. There is a 3 hour session in the morning and another 3 hour session in the afternoon.

Candidates must arrive at least 60 minutes prior to test time. Registration will be time consuming.

Testing will begin promptly at **8:00am**. **We will not wait for anyone.**
The morning testing session will be from **8:00am - 11:00am**

We will break for lunch from 11:00am – 11:50pm

The afternoon session will be from **12:00pm - 3:00pm**; you need to be in your seat by 11:50pm. **Again, we will not wait for anyone.**

**If you are late for either session, you will not be allowed entrance to the testing room. If you do not make the morning session, you will not be allowed into the afternoon session.**

***Things to Remember*:**

- Make sure to bring a picture ID with you.
- Make sure you have all the reference material (such as reference books, rate charts, non-programmable calculators), as you will not be allowed to leave the test site once the testing begins.
- Candidates may not bring electronic devices (e.g., cell phones, pagers, Palm pilots, programmable calculators, CD players, MP3 players/iPods) to the test site.
- You may want to use the restroom before testing (there will be no extra time at the end of the exam period to make up lost time)
- No eating will be allowed at the test site.
- During testing you will be allowed to use the computers in the room to access WARMS, C&P homepage, VARO homepage, U-Drive, the H drive. **YOU WILL NOT BE ALLOWED ACCESS TO EMAIL.**

Case 8:20-cv-02697 Document 1-3 Filed 11/16/20 Page 171 of 653 PageID 441

3/11/12

**ullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, May 01, 2013 7:55 AM
**To:** 'aileen_mullin@yahoo.com'
**Subject:** FW: week in a nurshell 03/11/2012 To Tammi and Bo

---

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Sunday, March 11, 2012 6:41 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Aileen Mullin
**Subject:** week in a nurshell

Good morning Tammi and Bo,

I'm concerned about being in room 215 on Wednesday's certification test. I know its a stretch, but can I take it in Human Resources, the Director's Office, or Front Office? Just throwing it out there.......

Tammi, I would like to use COP (continuation of pay) for the time lost but I don't know how to put it in ETA. Can you please advise Bo and me on this one. And hopefully you have the FMLA paperwork and the CA-2 will be to you today.

Last five days in a nutshell:

Wednesday: Sever asthma attack. Escorted from building by police. (My locations: VIBIT1 from 7:10-8:00. Room 230 from 8:00 – 10:00 +/-.)

Thursday: Another asthma attack. (Location: VBIT1 from 7:10 – 10:00.)

Friday: Complete bed rest. Still had pain in chest, a lesser degree of difficulty taking deep breaths, exhaustion.

Saturday: Partial bed rest. Pain gone, breathing more freely.

Sunday: Symptom free.

EXHIBIT
11

Case 8:20-cv-02697 Document 1-3 Filed 11/16/20 Page 167 of 173 PageID 828


**Mullin, Aileen, VBASPT**

**From:** Crump, Casey, VBASPT
**ent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin
**Signed By:** casey.crump@va.gov

;errie,

met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an ıccommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has ın ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This nust be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as ›ossible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and ertainly wants it to continue.

want everyone to understand the extended time in the office is a health hazard for Aileen. This is also an ongoing liability that I /ant to ensure you are personally aware of.

;andy,

understand Aileen has already spoken to you. I just wanted to keep you informed and hopefully you can provide the needed /ork at home assistance.

'hank you both.

;asey

***;asey Crump, DRO/Chief Steward***
***;t. Petersburg FL***
***'27-319-7280 Voice/Fax***

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Tuesday, March 13, 2012 11:44 AM
**To:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen Mullin
**Signed By:** kerrie.witty@va.gov

**Follow Up Flag:** Follow up
**Flag Status:** Red

Apparently the employee submitted medical documentation and a RA request yesterday (or last Friday). Tammi has it and I think you should go review it and determine if we need to let her work from home as an accommodation since her physician states that as the accommodation she needs. If she's still a trainee, we can make another decision but I don't want this one to sit like the ones before.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:18 PM
**To:** Smith, Sandra, VBASPT; Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

This was the employee who specifically talked to me about Room 222 - she is no longer sitting in room 222 so I had assumed that all was well - I guess that is not so.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:14 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

I was unaware of any statement from doctor that limited time in office. I had directed employee to HR some time ago for RA

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 12, 2012 3:30 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen Mullin

Do we have a RA request from this employee?

---

**From:** Crump, Casey, VBASPT
**Sent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin

Kerrie,

I met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and certainly wants it to continue.

3/13/12

RE: Aileen went home sick 

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, March 13, 2012 2:55 PM
**To:** Huffman, Jerry, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen went home sick
**Signed By:** sandra.l.smith1@va.gov

I will meet agin with Bonnie tomorrow to review medical documenation and discuss granting accomodation request. She wants to WAH and only be in office on Tuesdays and Fridays.

For test tomorrow, s he did not want to take RVSR cert test in room 215 and had asked for HR or VSCFO office. HR has prepared a computer in empty office in HR for her use. Employee needs to be aware of this accomodation.

Thanks,
Sandy

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Tuesday, March 13, 2012 2:40 PM
**To:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen went home sick

*Jerry E Huffman*, AVSCM
One Team, One Mission
An Advocate for Veterans

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 2:36 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** FW: Aileen went home sick

FYI...

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7553

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 1:05 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** Aileen went home sick

Bo,

She wasn't able to enter a request in ETA & I forgot to ask her if lunch is included or not... nevertheless - the CH database

RE: Aileen went home sick



has been updated.

<< OLE Object: Picture (Device Independent Bitmap) >>

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7553

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Friday, March 16, 2012 8:27 AM
**To:** Smith, Sandra, VBASPT
**Subject:** RE: AM
**Signed By:** kerrie.witty@va.gov

We haven't had a chance to talk about it yet so it's good if we can get her out on a temp basis for now.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Friday, March 16, 2012 8:20 AM
**To:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: AM
**Importance:** High

that's good as employee is already working on forms (provided by her coach) - have you talked to Bonnie about doing RA instead of this temp workplace adjustment?

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Thursday, March 15, 2012 8:35 PM
**To:** Huffman, Jerry, VBASPT; Smith, Sandra, VBASPT
**Subject:** AM

Wanted to let you know we ran our strategy by regional counsel yesterday. Expect concurrence on the temp workplace adjustment tomorrow. Will let you know.

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Wednesdays, and Thursdays. You will be required to report to work at the St. Petersburg Regional Office on Tuesdays, and Fridays.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

- [x] We will provide the accommodation requested by *(enter date)* 03/21/2012
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

This accommodation will be provided by (enter date) ____

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty
DMO SIGNATURE

3/20/12
DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

EXHIBIT 12

FMLA
3/2/2012

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

WHD

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: ______

Employee's job title: ______ Regular work schedule: ______

Employee's essential job functions: ______

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Alieen Mullin
First Middle Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Stephen Blanauesch 6200 1st Ave N

Type of practice / Medical specialty: Allergy / Immunology

Telephone: (727) 345 1900 Fax: (727) 347 5273



CONTINUED ON NEXT PAGE

Form WH-380-E Revised January 2009

EXHIBIT
13+2

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 2009

Probable duration of condition: Chronic

Mark below as applicable:

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___Yes. If so, dates of admission:

Oct 2010 Nov 2010, Dec 2010, Mar 2011 Sept 2011 Oct 2011 Dec 2011 Mar 2012

Date(s) you treated the patient for condition:

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___No X Yes.
when she has attacks

If so, identify the job functions the employee is unable to perform:

All

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Patient has allergic sinusitis and asthma. The asthma worsens at work at the VA leading to severe attacks requiring urgent care.



CONTINUED ON NEXT PAGE

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No _X_Yes.

If so, estimate the beginning and ending dates for the period of incapacity: 1-4 days [illegible] 1-4 weeks

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No _X_Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
___No _X_Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:
[illegible]

Estimate the part-time or reduced work schedule the employee needs, if any:

_______ hour(s) per day; _______ days per week from _______ through _______

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No _X_Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?
___No _X_Yes. If so, explain:
[illegible]

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: 1-4 times per 3 week(s) ___ month(s)

Duration: ___ hours or 1-4 day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

I recommend the patient be allowed to work from home [illegible] trips to the work site as required while at the work site

CONTINUED ON NEXT PAGE

Form WH-380-E Revised [illegible]

Page 2

limit exposure to the
building
consider installing a
total building air purifier
dehumidification system
Patient must be allowed
to leave immediately
from the work place
if she develops asthma.

[signature] MD 3 Dec 12

Signature of Health Care Provider Date

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC [illegible]210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.



Form WH-380-F Revised January [illegible]

Aileen Mullin 3-03-60

MAR 2 2012

BP 132/86

Continues to have problems at work.
Brought a nebulizer to work.
She requested a move.
But wasn't moved at 1st.
Had an a Hack that lead to 911 call & trip to St Pete General.
Since that was moved to a different floor.
She still has sx's in that area. Can't work more than 4 days without having asthma.



EXHIBIT 14

They gave her a room sized
air purifier but she works
in a large open area
Would like to apply for
FMLA - working at home
c̄ limited exposure to
work site

HEENT - PND
Chest - coughing,
- end exp wheeze
rases
P - will fill out forms
for FMLA

3-3-12. copies of FMLA papers in chart - RJG

To: Bonnie Wax

Fr: John Smith, AFGE Steward

Re: Aileen Mullin request for Modified Accommodation and Administrative Leave

Dt: February 19, 2013

As the modified accommodation, regarding Ms. Mullin's Workers' Compensation illnesses, has not been adequately discussed and resolved, we ask the Ms. Mullin be placed on paid Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

The following is a synopsis of recent events regarding Ms. Mullin's Workers' Compensation illnesses, since finishing her treatment for breast cancer in late December 2012:

- Wednesday, January 2, 2013 - Ms. Mullin returned to work.

Ms. Mullin works from home, reporting to the office once or twice a week to minimize her exposure in the building. (Ms. Mullin works at home due to workplace-related illnesses: asthma and chronic sinusitis.*)

Ms. Mullin reported to the office, approximately 24 total hours, during the month of January.

- Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Ms Mullin suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Ms. Mullin had been asymptomatic when on leave for breast cancer. )
- Thursday, January 17, 2013 - Ms. Mullin was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed.
- Tuesday, January 23, 2012 - The next time Ms. Mullin entered the building; Within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain.
- Saturday, January 26, 2013 - Ms. Mullin was seen by the medical specialist who deemed that it was not safe for her to enter the building without respirator. He stated that she has to further minimize her time in the building.
- Monday, January 28, 2013 - Ms. Mullin informed the agency of her worsening reaction to being in the building and of the doctor's orders.
- Tuesday, January 29, 2013 - Ms. Mullin had numerous conversations with the Human Resource (HR) Specialist attempting to determine how a respirator would be attained.

EXHIBIT
PENGAD 800-631-6989
15

- Wednesday January 30, 2013 - Though ill, Ms. Mullin requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Ms. Mullin's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Ms. Mullin voiced her belief that collaboratively a plan could be worked out. Aid with marginal job functions such as assistance retrieving documents from the printer and moving the files were suggested by Ms. Mullin. The group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job.

However, later the same afternoon, Human Resources informed Ms. Mullin that her request for modifications to her accommodation was denied (without the benefit of further conversation.)

As Ms. Mullin had witnessed such treatment of other disabled employees, she realized her job was in jeopardy. She became extremely alarmed and distraught. She experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she has no history of).

- Thursday, January 31, 2013 - Ms. Mullin was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she she remained hospitilized for one week.
- February 5, 2013 - While in the hospital, Ms. Mullin spoke to the HR specialist who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position was one essential function and could not be broken down by tasks: " ....I understand that you feel these tasks are minimal and can be done by someone else, however, collectively these tasks take a significant amount of time to complete..... **It's the whole in-office process that is considered an essential function of the job**... " This information caused Ms. Mullin further upset and an exacerbation of her condition. (Please note that the HR Specialist didn't inquire as to why, or how long, Ms. Mullin would be in the hospital.)
- Wednesday, February 6, 2013 - Ms. Mullin was discharged from the hospital after treatment for sinusitis and gastrointestinal conditions. Her doctor required her to remain out of work for an additional two weeks ~ and to avoid stressful situations during her recovery.

Ms. Mullin is now scheduled to return to work on Thursday, February 21. As the decision on the modified accommodation, for Workers' Compensation illnesses, was premature, and has not been adequately been resolved, we ask the Ms. Mullin be placed on Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

Please provide the names of the members of the Reasonable Accommodation Committee.

Due to the gravity of this situation, we respectfully respect a response to this request by the close of business.

* U.S. Department of Labor, Workers' Compensation File Number: 062294294

enc.
Letter from Social Worker, St. Anthony's Hospital

cc:
Aileen Mullin
Ulysee McBurough, VBA
Jon Jackson, DOL
Odessa Johnson, EEO
John Henley, EEO
Everett Kelly, District President, AFGE
Brenda Stallard, AFGE
Valorie Reilly, AFGE
Keith Pryor, AFGE
Casey Crump, AFGE

5/7/12

Copy

This Leave Request template is designed so none of the people sign it are responsible for dating it. There's no way of tracking/verifying who is holding it up

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: May 7, 2012.

From: Ulyssee McBurrough Jr., Coach, VBIT 1C

Subj: Request for Advanced Sick Leave in lieu of Leave Without Pay (LWOP) under FMLA

To: Veterans Service Center Manager
Director, St. Petersburg Regional Office
Human Resources Management Division

1. Aileen Mullin, RVSR, has requested Advanced Sick Leave in lieu of LWOP under FMLA in the amount of 80 hours.

2. Aileen Mullin has requested Advanced Sick Leave due to surgery medical surgery performed on May 4, 2012.

3. I am recommending (approval)/disapproval of the request for 80 hours of Advanced Sick Leave in lieu of LWOP under FMLA.

Coach, ULYSSEE McBURROUGH JR.

JERRY HUFFMAN, AVSCM
~~Recommend~~ Approval/~~Disapproval~~

(for) SANDRA L. SMITH, VSCM
Recommend Apprproval/Disapproval

BONNIE J. WAX
Human Resources Manager
Recommend Approval/Disapproval

KERRIE L. WITTY
Director
Approval/Disapproval

EXHIBIT 16

00587

Subject: Fw: Requested info

From: aileen_mullin@

To: mjsflorida@verizon.net;

Date: Wednesday, June 27, 2012 12:18 PM

Sent via BlackBerry by AT&T

---

**From:** "Reilly, Valorie, VBASPT" <valorie.reilly@va.gov>
**Date:** Wed, 27 Jun 2012 12:13:32 -0400
**To:** <aileen_mullin@
**Subject:** FW: Requested info

Valorie Reilly, President
AFGE Local 1594
5th District AFGE/NVAC Representative
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220

---

**From:** Works, Philip, VBASPT
**Sent:** Wednesday, June 27, 2012 11:08 AM
**To:** Reilly, Valorie, VBASPT
**Subject:** Requested info

Good morning,

Regarding Aileen Mullins:

Advance Sick Leave: The Director approved the requested 80 hours on May 10, 2012. The dates to be covered under that request were May 11 – May 24, 2012. Is there another request pending?

VLTP: A second VLTP participation was approved 6/20/12 based on medical emergency begun May 30, 2012 – September 11, 2012.

EXHIBIT 17

Donations received: I counted a grand total of 158 hours donated (that includes both emergency periods).

Thank you.

Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923
(fax) 727-319-7750

*"One Team, One Mission"*

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/29/2012

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/ 317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: ____

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ____ (Middle) Mullin (Last) (954) 263-1510

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Jeffrey Paonessa 1201 5th Ave. St. Petersburg

Type of practice / Medical specialty: Oncology

Telephone: (727) 821-0017 Fax: (727) 822-7473

 CONTINUED ON NEXT PAGE 

EXHIBIT 18

[illegible]

1. Approximate date condition commenced: 3-16-2012

Probable duration of condition: 6 months

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

3-22-12 - consultation

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No ✓ Yes. If so, state the nature of such treatments and expected duration of treatment:

Dr. Karen Kritsky - Surgery

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: ___________

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No ___ Yes.

If so, identify the job functions the employee is unable to perform:

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

New diagnosis of Breast Cancer, she will need surgery followed by chemotherapy and possible radiation.



CONTINUED ON NEXT PAGE

[redacted]

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? __No ✓ Yes

If so, estimate the beginning and ending dates for the period of incapacity: present - 6 months

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? __No ✓ Yes.

If so, are the treatments or the reduced number of hours of work medically necessary? __No ✓ Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

weekly chemo and related treatment

Estimate the part-time or reduced work schedule the employee needs, if any:

________ hour(s) per day; ________ days per week from ________ through ________

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ____No ✓ Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups? ____ No ✓ Yes. If so, explain:

Side effects from chemotherapy

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s)

Duration: ____ hours or ___ day(s) per episode

[redacted]

 CONTINUED ON NEXT PAGE 

Signature of Health Care Provider — Date 3/23/12

For. Jeffrey Parenssa

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

WHD U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: Mon. - Fri. 7:00am - 3:30pm

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ______ (Middle) Mullin (Last)

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Marie Catherine Lee 12902 Magnolia Dr Tampa FL

Type of practice / Medical specialty: Surgical Oncology

Telephone: ( ) ______ Fax:( 813 ) 745-2002



CONTINUED ON NEXT PAGE



EXHIBIT 19

[redacted]

1. Approximate date condition commenced: 05/04/12

Probable duration of condition: 05/18/12

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
X No ___Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

05/04, 05/02, 04/24, 04/17, 04/10, 3/28/12

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date:

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No X Yes.

If so, identify the job functions the employee is unable to perform:

NO WORK OF any kind

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Surgery, MD visits, scans, labwork

 CONTINUED ON NEXT PAGE 

[redacted]

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

If so, estimate the beginning and ending dates for the period of incapacity: 05/04 - 05/18/12

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No X Yes.

If so, are the treatments or the reduced number of hours of work medically necessary? ___No X Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

dates and times of treatment will vary

Estimate the part-time or reduced work schedule the employee needs, if any:

2-8 hour(s) per day; 1-3 days per week from 05/22/12 through 11/22/12 as needed

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? X No ___Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups? ___ No ___Yes. If so, explain:

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ___ times per ___ week(s) ___ month(s)

Duration: ___ hours or ___ day(s) per episode

[redacted]

 CONTINUED ON NEXT PAGE 

Signature of Health Care Provider

Date 5/7/12

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# FW: How you doing

From: Mullin, Aileen, VBASPT (aileen.mullin@va.gov)

To: aileen_mullin@yahoo.com

Date: Thursday, May 3, 2012, 03:51 PM EDT

---

**From:** Crump, Casey, VBASPT
**Sent:** Thursday, May 03, 2012 3:06 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** How you doing

Aileen,

I have been busy and have not seen you around lately. I spoke with Bonnie Wax the other day about your condition. She said the tumor you have is what caused your breathing problems. She said it was apparently exerting some pressure on your lungs. She also said she was relieved your condition was not caused by our office and that we do not actually have sick building syndrome. Anyway, I hope your doing well and your conditions improve. Later.

Casey

EXHIBIT
20

**Wax, Bonnie, VBASPT**

**From:** VAVBASPT/RO/HRM
**Sent:** Friday, June 29, 2012 3:26 PM
**Subject:** Voluntary Leave Transfer Program
**Attachments:** Donation Form.pdf

The following employees have been approved for the Voluntary Leave Transfer Program. If you would like to donate annual leave please complete and print the attached form and turn it in to Human Resources. The minimum that can be donated is 4 hours. Additional questions may be directed to Tammi Clarke at ext. 5818.

- Yvonne Hall
- Jennifer Lane
- Aileen Mullin – Condition: Chemotherapy for the treatment of breast cancer.

Please see attached donation form.



EXHIBIT
21

**Clarke, Tamanique, VBASPT**

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, February 05, 2013 12:09 PM
**To:** 'aileen_mullin@yahoo.com'
**Subject:** Essential Function: In-Office Process

Hi Aileen,

Below is the information you requested. I understand that you feel these tasks are minimal and can be done by someone else, however collectively these tasks take a significant amount of time to complete. It's the whole in-office process that is considered an essential function of the job. Based on our phone conversation, it seems that there are certain tasks of the in-office process that you are seeking assistance with. If you want we can talk about it in our next meeting or you can reply back with what it is that you are seeking assistance with.

Upon returning to the building, files must be covered back into the building. Next, the printed rating decisions must be retrieved from the work at home printer location along with any mail from the IPC. Any additional documents such as CAPRI records must be printed and placed into the files when in the office. The printed documents are then reviewed and corrections/misprints are made while in the office. Any associated mail is also added to the files. Your files must be taken to 2nd floor for 2nd signature review to determine if corrections are needed. Corrections must be done while in the building. If no corrections are needed, the file is printed blue at that time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and delivered to the POA table for Service Officer review. Examination requests must be entered into Capri, and buck slips must be added to the file. The file needs to be covered out to the examination facility and delivered to the IPC. Next, more files are gathered and covered out to yourself to take home. The whole in-office file process can take the average work at home rating specialist 3 to 5 hours or more depending on the number of files to be processed and is an essential function of your job.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*



EXHIBIT
22

# Occupational diseases as granted/acknowledged by the DOL

From: Mullin, Aileen, VBASPT (aileen.mullin@va.gov)

To: ulyssee.mcburrough@va.gov; john.r.smith2@va.gov; casey.crump@va.gov

Cc: kellee@afge.org; carolyn.allard@va.gov; Keith.Pryor3@va.gov; valorie.reilly@va.gov

Date: Monday, January 28, 2013, 11:25 AM EST

I need your help so I can do this job.

Because of the severity of my body's reaction to being in the building last week (2 HRS +/-) and the week before (10 hrs +/-)), I went back to the specialist (Board Certified: Allergy/Immunology, Internal Medicine). Additional tests were administered.

The doctor advised that I further minimize my time in the building AND that for me to safely work in the building*, I will need to wear a mask similar to those used by people working in auto body shops and industrial clean-up operations. **WHAT???????????** I can't begin to tell you how horrifying it is the think I have to wear one of those devices ~ in order to do my job ... (also horrifying is knowing about other people, on the floor, on our team, that are sick; Some over medicating themselves in order to be able to be in there)

- I just want to be a successful RVSR. I want to know how to do this job and do it well.

- I've already lost months and months of OJT/ hands-on training (starting long before the diagnosis of cancer).

- I've done/am doing every within my realm of control/knowledge to learn how to address Veteran's claims as a Rater~

.

- I've done every thing, I know to do, to try to keep my body safe ~ while not fully jeopardizing my job~

I can't do this own my own. I need your help in identifying/ implementing reasonable accommodations. I trust that if we put our heads together there's a way for me to safely be a successful RVSR

I'll be waiting to hear from you, and if need be I'm come right over so we can meet (outside). Just give me the word.

For now,

Aileen
954-263-1510

PS
- The doctor wrote a prescription for the breathing apparatus for Human Resources.

Just so you know,
I have repeatedly attempted ~ and received not response to ~ requests for answers as to what has happened as a result of the most recent OSHA complaints (mold, AQ, rats**).

I have repeatedly attempted ~ and received no answers to ~ requests for information as to how the RO's Safety Committee is handling safety concerns.

* (Especially the areas of the building that have already been identified as having air quality issues)
**(Note: Some rodent species excrement is far more harmful than others. If there really is an issue with rats, we need to know what kind and the locations (Note: Rodents in duct work offer a set problems that differ greatly from ones that are in other parts of a building.)

ole0.bmp
29.3kB

EXHIBIT
23



VA 0043

ole1.bmp
7.4kB

**Clarke, Tamanique, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 29, 2013 4:34 PM
**To:** McBurrough, Ulyssee, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Ingram, Walter, VBASPT
**Subject:** Working things out

Hi you guys,

Tammi and I are doing what we can to figure out some of the details as to how these accommodations can be worked out. We've also been in touch with the Department of Labor and started a list of questions/requests for my doctor. Are you available to meet in the morning? We need help with some of the details.

Please just let Tammi what works for you and she can call me and I'll be right over.

Thanks,

Aileen

PS The files are packed-up and ready to go.

EXHIBIT

24

1/31/13 Essential Functions Accommodations

**Subject:** respirator

**From:** Aileen Mullin (aileen_mullin@

**To:** Tamanique.Clarke@va.gov;

**Cc:** ulyssee.mcburrough@va.gov; john.r.smith2@va.gov; kellee@afge.org;

**Date:** Thursday, January 31, 2013 1:16 PM ← Later the same day I was hospitalized as a result of my bodies reaction to the stress

For the doctors to define the specs for an approprite respirator, they now need to know how the device will be used. This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table, again, more info is needed.

One important detail pertains to time: How long is it anticipated I will need the respiratory protection to perform the 'essential functions' of a WAH RVSR (I can't answer this question because I'm not sure what the RO considers as functions that I can not receive help to expedite.)

Can you please e-mail us the 'essential functions' I've have been denied accommodations for. Its info needed for the specialists to make an informed recommendation.

Also, I would like for all of us to brain-storm options as to where in the building I can work, that will save the complete humiliation and distraction I'll have to contend with.

Thanks,
Aileen

PS Please e-mail me at the non-va e-mail because I'm not working today.

EXHIBIT 25

**Clarke, Tamanique, VBASPT**

**From:** Aileen Mullin <aileen_mullin@yahoo.com>
**Sent:** Tuesday, February 05, 2013 8:11 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Aileen Mullin
**Subject:** Re: Our conversation this morning

Thank you for getting back to me, but I am physically unable to continue this discussion at the present time. When I am released from the hospital and am sufficiently recovered, I will contact you.

Aileen Mullin

---

**From:** "Clarke, Tamanique, VBASPT" <Tamanique.Clarke2@va.gov>
**To:** aileen_mullin@yahoo.com
**Cc:** "McBurrough, Ulyssee, VBASPT" <ulyssee.mcburrough@va.gov>; "Smith, John, VBASPT" <john.r.smith2@va.gov>
**Sent:** Tuesday, February 5, 2013 12:19 PM
**Subject:** RE: Our conversation this morning

You had asked for a copy of what was being denied and I explained that we have a formal denial process and that it was sent to Regional Counsel for review. I did not say that we sent it to Regional Counsel at your request. It's part of the denial process.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Tuesday, February 05, 2013 12:15 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Aileen Mullin
**Subject:** Our conversation this morning

Good Afternoon,

In our telephone conversation this morning, you informed me that you had submitted a "Request for Accomodations" to GC at my request.

Any suggestion that this action was requested by me is patently false.

The brevity of my response is due to the fact that I am still in hospital.

Aileen Mullin

EXHIBIT
26

**Clarke, Tamanique, VBASPT**

| | |
|---|---|
| **From:** | Works, Philip, VBASPT |
| **Sent:** | Wednesday, February 20, 2013 4:13 PM |
| **To:** | Smith, John, VBASPT; Mullin, Aileen, VBASPT |
| **Cc:** | Clarke, Tamanique, VBASPT; Wax, Bonnie, VBASPT (Bonnie.Wax2@va.gov) |
| **Subject:** | February 20th Request for AA |
| **Signed By:** | Philip.Works2@va.gov |
| **Importance:** | High |

Good afternoon,

Unfortunately I have not been able to reach Mr. Smith by phone to discuss the letter delivered to Human Resources at approximately 3:20 this afternoon.

However, the Director has granted Ms. Mullin authorized absence for her regularly scheduled tours of duty Thursday, February 21, 2013 through Monday, February 25, 2013.

This time is being provided to allow an opportunity for Ms. Mullin to gather any additional medical documentation needed in support of her request for Reasonable Accommodation and then submit her revised request on Tuesday, February 26. Any requests for additional time will be considered based on the circumstances present at the time of the request.

One possible resolution raised earlier in this process was the use of a respirator. However, to date, the agency has not received further information regarding the specifications of that device (filtration size, types of filtration, etc.) so as to be able to locate or purchase these for Ms. Mullin's use. Please provide as soon as possible.

This response cannot address all issues raised in the February 20th letter and is only an interim reply to address the most pressing issues. A more detailed response will be forthcoming.

Thank you,
Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923 | (fax) 727-319-7750

EXHIBIT
27

April

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

April 12, 2013

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number: 062294294
Re: Aileen Mullin (DOB 03/03/60)

To Whom It May Concern:

This is an addendum to my letter dated May 24, 2012 a copy of which is appended for your information regarding Aileen Mullin's current situation. She continues to experience significant buffeting of her medical condition when she returns to her office at the VA. At this point in time I would recommend that she not return to her office at the VA until appropriate accommodations can be made. The accommodations I am referring to are improvements in the indoor environment that would prevent the onset and or aggravation of her asthma, sinusitis, and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

EXHIBIT
28

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

April 12, 2013

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number: 062294294
Re: Aileen Mullin (DOB 03/03/60)

To Whom It May Concern:

This is an addendum to my letter dated May 24, 2012 a copy of which is appended for your information regarding Aileen Mullin's current situation. She continues to experience significant buffeting of her medical condition when she returns to her office at the VA. At this point in time I would recommend that she not return to her office at the VA until appropriate accommodations can be made. The air purifier machine provided in her work area is not sufficient. The accommodations I am referring to are improvements in the indoor environment that would prevent the onset and or aggravation of her asthma, sinusitis, and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

EXHIBIT 29

Mullin, Aileen 06-22-2012

NO Show JUN 27 2012

HT

WT

BP

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| V-65 | 7 mix D 1:100 .10 | 3 grass 1:100 .10 | 4 weed 1:100 .10 | Oak 1:100 .10 | | | |
| V-66 | S DM 10,000 .10 | CR 1:100 .10 | Pollen [illegible] .20 | | | | |

JAN 26 2013

wt: 197#

ht: 5'7"

BP: 132/88

Doing well with her Breast cancer therapy. Has returned to work. They continue to allow her to work at home but still has to go in for brief periods. This causes sinus S+S [illegible] [illegible] leaving S+S. HEENT - [illegible] Hughes [illegible] tongue lip Class 4 - [illegible] nodes [illegible]

Aileen Mullin DOB: 3/3/1960 Chart#: 4696 pg: 2/20

- Can write letter re: getting adjunctive help while at work & time there.
- Rx for respirator to use

2 Feb 13 At St A's. - sinuses bleeding
- also pain
- rectal bleeding

2-26-13. Dr K. will write letter to her employer when she gives us employer's name and address. RTG

4-12-13. letter written - copy in chart. RTG

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - modifications to your current approved accommodation to work from home 3 days per week.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter, please contact Tammi Clarke, Human Resources Specialist at(727)319-5818.

- [ ] We will provide the accommodation requested by *(enter date)* 02/01/2013

- [x] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

to move your desk to the old POW suite where your supervisor Ulyssee McBurrough is located. Your current air purifier will be placed in your new workspace and a second larger air purifier will be placed in the suite as well. Your computer will be set up to print to the printer located inside of the suite so that you do not have to walk outside of the suite to collect the documents you print. You indicated that you will obtain the respirator prescribed by your physician and wear it while inside of the building.

*This is a projected date.

This accommodation will be provided by (enter date) 03/05/2013*

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty (signature)
DMO SIGNATURE

02/27/2013
DATE

EXHIBIT 30

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Wednesday, April 03, 2013 12:02 PM |
| **To:** | McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT |
| **Cc:** | Smith, John, VBASPT; Smith, Sandra, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT |
| **Subject:** | FW: Rescinding of accommodations currently in place |
| **Attachments:** | ca-7.pdf; SF-201199A Direct Deposit Form.pdf |

Hi gentlemen,

I just want you to know that I've asked John and Casey to assist me in developing an emergency medical plan.

The Agency's restriction, as to the hours I am permitted to work at home, will be detrimental to my health.

When I had the asthma attach last year, I wanted to call 911 but didn't know how to explain where in the building I was ~ Then the asthma quickly increased in severity and I couldn't communicate ~ I was gasping. The 'powers that be' who I pleaded to for help, failed to respond accordingly. Thank God, a friend did response to text. If not, I could have suffered a brain injury or death.

If I go into another full blown asthma attack, time will be of the essence.

My body has a long way to go before its healed from the cancer treatments. I fear that another attack will be crippling more quickly ~ and I won't be afforded to time, or ability, to search and beg for someone to render aid.

It would be grossly irresponsible (and naive) to depend on Human Resources to assist

There has to be an emergency plan.

Aileen

The four hours, twice a week, modification to the existing accommodation was working. I may have felt better coming into the building then when I left if but at least I I was able to stay out of the emergency room and doctor's office. Yes, the modification that **Tammi, John and I agreed to WAS effective**!!!! But that's a moot point.

Unfortunately, the Agency made it clear that it is adhering to its pattern of refusing to permit accommodations appropriate to for specific disability: "give accommodations to one employee, you'll have to give them to every employee that comes in with a doctors note". (Cookie cutter accommodations for chronic iconditions such as MS, PTSD, TBI heart problems, respiratory problems have been WAH Mon, Wen, Fri))

---

A kind man once adised me to pick my battles.

Reference: The 4/1/3013 e-mail from HR.
I took a few notes , but its a battle that can wait ...

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 01, 2013 4:02 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Good Afternoon Ms. Mullin,

EXHIBIT 31

To those without detailed knowledge of events that transpired since the 27th of February, these first two paragraphs would appear to contain logical and valid facts. Reality is, they contain neither logical or valid facts ... the EEOC is going to have a heyday.

our reasonable accommodation approval form, entitled Approval of Accommodation Request and dated February 27, 2012, clearly stated, "Modifications to your current approved accommodation to work from home 3 days per week." Your approval document does not state you are permitted to work four (4) hours in the office and four (4) hours at home. If we had granted such an accommodation, it would have been in writing.

No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays.

- What category of Leave request should be entered in ETA? You may take sick leave, annual leave in lieu of sick, or request leave without pay. The choice is yours. Your request for leave needs to be made through your supervisor.
- ...The request "needs to be made **THROUGH**" my supervisor .... through to who? To what end?
- I would prefer to use LWOP when the asthma attacks occurs, but I'm concerned that the 'powers that be' will use this as an opportunity to charge me with being AWOL:
Example: My breathing becomes labored. I have to leave the building immediately. There's no time for the processing of LWOP documentation ....

- What evidence will the Agency require so that I am paid under Worker's Compensation? The Department of Labor will need medical documentation to support a claim for reimbursement.
- Incomplete answer: The fact that evidence needs to be 'medical' is a given: What does the evidence have to include?

- What is the procedure for requesting payment under Worker's Compensation? You will need to complete the attached CA-7 and direct deposit form.
- An incomplete answer ... how do I proceed after the completion of the forms .....

- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation? Please contact Department of Labor at (904)366-0100. You can leave a message to speak with your claims examiner who can discuss in detail any further concerns or questions you may have.
- Denial of clarification / information:DOL told me to contact HR....

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

To: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, `012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.

My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.

I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***

If it is true that the modification to accommodations has been reversed, please help me understand why.

If it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?

- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,

Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

*** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:

- elevated penicillium spore counts
- elevated aspergillus spore counts

- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter

Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ______

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NS Kerrie Witty (signature) — DMO SIGNATURE

04/15/2013 — DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

EXHIBIT 32

Department of Veterans Affairs

## APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, Thursdays, and Fridays. You will be required to report to the St. Petersburg Regional Office on Fridays at the beginning of your tour. Your coach or his designee will meet you outside the Regional Office to provide your work and pick up your work. You are required return to your home office in a timely manner to complete you tour of duty on Fridays.

- [x] We will provide the accommodation requested by *(enter date)* 04/19/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Matthew Correa, Human Resources Specialist at(727) 319-5800 ext. 6560.

This accommodation will be provided by (enter date) ____________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty (signature)
DMO SIGNATURE

04/19/2013
DATE

EXHIBIT
PENGAD 800-631-6989
33

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - To work solely in the VBMS paperless system to avoid the transfer of case files, and to improve the communication with you and your mentor.

Because this is a new program early in its development there is not enough case files in your assigned lane/digits to maintain the proper workload. Therefor you will be given work outside your assigned digits so that you can continue to use the VBMS system without delay or loss of productivity.

- [x] We will provide the accommodation requested by *(enter date)* 09/3/2013

- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter, please contact Matthew Correa, Human Resources Specialist at (727)319-5800 ext 6560

This accommodation will be provided by (enter date) ________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

818 Kerrie Witty (signature) — 08/27/2013

DMO SIGNATURE — DATE

EXHIBIT 34

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** — Adobe LiveCycle Designer

**Witty, Kerrie L., VBASPT**

**From:** Reilly, Valorie, VBASPT
**Sent:** Tuesday, September 30, 2014 6:26 PM
**To:** Witty, Kerrie L., VBASPT
**Subject:** RE: Request for Reconsideration of RA

Yes, I think that would work. I will let her know.

Thank you, Kerrie.

Valorie Reilly, President
AFGE Local 1594
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220
AFGE

**From:** Witty, Kerrie L., VBASPT
**Sent:** Tuesday, September 30, 2014 5:56 PM
**To:** Reilly, Valorie, VBASPT
**Subject:** Re: Request for Reconsideration of RA

Let's arrange for her to be there (just outside the main entrance) a few minutes before 10am and I'll try and get him out a few minutes early so he can meet her on his way to the car. It won't be very long but she'll get something (a personal introduction) other employees will not. Will that work?

**From**: Reilly, Valorie, VBASPT
**Sent**: Tuesday, September 30, 2014 05:51 PM
**To**: Witty, Kerrie L., VBASPT
**Subject**: RE: Request for Reconsideration of RA

Kerrie,

Thank you.

How can I facilitate this?

Valorie Reilly, President
AFGE Local 1594
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220

EXHIBIT
35

AFGE

**From:** Witty, Kerrie L., VBASPT
**Sent:** Tuesday, September 30, 2014 5:30 PM
**To:** Reilly, Valorie, VBASPT
**Subject:** Re: Request for Reconsideration of RA

I can arrange for her to meet the Secretary outside the building.

**From**: Reilly, Valorie, VBASPT
**Sent**: Tuesday, September 30, 2014 04:38 PM
**To**: Correa, Matthew, VBASPT
**Cc**: Witty, Kerrie L., VBASPT; Wax, Bonnie, VBASPT; THOMPSON, Keith J., VBANASH; jay.afge.oobo@gmail.com <jay.afge.oobo@gmail.com>; joyce@knclawfirm.com <joyce@knclawfirm.com>; Simmons, Isabel (ORM)
**Subject**: Request for Reconsideration of RA

Matt,

I'm concerned about the denial of an RA for Aileen Mullin to meet the SecVA, after being randomly chosen to attend a town hall for the occasion by the RO317. Therefore, we wish to document the inconsistent attention to evidence amid ongoing concerns about RAs.

First, you advised the employee you were working on the RA Friday, and then this morning, and then "closed" the interactive process without further help to the employee early this afternoon.

Second, in denial of RA, medical documentation and reported facts are misconstrued; misquoting facts and evidence.

Third, you render decisions without evidence - "would not be effective" is contrary to medical evidence presented; and "medical documentation presented is not adequate" is also contrary to VA rules for a proper prescription and note from a licensed physician. VBA offers no medical evidence to the contrary.

Fourth, please provide all evidence that this request would provide an undue hardship. An RFI will being issued on this matter.

Fifth, please provide the ODI denial approval.

The continued difficulty and conclusory nature of HR responses to the concerns raised by disabled employees requesting accommodations remains troublesome and disheartening. Rather than offering alternatives to this disabled employee, the response that there is a short lead time shows a demonstrative lack of consideration for the uniqueness of the situation: the Agency's top leader visiting our Regional Office for the first time.

Ms. Mullin's RA is for an OWCP respiratory condition and presumably the purpose of the denial is to prevent her from meeting the Secretary. Further, it may signify reprisal for prior EEO activity.

At this time we urgently await your response as the Secretary's visit is scheduled for tomorrow.

Thank you.

Valorie

Valorie Reilly, President
AFGE Local 1594
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220

---

Begin forwarded message:

**From:** "Mullin, Aileen, VBASPT" <Aileen.Mullin@va.gov>

**Subject: RE: Accommodation for OWCP accepted conditions - Denial of accomodation and closing the door on the interactive process**

**Date:** September 30, 2014 at 1:37:56 PM EDT

**To:** "Correa, Matthew, VBASPT" <Matthew.Correa@va.gov>

**Cc:** "Smith, Sandra, VBASPT" <sandra.l.smith1@va.gov>, "Reilly, Valorie, VBASPT" <valorie.reilly@va.gov>, <jay.afge.oobo@gmail.com>, <Joyce.kitchens@knclawfirm.com>

Matt,

Its as if the conversation we had yesterday didn't even occur.

I'll be getting back to you.

-----Original Message-----
From: Correa, Matthew, VBASPT
Sent: Tuesday, September 30, 2014 1:03 PM
To: Mullin, Aileen, VBASPT
Cc: Smith, John, VBASPT
Subject: RE: Accommodation for OWCP accepted conditions

Aileen,
Attached is your accommodation determination. Please let me know if you have any questions.

Thank you,

Matthew Correa
matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

VA Core Values: Integrity, Commitment, Advocacy, Respect, Excellence

-----Original Message-----
From: Mullin, Aileen, VBASPT
Sent: Tuesday, September 30, 2014 10:31 AM
To: Correa, Matthew, VBASPT
Subject: RE: Accommodation for OWCP accepted conditions

Thank you Matt, I'm working on it too.

-----Original Message-----
From: Correa, Matthew, VBASPT
Sent: Tuesday, September 30, 2014 8:28 AM
To: Mullin, Aileen, VBASPT
Cc: Smith, John, VBASPT
Subject: RE: Accommodation for OWCP accepted conditions

Aileen,
Just wanted to let you know that I am actively working on your request.

Thank you,
Matthew Correa
matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

VA Core Values: Integrity, Commitment, Advocacy, Respect, Excellence

-----Original Message-----
From: Mullin, Aileen, VBASPT
Sent: Friday, September 26, 2014 4:34 PM
To: Correa, Matthew, VBASPT
Cc: Smith, John, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
Subject: Accommodation for OWCP accepted conditions

Dear Matt,

Hope all is well with you.

I was surprised, and thrilled, to receive my invitation to attend the Secretary's meeting, but need your assistance in arranging for accommodations.

I have a respirator and nebulizer, but can you get a small portable oxygen concentrator? I have a prescription and heard the VAMC can provide one for my visit to the RO.

Thank you in advance for your assistance, and if you could get back to me as soon as possible it would be appreciated: As there's only a few days, I want to curtail any situations that would create a barrier to me enjoying this benefit of working for the RO.

Respectfully,
Aileen

---

VA Handbook

http://www.diversity.va.gov/programs/files/pwd/Handbook_5975-1.pdf

(2) Engage in the interactive process by working collaboratively with their supervisors or DMO, HRMO representatives, VA's Section 508 Accessibility Testing and Training Center, and CAP, to identify accommodations that will enable them to perform the essential functions of their job, participate in VA activities, and/or enjoy the benefits and privileges of VA employment.

INTERACTIVE PROCESS.

a. When the individual makes an oral or written request for reasonable accommodation, managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request. The interactive process is the communication between the DMO and the employee, in consultation with the LRAC, to determine how best to respond to the employee's request. During this process, an individualized assessment will be conducted to review essential and marginal job functions, the employee's limitations, and possible accommodations. The interactive process may require more than one discussion. The DMO or LRAC will also explain the reasonable accommodation process to the employee at this time.

b. Ongoing communication and cooperation are important, especially when a specific limitation, problem, or barrier is unclear or when the disability or an effective accommodation is not obvious. Thus, interactive discussions should be documented, with at least the date, time, participants, and key points noted. Failing to engage in the interactive process is a violation of the Rehabilitation Act of 1973, as amended, and may create liability for VA

INTERACTIVE PROCESS.

a. When the individual makes an oral or written request for reasonable accommodation,

managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request. The interactive process is the communication between the DMO and the employee, in consultation with the LRAC, to determine how best to respond to the employee's request. During this process, an individualized assessment will be conducted to review essential and marginal job functions, the employee's limitations, and possible accommodations. The interactive process may require more than one discussion. The DMO or LRAC will also explain the reasonable accommodation process to the employee at this time.

b. Ongoing communication and cooperation are important, especially when a specific\ limitation, problem, or barrier is unclear or when the disability or an effective accommodation is not obvious. Thus, interactive discussions should be documented, with at least the date, time. participants, and key points noted.

c. In the case of an applicant for employment, the local HRMO ( or his or her designee) will engage in the interactive process with the applicant.

d. Once a job offer has been made, if an accommodation is requested, the interactive process with the new employee with a known disability (post offer but pre-on boarding) should be conducted by the supervisor and the LRAC, in consultation with the GC, RC or NRAC , if necessary, to discuss and identify possible accommodations , and ensure that the requested accommodation is in place when the new employee starts.

e. Failing to engage in the interactive process is a violation of the Rehabilitation Act of 1973, as amended, and may create liability for VA.

10. INTERIM WORKPLACE ADJUSTMENTS.

Where feasible, interim workplace adjustments or accommodations will be provided for an employee with an obvious or documented disability until a final decision has been made on the request for accommodation (and, if approved, implemented). The interim workplace adjustment should enable the individual to perform the essential functions of the job or enjoy the benefits and privileges of employment without posing a direct threat to anyone's health and safety. Interim workplace adjustments are not required or guaranteed, but are highly recommended when they can be offered without adverse impact on the operation of the unit. The office or facility should strive to provide an interim accommodation if there will be a delay in acquiring the approved accommodation. This is sometimes the case when the accommodation is ordered from the Department of Defense's CAP. VA Form 0857c, Approval of Interim Accommodation, can be used to document t the agreement to make a workplace adjustment until the requested accommodation can be arrange

(2) In the event of medical emergency,

first aid and safety personnel may be informed if an employee's disability might require emergency treatment

Direct Threat. The individual poses a "direct threat" to the health and safety of himself or herself or others. To meet this factor, there must be a high probability of substantial harm that cannot be eliminated or reduced by providing an accommodation. In those instances, the DMO must consider the limitations of the individual, specifically, the risk posed by the impairment or functional limitation, the duration of the risk, the nature and severity of the potential harm, the likelihood that the harm will actually occur, and imminence of the potential harm. Per EEOC guidance. direct threat determinations, as with all decisions related to reasonable accommodation, are made on a case by case basis; the decision may not be based on generalizations or assumptions. A health care professional, facility safety officer, or RC may be consulted for assistance.

(1) Undue Hardship

A determination of undue hardship means that VA finds that a specific accommodation would be significantly difficult to provide, or would fundamentally alter the nature of the operations of the affected VA organization, as defined earlier. Before reaching this determination, the DMO, in consultation with the LRAC, must explore whether other effective accommodations are available and can be provided. (Note: In determining whether an accommodation poses an undue hardship, the financial resources of the organization or the Department as a whole should be considered, not just the resources of the individual facility or staff office. Thus, only the Secretary, VA, can deny a request based on cost, and facilities can invoke undue hardship only for impact on operations.)

-----Original Appointment-----

**From:** Clisby, Bruce, VBASPT
**Sent:** Thursday, September 25, 2014 1:01 PM
**To:** Clisby, Bruce, VBASPT; Flaquer-Bertran, Rafael, VBASPT; Santiago, Brigido, VBASPT; Dhanpat-Singh, Nerissa, VBASPT; Ecord, Dennis, VBASPT; Williams, David, VBASPT; Cupp, Randie, VBASPT; Chatman, Wayne, VBASPT; Smith, Larry, VBASPT; Jamison, Clarence, VBASPT; Swain, Robert, VBASPT; Boswell, Terinia, VBASPT; Mickley, Jessica, VBASPT; Patrick, Emily, VBASPT; Ansboury, Jacqueline, VBASPT; Allard, Carolyn, VBASPT; Biggs, Jay, VBASPT; Miller, David, VBASPT; Hagger, Michael, VBASPT; Wiest, David, VBASPT; Estrada, Marilyn, VBASPT; Covert, Karl, VBASPT; Williams, Christina, VBASPT; Smith, Lawrence, VBASPT; Fournier-Rivas, Annette, VBASPT; Laroche, Edward, VBASPT; Davis, David, VBASPT; Antoinette, Victoria, VBASPT; Vainwright, Jeffrey, VBASPT; Brown, Tyechia, VBASPT; Vieira, Daniel, VBASPT; Shavers, Shirley, VBASPT; Tello, Camille, VBASPT; Howard, Rebecca, VBASPT; Olson, Tammy, VBASPT; Gier, Alicia, VBASPT; Dodson, Andre, VBASPT; Teigman, Debra, VBASPT; Page, James, VBASPT; PEREIRA, MARSHA, VBASPT; Downs, Jillian, VBASPT; Herrera, Juan, VBASPT; Anderson, Ronald, VBASPT; Brown, Sandra, VBASPT; Moyer, Eric, VBASPT; Beltz, Christopher, VBASPT; Foster, Melvin, VBASPT; Rhyne, James, VBASPT; Alonzo, Flavio, VBASPT; Cook, Christopher, VBASPT; Murtaugh, Sally, VBASPT; Pavlica, Melody, VBASPT; Glandon, Danielle, VBASPT; Norris, Carrie, VBASPT; MASTIN, CHRISTOPHER, VBASPT; Dukes, Darlene, VBASPT; Oxendine, Wardrecka, VBASPT; Sindler, Mike, VBASPT; Kremer, Robyn, VBASPT; Kraftchak, Jeffrey, VBASPT; Brash, Francine, VBASPT; Blossom, Linda, VBASPT; Gasiewicz, Joseph, VBASPT; Jordan, Gregg, VBASPT; Vigo, Richard, VBASPT; Leffler, Catalina, VBASPT; Ward, Jennifer, VBASPT; Fetherman, Kendra, VBASPT; Eaton, Deborah, VBASPT; Zolciak, Valoree, VBASPT; Coston, Tommy, VBASPT; Neser, Kenneth, VBASPT; Cardarella, Karen, VBASPT; Nicholson, Adela, VBASPT; Lang, Paul, VBASPT; Jones-Pereira, Sarah, VBASPT; Signorelli, Michael, VBASPT; Woods, Andrew, VBASPT; Rivera, Jose, VBASPT; Rodriguez, Jorge, VBASPT; Gammons, Benton, VBASPT; Vukovich, Dean, VBASPT; Wiggins, Larry, VBASPT; Davis, Moziela, VBASPT; Bogue, Vivian, VBASPT; Primero, Rosalina, VBASPT; Garrigus, Jason, VBASPT; Harrell, Machelle, VBASPT; Teague, James, VBASPT; Thornton, Clifton, VBASPT; Trent, Michelle, VBASPT; Battle, Harry, VBASPT; Lane, Keshia, VBASPT; Weise, Alison, VBASPT; Brown, Luisette, VBASPT; Homay, Robert, VBASPT; Macias, Luciano, VBASPT; Shaw, Kevin, VBASPT; Andujar, Benny, VBASPT; Timmer, Jason, VBASPT; Spradley, Kenneth, VBASPT; Martin, Crosdale, VBASPT; Deberry, Lael, VBASPT; Davis, William, VBASPT; Rivera, Eric, VBASPT; Norton, John, VBASPT; Powers, Dianna, VBASPT; Long, Johana, VBASPT; Dudley, Jerry, VBASPT; Cooper, Kimberly, VBASPT; Tarter, Thomas, VBASPT; Jackson, Stephen, VBASPT; NORTON, RODNEY, VBASPT; Kimm, Michael, VBASPT; Bennett, Eric, VBASPT; Nicholson, Dennis, VBASPT; Evans, Tarres, VBASPT; Miller, Heather, VBASPT; Nyhart, Judy, VBASPT; Rousseau, Michael, VBASPT; Miller, Tracy, VBASPT; Longo II, Anthony, VBASPT; Mirk, Eric, VBASPT; Grimes, Paj, VBASPT; Hall, Yvonne, VBASPT; Fitzgerald, Dana, VBASPT; Davis, Edward, VBASPT; Ferguson, Angela, VBASPT; Hunt, Julie, VBASPT; Kirsch, William, VBASPT; Allen, Latonia, VBASPT; Pinder, Eric, VBASPT; King, Victor, VBASPT; Street, Kelly, VBASPT; Howard, Michael, VBASPT; Simms, Charles, VBASPT; Haught, Easton, VBASPT; Helmy, John, VBASPT; Collins, Jonathan, VBASPT; Krum, John, VBASPT; Teitelbaum, Heather, VBASPT; Thompson, Benjamin, VBASPT; Gulley, Anna, VBASPT; Smith, Edward, VBASPT; McDonal, Darryl, VBASPT; Haczynski, Selina, VBASPT; Lynn, Martha, VBASPT; Hargreaves, Tyler, VBASPT; Defee, Janet, VBASPT; Dankowski, Anna, VBASPT; Campbell, Lindsey, VBASPT; Mullin, Aileen, VBASPT; Rodriguez, Juan, VBASPT; Alexander, LaTonya, VBASPT; Doyel, Paula, VBASPT; Blume, Lisa, VBASPT; Badger, Christia, VBASPT; Phillips, Jack, VBASPT; Eads, Davina, VBASPT; Powers, Keith, VBASPT
**Subject:** Invitation: SECVA Employee Meeting
**When:** Wednesday, October 01, 2014 8:30 AM-10:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Room 215

You have been randomly selected to attend the employee meeting hosted by the Secretary of Veterans Affairs, Robert A. McDonald, on Wednesday, October 1st. At the meeting he will conduct a meeting with employees to present current information and answer questions from employees. Due to space limitations we randomly selected employees from each division of the Regional Office to attend this meeting. Please join us in welcoming him and showing we are truly "One Team. One Mission. An Advocate for Veterans."

**Please confirm your attendance by accepting or declining this meeting request as soon as possible.**

**If a reply is not received by 10:00 am, Tuesday, September 30th, your invitation will be forfeited to another random employee.**

- The meeting will begin *promptly* at 9:00 am, October 1st, in Room 215.

- The meeting will last 1 hour, at which point the Secretary is scheduled to depart the Regional Office.

- Please plan on being seated no later than 8:45 am.

# RVSR IWT Session

## TMS Curricula ID: VBA-xxx, Challenge 2013-4

## Class Schedule – Week #1 (Externals Only)

| | Monday<br>June 3 | Tuesday<br>June 4 | Wednesday<br>June 5 | Thursday<br>June 6 | Friday<br>June 7 | |
|---|---|---|---|---|---|---|
| 9:00 | Welcome<br>VA Terminology | VA 21-526 | PIES and Records Management | VSR DTA | External Post-test | 9:00 |
| 9:30 | | | | | | 9:30 |
| 10:00 | | Original Compensation Claims | | | Post-test Review | 10:00 |
| 10:30 | | | | | | 10:30 |
| 11:00 | Records Management | | Special Issues Claims | | | 11:00 |
| 11:30 | | Non-Original Compensation Claims | | | | 11:30 |
| 12:00 | | | | | | 12:00 |
| 12:30 | | | | | | 12:30 |
| 1:00 | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | 1:00 |
| 1:30 | | | | | | 1:30 |
| 2:00 | VSRO TPSS: Getting Started | VSRO TPSS: M2: Establishing Veteran Status | Unavailable Service Records | VSRO TPSS: M5: Stages of a Claim | Make Up Classes | 2:00 |
| 2:30 | | | | | | 2:30 |
| 3:00 | M1: Attitudes and Values | M3: Mail Handling | VSRO TPSS: M4: Establishing a Claim | M6: Time Management | | 3:00 |
| 3:30 | | | | | | 3:30 |
| 4:00 | | | | | | 4:00 |
| 4:30 | | | | | | 4:30 |
| 5:00 | | | | | | 5:00 |
| 5:30 | | | | | | 5:30 |

**Notes:**

- Allow for 15-minute breaks in the morning and afternoon.
- This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.
- Times are based on Eastern Time Zone.

EXHIBIT
PENGAD 800-631-6989
36

# RVSR IWT Session
## TMS Curricula ID: VBA-xxx, Challenge 2013-4
## Class Schedule – Week #2

| | Monday<br>June 10 | Tuesday<br>June 11 | Wednesday<br>June 12 | Thursday<br>June 13 | Friday<br>June 14 |
|---|---|---|---|---|---|
| 9:00 | Introductions and Welcome | DBQ | Effective Dates | Rating Analysis | Deferred Ratings |
| 9:30 | | | | | |
| 10:00 | RVSR References | | | | |
| 10:30 | | | | | |
| 11:00 | | Medical Opinions | | | |
| 11:30 | | | | | Evaluating Disabilities |
| 12:00 | | | SMC | Service Records | |
| 12:30 | | | | | |
| 1:00 | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* |
| 1:30 | | | | | |
| 2:00 | General Policy | Medical TPSS | Ancillary Benefits | Rating Schedule 4.1 to 4.31 | |
| 2:30 | | | | | |
| 3:00 | | | | | Test 1 |
| 3:30 | | Effective Date TPSS | | | |
| 4:00 | | Duty to Assist TPSS | Claims Recognition TPSS | Exam Review TPSS | |
| 4:30 | | | | | |
| 5:00 | | | Rating Schedule TPSS | | Test 1 Review |
| 5:30 | | | | | |

**Notes:**

- Allow for 15-minute breaks in the morning and afternoon.
- This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.
- Times are based on Eastern Time Zone.

# RVSR IWT Session

## TMS Curricula ID: VBA-xxx, Challenge 2013-4

## Class Schedule – Week #3

| | Monday June 17 | Tuesday June 18 | Wednesday June 19 | Thursday June 20 | Friday June 21 | |
|---|---|---|---|---|---|---|
| 9:00 | Test 2 | Infectious Disease MTPSS | Endocrine MTPSS | GYN MTPSS | Skin MTPSS | 9:00 |
| 9:30 | | | | | | 9:30 |
| 10:00 | Test 2 Review | | | | | 10:00 |
| 10:30 | | | | | | 10:30 |
| 11:00 | VBMS-R | | | | | 11:00 |
| 11:30 | | | | | | 11:30 |
| 12:00 | | | | | | 12:00 |
| 12:30 | | | | | | 12:30 |
| 1:00 | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | 1:00 |
| 1:30 | | | | | | 1:30 |
| 2:00 | VBMS-R *(continued)* | Infectious Rating Schedule | Endocrine Rating Schedule | GYN Rating Schedule | Skin Rating Schedule | 2:00 |
| 2:30 | | | | | | 2:30 |
| 3:00 | | Infectious E-Cases | Endocrine E-Cases | GYN E-Cases | Skin E-Cases | 3:00 |
| 3:30 | | | | | | 3:30 |
| 4:00 | | | | | | 4:00 |
| 4:30 | | | | | | 4:30 |
| 5:00 | | | | | | 5:00 |
| 5:30 | | | | | | 5:30 |

**Notes:**

- Allow for 15-minute breaks in the morning and afternoon.
- This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.
- Times are based on Eastern Time Zone.

# RVSR IWT Session
## TMS Curricula ID: VBA-xxx, Challenge 2013-4
## Class Schedule – Week #4

| | Monday<br>June 24 | Tuesday<br>June 25 | Wednesday<br>June 26 | Thursday<br>June 27 | Friday<br>June 28 |
|---|---|---|---|---|---|
| 9:00 | **Cardiovascular MTPSS** | **Cardiovascular E-Cases** | Musculoskeletal MTPSS *(continued)* | **Musculoskeletal Rating Schedule (Knees & Muscles)** | **Neurological MTPSS** |
| 9:30 | | | | | |
| 10:00 | | | | | |
| 10:30 | | | | | |
| 11:00 | | **Arteries & Veins Rating Schedule** | | **Musculoskeletal E-Cases** | |
| 11:30 | | | | | |
| 12:00 | | **Cardiovascular E-Cases** | | | |
| 12:30 | | | | | |
| 1:00 | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** |
| 1:30 | | | | | |
| 2:00 | **Cardiac Rating Schedule (Heart)** | **Musculoskeletal MTPSS** | **Musculoskeletal Rating Schedule (Arthritis & Back)** | Musculoskeletal E-Cases *(continued)* | **Neurological Rating Schedule** |
| 2:30 | | | | | |
| 3:00 | | | | | |
| 3:30 | | | | | |
| 4:00 | **Cardiovascular E-Cases** | | | | **Neurological E-Cases** |
| 4:30 | | | **Musculoskeletal E-Cases** | | |
| 5:00 | | | | | |
| 5:30 | | | | | |

**Notes**:

- **Allow for 15-minute breaks in the morning and afternoon.**
- **This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.**
- **Times are based on Eastern Time Zone.**

# RVSR IWT Session

## TMS Curricula ID: VBA-xxx, Challenge 2013-4

## Class Schedule – Week #5

| | Monday<br>July 8 | Tuesday<br>July 9 | Wednesday<br>July 10 | Thursday<br>July 11 | Friday<br>July 12 | |
|---|---|---|---|---|---|---|
| 9:00 | Neurological E-Cases | Mental Rating Schedule | | Digestive Rating Schedule | Auditory Rating Schedule | 9:00 |
| 9:30 | | | | | | 9:30 |
| 10:00 | | | | | | 10:00 |
| 10:30 | TBI Rating Schedule | | Dental Rating Schedule | Digestive E-Cases | | 10:30 |
| 11:00 | | | | | Auditory E-Cases | 11:00 |
| 11:30 | | | | | | 11:30 |
| 12:00 | | Mental E-Cases | Dental E-Cases | | | 12:00 |
| 12:30 | TBI Calculator | | | | | 12:30 |
| 1:00 | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | 1:00 |
| 1:30 | | | | | | 1:30 |
| 2:00 | Mental MTPSS | | Digestive MTPSS | | | 2:00 |
| 2:30 | | | | Auditory MTPSS | | 2:30 |
| 3:00 | | | | | | 3:00 |
| 3:30 | | | | | Hemic MTPSS | 3:30 |
| 4:00 | | | | | | 4:00 |
| 4:30 | | Dental MTPSS | | | | 4:30 |
| 5:00 | | | | | | 5:00 |
| 5:30 | | | | | | 5:30 |

**Notes:**

- Allow for 15-minute breaks in the morning and afternoon.
- This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.
- Times are based on Eastern Time Zone.

# RVSR IWT Session
## TMS Curricula ID: VBA-xxx, Challenge 2013-4
## Class Schedule – Week #6

| | Monday July 15 | Tuesday July 16 | Wednesday July 17 | Thursday July 18 | Friday July 19 | |
|---|---|---|---|---|---|---|
| 9:00 | Hemic MTPSS *(continued)* | **Vision MTPSS** | Vision E-Cases *(continued)* | Respiratory E-Cases *(continued)* | Genitourinary E-Cases *(continued)* | 9:00 |
| 9:30 | | | | | | 9:30 |
| 10:00 | | | **Respiratory MTPSS** | **Genitourinary MTPSS** | **Individual Unemployability** | 10:00 |
| 10:30 | | | | | | 10:30 |
| 11:00 | | | | | | 11:00 |
| 11:30 | | | | | | 11:30 |
| 12:00 | | | | | | 12:00 |
| 12:30 | | | | | | 12:30 |
| 1:00 | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** | ***LUNCH*** | 1:00 |
| 1:30 | | | | | | 1:30 |
| 2:00 | **Hemic Rating Schedule** | **Vision Rating Schedule** | | | | 2:00 |
| 2:30 | | | | | | 2:30 |
| 3:00 | **Hemic E-Cases** | | **Respiratory Rating Schedule** | **Genitourinary Rating Schedule** | **Introduction to Appeals** | 3:00 |
| 3:30 | | | | | | 3:30 |
| 4:00 | | | | | | 4:00 |
| 4:30 | | **Vision E-Cases** | **Respiratory E-Cases** | **Genitourinary E-Cases** | **Appeals E-Cases** | 4:30 |
| 5:00 | | | | | | 5:00 |
| 5:30 | | | | | | 5:30 |

**Notes**:
- **Allow for 15-minute breaks in the morning and afternoon.**
- **This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.**
- **Times are based on Eastern Time Zone.**

# RVSR IWT Session

## TMS Curricula ID: VBA-xxx, Challenge 2013-4

## Class Schedule – Week #7

| | Monday July 22 | Tuesday July 23 | Wednesday July 24 | Thursday July 25 | Friday July 26 | |
|---|---|---|---|---|---|---|
| 9:00 | Diabetic Complications | Rating Reductions | Test 2 | Test 2 Review | No Classes | 9:00 |
| 9:30 | | | | | | 9:30 |
| 10:00 | | | | | | 10:00 |
| 10:30 | | | | | | 10:30 |
| 11:00 | | 4.28 to 4.30 Ratings | Practicum | [redacted] | | 11:00 |
| 11:30 | | | | | | 11:30 |
| 12:00 | Practical Exercises | | | | | 12:00 |
| 12:30 | | | | | | 12:30 |
| 1:00 | *LUNCH* | *LUNCH* | *LUNCH* | *LUNCH* | | 1:00 |
| 1:30 | | | | | | 1:30 |
| 2:00 | | Review of IWT | Practicum *(continued)* | [redacted] | | 2:00 |
| 2:30 | | | | | | 2:30 |
| 3:00 | New and Material Claims | | | | | 3:00 |
| 3:30 | | | | | | 3:30 |
| 4:00 | | | | | | 4:00 |
| 4:30 | | | | | | 4:30 |
| 5:00 | | | | IWT Wrap Up | | 5:00 |
| 5:30 | | | | | | 5:30 |

**Notes**:

- Allow for 15-minute breaks in the morning and afternoon.
- This schedule is meant to be a guide. Be flexible with class times to ensure that learning objectives are met.
- Times are based on Eastern Time Zone.

# Notice of Occupational Disease and Claim for Compensation

**U. S. Department of Labor**
Office of Workers' Compensation Programs

**nployee: Please complete all boxes 1 - 18 below. Do not complete shaded areas.**
**.mploying Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.**

**Employee Data**

1. Name of Employee (Last, First, Middle)
**Mullin** **Aileen**

2. Social Security Number

3. Date of birth Mo. Day Yr.

4. Sex
F

5. Home telephone

6. Grade as of date of last exposure
Level **11** Step **2**

7. Employee's home mailing address (include street address, city, state, and ZIP code)
City State ZIP Code
05

8. Dependents
- [ ] Wife, Husband
- [ ] Children under 18 years
- [ ] Other

**Claim Information**

9. Employee's occupation
**VETERANS SERVICE REPRESENTATIVE (RATING)**

a. Occupation code

10. Location where you worked when disease or illness occurred (include street address, city, state, and ZIP code)
**9500 BAY PINES BLVD**
City
**SAINT PETERSBURG**
State **LA** ZIP Code **33708**

11. Date you first became aware of disease or illness
Mo. Day Yr.
**05/01/2009**

12. Date you first realized the disease or illness was caused or aggravated by your employment
Mo. Day Yr.
**06/01/2010**

13. Explain the relationship to your employment, and why you came to this realization

**see attached**

14. Nature of disease or illness See attached
**Symptoms triggered at work include, but are not limited to: Breathing problems ranging from chest tightness, wheezing, to asthmatic attacks.**

OWCP Use - NOI Code
b. Type code
c. Source code

15. If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.

**see attached**

16. If the statement requested in item I of the attached instructions is not submitted with this form, explain reason for delay.

EXHIBIT
37

17. If the medical reports requested in item 2 of attached instructions are not submitted with this form, explain reason for dela

**Employee Signature**

18. I certify, under penalty of law, that the disease or illness described above was the result of my employment with the United States Government, and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and other benefits provided by the Federal Employees' Compensation Act.

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government, agency) to furnish any desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative). This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

gnature of employee or person acting on his/her behalf [signature] Date 3/2/2012

Have your supervisor complete the receipt attached to this form and return it to you for your records.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

Mullin, Aileen

CA-2 attachment

Pg 1 of 2

1) I was hired with a 2-year probationary period.

2) By the time my condition was identified as irrefutably related to the workplace, I already had disconcerting experiences with Human Resources and witnessed first hand what they are capable of when dealing with employees with health issues.

3) I had sought medical, legal and EEO guidance and was received unanimous confirmation that a) it was within my legal rights to move forward but b) I would need to prepare myself for possible/probable grievous consequences.

I still fear for my career, but now I don't seem to have a choice but to file a claim. In September 2011, after two months of being completely symptom free while at external training in Baltimore, Md., I returned to the workplace and became even more severely ill: Unable to breathe freely – even with medication. Again, symptoms that where only triggered in the building.

I notified my immediate supervisor that I was having difficulty breathing.

I requested, and worked, alternate compressed work schedules. I attempted an arrangement where I had Mondays off to allow for three days of healing between work weeks. I also worked another schedule to minimize the consecutive days I'm in the building by having Wednesdays off.

In October I periodically started leaving the building to get fresh air. I informed my supervisor.

October 26, 2011 was the first time the VA police had to assist me out of the building.

I requested, and worked, alternate compressed work schedules. I attempted an arrangement where I had Mondays off to allow for three days of healing between work weeks. I also worked another schedule to minimize the consecutive days I was in the building by having Wednesdays off. The requests for schedule changes were handled by immediate supervisor. The reasons for the request were presented each time.

My doctor increased my medications.

As the situation worsened, my supervisor recommended I consider wearing a mask, pointing out that another woman in the area does. He also suggested I consider using a portable oxygen tank.

An Acting Coach reported my concerns and then problems with the HVAC were identified addressed.

My workstation was moved within the same area.

After a particularly severe asthma attack, I requested a move to another part of the building. My supervisor turned the matter over to Human Resources.

I met with Human Resources on January 10, 2012 and it was agreed that I would be reassigned to another part of the building to see if this would help. We discussed, at length and in great detail, the similar symptoms that many employees were also suffering from.

The reassignment did not occur quickly enough. On January 12, 2012, I had an asthma attack so severe that I couldn't get it under control using an emergency inhaler followed by administering two additional medications via my portable nebulizer. I had to taken to the emergency room, by ambulance, for treatment.

I am currently working in yet another location, within the building, but problems continue. Often I'm forced to leave work before the end of my scheduled tour because of difficulty breathing. Usually I can get out of the building on my own. But March 7th, was the forth time I needed police assistance due to the severity of an asthma attack.

I arrive at work healthy. I leave sick.

VA 011687

Mullin, Aileen
CA-2 / CA-2 Attachment
pg 2 of 2

**11. Date you first became aware of disease or illness:** May 2009

**12. Date you first realized the disease or illness was caused or aggravated by your employment:** June 2010.

**13. Explain the relationship to your employment, and why you came to this realization:**

My symptoms start and increase in number and severity relative to time spent in the building. The more time I spend in the building the sicker I become. The symptoms ease after I leave the building. The longer I am away from the building, the healthier I become.

I was hired in February 2009 in good health. May 2009 I was moved from the training unit to 'the floor" and within weeks I was feeling sick. In the months that followed, the symptoms increased in number, complexity and intensity.

I sought medical attention. *Within months of my employment, I was seen in the emergency room, by ENTs and allergists, a rheumotologist, a neurologist, etc. I was subjected to testing that included allergy testing, CT Scans, extensive blood workup, and pulmonary function testing.*

In an attempt to identity/eliminate possible causes, A) I moved out of my house for several weeks. No change. B) I considered the Veterans' archival files as a possible cause, however, they were ruled out when I was assigned to the Public Contact Unit (in the same building) where we didn't work with archival claims files and I was very sick. When I worked with Veterans' claims files during external training in Baltimore, I was completely symptom free. C) I worked alternate work schedules and cycles of symptoms were unchanged.

As a new hire, I avoided taking time off from work. Therefore, it was months before I had consecutive days away from the building. When offered the opportunity for time away from the building, my good health returned!

I recover when I'm away from the building on weekends, holidays, sick leave, etc. When I return to the building, I relapse. The longer I am away from the building, the healthier I become.

With extended periods away from the building I become symptom fee.

*(Note:It is the norm for employees to be assigned and re-assigned to different teams and areas within the building frequently. Since February 2009 I've been assigned to no less than 8 locations within the building and had extended stays in Baltimore for training purposes.)*

**14. Nature of Disease or Illness:**

Symptoms triggered at work include, but are not limited to: Breathing problems ranging from chest tightness, wheezing, to asthmatic attacks. Dysphonia, hoarseness, throat pain, difficulty swallowing, coughing. Hypersensitivity reactions. Ear pain, nose bleeds.

***If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.***

I reported that I was sick, in relation to the building, to Human Resources, Support Services Division, the Service Center and an EEO Representative.

June of 2010 was the first time a formally addressed my concerns with my administrator (Assistant Service Center Manager). I requested the opportunity to discuss options such as alternate work settings or schedules. The discussion never took place. Instead I was sent an e-mail, from a lower level administrator who I had never spoken to about the issue, and told to complete a CA-2 and submit to Human Resources.

I did not file a claim with Human Resources out of fear for my career with the federal government. My fear was based on a combination of factors that included:

WC 419

# EXHIBIT 2

Advanced ENT's of TAMPA BAY

Trina E. Espinola M.D., F.A.C.S
Elisa M. Lynskey, M.D.
Deborah A. Novack, ARNP
Jennifer L. Wallace, P.A.
625 Sixth Avenue South, Suite 385
St Petersburg, FL 33701
Phone (727) 553-7100 Fax (727) 553-7198

## Absence from School/Work

Please excuse Aileen Mullins from school/ work.
patient has intermitted hoarsness with reflux disease
They had an appointment on 1·4·10 and should be able to return on 1·5·10

They should observe the following restrictions: patient should be on voice restrictions, for atleast six weeks, unless talking among co workers.

Thank you for your cooperation in this matter and please feel free to contact the office with any questions.

# EXHIBIT 3

**Department of Veterans Affairs**

# Memorandum

1st Denial of Accommodations

No one in HR discussed this w/ me or my doctor —

It was unsolicited

**Date:** January 26, 2010

**From:** Human Resources Manager (25)

**Subj:** Reasonable Accommodation

**To:** Aileen Mullin
Veterans Service Representative
St. Petersburg Regional Office

1. On January 6, 2010, you provided documentation indicating that you have a temporary medical condition that impairs your ability to speak, and that the condition is expected to resolve itself within six weeks. Since this is temporary in nature, you are not entitled to an accommodation under the ADA Amendments Act (ADAAA) of 2008, at this time.

2. In recognition of your current medical limitations, the Veterans Service Center (VSC) will reschedule your rotation in the phone unit to a later date. In the interim, you will be reassigned to the Pre-Decision team 1 effective February 1, 2010. In addition, you will be credited for 31 days, which is the number of days you served in the current phone rotation.

3. If you require additional information, please contact Virginia López, Human Resources Specialist, at 727-319-5919.

HR COPY

BONNIE WAX

Received By: [signature] Date: 12/27/09

Please note that when I submitted medical documentation it was not my intention to request accommodations, but for informational purposes. Thank you for your support and consideration. Sincerely,

# EXHIBIT 4

# Training and asthma

From: Aileen Mullin (aileen_mullin@yahoo.com)

To: michael.palmer2@va.gov

Cc: james.cartner@va.gov

Date: Sunday, January 8, 2012, 09:58 PM EST

Good morning Mike,

In light of the severity of Friday's asthmatic reaction, I don't believe it would be wise to change my compressed day from Wednesday. (Please know that these respiratory attacks/symptoms aren't triggered when I'm outside of work.)

I changed my schedule in December so I would only be in the building/room for two consecutive days, due to the air quality. Simultaneous to the change in my schedule, building maintenance/plant engineers stepped in and dealt with HVAC system issues. Immediately upon changes to the HVAC system, I noted improvements to my respiratory symptoms and a marked increase in my production.

There's been significant HVAC issues in RBT222 since we returned from Baltimore in September. Thankfully plant engineering took steps, but there are still a number of people in the room having ongoing respiratory related conditions: Chronic coughs, sinus infections, colds, etc. and those of us with asthma may be the most immediatly affected.

As for our upcoming trainings, I understand that new RVSR trainings are proposed to be held on Tuesdays , Wednesdays and Thursdays to accommodate the schedules of others. However, I am unable to work four days in a row in the current environment. I am open to other options as I need be part of this crucial training.

Suggestions for training:

* record sessions so that they are available for anyone who happens to be absent on Wednesday due to annual or sick leave

*conduct trainings on Tuesdays and Thursdays when all are scheduled to be in the classroom

Suggestions for alternative work settings :

* relocate workstation outside the second floor east quadrant

* consider work from home option

Thank you for your consideration.

Aileen

# EXHIBIT 5

**From:** Mullin, Aileen, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm
**To:** Clarke, Tamanique, VBASPT
**Sent:** January 12, 2012 6:39 AM (UTC-06:00)

Good morning Tammi,

Just wanted to let you know that the PCData Move is available on my computer,and I'm just waiting further instruction as to when and where I should move to.

Thank you again,

Aileen

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 10, 2012 12:28 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Palmer, Michael, VBASPT; Cartner, James, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

I don't think so. You should contact your union rep and let them know what you need. If he/she is unfamiliar with the form, they should contact Keith Pryor or Valorie Reilly.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 10, 2012 12:26 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Palmer, Michael, VBASPT; Cartner, James, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

Sounds good. Is the form available electronically?

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 10, 2012 12:23 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

I was informed that you want to bring a Union rep. That is fine. Before I can discuss your situation with your union rep present I will need a designation form that includes discussing your personal medical information with rep present.

*Tammi Clarke*

*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 10, 2012 12:19 PM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

Hi Tammy,

I'll see you at 1:30.

Thank you,
Aileen

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 10, 2012 12:00 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** Please come to HR @ 1:30pm
**Importance:** High

Hello Ms. Mullin,

It has been brought to my attention that you may in need of a temporary workplace adjustment and possible other accommodations due to a medical condition. Let's meet at 1:30pm to discuss your situation and what accommodations you need. Please let me know if this time does not work for you.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 6

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
Southeastern Operations
140 Fountain Parkway, sixth Floor, Suite 620
St. Petersburg, FL 33716

In Reply Refer To: ORM/08J

Written Affidavit

In the Matter of the EEO Complaint of Discrimination of
Complainant – Aileen Mullin
200I-0317-2012103413

Aileen Mullin )
)
Complainant )
)
V. ) Case No: 200I-0317-2012103413

Secretary
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420
Respondent

Facility: VA Regional Office
St. Petersburg, FL

Initials: B3 1

**The claim accepted for investigation is:**

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tami Clark (TC) and union official Carol Allard (CA)**

**On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.**

I, **Tamanique Clarke** solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

1. Spell your name for the record.

T-A-M-A-N-I-Q-U-E C-L-A-R-K-E

2. What is your position title?

Human Resources Specialist

3. How long have you been in this position?

3 years

4. What is your organizational unit?

Veterans Benefits Administration, St. Petersburg Regional Office, Human Resources Division.

5. Who is your first and second level, supervisors?

Initials: TC

Bonnie Wax, Human Resources Manager – first level
Suzanne Nunziata, Assistant Director – second level

6. The complaint, are based on disability and reprisal. Do you have a disability (yes or no will appropriate).

No.

7. Do you have knowledge of the complainant's disabilities? If yes, when and how did you become aware of the complainant's disabilities?

Yes, the complainant disclosed her asthma illness to me in January 2012. She disclosed cancer around April or May 2012. I learned of the chronic sinusitis when the Department of Labor approved her claim for compensation in August 2012. I handled Worker's Compensation claims at the time.

8. The complainant asserts her disabilities are cancer, Asthma, chronic sinus infection, vocal cord dysfunction, Insomnia, Irritable Bowel Syndrome, and Iritis. Are you aware the complainant has these disabilities? If yes, when and how did you become aware?

I am aware of cancer, asthma, chronic sinusitis. I am not aware of vocal cord dysfunction, insomnia, irritable bowel syndrome, and iritis. The complainant disclosed her asthma illness to me in January 2012. She disclosed cancer around April or May 2012. I learned of the chronic sinusitis when the Department of Labor approved her claim for compensation in August 2012. I handled Worker's Compensation claims at the time.

9. Please, describe the complainant's duties and responsibilities?

As stated in her position description, Ms. Mullin is responsible for:

Initials: ___ 3

1. The RVSR analyzes claims to determine:

A. if diseases and injuries were incurred in or aggravated by the military service in the line of duty for purposes of compensation, hospital and outpatient treatment, prosthetic appliances, vocational training, and related employment and compensation benefits such as eligibility for a monthly allowance for children with spina bifida. As needed, the RVSR instructs the VSR to initiate action to obtain all required evidence to support the claim. In some instances, the incumbent monitors the claim to eliminate unnecessary delays in receiving needed evidence.

B. A need for examination, reexamination, and hospitalization for observation of veterans and their dependents and the character of such examination and reexamination.

C. Competency of veterans, their dependents, and beneficiaries, and the permanent incapacity of children, husband or widow for self-support as well as testamentary capacity for insurance purposes.

2. The RVSR determines service-connection, percentage of disability, permanent and total disability, and entitlement to compensation, pension,and vocational training, medical and dental treatment, automobiles or other conveyances, insurance, specially adapted housing, dependent education allowances, and other ancillary benefits.

3. The RVSR assures proper application of the Rating Schedule and other applicable instructions, and he or she is fully accountable for proper analysis, appropriate development, and final rating determinations.

4. While not routinely required, the RVSR may directly communicate and interact with the veteran to facilitate timely, proper decisions. As dictated by the

circumstances of each case, the RVSR may conduct interviews in person or by telephone with veterans, eligible individuals, representatives, and advocates to obtain or clarify information.

5. If a veteran expresses an indication of dissatisfaction with a determination, the RVSR will provide consultative advice and assistance as requested by the assigned VSR or the DRO to facilitate efforts to provide a full and comprehensive explanation of the decision in question and gain acceptance of the determination or elicit information that could lead to a revised decision.

6. The Rating VSR communicates with VSRs and other employees in the Regional Office, employees of VA Medical Centers, and other Regional Offices. As required, the RVSR communicates with veterans and representatives/advocates, Central Office, and other federal/state/local agencies, in support of efforts to assist veterans.

7. The RVSR actively participates in meetings and is expected to lend his/her expertise in developing Veterans Service Representatives' skills as they relate to evidence gathering for rating decisions.

8. Acts as advocate for veterans and their beneficiaries in their dealings with other VA elements and organizations that affect their claims.

9. Performs other related duties as assigned.

The RVSR analyzes and makes determinations on numerous and complex issues relating to VA benefits. The work is vital to the processes through which the agency directly informs and serves the public. Conclusions reached and the decisions made are normally binding on both the agency and the claimant. The decisions by the RVSR can result in award decisions involving the expenditure of large sums of money or denials that can have major adverse consequences for

Initials: TC

an applicant. They may also affect the applicant's eligibility for Medicare and Medicaid protection, social services, food stamps, and other forms of income assistance. The RVSR makes final determinations binding on the agency on all claims not requiring higher level concurrence or approval.

10. Which are the essential functions of this position?

As described in an email from her supervisor, some of essential functions of this position are: "All files the Rating Specialist takes home must be covered out to the work at home Rating Specialist. These files must also be logged into the work at home database for files to be taken home weekly. After covering files into oneself, mail must be picked up from the IPC for each file that has a mail search. Also before working file at home, files must be covered again to ensure no mail search has been added. If a mail search has been added then mail need to be picked up after returning into the building. First upon returning into the building, files must be covered back into the building. Next the rating decision should have already been printed and sent to the work at home printer. Any additional documents such as CAPRI records must be printed and placed into the files after returning into the office. The Work at home Rating Specialist must retrieve the printed documents from the work at home printer location and any mail from the IPC. Reviewing these documents need to be done by the work at home Rating Specialist at this time. If any correction or misprints are needed, it needs to be done at this time. Again any associated mail or corrections need be made at this time. All 2nd signature review files must be sent the 2nd floor for review. Files that have been reviewed for 2nd signature review must be corrected at this time and if no correction action is needed, they must be printed blue at this time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and next delivered to the POA table for Service Officer reviews. Entering examination request must be entered into Capri, and the buck slip added to the file and the file covered out to the examination facility and delivered to the IPC. Files must be gathered to take home as the above process starts over. This

could take an average work home Rating Specialist 3 to 5 hours or more. This depends on number of files being processed. We also do team meeting the day the all rating specialist are in the office and these meeting last up to 1 hour."

11. Does the complainant meet the education, skills, and experience requirements of the position? Explain your answer.

Yes. The complainant attended pre-requisite training and attended Challenge Training. However, in March 2013 she indicated that she needed to be retrained due to her absence from work.

12. Did the complainant request a reasonable accommodation from or through you? If yes, what did you do?

Yes, I processed her requests and was able to grant her requests.

13. What was the agency's reasonable accommodation process at the time of the accommodation request at issue?

Employees came directly to HR, through their supervisor, or submitted a request online for an accommodation. If medical documentation was needed, I would request it from the employee. If the medical documentation supported the request, the request was granted unless it required the removal of essential functions or ineffective. If a request could not be granted exactly as requested, I would work with employee and division to determine to reach a resolution.

14. Are you aware of the complainant's EEO activity? If yes, how and when did you become aware? Yes, I became aware when our office received a request for information dated March 15, 2013.

15. Were you involved in the complainant's EEO activity?

**Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tami Clark (TC) and union official Carol Allard (CA)**

16. What happened in the aforementioned event? Be specific

We agreed to the new work area during our meeting, but the Agency needed some time to coordinate the move. Human Resources and the Veterans Service Center Manager coordinated Ms. Mullin's move to another work area. This task was completed as indicated in the attached email dated January 12, 2012. The Agency does not believe that a two day turnaround time is unreasonable.

17. Were there a meeting held on January 10, 2012, and was it agreed to move the complainant to another work area?

Yes.

18. Was the complainant moved, to another work area as agreed on January 10, 2012? If not, why not?

This task was completed as indicated in the attached email dated January 12, 2012. The Agency does not believe that a two day turnaround time is unreasonable.

**On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel**

19. Explain, what happened?

In regards to restructuring marginal tasks, the complainant and I spoke on the telephone on February 5, 2013, and then communicated by email. Please see the attached emails both dated February 5, 2013, where there is obvious willingness to communicate and interact about possible solutions. Ms. Mullin's original restructuring request would have required the removal of essential functions. Ms. Mullin did not want to come into the building at all, and instead she wanted have someone collect/distribute her work and bring it back outside to her. I did not refuse to discuss Ms. Mullin's request as evidenced by the interactions

by phone and email. Ms. Mullin stated in her email, "When I am released from the hospital and am sufficiently recovered, I will contact you."

All reasonable accommodations denials go through Regional Council. Before Regional Council completed their review Ms. Mullin informed me that she wanted to have another meeting to see if there were any other options to accommodate her needs. There was no longer a need for Regional Council to review the letter and it was rescinded. Another meeting was scheduled. The meeting was productive and new accommodations were provided. Please see the attached reasonable accommodation approval letter dated February 27, 2013.

20. Did you speak to the complainant in a sarcastic manner?

No.

21. Did you refuse to discuss restructuring marginal tasks to modify her existing accommodation? If not, why not? If yes, what did you say?

No, reasonable accommodations require an interactive process. Please see the enclosed email dated February 5, 2013. I welcomed the complainant's feedback.

22. Was the complainant's request to modify her existing accommodation denied? If yes, why? According to the complainant you told her, "Aileen these things that you think are marginal tasks, or minimal tasks, they're essential parts of your job. It is essential that you get your documents from the copy machine, and it's essential that you go over to the mail..." What is your response?

No. Her request was granted on February 27, 2013.

23. Did General Counsel uphold the denial?

The denial letter was rescinded from General Counsel when Ms. Mullin requested another meeting so they never reviewed it. Another meeting was scheduled. The meeting was productive and new accommodations were provided.

24. Were your actions to subject the complainant to a hostile work environment, and/or harassment?

No.

25. Is there anything you would like to add?

No.

The above information is furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this 26th day of August, 2013.

Tamanique Clarke
Affiant Signature

Enclosures

# EXHIBIT 7

**From:** Mullin, Aileen, VBASPT
**Subject:** Status of heath issues
**To:** Brown, Larry, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT; Clarke, Tamanique, VBASPT; Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Sent:** January 31, 2012 6:41 AM (UTC-06:00)

Good morning All,

Yesterday, for the second time since the move to VBIT1, the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest.) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be a prudent to do so without delay.

Thank you for your support,

Aileen

Note: Tammie, the Workmens' Comp form is complete and is being sent for review. As soon as its return I'll get it to you.

# EXHIBIT 8

**From:** Mullin, Aileen, VBASPT
**Subject:** RE: Air purifier
**To:** Clarke, Tamanique, VBASPT
**Sent:** February 1, 2012 11:11 AM (UTC-06:00)

Thank you Tammi!!

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Wednesday, February 01, 2012 8:14 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Air purifier

Good Morning Aileen,

I submitted the order to SSD yesterday. I'm hoping it will arrive by Friday.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, February 01, 2012 7:47 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** Air purifier

Good morning Tammi,

Have you been able to make any head-way in getting the air-purifier?

Aileen

# EXHIBIT 9

# EQUIPMENT ASSIGNMENT

I, AILEEN MULLEN ACKNOWLEDGE RECEIPT OF THE FOLLOWING GOVERMENT EQUIPMENT TO BE USED IN THE PERFORMANCE OF MY DUTIES AS AN EMPLOYEE AT THE VA REGIONAL OFFICE, ST. PETERSBURG, FL.

| EQUIPMENT | MAKE & MODEL # | SERIAL # OR PHONE # | DATE ASSIGNED |
|---|---|---|---|
| BEEPER | | | |
| CELL PHONE | | | |
| CHAIR | | | |
| COMPUTER/MONITOR | | | |
| PRINTER/FAX | | | |
| STAMPS | | | |
| CERTIFICATION | | | |
| DATE | | | |
| SIGNATURE | | | |
| OTHER EQUIPMENT | | | |
| **1 Honeywell Air Purifier** | 16200 | | 02-02-2012 |

A. I UNDERSTAND THAT I'M RESPONSIBLE FOR MAINTAINING THE EQUIPMENT AND IF A PROBLEM ARISES TO CONTACT MY SUPERVISOR IMMEDIATELY.

B. I UNDERSTAND THAT THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE BELONGS TO VA REGIONAL OFFICE, ST. PETERSBURG, FL AND, THAT UPON MY TERMINATION FROM THE VA REGIONAL OFFICE AND/OR TIME PERIOD, WHERE I NO LONGER NEED THE EQUIPMENT, SUPPLIES, AND/OR FURNITURE THAT I MUST RETURN THE EQUIPMENT, SUPPLIES, AND/OR FURNTIURE. IF I FAIL TO RETURN THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE, I WILL BE RESPONSIBLE FOR REIMBURSING THE VA REGIONAL OFFICE FOR REPLACEMENT COSTS.

[signature]
EMPLOYEE'S SIGNATURE

2/2/2012
DATE

n91d2

# EXHIBIT 10

# Department of Veterans Affairs

# Memorandum

Date: ______02/29/12________________

From: RVSR/__Aileen Mullin_______________

Subj: BRVSR Certification Exam

Thru: 21FO

To: Human Resources

☒ I elect to take the BRVSR skills certification examination scheduled for March 14, 2012. I have received the web link to the candidate guide as shown: http://cptraining.vba.va.gov/C&P_Training/Skills_Cert/Documents/Readiness.doc and have had a discussion with my supervisor regarding my eligibility.

☐ I decline the opportunity to take the BRVSR certification exam on March 14, 2012.

Aileen Mullin______
Print Name

[signature]
Signature

# EXHIBIT 11

**From:** Mullin, Aileen, VBASPT
**Subject:** ETA and Certification
**To:** Clarke, Tamanique, VBASPT; McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Sent:** March 12, 2012 6:21 AM (UTC-05:00)

Good morning Tammi and Bo,

Thank goodness last week is behind me. Going in to the new week I need to talk to you about a couple of things:

I'm concerned about being in room 215 for Wednesday's certification exam. I know its a stretch, but can I take the test in another part of the building: Human Resources, the Director's Office, or Front Office? Just throwing it out there.......

Tammi, I would like to use COP (continuation of pay) for the time lost but I don't know how to record the time ETA. Can you please advise Bo and me on this one. And hopefully you have the FMLA paperwork and the CA-2 will be to you today.

(Just to let you know, Thursday morning, Millie graciously let me use her office (and stayed with me) when I had another attack and had to use the nebulizer. Her kindness was/is appreciated.)

Last five days in a nutshell:
Wednesday: Severe asthma attack. Escorted from building by police. (My locations: VIBIT1 from 7:10-8:00. Room 230 from 8:00 – 10:00 +/-.)

Thursday: Another asthma attack. (Location: VBIT1 from 7:10 – 10:00.)
Friday: Complete bed rest. Still had pain in chest, a lesser degree of difficulty taking deep breaths, exhaustion.
Saturday: Partial bed rest. Pain gone, breathing more freely.
Sunday: Symptom free.

Aileen

# EXHIBIT 12

**From:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)
**To:** Mullin, Aileen, VBASPT
**Bcc:** Wax, Bonnie, VBASPT
**Sent:** March 14, 2012 12:07 PM (UTC-05:00)

Me too. I tried to contact you yesterday about your request to test in Human Resources, the Director's Office or the VSC Front Office. I wanted to confirm that it would be safe for you to test/work on the 3rd floor, and to inform you that we had granted you a temporary workplace adjustment: A special testing workstation was set-up for you in a vacant office in the Director's Office on the 3rd floor. I was later informed by your supervisor that you have left work at 1pm, so I was unable to reach you. In your absence, we took action on your behalf to ensure that everything was ready for you to walk in and take the test in a location you specifically identified as appropriate for your condition. We were informed by your supervisor this morning that you had decided not to test, so although the temporary workplace adjustment was not used, I thought you should know that we took extraordinary measures to ensure you could test if you chose to.

I hope you are feeling better.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 11:42 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

Oh Tammi, thank you for your effort. I really wish we could have been in touch yesterday.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 12:21 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I'm trying to work very quickly on this because I want to ensure your safety. You indicated that HR, the Director's Office, and the VSC Front Office would suffice as testing locations. Are you saying that you can safely test/work in these locations on the third floor of the building?

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 12:05 PM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I wish we had too, but we covered many important subjects when we met.... My tour ends at 3:30, and then I'm scheduled to meet with Jim .... And truth be told, I don't know if I'll make it that long: Pain is seeping back into my chest.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 11:47 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I must have missed that part of the email. I wish we had talked about this when we met yesterday. Maybe this is thing you were trying to remember to talk about.

I think we'll be able to work something out. What time do you leave today?

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 10:59 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I did get the e-mail and that's why I sent you and Bo the e-mail yesterday asking if there's an alternate site I can test in:

*"Good morning Tammi and Bo,*

*Thank goodness last week is behind me. Going in to the new week I need to talk to you about a couple of things:*

*"I'm concerned about being in room 215 for Wednesday's certification exam. I know its a stretch, but can I take the test in another part of the building: Human Resources, the Director's Office, or Front Office? Just throwing it out there......."*

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 10:48 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** FW: BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You didn't receive this email?

**From:** VAVBASPT/RO/HRM
**Sent:** Monday, March 12, 2012 10:52 AM
**Cc:** Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT
**Subject:** BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You are welcome to go down to Room 215 and set up your workspace for the test.

Date: **March 14, 2012**
Location: Room 215
Time: 7:00am - 3:30pm

**Please use the computer labeled with your name.**

Please note that this is for computer setup only. Do not bring your reference materials until the day of the test.

---

On the day of the exam, plan on your work day being from 7:00 am – 3:30 pm.

The exam will consist of two 3 hour sessions. There is a 3 hour session in the morning and another 3 hour session in the afternoon.

Candidates must arrive at least **60** minutes prior to test time. Registration will be time consuming.

Testing will begin promptly at **8:00am**. **We will not wait for anyone.**
The morning testing session will be from **8:00am - 11:00am**

We will break for lunch from 11:00am – 11:50pm

The afternoon session will be from **12:00pm - 3:00pm**; you need to be in your seat by 11:50pm. **Again, we will not wait for anyone.**

**If you are late for either session, you will not be allowed entrance to the testing room. If you do not make the morning session, you will not be allowed into the afternoon session.**

***Things to Remember***:

- Make sure to bring a picture ID with you.
- Make sure you have all the reference material (such as reference books, rate charts, non-programmable calculators), as you will not be allowed to leave the test site once the testing begins.
- Candidates may not bring electronic devices (e.g., cell phones, pagers, Palm pilots, programmable calculators, CD players, MP3 players/iPods) to the test site.
- You may want to use the restroom before testing (there will be no extra time at the end of the exam period to make up lost time)
- No eating will be allowed at the test site.
- During testing you will be allowed to use the computers in the room to access WARMS, C&P homepage, VARO homepage, U-Drive, the H drive. **YOU WILL NOT BE ALLOWED ACCESS TO**

**EMAIL.**

# EXHIBIT 13

Thanks again Bo, I appreciate your efforts,

Sincerely,

Aileen

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Wednesday, March 14, 2012 8:19 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Huffman, Jerry, VBASPT
**Subject:** Certification test

Hello Aileen,

This email is just to confirm that you decided not to take the RVSR certification test today. We met this morning to talk about the RVSR certification test. I reminded you that the test is today, and informed you that the test location is on the 3rd floor. You stated earlier this morning that you do not wish to take the RVSR certification test. Your desire is to receive a resolution as to the problems you are having at work. You have stated that you are not concerned with testing, and that you concerned with living and not dying. Therefore, you have decided not to take the RVSR certification today. Also, I have set up a meeting for you to discuss this matter with Jerry today.

*Ulyssee McBurrough Jr.*
Coach, VBIT 1C
727 319 7313

# EXHIBIT 14

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Tuesday, March 13, 2012 11:44 AM
**To:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen Mullin
**Signed By:** kerrie.witty@va.gov

**Follow Up Flag:** Follow up
**Flag Status:** Red

Apparently the employee submitted medical documentation and a RA request yesterday (or last Friday). Tammi has it and I think you should go review it and determine if we need to let her work from home as an accommodation since her physician states that as the accommodation she needs. If she's still a trainee, we can make another decision but I don't want this one to sit like the ones before.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:18 PM
**To:** Smith, Sandra, VBASPT; Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

This was the employee who specifically talked to me about Room 222 - she is no longer sitting in room 222 so I had assumed that all was well - I guess that is not so.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:14 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

I was unaware of any statement from doctor that limited time in office. I had directed employee to HR some time ago for RA

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 12, 2012 3:30 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen Mullin

Do we have a RA request from this employee?

---

**From:** Crump, Casey, VBASPT
**Sent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin

Kerrie,

I met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and certainly wants it to continue.

Aileen Mullin

I want everyone to understand the extended time in the office is a health hazard for Aileen. This is also an ongoing liability that I want to ensure you are personally aware of.

Sandy,

I understand Aileen has already spoken to you. I just wanted to keep you informed and hopefully you can provide the needed work at home assistance.

Thank you both.

Casey

***Casey Crump, DRO/Chief Steward***
***St. Petersburg FL***
***727-319-7280 Voice/Fax***

# EXHIBIT 15

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, March 13, 2012 11:55 AM
**To:** Wax, Bonnie, VBASPT
**Subject:** FW: Aileen Mullin
**Signed By:** sandra.l.smith1@va.gov

Bonnie,

If you have a RA request, I'd like to take a look at it. Maybe we can move it quickly if there is med. documentation to support

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:18 PM
**To:** Smith, Sandra, VBASPT; Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

This was the employee who specifically talked to me about Room 222 - she is no longer sitting in room 222 so I had assumed that all was well - I guess that is not so.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:14 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

I was unaware of any statement from doctor that limited time in office. I had directed employee to HR some time ago for RA

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 12, 2012 3:30 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen Mullin

Do we have a RA request from this employee?

---

**From:** Crump, Casey, VBASPT
**Sent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin

Kerrie,

I met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and certainly wants it to continue.

I want everyone to understand the extended time in the office is a health hazard for Aileen. This is also an ongoing liability that I want to ensure you are personally aware of.

Sandy,

I understand Aileen has already spoken to you. I just wanted to keep you informed and hopefully you can provide the needed work at home assistance.

Thank you both.

Casey

***Casey Crump, DRO/Chief Steward***
***St. Petersburg FL***
***727-319-7280 Voice/Fax***

# EXHIBIT 16

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, March 13, 2012 2:55 PM
**To:** Huffman, Jerry, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen went home sick
**Signed By:** sandra.l.smith1@va.gov

I will meet agin with Bonnie tomorrow to review medical documenation and discuss granting accomodation request. She wants to WAH and only be in office on Tuesdays and Fridays.

For test tomorrow, s he did not want to take RVSR cert test in room 215 and had asked for HR or VSCFO office. HR has prepared a computer in empty office in HR for her use. Employee needs to be aware of this accomodation.

Thanks,
Sandy

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Tuesday, March 13, 2012 2:40 PM
**To:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen went home sick

*Jerry E Huffman*, AVSCM
One Team, One Mission
An Advocate for Veterans

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 2:36 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** FW: Aileen went home sick

FYI...

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7553

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 1:05 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** Aileen went home sick

Bo,

She wasn't able to enter a request in ETA & I forgot to ask her if lunch is included or not...nevertheless - the CH database

RE: Aileen went home sick 

has been updated.

<< OLE Object: Picture (Device Independent Bitmap) >>

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7553

# EXHIBIT 17

Department of Veterans Affairs

## APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Wednesdays, and Thursdays. You will be required to report to work at the St. Petersburg Regional Office on Tuesdays, and Fridays.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

- [x] We will provide the accommodation requested by *(enter date)* 03/21/2012
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

This accommodation will be provided by (enter date)

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty — DMO SIGNATURE

3/20/12 — DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f**

Adobe LiveCycle Designer

EXHIBIT 12

# EXHIBIT 18

**From:** Wax, Bonnie, VBASPT
**Subject:** FW: Occupational diseases as granted/acknowledged by the DOL
**To:** Clarke, Tamanique, VBASPT; Works, Philip, VBASPT; Correa, Matthew, VBASPT
**Sent:** January 28, 2013 12:02 PM (UTC-06:00)

Can we discuss this today?

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Monday, January 28, 2013 12:35 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Huffman, Jerry, VBASPT
**Subject:** FW: Occupational diseases as granted/acknowledged by the DOL

See e-mail below!

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

---

**From:** Smith, John, VBASPT
**Sent:** Monday, January 28, 2013 12:32 PM
**To:** Mullin, Aileen, VBASPT; McBurrough, Ulyssee, VBASPT; Crump, Casey, VBASPT
**Cc:** kellee@afge.org; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT; Reilly, Valorie, VBASPT
**Subject:** RE: Occupational diseases as granted/acknowledged by the DOL

**I wonder if they can find you desk space at the hospital where they schedule C&P exams or make you work from home 5 days a week.**

**I wonder if it could also be the actual stuff the outside of files were sprayed with to keep mold, mildew, and bugs off at RMC and FARCs**

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, January 28, 2013 11:25 AM
**To:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Crump, Casey, VBASPT
**Cc:** 'kellee@afge.org'; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Occupational diseases as granted/acknowledged by the DOL
**Importance:** High

I need your help so I can do this job.

Because of the severity of my body's reaction to being in the building last week (2 HRS +/-) and the week before (10 hrs +/-)), I went back to the specialist (Board Certified: Allergy/Immunology, Internal Medicine). Additional tests were administered.

The doctor advised that I further minimize my time in the building AND that for me to safely work in the building*****, I will need to wear a mask similar to those used by people working in auto body shops and industrial clean-up operations. **WHAT???????????** I can't begin to tell you how horrifying it is the think I have to wear one of those devices ~ in order to do my job … (also horrifying is knowing about other people, on the floor, on our team, that are sick; Some over medicating themselves in order to be able to be in there)

- I just want to be a successful RVSR. I want to know how to do this job and do it well.

- I've already lost months and months of OJT/ hands-on training (starting long before the diagnosis of cancer).

- I've done/am doing every within my realm of control/knowledge to learn how to address Veteran's claims as a Rater~ .

- I've done every thing, I know to do, to try to keep my body safe ~ while not fully jeopardizing my job~

I can't do this own my own. I need your help in identifying/ implementing reasonable accommodations. I trust that if we put our heads together there's a way for me to safely be a successful RVSR

I'll be waiting to hear from you, and if need be I'm come right over so we can meet (outside). Just give me the word.

For now,

Aileen

954-263-1510

PS

- The doctor wrote a prescription for the breathing apparatus for Human Resources.

Just so you know,

I have repeatedly attempted ~ and received not response to ~ requests for answers as to what has happened as a result of the most recent OSHA complaints (mold, AQ, rats**).

I have repeatedly attempted ~ and received no answers to ~ requests for information as to how the RO's Safety Committee is handling safety concerns.

* (Especially the areas of the building that have already been identified as having air quality issues)

**(Note: Some rodent species excrement is far more harmful than others. If there really is an issue with rats, we need to know what kind and the locations (Note: Rodents in duct work offer a set problems that differ greatly from ones that are in other parts of a building.)

<< OLE Object: Picture (Device Independent Bitmap) >> << OLE Object: Picture (Device Independent Bitmap) >>

# EXHIBIT 19

**From:** Clarke, Tamanique, VBASPT
**Subject:** Aileen Mullin
**To:** Clarke, Tamanique, VBASPT
**Sent:** January 29, 2013 10:26 AM (UTC-06:00)

Aileen Mullin –

Has to wear respirator mask, and has paperwork to fax

Dr. says she has to limit time in the office even more

Has the prescription for the mask. Will go try to get the mask today. We'll set up a meeting tomorrow to meet for a reasonable accommodation.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 20

**From:** McBurrough, Ulyssee, VBASPT
**Subject:** RE: Meeting Request
**To:** Clarke, Tamanique, VBASPT
**Sent:** January 31, 2013 4:12 PM (UTC-06:00)

I am go any date and time as long as we are in the building.

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 29, 2013 1:19 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** Meeting Request
**Importance:** High

Hi Bo,

I spoke to Aileen Mullin today. She is working on getting a mask so that she can enter the building. She sent in a note stating that she needed to limit her exposure to the building. I told her that I would like to set up a meeting with myself, you, and her. She'll be able to bring her union rep as well if she wants. Are there any dates that you are not available to meet?

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 21

**Clarke, Tamanique, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 29, 2013 4:34 PM
**To:** McBurrough, Ulyssee, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Ingram, Walter, VBASPT
**Subject:** Working things out

Hi you guys,

Tammi and I are doing what we can to figure out some of the details as to how these accommodations can be worked out. We've also been in touch with the Department of Labor and started a list of questions/requests for my doctor. Are you available to meet in the morning? We need help with some of the details.

Please just let Tammi what works for you and she can call me and I'll be right over.

Thanks,

Aileen

PS The files are packed-up and ready to go.

EXHIBIT
PENGAD 800-631-6989
24

# EXHIBIT 22

1/31/13

Essential Functions
Accommodations

Subject: respirator

From: Aileen Mullin (aileen_mullin@

To: Tamanique.Clarke@va.gov;

Cc: ulyssee.mcburrough@va.gov; john.r.smith2@va.gov; kellee@afge.org;

Date: Thursday, January 31, 2013 1:16 PM ← Later the same day I was hospitalized as a result of my bodies reaction to the stress

For the doctors to define the specs for an approprite respirator, they now need to know how the device will be used. This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table, again, more info is needed.

One important detail pertains to time: How long is it anticipated I will need the respiratory protection to perform the 'essential functions' of a WAH RVSR (I can't answer this question because I'm not sure what the RO considers as functions that I can not receive help to expedite.)

Can you please e-mail us the 'essential functions' I've have been denied accommodations for. Its info needed for the specialists to make an informed recommendation.

Also, I would like for all of us to brain-storm options as to where in the building I can work, that will save the complete humiliation and distraction I'll have to contend with.

Thanks,
Aileen

PS Please e-mail me at the non-va e-mail because I'm not working today.

EXHIBIT 25

# EXHIBIT 23

**Clarke, Tamanique, VBASPT**

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, February 05, 2013 12:09 PM
**To:** 'aileen_mullin@yahoo.com'
**Subject:** Essential Function: In-Office Process

Hi Aileen,

Below is the information you requested. I understand that you feel these tasks are minimal and can be done by someone else, however collectively these tasks take a significant amount of time to complete. It's the whole in-office process that is considered an essential function of the job. Based on our phone conversation, it seems that there are certain tasks of the in-office process that you are seeking assistance with. If you want we can talk about it in our next meeting or you can reply back with what it is that you are seeking assistance with.

Upon returning to the building, files must be covered back into the building. Next, the printed rating decisions must be retrieved from the work at home printer location along with any mail from the IPC. Any additional documents such as CAPRI records must be printed and placed into the files when in the office. The printed documents are then reviewed and corrections/misprints are made while in the office. Any associated mail is also added to the files. Your files must be taken to 2nd floor for 2nd signature review to determine if corrections are needed. Corrections must be done while in the building. If no corrections are needed, the file is printed blue at that time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and delivered to the POA table for Service Officer review. Examination requests must be entered into Capri, and buck slips must be added to the file. The file needs to be covered out to the examination facility and delivered to the IPC. Next, more files are gathered and covered out to yourself to take home. The whole in-office file process can take the average work at home rating specialist 3 to 5 hours or more depending on the number of files to be processed and is an essential function of your job.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*



EXHIBIT 22

# EXHIBIT 24

**Clarke, Tamanique, VBASPT**

**From:** Aileen Mullin <aileen_mullin@yahoo.com>
**Sent:** Tuesday, February 05, 2013 8:11 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Aileen Mullin
**Subject:** Re: Our conversation this morning

Thank you for getting back to me, but I am physically unable to continue this discussion at the present time. When I am released from the hospital and am sufficiently recovered, I will contact you.

Aileen Mullin

---

**From:** "Clarke, Tamanique, VBASPT" <Tamanique.Clarke2@va.gov>
**To:** aileen_mullin@yahoo.com
**Cc:** "McBurrough, Ulyssee, VBASPT" <ulyssee.mcburrough@va.gov>; "Smith, John, VBASPT" <john.r.smith2@va.gov>
**Sent:** Tuesday, February 5, 2013 12:19 PM
**Subject:** RE: Our conversation this morning

You had asked for a copy of what was being denied and I explained that we have a formal denial process and that it was sent to Regional Counsel for review. I did not say that we sent it to Regional Counsel at your request. It's part of the denial process.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Tuesday, February 05, 2013 12:15 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Aileen Mullin
**Subject:** Our conversation this morning

Good Afternoon,

In our telephone conversation this morning, you informed me that you had submitted a "Request for Accomodations" to GC at my request.

Any suggestion that this action was requested by me is patently false.

The brevity of my response is due to the fact that I am still in hospital.

Aileen Mullin

EXHIBIT
26

# EXHIBIT 25

Gmail Aileen Mullin <aemflorida@gmail.com>

# 02/26/2013 Accommodation Ideas for Respiratory Impairments sent to HR

2 messages

**Aileen Mullin** <aileen_mullin@yahoo.com> Fri, Mar 1, 2013 at 8:29 AM
Reply-To: Aileen Mullin <aileen_mullin@yahoo.com>
To: "aemflorida@gmail.com" <aemflorida@gmail.com>

> **From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
> **Sent:** Wednesday, February 13, 2013 11:56 AM
> **To:** Tammi Clarke
> **Cc:** kellee@afge.org; Smith, John, VBASPT; Reilly, Valorie, VBASPT; Valorie Reilly; keith pryor; Crump, Casey, VBASPT; McBurrough, Ulyssee, VBASPT
> **Subject:** Accommodation Ideas for Respiratory Impairments
>
> This site has helpful ideas as to address the need for respiratory based accommodations
>
> http://askjan.org/media/respiratory.html

---

**Aileen Mullin** <aemflorida@gmail.com> Fri, Mar 1, 2013 at 11:55 AM
To: "Henley, John (ORM)" <John.Henley@va.gov>
Cc: Odessa.johnson@va.gov

> **From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
> **Sent:** Wednesday, February 13, 2013 11:56 AM
> **To:** Tammi Clarke
> **Cc:** kellee@afge.org; Smith, John, VBASPT; Reilly, Valorie, VBASPT; Valorie Reilly; keith pryor; Crump, Casey, VBASPT; McBurrough, Ulyssee, VBASPT
> **Subject:** Accommodation Ideas for Respiratory Impairments
>
> This site has helpful ideas as to address the need for respiratory based accommodations
>
> http://askjan.org/media/respiratory.html

4

Search Text Size

For Employers | For Individuals | For Others | ADA Library | Accommodation Search | A - Z of Disabilities | Publications | Resources

Home | Accommodation Information: A - Z | Allergies | Accommodation Ideas for Respiratory Impairments

# Accommodation and Compliance Series: Employees with Respiratory Impairment

Preface

Introduction Information About Americans with Disabilities Act Accommodating Employees Resources References

PDF Version DOC Version Share

## Introduction

JAN's Accommodation and Compliance Series is designed to help employers determine effective accommodations and comply with Title I of the Americans with Disabilities Act (ADA). Each publication in the series addresses a specific medical condition and provides information about the condition, ADA information, accommodation ideas, and resources for additional information.

The Accommodation and Compliance Series is a starting point in the accommodation process and may not address every situation. Accommodations should be made on a case by case basis, considering each employee's individual limitations and accommodation needs. Employers are encouraged to contact JAN to discuss specific situations in more detail.

For information on assistive technology and other accommodation ideas, visit JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar.

## Information about Respiratory Impairments

### What is a respiratory impairment?

Respiratory impairment is a generic term that refers to a number of medical conditions that can affect the respiratory system and may result in limitations such as labored breathing or asthma attacks, fatigue and difficulty with mobility, heightened sensitivity to ordinary substances and chemicals, and compromised immunity to infection.

### What causes respiratory impairments?

The following is a non-comprehensive list of many of the medical conditions that may result in respiratory impairments: Allergies, Asthma, Chemical Sensitivity (MCS), Chronic Obstructive Pulmonary Disease, Cystic Fibrosis, Environmental Illness (EI), Fragrance Sensitivity, Lung Cancer, Pulmonary Sarcoidosis, Tuberculosis, Emphysema, Pulmonary Hypertension, Latex Allergy, and AIDS Related Lung Disease.

For more detailed information, see Appendix A at the end of this document.

### How are respiratory impairments treated?

Treatment of respiratory impairments depends on many factors, such as the type and stage of impairment; family history; and the individual's medical history, health, and age. Any of the following may be used for treating respiratory impairments: Inhalers or nebulizers containing bronchodilators or corticosteroids, expectorants, antibiotics, oxygen therapy, chemotherapy, lung transplantation, lung reduction surgery, natural treatments such as N-Acetyl Cysteine and Carnitine, and complementary/integrative therapies and treatments (About.com, 2006).

## Respiratory Impairments and the Americans with Disabilities Act

**Are respiratory impairments disabilities under the ADA?**

The ADA does not contain a list of medical conditions that constitute disabilities. Instead, the ADA has a general definition of disability that each person must meet (EEOC Regulations . . ., 2011). Therefore, some people with respiratory impairments will have a disability under the ADA and some will not.

A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded as having an impairment (EEOC Regulations . . . , 2011). For more information about how to determine whether a person has a disability under the ADA, visit http://AskJAN.org/corner/vol05iss04.htm.

## Accommodating Employees who are Respiratory Impairments

Note: People with respiratory impairments may develop some of the limitations discussed below, but seldom develop all of them. Also, the degree of limitation will vary among individuals. Be aware that not all people with respiratory impairments will need accommodations to perform their jobs and many others may only need a few accommodations. The following is only a sample of the possibilities available. Numerous other accommodation solutions may exist.

**Questions to Consider:**

1. What limitations is the employee experiencing?
2. How do these limitations affect the employee and the employee's job performance?
3. What specific job tasks are problematic as a result of these limitations?
4. What accommodations are available to reduce or eliminate these problems? Are all possible resources being used to determine possible accommodations?
5. Has the employee been consulted regarding possible accommodations?
6. Once accommodations are in place, would it be useful to meet with the employee to evaluate the effectiveness of the accommodations and to determine whether additional accommodations are needed?
7. Do supervisory personnel and employees need training??

**Accommodation Ideas:**

**Fatigue/Weakness:**

- Accessible facility (Ramps, parking etc.)
- Reduce/eliminate lifting, walking, etc.
- Flexibility to sit or stand (Adjustable workstation)
- Rest area with cot
- Later start time
- Frequent rest breaks
- Shorten work day and extend work week
- Job sharing

**Avoiding Environmental Triggers:**

Some respiratory impairments are aggravated by environmental triggers. It may be helpful to:

- Maintain a clean and healthy work environment
- Provide air purification
- Condition, heat, dehumidify, or add moisture to the air as appropriate
- Provide additional rest breaks for the individual to get fresh air or take medication
- Create a smoke and fragrance-free work environment
- Consider an alternative work arrangement such as work from home
- Allow for alternative work arrangements when construction is taking place
- Use alternative pest management practices

- Implement a flexible leave policy
- Allow for alternative means of communication such as telephone, e-mail, instant messaging, fax, or memos

**Accessibility Accommodations:**

An individual who experiences respiratory limitations may have difficulty performing activities that require gross motor movement, such as walking long distances, or performing activities that require excessive physical activity. It may be necessary to address access concerns for an individual who has difficulty approaching the work facility, moving around the facility, getting to work, or traveling as an essential job function.

- Modify the work-site to make it accessible
- Provide an accessible parking space with an unobstructed and easily traveled path into the workplace
- Provide an entrance free of steps with doors that open automatically or that have a maximum opening force of five pounds
- Provide an accessible route of travel to and from work areas used by the individual throughout the work environment
- Consider providing a scooter or motorized cart for the employee to use for long distances if the employee does not already use a mobility aid
- Move the individual's workstation closer to equipment, materials, and rooms the individual uses frequently
- Modify the workstation to accommodate a wheelchair, scooter, or the use of oxygen therapy equipment
- Arrange the workstation so materials and equipment are within reach range
- Provide restrooms that are easily accessed from the individual's workstation
- Review emergency evacuation procedures

**Modify Policies:**

Due to the unpredictable nature of the onset of respiratory limitations, an individual may have difficulty maintaining regular attendance or a regular schedule. It may be necessary to:

- Modify the location where work is performed
- Modify the attendance policy
- Provide leave as an accommodation
- Provide a modified or part-time work schedule
- Provide breaks

**Maintain Air Quality:**

The U.S. Environmental Protection Agency (EPA) provides suggestions for improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html. Employers should keep indoor air quality concerns in mind for employees with and without respiratory impairments. Good IAQ can improve worker productivity for everyone. To maintain air quality, it may be necessary to:

- Provide an office or workspace that has working windows
- Maintain the heating, ventilation, and air conditioning (HVAC) system
- Test indoor air quality
- Use air purification systems throughout the building or in personal workstations
- Reduce workplace pollutants
- Provide a mask
- Adjust indoor temperature to meet the individual's needs
- Institute a fragrance-free workplace
- Provide pre-notification of construction and cleaning in the workplace
- Use non-toxic building materials, furnishings, supplies, and flooring
- Use non-toxic solvents, primers, stains, paints, etc.

**Situations and Solutions:**

A teacher diagnosed with sick building syndrome was required to attend weekly faculty meetings in the school building. She usually taught class from a portable classroom outside of the building and could not be in the school building for extended time. JAN suggested that she use either a speakerphone or PA system from her classroom to listen in and participate in the meetings, be provided with meeting minutes, or attend the meetings and wear a respirator mask if she felt comfortable doing so.

An office worker with fragrance sensitivity was having difficulty because of the cleaning products used in the employee restroom. JAN provided information about non-toxic cleaning products.

An employee with bronchial asthma could not work in hot environments. JAN discussed air-conditioning, including a window unit for the employee's office if the employer could not install central air.

A hospital worker with COPD had difficulty walking from the employee lot to the work-site. The parking lot was very large and employees parked on a first-come, first-serve basis. JAN suggested providing a reserved parking space close to the work-site.

**Products:**

There are numerous products that can be used to accommodate people with limitations. JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar is designed to let users explore various accommodation options. Many product vendor lists are accessible through this system; however, upon request JAN provides these lists and many more that are not available on the Web site. Contact JAN directly if you have specific accommodation situations, are looking for products, need vendor information, or are seeking a referral.

## Resources

## References

About.com. (2006). *What is lung disease?* (2006). Retrieved September 5, 2008, from http://lungdiseases.about.com/od/basicinformation/a/basicinfo.htm

EEOC Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 29 C.F.R. § 1630 (2011).

**Appendix A**

The following is a non-comprehensive summary of many of the medical conditions that may result in respiratory limitations. For more detailed information, contact an appropriate medical professional or the resources listed at the end of this document.

Allergies: According to the Asthma and Allergy Foundation of America (AAFA), an estimated 50 to 60 million Americans are affected by allergies. In fact, allergies are the sixth leading cause of chronic disease in the United States (AAFA, n.d.). It is common for an individual to be sensitive to more than one particular irritant. A substance that may normally not affect the average person may produce nasal congestion, itchy, watery eye, or an asthma attack for someone who is allergic. Allergic symptoms may occur due to dust, mold, mildew, pollen, foods, and insects among any number of other substances.

Asthma: According to the American Lung Association (ALA), asthma is a chronic lung disease that can be life threatening (ALA, 2008d). Asthma causes breathing problems known as asthma attacks or episodes of asthma. A person with asthma might get an asthma attack when they have a cold or some other kind of respiratory infection or when they breathe something that bothers the lungs such as cigarette smoke or dust. Asthma symptoms are often triggered by changes in weather (cold or hot), emotional distress and exercise. Asthma attacks may start suddenly or may take an extended period of time, even days, to develop. Attacks can be severe, moderate or mild and can require a period of recuperation.

Chemical Sensitivity (MCS), Environmental Illness (EI), and Fragrance Sensitivity: Chemical sensitivity, or MCS, is characterized by such symptoms as headaches, dizziness, nausea, breathing difficulties, tightening of the throat, chronic laryngitis, difficulty concentrating, memory loss, learning disorders, eczema, arthritis-like sensations, and muscle pain (About.com, 2006). A person who experiences limitations due to MCS or EI may have any of the above mentioned symptoms when exposed to such irritants as fragrances, cleaning agents, smoke, pesticides, molds, fumes from office machines, car exhaust, paint, new carpeting, solvents and other irritants.

For more specific information regarding MCS/EI, see JAN's Accommodation and Compliance Series: Employees with Chemical Sensitivity or Environmental Illness at http://AskJAN.org/media/MCS.html.

For more specific information regarding fragrance sensitivity, see JAN's Accommodation and Compliance Series: Employees with Fragrance Sensitivity at http://AskJAN.org/media/fragrance.html.

Chronic Obstructive Pulmonary Disease (COPD): The American Lung Association indicates that COPD is the fourth leading cause of death in America. Approximately 16.4 million Americans are diagnosed with COPD. COPD includes diseases that are characterized by obstruction to airflow such as emphysema or chronic bronchitis. It does not include other obstructive diseases such as asthma. Chronic bronchitis is an inflammation and eventual scarring of the lining of the bronchial tubes and is evidenced by a chronic cough, increased mucus, frequent clearing of the throat and shortness of breath. Emphysema causes irreversible lung damage and is evidenced by cough, shortness of breath and limited exercise tolerance (ALA, 2002a).

Lung Cancer: According to the American Cancer Society's Lung Cancer Resource Center, it is estimated that there will be 169,400 new cases of lung cancer in the United States in 2002. Statistics show that lung cancer is the leading cause of cancer death among both men and women. More people die of lung cancer than of colon, breast, and prostate cancers combined (ACS, n.d.a).

Lung cancer generally develops over a period of years and typically affects people over the age of 50. The American Lung Association's, Facts About Lung Cancer, describes cancers that begin in the lungs. Lung related cancers are divided into two major types, non-small cell lung cancer and small cell lung cancer. Non-small cell lung cancer generally spreads to distant organs more slowly than small cell lung cancer. Squamous cell carcinoma, adenocarcinoma, and large cell carcinoma are three types of non-small cell lung cancer (ACS, n.d.a).

Pulmonary Sarcoidosis: Pulmonary sarcoidosis affects lung volume decreasing the amount of air the lungs can hold. The American Lung Association describes the disease as being characterized by the presence of granulomas, small areas of inflamed cells. They can appear on the walls of the alveoli (small air sacs in the lungs), or on the walls of the bronchioles (breathing tubes in the lungs), or in the lymph nodes surrounding the lungs. Symptoms include a dry cough, shortness of breath, or mild chest pain. Additionally, the person may experience fatigue, weakness, and weight loss. In cases where symptoms do appear outside the lung, they can include a scaly rash, red bumps on the legs, fever, soreness of the eyes, and pain and swelling of the ankles (ALA, 2008b).

Tuberculosis (TB): TB is an infection that primarily affects the lungs but can also affect other organs and tissues in the body. The infection is spread by airborne TB bacteria. A person may have TB infection or TB disease. If a person has TB infection they are essentially a carrier of the bacteria but are not affected by the bacteria. A person infected with TB disease, however, is ill and requires treatment. A person with TB disease can spread the disease. Symptoms of TB disease include excessive coughing (including coughing blood), repeated night sweats, unexplained weight loss, loss of appetite, fever, chills, and general lethargy. According to the American Lung Association, the rate of reported tuberculosis dropped 45 percent between 1992 and 2000. The decrease in reported TB has been attributed to improved TB control programs (ALA, 2008f).

Emphysema: According to the American Lung Association, emphysema ranks 15th among chronic conditions that contribute to activity limitations. An estimated 44 percent of individuals with emphysema report that daily activities have been limited by the disease. Emphysema develops gradually, usually from exposure to cigarette smoke. Some individuals are born with a deficiency of a protein known as alpha 1-antitrypsin (AAT) which can lead to an inherited form of emphysema called alpha 1-antitrypsin (AAT) deficiency-related emphysema. For individuals with emphysema, the air sacs in the lungs become damaged and less able to transfer oxygen to the bloodstream. The individual then becomes short of breath and has difficulty exhaling because the lungs also lose their elasticity (ALA, 2008a).

Pulmonary Hypertension (PH): There are two forms of pulmonary hypertension, primary (PPH) and secondary (SPH). According to the American Lung Association, it is estimated that there are 300 new cases of PPH per year. PPH is defined as a rare disease of unknown cause that results in the progressive narrowing of the blood vessels of the lungs, causing high blood pressure in these blood vessels which eventually leads to heart failure. Secondary pulmonary hypertension (SPH) results from other types of lung disease, abnormal breathing processes, or heart disease (ALA, 2002h). According to the Mayo Clinic, symptoms and limitations of PPH include shortness of breath with exertion and general fatigue, passing-out spells, dizziness, ankle or leg swelling, and chest pain or pressure (ALA, 2008a).

Latex Allergy: The Occupational Safety and Health Administration (OSHA) states the following about latex allergy, "Allergy to latex was first recognized in the late 1970s. Since then, it has become a major health concern as an increasing number of people in the work place have been affected. Health care workers exposed to latex gloves or medical products containing latex are especially at risk. It is estimated that 8-12% of health care workers are latex sensitive. Between 1988 and 1992, the Federal Drug Administration (FDA) received more than 1,000 reports of adverse health effects from exposure to latex, including 15 deaths due to such exposure" (OSHA, n.d).

Latex allergy reactions can range from mild to very severe. Typically, the allergy begins with an irritant contact dermatitis and can develop into an immediate allergic reaction with respiratory symptoms. An individual with a latex allergy can be affected after coming into physical contact with products like latex gloves, elastic from waist bands, rubber bands, or medical equipment, by inhaling proteins from powdered latex gloves or balloons or by ingesting food products that have been prepared by workers using latex products.

For more specific information regarding latex allergy, see JAN's Accommodation and Compliance Series: Employees who are Allergic to Natural Rubber Latex at http://AskJAN.org/media/LATEX.html.

AIDS Related Lung Disease: A person with AIDS may experience any number of lung infections. Most common are pneumocystis carinii pneumonia (PCP), which is caused by a fungus, and tuberculosis and mycobacterium avium complex (MAC) which are caused by bacterium. AIDS also predisposes an individual to a variety of other lung infections from bacteria and molds (ACS, n.d.b). It is important for an individual with a compromised immune system to make an effort to avoid exposure to viruses and bacteria to stay healthy.

**References for Appendix A**


About.com. (2006). Multiple chemical sensitivity (MCS) the controversy? (2006). Retrieved September 5, 2008, from http://allergies.about.com/library/weekly/aa011899.htm?terms=Multiple+Chemical+Sensitivity

American Cancer Society (n.d.a). All about lung cancer. Retrieved September 5, 2008, from http://www.cancer.org/docroot/CRI/CRI_2x.asp?sitearea=&dt=15

American Cancer Society (n.d.b). AIDS-related lung cancers. Retrieved September 5, 2008, http://www.cancer.orgp

American Lung Association (2008a). Chronic obstructive pulmonary disease (COPD). Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008b). Sarcoidosis. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008c). Tuberculosis fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008d). Asthma in adults fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008e). Lung cancer fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008f). Tuberculosis fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2003). Primary pulmonary hypertension (PPH) fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

Asthma and Allergy Foundation of America (n.d.). Allergy facts and figures. Retrieved January 26, 2006, from http://www.aafa.org

Occupational Safety and Health Administration (n.d.). Safety and health topics latex allergy. Retrieved September 5, 2008, from http://www.osha.gov


**Updated 12/30/11**


ASK A JAN CONSULTANT

**JAN provides free, confidential technical assistance about job accommodations and the Americans with Disabilities Act (ADA).** Send Us Feedback.

**(800)526-7234 (Voice)**
**(877)781-9403 (TTY)**
Live Chat
Email

A service of the Office of Disability Employment Policy, U.S. Department of Labor

Accessibility | Copyright | Disclaimer | Privacy Statement | Site Map

# EXHIBIT 26

To: Bonnie Wax

Fr: John Smith, AFGE Steward

Re: Aileen Mullin request for Modified Accommodation and Administrative Leave

Dt: February 19, 2013

As the modified accommodation, regarding Ms. Mullin's Workers' Compensation illnesses, has not been adequately discussed and resolved, we ask the Ms. Mullin be placed on paid Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

The following is a synopsis of recent events regarding Ms. Mullin's Workers' Compensation illnesses, since finishing her treatment for breast cancer in late December 2012:

- Wednesday, January 2, 2013 - Ms. Mullin returned to work.

Ms. Mullin works from home, reporting to the office once or twice a week to minimize her exposure in the building. (Ms. Mullin works at home due to workplace-related illnesses: asthma and chronic sinusitis.*)

Ms. Mullin reported to the office, approximately 24 total hours, during the month of January.

- Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Ms Mullin suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Ms. Mullin had been asymptomatic when on leave for breast cancer. )
- Thursday, January 17, 2013 - Ms. Mullin was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed.
- Tuesday, January 23, 2012 - The next time Ms. Mullin entered the building; Within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain.
- Saturday, January 26, 2013 - Ms. Mullin was seen by the medical specialist who deemed that it was not safe for her to enter the building without respirator. He stated that she has to further minimize her time in the building.
- Monday, January 28, 2013 - Ms. Mullin informed the agency of her worsening reaction to being in the building and of the doctor's orders.
- Tuesday, January 29, 2013 - Ms. Mullin had numerous conversations with the Human Resource (HR) Specialist attempting to determine how a respirator would be attained.

EXHIBIT 15

- Wednesday January 30, 2013 - Though ill, Ms. Mullin requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Ms. Mullin's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Ms. Mullin voiced her belief that collaboratively a plan could be worked out. Aid with marginal job functions such as assistance retrieving documents from the printer and moving the files were suggested by Ms. Mullin. The group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job.

However, later the same afternoon, Human Resources informed Ms. Mullin that her request for modifications to her accommodation was denied (without the benefit of further conversation.)

As Ms. Mullin had witnessed such treatment of other disabled employees, she realized her job was in jeopardy. She became extremely alarmed and distraught. She experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she has no history of).

- Thursday, January 31, 2013 - Ms. Mullin was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she she remained hospitilized for one week.
- February 5, 2013 - While in the hospital, Ms. Mullin spoke to the HR specialist who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position was one essential function and could not be broken down by tasks: " ....I understand that you feel these tasks are minimal and can be done by someone else, however, collectively these tasks take a significant amount of time to complete..... **It's the whole in-office process that is considered an essential function of the job**... " This information caused Ms. Mullin further upset and an exacerbation of her condition. (Please note that the HR Specialist didn't inquire as to why, or how long, Ms. Mullin would be in the hospital.)
- Wednesday, February 6, 2013 - Ms. Mullin was discharged from the hospital after treatment for sinusitis and gastrointestinal conditions. Her doctor required her to remain out of work for an additional two weeks ~ and to avoid stressful situations during her recovery.

Ms. Mullin is now scheduled to return to work on Thursday, February 21. As the decision on the modified accommodation, for Workers' Compensation illnesses, was premature, and has not been adequately been resolved, we ask the Ms. Mullin be placed on Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

Please provide the names of the members of the Reasonable Accommodation Committee.

Due to the gravity of this situation, we respectfully respect a response to this request by the close of business.

* U.S. Department of Labor, Workers' Compensation File Number: 062294294

enc.
Letter from Social Worker, St. Anthony's Hospital

cc:
Aileen Mullin
Ulysee McBurough, VBA
Jon Jackson, DOL
Odessa Johnson, EEO
John Henley, EEO
Everett Kelly, District President, AFGE
Brenda Stallard, AFGE
Valorie Reilly, AFGE
Keith Pryor, AFGE
Casey Crump, AFGE

# EXHIBIT 27

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

☐ APPLY FOR A JOB,

☒ PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR

☐ ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - modifications to your current approved accommodation to work from home 3 days per week.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter, please contact Tammi Clarke, Human Resources Specialist at(727)319-5818.

☐ We will provide the accommodation requested by *(enter date)* 02/01/2013

☒ As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

to move your desk to the old POW suite where your supervisor Ulyssee McBurrough is located. Your current air purifier will be placed in your new workspace and a second larger air purifier will be placed in the suite as well. Your computer will be set up to print to the printer located inside of the suite so that you do not have to walk outside of the suite to collect the documents you print. You indicated that you will obtain the respirator prescribed by your physician and wear it while inside of the building.

*This is a projected date.

This accommodation will be provided by (enter date) 03/05/2013*

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

AM

Kerrie Witty
DMO SIGNATURE

02/27/2013
DATE

EXHIBIT
PENGAD 800-631-6989
30

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f**

Adobe LiveCycle Designer

# EXHIBIT 28

**From:** Wax, Bonnie, VBASPT
**Subject:** FW: Concerns.
**To:** Clarke, Tamanique, VBASPT
**Sent:** April 15, 2013 9:47 AM (UTC-05:00)

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 18, 2013 3:06 PM
**To:** Wax, Bonnie, VBASPT
**Subject:** RE: Concerns.

I have.

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Monday, March 18, 2013 3:05 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: Concerns.

Have you seen this?

---

**From:** Smith, Sandra, VBASPT
**Sent:** Sunday, March 17, 2013 2:44 PM
**To:** Huffman, Jerry, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** RE: Concerns.

When is she here? I will speak to her when she's here but we'll have to work around our interview schedule.

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Thursday, March 14, 2013 4:15 PM
**To:** Smith, Sandra, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Wax, Bonnie, VBASPT
**Subject:** FW: Concerns.
**Importance:** High

Sandy, I am available tomorrow or whenever you are to speak to her.

*Jerry Huffman*
AVSCM
St Petersburg VSC

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Thursday, March 14, 2013 3:57 PM
**To:** Huffman, Jerry, VBASPT; Clarke, Tamanique, VBASPT
**Cc:** Collins, Veronica, VBASPT
**Subject:** Concerns.
**Importance:** High

Hello Jerry,

I discussed the work situation with Aileen Mullins this morning and she has some concerns. First the Purifier in the room appears to be working great to me. Aileen is indicating that her work situation is not working. She is not saying exactly what the problem is and to me she is just rambling. Aileen is asking to speak with you and the Service Center Manager tomorrow. If tomorrow is not ok, then can we get a date for next Tuesday or Thursday? My observation is that Aileen is mostly not wearing the prescribed mask while in the building. At times she does put the mask on while in the building and sometimes while working at her desk. My understanding is that the mask is supposed to be a fix to the problem and the purifier is an added benefit?

2nd she is failing at processing rating decision. She has completed less than 2 rating decision for the month of March. She completed 3 drafts during the month of February and only 1 of those has been signed. I will be sitting down with her this coming Tuesday to discuss her monthly reviews.

She indicating that she needs to be retrained as an RVSR. Melvin her Assigned DRO has noted that her rating are fine, but she needs to process more rating. She has also asked for the dimensioned of the room that she is working in. I will get these from Danny and give them to her tomorrow. It also appears that she does not wish to discuss this matter with Human Resources. I am doing all that I can to assist her in being a successful RVSR and I am concerned about her health as well. However, we also need some assistant for Aileen as well in this matter. Thanks for listing.

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

# EXHIBIT 29

**From:** Clarke, Tamanique, VBASPT
**Subject:** Air Purifier
**To:** Mullin, Aileen, VBASPT
**Sent:** March 25, 2013 1:59 PM (UTC-05:00)

Hello Ms. Mullin,

It was brought to my attention that you had some concerns about the air purifier in your work space. As an additional measure, a third air purifier was added to the workspace today. Prior to installing the third air purifier, we checked the air quality indicator on the Oransi Max HEPA Air Purifier and it read that the air quality was very good.

I am concerned about your health. Your physician prescribed a mask that you are to wear while in the building, however there have been times I've seen you without the mask on. You too, have a responsibility to protect your health. The air purifiers are secondary to your prescribed mask and were installed only as an additional protection.

As the Local Reasonable Accommodation Coordinator (LRAC), it is important that you bring your concerns to me directly to avoid any delays in responding to your concerns and needs. I heard about your concerns indirectly. I could have addressed them sooner had I known. I'm available if you have any additional questions or concerns.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 30

**From:** McBurrough, Ulyssee, VBASPT
**Subject:** FW: Rescinding of accommodations currently in place
**To:** Clarke, Tamanique, VBASPT
**Sent:** April 1, 2013 1:59 PM (UTC-05:00)

I sent this earlier.

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Monday, April 01, 2013 1:36 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Thanks

*Jerry Huffman*
AVSCM
St Petersburg VSC

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Monday, April 01, 2013 12:45 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

There is no Reasonable Accommodation agreement that allows Ms. Mullins to work split days at work and from home. Our meeting took place on the February 28, 2013, to discuss Aileen work situation. At this time Aileen was out sick for about a week and she called in by phone to discuss this matter. Aileen was indication that her condition would not allow her to work from this building. Aileen along with 2 union representatives and I along with Tammy Clark were discussing her work situation. Aileen was in the process of obtaining a mask prior to returning to work. Tammy Clark did note that Aileen Reasonable Accommodation agreement required her to work 2 day in the office. John Smith asked that we try her at half days in the office at first to see how this would work with the mask and the air purifiers. Again Aileen was in the process of obtaining a mask and since that time has obtained the prescribed mask. At first Aileen worked out of QRT training room and now we use the office space where the doctor is located along with 3 Coaches. It appears that the mask and the Air Purifiers are aiding her work situation. Before this Aileen worked within the section with the other employees on Tuesdays and Thursdays. To my understanding the reasonable accommodation that we were making is that Aileen would have a mask for the breathing condition and that air purifier system is an added benefit. No agreement was made to change the days from 2 full days to half days in the office.

Ulyssee McBurrough Jr.
Coach, Core 10

727 319 7313

**From:** Huffman, Jerry, VBASPT
**Sent:** Monday, April 01, 2013 10:27 AM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** FW: Rescinding of accommodations currently in place

Ulyssee,
Ms Mullins has stated that there was an agreement which you were following hence the reason you allowed split days between work and home. Please provide me a statement of what you recall from this meeting especially the outcome and any decision.

*Jerry Huffman*
AVSCM
St Petersburg VSC

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

To: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, 2012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.

My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.

I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***

If it is true that the modification to accommodations has been reversed, please help me understand why.

If it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?

- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,

Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

*** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:

- elevated penicillium spore counts
- elevated  aspergillus spore counts
- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter

Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

# EXHIBIT 31

# Fw: [WARNING: MESSAGE ENCRYPTED]FW: Rescinding of accommodations currently in place

From: Aileen Mullin (aileen_mullin@yahoo.com)

To: gemullin36@yahoo.com

Date: Monday, April 1, 2013, 08:32 PM EDT

----- Forwarded Message -----
**From:** "Mullin, Aileen, VBASPT" <Aileen.Mullin@va.gov>
**To:** aileen_mullin@yahoo.com
**Sent:** Monday, April 1, 2013 8:29 PM
**Subject:** [WARNING: MESSAGE ENCRYPTED]FW: Rescinding of accommodations currently in place

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 01, 2013 4:02 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Good Afternoon Ms. Mullin,

Your reasonable accommodation approval form, entitled Approval of Accommodation Request and dated February 27, 2012, clearly stated, "Modifications to your current approved accommodation to work from home 3 days per week." Your approval document does not state you are permitted to work four (4) hours in the office and four (4) hours at home. If we had granted such an accommodation, it would have been in writing.

No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays.

- What category of Leave request should be entered in ETA? You may take sick leave, annual leave in lieu of sick, or request leave without pay. The choice is yours. Your request for leave needs to be made through your supervisor.

- What evidence will the Agency require so that I am paid under Worker's Compensation? The Department of Labor will need medical documentation to support a claim for reimbursement.

- What is the procedure for requesting payment under Worker's Compensation? You will need to complete the attached CA-7 and direct deposit form.

- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation? Please contact Department of Labor at (904)366-0100. You can leave a message to speak with your claims examiner who can discuss in detail any further concerns or questions you may have.

*Tammi Clarke*

*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

To: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, 2012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.
My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.
I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***
If it is true that the modification to accommodations has been reversed, please help me understand why.

If it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?
- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,
Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

*** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:
- elevated penicillium spore counts
- elevated  aspergillus spore counts
- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter
Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

ca-7.pdf
428.9kB

SF-201199A Direct Deposit Form.pdf
404.9kB

# EXHIBIT 32

**From:** McBurrough, Ulyssee, VBASPT
**Subject:** FW: Rescinding of accommodations currently in place
**To:** Clarke, Tamanique, VBASPT
**Sent:** April 3, 2013 11:09 AM (UTC-05:00)
**Attached:** ca-7.pdf, SF-201199A Direct Deposit Form.pdf

FYI

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, April 03, 2013 12:02 PM
**To:** McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT
**Cc:** Smith, John, VBASPT; Smith, Sandra, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT
**Subject:** FW: Rescinding of accommodations currently in place

Hi gentlemen,

I just want you to know that I've asked John and Casey to assist me in developing an emergency medical plan.

The Agency's restriction, as to the hours I am permitted to work at home, will be detrimental to my health.

When I had the asthma attach last year, I wanted to call 911 but didn't know how to explain where in the building I was ~ Then the asthma quickly increased in severity and I couldn't communicate ~ I was gasping. The 'powers that be' who I pleaded to for help, failed to respond accordingly. Thank God, a friend did response to text. If not, I could have suffered a brain injury or death.

If I go into another full blown asthma attack, time will be of the essence.

My body has a long way to go before its healed from the cancer treatments. I fear that another attack will be crippling more quickly ~ and I won't be afforded to time, or ability, to search and beg for someone to render aid.

It would be grossly irresponsible (and naive) to depend on Human Resources to assist

There has to be an emergency plan.

Aileen

The four hours, twice a week, modification to the existing accommodation was working. I may have felt better coming into the building then when I left if but at least I I was able to stay out of the emergency room and doctor's office. Yes, the modification that **Tammi, John and I agreed to WAS effective**!!!! But that's a moot point.

Unfortunately, the Agency made it clear that it is adhering to its pattern of refusing to permit accommodations appropriate to for specific disability: "give accommodations to one employee, you'll have to give them to every employee that comes in with a doctors note". (Cookie cutter accommodations for chronic iconditions such as MS, PTSD, TBI heart problems, respiratory problems have been WAH Mon, Wen, Fri))

---

A kind man once adised me to pick my battles.

Reference: The 4/1/3013 e-mail from HR.
I took a few notes , but its a battle that can wait ...

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 01, 2013 4:02 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Good Afternoon Ms. Mullin,

To those without detailed knowledge of events that transpired since the 27th of February, these first two paragraphs would appear to contain logical and valid facts. Reality is, they contain neither logical or valid facts ... the EEOC is going to have a heyday.

Your reasonable accommodation approval form, entitled Approval of Accommodation Request and dated February 27, 2012, clearly stated, "Modifications to your current approved accommodation to work from home 3 days per week." Your approval document does not state you are permitted to work four (4) hours in the office and four (4) hours at home. If we had granted such an accommodation, it would have been in writing.

No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays.

- What category of Leave request should be entered in ETA? You may take sick leave, annual leave in lieu of sick, or request leave without pay. The choice is yours. Your request for leave needs to be made through your supervisor.
- ...The request "needs to be made **THROUGH**" my supervisor .... through to who? To what end?
- I would prefer to use LWOP when the asthma attacks occurs, but I'm concerned that the 'powers that be' will use this as an opportunity to charge me with being AWOL:
Example: My breathing becomes labored. I have to leave the building immediately. There's no time for the processing of LWOP documentation ....

- What evidence will the Agency require so that I am paid under Worker's Compensation? The Department of Labor will need medical documentation to support a claim for reimbursement.
- Incomplete answer: The fact that evidence needs to be 'medical' is a given: What does the evidence have to include?

- What is the procedure for requesting payment under Worker's Compensation? You will need to complete the attached CA-7 and direct deposit form.
- An incomplete answer ... how do I proceed after the completion of the forms .....

- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation? Please contact Department of Labor at (904)366-0100. You can leave a message to speak with your claims examiner who can discuss in detail any further concerns or questions you may have.
- Denial of clarification / information:DOL told me to contact HR....

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

To: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, 2012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.

My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.

I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***

If it is true that the modification to accommodations has been reversed, please help me understand why.

If it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?

- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,

Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

*** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:

- elevated penicillium spore counts
- elevated  aspergillus spore counts
- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter

Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

# EXHIBIT 33

**From:** Clarke, Tamanique, VBASPT
**Subject:** RA Approval Letter
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Bcc:** Correa, Matthew, VBASPT; Wax, Bonnie, VBASPT
**Sent:** April 15, 2013 2:10 PM (UTC-05:00)
**Attached:** RA Approval - Mullin 4-15-13.pdf

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013

- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NS Kerrie Witty — 04/15/2013

DMO SIGNATURE — DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** — Adobe LiveCycle Designer

# EXHIBIT 34

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Tuesday, April 16, 2013 7:43 AM |
| **To:** | McBurrough, Ulyssee, VBASPT |
| **Cc:** | Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org' |
| **Subject:** | FW: RA Approval Letter |
| **Attachments:** | RA Approval - Mullin 4-15-13.pdf |
| **Signed By:** | Aileen.Mullin@va.gov |
| **Importance:** | High |

PRETEXT

Good morning Bo,

At first read this message from Human Resources and the Director sound good, but its not

The message, and attached document, are riddled with pretext: I'll explain in a follow-up e-mail.
Respectfully,
Aileen

Since I amended my EEO complaint, the Agency's treatment of me has reached the level of being inhumane. The Agency is fully aware of my cancer, asthma, sinus infections ... and desire to move forward in my career ~ but none of that is enough for them to treat me with common decency.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NB Kerrie Witty

DMO SIGNATURE

04/15/2013

DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f**

Adobe LiveCycle Designer

# EXHIBIT 35

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Tuesday, April 16, 2013 2:31 PM |
| **To:** | McBurrough, Ulyssee, VBASPT |
| **Cc:** | Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; Allard, Carolyn, VBASPT; Ingram, Walter, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org' |
| **Subject:** | FW: RA Approval Letter |
| **Attachments:** | RA Approval - Mullin 4-15-13.pdf |
| **Importance:** | High |

Duplicity:

- I didn't not request these specific accommodations ~ They ***alone*** are useless and potentially harmful to me professionally and physically

- Needless to say, I did not request them on these specific accommodations 3/29/13. ~ To say otherwise is patently false

- The accommodations do not address assistance with marginal functions of the RVSR WAH position.

**We interpret the omission of key variables in attached VA From 0857f, as a denial of the accommodations we suggested to Tammi Clark on: January 29 and 30, 2013, February 6, 2013, February 25 through 28, 2013 and March 5, 2013.** If this interpretation of incorrect, please notify John Smith and me by close of business tomorrow afternoon.

Respectfully,

Aileen
am:

PS: It galls me that Human Resources flagrantly interferes with the mission of the VBA to break the backlog. Their manipulation of EEOC and Rehabilitation laws/regs/guidance, by targeting people with chronic illnesses, effects all of us. It takes our attention and effort away from were it should be; getting those claims taken care of. HR plays a key roll in effecting the waste of human capital.... Seriously, I'd rather be rating.

----------------------------------------

VA Handbook 5975.1

2.a. **VA shall provide reasonable accommodations to qualified individuals with disabilities to allow them to fully** participate in the application process, **perform essential job functions**, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause undue hardship to the Department.

4. b.**Essential Functions**:
The essential functions of a job are the **occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them**. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it

4i.**Reasonable Accommodation**:

A "reasonable accommodation" is a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. The accommodation **must be effective in meeting the needs of the individual** by addressing the barrier created by the functional limitations.

Types of reasonable accommodations include, but are not limited to: modification or adjustment to a job application process to permit an individual with a disability to be considered for a job, modification or adjustment necessary to enable a qualified individual with a disability to perform the essential functions of the job, and modifications or adjustments that enable employees with disabilities to enjoy equal benefits and privileges of employment.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013

- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ____________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NS [signature: Kerrie Witty]

DMO SIGNATURE

04/15/2013

DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

# EXHIBIT 36

**From:** Smith, Sandra, VBASPT
**Subject:** FW: RA Approval Letter
**To:** Mullin, Aileen, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT
**Sent:** April 16, 2013 4:00 PM (UTC-05:00)
**Attached:** RA Approval - Mullin 4-15-13.pdf

Aileen,

I received a copy of a letter from a doctor earlier this afternoon from John Smith, union steward. I did date-stamp for receipt of the letter and then forwarded the letter to Human Resource (HR) as that is the proper office for such matters.

When I recently reviewed copies of documents that you had provided to your supervisor, I felt that you had attempted to submit a RA request. Specifically I am referencing a copy of a letter to John Smith, an AFGE steward in which you requested him to forward information to the Director's office. When I followed up with the Director's office, they had not received this information. While it is acceptable to submit such requests to your supervisor, the St. Petersburg RO has a longstanding policy and process for employees to submit RA requests to the HR office. After receipt of this documentation, the HR office has processed your request and you have received the approval (attached).

I understand that you have concerns with communicating directly with the HR office; however, I assure you that there is no intentional or unintentional "pretext" involved with the approval of your most recent RA request. And, as I indicated above, the HR office is the appropriate office designated by the RO Director to both receive and process all RA requests.

I would also like to comment on some of the concerns you've raised with your supervisor with regard to Worker's Compensation. I believe that you have received information directly from the Department of Labor that is the best information on some of your concerns. The Department of Labor retains sole authority to manage the Worker's Compensation program. It would be your best course of action to contact the assigned claims examiner for your case with your specific questions. While the HR office here at the RO does accept and processes the paperwork, it is the Department of Labor that makes all decisions with regard to such claims; thus, they can provide the proper guidance as it relates to your claim.

Ulyssee, your Coach, has conveyed your request to attend RVSR Challenge training again. The decision of whether an employee can attend Challenge training a second time is not strictly within the RO's control as the Challenge Training is administered by VACO; however, I am supportive of your request. The next RVSR Challenge training is scheduled for June 2013. I have already indicated to VACO that St. Pete has one RVSR to attend this training. They will be soon be asking for more specific information. While I do not know if they will allow you to attend again, I do plan to advocate on your behalf for your attendance. If you do not want to attend this training in June please let me know as soon as possible.

Sincerely,

Sandy

Sandy Smith, VSCM
St. Petersburg RO
727.319.7672

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, April 16, 2013 7:43 AM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie,

VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org'
**Subject:** FW: RA Approval Letter
**Importance:** High

PRETEXT

Good morning Bo,

At first read this message from Human Resources and the Director sound good, but its not

The message, and attached document, are riddled with pretext: I'll explain in a follow-up e-mail.
Respectfully,
Aileen

Since I amended my EEO complaint, the Agency's treatment of me has reached the level of being inhumane. The Agency is fully aware of my cancer, asthma, sinus infections ... and desire to move forward in my career ~ but none of that is enough for them to treat me with common decency.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 37

**From:** Smith, Sandra, VBASPT
**Subject:** FW: RA Approval Letter
**To:** Mullin, Aileen, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, Sandra, VBASPT; Smith, John, VBASPT; Correa, Matthew, VBASPT
**Sent:** April 16, 2013 3:55 PM (UTC-05:00)
**Attached:** RA Approval - Mullin 4-15-13.pdf

Aileen,

I previously responded to an earlier email today. As I stated in the earlier email with regard to a letter I received, I will forward this email to the appropriate individual and office (Matthew Correa, Human Resources Office).

Sincerely,

Sandy

Sandy Smith, VSCM
St. Petersburg RO
727.319.7672

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, April 16, 2013 2:31 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; Allard, Carolyn, VBASPT; Ingram, Walter, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org'
**Subject:** FW: RA Approval Letter
**Importance:** High

Duplicity:

- I didn't not request these specific accommodations ~ They ***alone*** are useless and potentially harmful to me professionally and physically

- Needless to say, I did not request them on these specific accommodations 3/29/13. ~ To say otherwise is patently false

- The accommodations do not address assistance with marginal functions of the RVSR WAH position.

**We interpret the omission of key variables in attached VA From 0857f, as a denial of the accommodations we suggested to Tammi Clark on: January 29 and 30, 2013, February 6, 2013, February 25 through 28, 2013 and March 5, 2013.** If this interpretation of incorrect, please notify John Smith and me by close of business tomorrow afternoon.

Respectfully,

Aileen
am0303@hotmail.com

PS: It galls me that Human Resources flagrantly interferes with the mission of the VBA to break the backlog. Their

manipulation of EEOC and Rehabilitation laws/regs/guidance, by targeting people with chronic illnesses, effects all of us. It takes our attention and effort away from were it should be; getting those claims taken care of. HR plays a key roll in effecting the waste of human capital.... Seriously, I'd rather be rating.

---------------------------------------

VA Handbook 5975.1

2.a. **VA shall provide reasonable accommodations to qualified individuals with disabilities to allow them to fully** participate in the application process, **perform essential job functions**, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause undue hardship to the Department.

4. b.**Essential Functions**:
The essential functions of a job are the **occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them**. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it

4i.**Reasonable Accommodation**:
A "reasonable accommodation" is a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. The accommodation **must be effective in meeting the needs of the individual** by addressing the barrier created by the functional limitations.

Types of reasonable accommodations include, but are not limited to: modification or adjustment to a job application process to permit an individual with a disability to be considered for a job, modification or adjustment necessary to enable a qualified individual with a disability to perform the essential functions of the job, and modifications or adjustments that enable employees with disabilities to enjoy equal benefits and privileges of employment.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

# EXHIBIT 38

April

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

April 12, 2013

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number: 062294294
Re: Aileen Mullin (DOB 03/03/60)

To Whom It May Concern:

This is an addendum to my letter dated May 24, 2012 a copy of which is appended for your information regarding Aileen Mullin's current situation. She continues to experience significant buffeting of her medical condition when she returns to her office at the VA. At this point in time I would recommend that she not return to her office at the VA until appropriate accommodations can be made. The accommodations I am referring to are improvements in the indoor environment that would prevent the onset and or aggravation of her asthma, sinusitis, and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

EXHIBIT
28

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

April 12, 2013

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number: 062294294
Re: Aileen Mullin (DOB 03/03/60)

To Whom It May Concern:

This is an addendum to my letter dated May 24, 2012 a copy of which is appended for your information regarding Aileen Mullin's current situation. She continues to experience significant buffeting of her medical condition when she returns to her office at the VA. At this point in time I would recommend that she not return to her office at the VA until appropriate accommodations can be made. The air purifier machine provided in her work area is not sufficient. The accommodations I am referring to are improvements in the indoor environment that would prevent the onset and or aggravation of her asthma, sinusitis, and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

# EXHIBIT 39

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, Thursdays, and Fridays. You will be required to report to the St. Petersburg Regional Office on Fridays at the beginning of your tour. Your coach or his designee will meet you outside the Regional Office to provide your work and pick up your work. You are required return to your home office in a timely manner to complete you tour of duty on Fridays.

- [x] We will provide the accommodation requested by *(enter date)* 04/19/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Matthew Correa, Human Resources Specialist at(727) 319-5800 ext. 6560.

This accommodation will be provided by (enter date) ________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty
DMO SIGNATURE

04/19/2013
DATE

EXHIBIT
PENGAD 800-631-6989
33

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f**

Adobe LiveCycle Designer

# EXHIBIT 40

Aileen Mullin 3-03-60

MAR 2 2012
BP 138/86

Continues to have problems at work.
Brought a nebulizer to work.
She requested a move.
But wasn't moved at 1st.
Had an a Hack that lead to 911 call & trip to St Pete General.
Since that was moved to a different Floor.
She still has Sx's in that area. Can't work more than 4 days without having asthma.



ALLERGY ASSOC. 041

EXHIBIT 14

They gave her a room sized
air purifier but she works
in a large open area
Would like to apply for
FMLA - working at home
c̄ limited exposure to
work site
HEENT - PND
Chest - coughing,
- end exp wheeze
bases
P - will fill out forms
for FMLA

3-3-12. copies of FMLA papers in chart - RJG

# EXHIBIT 41

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: ____________________

Employee's job title: ____________________ Regular work schedule: ____________________

Employee's essential job functions: ____________________

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen Mullin
First Middle Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Stephen Klemawesch 6294 1st Ave N

Type of practice / Medical specialty: Allergy / Immunology

Telephone: (727) 345 1900 Fax: (727) 347 5273

 CONTINUED ON NEXT PAGE 

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 2009

Probable duration of condition: Chronic

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___Yes. If so, dates of admission:

Oct 2010, Nov 2010, Dec 2010, Mar 2011 Sept 2011 Oct 2011 Dec 2011 Mar 2012

Date(s) you treated the patient for condition:

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___No X Yes. when she has a attacks

If so, identify the job functions the employee is unable to perform:

All

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Patient has allergic sinusitis and asthma. The asthma worsens at work at the VA leading to severe attacks requiring urgent care.



CONTINUED ON NEXT PAGE

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

If so, estimate the beginning and ending dates for the period of incapacity: 1-4 Days every 2-3 weeks

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No X Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
___No X Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

Regular doctor apts 1 hour. Allergy shots monthly 1 hour

Estimate the part-time or reduced work schedule the employee needs, if any:

_________ hour(s) per day; _________ days per week from ___________ through ___________

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No X Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?
___ No X Yes. If so, explain:

She is unable to breathe therefore unable to work

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: 1-4 times per 3 week(s) _____ month(s)

Duration: _____ hours or 1-4 day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

I recommend the patient
be allowed to work from
home with periodic
trips to the work site
as required.
When at the work site



CONTINUED ON NEXT PAGE

limit exposure to the building
Consider installing a total building air purifier dehumidification system.
Patient must be allowed to leave immediately from the work place if she develops asthma.

[signature] MD 3/20/12

Signature of Health Care Provider Date

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# EXHIBIT 42

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to 12 workweeks or 480 hours of FMLA leave. The employee will be on leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. FMLA entitlement will begin on March 9, 2012 and will end on March 8, 2013. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently*. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode*. The employee was informed (in writing) by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is only for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or OPM71 prior to an extended (constant) FMLA absence, or completion of the OPM71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;
d. Notify the employee that new medical documentation is required when leave usage is not intermittent as defined by the Health Care Provider; (consult with HR)
e. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;

f. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;

g. Notify Human Resources of any changes such as constant leave when the employee is only approved for *intermittent* leave, or requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.

h. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours) between March 9, 2012 and March 8, 2013.

7. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

cc: Employee's Supervisor
Employee's Extended File

DEPARTMENT OF VETERANS AFFAIRS
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

March 14, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 9, 2012, request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Allergic sinusitis and asthma

If it should become necessary for you to extend your entitlement beyond the current certification, you will be required to provide an updated physician's statement from your health care provider.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* If your leave becomes constant, or exceeds the amount recommended by the Health Care Provider, you will be required to immediately provide updated medical documentation.

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay beginning March 9, 2012. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during this 12-week period as needed for this specific condition. Public Law 103-3 states your entitlement ceases in 12 months or March 8, 2013 (1 year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave.

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Manager (317/25)

Subj: Family and Medical Leave for Aileen Mullin

To: Roddy Cooke, Acting Financial Account Supervisor

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under FMLA, Ms. Mullin is entitled to up to 12 administrative workweeks of leave without (LWOP) pay beginning March 9, 2012. Specifically, Aileen Mullin may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay (LWOP) during this 12-week period as needed for this specific condition.

3. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently.* The Health Care Provider defined intermittent as: *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* The employee was informed by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

4. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide payroll with a new FMLA letter.

5. The Director has approved LWOP for Ms. Mullin. Therefore, the supervisor is authorized to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours. This authority is only for LWOP under FMLA, and does not extend to other types of requests for LWOP.

6. If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax

# EXHIBIT 43

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/29/2012

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/ 317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: ______

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ______ (Middle) Mullin (Last) (954) 263-1510

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Jeffrey Paonessa 1201 5th Ave. St Petersburg

Type of practice / Medical specialty: Oncology

Telephone: (727) 821-0017 Fax: (727) 822-7473

 CONTINUED ON NEXT PAGE 

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 3-16-2012

Probable duration of condition: 6 months

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

3-22-12 - consultation

Will the patient need to have treatment visits at least twice per year due to the condition? ___No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___No ✓ Yes. If so, state the nature of such treatments and expected duration of treatment:

Dr. Karen Kritsky - Surgery

2. Is the medical condition pregnancy? ✓ No ___Yes. If so, expected delivery date: ______

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ____ No ____ Yes.

If so, identify the job functions the employee is unable to perform:

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

New diagnosis of Breast Cancer, she will need surgery followed by chemotherapy and possible radiation.

 CONTINUED ON NEXT PAGE 

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No ✓ Yes.

If so, estimate the beginning and ending dates for the period of incapacity: present - 6 months

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ✓ Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
___No ✓ Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

weekly chemo and related treatment

Estimate the part-time or reduced work schedule the employee needs, if any:

_______ hour(s) per day; _______ days per week from _______ through _______

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ✓ Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?
___ No ✓ Yes. If so, explain:

Side effects from chemotherapy

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s)

Duration: ____ hours or ___ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.**

 CONTINUED ON NEXT PAGE 

m. Williamson, APRP 3/23/12

Signature of Health Care Provider Date

For. Jeffrey Paonessa

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# EXHIBIT 44

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: April 9, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Approval for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to a total of 12 workweeks or 480 hours of FMLA leave during a 12-month period. However, Ms. Mullin previously invoked her entitlement to FMLA on March 9, 2012, which will expire March 8, 2013. During this 12-month period, she may use up to a total of 12 workweeks of leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. Additional medical documentation for a new serious medical condition was submitted on March 23, 2012. According to the medical documentation, the duration of the medical condition will require FMLA leave throughout the next 6 months. Consequently, the employee is eligible for FMLA coverage until approximately September 23, 2012, for this new condition. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *constantly* for surgery, at a date to be determined by her healthcare provider. Additionally, following the employee's return to work, she will require absences intermittently, for medical treatment/ appointments, and during flare-ups of the condition. The frequency of these intermittent absences is unpredictable.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is only for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or SF71 prior to an extended (constant) FMLA absence, or completion of the SF71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;

d. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;
e. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;
f. Notify Human Resources of any changes such as requests to stay out of work longer, failure to return to work by the end date, requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.
g. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours).

7. Public Law 103-3 requires her entitlement to cease in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique "Tammi" Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

cc: Employee's Supervisor
Employee's Extended File

**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

April 9, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 23, 2012 request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Breast cancer

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay during a 12-month period. Although you submitted new medical documentation on March 23, 2012, for the above condition, you had an existing FMLA entitlement, which began on March 9, 2012. Public Law 103-3 requires your entitlement to cease in 12 months or March 22, 2013 (one year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave. However, your condition(s) may not require this entire period. Therefore, it is imperative that you read this letter carefully. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during your FMLA-related absences as needed for this specific condition.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work *constantly* for surgery, at a date to be determined by your health care provider, and then for *intermittent* absences for medical treatment/ appointments or flare-ups of your approved FMLA medical condition, for a period of 6 months or until September 23, 2012. If it should become necessary for you to extend your entitlement beyond the current certification of 30 days, you may be required to provide an updated physician's statement from your health care provider.

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique "Tammi" Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: April 9, 2012

From: Human Resources Manager (317/25)

Subj: Family and Medical Leave Act (FMLA) Approval for Aileen Mullin

To: Roddy Cooke, Acting Financial Account Supervisor

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under FMLA, Ms. Mullin is entitled to up to 12 administrative workweeks of leave without (LWOP) during a 12-month period. Although Ms. Mullin submitted additional medical documentation on March 23, 2012, she had an existing FMLA approval, which began on March 8, 2012. Public Law 103-3 requires her entitlement to cease in 12 months or March 9, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide payroll with a new FMLA letter.

3. Specifically, for the purposes of this approval memo, the medical documentation indicates that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *constantly* for a period of time to be determined by her healthcare provider at a later date, and intermittently for treatment/appointments and other necessary absences due to the approved FMLA condition, until September 23, 2012.

4. Ms. Mullin may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay (LWOP) during this 12-month period.

5. The Director has approved LWOP for Ms. Mullin. Therefore, the supervisor is authorized to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours. This authority is only for LWOP under FMLA, and does not extend to other types of requests for LWOP.

6. If you have any questions concerning this program or your employment status, please contact Tamanique "Tammi" Clarke, Human Resources Specialist, at 727-319-5818.

BJWax

Bonnie J. Wax

# EXHIBIT 45

FW: How you doing

From: Mullin, Aileen, VBASPT (aileen.mullin@va.gov)

To: aileen_mullin@yahoo.com

Date: Thursday, May 3, 2012, 03:51 PM EDT

---

**From:** Crump, Casey, VBASPT
**Sent:** Thursday, May 03, 2012 3:06 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** How you doing

Aileen,

I have been busy and have not seen you around lately. I spoke with Bonnie Wax the other day about your condition. She said the tumor you have is what caused your breathing problems. She said it was apparently exerting some pressure on your lungs. She also said she was relieved your condition was not caused by our office and that we do not actually have sick building syndrome. Anyway, I hope your doing well and your conditions improve. Later.

Casey

EXHIBIT
20

# EXHIBIT 46

**Henley, John (ORM)**

**From:** Crump, Casey, VBASPT
**Sent:** Tuesday, August 27, 2013 11:35 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413
**Signed By:** casey.crump@va.gov

Below is a copy of the email I sent Aileen on May 3, 2012. I did not know at the time and still do not know where Bonnie got the information. I had assumed Bonnie and Aileen had discussed until I sent the email and Aileen contacted me about the conversation. I don't believe Bonnie was just spreading information to anyone about Aileen's condition. As Chief Steward, I routinely discussed employee situations with HR. However, Aileen was upset and said she had not authorized Bonnie to discuss her medical condition with anyone.

**From:** Crump, Casey, VBASPT
**Sent:** Thursday, May 03, 2012 3:06 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** How you doing

Aileen,

I have been busy and have not seen you around lately. I spoke with Bonnie Wax the other day about your condition. She said the tumor you have is what caused your breathing problems. She said it was apparently exerting some pressure on your lungs. She also said she was relieved your condition was not caused by our office and that we do not actually have sick building syndrome. Anyway, I hope your doing well and your conditions improve. Later.

Casey

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 10:51 AM
**To:** Crump, Casey, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Casey Crump

Sub: EEO Investigation

Good morning, the subject complainant testified that Bonnie Wax said to you, "isn't that interesting about Ms. Mullin with her breast cancer and it was her breast cancer that caused all the breathing problems...there was never anything wrong with the building." Explain, what happened? Did Ms. Wax make the above comment to you? If yes, what was specifically said?

How did Ms. Wax know the complainant's breast cancer caused her breathing problem?

Thank you for your cooperation.

John Henley

# EXHIBIT 47

# Fwd: Aileen Mullin Leave Request

From: Mary Shapiro (mjsflorida@verizon.net)

To: aileen_mullin@yahoo.com

Date: Friday, May 4, 2012, 02:59 PM EDT

Sent from my iPad

Begin forwarded message:

**From:** Mary Shapiro <mjsflorida@verizon.net>
**Date:** May 4, 2012 2:51:55 PM EDT
**To:** "ulyssee.mcburrough@va.gov" <ulyssee.mcburrough@va.gov>
**Subject: Aileen Mullin Leave Request**

Bo, see message below from Aileen:

Bo,

I am requesting Advanced Leave of 72-80 hours. This should take care of the post-operative period of 2 weeks followed by approximately 6 weeks of radiation.

The Leave Form and the new FMLA Form (requested by HR) were given to Moffitt's Patient Disability Office today and will be faxed directly to HR when completed by the doctor. This takes approximately 5-7 days.

Thank you for your assistance.

Aileen

# EXHIBIT 48

Note: Signatures are not dated. This will become a major issue

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

**Date:** May 7, 2012.

**From:** Ulyssee McBurrough Jr., Coach, VBIT 1C

**Subj:** Request for Advanced Sick Leave in lieu of Leave Without Pay (LWOP) under FMLA

**To:** Veterans Service Center Manager
Director, St. Petersburg Regional Office
Human Resources Management Division

1. Aileen Mullin, RVSR, has requested Advanced Sick Leave in lieu of LWOP under FMLA in the amount of 80 hours.

2. Aileen Mullin has requested Advanced Sick Leave due to surgery medical surgery performed on May 4, 2012.

3. I am recommending approval/disapproval of the request for 80 hours of Advanced Sick Leave in lieu of LWOP under FMLA.

Coach, ULYSSEE McBURROUGH JR.

JERRY HUFFMAN, AVSCM
~~Recommend~~ Approval/~~Disapproval~~

SANDRA L. SMITH, VSCM
Recommend Apprproval/Disapproval

BONNIE J. WAX
Human Resources Manager
Recommend Approval/Disapproval

KERRIE L. WITTY
Director
Approval/Disapproval

C-6

# Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Mullin, Aileen | |

**3. Organization**

St. Petersburg Regional Office (317)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | May 11, 2012 | May 24, 2012 | 7:30:00 AM | 3:30:00 PM | 80 |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature | 7b. Date |
|---|---|
| Employee presently unavailable | 5/7/12 |

**8a. Official Action on Request:** ☒ Approved ☐ Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

| 8c. Supervisor Signature | 8d. Date |
|---|---|
| Kevin Witty | 5/10/12 |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

[illegible] w 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification n[illegible]. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may d[illegible] prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form 00507 Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

# EXHIBIT 49

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: Mon. - Fri. 7:00am - 3:30pm

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ____ (Middle) Mullin (Last)

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Marie Catherine Lee 12902 Magnolia Dr Tampa Fl

Type of practice / Medical specialty: Surgical Oncology

Telephone: ( ) ____ Fax: (813) 745-2002



CONTINUED ON NEXT PAGE

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: 05/04/12

Probable duration of condition: 05/18/12

**Mark below as applicable:**
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
X No ___Yes. If so, dates of admission:

Date(s) you treated the patient for condition:
05/04, 05/02, 04/24, 04/17, 04/10, 3/28/12

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ___________

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No X Yes.

If so, identify the job functions the employee is unable to perform:
NO WORK OF any kind

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Surgery, MD visits, scans, labwork

 CONTINUED ON NEXT PAGE 

[redacted]

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 05/04 - 05/18/12

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No X Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary? ___No X Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   dates and times of treatment will vary

   Estimate the part-time or reduced work schedule the employee needs, if any:

   2-8 hour(s) per day; 1-3 days per week from 05/22/12 through 11/22/12 as needed

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? X No ____Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups? ____ No ____Yes. If so, explain:

   ______________________________

   ______________________________

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency : _____ times per _____ week(s) _____ month(s)

Duration: _____ hours or ___ day(s) per episode

[redacted]

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

 CONTINUED ON NEXT PAGE 

Signature of Health Care Provider     Date 5/7/12

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# EXHIBIT 50

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: May 11, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Amendment for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. Human Resources received updated medical documentation regarding Aileen Mullin. Her FMLA was originally approved for intermittent use and for surgery, most recently updated via FMLA letter dated April 9, 2012. However, the Health Care Provider has provided additional documentation and established a surgery date and an estimation of the extent of absences.

2. The new medical documentation indicates that Ms. Mullin will be out constantly from May 4, 2012 through May 18, 2012. Additionally, Ms. Mullin will require periodic intermittent absences for treatment and follow-up appointments, the dates and times of which are unpredictable.

HR COPY

3. Under FMLA, the employee is entitled to up to a total of 12 administrative workweeks of leave without pay, which began on March 9, 2012. She is not allowed an additional 12 workweeks based on this amendment. She can use a total of 480 hours for the entire FMLA entitlement period. Her entitlement will still expire on May 8, 2013, at which point she may renew her entitlement, if necessary. In this case, Human Resources will provide a new memo.

4. If you have any questions or concerns, please contact Tammi Clarke, Human Resources Specialist at (727) 319-5818.

Bonnie J. Wax
Human Resources Manager

CC: Employee's Supervisor
Employee's Extended File

# EXHIBIT 51

## Documents faxed to Human Resouces from Moffitt Cancer Center

Aileen Mullin <aileen_mullin@yahoo.com>

Wed 5/9/2012 11:53 AM

**To:** Tamanique.Clarke@va.gov <Tamanique.Clarke@va.gov>
**Cc:** jerry.huffman@va.gov <jerry.huffman@va.gov>; ulyssee.mcburrough@va.gov <ulyssee.mcburrough@va.gov>; casey.crump@va.gov <casey.crump@va.gov>; valorie.reilley@va.gov <valorie.reilley@va.gov>; am0303@hotmail.com <am0303@hotmail.com>

Good morning Tammi,

While I was in surgery on Friday, on my behalf, a family member and friend met with a Specialist from Moffitt's Disability Office, . (Please know that the sole function of the Department is the handling of FMLA, Social Security, Private Insurance...). The FMLA and Application to Become a Leave Recipient forms were submitted and the situation I'm in, as to meeting the documentation requirements of Human Resources, was also addressed with the Specialist.

Will you please let us know,

a) If you've received, from Moffitt, the completed FMLA and Application to Become a Leave Transfer Recipient documents. If not please let me know as soon as possible.

b) If they have been received, does the information contained within them satisfy the requirements of Human Resources If not, please lay out the specific information/details required so we can forwarded it to Moffitt asap.

Your prompt response will be greatly appreciated,

Aileen

cc:

*Jerry Huffman*

*Ulyssee McBurriugh Jr,*

*Valorie.Reilley*

*Casey Crump*

*[compose?to=ulyssee.mcburrough@va.gov]*

# EXHIBIT 52

**Department of Veterans Affairs**

# Memorandum

Date: May 10, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work from May 4, 2012 through May 18, 2012. According to Payroll records, you exhausted all paid leave on May 9, 2012, and will be in a leave without pay (LWOP) status for 24 hours or more, until your return to duty.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

Kerrie Witty

KERRIE L. WITTY

Attachment

## Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

1. Applicant's name (*Last, first, middle*): MULLIN, AILEEN

2. Social Security Number: [redacted]

3. Employee Number:

4a. Position title: RVSR

4b. Pay plan.

4c. Grade/pay level: 11 / 2

5. Name of organization (*Agency, Department, Office, Division, Branch, etc.*): Veterans Benefits Administration

6. Office telephone number: HR 727 319 5818

7. Nature and severity of the medical emergency

8. Individual affected by medical emergency (*check one*)
- ☐ Employee
- ☐ Employee's family member

9. Date medical emergency began

10. Date medical emergency ended (*or is expected to end*)

✱ 11. Name of physician who will verify the medical emergency. (*Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.*)

12. What is the applicant's annual and sick leave balances as of end of last pay period?
Annual leave balance → ☐ Sick leave balance → ☐

13. How many hours of leave without pay have been used for this medical emergency?
Hours → ☐

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.
- ☐ Check box if applicant does not want a description distributed.
- ☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

Description of medical emergency

15a. Name of individual completing application (*If applying on behalf of the applicant*)

15b. Relationship to applicant

15c. Telephone number (area code)

16a. ***I certify that the above statements are true.***
(*Signature of applicant or individual applying on behalf of applicant*)

16b. Date signed

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

17. First level supervisor's recommendation
☐ Approve ☐ Disapprove
Signature Date signed

18. Deciding official's decision
☐ Approve ☐ Disapprove
Signature Date signed

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM 630
June 2001
Formerly Optional Form (OF) 630

## Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

| | | |
|---|---|---|
| 1. Applicant's name *(Last, first, middle)* MULLIN, AILEEN | 2. Social Security Number [redacted] | 3. Employee Number |
| 4a. Position title RVSR | 4b. Pay plan | 4c. Grade/pay level 11 / 12 |
| 5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)* Veterans Benefits Administration | | 6. Office telephone number HR 727 319 5818 |
| 7. Nature and severity of the medical emergency | | |
| 8. Individual affected by medical emergency *(check one)* ☐ Employee ☐ Employee's family member | 9. Date medical emergency began | 10. Date medical emergency ended *(or is expected to end)* |
| 11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)* * Marie Catherine Lee — 05/04/2012 - 05/18/12 outpatient surgery | | |
| 12. What is the applicant's annual and sick leave balances as of end of last pay period? Annual leave balance → ☐ Sick leave balance → ☐ | | 13. How many hours of leave without pay have been used for this medical emergency? Hours → ☐ |
| 14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant. ☐ Check box if applicant does not want a description distributed ☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program | | Description of medical emergency |
| 15a. Name of individual completing application *(If applying on behalf of the applicant)* | 15b. Relationship to applicant | 15c. Telephone number (area code) |
| 16a. *I certify that the above statements are true.* *(Signature of applicant or individual applying on behalf of applicant)* | | 16b. Date signed |

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| | | | |
|---|---|---|---|
| 17. First level supervisor's recommendation ☐ Approve ☐ Disapprove Signature | Date signed | 18. Deciding official's decision ☐ Approve ☐ Disapprove Signature | Date signed |

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM 630
June 2001
Formerly Optional Form (OF) 630

# EXHIBIT 53

**Department of Veterans Affairs**

# Memorandum

**Date:** September 18, 2012

**From:** Director, St. Petersburg VA Regional Office

**Subj:** Leave Issue – Mullin, A.

**To:** Payroll

**Thru:** Human Resources Management Division

1. The attached OPM Form 71's supersede all previously submitted OPM Form 71's for Ms. Aileen Mullin. Please process the attached 71's as annotated to correct Ms. Mullin's leave record.

2. If you have any questions, please contact Bonnie Wax, Human Resources Manager at (727) 319-7271.

for KERRIE L. WITTY
Director

Automated VA FORM 2105

# Request for Leave or Approved Absence

| 1. **Name** *(Last, first, middle)* | 2. **Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))** |
|---|---|
| Mullin, Aileen | [redacted] |

**ganization**

VSC (T&L 839)

| 4. **Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☐ **Accrued Sick Leave** | | | | | |
| ☒ **Advanced Sick Leave** | Jun 20, 2012 | Jun 29, 2012 | 07:00a | 03:30p | 64 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | |
| ☐ **eave Without Pay** | | | | | |

5. **Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**marks:**

Total leave 64 Advanced SL

7. **Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. **Employee Signature** | 7b. **Date** |
|---|---|
| | |

8a. **Official Action on Request:** ☐ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

8b. **Reason for Disapproval:**

| 8c. **Supervisor Signature** | 8d. **Date** |
|---|---|
| | |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification n This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may d prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form    Clear Form

# Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Mullin, Aileen | [redacted] |

**Organization**

VSC (T&L 839)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☒ Accrued Sick Leave | Aug 13, 2012 | Aug 13, 2012 | 07:00a | 10:00a | 4.00 |
| ☒ Advanced Sick Leave | Aug 13, 2012 | Aug 24, 2012 | 10:00a | 03:30p | 76.00 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**

Total leave 4 SL, 76 Advanced SL

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature** | **7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature** | **8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form | Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

# Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Frum, Elizabeth Ann | |

**3. Organization**

Department of Veterans Affairs/Veterans Benefits Administration

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☐ **Accrued Sick Leave** | | | | | |
| ☒ **Advanced Sick Leave** | Nov 14, 2011 | Nov 15, 2011 | 7:30:00 AM | 6:00:00 PM | 20 |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

Surgery performed on November 9, 2011 exacerbated my cervical injury.

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature | 7b. Date |
|---|---|
| Elizabeth Frum | 11/14/2011 |

**8a. Official Action on Request:** ☐ **Approved** ☒ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

Advanced SL previously granted and not paid back.

| 8c. Supervisor Signature | 8d. Date |
|---|---|
| Kevin Watts | 12/5/11 |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form    Clear Form

# REQUEST FOR LEAVE OR APPROVED ABSENCE

**1. NAME** *(Last, First, Middle Initial)*
Brinton, Laurie Noelle

**2. EMPLOYEE OR SOCIAL SECURITY NUMBER**

**3. ORGANIZATION** VSC

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From | DATE To | TIME From | TIME To | TOTAL HOURS |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advance Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advance Sick Leave | See dates below | | See times below | | 30.75 |
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | |
| ☒ Leave Without Pay | See dates below | | See times below | | 30.75 |

**Purpose:** ☒ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

**5. FAMILY AND MEDICAL LEAVE**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ I hereby invoke my to Family and Medical Leave for:

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

Contact your supervisor and/or your personnel office to obtain additional information about our entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:**

0[illegible]5/11 from 1:15 pm to 5:15 pm = 4 hours
[illegible]/11 from 8:45 am to 12:45 pm = 4 hours
09/22/11 from 8:45 am to 5:15 pm = 8 hours
09/23/11 from 8:45 am to 10:00 am = 1.25 hours
09/26/11 from 8:45 am to 12:45 pm = 4 hours
09/27/11 from 8:45 am to 5:15 pm = 8 hours
10/05/11 from 8:45 am to 10:15 am = 1.5 hours

**Please see attached memo for further details. ***

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** [signature] **DATE** 10/06/11

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED ☒ DISAPPROVED

*(If disapproved, give reason. If annual leave, initiate action to reschedule.)* Advanced Sick leave denied as not requested in advance. LWOP denied due to excessive absences and inability to maintain work schedule

**SIGNATURE** [signature] **DATE** 10/18/11

**PRIVACY ACT STATEMENT**

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**

St. Petersburg Regional Office (317)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | May 11, 2012 | May 24, 2012 | 7:30:00 AM | 3:30:00 PM | 80 |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

Employee presently unavailable

**7b. Date**

5/7/12

**8a. Official Action on Request:** ☒ Approved ☐ Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

Kevin Witty

**8d. Date**

5/10/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form Clear Form

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: 6-25-12

From: Ulyssee McBurrough Jr., Coach

Subj: Aileen Mullin – Requesting 104 hours of advanced leave.

To: Sandra L. Smith, VSCM

Aileen Mullin, RVSR had surgery on May 4, 2012. Currently, she has used all of her sick and annual leave. She is requesting a total of 13 leave days as she works 8 hours per day Monday through Friday.

She is requesting a total of 104 hours of advanced leave that will include the following days:

| Dates | Time | Total |
|---|---|---|
| 6- 20-12 to 7-09-12 | 7:00 pm - 3:30 pm | 104.00 hours |

As of the date of this memo, she only has 0 hours of annual leave remaining. She also has 0 hours of sick leave remaining. She has used all of her leave to include accrued and sick leave. Aileen's care provider has indicated that she has a serious health condition, therefore she has been granted FMLA as of May 11, 2012. She has used a total of 200 hours of FMLA as of today's date.

Ulyssee McBurrough Jr., Coach
Recommend/Do Not Recommend

Jerry Huffman, AVSCM
Recommend/Do Not Recommend

Sandra L. Smith, VSCM
Recommend/~~Do Not Recommend~~
I recommend 104 hrs but no more as that is one year's worth.

Bonnie Wax, HR Manager
Recommend/Do Not Recommend

Kerrie L. Witty, Director
Approval/Disapproval

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*
'ullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**
ST. Petersburg Regional Office (317)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | Jun 20, 2012 | Jul 9, 2012 | 7:00:00 AM | 3:30:00 PM | 104 hrs |

**Purpose:**
☒ Illness/injury/incapacitation of requesting employee
☐ Medical/dental/optical examination of requesting employee
☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
☐ Care of family member with a serious health condition
☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| 'eave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

☐ Birth/Adoption/Foster Care
☐ Serious health condition of spouse, son, daughter, or parent
☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**
Aileen is requesting 104 hours of advanced sick leave to use during her absence from work.

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**
Employee is not available for Signature

**7b. Date**
6/25/12

**8a. Official Action on Request:** ☐ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

**8d. Date**
7/6/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification nu... This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may ... prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may p... you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form | Clear Form

# SEPARATOR

# PAGE

# Request for Leave or Approved Absence

1. **Name** *(Last, first, middle)*
Mullin, Aileen

2. **Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**
[redacted]

**Organization**
VSC (T&L 839)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | May 21, 2012 | May 21, 2012 | 09:00a | 12:00p | 3.00 |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | May 29, 2012 | May 29, 2012 | 12:30p | 2:30p | 2.00 |
| ☒ Accrued Sick Leave | May 21, 2012 | May 21, 2012 | 07:00a | 09:00a | 2.00 |
| ☒ Advanced Sick Leave | May 29, 2012 | Jun 1, 2012 | 2:30p | 03:30p | 25.00 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☒ Other Paid Absence *(Specify in Remarks)* | May 21, 2012 | May 29, 2012 | 12:30p | 12:00p | 40.00 |
| ☐ Leave Without Pay | | | | | |

5. **Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**
Do not charge leave for the holiday- 05/28/12. Total leave 3 Accrued AL, 4 Accrued SL, 40 Donated, 25 Advanced SL

7. **Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

7a. **Employee Signature**

7b. **Date**

8a. **Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

8b. **Reason for Disapproval:**

8c. **Supervisor Signature**

8d. **Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form    Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*
Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**
VSC (T&L 839)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | Jul 10, 2012 | Jul 11, 2012 | 07:00a | 09:00a | 10.00 |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☒ Accrued Sick Leave | Jul 2, 2012 | Jul 2, 2012 | 07:00a | 10:00a | 3.00 |
| ☒ Advanced Sick Leave | Jul 2, 2012 | Jul 9, 2012 | 10:00a | 03:30p | 37.00 |
| ☐ Compensatory Time Off | | | | | |
| ☒ Other Paid Absence *(Specify in Remarks)* | Jul 11, 2012 | Jul 13, 2012 | 09:00a | 03:30p | 22.00 |
| ☐ Leave Without Pay | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**
Do not charge leave for the holiday- 6/4/12. Total leave 10 Accrued AL, 3 Accrued SL, 22 Donated, 37 Advanced SL

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature** | **7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature** | **8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form | Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

[redacted]

**Organization**

VSC (T&L 839)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☐ Advanced Sick Leave | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☒ Other Paid Absence *(Specify in Remarks)* | Jul 16, 2012 | Jul 27, 2012 | 07:00a | 03:30a | 80.00 |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**marks:**

Total leave 80 Donated

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature** | **7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature** | **8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification n... This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may d... revent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form | Clear Form

# Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Mullin, Aileen | |

**Organization**

VSC (T&L 839)

| 4. Type of Leave/Absence (Check appropriate box(es) below) | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | Aug 2, 2012 | Aug 2, 2012 | 12:00p | 03:30p | 3.00 |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☐ Advanced Sick Leave | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | Jul 30, 2012 | Aug 2, 2012 | 07:00a | 12:00p | 29.00 |
| ☐ Other Paid Absence (Specify in Remarks) | Aug 3, 2012 | Aug 3, 2012 | 07:00a | 12:00p | 5.00 |
| ☒ Leave Without Pay | Aug 3, 2012 | Aug 10, 2012 | 12:30p | 03:30p | 43.00 |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**

Total leave 3 Accrued AL, 34 Donated, 43 LWOP

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature** | **7b. Date**

**8a. Official Action on Request:** ☒ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature** | **8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form | Clear Form

# Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Mullin, Aileen | |

**Organization**

VSC (T&L 839)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | Jun 5, 2012 | Jun 5, 2012 | 07:00a | 12:00p | 5.00 |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☐ Advanced Sick Leave | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ ~~Compensatory Time Off~~ | Jun 4, 2012 | Jun 4, 2012 | 07:00a | 03:30p | 8 |
| ☒ Other Paid Absence *(Specify in Remarks)* | Jun 5, 2012 | Jun 5, 2012 | 12:30p | 02:30p | 2.00 |
| ☒ Leave Without Pay | Jun 5, 2012 | Jun 8, 2012 | 02:30p | 03:30p | 25.00 |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**

Total leave 5 Accrued AL, 10 Donated, 25 LWOP

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature | 7b. Date |
|---|---|
| | |

**8a. Official Action on Request:** ☒ Approved ☐ Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

| 8c. Supervisor Signature | 8d. Date |
|---|---|
| | |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form    Clear Form

# EXHIBIT 54

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sat | 04/28/12 | DO | | | | |
| | Sun | 04/29/12 | DO | | | | |
| | Wed | 05/02/12 | SL | 07:00A | 03:30P | 8.00 H | |
| | Fri | 05/04/12 | SL | 07:00A | 03:30P | 8.00 H | |
| | Sat | 05/05/12 | DO | | | | |
| 12-10 | Sun | 05/06/12 | DO | | | | |
| | Mon | 05/07/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Tue | 05/08/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Wed | 05/09/12 | SL | 07:00A | 11:15A | 4.25 H | FMLA |
| | | | AL | 11:45A | 03:30P | 3.75 H | FMLA |
| | Thu | 05/10/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Fri | 05/11/12 | AL | 07:00A | 09:00A | 2.00 H | FMLA/Donated AL 6hrs |
| | | | AL | 09:00A | NOON | 3.00 H | FMLA/Donated AL 6hrs |
| | | | AL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL 6hrs |
| | Sat | 05/12/12 | DO | | | | |
| | Sun | 05/13/12 | DO | | | | |
| | Mon | 05/14/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 05/15/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 05/16/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 05/17/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 05/18/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 05/19/12 | DO | | | | |
| 12-11 | Sun | 05/20/12 | DO | | | | |
| | Mon | 05/21/12 | SL | 07:00A | 09:00A | 2.00 H | FMLA/Donated AL 6/CHD |
| | | | AL | 09:00A | NOON | 3.00 H | FMLA/Donated AL 6/CHD |
| | | | AL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL 6/CHD |
| | Tue | 05/22/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Wed | 05/23/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Thu | 05/24/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Fri | 05/25/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Sat | 05/26/12 | DO | | | | |
| | Sun | 05/27/12 | DO | | | | |
| | Mon | 05/28/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Tue | 05/29/12 | AL | 07:00A | NOON | 5.00 H | FMLA/Donated AL5/ADVSL3/CH |
| | | | SL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL5/ADVSL3/CH |
| | Wed | 05/30/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Thu | 05/31/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Fri | 06/01/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Sat | 06/02/12 | DO | | | | |
| 12-12 | Sun | 06/03/12 | DO | | | | |
| | Mon | 06/04/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/donated AL |
| | Tue | 06/05/12 | AL | 07:00A | 08:00A | 1.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | AL | 08:00A | NOON | 4.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | AL | 12:30P | 02:30P | 2.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | WP | 02:30P | 03:30P | 1.00 H | FMLA/Donated AL 1hr/6 accr |
| | Wed | 06/06/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Thu | 06/07/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Fri | 06/08/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Sat | 06/09/12 | DO | | | 00476 | |

C-4

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sun | 06/10/12 | DO | | | | |
| | | | | | | | |
| | Sat | 06/16/12 | DO | | | | |
| 12-13 | Sun | 06/17/12 | DO | | | | |
| | | | | | | | |
| | Wed | 06/20/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Thu | 06/21/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 06/22/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 06/23/12 | DO | | | | |
| | Sun | 06/24/12 | DO | | | | |
| | Mon | 06/25/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 06/26/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Wed | 06/27/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Thu | 06/28/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 06/29/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 06/30/12 | DO | | | | |
| 12-14 | Sun | 07/01/12 | DO | | | | |
| | Mon | 07/02/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 07/03/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Wed | 07/04/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Thu | 07/05/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 07/06/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 07/07/12 | DO | | | | |
| | Sun | 07/08/12 | DO | | | | |
| | Mon | 07/09/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 07/10/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/11/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/12/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/13/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/14/12 | DO | | | | |
| 12-15 | Sun | 07/15/12 | DO | | | | |
| | Mon | 07/16/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 07/17/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/18/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/19/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/20/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/21/12 | DO | | | | |
| | Sun | 07/22/12 | DO | | | | |
| | Mon | 07/23/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 07/24/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/25/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/26/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/27/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/28/12 | DO | | | | |
| 12-16 | Sun | 07/29/12 | DO | | | | |
| | Mon | 07/30/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Tue | 07/31/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Wed | 08/01/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Thu | 08/02/12 | AL | 07:00A | NOON | 5.00 H | FMLA/Donated AL7/accrued A |
| | | | AL | 12:30P | 02:30P | 2.00 H | FMLA/Donated AL7/accrued A |
| | | | AL | 02:30P | 03:30P | 1.00 H | FMLA/Donated AL7/accrued A |
| | Fri | 08/03/12 | AL | 07:00A | NOON | 5.00 H | FMLA/accrued AL 5hrs/CHD |

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sat | 08/04/12 | DO | | | | |
| | Sun | 08/05/12 | DO | | | | |
| | Mon | 08/06/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA/CHD |
| | Tue | 08/07/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA 6.5 hrs/CHD |
| | Wed | 08/08/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Thu | 08/09/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Fri | 08/10/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Sat | 08/11/12 | DO | | | | |
| 12-17 | Sun | 08/12/12 | DO | | | | |
| | Mon | 08/13/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/14/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/15/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/16/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/17/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 08/18/12 | DO | | | | |
| | Sun | 08/19/12 | DO | | | | |
| | Mon | 08/20/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/21/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/22/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/23/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/24/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 08/25/12 | DO | | | | |
| 12-18 | Sun | 08/26/12 | DO | | | | |
| | Mon | 08/27/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/28/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/29/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/30/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/31/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 09/01/12 | DO | | | | |
| | Sun | 09/02/12 | DO | | | | |
| | Mon | 09/03/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Tue | 09/04/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Wed | 09/05/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Thu | 09/06/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Fri | 09/07/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Sat | 09/08/12 | DO | | | | |
| 12-19 | Sun | 09/09/12 | DO | | | | |
| | Mon | 09/10/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Tue | 09/11/12 | AL | 07:00A | 11:00A | 4.00 H | Donated AL |
| | | | AL | 11:30A | 03:30P | 4.00 H | Donated AL |
| | Wed | 09/12/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Thu | 09/13/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Fri | 09/14/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Sat | 09/15/12 | DO | | | | |
| | Sun | 09/16/12 | DO | | | | |
| | | | | | | | |
| | Tue | 09/18/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | | | | | | | |
| | Sat | 09/22/12 | DO | | | | |
| 12-20 | Sun | 09/23/12 | DO | | | | |
| | | | | | | | |
| | Tue | 09/25/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |

00478

# EXHIBIT 55

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**SOUTHEASTERN OPERATIONS**
**COUNSELOR REPORT**

**CASE NUMBER: 200I-0317-2012103413**
**COUNSELOR NAME: Harris, Deogory**

| | |
|---|---|
| Name of Aggrieved Party: | Ms. Aileen Mullin |
| Home and/or Alternate Address: | 745 Alamanda Way South, St. Petersburg, FL 33705 |
| Home Telephone Number: | 954-263-1510 |
| Cellular/Mobile Number | 954-263-1510 |
| Business Address: | P.O. Box 1437<br>St. Petersburg, FL 33731 |
| Business Telephone Number: | (727) 319-7838 |
| Email Address: | Aileen_mullin@yahoo.com |
| Position Title/Grade: | RVSR / / GS 11 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee | X | Former Employee | | Applicant | | | | | |
| VHA | | VBA | X | NCA | | Canteen | | Other | |
| Title 5 | X | Title 38 | | Hybrid T38 | | Full-time | X | Part-time | |
| Probationary | | Career | X | Career Conditional | | Temporary | | Term | |

| | | |
|---|---|---|
| Name of Facility: | VARO, ST. PETERSBURG | |
| Address of Facility: | P.O. Box 1437<br>St. Petersburg, FL 33731 | |
| Facility Telephone Number: | (727) 319-7838 | |
| Name of Representative: | None | Attorney<br>No |
| Representative's Address: | N/A | |
| Representative's Telephone: | N/A | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 06/05/2012 |
| Initial Interview | | | Date: | 06/06/2012 |
| Rights & Responsibilities/Notices: | UPS/Cert Mail: | 06/07/2012 | Rec'd: | 06/07/2012 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [ ] | Date | N/A |
| Notification to Facility Director | | | Date: | 06/06/2012 |
| ADR offered by facility [ ] MOU [ ]: | YES [X] | NO [ ] | Date: | 06/06/2012 |
| Facility Returned Signed Refusal | YES [ ] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [X] | NO [X] | Date: | 06/06/2012 |
| Settlement (SA) [ ] | Withdrawal (WD) | [ NO]: | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | UPS/Cert Mail: | 08/30/2012 | Rec'd: | 09/04/2012 |

A3

**Case Number: 200I-0317-2012103413**
**Name of Aggrieved Party: Ms. Aileen Mullin**
**Name of Facility: VARO, ST. PETERSBURG**
**Date of Initial Contact: 06/05/2012**

**RMO/WITNESS INFORMATION**

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Bonnie Wax, HR chief, 727-319-5800 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**CLAIM - 1:** Harassment/Hostile Work Environment (Non-Sexual) **Incident Date: 05/03/2012**
**Basis:** Disability - Physical

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely? | X | | |
| Administrative Grievance Filed | | | | | X | |

**Brief Description of Claim:**

a. Ms. Mullin stated on 5/3/2012, she received an email from Mr. Casey Crump, DRO, and Union Stewart, that Ms. Bonnie Wax stated that the tumors in her breast were causing the respiratory problems and not the building;

b. On 5/18/2012, Ms. Mullin stated that Ms. Valarie Riley, Union President requested her HR files and when she received them on the 31 May 2012, several documents/files were missing which were all health related. Ms. Mullin believes the missing documents are directly related to discrimination based on her disability (Physical).

**Resolution Sought:**

-Wants a formal apology for disclosing her information
-Wants the behavior from Ms. Wax to cease and management to address her behavior
- Would like oversight of future encounters of how she is being treated and handled by Ms. Bonnie Wax

**Management's Response:**

Ms. Mullin requested mediation so management was not contacted.

**Informal Documents Requested/Received:**

a. Documentation, if any, showing whether the supervisor or any management Official was made aware of the alleged harassment, e.g., written/verbal complaints;

b. Documentation, if any, of corrective action(s) taken subsequent to the alleged Harassment.

**Case Number: 200I-0317-2012103413**
**Name of Aggrieved Party: Ms. Aileen Mullin**
**Name of Facility: VARO, ST. PETERSBURG**
**Date of Initial Contact: 06/05/2012**

## SUMMARY OF RESOLUTION EFFORTS

Ms. Mullin and management were unable to reach an agreement in mediation, so she decided to file a formal complaint.

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim listed above was the only claim addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by UPS on 08/30/2012 and received on 09/04/2012.

EEO Counselor

9/5/2012
Date

# EXHIBIT 56

09/18/2012 22:40 FAX 001 ckk

COMPLAINT CASE NUMBER: 9/18 200I-0317-2012103413

OMB NO.: 2900-0716
RESPONDENT BURDEN: 30 Min.

Department of Veterans Affairs

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

1. NAME (Last, first, middle initial)(Please print): Mullin, Aileen

2. EMAIL ADDRESS: aileen_mullin@yahoo.com

3. MAILING ADDRESS: 745 Alamanda Way S, Saint Petersburg, FL 33705

4a. WORK TELEPHONE NUMBER (Include Area Code):

4b. HOME TELEPHONE NUMBER (Include Area Code): (954) 263-1510

5. ARE YOU:
- [X] A VA EMPLOYEE
- [ ] AN APPLICANT FOR EMPLOYMENT
- [ ] A FORMER VA EMPLOYEE

6a. JOB TITLE, SERIES AND GRADE: Rating Veterans Service Representative, 11, 2

6b. SERVICE/SECTION/PRODUCT LINE:

7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED: Department of Veterans Affairs Regional Office, PO Box 1437, St. Peterburg, FL 33731

NOTE: For each employment related matter that you believe was discriminatory you must list the bases *(list one or more of the following)*: **Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*, Disability *(Specify)*, Genetic Information, and Reprisal for prior EEO activity or having opposed discrimination.**

| 8. BASIS | 9. CLAIM(S) *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly describe what happened below. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| Physical Disability | Harassment/ Hostile Work Environment / EEO Reprisal | |

11. REMEDIES SOUGHT *(Use an additional sheet of paper if necessary.)*: see attached

12a. DO YOU HAVE A REPRESENTATIVE? [ ] YES [X] NO

12b. IF "YES," IS HE OR SHE AN ATTORNEY? [ ] YES [ ] NO

12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE:

12d. TELEPHONE NUMBER (Include Area Code):

12e. EMAIL ADDRESS:

13a. HAVE YOU CONTACTED AN EEO COUNSELOR? [X] YES [ ] NO

13b. NAME OF EEO COUNSELOR: Deogory T Harris

13c. DATE OF INITIAL CONTACT WITH ORM:

14. *If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper, if necessary.)*

15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? [ ] YES [X] NO

15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED.

16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? [ ] YES [X] NO

16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED.

17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? [ ] YES [X] NO

17b. IF "YES," PROVIDE THE NAME AND ADDRESS

18. SIGNATURE OF COMPLAINANT *(Do not print)*: [signature]

19. DATE: 09/17/2012

VA FORM AUG 2012 **4939**

SUPERSEDES VA FORM 4939, JAN 2012, WHICH SHOULD NOT BE USED.

Pg 1 of 5 A-4

**9. CLAIM(S)**

**Discrimination due to Physical Disabilities/ Harassment**

I was hired under an internship program with a 2-year probationary period. By the time respiratory condition was irrefutably related to the workplace, I already had disconcerting experiences with Human Resources and witnessed first hand what they are capable of when dealing with employees with health issues.

In September 2011, after two months of being completely symptom free while at external training in Baltimore, Md., I started becoming move severely ill, unable to breathe freely. while in the work place.

Between September 2011 and March 2012 there are at least 25 days that I had to leave work, before the end of my tour, because of respiratory issues. My administrators authorized each leave.

I repeatedly reached out to administrators and the Union telling telling them I was having breathing problems. I needed help. (I have copies of e-mails to/from my Coach, Assistance Coach, Human Resources, the Union that began in October 2011.)

Twice the VA police had to assist me out of the building.

I met with Human Resources and the Union on January 10, 2012 and it was agreed that I would be reassigned to another part of the building to see if this would 'help'.

The reassignment did not occur immediately. On January 12, 2012, I had to taken to the emergency room, by ambulance – I had an asthma attach so severe that I couldn't get it under control using an emergency inhaler followed by two additional medications via nebulizer.

A Worker's Compensation Claim was filed.

January 17, 2012 – I was assigned a new workstation.

January 31, 2012 – I notified Supervisors, Human Resources and Union that my respiratory problems forced me to leave work twice since assigned to the new area.

February 2, 2012 – I was issued a Honeywell Air Purifier designed to be used in a small room (10 x 10): **My work station is in an open cubical, in a area comparable to a football field. It was not an appropriate accommodation.**

March 3, 2012 – FMLA Documents submitted. Doctor stated, "...asthma worsens at work at VA leading to severe attacks requiring urgent care...I recommend the patient be allowed to work from home with periodic trips to work site . ...."

(At least another 5 asthma attacks)

Mullin, Aileen
2001-0317-2012103413
Pg 2 of 5

March 20, 2012 -- I received notice of another ineffective/incomplete accommodation: Authorization to work from home three days a week but I to report to the office on Tuesdays and Thursdays.

Reporting as instructed, again and again I had asthma attacks that forced me to leave the building.

**March 23, 2012 – I was diagnosed with breast cancer.**

**May 3, 2012 – Day before 1st surgery**

- I was told that my application for advanced leave had not been approved
- Human Resources informed me that there were problems with my application for FMLA, which was submitted in March 2012: I needed to supply additional medical information????
- I was informed me that the Human Resources Manager had said a horrible thing about my asthma and my breast cancer.

**May 4, 2012 – Partial mastectomy.**

May 10, 2012 - While recovering from the surgery, I requested a meeting with Administrators and Union representative.
- I reported to the Director what had happened the day prior to my operation.
- I asked the Director to assist in getting my Human Resource related applications processed.
- **I made it clear that I didn't want to hear any more from the Human Resource Manager.**

May 16, 2012: Union Representative Requested records from Human Resources.
- There was a delay in the release of the documents.
- The file was incomplete. Health related documents missing.

**May 21, 2012 – Second surgery:** Removal of more cancerous cells and widening of surgical margin.

**June 5, 2012** – I get the news I need **chemotherapy**

**June 5, 2012** – I receive a LENGTHY e-mail about the personnel records - from Human Resource Manager.?????? She sent it directly to me, not my Union representative AND - she was fully aware that I was still battling cancer.

**June 5, 2012: I filed an EEOC complaint.**

Upon my request, a second meeting with the Administration and Union was scheduled.

**June 10, 2012: Meeting with Director, Assistant Service Center Manager, AFGE Local Vice President and AFGE Steward.** Retribution Begins

Nothing about this meeting was positive.

I requested meeting with the belief that we could come to a 'meeting of the minds' pertaining to issues that included: Oversight of Leave Donations; Oversight of Human Resource's actions as pertained to me; And to again request that Bonnie Wax not to communicate directly with me... None of my requests were met kindly.

The Director brought up the EEO complaint I filed. I assured her that I believed that we could come to a 'meeting of the minds' and then I would willingly withdraw my complaint.

Mullin, Aileen
2001-0317-2012103413
Pg 3 of 6

HR Manager

The Director shared that Bonnie Wax felt that she was being targeted by the Union.

The Director stated that not only had she read, and approved, the e-mail Bonnie Wax sent me on June 5th, but she didn't see why I had a problem with it.

I was horribly upset by the callousness my concerns were met with. In tears I attempted to leave the meeting because the Director made it clear that there would be no 'meeting of the minds'.

The Union representatives convinced to stay. They wanted some part of the meeting could be salvaged. An accommodations conversation began:

If physically able to work while receiving cancer treatments, I wanted to. I offered solutions that would allow me to continue serving Veterans, but limiting my exposure to the building while receiving chemotherapy (concerns due to compromised immune system and history of asthma attacks).

The Director explained that she doesn't support granting accommodations, because if I was granted them, they would have to give accommodations to every employee that came in with a doctor's note.

8/24/2012- **Department of Labor granted the Worker's Compensation claim**, for Chronic Maxillary Sinusitis and Extrinsic Asthma as related to the building I work in, back to May 2009.

ADDITIONAL forms of Retribution

**Applications for Advanced Leave weren't processed** - No explanations. No warnings. This has been going on since I filed an EEOC on June 5th.

Pay Period End - Gross Pay - Net Pay
09/08/2012 - 4,547.20 - **481.07**
08/25/2012 - 0.00 - **0.00**
08/11/2012 - 1,051.54 - **524.43**
6/16/2012 - 1,563.10 - **895.82**

Now, all financially dependent aspects of my life are at jeopardy: **Including the continuation of my cancer treatment.**

**Applications for Leave Transfer were delayed, or not processed at all since the EEOC filed was filed.**

Date of Application / Date of Announcement

6/14/2012 – 6/29/2012
8/16/2012 – NEVER

**OPM required security investigation**

On 8/31/2012 OPM sent notification to my agency e-mail I was required to complete a security investigation. I didn't receive the e-mail. The agency was cc'd on the notification but failed to inform OPM that I was on continuous medical leave. HR

Mullin, Aileen
2001-0317-2012103413
pg 4 of 5

**Training**
I returned to work on 9/17/2012 to find that I had been removed from TMS: The VA's web based training system. The Point of Contact was able to get me re-established but we discovered that all my required training was no longer there?????

11. REMEDIES SOUGHT

Personal

- Qualification Standards (production standards) need to be adjusted to reflect actual on-the-job/learning time lost due to inaction by agency to make an accommodation.
- LWOP status will not affect time in grade per LWOP bulletin from OPM.
- Mentor of journeyman level or higher (not reviewer) for a period equal to the time on-the-job /learning time lost due to inaction by agency to make an accommodation.

General

- Eradicate the current culture, attitudes, practices and procedures that foster "we don't support accommodations. Give them to one employee and you have to give them to everyone that comes in with a doctors note."
- Conduct and Employee Air Quality Survey. Content of Study to be agreed upon by employer and AFGE. (Sample: http://www.osha.gov/dte/grant_materials/fy10/sh-20839-10/iaq_survey.pdf)
- Implement Leave Donation Pool that is available to all employees.
- Include language on employee's Leave Donation Announcement that advises donating employees to maintain a copy of their donation form and to check their next pay stub to verify that the leave was actually donated.
- Transparency of leave donations to employee. Provide number of hours donated from specific employees at the end of each pay period--prior to pay date.
- Clearly written and published guidelines (SOP) regarding FMLA, Leave Requests, Advance Leave process etc. to include time-line, process, responsibilities, etc. All actions require signature and date.
- Face-to-Face training for management and AFGE Stewards of SOP regarding FMLA, Leave Requests, Advance Leave process etc.
- Respond to employee requests within a "reasonable period" (ex. 5 days). Currently, the responses on all matters, including those of urgency regarding medical disabilities, are either greatly delayed or non existent.

Mullin, Aileen
2001-0317-2012103413
Pg 505

# EXHIBIT 57

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

In reply refer to: 08N

September 25, 2012

VIA: E-mail

Kerrie Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Receipt of Discrimination Complaint – Aileen Mullin, Case No. 2001-0317-2012103413, Filed September 18, 2012**

1. This is to inform you that Aileen Mullin, **an employee** at your facility filed an EEO complaint of discrimination on September 18, 2012, with the Office of Resolution Management (ORM), St. Petersburg, FL.

2. The complaint is currently being reviewed for acceptability determination. You will be informed as to whether the complaint is accepted or dismissed.

3. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint please contact the ADR Program Manager at (202) 501-2800.

4. A copy of the Complaint of Employment Discrimination, VA Form 4939 is enclosed.

5. For any questions, please contact Odessa Johnson, Case Manager at (386)487-1830.

Sincerely,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

**Enclosure: VA Form 4939**

# EXHIBIT 58

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg FL 33716

In reply refer to: 08J

October 18, 2012

VIA: Certified Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Partial Acceptance of your EEO Complaint No. 2001-0317-2012103413, filed on September 18, 2012, against officials of the VA Regional Office in St. Petersburg, FL**

1. On June 5, 2012, you initiated contact with an EEO counselor. Counseling concluded on August 30, 2012, when you were mailed the *Notice of Right to File a Discrimination Complaint*, which you received on September 4, 2012. On September 18, 2012, you filed a formal complaint of discrimination, VA Form 4939.

2. During the EEO counseling period you raised a claim of hostile work environment that consisted of the following events and indicated the events were based on disability: on May 3, 2012, you were informed that your request for advanced sick leave was denied; on May 3, 2012, you were informed that there were problems with your request of March 2012 for leave under the Family Medical Leave Act (FMLA); on May 3, 2012, you informed that Human Resources Manager Bonnie Wax (BW) made a horrible comment about your medical condition and; on May 31, 2012, HR failed to provide your Union representative with a complete record of documents that were needed to assist you with your reasonable accommodation request and the response to the information provided was delayed.

3. In the attachment to the formal complaint, you raised 12 new allegations that were not raised during the counseling period. You also indicated reprisal for prior EEO activity played a role in the alleged discrimination. Therefore, reprisal will be listed as a basis for discrimination.

The Equal Employment Opportunity Commission (EEOC) regulation 29 CFR § 1614.107(a) (2) in part, specifically requires dismissal of a claim that raises a matter that has not been brought to the attention of a counselor and is not like or related to a matter that has been brought to the attention of a counselor. The requirements for deciding if a claim is considered like or related to the original complaint are 1) do the new claims add to or clarify the original complaint and 2) could the new claims have reasonably been expected to have grown out of the initial complaint that was raised during counseling. We have determined that the new allegations are like or related and are inextricably intertwined with the events identified in the original complaint. As a result, these new allegations will be added to the instant complaint and analyzed for acceptability purposes.

4. Your complaint of discrimination raises the following claim:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal[1] as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.[2]**

**2. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**3. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems forced her to leave work twice since being reassigned to a different work area.**

**4. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**5. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**6. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.[3]**

**7. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**8. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a "horrible" comment about the complainant's medical condition.**

**9. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to**

---

[1] Reprisal as a basis for discrimination was raised in the formal complaint.

[2] Event 1 constitutes a discrete act that was not raised within 45 days of occurrence and is therefore **DISMISSED** as an independently actionable claim, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. This event is, however, determined to be sufficiently related to the overall pattern of harassment as it represent an action taken against the complainant and will be included for consideration in the analysis of the harassment claim.

[3] Events 6, 13 and 14 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

**10. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**11. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**12. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

**13. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

**14. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**15. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**16. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

5. In assessing a hostile environment claim, the totality of the circumstances must be examined, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonable interferes with the employee's work performance. A hostile environment claim generally requires a showing of a pattern of denigrating conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment. In determining whether harassment is sufficiently severe or pervasive to create a claim of hostile work environment, the harasser's conduct is evaluated from the objective standpoint of a reasonable person. An objectively hostile or abusive work environment is created only when a reasonable person would find it hostile or abusive.

We have determined your claim of harassment passed the severe or pervasive requirement for further processing. You identified 16 events that occurred over a 12-month period; which demonstrate an increase in frequency and severity. Therefore, you have stated an actionable claim of hostile work environment harassment.

6. As outlined in paragraph 4, the independently actionable discrete acts described under events **6, 13 and 14 and the overall harassment claim** are hereby **ACCEPTED**

for investigation. There is no immediate right to appeal the dismissed portion of your complaint. You will have the right to appeal the partial dismissal once final action is taken on the remainder of the complaint.

7. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, stating your disagreement. We will include your statement in the complaint file. If you do not contact this office within **7 calendar days**, we will assume that the claims are correctly stated.

8. We will assign the accepted claims to an impartial investigator under the supervision of the Office of Resolution Management (ORM). The investigator will contact you directly in order to obtain information or evidence you may wish to offer. The investigator is only authorized to investigate the claim specified.

9. You have additional rights that are fully explained in the enclosures to this letter.

10. **Failure to keep this office advised of any change of address could lead to dismissal of your complaint**. You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you. If you advise us of representation, we will mail all subsequent complaint-related correspondence to your representative, with copies to you, unless you advise us, in writing, that you are no longer represented by that individual.

11. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at **(386) 487-1830 or (386) 487-1827.**

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosures: Complainant Rights
Request for Hearing Form

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Notice of Partial Acceptance
Aileen Mullin
2001-0317-2012103413

## Complainant Rights

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

### Requesting a Hearing

In order to request a hearing, you must meet the following criteria:

- You have received your completed investigative file **-OR-**
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, complete the enclosed "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| **Equal Employment Opportunity Commission**<br>**Miami District Office**<br>**Miami Tower, Suite 1500**<br>**100 SE 2nd Street**<br>**Miami, FL 33131** | **Department of Veterans Affairs**<br>**Office of Resolution Management**<br>**140 Fountain Parkway, Suite 620**<br>**St. Petersburg, FL 33716** |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

### Requesting a Final Agency Decision

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>140 Fountain Parkway, Suite 620, St. Petersburg, FL 33716 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

### Requesting Civil Action

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name Eric K. Shinseki, Secretary of Veterans Affairs as the defendant.

### Requesting ADR

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at (202) 501-2800.

**HEARING REQUEST FORM**

**EEOC Hearings Unit**
**Equal Employment Opportunity Commission**
**Miami District Office**
**Miami Tower, Suite 1500**
**100 SE 2nd Street**
**Miami, FL 33131**

Dear Sir/Madam:

I am requesting the appointment of an EEOC Administrative Judge pursuant to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint; or I have received a notice from the agency that I have 30 days to elect a hearing or a final agency decision.

My name: Aileen Mullin

Agency Name & Address: Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Representative's Name ____________________
Representative's Title ____________________
Representative's Address ____________________
Representative's Phone Number ____________________

Agency Case No: 2001-0317-2012103413
Date Filed: September 18, 2012

In accordance with section 1614.108(g), I hereby certify that I have sent a copy of this request for a hearing to the following person at the agency:

Name: Winston Johnson, Regional EEO Officer

Address: Department of Veterans Affairs
Office of Resolution Management
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

Sincerely,

____________________ ____________________
(Signature of Complainant/Appellant) (Date)

# EXHIBIT 59

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

March 15, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 200I-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; **or**
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On October 18, 2012, we accepted a claim of hostile work environment harassment encompassing 16 different events that included three independently actionable discrete acts. On March 8, 2013, you raised the following allegations in a three-page narrative: (1) Around the spring/summer of 2011, you were denied the opportunity to use what you learned in training, and build on the training foundation that you received in Baltimore, Maryland and (2) The Union's request of December 18, 2012, for a detailed audit of all 2012 pay period leave usage was ignored.

Allegation 1 could not have grown out of the original complaint because the matter complained of occurred before the events in the previously accepted harassment claim. Therefore, the allegation is hereby **DISMISSED** for failure to raise with a counselor. With regard to allegation 2, EEO regulation 29 C.F.R. § 1614.107 (a) (1) provides, in part, that the agency shall dismiss a complaint or a portion of a complaint that fails to state a claim under § 1614.103 or § 1614.106 (a). Complainants fail to state a claim when: they are unable to show that they are aggrieved by the matter complained of; or 2) they lack standing to file a complaint because of their employment status; or 3) they fail to allege a basis of discrimination that falls within the purview of EEO law and regulations; or 4) the complaint concerns a matter over which the VA lacks authority or jurisdiction. The matter complained of in allegation 2 concerns a labor/management

issue and does not fall within the purview of EEO regulations. The proper procedure is to pursue this matter with the Fair Labor Relations Authority. Therefore, allegation 2 is also **DISMISSED,** for lack of jurisdiction.

The narrative that you submitted also provided relevant background information in support of the previously accepted claims and included 10 new allegations of continuing harassment. Although no relief will be available for such background information, the information may be used as evidence in support of the accepted claims during the investigation. Additionally, we have determined that the new allegations are like or related to the claims in the pending complaint. They add to and are inextricably intertwined with the overall harassment claim as outlined in our partial acceptance letter of October 18, 2012. Therefore, the allegations have been added to the complaint and are identified under the harassment claim as events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26. Accordingly, case number 200I-0317-2013103413 is amended as follows:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

Accepted ← **1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace; and on two occasions VA Police had to assist the complainant out of the building.**[1]

new → **2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**[2]

new ← **3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.** ***(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

new ← **5. Upon returning to work on January 12, 2012, complainant was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA).** ***(See Footnote #2)***

new ← **6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they**

[1] Event 1, 3 and 9 are discrete acts that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

refused to render aid while she was having a severe asthma attack. *(See Footnote #2)*

7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.

8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.

new ← 9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks. *(See Footnote #1 & 2)*

new ← 10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted. *(See Footnote #2)*

11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.

new ← 12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder. *(See Footnote #2)*

Discrete — 13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.[3]

14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).

15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a "horrible" comment about the complainant's medical condition.

16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

new — **19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.** ***(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

Discrete → **21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

new ← **22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.** ***(See Footnote #2)***

Discrete ← **23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

Discrete New — **26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** ***(See Footnotes 2 and 3)***

5. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

6. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly

in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

7. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

8. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

9. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosure: Hearing Request Form

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

## HEARING REQUEST FORM

**EEOC Hearings Unit**
**Equal Employment Opportunity Commission**
**Miami District Office**
**Miami Tower, Suite 1500**
**100 SE 2nd Street**
**Miami, FL 33131**

Dear Sir/Madam:

I am requesting the appointment of an EEOC Administrative Judge pursuant to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint; or I have received a notice from the agency that I have 30 days to elect a hearing or a final agency decision.

My name: Aileen Mullin

Agency Name & Address: Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Representative's Name ________________
Representative's Title ________________
Representative's Address ________________
Representative's Phone Number ________________

Agency Case No: 2001-0317-2012103413
Date Filed: September 18, 2012

In accordance with section 1614.108(g), I hereby certify that I have sent a copy of this request for a hearing to the following person at the agency:

Name: Winston Johnson, Regional EEO Officer

Address: Department of Veterans Affairs
Office of Resolution Management
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

Sincerely,

________________________ ____________
(Signature of Complainant/Appellant) (Date)

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

April 1, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 2001-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; **or**
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On March 15, 2013, we amended your complaint to include a claim of hostile work environment harassment encompassing 26 different events that included four independently actionable discrete acts. On March 29, 2013, you requested that your complaint be amended to include the following allegations:

**Claim A:** On March 26, 2013, you request for administrative absence for preparation of your EEO complaint was denied.

**Claim B:** On or about March 29, 2013, you were advised that modifications to your reasonable accommodation were reversed.

4. With regard to claim A, EEOC regulation 29 C.F.R. § 1614.107 (a) (1) provides, in part, that the agency shall dismiss a complaint or a portion of a complaint that fails to state a claim under Section 1614.103 or Section 1614.106 (a). Complainants fail to state a claim when: they are unable to show that they are aggrieved by the matter complained of; or 2) they lack standing to file a complaint because of their employment status; or 3) they fail to allege a basis of discrimination that falls within the purview of EEO law and regulations; or 4) the complaint concerns a matter over which the VA lacks authority or jurisdiction.

Complaints regarding denial of official time for EEO purposes do not state a claim for relief. As a result, they are not processed as complaints under 29 C.F.R. § 1614, because the focus is not on the agency's motivation in denying official time, but whether the agency violated the Commission's official time regulation. Therefore, **claim A above is hereby DISMISSED,** in accordance with 29 C.F.R. § 1614.107 (a) (1), for failure to state a claim.

5. We have determined that the incident in claim B above provided additional evidence to support the existing claim but, does not raise a new claim in or of itself. The incident described appears to have grown out of and is inextricably intertwined with the claim previously accepted harassment claim. Therefore, the incident has been added to the complaint and is identified below under the harassment claim as event 27. Accordingly, case number 200I-0317-2013103413 is amended as follows:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.[1]**

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.[2]**

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.** ***(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA).** ***(See Footnote #2)***

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they**

[1] Event 1, 3 and 9 are discrete that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

**refused to render aid while she was having a severe asthma attack.** ***(See Footnote #2)***

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.** ***(See Footnote #1 & 2)***

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.** ***(See Footnote #2)***

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**12. On May 31, 2012, although a cover sheet that stated** ***"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."*** **was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.** ***(See Footnote #2)***

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.** [3]

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated. *(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed. *(See Footnote #3)***

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation. *(See Footnote #2)***

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed. *(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel. *(See Footnotes 2 and 3)***

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

6. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

7. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

8. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

9. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

10. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

July 15, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 200I-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; **or**
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On April 1, 2013, we amended your complaint to include a claim of hostile work environment harassment encompassing 27 different events that included four independently actionable discrete acts. On July 11, 2013, you requested that your complaint be amended to include the following allegations:

**Claim A:** On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with you having a family member accompany you to a mediation session.

**Claim B:** On or about May 22, 2013, you were denied timely notification of the existence of mediation preparation training resources available through EEOC.

4. We have determined that the allegations are like or related to the claims in the original complaint. They appear to have grown out of and are inextricably intertwined with the previously accepted harassment claim. Therefore, the allegations are hereby added to the complaint and identified below under the harassment claim as events 28 and 29. Accordingly, case number 200I-0317-2013103413 is amended as follows:



A-4

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.[1]**

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.[2]**

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training. *(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA). *(See Footnote #2)***

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they refused to render aid while she was having a severe asthma attack. *(See Footnote #2)***

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks. *(See Footnote #1 & 2)***

[1] Event 1, 3 and 9 are discrete that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.** ***(See Footnote #2)***

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.** ***(See Footnote #2)***

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.**[3]

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.** ***(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.** ***(See Footnote #2)***

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** ***(See Footnotes 2 and 3)***

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

6. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

7. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

8. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

9. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

10. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

Winston Johnson

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

# EXHIBIT 60

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| AILEEN MULLIN, | ) Case No.: 8:20-cv-026970-VMC-AEP |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DENIS MCDONNOUGH, SECRETARY, | ) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) |
| Et al. | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S REQUESTS FOR PRODUCTIONS**

COMES NOW Plaintiff, Aileen Mullin and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure hereby provides supplemental answers Defendant's Requests for Productions. All responses, objections, general objections, instructions, and similar to Defendant's Requests for Production are incorporated herein.

**SUPPLEMENTAL ANSWERS TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**Request No. 6:** Documents sufficient to show **all phone calls** made by You on **January 12, 2012.**

**Response:** All documents that are identified to the best of our knowledge at this time will are provided in the supplemental production for RFP6.

**Request No. 7:** All documents supporting the amount of damages claimed by Plaintiff in this action.

**Response:** Objection notwithstanding, all documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP7.

**Request No. 8:** **Any and all photographs that were taken of** or taken by Plaintiff that depict Plaintiff engaging in activities related to Plaintiffs' enjoyment of life, including any pictures that were posted, uploaded, or otherwise added to any social networking sites ("SNS") or blogs, including but not limited to Facebook, Twitter, Instagram, Myspace, LinkedIn, or any similar websites posted since January 1, 2015. This includes photographs posted by others in which Plaintiffs have been tagged or otherwise identified therein.

**Response:** All documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP8 and 9.

**Request No. 9:** Any and all posts m**ade by Plaintiffs on any SNS** that relate to this Action, Plaintiffs' physical capabilities or impairments, Plaintiffs' domestic or international travel or travel plans, Plaintiffs' participation in athletics or recreational activities, Plaintiffs' fitness activities, and Plaintiffs' social and leisure activities.

**Response:** All documents that are identified to the best of our knowledge at this time are provided in the are provided in the supplemental production for RFP8 and 9.

**PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S REQUESTS FOR INTERROGATORIES**

COMES NOW Plaintiff, Aileen Mullin and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure hereby provides supplemental answers to Defendant's Requests for Interrogatories. All responses, objections, general objections, instructions, and similar from the Plaintiff's Answers to Defendant's Requests for Interrogatories are incorporated herein.

**SUPPLEMENTAL ANSWERS TO REQUESTS FOR INTERROGATORIES**

**RFI 1:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in **Count 1** of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Agency failed to accommodate and or abide by the applicable policies in processing Plaintiff's RA request in regards to the handling of incoming Veteran calls and prolonged speaking. The Act occurred over an extended period, with relevant dates provided below. Additional accommodation requests related to asthma/difficulty breathing are subsequently discussed. Such accommodation requests were also over a prolonged period with dates provided below.

After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the

Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation.

Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "….patient has intermittent hoarseness with reflux disease …. Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4.

On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando.

A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed.

On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask. On or around November 28, 2011, HR, Bonnie Wax signed off on a memo denying Plaintiff the ability to participate and receive training in accordance with the Collective Bargaining Agreement between the AFGE and DVA after AFGE Local 1594 Representative Keith Pryor and President Riley requested that Plaintiff be allowed to participate.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions.

On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer.

On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her.

On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clairifcation on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012 which resulted in EMS

being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

January 23, 2012 was the next time Plaintiff entered the work building and within two hours developed sinus pain and bleeding in addition to having her asthma aggravated resulting in lung pain. On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay."

On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and

HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working.

As of February 19, 2012, Agency had still failed to provide Plaintiff with any effective RA for her breathing conditions as described in memo from AFGE to Agency. From February through March 11, 2012, Agency failed to provide any effective RA for Plaintiff which resulted in her taking numerous days of leave to relieve her medical conditions that were aggravated by Agency's failure to provide an effective RA, despite being aware of her need for RAs.

On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed.

On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier.

On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and

she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested.

Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. This was an ineffective RA as it did not address how Plaintiff was to avoid the environmental trigger on the two days she would be required to work in the office. The requirement of forcing Plaintiff to work in the building for two days a week continued until April 2013 despite medical evidence that suggested she needed to be given full time telework.

On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite

Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

On or around May 3, 2012 Plaintiff was notified that her request for advanced sick leave was denied and during the Month of May 2012, HR was not providing Plaintiff or her AFGE representatives with pertinent documentation that she requested pertaining to her health records Agency had on file. On May 31, 2012, Plaintiff was provided an incomplete copy of her personnel files that she and the Union had requested.

On or around June 4, 2012, Plaintiff was informed by a coworker that hours which were donated to Plaintiff for leave were not credited to her.

On or around June 5, 2012, Plaintiff received a lengthy email from HR Bonnie Wax which Plaintiff found to be disturbing as she had specifically requested that Ms. Wax communicate with her AFGE representatives while Plaintiff was undergoing cancer treatment. Instead Ms. Wax ignored the request and contacted Plaintiff individually while she was undergoing her cancer treatment.

On or around June 8, 2012, Plaintiff was informed that other important health/RA documents were missing out of her personnel records. On June 10, 2012, Plaintiff requested a meeting with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith to discuss issues Plaintiff was experiencing with oversight of leave donations, Oversight of HR actions that pertained to her, and to again request that Ms. Wax not communicate with Plaintiff directly. During this meeting, Director Witty brought up the recent EEOC complaint Plaintiff had recently filed with ORM and did respond to any of Plaintiff's requests positively and that she did not understand why Plaintiff was upset that Ms. Wax sent the email to Plaintiff on June 5, 2012. During this meeting additional RAs were discussed for Plaintiff to be able to work while undergoing cancer

treatment that would limit her exposure in the building while being immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

Following this meeting, Ms. Wax treatment towards Plaintiff proceeded to worsen resulting in Plaintiff reporting Ms. Wax for harassment. From June 14-June 29, 2012, Plaintiff's request for leave under the leave transfer program were unreasonably delayed which resulted in Plaintiff not knowing if she would be getting paid during the period she was receiving cancer treatment. From August 11-August 25, 2012, Plaintiff's request for advanced sick leave were not processed promptly resulting in a loss of pay for Plaintiff while she was undergoing cancer treatment.

On August 31, 2012, OPM sent an email to Plaintiff's work email stating that she needed to complete a security investigation and that failure to do so could result in a lapse in her security clearance. However since Plaintiff was out on medical leave, she never received the notice and Agency failed to notify her despite also being on the email from OPM. On September 10, 2012, Plaintiff was notified that she had failed to complete the required investigation that was requested on August 31.

On or around September 12, 2012, Plaintiff discovered she had her access removed from the web based training system. Throughout the month of September 2012, Agency failed to promptly rectify the issue so Plaintiff could do any necessary training to get her to performing her duties as a RVSR.

On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have

less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator to which she also requested as an RA. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further.

Plaintiff reported to the office, approximately 24 total hours, during the month of January 2013. On or around Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Plaintiff suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Plaintiff had been asymptomatic when on leave for breast cancer). On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her

immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation).

On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further.

On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limiter her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process

her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE.

On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

On March 25, 2013, HR Tammi Clarke, emailed Plaintiff accusing her of not protecting her own health. On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day.

On March 29, 2013, Plaintiff also sent an email to HR Clarke expressing concern of the delay in processing her FMLA applications and requesting an update on her pending FMLA applications that were submitted on February 22 and February 23, 2013 as she had not heard anything since submitting them.

On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior.

On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior.

On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could may leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013.

On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to

help with the marginal duties that she would be required to perform in the building. On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

On or around April 29, 2013, Plaintiff was informed by her supervisor that her performance was not an acceptable level and that she was not on track for the next within grade increase.

On May 16, 2013, Plaintiff was informed that she did not qualify for the mandatory overtime that was being offered to RVSRs at the RO. This email was sent from Sandra Smith and Coach McBurrough.

On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied

her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff.

**RFI 2:** Please identify all individuals you contend were similarly situated in all material respects to you, as defined by the Eleventh Circuit, see Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227–28 (11th Cir. 2019), and were treated differently than you. In responding to this interrogatory, identify the individual, his or her supervisor, when the individual was employed by Defendant, how the individual was similarly situated in all material respects to you, and how the individual was treated differently.

**Response:**

Plaintiff is unaware of the specific names and disability status any other comparator employees that meet the definition as provided in *Lewis* at this time. All RVSRs in RO 317 that were provided with a RA would be considered a comparator. Plaintiff will supplement this request if she becomes aware of additional comparator employees.

**RFI 3:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in Count 2 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

On or around January 4, 2010, Agency required Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation.

On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." On January 26, 2010, Agency denied Plaintiff's RA request via a memo from HR.

On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office.

On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor.

On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions.

On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff

notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her.

On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clairifcation on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012 which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

January 23, 2012 was the next time Plaintiff entered the work building and within two hours developed sinus pain and bleeding in addition to having her asthma aggravated resulting in lung pain. On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia

and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay."

On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working.

As of February 19, 2012, Agency had still failed to provide Plaintiff with any effective RA for her breathing conditions as described in memo from AFGE to Agency. From February through March 11, 2012, Agency failed to provide any effective RA for Plaintiff which resulted in her taking numerous days of leave to relieve her medical conditions that were aggravated by Agency's failure to provide an effective RA, despite being aware of her need for RAs.

On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However,

Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested.

Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. This was an ineffective RA as it did not address how Plaintiff was to avoid the environmental trigger on the two days she would be required to work in the office. The requirement of forcing Plaintiff to work in the building for two days a week continued until April 2013 despite medical evidence that suggested she needed to be given full time telework.

On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator to which she also requested as an RA. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by

HR and she was informed that Agency could not grant her RA of limiting her time in the building further.

Plaintiff reported to the office, approximately 24 total hours, during the month of January 2013. On or around Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Plaintiff suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Plaintiff had been asymptomatic when on leave for breast cancer). On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff’s need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further

discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation).

On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further.

On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request.

On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator.

On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri).

She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays.

On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

**RFI 4:** Identify each act you contend constitutes a violation of the Rehabilitation Act as alleged in Count 3 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

**RFI 5:** Identify each act you contend constitutes retaliation as alleged in Count 4 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around November 28, 2011, HR, Bonnie Wax signed off on a memo denying Plaintiff the ability to participate and receive training in accordance with the Collective Bargaining Agreement between the AFGE and DVA after AFGE Local 1594 Representative Keith Pryor and President Riley requested that Plaintiff be allowed to participate.

On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

On or around May 3, 2012 Plaintiff was notified that her request for advanced sick leave was denied and during the Month of May 2012, HR was not providing Plaintiff or her AFGE representatives with pertinent documentation that she requested pertaining to her health records Agency had on file. On May 31, 2012, Plaintiff was provided an incomplete copy of her personnel files that she and the Union had requested.

On or around June 4, 2012, Plaintiff was informed by a coworker that hours which were donated to Plaintiff for leave were not credited to her.

On or around June 5, 2012, Plaintiff received a lengthy email from HR Bonnie Wax which Plaintiff found to be disturbing as she had specifically requested that Ms. Wax communicate with her AFGE representatives while Plaintiff was undergoing cancer treatment. Instead Ms. Wax ignored the request and contacted Plaintiff individually while she was undergoing her cancer treatment.

On or around June 8, 2012, Plaintiff was informed that other important health/RA documents were missing out of her personnel records.

On June 10, 2012, Plaintiff requested a meeting with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith to discuss issues Plaintiff was experiencing with oversight of leave donations, Oversight of HR actions that pertained to her, and to again request that Ms. Wax not communicate with Plaintiff directly. During this meeting, Director Witty brought up the recent EEOC complaint Plaintiff had recently filed with ORM and did respond to any of Plaintiff's requests positively and that she did not understand why Plaintiff was upset that Ms. Wax sent the email to Plaintiff on June 5, 2012. During this meeting additional RAs were discussed for Plaintiff to be able to work while undergoing cancer treatment that would limit her exposure in the building while being immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

From June 14-June 29, 2012, Plaintiff's request for leave under the leave transfer program were unreasonably delayed which resulted in Plaintiff not knowing if she would be getting paid during the period she was receiving cancer treatment.

From August 11-August 25, 2012, Plaintiff's request for advanced sick leave were not processed promptly resulting in a loss of pay for Plaintiff while she was undergoing cancer treatment.

On August 31, 2012, OPM sent an email to Plaintiff's work email stating that she needed to complete a security investigation and that failure to do so could result in a lapse in her security clearance. However since Plaintiff was out on medical leave, she never received the notice and Agency failed to notify her despite also being on the email from OPM. On September 10, 2012, Plaintiff was notified that she had failed to complete the required investigation that was requested on August 31.

On or around September 12, 2012, Plaintiff discovered she had her access removed from the web based training system. Throughout the month of September 2012, Agency failed to promptly rectify the issue so Plaintiff could do any necessary training to get her to performing her duties as a RVSR.

On March 25, 2013, HR Tammi Clarke, emailed Plaintiff accusing her of not protecting her own health.

From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator.

On March 29, 2013, Plaintiff also sent an email to HR Clarke expressing concern of the delay in processing her FMLA applications and requesting an update on her pending FMLA

applications that were submitted on February 22 and February 23, 2013 as she had not heard anything since submitting them.

On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior.

On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could may leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013.

On or around April 29, 2013, Plaintiff was informed by her supervisor that her performance was not an acceptable level and that she was not on track for the next within grade increase.

On May 16, 2013, Plaintiff was informed that she did not qualify for the mandatory overtime that was being offered to RVSRs at the RO. This email was sent from Sandra Smith and Coach McBurrough.

On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS.

On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful as her workload was not appropriately modified based on her accommodation request. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken as a result of the failure to accommodate. Between February through April 2014, Plaintiff's supervisor James Beauchamp micromanaged her workload.

**RFI 7:** Identify each act you took that you contend prompted the retaliation and hostile work environment alleged in Count 4 of the Complaint. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**Response:**

Objection notwithstanding, Plaintiff responds that her participation in protected EEOC activity to include participating the complaint process for her EEOC complaints under Agency Case Numbers 200I-0317-2014102766; 200I-0317-2015100312; 200I-0317-2012103413, and participating in the reasonable accommodation process forms the basis for her retaliation and hostile work environment claims. Plaintiff also contends that any reports she made to management and Director Witty pertaining to the harassment she was facing as articulated in her supplemental response to RFI 1. Together these are an exhaustive list of the protected activities.

**RFI 9:** Please identify any and all physicians (including medical doctors, doctors of osteopathy, chiropractors, or any other healthcare provider); pharmacists, hospitals, psychologists, psychiatrists, or other mental health counselors or professionals; ministers, counselors, or any other person with whom you consulted or sought treatment or whom you contacted because of any alleged disability identified in response to Interrogatory No. 8. In responding to this interrogatory, for each individual, please set forth the name and business address of the individual and the period of time in which you consulted with, sought treatment, or had contact with the individuals because of any serious health condition identified in **Interrogatory No. 6.**

**Response:**

Plaintiff directs Defendant to the document titled "BCBS OWCP Payment Info For Mullin" in supplemental RFP7, in the folder titled "Medical-Insurance".

**RFI 10:** Please set forth the factual basis for the allegations contained in paragraph 20 of your Complaint. When answering, please identify any disability or condition you contend was caused or aggravated by building exposure and Defendant's failure to accommodate and any medical provider who determined causation.

**Response:**

Plaintiff directs Defendant to the report done on 5/12/2021 by Dr. Ellen J Dutta and the reports done by Dr. Teekell Taylor dated 2/3/2020 in Supplemental RFP 7.

**RFI 11:** Please identify each accommodation that you requested of Defendant for your alleged disabilities, the specific accommodation sought, when you requested the accommodation, the form of your request (i.e., whether verbally or by e-mail, letter, or other writing), to whom you made the request, who responded to your request, when you received the response, and any witnesses to your request for accommodation or Defendant's response.

**Response:**

Objection notwithstanding, Plaintiff directs Defendant to her supplemental responses to RFI 1 and 3, as all of Plaintiff's RA requests made during the relevant time frame are detailed therein. Plaintiff further provides the below, which also includes information that is responsive to RFI 12.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at

Advanced ENTs of Tampa Bay, Trina Espanola, MD: "….patient has intermittent hoarseness with reflux disease …. Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print

from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

The Agency's denial of accommodation was insufficient. Sufficient accommodation would conform with the above medical recommendations limiting prolonged speaking, would provide adequate training for processes undertaken as a result of the accommodation, and would provide adequate access to all necessary systems needed to work from home. For the below-listed accommodations, the primary focus of the requests involves addressing exposure to poor air quality rather than issues more directly related to work load/duties that are detailed above. Though not specified below, ***all remaining accommodations are insufficient to the extent they do not limit the Plaintiff's time on the phone/prolonged speaking, adequate training for alternative processes, and access to alternative processes, as detailed above.***

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed. On or around September 6, 2011, Plaintiff received

notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

The denial of accommodation was insufficient. A sufficient accommodation would have been to move Plaintiff to another duty station where air quality was not a problem. A less sufficient accommodation would be to provide a compressed schedule to limit the consecutive days that Plaintiff spent in Room 222.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director

Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

The agreed upon accommodation was sufficient, but it was not implemented and the failure to implement the accommodation resulted in insufficient accommodation. A sufficient accommodation would be to be relocated to a work station without air quality issues. A less sufficient accommodation would be to modify her compressed schedule and to be provided a private space in which to use her nebulizer.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, “Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via

email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

The accommodation was insufficient. A sufficient accommodation would be to allow Plaintiff to work from home or another duty station where air quality was not a problem. A less sufficient accommodation would be to provide air purifier(s) that were appropriately sized for the room.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable

to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

The initial failure to respond to Plaintiff's RA request was insufficient. The evenutal accommodation of three days of telework was insufficient. A sufficient accommodation would not have required Plaintiff to return to a building with poor air quality and would allow Plaintiff a private space to use a nebulizer when necessary. The requirement for Plaintiff to work in a building with poor air quality for two days a week continued until April 2013 despite medical evidence that suggested Plaintiff needed to be given full time telework and/or transfer to a duty station where air quality was not an issue.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not

support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

The accommodation was insufficient. A sufficient accommodation would include limiting exposure to poor air quality, e.g., full time telework or assignment to a different duty station.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous

conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director

Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

The accommodation was insufficient. A sufficient accommodation would minimize exposure to duty stations with poor air quality. Plaintiff was eventually provided with a respirator, which partially addressed her RA requests.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for

wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

The accommodation was insufficient. A sufficient accommodation would limit all exposure to Room 222/poor air quality.

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

The request is insufficient because it does not address work flow/job duty issues. A sufficient accommodation would address the concerns presented in the above paragraph (i).

**RFI 12:** For each accommodation identified in your response to **Interrogatory Number 11,** please state whether the accommodation provided by Defendant, if any, was insufficient. For each accommodation you contend was insufficient, please explain how Defendant's offered accommodation was insufficient, the nature of any alternative accommodation sought, when you informed Defendant the accommodation was insufficient, the form of your request (i.e.,, whether verbally or by e-mail, letter, or other writing), to whom you made the request, who responded to your request, when you received the response, and any witnesses to your request for accommodation or Defendant's response

**Response:**

Objection notwithstanding, Plaintiff directs Defendant to her supplemental responses to RFI 1 and 3, as all of Plaintiff's RA requests made during the relevant time frame are detailed therein. Plaintiff further provides the below, which also includes information that is responsive to RFI 11. As such, the Plaintiff provides the following direct evidence of discrimination in relation to the RA requests.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR

(Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "….patient has intermittent hoarseness with reflux disease …. Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with

Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

The Agency's denial of accommodation was insufficient. Sufficient accommodation would conform with the above medical recommendations limiting prolonged speaking, would provide adequate training for processes undertaken as a result of the accommodation, and would provide adequate access to all necessary systems needed to work from home. For the below-listed accommodations, the primary focus of the requests involves addressing exposure to poor air quality rather than issues more directly related to work load/duties that are detailed above. ***Though not specified below, all remaining accommodations are insufficient to the extent they do not limit the Plaintiff's time on the phone/prolonged speaking, adequate training for alternative processes, and access to alternative processes, as detailed above.***

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller

rather than having her RA request processed. On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not

accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

The denial of accommodation was insufficient. A sufficient accommodation would have been to move Plaintiff to another duty station where air quality was not a problem. A less sufficient accommodation would be to provide a compressed schedule to limit the consecutive days that Plaintiff spent in Room 222.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS

services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

The agreed upon accommodation was sufficient, but it was not implemented and the failure to implement the accommodation resulted in insufficient accommodation. A sufficient accommodation would be to be relocated to a work station without air quality issues. A less sufficient accommodation would be to modify her compressed schedule and to be provided a private space in which to use her nebulizer.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami

Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

The accommodation was insufficient. A sufficient accommodation would be to allow Plaintiff to work from home or another duty station where air quality was not a problem. A less sufficient accommodation would be to provide air purifier(s) that were appropriately sized for the room.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was

never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

The initial failure to respond to Plaintiff's RA request was insufficient. The evenutal accommodation of three days of telework was insufficient. A sufficient accommodation would not have required Plaintiff to return to a building with poor air quality and would allow Plaintiff a private space to use a nebulizer when necessary. The requirement for Plaintiff to work in a building with poor air quality for two days a week continued until April 2013 despite medical evidence that suggested Plaintiff needed to be given full time telework and/or transfer to a duty station where air quality was not an issue.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not

support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

The accommodation was insufficient. A sufficient accommodation would include limiting exposure to poor air quality, e.g., full time telework or assignment to a different duty station.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous

conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director

Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

The accommodation was insufficient. A sufficient accommodation would minimize exposure to duty stations with poor air quality. Plaintiff was eventually provided with a respirator, which partially addressed her RA requests.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for

wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

The accommodation was insufficient. A sufficient accommodation would limit all exposure to Room222/poor air quality.

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

The request is insufficient because it does not address work flow/job duty issues. A sufficient accommodation would address the concerns presented in the above paragraph (i).

**RFI 13:** Do you contend that there is any direct evidence of discrimination or retaliation as defined by the Eleventh Circuit, see Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020), to support your claims? If so, please provide the factual basis for this belief, including identifying the purported direct evidence, who was involved, when it occurred, and any witnesses to the statement or event.

**Response:**

Objection notwithstanding, the Plaintiff directs Defendant to RFIs 1, 3, 4 and 5. Plaintiff further provides the below.

(i) After being assigned from Pre 3 to the Public Contact Unit, on or around 11/27/2009, Plaintiff spoke with supervisor (Coaches and Assistant Coaches: Jimmy Correa, Adella Nicholson) about medical issues she was having with speaking due to her medical conditions. The Plaintiff submitted medical documentation to her supervisor on or around December 29, 2009. The medical documentation stated that Plaintiff needed to restrain from any talking/speaking for a prolonged period. On or around January 4, 2010, Plaintiff's supervisor required the Plaintiff to report to the Phone Union on 2nd floor, Room 222 of RO317, without any accommodations for her speaking issues in accordance with her medical documentation. Plaintiff provided additional medical documentation in support of her RA to her supervisor and to HR (Megan Tarver) stating that she needed at least six weeks voice restriction per her doctor at Advanced ENTs of Tampa Bay, Trina Espanola, MD: "….patient has intermittent hoarseness with reflux disease …. Should observe the following restrictions: patient should be on voice restrictions for at least six weeks, unless talking among co-workers." On January 18, 2010, Plaintiff again

made an RA request based on her voice restrictions and submitted additional medical documentation from Dr. Raquelle Alexander, Board Certified Allergy-Immunology to the VA that stated "[t]his patient was seen by me today in my office. She has had several weeks of voice loss/laryngitis. She needs to be on voice rest, (no telephone work /conversation work on her job for several weeks more." Doc. 1-3, Ex. 30 at 1-3. On January 26, 2010, Agency denied Plaintiff's RA request via the memorandum of the same date from Human Resources, signed by Bonnie Wax. *Id.* At 4. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman. On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested. On or around August 27, 2013, Plaintiff was provided access to VBMS to access veteran file information remotely. However, Plaintiff was never provided with basic training on how to utilize VBMS. During October 2013-November 2013, Plaintiff was not receiving the appropriate workload in order to be fully successful, in part because the Agency had failed to accommodate her requests that would have impacted her workload. On February 9, 2014, Plaintiff was denied her within grade increase due to use of LWOP that was taken because of the Agency's failure to accommodate the Plaintiff. On or around June 11, 2013, Plaintiff made a request for additional RAs to have access to the collaborate with Decision Review Officers for the claims she was working, to have access and authority to print from home, and to have assistance with getting training materials needed for her position. She sent this request via email to HR Matthew Correa, her supervisors McBurrough, and Jerry Huffman.

On or around July 5, 2013, Plaintiff sent an email to HR Correa asking for an update on the status of the printing RA she requested.

(ii) On or around the week of July 7, 2010, Plaintiff reported to her first and second level supervisors, that her respiratory health problems only occurred when she was at work, and that she suspected that it was either the building or she was reacting to the Veterans' claims files as they were archival. She requested an RA to be assigned to the part of the building that the was recently renovated or that she be allowed to work in the Orlando Outbased Office. She told Dale Eschol, Coach, who in turn reported to Collette Burgess, AVSM. When Burgess approached her, she was informed about Plaintiff's health issues and Plaintiff requested she consider letting her move to the newly renovated New Loan guarantee area of the building or to an office in Orlando. A few days later Plaintiff received an email and was provided a CA-2 form from Renee Miller rather than having her RA request processed. On or around September 6, 2011, Plaintiff received notice that she was assigned to the Decision Team 1 (RO 317 3rd floor). Returning to RO 317, she was informed that she was required to stay (indefinitely) in Room 222 on the 2nd floor (aka the old Phone Unit room). Newly trained RVSRs, were told that there was no room for them with their designated Teams on the 3rd floor. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around December 6, 2011, Plaintiff reported to her second-level supervisor (James Cartner) that she and other employees were suffering from breathing issues and expressed concerns about how working in the environment she was assigned was negatively impacting her conditions and her ability to work, resulting in her having to take constant leave. On December 7, 2011, Plaintiff requested an RA by way of a change in workstation and or to have her compressed day off changed from Thursday to Wednesday to limit the consecutive days in the office to see if that helped with her conditions. On or around December 13, 2011, Plaintiff reported to AFGE Valorie Reilly that Agency had not accommodated her requests and that she needed to get a proper RA or her health would suffer. On or around January 6, 2012, Plaintiff again notified her supervisor, Michael Palmer, that she was suffering from a severe asthmatic episode and required to take leave for the rest of her shift until she could get her asthma under control as Agency had still not accommodated her since making her requests in December 2011. Agency also failed to follow the applicable RA policies and procedures upon receiving her RA request in December 2011.

(iii) On or around January 8, 2012, Plaintiff made another RA request to her supervisors, Michael Palmer and James Cartner, via email requesting that her compressed day off be changed and or to have her workstation changed to another area outside of the 2nd floor east quadrant. She also suggested the possibility of working from home and stated she would bring her own nebulizer to work as a precaution in case she suffered another severe episode, but she requested that she be given a private place to use if she required using the nebulizer. On January 9, 2012, Plaintiff notified AFGE Valorie Reilly and Keith Pryor of her RA request she made the day prior to see if they could also help her. On January 10, 2012, Plaintiff met with Tammi Clark of HR, Carol Allard of AFGE and informed HR of the issues she was suffering from due to her medical conditions. Ms. Clark verbally agreed that Plaintiff would be reassigned to another place before

she returned to work on January 12, 2012. However that reassignment never took place promptly and instead January 12, 2012, Plaintiff emailed Ms. Clark at 7:39 asking for further clarification on where she was to be reassigned. Due to Agency's failure to provide RA that was requested promptly as was verbally agreed to, Plaintiff suffered a severe asthmatic episode on January 12, 2012, which resulted in EMS being called to treat her. Additionally, Plaintiff was never provided any private space to use her nebulizer as she requested in her RA request she made a few days prior, but her nebulizer was unable to alleviate the attack she suffered from on the 12th and EMS services were required to get her breathing back to normal. Later that day, Assistant Director Suzanne Nunziata, Kerrie Witty, Sandy Smith, exchanged emails with each other stating how Plaintiff was supposed to have been accommodated to another area, but was never informed.

(iv) On or around January 31, 2012, Plaintiff reported to Assistant Service Center Manager, Larry Brown, Coach Ulysses (Bo) McBurrough, Assistant Coach, James Cartner, Human Resources Specialist Tamanique Clarke, AFGE Carol Allard, AFGE Valorie Reilly via an emailSubject: Status of health issues that stated "Good morning All, "Yesterday, for the second time since the move to VBIT1 [3rd floor], the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness in my chest) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be prudent to do so without delay." On or around February 2, 2012, Plaintiff was provided an air purifier (Honeywell Air Purifier 16200) however the purifier that was provided was completely ineffective as the air purifier that was provided was designed for a small room, but Plaintiff was assigned to a work station that was in an open cubicle in an area comparable to the size of a football field. On or around February 6, 2012, Plaintiff notified her supervisor, Larry Brown, that the air purifier she was provided was not working and that it was designed for

a 10 x 10 space. Plaintiff again made a request to be permitted to work from home, but was told the decision with be Sandy Smith and HR. That same morning, Plaintiff also notified HR Tami Clark, McBurrough, U e, VBASPT; Cartner, James, VBASPT Cc: Allard, Carolyn, VBASPT via email that the purifier was not working. On or about February 19, 2012, a memo from AFGE to the Agency explained that the Agency had yet to provide effective accommodation On April 15, 2013, Plaintiff's doctor submitted medical documentation to HR stating that Plaintiff should not return to work at the VA office and that the air purifier that Agency had provided in her workplace was not sufficient.

(vi) On March 3, 2012, Plaintiff submitted additional medical documentation making an RA request in which her provider requested that she be permitted to work from home with periodic trips to work site if needed. On March 12, 2012, Plaintiff sent an email to Tami Clark and Coach McBurrough, requesting an RA for the upcoming training certification test that would be required to be taken on the 2nd floor of the building where she previously suffered her most severe asthmatic episodes to date and described how she needed to take a substantial amount of leave in the last week just to recover from her aggravation she suffered earlier. On March 13, 2012, Director Witty emailed with Sandy Smith about Plaintiff's request for an RA to work from home and acknowledged that Plaintiff's physician requested it was needed. Director Witty also stated in this email that she did not want this request to sit like the ones before. Plaintiff went home sick on March 13, 2012 and Sandy Smith emailed Jerry Huffman stating that Plaintiff was to be accommodated in an empty HR office to take training exam that was supposed to take place on March 14, 2012, and that she was to be notified of such arrangements. However, Plaintiff was never notified of the arrangements prior to the 14th as HR failed to let her know, and she was unable to take the exam on the 14th as she was more concerned with getting a full time RA to address her

health issues that she was suffering from severely at the time and reported this to her supervisor Coach McBurrough. Plaintiff requested a meeting with Coach McBurrough and Jerry Huffman, however Mr. Huffman did not meet with her on the 14th as was requested. Rather than granting Plaintiff's March 3, 2012 RA request promptly based on the medical documentation she provided previously, Agency delayed until March 20, 2012 to notify Plaintiff that she would be permitted to work from home on Mondays, Wednesdays and Thursdays, and was to report to the RO on Tuesdays and Fridays. On April 12, 2012, as a result of Agency's failure to grant RAs for Plaintiff had to again use her nebulizer but since she was never granted an RA for a private space to use it, she was forced to go to her vehicle to use the nebulizer and had to be picked up by family from work due to her attack.

(vii) Following a request to meet on or about June 10, 2012, Plaintiff met with Director Witty, Jerry Huffman, AFGE Keith Pryor and Tedd Smith. Plaintiff discussed additional RA requesting that the Agency limit her exposure to poor air in Room 222 while undergoing cancer treatment/immunocompromised. The Director concluded the meeting stating that she did not support granting RAs because if she granted them then she would have to give one to every employee that came in with a doctor's note or word to that affect.

(viii) On or around January 15, 2013, Plaintiff reported to her supervisor, Coach McBurrough and Coach Veronica Collins, that she had suffered respiratory issues when working in the building and that she needed to get out of the building for the time being. Plaintiff requested an RA to have less time in the building to avoid suffering any kind of asthmatic attack. On January 17, 2013, Plaintiff submitted medical documentation in support of her RA request and on January 2, 2013, Plaintiff was seen by a medical specialist who deemed it was not safe for her to enter the building without a respirator; Plaintiff also requested an RA to use a respirator. After making these

RA requests, Plaintiff had made numerous attempts to speak with HR Tammi Clark and her supervisors to figure out how the respirator would be attained, but the processing of this request was unduly delayed by HR and she was informed that Agency could not grant her RA of limiting her time in the building further. On Thursday, January 17, 2013, Plaintiff was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed. On Tuesday, January 23, 2012, the next time Plaintiff entered the building; within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain. On Saturday, January 26, 2013 - Plaintiff was seen by the medical specialist who deemed that it was not safe for her to enter the building without a respirator. He stated that she has to further minimize her time in the building. On Monday, January 28, 2013, Plaintiff informed the agency of her worsening reaction to being in the building and requested an RA providing her most recent doctor's orders. On, Tuesday, January 29, 2013 - Plaintiff had numerous conversations with Tammi Clark Human Resource (HR) Specialist attempting to determine how a respirator would be attained. On Wednesday January 30, 2013, though ill, Plaintiff requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Plaintiff's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Plaintiff voiced her belief that collaboratively a plan could be worked out and requested that be given aid with marginal job functions such as assistance retrieving documents from the printer and moving the files in the building. The group was set to meet the next morning to further discuss options allowing Plaintiff to safely perform her job. However, later the same afternoon, Tammi Clark HR informed Plaintiff that her request for modifications to her existing accommodation was denied (without the benefit of further

conversation). On or around January 31, 2013, Plaintiff experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she had no history of). Plaintiff was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she remained hospitalized for one week. On or around February 5, 2013, while in the hospital, Plaintiff spoke to HR specialist Tammi Clarke, who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position had functions that could not be modified and that those duties could not be broken to limit Plaintiff's exposure in the building further. On or around February 19, 2013, Plaintiff again requested RAs but this time that she placed on paid Administrative Leave while the Agency determined how her duties in the office could be modified to limit her time there further. This request was made to HR Bonnie Wax from Plaintiff's AFGE representative. On February 20, 2013, HR Phillip Works emailed Plaintiff stating that Director Witty approved authorized absence from Thursday, February 21 through Monday, February 25, 2013 for Plaintiff and requested additional medical evidence from Plaintiff to process her RA request. On February 21, 2013, Plaintiff submitted additional medical documentation to her Supervisor Coach McBurrough and AFGE. On February 27, 2013, Plaintiff emailed HR Tammi Clarke again requesting an RA to limit her exposure in the building in accordance with her medical documentation Agency had on file for her conditions and RA requests. Plaintiff also requested clarification on why additional medical evidence was being requested by the Agency and what specifically was needed from her doctor. From February 28 through March 26, 2013, Agency refused to offer any RAs to Plaintiff to help her with her marginal functions that required exposure in the building. Plaintiff was required to wear a full respirator mask any time she was required to be in the building. Plaintiff was ridiculed and laughed at by co-workers - who were shocked by

the sight of her wearing her respirator. This humiliation could have been minimized if Ms. Clarke, LRAC had been willing to consider specific modifications as were requested by Plaintiff.

(ix) On March 29, 2013, Plaintiff was informed by Coach McBurrough that HR was rescinding her RAs that were previously agreed upon on February 27, 2013 that permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). She was informed that effective immediately she would be required to remain in the building for eight hours on Tuesdays and Thursdays. That same day Plaintiff sent and email to Tamminque Clarke requesting clarification on why the RAs that were working for her were being rescinded and also notified HR Clarke about the humiliation she was facing from her peers for wearing her respirator and that she would likely suffer another serious exacerbation of her breathing issues if she is required to work in the office for 8 hours a day. On April 1, 2013, Plaintiff received an email from HR Clarke stating that Plaintiff's RA request was not reversed or rescinded and claimed that Plaintiff was never approved to work 4 hours in the office and 4 hours at home, despite the fact that Plaintiff's supervisor had been allowing her to do exactly that for the month prior. On or around April 3, 2013, Plaintiff emailed her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE pleading for help with developing an emergency medical plan as she anticipated she suffer another severe asthmatic attack similar to the one she had in January 12, 2012 now that Agency had removed the RA that she using for the month prior. On or around April 15, 2013, Plaintiff received a VA form 0857f form from HR Clarke informing her that she would be permitted to work from home Mondays, Tuesdays, Wednesdays, and Thursdays, that she was required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am – 11:00 am, and at 11:00 she could leave the building to report home and complete the remainder of her tour from home. This was after Ms. Clarke had said that such accommodations would not be

in place on April 1, 2013. On April 16, 2013, Plaintiff sent an email to her supervisors Coach McBurrough, Sandra Smith, Jerry Huffman, and AFGE stating that HR still failed to address the RAs she requested to help with the marginal duties that she would be required to perform in the building. On or around September 19, 2013, Plaintiff's RA that she required annually for the mandatory certification training exam had not been verified (i.e. the private office in a location outside of 2nd floor where exam was held).

(x) On or around April 19, 2013, Plaintiff received an 0857f form informing her that she was being granted full time work from home so that she could avoid building exposure.

**RFI 14:** Unless identified in response to Interrogatory No. 13, please identify any discriminatory, retaliatory, or offensive comment, statement, or remark made by any current or former employee of Defendant that you contend supports your claims. In responding to this interrogatory, please set forth each comment, statement, or remark; who made the comment, statement, or remark; when the comment, statement, or remark was made; where the comment, statement, or remark was made or how it was communicated; and any witnesses to the comment, statement, or remark.

**Response:**

Plaintiff responds that the events listed in her response to RFI 1,3,4, and 5 together make up the events that support Plaintiff's claims of discrimination, retaliation, and hostile work environment. Plaintiff also states the following:

Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Plaintiff while she was experiencing severe workplace related respiratory problems despite multiple verbal and email notices being sent to him from Plaintiff requesting assistance due to her health issues. Rather than work with Plaintiff to find an RA that helped Plaintiff, Mr. Palmer went as far to say that Plaintiff was the only person in the room with a problem and asked why Plaintiff did not have a portable oxygen tank or wear a protective mask.

On or around May 3, 2012, HR Bonnie Wax violated Plaintiff's privacy by discussing Plaintiff's cancer diagnosis and other sensitive information contained within her 3/9/2012 FMLA

application relating to her cancer treatment with AFGE Casey Crump when Crump did not have authorization to know any of Plaintiff's medical information. Ms. Wax also informed Mr. Crump that she believed Plaintiff's cancer was the cause of her medical issues and not the building. Mr. Crump emailed Plaintiff on May 3, 2012 informing her of his conversation with Ms. Wax despite Plaintiff never notifying Mr. Crump she was diagnosed with cancer or that she was out due to treatment.

**RFI 15:** Please identify any other evidence of discriminatory or retaliatory intent not otherwise identified in response to Interrogatory Nos. 1-14 that you contend supports your claims of discrimination or retaliation in the Complaint.

**Response:** Plaintiff does not have any additional information other than what is proffered in interrogatories 1-14 at this time. Should additional responsive information become available, Plaintiff will supplement this response.

**RFI 17:** If you have received any income from **alternate employment, self-employment, or from sources other than employment** from January 1, 2009, to the present, please list the following:

a. The name, address, and phone number of every source from which you received income, compensation, gifts, benefits, or other things of value (if the source is an entity other than a single individual, please provide the name of your principal contact at that entity).

b. The total monetary value of the income, compensation, gifts, benefits, or other things of value that you received from each source during the specified year (please state this figure as a gross amount, *i.e.*, without adjustment for taxes or other deductions);

c. The nature of the income, compensation, gifts, benefits, or other things of value that you received from each source (*i.e.*, wages, income from self-employment, gift, etc.);

d. The dates on which amounts were received from each such source (if multiple payments were made on a regular basis, specify the beginning and ending dates of the period, the frequency with which payments were received, *i.e.* monthly, weekly, every two weeks, and any irregularities in the payment cycle).

**Response:**

Plaintiff has not received any income from alternate employment, self-employment, or other sources other than employment from January 1, 2009 to current. Plaintiff will provide a definitive number of wages associated with her OWCP claims by December 15, 2021, as she is waiting on obtaining the necessary records from DOL to verify her total OWCP wages for the

relevant time period.

**RFI 19:** With as much specificity as possible, please set forth **all of your injuries**, **the exact amount of damages that you claim**, whether as **an affirmative claim or as a setoff**, and **any other relie**f that you seek in this action from the court.

> In responding to this interrogatory, please include in your answer: **the count to which the item of damages relates**; **a statement of the elements of each claim of money damages and the amount being sought with respect to each such element**; any **specific non-monetary relief that you are seeking** in this action; the **category into which each item of damages falls**, i.e., general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the monetary value placed on each category of damage or relief; **the factual basis for each item of damages or relief**; and an **explanation of how you computed each item of damages or relief, including any mathematical formula used**.

**Response:** Plaintiff objects to this interrogatory in that it requests information that will not be fully developed until after additional discvoery is completed. Objection notwithstanding, Plaintiff will supplement this request and states the following damages:

- Backpay for period prior to being put on off work status to include reimbursement of sick leave, annual leave, leave without pay (LWOP), overtime pay, premium pay, holiday pay, holiday leave, step increases, location differential.
    - **Annual-** 145 hours (2012), 109.25 (2013), 148 (2014), 37.25 (2015), =439.5
    - **Sick-** 313.75 (2012), 18 (2015) = 331.75
    - **Admin**- 24.75 (2012), 64 (2013), 16 (2014) = 104.75
    - **LWOP-**224.00 (2012)**,** 182.5 (2013), 109 (2014), 730.5 (2015)= 1246
        - **Total hours thus far: *2,122***
        - **2,122 x current base pay is $43.46/hour= $92,222.12**
        - **With interest estimations, approximately $115,000**
    - **Overtime (TBD)**
- Front pay due to inability to return to work:
    - **1 year at Adjusted Base Pay of $90,405**
- Backpay for the period while Plaintiff was placed on an off work status

  - o **<u>Has to be offset by OWCP payments (TBD) and supplemented</u>**

- Reimbursement for the loss of creditable service entitlements and eligibilities to Federal Benefits and Programs affected by Plaintiff's LWOP and non-pay status.
- Reimbursement for Plaintiff's copying and mailing expenses related to her OWCP paperwork that she has submitted and requested from 2012 to current
  - o **(totaling ~$1000) (See "Mailing Receipts" folder in RFP 7.**
- Reimbursement for any lost retirement benefits, including any and all accrued Thrift Savings Plan benefits and quarterly credits for social security.
  - o **$40,541.26 for loss contributions from 2016-2021**
  - o Based on TSP Annual TSP Statements in RFP 7.
    - ▪ 2009- $2483.36 (amount contributed to TSP)
      2010- $4594
      2011- $5254.90
      2012- $8322.79
      2013- $7290.86
      2014-$8159.52
      2015- $4435.83
- $40,541.26 contributed in 6 years (avg of $6,7568 per year)
      2016- $0
      2017- $0
      2018-$0
      2019-$0
      2020-$0
      2021-$0
- Reimbursement for medical expenses.
  - o **$76,909.63 based on "BCBS Payment Info" in RFP 7.**
- Compensation for attorney fees.
  - o **~$70,000 (continuing)**
- Compensatory damages not to exceed $300,000 to compensate Plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, future medical costs, inconvenience,

career loss, loss of professional reputation and career opportunities, and loss of quality of life caused by Defendant's unlawful actions, as well as damages for Agency's delay in providing reasonable accommodations which resulted in exacerbation and development of Plaintiff's disabilities

  - Damages are based on an analysis of awards in like cases. The fact patterns examined to determine like cases were those where complainants experienced extreme suffering as a result of respiratory illness, denial of training and similar opportunities, and lowered performance evaluations, over a prolonged period for approximately four years.

- Compensation for the increase in Plaintiff's student loan interest resulting from her non-work status from 4/1/2015 to current totaling
  - **~$7253.**
- Compensation for payments Plaintiff missed towards her Public Service Loan Forgiveness Program from 4/1/2015 to current.
  - **(Current balance of $34,900).**
- Compensation for damage to credit score due to loss of income from agency's failure to accommodate resulting in Plaintiff being placed on non-work status.
  - **$1000**
- Pecuniary losses for medical payments. This answer will be supplemented by December 15, 2021.

Respectfully Submitted,

________________________________
James Solomon | james@smkfirm.com
Attorney for Plaintiff

**SOLOMON, MAHARAJ & KASIMATI, P.A.**
601 N. Ashley Dr., Suite 1100-192
Tampa, Florida 33602

Office: 813.497.7650
Email: info@smkfirm.com
Web: smkfirm.com

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AILEEN MULLIN, ) Case No.: 8:20-cv-026970-VMC-AEP
)
Plaintiff, )
)
v. )
)
DENIS MCDONNOUGH, SECRETARY, )
U.S. DEPARTMENT OF VETERANS AFFAIRS,)
Et al. )
Defendant. )
)
) December 7, 2021

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing Plaintiff's Supplemental Interrogatory Responses was served this 7th day of December 2021 via email.

Respectfully Submitted,

James M Solomon

James Solomon | james@smkfirm.com
Attorney for Plaintiff

**SOLOMON, MAHARAJ & KASIMATI, P.A.**
601 N. Ashley Dr., Suite 1100-192
Tampa, Florida 33602

Office: 813.497.7650
Email: info@smkfirm.com
Web: smkfirm.com

# EXHIBIT 61

Print

http://us-mg6.mail.yahoo.com/neo/launch?.rand=aa06ngsn2nj4r#mail

**Subject:** Fw: medical and HR

**From:** Aileen Mullin (aileen_mulli

**To:** valorie.reilly@va.gov;

**Cc:** casey.crump@va.gov;

**Date:** Thursday, June 7, 2012 2:02 PM

The Human Resources Memorandum, attached to my records, was signed by Bonnie and dated May 30, 2012. We received the documents on May the 31st.

Thank you for assisting me in getting them but unfortunately I need more assistance: The file appears to be incomplete. I don't know if pages are maintained else where, or destroyed due to legal requirements but....

Documents that are not with the package include (and may not be limited to) are:

December 2009 - Medical documentation I submitted?
January 2010 - HR/Accommodations documentation generated by HR and Medical documentation I submitted.
January 2012 - AFGE Release for Carol Allard submitted to HR?

Also please know that Tammie called on May 31st, in response the the message I left the day prior. In her message she informed me that she had not received my e-mails and her address has a '2' suffix. I do appreciate her getting back to me.

Thank you,

Aileen

PS Thank you for forwarding Bonnie's 'message' unencrypted.

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Tuesday, June 05, 2012 9:56 AM
**To:** aileen_mullin@
**Cc:** Reilly, Valorie, VBASPT
**Subject:** FW: medical and HR

Hi Aileen,

I hope you are feeling better. You are in my thoughts and prayers.

AFGE submitted a request for your records on May 16. The request we received asked for *"a copy of __all__ records personally identifiable to this employee [Aileen Mullin}. This request includes all records such as medical records, supervisory notes and/or extended any [sic] personnel file, etc."*

As a general rule, an employee either submitted the documentation maintained in their records or are provided copies of the documents filed in these records. In accordance with Article 24 of the VA/AFGE Master Agreement, an employee, or the employee's representative, can examine those records personally identifiable to the employee at any time, during normal duty hours. However, what

was expressly sought in this case was a copy of all records.

While I understand from your e-mail that the records were requested on your behalf in support of an appointment you had scheduled, this urgency was not described in the records request.

This was an extensive request that required us to "search" for records by personally identifiable information (such as name and SSN) in a variety of records (eOPF, reasonable accommodation, FMLA, OWCP, VLTP, local personnel file, employee medical file, performance folder, supervisory files), as well as coordinate the record search with HRC Jackson and your supervisory chain, and then copy, print and redact as needed. These searches can take time because most of our systems of records are not electronic, and when the records are being given to a third party, we have to go through a redaction process. It is customary for the agency to have 10 business days to respond to union information requests. We completed the information request as quickly as possible given the scope of the request, and delivered it to AFGE on May 31st.

You can, at any time during normal business hours, come to HR to examine personally identifiable records maintained locally. Upon request, copies of records not previously furnished will be furnished at no cost.

You can also access your electronic Official Personnel Folder (e-OPF) at any time. If you would like for us to show you how to do that, please let me know.

According to your e-mail you attempted to contact Ms. Clarke by e-mail on the 18th and 29th. She searched for emails from you and found no emails from you on the dates you referenced. We wondered if it went to her old email address.

You also indicated that you tried to reach Ms. Clarke during the afternoon of the 30th. Unfortunately, Tammi was off the afternoon of May 30th. She received your voice message at 8am the next morning.

There are several staff members in the Human Resources Division. Our names and desk numbers are listed on the Regional Office's SharePoint site, and are listed below for your convenience:

| | |
|---|---|
| Bonnie Wax | 727-319-7271 |
| Tammi Clarke | 727-319-5818 |
| Virginia Lopez | 727-319- 5919 |
| Cyndie Moore | 727-319-7349 |
| Philip Works | 727-319-5923 |

If my staff is not available, you are welcome to come directly to me. Please let me know if you need anything else.
I hope your procedure goes well.

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Wednesday, May 30, 2012 3:16 PM

Print

http://us-mg6.mail.yahoo.com/neo/launch?.rand=aa06ngsn2nj4r#mail

**To:** Wax, Bonnie, VBASPT
**Cc:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: medical and HR

---

**From:** Crump, Casey, VBASPT
**Sent:** Wednesday, May 30, 2012 2:00 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** aileen_mulli,
**Subject:** FW: medical and HR

Kerrie,

I'm not sure what the hold up is and it could simply be Jackson. However, Aileen should at least be informed if there is indeed a legitimate reason. Otherwise, she is left with with a perception based on experience. I want to specifically let you know because Aileen has already consulted about similar treatment.
Casey

---

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Wednesday, May 30, 2012 1:45 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Subject:** medical and HR

Hi Bo,

Just want you to know I was able to get an appointment this afternoon with the medical oncologist. Hopefully there' a simple answer to what's causing the problem, and an even simpler solution. I just want to move on and get back to work.

I also need you know that Human Resources continuess to cause problems for me and Jerry advised that if this were to happen, I should contact you. I don't know that you need to do anything, but as my Coach, and in light of HR's record of employee mistreatment, I just need you to know what's going on:

I can't get my records from them. Records I need, and have the legal right to have. This is what's gone on so far:

On the 16th of May, Valorie Reilly requested a copy of my records, for me. She requested they be available for the 29th. On the 18th I sent a follow-up e-mail to Tammie to make sure the request met HR requirements:

*"Good morning Tammie,*

*Valorie Reilley submitted a request for a copy of my Human Resources related records. I'm scheduled for another surgery on Monday, so if your department requires additional documentation to allow for the release of this information, please let me know as early today as possible to allow me to take action before surgery.*

*Thank you in advance for your assistance,"*

**I never received a response.**

Yesterday, the 29th I tried again:

*Hello Tammie,*

*Will you please get back to me as to the status of the request for my records: Are they ready for Valorie Reilly to*

*pick up?*

*Thank you in advance for your assistance,*

**Again, no response.**

At 12:45 this afternoon I tried to contact her by phone. I left a message asking her to respond to my call and verify whether or not she was receiving my e-mail. Needless to say, still no response.

*I have to leave now in order to get to the doctor's, who by the way is nothing less than horrified by the unnecessary extra stress the people in Human Resources so freely inflict on me. Never mind that, time for anther prayer and I'll be in touch.*

*Aileen*