EXHIBIT 1

# MEMORANDUM

DEPARTMENT OF
VETERANS AFFAIRS

Date: November 27, 2009

From: Veterans Service Center Manager

Subj: Personnel Reassignments

To: Team Coaches

The following personnel reassignments will be effective January 4, 2010.

| Name | From | To |
|---|---|---|
| Ali Faraji | Pre 1 | Public Contact |
| Tiffany Allen | Pre 1 | Public Contact |
| Douglas Crosby | Pre 1 | Public Contact |
| Jerry Dudley | Pre 1 | Public Contact |
| Christopher Nadeau | Pre 2 | Public Contact |
| Lisa Blume | Pre 2 | Public Contact |
| Thanh Ho | Pre 3 | Public Contact |
| Adrienne Carrasquillo | Pre 3 | Public Contact |
| Natalie Kennedy | Pre 3 | Public Contact |
| Aileen Mullin | Pre 3 | Public Contact |
| Amy Alamillo | Pre 4 | Public Contact |
| Matthew Scherer | Pre 4 | Public Contact |
| Lauren Borkowski | Pre 4 | Public Contact |
| Easton Haught | Pre 4 | Public Contact |
| Brian Deery | Post 1 | Public Contact |
| Tiffany Vega | Post 1 | Public Contact |
| Nina Bacigalupi | Post 2 | Public Contact |
| Jennifer Ward | Post 2 | Public Contact |
| Margaret Bace | Post 3 | Public Contact |
| Lindsay Schwalm | Post 4 | Public Contact |
| Christopher Wade | Post 4 | Public Contact |
| Donelle Saunders | Public Contact | Pre 1 |
| Kimberly Robinson | Public Contact | Pre 1 |
| Florentine Hernandez | Public Contact | Pre 2 |
| Christine Keirnan-Ortiz | Public Contact | Pre 2 |
| Amy Robinson | Public Contact | Pre 2 |
| Moziela Davis | Public Contact | Pre 3 |
| Jonathon Holbrook | Public Contact | Pre 3 |

| | | |
|---|---|---|
| Joshua Johnson | Public Contact | Pre 3 |
| Maurice Nadeau | Public Contact | Pre 3 |
| Kristin Splendore | Public Contact | Pre 4 |
| Camille Tello | Public Contact | Pre 4 |
| Stephanie Henderson | Public Contact | Pre 4 |
| Toni Johnson | Public Contact | Pre 4 |
| Erika Clay | Public Contact | Post 1 |
| Kenny Armstrong | Public Contact | Post 1 |
| Tamika Roberson | Public Contact | Post 2 |
| Rosetta Hall | Public Contact | Post 2 |
| Laura Jasen | Public Contact | Post 3 |
| Mary Smith | Public Contact | Post 4 |
| Richard Ashmead | Public Contact | Post 4 |
| Tammy Olson | Public Contact | Appeals |

SANDRA L. SMITH

cc:

Subject Employees
AFGE
HRM

EXHIBIT 2

**Suncoast Medical Clinic**
601 Seventh Street South
St. Petersburg, Florida 33701
(727) 894-1818 ~ Fax: (727) 824-8324

MULLIN, AILEEN
ACC: P865990
CHART#: 496951
08/17/2009

PROGRESS REPORT

PHYSICIAN:GLEN GOLDFARB MD

HISTORY OF PRESENT ILLNESS: Patient is a 49-year-old female seen in consultation from Dr. Tovar. The patient presents with complaint of hoarseness has become gradually worse over the past 5 days and is now moderately severe. The patient also presents in consultation for sinusitis. The patient reports onset of maxillary and frontal pain and headaches about 5 weeks ago. The patient reports she was treated with Augmentin for 10 days on 7/19 with partial temporary benefit. The patient reports she took a Z-Pak with partial temporary benefit.the patient denies nasal congestion but reports postnasal drainage. Patient reports she's been on Nasonex is 8/16/2009. The patient reports her asthma is not a more difficult control over the last few weeks. The patient reports she went to the emergency room yesterday because of maylase and increased symptoms and was prescribed Avelox for 10 days and prednisone. The patient reports she feels somewhat hypertensive starting the medications yesterday. The patient was given a chest x-ray that was clear. Chest x-ray report from 8/16/2001 shows normal chest her report. CT Scan of the sinuses performed on 8/16/2009 was reported as showing ethmoid and frontal sinusitis and right ostiomeatal complex disease. The patient is status post bone grafts to the maxillary and dental implants which the patient confirms.

PAST MEDICAL HISTORY: dyslipidemia, asthma.

PAST SURGICAL HISTORY: dental implants in progress the maxilla, extremity fractures.

CURRENT ALLERGY LIST:
- IVP DYE
- PCN-200

CURRENT MEDICATION LIST:
- ORTHO-NOVUM 1/35 (28) ORAL TABLET 1-35 MG-MCG, qd
- ELAVIL UNKNOWN/ALL UNITS, 10mg qd
- SKELAXIN ORAL TABLET 800 MG, 1 qhs prn
- ALBUTEROL INHALATION AEROSOL SOLUTION 90 MCG/ACT, 2 puffs qd prn
- ULTRAM ORAL TABLET 50 MG, prn
- VALTREX ORAL TABLET 500 MG, qd prn
- VYTORIN ORAL TABLET 10-40 MG, qd
- ZITHROMAX Z-PAK ORAL TABLET 250 MG, take as directed



*This document contains confidential information. Unauthorized disclosure or failure to maintain confidentiality is subject to penalties under Federal Law. If you received this document in error, call (727) 824-8326 immediately.*

**Suncoast Medical Clinic**
601 Seventh Street South
St. Petersburg, Florida 33701
(727) 894-1818 ~ Fax: (727) 824-8324

SOCIAL HISTORY: no history of smoking, does clerical work at the VA.

FAMILY HISTORY: mother with history of asthma, father with history of heart disease, hypertension and skin cancer.

REVIEW OF SYSTEMS:
CARDIOVASCULAR: Negative.
RESPIRATORY: Negative.
ENDOCRINE: Negative.
ALLERGIES: Negative.
INTEGUMENTARY: Negative.
Ten-system review, other than the above, negative.

VITALS SIGNS:
VS-TEMPERATURE: 98.4°f Oral
VS-PULSE: 70 Left Radial, Regular
VS-BLOOD PRESSURE: 112/70 Left Arm Sitting

PHYSICAL EXAMINATION:
GENERAL: The patient is well groomed, The patient communicates well, Affect is normal, alert and oriented x3.
HEAD/EYES: Normocephalic, atraumatic. Extraocular movements are intact. Frontal area nontender. Maxilla nontender.
EARS: Tympanic membranes are clear, External auditory canals normal, Hearing grossly normal, hears whispered voice adequately.
NASAL.Pontocaine was placed in the right and left nasal cavity right nasal cavity exam was flexible endoscope-moderate mucosal edema and inflammation diffusely noted. No discrete lesions superiorly, inferiorly, anteriorly posteriorly. No lesions in the nasopharynx, base of tongue, vallecula, posterior, hypopharynx and larynx.mild edema and erythema of the arytenoid and posteriorly because it. Left nasal cavity examined with a flexible endoscope -moderate mucosal edema and inflammation diffusely noted.no discrete lesions.
ORAL CAVITY: Normal oropharynx. Inspection of the lips is normal. Inspection of the gums is normal.
NECK: Salivary glands, no masses. No thyroid mass. No lymphadenopathy.
HEART: Regular rate and rhythm.
RESPIRATORY: Lungs clear to auscultation.
NEUROLOGIC: Facial nerve +1 by House-Brackmann classification. No nystagmus. Cranial nerves II-XII grossly intact.
SKIN: Normal skin turgor.

ASSESSMENT/PLAN: The patient's a 49-year-old female with rhinosinusitis. Patient is prescribed an additional



*This document contains confidential information. Unauthorized disclosure or failure to maintain confidentiality is subject to penalties under Federal Law. If you received this document in error, call (727) 824-8326 immediately.*

**Suncoast Medical Clinic**
601 Seventh Street South
St. Petersburg, Florida 33701
(727) 894-1818 ~ Fax: (727) 824-8324

3 weeks of Avelox Lactinex and will remain on Nasonex. The patient is referred for a copy is a CT scan of the sinuses in 3 weeks with followup in about 4 weeks time. Patient with hoarseness likely related to above and some component of muscle tension disphonia. I advised the patient that L. PR may be playing a role.

GLEN GOLDFARB, M.D.

CC: Dr. BAULA

Electronically Signed by: Glen R. Goldfarb, M.D. on Monday, August 17, 2009



*This document contains confidential information. Unauthorized disclosure or failure to maintain confidentiality is subject to penalties under Federal Law. If you received this document in error, call (727) 824-8326 immediately.*

TRINA E. ESPINOLA, M.D. F.A.C.S.
ELISA M. LYNSKEY, M.D.
DEBORAH A. NOVACK, A.R.N.P.
SHERRI A. WEISSMAN, PA-C
DIPLOMATE OF AM BOARD OF OTOLARYNGOLOGY
HEAD & NECK SURGERY
625 6TH AVENUE SOUTH, SUITE 385
ST. PETERSBURG, FL 33701
(727) 553-7100 TEL
(727) 553-7198 FAX

DEA # ______

NAME Mullin, Aileen AGE ______

ADDRESS ______ DATE 9/9/09

**Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND**

℞ pt with laryngitis need 10-14 days of voice rest but is otherwise capable to do Job Duties.

PLEASE SUBSTITUTE WITH FORMULARY.

LABEL
Refill ⊘ times.

______ (Signature)

**In order for the brand name product to be dispensed, the prescriber must write Medically Necessary below the signature.**

ST. PETERSBURG - SUNCOAST MEDICAL GROUP
ADULT AND PEDIATRIC ALLERGY & ASTHMA
RAQUELLE ALEXANDER, M.D.
BOARD CERTIFIED ALLERGY - IMMUNOLOGY
601 SEVENTH STREET SOUTH
ST. PETERSBURG, FL 33701
DEA # BA 2963432
(727) 824-8218
UPIN # F79148
BATCH # MDI090810AL0009859

NAME Mullin, Aileen AGE

DATE Jan 18, '04

ADDRESS

Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND
RESISTS ERASURES AND ALTERATIONS
ILLEGAL APPEARS IF COPIED

℞ This patient was seen by me today in my office. She has had several week h/o voice loss/laryngitis. She needs to be on voice rest (no telephone work / conversation work) on her job for several weeks or days

☐ 1-24
☐ 25-49
☐ 50-74
☐ 75-100
☐ 101-150
☐ 151 and over
Units

Label

Refill NR 1 2 3 4 5

(Signature)

In order for the brand name product to be dispensed, the prescriber must write 'Medically Necessary' on the front of this prescription.

9HAL0009859

424

319-7750

Advanced ENT's of Tampa Bay

Trina E. Espinola M.D., F.A.C.S
Elisa M. Lynskey, M.D.
Deborah A. Novack, ARNP
Jennifer L. Wallace, P.A.
625 Sixth Avenue South, Suite 385
St Petersburg, FL 33701
Phone (727) 553-7100 Fax (727) 553-7198

**Absence from School/Work** → Restriction

Please excuse Aileen Mullins from school/ work.

They had an appointment on 12·29·09 and should be able to return on 1/06/10

They should observe the following restrictions: Restrain from any talking/speaki

Thank you for your cooperation in this matter and please feel free to contact the office with any questions.

Pt has an appointment on 1/6/10
She should be on voice rest at least
until her evaluation on that date.

[signature]

TRINA E. ESPINOLA, M.D.
727 553-7100

3/4

**Mullin, Aileen, VBASPT**

**From:** Tarver, Megan, VBASPT
**Sent:** Wednesday, January 06, 2010 10:14 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Lopez, Virginia, VBASPT
**Subject:** RE: Medical documentation
**Signed By:** There are problems with the signature. Click the signature button for details.

Hi Aileen,

I did. Brenda brought me your new letter yesterday. I left a message for Jimmy Correa and I'll discuss your options when we talk to him.

Thank you,

***Megan Tarver***
Human Resources Specialist
Human Resources Management Division
727-319-5800 Ext. 6560

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 05, 2010 12:18 PM
**To:** Tarver, Megan, VBASPT
**Subject:** Medical documentation

Hi Megan,

I'm just following up to make sure you received a copy of the letter supplied by the doctor.

Thank you,
Aileen

**Department of Veterans Affairs**

# Memorandum

Date: January 26, 2010

From: Human Resources Manager (25)

Subj: Reasonable Accommodation

To: Aileen Mullin
Veterans Service Representative
St. Petersburg Regional Office

1. On January 6, 2010, you provided documentation indicating that you have a temporary medical condition that impairs your ability to speak, and that the condition is expected to resolve itself within six weeks. Since this is temporary in nature, you are not entitled to an accommodation under the ADA Amendments Act (ADAAA) of 2008, at this time.

2. In recognition of your current medical limitations, the Veterans Service Center (VSC) will reschedule your rotation in the phone unit to a later date. In the interim, you will be reassigned to the Pre-Decision team 1 effective February 1, 2010. In addition, you will be credited for 31 days, which is the number of days you served in the current phone rotation.

3. If you require additional information, please contact Virginia López, Human Resources Specialist, at 727-319-5919.

BONNIE WAX

Received By: ______________________ Date: ______________

124

Advanced ENT's of TAMPA BAY

**Trina E. Espinola M.D., F.A.C.S**
**Elisa M. Lynskey, M.D.**
**Deborah A. Novack, ARNP**
**Jennifer L. Wallace, P.A.**
625 Sixth Avenue South, Suite 385
St Petersburg, FL 33701
Phone (727) 553-7100 Fax (727) 553-7198

**Absence from School/Work**

Please excuse Aileen Mullins from school/ work. patient has intermitted hoarsness with reflux disease

They had an appointment on 1·4·10 and should be able to return on 1·5·10

They should observe the following restrictions: patient should be on voice restrictions for atleast six weeks, unless talking among co workers.

Thank you for your cooperation in this matter and please feel free to contact the office with any questions.

EXHIBIT 3

Aileen Mullins



**From:** Nunziata, Suzanne, VBASPT
**Sent:** Thursday, January 12, 2012 2:15 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Smith, Sandra, VBASPT
**Subject:** RE: Aileen Mullins - UPDATE
**Signed By:** suzanne.nunziata@va.gov

911 called and ambulance coming. Employee told to report to Sandy's office tomorrow, not go to 2nd floor.

---

**From:** Nunziata, Suzanne, VBASPT
**Sent:** Thursday, January 12, 2012 1:59 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Smith, Sandra, VBASPT
**Subject:** Aileen Mullins

I heard that this employee was going to be moved out of the training room on the 2nd floor yesterday due to complaints re: asthma. She had an asthma attack today and is down in the mothers room in LGY. She called HR from her cell phone. Sending HR rep to check and encourage her to call 911. If she says OK to go back to work, she is coming to HR to sit. Don't want to send her back to 2nd floor. Larry Brown reports that she was supposed to move yesterday but that did not happen? My thought is to send her home on AA today and tell her to report to 21FO tomorrow for reassignment?

EXHIBIT 4

1-31-12

## Allard, Carolyn, VBASPT

January

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 31, 2012 7:41 AM
**To:** Brown, Larry, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT; Clarke, Tamanique, VBASPT; Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Status of heath issues
**Signed By:** aileen.mullin@va.gov

Good morning All,

Yesterday, for the second time since the move to VBIT1, the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest.) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be a prudent to do so without delay.

Thank you for your support,

Aileen

Note: Tammie, the Workmens' Comp form is complete and is being sent for review. As soon as its return I'll get it to you.

EXHIBIT 5

# TABLE OF CONTENTS

## A. Administrative Material and Correspondence


| | |
|---|---|
| Notice of Rights and Responsibilities | A-1 |
| Notice of Right to File a Formal Complaint | A-2 |
| EEO Counselor's Report Dated 09/05/12 | A-3 |
| Formal Complaint of Discrimination | A-4 |
| Notice of Receipt of Complaint | A-5 |
| Notice of Acceptance of Complaint | A-6 |
| Investigator Assignment Letters | A-7 |
| EEO Manager (Liaison) Correspondence | A-8 |
| Letters and Notice to Complainant | A-9 |
| Letters and Notice to RMO and SME | A-10 |
| Letters and Notice to Witnesses | A-11 |


## B. Affidavits


| | |
|---|---|
| Testimony of Aileen Mullin (Complainant) | B-1 |
| Testimony of Bonnie Wax (RMO/SME) | B-2 |
| Written Affidavit of Tamanique Clarke (RMO/SME) | B-3 |
| Written Affidavit of Bettie Bookhart (RMO) | B-4 |
| Written Affidavit of Michael Palmer (RMO) | B-5 |
| Written Affidavit of Kerrie Witty (RMO) | B-6 |


## C. Records and Documents


| | |
|---|---|
| Reasonable Accommodation Documentation | C-1 |
| Background Investigation Documentation | C-2 |
| Regulations and AFGE Articles (Tele-Work/Workplace Safety) | C-3 |
| Regulations Pertaining to Leave Administration | C-4 |
| Organizational Charts | C-5 |
| Documentation of FMLA | C-6 |
| Documentation of VLTP | C-7 |
| Regional Office Flexiplace Policy | C-8 |
| Apollo Environmental, Inc (Air Quality Test) | C-9 |
| HR's Response to Request for Information | C-10 |
| E-mail from RMO Clarke Concerning Essential Functions of CP's Position | C-11 |
| Statements from Other Employees Concerning CP | C-12 |
| CP's Performance Appraisals | C-13 |
| Documentation Pertaining to Salary Shortfall | C-14 |
| Denial of Mold Training | C-15 |
| Memorandum from RMO Wax to Valorie Reilly (Mold Issue) | C-16 |
| CP's Position Descriptions | C-17 |
| Reports of Contact | C-18 |

**Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

Aileen Mullin )
)
)
Complainant )
)
v. **ORM Case Number:**
**2001-0317-2012103413**
)
Secretary )
Department of Veterans Affairs )
810 Vermont Avenue, NW ) **Formal Complaint Filed**
Washington, DC 20420 ) **September 18, 2012**
Respondent )
)

Facility: VA Regional Office
St. Petersburg, FL

John Henley, EEO Investigator
Office of Resolution Management (08J)
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

## I. Introduction

Having met all procedural requirements for acceptance with respect to the claims specified hereafter, this complaint was assigned for investigation on February 4, 2013. A desk investigation was held from February 18 through August 28, 2013. The complaint was amended on July 25, 2013, and April 1, 2013. This report is submitted for consideration of the EEO Regional Officer this 31st day of October 2013.

## II. Background

**Aileen Mullin (Disability-Yes; Reprisal-Yes; hereinafter the complainant)** is a Rating Veterans Service Representative at the VA Regional Office, St. Petersburg, FL. Believing her disability and EEO activity were factors in being subjected to numerous events of hostile work environment, advance sick leave denied or not processed; leave under the leave transfer program not processed, and reasonable accommodation request denied, the complainant contacted an EEO Counselor. EEO counseling did not result in a resolution; therefore, the complainant filed a formal complaint on September 18, 2012. (A-5 and A-4)

## III. Claims and Bases

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.**

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.**

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clarke (TC) and Union Official Carol Allard (CA).**

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they refused to render aid while she was having a severe asthma attack.**

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since-being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.**

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.**

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**12. On May 31, 2012, although a cover sheet that stated *"A copy of all records* personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder." was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.**

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.** *(Discrete Event)*

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.**

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** *(Discrete Event)*

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.**

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** *(Discrete Event)*

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** *(Discrete Event)*

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

## IV. Summary and Analysis

### A. Summary

The Responding Management Officials (RMOs) are Bonnie Wax (disability and EEO activity; hereinafter, **RMO/SME Wax**), Human Resources Manager; Tamanique Clarke (disability-none and EEO activity; hereinafter, **RMO/SME Clarke**), Human Resources Specialist; Bettie Bookhart (disability-none and EEO activity; hereinafter, **RMO Bookhart**), EEO Program Manager; Michael Palmer (disability and EEO activity unknown; hereinafter, **RMO Palmer**), Coach; Kerrie Witty (disability-none and EEO activity; hereinafter, **RMO Witty**), Director VA Regional Office, St. Petersburg, Florida.

The **complainant** identified her disabilities as cancer, asthma, and chronic sinus infections. The asthma is life threatening and severe; the cancer is under control and the symptoms are moderate. At the time she filed her complainant she had asthma, sinus infections, vocal cord dysfunction, and breast cancer. As the EEO process continued, she developed insomnia, irritable bowel syndrome (IBS), and iritis, secondary to the IBS. She has problems with sleeping and anxiety, and socially she feels isolated. She has been limited by her disability since October 2011, and she notified the agency in writing and verbally that she had disabilities by submitting medical documentation to the agency around September 2011. She does not know if her

disabilities are permanent or temporary. She could do her job with or without an accommodation. (B-1)

**RMO Wax** is aware of the complainant's disabilities. She learned of her asthma sometime in 2012, around the time the complainant was having the attacks at work. She learned of her diagnosis of cancer about three months later. She did not learn of her chronic sinus issues until probably a year later, but she was not certain of the exact date. (B-2)

**RMO Clarke** affirmed knowledge of the complainant's asthma in January 2012 and cancer around April or May 2012. She learned of the chronic sinusitis when Department of Labor approved the complainant for compensation in August 2012. She is not aware of vocal cord dysfunction, insomnia, irritable bowel syndrome, or iritis. (B-3)

The complainant requested a reasonable accommodation, and she processed the complainant's requests and the requests were granted. RMO Clarke explained that an employee can go directly to Human Resources, through their supervisor, or submit a request online for an accommodation. If medical documentation is needed, it is requested from the employee. If the medical documentation supports the request, the request is granted, unless it requires the removal of the essential functions of the position. If a request cannot be granted exactly as requested, she works with the employee and the division to reach a resolution. (B-3)

RMO Clarks became aware of the complainant's EEO activity on March 15, 2013, when her office received a request for documentation. (B-3)

**RMO Bookhart** became aware of the complainant's disabilities on or about June 6, 2012. As the EEO Program Manager, she is copied on EEO complaints sent to the Director. The complainant did not request a reasonable accommodation through her. (B-4)

**RMO Palmer** was aware only of the complainant's respiratory disability, but he does not recall when he learned of this condition. The complainant did not request a reasonable accommodation from him; however, due to the complainant having a medical episode in the training room, he referred her to Human Resources for possible reasonable accommodation, which is what supervisors are required to do if a reasonable accommodation is required or suspected. He denied knowledge of the complainant's EEO activity. (B-5)

**RMO Witty** stated the complainant shared with her that she had cancer and was undergoing chemotherapy, and that the complainant submitted a reasonable accommodation request. She is aware of the complainant's EEO activity because she is named the Responding Management Official (RMO). (B-6)

***The witnesses testified as follows:***

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace; and on two occasions VA Police had to assist the complainant out of the building.**

The **complainant** said at least 25 times, her asthma got so bad that she had to leave work or get out of the building because she could not breathe. She took shots to help with her breathing, and then returned to the building. On one occasion the complainant was very disoriented, and on another occasion, she had a severe asthma attack that required a coworker to help get the complainant to the police and the police helped her out of the building. (B-1)

**RMO Wax** was not present when the complainant had to leave the building because of respiratory issues, but she heard that the complainant had several emergencies that required immediate care. (B-2)

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**

The **complainant** attested that Barbara Zeh ended up hospitalized because of respiratory reactions in the building, and she had to wear a protective mask. RMO Palmer did not understand why the complainant did not wear a mask as well, and he stated the complainant was the only one sick. The reason RMO Palmer made this remark to the complainant was because she said to him, "Mike take a look around the room, look at the absenteeism rate, listen…to the coughing, look…someone is having an Asthma attack…we have a problem." That is when RMO Palmer said, "No, you're the only person here who has a problem."

Event 1 and Event 2 created a hostile environment for the complainant because she was forced in a room that was causing her problems, and out of fear of losing her job, she did not take proper care of her health. (B-1)

**RMO Wax** was not personally involved, but one of her staff member was. There was a legitimate reason why RMO Palmer was asking that question and it involved the complainant's worker's comp claim. The complainant was told to wear a mask, and RMO Wax's limited understanding of this incident was that RMO Palmer was asking the complainant why she was not following her doctor's instructions. (B-2)

**RMO Palmer** explained that during the period of October 2011 through January 2012, he moved the complainant away from the air conditioning duct at the complainant's request. Additionally, he told the complainant that if she become ill and needed to leave at any time, to inform him and he would address her leave. He also notified his supervisor and Human Resources Management of the complainant's concerns. (B-5)

RMO Palmer did not refuse to help the complainant in any way. He did not say that the complainant was the only one in the room with a problem, and he did not ask the complainant why she did not have a portable oxygen tank or why wasn't she wearing a protective mask. His actions were not to harass the complainant. (B-5)

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.**

The **complainant** attested that based on the AFGE Master Agreement, she was chosen to attend mold hazard training; however, RMO Wax sent a letter saying she could not attend. The complainant believes RMO Wax used a bogus part of the agreement to deny her the right to go to this training. (B-1 and C-15)

**RMO Wax** explained that she did not deny the complainant's request to attend mold hazard training. She said the request to attend the training was not made by the complainant. The request was made by AFGE Local 1594 for two individuals to attend, which included the complainant and Keith Pryor. The Master Agreement, Article 29, section 15(h) allows the agency to train union Health and Safety Representatives on mold removal. AFGE identified the complainant in their request, but the complainant was not their current union officer or on steward listing. The mold removal training is exclusive to the union safety and health representative, and the union had already identified Walter Ingram as their representative by letter in October 2011. Because there were two names on the list, and the agency was obligated to only train one person, the union was asked to clarify the identity of the representative they would like to attend. The complainant was not identified by AFGE; therefore, the union made the final determination as to who would attend. (B-2, C-15)

***Investigator's Note:*** *Event 4, Event 5, and Event 6 are inter-related and are summarized together.*

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, complainant was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clarke (TC) and Union Official Carol Allard (CA).**

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard for her life when they refused to render aid while she was having a severe asthma attack.**

The **complainant** attested that on January 10, 2012, with RMO Clarke and union Official Carol Allard, and she was told that she would be moved to another room because of the medical issues she was having in her present work area; however, when she returned to work on January 12, 2012, she was still in the same room. She started having respiratory issues, and it escalated to where she had to be taken to the emergency room by ambulance. (B-1)

Regarding Event 6, the **complainant** expressed that when she returned to work sometime in February 2012, management made her to stay in the building additional hours. Also, management had not established an emergency care medical plan; she had to do it herself; therefore, she felt management had no regard for her safety and well-being. (B-1)

**RMO Wax** affirmed knowledge of this incident because she manages the worker's compensation program, and RMO Wax confirmed she was aware the complainant was taken by ambulance to the emergency room on January 12, 2012. She explained that during a meeting on January 10, 2012, management agreed to move the complainant to a new work area, but management informed the complainant they needed some time to coordinate the move, particularly since it involved moving her phone, computer, and other equipment. Human Resources and the Veterans Service Center Manager coordinated the complainant's move to another work area, and this task was completed on January 12, 2012; which she does not believe was unreasonable. (B-2)

**RMO Wax** affirmed with certainty that there was no gross negligence on any one's part. The complainant said she was not feeling well, and from her understanding, the complainant went to a private room with a friend to use her nebulizer. RMO Wax explained that people felt helpless because Title 5 employees are not permitted to render emergency medical care because they are not licensed or authorized to do so. When the complainant did not feel better, RMO Clark called 911 and informed the complainant that he called for an ambulance. The complainant told RMO Clarke that she wanted to file a claim, and RMO Clarke walked down and brought the complainant the paperwork to file a claim. (B-2)

**RMO Clarke** responded during the meeting a new work area was agreed upon, but the Agency needed some time to coordinate the move with Human Resources and the Service Center Manager. The agency completed everything on January 12, 2012; therefore, he does not believe that a two day turnaround time is unreasonable. (B-3)

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since-being reassigned to a different work area.**

Regarding this event the **complainant** replied that when management decided to move her to another room, the asthma attacks and the Dysphonia continued. She still had to rush out of the building or leave work for the day. (B-1)

According to **RMO Wax** the complainant continued to have problems. She recalls that the complainant sent an e-mail message stating that she had been ill, but she has no personal knowledge of the complainant leaving. RMO Wax asked her staff to do a comparison of leave used both at home and in office and found that both were about equal. Although she was saying that she was having attacks at work, she also had to stay home due to her illness. (B-2)

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

The **complainant** explained that she knew of at least four other people who have respiratory problems and have reported it to management. They are in the same open cubicle area with a Honeywell machine-4. When she told management that the accommodation was not effective, RMO Clarke said, “Well it’s like your little bubble.” (B-1)

The complainant stated that on several occasions, she requested to work from home as a reasonable accommodation, and to be moved to another work location. Her request was denied and the agency offered an alternative accommodation of a small air purifier, which was not satisfactory. (B-1)

**RMO Wax** explained that the complainant requested an air purifier on January 31, 2012, which management provided to her on February 2, 2012, and there was no reason to believe the accommodation was ineffective. Since management heard nothing further from the complainant, it was reasonable for management to assume the air purifier was still working. There is a little mischaracterization of the size of the space. The air purifier purchased for the complainant was designed to clean the air in an 8- to 100 square feet area. It is only designated to clean the immediate area. It is not intended to clean the whole room. The room the complainant was assigned to was less than 700 square feet, which is much less than the size of a football field. (B-2, C-1)

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied; and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.**

The **complainant** responded this should be 2010 instead of 2012. She never met RMO Wax, and by this point she had already met with RMO Bookhart who told her, “These people don’t believe in doing accommodations.” RMO Wax sent the complainant an e-mail saying that her medical situation was temporary and it would resolve itself within six weeks. She does not know where RMO Wax got this information because no one from Human Resources ever talked to her, and her doctors were never asked for any information. She knew by law RMO Wax had to address the reasonable accommodation request. (B-1, C-1)

According to **RMO Wax** there is no memo dated February 26, 2012, but there is one dated February 26, 2010, and a doctor's note which states the patient has voice restrictions for a least six weeks. Permanent conditions are defined as lasting six months or more, so at that time the condition had to be permanent. Therefore, it is reasonable for management to assume that six weeks was not permanent in nature, and this was explained to the complainant in the memo. Even with the most generous interpretation of temporary versus permanent, at that time the complainant was still provided a temporary workplace adjustment to meet her medical needs; therefore, she was not harmed in any way. RMO Wax added that words like "chronic," "will never get better," could take years to recover" are associated with permanent conditions, and reasonable accommodation guidelines have changed since 2010. (B-2, C-1)

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.**

The **complainant** stated that she requested an accommodation to take the certification exam, which is computer-based; however, she was not informed until the morning of the test that they had found a new location for her to take the test so she would be able to sit (accommodation) for the exam. Since she was not notified in a timely manner, she did not have time to set things up and prepare for the exam; therefore, she did not get to take the exam. She feels management was hostile and demeaning because she was not appreciative of all the effort they went through to put her in a place where she could breathe. (B-1, C-1)

**RMO Wax** strongly disagreed with this allegation because in VBA, they have a unique process where they actually administer certification exams to the employees. If an employee requests a reasonable accommodation for the certification exam, they have deadlines, and the complainant did not make her request for an accommodation during the certification exam. March 12, 2012, the complainant acknowledged in an e-mail she knew it was a stretch, so management believed she understood that she had missed her deadline for an accommodation. However, the complainant was given an alternative accommodation of testing in a different location, which is what the complainant requested. The complainant said she would bring her air purifier, but on the date of the test, the complainant decided she wanted to test in a different room. (B-1, C-1)

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week; and on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

The **complainant** indicated that on January 10, and January 13, 2012, she was taken out of the workplace in an ambulance. It was not until March 20, 2012, that she was finally granted an accommodation to allow her to work from home, and again the accommodation was not tied to her specific disability, and she was not given what she needed for her disability. (B-1)

**RMO Wax** explained that during this time, the complainant never let management know that working from home three days per week was not an effective accommodation. A review of her leave records showed that the complainant was out more while working from home than she was when she was working in the office. Her medical condition was affecting her in the office and at home, so management believes a reasonable person would conclude that the reason for leave was not limited to the work environment. If the complainant had notified the agency that the accommodation was not working, they could have looked for another option. (B-2, C-1)

***Investigator's Note:*** *Event 12 and Event 16 are inter-related and are summarized together.*

**12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete record of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

The **complainant** explained that she asked Human Resources for a copy of her Official Personnel Folder (OPF). She needed her worker's comp record to assist with her reasonable accommodation request, and to respond to the HR's request for more medical information. Weeks passed before she was provided the records and when she received them, some pages were missing (i.e., the accommodation denial letter). This caused a delay in providing the information requested by Human Resources. (B-1)

**RMO Wax** explained that this is a mischaracterization. This incident involved a request from the AFGE local 1594 (which falls under U.S. Code, Title 5, Chapter 71, and the Federal Service Labor Relations Statute) for "all personally identifiable records related to (the complainant)" ... and her staff provided the appropriate materials. Event 21 had not occurred at the time management provided the information to AFGE, and the union's information request is not continuous in nature. (B-2, C-3)

RMO Wax indicated that the facility furnished information in accordance with 5 U.S.C., Chapter 71, the Labor Relations Statute, and the Labor Relations statute is different from Employee Rights. The complainant could have come to Human Resources at anytime and gotten a copy of any document in her folder because all federal employees have a right to look at their records. The union rights are a little different, and it causes Human Resources to have to look through many different systems of records. Management has 14 days to provide the union with copies of records, and if an employee comes to Human Resources and asks to see their records or any documents, they are provided the same day. RMO Wax stated they identified 379 documents that were provided to the union on May 31, 2012. (B-2)

***Investigator's Note:*** *Event 13 and Event 14 are inter-related and are summarized together.*

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.** *(Discrete Event)*

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA)**

The **complainant** attested that she went to Human Resources to make sure her FMLA paperwork was approved. She found out from RMO Clarke that the paperwork for her leave donation, FMLA, and advance sick leave was not accepted and that it did not provide enough information. Human Resources stated they needed to know the diagnosis and when she would be returning to work. (B-1)

**RMO Wax** explained that she did not know about the advance sick leave request because it is handled by the division. The leave policy states that up to 240 hours of advance sick leave can be granted at any one time. The division chief is authorized to approve up to 80 hours, but anything over 80 hours must be approved by the Director. (B-2, C-5, C-7, C-8)

**RMO Wax** affirmed that on March 9, 2012, the complainant submitted medical documentation for FMLA. The medical evidence was reviewed and it was determined that the complainant was eligible for the program. Three days later, on March 14, 2012, the complainant received written notice of approval to use up to 480 hours of leave under FMLA, and it was dated the original date the complainant submitted the medical documentation. So, the complainant was eligible for FMLA from March 9, 2012 to March 8, 2013. The confusion was that the approval was not related to cancer as the complainant disclosed in her EEO complaint. On March 23, 2013, management received additional medical evidence from the complainant regarding cancer. The complainant received notice on April 9, 2013, indicating that her approval for FMLA related to cancer was also approved. So, at the time she had two ongoing approvals for FMLA, and that is where the confusion comes in. Although the complainant submitted new documentation for cancer, her existing FMLA entitlement was still in effect and was never interrupted; therefore, the complainant could use FMLA related to either condition (asthma or cancer), but she was only entitled to a total of 480 hours of FMLA in a 12 month period. (B-2, C-5, C-7, C-8)

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

The **complainant** responded that when she returned to work from breast cancer, Casey Crump told her that RMO Wax remarked to him, "Isn't that interesting about Ms. Mullin with her breast cancer…it was her breast cancer that caused all the breathing problems…there was never anything wrong with the building." (B-1)

**RMO Wax** stated this allegation is absolutely false. Her comments were taken completely out of context and twisted into something horrible, when, in reality, they were completely relevant and appropriate to the situation. Mr. Crump came to Human Resources and they were talking about the recent air quality test results showing the building in normal range. During that discussion she made a comment about being glad there was nothing wrong with the building because she works there and breathes the same air too. (B-2)

RMO Wax continued … Mr. Crump was the complainant's designated representative at the time. She had recently been diagnosed with breast cancer. During her conversation with Mr. Crump and said she was sorry to hear about the cancer diagnosis, and she casually mentioned that (the complainant) may need to provide additional medical documentation. Also during that conversation she commented, "For all we know, not being medical professionals, her breathing problems could have been related to breast cancer and not asthma." She was certainly not insinuating that the complainant didn't have asthma or that the breathing issues were from cancer. She was giving Mr. Crump a hypothetical scenario to help him understand why management needed new medical documentation. (B-2)

**Casey Crump** (disability unknown and EEO activity unknown; hereinafter, **Witness Crump**), is the Chief Steward at the VA Regional Office, St. Petersburg, Florida. He explained that he does not know how RMO Wax got her information, but he assumed that the complainant had discussed her medical situation with RMO Wax. He does not believe RMO Wax was just spreading information to anyone about the complainant's condition, but the complainant was upset and said she did not authorize RMO Wax to discuss her medical condition with anyone. In the same e-mail, Witness Crump affirmed that RMO Wax did make the aforementioned comments. (C-18)

***Investigator's Note:*** *Event 17 and Event 18 are inter-related and are summarized together.*

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

The **complainant** said did not want to deal with RMO Wax because she upsets her, so she asked all correspondence go through the union. RMO Wax sent an e-mail to Valorie Reilly, and copied the complainant on it while she was in the hospital battling cancer and on a day that she was scheduled to have chemotherapy. When she read it, it upset her. (B-1)

The complainant explained that during a meeting, the Director informed the complainant that RMO Wax felt targeted by the union, that she approved RMO Wax's e-mail of June 5, 2012 to the complainant, that she could not understand why the complainant had a problem with the e-mail, and that she (the Director) does not support granting accommodations. (B-1)

**RMO Wax** responded that the complainant sent an e-mail to her coach and copied Mr. Crump, a union steward, but Mr. Crump was not the complainant's designated representative. Her designated representative was Valorie Reilly. The e-mail was sent from Mr. Crump to RMO Witty, and RMO Witty often sends the e-mail to RMO Wax for a response when it involves Human Resources issues. So, she responded to the complainant's e-mail, trying to answer her questions and give her as much assistance as possible. (B-2)

As to the complainant's concern that she sent the e-mail directly to the complainant and not to her representative, RMO Wax stated nothing prevents a management official from responding directly to an employee, especially since she copied the complainant's designated representative, Ms. Riley, on the response. RMO Wax explained that when there is a designated representative, management is required to include the union representative, and she did so in this case. She had no way of knowing the communication with the complainant was off limits. The complainant had sent the e-mail; therefore, she assumed she was well enough to have a response, and there was nothing offensive or inappropriate in her response. The content was professional and pertinent to the complainant asking about her information request and why a copy of the records had not been given to the union. (B-2, C-10)

**RMO Wax** explained that RMO Witty agreed to meet with the complainant on June 12, 2012, to facilitate communication between the parties. During that meeting, the complainant repeatedly complained about RMO Wax, but she felt the complaints had come from the union office; therefore, she told RMO Wax that she felt the union was targeting her (Wax). RMO Wax said that RMO Witty reviewed and approved the e-mail that RMO Wax sent to the complainant and her representative (Event 16) because she felt the union was targeting her, and it was RMO Witty's way of protecting RMO Wax from unfounded accusations from the union. (B-2)

On the issue of RMO Witty making the statement that, "She does not support granting accommodations," RMO Wax said that is categorically false, and that she had never heard RMO Witty say anything about not granting accommodations. She added that RMO Witty has granted numerous accommodations (over 300 accommodations out of 900 employees) during her tenure as Director. (B-2)

**RMO Witty** explained that she met with the complainant to discuss how she could assist her. During the meeting the complainant kept bringing up RMO Wax instead of how she could help the complainant. She reminded the complainant that they were there to talk about how RMO Witty could help her not RMO Wax. RMO Witty told the

complainant that she read RMO Wax's e-mail addressed to the complainant before she sent it and felt it was appropriate. RMO Witty denied saying in a meeting that she did not support granting accommodations, and that she has granted several accommodations in the past. (B-6)

**Jerry E. Huffman** (disability and EEO activity unknown; hereinafter, **Witness Huffman**); VBACMS at the VA Regional Office Columbia, South Carolina, explained that he was in a meeting with the complainant and RMO Witty, and he does not recall RMO Witty making the aforementioned comments. The meeting was because of the complainant's disapproval of the handling of her personal information. (C-18)

**Keith A. Pryor** (disability and EEO activity unknown; hereinafter, **Witness Pryor**); Vice President of AFGE 1594 at the VA Regional Office, St. Petersburg, Florida, said he was representing the complainant in a meeting with the her, Witness Huffman, and Human Resources (he could not recall the exact date) due to mitigating circumstances (currently no access to AFGE Records). He recalls RMO Witty indicating that she "typically does not believe in giving accommodations to employees, and if she did, then she would need to accommodate everyone…who requested an accommodation." Subsequently, the complainant received an accommodation to work at home, but it took several months of negotiations. (B-9)

**Theodore Smith (**disability and EEO activity unknown; hereinafter, **Witness Smith**); RVSR Core 70 at the VA Regional Office St. Petersburg, Florida, said that AFGE was using the complainant's case as a "witch hunt" against RMO Wax. At the time, RMO Witty was reluctant about several issues of reasonable accommodations with regards to file handling and coming into the office less frequently because the complainant was working from home. The complainant's other issues that were a source of consternation for RMO Witty were the complainant's concerns regarding air quality in the building as it had been documented there was moisture, mold, and rodent allergens present. (C-18)

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.**

The **complainant** stated she asked RMO Witty to assign someone other than RMO Wax to handle her donated leave because she was not getting it. RMO Witty was sarcastic and caustic, and the complainant was in tears and tried to end the meeting. She still does not know what happened to her donated leave. (B-1)

**RMO Wax** responded that she was aware of escalating problems regarding the complainant's donated leave. There was some misunderstanding about the Volunteer Leave Transfer Program (VLTP). Human Resources provided copies of the VLTP, but when the complainant raised concerns they conducted an audit a payroll audit, and even though there were a lot of exceptions to the complainant's timecard, they found the complainant's donated leave was processed appropriately. (B-2)

RMO Wax further explained that the complainant had a lot hours entered into the system incorrectly, but there was nothing wrong with her donated leave. The way the program works is the employee first has to meet the requirements of a medical emergency, and then have a zero leave balance, and there are specific limitations on the donated leave that have to be met. Payroll uses what is called a “set aside account” where they set the accruals aside so that when the employee comes off of donated leave they have some leave to use. As for as accountability, is it not necessary because both Human Resources and Payroll are audited on VLTP functions and is watched by a third party. (B-2, C-7)

**RMO Witty** explained that she does not recall any problems with the complainant’s donated leave. She submitted a request and RMO Witty approved it. The process is that the employee completes an application for donated leave and provides it to Human Resources Management. It then goes to RMO Witty for approval, and once she approves it, an e-mail is sent to the employee notifying them of who has requested donated leave. To her knowledge, the complainant wanted management to keep sending e-mails asking employees to donate leave to her, which is not something they do for any employee. Management sends the initial e-mail to employee, but it is not their practice to keep sending additional e-mails after that. However, at the complainant’s request, management did send subsequent e-mails to employees notifying them the complainant had requested donated leave. (B-6, C-7)

RMO Witty stated that her actions were not to harass or discriminate against the complainant. (B-6)

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

The **complainant** indicated that when a request for leave donation is made, it is supposed to be responded to in a timely fashion. Her leave was known to be urgent, but it was not processed that way. (B-1)

According to **RMO Wax** the complainant’s leave was not delayed, but she understood how the complainant could interpret it that way. The complainant submitted her application on June 14, 2012. Her VLTP application was processed and approved on June 20, 2012, which is only four business days. According to the policy, management has 20 calendar days. The complainant had already been approved for the VLTP beginning May 9, 2012, and they usually do not get second and third applications to join the VLTP. Once you are in it, you are in it, so the complainant was eligible to receive donations without interruption. According to the VA Handbook 5011 states it is the employee’s responsibility to find donors, but in the complainant’s case, management sent out at least three emails asking for donations on her behalf, so she received actually more assistance than other employees. (B-2, C-7)

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.**

The **complainant** explained that the facility's policy for requesting advance sick leave does not allow for transparency. The request originates with the Coach (supervisor) and it has to go through several signatures, but no one has to date their signature. She believes one of the most harassing and horrible things that management did consistently was never allowing her of knowing whether or not there would be a paycheck, if her advance sick leave was approved or not, or if there were or were not leave donations. From August 8-25, 2012, the complainant received no paycheck because management did not do the paperwork in a timely fashion. (B-1, C-7, C-8)

**RMO Wax** testified this is handled at the division level. The division chief can approve up to 80 hours and Director approves anything over 80 hours. The request does come through Human Resources, except to print out a report for the Director. (B-2)

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010 she withdrew her request for an accommodation.**

The **complainant** explained that she did not request an accommodation; therefore, she did not withdraw a request for an accommodation. (B-1)

**RMO Wax** believes this is a misunderstanding because the agency is required and expected to respond to anything that appear to be an accommodation request. In other words, the employee does not have to say, "I want a reasonable accommodation." They could say, "My back is killing me, this chair is hurting me," or they could submit a doctor's note or write something on their leave record that indicates that they have a disability, and the agency is expected to respond. Even though the complainant said she did not request a reasonable accommodation at that time, management was giving her the information on how to apply for an accommodation because she had given management some indication that she had a disability. (B-2)

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.**

Regarding this event, the **complainant** said her leave was not processed because there is no accountability. (B-1)

**RMO Wax** reiterated what she explained under Event 20 … the complainant was already in the VLTP, so she did not need to keep applying. In this instance it extended until November 9, 2012. There was no harm to the complainant, and she never lost her participation in the program. (B-2, C-7, C-8)

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

According to the **complainant**, OPM had been sending her e-mails, but she was out for cancer treatment. She said the facility knew OPM was trying to get in touch with her because they were copied on every message. She almost did not get her clearance renewed because the facility did not let OPM know she was out on extended leave. (B-1)

Regarding this event **RMO Wax** stated for whatever reason, Office of Personnel Management (OPM) decided to initiate and work on the complainant's background investigation at the time the complainant was battling cancer, and the process is ran outside of RMO Wax's office. The crux of the issue is that it [background check] is required as a condition of employment and if an employee fails to complete their background investigation for any reason, they could lose their position. So, not only did the agency not have any influence over the timing of the background investigation, the agency did not have the ability to extend or change it due to illness. It is the sole authority of OPM. It is the responsibility of the employee to communicate with the background investigator and explain their individual circumstances. (B-2, C-2)

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

The **complainant** indicated that she needed to catch up on training after being out on extended leave, but she could not access the training system. She believes it had to do with the facility not accommodating her. (B-1)

**RMO Wax** attested that it is standard practice that when an employee is in a leave without pay status for more than 31 days, when an employee is deployed with the military, when the employee is out after childbirth or a serious illness, their TMS account is deactivated. Unless it is deactivated for several, TMS system sends constant reminders to the supervisor and the employee to do the training and it appears on national reports whether or not they are in compliance. As soon as the employee returns to work, their account is reactivated. (B-2)

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied, and she was advised that the denial notice was forwarded to General Counsel.**

The **complainant** said she had a meeting with Tamanique Clarke about her reasonable accommodation who informed the complainant that her requests for accommodation had been denied and forwarded to General Counsel to be finalized. (B-1)

According **RMO Wax,** she has no knowledge of RMO Clarke ever making sarcastic comments to anyone, and especially not to the complainant, and she receives mainly praise about RMO Clarke. Also, it her understanding that RMO Clark did not refuse to restructure marginal tasks because this is something management can do; however, management cannot restructure the essential functions, which is what the complainant was asking management to do. The complainant did not want to come into the building at all, and instead having someone collect or distribute her work and bring it back outside to her. RMO Clarke did not refuse to discuss tasks, but that the division had told Human Resources this would be removing an essential function. All reasonable accommodation denials must go through Regional Counsel. The complainant's denial was pulled back and never issued. (B-2, C-11)

**RMO Clarke** denied speaking to the complainant in a sarcastic manner, and she did not refuse to discuss the complainant's request to restructure marginal tasks. She and the complainant spoke on the phone February 5, 2013, and communicated via e-mail. The attached e-mails of February 5, 2013, show there was a willingness to communicate and interact with the complainant on a possible resolution. The complainant's original request was to have someone collect/distribute her work and bring it back outside to her so she did not have to enter the building; however, this would have entailed the removal of an essential function of her position. (B-3, C-11)

RMO Clark affirmed that all reasonable accommodation denials go through Regional Counsel. Before Regional Counsel completed their review, the complainant informed RMO Clarke that she wanted to have another meeting to see if there were any other options to accommodate her. There was no longer a need for Regional Counsel to review the letter, and it was rescinded. A second meeting was held, and a new accommodation was provided. (B-3)

In response to the complainant assertion that RMO Clark told the complainant that her perception of marginal tasks (getting documents from the copier and getting mail from the mail room were, in fact, essential functions of her position. Consequently, the complainant's request was granted on February 27, 2013. RMO Clark said her actions were not to harass the complainant. (B-3)

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

The **complainant** explained that when she was originally granted her reasonable accommodation in March 2012, she was allowed to leave when she got sick and work from home. She was informed by RMO McBurrough that her request for modification to her reasonable accommodation had been rescinded, stating she was never approved to leave when she got sick. She sent an e-mail to RMO Clarke saying, "I'm understanding that my accommodation has been reversed." RMO Clarke e-mails back and said, "No, they were never reversed because you never had them…you were never allowed to do that (to work half days)…" (B-1)

**RMO Wax** attested that there was a misunderstanding regarding Event 27. On February 27, 2013, the complainant was approved to work three days from home and to work two days in the office. The complainant started working half days when she was in the office and started going home between 11:00am and noon. When management learned of this, it was corrected and the complainant was reminded of what her approved accommodation said. (B-2, C-10)

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

According to the **complainant,** RMO Bookhart led her to believe that authorization from the mediator and agency representative were required in order to have a family member accompany her to the mediation. (B-1)

**RMO Bookhart** replied that on May 29, 2013, she received an e-mail from the complainant asking if she was permitted to have two people (a representative and family member) accompany her to mediation. She contacted ORM concerning the complainant's request, and was told that it was the mediator's call because there was nothing in the regulations that prevented a family member from attending the mediation along with a representative. The complainant was able to have a representative and family member attend the mediation. Her actions were not to harass or discriminate against the complainant. (B-4)

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

According to the **complainant,** she exchanged approximately seven e-mails with RMO Bookhart after the mediation was scheduled. If RMO Bookhart's intentions were to assist in preparing her for mediation, she would not have waited until less than 24 hours prior to the mediation to share the resources. (B-1)

Regarding this event, **RMO Bookhart** explained that the mediation logistics, i.e. time, location, etc, were finalized on May 22, 2013. An e-mail dated May 30, 2013, the day prior to the scheduled mediation, was sent to the complainant. Included in the e-mail were two attachments, "Mediation Program Information for Employees and a Mediation Brochure. The e-mail also contained the link for viewing the video, "The Mediation Zone.'" The same training resources were made available to the complainant via e-mail dated June 11, 2012, in preparation for a previous ADR session with the Director. (B-4)

RMO Bookhart stated she is not aware of any specific timeline for providing mediation information. The training resources were made available to the complainant the day prior to mediation because of an oversight on her part, she forgot to send the information sooner. Her actions were not to subject the complainant to harassment or discrimination. (B-4)

**Harassment**

The **complainant** reported to RMO Witty that she believes she was being harassed. She wrote on the back of her performance appraisals that she was being harassed, and that she could not get her job done, which was seen by her coach, RMO Smith, and the service center manager. When RMO Wax talked about her breast cancer and the lung disease, that was the last straw and it's what triggered her reporting the alleged harassment. The complainant stated she delayed reporting the harassment because she was afraid of losing her job, and it did not stop after she reported it, but actually increased. For example, her last evaluation said she was not eligible for the next promotion, and she was not doing her work adequately. For two years she did not get her reasonable accommodation. (B-1)

The complainant indicated that her financials are wrecked because of the harassment and she lives in fear constantly. She has a hard time focusing and concentrating. Her EEO activity made RMO Witty dissatisfied and unhappy with her. So, since the EEO complaint RMO Witty's attitude changed towards her, and everyone who works under RMO Witty started changing how they treated her. The disability is a factor because she is not able to go in and do her job without being accommodated. (B-1)

**RMO Wax** replied that the complainant never told her that she felt harassed in any way or that her actions were offensive. The union came to her, but not the complainant. She acknowledged that the complainant voiced her concern about a hostile work environment, but that was kind of a common theme with the complainant. According to RMO Wax, management was transparent with the complainant; they tried to explain why they were doing things so the complainant would not think it was personally directed at her; and they showed the complainant policies and/or practices to help the complainant understand that management was doing their job and not harassing her.
The complainant made her complaints of hostile work environment known in e-mails, and RMO Wax believes the service center manager and supervisors addressed the complainant's concerns appropriately. (B-2)

RMO Wax denied subjecting the complainant to harassment, and she denied discriminating against the complainant. (B-2)

**Review of Documents**

C-1 Reasonable accommodation documentation

C-2 Background investigation documentation

C-3 Regulations and AFGE Articles concerning telework, time and attendance, occupational health, official records

C-4 Department of Veterans' Affairs Leave administration

C-5 Organizational Charts

C-6 Documentation of FMLA

C-7 Documentation of VLTP

C-8 Regional Office Flexi-place Policy

C-9 Apollo Environmental, Inc. air quality test

C-10 Response from Human Resources regarding requests for documentation

C-11 E-mail from RMO Clarke concerning essential functions of position

C-12 Statements from other employees concerning the complainant

C-13 CP's performance appraisals

C-14 Documentation pertaining to salary shortfall

C-15 Denial of mold training

C-16 Memorandum from RMO Wax to Valorie Reilly President of AFGE concerning mold in building

C-17 CP's position descriptions

C-18 Reports of Contact – statements from witnesses.

**Analysis**

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII follows a three-step evidentiary analysis. First, the burden is on the complainant to establish a prima facie case. Second, management has the burden of production to articulate a legitimate, non-discriminatory reason for its actions. Third, once management has articulated a legitimate, non-discriminatory reason for its actions, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is pretext for discrimination.

**Disparate Treatment - Disability**

**Prima Facie**

To establish a prima facie case of disability discrimination under the disparate treatment theory, a complainant must generally show that: (1) the complainant has a disability as defined in EEOC's governing regulations, (2) she is a "qualified individual with a disability"; (3) the employer had knowledge of the disability; and (4) the complainant was subjected to an adverse or unfavorable employment action under circumstances

giving rise to an inference of discrimination due to disability (e.g., treated differently than similarly situated employees who are not disabled or who have different disabilities). According to EEOC's regulations, an individual with a disability means a person who (1) has a physical or mental impairment that substantially limits one or more major life activities, or (2) has a record of such impairment, or (3) is regarded as having such an impairment. Major life activities include, but are not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

**Reasonable Accommodation**

To establish a prima facie case of failure to accommodate a physical or mental disability, the complainant must present evidence that: (1) **he/she** has a physical or mental impairment, (2) the impairment substantially limits one or more major life activities, (3) the disability precludes meeting established criteria of the position, (4) except for the disability, **he/she** is qualified to fill the position, (5) **he/she** requested an accommodation (or management was aware of a disability that was causing workplace problems and that prevented the complainant from requesting accommodation), and (6) there are plausible reasons to believe that the disability could have been accommodated.

The complainant's disabilities are cancer, asthma, and chronic sinus infections. The cancer is under control and the symptoms are moderate. At the time she filed her complainant, she had asthma, sinus infections, vocal cord dysfunction, and breast cancer. She developed insomnia, irritable bowel syndrome (IBS), iritis secondary to the IBS. She has problems with sleeping and anxiety, and is socially affected. Her disability was diagnosed in October 2011and that when her limitations began. She notified the agency in writing and verbally around September 2011. She does not know if her disabilities are permanent or temporary.

Management affirmed knowledge of the complainant's disability

**Reprisal - Prima Facie**

To establish a prima facie case of discrimination due to reprisal, the complainant must show that: (1) she engaged in prior EEO activity (i.e., participation in the EEO complaint process, or some form of opposition to discriminatory practices, or other exercise of EEO rights); and, (2) relevant management officials were aware of the complainant's prior protected activity; and, (3) management effected some action that adversely impacted on the complainant following the protected activity; and, the surrounding facts and circumstances raise an inference of retaliatory motivation, either because: a) the alleged retaliation occurred shortly after the participation (shortly is usually defined in terms of days, weeks, or months, not years), or b) complainant's treatment before engaging in protected activity was different that the treatment after such participation (i.e., complainant's treatment after the protected activity was noticeably worse than before), or c) complainant was treated differently than similarly situated persons who did not participate in protected activities.

In cases where there are no similarly situated employees, a complainant may be able to establish a prima facie case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of causal relationship between membership in the protected class and the adverse action (e.g., statistical evidence of disparities in treatment).

In this case the complainant identified the instant as the subject of reprisal. Management knew of her EEO activity because they were contacted by ORM staff. The complainant believes that after she filed her complaint, management's mistreatment increased or got worse.

**Hostile Work Environment Harassment**

**Prima Facie**

In order to establish a prima facie case of hostile work environment harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on disability and reprisal; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with work performance and/or of creating an intimidating, hostile, or offensive work environment. In cases of harassment by coworkers or other non-supervisors, the complainant must also show, (5) that management failed to take corrective action that was prompt, appropriate, and effective.

In this case the complainant believes that she was subjected to numerous events of hostile work environment/harassment. She believes because of her disabilities she was subjected to harassment and hostile work environment. She cited the 29 incidents summarized above as evidence. The complainant attested that Management knew of her concerns and did nothing that was appropriate or effective.

**Management's Response**

The burden now shifts to management to articulate, a non-discriminatory reason for its actions.

Management denied discriminating against the complainant because of her disability, they denied reprising against her, and they denied subjecting her to hostile work environment/harassment as alleged.

Management was aware the complainant had to be taken to the emergency room by ambulance. Management also stated that Title 5 employees are not allowed to render emergency medical care because they are not licensed to do so; therefore, there was no gross negligence. RMO Palmer denied that he refused to help the complainant while she was experiencing a workplace related respiratory problem. He also denied that he

told the complainant that she was the only one in the room with a problem and he denied asking her why she was not wearing a portable oxygen tank or protective mask.

RMO Wax did not deny the complainant mold training, but rather, AFGE who identified someone other than the complainant to attend this training. Management agreed the new work area was agreed to on January 10, 2012, but it took two days to complete the task on January 12, 2012, which management believes was not unreasonable. When the complainant complained the new worksite was still causing her respiratory problems, the complainant requested an air purifier on January 31, 2012, and management provided it to her on February 2, 1012. Management attested to having no knowledge of the complainant leaving work since being reassigned to the new work area. Management heard nothing from the complainant that the accommodation was ineffective; therefore, management assumed the accommodation was working.

Management testified that the complainant had a doctor's note that stated she was under voice restrictions for at least six weeks, and at the time the law said the condition had to be permanent not temporary, which was defined as six months or more. Management denied the complainant was not advised in a timely manner that her accommodation was granted. In Event 11, management indicated that complainant never let management know that working from home three days was not an effective accommodation. If the complainant had notified management that the accommodation was not effective, management would have looked for another option.

Management said Event 12 is a mischaracterization, and RMO Wax said her staff provided the appropriate materials. Management does not recall denying the complainant's advance sick leave request. Regarding Event 14, the complainant submitted an FMLA request on March 9, 2012, which was reviewed, and on March 14, 2012, the determination was that the complainant met the criteria for the program.

RMO Wax indicated that she did not make any statement about the complainant's medical condition. She said her comments were taken out of context. Management indicated that the complainant was provided with the information requested. Requesting information through the union is different than the complainant coming to HR and requesting the information.

Regarding Event 17, management confirmed that an email was sent to the complainant through the union, and the email was reviewed and approved by RMO Witty. Management denied that RMO Witty made the statement that she does not typically support granting accommodations. RMO Witty acknowledged that she reviewed the e-mail sent by RMO Wax to the union and copied to the complainant and she approved it. Management believes the union was using the complainant's case to target RMO Wax.

Regarding Event 19, management stated that when the complainant complained about her donated leave, management conducted an audit and found the donated leave was processed appropriately. Further, Leave under the VLTP program was not delayed. The complainant submitted her requested VLTP on June 14, 2012, and her request was approved on June 20, 2012. The complainant's request for advance sick was

processed. Management said this is a misunderstanding the facility is required to respond to any request that appear to be for an accommodation. For Event 23, the complainant was already in the VLTP, so she did not need to keep applying. Event 24: Management testified that the facility had nothing to do with employee investigations. They are handled strictly by OPM.

Management explained that it is standard practice to remove employees from the web-based training system. Management denied RMO Clarke spoke to the complainant in a sarcastic manner. Management did not refuse to restructure tasks and they have the authority to restructure secondary tasks; however, management restructure essential functions of a position, and that is what the complainant wanted to do.

Regarding Event 27, management indicated the complainant was approved to work three days at home and two days in the office, but the complainant started working half days when she was in the office. When Management learned of this, they corrected it.

Event 28: RMO Bookhart was not sure whether the complainant could have a representative and family attend the mediation, so she researched it and found out it was a mediator's call, and her family member was allow to attend the mediation along with her representative. She also responded that due to an oversight, she did not provide the complainant information on mediation until the day prior to the mediation.

**Pretext**

Finally, the Complainant must show based on a preponderance of the evidence that the articulated reasons provided by management are merely an attempt to disguise what is pretext. The complainant can show either with direct evidence or discriminatory motive or by showing that the articulated reasons of management are unworthy of belief.

The complainant and management testimonies are in conflict with each other with regard to the reasonable accommodation incidents. The complainant testified that management did not accommodate her or the accommodation was not effective. Management's testimony stated they did accommodate the complainant, but they did not know that the accommodation was not effective. If they had known they would have looked at other options. The complainant said that RMO Witty made the statement that she does not typically support given accommodations, and some of the witnesses support her testimony, and some do not. Management maintains that RMO Witty did not make such a statement.

The information in this report was obtained from witness testimonies and documentation provided by the complainant and/or agency.

*John Henley* 10/13/13

John Henley, EEO Investigator Date

# Office of Resolution Management

*Department of Veterans Affairs*

**NOTICE OF RIGHTS AND RESPONSIBILITIES**
**Aggrieved Party: Aileen Mullins**
**Case #2001-0317-2012103413**

ORM is required to advise you that you have certain rights and responsibilities regarding the EEO matter that you raised. They are:

a. The right to remain anonymous during EEO Counseling. Your name will be divulged to others only upon your authorization for ORM to do so. You should know, however, that it might be very difficult to resolve your complaint informally if you choose to remain anonymous. Please indicate your choice by initialing below:

____ **I want to remain anonymous**

____ **I do NOT want to remain anonymous**

b. The right to a representative during the EEO complaint process including during EEO counseling. You may select anyone to represent you, as long as their position with VA would not represent a conflict of interest. **The EEO counselor cannot be your representative.** Please initial next to your selection below:

____ **I do NOT want a representative at this time.** I understand I may select a representative later (or at any stage of the EEO process).

____ **I have a representative. My representative is:**

Name: Attorney: ____Yes ____No
Address: Phone: (      )
Fax: (      )

c. The right to have your claim(s) addressed through the agency Alternative Dispute Resolution (ADR) program or EEO counseling, **but not both.** Participation in the ADR program is voluntary on your part, as well as on management's part, and ADR may be entered into in lieu of traditional EEO counseling. If, mediation is agreed upon by you and management during the pre-complaint process, the counseling period may be extended up to but not more than 90 calendar days. The agreement to participate in the ADR program must be in writing, signed by you and the agency representative. When an agreement is signed by you and the agency representative, the EEO Counselor will only gather enough information on your basis(es) and claim(s) to assist the agency in making a procedural determination in the event resolution

A-1

through ADR is not reached. The EEO counselor will have no further involvement in the matter until the counselor is advised of the completion of the ADR process or the end of the 90 day counseling period, whichever comes first. At that time, if a resolution is not reached through ADR or the 90 day counseling period has ended, you will be issued a Notice of Right to File a Discrimination Complaint.

d. Under 29 C.F.R. §1614.301, Relationship to Negotiated Grievance Procedure, if you are employed by an agency subject to 5 U.S.C. 7121(d), and is covered by a bargaining unit agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, and you wish to file a complaint or a grievance of alleged employment discrimination, you must elect to raise the matter under either Part 1614 OR the negotiated grievance procedure, **but not both**. You may file the grievance before, during or after EEO counseling, but not after you file a formal discrimination complaint through EEO. An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely grievance. Whichever you file first, a formal EEO complaint or a union grievance, will be considered an election to proceed in that forum, and it must be presented in writing. At the formal level, any complaint filed after a grievance has been filed on the same matter, shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure. The dismissal of such a complaint shall advise the complainant of the obligation to raise discrimination in the grievance process and of the right to appeal the final grievance decision to the Commission.

e. If you are disputing a matter that can be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, **but not both**. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum.

f. Within thirty (30) days of your first contact with an EEO counselor, you have the right to receive a written notice terminating counseling and informing you of the right to file a formal complaint (unless the period has been extended by prior written consent). You also have the right, at the conclusion of counseling, to file a formal complaint within **15 calendar days** of receipt of the Notice of Right to File a Discrimination Complaint.

g. If you allege age discrimination, you have the right to file a lawsuit in Federal District Court, without filing a formal EEO complaint. A Notice of Intent to Sue must be filed within 180 calendar days of the date of the alleged discriminatory act. However, you must first notify the Equal Employment Opportunity Commission (EEOC), 131 M Street, NE Fourth Floor, Suite 4NWO2F Washington, DC 20507-0100 of your intent to do so, at least thirty (30) calendar days in advance of the filing your Notice of Intent to Sue.

h. If you are complaining about sex-based wage discrimination (being paid less than a person of the opposite sex, even though they are doing equal work), you may file a formal EEO complaint, or lawsuit in Federal District Court, pursuant to the Equal Pay Act. In addition to other remedies available through the EEO complaint process, liquidated damages are available for willful violation of the Equal Pay Act.

i. If you file a formal EEO complaint and it is accepted, you have the right to request an immediate Final Agency Decision from the Department of Veterans Affairs, or a hearing before an administrative judge of the EEOC after 180 days from the date you file the formal complaint, or after completion of the investigation, whichever comes first. If you request a Final Agency Decision, the request should be addressed to Regional EEO Officer Winston Johnson (08J), Office of Resolution Management, 140 Fountain Parkway, Suite 620, St. Petersburg, FL 33716. If you request an EEOC hearing, the request should be addressed to, District Director, EEOC, Miami District Office, 1201 NW 16th St. Miami, FL 33410 and with a copy to the above named Regional EEO Officer.

j. Except for complaints of age discrimination, you have the right to file a lawsuit in Federal District court at any time 180-calendar days after filing a formal complaint or up to 90 calendar days after receipt of a Final Agency Decision from VA. You may also appeal a Final Agency Decision to EEOC within 30 calendar days of receipt of the decision. If you choose to appeal a Final Agency Decision to EEOC, you have the right to file a lawsuit in Federal District Court at any time after 180 calendar days from the filing of such an appeal, or up to 90 calendar days after receiving an appellate decision from EEOC.

k. If you believe that other individuals, similarly situated to you, have suffered from the same kind of discrimination, you may have the right to file a class action complaint. A class action complaint must allege that you have been individually harmed by a VA personnel management policy or practice that has similarly harmed numerous other class members. You must also allege that there are questions of fact that are common to, and typical of, the claims of the class, and that you or your representative will fairly and adequately protect the interests of the class. EEOC also requires that a class agent be represented by a qualified attorney.

l. You have the responsibility to cooperate with VA during the processing of your complaint. If you file a formal EEO complaint, you must keep the VA informed of your current address; you must claim any certified mail sent to you, and you must cooperate with any investigator assigned to the complaint. If you eventually file an appeal with EEOC about the complaint, you must serve copies of the appeal papers on VA.

m. If your complaint involves back pay, you have a duty to mitigate damages by actively seeking and/or retaining employment. Interim earnings or amounts, which could be earned by a complainant with reasonable diligence, generally must be deducted from back pay.

n. If you have filed two or more complaints, the agency will consolidate them after appropriate notice to you. When a complaint has been consolidated with one or more earlier complaints, the agency shall complete its investigation within the earlier of 180 days after the filing of the last complaint or 360 days of the filing of the first complaint. In addition, the Administrative Judge may consolidate multiple complaints at the EEOC hearing stage.

o. Finally, you must limit any formal EEO complaint you may file to those matters discussed with ORM, or to like or related matters (that is, matters which are directly related to those matters or which are unmistakably derived from those matters). Additionally, if you wish to amend a previously filed complaint, only matters that are like or related to the claim(s) in the pending complaint may be added. To protect your rights, discuss all claims with ORM before you file a formal complaint.

p. If you reject an agency offer of resolution made pursuant to 29 C.F.R. §1614.109(c), it may result in the limitation of the Agency's payment of attorney's fees or costs.

If you wish to discuss your rights and responsibilities further, or if you have questions or need additional information, please contact your EEO counselor at:

Department of Veterans Affairs
Office of Resolution Management (08J)
140
Attention: Deogory Harris
Phone: (727) 540-3962
Fax: (727) 540-3976

Aileen Mullin, Aggrieved Party

Date

# Office of Resolution Management

*Department of Veterans Affairs*

**NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT**

Aggrieved Name: Aileen Mullin
Case No: 200I-0317-2012103413

1. If you are not satisfied with the results of the EEO counseling and believe that you have been subjected to discrimination because of race, color, religion, sex (sexual harassment or gender), national origin, age, disability or reprisal for prior EEO activities, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the 15-calendar day time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person or by mail with the Regional EEO Officer. You may also file it with the Secretary of Veterans Affairs or with the Deputy Assistant Secretary for Office of Resolution Management (DAS/ORM). Their addresses are listed below:

   **Regional EEO Officer**
   **Department of Veterans Affairs**
   **Office of Resolution Management 08J**
   **140 Fountain Parkway, Suite 620**
   **St. Petersburg, FL 33716**

   **Secretary of Veterans Affairs**
   **Department of Veterans Affairs**
   **810 Vermont Avenue, NW**
   **Washington, D.C. 20420**

   **Deputy Assistant Secretary (08)**
   **Office of Resolution Management (ORM)**
   **810 Vermont Avenue, NW**
   **Washington, D.C. 20420**

   If you file a complaint with the Secretary or the DAS/ORM, you must also provide a copy to this ORM Field Office. Failure to provide a copy to this ORM Field Office will only delay the processing of your client's complaint.

4. You must identify each event you are protesting and provide the date on which each event occurred. Your complaint must be specific and limited to the event

you discussed with the counselor. Therefore, if there are any events that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each event informally at EEO counseling.

5. You are entitled to representation at every stage of the complaint process. You may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest. If you do select a representative, you must inform this ORM Field Office, in writing, of the representative's name, telephone number, and business address.

6. If you are a member of the bargaining unit, you may have the right to dispute the events discussed with the counselor through the union grievance procedure. Regulations provide that you may file either a grievance <u>or</u> an EEO complaint about the events in dispute, but <u>not both</u>. Should you file both, whichever you file first (a union grievance or an EEO complaint) will be considered an election to proceed in that forum.

7. If you are complaining about a matter that may be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint <u>or</u> an MSPB appeal, but <u>not</u> <u>both</u>. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. If the counselor can be of further assistance to you, please advise.

______________________________ ____________________

**Aileen Mullin, Aggrieved Party** **Date**

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed sheet containing the label at the line so that the entire shipping label is visible. Place the label on a single side of the package and cover it completely with clear plastic shipping tape. Do not cover any seams or closures on the package with the label.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized retail outlets and UPS drivers.**
   Find your closest UPS location at: www.ups.com/dropoff
   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.

   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

FOLD HERE

DEOGORY HARRIS
727-540-3961
VA VACO ORM 485 ST. PETERSBURG
140 FOUNTAIN PARKWAY
ST. PETERSBURG FL 33716

2.0 LBS LTR 1 OF 1

SHIP TO:
AILEEN MULLIN
AILEEN MULLIN
ALAMANDA WAY SOUTH
ST. PETERSBURG FL 33705

FL 337 9-01

UPS 2ND DAY AIR 2
TRACKING #: 1Z A39 F00 A6 9805 4800

BILLING: P/P
ADULT SIGNATURE REQUIRED-MIN 21

Reference #1: VA VACO ORM 485 St. Petersburg
CS 14.5.29. WXPIE70 30.0A 07/2012

**Harris, Deogory (ORM)**

**From:** UPS Quantum View [auto-notify@ups.com]
**Sent:** Tuesday, September 04, 2012 11:51 AM
**To:** Harris, Deogory (ORM)
**Subject:** UPS Delivery Notification, Tracking Number 1ZA39F00A698054800

Discover more about UPS:
Visit www.ups.com
Sign Up For Additional E-Mail From UPS
Read Compass Online




***Do not reply to this e-mail. UPS and VA VACO ORM 485 St. Petersburg will not receive your reply.

**At the request of VA VACO ORM 485 St. Petersburg, this notice is to confirm that the following shipment has been delivered.**

**Important Delivery Information**

| | |
|---|---|
| **Tracking Number:** | 1ZA39F00A698054800 |
| **Delivery Date / Time:** | 04-September-2012 / 11:29 AM |
| **Adult Signature Captured** | |

**Delivery Location:** RESIDENTIAL
**Signed by:** MULLIN

**Shipment Detail**

**Ship To:**
Aileen Mullin
Aileen Mullin
745 ALAMANDA WAY S
SAINT PETERSBURG
FL
33705
US

| | |
|---|---|
| **Number of Packages:** | 1 |
| **UPS Service:** | 2ND DAY AIR |
| **Weight:** | 2.0 LBS |

# DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF RESOLUTION MANAGEMENT
## SOUTHEASTERN OPERATIONS
## COUNSELOR REPORT

**CASE NUMBER: 200I-0317-2012103413**
**COUNSELOR NAME: Harris, Deogory**

| | |
|---|---|
| Name of Aggrieved Party: | Ms. Aileen Mullin |
| Home and/or Alternate Address: | 745 Alamanda Way South, St. Petersburg, FL 33705 |
| Home Telephone Number: | 954-263-1510 |
| Cellular/Mobile Number | 954-263-1510 |
| Business Address: | P.O. Box 1437<br>St. Petersburg, FL 33731 |
| Business Telephone Number: | (727) 319-7838 |
| Email Address: | Aileen_mullin@yahoo.com |
| Position Title/Grade: | RVSR // GS 11 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Employee | X | Former Employee | | Applicant | | | | | |
| VHA | | VBA | X | NCA | | Canteen | | Other | |
| Title 5 | X | Title 38 | | Hybrid T38 | | Full-time | X | Part-time | |
| Probationary | | Career | X | Career Conditional | | Temporary | | Term | |

| | | |
|---|---|---|
| Name of Facility: | VARO, ST. PETERSBURG | |
| Address of Facility: | P.O. Box 1437<br>St. Petersburg, FL 33731 | |
| Facility Telephone Number: | (727) 319-7838 | |
| Name of Representative: | None | Attorney<br>No |
| Representative's Address: | N/A | |
| Representative's Telephone: | N/A | |

### NOTIFICATION OF PROCEDURAL RIGHTS

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 06/05/2012 |
| Initial Interview | | | Date: | 06/06/2012 |
| Rights & Responsibilities/Notices: | UPS/Cert Mail: | 06/07/2012 | Rec'd: | 06/07/2012 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [ ] | Date | N/A |
| Notification to Facility Director | | | Date: | 06/06/2012 |
| ADR offered by facility [ ] MOU [ ]: | YES [X] | NO [ ] | Date: | 06/06/2012 |
| Facility Returned Signed Refusal | YES [ ] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [X] | NO [X] | Date: | 06/06/2012 |
| Settlement (SA) [ ] | Withdrawal (WD) | [ NO]: | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | UPS/Cert Mail: | 08/30/2012 | Rec'd: | 09/04/2012 |

A3

Case Number: 200I-0317-2012103413
Name of Aggrieved Party: Ms. Aileen Mullin
Name of Facility: VARO, ST. PETERSBURG
Date of Initial Contact: 06/05/2012

**RMO/WITNESS INFORMATION**

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Bonnie Wax, HR chief, 727-319-5800 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**CLAIM - 1:** Harassment/Hostile Work Environment (Non-Sexual) **Incident Date: 05/03/2012**
**Basis:** Disability - Physical

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely? | X | | |
| Administrative Grievance Filed | | | | | X | |

**Brief Description of Claim**:

a. Ms. Mullin stated on 5/3/2012, she received an email from Mr. Casey Crump, DRO, and Union Stewart, that Ms. Bonnie Wax stated that the tumors in her breast were causing the respiratory problems and not the building;

b. On 5/18/2012, Ms. Mullin stated that Ms. Valarie Riley, Union President requested her HR files and when she received them on the 31 May 2012, several documents/files were missing which were all health related. Ms. Mullin believes the missing documents are directly related to discrimination based on her disability (Physical).

**Resolution Sought**:

-Wants a formal apology for disclosing her information
-Wants the behavior from Ms. Wax to cease and management to address her behavior
- Would like oversight of future encounters of how she is being treated and handled by Ms. Bonnie Wax

**Management's Response**:

Ms. Mullin requested mediation so management was not contacted.

**Informal Documents Requested/Received**:

a. Documentation, if any, showing whether the supervisor or any management Official was made aware of the alleged harassment, e.g., written/verbal complaints;

b. Documentation, if any, of corrective action(s) taken subsequent to the alleged Harassment.

**Case Number: 200I-0317-2012103413**
**Name of Aggrieved Party: Ms. Aileen Mullin**
**Name of Facility: VARO, ST. PETERSBURG**
**Date of Initial Contact: 06/05/2012**

## SUMMARY OF RESOLUTION EFFORTS

Ms. Mullin and management were unable to reach an agreement in mediation, so she decided to file a formal complaint.

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim listed above was the only claim addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by UPS on 08/30/2012 and received on 09/04/2012.

EEO Counselor

9/5/2012
Date

09/18/2012 22:40 FAX 001 CLK

COMPLAINT CASE NUMBER: 9/18 200I-0317-2012103413

OMB NO.: 2900-0716
RESPONDENT BURDEN: 30 Min.

Department of Veterans Affairs

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

***Read the instructions on the reverse side of this form carefully before completing the front of this form.***

| | | |
|---|---|---|
| 1. NAME *(Last, first, middle initial)(Please print)*<br>Mullin, Aileen | 3. MAILING ADDRESS<br>745 Alamanda Way S<br>Saint Petersburg, FL 33705 | 4a. WORK TELEPHONE NUMBER *(Include Area Code)* |
| 2. EMAIL ADDRESS<br>aileen_mullin@yahoo.com | | 4b. HOME TELEPHONE NUMBER *(Include Area Code)*<br>(954) 263-1510 |

| | | |
|---|---|---|
| 5. ARE YOU:<br>[X] A VA EMPLOYEE<br>[ ] AN APPLICANT FOR EMPLOYMENT<br>[ ] A FORMER VA EMPLOYEE | 6a. JOB TITLE, SERIES AND GRADE<br>Rating Veterans Service Representative, 11, 2<br>6b. SERVICE/SECTION/PRODUCT LINE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED<br>Department of Veterans Affairs<br>Regional Office<br>PO Box 1437<br>St. Peterburg, FL 33731 |

NOTE: For each employment related matter that you believe was discriminatory you must list the bases *(list one or more of the following)*: **Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*, Disability *(Specify)*, Genetic Information, and Reprisal for prior EEO activity or having opposed discrimination.**

| 8. BASIS | 9. CLAIM(S) *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly describe what happened below. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA-employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| Physical Disability | Harassment/ Hostile Work Environment / EEO Reprisal | |

11. REMEDIES SOUGHT *(Use an additional sheet of paper if necessary.)*
see attached

| | | |
|---|---|---|
| 12a. DO YOU HAVE A REPRESENTATIVE?<br>[ ] YES [X] NO | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12d. TELEPHONE NUMBER *(Include Area Code)* |
| 12b. IF "YES," IS HE OR SHE AN ATTORNEY?<br>[ ] YES [ ] NO | | 12e. EMAIL ADDRESS |
| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR?<br>[X] YES [ ] NO | 13b. NAME OF EEO COUNSELOR<br>Deogory T Harris | 13c. DATE OF INITIAL CONTACT WITH ORM |

14. *If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper, if necessary.)*

| | | | |
|---|---|---|---|
| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE?<br>[ ] YES [X] NO | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE?<br>[ ] YES [X] NO | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE?<br>[ ] YES [X] NO | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS | | |

| | |
|---|---|
| 18. SIGNATURE OF COMPLAINANT *(Do not print)* [signature] | 19. DATE<br>09/17/2012 |

VA FORM AUG 2012 **4939** SUPERSEDES VA FORM 4939, JAN 2012, WHICH SHOULD NOT BE USED.

pg 1 of 5 A-4

**9. CLAIM(S)**

**Discrimination due to Physical Disabilities/ Harassment**

I was hired under an internship program with a 2-year probationary period. By the time respiratory condition was irrefutably related to the workplace, I already had disconcerting experiences with Human Resources and witnessed first hand what they are capable of when dealing with employees with health issues.

In September 2011, after two months of being completely symptom free while at external training in Baltimore, Md., I started becoming move severely ill, unable to breathe freely. while in the work place.

Between September 2011 and March 2012 there are at least 25 days that I had to leave work, before the end of my tour, because of respiratory issues. My administrators authorized each leave.

I repeatedly reached out to administrators and the Union telling telling them I was having breathing problems. I needed help. (I have copies of e-mails to/from my Coach, Assistance Coach, Human Resources, the Union that began in October 2011.)

Twice the VA police had to assist me out of the building.

I met with Human Resources and the Union on January 10, 2012 and it was agreed that I would be reassigned to another part of the building to see if this would 'help'.

The reassignment did not occur immediately. On January 12, 2012, I had to taken to the emergency room, by ambulance – I had an asthma attach so severe that I couldn't get it under control using an emergency inhaler followed by two additional medications via nebulizer.

A Worker's Compensation Claim was filed.

January 17, 2012 – I was assigned a new workstation.

January 31, 2012 – I notified Supervisors, Human Resources and Union that my respiratory problems forced me to leave work twice since assigned to the new area.

February 2, 2012 – I was issued a Honeywell Air Purifier designed to be used in a small room (10 x 10): **My work station is in an open cubical, in a area comparable to a football field. It was not an appropriate accommodation.**

March 3, 2012 – FMLA Documents submitted. Doctor stated, "...asthma worsens at work at VA leading to severe attacks requiring urgent care...I recommend the patient be allowed to work from home with periodic trips to work site . ...."

(At least another 5 asthma attacks)

Mullin, Aileen
2001-0317-2012103413
Pg 2 of 5

March 20, 2012 -- I received notice of another ineffective/incomplete accommodation: Authorization to work from home three days a week but I to report to the office on Tuesdays and Thursdays.

Reporting as instructed, again and again I had asthma attacks that forced me to leave the building.

**March 23, 2012 – I was diagnosed with breast cancer.**

**May 3, 2012 – Day before 1st surgery**

- I was told that my application for advanced leave had not been approved
- Human Resources informed me that there were problems with my application for FMLA, which was submitted in March 2012: I needed to supply additional medical information????
- I was informed me that the Human Resources Manager had said a horrible thing about my asthma and my breast cancer.

**May 4, 2012 – Partial mastectomy.**

May 10, 2012 - While recovering from the surgery, I requested a meeting with Administrators and Union representative.
- I reported to the Director what had happened the day prior to my operation.
- I asked the Director to assist in getting my Human Resource related applications processed.
- **I made it clear that I didn't want to hear any more from the Human Resource Manager.**

May 16, 2012: Union Representative Requested records from Human Resources.
- There was a delay in the release of the documents.
- The file was incomplete. Health related documents missing.

**May 21, 2012 – Second surgery:** Removal of more cancerous cells and widening of surgical margin.

**June 5, 2012** – I get the news I need **chemotherapy**

**June 5, 2012** – I receive a LENGTHY e-mail about the personnel records - from Human Resource Manager.?????? She sent it directly to me, not my Union representative AND - she was fully aware that I was still battling cancer.

**June 5, 2012: I filed an EEOC complaint.**

Upon my request, a second meeting with the Administration and Union was scheduled.

**June 10, 2012: Meeting with Director, Assistant Service Center Manager, AFGE Local Vice President and AFGE Steward.** Retribution Begins

Nothing about this meeting was positive.

I requested meeting with the belief that we could come to a 'meeting of the minds' pertaining to issues that included: Oversight of Leave Donations; Oversight of Human Resource's actions as pertained to me; And to again request that Bonnie Wax not to communicate directly with me... None of my requests were met kindly.

The Director brought up the EEO complaint I filed. I assured her that I believed that we could come to a 'meeting of the minds' and then I would willingly withdraw my complaint.

Mullin, Aileen
2001-0317-2012103413
Pg 3 of 6

HR Manager

The Director shared that Bonnie Wax felt that she was being targeted by the Union.

The Director stated that not only had she read, and approved, the e-mail Bonnie Wax sent me on June 5th, but she didn't see why I had a problem with it.

I was horribly upset by the callousness my concerns were met with. In tears I attempted to leave the meeting because the Director made it clear that there would be no 'meeting of the minds'.

The Union representatives convinced to stay. They wanted some part of the meeting could be salvaged. An accommodations conversation began:

If physically able to work while receiving cancer treatments, I wanted to. I offered solutions that would allow me to continue serving Veterans, but limiting my exposure to the building while receiving chemotherapy (concerns due to compromised immune system and history of asthma attacks).

The Director explained that she doesn't support granting accommodations, because if I was granted them, they would have to give accommodations to every employee that came in with a doctor's note.

8/24/2012- **Department of Labor granted the Worker's Compensation claim**, for Chronic Maxillary Sinusitis and Extrinsic Asthma as related to the building I work in, back to May 2009.

ADDITIONAL forms of Retribution

**Applications for Advanced Leave weren't processed** - No explanations. No warnings. This has been going on since I filed an EEOC on June 5th.

Pay Period End - Gross Pay - Net Pay
09/08/2012 - 4,547.20 - **481.07**
08/25/2012 - 0.00 - **0.00**
08/11/2012 - 1,051.54 - **524.43**
6/16/2012 - 1,563.10 - **895.82**

Now, all financially dependent aspects of my life are at jeopardy: **Including the continuation of my cancer treatment.**

**Applications for Leave Transfer were delayed, or not processed at all since the EEOC filed was filed.**

Date of Application / Date of Announcement

6/14/2012 – 6/29/2012
8/16/2012 – NEVER

**OPM required security investigation**

On 8/31/2012 OPM sent notification to my agency e-mail: I was required to complete a security investigation. I didn't receive the e-mail. The agency was cc'd on the notification but failed to inform OPM that I was on continuous medical leave.

HR

Mullin, Aileen
2001-0317-2012103413

pg 4 of 5

**Training**
I returned to work on 9/17/2012 to find that I had been removed from TMS: The VA's web based training system. The Point of Contact was able to get me re-established but we discovered that all my required training was no longer there?????

11. REMEDIES SOUGHT

Personal

- Qualification Standards (production standards) need to be adjusted to reflect actual on-the-job/learning time lost due to inaction by agency to make an accommodation.
- LWOP status will not affect time in grade per LWOP bulletin from OPM.
- Mentor of journeyman level or higher (not reviewer) for a period equal to the time on-the-job /learning time lost due to inaction by agency to make an accommodation.

General

- Eradicate the current culture, attitudes, practices and procedures that foster "we don't support accommodations. Give them to one employee and you have to give them to everyone that comes in with a doctors note."
- Conduct and Employee Air Quality Survey. Content of Study to be agreed upon by employer and AFGE. (Sample: http://www.osha.gov/dte/grant_materials/fy10/sh-20839-10/iaq_survey.pdf)
- Implement Leave Donation Pool that is available to all employees.
- Include language on employee's Leave Donation Announcement that advises donating employees to maintain a copy of their donation form and to check their next pay stub to verify that the leave was actually donated.
- Transparency of leave donations to employee. Provide number of hours donated from specific employees at the end of each pay period--prior to pay date.
- Clearly written and published guidelines (SOP) regarding FMLA, Leave Requests, Advance Leave process etc. to include time-line, process, responsibilities, etc. All actions require signature and date.
- Face-to-Face training for management and AFGE Stewards of SOP regarding FMLA, Leave Requests, Advance Leave process etc.
- Respond to employee requests within a "reasonable period" (ex. 5 days). Currently, the responses on all matters, including those of urgency regarding medical disabilities, are either greatly delayed or non existent.

Mullin, Aileen
2001-0317-2012103413
Pg 505

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

September 25, 2012

VIA: Regular Mail

Aileen Mullin
Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Receipt of your Discrimination Complaint No. 200I-0317-2012103413, Filed September 18, 2012**

1. The official filing date of your complaint is September 18, 2012 based on the **date your fax was received.** This notice also provides you with written notification of your rights, as well as the time requirements for exercising those rights.

2. If your claims are accepted, your case will be assigned to an impartial investigator under the supervision of the Office of Resolution Management (ORM). The investigator will contact you directly in order to obtain information or evidence you may wish to offer. The investigation must be completed within 180 calendar days of the filing of your complaint. You will be provided with a copy of the investigative file upon completion and you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

3. If the investigation has not been completed within the 180 calendar-day time limit, regulations permit the agency and the complainant to agree, in writing, to extend the investigative period for not more than 90 calendar days. ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a final agency decision from OEDCA.

4. You must keep this office advised of any change of address. Failure to do so could lead to dismissal of your complaint. You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you in this matter. All subsequent actions on your complaint will be mailed or delivered to your representative, with copies to you,

unless you advise us in writing that you are no longer represented by that individual.

5. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. Please see the Mediation Program Information Sheet enclosed. If you are interested in using mediation to address the issues raised in your complaint, please contact the ADR Program Manager at (202) 501-2800.

6. For any questions, please contact Odessa Johnson, Case Manager at (386)487-1830.

Sincerely,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

**Enclosure: Counselor's Report**
Mediation Program Information Sheet

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08N

September 25, 2012

VIA: E-mail

Kerrie Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Receipt of Discrimination Complaint – Aileen Mullin, Case No. 200I-0317-2012103413, Filed September 18, 2012**

1. This is to inform you that Aileen Mullin, **an employee** at your facility filed an EEO complaint of discrimination on September 18, 2012, with the Office of Resolution Management (ORM), St. Petersburg, FL.

2. The complaint is currently being reviewed for acceptability determination. You will be informed as to whether the complaint is accepted or dismissed.

3. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint please contact the ADR Program Manager at (202) 501-2800.

4. A copy of the Complaint of Employment Discrimination, VA Form 4939 is enclosed.

5. For any questions, please contact Odessa Johnson, Case Manager at (386)487-1830.

Sincerely,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

**Enclosure: VA Form 4939**

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

In reply refer to: 08J

July 15, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 2001-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; <u>**or**</u>
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On April 1, 2013, we amended your complaint to include a claim of hostile work environment harassment encompassing 27 different events that included four independently actionable discrete acts. On July 11, 2013, you requested that your complaint be amended to include the following allegations:

<u>**Claim A:**</u> On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with you having a family member accompany you to a mediation session.

<u>**Claim B:**</u> On or about May 22, 2013, you were denied timely notification of the existence of mediation preparation training resources available through EEOC.

4. We have determined that the allegations are like or related to the claims in the original complaint. They appear to have grown out of and are inextricably intertwined with the previously accepted harassment claim. Therefore, the allegations are hereby added to the complaint and identified below under the harassment claim as events 28 and 29. Accordingly, case number 2001-0317-2013103413 is amended as follows:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.**[1]

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**[2]

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.** ***(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA).** ***(See Footnote #2)***

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they refused to render aid while she was having a severe asthma attack.** ***(See Footnote #2)***

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.** ***(See Footnote #1 & 2)***

[1] Event 1, 3 and 9 are discrete that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.** ***(See Footnote #2)***

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.** ***(See Footnote #2)***

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.** [3]

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.** ***(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.** ***(See Footnote #2)***

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** ***(See Footnotes 2 and 3)***

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

**28. On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session.**

**29. On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

6. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

7. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

8. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

9. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

10. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

Winston Johnson

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

July 15, 2013

In reply refer to: 08J

VIA: E-mail

Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Amendment of EEO Complaint of Aileen Mullin, 2001-0317-2012103413, Filed on September 18, 2012**

1. This is to inform you that the discrimination complaint of Aileen Mullin, an employee of the Veterans Service Center, was recently amended. Enclosed is a copy of the partial acceptance letter that was sent to the complainant.

2. All documents and records, including the Official Personnel Folder related to this complaint, must be maintained at the facility and made available at the time of the investigation.

3. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint, please contact Dessa Johnson, ORM Case Manager, at (386) 487-1830 or (386) 487-1827, or the ADR Program Manager at (202) 501-2800.

Sincerely yours,

Winston Johnson

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosure: Amendment Letter or July 15, 2013

Cc w/enclosures via e-mail: Bettie Bookhart, EEO Program Manager

**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

April 1, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 2001-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; **or**
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On March 15, 2013, we amended your complaint to include a claim of hostile work environment harassment encompassing 26 different events that included four independently actionable discrete acts. On March 29, 2013, you requested that your complaint be amended to include the following allegations:

> **Claim A:** On March 26, 2013, you request for administrative absence for preparation of your EEO complaint was denied.
>
> **Claim B:** On or about March 29, 2013, you were advised that modifications to your reasonable accommodation were reversed.

4. With regard to claim A, EEOC regulation 29 C.F.R. § 1614.107 (a) (1) provides, in part, that the agency shall dismiss a complaint or a portion of a complaint that fails to state a claim under Section 1614.103 or Section 1614.106 (a). Complainants fail to state a claim when: they are unable to show that they are aggrieved by the matter complained of; or 2) they lack standing to file a complaint because of their employment status; or 3) they fail to allege a basis of discrimination that falls within the purview of EEO law and regulations; or 4) the complaint concerns a matter over which the VA lacks authority or jurisdiction.

Complaints regarding denial of official time for EEO purposes do not state a claim for relief. As a result, they are not processed as complaints under 29 C.F.R. § 1614, because the focus is not on the agency's motivation in denying official time, but whether the agency violated the Commission's official time regulation. Therefore, **claim A above is hereby DISMISSED,** in accordance with 29 C.F.R. § 1614.107 (a) (1), for failure to state a claim.

5. We have determined that the incident in claim B above provided additional evidence to support the existing claim but, does not raise a new claim in or of itself. The incident described appears to have grown out of and is inextricably intertwined with the claim previously accepted harassment claim. Therefore, the incident has been added to the complaint and is identified below under the harassment claim as event 27. Accordingly, case number 2001-0317-2013103413 is amended as follows:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.[1]**

**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.[2]**

**3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.** ***(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA).** ***(See Footnote #2)***

**6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they**

[1] Event 1, 3 and 9 are discrete that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

**refused to render aid while she was having a severe asthma attack.** ***(See Footnote #2)***

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.** ***(See Footnote #1 & 2)***

**10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.** ***(See Footnote #2)***

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**12. On May 31, 2012, although a cover sheet that stated** ***"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."*** **was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.** ***(See Footnote #2)***

**13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.**[3]

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated. *(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed. *(See Footnote #3)***

**22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation. *(See Footnote #2)***

**23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed. *(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

**26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel. *(See Footnotes 2 and 3)***

**27. On or about March 29, 2013, the complainant was advised that modifications to her reasonable accommodation were reversed.**

6. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

7. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

8. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

9. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

10. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

March 15, 2013

VIA: First Class Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Amendment of Complaint No. 200I-0317-2012103413, Filed on September 18, 2012**

1. This will acknowledge receipt of your amendment request to your EEO discrimination complaint case referenced above.

2. EEO regulations permit a complainant to amend a complaint at any time before the conclusion of the investigation and to add claims that are "like or related" to those raised in the original complaint. The regulations provide that new evidence be reviewed to determine whether it:

A) Provides additional evidence to support the existing claim, but does not raise a new claim in or of itself;
B) Raises a new claim that is "like or related" to the claim raised in the pending complaint; **or**
C) Raises a new claim that is not "like or related" to the claim raised in the pending complaint.

3. On October 18, 2012, we accepted a claim of hostile work environment harassment encompassing 16 different events that included three independently actionable discrete acts. On March 8, 2013, you raised the following allegations in a three-page narrative: (1) Around the spring/summer of 2011, you were denied the opportunity to use what you learned in training, and build on the training foundation that you received in Baltimore, Maryland and (2) The Union's request of December 18, 2012, for a detailed audit of all 2012 pay period leave usage was ignored.

Allegation 1 could not have grown out of the original complaint because the matter complained of occurred before the events in the previously accepted harassment claim. Therefore, the allegation is hereby **DISMISSED** for failure to raise with a counselor. With regard to allegation 2, EEO regulation 29 C.F.R. § 1614.107 (a) (1) provides, in part, that the agency shall dismiss a complaint or a portion of a complaint that fails to state a claim under § 1614.103 or § 1614.106 (a). Complainants fail to state a claim when: they are unable to show that they are aggrieved by the matter complained of; or 2) they lack standing to file a complaint because of their employment status; or 3) they fail to allege a basis of discrimination that falls within the purview of EEO law and regulations; or 4) the complaint concerns a matter over which the VA lacks authority or jurisdiction. The matter complained of in allegation 2 concerns a labor/management

issue and does not fall within the purview of EEO regulations. The proper procedure is to pursue this matter with the Fair Labor Relations Authority. Therefore, allegation 2 is also **DISMISSED,** for lack of jurisdiction.

The narrative that you submitted also provided relevant background information in support of the previously accepted claims and included 10 new allegations of continuing harassment. Although no relief will be available for such background information, the information may be used as evidence in support of the accepted claims during the investigation. Additionally, we have determined that the new allegations are like or related to the claims in the pending complaint. They add to and are inextricably intertwined with the overall harassment claim as outlined in our partial acceptance letter of October 18, 2012. Therefore, the allegations have been added to the complaint and are identified under the harassment claim as events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26. Accordingly, case number 2001-0317-2013103413 is amended as follows:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

Accepted ← **1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace; and on two occasions VA Police had to assist the complainant out of the building.**[1]

New → **2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mask.**[2]

New ← **3. On November 28, 2011, BW denied the complainant's request for Mold Hazard Training.** ***(See Footnotes #1 & 2)***

**4. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

New ← **5. Upon returning to work on January 12, 2012, complainant was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tammi Clark (TC) and Union Official Carol Allard (CA).** ***(See Footnote #2)***

New ← **6. On January 12, 2012, the complainant was subjected to gross negligence as officials of the Regional Office showed no regard her life when they**

[1] Event 1, 3 and 9 are discrete acts that were not raised within 45 days of occurrence and are therefore **DISMISSED** as independently actionable claims, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. The events are, however, determined to be sufficiently related to the overall pattern of harassment as it represent additional actions taken against the complaint that are similar in nature to the overall harassment claim.

[2] Events 2, 3, 5, 6, 9, 10, 12, 19, 22 and 26 were raised in the complainant's three-page narrative that was dated march 8, 2013.

**refused to render aid while she was having a severe asthma attack.** ***(See Footnote #2)***

**7. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**

**8. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

new ← **9. On February 26, 2012, BW sent the complainant a memo advising her that her request for an accommodation was denied and she described the complainant's medical condition as a temporary condition that impairs her ability to speak, and that the condition is expected to resolve itself within six weeks.** ***(See Footnote #1 & 2)***

new ← **10. On March 11, 2012, the complainant was not advised in a timely manner that her accommodation request was granted.** ***(See Footnote #2)***

**11. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

new ← **12. On May 31, 2012, although a cover sheet that stated *"A copy of all records personally identifiable to Ms. Mullin. Management provides the following... Ms. Mullin's reasonable accommodation folder."* was attached to the complainant's Official Personnel Folder, the memo described above as event 21 was missing from the folder.** ***(See Footnote #2)***

Discrete — **13. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.**[3]

**14. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**15. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a "horrible" comment about the complainant's medical condition.**

**16. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

[3] Events 13, 21, 23 and 26 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**17. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**18. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

new — **19. On June 10, 2012, Director Kerrie Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated.** ***(See Footnote #2)***

**20. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

Discrete → **21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

new ← **22. In June 2012, although the complainant did not request an accommodation in 2010, BW stated in an e-mail that in 2010, she withdrew her request for an accommodation.** ***(See Footnote #2)***

Discrete ← **23. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**24. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**25. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

Discrete New — **26. On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.** ***(See Footnotes 2 and 3)***

5. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, to state your disagreement. If you submit a written statement, it will be included as part of the official record in your complaint file. If you do not contact this office within **7 calendar days**, it will be assumed that the claims are correctly stated.

6. The amended claims will be assigned to the Investigator who was previously assigned to investigate the earlier complaints. The investigator will contact you directly

in order to obtain information or evidence you may wish to offer. You will be provided a copy of the investigative file upon completion. At that time, you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

7. As a result of this notification of an amendment to your complaint, the time frame for completion of the investigation is adjusted. **The agency must complete its investigation within the earlier of 180 calendar days after the last amendment to the complaint or 360 calendar days after the filing of the original complaint.** ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek a mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a FAD from OEDCA.

8. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM Case Manager listed below or the ADR Program Manager at (202) 461-0280.

9. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at (386) 487-1830 or (386) 487-1827.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosure: Hearing Request Form

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

# HEARING REQUEST FORM

**EEOC Hearings Unit**
**Equal Employment Opportunity Commission**
**Miami District Office**
**Miami Tower, Suite 1500**
**100 SE 2nd Street**
**Miami, FL 33131**

Dear Sir/Madam:

I am requesting the appointment of an EEOC Administrative Judge pursuant to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint; or I have received a notice from the agency that I have 30 days to elect a hearing or a final agency decision.

My name: Aileen Mullin

Agency Name & Address: Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Representative's Name ____________________
Representative's Title ____________________
Representative's Address ____________________
Representative's Phone Number ____________________

Agency Case No: 200I-0317-2012103413
Date Filed: September 18, 2012

In accordance with section 1614.108(g), I hereby certify that I have sent a copy of this request for a hearing to the following person at the agency:

Name: Winston Johnson, Regional EEO Officer

Address: Department of Veterans Affairs
Office of Resolution Management
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

Sincerely,

____________________ ____________________
(Signature of Complainant/Appellant) (Date)

**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

March 14, 2013

In reply refer to: 08J

VIA: E-mail

Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Amendment of EEO Complaint of Aileen Mullin, 2001-0317-2012103413, Filed on September 18, 2012**

1. This is to inform you that the discrimination complaint of Aileen Mullin, an employee of the Veterans Service Center, was recently amended. Enclosed is a copy of the partial acceptance letter that was sent to the complainant.

2. All documents and records, including the Official Personnel Folder related to this complaint, must be maintained at the facility and made available at the time of the investigation.

3. Advanced preparation for the investigation is to begin as soon as possible. This preparation includes securing all documents (appropriately redacted)[1] identified in the attachment to this letter. We require that the requested information be provided to our office within **10 calendar days of your receipt of this letter** and addressed to the attention of:

**Department of Veterans Affairs**
**Office of Resolution Management (CID – 08J)**
**ATTN: Patti Davenport**
**2200 Fort Roots Drive**
**Bldg. 101 – Rm. 128**
**North Little Rock, AR 72114**

If any of the requested documents or information does not exist or is not maintained by your facility, please have an appropriate management official provide a signed and dated statement identifying the information and explaining why it cannot be provided.

4. The protection of the privacy of veterans, their dependents and beneficiaries, as well as the privacy of all employees and contractors of VA, and other individuals for whom personal records are created and maintained in accordance with Federal law is a critical requirement. As such, documents provided to us in response to our requests for documents or information

---

[1] Any patient/veteran information must conform to VA's guidelines/criteria for release of information and have the appropriate documentation to verify authorization to release such information to ORM.

**must be redacted prior to their release to ORM** for VA sensitive information[2] and personally identifiable information (PII). Specific examples of information that should be redacted/sanitized before their release to ORM include:

a. Social security numbers

b. Names of veterans, their dependents and/or beneficiaries

c. Medical/diagnostic and/or veteran claim information related to specific veterans, their dependents and/or beneficiaries

d. Dates of birth (the exception to this are for cases that allege age based discrimination).

e. Complainant's medical information, unless this information is accompanied with a release of information signed by the complainant.

5. If an additional request is necessary, it will be prepared by the investigator assigned to this complaint. Requests will be documented in the investigative file along with your facility's response, or lack thereof. **Failure to submit the requested documents may result in an adverse inference/sanction by the VA Office of Employment Discrimination Complaint Adjudication or the Equal Employment Opportunity Commission.**

6. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint, please contact Dessa Johnson, ORM Case Manager, at (386) 487-1830 or (386) 487-1827, or the ADR Program Manager at (202) 501-2800.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosures: Amendment Letter or March 14, 2013
Document List

Cc w/enclosures via e-mail: Bettie Bookhart, EEO Program Manager

2 VA sensitive information as defined by Public Law 109-461, is all Departmental data, on any storage media or in any form or format, which requires protection due to the risk of harm that could result from inadvertent or deliberate disclosure, alteration, or destruction of the information. The term includes information whose improper use or disclosure could adversely affect the ability of an agency to accomplish its mission, proprietary information, records about individuals requiring protection under various confidentiality provisions such as the Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).

**REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS**

COMPLAINANT'S NAME: AILEEN MULLIN
CASE NUMBER: 2001-0317-2012103413
DATE FILED: SEPTEMBER 18, 2012

INSTRUCTIONS: Please provide documents checked (√) below. This information is due in the ORM Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (√) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| ☐ RACE | ☐ COLOR | ☐ AGE |
| ☐ SEX | ☐ NATIONAL ORIGIN | √ DISABILITY |
| ☐ RELIGION | √ REPRISAL | |

**HARASSMENT**

√. Breakdown of the organizational unit[1] of the position to which the complainant was assigned as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s) as checked above for all employees and supervisors.

√ Documentation of the events 2, 3, 5, 6, 9, 10, 12, 19, and 22 under the accepted claim of hostile work environment harassment as described in the enclosed amendment letter.

**Please provide the following information for event 26:**

√ Appropriate data and documents for the specific action(s) in question. Refer to the claim and evidence described in the attached amendment letter.

√ Medical documentation concerning physical or mental impairment (for disability accommodation only) from VA or complainant's healthcare provider in the facility's possession.

√ Documentation concerning accommodation requested.

√ Documentation concerning non-duty or light duty status, including job or position description or statement of duties (for disability accommodation only).

√ Documentation concerning accommodation offer(s) of reassignment.

[1] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

✓ Documentation concerning non-reassignment offers of accommodation.

✓ Position description or functional statement for the complainant's assigned position.

✓ Complainant's performance plan effective during the period of impairment.

✓ Complainant's two most recent performance evaluations.

✓ Documentation concerning undue hardship by facility, if accommodation was not approved.

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg FL 33716

In reply refer to: 08J

October 18, 2012

VIA: Certified Mail

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Notice of Partial Acceptance of your EEO Complaint No. 2001-0317-2012103413, filed on September 18, 2012, against officials of the VA Regional Office in St. Petersburg, FL**

1. On June 5, 2012, you initiated contact with an EEO counselor. Counseling concluded on August 30, 2012, when you were mailed the *Notice of Right to File a Discrimination Complaint*, which you received on September 4, 2012. On September 18, 2012, you filed a formal complaint of discrimination, VA Form 4939.

2. During the EEO counseling period you raised a claim of hostile work environment that consisted of the following events and indicated the events were based on disability: on May 3, 2012, you were informed that your request for advanced sick leave was denied; on May 3, 2012, you were informed that there were problems with your request of March 2012 for leave under the Family Medical Leave Act (FMLA); on May 3, 2012, you informed that Human Resources Manager Bonnie Wax (BW) made a horrible comment about your medical condition and; on May 31, 2012, HR failed to provide your Union representative with a complete record of documents that were needed to assist you with your reasonable accommodation request and the response to the information provided was delayed.

3. In the attachment to the formal complaint, you raised 12 new allegations that were not raised during the counseling period. You also indicated reprisal for prior EEO activity played a role in the alleged discrimination. Therefore, reprisal will be listed as a basis for discrimination.

The Equal Employment Opportunity Commission (EEOC) regulation 29 CFR § 1614.107(a) (2) in part, specifically requires dismissal of a claim that raises a matter that has not been brought to the attention of a counselor and is not like or related to a matter that has been brought to the attention of a counselor. The requirements for deciding if a claim is considered like or related to the original complaint are 1) do the new claims add to or clarify the original complaint and 2) could the new claims have reasonably been expected to have grown out of the initial complaint that was raised during counseling. We have determined that the new allegations are like or related and are inextricably intertwined with the events identified in the original complaint. As a result, these new allegations will be added to the instant complaint and analyzed for acceptability purposes.

4. Your complaint of discrimination raises the following claim:

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal[1] as evidenced by the following events:**

**1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.[2]**

**2. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her work site.**

**3. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems forced her to leave work twice since being reassigned to a different work area.**

**4. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.**

**5. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.**

**6. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied.[3]**

**7. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).**

**8. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a "horrible" comment about the complainant's medical condition.**

**9. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to**

[1] Reprisal as a basis for discrimination was raised in the formal complaint.

[2] Event 1 constitutes a discrete act that was not raised within 45 days of occurrence and is therefore **DISMISSED** as an independently actionable claim, pursuant to 29 C.F.R. § 1614.107(a) (2) for failing to comply with the regulatory time limits. This event is, however, determined to be sufficiently related to the overall pattern of harassment as it represent an action taken against the complainant and will be included for consideration in the analysis of the harassment claim.

[3] Events 6, 13 and 14 constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. These events are also sufficiently related to the overall harassment claim as they represent three additional actions taken against the complainant and will also be included for consideration in the analysis of the harassment claim.

**assist the complainant with her reasonable accommodation request and the response to the information request was delayed.**

**10. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.**

**11. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.**

**12. From June 14, 2012 - June 29, 2012, the complainant's request for leave under the leave transfer was delayed.**

**13. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not processed.** ***(See Footnote #3)***

**14. On August 16, 2012, the complainant's request for the leave under the leave transfer program was not processed.** ***(See Footnote #3)***

**15. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.**

**16. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.**

5. In assessing a hostile environment claim, the totality of the circumstances must be examined, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonable interferes with the employee's work performance. A hostile environment claim generally requires a showing of a pattern of denigrating conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment. In determining whether harassment is sufficiently severe or pervasive to create a claim of hostile work environment, the harasser's conduct is evaluated from the objective standpoint of a reasonable person. An objectively hostile or abusive work environment is created only when a reasonable person would find it hostile or abusive.

We have determined your claim of harassment passed the severe or pervasive requirement for further processing. You identified 16 events that occurred over a 12-month period; which demonstrate an increase in frequency and severity. Therefore, you have stated an actionable claim of hostile work environment harassment.

6. As outlined in paragraph 4, the independently actionable discrete acts described under events **6, 13 and 14 and the overall harassment claim** are hereby **ACCEPTED**

for investigation. There is no immediate right to appeal the dismissed portion of your complaint. You will have the right to appeal the partial dismissal once final action is taken on the remainder of the complaint.

7. If you believe that the accepted claims are improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, stating your disagreement. We will include your statement in the complaint file. If you do not contact this office within **7 calendar days**, we will assume that the claims are correctly stated.

8. We will assign the accepted claims to an impartial investigator under the supervision of the Office of Resolution Management (ORM). The investigator will contact you directly in order to obtain information or evidence you may wish to offer. The investigator is only authorized to investigate the claim specified.

9. You have additional rights that are fully explained in the enclosures to this letter.

10. **Failure to keep this office advised of any change of address could lead to dismissal of your complaint.** You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you. If you advise us of representation, we will mail all subsequent complaint-related correspondence to your representative, with copies to you, unless you advise us, in writing, that you are no longer represented by that individual.

11. Our fax number is (386) 487-1874. If you have any questions please contact Dessa Johnson, EEO Case Manager, at **(386) 487-1830 or (386) 487-1827.**

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosures: Complainant Rights
Request for Hearing Form

cc: Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Notice of Partial Acceptance
Aileen Mullin
2001-0317-2012103413

### Complainant Rights

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

#### Requesting a Hearing

In order to request a hearing, you must meet the following criteria:

- You have received your completed investigative file **-OR-**
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, complete the enclosed "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| **Equal Employment Opportunity Commission**<br>**Miami District Office**<br>**Miami Tower, Suite 1500**<br>**100 SE 2nd Street**<br>**Miami, FL 33131** | **Department of Veterans Affairs**<br>**Office of Resolution Management**<br>**140 Fountain Parkway, Suite 620**<br>**St. Petersburg, FL 33716** |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

#### Requesting a Final Agency Decision

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>140 Fountain Parkway, Suite 620, St. Petersburg, FL 33716 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

#### Requesting Civil Action

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name Eric K. Shinseki, Secretary of Veterans Affairs as the defendant.

#### Requesting ADR

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at (202) 501-2800.

# HEARING REQUEST FORM

**EEOC Hearings Unit**
**Equal Employment Opportunity Commission**
**Miami District Office**
**Miami Tower, Suite 1500**
**100 SE 2nd Street**
**Miami, FL 33131**

Dear Sir/Madam:

I am requesting the appointment of an EEOC Administrative Judge pursuant to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint; or I have received a notice from the agency that I have 30 days to elect a hearing or a final agency decision.

My name: Aileen Mullin

Agency Name & Address: Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

Representative's Name ______________________
Representative's Title ______________________
Representative's Address ______________________
Representative's Phone Number ______________________

Agency Case No: 2001-0317-2012103413
Date Filed: September 18, 2012

In accordance with section 1614.108(g), I hereby certify that I have sent a copy of this request for a hearing to the following person at the agency:

Name: Winston Johnson, Regional EEO Officer

Address: Department of Veterans Affairs
Office of Resolution Management
Southeastern Operations
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

Sincerely,

______________________
(Signature of Complainant/Appellant)

______________________
(Date)

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

October 18, 2012

In reply refer to: 08J

VIA: E-mail

Kerrie L. Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Partial Acceptance of EEO Complaint of Aileen Mullin, 200I-0317-2012103413, Filed on September 18, 2012**

1. This is to inform you that Aileen Mullin, an employee of the Veterans Service Center, filed a complaint of discrimination on September 18, 2012. Enclosed is a copy of the partial acceptance letter that was sent to the complainant.

2. All documents and records, including the Official Personnel Folder related to this complaint, must be maintained at the facility and made available at the time of the investigation.

3. Advanced preparation for the investigation is to begin as soon as possible. This preparation includes securing all documents (appropriately redacted)[1] identified in the attachment to this letter. We require that the requested information be provided to our office within **10 calendar days of your receipt of this letter** and addressed to the attention of:

**Department of Veterans Affairs**
**Office of Resolution Management (CID – 08J)**
**ATTN: Patti Davenport**
**2200 Fort Roots Drive**
**Bldg. 101 – Rm. 128**
**North Little Rock, AR 72114**

If any of the requested documents or information does not exist or is not maintained by your facility, please have an appropriate management official provide a signed and dated statement identifying the information and explaining why it cannot be provided.

4. The protection of the privacy of veterans, their dependents and beneficiaries, as well as the privacy of all employees and contractors of VA, and other individuals for whom personal records are created and maintained in accordance with Federal law is a critical requirement. As such, documents provided to us in response to our requests for documents or information -

[1] Any patient/veteran information must conform to VA's guidelines/criteria for release of information and have the appropriate documentation to verify authorization to release such information to ORM.

**must be redacted prior to their release to ORM** for VA sensitive information[2] and personally identifiable information (PII). Specific examples of information that should be redacted/sanitized before their release to ORM include:

a. Social security numbers
b. Names of veterans, their dependents and/or beneficiaries
c. Medical/diagnostic and/or veteran claim information related to specific veterans, their dependents and/or beneficiaries
d. Dates of birth (the exception to this are for cases that allege age based discrimination).
e. Complainant's medical information, unless this information is accompanied with a release of information signed by the complainant.

5. If an additional request is necessary, it will be prepared by the investigator assigned to this complaint. Requests will be documented in the investigative file along with your facility's response, or lack thereof. **Failure to submit the requested documents may result in an adverse inference/sanction by the VA Office of Employment Discrimination Complaint Adjudication or the Equal Employment Opportunity Commission.**

6. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in this complaint, please contact Dessa Johnson, ORM Case Manager, at (386) 487-1830 or (386) 487-1827, or the ADR Program Manager at (202) 501-2800.

Sincerely yours,

**Winston Johnson**
Regional EEO Officer
Southeastern Operations

Enclosures: Partial Acceptance Letter
Document Lists

Cc w/enclosures via e-mail: Bettie Bookhart, EEO Program Manager

---

2 VA sensitive information as defined by Public Law 109-461, is all Departmental data, on any storage media or in any form or format, which requires protection due to the risk of harm that could result from inadvertent or deliberate disclosure, alteration, or destruction of the information. The term includes information whose improper use or disclosure could adversely affect the ability of an agency to accomplish its mission, proprietary information, records about individuals requiring protection under various confidentiality provisions such as the Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).

## REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS

**COMPLAINANT'S NAME:** AILEEN MULLIN
**CASE NUMBER:** 2001-0317-2012103413
**DATE FILED:** SEPTEMBER 18, 2012

**INSTRUCTIONS:** Please provide documents checked (✓) below. This information is due in the ORM Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (✓) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| ☐ RACE | ☐ COLOR | ☐ AGE |
| ☐ SEX | ☐ NATIONAL ORIGIN | ✓ DISABILITY |
| ☐ RELIGION | ✓ REPRISAL | |

### HARASSMENT (INCLUDING TIME & ATTENDANCE)

✓ Organizational chart for the organizational unit in which the complainant was assigned before and after the action in question.

✓ Statistical breakdown of the organizational unit[1] involved in the action in question as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s) as checked above.

✓ With regard to events 6, 13 and 14, summary data on leave use by employee's in complainant's section who are subordinates of the Responding Management Official (RMO) going back two years from the date of the action as follows:

✓ For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) affected, action taken based on leave use, date of action, and name position, and EEO category(s) of the agency official(s) who initiated the action.

✓ For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) who requested leave, if the leave was granted or denied, reason for leave denial and name, position, and EEO category(s) of the agency official(s) effecting the decision. Complainant's leave request(s) as well as leave requests for comparable employees.

✓ Documentation of any counseling provided concerning complainant's leave usage or leave usage pattern for complainant and subordinate employees comparable to complainant.

✓ Complainant's time and attendance or leave records for the two-year period prior to the action in question.

✓ Pertinent regulatory guidelines and local policies and procedures concerning leave administration in effect at the time of the action in question.

✓ Pertinent article(s) of the negotiated union agreement, if applicable.

✓ Relevant documentation concerning events 1 – 5, 7 – 12, 15 and 16.

[1] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division in the Labor Relations Section, the organizational unit is the Labor Relations Section.

Aileen Mullin
October 31, 2012

Amended *Notice of Partial Acceptance*
2001-0317-2012103413

1. Between September 2011 and March 2012 I was forced to either leave before the end of my tour, or for a period during the middle of my tour, at least 25 days, because of respiratory emergencies related to workplace. On two occasion VA police had to assist me out of the building.

5. On March 20, 2012, I was given another ineffective accommodation which authorized me to work home three days a week but did not address avoiding environmental triggers on the two days I am required to report to the office. I suffer severe, moderate and mild respiratory reactions which force me to leave the building.

6. On May 3, 2012, the day prior to breast cancer surgery, I was informed that my request for advanced sick leave had not been granted.

7. On May 3, 3012 I was informed that Human Resources Manager, Bonnie Wax (BW), told a twisted, horrible "story" about my medical conditions, and she did so to someone she was not authorized to release information to.

9. On May 28, 2012 HR officials failed to provide my Union Representative with a complete record of information that was needed to assist me with my Workers Compensation. The response for the information was delayed without explanation and the file was incomplete.

10. On June 5, 2012, while I was on sick leave, battling breast cancer, BW sent me a disturbing, lengthy e-mail. BW knew I was on sick leave, and should have been communicating with my Union Representative directly.

11. On June 10, 2012, during a meeting, Regional Director Kerry Witt (KW) stated BW felt that she was being targeted by the Union; The she (KW) knew about, and approved BW's e-mail, of June 5, 2012; KW stated she could not understand why I had a problem with it.* During the meeting I shared with KW my desire to work intermittently while receiving chemotherapy, but would require assistance (accommodations) to make it possible. KW said that she did not support granting accommodations.

*NOTE: On May 10, 2012, while on Sick Leave after 1st cancer surgery, I met with KW and reported the challenges and upset Bonnie Wax and Human Resources were causing me: Problems **directly related to my disabilities**. I also requested her assistance in resolving the problems with FMLA, Leave Donation and Advanced Leave requests. I requested that she intervene on my behalf by 'stopping' Bonnie Wax.

2001-0317-2012103413
Aileen Mullin
VARO – St Petersburg
St Petersburg, FL

Package received November 26, 2012

Please contact Patti Davenport at 501-257-1588 or via email when investigation has been assigned and documents will be forwarded to the Investigator.

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

February 4, 2013

John Henley, EEO Investigator
Office Resolution Management 08J
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

COPY

SUBJECT: Assignment of Investigation

**THIS ASSIGNMENT OF INVESTIGATION IS TO BEGIN ON FEBRUARY 4, 2013**

1. You are hereby assigned to investigate the following discrimination complaint:

**Aileen Mullin – 200I-0317-2012103413 – St. Petersburg VARO**

2. This letter will be your authorization to: (1) investigate the accepted claim(s) in this complaint; (2) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (3) require employees of the agency having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence. Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

3. Advanced preparation and investigative work are to begin immediately. A copy of the list of documents requested from the facility is **in CATS.** The resulting report of investigation is to be completed and submitted within 60 days of receipt of this notice.

4. You are authorized to use **Free State** for court reporting/transcription services.

5. For questions or assistance, please call me at 386-487-1830.

Sincerely,

Odessa Johnson
Case Manager

**Report should be submitted by: April 5, 2013**

Enclosure: Copy of Assignment Letter to Complainant
Copy of Assignment Letter to Facility Director

A-7

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

February 4, 2013

VIA: USPS

Aileen Mullin
745 Alamanda Way South
St. Petersburg, FL 33705

**SUBJECT: Assignment of an EEO Investigator to Investigate Your Complaint of Discrimination – Case No. 2001-0317-2012103413, Filed on September 18, 2012**

1. This is to inform you that John Henley of the Office of Resolution Management (ORM) is being assigned to investigate this complaint. This letter serves to authorize the Investigator to (a) investigate the accepted claims of this complaint; (b) require all employees of the agency to cooperate with the investigation; and (c) require employees having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence. Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

2. The Investigator will contact you in the near future to inform you of when the investigation will begin. Should you have any questions, please contact **John Henley** at 727-540-3966.

3. When the investigation is complete you will receive a copy of the investigation file as well as a digitized copy of the file on a CD. If you have opted for Electronic Delivery of Documents, you will receive only a CD. Should you wish to also receive a printed copy of the file, please inform the investigator in writing. The CD that you receive will be fully text searchable and can be bookmarked. It is an identical copy of the CD that is provided to EEOC should you request a Hearing. The password for the CD is **Va$eo115**.

Sincerely,

Winston Johnson
Regional EEO Officer
Southeastern Operations

/MCM

Enclosure: PA/HIPAA Notice

CONFIDENTIAL DOCUMENT - GENERATED IN THE ORM COMPLAINTS AUTOMATED TRACKING SYSTEM (CATS)

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

In reply refer to: 08J

February 4, 2013

VIA: E-mail

Kerrie Witty, Director (317/00)
Department of Veterans Affairs
VA Regional Office
PO Box 1437
St. Petersburg, FL 33731

**SUBJECT: Notice of Assignment of an EEO Investigator for the Complaint of Aileen Mullin, Case No. 200I-0317-2012103413, Filed on September 18, 2012**

1. This is to inform you that John Henley of the Office of Resolution Management (ORM) will be conducting the EEO Investigation concerning the discrimination complaint of Aileen **Mullin.**

2. This Investigator is authorized to: (a) investigate all accepted claims of this complaint; (b) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (c) require employees of the agency having any knowledge of the matters accepted for investigation to furnish testimony without a pledge of confidence.

3. Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

4. Advance preparation for the investigation will begin as soon as possible. This preparation includes securing all documents identified in the attachment to the original acceptance letter. The investigator will determine if supplemental documentation is needed. Failure to submit documents may result in an adverse inference/sanction by the Equal Employment Opportunity Commission. Documentation should be sent to: Department of Veterans Affairs, Office of Resolution Management, John Henley, 140 Fountain Parkway, Suite 620, St. Petersburg, FL 33716.

5. The Investigator will be contacting your EEO liaison to arrange for logistical support and assistance. You will be provided a copy of the investigative summary at the end of the investigation.

6. If you have any questions, please contact John Henley at **727-540-3966**.

Sincerely,

Winston Johnson
Regional EEO Officer
Southeastern Operations

/MCM

cc: Bettie Bookhart, EEO Program Manager

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: Email

In Reply Refer To:

February 5, 2013

Bettie Bookhart, EEO Manager
VA Regional Office
P. O. Box 1437
St. Petersburg, FL 22731

**Re: Investigation of EEO Complaint filed by Aileen Mullin ; ORM Case No. 200I-0317-2012103413**,

Dear Bettie Bookhart,

I will be conducting an investigation into the claim filed by Aileen Mullin.

The accepted claim(s) is as follows: See acceptance letter

1. The RMOs identified in the claim are Bonnie Wax, Kerrie Witty, Michael Palmer, Taminque Clarke, I will contact these individuals at their workplace to arrange interviews.

2. I will need the services of a Subject Matter Expert with knowledge of the facility's promotion and selection process. Please provide me with the contact information for this individual as soon as possible

3. I have received the documents requested and I thank you for your prompt response.

4. If you have any questions or need assistance, please call me at **727-540-3966.**

5. Thank you for your assistance with regard to the investigation of this claim.

Sincerely,

John Henley
EEO Investigator

A-8

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: E-MAIL

July 5, 2013

Aileen Mullin
745 Alamanda Way South
St. Petersburg FL 33705

**Re: Investigation of EEO Complaint filed by Aileen Mullin ; ORM Case No. 200I-0317-2012103413,**

Dear Ms. Mullin,

I have been assigned by the Office of Resolution Management to investigate the complaint of discrimination filed against the Department of Veterans Affairs. I will be conducting a desk investigation. I have tentatively scheduled your testimony for **Monday, July 8, 2013 at 1:00 p.m.**. I will call you at **954-263-1510**Error! Bookmark not defined.Error! Bookmark not defined. or provide me with another number. If this time and date is unacceptable to you, please contact me as soon as possible so that we can discuss an alternative. My telephone number is **727-540-3966**. The call in number is **1-800-767-1750 code: 93495#.**

You have the right to have a representative of your choice at all meetings with the investigator, within certain limits. First, your representative may not occupy a position with VA, such that his or her role as your advocate would present a conflict of interest. Generally, this precludes EEO program officials, employees of Human Resource Management Service (HRMS) and VA managers and supervisors from being your representative. Second, VA is not required to provide premium pay or travel expenses to facilitate your choice of a representative. Thus, if your representative works at a VA facility other than the one where your complaint arose, he or she will not be paid travel expenses in order to be present at meetings between you and the Investigator.

Please note that failure to cooperate with the investigation may result in the dismissal of your claim.

Your complaint raises the following claims:

**See acceptance of as amended dated April 1, 2013**

A-9

If you have the names of witnesses which direct knowledge of the claim that you wish me to interview, please forward their names to me as soon as possible. My telephone number is identified above and my email address is john.henley@orm.va.gov

The Agency is encouraging the use of Alternative Dispute Resolution (ADR) as an avenue for addressing issues that arise in the work area. If you are interested in pursuing ADR, please contact me as soon as possible and I will notify the Agency of your interest.

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Attachments: Notice and Guidelines

*OMB Number: 2900-0260*
*Estimated Burden: 2 minutes*

**Department of Veterans Affairs**

# REQUEST FOR AND AUTHORIZATION TO RELEASE MEDICAL RECORDS OR HEALTH INFORMATION

**Privacy Act and Paperwork Reduction Act Information:** The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164, 5 U.S.C. 552a, and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including Social Security Number (SSN) (the SSN will be used to locate records for release) is not furnished completely and accurately, Department of Veterans Affairs will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization. VA may disclose the information that you put on the form as permitted by law. VA may make a "routine use" disclosure of the information as outlined in the Privacy Act systems of records notices identified as 24VA19 "Patient Medical Record - VA" and in accordance with the VHA Notice of Privacy Practices. You do not have to provide the information to VA, but if you don't, VA will be unable to process your request and serve your medical needs. Failure to furnish the information will not have any affect on any other benefits to which you may be entitled. If you provide VA your Social Security Number, VA will use it to administer your VA benefits. VA may also use this information to identify veterans and persons claiming or receiving VA benefits and their records, and for other purposes authorized or required by law. The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB number. We anticipate that the time expended by all individuals who must complete this form will average 2 minutes. This includes the time it will take to read instructions, gather the necessary facts and fill out the form.

**ENTER BELOW THE PATIENT'S NAME AND SOCIAL SECURITY NUMBER IF THE PATIENT DATA CARD IMPRINT IS NOT USED.**

TO: DEPARTMENT OF VETERANS AFFAIRS (Print or type name and address of health care facility)

PATIENT NAME (Last, First, Middle Initial)
Aileen Mullin

SOCIAL SECURITY NUMBER
N/A

NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED
John Henley, EEO Investigator, Southeastern Operations, Office of Resolution Management
140 Fountain Parkway, Suite 620

**VETERAN'S REQUEST:** I request and authorize Department of Veterans Affairs to release the information specified below to the organization, or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ DRUG ABUSE ☐ ALCOHOLISM OR ALCOHOL ABUSE ☐ TESTING FOR OR INFECTION WITH HUMAN IMMUNODEFICIENCY VIRUS (HIV) ☐ SICKLE CELL ANEMIA

INFORMATION REQUESTED (Check applicable box(es) and state the extent or nature of the information to be disclosed, giving the dates or approximate dates covered by each)

☐ COPY OF HOSPITAL SUMMARY ☐ COPY OF OUTPATIENT TREATMENT NOTE(S) ☒ OTHER (Specify)

Medical Documentation to support disability for EEO investigation

PURPOSE(S) OR NEED FOR WHICH THE INFORMATION IS TO BE USED BY INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED
To support disability for EEO investigation

**NOTE: ADDITIONAL ITEMS OF INFORMATION DESIRED MAY BE LISTED ON THE BACK OF THIS FORM**

**AUTHORIZATION:** I certify that this request has been made freely, voluntarily and without coercion and that the information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization, in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation is effective upon receipt by the Release of Information Unit at the facility housing the records. Redisclosure of my medical records by those receiving the above authorized information may be accomplished without my further written authorization and may no longer be protected. Without my express revocation, the authorization will automatically expire: (1) upon satisfaction of the need for disclosure; (2) on ______ (date supplied by patient); (3) under the following condition(s):

**I understand that the VA health care practitioner's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.**

DATE

SIGNATURE OF PATIENT OR PERSON AUTHORIZED TO SIGN FOR PATIENT (Attach authority to sign, e.g., POA)

**FOR VA USE ONLY**

IMPRINT PATIENT DATA CARD (or enter Name, Address, Social Security Number)

TYPE AND EXTENT OF MATERIAL RELEASED

DATE RELEASED

RELEASED BY

VA FORM MAY 2005 **10-5345**

USE EXISTING STOCK OF VA FORM 10-5345, DATED NOV 2004.

# VA OFFICE OF RESOLUTION MANAGEMENT

## NOTICE TO COMPLAINANTS

Your EEO complaint of discrimination has been assigned to an Investigator for processing. In connection with the investigation, which will soon commence, you have certain rights, responsibilities and opportunities. We hope that by communicating them to you now you will better understand what you must do in connection with the investigation of your EEO complaint.

**The Investigator may use any one of several methods of investigations to include desk (telephonic interviews), fact-finding conferences, written affidavits, or on-site investigations. The method of investigation and number of witnesses to be interviewed is at the discretion of the Investigator.**

You have the right to have a representative of your choice at all meetings with the Investigator, within certain limits. First, your representative may not occupy a position with VA, such that his or her role as your advocate would present a conflict of interest. Generally, this precludes EEO program officials, employees of Human Resource Management Service (HRMS) and VA managers and supervisors from being your representative. Second, VA is not required to provide premium pay or travel expenses to facilitate your choice of a representative. Thus, if your representative works at a VA facility other than the one where your complaint arose, he or she will not be paid travel expenses in order to be present at meetings between you and the Investigator.

Any amendments to your claim of investigation must be directed, in writing, to the Regional EEO Officer at: Office of Resolution Management, Southeastern Operations 140 Fountain Parkway, Suite 620, St. Petersburg, FL 33716, or by facsimile to 727-540-3976.

It is your responsibility to cooperate with the Investigator assigned to your complaint. You are required to give testimony, which will be obtained by transcription of a tape recording or by a court reporter. Finally, you are also required to assist the Investigator in scheduling his or her interview with you without unnecessary delay. Postponements may be granted by the Investigator, but only for good cause, such as death in the

family, military leave, or other emergencies beyond your control. The Investigator may not grant postponements of more than 14 calendar days, however, without the approval of this Office. **Please note that failure to cooperate with the investigation may result in the dismissal of your claim.**

If you enter into an Alternative Dispute Resolution (ADR) process after a formal complaint is filed, the time period for processing the complaint may be extended, by agreement, for not more than 90 days. If the dispute is not resolved through ADR, the complaint must be processed within the extended time period. You have a right to representation during any ADR process.

There are also several legal burdens imposed upon you that you must meet in order to prevail in your complaint. The Investigator has been trained to look for evidence which satisfies those burdens, but you will be called upon to assist him or her in this effort.

If your complaint alleges that you have been treated differently because of your protected class, (i.e. race, color, religion, sex, national origin, age, or disabling condition) your initial burden is to allege such facts, which, if true, would raise an inference that discrimination had occurred. To do this, you must be able to identify at least one individual who is not of your protected class in circumstances similar to those in your claim. Should you allege reprisal for prior EEO activity, you must demonstrate you have engaged in protected EEO activity, you must demonstrate that the manager(s) responsible for the events in dispute knew of your prior EEO activity, you were subjected to unfavorable treatment and that it is logical to infer a cause and effect relationship between your prior EEO activity and the subsequent actions.

Should you meet this burden, management may be required to give a detailed explanation for its actions. Thereafter, the Investigator will attempt to discover whether there is any evidence to establish that management's explanations are unworthy of belief.

If your complaint alleges that management failed to accommodate a known disabling condition, your initial burden is to demonstrate that you have a substantial limitation to a major life activity (as opposed to a temporary illness or injury), but, with reasonable accommodation, you can still perform the essential duties of your position without endangering yourself or others. If your complaint alleges that management failed to accommodate your religious beliefs, your initial burden is to demonstrate that you had a religious belief or practice, which required some adjustment in your duties or your schedule at work.

If you meet the initial burden, management will be called upon to demonstrate that granting whatever accommodation you requested would impose an undue hardship on VA. In religion complaints, undue hardship is anything that would impose more than a de-minimus cost on the service or department in which you work. If management demonstrates that your requested accommodation would impose undue hardship, the

Investigator will attempt to obtain evidence to the contrary. If this is done, you will prevail in your complaint. If not, management will prevail.

The above explanations are provided so that you will know what you will be called upon to do, and that you will be better able to assess the desirability of informally resolving your complaint prior to the completion of the investigation. A similar advisement is being provided to management, for the same reasons. The Investigator is available to assist you and management in resolving your complaint. If you are interested in obtaining this kind of assistance, please contact the Investigator.

Attention: John Henley
Fax : 727 540 3976
From: Aileen Mullin
Phone: 954-263-1510

## ELECTION TO RECEIVE EEO CORRESPONDENCE VIA EMAIL

This process utilizes email to send correspondence including documents and notices that ORM would normally mail to your address of record. Because we are utilizing email, you will receive the documents and notices quicker and securely. You can also take advantage of this process to return documents and correspondence to ORM via email.

I, Aileen Mullin elect to receive EEO correspondence via
(Print Name)

**Email sent to the following email address:** aemflorida@gmail.com

By electing to receive correspondence via email, I understand that the date the Office of Resolution Management (ORM) emails me correspondence will be considered the date of receipt for the purpose of calculating timeliness.

I understand that some documents may be too large to email and that ORM will physically mail any such correspondence to my address of record.

I understand that if I have designated a representative, he/she will automatically receive EEO correspondence from ORM via email. If my representative chooses not to participate in the email receipt of documents, he/she must notify ORM in writing.

**Representative's Name:**____________________
**(Print Name)**

**Email address of representative:** ____________________

**Complainant** [signature] 2/7/2013
**Signature** **Date**



02/08/2013 16:58 FAX 001

Attention: John Henley
Fax: 727-510-3976

ORM
FAIRNESS INTEGRITY TRUST

# Office of Resolution Management

*Department of Veterans Affairs*

Aileen Mullins

1. **EEOC regulations require that the formal investigation be completed within 180 days of the file date. The original file date of your complaint is** September 18, 2013.

2. AM **I voluntarily request an extension, that the period to investigate my complaint be extended by 30/60/90 days from the date identified below.**

3. **Purpose of extension:**

Illness, hospitalization, recovery and (additional)/(continuous) harrassment & abuse by Human Resources exhausted and overwhelmed me for the last month
The extension is requested to allow for time to supply Mr. Henley w/ all pertinent information & Ms Johnson

Aileen Mullins 3/1/13 [signature]

Complainant Date

Representative Date

Regional EEO Officer Date

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: Email

August 15, 2013

Bonnie Wax, HR Manager
Department of Veterans Affairs
Regional Office
P.O. Box 1437
St. Petersburg, FL 33731

**Re: Investigation of EEO Complaint filed by Aileen Mullin ; ORM Case No. 200I-0317-2012103413,**

Dear Bonnie Wax:

I have been assigned by the Office of Resolution Management to investigate this complaint of employment discrimination. You have been identified as a Responding Management Official (RMO) in the complaint. I have tentatively scheduled your testimony for **Tuesday, August 20, 2013 at 10:00 a.m.**. I will contact you directly at **727-319-7271**. If the time and date or contact information is unacceptable to you, please contact me immediately at **727-540-3966**.

You have the right to have a representative of your choice at all meetings with the Investigator, within certain limits. First, your representative may not occupy a position with VA, such that his or her role as your advocate would present a conflict of interest. Generally, this precludes EEO program officials, employees of Human Resource Management Service (HRMS) and VA managers and supervisors from being your representative. Second, VA is not required to provide premium pay or travel expenses to facilitate your choice of a representative. Thus, if your representative works at a VA facility other than the one where your complaint arose, he or she will not be paid travel expenses in order to be present at meetings between you and the Investigator.

The claims accepted for investigation is as follows:

**See amended acceptance letter for claims and events**

If you have the names of witnesses which direct knowledge of the claim that you wish me to interview, please forward their names to me as soon as possible.

A-10

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Attachment: Notice

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: EMAIL

August 15, 2013

Kerrie Witty, Director
Department of Veterans Affairs
VA Regional Office
P. O. Box 1437
St. Petersburg, FL 33731

**Re: Investigation of EEO Complaint filed September 18, 2012; ORM Case 200I-0317-2012103413**

Dear Kerrie Witty,

I have been assigned by the Office of Resolution Management to investigate this complaint of discrimination filed against the Department of Veterans Affairs. You have been identified as an employee involved in the complaint.

I have attached questions related to the claim that you are required to answer. You are required to provide a written response to all of the questions within ten (10) days of receipt of the questions. At that time, you may provide me with any supporting documentation you wish to be considered as an exhibit in the investigate file. Your responses provided to the questions will be made under penalty of perjury and will become and exhibit in the permanent investigative file for the complaint. The responses can be mailed to my attention at **See letterhead for address**, facsimiled to my attention at **727-540-3976** or can submitted through encrypted email. Regardless of the method used for returning the affidavit, **please place your initials, name, and date where requested on the affidavit on all pages of the affidavit**.

If you are aware of any witnesses with direct knowledge related to the claim(s) under investigation, please provide me with a list of those individuals immediately by calling me at **727-540-3966**, or by facsimile. Please include a brief explanation of the direct knowledge the witness possesses.

You are entitled to a representative to assist you in preparation of your affidavit. Please consult the attached Notice which explains your right to representation in detail.

The claim accepted for investigation is as follows:

**See claim in written affidavit**

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Encls: Notice to Responding Management Officials
Affidavit

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: EMAIL

August 15, 2013

Bettie Bookhart, EEO Program Manager
Department of Veterans Affairs
VA Regional Office
P. O. Box 1437
St. Petersburg, FL 33731

**Re: Investigation of EEO Complaint filed September 18, 2012; ORM Case 200I-0317-2012103413**

Dear Bettie Bookhart,

I have been assigned by the Office of Resolution Management to investigate this complaint of discrimination filed against the Department of Veterans Affairs. You have been identified as an employee involved in the complaint.

I have attached questions related to the claim that you are required to answer. You are required to provide a written response to all of the questions within five (5) days of receipt of the questions. At that time, you may provide me with any supporting documentation you wish to be considered as an exhibit in the investigate file. Your responses provided to the questions will be made under penalty of perjury and will become and exhibit in the permanent investigative file for the complaint. The responses can be mailed to my attention at **See letterhead for address**, facsimiled to my attention at **727-540-3976** or can submitted through encrypted email. Regardless of the method used for returning the affidavit, **please place your initials, name, and date where requested on the affidavit on all pages of the affidavit**.

If you are aware of any witnesses with direct knowledge related to the claim(s) under investigation, please provide me with a list of those individuals immediately by calling me at **727-540-3966**, or by facsimile. Please include a brief explanation of the direct knowledge the witness possesses.

You are entitled to a representative to assist you in preparation of your affidavit. Please consult the attached Notice which explains your right to representation in detail.

The claim accepted for investigation is as follows:

**See claim in written affidavit**

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Encls: Notice to Responding Management Officials
Affidavit

**Henley, John (ORM)**

| | |
|---|---|
| **To:** | Clarke, Tamanique, VBASPT |
| **Cc:** | Bookhart, Bettie, VBASPT |
| **Subject:** | EEO Investigation ICO Aileen Mullin Case No. 200I-0317-2012103413 |
| **Attachments:** | 200I-0317-2012103413 Letter to RMO Clark (Written Affidavit).doc; 200I-0317-2012103413RMO Notice.doc; Affidavit (RMO Clark).doc |

August 14, 2013

Fm: John Henley, EEO Investigator

To: Tamanique Clarke, HR Specialist

Sub: EEO Investigation

Good morning Ms. Clarke, you have been named as a Responding Management Official (RMO) in the subject complaint. Please see the attached documents for your review and/or action.

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: EMAIL

August 13, 2013

Tamanique Clarke
Department of Veterans Affairs
VA Regional Office
P. O. Box 1437
St. Petersburg, FL 33731

**Re: Investigation of EEO Complaint filed September 18, 2012; ORM Case 200I-0317-2012103413**

Dear Tamanique Clarke,

I have been assigned by the Office of Resolution Management to investigate this complaint of discrimination filed against the Department of Veterans Affairs. You have been identified as an employee involved in the complaint.

I have attached questions related to the claim that you are required to answer. You are required to provide a written response to all of the questions within five (5) days of receipt of the questions. At that time, you may provide me with any supporting documentation you wish to be considered as an exhibit in the investigate file. Your responses provided to the questions will be made under penalty of perjury and will become and exhibit in the permanent investigative file for the complaint. The responses can be mailed to my attention at **See letterhead for address**, facsimiled to my attention at **727-540-3976** or can submitted through encrypted email. Regardless of the method used for returning the affidavit, **please place your initials, name, and date where requested on the affidavit on all pages of the affidavit**.

If you are aware of any witnesses with direct knowledge related to the claim(s) under investigation, please provide me with a list of those individuals immediately by calling me at **727-540-3966**, or by facsimile. Please include a brief explanation of the direct knowledge the witness possesses.

You are entitled to a representative to assist you in preparation of your affidavit. Please consult the attached Notice which explains your right to representation in detail.

The claim accepted for investigation is as follows:

**See claim in written affidavit**

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Encls: Notice to Responding Management Officials
Affidavit

**Henley, John (ORM)**

| | |
|---|---|
| **To:** | Palmer, Michael, VBASPT |
| **Cc:** | Bookhart, Bettie, VBASPT |
| **Subject:** | EEO Investigation ICO Aileen Mullin Case No. 2001-0317-2012103413 |
| **Attachments:** | 2001-0317-2012103413 Letter to RMO Palmer (Written Affidavit).doc; 2001-0317-2012103413RMO Notice.doc; Affidavit (RMO Palmer).doc |

August 14, 2013

Fm: John Henley, EEO Program Manager

To: Michael Palmer

Sub: EEO Investigation

Good morning Mr. Palmer, you have been named as a Responding Management Official (RMO) in the subject complaint. Please see the attached documents for your review and/or action and return.

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Southeastern Operations**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

VIA: EMAIL

August 13, 2013

Michael Palmer
Department of Veterans Affairs
VA Regional Office
P. O. Box 1437
St. Petersburg, FL 33731

**Re: Investigation of EEO Complaint filed September 18, 2012; ORM Case 200I-0317-2012103413**

Dear Michael Palmer,

I have been assigned by the Office of Resolution Management to investigate this complaint of discrimination filed against the Department of Veterans Affairs. You have been identified as an employee involved in the complaint.

I have attached questions related to the claim that you are required to answer. You are required to provide a written response to all of the questions within five (5) days of receipt of the questions. At that time, you may provide me with any supporting documentation you wish to be considered as an exhibit in the investigate file. Your responses provided to the questions will be made under penalty of perjury and will become and exhibit in the permanent investigative file for the complaint. The responses can be mailed to my attention at **See letterhead for address**, facsimiled to my attention at **727-540-3976** or can submitted through encrypted email. Regardless of the method used for returning the affidavit, **please place your initials, name, and date where requested on the affidavit on all pages of the affidavit**.

If you are aware of any witnesses with direct knowledge related to the claim(s) under investigation, please provide me with a list of those individuals immediately by calling me at **727-540-3966**, or by facsimile. Please include a brief explanation of the direct knowledge the witness possesses.

You are entitled to a representative to assist you in preparation of your affidavit. Please consult the attached Notice which explains your right to representation in detail.

The claim accepted for investigation is as follows:

**See claim in written affidavit**

Thank you for your assistance in this matter.

Sincerely,

John Henley
EEO Investigator

Encls: Notice to Responding Management Officials
Affidavit

# VA OFFICE OF RESOLUTION MANAGEMENT

## NOTICE TO RESPONDING MANAGEMENT OFFICIALS

As you may already know, you have been identified as a Responding Management Official (RMO) in an EEO complaint. This means that the complainant has identified you as being responsible, in whole or in part, for a decision, which the complainant believes, is discriminatory because of his or her race, color, religion, sex, national origin, age, disability, or in reprisal for prior EEO activity. As an RMO, you have certain rights, responsibilities and opportunities, with respect to the EEO investigation that is about to begin. We hope that by communicating them to you now, you will better understand what you must do in connection with the investigation.

You have the right to be informed of all allegations of wrongdoing lodged against you, and the right to respond to each one. The Investigator will advise you of all of those allegations.

You have the right to be represented by an individual of your choice, within certain limits. VA will not provide a representative for you, but they will grant official time to any individual you choose who is also a VA employee. Your choice of VA employees is limited by conflict of interest considerations. This means that you may not choose someone whose regular duties conflict with the role of being your personal advocate. Generally, this precludes EEO program officials and employees of the Human Resource Management Service (HRMS) from being your representative. In addition, VA is not required to provide premium pay or travel expenses to facilitate your choice of a VA representative. Thus, if your representative works at another VA facility, he or she may not be paid travel expenses in order to be present at meetings between you and the Investigator.

If the complainant enters an Alternative Dispute Resolution (ADR) process after a formal complaint is filed, the time period for processing the complaint may be extended for not more than 90 days. If the dispute is not resolved through ADR, the complaint must be processed within the extended time period.

It is your responsibility to cooperate with the Investigator assigned to the complaint. You may be required to give testimony that will be transcribed from a tape recording or by a court reporter. You may be required to complete a written affidavit.

Postponements may be granted by the Investigator, but only for good cause shown, such as death in the family, military leave or other emergencies beyond your control. The Investigator may not grant postponements of more than 14 calendar

days without approval from this Office. **Please note that failure to cooperate with the investigation may result in an adverse inference against the agency.**

If the complainant alleges that you have treated him or her differently, because of his or her protected class (i.e., race, color, religion, sex, national origin, or disability), the complainant must also allege such facts which create an inference that discrimination occurred. This is usually done by pointing out an individual of a different protected class whom you treated more favorably in similar circumstances. If the complainant alleges that you took reprisal actions due to a prior EEO activity, the complainant must allege such facts which create an inference that there was a cause and effect relationship between your actions and the prior EEO activity. Showing that the events in dispute occurred shortly after the prior EEO activity usually does this.

If the complainant is able to create these inferences, it becomes your burden to provide a detailed, legitimate, non-discriminatory reason for your actions to the Investigator. Should you do so, the Investigator is trained to look for evidence as to whether your stated reasons are your true reasons.

If the complainant alleges that you failed to accommodate a known disabling condition, the complainant's initial burden is to demonstrate that he or she has a substantial limitation to a major life activity (as opposed to a temporary illness or injury), but, with reasonable accommodation, he or she can still perform the essential duties of his or her position without endangering him or her self or others. Thereafter, it becomes your burden to demonstrate that the requested accommodation was provided or that it would have imposed an undue hardship on VA operations and, thereby, was not reasonable. If the complainant alleges that you failed to accommodate his or her religious beliefs, the complainant's initial burden is to demonstrate that he or she had a religious belief or practice, which required some adjustment in his or her duties or your schedule at work.

The above explanation is provided so that you will know what you will be called upon to do, and so that you will be better able to assess the desirability of informally resolving this complaint prior to the completion of the investigation. A similar advisement is being provided to the complainant, for the same reasons. The Investigator is available to assist you and the complainant in resolving this complaint. If you are interested in obtaining this kind of assistance, please contact the Investigator.

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Bookhart, Bettie, VBASPT |
| **Sent:** | Wednesday, September 25, 2013 11:17 AM |
| **To:** | Henley, John (ORM) |
| **Subject:** | FW: EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Attachments:** | Response - KPryor.pdf |
| **Signed By:** | bettie.bookhart@va.gov |

FYI

---

**From:** Henley, John (ORM)
**Sent:** Friday, September 20, 2013 10:22 AM
**To:** Bookhart, Bettie, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Good morning Bettie, I did received Mr. Smith's response but have not received a response from Mr. Pryor. No others. Thanks

---

**From:** Bookhart, Bettie, VBASPT
**Sent:** Thursday, September 19, 2013 7:23 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Have you received responses from Mr. Smith and Mr. Pryor? Are there any other outstanding responses that we owe you?

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, September 17, 2013 4:12 PM
**To:** Smith, Theodore, VBASPT
**Cc:** Bookhart, Bettie, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin Case No. 103413

September 17, 2013

Fm: John Henley, EEO Investigator

To: Theodore Smith

Sub: Follow-up

Good afternoon Mr. Smith, have you had chance to review your note to respond to the email below. Please respond immediately.

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, August 27, 2013 10:27 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Morning Sir,

A11

Yes I was there ... I was called in adhoc as our "president" was unable to attend. I'll have to go through my notes if I still have them, I thought I had given them over to the Steward who was representing Ms. Mullin.

The meeting was strained at best and language of being reserved about reasonable accommodations was made, I will get back with you later today of tomorrow, hopefully with more helpful information.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:45 AM
**To:** Smith, Theodore, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Theodore Smith

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Henley, John (ORM) |
| **Sent:** | Tuesday, August 27, 2013 10:51 AM |
| **To:** | Crump, Casey, VBASPT |
| **Subject:** | EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Signed By:** | john.henley@va.gov |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | Crump, Casey, VBASPT | Delivered: 8/27/2013 10:51 AM | Read: 8/27/2013 11:04 AM |

August 27, 2013

Fm: John Henley, EEO Investigation

To: Casey Crump

Sub: EEO Investigation

Good morning, the subject complainant testified that Bonnie Wax said to you, "isn't that interesting about Ms. Mullin with her breast cancer and it was her breast cancer that caused all the breathing problems...there was never anything wrong with the building." Explain, what happened? Did Ms. Wax make the above comment to you? If yes, what was specifically said?

How did Ms. Wax know the complainant's breast cancer caused her breathing problem?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Henley, John (ORM) |
| **Sent:** | Tuesday, August 27, 2013 9:55 AM |
| **To:** | Huffman, Jerry E., VBACMS |
| **Subject:** | EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Attachments:** | 2001-0317-2012103413Witness Notice.doc |
| **Signed By:** | john.henley@va.gov |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | Huffman, Jerry E., VBACMS | Delivered: 8/27/2013 9:55 AM | Read: 8/27/2013 10:06 AM |

August 27, 2013

Fm: John Henley, EEO Investigation

To: Jerry Huffman, Assistant Service Center Manager

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director(Kerrie Witty) told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Henley, John (ORM) |
| **Sent:** | Tuesday, September 17, 2013 4:15 PM |
| **To:** | Pryor, Keith, VBASPT |
| **Cc:** | Bookhart, Bettie, VBASPT |
| **Subject:** | FW: EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Signed By:** | john.henley@va.gov |

**Tracking:**

| Recipient | Delivery | Read |
|---|---|---|
| Pryor, Keith, VBASPT | Delivered: 9/17/2013 4:15 PM | Read: 9/24/2013 6:34 AM |
| Bookhart, Bettie, VBASPT | Delivered: 9/17/2013 4:15 PM | Read: 9/18/2013 7:10 AM |

September 17, 2013

Fm: John Henley, EEO Investigator

To: Keith Pryor

Sub: Follow-up

Good afternoon Mr. Pryor, please respond to the email below. Thank you.

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:47 AM
**To:** Pryor, Keith, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Keith Pryor

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:45 AM
**To:** Smith, Theodore, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Theodore Smith

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

# VA OFFICE OF RESOLUTION MANAGEMENT

## ROLE AND RESPONSIBILITIES OF WITNESSES IN THE FORMAL EEO COMPLAINT PROCESS

You have been identified as a person who may have information or insights that would be helpful in sorting through the EEO matters under investigation. Your role as a witness is to cooperate with the investigator, provide honest, objective feedback to questions asked of you, and to offer any additional observations you feel have a direct bearing on the circumstances being examined. Your assistance may prove critical to successful conclusion of the matters at hand and your help is very important to everyone concerned.

Participation in EEO complaint processing is a *protected activity.* This means that work related punishment or revenge because you participated in a protected activity is expressly forbidden. Such work related retaliation is called reprisal and is considered a violation of the laws and regulations governing EEO. In addition to serving as a witness, other examples of protected EEO activities include but are not limited to, such acts as filing an EEO complaint yourself, attending or participating in EEO related or sponsored events, attending EEO training or asking questions in an EEO class. Should you have reason to believe that because of your part in one of these protected activities, you are being made the subject of work related reprisal, you should contact the Office of Resolution Management at once. Reprisal is a legitimate basis under the law for a new EEO complaint.

As a witness you have the right to have a personal representative present to assist you and to advise you on your best interests. VA will not provide a representative for you, but they will grant official time to any individual you choose who is also a VA employee. Should you designate a private attorney, his or her fees and advances will be your responsibility. You may name any individual of your choosing as your personal representative, other than EEO program officials and employees of the Human Resources Management Service (HRMS) and members of General Counsel, who are excluded due to conflict of interest. VA is not required to provide premium pay or travel expenses to facilitate your choice of a VA representative.

As a federal employee we each have a responsibility to participate as required. While an individual can be directed to cooperate, we hope this will be treated as a request, not an order, and that you will participate without reservation or fear. Be assured that while your testimony becomes part of the official record, there will be no high visibility associated with your participation. Only those involved directly or administratively will be made aware of your inclusion in the process and your privacy will be respected as much as possible. Keep in mind that this process is built on fairness, integrity, and trust. You can

help in the details of this case, but you can also help by assuring that these three guiding principles continue to be the rule, rather than the exception. Thank you for being part of our team of concerned individuals who want to be sure we do the right things for the right reasons, and to assure that respect is a reciprocal gift, not to be denied under any circumstances.

Response to the amended events:

**Whether the complainant was subjected to a hostile work environment based on disability and reprisal as evidenced by the following events:**

**•On or about May 22, 2013, EEO Program Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session**

1. Explain what happened? *Ms. Bookhart unnecessarily led me to believe that authorization from the Mediator and Agency Representative were required in order for me to have a family member accompany to mediation*
2. What did Ms. Bookhart say? *The exact dialogue with Ms. Bookhart follows.* **

**From:** Bookhart, Bettie, VBASPT
**Sent:** Thursday, May 30, 2013 7:05 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

I apologize Aileen; I am the one that incorrectly said "mother" when I should have said "family member". Your request to the mediator is for a family member to attend. I am still waiting on his response.

**From:** Mullin, Aileen, VBASPT
**Sent:** Thursday, May 30, 2013 7:55 AM
**To:** Bookhart, Bettie, VBASPT
**Cc:** Henley, John (ORM); Smith, John, VBASPT; Johnson, Odessa W. (ORM); Crump, Casey, VBASPT; Pryor, Keith, VBASPT; McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

Good morning Bettie,

Did Sandy specify my mother? If she did, I need to know immediately so I can contact my mother to make sure a) she's available and b) she's willing.

Respectfully,
Aileen

**From:** Bookhart, Bettie, VBASPT
**Sent:** Thursday, May 30, 2013 6:31 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

**

***Aileen,***
***I sent your request to the mediator yesterday and am still waiting on his response. Sandy is ok with your mother attending but according to ORM, the mediator makes the decision. I will let you know as soon as a response is received.***

B-1

Bettie

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, May 29, 2013 8:55 AM
**To:** Bookhart, Bettie, VBASPT
**Cc:** Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; 'aileen_mullin@yahoo.com'; McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT; Johnson, Odessa W. (ORM); Pryor, Keith, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

Good morning Bettie,

Am I permitted to have two people accompany me to the meeting (a representative and a family member)?

Thank you,
Aileen

3. How was this harassment and subjected you to a hostile work environment? This act, in itself, my not have been deemed harassment if it didn't

**On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC**

1. Explain what happened. I exchanged no less than seven e-mails with Ms. Bookhart after the date and time for mediation was established and the time she shared the mediation preparation resources. If Ms Bookhart's intention was to assist in prepare me for medication, she wouldn't have waited until less than 24 prior to the meeting to share the resources.

   On the morning of the mediation, Ms. Bookhart met us at the designated site. She made a point of asking if I had received the information.

2. How was this harassment and subjected you to a hostile work environment? This one act in itself wouldn't be harassment or evidence of the hostile work environment, but unfortunately it is part of a pattern of treatment I've endured from Ms. Bookhart and the Agency.

Ms Bookhart had the choice of assisting me by making sure I knew about mediation perpetration resources, but no … I went to the mediation with no preparation, beyond what I found on the internet. After watching the "Medication Zone" video, I know I would have approached the mediation differently: From a better position.

I don't think the Agency had any interest in resolving our issues. I don't think the Bookhart had any interest in assisting us in resolving our issues: Scheduling the mediation was just a perfunctory act.

3. What training resources? Mediation brochure and link to "Mediation Zone"

4. Is there anything you want to add? In 2009, when I realized I was sick in relation to the work place, I sought Ms. Bookhart's council because I didn't know how to proceed without jeopardizing my job. She told me it was my right to file a claim for Worker's Compensation or for accommodations but reality was that the Agency doesn't believe in accommodations. It was disconcerting to learn that the EEO representative was aware of the mistreatment of employees with disabilities.

As my situation worsened, I began to suspect that Ms. Bookhart was part of the problem, not part of the solution.

My suspicions were confirmed by her appearance of indifference toward my situation in terms of my cancer and chemotherapy, and my problems with the Agency.

I wasn't surprised when I learned Ms. Bookhart had reported that a mediation had occurred in June of 2012 ~ and it hadn't.

I do wonder Ms. Bookhart's actions, and inactions, are a result of a 'chilling effect' .... Would she face adverse actions if she did what was legally and ethically righ

---

E-MAIL COMMUNICATIONS w/Ms Bookhart
**From:** Bookhart, Bettie, VBASPT
**Sent:** Tuesday, May 28, 2013 1:30 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; aileen_mullin@yahoo.com; McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

There is not a deadline. I am preparing documents for the session and was going to type the name of your representative, if any, on the "Agreement to Mediate". Typing the name, however, is not a requirement but participants will have to sign the agreement.

Bettie

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, May 28, 2013 2:14 PM
**To:** Bookhart, Bettie, VBASPT
**Cc:** Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; aileen_mullin@yahoo.com; McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

Hello Bettie,

At this time I can't provide the name of my representative, as I haven't been able to confirm his availability. Is there a deadline for providing the name?

Thank you,

Aileen

**From:** Bookhart, Bettie, VBASPT
**Sent:** Tuesday, May 28, 2013 7:03 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

Hi Aileen,

Please provide the name of your representative, if any, who will attend the mediation. Sandy Smith is the Responding Management Official.

Thank you,
Bettie

**From:** Bookhart, Bettie, VBASPT
**Sent:** Wednesday, May 22, 2013 3:17 PM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin ORM Case No. 103413

John,

Please let Aileen Mullin know that mediation is scheduled for **Friday, May 31, 2013**. The start time is **11:00 a.m.**; the location is **Bay Pines, Bldg 2** on the **3rd floor, Room #360.**

Thank you,
Bettie

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF RESOLUTION MANAGEMENT

In the matter of: ) Complaint No:
AILEEN MULLIN, ) 2001-0317-2012103413
Complainant,
vs.
DEPARTMENT OF VETERANS AFFAIRS,
VA Regional Office,
St. Petersburg, Florida,
Respondent.

AFFIDAVIT

TRANSCRIPT OF PROCEEDINGS in the above-entitled cause of the examination of AILEEN MULLIN before EEO Investigator John Henley, on Monday, July 8, 2013, at 1:00 p.m.

Reported by: Leigh Dempsey
Also present: John Smith
Transcribed by: Vanita Tildon

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973



PROCEEDINGS

INVESTIGATOR HENLEY: My name is John Henley, EEO Investigator, from the Office of Resolution Management, Southeastern Operations, St. Petersburg, Florida. I have been assigned to investigate EEO complaint Number 2001-0317-2012103413, filed by Aileen Mullin against the VA Regional Office St. Petersburg, Florida.

If you have a representative with you, would the representative please identify himself and who he's representing?

REPRESENTATIVE: I am representing Aileen Mullin. My name is John Smith.

INVESTIGATOR HENLEY: Would you like to receive a copy of your affidavit for review.

THE WITNESS: Yes, I would, please.

INVESTIGATOR HENLEY: Okay. Raise your right hand. Do you solemnly swear or affirm that the information you are about to give is true and complete to the best of your knowledge and belief?

THE WITNESS: Yes, I do.

INVESTIGATOR HENLEY: Please note that the testimony is given without a pledge of confidentiality. And what that means is that it will be shown to interested parties involved in the



EEO complaint process.

This is the testimony of Aileen Mullin given on July 8, 2013.

Whereupon,

AILEEN MULLIN

a witness, called for examination, after having been first duly sworn or affirmed, was examined and testified as follows:

EXAMINATION

BY INVESTIGATOR HENLEY:

**Q What is your full name and spell it for the record?**

A My full name is Aileen, no middle initial, Mullin, A-I-L-E-E-N, last name Mullin, M-U-L-L-I-N.

**Q What is your job position?**

A RVSR, Rating Veterans Service Representative.

**Q How long have you been in that position?**

A February 2009.

**Q What is your organizational unit?**

A Veterans Benefits Administration, RO 317.

**Q St. Petersburg --**

A St. Petersburg.

**Q VA Regional Office --**

A Yes, VA Regional Office.

**Q Who is your first and second-level supervisor by position**



**title?**

A This is something that just changed two weeks ago, I guess. My coach is James Beauchamp, his supervisor, Veterans Service Center Manager, is Charles Ellis. These are both new to me. I just started working under them.

**Q At the time that you filed the complaint, who were your first and second-level supervisors?**

A My supervisor was Ulyssee McBurrough, and his supervisor was Jerry Huffman.

**Q Okay. Now your complaint is based on your disability and reprisal. For the record, what is your disability?**

A I have two. Cancer is one and the second one is Asthma. No, three, add Asthma and chronic sinus infections.

**Q How severe is your disability?**

A I don't understand the question? You mean at the moment or is it terminal, you mean? The cancer is not terminal.

**Q Okay, so what I mean when I say how severe is, is it marginal or severe or, you know, something like that?**

A Okay, to the Asthma, which is triggered when I'm in the building, it's life threatening, it's severe, it's very severe. The cancer seems to be under control. It was stage 1 and I don't think that's life threatening. I'm still suffering from -- the treatment only stopped six months ago so I'm

still -- there's still moderate symptoms. It's not life threatening but my symptoms are moderate.
**Q How does your disability restrict you in your life activities? You know, for instance, like hearing, reading, taking care of yourself?**
A Can we -- I need to get clarification -- go off record.
INVESTIGATOR HENLEY: Let's go off the record, Leigh?
COURT REPORTER: Okay, off the record.
(Off the record at 1:22 p.m.)
(On the record at 1:24 p.m.)
THE WITNESS: At the time that I filed I had the Asthma, sinus infection, vocal chord dysfunction and Breast Cancer. As the EEO process continued, I developed additional disabilities. I now suffer from Insomnia, Irritable Bowel Syndrome, Iritis, secondary to the IBS.
BY INVESTIGATOR HENLEY:
**Q How does your disabilities restrict you in your life activities, such as sleeping, eating --**
A Sleeping is -- I have a very serious problem with sleeping and anxiety. I don't -- I do a terrible job feeding myself now. I don't exercise the way I need to because I'm -- this is important too after Cancer treatment. My yard is overgrown, my house is overgrown. I mean, I guess my bills are unpaid. Can



you write red hot mess in a -- did I elaborate on that?
**Q Is that all of your life activities --**
A Those are the only ones I'm thinking of right now but, no, but socially I'm affected.
**Q Okay. When you say "socially", what do you mean?**
A I don't socialize.
**Q Okay.**
A Like I'm very isolated and when I am I don't know how to enjoy it.
**Q How long have you been limited by your disabilities?**
A I have to say it's since -- very severely, probably very severely since January 2012 and they've just escalated and filled up since then. Oh, no 2011, October 2011.
**Q 2011?**
A October 2011.
**Q Okay. Is that when you was actually diagnosed with disabilities by your health care provider?**
A No, October was when my breathing challenges they were very bad in the building. I came back from a 2-month training in Baltimore and the Asthma became very severe and that's when they -- the accommodation problems got much worse. They wouldn't accommodate me. That's when I ended up like having to go to the extreme of being taken out by EMTs so that's when it



began.
**Q And that was in 2011?**
A The most severe limitations, yes.
**Q Are you identified as having a disability in agency records?**
A How would I know that?
**Q Did you notify the agency that you had disabilities?**
A Oh, yes, yes. Oh, yes, FMLA. There's medical documentation. Medical certifications have all been supplied to the agency.
**Q Okay, when did you supply that information approximately?**
A The beginning -- I would have to say in September 2011 and then as the other disabilities happened I kept them current.
**Q Is your disability permanent or temporary?**
A I don't know the answer to that.
**Q Okay. So when your health care provider diagnosed your disabilities you wasn't told whether it was going to be permanent or temporary?**
A Well, the Cancer they've always thought that was treatable. As far as the Insomnia, Anxiety, IBS, and Iritis, all the doctors say the sooner I stop working for the Veterans Benefits Administration -- that as long as I'm there I will probably -- and working under this administration they don't know. All they



can do is try to treat the symptoms. So that one is --
**Q Okay.**
A If I stay on it this is it.
**Q When you notified the agency how did you do it, in writing or verbal?**
A Both, written, verbal and email.
**Q What are the essential duties and responsibilities of the position?**
A That's lengthy. I'd have to look that up and read it to you. I think I have it with me but it's very -- it's lengthy.
**Q You can't just summarize it, what's your essential functions?**
A Well this is -- this is the essential function of my job as the Rating Specialist -- can we just go off the record so I can brainstorm by myself for a second?
INVESTIGATOR HENLEY: Let's go off the record, Leigh?
COURT REPORTER: All righty.
(Off the record at 1:29 p.m.)
(On the record at 1:30 p.m.)
THE WITNESS: This is a very brief synopsis of -- and this is the key responsibilities of my functions. And I want to say for the record I don't feel this is a complete description. My responsibility is to make decisions on veterans and their

dependents' claim for benefits, maybe compensation for disability ancillary benefits. My responsibility is to make sure that the veteran's claims and case is fully developed and all evidence is of record before the decisionmaking process starts.

When the evidence is of record my responsibility is to evaluate the evidence being current medical records, previous medical records, historical documentations, service treatment records and how they apply to our laws, how they apply to our current laws, how they apply to previous laws. It requires an extensive knowledge of all body systems, extensive knowledge of law, keen ability to research and interpret and question.

The responsibility as a Rater is I had been a -- fiduciary responsibility. The decisions that I make affect the veterans and their families as well as the country because my decisions are the ones that decide how, when a veteran is going to be compensated and how much the government's going to spend in their compensation.

For now that's all I can say. I may be making an amendment to that.

BY INVESTIGATOR HENLEY:

**Q Could you perform these duties and responsibilities with or without an accommodation?**



A With an accommodation, without an accommodation? I need clarification on that question. I understand with accommodation. I can do this job.

**Q Okay, if you did not have an accommodation could you still do the job?**

A Can we go off the record for a second?

INVESTIGATOR HENLEY: Take her off the record, Leigh.

COURT REPORTER: Off the record.

(Off the record at 1:33 p.m.)

(On the record at 1:36 p.m.)

BY INVESTIGATOR HENLEY:

**Q So the question was can you do your job with an accommodation or without an accommodation?**

A Yes. That's -- if I understand that question, the answer to it is yes.

**Q Have you requested an accommodation for your disability?**

A I have requested accommodations for my disability.

**Q And who did you submit this request to?**

A I have submitted it to Director Kerrie Witty, to Human Resources, Tamanique Clarke, Human Resources Matt Correa. On my behalf the union also requested -- I sent the request to Philip -- but I don't know his last name. I'll have to get back to you. Request for accommodations was given -- submitted --



and these are all verbal as well as in writing -- to Sandy Smith, Veterans Service Center Manager, Larry Brown, Assistant Service Center Manager, Collette Burgess, Assistant Service Center Manager, Jerry Huffman, Assistant Service Center Manager, coaches: Ulyssee McBurrough, Veronica Collins, Dale Eckholm, Jim Correa. Those are just ones that I can list off the top of my head that I specifically said I needed accommodations and then the ones who are familiar.

Oh, as well as, I'm sorry, the AFGE, the American Federal of Government Employees national vice president, Everett Kelley, local president Valorie Reilly, local vice president AFGE Keith Pryor. And those are the people who had authority over me that could have been positioned to do it.

**Q Do you have dates of when you submitted to these people?**

A Not in -- I can't rattle them off. Yes, I have dates for them. I can supply the dates for them.

**Q Do you have it with you?**

A I think I probably have them in the folder with me, yes.

**Q Okay.**

A Yes, we can --

**Q When you submitted your written request for a reasonable accommodation what date did you submit it?**

A 20 -- because I have that with -- the first written one I



have it with me and I would say that was October 2011.

**Q And the nature of that request?**

A I asked to be moved from the room I was in. I was having severe Asthmatic attacks so I asked them if they could let me work at home or move me to another area in the building, someplace where I had worked before where I hadn't been sick or just to try somewhere else in the building.

**Q And what was management's response?**

A No.

**Q And who was the decisionmaker on that?**

A The first one to give me the -- oh, there's a lot to these. Okay, I'm going to have to go back and forth a little here. The most severe one was Michael Palmer who was a coach who was not previously listed. Michael Palmer told me no, that there was no place else in the building to send me and that no one was allowed to work at home in my position with my degree of training.

My first request, actually, for accommodations was given to Collette Burgess, Veterans Service Center Manager, 2009, and I was told the policy is that they can't tell me, that I had to file a Workman's Comp claim through Human Resources.

**Q Okay, what I'm getting -- who were the final decision makers on the request?**

A Oh, I didn't know. I didn't know. I still don't know.
**Q Okay. And this accommodation would enable you to perform the essential functions of your position?**
A Yes.
**Q Now the other request that you -- your request for accommodation was for the same thing?**
A Initially. Initially, yes.
**Q Okay.**
A Many times I asked to work at home after -- I requested to be moved many times. I requested to work at home. And the most recent request was just last Friday because now I am at home but I don't have print capability but they don't respond to any of my requests.
**Q Did the agency offer you an alternative accommodation?**
A No. I don't know if I was putting here the law or the definition here. When I was in the building, without discussing it with me or my doctor, they supplied a small air purifier. I don't know how they chose that to be an appropriate accommodation. I don't know -- no one talked to me or my doctor as to why that was done so --
**Q So that was the alternative to what you had requested?**
A I assume so. I assume so. They also -- they changed my desk a few times and nobody talked to me about it. None of the



decisions they made had any input from me or my doctors.
**Q So the alternative was not satisfactory?**
A The alternative had nothing to do with my -- with the Asthma. It was unrelated. And the most recent accommodation now is that they don't want me in the building at all. So I'm completely alone in trying to do this job. They've isolated --
**Q Management does not want you in the building at all?**
A Yes, they won't -- yes, correct. They won't let me in the building at all and they are not supplying me with what I need in order to do the job.
**Q Did you let the agency know that the alternative was not satisfactory to you?**
A In writing in a meeting.
**Q Okay, what response did you get?**
A One response -- unfortunately, I don't have these responses in writing. I can't get them in writing. One of them, Matt Correa told me straight out that they -- there was no money in the budget to do an air quality study. That was the most recent reason I was told no. Usually, it's just it wasn't open for discussion. They wouldn't -- there was no -- I was allowed no dialogue or actually we had a number of meetings when we thought we came to a good idea.
I would meet with the agency, with Human Resources with my



union and come up with great -- what seemed like feasible solutions and in a meeting it sounded like a good idea and then I'd get a phone call saying all my requests were denied.
**Q Who would be the decisionmaker of that denial?**
A The last one I was told -- the last one I don't know. The one prior to that I was told it was Sandy Smith, Veterans Service Center Manager. During my attempt at mediation I brought that up and Sandy stated that that's not her role. She doesn't have the authority to make -- the Human Resources said it was Sandy Smith but Sandy Smith says that she doesn't have the authority to make that decision. She can offer input but she doesn't make the decision. Who the decisionmaker is, I can only assume it's Kerrie Witty.
**Q Have you currently been accommodated?**
A No.
**Q The other basis for your complaint is reprisal.**
REPRESENTATIVE: Can I ask a question before we go further?
INVESTIGATOR HENLEY: Let's go off the record, Leigh.
COURT REPORTER: Sure, off the record.
(Off the record at 1:45 p.m.)
(On the record at 1:46 p.m.)
BY INVESTIGATOR HENLEY:
**Q These questions are concerning the next basis, which is**



**reprisal, and when you use the basis as reprisal they're talking about prior EEO activity but it also can be talking about the current complaint under investigation too. So what EEO activity did you engage in that resulted in the reprisal action in this complaint?**
A Initially, it was a very small complaint against Bonnie Wax, the Manager of Human Resources for talking about -- I think it was just three issues originally. Bonnie Was spoke to someone outside of HR, a union representative, giving her theory that it was my Breast Cancer that caused the breathing disability. That was the day prior to my surgery.
I requested copies of my Human Resource records. They delayed and delayed and when I finally got them there were documents missing. Bonnie supplied the records and there were documents missing. And, basically, that was the whole thing just started with that was them wanting to have someone oversee the handling of my affairs in Human Resources as I went through my Breast Cancer treatment.
**Q So your EEO -- your reprisal is based on the current complaint we're investigating now and the events that happened after you filed the complaint?**
A Yes. And I have a question, is filing a Workman's Comp claim considered a protected act? Okay, thank you.

I can tell you how I know it was that too. I can tell you how I knew it was the reprisal was because of that.

**Q Go ahead?**

A After my first surgery I called for a meeting -- I requested a meeting with the Director, Kerrie Witty. At the meeting was Jerry Huffman, Sandy Smith, Casey Crump and Kerrie Witty. I asked at this meeting -- at this meeting I asked the Director to get involved because Human Resources had not processed my request for FMLA, application for advanced leave and another document. The Director was very helpful and supportive and things were taken care of immediately.

One of the other things I asked the Director to do was intervene on my behalf and literally to shut Bonnie Wax up. I wanted nothing to do with her. I had enough to deal with, I didn't need Bonnie Wax.

After that meeting I had had a second surgery and I discovered that the -- I was going to have to have chemotherapy and during that time I'm getting carbon copied on emails, railing emails from Bonnie Wax and the records that are missing.

And, again, my pay was being messed with and all these inconsistencies happened so I request a second meeting with Director Witty. When I went to the meeting it was AFGE's -- they were Ted Smith, Theodore Smith, local vice president Keith



Pryor, the Service Center Manager, Jerry Huffman, the Director and myself. The tone of this meeting couldn't have been any more different than the first. Her demeanor of hostility was apparent immediately. She wasn't open to discourse -- oh, I'm sorry, I apologize.

Director Witty wasn't open to discourse, and it was actually -- it was not far into the meeting when I -- because I told her, I said, "Director, I need you to intervene on my behalf. I need someone to be handling" -- by them, people were making leave donations to me but they were never getting processed. Documents were missing out of Human Resources. And I asked the Director for -- I told her that, to report that I'm still having problems with Human Resources.

And that's when the Director looks at me and said, "Well you're going to have to deal with Bonnie Wax sooner or later. There's no way of avoiding it." And I asked her why and she said, "Because of your EEO complaint." And I told the Director that I trust in the fact that the EEO complaint could go away, that we could come to a meeting of the minds, because at that point there were only three issues. And that we could just go forward and her anger -- this is at the meeting when she told me she didn't believe in giving -- stated in front of everyone that she doesn't believe in giving accommodations.



If they gave me accommodations they would have to give them to everyone else who walked in with a doctor's note.

**Q And those individuals that you just named were in the meeting, right?**

A Yep.

**Q Okay.**

A But this is when I knew -- so that's when I knew it was right -- I have the date with me, I can look up that date for you, but it was shortly after filing the EEO complaint that I was treated like this by the Director and it has never improved since then. It becomes systemically worse.

**Q Okay, now we're going to get a little bit more specific. We're going to talk about the events that have been accepted for investigation, and it says:**

**Whether the Complainant was subjected to a hostile work environment based on disability and reprisal as evidenced by the following events. Let's start with Number 1:**

**1. Between September 2011 and March 2012, the Complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and on two occasions VA police had to assist the Complainant out of the building.**

**Explain what happened?**



A And in one of the times it was by ambulance so that was the third event with the ambulance. When I came back from Baltimore and the group of us were put into this room called room 222. It was a training room and it was -- it wasn't long after we got back I started suffering from Dysphonia, which is a vocal chord dysfunction which I've only had as a result in being --

And the days -- as the days wore on my sinuses became more of a problem, my breathing became more of a problem and I went to my allergist again, Dr. Stephen Klemawesch.

He increased my medicine and ended up giving me a Nebulizer, which I have a portable Nebulizer, which I would carry to work. I started pre-medicating, he increased the pre-med to Zopinox as well as a steroid so I could go in to work and when I left work I'd do the same.

And as the days wore on, that wasn't working. And it took between September and January -- October and January, then those medications wouldn't work.

My first symptoms would be the voice, vocal chord dysfunction. Sometimes I would get like problems with my equilibrium. I would get disoriented. One time I got -- I was so disoriented I started exiting out the wrong door, through the front of the building. The police had to help me. And with these events I was telling Mike Palmer, my coach, "I have a

problem, please get me out."

At some point, it was in December, Mike Palmer had a temporary duty in Baltimore so James Cartner was the acting coach. While James Cartner was there he addressed the situation. He had building maintenance come in. They addressed some of the air conditioning issues of, you know, different -- he did what he could while he was there. But could not get me moved.

Mike Palmer just refused to deal with me at all. I emailed him saying, okay, I need somewhere -- this is when I realized I had to start using the machine at work. I emailed him and asked him if he would at least find someplace private that I can go so I don't have to sit there in the classroom or in the ladies, room using the machine. And he refused to do it. I'm sorry, I'm not answering the question the right way.

What happened was at least 25 different times, the Asthma would get so bad that I would have to leave or I would go and try to take care of my shots or things during lunch or I would leave during the middle of the day and try to breathe and get myself back together and then come back into the building.

Is that closer to answering your question?

**Q Yes.**

A Okay, sorry.



**Q And it says here on two occasions VA police had to assist you out of the building?**

A Yes.

**Q That's what you meant when you was disoriented going out of the wrong --**

A One of the times was I was -- one time it was because I was very disoriented and the second time was a severe Asthma attack and a coworker and friend, Mary Jo Shapiro, brought me out of the building, brought me to the police and got me out of the building and the Nebulizer is one I could use in the car. So she went and got my car, called my parents and the police stayed with me until my -- and until they set me up and medicated me in the parking lot until my parents could come and get me.

**Q And this happened at least 25 days?**

A With different levels and different degrees.

**Q Okay.**

A It wasn't always as severe as that.

**Q Okay.**

A Sometimes I would email that I've got to go and I just have to be -- so I could work at home. So I lost the pay on it. Sometimes I just knew I had to leave.

**Q Okay. Number 2, and I think you touched on it a little bit, says:**



**2. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the Complainant while she was experiencing severe workplace related respiratory problems; and he went as far as to say that the Complainant was the only person in the room with a problem and asked why the Complainant did not have a portable oxygen tank or wear a protective mask.**

A Unfortunately, I don't have this in writing. Mike Palmer has a way of not responding to things in writing. He was referring to -- when he said -- where someone else was wearing a mask. In the next room was an employee, her name is Barbara Zeh, Z-E-H, who was actually my mentor when I first started working, who ended up hospitalized for almost a month because of respiratory reactions in the building and she had to wear a protective mask. And he just didn't understand why I just didn't wear one of those or wear an oxygen mask as well.

His thing -- when he stated it was I was the only person sick. The reason he said that was I said, "Mike, take a look around the room, look at the absentee rate, listen to that one over there coughing, look at that one having an Asthma attack. This isn't -- we have a problem here." And this is when he got -- he was very vehement and said, "No, you're the only person here who has a problem."

**Q Those two events are kind of related. You said that they**



**subjected you to a hostile work environment, how so?**

A After that you mean?

**Q Yes.**

A The EEO complaint wasn't in place then.

**Q I didn't understand what you said, it wasn't in place then?**

A No, this is even before -- this is before I even filed the EEO complaint.

**Q Okay.**

A This is how I was treated before the EEO.

**Q Right, but it's been included in your EEO complaint?**

A Oh, yes, yes, yes.

**Q Okay.**

A And so I thought hostile meant it was after the EEO or is hostile can be at any point in time?

**Q You can be in a hostile work environment, you know --**

A Oh, yeah, that's one of the -- yeah.

**Q Okay. Before you questioned -- and you're claiming that these two events -- the other events too but we're just going to talk about these two right now -- they subjected you to hostile work environment?**

A Yes, yes, sir.

**Q Could you explain how?**

A Hostile and inhumane. That I was forced to stay in that

room and I was afraid to take proper care of myself out of fear that I would lose my job. I wasn't making the production standards they wanted and anywhere I asked for help at many different levels I was flat out denied and told me, no, there's no problem it's just you.

But, yeah, my biggest fear is I was afraid about losing my job and I didn't take proper care of my health. I didn't walk out of that place, I didn't fight with them because I knew I'd lose my job.

INVESTIGATOR HENLEY: Let's go off the record, Leigh.

COURT REPORTER: Off the record.

(Off the record at 2:01 p.m.)

(On the record at 2:02 p.m.)

BY INVESTIGATOR HENLEY:

**Q Okay, Number 3:**

**3. On November 28, 2011, BW denied the Complainant's request for Mold Hazard Training.**

**What does "BW" stand for?**

A Bonnie Wax.

**Q Okay. Explain what happened here?**

A I was -- and all she had to do -- no, actually, at that point it wasn't. The AFGE was supposed to work with the Safety Committee and someone was supposed to be trained on mold



mitigation and the issues with having to do with health issues. Because of my history with a strong interest in doing that and a desire to do that to my union president, Valorie Reilly. So I was chosen to go. Based on the AFGE Master Agreement, I was going to go.

Bonnie Wax sent a letter saying, no, Aileen Mullin's not going to any mold -- and she used some bogus part of the Constitution or the Agreement to deny me the right to go to that mold training.

**Q Was that reason --**

A I have it all with me.

**Q Just make sure I get copies of it, okay?**

A Okay.

**Q Number 4:**

**4. On January 4, 2012, the Complainant was taken to the emergency room by ambulance from her worksite.**

**Explain what happened here?**

**Do you want to go off the record for a minute?**

A Yeah.

INVESTIGATOR HENLEY: Let's go off the record, Leigh.

COURT REPORTER: Off the record.

(Off the record at 2:04 p.m.)

(On the reccrd at 2:12 p.m.)



BY INVESTIGATOR HENLEY:

**Q So we're at Number 4.**

**4. On January 12, 2012, the Complainant was taken to the emergency room by ambulance from her worksite.**

**Explain what happened?**

A I'm going to go back by I think three days, okay. I think it was January 9th I believe was the date --

**Q Okay.**

A -- that I met with Human Resources Tamanique Clarke -- so you know there were two of those in the system, in the VA system, Tamanique Clarke and AFGE representative Carol Allard. The three of us met and the conclusion of it was that Human Resources would take a look at the problem with the employees having symptoms in that room, that they would move me out of the room and put me in another location and then reevaluate the situation to see if there was any improvements or any other modifications that needed to be made.

I believe that was a Friday, Saturday, Sunday. I think I had no work on Monday. I came back on the 12th. I came in and there were no changes in place. I was still at the same desk, it was still in the same place. They have what's referred to as a PC data move. My computer had been set up so that the data could be moved to another site but there was no site -- there



was no move. I emailed Tamanique Clarke and told her that there was -- I was still in the same location.

Probably about 10:30, I went on break with Natalie Kennedy and Mary Shapiro. While we were in the cafeteria I was having the Dysphonia, feeling a bit disoriented and I didn't realize -- my breathing was getting bad. When I got back into the room because the friends were like, okay, time for the machine, I went and I grabbed the Nebulizer and I walked up to Mike Palmer's desk in front of the room and -- by then I was gasping and I said, "Mike, Mike, I have to go." I can't remember if I said I had to use the machine or I can't breathe or whatever it was but it was evident. And he looked up, raised his hand and said, "Go do what you have to do."

So I exited the room, I did run into James Cartner and he said, "Do you need me to come with you?" And I said, "No, I can use the machine." And I went to this area I had heard about where there was a wellness room. It's not a part of the building that I'd ever really been in but it was a room supposed to be set up for women who are nursing or things like that. I get down to the room and the room is locked and my breathing is getting worse.

And a woman, Margaret Macklin, not really a woman I had known, she found me stumbling about and she said, "Can I help

you, what's wrong?" I said, "I just need an electric socket. I have to plug this in. I need an electric socket." She assigns a conference room and sets me up. Now, at this point, I still think that the medicine's going to work and how this is going to work. So I set up the machine and I'm trembling, seriously trembling, and I know I'm in trouble.

I pick up my phone, I had the phone with me, my cell phone. The first phone call I made was to Valorie Reilly, president of the AFGE. Gasping, I said I need help. I need help. She said, "I'm sorry I can't help you, Aileen, I'm on a conference call." The second phone call I had Tamanique Clarke's business card with me so she was the second call and by then I'm really, really having a hard time trying to breathe, very hard time trying to breathe and I'm panicking and I told her I don't know what to do.

At that point I didn't know how -- I know I needed 911 but I didn't know how to explain where in the building I was in order to get an ambulance to me. She said, "I'll call you right back and I don't know what to do. I'll call you right back." And I say, "You have to call me right back," which she never did.

Next, I texted -- I had one more medicine I could use and I knew at that point if that medicine didn't work that I was



probably going to -- there was a good chance I was going to die. I texted Mary Jo Shapiro and she got to me and she opened up the last medicine that I could try and she kind of took over from there. Other people tried to come into the room. The was another coach, he was good, a Lee, I don't remember his last name.

Now, remember, Human Resources still hasn't shown up, nobody's shown up, nobody's checking. And I said -- but Mary Jo was -- and I didn't know what to do. My fear was that if I left without permission I would be charged with being AWOL. And so all I could think about was my -- this would give a chance that they'll charge me with being AWOL like they've done with other people on Family Medical Leave. They're going to charge me with being AWOL.

And Mary Jo got me to just think, just remove the agency, remove Mike Palmer, remove all those people from my thoughts and I made the decision I knew, which she just said we got to get you out of the building because I needed to get -- I just needed air. As we were leaving the area Tamanique Clarke showed up. By then I was angry at her by then. "Where were you, why didn't you come?" She said, "I had to speak to my supervisor first."

"And who's your supervisor?" which I was gasping as I said it." She said, "Suzanne Nunziata." I said, "What did she say?"



She said, well she told me I should call an ambulance. To this day I don't even know if they -- when they actually ever called an ambulance but -- so they get me out of the building and I literally stumble to the police. Mario is the police officer's first name, I'll supply you with the last name, he's the one who's helped me a number of times.

So I stumbled out of the elevator and he says, "Aileen, you need an ambulance." I know I need the ambulance so he called emergency services. They got me out of the building and I went through Tammi, Mary Jo, Mario and the medicine just wouldn't work. The medicine -- none of the medicines were working. The ambulance got me. They came and got me. At that point is when I looked at Tammi and I said, "Okay, who's going to pay for this? Who's paying for this?" And that's when she went back up and got the Workman's Comp form.

At the same time I'm trying to get a hold of Mike Palmer because I'm so afraid he's going to mark me AWOL because I've seen him do it. I've seen him do it to other people. I was in the ambulance and I called another coworker, Mare Brown. She works in the area and I'm like, "Mare, can you find Mike, can you find Mike?" I'm not really clear on that series of events, but she found Mike and Mike refused to call me and wouldn't talk to me.



**Q But on that day, January 12th, you were taken from your work to the emergency room by an ambulance?**
A And that's when I was in the ambulance.
**Q Okay --**
A And that's when I was taken to St. Pete General.
**Q Okay. And Number 5 I think you've already answered:**
**5. Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon January 10, 2012, during a meeting HR Specialist Tammi Clark (TC) and union official Carol Allard (CA).**
**So you've already -- that's what you was talking about when you --**
A I was done to -- 4 and 5, yeah.
**Q Okay. And Number 6, I think you may have responded to this also, it says:**
**6. On January 12, 2012, the Complainant was subjected to gross negligence as officials of the Regional Office showed no regard for her life when they refused to render aid while she was having a severe Asthma attack.**
A Yep.
**Q This was during the same time?**
A Yes, sir.
**Q Okay. All right.**

A It's going to be -- that is repeated again.
**Q Okay.**
A When I went back to work in -- when I went back to work I think it was February of this year and they made me stay in the building more hours. They didn't set up any emergency care. I, on my own, went and met with the sergeant to come up with an emergency medical plan.
**Q Okay.**
A So even as they forced me to stay in the building more hours they didn't do anything to make sure I could stay alive doing it.
**Q Okay. Let's move on to Number 7:**
**7. On January 31, 2012, the Complainant notified supervisors, HR and the unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**
A I'm ready.
**Q Explain exactly what went on here?**
A When I went -- so they moved me to this new area, which is designated an open area. It's an open concept cubicle about the size of a football field, I'd say, and the Asthma attacks continued, the Dysphonia continued, the Asthma attacks continued and I would have to rush out. I would have to leave for the



day. I would have to sick leave and at that point it was confirmed with Michele Trent, who was another assistant coach.
One time I had to -- one time I used the machine in another Veteran's Service Center Manager's office, Millie Capan, I think her last name is, and she stayed in the office. And she's another one, she said, "Oh, I know people have Asthma, it's the allergies." I'm like, "No, it's only in the building, it's only in the building." So she was someone else who ended up knowing. Yeah, I've had the Asthma attacks --
**Q Number 8:**
**8. On February 2, 2012, the Complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room even though her work station was an open cubicle in an area comparable to a football field.**
**Is that what you were speaking of a few minutes ago?**
A This is the accommodation that is -- I know of at least four other people who have respiratory problems and have reported it and they're in the same open cubicle area and they were all given a small room with the Honeywell machines -- 4 East also. And when I brought it to their attention that this wasn't effective Tammi Clark said she's -- well it's like your little bubble. Like it doesn't work. It wasn't designed for it.



**Q Number 9:**
**9. On February 26, 2012, Bonnie Wax sent the Complainant a memo advising her that her request for an accommodation was denied and she described the Complainant's medical condition as a temporary condition that impairs her ability speak and that the condition is expected to resolve itself within six weeks.**
A What's the date on that?
**Q February 26, 2012.**
A The year is wrong.
**Q So it should be?**
A 2010.
**Q Okay.**
A I have a copy of that with me.
**Q Okay. Explain what happened here?**
A I was hired in February 2009. Probably like May is when I realized that I was sick because the building and Dysphonia was the major symptoms, which is vocal chord dysfunction. My voice was nothing worse than a deep gasping sound. I saw many specialists and the whole nine yards. I was working for Tom Vernon on 31 when I received notification for a rotation onto the phone unit.
And by this point I had already watched how they were dealing with people who were sick. By this point I had already



met with Bettie Bookhart who told me that these people don't believe in doing accommodations. It's my right to do so but basically could do it at my own peril. So then I got moved down to the phone unit and I had no voice so I had to address it. I brought in a note and then back and forth to specialists.
I never met Bonnie Wax. I hadn't talked to anybody in Human Resources and I got this letter saying that my situation was temporary even though I had already been -- I didn't know where she got any of the information that she put in this memo. No one from Human Resources ever talked to me. My doctors were never asked for any information. So it was very terrifying for me to have her involved and have any knowledge and then to be writing misinformation.
So that's where that letter came from. I don't know where -- I don't know what it was. I mean, I knew by law she had to address the reasonable accommodation request.
**Q Number 10:**
**10. On March 11, 2012, the Complainant was not advised in a timely manner that her accommodation request was granted.**
**What happened?**
A On March?
**Q On March 11, 2012, the Complainant was not advised in a timely manner that her accommodation request was granted.**

A I can't remember the whole story on that. I'm going to have to look it up and I have it right here. Oh, oh -- how do you spell "oh, oh, oh," Leigh?

Okay, we, as a new class of RVSRs, were told that there was -- we were going to sit for a certification exam. By now I was already up in -- I was having difficulty breathing. I had contacted my coach, I had contacted Tammi Clark saying "Where can I take this test?" It's a computer-based test, other than in the area of the building that we already knew made me sick. The health condition was getting worse. They never got a hold of me.

It was not until the morning of the test when I had resigned to the fact that I wasn't going to be able to sit for this exam, that they tell me, well you can sit for the test, you have a few hours, we've found another location for you, without allowing -- have any time to prepare, to set anything up, to do anything. They did not tell me that they had set up an accommodation until the morning of the test. And I asked Tammi -- Tammi knew I had left. Tammi Clark knew I had left. I told her I can't breathe I have to go.

When I asked her, "Why didn't you call me and tell me the test site was ready, they had a clean test site?" "Well I don't have your phone number." "Oh, why didn't you get it from



someone?" And they got very ugly with me about being unappreciative and all the effort they had to go do to come up with an accommodation for me.

So not only did I not get the opportunity to take that test, they were -- it was hostile, very hostile and demeaning because I wasn't appreciative of all the effort they went to get someplace that I could hopefully breathe.

**Q Is that when you said your meeting was the day --**

A Well I actually think I have copies of those emails because I said, you know, I wish you had told me earlier. I wish I had known earlier and that's when she was saying -- she just said something about -- it was, "We've had to go to great lengths for you" like they were doing me a favor.

But doing an accommodation this was a pattern that I've seen over again. Doing an accommodation is a favor that they do in their mindset. It's that I am an inconvenience, that the disabilities are inconvenient. And this was the whole tone of her email.

**Q Number 11:**

**11. On March 20, 2012, the Complainant was given another ineffective accommodation when she was authorized to work at home three days a week and on the days the Complainant was required to report to the office she suffered Asthma attacks**



**which forced her to leave the building.**

**Yes?**

A So the original conversation and the formal request, this meeting with Tammi Clark about the breathing was -- I think you said I'd discussed it with them. It was actually January 10th not January 9th.

**Q Okay.**

A So January 10th. January 13th, I'm out in an ambulance. It wasn't until March 20th that they finally granted an accommodation to allow me to work at home. But, again, the accommodation wasn't tied to my specific disability. In the accommodation it doesn't talk about how we address it when there are problems with the breathing. None of the aspects of the sinus infection, the sinuses bleeding, my inability to breath. None of that is discussed.

There were no communications. There was no discourse about the accommodation than what we had found since then and, actually, in the mediation meeting with Sandy Smith she verified that that is the accommodation that is given to anyone who needs -- any RVSR who needs an accommodation they all get the exact same one. But they are not specific to illness, to disability, to need.

It had become apparent from working there as well as it was



confirmed by Sandy Smith. So I was not given what I needed for my body.

**Q So the days you had to come into the office you would still have the attacks and you would be forced to leave the building before the end of your tour?**

A Yes, this -- I think I need to interject something here that's going to tie in. This is when I was working for Ulyssee McBurrough, also known as "Bo", who was the assistant called Bo, and Jerry Huffman. And the two of them said if you get sick -- "Before you get sick just get out of the building. When you're sick you can work at home. You're set up to work at home. You've already come in, you've accounted for your files, you've done what you need to do, go home. Work from there." That was pre-EEO. This isn't in writing anywhere.

It was also confirmed by Sandy Smith that in the -- that recently Ulyssee McBurrough was counseled, he was disciplined, for allowing me to leave that way, that he should not have allowed me to go home and work, said, if I was sick -- if I claimed to be sick I had leave use my own sick time, which goes into a more current problem. Now that's where it becomes -- that's when it gets into retribution.

And this is the chill effect, the chill factor, that set in when someone -- to people who have done things that are right

and why people hesitate and don't want to do it right in that building because you can actually be counseled or disciplined for it. Okay. So that's -- okay.

**Q Number 12:**

**12. On May 31, 2012, although a cover sheet that stated "A copy of all records personally identifiable to Ms. Mullin. Management provides the following . . . Ms. Mullin's reasonable accommodation folder" was attached to the Complainant's Official Personnel Folder. The memo described above as Event 21 was missing from the folder.**

**Now explain that event?**

A I want to say this is prior to the EEO. I think it was in the title of -- tied within the EEO. This is when it started. I had also claimed a Workman's Comp during -- after the ambulance trip I had to file a Workman's Comp, which I never wanted to do because I knew what would happen to me. So I filed the Workman's Comp and there was also the EEO process going on. And so I wanted a copy of my Human Resource file and that's when I learned that legally I had the right to that.

So after much begging and pleading I finally got Valorie Reilly, our president, to send an email requesting these documents for me with a deadline. The deadline came when all sorts of things happened. The file was finally given to Valorie



Reilly, Valorie Reilly gave it someone else who brought it to my home. By then I was in my cancer treatment.

And when I went through it is when I noticed there were pages missing out of it and the pages that were missing were specific ones like that letter that I referred to about her denying my accommodation for the vocal chord dysfunction. That was missing from the file. They were things that I actually had copies of. I had my own physical copies that were missing from that file.

**Q Number 13:**

**13. On May 3, 2012, the Complainant was informed that her request for advanced sick leave was denied.**

**Who denied you the advanced sick leave?**

A It was -- let me see, this is -- okay, May 3rd -- this may answer a few good questions. May 3, 2012, was the day prior to my partial mastectomy. May 3rd, I went in to turn in all my files. While I was there I went to Human Resources to make sure that the FMLA part of the documents were correct, my request for leave donation and one other form I can't remember right now and that's when Tammi informed me that none of it was in place, none of it had been acceptable.

**Q The FMLA paperwork?**

A Even the FMLA paperwork. She didn't -- she said that the



FMLA paperwork didn't give enough information. At that point in time I didn't know that I should have requested in writing why it was insufficient. I just said, "I don't know what more you want. I have breast cancer and they won't know until they do the surgery. I don't have any" -- and she, "Well you have to give me more." I'm like "I don't know what to give you. I don't know what you want."

"You just have to get more. You have to find out what the diagnosis -- when you're going to return to work." And I like, "They won't know until they go in." I want to go past -- so the next day I went into surgery with Mary Jo Shapiro with me as well as my parents, Ann and George Mullin and as I was waiting to be taken into pre-op the four of us sat together knee-to-knee and tried to figure out a way to get the paperwork that Human Resources was demanding straightened out.

Going into breast surgery my mom had the medical proxy, Mary Jo knew about the shenanigans with the HR so she has an idea of how to process the paperwork so that was my last thought in going into surgery was how I was going to get through this -- I mean, my fear that I could, first of all, be charged AWOL, I could be without pay, they could fire me is what I went through.

When I came out of the anesthesia I guess that was the first thing out of my mouth was, "Mary Jo were you able to get



the paperwork done?" And even at Moffitt, Moffitt Cancer Center, they didn't know of more they could give Human Resources, Veterans Benefits Administration, St. Pete. They gave everything they could but they had never heard of anything and that was obviously harassment, there is hostility right there. Okay.

Now were back to the 3rd. So, on the 3rd that's when I left. I was told that nothing was in order. I went back to my desk and that's when, I also want to tie in with another question, is when I run into Casey Crump. Casey Crump is my AFGE chief steward. And Casey is the one who Bonnie Wax had told, you know, isn't that interesting about Ms. Mullin with her Breast Cancer and it was her Breast Cancer that caused all the breathing problems not -- there was never anything wrong with the building.

Because Casey Crump happens to be a Decision Review Officer his first reaction was fear because he knew if my Breast Cancer was that bad that it would affect my breathing, that it was going to be a fatal situation. He emailed me to say, "Hey, I heard this is going on." And that was right after going through what I did with Human Resources and my paperwork. To say I left there angry and upset is -- and I also reported that to AFGE president Valorie Reilly immediately then, right immediately

that Bonnie was saying these things and none of my paperwork was in order.
Can you turn it off a second?
INVESTIGATOR HENLEY: We're off the record, Leigh.
COURT REPORTER: Off the record.
(Off the record at 2:42 p.m.)
(On the record at 2:44 p.m.)
COURT REPORTER: Okay, on the record, and can everyone speak up a little bit?
THE WITNESS: Sure, I'm sorry, getting a little emotional here, getting a little whispery, I'll get past that.
COURT REPORTER: Sorry, okay, thank you.
BY INVESTIGATOR HENLEY:
**Q That sick leave was denied by who?**
A It was a verbal done by Tammi Wax --
**Q Tammi Wax?**
A -- Tammi Clarke.
**Q Tammi Clark, and you mentioned about your problem you had with FMLA and then you also -- we talked about Number 15, which was the horrible comments made by Bonnie Wax about your medical condition?**
A Yeah.
**Q Okay.**



A And in conclusion to that, things that Bonnie said to Casey Crump, in the second meeting with the Director the Director brought that subject up. The Director, Kerrie Witty, said, "What's this about Bonnie talking about your Breast Cancer and your lungs? Where is an email about that?" And I said, "Well there isn't an email, it was verbal." And she looked at me and she laughed. She says, "Oh, there's no record of that?" I just want that on the record. When it was reported, that was reported, that instance was reported to the Director and so it's not documented, it was dismissed.
**Q Okay. Let's move on to Number 16:**
**16. On May 31, 2012, HR officials failed to provide the Complainant's union representative with a complete record of information that was needed to assist the Complainant with her reasonable accommodation request and the response to the information request was delayed.**
A That's the same one.
**Q Okay.**
A That also ties into the Workman's Comp as well. These were the records that I needed. This is the beginning of them interfering with my claim for Workman's Compensation. I believe that was part of that too.
**Q Okay, explain how they interfered?**



A When I was taken out in the ambulance Tammi Clarke signed off on one of the documents I needed for Workman's Comp. As I went through the process, I was trying to apply for Workman's Comp on an illness that began in 2009 and wasn't sure how to go about it and I emailed Tammi and said, you know, are there deadlines I need to follow? Is it this form, it's that form? And, literally, the emails were never responded to.
I ran into her and -- with someone up there, I said, so what am I supposed to be doing? What's the deadline? Oh, there's no deadline. You just need to get it. They'll take it whenever it's there. And weeks and weeks passed and I strongly suspect that what they submitted -- because the Workman's Comp wanted copies of the air quality studies and other issues pertaining to the building and I strongly suspected that they did not comply to the document of record. I needed my own personnel records for it and I didn't speak later that -- and I think they were -- when they did the CA2 and those forms I believe there's some fraudulence there.
**Q Number 17:**
**17. On June 5, 2012, while the Complainant was battling Cancer, BW (Bonnie Wax) sent her a lengthy email instead of sending the email to her representative.**
A That's not -- the wording on that's slightly off. What she



did was I had stated clearly I didn't want to hear anything from Bonnie Wax. She upset me, I didn't want anything to do with her and I asked that all the correspondence go through the union. And she still -- she sent an email to Valorie Reilly but she cc'd me on it. And this is one of the ones at the meeting -- at the meeting with Kerrie Witty, Kerrie Witty who I had already asked to stop -- for her to intervene on my behalf and stop Bonnie Wax from communicating with me and to oversee what Bonnie Wax was doing, Kerrie Witty, at the second meeting, told me not only was she aware of this email that Bonnie Wax sent me she had approved it.
She had read it and approved it before Bonnie sent it. And I was actually at Moffitt. It was the day I was told when I had chemotherapy. It was just within 40 minutes of finding out I had chemo. I had opened up my main email and there was a thing from Bonnie Wax. Crying, upset, I can't even tell you --
**Q Number 18:**
**18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty (KW) stated Bonnie Wax felt that she was being targeted by the union, that she approved Bonnie Wax's email of June 5, 2012, and she could not understand why the Complainant had a problem with it and that she did not support granting accommodations.**

**I think you touched on that a few minutes ago?**
A There's like probably only one thing I need to wrap out on that. This is the meeting that -- the accommodation I asked for was, at that point -- was that during the time that I was going through chemo they expected that in the cycles I would be sick for two weeks and then able to work for one week but my autoimmune system was going to be compromised. So I just asked if someone could bring the files to the front door. My dad could drive me there so I could, you know, move -- be there for the handling of the movement of the files but to prevent me from having to go into the building and to protect myself.
And I said I need be doing something while I'm -- around. I need to keep my head out of the chemo world. Let me do this. And this is when Director Witty stated straight out, "We do not believe in giving accommodations." This is when she said that. And all through -- during that meeting -- also during that meeting she was so ugly to me that I actually tried to get up and leave.
I'm not even embarrassed to say I started crying. She was so ugly. She was not willing -- when I asked her if -- I said, "Can you please have someone oversee my leave donations?" Have another designated fact-find so somebody else can get them because they're disappearing, I'm not getting my leave." And



she was sarcastic and caustic. I asked her if someone else could get involved, someone else. It was one answer after another just sarcastic and mean to the point I was in tears and I tried to end the meeting.
I said, "There's no point in going on with this, you know the Director obviously has no interest in working this out. And I'm not sure but Casey Crump and Keith Pryor and Ted Smith somehow got me to back down and said, you know, we have to be able to -- we can salvage something from this meeting. And we did get through the rest of it, nothing was salvaged. So please know, as a result of that, no accommodation, she wouldn't -- that means I had to use more of my FMLA time. I had to use more leave time with no pay. Her decision right then and there had such a major effect on many aspects of my life.
Her denying me the opportunity to work on veteran's files, denying me the opportunity to be part of life. I mean, there's many big things that came out of that meeting.
**Q During this meeting, who was all present at this meeting? I think you mentioned it earlier but I want to make sure I have it on the record here.**
A Off the record it was Director Kerrie Witty, Assistant Service Center Manager Jerry Huffman, AFGE steward Theodore Smith, local vice president of the AFGE Keith Pryor and myself.



**Q Number 19:**
**19. On June 10, 2012, Director Kerrie Witty denied the Complainant's request to have her donated leave handled in a way that would allow her accountability, and as of September 2012 problems with the Complainant's donated leave escalated.**
**And I think you already responded to it?**
A Yes, I still don't know what happened with my donated leave. To date, I don't know what happened.
**Q Number 20:**
**20. On June 14, 2012, through June 29, 2012, the Complainant's request for leave under the leave transfer program was delayed.**
**What happened there?**
A I may -- I probably have to look further into that. When a request for leave donation is made it's supposed to be responded to in a timely fashion.
**Q Okay.**
A And my need for leave was known to be urgent and it wasn't processed that way.
**Q Okay. Okay. Number 21:**
**21. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the Complainant's advanced sick leave was not processed.**



**What happened here?**
A I don't understand that but -- how that was originally written. Oh, this is where the beginning -- the advanced sick leave was -- the process for requesting advanced sick leave at our Regional Office doesn't allow for any transparency. The requests originate from a coach and it has to go through a series of signatures and no one has to date their signature. No one knows when -- whose desk things get held up on, why things get processed or why they don't but if they're not done in a timely fashion there's no money in the paycheck.
Pay cycle, this is one of the most harassing, cruel, horrible things that they did consistently was never allow me the knowledge of knowing whether or not there would be a paycheck, if they were going to advance it, if they weren't, if there were leave donations, if there weren't. From week to week I didn't know if it was going to be any money coming in. So those dates are like I expected, you know, money coming in like $1200 to get along, because I had enough time that I could borrow against my own advanced leave. My paycheck was $480.
Paycheck 8-25, no money, nothing, only because the paperwork wasn't done in a timely fashion. The next one -- and I have asked, I've asked for -- requested copies of these, these leave donation requests, and I actually received a stack of

them, backfilled, a whole stack of imaginary -- in October, I guess it was October of 2012, when I nagged and nagged about it that they backfilled the form to cover up the fact that they didn't do these in a timely fashion. And I have a copy of all of those as well. So, yes, they tortured me with that.
**Q The process that you just described is that the actual policy for advanced sick leave?**
A Let me tell you, I had to describe very poorly and I'm going to own that. I want this in the record. At our Regional Office there are no SOPs that are published, that are handed to the employees, that are handed to the unions. We don't know what the exact procedures are. It is not common knowledge what the procedures are for FMLA, accommodations, leave donations, advancements, none of it.
What I was told verbally, still couldn't get in writing because I proved them -- submit the request to my coach. The coach applies it to, I believe it's an OPM 71, I think is the form, I'm not sure, 71 with a memo stating that it needs to be done. The attached memo goes through the Assistant Service Center Manager and Human Resources and a number of people who have to sign off on it and, finally, Kerrie Witty is the final signature and then Payroll can advance -- do the leave advance.
Am I positive of this? No, I've never seen it in writing,



I haven't been able to get it in writing. This is how I was told the process worked and I have a stack of them so you can see that none of these memos are signed and dated. They're signed but nothing's dated.
REPRESENTATIVE: Can I interject?
INVESTIGATOR HENLEY: Let's go off the record, Leigh.
COURT REPORTER: Off the record.
(Off the record at 2:59 p.m.)
(On the record at 3:00 p.m.)
INVESTIGATOR HENLEY: Let's go back on the record, Leigh.
THE WITNESS: The clarification of leave -- or the elaboration of the problems with the leave donation program at our Regional Office, there's a lack of accountability. When an employee would donate leave to me there's no system in place to notify the donor that that leave has been accepted and applied. The recipient has no notification as to whether or not a donor has donated time.
And on top of that, when we went through a formal process of requesting copies of my leave donations and Bonnie Wax supplied what she said I had of record the time didn't add up to what was showing up on my leave and earning statement. The amount of leave, actually, at that given day, the amount of leave on the leave form exceeded what was in my pay. Also, in



that, there was a leave donation -- she gave me a leave donation form that belonged -- was supposed to go to a different employee.
There's no oversight, there's nothing. And the numbers, the bookkeeping and the forms for my case were never in line. I have requested these forms again. I've requested an audit and we've been refused an audit. I cannot get an audit of my payroll. I had asked for a detailed -- I've asked the union to get me a detail of the audit and by means of not acting on that request I deem it as a complete denial an audit of my record.
BY INVESTIGATOR HENLEY:
**Q Number 22:**
**22. In June 2012, although the Complainant did not request an accommodation in 2010, Bonnie Wax stated in an email that in 2010 she withdrew her request for an accommodation.**
**Explain this incident?**
A This ties back to the event I told you about before, the one where I was put into the phone unit and I received the letter saying that an accommodation I had requested, which I didn't know anything about, was denied. This rambling email that I get that's from Bonnie later on would comment about that 2010 document and about the fact that I had withdrawn it. I don't know why she would refer back to it so in the future date



I didn't apply for it so I didn't withdraw it. I don't know what she was trying to cover up or what her intention was, what the pretext was with that statement.
When I received it I did write on it that this is not something I had requested. I didn't know what it was, and I do have copies of that. I don't know what she was saying. This is another Bonnie Wax pretext.
**Q Number 23:**
**23. On August 16, 2012, the Complainant's request for the leave under the leave transfer program was not processed.**
**And that's what you were talking about earlier.**
A Yes.
**Q Okay. All right. Number 24:**
**24. On August 31, 2012, after being advised that the Office of Personnel Management was conducting a security investigation on the Complainant, HR failed to inform OPM that she was on extended medical leave.**
**What happened here?**
A Now please keep in mind now it's August, I'm already -- I've already gone through -- I'm into the third round of chemotherapy with complications. My liver area they don't know if it's been shredded or not. I am so sick of feeling -- yeah, two surgeries, three rounds of chemo, broke trying to keep the

electricity on and I opened up my Hot Mail account and there's an email from someone in OPM. How he got my Hot Mail number email address I don't know but I'm thankful that he did.

It was an email kind of threatening in tone saying that I have refused to respond to requests for my investigation for a security clearance. As an RVSR, with a promotion I needed to have another investigation done. I never knew -- he had been sending the emails to my VA email account, which I didn't respond to since I wasn't working because I didn't have accommodation, but HR knew. They were carbon -- cc'd on every single one of those emails. They knew that the investigator was trying to get a hold of me.

They knew it and I was the one who had, you know, I responded back to him, I said, "I don't know why they haven't told you that I'm on extended medical leave." And he was humble and he was gracious and apologetic and he was fabulous. But HR -- actually, HR turned it around and said it was all his fault as well. But, yeah, yeah, I almost didn't get my security clearance while I had chemo because HR wouldn't let them know I wasn't at work.

**Q Number 25:**

**On September 17, 2012, the Complainant discovered that she was removed from the web-based training system.**



A Okay, ANA (ph.), which is our web-based training system, I could no longer access it. And there was a list of training that I needed to catch up on and I couldn't get access to any of them. A gentleman who was responsible for that within the VA, James Jones I think his name, he goes by JJ, he tried to help me over and over again to -- he'd established my identification in the system and then it would knock me out again. So, yeah, I couldn't access the training to get caught up on training for a very, very long period of time.

**Q Did you find out why you was not able to access --**

A In theory, this has not been confirmed, but when they did those things with my paycheck that left me in the leave without pay status the leave without pay status automatically kicked me out as an employee in TMS. So, again, no accommodations, no work, no income leads to leave without pay, which affected my life and also affected my training because it took me out of the training -- through the computer I was no longer an employee is the explanation we were given.

It all goes back to their unwillingness to accommodate me. All those were factors. This is my understanding of why that happened.

**Q Number 26:**

**26. On February 6, 2012, TC --**



A Tamanique Clarke.

**Q -- Tamanique Clarke spoke to the Complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation. The Complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.**

**What happened here? And I think you touched on it a little bit earlier.**

A No, I haven't touched on this one yet or barely. Three times the agency has changed my accommodations, the initial one March in 2012. They had me coming in two days a week Tuesdays and Thursdays. When I came back after the finalization -- okay, when I came back after the Cancer treatment -- actually, I tried to work during Cancer treatment. I used to try to come in and Veronica Clark, my assistant coach, Veronica Collins, I apologize, was short and abrupt and that was a challenge for me.

Also, I got very sick. In the 4th of December, one of these half days that I went in, because at this point I was still allowed to go home, but I went in and my lungs hurt. I was only there a couple of hours and the lungs I had terrible pain in my lungs and it didn't go away and I got out of the building quickly. By the next -- two days later I go in for another tour, a Thursday, my face started to hurt and within a



few hours my sinuses are bleeding.

Tammi Clark happened to be in the area and I talked to her about it. I had no voice, no voice, I was so sick and I left. This is the point the doctor says, "Aileen, you just can't go in there unless they modify these accommodations."

So I called a meeting, and I can verify these dates for you, but in the meeting was -- you were there, right -- John Smith, Tammi Clark, myself -- I don't know I'll have to check, there may have been a fourth person there but it was definitely John Smith, Tammi Clark and myself.

And we sat outside by the picnic tables because I couldn't go indoors and I said, "I think we can work this out," foolishly optimistic, rose colored glasses. "I have to further limit my time in the building but I think we can do this. This is how we can do it." And I started talking about the marginal functions of the position versus the essential and emphasized the fact that if we cut back my time in the building and strategize so that when I am there I can be with the Decision Review Officers and discuss the cases that need discussion.

And, you know, there's a common printer. If someone could pick up the printing for me I'd have it on my desk when I come in, that'll save me from walking on to that end of the building and, you know, mail searches. And I had all this -- dots and

plans and ways we could do it and I could continue serving veterans and it's all good.

And we scheduled to meet again the next day. That night after the meeting, it was probably about 5, I called Tammi back to tell her that I heard it was going to be cold the next day. I said maybe we can't meet outside, maybe we need to find another place to meet and this is when she informed me that all my requests for accommodations had been denied. "What are you talking about? We haven't even talked about them yet. May we come up?" "No, your accommodations have been denied."

"Like who denied my accommodation?" "Sandy Smith." And this is when I started crying and this is when I started crying so hard. Then I tried to go into my meeting in Moffitt, which is another thing I missed out on. It was a post-Cancer program that I was enrolled in and then we got through. I know I was screwed because like how do we go from this great meeting and we all thought it was a meeting of the minds and we can make this work. "No, everything is denied."

And that's when I started crying and that's when I didn't stop crying. I believe this was the same time and that's when they broke me. And during the night that's when I got sick and that's when I started developing terrible abdominal pain. Then I was beside myself. I knew that -- it didn't make any sense to



me that we could come to such a rational and reasonable conversation and the dialogue just to be thrown away again, just thrown away like it never occurred.

And I knew that they could position me to say I can't do my job. If they don't accommodate me I knew what the next step was. I've seen them do it to other people. Well we tried everything we can, you can't do the job, sorry, we've done everything we can. I have documents I can show where they do this to other employees. And during the night the pain got worse and I did end up hospitalized by the next morning and the hospital where I stayed I was hospitalized for seven days. I was hospitalized with rectal bleeding, uncontrollable rectal bleeding.

While I was in the hospital, actually, once again, rose colored classes, foolish Aileen, I know I have to get back to work when I get out of the hospital. I didn't understand the severity of my condition, my medical condition, at that point. So I called Tammi Clark and said, okay, how can we work this out so I can back to work when they let me out, you know, how are we going to work it out? And this is while I was in the hospital and she knew I was in the hospital.

I was, you know, tied up on IV machines and it was a terrible scene, and this is when she notified me that no, there



would be no accommodations, and I'm like denials had already been submitted to General Counsel to have it formalized. And that's when I'm like "Oh, how could you do that? How could you tell them you haven't even discussed this with me? But there has been no dialogue, that I don't -- you're denying a request that I've never even asked for, that hasn't been discussed, there's never been a process."

And yeah, I lost it, they had to actually call my primary and a social worker came in because I wasn't being the happy perfect patient to being totally inconsolable. So that's probably right when we started having this -- no, it was prior to that -- medicate me for anxiety because the anxiety that they caused is causing more damage. Okay, that's when she told me that, yes -- while I was in the hospital is when they said that, no, we won't talk about accommodations --

Hostile? Yes, hostile. Retribution? Yes, there is.

**Q Thank you. Number 27:**

**27. On or about March 29, 2013, the Complainant was advised that modifications to her reasonable accommodation request were reversed.**

A Yes. So the first round of requests had me in there on Tuesdays and Thursdays. When I got out of the hospital over the phone we had meetings with -- I was at home, John Smith, AFGE,



Casey Crump, AFGE union chief steward and Tammi Clark, who told us she was the designated local Reasonable Accommodation Coordinator, which none of us had ever even heard of. We didn't -- to the best of my knowledge we've never had one until this meeting. The agency never had one.

And it was very civilized, it was a very good meeting. Again, it just -- we came to a meeting of minds how I was assigned it, we designated a smaller area where we can contain the air, you know, we can, you know, work with the, you know, keep the air controllable, get me in and out, have me close to the Decision Review Officers so that the files can be moved.

We had a second meeting, the next meeting, and this is when John proposed to Tammi Clark that we do this. At least get me back in the building, see if it works out. If it works out we'll increase the number of hours that I'm in the building. If we could find a good location we'll work it out from there. We left the meeting and that's how it was. That was the agreement.

I returned to work, the first day I get back, great location, which seemed perfect but I guess for the agency it couldn't work. They moved me to a second location where the hostility -- I was put in an area with coaches and two of these women who were so aggressive, so angry towards me, slamming doors, slamming things, it was a terrible situation, which kept

me out so I'm completely far away from any Decision Review Officer. I'm not near anyone.

I have been told straight out that I will have no assistance with moving a file. Oh, I'm sorry, I'm going to back up. The conversation with Tammi Clark when I was in the hospital, and I have this stuff in writing, too, I have an email from her. She says, "Aileen, these things that you think are marginal tasks, or minimal tasks, they're essential parts of your job. It is essential that you get your documents from the copy machine, it's essential that you go over to the mail and it's essential" -- and I just knew that she was saying didn't make any sense.

I said, "You're going to tell me that those parts are the essential part of a Decision -- a Rating Specialist? This is what we do. You can't do this job unless you can go get mail from a certain location?" And she says, "Yes, because we in the agency have decided that your job function, all of your functions of your job are combined together to create one essential job function, which is every part of the process."

But, okay. So when I'm in the office in this location I actually had to go back in wearing a respirator. And it's a very large, ugly Freon respirator. And I didn't wear it all the time because I found like I couldn't stand wearing it like



walking across a big area or in the cafeteria, which is all just tiled floor and things like that, but I wore it the majority of time.

But the challenges work-wise were I still couldn't go and get the mail. I went to the common printer one time because they wouldn't get my stuff from the printing machine and a coworker was walking by. I said, "Hey, Beth," and she turned around and she started laughing at me, hysterically laughing at me because I'm standing there in this freaking respirator. I told her it's not funny. It looks funny. I look like a freak in it. Darth Vader they would call me. So I ducked around a corner into some little cubicle that I knew and I bawled my eyes out. And that was Sam -- the witness for that one is Samantha, Sam -- I forget her last name.

**Q McDonald?**

A Yeah, McDonald. So she calmed me down, got me down off the ceiling and as I walked out, who do I walk into except Bonnie Wax. Bonnie Wax, who I've never even spoken to, through all this stuff I've never even spoken to her. And she turns around and gives me a big huge grin, "Hi, Aileen." Shortly thereafter, come to find out, they were reporting on the fact that I was seen walking around without a respirator on and that I'm not taking responsibility for my own health because I'm not wearing



a respirator -- I'm sorry I regress.

All right, Leigh, I'm going to breathe for a second.

INVESTIGATOR HENLEY: Off the record, Leigh.

COURT REPORTER: Okay, off the record.

(Off the record at 3:22 p.m.)

(On the record at 3:23 p.m.)

INVESTIGATOR HENLEY:

**Q Let's go back on the record. So your reasonable accommodation was reversed so they had denied --**

A Okay. So I had been working -- when I was originally granted the accommodation in March of 2012, I was allowed, even though it was not in writing, Jerry Huffman and Bo -- Jerry had given approval for me to leave when I get sick and work at home, but, again, they didn't put it in writing.

After this meeting that John and Casey had had with Tammi Clark where it was agreed that I would come in for a short period of time, try to extend it, everything was approved, I come in for the next tour. It's on a Thursday, and I guess that was the 28th, and Ulyssee McBurrough pulled me aside to let me know that all of my requests for modification have been rescinded, that I had actually never been permitted to leave when I got sick, that when I got sick I am not at work I am to use my own leave, that the accommodation never said -- the



accommodation always said I had to be at work in that building for eight hours, which is false, not true. It doesn't say it anywhere in the document.

And they just blew me away. I mean, the whole thing was lies and he was directed to tell me these things. He was told, he says, "I was told that I was not supposed to let you leave." I said, "Well, Bo, this last time you didn't -- had nothing to do with you. It was agreed upon by Tammi Clark." He goes, "Well, Tammi says she didn't agree to it," that that conversation didn't happen, this reasonable accommodation.

So I emailed Tammi Clark, saying, "I'm understanding that my accommodation has been reversed. This must be a mistake." And she emailed me back, she says, "No, they were never reversed because you never had them, that you were never allowed to do that," and I have copies of all that for you. And that's when I started crying because again they frigging nailed me.

Jerry Huffman, my boss, walks in and let me tell you -- I had been trying to get hold of my bosses, Bo's bosses, for a month at least, emailing, "Can you set up a time?" They had refused to meet with me. I am like just -- people are afraid to be near me. They refuse to be near me because they're not permitted to do what's right. I had a coach, an assistant coach come by.

They were having a huge party that I couldn't -- breakfast I couldn't go to because I couldn't go out in the area and the assistant coach, Veronica Collins, comes out, "I can bring you a bagel," which, no, it's not an accommodation I'm just bringing a bagel because we can't do anything different for you. And Bo was telling out there, "Don't ever do anything different for Aileen."

So the accommodations that were refused -- that were reversed were now off and I have to stay in the building for eight hours. I have to be there eight hours on Tuesdays, eight hours on Thursdays. If not, I had to use my own leave when I left. They never put the medical dispenser where I go into the medical plant. Keeping me in the building they knew could kill me. They didn't make up any of the emergency medical plans.

I went to the VA police myself and told them what the situation was and we set up our own emergency medical plan because I knew that the next Asthma attack we weren't going to have any time to play. At this point my immune system is too compromised. I would be dead quickly. And that's all I'll say on that. Sorry, John.

**Q We've talked about 27 events. Of those 27 events why do you think that they subjected you to a hostile work environment and/or harassment?**



A I think probably the main key reason is because of my degree of my illness, that this isn't just carpal tunnel. This is not, you know, this isn't an easily fixed situation -- it because of the degree of the illness. Second is because I have stated, I have evidenced and I have proven through Workman's Comp it's granted that that building causes people to be sick. And they have something in there and I'm not saying sick building syndrome. I think something in that building is making people sick. I'm saying that because it's a big problem in there because of it.

I think that those are probably the two big reasons; my degree of illness and the fact that it's had some -- in the building.

**Q At any time did you inform the individuals who you're claiming are involved in this complaint that you found their behavior to be offensive or anything like that?**

A I reported it to Kerrie.

**Q And what was her response to you? You reported that you felt that you were being subjected to hostile work environment harassment?**

A Oh, no, there was hostile work environment? No, because that was the first time -- the real hostility started from Kerrie. There was nobody to report it to. Kerrie -- yes, I did



report it. Oh, wait a minute, I stand corrected. Yes, it's reported. It's actually -- I had written it on the back of my monthly evaluation, which has been seen by my coach, the Assistant Service Center Manager, Sandy Smith, the Service Center Manager.

**Q Who's your Assistant Service Center Manager?**

A At that time it was Jerry Huffman.

**Q Who was your coach?**

A Ulyssee McBurrough.

**Q And you say you wrote this on your performance --**

A Performance evaluation.

**Q That -- you said you was in a hostile work environment?**

A That I was being harassed, that I can't get my job done, I can't do it because I'm constantly, you know, trying to dismember pretext or protect myself or keep my job or get a paycheck. That they just won't stop. They never stop it, in fact.

**Q Did any one of those individuals respond to your --**

A Nope, no. It's the chill effect. Man, nobody's going to say anything to me about anything right now. Everyone needs to talk now and that's all there is to it.

Also, I want to tell you, the day that I got very upset, I guess that was March 28th, it was the day John came in, Jerry



Huffman was the first one in the door. He just happened to walk in and see me crying and he -- or even avoiding my meeting.

He was the guy who was originally good. He was just a stand up kind of guy. Now he just avoids me, wants nothing to do with me, saying that, "No, no, I never said that Aileen could go home sick." But that day I'm crying and he looked at me, he's like -- I said, "They won't stop. They won't stop." He says, "I don't know what you're talking about. I said, "The harassing emails. Look, there's another one." He comes in. So he got it through verbal as well as they've all received written notification of the harassment.

**Q Did you report that you was being harassed or was in a hostile working environment to anyone else?**

A Yes. The union. I actually drove all the way to Georgia to the AFGE national vice president's -- no, the district vice president of the AFGE.

**Q Okay.**

A Everett Kelley. Actually --

**Q And what did you tell him?**

A Just about everything I just told you. He's been cc'd on these emails all along. I begged him for help before I came and met with you. I have copies of everything. I begged for his help through this whole process. I actually was going to their

office the day I had the Asthma attack. So they -- or, no, I have copies of all that for you too.
**Q Now when you decided to report that you was in a hostile work environment and the harassment what triggered your report?**
A The initial one was probably Bonnie talking about my Breast Cancer and the lung disease -- I mean, the respiratory issue. That was the last straw for me. That's when I knew they had no scruples, they have no barriers and no boundaries.
**Q Did you report that you said you was being harassed and a hostile work environment right away or was there a delay?**
A Oh, there was a delay for years because this has been going on since 2010.
**Q Okay, explain the delay, why didn't you report it right away?**
A Because I was afraid I'd lose my job. They also, the union, the AFGE, refused to support me and help me and I was truly alone and it was Cancer. I was trying to deal with Cancer and fight Cancer and Human Resources and it was too much for me. And I also knew that prior to me reaching my four years I knew I'd just get fired. I'd be -- I knew that with everything that happened, I'd be unemployed.
**Q Was the agency's response appropriate?**
A No.



**Q Why not?**
A They've never responded. First of all, their number one means of response is no response at all. That's the way you submit it, there's no response at all. And no response is inappropriate. And the sarcasm like what Director Witty had done with me, Tammi Clark, Mike Palmer, the coaches in the area I sat with, was inappropriate. Sarcasm is an inappropriate form of communication.
**Q When you reported that you was in a hostile work environment being harassed did the harassment cease after you reported it?**
A No, it increased.
**Q Explain it increased?**
A It's increased.
**Q How so?**
A What happened just this week? This week? Let's see, last week it was printing documents. I can't print two-tone. So I have to print into the Regional Office and hope that they bring them out to the car. They all come out to the car. I do a report and veteran's claims and the information is changed. I looked in our tracking system called ASPEN, which is you have to put your excluded time into that or your accountability. Big holes in it. They just don't approve it.



Requests for leave, that I go and wait and have to wait and wait and wait before anybody will tell me if I can do it. Oh, no -- no, actually, my review of the record, my review that I got last Friday, it's got more. Now they had just -- oh, this is very important. Now it had been phrased -- my last evaluation says that not only am I not eligible for the next level of promotion but I'm not doing my work adequately now because they're saying that I should be functioning as though I've been in the two years -- doing the job for two years. And my stance is, no, you didn't give me the accommodations for two years.
So they're coming really close to be in a position where they can get rid of me again. So, no, they're being more aggressive not less aggressive.
**Q How did the harassment or hostile work environment affect you?**
A I cry a lot. I cry a lot, I have insomnia now. Talking about not getting pleasure, it seems like the only thing I get pleasure from sometimes is, well, children, watching and directing small children. But I used to be able to walk on the beach. I used to go say a prayer and feel better. I used to be able to do art. Nothing makes me feel better now. It's just this pain. I haven't been on a holiday, I stay in my house.



I'm in fear. I live in fear constantly of these people because they're much better equipped at duplicity in ways that I never knew about. My -- financially, I'm wrecked. Even when I have money I'm afraid to pay my bills because that came out of all this inconsistency during the Cancer. And now it's like I'm afraid to pay -- I'm afraid to use the money.
Actually, it's embarrassing. I had my electricity turned off last month and it's not that I didn't have the money it's the waiting until the last minute to pay it. I'm like -- I'm financially afraid now. My gut bleeds. I'm back and forth to running another barrier of tests on me, trying to figure out what's wrong. I could go on and on but I think it's probably better I don't go on -- so, yes, financially, physically, I don't feed myself right, I don't exercise, I don't play. I don't go to church and I'm at home. So, emotionally, physically, I'm just a piece of work.
**Q Has your job been affected in any way?**
A My job it gets affected when I get one of their crazy, nasty emails. When they do something to me I have a hard time focusing back on the file when they go -- because this is what's happening and this is what I put on my evaluation, I wrote it out that I couldn't -- I can't concentrate when Human Resources is throwing these things at me or these people are doing things

that, yeah I have a hard time focusing with what I want to be doing, which is working on a file, working for a veteran's claim. Yes, it does affect me.
**Q How did your EEO activity play a part in all of this, your activity, like retaliation, reprisal, how did that play a part in --**
A I think what it did was it made -- it obviously made the Director very dissatisfied and unhappy with me. And it's a top down organization so everyone under her who knows that -- the Director just makes it clear that I'm a problem. So since the EEO that was when -- the first meeting with the Director she was fine. After the EEO is when she became ugly with me and it was after the EEO that the people under her started changing how they treated me. That's how I feel.
**Q Your other basis is disability, how does your disability play into all of this?**
A Well, mostly, it's the Asthma is the biggest part of it. It plays into it because I can't go in and take care of things myself. You know, like I know, okay, here's this file, this one I'm working on right now, and it's a couple of things that I've never seen before. It's a great learning file, you know, it's full and complex. And the fact that I can't go in and say -- that's the part of -- the breathing and the fact that I can't go



in and do my job.
I can't -- I'm not allowed to even do my job. So that's the disability as far as the Asthma. The Cancer and things like that is that I'm still tired but that's all. I think that's the biggest one is the isolation the Asthma causes.
**Q Did you tell anyone about being harassed and in a hostile work environment right after it occurred?**
A Oh, yeah, oh, yeah.
**Q Who did you tell?**
A Well, personally, my doctor has known all along, my primary. She also sent me to a respiratory doctor who deals with sleep issues. The Iritis people, which is the secondary to the systemic incidents, he knows about it. So there is people in my medical life. I also saw a wonderful counselor for a while but she doesn't cover under our insurance so I'm not seeing her now. She's been part of it. A social worker at the hospital, the nurses at the hospital when they did it.
People like John and other reps who've had to like clean up the mess because they're there as soon as it's done and I was a bawling, you know, mess. You know, there are people who've seen it and there are a lot of people like my mom and my dad, Mary Jo Shapiro, Natalie Kennedy, friends that I used to teach with were there cleaning up the mess all the time.



**Q Did anyone see you immediately after any of the incidents --**
A Oh, sure, during the incidents and after the incidents. Yes. Oh, yeah.
**Q Who are those people?**
A Well, let's see, the during the ones, we can talk about that meeting with the Director when Jerry Huffman, Keith Pryor and Theodore Smith were there. I mean, I'm crying in the meeting. Yeah. You know, there were people right there in the workplace who've seen it. At home I live alone so it's usually, you know, it's a pick up the phone and call right away. Yeah. Barbara Zeh has a -- she's belongs with the people who have been very kind.
**Q To your knowledge did the individuals who were involved in the incidents in this complaint, have they subjected other employees to a hostile work environment and harassment?**
A Absolutely.
**Q Could you explain who they were?**
A I can tell you a story about one gentleman. He sat for our first RVSR test. I want to say it was October 2012, I believe, and I watched a disabled veteran, service connected veteran, have his chair taken away from him during a test. His name was Doug -- I don't know if it's Crosby or Cosby. I think it might



be Crosby. He was sitting next to me in the testing room. It was after lunch I noticed him making all sorts of odd sounds and I was thrown by that because he never struck me as being quite that serious.
Well come to find out during lunch Bonnie Wax, the manager of Human Resources, approached him and said that, "You have a chair there. That's not an accommodation requested for the exam. Where did you get that chair?" And, "Well, you gave it to me." And I remember him getting it because I don't have documentation of that. "Well you have a choice. You can either finish the chair in another -- finish the test in another chair or you can have your chair and leave the test. There's your choice."
The guy was in agony. I think it was like within two weeks he was in for another back surgery. He would not file an EEO complaint because of fear of what happens with Human Resources because in the past he had already had -- he'd gone for promotion and his paperwork got lost. There was lots of paperwork getting lost in the Human Resource office. That was one of the most egregious ones but not the worse.
So, yes, taking the guy's -- the service connected veteran's chair away from him was gross, it was cruel and unnecessary.

Another one is there's a woman, her name is Sandy Brown. Sandy Brown is a short, funky, Gulf War veteran. She had serious medical and physical issues that the agency is fully aware of and they have refused to accommodate her appropriately for her issues. She was given the same one I am. You have to be in the office Monday, Wednesday, Friday.

**Q And this involves Bonnie Wax?**

A Bonnie Wax, this is it. She had gone into Bonnie Wax's office and one time -- she's actually been taken out of the hospital -- a number of the times out of the building, once for breathing -- this woman, Sandy Brown, once for breathing. Another time because her fuse can be very short and she got so upset that she started, I guess -- she lost her temper with Sandy -- with Bonnie Wax in Bonnie Wax's office and I believe she was taken out for it. Her job's been threatened because of her behavior not being appropriate.

And I even said to my boss, I said, "You have to watch that. She's not given the appropriate accommodation. You're disciplining someone for a situation she's not creating. The agency's creating. She needs an accommodation, she already told you she needs to be isolated, she needs to be quiet, she needs to be safe. That one I found very, very bad.

Another one is a woman who -- Jennifer Lean. Jennifer Lean



is also a woman with Cancer but her Cancer is far more serious and far more aggressive than mine. Like me, she was actually in the hospital, I believe, when she was told -- she was charged with being AWOL over the telephone -- advanced leave. Again, an advanced leave that is not processed in a timely fashion. She was demoted -- well, actually, she took a demotion because she was so horribly harassed by Sandy.

Now, this is secondhand knowledge. This is what she told me. I don't know this firsthand but that Sandy Smith harassed her to the point that she finally stepped down from our division and she went from, I don't know if it was a GS-13 to a 12 or a 12 to an 11. And there was someone else similarly situated, another coach, who had a medical issue. They found a lateral position to put him into as a drone so he didn't lose his -- ' but they've been so cruel to this woman.

Another woman I know, Ann -- it will take me a minute to remember her last name -- she had to go back to Germany to take care of her father because he was told he was dying. She did the paperwork the way she thought she was supposed to. Again, there's no SOPs, no transparency. We don't know who communicates with you.

So she left, she flew overseas to be with her dad, called back to the RO, talked to Larry Brown and I believe Mike Palmer



to make sure everything was all right, a bit of a nervous woman, and they said "no" and they charged her with being AWOL because she didn't dot an I or cross a T. And she actually left her father's hospital bed and flew back last-minute because they threatened her job. Mike Palmer was horrible to her as well.

And, by the way, I've reported these things to the Director. That's just some of them. It's very -- Barbara Zeh, she finally took an early retirement. Barbara Zeh, and it was during a town hall meeting, she addressed the Director and said, "How come you're doing this construction and it's not taped up, it's not sealed up, people are having respiratory problems?" "Okay, well, I'll look into it."

Within a very short period of time her Asthma was so bad that she had to be hospitalized for an extended period of time. Again, another one who was given the same accommodation and she just got sicker and sicker and she finally took a -- she took an early retirement. Yeah. I could go on and on. These are just a few.

**Q What remedy are you seeking?**

A I have two sets of remedies that I'm seeking. One of the, personally, I would like front pay. I can never go back into -- they'll never let me work in there again. No, I shouldn't say that. They'll never allow me to work peacefully in there and



they'll never -- there's no sign that they're going to accommodate me in order to do that.

And I know that's very rarely done but that's my -- that would be my dream, full compensation, reimburse me for all my medical bills, all of the Asthma attacks, all of everything, just give me my money back, reinstate my time, pay for a really good shrink and counselor or something to help me get through it, you know. So, personally, that's what I would like.

Also, in my remedy though is I would like the agency, your agency, your branch of the agency, to go in there and stop this. I would actually give up the money if it -- we've been around and around about this but I would get a great deal of peace if I knew that somebody went in there and stopped what's going on in that office, if they would just stop it. I mean, there are people who are denied accommodations every day, people who were denied accommodations, many of them veterans.

Without accommodations, which means that you're not serving veterans, you're not doing your job. I would have liked someone to take it seriously and go in there and clean up that cesspool as well as do an air quality -- no, not an air quality -- an employee survey to find out what's causing the problem. There's a cover-up and I would like someone to stop the cover-up. That's in brief. I could actually go on and on about what I

want but that's --

**Q Okay. Well that's all the questions that I have. Is there anything you would like to add?**

INVESTIGATOR HENLEY: Let's go off the record, Leigh.

COURT REPORTER: Off the record.

(Off the record at 3:50 p.m.)

(On the record at 3:52 p.m.)

BY INVESTIGATOR HENLEY:

**Q Add whatever you feel you need to add?**

A At this point I think I would like -- oh, I know what I want to add. Bettie Bookhart, who is our EEO representative, I'm not sure what her function is, over at the Regional Office, I had mentioned earlier that I had sought her out to counsel me back in 2009 when I realized -- or 2010 when I realized I was sick. And her behavior that day was troubling because that's when she -- that was the first time I heard that the agency didn't believe in accommodations, which we know is later confirmed.

But, also, her behavior seems to be very much in support of the Regional Office and Kerrie Witty to the point where even when I went for the mediation here through the Office of Resolution Management, there was a video that she could have supplied me and documents to help me prepare for the mediation,



which she never sent until after I had already left for work the day prior to the mediation, which had been a pattern with her.

There were documents where the meeting that I had with -- the second meeting I had with Kerrie where I actually requested the meeting, I understand that she had identified that she had already arranged for a mediation and the mediation had actually happened when it never had. I wrote that in my EEO records here. I'm very concerned about her behavior and her acceptance of the status quo in that office. And I'm sure there's more and I'm sure as soon as I leave I'll think of some and if they're really important I will send an email to John and Ms. Johnson and I thank you for your time.

**Q Okay. I think Leigh has some spellings.**

COURT REPORTER: I do, would you like to go off the record first?

INVESTIGATOR HENLEY: Yeah, we can.

COURT REPORTER: Okay, then you are off the record.

(Off the record at 3:55 p.m.)

(On the record at 4:05 p.m.)

INVESTIGATOR HENLEY: Okay, I just want to remind you that your testimony is given without a pledge of confidentiality, which means it will be shown to interested parties involved in the EEO complaint process. Also be reminded that if I have to



call you back for further questions you'll still be under oath.

THE WITNESS: Okay.

INVESTIGATOR HENLEY: Well that concludes the testimony of Ms. Aileen Mullin given on July 8, 2013. I want to thank you guys for your time and cooperation.

THE WITNESS: I want to thank you.

INVESTIGATOR HENLEY: Thank you, Leigh.

THE WITNESS: Thank you, Leigh.

COURT REPORTER: Oh, you're welcome.

THE WITNESS: Thank you John and thank you John.

REPRESENTATIVE: Bye.

(Whereupon, at 4:06 p.m., the interview was concluded.)



C E R T I F I C A T E

This is to certify that the attached proceedings in the matter of the affidavit of AILEEN MULLIN, on Monday, July 8, 2013, were held according to the record and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording accomplished at the proceeding.

_______/s/___________
Leigh Dempsey
Reporter

_______/s/___________
Vanita Tildon
Transcriber

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

ERRATA SHEET

In the matter of: ) Complaint No:
AILEEN MULLIN, ) 2001-0317-2012103413
Complainant,
vs.
DEPARTMENT OF VETERANS AFFAIRS,
VA Regional Office,
St. Petersburg, Florida,
Respondent.

TESTIMONY OF: AILEEN MULLIN

The above information has been furnished without a pledge of confidentiality, and I understand that it may be shown to the interested parties to this complaint, subscribed and sworn to me, subject to the penalties of perjury on this date.

I have reviewed the transcript of my testimony. I wish to make the following corrections/changes:

| PAGE | LINE | AS TRANSCRIBED | CHANGE TO |
| --- | --- | --- | --- |

Witness Signature Date

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF RESOLUTION MANAGEMENT

In the matter of: ) Complaint No:

AILEEN MULLIN, ) 2001-0317-2012103413

Complainant,

vs.

DEPARTMENT OF VETERANS AFFAIRS, VA Regional Office, St. Petersburg, Florida,

Respondent.

AFFIDAVIT

TRANSCRIPT OF PROCEEDINGS in the above-entitled cause of the examination of BONNIE WAX before EEO Investigator John Henley, on Wednesday, August 28, 2013

Transcribed by: Vanita Tildon

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973



PROCEEDINGS

INVESTIGATOR HENLEY: My name is John Henley, EEO Investigator, from Southeastern Field Office of Resolution Management, St. Petersburg, Florida. I have been assigned to investigate EEO Complaint Number 2001-0317-2012104413, filed by Aileen Mullin against the VA Regional Office, St. Petersburg, Florida.

Your testimony today is given without a pledge of confidentiality, and what that means, it will be shown to interested parties involved in the EEO complaint process. This is the testimony of Bonnie Wax given on August 28, 2013.

Do you solemnly swear or affirm that the information you're about to give is true and complete to the best of your knowledge and belief so help you?

THE WITNESS: Yes, I do.

Whereupon,

BONNIE WAX

a witness, called for examination, after having been first duly sworn or affirmed, was examined and testified as follows:

EXAMINATION

BY INVESTIGATOR HENLEY:

**Q Please state your full name and spell it for the record?**

A Bonnie J. Wax, B-O-N-N-I-E, J, W-A-X.



**Q Okay. What is your position title?**

A Human Resources Manager, Supervisory Human Resource Specialist.

**Q Okay. How long have you been in this position?**

A Over four years not quite five.

**Q What is your organizational unit?**

A Department of Veterans Affairs BVA, St. Petersburg Regional Office, Human Resources Office.

**Q Okay. Who is your first and second-level supervisor by position title?**

A Suzanne Nunziata, Assistant Director, is my immediate supervisor and my second-level supervisor is Kerrie Witty, Director, although I do report directly to the Director on many issues.

**Q Okay. The complaint is based on disability and reprisal, the current complaint that is under investigation. Do you have a disability, "yes" or "no" is appropriate?**

A Yes, I do.

**Q Okay. The Complainant asserts that her disabilities are cancer, asthma and chronic sinus infection. Are you aware of the Complainant's impairments?**

A Yes. I learned of her asthma sometime in 2012 about the time she was having the attacks at work. I learned of her



diagnosis of cancer, I would guess, three months later. I did not learn of her chronic sinus issues until much later, probably a year. I'm not certain of the exact date.

**Q Your next question is which are the essential functions of her position, I think you sent me an email; is that correct?**

A Yes.

**Q That is correct, right?**

A Yes, it is correct.

**Q Okay.**

A The only part I didn't send is why the functions are essential to the position.

**Q Okay.**

A Would you like for me to answer that part?

**Q Yes, please?**

A Okay. Essential functions of a position are job-related duties that are so fundamental to the position that the individual holds that he or she cannot do the job without performing them. So a function is essential, say, if the position exists to perform the function, if there are a limited number of employees who could perform the function, if the function is specialized and the individual was hired based on their ability to perform it.

So there are very specific definitions of "essential

functions". They generally require a significant amount of time or perspective in order to complete them and they are generally serious consequences if they are not performed.

**Q Okay. Does the Complainant meet the education, skills and experience requirements for the position?**

A Yes, Ms. Mullins attended the required training to include prerequisites and challenge training. And in early 2013 Ms. Mullin stated that she needed additional training due to her absences as a result of her illness and the Veterans Service Center Manager asked for a special exception so that Ms. Mullin could attend challenge training a second time.

So, yes, she does meet the education, skills and experience required.

**Q The next question is concerning her reasonable accommodation. She requested to move from the room that she was in to another room because of a severe asthma attack. You just mentioned earlier before we got started that you will send me a response to that later?**

A Yes, and I actually may answer it later on in your questions because there is another question about that instance.

**Q Okay.**

A So how about this, anything I don't answer, later on I will definitely send you by close of business --



**Q Okay.**

A -- in writing.

**Q All right.**

A Okay.

**Q Now, the other question is about the nature of your involvement. You're also going to send me those?**

A Yes, about the work at home?

**Q Um-hum?**

A Yes. I'll send you who else was involved, the agency's response, the reason for the response, all the way down to Event 1.

**Q Okay.**

A Will that work?

**Q That will work.**

A Okay.

**Q Okay, let's change our focus and talk about the events that have been accepted for investigation.**

**Whether the Complainant was subjected to a hostile work environment based on disability and reprisal as evidenced by the following events:**

**Event 1. Between September 2011 and March 2012, the Complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the**



**workplace and on two occasions VA Police had to assist the Complainant out of the building.**

A Okay.

**Q Could you explain what happened there?**

A Well, I was not present for any of the times she left the building. I heard that Ms. Mullin had several medical emergencies that required emergency care but that's the extent of my actual knowledge of the 25 days.

**Q Okay.**

**Event Number 2: Between October 2011 and January 2012 --**

A Excuse me, I do have two more parts for that first one, if I may?

**Q Sure, go right ahead?**

A Okay. Ms. Mullin did inform the agency that she had been ill and that, you know, she had to leave multiple times and although we regret that she was not well the agency really has no control over an employee's medical condition or their emergencies; they're so unpredictable. I do know that she informed us that she was assisted out by the VA police but I was not actually present to witness it.

But it's not that uncommon. The VA police are stationed at our front door and so they're often involved anytime an ambulance is called or an employee is ill. Again, we don't have



any control over her health.

**Q Okay.**

**Number 2. Between October 2011 and January 2012, supervisor, Michael Palmer refused to help the Complainant while she was experiencing severe workplace-related respiratory problems; and he went as far as to say that the Complainant was the only person in the room with a problem and asked why the Complainant did not have a portable oxygen tank or wear a protective mask.**

**If you don't have any knowledge of that, you know, just --**

A Well, I was not personally involved in that but one of my staff members was and there is another part of the story about the mask. There was a legitimate reason why Mr. Palmer was asking that question and it involves Ms. Mullin's Worker's Comp claim.

**Q Um-hum.**

A My suggestion, if I may, would be to speak to Tamanique Clarke about that, she works for me, because Ms. Mullin was told to wear the mask. And so my limited understanding of it is that the supervisor was asking her why she was not following her doctor's instruction.

**Q Okay.**

**Number 3: On November 28, 2011, BW denied the**

**Complainant's request for Mold Hazard Training.**
**And I'm assuming "BW" stands for Bonnie Wax, correct?**
A Yes, it does.
**Q Okay. Okay, what is your response to that?**
A Well, basically, it says that I denied the request. The answer to that is "no". The request for Mold training was not made by Ms. Mullin. AFGE Local 1594 requested Mold Hazard training in November 2011 for two individuals: Aileen Mullin and Keith Pryor. Our Master Agreement, Article 29, section 15(h) allows the agency to train union Health & Safety Representatives on mold removal and so the union was asking for that training.
AFGE identified Aileen Mullin in their request but Aileen Mullin was not on their current union officer or steward listing and the Mold Removal training is exclusive to the union Safety & Health Representative and AFGE had already identified Walter Ingram (ph.) as their union Safety & Health Representative by letter, and I think that letter was somewhere around October 2011.
**Q Okay.**
A Because there were two names on the list and the agency is only obligated to train one person we asked AFGE to clarify the identity of the representative they would like to attend.



Ms. Mullin was not identified by AFGE.
**Q Okay.**
A So, essentially, the union determined who would attend, not me.
**Q Okay.**
**Number 4: On January 12, 2012, the Complainant was taken to the emergency room by ambulance from her worksite.**
**What is your knowledge of that?**
A I am aware of that because part of the area that I manage as the HR Manager is Worker's Compensation and it's my understanding that Ms. Mullin was taken by ambulance on January 12, 2012. She asked that the ambulance be called. She also filed a Worker's Compensation claim for a traumatic injury and she was paid authorized absence, we call it AA, for the remainder of her shift as a result of that workplace injury claim.
**Q Okay.**
**Number 5: Upon returning to work on January 12, 2012, she was not assigned to another work area as agreed upon January 10, 2012, during a meeting with HR Specialist Tammi Clarke (TC) and union official Carol Allard, A-L-L-A-R-D.**
A Yes.
**Q Okay, do you have any knowledge of that?**



A You know, as the HR Manager my staff briefs me on incidents and meetings and stuff like that so I am aware that management agreed to a new work area during a meeting with Ms. Mullin on January 10, 2012, but the agency cannot always move quickly and do it right that minute so we informed them that we needed some time to coordinate the move.
It's basically impossible to coordinate a move with phones, computers, data drops that quickly because we have to coordinate with outside offices. It requires advance planning. So Human Resources and the Veterans Service Center Manager coordinated Ms. Mullin's move to another work area and this task was completed on January 12th, two days, and I don't believe that that's unreasonable. A two-day turnaround is pretty quick, actually.
**Q Okay. Number 6 --**
A So she was actually assigned to another work area, it just took two days, so we did move her as agreed.
**Q Okay.**
**Number 6: On January 12, 2012, the Complainant was subjected to gross negligence as officials of the Regional Office showed no regard for her life when they refused to render aid while she was having a severe asthma attack.**
**What is your knowledge of that?**



A Well, I can tell you that a lot of people were very traumatized and upset by it. I was not present but I was privy to some of the discussions afterward and I can tell you that several people were quite upset about what happened. And it was more that they felt helpless because they didn't know what to do and I think if they knew what to do they probably would have done something.
But I can provide some information about whether Title 5 employees are permitted to render medical aid if you would like?
**Q Um-hum. Okay, go right ahead?**
A All of our employees in our building fall under what's called Title 5 and agency personnel appointed under Title 5 are not licensed or authorized to provide emergency medical care. So we can state with certainty that there was no gross negligence but they are not medical staff and Ms. Mullin, indicated she was not feeling well, from my understanding, and she went to a private room with a friend to use her Nebulizer.
She didn't feel better so 911 was called. Cell phones are readily available in the building so Ms. Mullin told Tammi Clarke that the ambulance had been called and that she wanted to file a claim so Ms. Clarke, my employee, walked down to the room where Ms. Mullin was being treated and provided her the paperwork.

I guess I don't know what else non-medical people could do. I have a friend of mine that has severe asthma. It's a very scary thing when you don't know what to do. You feel helpless, and that was my impression of the management officials that came in to talk about it afterwards: "You know, I don't know what to do, she used her Nebulizer. Oh, my gosh, oh," you know, they were just very upset.
Q Um-hum. Okay.
A So I would characterize it as not negligence but a feeling of helplessness that they knew she was in trouble and they didn't have the medical expertise to do anything.
Q Okay.
**Number 7: On January 31, 2012, the Complainant notified supervisors, HR and the unions that her respiratory problems with the worksite forced her to leave work twice since being reassigned to a different work area.**
**What's your knowledge of that?**
A I do know that she continued to have problems. I do recall that she sent an email message telling us that she had been ill but I had no personal knowledge of her actually leaving. I do know that I asked my staff to do a comparison of the leave she was using while she was at work and when she was at home and a review of the leave shows that she used just as much leave in



both places.
So although she was saying that she was having attacks at work she was also having to stay home from her illness. I believe when we were notified that she was still having more problems we gave her another air purifier and we tried to rush the delivery of the air purifier but at that point she really wasn't asking for anything else.
She did reiterate in that email message that the air purifier was needed right away and so we put a rush on it and got it for her the same day.
Q **Number 8: On February 2, 2012, the Complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room even though her work station was an open cubicle in an area comparable to a football field.**
**What is your response to that?**
A Well, this is a tough one. Ms. Mullin requested an air purifier on January 31st. We got her the best air purifier we could in two business days on February 2nd. She indicated to us that she needed it without delay and so there was no reason to conclude that she believed it was an ineffective accommodation. Since we heard nothing further from Ms. Mullin it was reasonable for us to assume the air purifier was still working.
There is a little mischaracterization of the size of the



space. The Honeywell 16200 air purifier that we got Ms. Mullin on February 2nd is designed to clean the air in an 80 to 100 square feet area. It's only designed to clean the immediate area. That's why people often carry their air purifiers with them. It's only for their immediate breathing area. It's not intended to clean the whole room.
Also of relevance, the room she was assigned to is Room 230 and it's just under 700 square feet. I think it's like 690 something. You know, a football field is way bigger than that. It's about 57,000 square feet. So the size of the work area -- this type or air purifier is intended to clean around the purifier, her actual desk and workspace. It's not intended to clean the full 700 square feet.
Q Okay.
A Her actual workspace is less than 80 feet.
Q Okay.
**Number 9: On February 26, 2012, BW sent the Complainant a memo advising her that her request for an accommodation was denied and she described the Complainant's medical condition as a temporary condition that impairs her ability speak and that the condition is expected to resolve itself within six weeks.**
**What is your response to that?**
A Okay. Part of -- you know, I have staff members who work



for me and a particular -- two individuals are assigned to reasonable accommodation and the first thing we do is determine eligibility. I did want to point out that the agency has no record of a document dated February 26th but we do have one dated January 26, 2010, and a doctor's note, and the doctor's note states the patient has voice restrictions for at least six weeks.
So the first thing my staff does is determine eligibility for a reasonable accommodation and in order to be eligible for a reasonable accommodation at that time, it has since changed, but at that time, the condition must have been permanent, which was defined at the time as six months or more -- lasting six months or more. It is, therefore, reasonable for us to assume that six weeks is not permanent in nature. And in the memorandum we explained that to Ms. Mullin.
So even with the most generous interpretation of temporary versus permanent at that time the employee was still provided a temporary workplace adjustment to meet her medical needs. So she was not harmed in any way. We went ahead and gave it to her but just not as a reasonable accommodation. When there is a permanent condition we see phrases like, "chronic", "will never get better", "could take years to recover". We generally do not see anything in the category of weeks. And so when something is

only expected to last weeks at that time it was considered temporary.
Q Okay.
**Number 10: On March 11, 2012, the Complainant was not advised in a timely manner that her accommodation request was granted.**
**What is your knowledge of that?**
A I would strongly disagree. We have rather a unique process here in VBA where we actually test our employees and those tests are called "Certification Exams". And we have a very specific process for Certification Exams. And if an employee is requesting a reasonable accommodation for the Certification Exam they have deadlines and Ms. Mullin did not make her request for an accommodation during the Certification Exam timely.
On March 12th she even acknowledged that in her email because she said she knew it was a stretch so we believe she understood that she had missed her deadline for an accommodation.
But we jumped through hoops and we were actually able to give her the accommodation within one day and so she was given a separate testing location, which is what she requested. Originally, she had filled out her test election form and stated she would bring her air purifier but within a day of the test



she decided she wanted to test in a different room.
We jumped through hoops, found the second test proctor, arranged for her to have the test in a separate room and then the morning of the test Ms. Mullin indicated she did not want to put her body through it and so she did not take the test.
So I believe we went above and beyond in this instance even with the unreasonable rush we responded timely and we gave her what she was asking for. Unfortunately, she was not feeling well enough and felt like she needed to protect her body and not test that date.
Q Okay.
**Number 11: On March 20, 2012, the Complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the Complainant was required to report to the office she suffered asthma attacks, which forced her to leave the building.**
**Do you have any knowledge of that?**
A Yes, but I would like to say, at that time Ms. Mullin had not reported that working at home three days per week was not an effective accommodation. We did a review of her leave records and she was out just as much while she was working at home, actually, she was out more while working at home than she was when she was working the office.



So, clearly, her medical condition was affecting her both in the office and at home so we believe a reasonable person would conclude that the reason for her leave was not limited to the work environment. She did notify the agency that the -- if she had notified the agency that the accommodation was not working we could have looked for another option but at that time we were not aware.
It is also the employee's responsibility to notify HR or their supervisor if the accommodation is not working.
Q Okay.
**Number 12: On May 31, 2012, although a cover sheet that stated "A copy of all records personally identifiable to Ms. Mullin. Management provides the following . . . Ms. Mullin's reasonable accommodation folder" was attached to the Complainant's Official Personnel Folder, the memo described above as Event 21 was missing from the folder.**
**What is your knowledge of that?**
A Well, this is completely mischaracterized and it's unfortunate. This request was not made by the Complainant. It was an information request from AFGE Local 1594 and it falls under the U.S. Code, Title 5, Chapter 71, the Federal Service Labor Relations statute. AFGE asked for "all", the key word there is "all" personally identifiable records related to



Ms. Mullin. As such, my staff provided the appropriate materials to AFGE on May 31st.
It is important to point out that the appropriate release forms were signed by Ms. Mullin allowing Human Resources to provide medical information to AFGE. If she had not signed that form we would not have provided her reasonable accommodation folder. But since she signed the release HR provided the appropriate materials to AFGE on May 31st, which included all of her records, to include the reasonable accommodation folder.
In my opinion, AFGE should not have asked for all of her personal information if they did not want it. So it really is not between the Complainant and Human Resources it was a union request that they are entitled to ask for under the Federal Labor Management statute.
There is one other part. Event 21 you asked about, am I correct?
Q Excuse me?
A Event 21 occurred on June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012.
Q Okay.
A You know, my staff prides itself on providing timely service but it would have been impossible for us to provide those documents to Ms. Mullin before they exist. June, July and

August events had not yet occurred when we provided the information to AFGE on May 31st so it was impossible for us -- so Event 21 is a non-issue. The events had not occurred at the time we provided the information. And union information requests are not continuing in nature. That means, when a union asks for an information request they have to ask for it again. We are not expected to provide new information as it develops.
Q Okay.
**Number 13: On May 3, 2012, the Complainant was informed that her request for advanced sick leave was denied.**
**What is your knowledge of that?**
A I don't know much about this because advance sick leave is handled by the divisions. I can share with you the policy and the approving authority. The policy for advance sick leave is up to 240 hours of advance leave can be granted at any one time. The approving authority, the Division Chief, can approve up to 80 hours. Anything more than 80 hours requires the Director's approval and other than that I don't have any knowledge of her specific advance sick leave request. I can tell you that that information is maintained by the division so in this case it would be the Veterans Service Center.
Q Okay.
**Number 14: On May 3, 2012, the Complainant was informed**



**that there were problems with her request of March 2012 for leave under the Family Medical Leave Act.**
**What is your knowledge of that?**
A Well, quite a bit about this. On March 9, 2012, Ms. Mullin submitted medical documentation for FMLA. We reviewed her medical evidence and determined she was eligible for the program. So three days later, on March 14th she received written notice of approval to use up 480 hours of leave under FMLA, and it was dated to the original date she submitted the medical. So she was eligible for FMLA beginning on March 9, 2012, and ending on March 8, 2013.
I think where her confusion was is that the approval was not related to cancer that Ms. Mullin self-disclosed in her EEO complaint. On March 23, 2012, we received additional medical evidence from Ms. Mullin regarding cancer. We received the second notice dated April 9th -- she received an additional notice on April 9th indicating that her approval for FMLA related to cancer was also approved. So at the time she had two ongoing approvals for FMLA and I think that's where the confusion comes in.
Although she submitted new documentation for cancer her existing FMLA entitlement was still in effect. It was never interrupted so she could use FMLA related to either condition,



asthma or cancer, but she is still only entitled to a total of 480 hours for both conditions in a 12-month period. So I'm not really sure what she's referring to as problems but I believe it had to do with the fact that, perhaps, she was expecting two separate approvals for 480 hours but employees are only entitled to one 480 period for multiple conditions.
Q Okay.
**Number 15: On March 3, 2012, Human Resources Manager Bonnie Wax made a horrible comment about the Complainant's medical condition.**
**What is your response to that? Well, the Complainant indicated that the quote -- what she testified is that you said that, "Isn't it interesting about Ms. Mullin about her breast cancer. Then it was her breast cancer that caused all the breathing problems. There was never anything wrong with the building."**
**What is your response to that?**
A Well, this is absolutely false and I must tell you this. This has given me a lot of consternation because I'm really sorry that it has been twisted around like that. My comments were taken completely out of context and twisted into something horrible when in reality they were completely relevant and appropriate to the situation.



So let me tell you what happened.
Q Okay.
A Mr. Crump is a very approachable union representative and he had come to Human Resources and we were talking about the recent air quality test results showing that the building was in the normal range. During that discussion I made some comment about being glad there was nothing wrong with the building because I work here too, you know, I breathe the same air. So I was making a comment about I was glad there was nothing wrong with the building.
After some discussion about the air quality we switched over to talking about Ms. Mullin and Mr. Crump was Ms. Mullin's designated representative at the time. She had recently been diagnosed with breast cancer and we had found her eligible for a reasonable accommodation and we had granted her accommodations related to her asthma. During my conversation with Mr. Crump I told him I was sorry to hear about the cancer diagnosis and I casually mentioned that Ms. Mullin may need to give us additional medical documentation.
Of course Mr. Crump was curious and he asked me why and pointed out that Ms. Mullin had already submitted the required paperwork and why would I make her give more just because she has cancer. And I explained that once she is identified as a

person with a disability the agency now has a positive obligation to ensure that we are meeting her medical needs. And so the accommodations may need to be changed or altered because now we're not only dealing with asthma but we're dealing with cancer and me, in my role, I have to ensure that the agency provides the appropriate accommodation so that she can perform the essential functions of her position.

And I explained to him that now with a new diagnosis of cancer the agency has no way of knowing what Ms. Mullin needs at this point without new medical documentation. We're not doctors. And he made some comment about not getting it or not understanding why I was going to trouble her with getting medical documentation. And I made a comment like, "For all we know, not being medical professionals, her breathing problems could have been related to breast cancer and not asthma. That's why we need the medical."

I was certainly not insinuating she didn't have asthma or that the breathing issues were from cancer. I was giving him a hypothetical to help him understand why we would be asking for new medical documentation. He asked me why it mattered, he was a little perturbed. I responded with a for instance. I said, "For instance, you know, maybe she doesn't need an air purifier now and instead requires frequent breaks due to chemotherapy or



a flexible schedule due to sickness from the chemotherapy or less noise because of headaches."

You know, every disability requires different accommodations. I told him that we need to understand, management, the agency, needs to understand if she has both asthma and cancer now or just cancer so that we can assure we're meeting her medical needs.

I think the thing that is most troubling to me about this is I have a lot of respect for Casey Crump. He is an Employee Advocate and I respect all the things he does to help and support employees. It is quite possible that he misunderstood my comment or took it out of context but I can assure you I would never make a horrible comment about anyone with cancer. I lost a dear friend of mine to cancer one year ago today and I still get all choked up about it.

For eight months I lived at Moffett Cancer in Tampa where Ms. Mullin had her treatment. I came to work every day and every night I went back to the hospital and stayed with my friend to care for him. It was awful. The treatment was as bad as the cancer. There were times I couldn't even hug him because he hurt so bad. So I would not wish this on anyone let alone mock someone with cancer. My heart was out to Aileen. I included her in my prayers every day and I am happy that she is



doing well because I lost my friend. He was not so lucky.

**Q Okay. Number 16. Do you want to continue?**

A Yeah, I'm okay.

**Q Okay.**

**Number 16: On May 31, 2012, HR officials failed to provide the Complainant's union representative with complete records of information that was needed to assist the Complainant with her reasonable accommodation request and the response to the information request was delayed.**

**Do you have any knowledge of that?**

A Yes. I just took a little sip so I'm feeling better, thank you.

**Q Okay.**

A This one is a little misunderstood. The agency furnished that which is required under 5 U.S.C., Chapter 71, the Labor Relations statute, and the Labor Relations statute is very different from employee rights. And Ms. Mullin could have come to HR at anytime and said, "I would like to see my document. I'd like to see my folder", and with a reasonable period of time for us to pull it we show employees their records.

We all, as federal employees, have a right to look at our record. The union rights are a little bit different and the way they requested the information it caused us to have to look



through many different systems of records and we identified 379 documents that we provided to them on May 31st. We had to, of course, copy and redact some of them as appropriate because if I go and look at my record I can look at everything but the union does not necessarily have the same right so it does take more time because we have to check everything and make sure we're in compliance with the statute.

We normally have 14 days to provide the union with copies of records, whereas, as I pointed out before, employee records we generally provide the same day. So we found six personally identifiable records. Ms. Mullin already had two approved and ongoing reasonable accommodations at the time and we do not believe that the delay of two days was any way harmful to her because of that. 5 U.S.C., Chapter 71 provides a reasonable time to provide the information and that's generally 14 days.

AFGE received the documents on May 31st and that was two days after May 22, 2012, and it obviously did not cause any harm to the employee because nothing was filed after that. So the information provided was not used to request another accommodation or anything like that.

**Q Number 17: On June 5, 2012, while the Complainant was battling cancer, BW sent her a lengthy email instead of sending the email to her representative.**

**What is your response to that?**
A It sounds like I am a horrible person. I would say that. Ms. Mullin sent an email to her Coach and she copied Casey Crump, a union steward, but Casey Crump was not Ms. Mullin's designated union representative. Her designated union representative was Valorie Reilly, and in my job I am keenly aware of who is the designated representative at any given time and Ms. Mullin had changed representatives several times. Ms. Mullin designated Ms. Riley in March 2012.
So the email was sent from Mr. Crump to the Director Kerrie Witty. Kerrie Witty often sends emails to me when it is HR content for a response. She's the Director, she has many things on her plate and so if it's HR-related she often forwards it to me, asks me to respond and copy her on the response or forward her my response so she's aware of what I said.
So I responded to Ms. Mullin's email trying to answer her questions and give her as much assistance as possible. As to her concern that I sent it while she was battling cancer, yes, I did. The agency and me, for that matter, are uncertain as to why the employee did not want a response from Human Resources when the content of the questions were clearly Human Resource related.
You know, although I'm very sympathetic that Ms. Mullin was



battling cancer, but nothing prevents a management official from responding to an employee directly, especially since I copied Ms. Mullin's designated representative Ms. Riley. The way the rules are written is when you have a designated rep I have to include the union rep and I did in this case.
So, in addition, I had no reason to believe communication with Ms. Mullin was off limits. She had sent the email so I assumed she was well enough to have a response. Actually, I expected that she wanted a response so Human Resources staff routinely responds to employee requests. We do it every day, employee inquiries.
In addition, there was nothing offensive or inappropriate in the response. The content was professional and pertinent to the issues she raised. It was about her information request and why the copy of the records had not been given to the union. So in the email I explained to her how we had to search and redact because it was being provided to the union instead of her. I also informed her that any employee can come to HR during normal hours and look at their record and she would not have to wait.
For us to give it to the union I also provided her information on how to access her electronic record so that if she needed it right away she could go in and get it. The email also identified five members of my staff that she could contact



if she needed any portion of her record. I felt like it was a very appropriate response and so I don't really understand the reaction.
**Q Number 18 and Number 19. They involve the Director Ms. Witty but I'll give you an opportunity to respond.**
A Okay.
18. On June 10, 2012, during a meeting, Regional Director Kerrie Witty, K-E-R-R-I-E, stated BW felt that she was being targeted by the union, that she approved Bonnie Wax's email of June 5, 2012, and she could not understand why the Complainant had a problem with it and that she did not support granting accommodations.
What is your knowledge of that?
A Okay, the first thing that I would like to clarify and, of course, you could clarify this with Ms. Witty. When she told me about the meeting she told me that she said she believed the union was targeting me. So that's a little bit different than the way it's actually written. Ms. Witty agreed to meet with Ms. Mullin on June 10, 2012, to facilitate communication between the parties.
It's my understanding from what the Director told me that Ms. Mullin continued to repeat complaints about me during the meeting. And the Director felt like they had just come directly



from the union office and it appeared to Ms. Witty that they had discussed me at lengths in the union office and that I had become the focal point of her meeting with Ms. Mullin.
And what she shared with me was that she was trying to redirect the conversation back to Ms. Mullin and away from me because the intent of her meeting was to help Ms. Mullin. Ms. Witty told me that she told the group that she knows the union has something against Bonnie but that the meeting was supposed to be about Ms. Mullin and that she would like to get back to hearing how she can help Ms. Mullin.
And that has been turned around that I believe I'm targeted by the union. To answer your question, "Do I believe I'm being targeted by the union", the answer would be "yes" but that involves labor/management relations, which is not really appropriate to discuss in this forum. The targeting is much broader than Ms. Mullin.
As for Ms. Witty reviewing email, she did review my email. She reviewed the email because she believes AFGE is targeting me and my career and it is her way of protecting me from their unfounded accusation. So she read the email, approved it, said that it was appropriate and go ahead and send it as a response because she knew they were going to allege that I had done something inappropriate.

**Q During that meeting -- you weren't in the meeting; is that correct?**
A I was not in the meeting but she came to tell me about it afterwards. There is one part of this question, though, that I did want to respond to and that's the part about the Director making a statement, "she did not support granting accommodations." I can tell you that that is categorically false. I have never heard Ms. Witty make any comments about not granting accommodations. I work very closely with her -- runs the reasonable accommodation process and Ms. Witty is the DMO so we work very closely with her.
And Ms. Witty has granted numerous appropriate accommodations during her tenure as the Director here and I would say at last count we were over 300 accommodations for our facility and we only have 900 employees. So that statement is just ridiculous. If anything, she has granted more accommodations than most Directors.
**Q Number 19: On June 10, 2012, Director Kerrie Witty denied the Complainant's request to have her donated leave handled in a way that would allow for accountability, and as of September 2012 problems with the Complainant's donated leave escalated.**
**Do you have any knowledge of that?**
A Yes. I wasn't aware of escalating problems regarding



Ms. Mullin's donated leave but I know that there were some misunderstandings about how the VLTP regulation and program is supposed to run. I know that we provided copies of the VLTP transfer program but when she raised concerns we conducted a review, or what we call an audit, a payroll audit, and found that her donated leave was processed appropriately.
However, there were a lot of exceptions to her timecard and I don't know if you all are on the same system we are on but let's say you work 8 to 5 and you have a typo and you put in 7 to 5, the system's going to throw it out and say those aren't your hours as an exception. So she had a lot of wrong hours in there but there was nothing wrong with her donated leave. The exceptions had no effect on her donated leave.
But the way the program works is the employee first has to meet the requirement of a medical emergency and then they have to have a zero leave balance in order to use donated leave and then there are specific limitations on the donated leave that they have to meet. And then Payroll uses what's called a "set-aside account" where they set the accruals aside so that when the employee comes off of donated leave they have some leave to use.
And so we did an audit of all of those programs and they were done correctly. Her request for accountability, I'm not



really aware of those requests but it is quite possible she asked for that but it's really not necessary because both Human Resources and Payroll are audited on VLTP functions. So this is something that is watched by third-parties. So if there were any problems with it it would be found and corrected by, you know, a different organization.
**Q Okay.**
**Number 20: On June 14, 2012, through June 29, 2012, the Complainant's request for leave under the leave transfer program was delayed.**
**What is your knowledge of that?**
A It was not delayed, but I understand how she could interpret it that way so let me explain. Ms. Mullin's request for VLTP was not delayed or interrupted. She had submitted the application on June 14, 2012. Her VLTP application was processed and approved on June 20th, which is only four business days. According to policy, we have 20 calendar days so we were well within the standard for processing it.
But the important part is Ms. Mullin had already been approved to be on the VLTP Program beginning on May 9th. So we don't generally have second and third applications to join the VLTP Program. Once you're in it you're in it. And so she was eligible to receive donations without interruption. The



additional paperwork was more of a courtesy than anything that was a process.
Basically, the employee submits the application, we determine if a medical emergency exists and determine eligibility, then we process the donation. So none of that process was ever interrupted for her. Even though she thinks the June 20th was not submitted on time it really wasn't even necessary because she was already in the program. Kind of like, and this is probably a bad analogy, applying for food stamps, already getting the money and then applying again and expecting something different. You're already getting the food stamps and that's kind of what has happened with the VLTP Program here.
**Q Okay.**
A The other part to this was she was sending multiple emails -- asking us to send out multiple emails on her behalf that she was on the VLTP Program and it is the agency's standard practice to only send out one email. And the Handbook 5011 states that after that it is the employee's responsibility to find donors. But in an effort to help Ms. Mullin we sent out at least three emails on her behalf so she actually received more assistance than other employees.
**Q Number 21: On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the Complainant's advanced sick**

**leave was not processed.**
**You have any knowledge of that?**
A Not really. This is generally handled at the division level. Again, the Division Chiefs can approve up to 80 hours and the Director approves anything over 80 hours. They do come through my office but more just to print out the report for the Director. We don't really have a big role in this process so I really can't speak to this.
**Q Okay.**
**Number 22: In June 2012, although the Complainant did not request an accommodation in 2010, BW stated in an email that in 2010 she withdrew her request for an accommodation.**
**What is your knowledge of that?**
A Again, I think this is just a misunderstanding. The agency is required and expected to respond to any behaviors that appear to be an accommodation request. In other words, the employee doesn't have to say, "I want a reasonable accommodation." They could say, "My back is killing me, this chair is hurting me" or they could submit a doctor's note or they could write something on their leave record that indicates that they have a disability and the agency is expected to respond, find and respond to these behaviors in order to be compliant with the statute.
So even though Ms. Mullin says she did not request a



reasonable accommodation at that time we were giving her the information for informational purposes on how to apply for an accommodation because she had given us some indication that she had a disability.
**Q Okay. Number 23, and it's similar to number 20. She says:**
**23: On August 16, 2012, the Complainant's request for the leave under the leave transfer program was not processed.**
**You have any knowledge of that?**
A Again, it's the same thing we were talking about before with the food stamps. She already was in the program so she didn't need to keep applying. In this instance it just extended it out to November 9, 2012. There was no harm to the employee. She never lost her participation in the program. She was in it the entire time. It just basically extended it.
**Q Okay.**
**Number 24: On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the Complainant, HR failed to inform OPM that she was on extended medical leave.**
**You have any knowledge of that?**
A Yes. I am very familiar with this process. On the actual announcement that Ms. Mullin applied for her Veterans Service Rep Rating position in May of 2011 it indicated that the



position required an MBI, a minimum background investigation, and that it was a condition of employment so it was a requirement in order to hold the position.
For whatever reason, OPM, I don't control them, I have no authority or control over OPM, decided to initiate and work on her background at the time she was battling cancer. In addition, this process is run outside my office. We don't conduct background investigations nor do they check with us before they contact employees. So I think the crux of the issue here is that it is a condition of employment and if an employee fails to complete their background investigation for any reason they could lose their position because it is a requirement.
So not only did the agency not have any influence over the timing of the background, we also do not have the ability to extend or change it due to illness. It is at the sole authority of OPM and even if we had tried to influence it and ask them not to contact Ms. Mullin we would have been laughed at because it is a condition of employment that she had not met. And if an employee fails to meet a condition of employment the normal course of action is proposed removal.
So in this instance it is really up to the employee to communicate with the background investigator and explain their individual circumstances and then OPM would decide whether they



were going to grant an extension or not. They could have easily said, "No, you've been in the position too long without a background investigation, you must do it now." It is at their sole discretion.
**Q Okay.**
**Number 25: On September 17, 2012, the Complainant discovered that she was removed from the web-based training system.**
**You have any knowledge of that?**
A Yes. This is a standard practice. I don't know if you have to take all of the mandatory training like Privacy, HIPAA and No Fear, all of those kind of things. They come up every year and when an employee is in a leave without pay status for more than 31 days their TMS account is deactivated. They're deactivated for several reasons because the TMS system sends constant reminders to the supervisor and the employee to do the training and it shows on national reports that we are not in compliance.
And so it is standard procedure to take employees out that are maybe deployed in the military, have serious illness or maybe even out for the birth of a child. So I would guess that right now there're probably 30 or 40 employees that are currently inactive and removed from TMS but as soon as they

return to work they are reinitiated and turned back on, if you will.
Q Okay.
**Number 26: On February 6, 2013, TC (and I'm assuming that's Tammi Clarke) spoke to the Complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the Complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.**
**Do you have any knowledge of that?**
A Yes. Does it say what Ms. Clarke said to her sarcastically because I have never seen that?
Q No.
A Okay. Well, let me speak to that first then. I don't have any knowledge of Tammi ever making sarcastic comments to anyone and especially to Ms. Mullin. I would say quite to the contrary. I receive mainly praise about Ms. Clarke. She manages a lot of medical issues. She probably sees 100 employees a month related to medical issues and so I believe if there was a real problem with an attitude or sarcastic comments I would hear about it a lot because she has a lot of interaction with our sick employees.
So unless she has a specific allegation that I could ask



Tammi about I would have to defend Tammi and say it's more likely that she was not sarcastic because of my experience with other employees.
As for restructuring marginal tasks, it's not my understanding that she refused to restructure marginal tasks. As a matter of fact, there was quite a bit of evidence we submitted to EEO ORM about emails back and forth where there was obviously a willingness to communicate and interact about possible solutions and we can restructure marginal tasks. What we can't do is remove essential functions and part of what Ms. Mullin was asking us to do was to remove essential functions.
Ms. Mullin did not want to come into the building at all and instead have someone collect or distribute her work and bring it back outside to her. My understanding is that Ms. Clarke did not refuse to discuss it but she did state that the division had told us that it would be removing an essential function.
Q Okay.
A There's one other part to that question something about denials to General Counsel or Regional Counsel, was that it?
**Q It says her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.**



A Okay. All reasonable accommodation denials must go through Regional Counsel and so, yes, it was submitted to Regional Counsel for review but before it was actually reviewed and approved as a denial the group got together again, they had another meeting scheduled and so it was pulled back and the denial was never issued.
Q Okay.
**Number 27: On or about March 29, 2013, the Complainant was advised that modifications to her reasonable accommodation were reversed.**
**Do you have any knowledge of that?**
A Yes, it's a misunderstanding. On February 27th Ms. Mullin was approved to work from three days per week and that's three full days. So she would work at home three full days and she would work in the office two full days. We're not really certain how it came about but the employee, Ms. Mullin, started working half days when she was in the office and she was leaving anywhere between 11 and 12 and going home.
When management learned of this it's my understanding that it was corrected and Ms. Mullin was reminded what her accommodation approval said. So they discovered that she was going home early on the days she was in the office, they reminded her that that's not what she was approved to do. She



was not permitted to work four hours in the office and four hours at home. She had to stay the entire day. So no accommodation was reversed or rescinded because she was never granted that accommodation. Basically, she was corrected.
**Q Okay. Events Number 28 and 29, they were responded to by Ms. Bookhart.**
A Okay.
**Q Okay, the questions now is going to be about harassment and hostile work environment.**
A Okay.
**Q At anytime did the Complainant indicate to you in any way that she considered your actions to be offensive, harassment or subjecting her to a hostile work environment?**
A Okay, I'll start with offensive. She never spoke to me personally about anything offensive. The union would come to me and talk to me but nothing from Ms. Mullin. And what was the other part harassed or?
**Q Harassed, yeah, harassed or subjected to a hostile work environment?**
A Yes, I'm sure she did. That was kind of a common theme with her. If we asked her to do what every other employee is expected to do, such as bring in medical documentation, there were comments about being harassed or, you know, this being a

hostile work environment. They were never directed to me though but my staff did share with me that she felt like she didn't have to submit the medical or she should not have to, and there were comments like that. The actual specifics she stated I don't know.

**Q Okay. To your knowledge, were there any remedial actions to address her concerns about harassment or hostile work environment?**

A Yes, repeatedly. If she ever said she felt harassed because, say, for instance, the example I gave she had to turn in new medical evidence, we would explain to her that this is the common practice, that this is not harassment, this is what every employee has to do and you have to do it just like every other employee. So, yes, we responded accordingly.

As far as the hostile work environment, I don't believe she ever said that to us but I do believe she included it in emails and I think the Service Center Manager and the supervisors addressed those.

**Q Okay. The allegation you just talked about, when did you learn of these allegations?**

A As far as -- I learned through emails mostly. I didn't really have much communication with her at all other than emails. I couldn't tell you the exact date.



**Q Okay.**

A But I know that when she made these allegations we would make sure we were treating her the same as every other employee and we were very transparent with her so that she wouldn't think we were harassing her. We tried to explain why we were doing things so that she didn't think that it was personally directed at her and we showed her policies or practices or whatever we needed to to try and help her understand that we were doing our job not harassing her.

**Q What was the agency's procedure for responding to allegations of harassment at the time?**

A I know that we would try to address them but the specifics of the policy I don't know. I know that oftentimes we responded in writing and I know that they had many meetings with her supervisor, HR and the union present to try and work through some of her concerns. And I believe she went to EEO and I believe they tried to work through some of her concerns but more than that I don't know.

**Q To your knowledge, did the agency make a determination as to whether the Complainant was harassed?**

A My understanding the determination was no but I was not part of that.

**Q We've talked about several events. Your actions in those**



**events, was it to subject the Complainant to a hostile work environment?**

A Absolutely not. I am if anything very sympathetic to people who have cancer, probably overly sympathetic, because of my experiences in life and I would never do anything to put more stress on her or her body, especially when she's going through treatment.

**Q Were your actions to discriminate against the Complainant?**

A No, absolutely not.

**Q Well, that concludes all the questions that I have. Is there anything you would like to add?**

A No, other than I will get those remaining questions to you.

**Q Okay. And I want to thank you for your cooperation and your time, and just a reminder that your testimony is given without a pledge of confidentiality.**

A Okay.

**Q Which means it will be shown to interested parties involved in the EEO complaint process.**

A Okay.

**Q And also be reminded that if I have to ask you more questions that you will still be under oath.**

A Of course.

**Q And I will make sure that you get a copy of your testimony**



**for you to review.**

A Thank you.

**Q Okay. So I want to thank you very much for your patience and your time.**

A All right, thank you, sir.

**Q Thank you.**

A Enjoy your weekend and your vacation.

**Q You do the same.**

A Thank you.

**Q Okay.**

A Bye-bye.

**Q Bye-bye.**

**(Whereupon, the interview was concluded.)**

CERTIFICATE

This is to certify that the attached proceedings in the matter of the affidavit of BONNIE WAX, on Wednesday, August 28, 2013, were held according to the record and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording accomplished at the proceeding.

/s/
Venita Tildon
Transcriber

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973



ERRATA SHEET

| | |
|---|---|
| In the matter of: | Complaint No: |
| AILEEN MULLIN, Complainant, | 2001-0317-2012103413 |
| vs. | |
| DEPARTMENT OF VETERANS AFFAIRS, VA Regional Office, St. Petersburg, Florida, Respondent. | |

TESTIMONY OF: BONNIE WAX

The above information has been furnished without a pledge of confidentiality, and I understand that it may be shown to the interested parties to this complaint, subscribed and sworn to me, subject to the penalties of perjury on this date.

I have reviewed the transcript of my testimony. I wish to make the following corrections/changes:

PAGE LINE AS TRANSCRIBED CHANGE TO

Bonnie Wax 9/16/13
Witness Signature Date

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 626-8973

## ERRATA SHEET

TESTIMONY OF: Bonnie Wax

I have reviewed the transcript of my testimony. I wish to make the following corrections/changes:

| PAGE | LINE | AS TRANSCRIBED | CHANGE TO |
|---|---|---|---|
| 3 | 2 | Resource | Resources |
| 12 | 15 | But | Because |
| 26 | 22 | Was | Went |
| 27 | 11 | Little sip | Little sip of water |
| 29 | 2 | I would say that. | The way they say that. |
| 32 | 20 | Accusation | Accusations |
| 33 | 9 | Her - - runs | Her, HR runs |
| 37 | 21 | Respond, find and respond | Find and respond |

[signature] 9/16/13

Witness Signature                Date

Page ____ of_____

**Henley, John (ORM)**

**To:** Wax, Bonnie, VBASPT
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Thank you Ms. Wax.

**From:** Wax, Bonnie, VBASPT
**Sent:** Wednesday, August 28, 2013 7:29 AM
**To:** Henley, John (ORM)
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Mr. Henley,

The two questions below have fairly lengthy responses, so I thought I would provide them to you in writing prior to the interview.

- **Please describe the complainant's duties and responsibilities.**

*The RVSR analyzes claims to determine:*

*A. if diseases and injuries were incurred in or aggravated by the military service in the line of duty for purposes of compensation, hospital and outpatient treatment, prosthetic appliances, vocational training, and related employment and compensation benefits such as eligibility for a monthly allowance for children with spina bifida. As needed, the RVSR instructs the VSR to initiate action to obtain all required evidence to support the claim. In some instances, the incumbent monitors the claim to eliminate unnecessary delays in receiving needed evidence.*

*B. A need for examination, reexamination, and hospitalization for observation of veterans and their dependents and the character of such examination and reexamination.*

*C. Competency of veterans, their dependents, and beneficiaries, and the permanent incapacity of children, husband or widow for self-support as well as testamentary capacity for insurance purposes.*

*2. The RVSR determines service-connection, percentage of disability, permanent and total disability, and entitlement to compensation, pension, and vocational training, medical and dental treatment, automobiles or other conveyances, insurance, specially adapted housing, dependent education allowances, and other ancillary benefits.*

*3. The RVSR assures proper application of the Rating Schedule and other applicable instructions, and he or she is fully accountable for proper analysis, appropriate development, and final rating determinations.*

*4. While not routinely required, the RVSR may directly communicate and interact with the veteran to facilitate timely, proper decisions. As dictated by the circumstances of each case, the RVSR may conduct interviews in person or by telephone with veterans, eligible individuals, representatives, and advocates to obtain or clarify information.*

*5. If a veteran expresses an indication of dissatisfaction with a determination, the RVSR will provide consultative advice and assistance as requested by the assigned VSR or the DRO to facilitate efforts to provide a full and comprehensive explanation of the decision in question and gain acceptance of 'he determination or elicit information that could lead to a revised decision.*

*6. The Rating VSR communicates with VSRs and other employees in the Regional Office, employees of VA Medical Centers, and other Regional Offices. As required, the RVSR communicates with veterans and representatives/advocates, Central Office, and other federal/state/local agencies, in support of efforts to assist veterans.*

*7. The RVSR actively participates in meetings and is expected to lend his/her expertise in developing Veterans Service Representatives' skills as they relate to evidence gathering for rating decisions.*

*8. Acts as advocate for veterans and their beneficiaries in their dealings with other VA elements and organizations that affect their claims.*

*9. Performs other related duties as assigned. The RVSR analyzes and makes determinations on numerous and complex issues relating to VA benefits. The work is vital to the processes through which the agency directly informs and serves the public. Conclusions reached and the decisions made are normally binding on both the agency and the claimant. The decisions by the RVSR can result in award decisions involving the expenditure of large sums of money or denials that can have major adverse consequences for an applicant. They may also affect the applicant's eligibility for Medicare and Medicaid protection, social services, food stamps, and other forms of income assistance. The RVSR makes final determinations binding on the agency on all claims not requiring higher level concurrence or approval.*

- **Which are the essential functions of this position?**

VSC Management provided the following essential functions of this position: "All files the Rating Specialist takes home must be covered out to the work at home Rating Specialist. These files must also be logged into the work at home database for files to be taken home weekly. After covering files into oneself, mail must be picked up from the IPC for each file that has a mail search. Also before working file at home, files must be covered again to ensure no mail search has been added. If a mail search has been added then mail need to be picked up after returning into the building. First upon returning into the building, files must be covered back into the building. Next the rating decision should have already been printed and sent to the work at home printer. Any additional documents such as CAPRI records must be printed and placed into the files after returning into the office. The Work at home Rating Specialist must retrieve the printed documents from the work at home printer location and any mail from the IPC. Reviewing these documents need to be done by the work at home Rating Specialist at this time. If any correction or misprints are needed, it needs to be done at this time. Again any associated mail or corrections need be made at this time. All 2nd signature review files must be sent the 2nd floor for review. Files that have been reviewed for 2nd signature review must be corrected at this time and if no correction action is needed, they must be printed blue at this time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and next delivered to the POA table for Service Officer reviews. Entering examination request must be entered into Capri, and the buck slip added to the file and the file covered out to the examination facility and delivered to the IPC. Files must be gathered to take home as the above process starts over. This could take an average work home Rating Specialist 3 to 5 hours or more. This depends on number of files being processed. We also do team meeting the day the all rating specialist are in the office and these meeting last up to 1 hour."

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 8:28 AM
**To:** Wax, Bonnie, VBASPT
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Here is the call in number for your interview at the VANTS line 1-800-767-1750 code 93495#. Your testimony will be recorded and transcribed by a court reporter.

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Tuesday, August 27, 2013 8:11 AM
**To:** Henley, John (ORM)
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Thanks so much. Will you be calling my office? 727-319-7271.

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 7:52 AM
**To:** Wax, Bonnie, VBASPT
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Good morning Ms. Wax, tomorrow at 10:00 a.m. it is.

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Tuesday, August 27, 2013 7:16 AM
**To:** Henley, John (ORM)
**Subject:** RE: Questions ICO Aileen Mullin Case No. 103413

Tomorrow would be better for me.

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Henley, John (ORM)
**Sent:** Thursday, August 22, 2013 9:26 AM
**To:** Wax, Bonnie, VBASPT
**Subject:** Questions ICO Aileen Mullin Case No. 103413

August 22, 2013

Fm; John Henley, EEO Investigator

To: Ms. Bonnie Wax, HR Manager

Sub; Questions

Good morning Ms. Wax, I apologize for the inconvenience of rescheduling the interview, but the Case Manager has not made a decision on the new events. I want to do one interview to cover all the events. Therefore, if it is convenient for you Tuesday of Next week at the same time for the interview. Attached are the questions. I believe you have a copy of the accepted claims already. Again sorry for the inconvenience. The call in number for the interview is 1-800-767-1750 Code 93495#

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
Southeastern Operations
140 Fountain Parkway, sixth Floor, Suite 620
St. Petersburg, FL 33716

In Reply Refer To: ORM/08J

# Written Affidavit

In the Matter of the EEO Complaint of Discrimination of
Complainant – Aileen Mullin
2001-0317-2012103413

Aileen Mullin )
)
Complainant )
)
V. ) Case No: 2001-0317-2012103413

)
)
)
Secretary )
Department of Veterans Affairs )
810 Vermont Avenue, NW )
Washington, DC 20420 )
Respondent )
)
Facility: VA Regional Office )
St. Petersburg, FL )
)
)
)
)
__________________________________)

Initials: B3 1

**The claim accepted for investigation is:**

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tami Clark (TC) and union official Carol Allard (CA)**

**On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel.**

I, **Tamanique Clarke** solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

1. Spell your name for the record.

T-A-M-A-N-I-Q-U-E C-L-A-R-K-E

2. What is your position title?

Human Resources Specialist

3. How long have you been in this position?

3 years

4. What is your organizational unit?

Veterans Benefits Administration, St. Petersburg Regional Office, Human Resources Division.

5. Who is your first and second level, supervisors?

Bonnie Wax, Human Resources Manager – first level
Suzanne Nunziata, Assistant Director – second level

6. The complaint, are based on disability and reprisal. Do you have a disability (yes or no will appropriate).

No.

7. Do you have knowledge of the complainant's disabilities? If yes, when and how did you become aware of the complainant's disabilities?

Yes, the complainant disclosed her asthma illness to me in January 2012. She disclosed cancer around April or May 2012. I learned of the chronic sinusitis when the Department of Labor approved her claim for compensation in August 2012. I handled Worker's Compensation claims at the time.

8. The complainant asserts her disabilities are cancer, Asthma, chronic sinus infection, vocal cord dysfunction, Insomnia, Irritable Bowel Syndrome, and Iritis. Are you aware the complainant has these disabilities? If yes, when and how did you become aware?

I am aware of cancer, asthma, chronic sinusitis. I am not aware of vocal cord dysfunction, insomnia, irritable bowel syndrome, and iritis. The complainant disclosed her asthma illness to me in January 2012. She disclosed cancer around April or May 2012. I learned of the chronic sinusitis when the Department of Labor approved her claim for compensation in August 2012. I handled Worker's Compensation claims at the time.

9. Please, describe the complainant's duties and responsibilities?

As stated in her position description, Ms. Mullin is responsible for:

1. The RVSR analyzes claims to determine:

A. if diseases and injuries were incurred in or aggravated by the military service in the line of duty for purposes of compensation, hospital and outpatient treatment, prosthetic appliances, vocational training, and related employment and compensation benefits such as eligibility for a monthly allowance for children with spina bifida. As needed, the RVSR instructs the VSR to initiate action to obtain all required evidence to support the claim. In some instances, the incumbent monitors the claim to eliminate unnecessary delays in receiving needed evidence.

B. A need for examination, reexamination, and hospitalization for observation of veterans and their dependents and the character of such examination and reexamination.

C. Competency of veterans, their dependents, and beneficiaries, and the permanent incapacity of children, husband or widow for self-support as well as testamentary capacity for insurance purposes.

2. The RVSR determines service-connection, percentage of disability, permanent and total disability, and entitlement to compensation, pension,and vocational training, medical and dental treatment, automobiles or other conveyances, insurance, specially adapted housing, dependent education allowances, and other ancillary benefits.

3. The RVSR assures proper application of the Rating Schedule and other applicable instructions, and he or she is fully accountable for proper analysis, appropriate development, and final rating determinations.

4. While not routinely required, the RVSR may directly communicate and interact with the veteran to facilitate timely, proper decisions. As dictated by the

circumstances of each case, the RVSR may conduct interviews in person or by telephone with veterans, eligible individuals, representatives, and advocates to obtain or clarify information.

5. If a veteran expresses an indication of dissatisfaction with a determination, the RVSR will provide consultative advice and assistance as requested by the assigned VSR or the DRO to facilitate efforts to provide a full and comprehensive explanation of the decision in question and gain acceptance of the determination or elicit information that could lead to a revised decision.

6. The Rating VSR communicates with VSRs and other employees in the Regional Office, employees of VA Medical Centers, and other Regional Offices. As required, the RVSR communicates with veterans and representatives/advocates, Central Office, and other federal/state/local agencies, in support of efforts to assist veterans.

7. The RVSR actively participates in meetings and is expected to lend his/her expertise in developing Veterans Service Representatives' skills as they relate to evidence gathering for rating decisions.

8. Acts as advocate for veterans and their beneficiaries in their dealings with other VA elements and organizations that affect their claims.

9. Performs other related duties as assigned.

The RVSR analyzes and makes determinations on numerous and complex issues relating to VA benefits. The work is vital to the processes through which the agency directly informs and serves the public. Conclusions reached and the decisions made are normally binding on both the agency and the claimant. The decisions by the RVSR can result in award decisions involving the expenditure of large sums of money or denials that can have major adverse consequences for

an applicant. They may also affect the applicant's eligibility for Medicare and Medicaid protection, social services, food stamps, and other forms of income assistance. The RVSR makes final determinations binding on the agency on all claims not requiring higher level concurrence or approval.

10. Which are the essential functions of this position?

As described in an email from her supervisor, some of essential functions of this position are: "All files the Rating Specialist takes home must be covered out to the work at home Rating Specialist. These files must also be logged into the work at home database for files to be taken home weekly. After covering files into oneself, mail must be picked up from the IPC for each file that has a mail search. Also before working file at home, files must be covered again to ensure no mail search has been added. If a mail search has been added then mail need to be picked up after returning into the building. First upon returning into the building, files must be covered back into the building. Next the rating decision should have already been printed and sent to the work at home printer. Any additional documents such as CAPRI records must be printed and placed into the files after returning into the office. The Work at home Rating Specialist must retrieve the printed documents from the work at home printer location and any mail from the IPC. Reviewing these documents need to be done by the work at home Rating Specialist at this time. If any correction or misprints are needed, it needs to be done at this time. Again any associated mail or corrections need be made at this time. All 2nd signature review files must be sent the 2nd floor for review. Files that have been reviewed for 2nd signature review must be corrected at this time and if no correction action is needed, they must be printed blue at this time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and next delivered to the POA table for Service Officer reviews. Entering examination request must be entered into Capri, and the buck slip added to the file and the file covered out to the examination facility and delivered to the IPC. Files must be gathered to take home as the above process starts over. This

could take an average work home Rating Specialist 3 to 5 hours or more. This depends on number of files being processed. We also do team meeting the day the all rating specialist are in the office and these meeting last up to 1 hour."

11. Does the complainant meet the education, skills, and experience requirements of the position? Explain your answer.

Yes. The complainant attended pre-requisite training and attended Challenge Training. However, in March 2013 she indicated that she needed to be retrained due to her absence from work.

12. Did the complainant request a reasonable accommodation from or through you? If yes, what did you do?

Yes, I processed her requests and was able to grant her requests.

13. What was the agency's reasonable accommodation process at the time of the accommodation request at issue?

Employees came directly to HR, through their supervisor, or submitted a request online for an accommodation. If medical documentation was needed, I would request it from the employee. If the medical documentation supported the request, the request was granted unless it required the removal of essential functions or ineffective. If a request could not be granted exactly as requested, I would work with employee and division to determine to reach a resolution.

14. Are you aware of the complainant's EEO activity? If yes, how and when did you become aware? Yes, I became aware when our office received a request for information dated March 15, 2013.

15. Were you involved in the complainant's EEO activity?

**Upon returning to work on January 12, 2012, was not assigned to another work area as agreed upon on January 10, 2012, during a meeting with HR Specialist Tami Clark (TC) and union official Carol Allard (CA)**

16. What happened in the aforementioned event? Be specific

We agreed to the new work area during our meeting, but the Agency needed some time to coordinate the move. Human Resources and the Veterans Service Center Manager coordinated Ms. Mullin's move to another work area. This task was completed as indicated in the attached email dated January 12, 2012. The Agency does not believe that a two day turnaround time is unreasonable.

17. Were there a meeting held on January 10, 2012, and was it agreed to move the complainant to another work area?

Yes.

18. Was the complainant moved, to another work area as agreed on January 10, 2012? If not, why not?

This task was completed as indicated in the attached email dated January 12, 2012. The Agency does not believe that a two day turnaround time is unreasonable.

**On February 6, 2013, TC spoke to the complainant in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation, the complainant's request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel**

19. Explain, what happened?

In regards to restructuring marginal tasks, the complainant and I spoke on the telephone on February 5, 2013, and then communicated by email. Please see the attached emails both dated February 5, 2013, where there is obvious willingness to communicate and interact about possible solutions. Ms. Mullin's original restructuring request would have required the removal of essential functions. Ms. Mullin did not want to come into the building at all, and instead she wanted have someone collect/distribute her work and bring it back outside to her. I did not refuse to discuss Ms. Mullin's request as evidenced by the interactions

by phone and email. Ms. Mullin stated in her email, "When I am released from the hospital and am sufficiently recovered, I will contact you."

All reasonable accommodations denials go through Regional Council. Before Regional Council completed their review Ms. Mullin informed me that she wanted to have another meeting to see if there were any other options to accommodate her needs. There was no longer a need for Regional Council to review the letter and it was rescinded. Another meeting was scheduled. The meeting was productive and new accommodations were provided. Please see the attached reasonable accommodation approval letter dated February 27, 2013.

20. Did you speak to the complainant in a sarcastic manner?

No.

21. Did you refuse to discuss restructuring marginal tasks to modify her existing accommodation? If not, why not? If yes, what did you say?

No, reasonable accommodations require an interactive process. Please see the enclosed email dated February 5, 2013. I welcomed the complainant's feedback.

22. Was the complainant's request to modify her existing accommodation denied? If yes, why? According to the complainant you told her, "Aileen these things that you think are marginal tasks, or minimal tasks, they're essential parts of your job. It is essential that you get your documents from the copy machine, and it's essential that you go over to the mail..." What is your response?

No. Her request was granted on February 27, 2013.

23. Did General Counsel uphold the denial?

The denial letter was rescinded from General Counsel when Ms. Mullin requested another meeting so they never reviewed it. Another meeting was scheduled. The meeting was productive and new accommodations were provided.

24. Were your actions to subject the complainant to a hostile work environment, and/or harassment?

No.

25. Is there anything you would like to add?

No.

The above information is furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this 26th day of August, 2013.

Tamanique Clarke
Affiant Signature

Enclosures

Initials: TC 10

**Clarke, Tamanique, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Thursday, January 12, 2012 7:39 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

Good morning Tammi,

Just wanted to let you know that the PCData Move is available on my computer,and I'm just waiting further instruction as to when and where I should move to.

Thank you again,

Aileen

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 10, 2012 12:28 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Palmer, Michael, VBASPT; Cartner, James, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

I don't think so. You should contact your union rep and let them know what you need. If he/she is unfamiliar with the form, they should contact Keith Pryor or Valorie Reilly.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, January 10, 2012 12:26 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Palmer, Michael, VBASPT; Cartner, James, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

Sounds good. Is the form available electronically?

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, January 10, 2012 12:23 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Please come to HR @ 1:30pm

**Clarke, Tamanique, VBASPT**

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, February 05, 2013 12:09 PM
**To:** 'aileen_mullin@yahoo.com'
**Subject:** Essential Function: In-Office Process

Hi Aileen,

Below is the information you requested. I understand that you feel these tasks are minimal and can be done by someone else, however collectively these tasks take a significant amount of time to complete. It's the whole in-office process that is considered an essential function of the job. Based on our phone conversation, it seems that there are certain tasks of the in-office process that you are seeking assistance with. If you want we can talk about it in our next meeting or you can reply back with what it is that you are seeking assistance with.

Upon returning to the building, files must be covered back into the building. Next, the printed rating decisions must be retrieved from the work at home printer location along with any mail from the IPC. Any additional documents such as CAPRI records must be printed and placed into the files when in the office. The printed documents are then reviewed and corrections/misprints are made while in the office. Any associated mail is also added to the files. Your files must be taken to 2nd floor for 2nd signature review to determine if corrections are needed. Corrections must be done while in the building. If no corrections are needed, the file is printed blue at that time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and delivered to the POA table for Service Officer review. Examination requests must be entered into Capri, and buck slips must be added to the file. The file needs to be covered out to the examination facility and delivered to the IPC. Next, more files are gathered and covered out to yourself to take home. The whole in-office file process can take the average work at home rating specialist 3 to 5 hours or more depending on the number of files to be processed and is an essential function of your job.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

**Clarke, Tamanique, VBASPT**

**From:** Aileen Mullin <aileen_mullin@yahoo.com>
**Sent:** Tuesday, February 05, 2013 8:11 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Aileen Mullin
**Subject:** Re: Our conversation this morning

Thank you for getting back to me, but I am physically unable to continue this discussion at the present time. When I am released from the hospital and am sufficiently recovered, I will contact you.

Aileen Mullin

**From:** "Clarke, Tamanique, VBASPT" <Tamanique.Clarke2@va.gov>
**To:** aileen_mullin@yahoo.com
**Cc:** "McBurrough, Ulyssee, VBASPT" <ulyssee.mcburrough@va.gov>; "Smith, John, VBASPT" <john.r.smith2@va.gov>
**Sent:** Tuesday, February 5, 2013 12:19 PM
**Subject:** RE: Our conversation this morning

You had asked for a copy of what was being denied and I explained that we have a formal denial process and that it was sent to Regional Counsel for review. I did not say that we sent it to Regional Counsel at your request. It's part of the denial process.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Tuesday, February 05, 2013 12:15 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Aileen Mullin
**Subject:** Our conversation this morning

Good Afternoon,

In our telephone conversation this morning,you informed me that you had submitted a "Request for Accomodations" to GC at my request.

Any suggestion that this action was requested by me is patently false.

The brevity of my response is due to the fact that I am still in hospital.

Aileen Mullin

Information requested for Czartorynski EEO case, not submitted by HR

**Summary of all merit promotion activities in past 2 years**

**Chief, Social Work Service**

- GS-0185-14
- 8/2012
- Selecting official: Laureen Doloresco; White Female
- Selectee: Bob Blackwood; Asian Male
- Breakdown of applicants:
    - Barbara Harter; White Female

**Summary of candidate interview scores**

Summary of candidates

**Henley, John (ORM)**

**From:** Bookhart, Bettie, VBASPT
**Sent:** Friday, August 23, 2013 11:14 AM
**To:** Henley, John (ORM)
**Cc:** Bookhart, Bettie, VBASPT
**Subject:** RE: Additional Event ICO Aileen Mullin Case No. 103413
**Signed By:** bettie.bookhart@va.gov

Per your request ----

**From:** Henley, John (ORM)
**Sent:** Friday, August 23, 2013 9:32 AM
**To:** Bookhart, Bettie, VBASPT
**Subject:** Additional Event ICO Aileen Mullin Case No. 103413

August 23, 2013

Fm: John Henley, EEO Investigator

To: Bettie Bookhart, EEO Program Manager

Sub: Additional Event

Good morning Bettie, there one more event that require your response. Please see below:

**On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

1. Please explain, what happened? The mediation logistics, i.e., date, time, location, etc. were finalized on May 22, 2013. An email dated May 30, 2013, the day prior to the scheduled session, was sent to the complainant. Included in the email were 2 attachments, "Mediation Program Information for Employees and a Mediation Brochure. The email also contained the link for viewing the video, "The Mediation Zone".

   These same training resources were made available to the complainant, via an email dated June 11, 2012, in preparation for a previous ADR session with the Director.

2. Was the complainant denied timely notification of existence of mediation preparation training resources available through EEOC? If yes, why? I am not aware of any specific timeline for providing mediation information. The training resources were made available to the complainant the day prior to mediation because of an oversight on my part; I forgot to send them sooner.

3. Was this to subject the complainant to a hostile work environment harassment? No

4. Did you discriminate against the complainant? No

Please expedite your response. Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs

B-4

**Henley, John (ORM)**

**To:** Bookhart, Bettie, VBASPT
**ıubject:** Additional Event ICO Aileen Mullin Case No. 103413

August 23, 2013

Fm: John Henley, EEO Investigator

To: Bettie Bookhart, EEO Program Manager

Sub: Additional Event

Good morning Bettie, there one more event that require your response. Please see below:

**On or about May 22, 2013, the complainant was denied timely notification of the existence of mediation preparation training resources available through EEOC.**

1. Please explain, what happened?

2. Was the complainant denied timely notification of existence of mediation preparation training resources available through EEOC? If yes, why?

3. Was this to subject the complainant to a hostile work environment harassment?

4. Did you discriminate against the complainant?

Please expedite your response. Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
Southeastern Operations
140 Fountain Parkway, sixth Floor, Suite 620
St. Petersburg, FL 33716

In Reply Refer To: ORM/08J

Written Affidavit

In the Matter of the EEO Complaint of Discrimination of
Complainant – Aileen Mullin
200I-0317-2012103413

| | | |
|---|---|---|
| Aileen Mullin | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| V. | ) | Case No: 200I-0317-2012103413 |

Secretary
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420
Respondent

Facility: VA Regional Office
St. Petersburg, FL

Initials: [signature] 1

**The claim accepted for investigation is:**

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**On or about May 22, 2013, EEO Manager Bettie Bookhart (BB) attempted to interfere with the complainant's family member accompanying her to a mediation session**

I, **Bettie Bookhart** solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

1. Spell your name for the record. Bettie Jean Bookhart

2. What is your position title? Equal Employment Opportunity (EEO) Program Manager

3. How long have you been in this position? - September 23, 2005.

4. What is your organizational unit? – Director's Office

5. Who is your first and second level, supervisors? – Suzanne Nunziata, Assistant Director (1st line supervisor); Kerrie Witty, Director (2nd line supervisor)

6. The complaint, are based on disability and reprisal. Do you have a disability (yes or no will appropriate). No

7. Do you have knowledge of the complainant's disabilities? – Yes –
If yes, when and how did you become aware of the complainant's disabilities? On or about June 6, 2012. As EEO Manager, I am copied on EEO complaints sent to the Director from the Office of Resolution Management (ORM).

8. Did the complainant request a reasonable accommodation from or through you? - No
If yes, what did you do?

9. What was the agency's reasonable accommodation process at the time of the accommodation request at issue? See response in question 8

10. Are you aware of the complainant's EEO activity? – Yes
If yes, how and when did you become aware? As EEO Manager, I am copied on EEO complaints sent to the Director from ORM. I received ORM's Notice of Informal Counseling dated June 6, 2012.

Initials: BB 2

11. What happened in the event mentioned above? Be specific.

On May 29, 2013, I received an email from Aileen Mullin asking if she was permitted to have two people (a representative and family member) accompany her to mediation. I telephoned John Henley, ORM, informed him of Aileen's request and asked if permitting a family member to attend mediation was acceptable. John told me that the mediator makes the decision so I attempted to contact Rick Wingate, the assigned mediator for Aileen's EEO complaint. Odessa Johnson, Case Manager at ORM, sent an email, dated May 30, 2013, to Aileen and me advising that there was nothing in EEOC's regulations that would prohibit the complainant's family member from attending the mediation session, along with her representative. A representative and family member did attend the scheduled mediation.

12. Were your actions to subject the complainant to a hostile work environment, and/or harassment? No

13. Was your action to discriminate against the complainant? No

21. Is there anything you would like to add? No

The above information is furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this 19th day of August, 2013.

Bettie Bookhart

Bettie Bookhart
Affiant Signature

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
Southeastern Operations
140 Fountain Parkway, sixth Floor, Suite 620
St. Petersburg, FL 33716

In Reply Refer To: ORM/08J

Written Affidavit

In the Matter of the EEO Complaint of Discrimination of
Complainant – Aileen Mullin
200I-0317-2012103413

| | | |
|---|---|---|
| Aileen Mullin | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| V. | ) | Case No: 200I-0317-2012103413 |
| Secretary<br>Department of Veterans Affairs<br>810 Vermont Avenue, NW<br>Washington, DC 20420<br>Respondent | ) | |
| Facility: VA Regional Office<br>St. Petersburg, FL | ) | |

B-5

Initials: MM 1

**The claim accepted for investigation is:**

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. Between October 2011 and January 2012, supervisor, Michael Palmer (MP) refused to help the complainant while she was experiencing severe workplace related respiratory problems; and he went as far to say that the complainant was the only person in the room with a problem and asked why the complainant did not have a portable oxygen tank or wear a protective mast**

I, **Michael Palmer** solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

1. Spell your name for the record.

Michael Jerome Palmer

2. What is your position title?

Coach Intake Processing Center (IPC)

3. How long have you been in this position?

Two Months

4. What is your organizational unit?

Veteran Service Center RO 317

5. Who is your first and second level, supervisors?

First line supervisors- Collette Burges

2nd level supervisor- Sandra Smith

6. The complaint, are based on disability and reprisal. Do you have a disability (yes or no will appropriate). Yes

7. Do you have knowledge of the complainant's disabilities? If yes, when and how did you become aware of the complainant's disabilities?

I do not recall when I learned of the complainant's disability. Employee informed me that she had some problems in room 222 training room and requested to move from under the air conditioner duct.

8. The complainant asserts her disabilities are cancer, Asthma, chronic sinus infection, vocal cord dysfunction, Insomnia, Irritable Bowel Syndrome, and Iritis. Are you aware the complainant has these disabilities? If yes, when and how did you become aware?

No, the only condition the employee informed me about was the fact she was having some respiratory problems in training room 222 when she arrived sometime in October 2011.

9. Please, describe the complainant's duties and responsibilities?

Employee reviews evidence and directs development in order to make a decision to grant or deny veterans' claims for service connection.

10. Which are the essential functions of this position?

Review evidence in claims files and make decisions in electronic system.

11. Does the complainant meet the education, skills, and experience requirements of the position? Yes. Explain your answer

Employee attended all required Veterans Affairs training to be able to provide a decision for veterans' claims.

12. Did the complainant request a reasonable accommodation from or through you? If yes, what did you do? No. However, based on employee having a medical episode in the training room, I referred to HR for possible reasonable accommodation for Ms. Mullin

13. What was the agency's reasonable accommodation process at the time of the accommodation request at issue?

Supervisors are required to direct employees to Human Resources if reasonable accommodation is required or suspected.

14. Are you aware of the complainant's EEO activity? If yes, how and when did you become aware? No

15. Were you involved in the complainant's EEO activity previously? No

16. What happened in the event mentioned above? Be specific. During the period of October 2011 through January 2012, I move Ms. Mullin away from the A/C duct per her request. Additionally, I told her that if she became ill and needed to leave at any time that she should inform me and I would address her leave. I also notified my Supervisors and Human Resources of her concerns with room 222.

17. Did you refuse to help the complainant while she was experiencing severe respiratory problems? No

18. Did you say to the complainant that she was the only one in the room with a problem, and asked the complainant why she did not have portable oxygen tank or wear a protective mask. No

19. If you did not say the aforementioned statements, what did you say? I told her that I would move her away from the A/C duct. I also told her that if she became ill and needed to leave at any time that she should inform me and I would address her leave.

20. Were your actions to subject the complainant to a hostile work environment, and/or harassment? No

21. Is there anything you would like to add? No

The above information is furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this 20 day of August, 2013.

Michael Palmer
Affiant Signature

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
Southeastern Operations
140 Fountain Parkway, sixth Floor, Suite 620
St. Petersburg, FL 33716

In Reply Refer To: ORM/08J

Written Affidavit

In the Matter of the EEO Complaint of Discrimination of
Complainant – Aileen Mullin
200I-0317-2012103413

Aileen Mullin )
)
Complainant )
)
V. ) Case No: 200I-0317-2012103413

Secretary
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420
Respondent

Facility: VA Regional Office
St. Petersburg, FL

B-6

**The claim accepted for investigation is:**

**Whether the complainant was subjected to a hostile work environment, based on disability and reprisal as evidenced by the following events:**

**1. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations**

**2. On June 10, 2012, Director Kerry Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated**

I, **Kerrie Witty** solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

1. Spell your name for the record. Kerrie Witty
2. What is your position title? Director
3. How long have you been in this position? 3 years 2 months
4. What is your organizational unit? VBA – St. Petersburg VARO
5. Who is your first and second level, supervisors? Keith Thompson, Diana Rubens
6. The complaint, are based on disability and reprisal. Do you have a disability (yes or no will appropriate). No
7. Do you have knowledge of the complainant's disabilities? If yes, when and how did you become aware of the complainant's disabilities? Complainant shared with me that she has cancer and was undergoing chemotherapy and she also submitted a reasonable accommodation.
8. Are you aware of the complainant's EEO activity? If yes, how and when did you become aware? Yes, I was named as RMO.

**1. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the union; that she approved BW's e-mail of June 5, 2012, and she could not understand why the**

**complainant had a problem with it and; that she did not support granting accommodations**

9. What happened in the aforementioned event? Be specific. I met with the complainant at her request to discuss how I could assist her. During the meeting she kept bringing up Bonnie Wax and not talking about herself and how I could help her. I was trying to remind her that we were here to talk about her and not Bonnie Wax. I had read Bonnie's e-mail she sent to the complainant before she sent it and felt it was appropriate and had addressed her questions and concerns. The complainant did not like Bonnie's e-mail and again, kept talking about Bonnie as opposed to discussing her needs which is what the meeting was about.

10. Did you tell the complainant that you did not support granting accommodations? No, I have granted several accommodations in the past and that is what I told the employee. During the meeting I was trying to discuss with the employee what she felt she needed from me so I could assist her.

**2. On June 10, 2012, Director Kerry Witty (KW) denied the complainant's request to have her donated leave handled in a way that would allow for accountability; and as of September 2012, problems with the complainant's donated leave escalated**

Explain, what happened in this event? I don't recall any problems with her request for donated leave. She submitted a request and I approved it.

12. Did you deny the complainant's request to have accountability for her donated leave? If yes why? I approved the complainant's request for donated leave. I'm not sure what is meant by accountability for her donated leave.

13. What is the policy or procedure when an employee is donated leave? They complete an application for donated leave and provide it to HR. It then comes to me for approval and once I approve it, an e-mail is sent to employees notifying them of who has requested donated leave.

14. Did the complainant follow this policy? As I recall she wanted us to keep sending e-mails asking employees to donate her leave which is not something we did for all employees. We send the initial e-mail to employees but it was not

Initials: KW 3

our practice to keep sending additional e-mails after that. However, at the complainant's request, we did send subsequent e-mails to employees notifying them the complainant had requested donated leave.

15. Were your actions to subject the complainant to a hostile work environment, and/or harassment? No

16. Were your actions to discriminate against the complainant due to her disability and/or EEO activity? No

20. Is there anything you would like to add? No

The above information is furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this 20 day of Aug, 2013.

Kerrie Witty

Kerrie Witty
Affiant Signature

**Henley, John (ORM)**

**From:** Aileen Mullin [aemflorida@gmail.com]
**Sent:** Friday, March 01, 2013 11:54 AM
**To:** Henley, John (ORM)
**Cc:** Odessa.johnson@va.gov; Smith, John, VBASPT; Raynene Suarez
**Subject:** Fwd: Fw: February 20th Request for AA

---

**From:** Works, Philip, VBASPT
**Sent:** Wednesday, February 20, 2013 4:13 PM
**To:** Smith, John, VBASPT; Mullin, Aileen, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Wax, Bonnie, VBASPT
**Subject:** February 20th Request for AA
**Importance:** High

Good afternoon,
Unfortunately I have not been able to reach Mr. Smith by phone to discuss the letter delivered to Human Resources at approximately 3:20 this afternoon.

However, the Director has granted Ms. Mullin authorized absence for her regularly scheduled tours of duty Thursday, February 21, 2013 through Monday, February 25, 2013.

This time is being provided to allow an opportunity for Ms. Mullin to gather any additional medical documentation needed in support of her request for Reasonable Accommodation and then submit her revised request on Tuesday, February 26. Any requests for additional time will be considered based on the circumstances present at the time of the request.

One possible resolution raised earlier in this process was the use of a respirator. However, to date, the agency has not received further information regarding the specifications of that device (filtration size, types of filtration, etc.) so as to be able to locate or purchase these for Ms. Mullin's use. Please provide as soon as possible.

This response cannot address all issues raised in the February 20th letter and is only an interim reply to address the most pressing issues. A more detailed response will be forthcoming.

Thank you,
Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923 | (fax) 727-319-7750

Here'st a synopsis of what I've been put through since we last met:

- Wednesday 20th: The Memorandum from the AFGE, addressed to Bonnie Wax, was hand delivered to Human Resources. The memo was received by Philip Works. Knowing this, explains how Mr Works would have had an opportunity to read the memo.

On the same day, Mr. Works sent the above e-mail (which I had no knowledge of until I returned to work on Tuesday January 26th.)

Clearly Mr. Works' knowledge and involvement exceeds a casual glance at the Memorandum addressed to Bonnie Wax. Other than by reputation, I don't know this man. I don't understand why he would be in contact me under any circumstances. I don't understand how he could suddenly have an active roll in this process. Bonnie or Tammi Clark I understand. But Philip Works?????

Are there no privacy boundaries within Human Resources?????

If law dictates that everyone in HR is allowed equal access to any/all employee medical information information, as troubling as that would be, I'll have to come to terms with it.

Can your office help clarify the regulations/laws that spell this out. If not, will you please point me in a direction so I can do the research.

- Mr Works sent this message to my work e-mail, knowing full well that I was on medical leave. (It has been repeatedly been evidenced, that Human Resources has my personal contact information ~ including an e-mail address. ) I didn't know of the following e-mails ' existence until my return to work on February 26th.

- And please know that February 26th, 27th and 28th were dreadful. ... There were phone calls, faxing, conference calls, e-mails . . . . All in an effort to get them to a place that would allow me to get back to work ~ safely back to work. Human Resources misconstrued, ignored and blatantly defied laws, regulations and guidance set for by the EEOC, The Rehabilitation Act, VA Directive 5975.1 and JAN Job Accommodation Network.

**Henley, John (ORM)**

**From:** Aileen Mullin [aemflorida@gmail.com]
**Sent:** Friday, March 01, 2013 11:57 AM
**To:** Henley, John (ORM)
**Cc:** Odessa.johnson@va.gov
**Subject:** Fwd: 02/27/2013 request for clarification submitted to HR

----- Forwarded Message -----
**From:** Aileen Mullin <aileen_mullin(
**To:** Tammi Clarke <Tamanique.Clarke@va.gov>
**Cc:** casey crump <casey.crump@va.gov>; John VBASPT Smith <john.r.smith2@va.gov>; Ulysee McBurrough <ulyssee.mcburrough@va.gov>; "kellee@afge.org" <kellee@afge.org>; Valorie VBASPT Reilly <valorie.reilly@va.gov>; "valorie.reilley@gmail.com" <valorie.reilley@gmail.com>
**Sent:** Wednesday, February 27, 2013 6:54 AM
**Subject:** clarification

Good morning,

As I attempted to clarify yesterday, I am requesting a **modification** to an existing accommodation due to the severity of my reaction to exposure. The existing accommodation is in place to **limit time** in the building. From my understanding, the agency has deemed that the information of record is insufficient to enable the Reasonable Accommodation Committee to make an informed determination as to modifications of the current accommodation of limiting time in the building. Also, my understanding is that the agency is requiring additional medical documentation to address the need to limit exposure. My doctor and I respectfully request clarification as to why the documents of record are insufficient and identify/clarify the specific, additional, information needed to address the need to further limit exposure. At this time, we are both a loss as to what the agency is asking for.

When exploring essential and marginal functions of the WAH RVSR position, in terms of respiratory disabilities, it may be helpful to consider options that would be identified for RVSRs (or VSRs) with other disabilities, such as being wheelchair bound due to paraplegia or visually impaired. Would the Reasonable Accommodations Committee consider options to address the need for functions such as file movement and searching through bins of mail? Food for thought.

Respectfully,

Aileen

**Henley, John (ORM)**

**From:** Aileen Mullin [aemflorida@gmail.com]
**Sent:** Friday, March 01, 2013 11:55 AM
**To:** Henley, John (ORM)
**Cc:** Odessa.johnson@va.gov
**Subject:** Fwd: 02/26/2013 Accommodation Ideas for Respiratory Impairments sent to HR

**From:** Aileen Mullin [mailto:aileen_mullin
**Sent:** Wednesday, February 13, 2013 11:56 AM
**To:** Tammi Clarke
**Cc:** kellee@afge.org; Smith, John, VBASPT; Reilly, Valorie, VBASPT; Valorie Reilly; keith pryor; Crump, Casey, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** Accommodation Ideas for Respiratory Impairments

This site has helpful ideas as to address the need for respiratory based accommodations

http://askjan.org/media/respiratory.html

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Tuesday, April 16, 2013 7:43 AM |
| **To:** | McBurrough, Ulyssee, VBASPT |
| **Cc:** | Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org' |
| **Subject:** | FW: RA Approval Letter |
| **Attachments:** | RA Approval - Mullin 4-15-13.pdf |
| **Signed By:** | Aileen.Mullin@va.gov |
| **Importance:** | High |

PRETEXT

Good morning Bo,

At first read this message from Human Resources and the Director sound good, but its not

The message, and attached document, are riddled with pretext: I'll explain in a follow-up e-mail.
Respectfully,
Aileen

Since I amended my EEO complaint, the Agency's treatment of me has reached the level of being inhumane. The Agency is fully aware of my cancer, asthma, sinus infections ... and desire to move forward in my career ~ but none of that is enough for them to treat me with common decency.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ____________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NB [signature: Kerrie Witty]

DMO SIGNATURE

04/15/2013

DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f**

Adobe LiveCycle Designer

**Henley, John (ORM)**

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, April 16, 2013 1:46 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; Ingram, Walter, VBASPT; 'kellee@afge.org'; Johnson, Odessa W. (ORM); Henley, John (ORM)
**Subject:** IAQ not being addressed

For 'the record' Bo:

March 6, 2013 Human Resources modified my accommodations by assigning me to a new work station and supplying air-purifiers. These are inadequate/ineffective **accommodations** for workplace triggered asthma and sinusitis.

**Indoor Air Quality Issues**:

According to the specs on the air-purifier, the machines aren't designed to mitigate the majority IAQ problems we have at the RO. ( The 2011 and 2012 IAQ studies indicate a worsening of variables that contribute to, and result from the poor air quality. Additionally, the studies were done pre-rat infestation and didn't include occupant surveys.* )

**Effort to Engage in an Interactive Process to Identify Appropriate Accommodations:**

I've repeatedly attempted to engage Human Resources in the *VA Handbook's* prescribed 'interactive process' to identify accommodations that will help me perform the essential functions of my job, enable me to participate in VA activities, and/or enjoy the benefits and privileges of VA employment.

On my behalf, my immediate supervisor and union representatives have repeatedly attempted to have productive dialogue with Human Resources.

If the medical information Human Resources is insufficient to grant modification to current accommodations, for my specific disabilities, I have asked them to please specify why the information is insufficient and if additional information is required to specify the information they require.**

Human Resources refuses to work with us to explore/identify effective accommodations.

**Where do we go from here?**

The Agency displays a blatant disregard form my safety.

Until I am granted the appropriate accommodations, I won't be returning to the building on 4/19/13 (see Tammi's e-mail). I'll make arrangements to get the files to you but don't know we proceed from there?

- Is there work I can do from home?
- Paid Administrative Leave until the Agency takes appropriate action?
- Workers' Compensation?
- Other options????

Please send e-mails to me at am0303@hotmail.com and John Smith at john.r.smith2@va.gov .

---

http://www.epa.gov/iaq/largebldgs/i-beam/text/fundamentals_of_iaq.html

At the March Town Hall meeting, I asked the director to let us know what species of rodent was infesting the building and how the rodents fecal matter was being cleaned up. I also offered reasons why it was important for

the employees to have the information: I haven't not been able to find record of her response to the request for this health and safety based information

**Reasonable Accommodation:**

A "reasonable accommodation" is a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. T**he accommodation must be effective in meeting the needs of the individual by addressing the barrier created by the functional limitations.**

*VA Handbook* **5975.1**

**Henley, John (ORM)**

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, June 12, 2013 8:51 PM
**To:** Correa, Matthew, VBASPT
**Cc:** Smith, John, VBASPT; Henley, John (ORM); Johnson, Odessa W. (ORM); McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT; Crump, Casey, VBASPT; Pryor, Keith, VBASPT
**Subject:** RE: Reasonable Accommodation

Hi Matt,

I'm not sure of what you mean when you ask what kind of accommodation I'm seeking.

What is needed, in order to learn and be successful in at my job, hasn't changed since you and I met with Jerry Huffman. (Which is the same as was discussed in meetings (and e-mails) going all the way back to January ~ with Tammi Clark, John Smith, Casey Crump, Ulysee McBurrough...) I need the opportunity to meet with a Decision Review Officer:

> "When assessing some of our Veteran's 'files' ~ which are **complex** ~ in terms of medical conditions and evidence, and/or historical law changes and interpretations, and/or beyond my realm of knowledge and training ~ I need help. I need to be face to face with someone (an expert) to look at the file with me. E-mail, phone calls, instant messaging suffice often ~ but ........ they don't work for the Veteran, who needs the extra 'expertise', to get their claims taken care of."

As for what assistive technology is available, and appropriate for (secure) distant viewing of Veteran's claims file and conferring with a DRO, I suggest we try contacting subject-area experts in NSC, CAP, ODI or JAN.

Respectfully,

Aileen

---

**From:** Correa, Matthew, VBASPT
**Sent:** Tuesday, June 11, 2013 11:41 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** Reasonable Accommodation

Aileen,
I am in the understanding that you made a request for reasonable accommodation for more face to face interaction. I was told that you might mean something like skype or similar. Can you please let me know what kind of accommodation you are seeking.

Thank you,

*Matthew Correa*

matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560

To: Bonnie Wax

Fr: John Smith, AFGE Steward

Re: Aileen Mullin request for Modified Accommodation and Administrative Leave

Dt: February 19, 2013

As the modified accommodation, regarding Ms. Mullin's Workers' Compensation illnesses, has not been adequately discussed and resolved, we ask the Ms. Mullin be placed on paid Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

The following is a synopsis of recent events regarding Ms. Mullin's Workers' Compensation illnesses, since finishing her treatment for breast cancer in late December 2012:

- Wednesday, January 2, 2013 - Ms. Mullin returned to work.

Ms. Mullin works from home, reporting to the office once or twice a week to minimize her exposure in the building. (Ms. Mullin works at home due to workplace-related illnesses: asthma and chronic sinusitis.*)

Ms. Mullin reported to the office, approximately 24 total hours, during the month of January.

- Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Ms Mullin suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Ms. Mullin had been asymptomatic when on leave for breast cancer. )

- Thursday, January 17, 2013 - Ms. Mullin was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed.

- Tuesday, January 23, 2012 - The next time Ms. Mullin entered the building; Within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain.

- Saturday, January 26, 2013 - Ms. Mullin was seen by the medical specialist who deemed that it was not safe for her to enter the building without respirator. He stated that she has to further minimize her time in the building.

- Monday, January 28, 2013 - Ms. Mullin informed the agency of her worsening reaction to being in the building and of the doctor's orders.

- Tuesday, January 29, 2013 - Ms. Mullin had numerous conversations with the Human Resource (HR) Specialist attempting to determine how a respirator would be attained.

- Wednesday January 30, 2013 - Though ill, Ms. Mullin requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Ms. Mullin's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building.

Ms. Mullin voiced her belief that collaboratively a plan could be worked out. Aid with marginal job functions such as assistance retrieving documents from the printer and moving the files were suggested by Ms. Mullin. The group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job.

However, later the same afternoon, Human Resources informed Ms. Mullin that her request for modifications to her accommodation was denied (without the benefit of further conversation.)

As Ms. Mullin had witnessed such treatment of other disabled employees, she realized her job was in jeopardy. She became extremely alarmed and distraught. She experienced an acute onset of severe gastrointestinal pain and bleeding (a condition she has no history of).

- Thursday, January 31, 2013 - Ms. Mullin was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she she remained hospitilized for one week.
- February 5, 2013 - While in the hospital, Ms. Mullin spoke to the HR specialist who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position was one essential function and could not be broken down by tasks: " ....I understand that you feel these tasks are minimal and can be done by someone else, however, collectively these tasks take a significant amount of time to complete..... **It's the whole in-office process that is considered an essential function of the job**... " This information caused Ms. Mullin further upset and an exacerbation of her condition. (Please note that the HR Specialist didn't inquire as to why, or how long, Ms. Mullin would be in the hospital.)
- Wednesday, February 6, 2013 - Ms. Mullin was discharged from the hospital after treatment for simusitis and gastrointestinal conditions. Her doctor required her to remain out of work for an additional two weeks ~ and to avoid stressful situations during her recovery.

Ms. Mullin is now scheduled to return to work on Thursday, February 21. As the decision on the modified accommodation, for Workers' Compensation illnesses, was premature, and has not been adequately been resolved, we ask the Ms. Mullin be placed on Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

Please provide the names of the members of the Reasonable Accommodation Committee.

Due to the gravity of this situation, we respectfully exspect a response to this request by the close of business.

* U.S. Department of Labor, Workers' Compensation File Number: 062294294

enc.
Letter from Social Worker, St. Anthony's Hospital

cc:
Aileen Mullin
Ulysee McBurough, VBA
Jon Jackson, DOL
Odessa Johnson, EEO
John Henley, EEO

Everett Kelly, District President, AFGE
Brenda Stallard, AFGE
Valorie Reilly, AFGE
Keith Pryor, AFGE
Casey Crump, AFGE

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Wednesday, April 03, 2013 12:02 PM |
| **To:** | McBurrough, Ulyssee, VBASPT; Huffman, Jerry, VBASPT |
| **Cc:** | Smith, John, VBASPT; Smith, Sandra, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT |
| **Subject:** | FW: Rescinding of accommodations currently in place |
| **Attachments:** | ca-7.pdf; SF-201199A Direct Deposit Form.pdf |

Hi gentlemen,

I just want you to know that I've asked John and Casey to assist me in developing an emergency medical plan.

The Agency's restriction, as to the hours I am permitted to work at home, will be detrimental to my health.

When I had the asthma attach last year, I wanted to call 911 but didn't know how to explain where in the building I was ~ Then the asthma quickly increased in severity and I couldn't communicate ~ I was gasping. The 'powers that be' who I pleaded to for help, failed to respond accordingly. Thank God, a friend did response to text. If not, I could have suffered a brain injury or death.

If I go into another full blown asthma attack, time will be of the essence.

My body has a long way to go before its healed from the cancer treatments. I fear that another attack will be crippling more quickly ~ and I won't be afforded to time, or ability, to search and beg for someone to render aid.

It would be grossly irresponsible (and naive) to depend on Human Resources to assist

There has to be an emergency plan.

Aileen

The four hours, twice a week, modification to the existing accommodation was working. I may have felt better coming into the building then when I left if but at least I I was able to stay out of the emergency room and doctor's office. Yes, the modification that **Tammi, John and I agreed to WAS effective**!!!! But that's a moot point.

Unfortunately, the Agency made it clear that it is adhering to its pattern of refusing to permit accommodations appropriate to for specific disability: "give accommodations to one employee, you'll have to give them to every employee that comes in with a doctors note". (Cookie cutter accommodations for chronic iconditions such as MS, PTSD, TBI heart problems, respiratory problems have been WAH Mon, Wen, Fri))

---

A kind man once adised me to pick my battles.

Reference: The 4/1/3013 e-mail from HR.
I took a few notes , but its a battle that can wait ...

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 01, 2013 4:02 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Good Afternoon Ms. Mullin,

To those without detailed knowledge of events that transpired since the 27th of February, these first two paragraphs would appear to contain logical and valid facts. Reality is, they contain neither logical or valid facts ... the EEOC is going to have a heyday.

our reasonable accommodation approval form, entitled Approval of Accommodation Request and dated February 27, 2012, clearly stated, "Modifications to your current approved accommodation to work from home 3 days per week." Your approval document does not state you are permitted to work four (4) hours in the office and four (4) hours at home. If we had granted such an accommodation, it would have been in writing.

No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays.

- What category of Leave request should be entered in ETA? You may take sick leave, annual leave in lieu of sick, or request leave without pay. The choice is yours. Your request for leave needs to be made through your supervisor.
- ...The request "needs to be made **THROUGH**" my supervisor .... through to who? To what end?
- I would prefer to use LWOP when the asthma attacks occurs, but I'm concerned that the 'powers that be' will use this as an opportunity to charge me with being AWOL:
Example: My breathing becomes labored. I have to leave the building immediately. There's no time for the processing of LWOP documentation ....

- What evidence will the Agency require so that I am paid under Worker's Compensation? The Department of Labor will need medical documentation to support a claim for reimbursement.
- Incomplete answer: The fact that evidence needs to be 'medical' is a given: What does the evidence have to include?

- What is the procedure for requesting payment under Worker's Compensation? You will need to complete the attached CA-7 and direct deposit form.
- An incomplete answer ... how do I proceed after the completion of the forms .....

- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation? Please contact Department of Labor at (904)366-0100. You can leave a message to speak with your claims examiner who can discuss in detail any further concerns or questions you may have.
- Denial of clarification / information:DOL told me to contact HR....

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

To: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, 2012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.

My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.

I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***

If it is true that the modification to accommodations has been reversed, please help me understand why.

If it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?

- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,

Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

*** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:

- elevated penicillium spore counts
- elevated aspergillus spore counts

- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter

Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

**Henley, John (ORM)**

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, July 10, 2013 2:50 PM
**To:** Correa, Matthew, VBASPT
**Cc:** Beauchamp, James, VBASPT; Ellis, Charles, VBASPT; aileen_mullin@yahoo.com; Smith, John, VBASPT; Smith, Sandra, VBASPT; Henley, John (ORM); Johnson, Odessa W. (ORM); kellee@afge.org; Reilly, Valorie, VBASPT; hargrl@afge.org
**Subject:** Printing - accommodation HR

Hi Matt,

Hindrance to my training is just one problem that the Agency's *alternate accommodation* fails to address: It still denies me the opportunity to see and/or act upon Veteran's claims related documents I generate ~ A concern that has a potential negative impact on Veterans, the Service Center ~ and me.

Here are just a few of the problems we face:

1) When rating, requesting exams and completing development on Veterans' claims, I am denied the opportunity to proofread my work before its submitted to the VA Medical Centers, co-workers, administrators and QRT for quality review. (I don't think I need to elaborate on the potential pitfalls this presents, but if the Agency requires me to elaborate I will do so)
2) I am denied the opportunity to insure that documents I generate are 'married' to the appropriate file I'm returning to the RO. (Draft and deferred ratings – it happens!)
3) When a designated administrator, fails to give me a printed document, by choice or oversight, there's nothing I can do. The administrator has control, but I am accountable for the work. ~ The most troubling aspect of this is that I know of Veteran's exams, that I have drafted, but have not ordered: This won't effect HR, but it will effect the Veterans who end up with no examination and a Provisional Rating ~ (Again, if the Agency requires details I will supply them)

Back to the subject of training:
How's is the printing of, and handing-off of, training documents going to be accomplished in a timely fashion (prior to the trainings). I will forward the Challenge schedule so the Agency has a an outline of what trainings I have already unnecessarily struggled to do and has yet to be assigned. Below is an outline for what was needed for today and every Body System lesson follow the same basic pattern. Seriously, I need the material in hand during the trainings.

The Agency's timely response is needed: I am falling further and further behind in my training.

(Note: The technical aspects of establishing a printer connection can be done in very short order. Off-site printing capability is also not a time/technical issue; it is done for any number of reasons.)

---

Today I needed all documents as related to Dental/Oral Training* and the Digestive MTPSS**.

*Dental Rating Schedule live training (Power Point, Dental Student Handout, Dental Treatment Chart, e-case and Lync's 'conversations'. Please note, that to date instructor supplied handouts are made available at the beginning of the meeting or immediately after. Please advise as to how this will be available to me when needed.)

** Digestive MTPSS, see below
__Digestive System__

**Henley, John (ORM)**

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, July 05, 2013 1:52 PM
**To:** Correa, Matthew, VBASPT
**Cc:** Smith, John, VBASPT; kellee@afge.org; Henley, John (ORM)
**Subject:** Accommodation: Printing capability and training

Hi Matt,

Have you been able to make any head-way in gaining approval for me to print from home?

In Challenge, there's an assumption that the trainees have the ability to print. These are in-depth, intense and lengthy lessons in terms of every body-system: In the Neurological Module alone, there are detailed Job Aids, Rating Schedules and Lessons that I need to be able to print. (As well as the pertinent Fast Letters, Training Letters, DADs ... that were noted in the Live portion of the training.)

My current situation leaves me at a distinct disadvantage. Two key areas of concern are 1)Lessons take me longer than they should because I'm hand writing the notes and trying to work with many screens and pieces of information open at the same time and 2) I won't have resources to refer back to when rating Veterans claims.

If the Agency does not want to issue a printer I am willing to supply one myself. But please, will you see what can be done to get the authority to print granted.

Thank you in advance for your time and effort,

Aileen

PS: Attached are a few screen shots; Examples of what I'm trying to explain.






**BRAIN STRUCTURE FUNCTIONS**

| Brain Structure | Function |
|---|---|
| Cerebrospinal Fluid | ▪ Removes waste<br>▪ Cushions Central Nervous System |
| Cerebrum (Left Hemisphere) | ▪ Analytical Thinking ▪ Math<br>▪ Facts ▪ [illegible]<br>▪ Logic ▪ [illegible]<br>▪ Language ▪ Analysis<br>▪ [illegible] ▪ [illegible]<br>▪ [illegible] |
| Cerebrum (Right Hemisphere) | ▪ Insight and Intuition ▪ Music<br>▪ Imagination ▪ [illegible]<br>▪ Face Recognition ▪ [illegible]<br>▪ Spatial Orientation ▪ Art and Color<br>▪ Colors ▪ [illegible] |
| Cerebellum | ▪ Voluntary Motor Movement<br>▪ Balance and Equilibrium<br>▪ Muscle Tone |
| Brainstem | ▪ [illegible]<br>▪ Breathing<br>▪ Heart rate<br>▪ Digestion<br>▪ Blood pressure<br>▪ Arousal |
| [illegible] | ▪ [illegible]<br>▪ Eye movement<br>▪ Vision<br>▪ Facial Sensation<br>▪ Hearing<br>▪ [illegible]<br>▪ [illegible] |


NEUROLOGICAL MODULE

Terminology
Introduction,
Topic 1: Digestive Wordparts,
Capstone Exercise (Terminology)

Anatomy
Introduction,
Topic 1: Anatomy of the Oral Cavity and Pharynx
Topic 2: Anatomy of the Large Intestines and Accessory Organs
Capstone Exercise (Anatomy)

Physiology
Introduction
Topic 1: Mechanical, Chemical, and Enzyme Components of Digestion
Topic 2: Functions of the Oral Cavity and Pharynx
Topic 3: Functions of the Esophagus, Stomach and Small Intestine
Topic 4: Functions of the Large Intestine and Accessory Organs
Capstone Exercise (Physiology)

Pathophysiology

Introduction

Topic 1: Medical Disorders of the Digestive System
Topic 2: Rating Criteria for the Digestive Disorders
Capstone Exercise (Pathophysiology)

**Job Aids**

- Determination of the Severity Level of the Disorder
- Duodenal Ulcer
- Gastritis
- Gastroesophageal Reflux Disease (GERD)
- Hemorrhoids
- Hiatal Hernia
- Identification of the Diagnosis for a Disorder in the VA Exam
- Irritable Colon Syndrome
- Location of the Rating for a Disorder in the Rating Schedule
- Location of the VBA Diagnostic Code for a Digestive Disorder
- Postgastrectomy Syndrome

---

**From:** Correa, Matthew, VBASPT
**Sent:** Wednesday, July 10, 2013 9:12 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Accommodation: Printing capability and training

Aileen,
I am working on getting you all of the material for the training printed for you. I know that having a printer at home would be easier but the time that might take would hinder your training. We are hoping to have it all printed and ready for pickup this week.

Thank you,

*Matthew Correa*

matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

**VA Core Values:** Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, July 09, 2013 8:54 AM
**To:** Morey, Lee Ann, VBASPT
**Cc:** Mailhiot, Jennifer, VBASPT; Beauchamp, James, VBASPT; Correa, Matthew, VBASPT; Ellis, Charles, VBASPT; Smith, John, VBASPT; Crenshaw, Leah, VBASPT
**Subject:** FW: Accommodation: Printing capability and training

Good morning Lee,

Thanks for sending the headset: I received it, as well as the message about returning it.

As for the training itself, its been phenomenal: The body system lessons, learned through Medical TPSS, are fascinating and taught in depth; And the live trainings are completely interactive. As far as I can tell they utilize all facets of the meeting applications.

Working off-site has presented technical challenges, but between NSC and the instructional designer we've worked through most of them.

Printing (or lack there of) is a big problem. I'm trying to remedy it with HR, and I'll keep you in the loop as far as how that's going. Below is my most recent e-mail to HR.

Take care Lee and thank you,

Aileen
PS I still haven't tracked down my travel packet, but the day is young.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, July 05, 2013 12:52 PM
**To:** Correa, Matthew, VBASPT
**Cc:** Smith, John, VBASPT; kellee@afge.org; Henley, John (ORM)
**Subject:** Accommodation: Printing capability and training

Hi Matt,

Have you been able to make any head-way in gaining approval for me to print from home?

In Challenge, there's an assumption that the trainees have the ability to print. These are in-depth, intense and lengthy lessons in terms of every body-system: In the Neurological Module alone, there are detailed Job Aids, Rating Schedules

and Lessons that I need to be able to print. (As well as the pertinent Fast Letters, Training Letters, DADs ... that were noted in the Live portion of the training.)

My current situation leaves me at a distinct disadvantage. Two key areas of concern are 1)Lessons take me longer than they should because I'm hand writing the notes and trying to work with many screens and pieces of information open at the same time and 2) I won't have resources to refer back to when rating Veterans' claims.

If the Agency does not want to issue a printer I am willing to supply one myself. But please, will you see what can be done to get the authority to print granted.

Thank you in advance for your time and effort,

Aileen

PS: Attached are a few screen shots; Examples of what I'm trying to explain.








NEUROLOGICAL MODULE

5/24/12

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

May 24, 2012

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number:
Re: Aileen Mullin (DOB

To Whom It May Concern:

It is my opinion that Aileen Mullin's respiratory difficulties are related to her work environment at the Veterans Administration Hospital. This woman has a history of allergic difficulties dating to her youth. When she lived in Ft. Lauderdale she was placed on immunotherapy with good improvement in her symptomatology. She moved to Pinellas County in 2004 and was well. When she initially moved here she was a teacher. Once she began employment at the Veterans Administration Hospital she started having significant worsening of her respiratory problems. In addition to sinusitis she developed dysphonia, vocal cord dysfunction, and asthma. She also began to have recurrent infections. Physical exams that I have conducted when she has had these symptoms have confirmed physical changes consistent with sinusitis or expiratory wheezing consistent with asthma. Treatment with a variety of modalities including inhaled broncho dilators, inhaled steroids, oral antibiotics, antihistamines, Singulair and nebulizer therapy have all had measurable benefit at least temporarily. She has had the greatest improvement in her symptoms by relocating her work site to her house. Specifically since she has been working from home not only has her asthma abated but she has not had a respiratory infection. Also since working at home she has had zero need to use her nebulizer. It is my impression that her work environment at the VA hospital has exacerbated an underlying allergic condition and created new symptoms in the form of reactive airways and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

1/31/13

Essential Functions
Accommodations

**Subject:** respirator

**From:** Aileen Mullin (aileen_mullin@

**To:** Tamanique.Clarke@va.gov;

**Cc:** ulyssee.mcburrough@va.gov; john.r.smith2@va.gov; kellee@afge.org;

**Date:** Thursday, January 31, 2013 1:16 PM ← Later the same day I was hospitalized as a result of my bodies reaction to the stress

For the doctors to define the specs for an approprite respirator, they now need to know how the device will be used. This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table, again, more info is needed.

One important detail pertains to time: How long is it anticipated I will need the respiratory protection to perform the 'essential functions' of a WAH RVSR (I can't answer this question because I'm not sure what the RO considers as functions that I can not receive help to expedite.)

Can you please e-mail us the 'essential functions' I've have been denied accommodations for. Its info needed for the specialists to make an informed recommendation.

Also, I would like for all of us to brain-storm options as to where in the building I can work, that will save the complete humiliation and distraction I'll have to contend with.

Thanks,
Aileen

PS Please e-mail me at the non-va e-mail because I'm not working today.

2/6/13

**St. Anthony's Hospital**
BayCare Health System

1200 Seventh Ave. North
St. Petersburg, FL 33705
**T.** 727.825.1100
www.stanthonys.com

To Whom It May Concern:

Patient Aileen Mullin was admitted to St Anthony's on 1/31/13 and will be discharged home today 2/6/13. I am Ms. Mullin's hospital social worker and wanted to express my admiration for this patient. Ms. Mullin and I met on several different occasions to discuss her plan of care after hospital discharge. Ms. Mullin has had a medically complex history but is determined and hopeful to continue working with Veterans. Patient has been providing services to veterans for years and is dedicated and compassionate about this population. I have worked in the hospital setting for 12 years and have been truly inspired by Ms Mullin. She is wanting to continue working and prefers not applying for disability or unemployment. Ms. Mullin feels this financial assistance should be used appropriately for individuals who are in fact unable to work. Ms. Mullin is capable of continuing her current position at the VA and I would hope that she is given the opportunity to do so. She is an amazing woman and any place of employment should feel honored to have her represent their organization. Please call me with any questions. Thank you for your time.

Sincerely

Selena S Seib, BSW

St Anthony's Hospital

4/1/13

PRE TEXT !!

**Mullin, Aileen, VBASPT**

**Subject:** FW: Rescinding of accommodations currently in place
**Attachments:** SF-201199A Direct Deposit Form.pdf; ca-7.pdf

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 01, 2013 3:02 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: Rescinding of accommodations currently in place

Good Afternoon Ms. Mullin,

Your reasonable accommodation approval form, entitled Approval of Accommodation Request and dated February 27, 2012, clearly stated, "Modifications to your current approved accommodation to work from home 3 days per week." Your approval document does not state you are permitted to work four (4) hours in the office and four (4) hours at home. If we had granted such an accommodation, it would have been in writing. ← Neither does it say I can not

No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays. ← False Statement. Ms Clarke authorized it

- What category of Leave request should be entered in ETA? You may take sick leave, annual leave in lieu of sick, or request leave without pay. The choice is yours. Your request for leave needs to be made through your supervisor.

- What evidence will the Agency require so that I am paid under Worker's Compensation? The Department of Labor will need medical documentation to support a claim for reimbursement.

- What is the procedure for requesting payment under Worker's Compensation? You will need to complete the attached CA-7 and direct deposit form.

- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation? Please contact Department of Labor at (904)366-0100. You can leave a message to speak with your claims examiner who can discuss in detail any further concerns or questions you may have.

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Friday, March 29, 2013 1:13 PM
**To:** Clarke, Tamanique, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; McBurrough, Ulyssee, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); Smith, John, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT
**Subject:** Rescinding of accommodations currently in place

**Accommodations in place because of Department of Labor, Worker's Compensation established, building-related extrinsic asthma and chronic maxillary sinusitis

** As humiliation as it is to use the respirator ( I have been laughed at and ridiculed), I do so the majority of the time I'm outside my workspace, especially in the areas of the building that are known to have:

- elevated penicillium spore counts
- elevated aspergillus spore counts
- elevated carbon dioxide levels
- elevated humidity
- rodent fecal matter

Examples of times the respirator is not worn include; when I eat, drink or converse, in the cafeteria, which to the best of my knowledge doesn't have any of the above mentioned air-borne toxins.

o: Tammi Clark, Local Reasonable Accommodation Coordinator
Reference: Rescinding of Previously Granted Modification to Worker's Compensation related Accommodation.

I was just informed that the modification to my accommodations, that you agreed to on February 27, 2012*, has been rescinded: Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays ( WAH Mon Wen Fri). Effective immediately I am required to remain in the building for eight hours on Tuesdays and Thursdays? **.

My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, its has been effective in preventing major respiratory events.

I never feel as good leaving the building as I do entering it, but I've been able to stay out of the emergency room and/or the doctor's office. ***

If it is true that the modification to accommodations has been reversed, please help me understand why.

it is true that the modification to accommodations has been reversed, and I am required to stay in the building until I am symptomatic (re: building-related extrinsic asthma and / or chronic maxillary sinusitis) how should I proceed?

- What category of Leave request should be entered in ETA?
- What evidence will the Agency require so that I am paid under Worker's Compensation?
- What is the procedure for requesting payment under Worker's Compensation?
- What questions haven't I asked, that I should know the answer to, in terms of on-site aggravation of Worker's Compensation?

Thank you in advance for your clarification,

Aileen

** Attendees at the meeting:
Tammi Clark, Local Reasonable Accommodation Coordinator, Human Resources
Ulyssee McBurrough Jr, Coach, CORE10
John Smith, Union Steward, AFGE
Casey Crump, Union Chief Steward, AFGE
Myself (telephonically)

**Department of Veterans Affairs**

# Memorandum

1st Denial of Accommodations
No one in HR discussed this w/ me or my doctor —
It was unsolicited

Date: January 26, 2010

From: Human Resources Manager (25)

Subj: Reasonable Accommodation

To: Aileen Mullin
Veterans Service Representative
St. Petersburg Regional Office

1. On January 6, 2010, you provided documentation indicating that you have a temporary medical condition that impairs your ability to speak, and that the condition is expected to resolve itself within six weeks. Since this is temporary in nature, you are not entitled to an accommodation under the ADA Amendments Act (ADAAA) of 2008, at this time.

2. In recognition of your current medical limitations, the Veterans Service Center (VSC) will reschedule your rotation in the phone unit to a later date. In the interim, you will be reassigned to the Pre-Decision team 1 effective February 1, 2010. In addition, you will be credited for 31 days, which is the number of days you served in the current phone rotation.

3. If you require additional information, please contact Virginia López, Human Resources Specialist, at 727-319-5919.

[signature]
BONNIE WAX

HR COPY

Received By: [signature] Date: 12/27/09

Please note that when I submitted medical documentation it was not my intention to request accommodations, but for informational purposes. Thank you for your support and consideration. Sincerely, ...

# Authorization for Examination And/Or Treatment

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

The following request for information is authorized by law (5 USC 8101 et. seq.). Benefits and/or medical services expenses may not be paid or may be subject to suspension under this program unless this report is completed and filed as requested. Information collected will be handled and stored in compliance with the Freedom of Information Act, the Privacy Act of 1974 and OMB Cir. No. A-108.

OMB No.: 1215-0103
Expires: 09-30-91

## PART A - AUTHORIZATION

1. Name and Address of the Medical Facility or Physician Authorized to Provide the Medical Service:

2. Employee's Name (last, first, middle): Mullins, Aileen

3. Date of Injury (mo., day, yr.): 01/12/2012

4. Occupation: RVSR

5. Description of Injury or Disease: Asthma attack

6. You are authorized to provide medical care for the employee for a period of up to sixty days from the date shown in item 11, subject to the condition stated in item A, and to the condition indicated either 1 or 2, in item B.

A. Your signature in item 35 of Part B certifies your agreement that all fees for services shall not exceed the maximum allowable fee established by OWCP and that payment by OWCP will be accepted as payment in full for said services.

B. ☑ 1. Furnish office and/or hospital treatment as medically necessary for the effects of the injury. Any surgery other than emergency must have prior OWCP approval

☐ 2. There is doubt whether the Employee's condition is caused by an injury sustained in the performance of duty, or is otherwise related to the employment. You are authorized to examine the employee using indicated non-surgical diagnostic studies, and promptly advice the undersigned whether you believe the condition is due to the alleged injury or to any circumstances of the employment. Pending further advice you may provide necessary conservative treatment if you believe the condition may be to the injury or to the employment.

7. If a Disease or Illness is Involved, OWCP Approval for issuing Authorization was Obtained from: (Type Name and Title of OWCP Official)

8. Signature of Authorizing Official: [signature]

9. Name and Title of Authorizing Official: (Type or print clearly)
Tamanique Clarke HR Specialist

10. Local Employing Agency Telephone Number: (727) 319-5818

11. Date (mo., day, year)

12. Send one copy of your report: (Fill in remainder of address)

**U.S. DEPARTMENT OF LABOR**
Employment Standards Administration
Office of Workers' Compensation Programs
400 West Bay Street
Room 827
Jacksonville, FL 32202

13. Name and Address of Employee's Place of Employment:
Department of Veterans Affairs

Department or Agency
VBA

Bureau or Office
RO 317

Local Address (Including Zip Code)
9500 Bay Pines Blvd.
St. Petersburg, FL 33708

**Public Burden Statement**

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing burden, to the Office of Information Management, Department of Labor, Room N1301,200 Constitution Avenue, N.W., Washington, D.C. 20210; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

This form was electronically produced by National Production Services Staff

Form CA-16
Rev. Oct. 1988

# Notice of Occupational Disease and Claim for Compensation

**U. S. Department of Labor**
Office of Workers' Compensation Programs

**Employee: Please complete all boxes 1 - 18 below. Do not complete shaded areas.**
**Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.**

**Employee Data**

1. Name of Employee (Last, First, Middle)
**Mullin Aileen**

2. Social Security Number

3. Date of birth Mo. Day Yr.

4. Sex
F

5. Home telephone

6. Grade as of date of last exposure Level **11** Step **2**

7. Employee's home mailing address (include street address, city, state, and ZIP code)
City
State
ZIP Code …05

8. Dependents
☐ Wife, Husband
☐ Children under 18 years
☐ Other

**Claim Information**

9. Employee's occupation
**VETERANS SERVICE REPRESENTATIVE (RATING)**

a. Occupation code

10. Location where you worked when disease or illness occurred (include street address, city, state, and ZIP code)
**9500 BAY PINES BLVD**
City **SAINT PETERSBURG** State **LA** ZIP Code **33708**

11. Date you first became aware of disease or illness Mo. Day Yr.
**05/01/2009**

12. Date you first realized the disease or illness was caused or aggravated by your employment Mo. Day Yr.
**06/01/2010**

13. Explain the relationship to your employment, and why you came to this realization

**see attached**

14. Nature of disease or illness See attached
**Symptoms triggered at work include, but are not limited to: Breathing problems ranging from chest tightness, wheezing, to asthmatic attacks.**

OWCP Use - NOI Code
b. Type code
c. Source code

15. If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.

**see attached**

16. If the statement requested in item I of the attached instructions is not submitted with this form, explain reason for delay.

17. If the medical reports requested in item 2 of attached instructions are not submitted with this form, explain reason for delay.

**Employee Signature**

18. I certify, under penalty of law, that the disease or illness described above was the result of my employment with the United States Government, and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and other benefits provided by the Federal Employees' Compensation Act.

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government, agency) to furnish any desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative). This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

**Signature of employee or person acting on his/her behalf** Date 3/2/2012

Have your supervisor complete the receipt attached to this form and return it to you for your records.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.



For sale by the Superintendent of Documents, U.S. Government Printing Office Washington, DC 20402 WC … Form CA-2 Rev. Jan. 1997

Mullin, Aileen

CA-2 attachment

Pg 1 of 2

1) I was hired with a 2-year probationary period.

2) By the time my condition was identified as irrefutably related to the workplace, I already had disconcerting experiences with Human Resources and witnessed first hand what they are capable of when dealing with employees with health issues.

3) I had sought medical, legal and EEO guidance and was received unanimous confirmation that a) it was within my legal rights to move forward but b) I would need to prepare myself for possible/probable grievous consequences.

I still fear for my career, but now I don't seem to have a choice but to file a claim. In September 2011, after two months of being completely symptom free while at external training in Baltimore, Md., I returned to the workplace and became even more severely ill: Unable to breathe freely – even with medication. Again, symptoms that where only triggered in the building.

I notified my immediate supervisor that I was having difficulty breathing.

I requested, and worked, alternate compressed work schedules. I attempted an arrangement where I had Mondays off to allow for three days of healing between work weeks. I also worked another schedule to minimize the consecutive days I'm in the building by having Wednesdays off.

In October I periodically started leaving the building to get fresh air. I informed my supervisor.

October 26, 2011 was the first time the VA police had to assist me out of the building.

I requested, and worked, alternate compressed work schedules. I attempted an arrangement where I had Mondays off to allow for three days of healing between work weeks. I also worked another schedule to minimize the consecutive days I was in the building by having Wednesdays off. The requests for schedule changes were handled by immediate supervisor. The reasons for the request were presented each time.

My doctor increased my medications.

As the situation worsened, my supervisor recommended I consider wearing a mask, pointing out that another woman in the area does. He also suggested I consider using a portable oxygen tank.

An Acting Coach reported my concerns and then problems with the HVAC were identified addressed.

My workstation was moved within the same area.

After a particularly severe asthma attack, I requested a move to another part of the building. My supervisor turned the matter over to Human Resources.

I met with Human Resources on January 10, 2012 and it was agreed that I would be reassigned to another part of the building to see if this would help. We discussed, at length and in great detail, the similar symptoms that many employees were also suffering from.

The reassignment did not occur quickly enough. On January 12, 2012, I had an asthma attack so severe that I couldn't get it under control using an emergency inhaler followed by administering two additional medications via my portable nebulizer. I had to taken to the emergency room, by ambulance, for treatment.

I am currently working in yet another location, within the building, but problems continue. Often I'm forced to leave work before the end of my scheduled tour because of difficulty breathing. Usually I can get out of the building on my own. But March 7th, was the forth time I needed police assistance due to the severity of an asthma attack.

I arrive at work healthy. I leave sick.

Mullin, Aileen

CA-2 / CA-2 Attachment

pg 2 of 2

**11. Date you first became aware of disease or illness:** May 2009

**12. Date you first realized the disease or illness was caused or aggravated by your employment:** June 2010.

**13. Explain the relationship to your employment, and why you came to this realization:**

My symptoms start and increase in number and severity relative to time spent in the building. The more time I spend in the building the sicker I become. The symptoms ease after I leave the building. The longer I am away from the building, the healthier I become.

I was hired in February 2009 in good health. May 2009 I was moved from the training unit to 'the floor" and within weeks I was feeling sick. In the months that followed, the symptoms increased in number, complexity and intensity.

I sought medical attention. *Within months of my employment, I was seen in the emergency room, by ENTs and allergists, a rheumotologist, a neurologist, etc. I was subjected to testing that included allergy testing, CT Scans, extensive blood workup, and pulmonary function testing.*

In an attempt to identity/eliminate possible causes, A) I moved out of my house for several weeks. No change. B) I considered the Veterans' archival files as a possible cause, however, they were ruled out when I was assigned to the Public Contact Unit (in the same building) where we didn't work with archival claims files and I was very sick. When I worked with Veterans' claims files during external training in Baltimore, I was completely symptom free. C) I worked alternate work schedules and cycles of symptoms were unchanged.

As a new hire, I avoided taking time off from work. Therefore, it was months before I had consecutive days away from the building. When offered the opportunity for time away from the building, my good health returned!

I recover when I'm away from the building on weekends, holidays, sick leave, etc. When I return to the building, I relapse. The longer I am away from the building, the healthier I become.

With extended periods away from the building I become symptom fee.

*(Note:It is the norm for employees to be assigned and re-assigned to different teams and areas within the building frequently. Since February 2009 I've been assigned to no less than 8 locations within the building and had extended stays in Baltimore for training purposes.)*

**14. Nature of Disease or Illness:**

Symptoms triggered at work include, but are not limited to: Breathing problems ranging from chest tightness, wheezing, to asthmatic attacks. Dysphonia, hoarseness, throat pain, difficulty swallowing, coughing. Hypersensitivity reactions. Ear pain, nose bleeds.

***If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.***

I reported that I was sick, in relation to the building, to Human Resources, Support Services Division, the Service Center and an EEO Representative.

June of 2010 was the first time a formally addressed my concerns with my administrator (Assistant Service Center Manager). I requested the opportunity to discuss options such as alternate work settings or schedules. The discussion never took place. Instead I was sent an e-mail, from a lower level administrator who I had never spoken to about the issue, and told to complete a CA-2 and submit to Human Resources.

I did not file a claim with Human Resources out of fear for my career with the federal government. My fear was based on a combination of factors that included:



WC 218

# Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form - PAGE 2

Patient Name: D/A: / / Visit/Review Date: / /

## SECTION IV FUNCTIONAL LIMITATIONS AND RESTRICTIONS

*Assignment of limitations or restrictions must be based upon the injured employee's specific clinical dysfunction or status related to the work injury. However, the presence of objective relevant medical findings does not necessarily equate to an automatic limitation or restriction in function.*

☒ 21. No functional limitations identified or restrictions prescribed as of the following date: 1/6/17

☐ 22. The injured workers' functional limitations and restrictions, identified in detail below, are of such severity that he/she cannot perform activities, even at a sedentary level (e.g. hospitalization, cognitive impairment, infection, contagion), as of the following date: / / . *Use additional sheet if needed.*

☐ 23. The injured worker may return to activities so long as he/she adheres to the functional limitations and restrictions identified below. Identify ONLY those functional activities that have specific limitations and restrictions for this patient. Identify joint and/or body part ______ Use additional sheet if needed.

| Functional Activity | Load | Frequency & Duration | ROM/ Position & Other Parameters |
|---|---|---|---|
| ☐ Bend | | | |
| ☐ Carry | | | |
| ☐ Climb | | | |
| ☐ Grasp | | | |
| ☐ Kneel | Avoid | | |
| ☐ Lift-floor > waist | | | |
| ☐ Lift-waist>overhead | activities | | |
| ☐ Pull | | | |
| ☐ Push | triggers as | much as | |
| ☐ Reach – overhead | | possible | |
| ☐ Sit | | | |
| ☐ Squat | | | |
| ☐ Stand | | | |
| ☐ Twist | | | |
| ☐ Walk | | | |
| ☐ Other | | | |

COMMENTS:

Other choices; Skin Contact/ Exposure; Sensory; Hand Dexterity; Cognitive; Crawl; Vision; Drive/Operate Heavy Equipment; Environmental Conditions: heat, cold, working at heights, vibration; Auditory; Specific Job Task(s); etc.

*NOTE: Any functional limitations or restrictions assigned above apply to both on and off the job activities, and are in effect until the next scheduled appointment unless otherwise noted or modified prior to the appointment date.*

*Specify those functional limitations and restrictions, in item 23, which are permanent if MMI / PIR have been assigned in item 24.*

## SECTION V MAXIMUM MEDICAL IMPROVEMENT / PERMANENT IMPAIRMENT RATING

24. Patient has achieved maximum medical improvement?

☐ a) YES, Date: / / ☐ b) NO ☐ c) Anticipated MMI date: / /

☐ d) Anticipated MMI date cannot be determined at this time. Future Medical Care Anticipated: ☐ e) YES ☐ f) No

☐ Comments: ______

25. ___% Permanent Impairment Rating (body as a whole) Body part/system: ______

26. Guide used for calculation of Permanent Impairment Rating (based on date of accident - see instructions):

☐ a) 1996 FL Uniform PIR Schedule ☐ b) Other, specify: ______

27. Is a residual clinical dysfunction or residual functional loss anticipated for the work-related injury?

☐ a) YES ☐ b) NO ☐ c) Undetermined at this time.

## SECTION VI FOLLOW-UP

28. Please call ______ to set up your follow-up appointment

Or call the specialist for a follow up appointment. Specialist's name: ______ Phone number: ______

## SECTION VII ATTESTATION STATEMENT

*"As the Physician, I hereby attest that all responses herein have been made, in accordance with the instructions as part of this form, to a reasonable degree of medical certainty based on objective relevant medical findings, are consistent with my medical documentation regarding this patient, and have been shared with the patient."*

*"I certify to any MMI / PIR information provided in this form."*

Physician Group: [signature] Date: 1/6/17

Physician Signature: [signature] Physician DOH License #: ______

Physician Name: ______ (print name) Physician Specialty: Family

Helen Featherston, ARNP
LIC #,

If any direct billable services for this visit were rendered by a provider other than a physician, please complete sections below:

*"I hereby attest that all responses herein relating to services I rendered have been made, in accordance with the instructions as part of this form, to a reasonable degree of medical certainty based on objective relevant medical findings, are consistent with my medical documentation regarding this patient, and have been shared with the patient."*

Provider Signature: ______ Provider DOH License #: ______

Provider Name: ______ (print name) Date: / /

HCA00103 rev 11/08

Page 2 of 2

Arlen Miller

WC 518

# Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form - PAGE 1

BEFORE COMPLETING THIS FORM, PLEASE CAREFULLY REVIEW THE INSTRUCTIONS BEGINNING ON PAGE 3

NOTE: Health care providers shall legibly and accurately complete all sections of this form, limiting their responses to their area of expertise.

| | | |
|---|---|---|
| 1. Insurer Name: | 2. Visit/Review Date: / / | 5. FOR INSURER USE ONLY |
| 3. Injured Employee (Patient) Name: Hillerea Mullin | 4. Date of Birth: / / | |
| 6. Date of Accident: / / 1-12-12 | 7. Employer Name: U.H. | 8. Initial visit with this physician? ☐ a) NO ☐ b) YES |

## SECTION I — CLINICAL ASSESSMENT / DETERMINATIONS

9. ☐ No change in items 9 – 13d since last reported visit. If checked, GO TO SECTION II.

10. Injury/ Illness for which treatment is sought is:
☐ a) NOT WORK RELATED ☒ b) WORK RELATED ☐ c) UNDETERMINED as of this date

11. Has the patient been determined to have Objective Relevant Medical Findings? Pain or abnormal anatomical findings, in the absence of objective relevant medical findings, shall not be an indicator of injury and/or illness and are not compensable.
☐ a) NO ☒ b) YES ☐ c) UNDETERMINED as of this date
If YES or UNDETERMINED, explain: Wheezing

12. Diagnosis(es): Acute asthma exacerbation

13. Major Contributing Cause: When there is more than one contributing cause, the reported work-related injury must contribute more than 50% to the present condition and be based on the findings in item 11.

a) Is there a pre-existing condition contributing to the current medical disorder? Hx asthma
☐ $a_1$) NO ☒ $a_2$) YES ☐ $a_3$) UNDETERMINED as of this date

b) Do the objective relevant medical findings identified in item 11 represent an exacerbation (temporary worsening) or aggravation (progression) of a pre-existing condition?
☐ $b_1$) NO ☒ $b_2$) exacerbation ☐ $b_3$) aggravation ☐ $b_4$) UNDETERMINED as of this date

c) Are there other relevant co-morbidities that will need to be considered in evaluating or managing this patient?
☒ $c_1$) NO ☐ $c_2$) YES

d) Given your responses to the items above, is the injury/illness in question the major contributing cause for:
☐ $d_1$) NO ☒ $d_2$) YES the reported medical condition?
☐ $d_3$) NO ☒ $d_4$) YES the treatment recommended (management/treatment plan)?
☐ $d_5$) NO ☒ $d_6$) YES the functional limitations and restrictions determined?

## SECTION II — PATIENT CLASSIFICATION LEVEL

☐ 14. LEVEL I - Key Issue: specific, well-defined medical condition, with clear correlation between objective relevant physical findings and patients' subjective complaints. Treatment correlates to the specific findings.

☐ 15. LEVEL II - Key issue: regional or generalized deconditioning (i.e. deficits in strength, flexibility, endurance, and Motor control. Treatment: physical reconditioning and functional restoration.

☐ 16. LEVEL III -Key issue: poor correlation between patient's complaints and objective, relevant physical findings, indicating both somatic and non-somatic clinical factors. Treatment: interdisciplinary rehabilitation and management.

☐ 17. LEVEL UNDETERMINED AS OF THIS DATE.

## SECTION III — MANAGEMENT / TREATMENT PLAN

☐ 18. No clinical services indicated at this time. If checked, GO TO SECTION IV

☐ 19. No change in items 20a – 20g since last report submitted. If checked, GO TO SECTION IV

20. The following proposed, subsequent clinical service(s) is/are deemed medically necessary.

*** THIS IS A PROVIDER'S WRITTEN REQUEST FOR INSURER AUTHORIZATION OF TREATMENT OR SERVICES. ***

☐ a) Consultation with or referral to a specialist. Identify principal physician: ____
Identify specialty & provide rationale: ____
☐ $a_1$) CONSULT ONLY ☐ $a_2$) REFERRAL & CO-MANAGE ☐ $a_3$) TRANSFER CARE

☐ b) Diagnostic Testing: (Specify) ____

☐ c) Physical Medicine. Check appropriate box and indicate specificity of services, frequency and duration below:
☐ $c_1$) Physical/Occupational therapy, Chiropractic, Osteopathic or comparable physical rehabilitation.
☐ $c_2$) Physical Reconditioning (Level II Patient Classification)
☐ $c_3$) Interdisciplinary Rehabilitation Program (Level III Patient Classification)
Specific instruction(s): ____

☐ d) Pharmaceutical(s) (specify): ____

☐ e) DME or Medical Supplies: ____

☐ f) Surgical Intervention - specify procedure(s): ____
☐ $f_1$) In-Office: ____
☐ $f_2$) Surgical Facility: ____
☐ $f_3$) Injectable(s) (e.g. pain management): ____

☐ g) Attendant Care: ____

## PART B - ATTENDING PHYSICIAN'S REPORT

14. Employee's Name (last, first, middle)

MULLIN, AILEEN

15. What History of Injury or Disease Did Employee Give You?

BECAME SOB - WHEEZES AT WORK - States sx "only at work in a certain building"

16. Is there any History or Evidence of Concurrent or Preexisting Injury, Disease, or Physical Impairment? (If yes, please describe)

☒ Yes ☐ No Hx asthma

16a. ICD-9 Code

17. What are Your Findings? (Include results of X-rays, laboratory tests, etc.)

NONE — Lung: SCANT insp/expiratory wheeze ĉ Rx HF Duoneb TX

18. What is your diagnosis?

Acute asthma exacerbation

18a. ICD-9 Code

19. Do You Believe the Condition Found was Caused or Aggravated by the Employment Activity Described? (Please explain your answer if there is doubt.)

☒ Yes ☐ No

20. Did Injury Require Hospitalization? ☐ Yes ☒ No
If yes, date of admission (mo., day, year)
Date of discharge (mo., day, year)

21. Is Additional Hospitalization Required? ☐ Yes ☒ No

22. Surgery (If any, describe type)

NA

23. Date Surgery Performed (mo., day, year)

NA

24. What (Other) Type of Treatment Did You Provide?

Continue current meds SCRIPTS - MEDS - Prednisone 60mg QD x 5days

25. What Permanent Effects, If Any, Do You Anticipate?

26. Date of First Examination (mo., day, year)

1-12-12

27. Date(s) of Treatment (mo., day, year)

1-12-12

28. Date of Discharge from Treatment (mo., day, year)

29. Period of Disability (mo., day, year) (If termination date unknown, so indicate)

NA
Total Disability: From To
Partial Disability: From To

30. Is Employee Able to Resume
☐ Light Work Date:
☐ Regular Work Date:

31. If Employee is Able to Resume Work, Has He/She been Advised? ☒ Yes ☐ No If Yes, Furnish Date Advised

AP ~~Unknown~~ 1.16.12

32. If Employee is Able to Resume Only Light Work, Indicate the Extent of Physical Limitations and the Type of Work that Could Reasonably be Performed with these Limitations.

33. General Remarks and Recommendations for Future Care, if Indicated. If you have made a Referral to Another Physician or to a Medical Facility, Provide Name and Address.

Company Care

34. Do You Specialize? ☒ Yes ☐ No (If Yes, state specialty)

EMERGENCY DEPT - Board certified FAMILY PRACTICE ARNP

35. SIGNATURE OF PHYSICIAN. I certify that all the statements in response to the questions asked in Part B of this form are true, complete and correct to the best of my knowledge. Further, I understand that any false or misleading statement or any misrepresentation or concealment of material fact which is knowingly made may subject me to felony criminal prosecution.

Helen Featherston, ARNP

[signature] ARNP

36. Address (No., Street, City, State, Zip Code)

6500 - 38th Av
St Pete Fla
33710

37. Tax Identification Number

38. Date of Report

1.12.12

MEDICAL BILL: Charges for your services should be presented to the AMA standard "Health Insurance Claim Form" (AMA OP 407/408/409; OWCP-1500a, or HCFA 1500). Service must be itemized by Current Procedural Terminology Code (CPT 4) and the form must be signed.

For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402
*U.S. Government Printing Office: 1990-261 871/11410



WC 318

# EQUIPMENT ASSIGNMENT

I, AILEEN MULLEN ACKNOWLEDGE RECEIPT OF THE FOLLOWING GOVERMENT EQUIPMENT TO BE USED IN THE PERFORMANCE OF MY DUTIES AS AN EMPLOYEE AT THE VA REGIONAL OFFICE, ST. PETERSBURG, FL.

| EQUIPMENT | MAKE & MODEL # | SERIAL # OR PHONE # | DATE ASSIGNED |
|---|---|---|---|
| BEEPER | | | |
| CELL PHONE | | | |
| CHAIR | | | |
| COMPUTER/MONITOR | | | |
| PRINTER/FAX | | | |
| STAMPS | | | |
| CERTIFICATION | | | |
| DATE | | | |
| SIGNATURE | | | |
| OTHER EQUIPMENT | | | |
| **1 Honeywell Air Purifier** | 16200 | | 02-02-2012 |

A. I UNDERSTAND THAT I'M RESPONSIBLE FOR MAINTAINING THE EQUIPMENT AND IF A PROBLEM ARISES TO CONTACT MY SUPERVISOR IMMEDIATELY.

B. I UNDERSTAND THAT THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE BELONGS TO VA REGIONAL OFFICE, ST. PETERSBURG, FL AND, THAT UPON MY TERMINATION FROM THE VA REGIONAL OFFICE AND/OR TIME PERIOD, WHERE I NO LONGER NEED THE EQUIPMENT, SUPPLIES, AND/OR FURNITURE THAT I MUST RETURN THE EQUIPMENT, SUPPLIES, AND/OR FURNTIURE. IF I FAIL TO RETURN THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE, I WILL BE RESPONSIBLE FOR REIMBURSING THE VA REGIONAL OFFICE FOR REPLACEMENT COSTS.

[signature]
EMPLOYEE'S SIGNATURE

2/2/2012
DATE

**Mullin, Aileen, VBASPT**

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, February 06, 2012 8:26 AM
**To:** Clarke, Tamanique, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT
**Cc:** Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Air purifier
**Signed By:** aileen.mullin@va.gov

Good morning All,

Just for the record, and at risk of sounding ungrateful, I don't think the air purifier is going to have the effect we hoped for: I read the specs and discovered that its meant to be used in a small room (10' x 10'), and not designed for an open cubical in an area comparable to a large open area.

For now, I have it running full force and my fingers are crossed.

Aileen Mullin
RVSR VBIT1C
VARO 317/ St. Petersburg

**Mullin, Aileen, VBASPT**

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, March 25, 2013 3:17 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** Air Purifier
**Signed By:** Tamanique.Clarke2@va.gov

I don't know how the Agency decided this was the correct accommodation

Hello Ms. Mullin,

It was brought to my attention that you had some concerns about the air purifier in your work space. As an additional measure, a third air purifier was added to the workspace today. Prior to installing the third air purifier, we checked the air quality indicator on the Oransi Max HEPA Air Purifier and it read that the air quality was very good.

I am concerned about your health. Your physician prescribed a mask that you are to wear while in the building, however there have been times I've seen you without the mask on. You too, have a responsibility to protect your health. The air purifiers are secondary to your prescribed mask and were installed only as an additional protection.

As the Local Reasonable Accommodation Coordinator (LRAC), it is important that you bring your concerns to me directly to avoid any delays in responding to your concerns and needs. I heard about your concerns indirectly. I could have addressed them sooner had I known. I'm available if you have any additional questions or concerns.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

⇒ ?? – I was mocked and ridiculed when wearing the respirator, but still wore it the majority of time I was in the building –

⇒ It was very troubling to me to discover I was being "watched/monitored. Harrassment / Hostile

Honeywell | Store

ORDER ONLINE
*OR CALL* (847) 701-3038

Home | Contact Us | Order Tracking | FAQs | Find a Contractor | About Us

SEARCH: Go

Shopping Cart

» Heating & Cooling
» Home Convenience
» Home Air Quality

Humidifiers
Air Purifiers
Filters & Accessories

Humidifier Filters
Air Purifier Filters
Furnace HVAC Filters

» Security & Safety
» Backup Power
» Home Electronics
» Home Care & Cleaning
» Commercial Air Quality
» Muck Boots
» Wind Turbine
» Gift Certificates

Home Home Air Quality Air Purifiers

# Honeywell 16200 HEPA Clean Tabletop Air Purifier



Honeywell HEPA Clean Tabletop Air Purifier

AVAILABILITY: In Stock

**Regular Price: $69.99**

$46.99 SAVE **$23.00**

ADD TO CART

Tweet Pin it Like 3

View large images

View a demo video on this product

ACCREDITED BUSINESS BBB A+ Rated

Find us on Facebook

ENTER OUR Sweepstakes

Features Description Details Reviews FAQs Video

- 4 stage cleaning system with 3 power levels.
- Washable pre-filter.
- Ionizer for extra cleaning power turns on/off as desired.
- AHAM Certified recommended room size: 8'X10' (80 Sq. ft.)
- AHAM CADR: 53.

Products:

Humidifiers... RTS Transfer Switches... Portable Air Cleaners... Safes... Water Alarm... Humidifier Filters... Air Purifier Filters... Light Switch Timers... Farm & Ranch... Portable Generators... Weather Stations... Door Chimes... Maintenance Kits... Home Standby Generators... Wind Turbine... Central Vacuum Systems & Accessories... Electronic Air Cleaners... Air Purifiers... Work Boots... For Kids... Heaters... Vacuum Filters... Vacuum Bags... Fans... Vacuum Belts... Gift Certificates... Furnace HVAC Filters... Inverter Generators... Shredders... Commercial Air Filters... Lawn & Garden... Socks & Accessories... Ceiling Fan Remotes... Sports & Outdoors... Thermostats... Media Air Cleaners...

**Related Products**


Honeywell 17000-S QuietCare Permanent, True HEPA Air Purifier, Germ Reduction


Honeywell 50150-N True HEPA Allergen Reducer Germ Fighting Air Purifier with Permanent HEPA Filter


Honeywell 50250 True HEPA, Germ Fighting, Allergen Reducer Air Purifier with Long-Lasting HEPA Filter


Honeywell HFD-010 QuietClean Compact Tower Air Purifier with Permanent Filter


Honeywell HFD-110 QuietClean Tower Air Purifier with Permanent Washable Filters

Honey... QuietClean... Permane...

Honeywell H... Germ Redu... Od...

OPEN CONCEPT WORK AREA
- High ceilings
- Comparable in area to a ball field
- Literally hundreds of cubicles
- Majority of cubicles walls are chest high

Accomodation issued 2/2/2012
Honeywell Air Purifier 16200
- designed for/recommended for 8'x10' rooms

Home | Contact Us | Find a Contractor | Pr...

The Honeywell Trademark is used under license from Honeywell International Inc. © 2012 eAccess Solutions, Inc.

pg 2 of 2

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Wednesdays, and Thursdays. You will be required to report to work at the St. Petersburg Regional Office on Tuesdays, and Fridays.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

- [x] We will provide the accommodation requested by *(enter date)* 03/21/2012
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

This accommodation will be provided by (enter date)

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

Kerrie Witty 3/20/12

DMO SIGNATURE

"Work At Home" Cookie Cutter Accomodations

Does not address asthma

No matter the reason, we all get the same accomodation

Partially addresses medical need

he employee

VA FORM
JUN 2010

XMS *Heart Disease *PTSD

Subject: Re:

From: aileen_mullin@yahoo.com (aileen_mullin@

To: casey.crump@va.gov;

Date: Monday, May 21, 2012 8:29 AM

2nd Surgery

That could be awhile, depending on how things go today.
Sent via BlackBerry by AT&T

---

**From:** "Crump, Casey, VBASPT" <casey.crump@va.gov>
**Date:** Mon, 21 May 2012 07:23:58 -0400
**To:** <aileen_mullin@yahoo.com>
**Subject:** RE:

Let me know when you are in the office.

---

**From:** Aileen Mullin [mailto:aileen_mullin
**Sent:** Sunday, May 20, 2012 9:44 PM
**To:** Tammi Clarke
**Cc:** McBurrough, Ulyssee, VBASPT; Valorie Reilley
**Subject:**

Reference: Surgery scheduled for May 21, 2012.

Good morning Tammie,

I don't know what documentation Human Resources will require to address leave needed for the surgery I'm having on Monday, 5/21. I shared this concern with a Specialist in Moffitt's Disability Office and they assured me that they will supply you with what VBA HR requires.

Please FAX any forms and/or an explanation of required information to:

Patient Disability Office Fax 813-745-2002

Thank you,

Aileen

1st Surgery

MOFFITT CANCER CENTER

No. 778725

☐ Spanish directions on label
(813) 745-4673(Hospital & Doctor)
(813) 745-8484(Pharmacy)

MARIE CATHERINE LEE, M.D.

12902 Magnolia Drive • Tampa, Florida 33612

DOB:

Name Mullin, Ailleen Date 5/2/12

Address

℞ The patient above is having surgery on 5-4-12. Estimated recovery time is 5 to 7 days

Questions: Call: 813-745-8167

☐ Label

Refill 0 - 1 - 2 - 3 - 4 PRN

Florida Medicaid Requires DPR License # ME 99730

Signature M.D.

Print: MARIE CATHERINE LEE, M.D.

NPI # 1083626923 DEA #

BUC0803173949 • Eraser Proof • Background Color Must Be Blue • Void Will Appear if Copied

**Subject:** Fw: medical and HR

**From:** Aileen Mullin (aileen_mulli

**To:** valorie.reilly@va.gov;

**Cc:** casey.crump@va.gov;

**Date:** Thursday, June 7, 2012 2:02 PM

The Human Resources Memorandum, attached to my records, was signed by Bonnie and dated May 30, 2012. We received the documents on May the 31st.

Thank you for assisting me in getting them but unfortunately I need more assistance: The file appears to be incomplete. I don't know if pages are maintained else where, or destroyed due to legal requirements but....

Documents that are not with the package include (and may not be limited to) are:

December 2009 - Medical documentation I submitted?
January 2010 - HR/Accommodations documentation generated by HR and Medical documentation I submitted.
January 2012 - AFGE Release for Carol Allard submitted to HR?

Also please know that Tammie called on May 31st, in response the the message I left the day prior. In her message she informed me that she had not received my e-mails and her address has a '2' suffix. I do appreciate her getting back to me.

Thank you,

Aileen

PS Thank you for forwarding Bonnie's 'message' unencrypted.

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Tuesday, June 05, 2012 9:56 AM
**To:** aileen_mullin@
**Cc:** Reilly, Valorie, VBASPT
**Subject:** FW: medical and HR

Hi Aileen,

I hope you are feeling better. You are in my thoughts and prayers.

AFGE submitted a request for your records on May 16. The request we received asked for *"a copy of all records personally identifiable to this employee [Aileen Mullin}. This request includes all records such as medical records, supervisory notes and/or extended any [sic] personnel file, etc."*

As a general rule, an employee either submitted the documentation maintained in their records or are provided copies of the documents filed in these records. In accordance with Article 24 of the VA/AFGE Master Agreement, an employee, or the employee's representative, can examine those records personally identifiable to the employee at any time, during normal duty hours. However, what

was expressly sought in this case was a copy of all records.

While I understand from your e-mail that the records were requested on your behalf in support of an appointment you had scheduled, this urgency was not described in the records request.

This was an extensive request that required us to "search" for records by personally identifiable information (such as name and SSN) in a variety of records (eOPF, reasonable accommodation, FMLA, OWCP, VLTP, local personnel file, employee medical file, performance folder, supervisory files), as well as coordinate the record search with HRC Jackson and your supervisory chain, and then copy, print and redact as needed. These searches can take time because most of our systems of records are not electronic, and when the records are being given to a third party, we have to go through a redaction process. It is customary for the agency to have 10 business days to respond to union information requests. We completed the information request as quickly as possible given the scope of the request, and delivered it to AFGE on May 31st.

You can, at any time during normal business hours, come to HR to examine personally identifiable records maintained locally. Upon request, copies of records not previously furnished will be furnished at no cost.

You can also access your electronic Official Personnel Folder (e-OPF) at any time. If you would like for us to show you how to do that, please let me know.

According to your e-mail you attempted to contact Ms. Clarke by e-mail on the 18th and 29th. She searched for emails from you and found no emails from you on the dates you referenced. We wondered if it went to her old email address.

You also indicated that you tried to reach Ms. Clarke during the afternoon of the 30th. Unfortunately, Tammi was off the afternoon of May 30th. She received your voice message at 8am the next morning.

There are several staff members in the Human Resources Division. Our names and desk numbers are listed on the Regional Office's SharePoint site, and are listed below for your convenience:

| | |
|---|---|
| Bonnie Wax | 727-319-7271 |
| Tammi Clarke | 727-319-5818 |
| Virginia Lopez | 727-319- 5919 |
| Cyndie Moore | 727-319-7349 |
| Philip Works | 727-319-5923 |

If my staff is not available, you are welcome to come directly to me. Please let me know if you need anything else.
I hope your procedure goes well.

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Wednesday, May 30, 2012 3:16 PM

**To:** Wax, Bonnie, VBASPT
**Cc:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: medical and HR

---

**From:** Crump, Casey, VBASPT
**Sent:** Wednesday, May 30, 2012 2:00 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** aileen_mulli
**Subject:** FW: medical and HR

Kerrie,

I'm not sure what the hold up is and it could simply be Jackson. However, Aileen should at least be informed if there is indeed a legitimate reason. Otherwise, she is left with with a perception based on experience. I want to specifically let you know because Aileen has already consulted about similar treatment.
Casey

---

**From:** Aileen Mullin [mailto:aileen_mullin@yahoo.com]
**Sent:** Wednesday, May 30, 2012 1:45 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Subject:** medical and HR

Hi Bo,

Just want you to know I was able to get an appointment this afternoon with the medical oncologist. Hopefully there' a simple answer to what's causing the problem, and an even simpler solution. I just want to move on and get back to work.

I also need you know that Human Resources continuess to cause problems for me and Jerry advised that if this were to happen, I should contact you. I don't know that you need to do anything, but as my Coach, and in light of HR's record of employee mistreatment, I just need you to know what's going on:

I can't get my records from them. Records I need, and have the legal right to have. This is what's gone on so far:

On the 16th of May, Valorie Reilly requested a copy of my records, for me. She requested they be available for the 29th. On the 18th I sent a follow-up e-mail to Tammie to make sure the request met HR requirements:

*"Good morning Tammie,*

*Valorie Reilley submitted a request for a copy of my Human Resources related records. I'm scheduled for another surgery on Monday, so if your department requires additional documentation to allow for the release of this information, please let me know as early today as possible to allow me to take action before surgery.*

*Thank you in advance for your assistance,"*

**I never received a response.**

Yesterday, the 29th I tried again:

*Hello Tammie,*

*Will you please get back to me as to the status of the request for my records: Are they ready for Valorie Reilly to*

*pick up?*

*Thank you in advance for your assistance,*

**Again, no response.**

At 12:45 this afternoon I tried to contact her by phone. I left a message asking her to respond to my call and verify whether or not she was receiving my e-mail. Needless to say, still no response.

*I have to leave now in order to get to the doctor's, who by the way is nothing less than horrified by the unnecessary extra stress the people in Human Resources so freely inflict on me. Never mind that, time for anther prayer and I'll be in touch.*

*Aileen*

Fax: (727) 347-5273

Telephone: (727) 345-1900

ALLERGY ASSOCIATES

☐ STEPHEN J. KLEMAWESCH, M.D. DEA #AK 2712746 Lic. #ME44273 NPI #1568467785

☐ PATRICK J. KLEMAWESCH, M.D. DEA #FK 1339630 Lic. #ME93707 NPI #1043293335

6294 First Avenue North St. Petersburg, FL 33710

Name Arleen Rullin. Date 26 Jan/13

Address

℞ Dispense one respirator mask and filter cartridges. Medically necessary

☐ Label

Refill - 0 - 1 - 2 - 3 - 4 - PRN

[signature], M.D.

Advanced ENT's of TAMPA BAY

Trina E. Espinola M.D., F.A.C.S
Elisa M. Lynskey, M.D.
Deborah A. Novack, ARNP
Jennifer L. Wallace, P.A.
625 Sixth Avenue South, Suite 385
St Petersburg, FL 33701
Phone (727) 553-7100 Fax (727) 553-7198

## Absence from School/Work

Please excuse Aileen Mullins from school/ work.
patient has intermitted hoarsness with reflux disease
They had an appointment on 1.4.10 and should be able to return on 1.5.10

They should observe the following restrictions: patient should be on voice restrictions, for atleast six weeks, unless talking among coworkers.

Thank you for your cooperation in this matter and please feel free to contact the office with any questions.

ST. PETERSBURG - SUNCOAST MEDICAL GR[illegible]
ADULT AND PEDIATRIC ALLERGY & ASTHM[illegible]
**RAQUELLE ALEXANDER, M.D.**
BOARD CERTIFIED ALLERGY - IMMUNOLOGY
601 SEVENTH STREET SOUTH
ST. PETERSBURG, FL 33701

(727) 824-8218
UPIN # F79148
BATCH # MDI090810AL0009859
DEA # BA 2963432

NAME Mullin, Aileen
AGE
ADDRESS
DATE Jan 18, '09

Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND
RESISTS ERASURES AND ALTERATIONS
ILLEGAL APPEARS IF COPIED

℞ This patient was seen by me today in my office. She has had several week h/o voice loss / laryngitis. She needs to be on voice rest (no telephone work / conversation work) on her job for several weeks more

☐ 1-24
☐ 25-49
☐ 50-74
☐ 75-100
☐ 101-150
☐ 151 and over
Units

Label
Refill NR 1 2 3 4 5

(Signature)

In order for the brand name product to be dispensed, the prescriber must write 'Medically Necessary' on the front of this prescription.

9HAL0009859

ST. PETERSBURG - SUNCOAST MEDICAL
ADULT AND PEDIATRIC ALLERGY & AS1,
**RAQUELLE ALEXANDER, M.D.**
BOARD CERTIFIED ALLERGY - IMMUNOLOGY
601 SEVENTH STREET SOUTH
ST. PETERSBURG, FL 33701

(727) 824-8218
UPIN # F79148
BATCH # MDI090810AL0009859
DEA # BA 2963432

NAME Mullin, Aileen
AGE
ADDRESS
DATE Jan 18, '09

Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND
RESISTS ERASURES AND ALTERATIONS
ILLEGAL APPEARS IF COPIED

℞ This patient was seen by me today in my office. She has had several week h/o voice loss / laryngitis. She needs to be on voice rest (no telephone work / conversation work) on her job for several weeks more

☐ 1-24
☐ 25-49
☐ 50-74
☐ 75-100
☐ 101-150
☐ 151 and over
Units

Label
Refill NR 1 2 3 4 5

(Signature)

In order for the brand name product to be dispensed, the prescriber must write 'Medically Necessary' on the front of this prescription.

9HAL0009859

74102

Chase
888
694
6909

University of Florida
Gaby Montes

Department of Veterans Affairs

# VA GOVERNMENT PROPERTY LOAN FORM

## PART I - PROPERTY LOAN DESCRIPTION

*NOTE: This agreement sets forth the conditions under which the facility has agreed to loan the following property. VA defines a loan as "for the borrower's temporary use."*

A. DESCRIPTION OF PROPERTY ON TEMPORARY LOAN *(Issuer must insure property is operating and functioning properly prior to issue)*

☐ LAPTOP ☐ PDA ☐ PAGER ☒ MONITOR ☐ PRINTER
☐ MOBILE PHONE ☐ BROADBAND CARD ☐ REMOVABLE MEDIA ☒ DESKTOP COMPUTER
☐ OTHER *(Specify)*

B. EQUIPMENT ENTRY (EE) NO.

| C. VALUE OF EQUIPMENT | E. SERIAL NO. | F. MODEL |
|---|---|---|
| | 7GBYDN1<br>CN0RNMH67444504T407S | |

| G. JUSTIFICATION FOR LOAN OF VA PERSONAL PROPERTY | H. ISSUE DATE | I. EXPECTED RETURN DATE (Employee, loan not to exceed on (1) year) |
|---|---|---|
| | 03/23/2012 | |

J. APPOINTED RESPONSIBLE OFFICIAL
☐ ORGANIZATION EIL OFFICIAL (VACO) ☐ PROGRAM MANAGER/COTR *(Non-VA employee, loan not to exceed 60 days)* ☐ EIL CUSTODIAL OFFICER

| K. NAME OF RESPONSIBLE OFFICIAL | L. SIGNATURE | M. TELEPHONE NUMBER |
|---|---|---|
| MIKE HELMICK | [signature] | 727-319-7700 |

| N. SIGNATURE OF INFORMATION SECURITY OFFICER *(if data sensitive item)* | O. DATE SIGNED |
|---|---|
| [signature] | 3/23/12 |

**AGREEMENT:** I hereby accept the responsibility of the item referenced above in item A, and agree to return the item in as good condition as when loaned, fair wear and tear excepted.

| P. NAME/SIGNATURE OF BORROWER | Q. NAME/SIGNATURE OF DIRECTOR/APPROVING OFFICIAL | R. DATE SIGNED |
|---|---|---|
| AILEEN MULLIN / [signature] | [signature] | 3/23/12 |

| S. ADDRESS OF VA PERSONAL PROPERTY *(other than home)* | T. OTHER PERTINENT INFORMATION |
|---|---|
| 9500 BAY PINES BLVD<br>ST PETERSBURG, FL 33708 | APT/SUITE: |

## PART II - VA PROPERTY RETURN RECEIPT

A. IDENTIFICATION OF EXCEPTIONS, DISCREPANCIES, CONDITION CODE ISSUES, AND PROBLEMS *(Please note N/A if property is returned in as good condition as when loaned, fair wear and tear excepted, and there are no other problems with the returned property.)*

**ACKNOWLEDGEMENT OF RECEIPT:** The property identified in Part I, Item A, of this form has been returned without any exceptions, discrepancies, condition code issues, and/or problems except as noted. A signed copy of this form (VA Form 0887) shall be forwarded to and maintained in the Property Management Division for Central Office property. Within 72 hours of receipt the IT EIL Custodial Officer/Accountable Officer will annotate corrective changes to the "location" and "comments" fields in AEMS/MERS.

| B. RETURN ACKNOWLEDGED BY IT EIL CUSTODIAL OFFICER/EIL CUSTODIAL OFFICER *(Signature of IT EIL Officer/EIL Custodial Officer)* | C. DATE SIGNED | D. EQUIPMENT ENTRY (EE) NO. |
|---|---|---|
| | | |

| ACKNOWLEDGEMENT OF RECEIPT: A copy of this signed form has been received for my files. ▶ | E. BORROWER INITIALS | F. DATE |
|---|---|---|
| | | |

VA FORM 0887 DEC 2008

## PART III - VA PROPERTY PASS

### PROPERTY PASS

| ISSUE DATE | EXPECTED RETURN DATE |
|---|---|
| 03/23/2012 | |

NAME OF BORROWER
AILEEN MULLIN

NAME OF IT EIL CUSTODIAL OFFICER/ACCOUNTABLE OFFICER
Charles L. Hart

SIGNATURE OF IT EIL CUSTODIAL OFFICER/ACCOUNTABLE OFFICER
[signature]

TELEPHONE NUMBER
(727) 319-6735

DESCRIPTION OF PROPERTY ON TEMPORARY LOAN

☐ LAPTOP ☐ PDA ☐ PAGER
☐ MOBILE PHONE ☐ BROADBAND CARD ☒ MONITOR
☐ REMOVABLE MEDIA ☒ DESKTOP COMPUTER ☐ PRINTER
☐ OTHER *(Specify)*

| SERIAL NO. | MODEL |
|---|---|
| 7GBYDN1<br>CN0RNMH67444504T407S | |

*NOTE: Cut and fold Property Pass for placement in wallet for quick access and reviewing by Security or Law Enforcement Officials.*

00238

VA FORM 0887 DEC 2008

EXISTING STOCK OF VA FORM 0887, DEC 2008, MAY BE USED UNTIL EXHAUSTED.

Adobe LiveCycle Designer 8.0

**From:** Nunziata, Suzanne, VBASPT
**Sent:** Thursday, January 12, 2012 2:15 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Smith, Sandra, VBASPT
**Subject:** RE: Aileen Mullins - UPDATE
**Signed By:** suzanne.nunziata@va.gov

911 called and ambulance coming. Employee told to report to Sandy's office tomorrow, not go to 2nd floor.

---

**From:** Nunziata, Suzanne, VBASPT
**Sent:** Thursday, January 12, 2012 1:59 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Smith, Sandra, VBASPT
**Subject:** Aileen Mullins

I heard that this employee was going to be moved out of the training room on the 2nd floor yesterday due to complaints re: asthma. She had an asthma attack today and is down in the mothers room in LGY. She called HR from her cell phone. Sending HR rep to check and encourage her to call 911. If she says OK to go back to work, she is coming to HR to sit. Don't want to send her back to 2nd floor. Larry Brown reports that she was supposed to move yesterday but that did not happen? My thought is to send her home on AA today and tell her to report to 21FO tomorrow for reassignment?

**From:** Wax, Bonnie, VBASPT
**Sent:** Thursday, June 14, 2012 3:46 PM
**To:** Reilly, Valorie, VBASPT
**Subject:** RE: medical and HR

Here are the documents encrypted. Bonnie

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Thursday, June 14, 2012 3:45 PM
**To:** Reilly, Valorie, VBASPT
**Cc:** 'aileen_mullin(
**Subject:** RE: medical and HR

Valorie,

Unfortunately we were not told that these documents were urgent or that Ms. Mullins had a medical appointment for which she needed these documents. We learned of the urgency after the fact. Absent some indication that it is time sensitive, we process information requests according to the normal timelines of 10-14 days.

My staff tried to deliver the documents to AFGE around 4:00pm of May 30th, but no one was available to accept the packet.

We do not have one big personnel folder for every employee that contains their entire work history. Instead, there are separate sets of files for every type of action – VLTP, FMLA, Reasonable Accommodations, etc. The records are not electronic, nor are they necessarily in alphabetical order. Records are stored by year and type (2012 FMLA, 2011 Disciplinary Actions, 2009 Reasonable Accommodations) to allow for purging of records according to government wide regulation. This means that we literally have to look through thousands of files trying to find anything related to a specific employee.

Based on your most recent email, we searched closed records for 2010. We found some documents related to Ms. Mullin's withdrawn 2010 accommodation request as well as some certification exam forms. However, as these were not stored in a system of records retrievable by individual identifier (e.g. name or SSN), they were not found during the search to satisfy the initial request.

I am unable to attach the documents to an unencrypted email. Will send under separate email.

Thanks,
*Bonnie*

**Bonnie J. Wax**
**Human Resources Manager**
Desk: 727-319-7271
Fax: 727-319-7750

VA Core Values: Integrity, Commitment, Advocacy, Respect, Excellence

**From:** Reilly, Valorie, VBASPT
**Sent:** Friday, June 08, 2012 7:36 PM
**To:** Wax, Bonnie, VBASPT; aileen_mullin
**Cc:** Crump, Casey, VBASPT; Witty, Kerrie L., (SES) VBASPT; Smith, Sandra, VBASPT
**Subject:** RE: medical and HR

Bonnie,

I'm not sure why you felt it necessary to send this particular message to Aileen, however, I would like to correct the record on a few items.

First, Ms. Mullin asked the union to request all records that pertained to her as are her rights not just under the MCBA, but also under the Privacy Act. As her representative, I made that request. She made this request after the difficulty she received from your office regarding her requests for reasonable accommodations.

As for the timelines, here are the correct dates:

- I requested the information on May 16th and asked they be provided by May 28th.
- After inquiring about the status of the request on May 28th, I was told your staff was still working on them.
- On May 30th, I was advised that your staff was "going through to see if they had everything."
- I did not receive the information until May 31st.

Ms. Mullin has identified several documents that were not provided. They include the following:
*1. December 2009 - Medical documentation submitted.*
*2. January 2010 - HR/Accommodations documentation generated by HR and Medical documentation submitted.*
*3. January 2012 - AFGE Release Carol Allard submitted to HR.*

*Your prompt attention to this matter is appreciated.*

*Thank you.*

*Valorie*
Valorie Reilly, President
AFGE Local 1594
5th District AFGE/NVAC Representative
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Tuesday, June 05, 2012 9:56 AM
**To:** aileen_mullin
**Cc:** Reilly, Valorie, VBASPT
**Subject:** FW: medical and HR

Hi Aileen,

I hope you are feeling better. You are in my thoughts and prayers.

AFGE submitted a request for your records on May 16. The request we received asked for *"a copy of all records personally identifiable to this employee [Aileen Mullin}. This request includes all records such as medical records, supervisory notes and/or extended any [sic] personnel file, etc."*

As a general rule, an employee either submitted the documentation maintained in their records or are provided copies of the documents filed in these records. In accordance with Article 24 of the VA/AFGE Master Agreement, an employee, or the employee's representative, can examine those records personally identifiable to the employee at any time, during normal duty hours. However, what was expressly sought in this case was a copy of all records.

While I understand from your e-mail that the records were requested on your behalf in support of an appointment you had scheduled, this urgency was not described in the records request.

This was an extensive request that required us to "search" for records by personally identifiable information (such as name and SSN) in a variety of records (eOPF, reasonable accommodation, FMLA, OWCP, VLTP, local personnel file, employee medical file, performance folder, supervisory files), as well as coordinate the record search with HRC Jackson and your supervisory chain, and then copy, print and redact as needed. These searches can take time because most of our systems of records are not electronic, and when the records are being given to a third party, we have to go through a redaction process. It is customary for the agency to have 10 business days to respond to union information requests. We completed the information request as quickly as possible given the scope of the request, and delivered it to AFGE on May 31st.

You can, at any time during normal business hours, come to HR to examine personally identifiable records maintained locally. Upon request, copies of records not previously furnished will be furnished at no cost.

You can also access your electronic Official Personnel Folder (e-OPF) at any time. If you would like for us to show you how to do that, please let me know.

According to your e-mail you attempted to contact Ms. Clarke by e-mail on the 18th and 29th. She searched for emails from you and found no emails from you on the dates you referenced. We wondered if it went to her old email address.

You also indicated that you tried to reach Ms. Clarke during the afternoon of the 30th. Unfortunately, Tammi was off the afternoon of May 30th. She received your voice message at 8am the next morning.

There are several staff members in the Human Resources Division. Our names and desk numbers are listed on the Regional Office's SharePoint site, and are listed below for your convenience:

| | |
|---|---|
| Bonnie Wax | 727-319-7271 |
| Tammi Clarke | 727-319-5818 |
| Virginia Lopez | 727-319- 5919 |
| Cyndie Moore | 727-319-7349 |
| Philip Works | 727-319-5923 |

If my staff is not available, you are welcome to come directly to me. Please let me know if you need anything else. I hope your procedure goes well.

Thanks,
*Bonnie*

Bonnie J. Wax
Human Resources Manager

Desk: 727-319-7271
Fax: 727-319-7760

VA Core Values: Integrity, Commitment, Advocacy, Respect, Excellence

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Wednesday, May 30, 2012 3:16 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: medical and HR

---

**From:** Crump, Casey, VBASPT
**Sent:** Wednesday, May 30, 2012 2:00 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** aileen_mullin@
**Subject:** FW: medical and HR

Kerrie,

I'm not sure what the hold up is and it could simply be Jackson. However, Aileen should at least be informed if there is indeed a legitimate reason. Otherwise, she is left with with a perception based on experience. I want to specifically let you know because Aileen has already consulted about similar treatment.
Casey

---

**From:** Aileen Mullin [mailto:aileen_mullin
**Sent:** Wednesday, May 30, 2012 1:45 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Subject:** medical and HR

Hi Bo,

Just want you to know I was able to get an appointment this afternoon with the medical oncologist. Hopefully there' a simple answer to what's causing the problem, and an even simpler solution. I just want to move on and get back to work.

I also need you know that Human Resources continuess to cause problems for me and Jerry advised that if this were to happen, I should contact you. I don't know that you need to do anything, but as my Coach, and in light of HR's record of employee mistreatment, I just need you to know what's going on:

I can't get my records from them. Records I need, and have the legal right to have. This is what's gone on so far:

On the 16th of May, Valorie Reilly requested a copy of my records, for me. She requested they be available for the 29th. On the 18th I sent a follow-up e-mail to Tammie to make sure the request met HR requirements:

*"Good morning Tammie,*

*Valorie Reilley submitted a request for a copy of my Human Resources related records. I'm scheduled for another surgery on Monday, so if your department requires additional documentation to allow for the release of this information, please let me know as early today as possible to allow me to take action before surgery.*

*Thank you in advance for your assistance,"*

**I never received a response.**

Yesterday, the 29th I tried again:

*Hello Tammie,*

*Will you please get back to me as to the status of the request for my records: Are they ready for Valorie Reilly to pick up?*

*Thank you in advance for your assistance,*

**Again, no response.**

At 12:45 this afternoon I tried to contact her by phone. I left a message asking her to respond to my call and verify whether or not she was receiving my e-mail. Needless to say, still no response.

*I have to leave now in order to get to the doctor's, who by the way is nothing less than horrified by the unnecessary extra stress the people in Human Resources so freely inflict on me. Never mind that, time for anther prayer and I'll be in touch.*

*Aileen*

**To:** Huffman, Jerry, VBASPT
**Subject:** RE: medical and HR

Bonnie advised that while they can hand over records to employee, when 3rd part asks for them (i.e., AFGE ) they have to be redacted and this takes a lot longer. bonnie claims that employee had not requested records previously.

Not sure what is going on but would use please contact Aileen yourself and see if she has all records that she needs? I am concerned.

Thanks,
Sandy

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Wednesday, May 30, 2012 2:20 PM
**To:** Smith, Sandra, VBASPT
**Subject:** FW: medical and HR

*Jerry Huffman*
AVSCM
St Petersburg VSC

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Wednesday, May 30, 2012 2:02 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** FW: medical and HR

FYI!

*Ulyssee McBurrough Jr.*
Coach, VBIT 1C
727 319 7313

---

**From:** Aileen Mullin [mailto:aileen_mullin---
**Sent:** Wednesday, May 30, 2012 1:45 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Crump, Casey, VBASPT
**Subject:** medical and HR

Hi Bo,

Just want you to know I was able to get an appointment this afternoon with the medical oncologist. Hopefully there' a simple answer to what's causing the problem, and an even simpler solution. I just want to move on and get back to work.

I also need you know that Human Resources continuess to cause problems for me and Jerry advised that if this were to happen, I should contact you. I don't know that you need to do anything, but as my Coach, and in light of HR's record of employee mistreatment, I just need you to know what's going on:

I can't get my records from them. Records I need, and have the legal right to have. This is what's gone on so far:

On the 16th of May, Valorie Reilly requested a copy of my records, for me. She requested they be available for the 29th. On the 18th I sent a follow-up e-mail to Tammie to make sure the request met HR requirements:

"*Good morning Tammie,*

*Valorie Reilley submitted a request for a copy of my Human Resources related records. I'm scheduled for another surgery on Monday, so if your department requires additional documentation to allow for the release of this information, please let me know as early today as possible to allow me to take action before surgery.*

*Thank you in advance for your assistance,"*

**I never received a response.**

Yesterday, the 29th I tried again:

*Hello Tammie,*

*Will you please get back to me as to the status of the request for my records: Are they ready for Valorie Reilly to pick up?*

*Thank you in advance for your assistance,*

**Again, no response.**

At 12:45 this afternoon I tried to contact her by phone. I left a message asking her to respond to my call and verify whether or not she was receiving my e-mail. Needless to say, still no response.

*I have to leave now in order to get to the doctor's, who by the way is nothing less than horrified by the unnecessary extra stress the people in Human Resources so freely inflict on me. Never mind that, time for anther prayer and I'll be in touch.*

*Aileen*

# SEPARATOR

# PAGE

Thanks again Bo, I appreciate your efforts,

Sincerely,

Aileen

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Wednesday, March 14, 2012 8:19 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Huffman, Jerry, VBASPT
**Subject:** Certification test

Hello Aileen,

This email is just to confirm that you decided not to take the RVSR certification test today. We met this morning to talk about the RVSR certification test. I reminded you that the test is today, and informed you that the test location is on the 3rd floor. You stated earlier this morning that you do not wish to take the RVSR certification test. Your desire is to receive a resolution as to the problems you are having at work. You have stated that you are not concerned with testing, and that you concerned with living and not dying. Therefore, you have decided not to take the RVSR certification today. Also, I have set up a meeting for you to discuss this matter with Jerry today.

*Ulyssee McBurrough Jr.*
Coach, VBIT 1C
727 319 7313

RE: Aileen went home sick 

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, March 13, 2012 2:55 PM
**To:** Huffman, Jerry, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen went home sick
**Signed By:** sandra.l.smith1@va.gov

I will meet agin with Bonnie tomorrow to review medical documenation and discuss granting accomodation request. She wants to WAH and only be in office on Tuesdays and Fridays.

For test tomorrow, s he did not want to take RVSR cert test in room 215 and had asked for HR or VSCFO office. HR has prepared a computer in empty office in HR for her use. Employee needs to be aware of this accomodation.

Thanks,
Sandy

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Tuesday, March 13, 2012 2:40 PM
**To:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen went home sick

*Jerry E Huffman,* AVSCM
One Team, One Mission
An Advocate for Veterans

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 2:36 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** FW: Aileen went home sick

FYI...

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7563

---

**From:** Trent, Michelle, VBASPT
**Sent:** Tuesday, March 13, 2012 1:05 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** Aileen went home sick

Bo,

She wasn't able to enter a request in ETA & I forgot to ask her if lunch is included or not...nevertheless - the CH database

has been updated.

<< OLE Object: Picture (Device Independent Bitmap) >>

*Michelle Trent*
VBITs 1 Asst Coach
VARO 317 - St. Petersburg, FL
727.319.7553

**Mullin, Aileen, VBASPT**

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 1:16 PM
**To:** Crump, Casey, VBASPT
**Subject:** FW: BRVSR Test 3/14/12 (Computer Set-up)
**Signed By:** aileen.mullin@va.gov

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Wednesday, March 14, 2012 1:07 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

Me too. I tried to contact you yesterday about your request to test in Human Resources, the Director's Office or the VSC Front Office. I wanted to confirm that it would be safe for you to test/work on the 3rd floor, and to inform you that we had granted you a temporary workplace adjustment: A special testing workstation was set-up for you in a vacant office in the Director's Office on the 3rd floor. I was later informed by your supervisor that you have left work at 1pm, so I was unable to reach you. In your absence, we took action on your behalf to ensure that everything was ready for you to walk in and take the test in a location you specifically identified as appropriate for your condition. We were informed by your supervisor this morning that you had decided not to test, so although the temporary workplace adjustment was not used, I thought you should know that we took extraordinary measures to ensure you could test if you chose to.

...pe you are feeling better.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 11:42 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

Oh Tammi, thank you for your effort. I really wish we could have been in touch yesterday.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 12:21 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I'm trying to work very quickly on this because I want to ensure your safety. You indicated that HR, the Director's Office, and the VSC Front Office would suffice as testing locations. Are you saying that you can safely test/work in these locations on the third floor of the building?

*Tammi Clarke*
*Human Resources Specialist*
*P... ne: (727) 319-5818*
*... (727) 319-7750*

*throwing it out there......."*

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 10:48 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** FW: BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You didn't receive this email?

---

**From:** VAVBASPT/RO/HRM
**Sent:** Monday, March 12, 2012 10:52 AM
**Cc:** Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT
**Subject:** BRVSR Test 3/14/12 (Computer Set-up)
**Importance:** High

You are welcome to go down to Room 215 and set up your workspace for the test.

Date: **March 14, 2012**
L..ation: Room 215
..e: 7:00am - 3:30pm

**Please use the computer labeled with your name.**

Please note that this is for computer setup only. Do not bring your reference materials until the day of the test.

---

On the day of the exam, plan on your work day being from 7:00 am – 3:30 pm.

The exam will consist of two 3 hour sessions. There is a 3 hour session in the morning and another 3 hour session in the afternoon.

Candidates must arrive at least 60 minutes prior to test time. Registration will be time consuming.

Testing will begin promptly at **8:00am. We will not wait for anyone.**
The morning testing session will be from **8:00am - 11:00am**

We will break for lunch from 11:00am – 11:50pm

The afternoon session will be from **12:00pm - 3:00pm**; you need to be in your seat by 11:50pm. **Again, we will not wait for anyone.**

**I' ..ı are late for either session, you will not be allowed entrance to the testing room. If you do not make the ..ning session, you will not be allowed into the afternoon session.**

***Things to Remember***:

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 12:05 PM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I wish we had too, but we covered many important subjects when we met.... My tour ends at 3:30, and then I'm scheduled to meet with Jim .... And truth be told, I don't know if I'll make it that long: Pain is seeping back into my chest.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Tuesday, March 13, 2012 11:47 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I must have missed that part of the email. I wish we had talked about this when we met yesterday. Maybe this is thing you were trying to remember to talk about.

I think we'll be able to work something out. What time do you leave today?

*T mmi Clarke*
*man Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, March 13, 2012 10:59 AM
**To:** Clarke, Tamanique, VBASPT
**Subject:** RE: BRVSR Test 3/14/12 (Computer Set-up)

I did get the e-mail and that's why I sent you and Bo the e-mail yesterday asking if there's an alternate site I can test in:

*"Good morning Tammi and Bo,*

*Th k goodness last week is behind me. Going in to the new week I need to talk to you about a couple of t s:*

*"I'm concerned about being in room 215 for Wednesday's certification exam. I know its a stretch, but can I ake the test in another part of the building: Human Resources, the Director's Office, or Front Office? Just*

- Make sure to bring a picture ID with you.
- Make sure you have all the reference material (such as reference books, rate charts, non-programmable calculators), as you will not be allowed to leave the test site once the testing begins.
- Candidates may not bring electronic devices (e.g., cell phones, pagers, Palm pilots, programmable calculators, CD players, MP3 players/iPods) to the test site.
- You may want to use the restroom before testing (there will be no extra time at the end of the exam period to make up lost time)
- No eating will be allowed at the test site.
- During testing you will be allowed to use the computers in the room to access WARMS, C&P homepage, VARO homepage, U-Drive, the H drive. **YOU WILL NOT BE ALLOWED ACCESS TO EMAIL.**

**To:** Wax, Bonnie, VBASPT
**Subject:** can I come talk to you about this now?
You got waylaid by Mercy after OFO and then I got busy with something too.

I'd really like this RA to be approved.

Sandt

---

**From:** Huffman, Jerry, VBASPT
**Sent:** Wednesday, March 14, 2012 2:36 PM
**To:** Smith, Sandra, VBASPT
**Subject:** FW: Certification test

FYI.......

*Jerry E Huffman*, AVSCM
One Team, One Mission
An Advocate for Veterans

---

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Wednesday, March 14, 2012 2:34 PM
**To:** Huffman, Jerry, VBASPT
**Subject:** FW: Certification test

*Ulyssee McBurrough Jr.*
Coach, VBIT 1C
727 319 7313

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, March 14, 2012 12:29 PM
**To:** McBurrough, Ulyssee, VBASPT
**Subject:** FW: Certification test

Hello Bo,

I appreciate the effort put into setting up a computer on the third floor. Unfortunately , not learning about the arrangement until 7:20 this morning, I couldn't take advantage of the situation. If I had been contacted yesterday it would have allowed for the time to get myself situated mentally, physically and logistically.

Also please know that I am concerned about the certification exam. I diligently prepared for it and feel I'm ready for it, but coming to work this morning my paramount concern was protecting my body.

Do you know if Jerry has seen a copy of the doctors' report and summary of events. If he hasn't, I have a copy here. Just let me know if they're needed.

**From:** Wax, Bonnie, VBASPT
**Sent:** Thursday, March 15, 2012 8:35 PM
**To:** Huffman, Jerry, VBASPT; Smith, Sandra, VBASPT
**Subject:** AM
**Signed By:** bonnie.wax2@va.gov

Wanted to let you know we ran our strategy by regional counsel yesterday. Expect concurrence on the temp workplace adjustment tomorrow. Will let you know.

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Friday, March 16, 2012 8:27 AM
**To:** Smith, Sandra, VBASPT
**Subject:** RE: AM
**Signed By:** kerrie.witty@va.gov

We haven't had a chance to talk about it yet so it's good if we can get her out on a temp basis for now.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Friday, March 16, 2012 8:20 AM
**To:** Witty, Kerrie L., (SES) VBASPT
**Subject:** FW: AM
**Importance:** High

that's good as employee is already working on forms (provided by her coach) - have you talked to Bonnie about doing RA instead of this temp workplace adjustment?

---

**From:** Wax, Bonnie, VBASPT
**Sent:** Thursday, March 15, 2012 8:35 PM
**To:** Huffman, Jerry, VBASPT; Smith, Sandra, VBASPT
**Subject:** AM

Wanted to let you know we ran our strategy by regional counsel yesterday. Expect concurrence on the temp workplace adjustment tomorrow. Will let you know.

# SEPARATOR

# PAGE

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, March 13, 2012 11:55 AM
**To:** Wax, Bonnie, VBASPT
**Subject:** FW: Aileen Mullin
**Signed By:** sandra.l.smith1@va.gov

Bonnie,

If you have a RA request, I'd like to take a look at it. Maybe we can move it quickly if there is med. documentation to support

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:18 PM
**To:** Smith, Sandra, VBASPT; Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

This was the employee who specifically talked to me about Room 222 - she is no longer sitting in room 222 so I had assumed that all was well - I guess that is not so.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:14 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

I was unaware of any statement from doctor that limited time in office. I had directed employee to HR some time ago for RA

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 12, 2012 3:30 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen Mullin

Do we have a RA request from this employee?

---

**From:** Crump, Casey, VBASPT
**Sent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin

Kerrie,

I met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and certainly wants it to continue.

I want everyone to understand the extended time in the office is a health hazard for Aileen. This is also an ongoing liability that I want to ensure you are personally aware of.

Sandy,

I understand Aileen has already spoken to you. I just wanted to keep you informed and hopefully you can provide the needed work at home assistance.

Thank you both.

Casey

***Casey Crump, DRO/Chief Steward***
***St. Petersburg FL***
***727-319-7280 Voice/Fax***

Aileen Mullin

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Tuesday, March 13, 2012 11:44 AM
**To:** Smith, Sandra, VBASPT
**Subject:** RE: Aileen Mullin
**Signed By:** kerrie.witty@va.gov

**Follow Up Flag:** Follow up
**Flag Status:** Red

Apparently the employee submitted medical documentation and a RA request yesterday (or last Friday). Tammi has it and I think you should go review it and determine if we need to let her work from home as an accommodation since her physician states that as the accommodation she needs. If she's still a trainee, we can make another decision but I don't want this one to sit like the ones before.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:18 PM
**To:** Smith, Sandra, VBASPT; Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

This was the employee who specifically talked to me about Room 222 - she is no longer sitting in room 222 so I had assumed that all was well - I guess that is not so.

---

**From:** Smith, Sandra, VBASPT
**Sent:** Monday, March 12, 2012 4:14 PM
**To:** Witty, Kerrie L., (SES) VBASPT; Wax, Bonnie, VBASPT
**Subject:** RE: Aileen Mullin

I was unaware of any statement from doctor that limited time in office. I had directed employee to HR some time ago for RA

---

**From:** Witty, Kerrie L., (SES) VBASPT
**Sent:** Monday, March 12, 2012 3:30 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Smith, Sandra, VBASPT
**Subject:** FW: Aileen Mullin

Do we have a RA request from this employee?

---

**From:** Crump, Casey, VBASPT
**Sent:** Monday, March 12, 2012 3:22 PM
**To:** Witty, Kerrie L., (SES) VBASPT
**Cc:** Mullin, Aileen, VBASPT; Smith, Sandra, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Aileen Mullin

Kerrie,

I met with Aileen this afternoon and was brought up to speed on her situation. Aileen is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. Aileen has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home process should be afforded the same attention. Aileen is dedicated to her job and certainly wants it to continue.

I want everyone to understand the extended time in the office is a health hazard for Aileen. This is also an ongoing liability that I want to ensure you are personally aware of.

Sandy,

I understand Aileen has already spoken to you. I just wanted to keep you informed and hopefully you can provide the needed work at home assistance.

Thank you both.

Casey

***Casey Crump, DRO/Chief Steward***
***St. Petersburg FL***
***727-319-7280 Voice/Fax***

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Thursday, April 18, 2013 12:34 PM |
| **To:** | Correa, Matthew, VBASPT |
| **Cc:** | Smith, John, VBASPT; McBurrough, Ulyssee, VBASPT; Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Crump, Casey, VBASPT; Pryor, Keith, VBASPT; Ingram, Walter, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM) |
| **Subject:** | RE: RA Approval Letter |

I know its a lot Matt, and unfortunately you got tossed into the middle of the mess. I've been banging my head against this wall since returning to work in January, after cancer treatment. (Dealing with the Agency and the IAQ issue has been harder on me than chemo, radiation and surgery combined. Literally)

- Before effective accommodations can be identified, barriers have to be identified. The key barrier is the IAQ. The agency controls all the IAQ information and until they provide all relevant details, specific appropriate accommodations can not be defined.

- Until the marginal and essential are spelled out (properly) we can't determine what functions require accommodation in order to complete them and which one the agency won't even consider accommodating. In all seriousness, Tammi told me I wasn't even permitted assistance in gathering my documents from the printer...

Its a 'catch-22 that we can't give you a simple, straightforward answer to ~ because its a complex problem and we don't have all the information needed to take care of it.

Matt, please trust that I'm not trying to dodge your request for specific accommodation information .... We (my doctors, the union, myself) don't have adequate information to respond to the request. Also, please ask Bonnie, Philip and Tammi for all the information/correspondence they have: All three of them have been involved, one way or another, since January ~ and since they tasked you with fixing this problem, it would be helpful if you had all the information.

Respectfully,

Aileen

PS: Until the IAQ and functions of the position are figured out I'm in a terrible position: I can't come in the building ~ Until I can get files to and from the building or I'm assigned work that doesn't require me to come into the building, ~
I won't have work to do.

I'll be waiting to hear from you so please stay in touch via th cc to John Smith and Ulysee.

---

**From:** Correa, Matthew, VBASPT
**Sent:** Thursday, April 18, 2013 11:15 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Smith, John, VBASPT
**Subject:** RE: RA Approval Letter

Aileen,
I will take some time to address all of your responses, but most importantly you said that you are seek an accommodation that has not been provided. Can you please let me know what accommodation you are seeking so that I can start working on it.

Thank you,

*Matthew Correa*

matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

**VA Core Values:** Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Thursday, April 18, 2013 8:08 AM
**To:** Correa, Matthew, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Smith, John, VBASPT; Reilly, Valorie, VBASPT; Crump, Casey, VBASPT; Pryor, Keith, VBASPT; Ingram, Walter, VBASPT; Smith, Theodore, VBASPT
**Subject:** FW: RA Approval Letter

Good morning Mathew,

---

**From:** Aileen Mullin [mailto:aileen_mullin@
**Sent:** Thursday, April 18, 2013 7:38 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** Fw: RA Approval Letter

---

**From:** Correa, Matthew, VBASPT
**Sent:** Wednesday, April 17, 2013 3:47 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Smith, John, VBASPT
**Subject:** RE: RA Approval Letter

Aileen,

- Medical documentation (Not limited to: FMLA 03/03/2012, Letter to DOL 04/16/2013, Rx 01/26/2013, Letter from Dr Levoir 01/28/2013)
I have your employee medical file: included is the FMLA letter dated 03/03/2012, the Rx from 01/26/2013, the email dated 01/28/2013, but the email states that the attachment was removed so I don't have the letter from Dr Levoir, I don't have the letter to DOL 04/16/2013 as this was yesterday. Can you forward the 04/16/2013 letter?
- The letter from Levoir was delivered to HR with the 1/26/13 Rx, but since it wasn't given to you I faxed you another copy along with the 4/16/13 DOL letter.
- Will you see if you have the memo dated 2/19/13, Re: Aileen Mullin request fro Modified Accommodation and Administrative Leave.

- Specs on air purifiers used in my work area
I have the specifications on the air purifiers in your work area and the square footage.
- Please verify that the footage includes the ceiling height (LxWxH) and that the specs define what airborne matter the machines are desgned address.

- 2011 and 2012 RO IAQ studies
We have copies of these in HR.
After you've had a chance to read them lets set up a conference call to go over details that are relevant to my situation.

- Reports on the rodent infestation*
I am aware that there was an OSHA complaint and that the safety committee did an investigation along with SSD, but I am unaware of them coming up with any finding. If you have a report of finding of a rodent infestation please let me know.

During the March Town Hall meeting, the Director acknowledged that there's a rodent infestation and that the agency had gone out for bids to address the problem. The bid request and responses, as well as remediation steps taken, would be help in identifying possible bilological contiments.

At the meeting I asked the director to let us know what species of rodent was infesting the building and how the rodents fecal matter was being cleaned up. I also offered reasons as to why it is important for the employees with specific medical conditions to have the information .*

I haven't not been able to find record of her response.

* *"The protein in urine from rats and mice is a potent allergen. When it dries, it can become airborne."*
http://www.epa.gov/iaq/biologic.html

- DOL's acceptance/granting of claim for work related illnesses
I have copies of your claim

- Essential and marginal function of the RVSR position
I have the essential functions of the RVSR position, however I don't have a copy of the marginal functions I would love a copy if you have it.

Identification of essential and marginal is a detailed process stemming for the job description. There are lots of resources availavle to assist in the process, I'm attaching a few examples. We'll need some guidance, but I'm sure together we can identify the functions and then categorize them as essential vs marginal.

*"In identifying an essential function to determine if an individual with a disability is qualified, the employer should focus on **the purpose of the function and the result to be accomplished, rather than the manner in which the function presently is performed**. An individual with a disability may be qualified to perform the function if an accommodation would enable this person to perform the job in a different way, and the accommodation does not impose an undue hardship. Although it may be essential that a function be performed, frequently it is not essential that it be performed in a particular way." (EEOC, 1992)*

Is there an accommodation that you are seeking that you have not been provided?
Yes Mathew, there are accommodations I'm 'seeking' that have not been provided ~

I don't how the agency determined that the accommodations granted earlier this week are relevant to my specific medical conditions ~ as they relate to my position as an WAH/RVSR.

None of the ideas presented to HR are addressed in the accommodation letter.

After you have the opportunity to read the IAQ studies and medical information, we'll be in a good position to put our heads together to identify appropriate accommodations .

Thank you,
Matthew Correa

matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

**VA Core Values:** Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, April 17, 2013 2:05 PM
**To:** Correa, Matthew, VBASPT
**Cc:** Smith, John, VBASPT; McBurrough, Ulyssee, VBASPT; Crump, Casey, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT
**Subject:** RE: RA Approval Letter

Thank you Mathew, I hope you can help.

We need to begin by confirming you have basic information pertaining to my occupation, medical conditions and actual workplace:

- Medical documentation (Not limited to: FMLA 03/03/2012, Letter to DOL 04/16/2013, Rx 01/26/2013, Letter from Dr Levoir 01/28/2013)
- Specs on air purifiers used in my work area
- 2011 and 2012 RO IAQ studies
- Reports on the rodent infestation*
- DOL's acceptance/granting of claim for work related illnesses
- Essential and marginal function of the RVSR position

Please let me know what you do, and do not have so John and I can assist in getting it to you,

Again, thank you Mathew .... I really hope we can make this work.

Respectfully,

Aileen
a

*("The protein in urine from rats and mice is a potent allergen. When it dries, it can become airborne." http://www.epa.gov/iaq/biologic.html)

---

**From:** Correa, Matthew, VBASPT
**Sent:** Wednesday, April 17, 2013 12:47 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** Smith, John, VBASPT
**Subject:** RE: RA Approval Letter

Aileen,
I wanted to let you know that I am taking the duties of Local Reasonable Accommodation Coordinator from Tammi, and that I will be working with you on any future accommodation needs. Please let me know if there is anything I can do for you, or if there is any accommodations that I can help you with.

Thank you,

*Matthew Correa*

matthew.correa@va.gov
HR Specialist
Human Resources Division
VA Regional Office
St. Petersburg, FL
Desk: 727.319.5800 ext. 6560
Fax: 727.319.7750

**VA Core Values**: Integrity, Commitment, Advocacy, Respect, Excellence

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Wednesday, April 17, 2013 10:33 AM
**To:** Smith, Sandra, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Correa, Matthew, VBASPT
**Subject:** RE: RA Approval Letter

Thank you Sandy

---

**From:** Smith, Sandra, VBASPT
**Sent:** Tuesday, April 16, 2013 4:55 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT; Smith, Sandra, VBASPT; Smith, John, VBASPT; Correa, Matthew, VBASPT
**Subject:** FW: RA Approval Letter
**Importance:** High

Aileen,

I previously responded to an earlier email today. As I stated in the earlier email with regard to a letter I received, I will forward this email to the appropriate individual and office (Matthew Correa, Human Resources Office).

Sincerely,

Sandy

Sandy Smith, VSCM
St. Petersburg RO
727.319.7672

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, April 16, 2013 2:31 PM
**To:** McBurrough, Ulyssee, VBASPT
**Cc:** Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; Allard, Carolyn, VBASPT; Ingram, Walter, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org'
**Subject:** FW: RA Approval Letter
**Importance:** High

Duplicity:

- I didn't not request these specific accommodations ~ They ***alone*** are useless and potentially harmful to me professionally and physically

- Needless to say, I did not request them on these specific accommodations 3/29/13. ~ To say otherwise is patently false

- The accommodations do not address assistance with marginal functions of the RVSR WAH position.

**We interpret the omission of key variables in attached VA From 0857f, as a denial of the accommodations we suggested to Tammi Clark on: January 29 and 30, 2013, February 6, 2013, February 25 through 28, 2013 and March 5, 2013.** If this interpretation of incorrect, please notify John Smith and me by close of business tomorrow afternoon.

Respectfully,

Aileen
am

PS: It galls me that Human Resources flagrantly interferes with the mission of the VBA to break the backlog. Their manipulation of EEOC and Rehabilitation laws/regs/guidance, by targeting people with chronic illnesses, effects all of us. It takes our attention and effort away from were it should be; getting those claims taken care of. HR plays a key roll in effecting the waste of human capital.... Seriously, I'd rather be rating.

---------------------------------------

VA Handbook 5975.1

2.a. **VA shall provide reasonable accommodations to qualified individuals with disabilities to allow them to fully** participate in the application process, **perform essential job functions**, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause undue hardship to the Department.

4. b.**Essential Functions**:
The essential functions of a job are the **occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them**. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it

4i.**Reasonable Accommodation**:
A "reasonable accommodation" is a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. The accommodation **must be effective in meeting the needs of the individual** by addressing the barrier created by the functional limitations.

Types of reasonable accommodations include, but are not limited to: modification or adjustment to a job application process to permit an individual with a disability to be considered for a job, modification or adjustment necessary to enable a qualified individual with a disability to perform the essential functions of the job, and modifications or adjustments that enable employees with disabilities to enjoy equal benefits and privileges of employment.

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Tuesday, April 16, 2013 2:31 PM |
| **To:** | McBurrough, Ulyssee, VBASPT |
| **Cc:** | Smith, Sandra, VBASPT; Huffman, Jerry, VBASPT; Reilly, Valorie, VBASPT; Pryor, Keith, VBASPT; Crump, Casey, VBASPT; Smith, John, VBASPT; Allard, Carolyn, VBASPT; Ingram, Walter, VBASPT; Johnson, Odessa W. (ORM); Henley, John (ORM); 'kellee@afge.org' |
| **Subject:** | FW: RA Approval Letter |
| **Attachments:** | RA Approval - Mullin 4-15-13.pdf |
| **Importance:** | High |

Duplicity:

- I didn't not request these specific accommodations ~ They ***alone*** are useless and potentially harmful to me professionally and physically

- Needless to say, I did not request them on these specific accommodations 3/29/13. ~ To say otherwise is patently false

- The accommodations do not address assistance with marginal functious of the RVSR WAH position.

**We interpret the omission of key variables in attached VA From 0857f, as a denial of the accommodations we suggested to Tammi Clark on: January 29 and 30, 2013, February 6, 2013, February 25 through 28, 2013 and March 5, 2013.** If this interpretation of incorrect, please notify John Smith and me by close of business tomorrow afternoon.

Respectfully,

Aileen
am:

PS: It galls me that Human Resources flagrantly interferes with the mission of the VBA to break the backlog. Their manipulation of EEOC and Rehabilitation laws/regs/guidance, by targeting people with chronic illnesses, effects all of us. It takes our attention and effort away from were it should be; getting those claims taken care of. HR plays a key roll in effecting the waste of human capital.... Seriously, I'd rather be rating.

---------------------------------------

VA Handbook 5975.1

2.a. **VA shall provide reasonable accommodations to qualified individuals with disabilities to allow them to fully** participate in the application process, **perform essential job functions**, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause undue hardship to the Department.

4. b.**Essential Functions**:
The essential functions of a job are the **occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them**. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it

4i.**Reasonable Accommodation**:

A "reasonable accommodation" is a change in the work environment or in work processes that enables a qualified individual with a disability to enjoy equal employment opportunities. The accommodation **must be effective in meeting the needs of the individual** by addressing the barrier created by the functional limitations.

Types of reasonable accommodations include, but are not limited to: modification or adjustment to a job application process to permit an individual with a disability to be considered for a job, modification or adjustment necessary to enable a qualified individual with a disability to perform the essential functions of the job, and modifications or adjustments that enable employees with disabilities to enjoy equal benefits and privileges of employment.

---

**From:** Clarke, Tamanique, VBASPT
**Sent:** Monday, April 15, 2013 3:10 PM
**To:** Mullin, Aileen, VBASPT; Smith, John, VBASPT
**Cc:** Smith, Sandra, VBASPT; McBurrough, Ulyssee, VBASPT
**Subject:** RA Approval Letter
**Importance:** High

Hello Ms. Mullin,

Based on your most recent reasonable accommodation request March 29, 2013, attached is your new accommodation approval letter. My duties as the LRAC are transferring to Matthew Correa. He will be able to assist you with any future accommodation requests.

Thank you,

*Tammi Clarke*
*Human Resources Specialist*
*Phone: (727) 319-5818*
*Fax: (727) 319-7750*

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Tuesdays, Wednesdays, and Thursdays. You are required to report to work at the St. Petersburg Regional Office on Fridays from 7:00am - 11:00am. At 11:00am you may leave the building to report home and complete the remainder of your tour from home. You are required to email your supervisor when you begin working from home and when you stop working from home on Fridays only to account for the remainder of your tour of duty.

This approval is in addition to your most recent approved accommodations dated February 27, 2013.

--continued below--

- [x] We will provide the accommodation requested by *(enter date)* 04/15/2013
- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

This accommodation will be provided by (enter date) ______

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

NS [signature: Kerrie Witty]

DMO SIGNATURE

04/15/2013

DATE

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM JUN 2010 **0857f** Adobe LiveCycle Designer

# SEPARATOR

# PAGE

# JAN

Job Accommodation Network

Practical Solutions • Workplace Success

## Accommodation and Compliance Series

# Employees with Respiratory Impairments

Job Accommodation Network
PO Box 6080
Morgantown, WV 26506-6080
(800)526-7234 (V)
(877)781-9403 (TTY)
jan@askjan.org
askjan.org

ODEP
Office of Disability Employment Policy

A service of the U.S. Department of Labor's Office of Disability Employment Policy

# Preface

The Job Accommodation Network (JAN) is a service of the Office of Disability Employment Policy of the U.S. Department of Labor. JAN makes documents available with the understanding that the information be used solely for educational purposes. The information is not intended to be legal or medical advice. If legal or medical advice is needed, appropriate legal or medical services should be contacted.

JAN does not endorse or recommend any products or services mentioned in this publication. Although every effort is made to update resources, JAN encourages contacting product manufacturers/vendors and service providers directly to ensure that they meet the intended purposes. This guarantees that the most up-to-date information is obtained.

The following document is not copyrighted and reproduction is encouraged. Section 105 of the Copyright Law provides that no copyright protection is available for works created by the U.S. Government. Therefore, all works created by JAN fall under this provision. While individuals may use such work with impunity, individuals may not claim copyright in the original government work, only in the original material added. Individuals may access the full text of the law from the U.S. Copyright Office http://www.loc.gov/copyright. Please note that specific information cited by JAN may be copyrighted from other sources. Citing secondary sources from a JAN publication may violate another organization's or individual's copyright. Permission must be obtained from these sources on a case-by-case basis. When using JAN materials, JAN asks that the materials not be reproduced for profit, that the tone and substance of the information are not altered, and that proper credit is given to JAN as the source of the information. For further information regarding this or any other document provided by JAN, please contact JAN.

Updated 03/23/10.

# JAN'S ACCOMMODATION AND COMPLIANCE SERIES

## Introduction

JAN's Accommodation and Compliance Series is designed to help employers determine effective accommodations and comply with Title I of the Americans with Disabilities Act (ADA). Each publication in the series addresses a specific medical condition and provides information about the condition, ADA information, accommodation ideas, and resources for additional information.

The Accommodation and Compliance Series is a starting point in the accommodation process and may not address every situation. Accommodations should be made on a case by case basis, considering each employee's individual limitations and accommodation needs. Employers are encouraged to contact JAN to discuss specific situations in more detail.

For information on assistive technology and other accommodation ideas, visit JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar.

## Information about Respiratory Impairments

**What is a respiratory impairment?**

Respiratory impairment is a generic term that refers to a number of medical conditions that can affect the respiratory system and may result in limitations such as labored breathing or asthma attacks, fatigue and difficulty with mobility, heightened sensitivity to ordinary substances and chemicals, and compromised immunity to infection.

**What causes respiratory impairments?**

The following is a non-comprehensive list of many of the medical conditions that may result in respiratory impairments: Allergies, Asthma, Chemical Sensitivity (MCS), Chronic Obstructive Pulmonary Disease, Cystic Fibrosis, Environmental Illness (EI), Fragrance Sensitivity, Lung Cancer, Pulmonary Sarcoidosis, Tuberculosis, Emphysema, Pulmonary Hypertension, Latex Allergy, and AIDS Related Lung Disease.

For more detailed information, see Appendix A at the end of this document.

**How are respiratory impairments treated?**

Treatment of respiratory impairments depends on many factors, such as the type and stage of impairment; family history; and the individual's medical history, health, and age. Any of the following may be used for treating respiratory impairments: Inhalers or nebulizers containing bronchodilators or corticosteroids, expectorants, antibiotics, oxygen therapy, chemotherapy, lung transplantation, lung reduction surgery, natural treatments such as N-Acetyl Cysteine and Carnitine, and complementary/integrative therapies and treatments (About.com, 2006).

## Respiratory Impairments and the Americans with Disabilities Act

### Are respiratory impairments disabilities under the ADA?

The ADA does not contain a list of medical conditions that constitute disabilities. Instead, the ADA has a general definition of disability that each person must meet (EEOC Regulations . . ., 2011). Therefore, some people with respiratory impairments will have a disability under the ADA and some will not.

A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded as having an impairment (EEOC Regulations . . . , 2011). For more information about how to determine whether a person has a disability under the ADA, visit http://AskJAN.org/corner/vol05iss04.htm.

# Accommodating Employees with Respiratory Impairments

(Note: People with respiratory impairments may develop some of the limitations discussed below, but seldom develop all of them. Also, the degree of limitation will vary among individuals. Be aware that not all people with respiratory impairments will need accommodations to perform their jobs and many others may only need a few accommodations. The following is only a sample of the possibilities available. Numerous other accommodation solutions may exist.)

**Questions to Consider:**

1. What limitations is the employee with respiratory impairment experiencing?

2. How do these limitations affect the employee and the employee's job performance?

3. What specific job tasks are problematic as a result of these limitations?

4. What accommodations are available to reduce or eliminate these problems? Are all possible resources being used to determine possible accommodations?

5. Has the employee with respiratory impairment been consulted regarding possible accommodations?

6. Once accommodations are in place, would it be useful to meet with the employee with respiratory impairment to evaluate the effectiveness of the accommodations and to determine whether additional accommodations are needed?

7. Do supervisory personnel and employees need training regarding respiratory impairments?

**Accommodation Ideas:**

Avoiding Environmental Triggers:

Some respiratory impairments are aggravated by environmental triggers. It may be helpful to:

- Maintain a clean and healthy work environment
- Provide air purification
- Condition, heat, dehumidify, or add moisture to the air as appropriate
- Provide additional rest breaks for the individual to get fresh air or take medication
- Create a smoke and fragrance-free work environment
- Consider an alternative work arrangement such as work from home
- Allow for alternative work arrangements when construction is taking place
- Use alternative pest management practices
- Implement a flexible leave policy

- Allow for alternative means of communication such as telephone, e-mail, instant messaging, fax, or memos

Accessibility Accommodations:

An individual who experiences respiratory limitations may have difficulty performing activities that require gross motor movement, such as walking long distances, or performing activities that require excessive physical activity. It may be necessary to address access concerns for an individual who has difficulty approaching the work facility, moving around the facility, getting to work, or traveling as an essential job function.

- Modify the work-site to make it accessible
- Provide an accessible parking space with an unobstructed and easily traveled path into the workplace
- Provide an entrance free of steps with doors that open automatically or that have a maximum opening force of five pounds
- Provide an accessible route of travel to and from work areas used by the individual throughout the work environment
- Consider providing a scooter or motorized cart for the employee to use for long distances if the employee does not already use a mobility aid
- Move the individual's workstation closer to equipment, materials, and rooms the individual uses frequently
- Modify the workstation to accommodate a wheelchair, scooter, or the use of oxygen therapy equipment
- Arrange the workstation so materials and equipment are within reach range
- Provide restrooms that are easily accessed from the individual's workstation
- Review emergency evacuation procedures

Modify Policies:

Due to the unpredictable nature of the onset of respiratory limitations, an individual may have difficulty maintaining regular attendance or a regular schedule. It may be necessary to:

- Modify the location where work is performed
- Modify the attendance policy
- Provide leave as an accommodation
- Provide a modified or part-time work schedule
- Provide breaks

Maintain Air Quality:

The U.S. Environmental Protection Agency (EPA) provides suggestions for improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html. Employers should keep indoor air

quality concerns in mind for employees with and without respiratory impairments. Good IAQ can improve worker productivity for everyone. To maintain air quality, it may be necessary to:

- Provide an office or workspace that has working windows
- Maintain the heating, ventilation, and air conditioning (HVAC) system
- Test indoor air quality
- Use air purification systems throughout the building or in personal workstations
- Reduce workplace pollutants
- Provide a mask
- Adjust indoor temperature to meet the individual's needs
- Institute a fragrance-free workplace
- Provide pre-notification of construction and cleaning in the workplace
- Use non-toxic building materials, furnishings, supplies, and flooring
- Use non-toxic solvents, primers, stains, paints, etc.

**Situations and Solutions:**

A teacher diagnosed with sick building syndrome was required to attend weekly faculty meetings in the school building. She usually taught class from a portable classroom outside of the building and could not be in the school building for extended time. JAN suggested that she use either a speakerphone or PA system from her classroom to listen in and participate in the meetings, be provided with meeting minutes, or attend the meetings and wear a respirator mask if she felt comfortable doing so.

An office worker with fragrance sensitivity was having difficulty because of the cleaning products used in the employee restroom. JAN provided information about non-toxic cleaning products.

An employee with bronchial asthma could not work in hot environments. JAN discussed air-conditioning, including a window unit for the employee's office if the employer could not install central air.

A hospital worker with COPD had difficulty walking from the employee lot to the work-site. The parking lot was very large and employees parked on a first-come, first-serve basis. JAN suggested providing a reserved parking space close to the work-site.

**Products:**

There are numerous products that can be used to accommodate people with limitations. JAN's Searchable Online Accommodation Resource at http://AskJAN.org/soar is designed to let users explore various accommodation options. Many product vendor lists are accessible through this system; however, JAN provides these lists and many more that are not available on the Web site upon request. Contact JAN directly if you have specific accommodation situations, are looking for products, need vendor information, or are seeking a referral.

## Resources

**Job Accommodation Network**
West Virginia University
PO Box 6080
Morgantown, WV 26506-6080
Toll Free: (800)526-7234
TTY: (877)781-9403
Fax: (304)293-5407
jan@AskJAN.org
http://AskJAN.org

The Job Accommodation Network (JAN) is a free consulting service that provides information about job accommodations, the Americans with Disabilities Act (ADA), and the employability of people with disabilities.

**Office of Disability Employment Policy**
200 Constitution Avenue, NW, Room S-1303
Washington, DC 20210
Toll Free: (866)633-7365
TTY: (877)889-5627
Fax: (202)693-7888
http://www.dol.gov/odep/

The Office of Disability Employment Policy (ODEP) is an agency within the U.S. Department of Labor. ODEP provides national leadership to increase employment opportunities for adults and youth with disabilities while striving to eliminate barriers to employment.

**American Cancer Society**
250 Williams Street NW
Atlanta, GA 30303
Toll Free: (800)227-2345
Direct: (404)315-1123
Fax: (404)315-9348
http://www.cancer.org

The American Cancer Society is the nationwide community-based voluntary health organization dedicated to eliminating cancer as a major health problem by preventing cancer, saving lives, and diminishing suffering from cancer, through research, education, advocacy, and service.

**American Lung Association**
1301 Pennsylvania Avenue NW
Suite 800
Washington, DC 20004
Direct: (202)785-3355
Fax: (202)452-1805
info@lungusa.org
http://www.lungusa.org/

Conducts educational programs, sponsors conferences, publications, fellowships and research grants.

**Asthma and Allergy Foundation of America**
8201 Corporate Drive, Suite 1000
Landover, MD 20785
Toll Free: (800)727-8462
Fax: (202)466-8940
http://www.aafa.org/

The Asthma and Allergy Foundation of America (AAFA) is the premier patient organization dedicated to improving the quality of life for people with asthma and allergies and their caregivers, through education, advocacy and research. AAFA, a not-for-profit organization founded in 1953, provides practical information, community based services, support and referrals through a national network of chapters and educational support groups. AAFA also sponsors research toward better treatments and a cure for asthma and allergic diseases.

## References

About.com. (2006). *What is lung disease?* (2006). Retrieved September 5, 2008, from http://lungdiseases.about.com/od/basicinformation/a/basicinfo.htm

EEOC Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 29 C.F.R. § 1630 (2011).

## Appendix A

The following is a non-comprehensive summary of many of the medical conditions that may result in respiratory limitations. For more detailed information, contact an appropriate medical professional or the resources listed at the end of this document.

Allergies: According to the Asthma and Allergy Foundation of America (AAFA), an estimated 50 to 60 million Americans are affected by allergies. In fact, allergies are the sixth leading cause of chronic disease in the United States (AAFA, n.d.). It is common for an individual to be sensitive to more than one particular irritant. A substance that may normally not affect the average person may produce nasal congestion, itchy, watery eye, or an asthma attack for someone who is allergic. Allergic symptoms may occur due to dust, mold, mildew, pollen, foods, and insects among any number of other substances.

Asthma: According to the American Lung Association (ALA), asthma is a chronic lung disease that can be life threatening (ALA, 2008d). Asthma causes breathing problems known as asthma attacks or episodes of asthma. A person with asthma might get an asthma attack when they have a cold or some other kind of respiratory infection or when they breathe something that bothers the lungs such as cigarette smoke or dust. Asthma symptoms are often triggered by changes in weather (cold or hot), emotional distress and exercise. Asthma attacks may start suddenly or may take an extended period of time, even days, to develop. Attacks can be severe, moderate or mild and can require a period of recuperation.

Chemical Sensitivity (MCS), Environmental Illness (EI), and Fragrance Sensitivity: Chemical sensitivity, or MCS, is characterized by such symptoms as headaches, dizziness, nausea, breathing difficulties, tightening of the throat, chronic laryngitis, difficulty concentrating, memory loss, learning disorders, eczema, arthritis-like sensations, and muscle pain (About.com, 2006). A person who experiences limitations due to MCS or EI *may* have any of the above mentioned symptoms when exposed to such irritants as fragrances, cleaning agents, smoke, pesticides, molds, fumes from office machines, car exhaust, paint, new carpeting, solvents and other irritants.

For more specific information regarding MCS/EI, see JAN's Accommodation and Compliance Series: Employees with Chemical Sensitivity or Environmental Illness at http://AskJAN.org/media/MCS.html.

For more specific information regarding fragrance sensitivity, see JAN's Accommodation and Compliance Series: Employees with Fragrance Sensitivity at http://AskJAN.org/media/fragrance.html.

Chronic Obstructive Pulmonary Disease (COPD): The American Lung Association indicates that COPD is the fourth leading cause of death in America. Approximately 16.4 million Americans are diagnosed with COPD. COPD includes diseases that are characterized by obstruction to airflow such as emphysema or chronic bronchitis. It does not include other obstructive diseases such as asthma. Chronic bronchitis is an

inflammation and eventual scarring of the lining of the bronchial tubes and is evidenced by a chronic cough, increased mucus, frequent clearing of the throat and shortness of breath. Emphysema causes irreversible lung damage and is evidenced by cough, shortness of breath and limited exercise tolerance (ALA, 2002a).

Lung Cancer: According to the American Cancer Society's Lung Cancer Resource Center, it is estimated that there will be 169,400 new cases of lung cancer in the United States in 2002. Statistics show that lung cancer is the leading cause of cancer death among both men and women. More people die of lung cancer than of colon, breast, and prostate cancers combined (ACS, n.d.a).

Lung cancer generally develops over a period of years and typically affects people over the age of 50. The American Lung Association's, *Facts About Lung Cancer*, describes cancers that begin in the lungs. Lung related cancers are divided into two major types, non-small cell lung cancer and small cell lung cancer. Non-small cell lung cancer generally spreads to distant organs more slowly than small cell lung cancer. Squamous cell carcinoma, adenocarcinoma, and large cell carcinoma are three types of non-small cell lung cancer (ACS, n.d.a).

Pulmonary Sarcoidosis: Pulmonary sarcoidosis affects lung volume decreasing the amount of air the lungs can hold. The American Lung Association describes the disease as being characterized by the presence of granulomas, small areas of inflamed cells. They can appear on the walls of the alveoli (small air sacs in the lungs), or on the walls of the bronchioles (breathing tubes in the lungs), or in the lymph nodes surrounding the lungs. Symptoms include a dry cough, shortness of breath, or mild chest pain. Additionally, the person may experience fatigue, weakness, and weight loss. In cases where symptoms do appear outside the lung, they can include a scaly rash, red bumps on the legs, fever, soreness of the eyes, and pain and swelling of the ankles (ALA, 2008b).

Tuberculosis (TB): TB is an infection that primarily affects the lungs but can also affect other organs and tissues in the body. The infection is spread by airborne TB bacteria. A person may have *TB infection* or *TB disease*. If a person has TB infection they are essentially a carrier of the bacteria but are not affected by the bacteria. A person infected with TB disease, however, is ill and requires treatment. A person with TB disease can spread the disease. Symptoms of TB disease include excessive coughing (including coughing blood), repeated night sweats, unexplained weight loss, loss of appetite, fever, chills, and general lethargy. According to the American Lung Association, the rate of reported tuberculosis dropped 45 percent between 1992 and 2000. The decrease in reported TB has been attributed to improved TB control programs (ALA, 2008f).

Emphysema: According to the American Lung Association, emphysema ranks 15th among chronic conditions that contribute to activity limitations. An estimated 44 percent of individuals with emphysema report that daily activities have been limited by the disease. Emphysema develops gradually, usually from exposure to cigarette smoke. Some individuals are born with a deficiency of a protein known as alpha 1-antitrypsin

(AAT) which can lead to an inherited form of emphysema called alpha 1-antitrypsin (AAT) deficiency-related emphysema. For individuals with emphysema, the air sacs in the lungs become damaged and less able to transfer oxygen to the bloodstream. The individual then becomes short of breath and has difficulty exhaling because the lungs also lose their elasticity (ALA, 2008a).

Pulmonary Hypertension (PH): There are two forms of pulmonary hypertension, primary (PPH) and secondary (SPH). According to the American Lung Association, it is estimated that there are 300 new cases of PPH per year. PPH is defined as a rare disease of unknown cause that results in the progressive narrowing of the blood vessels of the lungs, causing high blood pressure in these blood vessels which eventually leads to heart failure. Secondary pulmonary hypertension (SPH) results from other types of lung disease, abnormal breathing processes, or heart disease (ALA, 2002h). According to the Mayo Clinic, symptoms and limitations of PPH include shortness of breath with exertion and general fatigue, passing-out spells, dizziness, ankle or leg swelling, and chest pain or pressure (ALA, 2008a).

Latex Allergy: The Occupational Safety and Health Administration (OSHA) states the following about latex allergy, "Allergy to latex was first recognized in the late 1970s. Since then, it has become a major health concern as an increasing number of people in the work place have been affected. Health care workers exposed to latex gloves or medical products containing latex are especially at risk. It is estimated that 8-12% of health care workers are latex sensitive. Between 1988 and 1992, the Federal Drug Administration (FDA) received more than 1,000 reports of adverse health effects from exposure to latex, including 15 deaths due to such exposure" (OSHA, n.d).

Latex allergy reactions can range from mild to very severe. Typically, the allergy begins with an irritant contact dermatitis and can develop into an immediate allergic reaction with respiratory symptoms. An individual with a latex allergy can be affected after coming into physical contact with products like latex gloves, elastic from waist bands, rubber bands, or medical equipment, by inhaling proteins from powdered latex gloves or balloons or by ingesting food products that have been prepared by workers using latex products.

For more specific information regarding latex allergy, see JAN's Accommodation and Compliance Series: Employees who are Allergic to Natural Rubber Latex at http://AskJAN.org/media/LATEX.html.

AIDS Related Lung Disease: A person with AIDS may experience any number of lung infections. Most common are pneumocystis carinii pneumonia (PCP), which is caused by a fungus, and tuberculosis and mycobacterium avium complex (MAC) which are caused by bacterium. AIDS also predisposes an individual to a variety of other lung infections from bacteria and molds (ACS, n.d.b). It is important for an individual with a compromised immune system to make an effort to avoid exposure to viruses and bacteria to stay healthy.

## References for Appendix A

About.com. (2006). *Multiple chemical sensitivity (MCS) the controversy?* (2006). Retrieved September 5, 2008, from http://allergies.about.com/library/weekly/aa011899.htm?terms=Multiple+Chemical+Sensitivity

American Cancer Society (n.d.a). *All about lung cancer.* Retrieved September 5, 2008, from http://www.cancer.org/docroot/CRI/CRI_2x.asp?sitearea=&dt=15

American Cancer Society (n.d.b). *AIDS-related lung cancers.* Retrieved September 5, 2008, http://www.cancer.org/docroot/CRI/content/CRI_2_4_4x_AIDS-Related_Cancers_78.asp

American Lung Association (2008a). *Chronic obstructive pulmonary disease (COPD).* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2058829&content_id={12C9AADB-157F-4ABB-A4C4-FC694FBE0323}&notoc=1

American Lung Association (2008b). *Sarcoidosis.* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2060727&content_id={96FE4972-D321-4E95-B03F-042FEFB92682}&notoc=1

American Lung Association (2008c). *Tuberculosis fact sheet.* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2060731&content_id={1ED78388-82B6-4D6B-A242-C6794FB77034}&notoc=1

American Lung Association (2008d). *Asthma in adults fact sheet.* Retrieved September 5, 2008, from

http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2058817&content_id={39966A20-AE3C-4F85-B285-68E23EDC6CA8}&notoc=1

American Lung Association (2008e). *Lung cancer fact sheet.* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2060245&content_id={BD3F3387-3AA3-4660-9EF7-3F5BD8B6D251}&notoc=1

American Lung Association (2008f). *Tuberculosis fact sheet.* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2060731&content_id={1ED78388-82B6-4D6B-A242-C6794FB77034}&notoc=1

American Lung Association (2003). *Primary pulmonary hypertension (PPH) fact sheet.* Retrieved September 5, 2008, from http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=2060321&content_id={FA692DC0-B9A9-4BDC-88F4-2609BD6E0EDD}&notoc=1

American Lung Association (2008f). *Tuberculosis fact sheet.* Retrieved January 26, 2006, from http://www.lungusa.org/site/pp.asp?c=dvLUK9O0E&b=35804

Asthma and Allergy Foundation of America (n.d.). *Allergy facts and figures.* Retrieved January 26, 2006, from http://www.aafa.org/display.cfm?id=9&sub=30

Occupational Safety and Health Administration (n.d.). Safety and health topics latex allergy. Retrieved September 5, 2008, from http://www.osha.gov/SLTC/latexallergy/index.html

This document was developed by the Job Accommodation Network, funded by a contract agreement from the U.S. Department of Labor, Office of Disability Employment Policy (DOL079RP20426). The opinions expressed herein do not necessarily reflect the position or policy of the U.S. Department of Labor. Nor does mention of trade names, commercial products, or organizations imply endorsement by the U.S. Department of Labor.

4

Search Text Size

| For Employers | For Individuals | For Others | ADA Library | Accommodation Search | A - Z of Disabilities | Publications | Resources |

Home | Accommodation Information: A - Z | Allergies | Accommodation Ideas for Respiratory Impairments

# Accommodation and Compliance Series: Employees with Respiratory Impairment

Preface

Introduction Information About Americans with Disabilities Act Accommodating Employees Resources References

PDF Version DOC Version Share

## Introduction

JAN's Accommodation and Compliance Series is designed to help employers determine effective accommodations and comply with Title I of the Americans with Disabilities Act (ADA). Each publication in the series addresses a specific medical condition and provides information about the condition, ADA information, accommodation ideas, and resources for additional information.

The Accommodation and Compliance Series is a starting point in the accommodation process and may not address every situation. Accommodations should be made on a case by case basis, considering each employee's individual limitations and accommodation needs. Employers are encouraged to contact JAN to discuss specific situations in more detail.

For information on assistive technology and other accommodation ideas, visit JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar.

## Information about Respiratory Impairments

**What is a respiratory impairment?**

Respiratory impairment is a generic term that refers to a number of medical conditions that can affect the respiratory system and may result in limitations such as labored breathing or asthma attacks, fatigue and difficulty with mobility, heightened sensitivity to ordinary substances and chemicals, and compromised immunity to infection.

**What causes respiratory impairments?**

The following is a non-comprehensive list of many of the medical conditions that may result in respiratory impairments: Allergies, Asthma, Chemical Sensitivity (MCS), Chronic Obstructive Pulmonary Disease, Cystic Fibrosis, Environmental Illness (EI), Fragrance Sensitivity, Lung Cancer, Pulmonary Sarcoidosis, Tuberculosis, Emphysema, Pulmonary Hypertension, Latex Allergy, and AIDS Related Lung Disease.

For more detailed information, see Appendix A at the end of this document.

**How are respiratory impairments treated?**

Treatment of respiratory impairments depends on many factors, such as the type and stage of impairment; family history; and the individual's medical history, health, and age. Any of the following may be used for treating respiratory impairments: Inhalers or nebulizers containing bronchodilators or corticosteroids, expectorants, antibiotics, oxygen therapy, chemotherapy, lung transplantation, lung reduction surgery, natural treatments such as N-Acetyl Cysteine and Carnitine, and complementary/integrative therapies and treatments (About.com, 2006).

## Respiratory Impairments and the Americans with Disabilities Act

**Are respiratory impairments disabilities under the ADA?**

The ADA does not contain a list of medical conditions that constitute disabilities. Instead, the ADA has a general definition of disability that each person must meet (EEOC Regulations . . ., 2011). Therefore, some people with respiratory impairments will have a disability under the ADA and some will not.

A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded as having an impairment (EEOC Regulations . . . , 2011). For more information about how to determine whether a person has a disability under the ADA, visit http://AskJAN.org/corner/vol05iss04.htm.

## Accommodating Employees who are Respiratory Impairments

Note: People with respiratory impairments may develop some of the limitations discussed below, but seldom develop all of them. Also, the degree of limitation will vary among individuals. Be aware that not all people with respiratory impairments will need accommodations to perform their jobs and many others may only need a few accommodations. The following is only a sample of the possibilities available. Numerous other accommodation solutions may exist.

**Questions to Consider:**

1. What limitations is the employee experiencing?
2. How do these limitations affect the employee and the employee's job performance?
3. What specific job tasks are problematic as a result of these limitations?
4. What accommodations are available to reduce or eliminate these problems? Are all possible resources being used to determine possible accommodations?
5. Has the employee been consulted regarding possible accommodations?
6. Once accommodations are in place, would it be useful to meet with the employee to evaluate the effectiveness of the accommodations and to determine whether additional accommodations are needed?
7. Do supervisory personnel and employees need training??

**Accommodation Ideas:**

**Fatigue/Weakness:**

- Accessible facility (Ramps, parking etc.)
- Reduce/eliminate lifting, walking, etc.
- Flexibility to sit or stand (Adjustable workstation)
- Rest area with cot
- Later start time
- Frequent rest breaks
- Shorten work day and extend work week
- Job sharing

**Avoiding Environmental Triggers:**

Some respiratory impairments are aggravated by environmental triggers. It may be helpful to:

- Maintain a clean and healthy work environment
- Provide air purification
- Condition, heat, dehumidify, or add moisture to the air as appropriate
- Provide additional rest breaks for the individual to get fresh air or take medication
- Create a smoke and fragrance-free work environment
- Consider an alternative work arrangement such as work from home
- Allow for alternative work arrangements when construction is taking place
- Use alternative pest management practices

- Implement a flexible leave policy
- Allow for alternative means of communication such as telephone, e-mail, instant messaging, fax, or memos

**Accessibility Accommodations:**

An individual who experiences respiratory limitations may have difficulty performing activities that require gross motor movement, such as walking long distances, or performing activities that require excessive physical activity. It may be necessary to address access concerns for an individual who has difficulty approaching the work facility, moving around the facility, getting to work, or traveling as an essential job function.

- Modify the work-site to make it accessible
- Provide an accessible parking space with an unobstructed and easily traveled path into the workplace
- Provide an entrance free of steps with doors that open automatically or that have a maximum opening force of five pounds
- Provide an accessible route of travel to and from work areas used by the individual throughout the work environment
- Consider providing a scooter or motorized cart for the employee to use for long distances if the employee does not already use a mobility aid
- Move the individual's workstation closer to equipment, materials, and rooms the individual uses frequently
- Modify the workstation to accommodate a wheelchair, scooter, or the use of oxygen therapy equipment
- Arrange the workstation so materials and equipment are within reach range
- Provide restrooms that are easily accessed from the individual's workstation
- Review emergency evacuation procedures

**Modify Policies:**

Due to the unpredictable nature of the onset of respiratory limitations, an individual may have difficulty maintaining regular attendance or a regular schedule. It may be necessary to:

- Modify the location where work is performed
- Modify the attendance policy
- Provide leave as an accommodation
- Provide a modified or part-time work schedule
- Provide breaks

**Maintain Air Quality:**

The U.S. Environmental Protection Agency (EPA) provides suggestions for improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html. Employers should keep indoor air quality concerns in mind for employees with and without respiratory impairments. Good IAQ can improve worker productivity for everyone. To maintain air quality, it may be necessary to:

- Provide an office or workspace that has working windows
- Maintain the heating, ventilation, and air conditioning (HVAC) system
- Test indoor air quality
- Use air purification systems throughout the building or in personal workstations
- Reduce workplace pollutants
- Provide a mask
- Adjust indoor temperature to meet the individual's needs
- Institute a fragrance-free workplace
- Provide pre-notification of construction and cleaning in the workplace
- Use non-toxic building materials, furnishings, supplies, and flooring
- Use non-toxic solvents, primers, stains, paints, etc.

**Situations and Solutions:**

A teacher diagnosed with sick building syndrome was required to attend weekly faculty meetings in the school building. She usually taught class from a portable classroom outside of the building and could not be in the school building for extended time. JAN suggested that she use either a speakerphone or PA system from her classroom to listen in and participate in the meetings, be provided with meeting minutes, or attend the meetings and wear a respirator mask if she felt comfortable doing so.

An office worker with fragrance sensitivity was having difficulty because of the cleaning products used in the employee restroom. JAN provided information about non-toxic cleaning products.

An employee with bronchial asthma could not work in hot environments. JAN discussed air-conditioning, including a window unit for the employee's office if the employer could not install central air.

A hospital worker with COPD had difficulty walking from the employee lot to the work-site. The parking lot was very large and employees parked on a first-come, first-serve basis. JAN suggested providing a reserved parking space close to the work-site.

**Products:**

There are numerous products that can be used to accommodate people with limitations. JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar is designed to let users explore various accommodation options. Many product vendor lists are accessible through this system; however, upon request JAN provides these lists and many more that are not available on the Web site. Contact JAN directly if you have specific accommodation situations, are looking for products, need vendor information, or are seeking a referral.

## Resources

## References

About.com. (2006). *What is lung disease?* (2006). Retrieved September 5, 2008, from http://lungdiseases.about.com/od/basicinformation/a/basicinfo.htm

EEOC Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 29 C.F.R. § 1630 (2011).

**Appendix A**

The following is a non-comprehensive summary of many of the medical conditions that may result in respiratory limitations. For more detailed information, contact an appropriate medical professional or the resources listed at the end of this document.

Allergies: According to the Asthma and Allergy Foundation of America (AAFA), an estimated 50 to 60 million Americans are affected by allergies. In fact, allergies are the sixth leading cause of chronic disease in the United States (AAFA, n.d.). It is common for an individual to be sensitive to more than one particular irritant. A substance that may normally not affect the average person may produce nasal congestion, itchy, watery eye, or an asthma attack for someone who is allergic. Allergic symptoms may occur due to dust, mold, mildew, pollen, foods, and insects among any number of other substances.

Asthma: According to the American Lung Association (ALA), asthma is a chronic lung disease that can be life threatening (ALA, 2008d). Asthma causes breathing problems known as asthma attacks or episodes of asthma. A person with asthma might get an asthma attack when they have a cold or some other kind of respiratory infection or when they breathe something that bothers the lungs such as cigarette smoke or dust. Asthma symptoms are often triggered by changes in weather (cold or hot), emotional distress and exercise. Asthma attacks may start suddenly or may take an extended period of time, even days, to develop. Attacks can be severe, moderate or mild and can require a period of recuperation.

Chemical Sensitivity (MCS), Environmental Illness (EI), and Fragrance Sensitivity: Chemical sensitivity, or MCS, is characterized by such symptoms as headaches, dizziness, nausea, breathing difficulties, tightening of the throat, chronic laryngitis, difficulty concentrating, memory loss, learning disorders, eczema, arthritis-like sensations, and muscle pain (About.com, 2006). A person who experiences limitations due to MCS or EI may have any of the above mentioned symptoms when exposed to such irritants as fragrances, cleaning agents, smoke, pesticides, molds, fumes from office machines, car exhaust, paint, new carpeting, solvents and other irritants.

For more specific information regarding MCS/EI, see JAN's Accommodation and Compliance Series: Employees with Chemical Sensitivity or Environmental Illness at http://AskJAN.org/media/MCS.html.

For more specific information regarding fragrance sensitivity, see JAN's Accommodation and Compliance Series: Employees with Fragrance Sensitivity at http://AskJAN.org/media/fragrance.html.

Chronic Obstructive Pulmonary Disease (COPD): The American Lung Association indicates that COPD is the fourth leading cause of death in America. Approximately 16.4 million Americans are diagnosed with COPD. COPD includes diseases that are characterized by obstruction to airflow such as emphysema or chronic bronchitis. It does not include other obstructive diseases such as asthma. Chronic bronchitis is an inflammation and eventual scarring of the lining of the bronchial tubes and is evidenced by a chronic cough, increased mucus, frequent clearing of the throat and shortness of breath. Emphysema causes irreversible lung damage and is evidenced by cough, shortness of breath and limited exercise tolerance (ALA, 2002a).

Lung Cancer: According to the American Cancer Society's Lung Cancer Resource Center, it is estimated that there will be 169,400 new cases of lung cancer in the United States in 2002. Statistics show that lung cancer is the leading cause of cancer death among both men and women. More people die of lung cancer than of colon, breast, and prostate cancers combined (ACS, n.d.a).

Lung cancer generally develops over a period of years and typically affects people over the age of 50. The American Lung Association's, Facts About Lung Cancer, describes cancers that begin in the lungs. Lung related cancers are divided into two major types, non-small cell lung cancer and small cell lung cancer. Non-small cell lung cancer generally spreads to distant organs more slowly than small cell lung cancer. Squamous cell carcinoma, adenocarcinoma, and large cell carcinoma are three types of non-small cell lung cancer (ACS, n.d.a).

Pulmonary Sarcoidosis: Pulmonary sarcoidosis affects lung volume decreasing the amount of air the lungs can hold. The American Lung Association describes the disease as being characterized by the presence of granulomas, small areas of inflamed cells. They can appear on the walls of the alveoli (small air sacs in the lungs), or on the walls of the bronchioles (breathing tubes in the lungs), or in the lymph nodes surrounding the lungs. Symptoms include a dry cough, shortness of breath, or mild chest pain. Additionally, the person may experience fatigue, weakness, and weight loss. In cases where symptoms do appear outside the lung, they can include a scaly rash, red bumps on the legs, fever, soreness of the eyes, and pain and swelling of the ankles (ALA, 2008b).

Tuberculosis (TB): TB is an infection that primarily affects the lungs but can also affect other organs and tissues in the body. The infection is spread by airborne TB bacteria. A person may have TB infection or TB disease. If a person has TB infection they are essentially a carrier of the bacteria but are not affected by the bacteria. A person infected with TB disease, however, is ill and requires treatment. A person with TB disease can spread the disease. Symptoms of TB disease include excessive coughing (including coughing blood), repeated night sweats, unexplained weight loss, loss of appetite, fever, chills, and general lethargy. According to the American Lung Association, the rate of reported tuberculosis dropped 45 percent between 1992 and 2000. The decrease in reported TB has been attributed to improved TB control programs (ALA, 2008f).

Emphysema: According to the American Lung Association, emphysema ranks 15th among chronic conditions that contribute to activity limitations. An estimated 44 percent of individuals with emphysema report that daily activities have been limited by the disease. Emphysema develops gradually, usually from exposure to cigarette smoke. Some individuals are born with a deficiency of a protein known as alpha 1-antitrypsin (AAT) which can lead to an inherited form of emphysema called alpha 1-antitrypsin (AAT) deficiency-related emphysema. For individuals with emphysema, the air sacs in the lungs become damaged and less able to transfer oxygen to the bloodstream. The individual then becomes short of breath and has difficulty exhaling because the lungs also lose their elasticity (ALA, 2008a).

Pulmonary Hypertension (PH): There are two forms of pulmonary hypertension, primary (PPH) and secondary (SPH). According to the American Lung Association, it is estimated that there are 300 new cases of PPH per year. PPH is defined as a rare disease of unknown cause that results in the progressive narrowing of the blood vessels of the lungs, causing high blood pressure in these blood vessels which eventually leads to heart failure. Secondary pulmonary hypertension (SPH) results from other types of lung disease, abnormal breathing processes, or heart disease (ALA, 2002h). According to the Mayo Clinic, symptoms and limitations of PPH include shortness of breath with exertion and general fatigue, passing-out spells, dizziness, ankle or leg swelling, and chest pain or pressure (ALA, 2008a).

Latex Allergy: The Occupational Safety and Health Administration (OSHA) states the following about latex allergy, "Allergy to latex was first recognized in the late 1970s. Since then, it has become a major health concern as an increasing number of people in the work place have been affected. Health care workers exposed to latex gloves or medical products containing latex are especially at risk. It is estimated that 8-12% of health care workers are latex sensitive. Between 1988 and 1992, the Federal Drug Administration (FDA) received more than 1,000 reports of adverse health effects from exposure to latex, including 15 deaths due to such exposure" (OSHA, n.d).

Latex allergy reactions can range from mild to very severe. Typically, the allergy begins with an irritant contact dermatitis and can develop into an immediate allergic reaction with respiratory symptoms. An individual with a latex allergy can be affected after coming into physical contact with products like latex gloves, elastic from waist bands, rubber bands, or medical equipment, by inhaling proteins from powdered latex gloves or balloons or by ingesting food products that have been prepared by workers using latex products.

For more specific information regarding latex allergy, see JAN's Accommodation and Compliance Series: Employees who are Allergic to Natural Rubber Latex at http://AskJAN.org/media/LATEX.html.

AIDS Related Lung Disease: A person with AIDS may experience any number of lung infections. Most common are pneumocystis carinii pneumonia (PCP), which is caused by a fungus, and tuberculosis and mycobacterium avium complex (MAC) which are caused by bacterium. AIDS also predisposes an individual to a variety of other lung infections from bacteria and molds (ACS, n.d.b). It is important for an individual with a compromised immune system to make an effort to avoid exposure to viruses and bacteria to stay healthy.

**References for Appendix A**

About.com. (2006). Multiple chemical sensitivity (MCS) the controversy? (2006). Retrieved September 5, 2008, from http://allergies.about.com/library/weekly/aa011899.htm?terms=Multiple+Chemical+Sensitivity

American Cancer Society (n.d.a). All about lung cancer. Retrieved September 5, 2008, from http://www.cancer.org/docroot/CRI/CRI_2x.asp?sitearea=&dt=15

American Cancer Society (n.d.b). AIDS-related lung cancers. Retrieved September 5, 2008, http://www.cancer.orgp

American Lung Association (2008a). Chronic obstructive pulmonary disease (COPD). Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008b). Sarcoidosis. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008c). Tuberculosis fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008d). Asthma in adults fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008e). Lung cancer fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2008f). Tuberculosis fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

American Lung Association (2003). Primary pulmonary hypertension (PPH) fact sheet. Retrieved September 5, 2008, from http://www.lungusa.org

Asthma and Allergy Foundation of America (n.d.). Allergy facts and figures. Retrieved January 26, 2006, from http://www.aafa.org

Occupational Safety and Health Administration (n.d.). Safety and health topics latex allergy. Retrieved September 5, 2008, from http://www.osha.gov

**Updated 12/30/11**

**ASK A JAN CONSULTANT**

**JAN provides free, confidential technical assistance about job accommodations and the Americans with Disabilities Act (ADA). Send Us Feedback.**

**(800)526-7234 (Voice)**
**(877)781-9403 (TTY)**
**Live Chat**
**Email**

ODEP A service of the Office of Disability Employment Policy U.S. Department of Labor

Accessibility | Copyright | Disclaimer | Privacy Statement | Site Map

# EQUIPMENT ASSIGNMENT

I, AILEEN MULLEN ACKNOWLEDGE RECEIPT OF THE FOLLOWING GOVERMENT EQUIPMENT TO BE USED IN THE PERFORMANCE OF MY DUTIES AS AN EMPLOYEE AT THE VA REGIONAL OFFICE, ST. PETERSBURG, FL.

| EQUIPMENT | MAKE & MODEL # | SERIAL # OR PHONE # | DATE ASSIGNED |
|---|---|---|---|
| BEEPER | | | |
| CELL PHONE | | | |
| CHAIR | | | |
| COMPUTER/MONITOR | | | |
| PRINTER/FAX | | | |
| STAMPS | | | |
| CERTIFICATION | | | |
| DATE | | | |
| SIGNATURE | | | |
| OTHER EQUIPMENT | | | |
| **1 Honeywell Air Purifier** | 16200 | | 02-02-2012 |

A. I UNDERSTAND THAT I'M RESPONSIBLE FOR MAINTAINING THE EQUIPMENT AND IF A PROBLEM ARISES TO CONTACT MY SUPERVISOR IMMEDIATELY.

B. I UNDERSTAND THAT THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE BELONGS TO VA REGIONAL OFFICE, ST. PETERSBURG, FL AND, THAT UPON MY TERMINATION FROM THE VA REGIONAL OFFICE AND/OR TIME PERIOD, WHERE I NO LONGER NEED THE EQUIPMENT, SUPPLIES, AND/OR FURNITURE THAT I MUST RETURN THE EQUIPMENT, SUPPLIES, AND/OR FURNTIURE. IF I FAIL TO RETURN THIS EQUIPMENT, SUPPLIES, AND/OR FURNITURE, I WILL BE RESPONSIBLE FOR REIMBURSING THE VA REGIONAL OFFICE FOR REPLACEMENT COSTS.

[signature] 2/2/2012

EMPLOYEE'S SIGNATURE DATE

# PLATINUM AIR™
# AIR PURIFIER
**Model 16200**

This model has a 4 Stage Cleaning System with 3 power levels Built-in, independently controlled ionizer for extra cleaning power. The ProTec Antimicrobial treated filter helps prevent mold growth on the filter Odor-Lock (tm) Filter Technology helps remove common household odors. There is an Electronic filter change reminder and you can use The Platinum Air HEPA Air Purifier - 16200 in horizontally or in the vertical position in smaller areas.

## Features

| | |
|---|---|
| • Air Filter | HEPA |
| • Standard Warranty | 3 Year Limited |
| • Manufacturer | Honeywell International, Inc |
| • Manufacturer Part Number | 16200 |
| • Coverage | 110 |
| • Manufacturer Website Address | www51.honeywell.com/honeywell/ |
| • CADR | 70 |
| • Status Indicators | Electronic filter change reminder |
| • Features | Odor Reduction |
| • Product Name | Honeywell Enviracaire Platinum 16200 HEPA Air Purifier |
| • Country of Origin | China |
| • Product Type | Air Purifier |

## Tech Specs

| | |
|---|---|
| • Status Indicators | Electronic filter change reminder |
| • Manufacturer Part Number | 16200 |
| • Product Line | Enviracaire |
| • Product Name | Enviracaire Platinum 16200 HEPA Air Purifier |
| • Manufacturer Website Address | www51.honeywell.com/honeywell/ |
| • Manufacturer | Honeywell International, Inc |
| • Product Type | Air Purifier |
| • Brand Name | Honeywell |
| • Recycled Content | 0% |
| • Post-consumer-waste% | 0% |
| • Recycled | No |
| • Assembly Required | No |
| • Air Filter | HEPA - 99% |
| • Features | Odor Reduction |
| Remove Dust | |
| Remove Smoke | |
| Remove Pollen | |
| Remove Pet Dander | |
| Mold Spores | |
| • CADR | 70 |
| • Coverage | 96" x 10 ft/80 Sq. ft. |
| • Standard Warranty | 3 Year Limited |

▾ advertisement

## Product Attributes

- Color: Tan
- Color Class: White
- Electric Power Supply: Cord

035-04007-000_R1 16200 OM Eng.fm Page 1 Tuesday, July 29, 2003 1:44 PM

Honeywell®




enviracaire®

# PLATINUM AIR™ AIR PURIFIER

**Model 16200**

## IMPORTANT SAFETY INSTRUCTIONS

### READ AND SAVE THESE SAFETY INSTRUCTIONS BEFORE USING THIS PRODUCT.

When using electrical appliances, basic precautions should always be followed to reduce the risk of fire, electric shock, and injury to persons, including the following:

1. Read all instructions before operating the air cleaner.
2. Place air cleaner where it is not easily knocked over by persons in the household.
3. Always turn the air cleaner controls to the OFF position and unplug from the wall outlet when not in use.
4. To disconnect the air cleaner, first turn controls to the OFF position, grip the plug and pull it from the wall outlet. Never pull by the cord.
5. Do not use any product with a damaged cord or plug or if product malfunctions, is dropped or damaged in any manner. Keep the cord away from heated surfaces.
6. Do not use air cleaner outdoors.
7. Never use air cleaner unless it is fully assembled.
8. Do not run power cord under carpets, and do not cover with throw rugs. Arrange cord such that it will not be tripped over.
9. Do not use air cleaner where combustible gases or vapors are present.
10. Do not expose the air cleaner to rain, or use near water, in a bathroom, laundry area or other damp location.
11. The air cleaner must be used in its upright position or horizontal position only.
12. Do not allow foreign objects to enter ventilation or exhaust opening as this may cause electric shock or damage to the air cleaner. Do not block air outlets or intakes.
13. Locate air cleaner near the outlet and avoid using an extension cord.
14. This appliance has a polarized plug (one blade is wider than the other). To reduce the risk of shock, this plug is intended to fit only one way in a polarized outlet. If the plug does not fit fully in the outlet, reverse the plug. If it still does not fit, contact a qualified electrician. DO NOT attempt to defeat this safety feature.
15. A loose fit between the AC outlet (receptacle) and plug may cause overheating and a distortion of the plug. Contact a qualified electrician to replace loose or worn outlet.
16. Do not sit, stand or place heavy objects on the air cleaner.
17. Disconnect power supply before servicing.
18. **SAVE THESE INSTRUCTIONS**

**WARNING: TO REDUCE THE RISK OF FIRE OR ELECTRIC SHOCK, DO NOT USE THIS AIR CLEANER WITH ANY SOLID-STATE SPEED CONTROL DEVICE.**

The Honeywell trademark is used by Kaz, Inc. under license from Honeywell Intellectual Properties, Inc

## HOW YOUR AIR PURIFIER WORKS:

This model air purifier incorporates a 4-stage cleaning system to help clean the air that passes through the filter in the unit (Fig. 1).

**Stage 1:** Washable Particle Pre-Filter
**Stage 2:** Odor-Lock™ Carbon Filter
**Stage 3:** 99% HEPA Filter with ProTec™ antimicrobial treatment
**Stage 4:** Electronic Ionizer

**4-Stage Cleaning System** Fig. 1




## SET-UP:

- Select a firm, level and flat location. For proper airflow, locate the unit at least 3 feet (1 M) from any wall or furniture.
- When operating, large volumes of air are drawn toward the air purifier. Surrounding areas should be cleaned and/or vacuumed frequently to prevent build-up of dust and other contaminates. This may also help prolong the life of the filter. If the unit is placed on a light colored carpet, a small mat or rug should be used underneath to prevent permanent staining. This is especially important in homes with contamination from smoking or fireplaces.

## INSTALL MAIN FILTER:

The Filter is supplied within the air purifier. It is wrapped to ensure purity.

- Turn-off and unplug the air purifier. While pressing on the two notches along the front grille, pull the grille towards you and remove it (See Fig. 2). Gently push down on the top filter frame and pull forward.
- Remove the protective wrap from the Filter.
- Place back into the air purifier housing and snap filter grille into place.

Fig. 2



## OPERATION:

- Ensure the air purifier is plugged into a working electrical outlet and the Power Knob and Ionizer Knob are OFF.
- Start and run the air purifier on High for several minutes and then rotate the Power Knob to the desired cleaning level.

**It is recommended you run your air purifier 24 hours a day to ensure continuous cleaning. Portable air purifiers are more effective in rooms where all doors and windows are closed.**

## IONIZER FEATURE:

The Ionizer helps boost the performance of the air purifier and helps freshen the air.

Fig. 3



- Turn the Ionizer Control Knob (See Fig. 3) to the ON position. This will power the Ionizer on. To turn the Ionizer feature off, simply turn knob to the OFF position.

## ELECTRONIC FILTER CHANGE REMINDER:

This model air purifier has an electronic filter check to remind you when to check or replace the Main filter based on the air cleaner's hours of use.

Once a filter has reached the end of its expected life, its light will remain on until it is RESET. You may unplug the air cleaner without interrupting the filter check.

A red LED light will illuminate when it is time to change the filter. Please replace with Honeywell® Main replacement filter number **16216**.

You should periodically check the filter. Depending on operating conditions, the Filter should be replaced every 6 months.

**To RESET the Electronic Filter Check:**

**Fig 4**




When the filter monitor light remains on, it is time to check/replace the Main filter and reset the filter monitor, if needed. With the unit powered on, insert the tip of a ball-point pen or paperclip next to the LED filter check light and hold for approximately 5 seconds until the light turns off (Fig 4). Depending upon your individual usage (environment and hours used), you may need to check and replace the filter more or less frequently. If the Main filter is replaced before the filter monitor light turns on, the filter monitor should be reset at the same time.

## MAINTAINING YOUR STAGE 1 WASHABLE PARTICLE PRE-FILTER:

The stage 1 particle pre-filter helps pick up large airborne particles that enter the front grille. This pre-filter can be periodically removed and shaken to clean it. Alternatively, it can be rinsed by hand under warm water.

Let the pre-filter air dry completely before inserting back into the unit. If you need to replace this item, please see Consumer Relations section on the next page.

## WHEN TO REPLACE THE MAIN FILTER?

These replacement intervals are intended as guidelines only. Useful life expectancy of any filter media is dependent upon the concentration of contaminates going through the system. High concentrations of contaminates such as dust, pet dander and smoking will reduce the useful life of the filter.

**NOTE:** The Main filter is not washable.

## CLEANING AND STORAGE:

We recommend that you clean the air purifier at least once a month and before extended storage. Use only a dry cloth to wipe the external surfaces of the air purifier. **DO NOT USE WATER, WAX POLISH, OR ANY CHEMICAL SOLUTION.**
If your Air Purifier will not be used for more than 30 days, we recommend:

- Remove the Main Filter from the unit.
- Wrap the Main Filter in an air tight plastic bag.

## FREQUENTLY ASKED QUESTIONS:

***My Air Purifier is starting to make noise and the air output is less. What's wrong?***
The filters may be dirty. High amounts of contaminates can block the pores in the filter and stop the air from moving through it. Replace the Filter.

***How long should I run my Air Purifier?***
For best results, you should operate your Air Purifier 24 hours a day. This unit will be more effective when doors and windows are closed.

***Can I wash my Main filter?***
No. Washing the Main filter will destroy it.

For more troubleshooting tips, visit our website at: **www.kaz.com**

**CONSUMER RELATIONS:**

**NOTE: IF YOU CONTINUE TO EXPERIENCE A PROBLEM, PLEASE RETURN THE AIR PURIFIER TO THE PLACE OF ORIGINAL PURCHASE OR SEE YOUR WARRANTY. DO NOT ATTEMPT TO OPEN THE AIR PURIFIER YOURSELF. DOING SO MAY VOID YOUR WARRANTY AND CAUSE DAMAGE TO THE PRODUCT OR PERSONAL INJURY. IF YOU HAVE ANY QUESTIONS REGARDING THE AIR PURIFIER, PLEASE CALL OR WRITE:**

Kaz Home Environment
Consumer Relations Department
250 Turnpike Road
Southborough, MA 01772

Toll Free: 1-800-332-1110
E-mail: consumerrelations@kaz.com

**ACCESSORIES, REPLACEMENT FILTERS:**

To order replacement Filter (16216), visit our website at: **www.kaz.com** or call us at 1-800-332-1110.

Washable Pre-Filter 16266: $5.25
Main Filter 16216: $29.99

**3 YEAR LIMITED WARRANTY**

You should first read all instructions before attempting to use this product.

**Register your product on-line at www.kaz.com or complete and return the Customer Response Card within 7 days.**

A. This 3 year limited warranty applies to repair or replacement of product found to be defective in material or workmanship. This warranty does not apply to damage resulting from commercial, abusive, unreasonable use or supplemental damage. Defects that are the result of normal wear and tear will not be considered manufacturing defects under this warranty.
**KAZ IS NOT LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON THIS PRODUCT IS LIMITED IN DURATION TO THE DURATION OF THIS WARRANTY.** Some jurisdictions do not allow the exclusion or limitation of incidental or consequential damages or limitations on how long an implied warranty lasts, so the above limitations or exclusions may not apply to you. This warranty gives you specific legal rights, and you also may have other rights which vary from jurisdiction to jurisdiction. This warranty applies only to the original purchaser of this product from the original date of purchase.

B. At its option, Kaz will repair or replace this product if it is found to be defective in material or workmanship. Defective product should be returned to the place of purchase in accordance with store policy. Thereafter, while within the warranty period defective product may be returned to Kaz.

C. This warranty does not cover damage resulting from any unauthorized attempts to repair or from any use not in accordance with the instruction manual.

D. Return defective product to Kaz Home Environment with a brief description of the problem. Include proof of purchase and a $10 US / $15.50 CAN check or money order for handling, return packing and shipping charges. Please include your name, address and daytime phone number. You must prepay shipping charges. Send to:

**In US:**
Kaz Home Environment
Attn: Returns Department
4755 Southpoint Drive
Memphis, TN 38118
USA

**In Canada:**
Kaz Home Environment
Attn: Returns Department
510 Bronte Street South
Milton, ON L9T 2X6
Canada

**Patent Pending**



© 2003 Kaz, Inc All Rights Reserved.
P/N 035-04007-000, Rev 1
Artwork 043-01271-000

035-04007-000_R1 16200 OM fr.fm Page 1 Tuesday, July 29, 2003 1:48 PM

**Honeywell**®



**enviracaire**®

# LE PURIFICATEUR D'AIR PLATINUM AIR^MC

**Modèle 16200**

## IMPORTANTES INSTRUCTIONS DE SÉCURITÉ

### PRIÈRE DE LIRE ET DE CONSERVER CES INSTRUCTIONS DE SÉCURITÉ AVANT D'UTILISER LE PURIFICATEUR D'AIR.

L'utilisation d'appareils électriques nécessite des précautions élémentaires afin de réduire les risques d'incendie, de choc électrique ou de blessures. Parmi les précautions à observer, on compte les suivantes :

1. Lire toutes les instructions avant d'utiliser le purificateur d'air.
2. Placer l'appareil là où il ne risque pas d'être renversé.
3. Toujours régler l'appareil à la position OFF et le débrancher quand il ne sert pas.
4. Pour débrancher l'appareil, le régler d'abord à la position OFF, puis enlever la fiche de la prise de courant. Éviter de tirer sur le cordon d'alimentation.
5. Éviter d'utiliser tout appareil dont la fiche ou le cordon d'alimentation est endommagé. Éviter également d'utiliser l'appareil si celui-ci a montré des signes de mauvais fonctionnement, si on l'a laissé tomber ou s'il a été endommagé de quelque façon que ce soit. Tenir le cordon d'alimentation loin des surfaces chaudes.
6. Ne pas utiliser l'appareil à l'extérieur.
7. Ne pas utiliser l'appareil s'il n'est pas complètement assemblé.
8. Éviter de faire passer le cordon d'alimentation sous les tapis ou de le recouvrir d'une carpette. Placer l'appareil à un endroit où l'on ne risque pas de trébucher sur le cordon d'alimentation.
9. Éviter de faire fonctionner l'appareil dans une pièce contenant des gaz ou des vapeurs combustibles.
10. Éviter de laisser l'appareil à la pluie ou de le faire fonctionner à proximité de l'eau, dans une salle de bains, une salle de lessive ou dans tout autre endroit humide.
11. L'appareil doit toujours être utilisé dans la position pour laquelle il a été conçu.
12. S'assurer qu'aucun corps étranger ne pénètre dans les ouvertures prévues pour la ventilation ou l'évacuation, au risque de recevoir une décharge électrique ou d'endommager l'appareil. Ne pas bloquer les ouvertures servant à l'admission ou à l'évacuation de l'air.
13. Installer le purificateur d'air à proximité d'une prise de courant et éviter d'utiliser une rallonge.
14. Cet appareil est équipé d'une fiche polarisée (fiche dont l'une des lames est plus large que l'autre). Afin de réduire les risques de choc électrique, cette fiche ne peut être insérée que d'une seule manière dans la prise de courant polarisée. Si la fiche ne s'insère pas complètement dans la prise, tourner la fiche. Si la fiche ne s'insère toujours pas dans la prise, communiquer avec un électricien. ÉVITER de contourner le dispositif de sécurité que constitue la fiche polarisée.
15. Une connexion trop lâche de la fiche dans la prise de courant c.a. peut entraîner une surchauffe et une déformation de la fiche. Communiquer avec un électricien pour faire remplacer les prises de courant lâches ou usées.
16. Éviter de s'asseoir sur le purificateur d'air, de se tenir debout dessus ou d'y déposer des objets lourds.
17. Couper l'alimentation électrique avant d'effectuer l'entretien de l'appareil.
18. **CONSERVER CES INSTRUCTIONS**

**ATTENTION : AFIN DE RÉDUIRE LE RISQUE D'INCENDIE OU DE CHOC ÉLECTRIQUE, ÉVITEZ D'UTILISER UNE COMMANDE DE VITESSE TRANSISTORISÉE AVEC LE PURIFICATEUR D'AIR.**

La marque de commerce Honeywell est utilisée par Kaz, Inc., avec l'autorisation de Honeywell Intellectual Properties, Inc.

**FONCTIONNEMENT DU PURIFICATEUR D'AIR:**

Ce purificateur d'air possède un système de filtration en 4 étapes qui purifie l'air qui passe au travers des filtres de l'appareil (fig. 1).

**Étape 1:** Le pré-filtre de particules lavable
**Étape 2:** Le filtre au charbon Odor-Lock^MC
**Étape 3:** Le filtre HEPA qui élimine 99 % des particules, avec traitement antimicrobien ProTec^MC
**Étape 4:** L'ionisateur électronique



Fig. 1

**INSTALLATION:**

- Placez l'appareil sur une surface rigide, droite et plane. Pour une circulation d'air adéquate, placez l'appareil à au moins 1 mètre (3 pi) des murs et des meubles.
- Le purificateur d'air aspire une grande quantité d'air lorsqu'il fonctionne; veillez à toujours garder propre les environs immédiats pour éviter l'accumulation de poussière ou de tout autre contaminant et pour prolonger la durée de vie du filtre. Placez un petit tapis sous le purificateur d'air si celui-ci est posé sur un tapis pâle. Cette précaution évitera de tacher le tapis, surtout lorsque le purificateur d'air est utilisé dans un endroit où il y a de la fumée de cigarette ou un foyer.

**INSTALLATION DU FILTRE PRINCIPAL:**

Un filtre est fourni à l'intérieur du purificateur d'air; il a été enveloppé pour préserver sa pureté.

- Mettez le purificateur d'air hors tension et débranchez-le. Tout en appuyant sur les deux encoches le long de la grille avant, tirez la grille vers vous pour la retirer (voir fig. 2), puis appuyez légèrement sur le dessus du filtre et tirez-le vers l'avant.
- Enlevez l'enveloppe protectrice du filtre.
- Replacez le filtre dans le boîtier du purificateur d'air puis remettez la grille en place.

Fig. 2



**FONCTIONNEMENT:**

- Assurez-vous que le bouton de réglage de la puissance et l'interrupteur de l'ionisateur sont en position d'arrêt (OFF) et que le purificateur d'air est branché dans une prise de courant qui fonctionne.
- Mettez le purificateur d'air en marche et faites-le fonctionner à la puissance maximale pendant plusieurs minutes, puis réglez-le au degré de purification désiré.

**On recommande de faire fonctionner le purificateur d'air 24 heures par jour pour que la purification se fasse continuellement. Pour accroître l'efficacité des purificateurs d'air portatifs, fermez les portes et les fenêtres de la pièce dans laquelle ils se trouvent.**

**CARACTÉRISTIQUES DE L'IONISATEUR:**

L'ionisateur augmente la performance du purificateur d'air et contribue à l'assainissement de l'air.

Fig. 3



- Pour activer ou désactiver la fonction d'ionisation, réglez l'interrupteur de l'ionisateur en position de marche (ON) ou en position d'arrêt (OFF) (voir fig. 3).

**AIDE-MÉMOIRE ÉLECTRONIQUE POUR LE CHANGEMENT DE FILTRE:**

Ce purificateur d'air est doté d'un dispositif de contrôle électronique qui vous avertit lorsqu'il est temps de vérifier ou de changer le filtre principal. Le dispositif comptabilise les heures d'utilisation du purificateur d'air.

Au terme de la durée de vie prévue du filtre, un témoin lumineux s'allume. Il ne s'éteint qu'après la réinitialisation (RESET) du dispositif de contrôle électronique. Vous pouvez débrancher l'appareil sans interrompre le dispositif de contrôle.

Lorsque le filtre principal doit être changé, un témoin lumineux rouge s'allume. Remplacez le filtre par un filtre principal de remplacement Honeywell[MD], modèle **16216**.

Vérifiez régulièrement le filtre; il devrait être changé tous les six mois, selon les conditions d'utilisation.

**Réinitialisation du dispositif de contrôle électronique pour le changement de filtre:**

**Fig. 4**




Lorsque le témoin lumineux du filtre s'allume, il faut vérifier ou remplacer le filtre principal et, le cas échéant, réinitialiser le dispositif de contrôle électronique pour le changement de filtre. Pour la réinitialisation, l'appareil doit être en marche; insérez la pointe d'un stylo à bille ou d'un trombone à côté du témoin lumineux et appuyez pendant environ 5 secondes, jusqu'à ce que le témoin lumineux s'éteigne (fig. 4). Le filtre devra être vérifié et remplacé plus ou moins fréquemment selon les conditions d'utilisation (endroit où il sera utilisé et durée de fonctionnement). Si on remplace le filtre principal avant que le témoin lumineux ne se soit allumé, on doit aussi réinitialiser le dispositif de contrôle électronique.

**ENTRETIEN DU PRÉ-FILTRE DE PARTICULES LAVABLE:**

Le pré-filtre de particules arrête les grosses particules en suspension dans l'air qui entrent par la grille avant. Enlevez régulièrement le pré-filtre pour le nettoyer : secouez-le ou rincez-le à l'eau tiède.
Laissez le pré-filtre sécher complètement à l'air libre avant de le remettre en place. Si vous devez le remplacer, consultez la section « Service à la clientèle » à la page suivante.

**QUAND FAUT-IL REMPLACER LE FILTRE PRINCIPAL?**

L'intervalle de remplacement recommandé ne sert que de point de repère. La longévité de tout matériau filtrant dépend de la concentration de contaminants qui passent dans le système de filtration. Les fortes concentrations de contaminants tels que poussière, squames d'animaux et fumée de cigarette diminuent la durée de vie du filtre.

**REMARQUE:** Le filtre principal n'est pas lavable.

**NETTOYAGE ET ENTREPOSAGE:**

On recommande de nettoyer le purificateur d'air au moins une fois par mois et avant un entreposage prolongé. Utilisez uniquement un chiffon sec pour nettoyer les surfaces externes du purificateur d'air. **ÉVITEZ D'UTILISER DE L'EAU, DE LA CIRE POUR MOBILIER OU TOUT AUTRE PRODUIT CHIMIQUE.**
Si vous prévoyez ne pas utiliser le purificateur d'air pendant plus de 30 jours, il est recommandé de:

- Enlever le filtre principal de l'appareil.
- Envelopper le filtre principal dans un sac de plastique fermé hermétiquement.

**QUESTIONS FRÉQUENTES:**

***Mon purificateur d'air commence à faire du bruit et il expulse moins d'air. Qu'est-ce qui ne va pas?***
Les filtres sont peut-être sales. Une grande quantité de contaminants peut boucher les interstices du filtre, ce qui empêche l'air de passer au travers. Remplacez le filtre.

***Combien de temps devrais-je laisser fonctionner mon purificateur d'air?***
Pour obtenir de meilleurs résultats, laissez fonctionner votre purificateur d'air 24 heures par jour. L'efficacité de cet appareil sera accrue si les portes et les fenêtres sont fermées.

***Est-ce que je peux laver le filtre principal?***
Non, vous détruiriez le filtre principal en le lavant.

Pour d'autres conseils de dépannage, visitez notre site Web au **www.kaz.com** (en anglais seulement).

**SERVICE À LA CLIENTÈLE:**

**REMARQUE : SI UN PROBLÈME PERSISTE, RETOURNEZ LE PURIFICATEUR D'AIR À L'ENDROIT OÙ VOUS L'AVEZ ACHETÉ OU CONSULTEZ LA GARANTIE. N'ESSAYEZ PAS D'OUVRIR LE PURIFICATEUR D'AIR, SOUS PEINE D'ANNULER LA GARANTIE, D'ENDOMMAGER L'APPAREIL OU DE CAUSER DES BLESSURES. POUR TOUTE QUESTION RELATIVE AU PURIFICATEUR D'AIR, VEUILLEZ APPELER OU ÉCRIRE :**

Kaz Home Environment
Consumer Relations Department
250 Turnpike Road
Southborough, MA 01772 USA

Sans frais : 1-800-332-1110
Courriel : consumerrelations@kaz.com

**ACCESSOIRES ET FILTRES DE REMPLACEMENT:**

Pour commander un filtre principal de remplacement (16216), visitez notre site Web au **www.kaz.com** (en anglais seulement) ou composez le 1 800 332-1110.

Pré-filtre lavable 16266 : 5,25 $
Filtre principal 16216 : 29,99 $

**GARANTIE LIMITÉE DE 3 ANS**

Prière de lire toutes les instructions avant de tenter d'utiliser ce produit.

**Enregistrer ce produit en ligne à l'adresse www.kaz.com ou remplir et retourner la carte ci-jointe dans les 7 jours suivant l'achat.**

A. Cette garantie limitée de 3 ans s'applique à la réparation ou au remplacement d'un produit comportant un vice de matière ou de main-d'œuvre. Cette garantie ne s'applique pas aux dégâts découlant d'un usage commercial, abusif ou déraisonnable, ni aux dégâts supplémentaires. Les défaillances résultant de l'usure normale ne sont pas considérées comme des vices de fabrication en vertu de la présente garantie.
**KAZ N'EST NULLEMENT RESPONSABLE POUR LES DOMMAGES FORTUITS OU INDIRECTS, QUELS QU'ILS SOIENT. TOUTE GARANTIE IMPLICITE DE QUALITÉ MARCHANDE ET DE CONVENANCE RELATIVE À CE PRODUIT A LA MÊME DURÉE LIMITE QUE LA PRÉSENTE GARANTIE.** Dans certaines régions, on ne permet pas l'exclusion ou la limitation des dommages fortuits ou indirects, ni les limites de durée applicables à une garantie implicite; par conséquent, il est possible que ces limitations ou exclusions ne s'appliquent pas dans votre cas. Cette garantie vous confère des droits précis, reconnus par la loi. Ces droits diffèrent d'une région à l'autre, et il est possible que vous en ayez d'autres. Cette garantie s'applique uniquement à l'acheteur initial de ce produit, à compter de la date de l'achat.

B. À sa discrétion, Kaz réparera ou remplacera ce produit si l'on constate qu'il comporte un vice de matière ou de main-d'œuvre. Tout produit défectueux devrait être retourné à l'endroit où il a été acheté, conformément à la politique du magasin. Par la suite, tout produit défectueux dont la garantie est toujours valide peut être retourné à Kaz.

C. Cette garantie ne couvre pas les dommages découlant des tentatives de réparation non autorisées ou de toute utilisation non conforme au présent manuel.

D. Retourner tout produit défectueux à Kaz Home Environment, accompagné d'une brève description du problème. Inclure une preuve d'achat et un chèque ou un mandat de poste de 10,00 $ US ou 15,50$ CAN pour les frais de manutention, d'emballage de retour et d'expédition. Prière d'indiquer nom, adresse et numéro de téléphone durant la journée. Les frais d'expédition doivent être payés à l'avance. Adresser à :

**Aux Etats-Unis :**
Kaz Home Environment
Attn: Returns Department
4755 Southpoint Drive
Memphis, TN 38118
USA

**Au Canada :**
Attn: Returns Department
510 Bronte Street South
Milton, ON L9T 2X6
Canada

**brevet en instance**



© 2003 Kaz, Inc Tous droits réservé
P/N. 035-04007-000, Rev 1
Artwork: 043-01271-000

035-04007-000_R1 16200 OM sp.fm Page 1 Tuesday, July 29, 2003 1:52 PM

Honeywell®




**enviracaire®**

# PURIFICADOR DE AIRE PLATINUM AIR™

**Modelo 16200**

## IMPORTANTES INSTRUCCIONES DE SEGURIDAD

### LEA TODAS LAS INSTRUCCIONES ANTES DE USAR ESTE PRODUCTO.

Siempre que utilice instrumentos eléctricos, debe seguir precauciones básicos de seguridad para reducir el riesgo de incendio, choques eléctricos, quemaduras y otras lesiones, incluyendo las siguientes:

1. Lea todas las instrucciones antes de usar su purificador de aire
2. Coloque el aparato donde ningún ocupante del hogar pueda volcarlo.
3. Siempre que no vaya a usar el aparato, apáguelo (posición OFF) y desenchúfelo.
4. Antes de desenchufar el purificador de aire, asegúrese que todos los botones están en posición OFF. Retire el enchufe de la toma sin tirar del cable de alimentación.
5. No debe usar el aparato si el enchufe o el cable eléctrico están dañados. Tampoco use el aparato si presenta síntomas de un mal funcionamiento o si se ha caído o dañado de una forma u otra. Coloque el cable eléctrico lejos de toda fuente de calor.
6. No use el purificador al aire libre.
7. No use el purificador de aire si no está totalmente montado..
8. No pase el cable eléctrico bajo tapices ni alfombras. Coloque el aparato de forma que nadie pueda tropezar con el cable.
9. No use el purificador de aire donde haya gases o vapores inflamables.
10. No deje el purificador de aire bajo la lluvia, ni lo use a proximidad del agua, ni en el cuarto de baño, sala de lavado ni ningún otro lugar húmedo.
11. El purificador de aire sólo debe funcionar en posición vertical.
12. No meta ningún objeto por los orificios de ventilación ni las salidas de aire, podría recibir una descarga eléctrica o dañar el purificador. No obstruya las entradas ni salidas de aire.
13. Coloque el purificador de aire cerca de una toma de corriente para no usar una alargadera.
14. Su aparato viene con un enchufe polarizado (un macho más ancho que otro). Para evitar choques eléctricos, sólo hay una forma de entrar el enchufe en la toma. Si no entra totalmente, gírelo. Si tampoco entra, llame a un electricista. Respete el dispositivo de seguridad que constituye el enchufe polarizado.
15. Una mala conexión entre la toma de corriente y el enchufe puede provocar recalentamiento y deformación del mismo. Llame a un electricista para que le cambie la toma de corriente defectuosa.
16. No se siente ni se pare sobre el purificador de aire, ni coloque objetos pesados encima.
17. Desenchufe el aparato antes de realizar el mantenimiento.

### 18. CONSERVE ESTAS INSTRUCCIONES

**ADVERTENCIA : PARA EVITAR INCENDIOS O CHOQUES ELECTRICOS, NO UTILICE EL APARATO CON NINGUN DISPOSITIVO DE CONTROL DE VELOCIDAD TRANSISTORIZADO.**

Kaz, Inc. utiliza la denominación comercial Honeywell con autorización expresa de Honeywell Intellectual Properties, Inc.

035-04007-000_R1 16200 OM sp.fm Page 2 Tuesday, July 29, 2003 1:52 PM

## FUNCIONAMIENTO DEL PURIFICADOR DE AIRE:

Su purificador de aire posee un sistema de filtración en 4 etapas para purificar el aire que pasa por los filtros del aparato (figura 1).

**Etapa 1:** El prefiltro de partículas lavable
**Etapa 2:** El filtro de carbón Odor-Lock™
**Etapa 3:** El filtro HEPA 99 %, con tratamiento antimicrobiano ProTec™
**Etapa 4:** El ionizador electrónico



figura 1

## ARREGLO:

- Coloque el apareto sobre una superficie rígida, recta y plana. Para obtener una circulación de aire adecuada, coloque el apareto al menos un metro de los paredes y de los muebles.
- El purificador de aire en uso aspira gran cantidad de aire. Mantenga su entorno inmediato siempre limpio para evitar que se acumule polvo o cualquier otro elemento contaminante y el filtro le durará más tiempo. Coloque una pequeña alfombra bajo el purificador de aire si su moqueta es de color claro para que no se le manche, sobre todo si usa el purificador de aire donde hay humo de tabaco o una chimenea.

## INSTALACION DEL FILTRO PRINCIPAL:

Su purificador de aire viene con un filtro embalado para garantizar su pureza íntegra.

- Apague y desenchufe el purificador de aire. Presione las dos muescas de la rejilla y seguidamente tire de la rejilla hacia Ud. para retirarla (ver figura 2). Presione ligeramente sobre el filtro y retírelo.
- Retire el embalaje del filtro.
- Vuelva a colocar el filtro en el purificador y finalmente la rejilla.

Figura 2



## FUNCIONAMIENTO:

- Asegúrese que el selector de potencia y el interruptor del ionizador están apagados (OFF) y que el purificador de aire está enchufado a una toma operacional.
- Prenda el purificador de aire y déjelo funcionar a máxima potencia (HIGH) durante varios minutos. Seguidamente, gradúelo a la potencia que desee.

**Se recomienda que el purificador de aire funcione las 24 horas al día asegurar una purificación del aire continua . Los purificadores de aire portátiles son más eficaces si cierra las puertas y ventanas de la habitación donde se encuentran.**

## PARTICULARIDADES DEL IONIZADOR:

El ionizador aumenta la eficacia del purificador de aire y contribuye al saneamiento del aire.

Figura 3




- Para activar o desactivar la función de ionización, pulse el interruptor del ionizador, posición ON u OFF respectivamente (véase figura 3).

**RECORDATORIO ELECTRONICO PARA EL CAMBIO DE FILTRO:**

Su purificador de aire posee un dispositivo de control electrónico para recordarle cuándo debe verificar o cambiar el filtro principal. El dispositivo contabiliza las horas de uso del purificador de aire.

Cuando deba cambiar el filtro, se encenderá una luz que sólo se apagará cuando reajuste (RESET) el dispositivo de control electrónico. El simple hecho de desenchufar el aparato no pondrá el dispositivo a cero.

Cuando deba cambiar el filtro principal, se encenderá una luz roja. Sustituya el filtro por un filtro principal de recambio Honeywell^MR, número **16216**.

Compruebe el filtro asiduamente. Debe cambiarlo cada 6 meses, según las condiciones de uso.

**Reajuste (RESET) del dispositivo de control electrónico para el cambio de filtro:**

**Figura 4**




Cuando se prenda la luz del filtro, compruebe el filtro principal y, si es necesario, cámbielo y reajuste el dispositivo de control electrónico para cambio de filtro . Proceda al reajuste (RESET) con el aparato en marcha, introduciendo la punta de un bolígrafo o un clip al lado de la luz y presionando aproximadamente 5 segundos, hasta que la luz se apague (figura 4). El filtro debe comprobarse y cambiarse con más o menos frecuencia dependiendo del uso que haga del purificador de aire (dónde y cuánto tiempo lo utiliza). Si cambia el filtro principal antes que se prenda la luz, igualmente tendrá que reajustar el dispositivo de control electrónico.

**MANTENIMIENTO DEL PREFILTRO DE PARTICULAS LAVABLE:**

El prefiltro de partículas detiene las partículas más gruesas suspendidas en el aire que entran por la rejilla delantera. Quite asiduamente el prefiltro y límpielo sacudiéndolo o enjuagándolo con agua tibia.

Deje secar el prefiltro completamente antes de volver a colocarlo. Si debe sustituirlo, consulte la sección « Servicio a la clientela » más adelante.

**¿CUANDO SUSTITUIR EL FILTRO PRINCIPAL?**

A la hora de sustituir los filtros, el dispositivo de control electrónico sólo es una referencia a título indicativo. La duración de los filtros depende del grado de concentración de contaminantes al que estén expuestos. La presencia de fuentes contaminantes importantes tales como polvo, escamas de animales o humo de tabaco harán que su filtro dure menos.

**NOTA:** el filtro principal no es lavable.

**LIMPIEZA Y ALMACENAMIENTO:**

Se recomienda limpiar el purificador de aire al menos una vez al mes y antes de guardarlo por un cierto tiempo. Use un paño seco para limpiar las superficies exteriores del purificador de aire. **NO USE AGUA, CERA PARA MUEBLES NI NINGÚN OTRO PRODUCTO QUÍMICO.**
Si no va a usar el purificador de aire durante más de 30 días, le recomendamos que:

- Quite el filtro principal del aparato.
- Guarde el filtro principal en una bolsa de plástico hermética.

**PREGUNTAS MAS FRECUENTES:**

***Mi purificador de aire ha empezado a hacer ruido y cada vez sale menos aire. ¿Por qué?***
Puede que los filtros estén sucios. Una alta concentración de contaminantes puede obstruir los intersticios del filtro impidiendo que el aire pase. Cambie el filtro.

***¿Cuánto tiempo debo dejar funcionando el purificador de aire?***
Para obtener un resultado óptimo, deje funcionar el purificador las 24 horas del día. El aparato será más eficaz si cierra las puertas y ventanas del lugar donde se encuentre.

***¿Puedo lavar el filtro principal?***
No; si lava el filtro principal, lo dañará.

Encontrará otros consejos en nuestro sitio Web: **www.kaz.com** (en inglés)

**SERVICIO A LA CLIENTELA:**

**NOTA: SI EL PROBLEMA PERSISTE, DEVUELVA EL PURIFICADOR DE AIRE AL COMERCIO DONDE LO COMPRO O CONSULTE LA GARANTIA. NO INTENTE ABRIR EL PURIFICADOR, PODRIA ANULAR LA GARANTIA Y DANAR EL APARATO O CAUSAR OTROS DANOS. PARA CUALQUIER CUESTION SOBRE EL PURIFICADOR DE AIRE, ESCRIBA O LLAME A:**

Kaz Home Environment
Consumer Relations Department
250 Turnpike Road
Southborough, MA 01772 USA

Llame sin coste al : 1-800-332-1110
O envíe un correo a :
consumerrelations@kaz.com

**ACCESORIOS Y FILTROS DE RECAMBIO:**

Puede pedir un filtro principal de recambio (16216) en nuestro sitio Web: **www.kaz.com** (únicamente en inglés), o llamando al 1 800 332-1110.

Prefiltro lavable 16266 : 5,25 $
Filtro principal 16216 : 29,99 $

**GARANTIA LIMITADA DE 3 ANOS**

Por favor, lea todas las instrucciones antes de usar este producto.

**Regístrelo en línea a la dirección www.kaz.com o rellene y eníe la ficha adjunta en los 7 días siguientes a su compra.**

A. La presente garantía limitada de 3 años cubre la reparación o sustitución de todo producto con un defecto de fábrica o de mano de obra. Esta garantía excluye los defectos ocasionados por el uso comercial, abusivo o desrazonable y los daños adicionales. Los fallos resultantes del desgaste normal no se consideran defectos de fábrica en virtud de la presente garantía. **KAZ QUEDA EXENTA DE TODA RESPONSABILIDAD POR DANOS FORTUITOS O INDIRECTOS DE TODO TIPO. TODA GARANTIA IMPLICITA DE CALIDAD COMERCIAL O DE CONVENIENCIA RELACIONADA CON ESTE PRODUCTO TENDRA LA MISMA VIGENCIA QUE LA PRESENTE GARANTIA.** En ciertos lugares no se permite la exclusión o limitación a daños fortuitos o indirectos, ni los límites de duración aplicables a una garantía implícita. Por consiguiente, es posible que estas limitaciones o exclusiones no se apliquen en su caso. Esta garantía le confiere unos derechos precisos, reconocidos por la ley. Dichos derechos difieren de un lugar a otro y es posible que usted tenga otros. La presente garantía sólo será válida con la compra inicial del producto a partir de la fecha de compra.

B. Kaz se reserva todo derecho de reparación o sutstitución del presente producto si se constata que presenta un defecto de fábrica o mano de obra. Todo producto defectuoso debe devolverse al lugar donde lo compró y de acuerdo con la política de dicho comercio. Seguidamente, todo producto defectuoso cuya garantía esté en vigor, podrá ser devuelto a Kaz.

C. Esta garantía no cubre los daños ocasionados por tentativas de reparación no autorizadas o por el uso no conforme con el presente manual.

D. Para devolver un producto defectuoso a Kaz Home Environment, adjunte una descripción breve del problema junto con una prueba de compra y un cheque o giro postal de 10,00 $ US o 15,50 $ CAN para los gastos de manutención, embalaje de vuelta y reenvío. Indique su nombre, dirección y un número de teléfono donde podamos localizarle durante el día. Los gastos de envío deben pagarse por adelantado. Enviar a:

**Para Estados Unidos :**
Kaz Home Environment
Attn: Returns Department
4755 Southpoint Drive
Memphis, TN 38118
USA

**Para Canadá :**
Attn: Returns Department
510 Bronte Street South
Milton, ON L9T 2X6
Canada

**patente pendiente**



© 2003 Kaz, Inc. Tous droits réservé.
P/N: 035-04007-000, Rev 1
Artwork: 043-01271-000

OMB Number: 2900-0260
Estimated Burden: 2 minutes

**Department of Veterans Affairs**

# REQUEST FOR AND AUTHORIZATION TO RELEASE MEDICAL RECORDS OR HEALTH INFORMATION

**Privacy Act and Paperwork Reduction Act Information:** The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164, 5 U.S.C. 552a, and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including Social Security Number (SSN) (the SSN will be used to locate records for release) is not furnished completely and accurately, Department of Veterans Affairs will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization. VA may disclose the information that you put on the form as permitted by law. VA may make a "routine use" disclosure of the information as outlined in the Privacy Act systems of records notices identified as 24VA19 "Patient Medical Record - VA" and in accordance with the VHA Notice of Privacy Practices. You do not have to provide the information to VA, but if you don't, VA will be unable to process your request and serve your medical needs. Failure to furnish the information will not have any affect on any other benefits to which you may be entitled. If you provide VA your Social Security Number, VA will use it to administer your VA benefits. VA may also use this information to identify veterans and persons claiming or receiving VA benefits and their records, and for other purposes authorized or required by law. The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB number. We anticipate that the time expended by all individuals who must complete this form will average 2 minutes. This includes the time it will take to read instructions, gather the necessary facts and fill out the form.

**ENTER BELOW THE PATIENT'S NAME AND SOCIAL SECURITY NUMBER IF THE PATIENT DATA CARD IMPRINT IS NOT USED.**

TO: DEPARTMENT OF VETERANS AFFAIRS (Print or type name and address of health care facility)

PATIENT NAME (Last, First, Middle Initial): Aileen Mullin

SOCIAL SECURITY NUMBER: N/A

NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

John Henley, EEO Investigator, Southeastern Operations, Office of Resolution Management
140 Fountain Parkway, Suite 620

**VETERAN'S REQUEST:** I request and authorize Department of Veterans Affairs to release the information specified below to the organization, or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ DRUG ABUSE ☐ ALCOHOLISM OR ALCOHOL ABUSE ☐ TESTING FOR OR INFECTION WITH HUMAN IMMUNODEFICIENCY VIRUS (HIV) ☐ SICKLE CELL ANEMIA

INFORMATION REQUESTED (Check applicable box(es) and state the extent or nature of the information to be disclosed, giving the dates or approximate dates covered by each)

☐ COPY OF HOSPITAL SUMMARY ☐ COPY OF OUTPATIENT TREATMENT NOTE(S) ☒ OTHER (Specify)

Medical Documentation to support disability for EEO investigation

PURPOSE(S) OR NEED FOR WHICH THE INFORMATION IS TO BE USED BY INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

To support disability for EEO investigation

**NOTE: ADDITIONAL ITEMS OF INFORMATION DESIRED MAY BE LISTED ON THE BACK OF THIS FORM**

**AUTHORIZATION:** I certify that this request has been made freely, voluntarily and without coercion and that the information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization, in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation is effective upon receipt by the Release of Information Unit at the facility housing the records. Redisclosure of my medical records by those receiving the above authorized information may be accomplished without my further written authorization and may no longer be protected. Without my express revocation, the authorization will automatically expire: (1) upon satisfaction of the need for disclosure; (2) on ______ (date supplied by patient); (3) under the following condition(s):

**I understand that the VA health care practitioner's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.**

| DATE | SIGNATURE OF PATIENT OR PERSON AUTHORIZED TO SIGN FOR PATIENT (Attach authority to sign, e.g., POA) |
|---|---|
| | |

**FOR VA USE ONLY**

| IMPRINT PATIENT DATA CARD (or enter Name, Address, Social Security Number) | TYPE AND EXTENT OF MATERIAL RELEASED | |
|---|---|---|
| | DATE RELEASED | RELEASED BY |

VA FORM MAY 2005 **10-5345**

USE EXISTING STOCK OF VA FORM 10-5345, DATED NOV 2004.

**Moore, Cynthia, VBASPT**

**From:** Adams, Thomas J., VBAJAX
**Sent:** Friday, August 31, 2012 9:16 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT; Moore, Cynthia, VBASPT
**Subject:** eQIP Investigation - Aileen
**Signed By:** Thomas.Adams3@va.gov

August 31, 2012

Aileen Mullin,

1. VA policy established that all individuals whose duties require physical or logical access to VA facilities, information systems, and data repositories must possess a PIV Badge. As a result of the mandate, your duties as a Rating Veterans Service Representative require you to complete a background investigation.

2. The background investigation questionnaire is completed online. To continue with the process, please go to this web site http://www.opm.gov/e-qip and click on the Enter e-QIP Applicant Site button, and follow the instructions. When you click the above button your computer will test the compatibility of your configuration. Instructions are on the page for the TLS problem you may encounter. Additionally, if you get through the e-QIP setup and **can** see your three golden questions but cannot log on, please call the security office representative identified at the bottom of the page.

3. Please complete this process within **10 days** of initiation. **If e-QIP's suspense for "Initiated Untouched by Applicant" is not met, OPM will automatically cancel your investigation.** Additionally, the Chief of Human Resources or Human Resources Liaison will be notified that the requirements of EO 12968 or EO 10450 and VA directives have not been met.

*********************************************** NOTE ***************************************************

4. **During the Release Investigation Request process please disregard STEP 3. Do *not* upload or Fax any documents into e-QIP.**

5. If you need access to your Selective Service Registration Number, use this link.
   https://www.sss.gov/regVer/wfVerification.aspx

6. Contact your local HR Liaison for finger prints instructions.

7. **After completing the e-QIP process**, you will need to print, sign and submit your signature pages to **HRC Jackson /E-QIP Specialist via Fax (601-368-4907) or Email**. Deliver your original completed forms to your Regional Office's Human Resources Liaison. They will ensure that the originals get mailed to our location.

8. If you are encountering difficulty logging on to e-QIP, it is likely you need to adjust your security settings within Internet Explorer. Under Internet Options, Advanced, you need to make sure the "use TLS 1.0" box is checked.

If you need any assistance please contact your **HR Liaison** or **HRC Jackson /E-QIP Specialists** at 601-364-7239 or 7281.

Thanks,

**Thomas J. Adams**
**e-QIP Specialist**
Dept. of Veterans Affairs
Veterans Benefit Administration - Human Resources Center
1600 E. Woodrow Wilson Ave. 3rd Floor
Jackson, MS 39216
Phone (601) 364-7239; Fax (601) 368-4907
thomas.adams3@va.gov

**Moore, Cynthia, VBASPT**

| | |
|---|---|
| **From:** | Riggs, Scotty, VBAJAX |
| **Sent:** | Monday, September 10, 2012 10:09 AM |
| **To:** | Mullin, Aileen, VBASPT |
| **Cc:** | Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT; Moore, Cynthia, VBASPT |
| **Subject:** | Investigation Request |
| **Signed By:** | scotty.riggs@va.gov |

Mrs. Mullin,

Information in e-QIP reflects you have not touched your investigation since you were initiated on **August 31, 2012**. You had five days after being initiated into e-QIP to complete your investigation. As you can see, you are late.

A security investigation is required in the Federal government and is a condition of employment.

You must complete your investigation as soon as possible, **but no later than Wednesday, September 12, 2012.**

You can access e-QIP at http:/www.opm.gov/e-QIP.

If you need any assistance please contact your **HR Liaison** or **HRC Jackson /E-QIP Specialists** at 601-364-7239 or 7281.

Thanks.

Scotty Riggs
HR Specialist (E-QIP)
Veterans Benefit Administration
1600 E. Woodrow Wilson Ave. 3rd Floor
Jackson, MS 39216
(601) 364-7281- Phone
(601) 368-4907- Fax

**Moore, Cynthia, VBASPT**

| | |
|---|---|
| **From:** | Riggs, Scotty, VBAJAX |
| **Sent:** | Thursday, September 13, 2012 10:37 AM |
| **To:** | Mullin, Aileen, VBASPT; am0303@hotmail.com |
| **Cc:** | Works, Philip, VBASPT; Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT; Moore, Cynthia, VBASPT; Caro, Ganay, VBASPT |
| **Subject:** | Investigation request |
| **Signed By:** | scotty.riggs@va.gov |

Mrs. Mullin,

**2nd Request**

Information in e-QIP reflects you have not touched your investigation since you were initiated on **August 31, 2012**. You had five days after being initiated into e-QIP to complete your investigation. As you can see, you are late.

A security investigation is required in the Federal government and is a condition of employment.

You must complete your investigation as soon as possible, **but no later than Friday, September 14, 2012.**

You can access e-QIP at http:/www.opm.gov/e-QIP.

If you need any assistance please contact your **HR Liaison** or **HRC Jackson /E-QIP Specialists** at 601-364-7239 or 7281.

Thanks.

Scotty Riggs
HR Specialist (E-QIP)
Veterans Benefit Administration
1600 E. Woodrow Wilson Ave. 3rd Floor
Jackson, MS 39216
(601) 364-7281- Phone
(601) 368-4907- Fax

**Moore, Cynthia, VBASPT**

| | |
|---|---|
| **From:** | Aileen Mullin <am0303@hotmail.com> |
| **Sent:** | Thursday, September 13, 2012 11:52 AM |
| **To:** | Riggs, Scotty, VBAJAX; Mullin, Aileen, VBASPT |
| **Cc:** | Works, Philip, VBASPT; Clarke, Tamanique, VBASPT; Lopez, Virginia, VBASPT; Moore, Cynthia, VBASPT; Reilly, Valorie, VBASPT; keith.pryor@va.gov; Smith, John, VBASPT; Crump, Casey, VBASPT; sandra.l.smith@va.gov; Huffman, Jerry, VBASPT; Aileen Mullin; kellee@afge.org; McBurrough, Ulyssee, VBASPT; Smith, Theodore, VBASPT |
| **Subject:** | RE: Investigation request |

Dear Mr. Riggs,

Per our conversation, I have breast cancer and have been on continuous medical leave since the 20th of June. I didn't receive notification that the investigation had been initiated, and have no record of receiving a 1st request from your office.

Also please know that the manager of Human Resources and, at a minimum, two of the employees listed in your "cc:" are aware of the fact that I have cancer, and have been on medical leave.

Thank your for your consideration,

Respectfully,

Aileen Mullin

---

Subject: Investigation request
Date: Thu, 13 Sep 2012 10:36:49 -0400
From: Scotty.Riggs@va.gov
To: Aileen.Mullin@va.gov; am(
CC: Philip.Works2@va.gov; Tamanique.Clarke2@va.gov; virginia.lopez@va.gov; Cynthia.M.Moore@va.gov; Ganay.Caro@va.gov

Mrs. Mullin,
**2nd Request**
Information in e-QIP reflects you have not touched your investigation since you were initiated on **August 31, 2012**. You had five days after being initiated into e-QIP to complete your investigation. As you can see, you are late.
A security investigation is required in the Federal government and is a condition of employment.
You must complete your investigation as soon as possible, **but no later than Friday, September 14, 2012**.
You can access e-QIP at http:/www.opm.gov/e-QIP.
If you need any assistance please contact your **HR Liaison** or **HRC Jackson /E-QIP Specialists** at 601-364-7239 or 7281.
Thanks.
Scotty Riggs
HR Specialist (E-QIP)
Veterans Benefit Administration
1600 E. Woodrow Wilson Ave. 3rd Floor
Jackson, MS 39216
(601) 364-7281- Phone
(601) 368-4907- Fax

**Moore, Cynthia, VBASPT**

| | |
|---|---|
| **From:** | Adams, Thomas J., VBAJAX |
| **Sent:** | Monday, October 15, 2012 9:45 AM |
| **To:** | Mullin, Aileen, VBASPT |
| **Cc:** | Caro, Ganay, VBASPT; Clarke, Tamanique, VBASPT; Moore, Cynthia, VBASPT |
| **Subject:** | OPM Request For Information - Aileen |
| **Signed By:** | thomas.adams3@va.gov |

October 15, 2012

Aileen Mullin

OPM is requesting the following information. Please provide as soon as possible but no later than *Monday, October 15, 2012*.

1. Please provide the "**Full Name Given At Birth**".

Thanks,

**Thomas J. Adams**
**Human Resources Specialist (e-QIP)**
Dept. of Veterans Affairs
Veterans Benefit Administration - Human Resources Center
1600 E. Woodrow Wilson Ave. 3rd Floor
Jackson, MS 39216
Phone (601) 364-7239; Fax (601) 368-4907
thomas.adams3@va.gov

# ARTICLE 20 - TELEWORK

## Section 1 - General

A. The Department and the Union jointly recognize the mutual benefits of a flexible workplace program to the Department and its employees. Balancing work and family responsibilities, assistance to the elderly or disabled employees, and meeting environmental, financial, and commuting concerns are among its advantages. In recognizing these benefits, both parties also acknowledge the needs of the Department to accomplish its mission. The primary intent of the telework program is to support the mission of the Department in an alternative work setting. Telework must not be used as an alternative to or in lieu of dependent care. Employees who telework will be permitted to take care of personal matters in the same way as employees who do not telecommute. The Department Telework Program will be governed by applicable law, government-wide rules and regulations, VA Directives and Handbooks, and this article.

B. Any Telework Program established under this article will be a voluntary program which permits employees to work at home or at other approved sites away from the office for all or a part of the workweek.

C. The parties agree that employees participating in telework are performing the same duties as their counterparts working at VA facilities. In the interest of fairness and equity, employees shall not be disadvantaged on their performance expectations because of their participation in telework. The Department shall use the same measurements of work for employees who are on telework as are used for those employees who perform those same tasks at their Official Duty Station (ODS).

## Section 2 - Definitions

A. Telework

The terms "telework" and "telecommuting" are synonymous and include working at home or in satellite office sites or other approved telework work sites.

B. Alternate Duty Station (ADS)

A worksite other than the employee's official duty station, such as employee's residence (defined as a specific room or area within an employee's primary residence), a telecommuting center, a facility established by state, local, or county governments, private sector organizations for use by teleworkers, or an established satellite location including other VA facilities. The alternative worksite must be mutually agreeable to the employee and their supervisor.

C. Official Duty Station (ODS)

A telecommuting employee's official duty station continues to be the permanent duty station. Generally, the official worksite for an employee covered by a telework agreement is the location of the regular worksite for the employee's position (that is, the place where the employee would normally work absent a telework agreement), as long as the employee is scheduled to report physically at least twice a pay period on a regular and recurring basis to that regular worksite. Employees should refer to 5 CFR 531.605 for application of special situations.

D. Telework Center

The Department satellite facility that the General Services Administration (GSA) establishes to provide federal employees an opportunity to work at an alternative location that is geographically convenient to the employee's residence. The space at the telework center is owned or leased by one or more federal agencies.

E. Regular and Recurring Telework

Regular and recurring telework means the employee works at an ADS on a regularly scheduled basis (for example, one or more days per week, the second Wednesday of each pay period, Tuesday afternoon, two hours per day, etc.), at a home, a telework center, or other offsite location.

F. Short-Term or Temporary Telework

Short-term or temporary telework is when an employee is prevented from reporting to the regular worksite due to an injury, recuperation from surgery, etc., for short periods of time (usually no more than three to six months). Employees participating in this type of telework may work full-time or may combine part-time work with leave use depending on the circumstances of the individual and the portability/availability of work at the alternative site.

G. Periodic or Intermittent Telework

Periodic or intermittent telework is ad-hoc in nature and can be used when a project or assignment requires intense concentration or weather conditions are unfavorable.

**Section 3 - Criteria**

If employees meet the criteria for telework, the Department may approve their participation in telework arrangements in accordance with applicable law and this article. Department officials are responsible for determining which positions are appropriate for telework arrangements, consistent with labor

relations obligations. The guidelines for approving telework arrangements are based on, but not limited to, the following:

A. Work activities to be performed at an ADS must be portable (may be performed away from the traditional worksite, either in whole or in part, and can be evaluated by the supervisor);

B. The position's contact with other employees, the supervisor or manager, and serviced clientele is predictable and normally scheduled and can otherwise be accomplished via telephone or videoconferencing;

C. The technology needed to perform work offsite must be available;

D. Employees may be linked electronically to the traditional office location by computer or may simply take work to the ADS, requiring no computer;

E. Privacy Act materials, evidence, or sensitive documents (hard copy or electronic) may be accessed remotely, provided the employee agrees to protect government/VA records from unauthorized disclosure or damage and will comply with the requirements of the Privacy Act and all other applicable federal laws and government-wide regulations and other applicable VA Policies and Directives;

F. The employee volunteered (or concurred with the supervisor's recommendation) to perform work at the ADS;

G. An employee has a "fully successful" (or equivalent) performance appraisal. If the employee has worked more than 12 months and does not have an appraisal, they shall be assumed to be "Fully Successful" for purposes of telework;

H. The employee must have a telephone, workspace suitable to perform work, utilities adequate for installing equipment, and space that is free from interruptions and provides reasonable security and protection for government property;

I. The employee is willing to sign and abide by the Telework Program Agreement concerning participation in the Telework Program.

## Section 4 - Furniture and Equipment

A. Employees participating in the Telework Program will be provided equipment necessary to perform their duties, consistent with the telework proposal, VA Form 0740a (Oct 2008) and the Alternative Workplace Telework Agreement.

B. The Department will allow each employee on telework to use an assigned Department computer at the employee's ADS. If an employee prefers to use a personal computer, or if a portable computer is unavailable, the Department will load and maintain all software to the personal computer

that is necessary for accomplishing the job. A phone line and portable computer will be provided.

C. Any time the Department gives up space or otherwise downsizes the office, any excess equipment or furniture may be made available to employees in this program, subject to the limitations of Paragraph A above. Agreements between the local union and the facility will address how the equipment will be assigned.

## Section 5 - Telework Program Agreement

A. Prior to participating in the Telework Program, employees will be required to complete, on a one-time basis, a Telework Program Agreement that has been negotiated between the Department and the local union. A new Telework Program Agreement must be completed if significant changes occur (e.g., change in ADS address/location, change in supervisor, and/or change in official duty station). Continued participation in telework shall be subject to periodic review by the supervisor for compliance with the requirements of this article.

B. The Agreement documents a commitment by the employee and the supervisor to abide by the applicable guidelines and must be in place before the employee begins working at an alternative worksite.

C. Participants may be permitted to work at home or other telework worksites full days or a portion of a day.

D. At a minimum, Telework Agreements must contain the following:

1. ADS location such as the employee's home address or the address of the telecenter;

2. The location of the ADS must be of mutual agreement to the employee and the Department;

3. A telework schedule which identifies the days the employee will work each week, pay period, or month. For intermittent arrangements, the agreement should prescribe the procedures that will be used for approval of specifically requested days to be worked at the ADS. Agreements for short term/temporary use should identify the time period (from/to date), number of days, and hours per week or pay period during which work will be performed;

4. Procedures for administrative processes such as leave approval from the ADS, time and attendance reporting, weather dismissal time and attendance, etc.;

5. Privacy Act/security provision;

6. Description of the work to be performed at the alternative worksite that can include specific duties or projects to be completed and any deadlines for delivery that may apply;

7. Any procedures required for work processes such as a requirement to submit progress reports, submission, and review of completed work, participation in meetings, conference calls, etc.; and,

8. The duration of the employee's participation.

E. Teleworkers must complete and sign the Telework Self-Certification Safety Checklist (VA- 0740b) certifying that the ADS is safe and that all requirements to do official work at home are met. The employee agrees to permit inspections by representatives of the Department, as required, during normal working hours to insure proper maintenance of any government-owned property and conformance with safety standards. The employee will be provided advance notice of any inspection. The local union has the right to be present at the inspection. The date of the safety inspection will be coordinated between the safety inspector and the employee within five days of the day that the inspection has been determined to be needed. The date of this inspection will be provided to the local union.

**Section 6 - Hours of Work and Leave**

A. Employees performing work at the alternate worksite will follow established procedures for requesting and obtaining approval of leave, consistent with Article 35 - Time and Leave of this Agreement.

B. Employees performing work at the alternate worksite are subject to the same maximum workday limits as they would be if they were performing work at their official duty station, consistent with Article 21 - Hours of Work and Overtime of this Agreement.

C. The number of days each week, pay period, or month an employee will work at an alternative worksite will vary depending on the individual arrangement made between the employee and the supervisor. Employees may work as few as one day per month or as many as five days per week for full time telework.

D. Employees on duty shall be available to participate in regular staff meetings and other meetings necessary to the accomplishment of work; have direct interaction with the supervisor, coworkers, and customers; and access equipment, files, and reference materials not available at the ADS. Supervisors will consider deviations from this requirement to include such circumstances as accommodating physical disabilities, recovery from illness or injury, field work, etc.

E. With supervisory approval, employees may choose to change their scheduled work hours, or change to or from an Alternative Work Schedule. For example, an employee may begin their work at an earlier time when working from home since no time is spent commuting to the worksite.

## Section 7 - Pay Issues

A. An employee's pay will not be negatively impacted solely by the employee's decision to telework. Overtime pay, premium pay, special salary rate, and other entitlements continue while the employee telecommutes as long as the employee remains eligible under Federal pay laws/authorities for overtime pay, premium pay, special salary rates, and other entitlements. Employees will be notified by the Department prior to accepting telework of any consequences to their pay entitlements that will result from telework.

B. The governing rules, regulations, and policies concerning attendance, leave, and overtime are unchanged by participation in telework. Hours of duty must be addressed in telework agreements. Employees will be compensated for overtime or night work performed with approval in advance.

C. To claim expenses related to the business use of part of the employee's home, the employee must meet specific requirements as found in the appropriate Internal Revenue Service's publications, currently IRS Publications 17 and 587. It is advisable to consult a tax advisor to see if a deduction might be available.

## Section 8 - Position Descriptions and Performance Standards

A. Telecommuting will seldom require changes in position descriptions, but may affect factors such as supervisory controls or work environment. An employee is not relieved of and is expected to meet the performance standards established for their position at the official duty station.

B. When there are no employees performing similar tasks at the ODS, the performance standards for telecommuting employees should be results-oriented and should describe the quantity and quality of expected work products and the method of evaluation.

## Section 9 - Temporary Recall from ADS

A. Employees who are on duty may be required to report to their ODS for previously scheduled training, conferences, other meetings, or to perform work on a short term basis that cannot otherwise be performed at the ADS or accomplished via telephone or other reasonable alternative methods.

B. Employees may also be required to report to their ODS for valid operational needs to perform agency work which cannot otherwise be performed on another workday, at the ADS, via telephone, or other reasonable alternative methods. In such cases, employees will be provided reasonable advance notice and be provided a reasonable time to report. Employees should make every effort to report as soon as possible.

C. When requiring an employee to report on short notice, the employee's needs will be considered along with the reason for the change in work location.

**Section 10 - Requests to Telework**

The employee will submit a standard request form, Telework Proposal (VA-0740a) for their assignment to be performed at the ADS. The request will describe the duties to be performed and the specific day(s) involved. The request will be submitted to the Department for approval. The Department will document approval or denial of the request as soon as possible. Employees must make the request to work at the ADS at least one workday in advance; however, this time frame may be waived at the discretion of the Department. If the assignment is initiated by the Department, and the employee concurs, the employee is still responsible for submitting a Telework Program Work Assignment Request (VA-0870a) in addition to signing the Telework Program Agreement described in Section 5 of this article.

**Section 11 - Removal from Program**

A. The Department may remove an employee from the Telework Program based on the employee's failure to adhere to the requirements specified in the Telework Program Agreement and/or a decline in overall performance below the fully successful level. Normally, employees will not be removed from participation for single, minor infractions of Telework Program requirements. Supervisors will counsel employees about specific problems before effecting removal. The counseling will be confirmed in writing. When a decision is made to remove an employee from the Telework Program, the employee must be given written notice indicating the reason(s) for removal. The employee may reapply for Telework Program participation 30 calendar days after removal from the program, provided that his/her performance is at least fully successful.

B. Any time an employee believes they need to permanently or temporarily return to work in the ODS, the employee will normally provide the Department with 30 calendar days notice of the needed change, except in emergency situations. The Department will make reasonable efforts to accommodate the employee's needs. Employees returning to the ODS in these circumstances must recognize that the equipment and workstations that are made available

by the Department may not immediately be the same as the ones they had prior to participating in the Telework Program. The Department is expected to provide the employee a complete work area equal or similar to that of others in their occupation in their assigned work area within a reasonable timeframe.

## Section 12 - Problems Affecting Work Performance

Employees will promptly inform supervisors whenever any problems arise which adversely affect their ability to perform work at the ADS. Examples could include situations such as equipment failure, power outages, telecommunications difficulties, etc.

## Section 13 - Emergency Closing/Group Dismissal

A. A telecommuting employee will sometimes, but not always, be affected by an emergency requiring the main office to close. When both the main office and the ADS are affected by a widespread emergency, the Department should grant the telecommuting employee excused absence as appropriate.

B. When an emergency affects only the ADS for a major portion of the workday, the Department can require the telecommuting employee to report to the main office, approve annual leave or leave without pay, or authorize an excused absence.

C. The telework site may be unaffected by emergencies that lead to closings and dismissals at the ODS. If work can proceed at an ADS, then the employee may not be excused from duty just because other employees elsewhere have been dismissed or excused from reporting.

## Section 14 - Telecommuting Centers

The parties agree to discuss the feasibility of telecommuting centers.

## Section 15 - Emergency Situations

In the event of a local emergency situation such as a transit strike or a natural disaster which adversely affects an employee's ability to commute to the workplace, the parties agree to immediately discuss possible temporary telework arrangements for affected employee(s).

## Section 16 - Evaluation of Program

The parties agree to meet six months after the implementation of this Agreement to assess any concerns relevant to employees working at their residence such as availability of laptop computers.

## Section 17 - Union Notification

The local union will be notified when employees are placed on telework and taken off telework.

## Section 18 - Local Telework Negotiations

Upon the effective date of this Agreement, the local parties may begin negotiations over the following issues:

A. Application and selection procedures for participation in the telework and the alternative work schedule and compressed work schedule. These procedures may include, but are not limited to, issues such as negotiating procedures for breaking ties if the number of applicants exceeds the number of opportunities available;

B. Methods for resolving conflicting employee requests for specific work at home schedules;

C. Methods for rewarding increased productivity of telecommuters;

D. Procedures for disbursing excess equipment or furniture;

E. Determining the eligibility of other positions, if any, for telework, alternative work schedules, and compressed work schedules that are not listed as currently eligible for telework;

F. Determining the feasibility of establishing a local telework committee for oversight of telework; and,

G. Any other issues affecting the bargaining unit not otherwise covered in this Article.

## Section 19 - Grandfather Clause

On the effective date of this Agreement, employees currently working at an ADS are not required to reapply for telework.

# SEPARATOR

# PAGE

# ARTICLE 24 - OFFICIAL RECORDS

## Section 1 - Official Records and Files

No personnel record may be collected, maintained, or retained except in accordance with law, government-wide regulations, Department regulations, and this Agreement or its Supplements. All personnel records are confidential and shall be known or viewed by officials only with a legitimate need to know for the performance of their duties; they must be retained in a secure location. Employees shall be advised of the nature and purpose of their eOPF and its location.

## Section 2 - Access to Records

A. During normal duty hours, employees and/or their representative(s) designated in writing shall have the right to examine records personally identified to the employee (i.e., eOPF, EEO, evidence files, appeal and grievance records), PDs, and classification standards during normal duty hours. Employees, or their representative(s) designated in writing, may receive at no cost copies of personally identified records which have not been previously furnished. Additional copies will be provided; however, there may be a charge in accordance with the Department fee schedules in effect at the time of request.

B. Employees' access to their own medical records maintained by the Department may be refused only if, in the sole judgment of a health care professional, their disclosure would be harmful to the mental or physical health of the individual. In such cases, the medical record(s) may be released only to an employee's representative designated in writing. There may be instances where the Department health care official may encourage the release of medical information to another health care professional.

C. The employee shall have the right to prepare and enter a concise statement of disagreement with any document filed on the left (temporary) side of the eOPF. Nothing in this section shall negate an employee's right to grieve any matter.

D. Access to personnel records of the employee by the employee and/or the designated representative will be granted when requested if such records are maintained on the facility where the employee is located. If the records are not so maintained, the appropriate administrative office will immediately initiate action to obtain the records from their location within three working days of the request and make them available to the employee and/or designated representative.

## Section 3 - Outdated Records

A. All official personnel records shall be purged and information disposed of in accordance with appropriate records control schedules.

B. When eOPFs are purged, personal materials provided by the employee shall be returned to the employee (e.g., transcripts, certificates).

C. Each facility will maintain a system of follow-up to assure that any written counseling, disciplinary, or similar action with a time limit on it is removed on the proper date and returned to the employee.

D. If any outdated or unauthorized material is accidentally left in a file, it may not be used to support any personnel action detrimental to the employee.

## Section 4 - Supervisory Notes

A. Individual files on each employee not approved by the Department as an official system of records will not be kept by Department officials at any level.

B. Subject to Paragraph C of this section, if supervisors make a personal decision to keep notes on employees, the notes or files:

   1. Must be absolutely uncirculated and cannot be reviewed by anyone else (this includes secretaries, other supervisors, or Department officials); and,

   2. Must be maintained in secure fashion in order to prevent disclosure.

C. Supervisory notes may only be used to support any action detrimental to an employee if such note(s) have been shown to the employee at the earliest available time after the entry was made and a copy provided to the employee. Once an employee has received a copy of the supervisory note(s), the note(s) can be provided to an appropriate Department official with a legitimate need to know for the performance of their duties.

D. The time frames for retaining supervisory notes will be up to six months, unless used in a personnel action.

# SEPARATOR

# PAGE

# ARTICLE 29 - SAFETY, HEALTH, AND ENVIRONMENT

## Section 1 - General

A. The parties recognize that a safe and healthful work environment is valued by the Department; is necessary for the accomplishment of the Department's missions; and contributes to a high quality of life for the employees. It shall be the responsibility of the Department to establish and maintain an effective and comprehensive Occupational Safety and Health Program (Program) in accordance with Public Law 91-596, the Occupational Safety and Health Act of 1970 (referred to as the Act), Executive Order 12196, 29 CFR Part 1960 (and all its sub parts along with Directives and the VA Handbooks 7700 and 7700.1) and, 29 CFR 1904 (Occupational Safety and Health Administration (OSHA) Recordkeeping Provision for Federal Employees). In administering the program, the Department agrees to recognize the Union as the exclusive representative of bargaining unit employees. The Department shall furnish places and conditions of employment which are free of recognized hazards and unhealthful working conditions.

B. The Department will abate recognized hazards that are causing or are likely to cause death or serious harm and protect employees in the interim.

C. Specific procedures for preventing and abating safety and health hazards will be jointly developed with the Union through the National, Intermediate, and Local Safety committees.

## Section 2 - National Safety and Health Committee

The Union will have representation for each of the administrations that is a part of the Department Safety and Health Committee. Bargaining unit employees who spend time on the National Safety and Health Committees initiated by the Department in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement. The Department shall pay for all meeting related travel expenses as well as per diem. The parties shall exchange agenda items as far in advance as possible of the meeting so that travel and per diem may be arranged.

## Section 3 - Union Participation

A. The Union President will designate five National Safety and Health Representatives who will each be on 50% official time. They will work with the Department's national-level safety and health officials in developing and implementing the Program. The National Safety and

Health Representatives will represent the interests of the Union and the employees in the development and implementation of all aspects of the Department's and Administrations' occupational safety and health program. The National Safety and Health Representatives will be the points of contact for any safety and health initiatives at the Department, Administration, and/or System levels that impact employee safety and health. The parties will develop joint training programs and materials in safety and health for bargaining unit employees. The representatives will provide training and assistance to local unions in the performance of their responsibilities under the Program. The National Safety and Health Representatives may visit facilities within the bargaining unit to work with local unions on safety and health matters. Notice of such visits will be given to the Director of each facility.

B. The Department recognizes that Union participation in its Occupational Safety and Health Program is essential for the success of that Program. The Union may designate representatives at the facility level, intermediate levels, and the National level who will represent the interests of the Union and the employees in the development and implementation of this Program. The parties agree that work on the Safety and Health Program is a part of the ongoing Partnership between the Department and the Union. Time spent serving as a Union representative during safety and health inspections, as a member of a Safety and Health Committee or its subcommittees, developing plans for abatement of materials, investigating accidents, and safety-related committee assignments will be considered duty time.

C. The National Safety and Health Representatives will be given copies of all Designated Agency Safety and Health Official (DASHO) letters and other national-level communications to the field on safety and health matters as well as all safety manuals and publications. The DASHO written correspondence and reports will include the Department's goals and objectives annually for reducing and eliminating occupational accidents, injuries, and illnesses. The report should include the plans and procedures for evaluating VBA, NCA, and VHA occupational safety and health programs and their effectiveness at all operational levels.

D. The Department will pay tuition, travel, and per diem expenses for each National Safety and Health Representative to attend at least one conference each year.

E. The NVAC President may designate additional representatives to work on individual projects of mutual interest to the parties. The NVAC President may designate representatives at the National or appropriate intermediate levels within the Department to develop and implement the Safety and Health Program at that level.

F. The Union's National, Intermediate, and local union Safety and Health Representatives will be authorized the use of long distance communications and conference call capabilities.

G. Each local union at a bargaining unit facility may designate a local Safety and Health Representative who will serve as the local union's point of contact for safety and health matters at the facility. Functions of local Safety and Health Representatives include, but are not limited to the following:

1. Conduct joint inspections;

2. Issue joint reports regarding inspection findings to the appropriate Department official;

3. Participate, as appropriate, in inspections conducted by governmental authorities outside the Department's control including Joint Commission;

4. Receive and investigate employee reports of unsafe or unhealthy conditions (employees should submit such reports to both the local union's and Department's representatives);

5. Develop and monitor abatement plans needed to correct local conditions as appropriate (all personnel subject to the hazard shall be advised of the action and of the interim protective measure in effect and shall be kept informed of the subsequent progress on the abatement plan. To document receipt, the completed Abatement Plans will be jointly signed by the local union's Safety Representative and a representative from the Department);

6. Refer matters to Environmental Protection Agency (EPA), OSHA and/or National Institute for Occupational Safety and Health (NIOSH) as appropriate;

7. Receive copies of any written notice referred by a facility official in response to an employee report of an unsafe or unhealthy condition, in compliance with 29 CFR 1960 time limits;

8. Monitor preventive maintenance plans for Heating, Ventilating, and Air Conditioning (HVAC) system components;

9. Receive all reports of security incidents involving threats to employees, their offices, and property (such reports may be sanitized as appropriate);

10. Receive all accident reports (such reports may be sanitized as appropriate).

H. Each facility with 25 or more employees will have an Occupational Safety and Health and Fire Prevention Committee (Committee) in accordance with 29 CFR 1960 and all its subparts.

I. The local union will be afforded representatives on such Committees, the number of which is subject to local negotiation. The facility's Committee may establish subcommittees to address particular issues or subjects, and the local union will be represented on each subcommittee. The local union will be given the opportunity to have a representative on any other facility-level committee that relates to the safety and health issues of bargaining units. These will include, but not be limited to, Blood Borne Pathogens and Infection Control Committees.

J. The local union will be given the opportunity to participate in all scheduled workplace inspections which are intended to detect hazards to employee safety and health, whether conducted by Department Safety and Health personnel, non-Department employees acting on behalf of the Department, OSHA and EPA personnel, or other regulatory agencies and bodies.

**Section 4 - Standards**

A. The Department shall comply with Occupational Safety and Health Standards issued under Section 6 of the Act and/or where the Secretary of Labor has approved compliance with alternative standards in accordance with 29 CFR 1960 and all its sub-parts. The Department will notify the Union in accordance with Article 47 - Mid-Term Bargaining, prior to the submission of any alternate standards to the Secretary of Labor. On a case-by-case basis, the parties shall adopt more stringent safety and/or health standards to address specific concerns.

B. Personal Protective Equipment (PPE), as required by appropriate OSHA standards to protect employees from hazardous conditions encountered during the performance of their official duties will be provided and replaced as necessary at no cost to employees required to wear specific PPE. Employees who are exposed to the hazards of outdoor environments, such as heat or extreme cold weather, will be provided appropriate PPE to OSHA recommendations. Some commonly needed types of PPE include, but are not limited to: safety glasses; steel-toed safety shoes/boots; SPF lotion; etc. Hazard assessments to determine the need for PPE will be conducted by each facility for each workplace. These assessments will also evaluate the need for and feasibility of engineering controls or other devices designed to reduce workplace injuries and illnesses or eliminate the need for PPE. These assessments will be documented and a copy provided to the local union. When assessments determine the appropriateness of PPE, affected employees will have the opportunity to choose from available and

appropriate styles and sizes to optimize employee comfort and protection. Employees will receive training on the proper use and care of PPE.

C. Consistent with 5 CFR 1910.132, the Department shall provide training to those employees who are required by this section to use PPE and shall certify in writing that the training was provided.

D. Nothing in this section precludes local level negotiations.

**Section 5 - Report, Evaluation, and Abatement of Unsafe and Unhealthful Working Conditions**

A. Any employee, group of employees, or representatives of employees who believe that an unsafe or unhealthful working condition exists in any workplace has the right to report such condition to the appropriate supervisor, the facility director, the appropriate Department Safety and Health official, and the Union. In the case of immediate threat to life or danger of serious physical harm, the employee shall immediately report the situation to the supervisor and/or facility Safety and Health personnel.

B. Facility Safety and Health personnel and local safety representatives will evaluate employee reports of unsafe or unhealthful working conditions in accordance with 29 CFR 1960. The local union will be formally notified of all hazards as defined in 29 CFR 1960.

C. The Department agrees to ensure prompt abatement of unsafe and unhealthful working conditions.

D. If there is an emergency situation in an office or work area, the first concern is for the employees and the public they serve. Should it become necessary to evacuate a building, the Department will take precautions to guarantee the safety of employees and the public. Individuals ordinarily will not be readmitted until it is determined in conjunction with whatever expert resources have been called in, depending on the circumstances, that there is no longer danger to the evacuated personnel. "Expert resources" may include, but are not limited to, local police departments, the Federal Protective Service, local fire departments, appropriate health authorities, etc. The local union Health and Safety Committee members or local union Health and Safety Representatives will be notified as soon as the Department becomes aware regarding the emergency situation.

E. In accordance with 29 CFR 1960, an abatement plan will be prepared if the abatement of an unsafe or unhealthy working condition will not be possible within 30 calendar days. Such plan shall contain a proposed timetable for the abatement and a summary of steps being taken in the interim to protect employees from being injured as a result of the unsafe or unhealthy working conditions.

F. When abatement action is dependent upon GSA or other lessors, the abatement must be prepared in conjunction with appropriate members of that group. The facility Health and Safety Committee will be timely notified and consulted, and all personnel subject to the hazard shall be advised of interim measures in effect and shall be kept informed of subsequent progress on the abatement plan.

G. Prior to the establishment of an official abatement plan, the Department shall take interim steps for the protection of the employees.

H. Any equipment, devices, structures, clothing, supplies, tools, or instruments that are found to be unsafe will be removed from service, locked-out, and/or tagged-out or rendered inoperative, as appropriate.

I. An employee and/or their representative submitting a report of unhealthful or unsafe conditions should be notified in writing within 15 days if the official receiving the report determines there are not reasonable grounds to believe such a hazard exists and does not plan to make an inspection based on such report. A copy of each such notification shall be provided by the Department to the appropriate certified safety and health committee, where established. The Department's inspection or investigation report, if any, shall be given to the employee and/or their representative 15 days after completion of the inspection, for safety violations, or within 30 days, for health violations, unless there are compelling reasons.

## Section 6 - Comprehensive Analysis of Injuries and Illnesses

A. The Department agrees that comprehensive analysis will be performed to determine causes and appropriate corrective actions concerning patterns of injuries and illnesses that occur at each facility. The analysis will examine such factors as: the general conditions under which the affected employee's job is performed; the processes and procedures involved in the performance of that job; and, any unusual factors that may have contributed to the injury or illness. Recommendations to correct the conditions that contributed to the injury or illness will be included in the written results of this analysis and presented to the facility safety committee.

B. Particular attention will be paid where patterns of injuries or illnesses are found in a given occupation, facility, or part of a facility. Experience in correcting hazards will be shared within the Department in an effort to find optimal ways of reducing injuries and illnesses.

C. The Department shall post a copy of its agency annual summary of federal occupational injuries and illnesses for a facility, as compiled pursuant to 29 CFR 1960.67 or 1960.69, at such facility, not later than 45 calendar days after the close of the fiscal year or otherwise disseminate a copy of the annual

summary for a facility in written form to all employees of the facility. Copies of the annual summary shall be posted for a minimum of 30 consecutive days in a conspicuous place or places in the facility where notices to employees are customarily posted. Where facility activities are physically dispersed, the notice may be posted at the location to which employees report each day. Where employees do not primarily work at or report to a single location, the notice may be posted at the location from which the employees operate to carry out their activities. Each federal agency shall take necessary steps to ensure that such summary is not altered, defaced, or covered by other material.

## Section 7 - Imminent Danger Situations

A. The term "imminent danger" means any conditions or practices in any workplace which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through normal procedures (29 CFR 1960.2(u)).

B. In the case of imminent danger situations, employees shall make reports by the most expeditious means available. Consistent with 29 USC 651 and 29 CFR Part 1960 the employee has a right to decline to perform his/her assigned tasks because of a reasonable belief that, under the circumstances, the task poses an imminent risk of death or serious bodily harm coupled with a reasonable belief that there is insufficient time to effectively seek corrective action through normal hazard reporting and abatement procedures. However, in these instances, the employee must report the situation to his supervisor or another supervisor who is immediately available.

C. If the condition can be corrected and the corrected condition does not pose an imminent danger, the employee must return to work. If the supervisor cannot correct the condition, the supervisor shall request an inspection by facility safety and/or health personnel.

D. A local union representative will be given the opportunity to be present during the inspection by the facility safety and/or health personnel. If facility safety and/or health personnel decide the condition does not pose an imminent danger, the instruction to return to work shall be in writing and contain a statement declaring the area or assignment to be safe. When this notification is given to the employee, the local union shall be notified in writing as well.

E. When the Department receives a report that a dangerous, unhealthful or potentially dangerous or unhealthful condition is present at a particular work site, the Department shall notify the Health and Safety Committee

and the local union Health and Safety representative(s) of the alleged dangerous or unhealthful condition.

**Section 8 - Training**

A. The Department shall provide safety and health training for employees, including specialized job safety training, appropriate to the work performed by the employee. This training will address the Department's and the facility's Occupational Safety and Health Program, with emphasis on the rights and responsibilities of employees.

B. The Department will provide basic and specialized safety and health training for Union Safety and Health Representatives. In accordance with applicable law and regulations, the Department shall provide training for all duties commensurate with the scope of the responsibilities.

C. The Union will participate in the development of safety and health training, including curriculum and training materials.

**Section 9 - Allegations of Reprisal**

The Department agrees there will be no restraint, interference, coercion, discrimination, or reprisal directed against an employee for filing a report of an unsafe or unhealthful working condition or for participating in Department Occupational Safety and Health Program activities or because of the exercise by an employee on behalf of him/herself or others, of any right afforded by Section 19 of the Occupational Safety and Health Act, Executive Order 12196, or 29 CFR 1960.

**Section 10 - Work-Related Injuries and Illnesses**

A. Employees must report any and all injuries that are work-related to their supervisor. The supervisor will take appropriate action to insure that:

   1. The employee has the opportunity to report to the Employee Health Physician or his/her personal physician for treatment, completion of necessary reports, etc.

   2. Appropriate facility personnel are promptly notified to ensure timely processing of necessary reports and employee claims. The Department agrees that assistance will be given to employees in preparing necessary forms and documents for submission to the Office of Workers' Compensation Programs (OWCP) and those employees will be informed of their rights under the Federal Employees' Compensation Act, as amended in 1974.

B. An employee who has sustained a work-related injury or illness will be required to perform duties only to the extent and limits as prescribed by

the treating physician or the Employee Health Physician, as appropriate. No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness. In the event that the employee's supervisor does not have limited duty that meets the physician's stated limitations for the employee, the supervisor will make a good faith effort to locate limited duty work within the facility that the employee can perform. If limited duty is not available, the employee will be placed on continuation of pay, if eligible, or in an appropriate leave status at the employee's option. The local union may suggest limited duty opportunities at the facility. The Union has the right to represent any unit employee at any stage of this procedure (see Article 19 - Fitness for Duty).

C. Within seven calendar days after receiving information of an occupational injury or illness, appropriate information concerning such injury or illness shall be entered on the log. The record shall be completed within seven calendar days after the receipt of information that an occupational injury or illness has occurred.

D. Qualified inspectors must have sufficient documented training/experience in recognizing the particular safety and/or health hazard that they are inspecting (note 29 CFR 1960.25). At the request of the local union, the Department will certify in writing, by reference to classes/ experience, that the inspector is sufficiently competent to recognize and evaluate the particular safety and/or health hazard that they are inspecting, and to suggest general abatement procedures.

**Section 11 - Use of Insecticides/Chemicals**

There will be no application of insecticides/chemicals during working hours. However, exceptions may be made in sensitive hospital areas. Such other chemicals include paint, carpet glue, HVAC cleaning agents, and similar construction or maintenance chemicals. Whenever pesticides are used in a large scale application, the Health and Safety representatives as well as employees will receive advance notice about the spraying. Individuals with special health needs will be reasonably accommodated.

**Section 12 - Leases**

A. Prior to occupancy by any employee of space occupied by the Department, the Department will provide the local union a copy of the pre-occupancy inspection to identify possible hazards or serious violations of OSHA standards. All leases will comply with 29 CFR 1960.34 and 41 CFR Part 102. Careful consideration should be made by the Department to avoid incompatible groupings, e.g., chemical or biological laboratories in office space.

B. Pursuant to 29 CFR 1960.30(d), when a hazard cannot be abated before occupancy, the local union and all employees subject to the hazard shall be advised of the preliminary abatement plan and of interim protective measures in effect, and shall be kept informed of subsequent progress on the abatement plan.

C. These provisions are not a waiver of the local union's right to request additional information, consultation, and bargaining.

**Section 13 - Temperature Conditions**

The parties recognize that temperature conditions in and around work areas can have a direct bearing on employees' health. As a part of an overall emergency contingency plan, supervisors who may have employees who are susceptible to heat or cold illness within their working environment will have a written plan for appropriate emergent cooling or heating procedures. The parties agree that the problem of temperature extremes, either hot or cold, and appropriate measures to reduce the risk of exposed employees are appropriate matters for referral to established Health and Safety Committees or to the local Health and Safety Representatives, consistent with the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) guidelines and preventive medical guidelines for emergency procedures.

**Section 14 - Asbestos**

A. The Department shall conduct an inspection in each facility to determine the existence of asbestos. Qualified inspectors will inspect the facility for asbestos under EPA standards for Hazardous Air Pollutants regulation.

B. The Department will review all construction and/or space modification contracts and/or work orders to determine if asbestos is present and, if so, how to proceed with appropriate removal or containment.

C. The Department will notify the local union prior to initiating procedures for asbestos removal.

D. Where it has been determined that asbestos exists in a facility, the Department will conduct periodic air sampling as appropriate.

E. If air sampling indicates that airborne concentrations of asbestos fibers exceeds regulatory levels, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive asbestos concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F. If the airborne asbestos concentration amounts are exceeded, the Department will insure abatement of the asbestos hazard pursuant to 29 CFR 1910.1001(f).

G. Once significant airborne asbestos particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

H. Union Health and Safety representatives will be given training on asbestos removal and permitted to monitor removal procedures.

I. Union Health and Safety Representatives will be given a copy of all tests monitoring asbestos levels.

J. Asbestos abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K. The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of asbestos fibers.

L. Asbestos and asbestos-contaminated material shall be collected and disposed of in accordance with appropriate EPA regulations.

M. The Department will institute a medical surveillance program for all employees substantively engaged in work involving asbestos for 30 or more days per year. Employees who are exposed to airborne asbestos fibers will receive medical monitoring.

N. The Department will make available medical examinations and consultations to each employee prior to assignment to an area containing asbestos which requires that negative pressure respirators be worn.

O. When an employee is assigned to an area where substantive asbestos exposure will exceed 30 or more days per year, a medical examination must be given within 10 working days following the 30th day of exposure.

P. The Department shall record all measurements taken to monitor employee exposure to asbestos including tremolite, anthophyllite, and actinolite. Such records shall be maintained for at least 30 years. The records will include information such as the date of measurement, the operation which caused exposure, the sampling method employed by the Department, the number, duration and results of the samples, type of protective devices worn, and name of the employee exposed.

Q. The Department will initiate a maintenance program in all facilities that contain asbestos. Such a maintenance program will include:

1. Inventory of all asbestos containing materials in a facility;

2. Periodic examinations of asbestos containing materials to detect deterioration;
3. Written procedures for handling asbestos materials;
4. Written procedures for asbestos disposal;
5. Written procedures for dealing with asbestos related emergencies;
6. Training of those required to handle asbestos containing material in safe handling procedures;
7. Training of all affected personnel in prohibited activities which would enhance dangerous exposure; and,
8. The Department must inform all affected employees regarding the standards contained within this section regarding asbestos.

Such information must be provided to each employee on a yearly basis and include instructions regarding safe asbestos handling. Also, access to information regarding exposure records and medical records must be provided on a yearly basis.

## Section 15 - Mold

A. The Department shall conduct an inspection in each facility to determine the existence of mold. Qualified inspectors will inspect the facility for mold under EPA standards for Hazardous Air Pollutants regulation.

B. The Department will review all construction and/or space modification contracts and/or work orders to determine if mold is present and, if so, how to proceed with appropriate removal or containment.

C. The Department will notify the local union prior to initiating procedures for mold removal.

D. Where it has been determined that mold exists in a facility, the Department will conduct periodic surface and air sampling as appropriate.

E. If surface or air sampling indicates that airborne concentrations of mold exceeds levels in the control sample, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive mold concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F. If the airborne or surface mold concentration amounts are exceeded, the Department will ensure abatement of the mold hazard.

G. Once significant airborne or surface mold particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

H. Union Health and Safety Representatives will be given training on mold removal and permitted to monitor removal procedures.

I. Union Health and Safety Representatives will be given a copy of all tests monitoring mold levels.

J. Mold abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K. The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of mold.

**Section 16 - Use of Respirators**

Situations requiring employees to wear respirators for safety shall be a subject for local bargaining which will include a process for respirator fit testing.

**Section 17 - On-site Security**

A. The Department shall protect employees from abusive and threatening occurrences and shall take reasonable precautions to ensure such protections.

B. The Department shall arrange for emergency protective assistance at each facility to enable employees to receive assistance if the situation requires it.

C. Whenever an employee is faced with a physically threatening situation, the Department shall provide appropriate assistance.

D. Employees shall not be required to divulge personally identifiable information to the public in individual circumstances where the employee reasonably believes harassment or physical abuse may result. In such cases, the employee should inform the supervisor in a timely manner.

E. The Department shall equip reception areas with appropriate security devices to ensure, to the maximum extent possible, employee safety.

F. All phones will be labeled with appropriate emergency numbers.

## Section 18 - Emergency Preparedness

A. Each facility shall have an emergency preparedness plan. This plan will publish the chain of command which will identify a member of the Department who will be physically present for employee direction during all scheduled work hours in each installation. The plan will also cover employee procedures in the event of fire, earthquake, bomb threat, tornado, flood, hurricane, weapons of mass destruction, or similar emergency or nationally declared emergencies. Evacuation drills will be conducted quarterly.

B. The Department agrees to make reasonable efforts to assure that each installation has adequate personnel available to administer Cardio-Pulmonary Resuscitation (CPR). All clinical personnel and other employees required to respond to code calls will become familiar with all work site locations within the facility.

1. The Department will provide CPR shields and masks for those employees administering CPR.

2. Training for CPR certification and/or recertification will be at no cost to the employees.

C. The Department agrees that the first concern when an employee is injured on the job is to make certain that the employee gets prompt emergency medical treatment. Doubts over whether medical attention is necessary will be resolved in favor of arranging medical treatment.

D. When it is necessary to assist an employee to return home because of illness or incapacitation or to provide transportation to a medical facility, the Department will arrange for transportation. If a co-worker is required to transport the employee, there will be no charge to leave for the co-worker.

E. The Department agrees to maintain adequate first aid supplies at each permanent installation. All employees will have reasonable access to these supplies.

## Section 19 - Smoking Cessation Program

A. The parties agree that they will intensify efforts to assist those employees who are interested in breaking the smoking habit. The parties are committed to making cessation programs available to each and every employee who wishes to participate in them. The mechanics of the programs are an appropriate subject for local bargaining. Programs will include or be similar to programs conducted by the American Lung Association or the American Heart Association.

B. Employees who wish to stop smoking but who are unable to successfully complete a smoking cessation program, or who have quit smoking but are

experiencing related difficulties, may seek additional assistance through the EAP. Employee participation in assistance or cessation programs is strictly voluntary.

**Section 20 - Video Display Terminals - Ergonomic Environment**

Video Display Terminal (VDT) refers to a computer-like terminal which displays information on a television-like screen.

A. The policy of the Department is to provide safe and healthful workplaces for all employees. In keeping with the policy, the Department acknowledges that there are certain ergonomic and environmental factors that can contribute to the health and comfort of VDT users. These factors involve the proper design of work stations and the education of managers, supervisors, and employees about the ergonomic job design and organizational solutions to VDT problems as recommended in various studies published by the NIOSH.

B. The Department agrees that employees should be provided information about ergonomic hazards and how to prevent ergonomically-related injuries. This information could be provided by OSHA Safety and Health Guidelines and other available literature. The Department agrees to provide, to the maximum extent possible, workstations and equipment (chairs, tables, workstations, lighting, keyboards, screens, and printers, etc.) that meet ergonomic design criteria. It is also agreed that when equipment is purchased, to the extent possible, training should be provided by a vendor on how to safely and properly operate that equipment.

C. The Department will achieve this by:

1. Purchasing, using, and maintaining VDTs in a safe manner;

2. Providing accessory equipment, to include, but not limited to, keyboards, worktables, chairs that are height-adjustable and provide proper back support, foot rests, wrist rests, document holder, glare screens, and other ergonomic equipment;

3. The national parties agree to the process below for the purchase of furniture and office equipment to address individual requests for workstation modification. Options:

    a. Negotiate using a locally-developed, mutually-agreed process;

    b. Negotiate on a case-by-case basis; or,

    c. Use the Alternative below;

    Alternative:

    1) The employee will be given an ergonomic assessment, which will identify the employee's needs and the available modifications;

2) The employee will be provided a list of available furniture/equipment;

3) The employee and a representative of the local union will meet with a Department official to discuss and decide on the employee's choice from among the available options;

4) The employee's choice will be selected if it is reasonable, considering all the circumstances.

The local parties also may agree to use the above procedure for furniture or equipment that is to be provided to a group of employees.

d. Seeking and acquiring information and technical assistance, as needed, from appropriate resources on methods for most effectively designing VDT work station layouts;

e. Laying out workspaces that are properly illuminated to reduce glare and ensure visual comfort to VDT users while providing adequate lighting for traditional clerical tasks;

f. Educating employees about the proper and safe operations of VDTs, including the value of interspersing prolonged periods of VDT use with other work tasks requiring less intensive visual concentration;

g. Where there are prolonged periods of VDT use and no other work tasks available, those employees shall be given a rest break;

h. Distributing information to all employees annually on VDTs and ergonomic furniture and identifying Department resources for more information;

i. Reviewing the set-up of equipment and furniture for VDT work stations as a regular part of safety and health inspections.

D. <u>VDT Emissions Test</u>

In accordance with standards for acceptable radiation emissions of VDTs, the Department will conduct periodic tests of terminals for any emissions. Any terminal that tests above standard will be repaired to meet the standard, or it will be removed from service.

E. <u>Non-VDT Work Reassignment Request</u>

If a pregnant employee requests reassignment for all or some portion of her pregnancy and has a written recommendation from her physician, the Department will reassign that employee to do available work that does not involve the use of a VDT.

F. VDT Breaks

Where an employee uses a VDT or other keying device for at least one hour, the employee shall receive a 10 minute break for every hour of utilization. Such breaks will be in addition to regularly scheduled rest periods. This does not preclude employees from receiving rest breaks when suitable non-VDT work is not available.

G. Lighting

1. VDTs shall be placed perpendicular to and away from windows and between rows of lights, to avoid excessive glare and where such an arrangement is not possible, windows shall be fitted with blinds or drapes.

2. Where the efforts in A. above have not satisfactorily resolved the problem of excessive glare, employees who operate a VDT will be furnished with an anti-glare screen.

3. An articulating task light which is adjustable in direction and intensity will be provided for users upon request.

4. The Department will provide lighting that is adequate/appropriate for the work setting.

H. Keyboard and Screen

1. Keyboards should be placed on a level and stable surface for normal keying function.

2. Keyboards, in combination with their supporting surface, chair and other furniture shall permit users to adopt and maintain neutral wrist positions.

3. Screens shall be easily adjustable for brightness.

4. Screens shall be adjustable horizontally and vertically to fit the user's line of vision.

5. Employees who operate a VDT will, upon request, be provided with adaptive devices such as a padded wrist rest, mouse pads, document holders that have adjustable height and tilt, foot rests, keyboard trays, and other appropriate adaptive devices designed to prevent repetitive strain injuries. The procedures stated in C.3 of this Section will be used in considering such requests.

I. Printers

1. Excessive impact printer noise shall be reduced by a combination of distance and/or noise-reducing techniques, such as noise-reducing

cover or shield, carpeting, partitions, and sound absorbing ceilings and walls. Printers will meet the requirements of 29 CFR 1910.95(b)(1).

2. Printers will be placed in a manner so that employees do not have to excessively bend, stoop, or reach to remove printed materials.

J. Chairs and Desks

1. The Department shall provide ergonomic adjustable chairs, designed to minimize musculoskeletal discomfort.

2. When making an ergonomic assessment, professional consensus standards, including but not limited to, American National Standards Institute (ANSI) and NIOSH, should be considered when purchasing chairs and desks. When assigning work space and purchasing chairs and desks, professional consensus standards, including but not limited to ANSI and NIOSH, will be followed when required by the National Technology Transfer and Advancement Act.

K. Training and Education

1. The Department shall provide information annually for the safe and healthful operation of VDTs and associated equipment. The information shall include, but not be limited to instructions on relaxation exercise for visual and musculoskeletal strain, the proper use of footrests and wrist rests, adjusting furniture, proper posture, and other beneficial work habits.

2. As new information becomes available, employees will be provided with updated information.

**Section 21 - Vision Program**

This section concerns VDTs, eye examinations, and eyeglasses/contacts (including disposable lenses) and is entered into by and between the Department and the Union. This Agreement covers all employees in the AFGE bargaining unit that use a workplace VDT as part of their normal work and when the use of such equipment requires using PPE by an employee during the performance of their official duties in order to mitigate hazardous conditions encountered. Any examinations or special eyeglasses/contacts given as PPE in this section must be consistent with OSHA guidelines regarding VDT usage.

A. Employees experiencing eye problems from use of a workplace VDT would meet with the Department and explore options provided in Section 20 above to address this problem.

B. Employees shall only be eligible for VDT related eye exams and eyeglasses/contacts (including disposable lenses) based upon supervisory certification that the employee does use a VDT in the course of their official duties and efforts made consistent with Section 20 are not sufficient to address the

results of the VDT use associated with the position. Based on receiving this certification the employee can request reimbursement as provided in Section C below.

C. To request reimbursement, the employee must present a form obtained from the Department to a licensed optical practitioner (e.g., optometrist or ophthalmologist) which will indicate that any prescription should only be for workplace VDT use. The practitioner must certify on the form that the special eyeglasses/contacts (including disposable lenses) are for workplace VDT use. Special eyeglasses/contacts are those that are:

   1. Required due to workplace VDT use if the person would not require the use of special eyeglasses/contacts or other treatment for a job that would not cause the same level of eye problem; or,

   2. The special eyeglasses/contacts required for the work at the workplace VDT are different in prescription or design from those which would be required to meet the other general daily vision needs of the individual.

   This form must be returned to the Department. If an eligible employee provides a completed form and a prescription from the practitioner indicating that the employee needs special eyeglasses/contacts (including disposable lenses) in order to operate a workplace VDT without eyestrain or because of other optical-related problems, the Department shall reimburse the employee for 100% of the eye examination in an amount not to exceed $50.

D. An employee who has met the conditions listed in A and B above will be entitled to a pair of special eyeglasses/contacts (including disposable lenses) for workplace VDT operation at Department expense. The Department will bear the cost up to $175. The Department will either procure the special eyeglasses/contacts (including disposable lenses) of the employee's choice, or will reimburse the employee upon the presentation of proper documentation. The option will be left to the Department.

E. Employees shall be entitled to a reasonable amount of excused absence to obtain eyeglasses/contacts (including disposable lenses), and VDT eyeglass/contact examination and fitting, provided that the employee, in fact, has an authorized VDT eyeglass/contact (including disposable lenses) prescription. Normally, this will not exceed two hours total time for all matters.

F. If an eligible employee who has already received a Department provided pair of VDT glasses/contacts (including disposable lenses) believes that he/she needs a new VDT-related prescription, he/she shall be eligible to re-participate in the program, consistent with each of the steps identified above.

G. Eyeglasses/contacts (including disposable lenses) provided for under the terms of this Agreement remain government property, and as such, the employee may be requested to surrender them when the employee separates from the Department.

H. Employees are ineligible for participation in the Department's vision program while on OWCP, Leave Without Pay (LWOP) or extended sick leave.

## Section 22 - Indoor Air Quality

A. The parties agree that all employees are entitled to work in an environment containing safe and healthful indoor air quality.

B. The Department shall provide safe and healthful indoor air quality by conforming to laws, guidelines, regulations, and/or policies issued by federal regulatory agencies such as OSHA, ASHRAE, EPA, and GSA.

C. On-site investigations/inspections will be conducted when a problem concerning Indoor Air Quality or Building Related Illness is formally brought to the Department's attention. These investigations/inspections shall meet the criteria of the GSA Federal Property Management Regulations and the ASHRAE, the protocols of OSHA, or the American Conference of Government Industrial Hygienists.

D. In compliance with engineering standards, the Department shall maintain ventilation efficiency:

1. Ensuring that outdoor air supply dampers and room vents are open;
2. Removing or modifying partitions or obstructions which block fresh air flow;
3. Balancing the system to prevent to prevent inflow or outflow of contaminated air due to pressure differentials between rooms.

E. In all facilities, the Department shall ensure that:

1. Appropriate measures are taken to minimize and/or eliminate the impact of contamination from outside sources such as garages, cooling towers, building exhausts, etc.;
2. Where the levels of such contaminants become health threatening, the Department will either seek to relocate or evacuate the facility;
3. Temperature is maintained in accordance with ASHRAE standards;
4. Humidity is maintained in accordance with ASHRAE standards;
5. Filtration, electronic cleaners, chemical treatment with activated charcoal or other absorbents are used.

F. Microbial Contamination

1. The Department agrees to eliminate or control all known and potential sources of microbial contaminants by assessments and appropriate response to all areas where water collection and leakage has occurred including floors, roofs, HVAC cooling coils, drain pans, humidifiers containing reservoirs of stagnant water, air washers, fan coil units, and filters. Such response will normally require prompt cleaning and repair of contaminated areas.

2. The Department also agrees to:

   a. Clean and disinfect or remove and discard porous organic materials that are contaminated (e.g., damp insulation in ventilation system, moldy ceiling tiles, and mildewed carpets); and,

   b. Clean and disinfect non-porous surfaces where microbial growth has occurred with detergents, micro biocides, or other biocides and insuring that these cleaners have been removed before air handling units are turned on.

In any leased space the Department will deal with the lessor and/or GSA to achieve these objectives.

**Section 23 - Renovation and Construction**

A. Wherever the Department decides to alter the physical work site of employees represented by the Union, the local union will be notified in advance in accordance with Article 47 - Mid-Term Bargaining.

B. The Department will:

   1. Isolate areas of significant renovation, painting, and carpet laying from occupied areas that are not under construction;

   2. Perform this work during evenings and weekends;

   3. Ensure that contaminated concentrations are sufficiently diluted prior to occupancy;

   4. Supply adequate ventilation during and after completion of work to assist in dilution of the contaminant level; and,

   5. In leased space work with the lessor and/or GSA in order to achieve and maintain these standards.

**Section 24 - Wellness Program**

A. The parties agree that recognizing, minimizing, and coping with stress are essential parts of employee wellness. The Department will provide training

at least annually on stress reduction. This will be a part of each facility's Wellness Program.

B. Employees who feel they are experiencing harmful levels of job-related stress may contact employee counseling services.

C. Department facilities will establish Wellness Committees or subcommittees to address wellness and health programs.

D. The Department agrees to provide the following services:

1. Emergency diagnosis and initial treatment of injury or illness that becomes necessary during working hours and that is within the competency of the professional staff and facilities of the health service units and if the injury or illness is work-related and the above-described services are not available, the employee will be transported to the appropriate medical facility;

2. Provision for special health examinations for specific categories of employees whose work environment presents peculiar health hazards;

3. Individual facilities will provide diagnoses and/or screening tests and health education programs for unit employees as a health service;

   a. It is understood by the parties that these services are subordinate to the Department's mission.

   b. These services will be subject to the Department's determination of available resources.

4. Referral of employees to private physicians, dentists, and other community health resources, upon request.

   a. An employee will be expected to notify his/her supervisor of his/her intention to seek medical treatment in health units.

   b. When this is not feasible, the employee may report directly to the health unit or person authorized to render emergency care.

5. Each facility where employees are exposed to chemical or biological hazards will implement a medical surveillance program in accordance with applicable regulations.

6. The Department and the Union support wellness and initiatives that focus on various activities, including physical activity, weight management, smoking cessation, stress management, healthy lifestyle classes, and nutrition.

a. Therefore, the Department will promote physical fitness and wellness by, at a minimum, providing stress reduction and physical fitness information.

b. Where fitness facilities or fitness areas are available at the worksite, employees will be permitted access to them.

c. If modifying, providing, or allowing access to a local fitness center, the local union will be involved in the process. The decision will give appropriate weight to such factors as health industry recommendations, facility design, maintenance, safety, and return on investment analysis.

d. Employees may utilize wellness/fitness centers during duty hours, infrequently, for short periods of time, for the participation in physical wellness activities, at no additional cost to the employees. Where existing methods are already in place, they will be continued, until changed through negotiations. This section is subject to local negotiations.

E. The Department shall permit employees to do non-strenuous stretching exercise that are socially acceptable in an office setting to relieve physical stress and/or discomfort. Some of these exercises may be performed by the employees at their workstation during the work time as necessary. The need for this will vary from employee to employee. Participation shall be voluntary.

## Section 25 - Equipment, Machinery, and Furniture

A. Employees are encouraged to report (see Section 5) equipment, machinery, or furniture that cause or have potential to cause injuries such as repetitive motion injuries. The Department agrees to investigate such reports expeditiously and to implement appropriate corrective action. All such ergonomic assessments and/or recommendations shall be in writing and submitted to the local Safety and Health Committee.

B. As much as possible, equipment, machinery, and furniture purchased by the Department will be ergonomically compatible with the individual. The local union will be involved in the development of facility policies that address the selection and purchase of equipment, machinery, and furniture.

C. The Department will ensure that employees have been oriented to the use of new equipment or machinery and will ensure that this equipment or machinery has been inspected before initial use, when required.

D. Only qualified personnel shall perform maintenance or repair on or about moving or operating machines. This does not preclude the normal or necessary adjustments to be made to machinery or equipment while

in operation. Qualified personnel shall not be required to perform any maintenance or repair while the machine is in operation where it can be shown that there is a substantial risk of injury or a feasible alternative exists.

## Section 26 - Workplace Violence

The parties agree that violence should be eliminated from all workplaces within the Department. Each facility will develop a policy and a plan jointly with the local union on the prevention of violence. Annual training shall be offered to all employees.

## Section 27 - Safety and Health Records

A. The Department agrees to compile and maintain records required by the Act and the Department safety and health programs. The Department agrees to ensure access by employees, former employees, and Union representatives to records/logs of facility occupational injuries and illnesses (including copies of accident reports) and to the annual summary of these in accordance with 29 CFR 1960, consistent with FOIA and Privacy Act requirements.

B. The Department and the Union will identify employees who occupy positions that carry potential risks to their health. The parties will establish and maintain procedures for the medical surveillance of such employees.

## Section 28 - Hazardous Duty Pay and Environmental Differential

A. Environmental Differential (FWS)

1. In accordance with 5 CFR Part 532, Subpart E, Appendix A, the appropriate environmental differential will be paid to an employee who is exposed to an unusually severe hazard, physical hardship, or a working condition meeting the standards described under the categories stated therein.

2. If at any time an employee and/or the local union believes that differential pay is warranted under 5 CFR Part 532, Subpart E, Appendix A, the matter may be raised at step 3 of the negotiated grievance procedure.

B. Hazardous Duty Pay

1. Pay for irregular or intermittent duty involving physical hardship or hazard for GS employees will be paid in accordance with the provisions of OPM regulations (5 CFR, Part 550, Sub-part I).

2. The parties agree that any physical hardship or hazardous duties must be considered as part of position classification. Upon request, the Department shall inform the employee or local union whether or not such duties were taken into account in establishing the grade of the

position and how the duties affected the grade established including whether, absent those duties, the grade would have been lower.

**Section 29 - Arrangements for Health Hazards Involving Communicable Diseases**

Facilities will:

A. Make appropriate arrangements for employees interviewing individuals with known communicable disease;

B. Take appropriate precautions when there is contact with a person who may have tuberculosis (TB) and employees with exposure or potential exposure to TB will be offered TB screening tests during working hours at no cost to the employees;

C. Keep records of employees exposure to active TB at the work site;

D. Take appropriate precautions against the spread of infectious diseases;

E. Provide timely testing for employees who reasonably believe they were exposed in the course of their employment to a serious infectious disease (there will be no cost to the employees for leave or the exam); and,

F. Employees are encouraged to get flu vaccinations once a year.

**Section 30 - Pollution Prevention Strategy**

A. The Department will maintain a current list of all hazardous materials in their respective sections/services and will be required to maintain paper copies of current Material Safety Data Sheets (MSDS) in each workplace.

B. All facilities will identify each employee using hazardous chemicals in the performance of his/her duties.

C. Assessments will be made for each of the hazardous chemicals and a determination will be made if there could be a less hazardous chemical which would fulfill the respective need.

D. All chemicals or hazardous materials purchased shall require MSDS with purchase.

E. Employees will be retrained at least annually on the handling and disposal of each hazardous chemical.

F. The Professional Industrial Hygienist will perform a physical inventory and audit January and July of each year and report to the facility Safety Committee on the compliance requirements, training needs of persons handling hazardous chemicals, and disposals requirements.

G. Types and quantities of hazardous waste generated at each health care facility and the methods used for disposal of each type of waste will be identified.

H. The facility Safety Committee will review methods used to dispose of hazardous waste for compliance with applicable criteria.

I. All affected employees who may be affected by each hazardous chemical and the risks associated with the hazardous chemicals will be informed.

J. Monitoring is a proper subject for the Safety and Health Committee.

## Section 31 - Dissemination of Occupational Safety and Health Program Information

A. Any details of the Department's Occupational Safety and Health Program and applicable safety and health standards shall be made available upon request to employee representatives for review. A copy of any written program applying to the Department's Occupational Safety and Health Program should be provided to each committee member at the appropriate level.

B. Each workplace shall post conspicuously in each facility, and keep posted information for employees of the provisions of the Act and Executive Order 12196. Each facility will provide the poster to each workplace detailing the necessary elements of 29 CFR 1960.12. Posters shall not be altered, defaced or covered by other material(s). If damaged or altered the Department will take responsibility for replacing them within 30 days. The Department will inform all employees of their rights under 29 CFR 1960 on an annual basis in writing.

## Section 32 - Exposure to Radiation

In accordance with the United States Nuclear Regulatory Commission (NRC) guidance and standards, the Department shall take necessary preventive steps to protect employees from exposure to radiation.

A. Employees in high risk areas will be provided devices to measure current and accumulated exposure levels. Employees will be alerted monthly to the employees' current and accumulated exposure level, and annually to the employees' accumulated exposure level.

B. The Department will take additional steps necessary to prevent exposure if any employee is exposed to a level of radiation that is or could become a health or safety issue. Examples of known sources of possible exposure are security machines at points of entry and imaging/X-ray departments.

## Section 33 - Ergonomic Lifting

A. The Department agrees that all employees are a most valued resource and shall be recognized as such.

B. The Department agrees to provide employees with information concerning safe lifting. The Department further recognizes and agrees that this information must be appropriate to the specific work performed.

C. Any lifting equipment must be selected based on operational and employee needs, physical environment, hazard assessment, injury analysis, and Union input.

D. A joint committee, to include local union participation will be established in each facility to review available equipment, solicit employee input, and make recommendations. This may be done by a local health and safety committee, if one exists.

E. Implementation of this section also is appropriate for local negotiations.

## Section 34 - Temporary Work Restriction

When an employee provides the Department with a health care provider's statement that the employee has temporary work restrictions, the Department will address the employee's personal health care provider's recommendation and make a determination if there are any duties the employee can perform under those work restrictions. The Department will make every effort, to the extent it is operationally feasible, to identify duties the employee can perform in his/her position. The Department will inform the employee of the decision. Under the Health Insurance Portability and Accountability Act (HIPAA), the Department cannot contact the employee's personal health care provider without a signed release from the employee.

# SEPARATOR

# PAGE

# ARTICLE 30 - OCCUPATIONAL HEALTH

## Section 1 - Purpose

The purpose of this article is to aid in the protection of employees from communicable diseases, maintain a healthful working environment, and provide preventive health measures.

## Section 2 - General

The following occupational health services, among others, shall be provided:

A. Emergency diagnosis and first aid treatment of an injury or illness that becomes necessary during working hours and that are within the competency of the professional staff and facilities of the available occupational health service unit, whether or not such illness was caused by employment. Local policy may define emergency treatment of non-work related conditions in tracking of infectious diseases among the employee population. In cases where necessary emergency treatment is not available onsite, the employee may be taken to his/her physician or suitable community medical facility if the employee requests it or is unable to request it. Employees will be made aware annually that there may be charges for some services rendered;

B. Pre-placement examinations where required by applicable laws, VA policy, or the OPM instructions;

C. In-service occupational examinations of employees or examinations to appraise and report work environment health hazards to prevent and control health risks, as required;

D. Administering, at the discretion of the responsible occupational health service unit physician or occupational healthcare provider, treatments and medications:

   1. Furnished by the employee and prescribed in writing by a personal physician as reasonably necessary to maintain the employee at work; or,

   2. Prescribed by a physician providing medical care under 5 USC Chapter 81.

E. Preventive services to provide health education to maintain personal health; and to provide specific disease screening examinations and immunizations, in accordance with Article 29 - Safety, Health, and Environment, Section 24, D 2 and D 3 of this Agreement.

F. Referral, upon their request, of employees to community health resources.

## Section 3 - Service Requirements

The Department shall:

A. Provide post-exposure examinations as mandated by applicable regulatory agencies;

B. Provide medical surveillance for employees exposed to hazardous materials and communicable diseases (such as asbestos or tuberculosis). The Department shall provide the local union a list of any classification or position that is required to be part of the medical surveillance program, including but not limited to the "fit-tested" for respirators program.

C. Cooperate with local public health agencies, physicians and programs in providing measures that protect against diseases of public health significance.

D. The occupational health unit will be supplied the specific medical information about the duties of an employee's position and any other pertinent factors necessary to assess that employee's ability to perform the job. (See Article 19 - Fitness for Duty.)

E. Provide, or make arrangements for, health maintenance examinations for all Department employees eligible for them. The occupational health care provider will use discretion in determining how comprehensive the medical evaluation will be. Special tests and diagnostic procedures may be ordered as appropriate, based upon the evaluation's findings. Employees will be informed of any discrepancies or abnormalities shown in the evaluation; and, they will be encouraged to follow up with treatment or corrective action as soon as possible with their personal primary care provider.

## Section 4 - Occupational Health Services

A. The Department will provide an occupational health services program for all VA employees consistent with this Agreement and Department policy.

B. Where there are 300 or more federal employees working in one location and there are no existing health services, arrangements shall be made to establish a Department occupational health unit unless occupational health services can be furnished by participation in a nearby occupational health unit serving other federal employees. For locations with fewer than 300 employees, occupational health services shall be provided by contract with private or public sources or by establishment of an occupational health service unit, whichever is deemed to be more feasible.

C. Employees shall notify their supervisor when they seek treatment from an occupational health unit. When this is not feasible, they may report directly to the occupational health unit or person authorized to render emergency

care. Facilities will have written procedures on how to address medical emergencies occurring to employees.

D. The confidential nature of medical conditions shall be recognized and respected. Employee medical records maintained by the Department must be separately and distinctly secured from any other medical records.

E. Procedures for disability retirement and OWCP are not part of the Occupational Health program and are governed by Article 41 - Worker's Compensation and other applicable authorities.

F. Occupational health services will be provided under the direction of a licensed independent practitioner.

## Section 5 - Immunizations

A. Through vaccinations and immunizations of employees, the Department will assist in maintaining a high level of protection against epidemics of communicable disease such as influenza. This will include the administration of vaccines, prophylactic drugs, and agents, usually without charge. Employees will be notified in advance of any charges and the amount, given the option to accept or not accept the immunization/vaccination, and provided information about other service providers who provide the immunization/vaccination.

B. Justification for allocations of vaccinations and immunizations to employee populations will be provided to the Union at the time of the immunizations.

## Section 6 - Treatment

Nature and Extent of Non-Work Related Treatment:

A. It is an expectation that all employees will have a private personal physician or healthcare provider;

B. If an employee suffers a minor illness or injury, which interferes with their ability to perform their duties, treatment may be rendered;

C. Treatment will be limited to relieve their discomfort and enable them to remain at work, and in an emergency, appropriate care to stabilize and transport the employee will be rendered;

D. If the installation has dental facilities, emergency treatment may be given for minor dental conditions;

E. These treatments are not intended to provide definitive medical or dental care or replace the employee's primary care provider;

F. The employee will be referred to their private physician or dentist for any necessary follow-up or definitive care;

G. In the event transportation or hospitalization is required, the employee will be responsible for associated costs;

H. On an annual basis, employees shall be advised in writing that they will be charged for transportation and hospitalization.

Section 7 - Pandemics

A pandemic is defined as an epidemic of infectious disease that is widespread across human populations.

A. The parties agree that employees are an essential resource in caring for Veterans. The Department will take appropriate precautions to prevent the spread of infectious disease.

B. The Department shall offer immunizations at no cost to the employee. No employee shall be forced to participate in an immunization program if the employee has a medical condition which would be adversely affected by the immunization. A statement from a health care provider (as defined in Article 35 Section 16 E (6) (d)) that an immunization would adversely affect the employee's medical condition is sufficient evidence of such a medical condition. An employee may also receive an exemption based upon their religious beliefs. An employee's written statement that he/she has a religious belief that conflicts with the immunization is sufficient to establish evidence of a religious belief. In either exception, any statements or records shall be kept confidential by the Department.

C. Employees shall be issued appropriate individual PPE as recommended by recognized authorities such as OSHA. There shall be sufficient equipment so that employees are neither expected to reuse the equipment unless it is designed for reuse nor shall they share such equipment.

D. If respirators are required for safety and health, each employee will be fit-tested and trained on the proper care of the respirator.

E. The employee who is ill as a result of a pandemic will be granted sick leave or leave without pay upon request.

F. If the employee is suspected to have contracted a communicable disease, and is sent home from the worksite without valid verification of the illness, there will be no charge to leave. In such instances the employee must be available to return to duty upon request, unless the employee requests to use sick or other leave.

G. Temporary telework arrangements are appropriate for those employees who cannot report to work due to illness, providing the position held is conducive to telework. During pandemic, the usual requirements for

telework may be waived in order to benefit both the Department and the employee.

## Section 8 - Local Bargaining

Local bargaining on this article is appropriate so long as it does not conflict or interfere with, or impair implementation of, this Master Agreement.

**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
St. Petersburg, Florida

**CIRCULAR 25-08-1**

January 31, 2008

## LEAVE ADMINISTRATION

1. **PURPOSE**

To establish and outline the policy, responsibilities, and procedures for the administration of leave laws and regulations.

2. **POLICY**

The leave program will be administered on a uniform and equitable basis within the scope of applicable laws, regulations, and collective bargaining agreement with consideration given to efficiency in management and conduct of agency operations.

3. **RESPONSIBILITIES**

a. Division Chiefs are responsible, as authorized, for administering the leave and excused absence policies and regulations for employees under their supervision. This includes:

(1) Planning, taking into consideration current and anticipated workloads to ensure that sufficient employees are on duty to cover Division functions at all times.

(2) Scheduling leave usage throughout the calendar year to allow each employee, to the extent possible, to use annual leave at time preferred and to avoid forfeiture of annual leave.

(3) Ensuring that all subordinate supervisors receive appropriate training in administering leave policies and regulations; that employees are trained in the proper use of leave and are kept informed on leave matters and that employees are informed of the name or title of the leave approving official.

(4) Ensuring maintenance of adequate records, assuring that certification of time and attendance reports is correct in all respects.

b. Leave Approving Officials are responsible for:

(1) Maintaining control over attendance, leave, and excused absence of employees under their supervision. Determining whether an employee's absence from regular duties constitutes official duty, approved leave, excused absence without charge to leave, or absence without leave, and ensuring that the timekeeper is promptly notified.

(2) Acting promptly on requests for leave and determining the necessity for, or acceptability of, sick leave medical certificates.

(3) Consulting with their Human Resources Specialist for advice concerning the interpretation of leave regulations.

C-4

(4) Ensure that annual leave is scheduled for use so as to prevent any unintended loss at the end of the leave year.

c. Employees are responsible for observing leave and excused absence policies and regulations which affect them. This includes:

(1) Being at their post of duty during official duty hours unless they are on approved leave or excused absence without charge to leave.

(2) Observing the time and attendance policies and procedures.

(3) Requesting approval of annual leave and/or sick leave for medical, dental, or optical examination or treatment.

(4) Making timely report of absences not previously approved.

(5) Scheduling annual leave to avoid forfeiture.

d. Supervisory Human Resources Specialist is responsible for the general administration of the leave program. This includes interpreting leave policies and regulations and providing for employee orientation on leave provisions and supervisory training in leave administration.

## 4. PROCEDURES

a. Annual Leave

(1) Purpose: Annual leave may be granted for any of the following reasons:

(a) To allow every employee a vacation period of extended leave for rest and recreation;

(b) To provide periods of time off for personal and emergency purposes; and

(c) To perform service with the uniformed services while on active duty or active/inactive duty for training.

(2) The Human Resources staff will determine creditable service for leave earning purposes. Leave is earned as follows:

| Group | Creditable Service | Full Time Employees | Part Time Employees |
|---|---|---|---|
| | | Annual leave credit per pay period | Hours needed in a pay status to earn 1 hour of annual leave |
| 1 | Employees with less than 3 years service | 4 | 20 |
| 2 | Employees with 3, but less than 15 years service | 6 | 13 |
| 3 | Employees with 15 or more years service | 8 | 10 |

(4) All requests for annual leave should be made in advance. All requests for annual leave must be submitted and approved through the Enhanced Time & Attendance (ETA).

(5) Annual leave may be advanced only in an amount that can be earned by the end of the leave year in which it is granted. Employees who are incapacitated for duty because of serious illness or disability should be advanced sick leave for up to thirty (30) days. The employee will not be required to utilize any annual leave prior to utilizing the advanced sick leave. When an employee is serving under an appointment which will expire before the end of the leave year, annual leave may be advanced up to the amount the employee would otherwise earn during the term of the appointment. Approval of requests for advance leave is at the discretion of the agency, but it is agreed that advance leave, including both sick and annual, will be fairly and equitably administered. Denials of requests for advance leave must be conveyed to the employee promptly and must contain a specific explanation of the reasons for the denial.

(6) In cases of extended leave, the supervisor will advise the employee of possible annual leave forfeiture and the need to schedule the leave in writing to ensure any possible entitlement to restoration if the leave is forfeited. The supervisor is responsible for informing the employee of the necessity to schedule and/or reschedule the use of annual leave to avoid forfeiture, even though an absence because of illness occurred during the year. The supervisor will contact his/her Human Resources Specialist for advice and procedures on carry over of annual leave due to administrative error, exigencies of public business, or illness.

b. <u>Sick Leave</u>

(1) Purpose: Sick leave may be granted for any of the following reasons:

(a) When the employee is incapacitated for the performance of duty because of sickness, injury, or pregnancy and confinement.

(b) For medical, dental, or optical examination or treatment (including adjustment of prosthetic devices).

(c) When a member of the employee's immediate family is afflicted with a contagious disease and requires the personal care and attendance of the employee.

(d) When, through exposure to contagious disease, the presence of the employee at the place of duty would jeopardize the health of others.

(e) To provide care for a family member who is incapacitated as the result of physical or mental illness, injury, pregnancy, or childbirth or who receives medical, dental or optical examinations.

(f) To make arrangements necessitated by the death of a family member or attend the funeral of a family member, including necessary travel, pre-funeral and after-funeral/burial gatherings or ceremonies, memorial services; and reading of a will.

(g) When absent from duty relating to the adoption of a child.

(2) Full-time employees earn sick leave at the rate of 4 hours for each full biweekly pay period. Part-time employees with an established tour of duty earn sick leave at the rate of 1 hour for each 20 hours of duty.

(3) Sick leave granted because of a contagious disease shall be limited to the period prescribed by regulations of local health authorities or certified by a physician, where health regulations do not specify the period of isolation, quarantine, or restricted movement.

(4) Requests for leave for prearranged medical, dental, or optical examination or treatment should always be submitted and approved in advance through the ETA.

(5) It is the responsibility of an employee who is incapacitated for duty to notify the immediate supervisor or designee (or to have any responsible person make the notification for the employee) at the work site as soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exist. Employees that are incapacitated for duty will use one of the two following notification procedures, as appropriate:

- An employee calling during business hours to request sick leave who has a sufficient sick leave balance to cover the period of the request, may leave a voice mail message for his/her supervisor, if the supervisor is not available when he/she calls. Similarly,an employee who is approved intermittent FMLA may also leave a voice mail message for his/her supervisor, if the supervisor is not available when he/she calls. If FMLA is invoked, the message will also state the type of leave being requested (AL, SL, or LWOP).

- An employee who wishes to request any type of leave in lieu of sick leave (i.e., has an insufficient sick leave balance to cover the period of the request) must speak to his/her supervisor, or designee, to request the leave. To facilitate this, each Division will provide its employees with the direct phone numbers of his/her 1st and 2nd line supervisors as well as the Division front office. Approval of the request for leave will be based on the individual employee's circumstances.

An employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required. Upon return to duty, an employee must enter a leave request into the ETA. Employees will not be required to reveal the nature of their illness as a condition for approval of sick leave

(6) An employee requesting annual leave, sick leave, or leave without pay for periods of illness of more than three consecutive workdays must make an appropriate request and may be required to furnish evidence of the need for sick leave upon return to duty. An employee may justify the request for sick leave by medical certification from the Department's physician or the employee's personal physician/health care provider, or the employee's own written statement in instances where the illness was not treated by a physician. The employee's statement will explain why a physician was not seen.

(7) Where there is substantial reason to believe that an employee is abusing the sick leave entitlement, the employee shall be formally counseled and advised of the possibility of future medical certification requirements should the abuse continue. If the abuse continues, the employee may be required to furnish a medical certification for each sick leave application. All such cases requiring a counseling or medical certification may be reviewed in four (4) months but not later than six (6) months afterward.

Frequency or amount of leave used will not be the sole factor for determining sick leave abuse, nor will leave for which medical documentation has been provided. When abuse ceases, the restriction will be removed, the record shall be made clean, and the employee will be notified of this action. The employee will also be notified of the reasons, in writing, if the restriction is to be continued.

(8) In cases of serious disability or ailments, an employee with no time limit in his or her appointment should be advanced sick leave not in excess of 240 hours. For employees in the AFGE bargaining unit, advanced sick leave for a serious disability or ailment may be granted when the employee has served on a permanent appointment and has been under a retirement system for one year or more. Any request for advanced sick leave must be submitted through the ETA and must be supported by medical certification which contains a clear and comprehensive explanation of the illness and must provide an indication as to when the attending physician expects the employee to be able to resume his/her duties. Sick leave will not be advanced to an employee when it is known or when it is reasonably expected that he/she will not return to duty. Pending receipt and consideration of required medical certification, timecards will be annotated to reflect "absent without leave" unless the employee requests and is granted some other type of leave.

(9) An employee who engages in outside employment during any part of the time for which he/she requests sick leave shall notify the supervisor of the outside employment.

c. Voluntary Leave Transfer Program

(1) The Voluntary Leave Transfer Program permits employees to donate annual leave to other Federal employees who are experiencing a medical emergency. A medical emergency is a medical condition of an employee or a family member of the employee that is likely to require the employee's absence from duty for a prolonged period of time and to result in a substantial loss of income to the employee because of the unavailability of paid leave.

(2) Any employee who has experienced or is experiencing a medical emergency may make a written request to become a participant in the voluntary leave transfer program. To be eligible to apply for the program, the employee must have exhausted all of his/her available paid leave and has been or is expected to be absent from duty without available paid leave for at least 24 hours (3 workdays). The request must contain (a) name, position title, and grade or pay level of the potential leave recipient; (b) the reasons why transferred leave is needed, including a brief description of the nature, severity, and anticipated duration of the medical emergency, and if it is a recurring one, the approximate frequency of the medical emergency; and (c) certification from one physician, or other appropriate expert, with regard to the medical emergency. Additional information may be requested to support the application.

(3) Completed OF 630 Leave Recipient Application Under the Voluntary Leave Transfer Program should be forwarded to the employee's supervisor, who will forward the application to the Human Resources office for review prior to forwarding the request to the Director. The employee may request an application form from the Human Resources office. Applicants usually will be notified within 10 workdays of their eligibility to participate in the program as leave participants.

(4) In order to ensure the privacy of those who wish to participate in the program, employees who are eligible and are approved as leave recipients will have the discretion of determining their own means of informing potential leave donors from within VA. Potential donors from other Federal agencies may be considered in accordance with the regulations governing the program.

(5) The donation of annual leave is entirely voluntary. However, employees may not donate annual leave to their immediate supervisor. There are also minimum requirements and limitations on the amount of annual leave that can be donated. Employees who are interested in donating annual leave to a specific recipient may contact the Human Resources office for additional information.

(6) Annual leave donations will be transferred from the accounts of donors to the leave recipient's account. These annual leave donations will be used for the recipient's current leave charges and to liquidate any advance leave indebtedness. When the leave recipient's medical emergency no longer meets the criteria of this policy (for example, the employee is able to return to duty), the remaining annual leave in the person's account will be recredited to donors on a prorated basis in accordance with OPM regulations and VA policy.

(7) VA supports the concept of the leave transfer program. However, the decision to apply to become a leave recipient, or to donate leave, is personal and must be made on a completely voluntary basis.

d. Absence for Maternity/Paternity Reasons

(1) Employees are encouraged to report pregnancy to their supervisors as soon as it is an established fact so that any necessary steps may be taken (a) to protect the employees' health or modify work or working conditions and (b) to plan for any necessary staffing.

(2) Requests for leave relating to pregnancy and confinement must be submitted and approved through the ETA. The granting of leave may consist of a combination of sick leave, annual leave, and/or leave without pay. The type of leave used must meet the statutory and regulatory requirements for that particular type of leave.

e. Military Leave

(1) Military leave is leave of absence with pay which must be granted to all full-time and part-time employees serving in other than time-limited appointments who are members of the National Guard or a Reserve component of the U. S. Armed Forces to perform military duty.

(2) Full-time employees serving in other than time-limited appointments who are members of the Reserve components of the Armed Forces or National Guard will be granted two types of leave.

(a) At the rate of 15 days (120 hours) per fiscal year and, to the extent that it is not used in a fiscal year, accumulates for use in the succeeding fiscal year until it totals 15 days at the beginning of a fiscal year. This gives a full-time employee the potential of 30 days (240 hours) military leave during a fiscal year.

(b) Not to exceed 22 workdays in a fiscal year for the purpose of : (1) support of civil authorities in the protection of life and property; or (2) performance of full-time military service as a result of a call or order to duty in support of a contingency operation as defined in section 101(a)(13) of title 10, U.S.C.

(3) Part-time employees serving in other than time-limited appointments, shall accrue military leave by a percentage of the rate prescribed under paragraph 4e(2)(a) which is determined by dividing 40 into the number of hours in the regularly scheduled workweek of the part-time employee.

(4) Military leave should be requested as far in advance as possible. Requests should be submitted through ETA, with an accompanying set of orders to verify the active duty. A certificate of attendance at the training duty signed by the unit commanding officer must be furnished the supervisor upon return to duty at the Regional Office. Military leave is charged only for hours the employee otherwise would have worked.

f. Court Leave

Court leave is leave with pay for attending court, as a witness not in an official capacity on behalf a State or local government, or jury service in a United States, District of Columbia, or a State or local court. An employee will be required to furnish evidence of jury service. Employees will contact the Agent Cashier to determine what monies received for service as a juror or witness must be turned in.

g. Excused Absences

(1) Leave to Vote

As a general rule, where the polls are not open at least three hours either before or after an employee's regular hours of work, an amount of excused leave may be granted which will permit reporting for work three hours after the polls open or leave work three hours before the polls close, whichever requires the lesser amount of time off. Under exceptional circumstances, where the general rule does not allow an employee sufficient time, he/she may be excused for an additional period not to exceed a full day.

(2) Blood Donor Program

Employees who give blood without compensation to the Red Cross (or similar organizations) may be excused without charge to leave for the portion of the day blood is donated which may be desirable for rest and recuperation.

(3) VA Placement Matters

Employees required to report for placement interviews in connection with placement within the VA will be authorized absence without charge to leave for the time involved when such matters are conducted during the employee's regular work hours.

(4) Training

Employees may be excused to attend educational lectures, seminars, courses of instruction, etc., in the VA in-service training programs and to participate in other training as defined in 5 USC 4104. While absent from the usual worksite for such activity, the employee is considered to be on official duty during normal work hours.

(5) Change in Station

An employee who is being transferred for the convenience of the Government from one VA station to another may be excused without charge to leave for the time required, not to exceed 2 workdays, to make arrangements for moving. If a round trip to find housing has been authorized, the employee may be granted excused leave not to exceed one workday to get settled at the new location. Where no advance round trip has been authorized, the employee may be granted five workdays with no charge to leave to find housing and move into it.

(6) Official Time for Representational Functions – Official time must be requested in advance from the appropriate leave approving official. Employees requesting Official Time may not use Official Time prior to receiving approval.

(a) Representational functions means those authorized activities undertaken by employees on behalf of other employees pursuant to such employees' rights to representation under statute, regulation, executive order, or negotiated agreement. It includes activities undertaken by specific individual designation (such as the designation of a representative in a grievance action or an EEO complaint), certain health and safety matters, formal and Weingarten-type meetings.

(b) The use of official time and related travel per diem expenses incurred by employees performing representational duties (e.g., grievance procedures, EEO complaint appeal) will be recorded on the time card. The supervisor will advise the timekeeper of the amount of time an employee spends in representational duties. Supervisors will contact the Human Resources office for guidance in determining representational functions.

(7) Official time for EEO complaints

(a) The complainant, if an employee of the VA, shall have a reasonable amount of official time to prepare and present his/her EEO complaint. The amount of time considered reasonable for the employee will depend on the circumstances in each case and will be determined by the delegated leave approving official. Witnesses shall also be afforded official time whenever their presence is required during the course of the complaint process.

h. Leave Without Pay (LWOP)

(1) LWOP is granted at the discretion of Management, except in the following cases: When requested by a disabled veteran for medical treatment; by a reservist or National Guardsman for active military training duty; by an employee who has a claim pending with the Office of Workers' Compensation Programs (OWCP) and who is incapacitated for work, except in case of an overriding requirement for separation, such as reduction-in-force or removal for cause; or, by an employee who makes a request under the Family and Medical Leave Act and meets the criteria for that program.

(2) Leave approving authorities for leave without pay are outlined in Appendix A. SF-52, Request for Personnel Action, must be submitted for any leave without pay that exceeds 30 days. An additional SF-52 is required when employees return from leave without pay status for periods in excess of 30 days.

(3) Employees are responsible for payment of their health benefits plan while on a leave without pay status.

(4) Division Chiefs will establish division procedures to ensure that the Human Resources office is notified when an employee is in a leave without pay status that is expected to exceed 7 calendar days. This notification enables the Human Resources office to timely issue an SF-8, Notice to Federal Employee About Unemployment Insurance.

i. Family and Medical Leave Act (FMLA): FMLA policies and procedures for bargaining unit employees are outlined in the Master Agreement between the VA and AFGE. The following information is provided for non-bargaining unit employees:

(1) Full-time and part-time employees who have been employed for at least 12 months may request leave without pay (LWOP) under FMLA. Intermittent employees and employees serving under temporary appointment with a time limitation of 1 year or less are not covered under the provisions of the FMLA. A total of 12 administrative workweeks (480 hours) will be made available equally for a full-time or part-time employee in direct proportion to the number of hours in the employee's regularly scheduled administrative workweek. Any holidays authorized under 5 U.S.C. 6103 or by Executive order and nonworkdays established by Federal statute, Executive order, or administrative order that occur during the period in which the employee is on family and medical leave may not be counted toward the 12-week entitlement to family and medical leave. The 12-month period begins on the date an employee first takes leave for a family or medical need and continues for 12 months. Requests of other than an emergent nature must be made at least thirty days before leave is to begin or as soon as is practicable.

(2) Examples of reasons for FMLA are:

(a) The birth of a son or daughter of the employee and the care of such son or daughter;

(b) The placement of a son or daughter with the employee for adoption or foster care;

(c) The care of a spouse, son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition; or

(d) A serious health condition of the employee that makes the employee unable to perform the essential functions of his/her position.

(3) Procedures:

(a) An employee's request for leave under FMLA must be made in writing, preferably on SF-71, Request for Leave or Approved Absence. This request must state that the employee is invoking his/her entitlements to leave under the FMLA. The request must go through the employee's appropriate supervisory channels.

(b) Each request will be supported by written medical certification issued by the health care provider of the employee or the health care provider of the spouse, son, daughter, or parent of the employee, as appropriate. The medical certification shall include:

1) The date the serious health condition commenced;

2) The probable duration of the serious health condition or specify that the serious health condition is a chronic or continuing condition with an unknown duration and whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity;

3) The appropriate medical facts within the knowledge of the health care provider regarding the serious health condition, including a general statement as to the incapacitation, examination, or treatment that may be required by a health care provider;

4) If the leave is for the care of a spouse, son, daughter, or parent of the employee with a serious health condition, a statement from the health care provider that the spouse, son, daughter, or parent of the employee requires psychological comfort and/or physical care, needs assistance for basic medical, hygienic, nutritional, safety, or transportation needs or in making arrangements to meet such needs, and would benefit from the employee's care or presence, and a statement from the employee on the care he/she will provide and an estimate of the amount of time needed to care for his/her spouse, son, daughter, or parent, where applicable.

5) If the leave is for an employee's serious health condition which makes the employee unable to perform any one or more of the essential functions of his or her position, a statement that the employee is unable to perform one or more of the essential functions of his or her position or requires medical treatment for a serious health condition, based on written information provided by the agency or discussion with the employee about the essential functions of his or her position.

6) In the case of certification for intermittent leave or leave on a reduced leave schedule for 4) or 5) above for planned medical treatment, the dates (actual or estimates) on which such treatment is expected to be given, the duration of such treatment, and the period of recovery, if any, or specify that the serious health condition is a chronic or continuing condition with an unknown duration and whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity.

(c) In cases of emergency, employees or responsible designated persons will have 15 calendar days to provide the appropriate medical certification.

(d) Employees may substitute paid leave in lieu of LWOP under the FMLA. Employees must request this substitution of paid leave in advance. Paid leave cannot be granted retroactively under FMLA. Substitution of paid leave must be consistent with appropriate statutory and regulatory requirements.

j. Family Friendly Leave Act (FFLA): FFLA policies and procedures for bargaining unit employees are outlined in the Master Agreement between the VA and AFGE. The following information is provided for non-bargaining unit employees and may also apply to bargaining unit employees:

(1) Sick Leave for Family Care or Bereavement Purposes: Most Federal employees may use up to 13 days (104 hours) of sick leave, each leave year, to provide care for a family member who is incapacitated as a result of physical or mental illness, injury, pregnancy, childbirth; provide care for a family member as a result of medical, dental, or optical exam or treatment; or to make arrangements necessitated by the death of a family member or attend the funeral of a family member. Current sick leave policies and/or negotiated procedures apply. Sick leave under the Family Friendly Leave Act is treated like the employee's personal sick leave and follows the same restrictions.

(a) Full-time employees are entitled to use up to 104 hours of sick leave each leave year for these purposes.

(b) Part-time employees and employees with uncommon tours of duty are also covered, and the amount of sick leave permitted is pro-rated in proportion to the average number of hours of work in the employee's scheduled tour of duty each week.

(c) An employee may be advanced sick leave (or a proportional amount for an employee on a part-time schedule or uncommon tour of duty).

(2) Sick Leave to Care for a Family Member with a Serious Health Condition:

(a) Most full-time employees may use up to 12 administrative workweeks (480 hours) of sick leave each leave year to care for a family member with a serious health condition. In such cases, the employee is required to provide medical certification that (1) the family member requires psychological comfort and/or physical care; (2) the family member would benefit from the employee's care or presence; and (3) the employee is needed to care for the family member for a specified period of time. A part-time employee or an employee with an uncommon tour may use sick leave in an amount equal to 12 times the average number of hours of work in the employee's scheduled tour of duty each week. Any portion of the 13-day maximum limit of sick leave used for general family care or bereavement in a leave year must be deducted from the 12-week entitlement for expanded family care. If an employee has already used 12 weeks of sick leave to care for a family member with a serious health condition, he or she cannot use an additional 104 hours in the same leave year for general family care purposes. An employee is entitled to a total of 12 weeks of sick leave each leave year for ***all*** family care purposes.

(b) A serious health condition has the same meaning used under the Family and Medical Leave Act (FMLA) of 1993. This includes such conditions as cancer, heart attacks, heart bypass or valve operations, strokes, severe injuries, kidney dialysis, Alzheimer's disease, clinical depression, mental conditions that require inpatient care or continuing treatment, pregnancy, and childbirth. Sick leave may not be used under this heading for bonding or to care for a healthy newborn and is only granted for the period of the mother's incapacitation. This term is not intended to cover short-term conditions for which treatment and recovery are very brief. The common cold, the flu, earaches, upset stomach, headaches (other than migraines), routine dental or orthodontia problems, etc., are not serious health conditions unless complications arise.

(3) Employees may be authorized up to 7 days excused absence for bone marrow donations and up to 30 days for organ donations. Leave for bone marrow and organ donation is a separate category of leave that is in addition to annual and sick leave. Requests must be submitted in writing, through appropriate supervisory channels to the Director for approval. These requests must be accompanied by appropriate medical documentation.

k. Tardiness or Brief Periods of Absence: Supervisors should excuse, without charge to leave, infrequent, brief periods of tardiness/absence if such tardiness/absence was for a good cause.

5. **REFERENCES**

5 U.S.C. Chapter 63
5 CFR, part 630
VA Handbook 5011
Master Agreement between VA and AFGE

6. **RESCISSION**

RO Circular 25-05-1 dated September 23, 2005. This circular will expire January 31, 2010.

BARRY M. BARKER
Director

Distribution: F

## Leave Approving Officials

| Type of Leave | Division Chief | Assistant Director | Director | Leave Requesting Method |
|---|---|---|---|---|
| **Annual Leave** | | | | |
| Annual leave & advanced annual leave of 10 workdays or less | Non-supervisor* Supervisor* | Division Chief | Assistant Director | ETA or other electronic system |
| Advance annual leave in excess of 10 workdays | | Non-supervisor Supervisor Division Chief | Assistant Director | ETA or other electronic system with Division Chief's recommendation submitted through HR to Assistant Director |
| Carry-over of annual leave in excess of the maximum permissible amount | | | | Procedures outlined in VA Handbook 5011, Part III, Chapter 2,3.f. |
| **Sick Leave** | | | | |
| Sick leave and advanced sick leave of 10 workdays or less | Non-supervisor* Supervisor* | Division Chief | Assistant Director | ETA or other electronic system, Medical Certificate – more than 3 workdays. |
| Advanced sick leave in excess of 10 workdays | | Non-supervisor Supervisor Division Chief | Assistant Director | ETA or other electronic system, Medical Certificate with Division Chiefs recommendation through HR to Assistant Director |
| **Other Leave** | | | | |
| Voluntary Leave Transfer Program | | | Non-supervisor Supervisor Division Chief Assistant Director | Written request with required information and medical certification sent through HR to Director. |
| Absence for Maternity Reasons | | | | May consist of AL, SL, or LWOP, or combination. Refer to appropriate type of leave (MUST BE MEDICALLY CERTIFIED) |
| Absence for Paternity Reasons | | | | May consist of AL, SL or LWOP. Refer to appropriate type of leave. |
| Military Leave | Non-supervisor Supervisor | Division Chief | Assistant Director | ETA or other electronic system. Set of Active Duty Orders. Employee must submit certificate of attendance of the training duty signed by CO after he/she returns to duty. |

## Leave Approving Officials

| Type of Leave | Division Chief | Assistant Director | Director | Leave Requesting Method |
|---|---|---|---|---|
| Court Leave | Non-supervisor Supervisor | Division Chief | Assistant Director | ETA or other electronic system EMPLOYEE MUST SUBMIT OFFICIAL COURT NOTICE PRIOR TO APPROVAL. |
| **Excused Absenses** | | | | |
| Leave to Vote | | Non-supervisor Supervisors Division Chief | Assistant Director | ETA or other electronic system submitted through Division Chief to Assistant Director |
| Blood Donor Program; VA Placement Matters: Change in Station | Non-supervisor* Supervisor* | Division Chief | Assistant Director | Orally |
| Attendance at conference and conventions of civil, professional, technical organizations | | | | |
| Less than 4 hours | Non-supervisor* Supervisor* | Division Chief | Assistant Director | ETA or other electronic system |
| More than 4 hours | | Non-supervisor Supervisors Division Chief | Assistant Director | ETA or other electronic system |
| Official time for representational functions | Non-supervisor | | | Written Request |
| Official time for EEO complaints | Non-supervisor* Supervisor* | Division Chief | Assistant Director | Orally |
| Leave without pay 10 workdays or less | Non-supervisor* Supervisor* | Division Chief | Assistant Director | ETA or other electronic system. HR to be notified when an employee is expected to exceed 7 calendar days. |
| Leave without pay in excess of 10 workdays | | Non-supervisor Supervisor Division Chief | Assistant Director | ETA or other electronic system with Division Chief's recommendation submitted through HR to Assistant Director. SF-52 will be attached for LWOP in excess of 30 calendar days |

- Subordinate supervisors may be delegated authority to approve leave marked with an asterisk (*) and to excuse tardiness of less than one hour. Such delegations will be made known in writing to employees concerned with copy furnished to the Director.

# SEPARATOR

# PAGE

**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
St. Petersburg, Florida

**CIRCULAR NO. 24-06-3**

April 7, 2006

# TIME AND ATTENDANCE REPORTING

## 1. PURPOSE:

To outline responsibility for maintenance and submission of Time and Attendance Data utilizing the Enhanced Time and Attendance (ETA) System.

## 2. GENERAL:

It is the policy of this Regional Office to perform timekeeping functions and maintain all time and leave records in accordance with applicable VA Directives to ensure that each employee is paid in a timely manner for all work performed during a biweekly pay period.

## 3. RESPONSIBILITY:

### A. DIVISION CHIEFS ARE RESPONSIBLE FOR:

(1) Requesting designation of unit timekeepers/alternate timekeepers for their division. The Chief, Support Services approves/disapproves timekeeper/alternate designations. Designations will be authorized by memorandum, addressed to the Chief, Support Services. The original will be forwarded to Payroll for filing. A copy will be returned to the originating office once menu option(s) have been assigned and name(s) added to the designated T&L Unit. Written designation requests must be kept current at all times. Division Chief will also insure that VAF ISO 302(317), ETA Access Request-VARO St. Petersburg, Fl, is completed as necessary for access to appropriate ETA Menus.

(2) Selecting timekeepers who are reliable, stable in their positions, and fully aware of the responsibility placed upon them.

(3) Insuring that all timekeeper postings and supervisory approvals are finalized by 9:30 a.m. on the Monday following each pay period or as required by the Employee Accounts Section, when special circumstances dictate different deadlines.

(4) Monitoring, in cooperation with supervisors and unit timekeepers, the Pay Period Exceptions and Prior Pay Period Exceptions listings to ensure that all exceptions are resolved within two pay periods.

(5) Ensuring that unit timekeepers/alternates are not relatives of a Payroll Technician (or others having payroll responsibilities). If a designated timekeeper/alternate becomes related to a Payroll Technician (or others having payroll responsibilities) subsequent to their designation, Division Chief will advise Payroll and rescind their designation immediately.

B. **SUPERVISORS ARE RESPONSIBLE FOR:**

(1) Administering the leave policies and regulations for employees under their supervision. Ensuring that annual/sick leave balances are not overdrawn, and other types of leave/absence are not exceeded. Obtaining proper documentation for the types of leave/absences when required.

(2) Ensuring that employees enter their leave requests prior to taking leave, except in extenuating circumstances, and then immediately upon their return to duty.

(3) Ensuring that the unit timekeepers are promptly notified concerning time and leave, and that they have sufficient time for ***daily*** posting of time and attendance reports in order to maintain accurate and complete records.

(4) Approving leave, overtime/compensatory time, and corrected timecards ***daily*** at the supervisor level using Option 1 of T&A Supervisor Menu.

(5) Verifying the accuracy of the data posted to the timecards; remarks are entered when required; and approving leave ***only*** when positive balances are displayed on the approval screen.

(6) Monitoring, in cooperation with unit timekeeper(s), the Pay Period Exceptions and Prior Pay Period Exceptions listings to ensure that all exceptions are resolved within two pay periods.

(7) Ensuring that employees are scheduled for their established tour hours during the bi-weekly pay period.

C. **UNIT TIMEKEEPERS ARE RESPONSIBLE FOR:**

(1) Entering scheduled tours of duty for all employees assigned to their jurisdiction no later than close-of-business on the Thursday prior to the beginning of each pay period. Under no circumstances may a unit timekeeper/alternate perform timekeeping duties for a relative.

(2) Daily ***posting*** of attendance and leave on electronic Time and Attendance Reports. A statement must be entered in remarks when an employee not at work because of military leave, Absent without Leave (AWOL), Leave without Pay (LWOP), Family and Medical Act leave (FML), Family Friendly leave (FFL), suspension, jury duty/court leave, travel, training, authorized absence or a time-off award.

(3) Verifying leave balance prior to posting leave to ensure that an employee does not overdraw their leave account.

(4) Daily preparation of electronic overtime/compensatory time requests. Enter a brief statement in remarks for justification.

(5) Preparing corrected time and attendance data daily.

(6) Obtaining SF-71s from employees not having VISTA access and from employees using sick leave for Family Friendly Leave (FFL), Family Medical Leave (FMLA), bereavement, or adoption.

(7) Ensuring that documentation is forwarded to Payroll for various types of leave and absences; (i.e. military leave, jury duty/court leave, LWOP, training, annual leave donation under Voluntary Leave Transfer program, authorized absence, etc.)

(8) Keeping alternate timekeepers fully and completely informed as to the primary timekeeper's absence and location of information necessary to complete daily posting.

(9) Ensuring that electronic Time and Attendance Reports are completed and available for certification no later than 9:00a.m. on the Monday following the end of the pay period or as required by the Employee Accounts Section, when special circumstances dictate different deadlines.

(10) Monitoring, in cooperation with certifying officials, the Pay Period Exceptions and Prior Pay Period Exceptions listing to ensure that all exceptions are resolved with two pay periods.

(11) Picking up Earnings and Leave Statements from the Employee Accounts Office after 10:00 a.m. on the Tuesday of payday. Earnings and Leave Statements will be hand delivered to employees at their work site.

D. **EMPLOYEES ARE RESPONSIBLE FOR:**

(1) Requesting leave through their immediate supervisor in advance of the effective date, except in emergency situations.

(2) Entering requests for leave (prior to taking leave, except in extenuating circumstances) using Option "*1*" of the "*Employee T&A Menu*". If a leave request is not entered in advance, it must be entered immediately upon the employee's return to duty. Employees are responsible for verifying the accuracy of data posted to their timecard at the end of each pay period. Option 6 (Display Pay Period) on the employee menu is used for this purpose.

(3) Checking their leave balance (Option 2 on the Employee Menu) before requesting leave, to ensure that their leave balance does not become overdrawn. The balance shown on the screen is current at the beginning of each pay period. However, it does not take into consideration any leave used during the current pay period or pending corrections to previous time cards. Compensatory time balances must be used by the date shown on the leave balance screen.

(4) Preparing a paper SF-71 to request leave if they do not have VISTA access or requesting sick leave for Family Friendly Leave (FFL), Family Medical Leave (FMLA), bereavement, or adoption.

(5) Providing supervisor with documentation, in advance when possible, for periods of extended leave such as, military leave, jury duty/court leave, FML, FFL, sick leave, LWOP, authorized absence, travel or training.

(6) Keeping supervisor informed of their progress when on leave or continuation of pay.

E. **SUPPORT SERVICES PAYROLL IS RESPONSIBLE FOR:**

(1) Proper preparation and maintenance of time and leave records of all employees.

(2) Assigning a numerical designation for each Time and Leave Unit.

(3) Reviewing time and leave posting and coding on Time and Attendance Reports to ensure that remarks are entered, codes are appropriate for premium pay and documentation is received.

(4) Conducting initial training of newly appointed unit timekeepers, supervisors and certifying officials within 30 days of their appointment. Conducting annual refresher training for all unit timekeepers and supervisors.

(4) Performing system audits of all timekeepers on a semiannual basis, or more frequently when warranted. Upon completion of desk audits, a report will be made to the timekeeper's Division Chief, over the signature of the Chief, Support Services.

(6) Recommending the revocation of a designation of timekeeper when considered necessary for effective and efficient timekeeping. The recommendation will be made to the Division Chief through the Director, over the signature of the Chief, Support Services.

(7) Monitoring, in cooperation with unit timekeepers, supervisors and Division Chiefs, the Pay Period Exceptions and Prior Pay Period Exceptions listings to ensure that all exceptions are resolved within two pay periods.

(8) Ensuring that unit timekeepers/alternates are not relatives of a Payroll Technician (or others having payroll responsibilities). If a designated timekeeper/alternate becomes related to a Payroll Technician (or others having payroll responsibilities) subsequent to their designation, Payroll will advise the appropriate Division Chief and request that they rescind the designation immediately.

F. **HUMAN RESOURCES IS RESPONSIBLE FOR:**

Providing Payroll Technician with documentation for employee participants and donors under the Voluntary Leave Transfer program.

## 4. REFERENCES:

VA Manual MP-6, Part V, Supplement 2.2, Chapter 1,
VA Directive 5610.4
VA Directive 4100
VA Handbook 5011

**5. <u>RESCISSION:</u>** RO Circular No. 24-95-2 dated March 2, 1995.

BARRY M. BARKER
Director

Distribution:
"E"

# SEPARATOR

# PAGE

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR Data is current as of November 8, 2012

Title 5: Administrative Personnel

---

**PART 630—ABSENCE AND LEAVE**

---

**Contents**

**Subpart A—General Provisions**

§ 630.101 Responsibility for administration.

**Subpart B—Definitions and General Provisions for Annual and Sick Leave**

§ 630.201 Definitions.
§ 630.202 Full biweekly pay period; leave earnings.
§ 630.203 Pay periods other than biweekly.
§ 630.204 Fractional pay periods.
§ 630.205 Credit for prior work experience and experience in a uniformed service for determining annual leave accrual rate.
§ 630.206 Minimum charge.
§ 630.207 Travel time.
§ 630.208 Reduction in leave credits.
§ 630.209 Refund for unearned leave.
§ 630.210 Uncommon tours of duty.
§ 630.211 Exclusion of Presidential appointees.
§ 630.212 Use of annual leave to establish initial eligibility for retirement or continuation of health benefits.

**Subpart C—Annual Leave**

§ 630.301 Annual leave accrual and accumulation—Senior Executive Service, Senior-Level, and Scientific and Professional Employees.
§ 630.302 Maximum annual leave accumulation—forty-five day limitation.
§ 630.303 Part-time employees; earnings.
§ 630.304 Accumulation limitation for part-time employees.
§ 630.305 Designating agency official to approve exigencies.
§ 630.306 Time limit for use of restored annual leave.
§ 630.307 Time limit for use of restored annual leave—former missing employees.
§ 630.308 Scheduling of annual leave.
§ 630.309 Time limit for use of restored annual leave—extended exigency of the public business.
§ 630.310 Scheduling of annual leave by employees determined necessary for Year 2000 computer conversion efforts.
§ 630.311 Scheduling of annual leave by employees determined necessary to respond to the "National Emergency by Reason of Certain Terrorist Attacks."

**Subpart D—Sick Leave**

§ 630.401 Granting sick leave.
§ 630.402 Advanced sick leave.
§ 630.403 Substitution of sick leave for unpaid family and medical leave to care for a covered

servicemember.
§ 630.404 Requesting sick leave.
§ 630.405 Supporting evidence for the use of sick leave.
§ 630.406 Use of sick leave during annual leave.
§ 630.407 Sick leave used in the computation of an annuity.
§ 630.408 Records on the use of sick leave.

**Subpart E—Recredit of Leave**

§ 630.501 Annual leave recredit.
§ 630.502 Sick leave recredit.
§ 630.503 Leave from former leave systems.
§ 630.504 Reestablishment of leave account after military service.
§ 630.505 Restoration after appeal.
§ 630.506 Minimum unit.

**Subpart F—Home Leave**

§ 630.601 Definitions.
§ 630.602 Coverage.
§ 630.603 Computation of service abroad.
§ 630.604 Earning rates.
§ 630.605 Computation of home leave.
§ 630.606 Grant of home leave.
§ 630.607 Transfer and recredit of home leave.

**Subpart G—Shore Leave**

§ 630.701 Coverage.
§ 630.702 Definitions.
§ 630.703 Computation of shore leave.
§ 630.704 Granting shore leave.

**Subpart H—Funeral Leave**

§ 630.801 Applicability.
§ 630.802 Coverage.
§ 630.803 Definitions.
§ 630.804 Granting of funeral leave.

**Subpart I—Voluntary Leave Transfer Program**

§ 630.901 Purpose and applicability.
§ 630.902 Definitions.
§ 630.903 Administrative procedures.
§ 630.904 Application to become a leave recipient.
§ 630.905 Approval of application to become a leave recipient.
§ 630.906 Transfer of annual leave.
§ 630.907 Accrual of annual and sick leave.
§ 630.908 Limitations on donation of annual leave.
§ 630.909 Use of transferred annual leave.
§ 630.910 Termination of medical emergency.
§ 630.911 Restoration of transferred annual leave.
§ 630.912 Prohibition of coercion.
§ 630.913 Records and reports.

**Subpart J—Voluntary Leave Bank Program**

§ 630.1001 Purpose and applicability.
§ 630.1002 Definitions.

§ 630.1003 Establishing leave banks and leave bank boards.
§ 630.1004 Application to become a leave contributor and leave bank member.
§ 630.1005 Limitations on contribution of annual leave.
§ 630.1006 Application to become a leave recipient.
§ 630.1007 Approval of application to become a leave recipient.
§ 630.1008 Accrual of annual and sick leave.
§ 630.1009 Use of annual leave withdrawn from a leave bank.
§ 630.1010 Termination of medical emergency.
§ 630.1011 Prohibition of coercion.
§ 630.1012 Records and reports.
§ 630.1013 Participation in voluntary leave transfer and leave bank programs.
§ 630.1014 Movement between voluntary leave bank programs.
§ 630.1015 Movement between voluntary leave bank and leave transfer programs.
§ 630.1016 Termination of a voluntary leave bank program.

**Subpart K—Emergency Leave Transfer Program**

§ 630.1101 Purpose, applicability, and administration.
§ 630.1102 Definitions.
§ 630.1103 Establishment of an emergency leave transfer program.
§ 630.1104 Donations from a leave bank to an emergency leave transfer program.
§ 630.1105 Application to become an emergency leave recipient.
§ 630.1106 Agency review of an application to become an emergency leave recipient.
§ 630.1107 Notification of approval or disapproval of an application to become an emergency leave recipient.
§ 630.1108 Use of available paid leave.
§ 630.1109 Donating annual leave.
§ 630.1110 Limitation on the amount of annual leave donated by an emergency leave donor.
§ 630.1111 Limitation on the amount of donated annual leave received by an emergency leave recipient.
§ 630.1112 Transferring donated annual leave between agencies.
§ 630.1113 Using donated annual leave.
§ 630.1114 Accrual of leave while using donated annual leave.
§ 630.1115 Limitations on the use of donated annual leave.
§ 630.1116 Termination of a disaster or emergency.
§ 630.1117 Procedures for returning unused donated annual leave to emergency leave donors and leave banks.
§ 630.1118 Protection against coercion.

**Subpart L—Family and Medical Leave**

§ 630.1201 Purpose, applicability, and administration.
§ 630.1202 Definitions.
§ 630.1203 Leave entitlement.
§ 630.1204 Qualifying exigency leave.
§ 630.1205 Intermittent leave or reduced leave schedule.
§ 630.1206 Substitution of paid leave.
§ 630.1207 Notice of leave.
§ 630.1208 Medical certification.
§ 630.1209 Certification for leave taken because of a qualifying exigency.
§ 630.1210 Protection of employment and benefits.
§ 630.1211 Health benefits.
§ 630.1212 Greater leave entitlements.
§ 630.1213 Records and reports.

**Subpart M—Reservist Leave Bank Program**

§ 630.1301 Purpose and applicability.
§ 630.1302 Definitions.

§ 630.1303 Identifying eligible returnees.
§ 630.1304 Receipt, processing, and transfer of leave.
§ 630.1305 Limitations on contribution of annual leave.
§ 630.1306 Prohibition of coercion.
§ 630.1307 Crediting annual leave accounts of eligible returnees.
§ 630.1308 Use of annual leave contributed under this program.
§ 630.1309 Records and reports.

---

AUTHORITY: 5 U.S.C. 6311; § 630.205 also issued under Pub. L. 108-411, 118 Stat 2312; § 630.301 also issued under Pub. L. 103-356, 108 Stat. 3410 and Pub. L. 108-411, 118 Stat 2312; § 630.303 also issued under 5 U.S.C. 6133(a); §§ 630.306 and 630.308 also issued under 5 U.S.C. 6304(d)(3), Pub. L. 102-484, 106 Stat. 2722, and Pub. L. 103-337, 108 Stat. 2663; subpart D also issued under Pub. L. 103-329, 108 Stat. 2423; § 630.501 and subpart F also issued under E.O. 11228, 30 FR 7739, 3 CFR, 1974 Comp., p. 163; subpart G also issued under 5 U.S.C. 6305; subpart H also issued under 5 U.S.C. 6326; subpart I also issued under 5 U.S.C. 6332, Pub. L. 100-566, 102 Stat. 2834, and Pub. L. 103-103, 107 Stat. 1022; subpart J also issued under 5 U.S.C. 6362, Pub. L 100-566, and Pub. L. 103-103; subpart K also issued under Pub. L. 105-18, 111 Stat. 158; subpart L also issued under 5 U.S.C. 6387 and Pub. L. 103-3, 107 Stat. 23; and subpart M also issued under 5 U.S.C. 6391 and Pub. L. 102-25, 105 Stat. 92.

SOURCE: 33 FR 12475, Sept. 4, 1968, unless otherwise noted.

## Subpart A—General Provisions

### § 630.101 Responsibility for administration.

The head of an agency having employees subject to this part is responsible for the proper administration of this part so far as it pertains to employees under his jurisdiction, and for maintaining an account of leave for each employee in accordance with methods prescribed by the General Accounting Office.

[34 FR 13655, Aug. 26, 1969]

## Subpart B—Definitions and General Provisions for Annual and Sick Leave

### § 630.201 Definitions.

(a) In section 6301(2)(iii) of title 5, United States Code, the term *temporary employee engaged in construction work at an hourly rate* means an employee hired on a temporary basis solely for the purpose of work on a specific construction project and paid on an hourly rate.

(b) In subparts B through G of this part:

*Accrued leave* means the leave earned by an employee during the current leave year that is unused at any given time in that year.

*Accumulated leave* means the unused leave remaining to the credit of an employee at the beginning of the leave year.

*Agency* means an Executive agency, as defined in 5 U.S.C. 105, and any other entity of the Federal Government that employs officers and employees to whom subchapter I of chapter 63 of title 5, United States Code, applies.

*Committed relationship* means one in which the employee, and the domestic partner of the employee, are each other's sole domestic partner (and are not married to or domestic partners with anyone else); and share responsibility for a significant measure of each other's common welfare and financial obligations. This includes, but is not limited to, any relationship between two individuals of the same or opposite sex that is granted legal recognition by a State or by the District of Columbia as a marriage or analogous relationship (including, but not limited to, a civil union).

*Domestic partner* means an adult in a committed relationship with another adult, including both same-sex and opposite-sex relationships.

*Employee* means an employee to whom subchapter I of chapter 63 of title 5, United States Code, applies.

*Family member* means an individual with any of the following relationships to the employee:

(1) Spouse, and parents thereof;

(2) Sons and daughters, and spouses thereof;

(3) Parents, and spouses thereof;

(4) Brothers and sisters, and spouses thereof;

(5) Grandparents and grandchildren, and spouses thereof;

(6) Domestic partner and parents thereof, including domestic partners of any individual in paragraphs (2) through (5) of this definition; and

(7) Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

*Health care provider* has the meaning given that term in § 630.1202.

*Leave year* means the period beginning with the first day of the first complete pay period in a calendar year and ending with the day immediately before the first day of the first complete pay period in the following calendar year.

*Medical certificate* means a written statement signed by a registered practicing physician or other practitioner certifying to the incapacitation, examination, or treatment, or to the period of disability while the patient was receiving professional treatment.

*Parent* means—

(1) A biological, adoptive, step, or foster parent of the employee, or a person who was a foster parent of the employee when the employee was a minor;

(2) A person who is the legal guardian of the employee or was the legal guardian of the employee when the employee was a minor or required a legal guardian;

(3) A person who stands *in loco parentis* to the employee or stood *in loco parentis* to the employee when the employee was a minor or required someone to stand *in loco parentis;* or

(4) A parent, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

*Serious health condition* has the meaning given that term in § 630.1202.

*Son or daughter* means—

(1) A biological, adopted, step, or foster son or daughter of the employee;

(2) A person who is a legal ward or was a legal ward of the employee when that individual was a minor or required a legal guardian;

(3) A person for whom the employee stands *in loco parentis* or stood *in loco parentis* when that individual was a minor or required someone to stand *in loco parentis;* or

(4) A son or daughter, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

*Uncommon tour of duty* means an established tour of duty that exceeds 80 hours of work in a biweekly pay period, provided the tour—

(1) Includes hours for which the employee is compensated by standby duty pay under 5 U.S.C. 5545(c)(1) and § 550.141 of this chapter;

(2) Is a regular tour of duty (as defined in § 550.1302 of this chapter) established for firefighters compensated under 5 U.S.C. 5545b and part 550, subpart M, of this chapter; or

(3) Is authorized for a category of employees by the Office of Personnel Management.

*United States* means the several States and the District of Columbia.

[61 FR 64450, Dec. 5, 1996, as amended at 63 FR 64595, Nov. 23, 1998; 65 FR 37239, June 13, 2000; 71 FR 54570, Sept. 18, 2006; 75 FR 33495, June 14, 2010]

**§ 630.202 Full biweekly pay period; leave earnings.**

(a) *Full-time employees.* A full-time employee earns leave during each full biweekly pay period while in a pay status or in a combination of a pay status and a nonpay status.

(b) *Part-time employees.* Hours in a pay status in excess of an agency's basic working hours in a pay period are disregarded in computing the leave earnings of a part-time employee.

[33 FR 12475, Sept. 4, 1968, as amended at 55 FR 6595, Feb. 26, 1990]

**§ 630.203 Pay periods other than biweekly.**

An employee paid on other than a biweekly pay period basis earns leave on a pro rata basis for a full pay period.

**§ 630.204 Fractional pay periods.**

When an employee's service is interrupted by a non-leave-earning period, he earns leave on a pro rata basis for each fractional pay period that occurs within the continuity of his employment.

**§ 630.205 Credit for prior work experience and experience in a uniformed service for determining annual leave accrual rate.**

(a) The head of an agency or his or her designee may, at his or her sole discretion, provide credit for service that otherwise would not be creditable under 5 U.S.C. 6303(a) for the purpose of determining the annual leave accrual rate of an individual receiving his or her first appointment (regardless of tenure) as a civilian employee of the Federal Government or an employee who is reappointed following a break in service of at least 90 calendar days after his or her last period of civilian Federal employment. The head of the agency or his or her designee must determine that the skills and experience the employee possesses are—

(1) Essential to the new position and were acquired through performance in a prior position having duties that directly relate to the duties of the position to which he or she is being appointed; and

(2) Necessary to achieve an important agency mission or performance goal.

(b) Notwithstanding 5 U.S.C. 6303(a), the head of an agency or his or her designee may, at his or her sole discretion, provide credit for active duty uniformed service that otherwise would not be creditable under 5 U.S.C. 6303(a) for the purpose of determining the annual leave accrual rate of an employee who is a retired member of a uniformed service as defined by 38 U.S.C. 4303. The head of the agency or his or her designee must determine that the skills and experience the employee possesses are—

(1) Essential to the new position and were acquired through performance in a position in the uniformed services having duties that directly relate to the duties of the position to which he or she is being appointed; and

(2) Necessary to achieve an important agency mission or performance goal.

(c) When the head of an agency or his or her designee makes a determination to provide service credit for prior work experience or active duty in the uniformed services under paragraph (a) or (b) of this section, he or she must determine the amount of service that will be credited. The amount of service credited may not exceed the actual amount of service during which the employee performed duties directly related to the position to which the employee is being appointed.

(d) An employee must provide written documentation, acceptable to the agency, of his or her prior work experience. An employee must provide written documentation from the military, acceptable to the agency, of his or her uniformed service. The head of an agency or his or her designee must make the determination to approve an employee's qualifying prior work experience before the employee enters on duty.

(e) The agency must establish documentation and recordkeeping procedures sufficient to allow reconstruction of each action.

(f)(1) Credit for prior work experience or experience in a uniformed service under paragraphs (a) and (b) of this section is granted to the employee upon the effective date of his or her initial appointment to the agency or reappointment after a 90-day break in service and remains creditable for annual leave accrual purposes thereafter unless the employee fails to complete 1 full year of continuous service with the appointing agency.

(2) If an employee is placed in a leave without pay status during the 1-year period of continuous service required by paragraph (f)(1) of this section, the 1-year period of continuous service must be extended by the amount of time in a leave without pay unless—

(i) The employee separates or is placed in a leave without pay status to perform service in the uniformed services (as defined in 38 U.S.C. 4303 and 5 CFR 353.102) and later returns to civilian service through the exercise of a reemployment right provided by law, Executive order, or regulation; or

(ii) The employee separates or is placed in a leave without pay status because of an on-the-job injury with entitlement to injury compensation under 5 U.S.C. chapter 81 and later recovers sufficiently to return to work.

(g) If an employee separates from Federal service or transfers to another agency before completing 1 full year of continuous service with the appointing agency—

(1) Any credit under paragraph (a) or (b) of this section must be subtracted from the employee's total creditable service before the employee transfers or separates, and the agency must establish a new service computation date for leave accrual purposes under 5 U.S.C. 6303(a);

(2) Any annual leave accrued or accumulated by an employee as a result of receiving credit for service under paragraph (a) or (b) of this section remains to the credit of the employee; and

(3) The agency must—

(i) Transfer the annual leave balance to the new employing agency under 5 CFR 630.501 if the employee is transferring to a position to which annual leave may be transferred; or

(ii) Make a lump-sum payment under 5 CFR 550.1205 for any unused annual leave if the employee is separating from Federal service or moving to a position to which annual leave cannot be transferred.

[70 FR 22246, Apr. 29, 2005, as amended at 71 FR 54570, Sept. 18, 2006]

**§ 630.206 Minimum charge.**

(a) Unless an agency establishes a minimum charge of less than one hour, or establishes a different minimum charge through negotiations, the minimum charge for leave is one hour, and additional charges are in multiples thereof. If an employee is unavoidably or necessarily absent for less than one hour, or tardy, the agency, for adequate reason, may excuse him without charge to leave.

(b) When an employee is charged with leave for an unauthorized absence or tardiness, the agency may not require him to perform work for any part of the leave period charged against his account.

[33 FR 12475, Sept. 4, 1968, as amended at 38 FR 18446, July 11, 1973; 38 FR 26601, Sept. 24, 1973]

**§ 630.207 Travel time.**

The travel time granted an employee under section 6303(d) of title 5, United States Code, is inclusive of the time necessarily occupied in traveling to and from his post of duty and (a) the United States, or (b) his place of residence, which is outside the area of employment, in the Commonwealth of Puerto Rico or the territories or possessions of the United States. The employee shall designate his place of residence in his request for leave under section 6303(d) of title 5, United States Code.

**§ 630.208 Reduction in leave credits.**

(a) When the number of hours in a nonpay status in a full-time employee's leave year equals the number of basepay hours in a pay period, the agency shall reduce his credits for leave by an amount equal to the amount of leave the employee earns during the pay period. When the employee's number of hours of nonpay status does not require a reduction of leave credits, the agency shall drop those hours at the end of the employee's leave year. For the purpose of determining the reduction of leave credits under this paragraph when an employee has one or more breaks in service during a leave year, the agency shall include all hours in a nonpay status (other than nonpay status during a fractional pay period when no leave accures) for each period of service during the leave year in which annual leave accrued.

(b) An employee who is in a nonpay status for his entire leave year does not earn leave.

(c) When a reduction in leave credits results in a debit to an employee's annual leave account at the end of a leave year, the agency shall:

(1) Carry the debit forward as a charge against the annual leave to be earned by the employee in the next leave year; or

(2) Require the employee to refund the amount paid him for the period covering the excess leave that resulted in the debit.

(d) A period covered by an employee's refund for unearned advanced leave is deemed not a nonpay status under this section.

**§ 630.209 Refund for unearned leave.**

(a) When an employee who is indebted for unearned leave is separated, the agency shall:

(1) Require him to refund the amount paid him for the period covering the leave for which he is indebted; or

(2) Deduct that amount from any pay due him.

An employee who enters active military service with a right of restoration is deemed not separated for the purpose of this paragraph.

(b) This section does not apply when an employee:

(1) Dies;

(2) Retires for disability; or

(3) Resigns or is separated because of disability which prevents him from returning to duty or continuing in the service, and which is the basis of the separation as determined by his agency on medical evidence acceptable to it.

**§ 630.210 Uncommon tours of duty.**

(a) An agency may require that an employee with an uncommon tour of duty accrue and use leave on the basis of that uncommon tour of duty. The leave accrual rates for such employees shall be directly proportional (based on the number of hours in the biweekly tour of duty and the accrual rate of the corresponding leave category) to the standard leave accrual rates for employees who accrue and use leave on the basis of an 80-hour biweekly tour of duty. One hour (or appropriate fraction thereof) of leave shall be charged for each hour (or appropriate fraction thereof) of absence from the uncommon tour of duty.

(b) When an employee is converted to a different tour of duty for leave purposes, his or her leave balances shall be converted to the proper number of hours based on the proportion of hours in the new tour of duty compared to the former tour of duty.

(c) An agency shall establish an uncommon tour of duty for each firefighter compensated under part 550, subpart M, of this chapter. The uncommon tour of duty shall correspond directly to the firefighter's regular tour of duty, as defined in § 550.1302 of this chapter, so that each firefighter accrues and uses leave on the basis of that tour.

[59 FR 66635, Dec. 28, 1994, as amended at 63 FR 64595, Nov. 23, 1998; 67 FR 15467, Apr. 2, 2002]

**§ 630.211 Exclusion of Presidential appointees.**

(a) *Authority.* (1) Section 6301(2)(xi) of title 5, United States Code, authorizes the President to exclude certain Presidential appointees in the executive branch or the government of the District of Columbia from the annual and sick leave provisions of subchapter I of chapter 63 of title 5, United States Code, and from the related provisions of this part.

(2) The President, by Executive Order 10540, as amended, has delegated to the Office of Personnel Management the responsibility for making exclusions under section 6301(2)(xi), and the Office of Personnel Management has delegated responsibility to the head of each agency consistent with the provisions of this section.

(3) Presidential appointees in positions where the rate of basic pay is equal to or exceeds the rate for level V of the Executive Schedule are already excluded from the annual and sick leave provisions by 5 U.S.C. 6301(2)(x). Therefore, no further action by an agency is necessary to exclude these appointees.

(b) *Criteria for exclusions.* The head of an agency may exclude an officer in the agency from the annual and sick leave provisions only if the officer meets all of the following criteria:

(1) The officer is a Presidential appointee;

(2) The officer is not a United States attorney or United States marshal; and

(3) The officer's responsibilities for carrying out the duties of the position continue outside normal duty hours and while away from the normal duty post.

(c) *Revocation of exclusion.* The head of an agency may revoke an exclusion from the annual and sick leave provisions which was made under this section.

(d) *Reports.* The head of an agency must report any exclusion, or revocation of an exclusion, authorized under this section to the Office of Personnel Management.

(e) *Continuation of previous authorizations.* Any officer in an agency who was excluded by action of the President or the Civil Service Commission prior to February 15, 1979, from the annual and sick leave provisions under the authority of 5 U.S.C. 6301(2)(xi) shall continue to be excluded from annual and sick leave unless the exclusion is revoked by the agency under the provisions of this section.

[44 FR 54694, Sept. 21, 1979, as amended at 56 FR 18663, Apr. 23, 1991]

**§ 630.212 Use of annual leave to establish initial eligibility for retirement or continuation of health benefits.**

(a) An employee may elect to use annual leave and remain on the agency's rolls in order to establish initial eligibility for immediate retirement under 5 U.S.C. 8336, 8412, or 8414, and/or to establish initial eligibility under 5 U.S.C. 8905 to continue health benefits coverage into retirement, as provided in:

(1) Section 351.606(b)(1) for an employee who would otherwise have been separated by reduction in force procedures under part 351 of this chapter; or

(2) Section 351.606(b)(2) of this chapter for an employee who would otherwise have been separated by adverse action procedures under authority of part 752 of this chapter because of the employee's decision to decline relocation (including transfer of function).

(b)(1) Annual leave that may be used for the purposes described in paragraph (a) of this section includes all accumulated, accrued, and restored annual leave to the employee's credit prior to the effective date of the reduction in force or relocation (including transfer of function) and annual leave earned by an employee while in a paid leave status after the effective date of the reduction in force or relocation (including transfer of function).

(2) Annual leave that is advanced to an employee under 5 U.S.C. 6302(d), including any advance annual leave that may be credited to an employee's leave account after the effective date of the reduction in force or relocation (including transfer of function), may not be used for purpose of this section.

(3) For purposes of this section, the employing agency may approve the use of any or all annual leave donated to an employee under part 630, subpart I, of this chapter (Voluntary Leave Transfer Program), or made available to the employee under part 630, subpart J, of this chapter (Voluntary Leave Bank Program), as of the effective date of the reduction in force or relocation.

[62 FR 10683, Mar. 10, 1997]

## Subpart C—Annual Leave

**§ 630.301 Annual leave accrual and accumulation—Senior Executive Service, Senior-Level, and Scientific and Professional Employees.**

(a) Annual leave accrues at the rate of 1 day (8 hours) for each full biweekly pay period for an employee who is covered by 5 U.S.C. 6301, who is employed for the full pay period, and who—

(1) Holds a position in the Senior Executive Service (SES) which is subject to 5 U.S.C. 5383; or

(2) Holds a senior-level (SL) or scientific or professional (ST) position which is subject to 5 U.S.C. 5376.

(b) The head of an agency may request that OPM authorize an annual leave accrual rate of 1 full day (8 hours) for each biweekly pay period for additional categories of employees who are covered by 5 U.S.C. 6301 and who hold positions that are determined by OPM to be equivalent to positions subject to the pay systems under 5 U.S.C. 5383 or 5376. Such a request must include documentation that the affected pay system is equivalent to the SES or SL/ST pay system because it meets all three of the following conditions:

(1) Pay rates are established under an administratively determined (AD) pay system that was created under a separate statutory authority. If an AD position has a single rate of pay established under an authority outside of 5 U.S.C. chapters 51 and 53, that single rate (excluding locality pay) must be higher than the rate for GS-15, step 10 (excluding locality pay). If an AD position is paid within a rate range established under an authority outside of 5 U.S.C. chapters 51 and 53, the minimum rate of the rate range (excluding locality pay) must be at least equal to the minimum rate for the SES and SL/ST pay systems (120 percent of the rate for GS-15, step 1, excluding locality pay), and the maximum rate of the rate range (excluding locality pay) must be at least equal to the rate for level IV of the Executive Schedule;

(2) Covered positions are equivalent to a "Senior Executive Service position" as defined in 5 U.S.C. 3132(a)(2), a senior-level position ( *i.e.* , a non-executive position that is classified above GS-15, such as a high-level special assistant or a senior attorney in a highly-specialized field who is not a manager, supervisor, or policy advisor), or a scientific or professional position as described in 5 U.S.C. 3104; and

(3) Covered positions are subject to a performance appraisal system established under 5 U.S.C. chapter 43 and 5 CFR part 430, subparts B and C, or other applicable legal authority, for planning, monitoring, developing, evaluating, and rewarding employee performance.

(c) If OPM approves an agency's request to cover additional categories of employees, the higher annual leave accrual rate will become effective for the pay period during which OPM approves the agency's request. Agencies must credit annual leave at the 8-hour accrual rate for affected employees who are employed for the full pay period.

(d) An employee who moves to a position not covered by this section will no longer be entitled to the higher annual leave accrual rate established under paragraph (a) or (b) of this section, except as provided in 5 U.S.C. 6303(a). Upon movement to a noncovered position, an employee's annual leave accrual rate must be determined based on his or her years of creditable service, as provided in 5 U.S.C. 6303(a).

(e) Unused annual leave accrued by an employee while serving in a position subject to one of the pay systems under 5 U.S.C. 5383 (Senior Executive Service) or 5 U.S.C. 5376 (Senior-Level and Scientific or Professional) or 10 U.S.C. 1607(a) (Intelligence Senior Level), shall accumulate for use in succeeding years until it totals not more than 90 days (720 hours) at the beginning of the first full biweekly pay period (or corresponding period for an employee who is not paid on the basis of biweekly pay periods) occurring in a calendar year.

(f) When an employee in a position outside of those listed in paragraph (e) of this section moves to a position covered by paragraph (e) of this section, any annual leave accumulated prior to movement shall remain to the employee's credit.

(1) Annual leave accumulated prior to movement to a position covered by paragraph (e) of this section that is in excess of the amount allowed for the former position by 5 U.S.C. 6304(a), (b), or (c) and that is not used by the beginning of the first full biweekly pay period in the next leave year shall be subject to forfeiture.

(2) If an employee serves less than a full pay period in a position listed in paragraph (e) of this section, only that portion of accrued annual leave that is attributable to service in such a position shall be subject to the 90-day (720-hour) limitation on accumulation of annual leave. Annual leave accrued during the remainder of the pay period shall be subject to the limitations in 5 U.S.C. 6304(a), (b), and (c), as appropriate.

(g) When an employee covered by paragraph (e) of this section moves to a position not covered by paragraph (e) of this section, any annual leave accumulated while serving in the former position that is in excess of the amount allowed for the position by 5 U.S.C. 6304(a), (b), or (c) shall remain to the employee's credit and shall be subject to reduction under procedures identical to those described in 5 U.S.C. 6304(c).

(h) An employee in the Senior Executive Service who, as of the first day of the first pay period beginning after October 13, 1994, has accumulated annual leave in excess of 90 days (720 hours) is entitled to retain that leave as a personal leave ceiling. The leave shall be credited to the employee and shall be subject to reduction in the following manner:

(1) Annual leave credited to an employee shall be based on the amount of annual leave accumulated by the employee as of the end of the pay period preceding the first pay period beginning after October 13, 1994. The credited leave shall exclude—

(i) Any annual leave restored to the employee under 5 U.S.C. 6304(d); and

(ii) Any annual leave advanced to the employee under 5 U.S.C. 6302(d) that had not yet been earned.

(2) Annual leave credited to an employee that is in excess of 90 days (720 hours) shall be subject to reduction in the same manner as provided in 5 U.S.C. 6304(c) until the employee's accumulated annual leave is equal to or less than 90 days (720 hours). For the 1994 leave year, 5 U.S.C. 6304(c) shall be applied only for leave earned and used between the start of the first pay period beginning after October 13, 1994, and the end of the 1994 leave year.

(i) Agencies shall notify affected employees and maintain records on the accumulated annual leave credited to each employee under paragraph (h) of this section and on any reductions in the credited annual leave made under 5 U.S.C. 6304(c). If the employee transfers to another agency, such records shall be provided to the gaining agency.

[59 FR 65705, Dec. 21, 1994, as amended at 60 FR 33328, June 28, 1995; 70 FR 13344, 13345, Mar. 21, 2005; 71 FR 61634, Oct. 19, 2006; 73 FR 18943, Apr. 8, 2008]

**§ 630.302 Maximum annual leave accumulation—forty-five day limitation.**

(a) The effective date on which an employee (otherwise eligible thereunder) becomes subject to section 6304(b) of title 5, United States Code, is the:

(1) Date of his entry on duty when he is employed locally;

(2) Date of his arrival at a post of regular assignment for duty; or

(3) Date on which he begins to perform duty in an area outside the United States and the area of recruitment or from which transferred, when the employee is required to perform duty en route to his post of regular assignment for duty.

(b) Subject to section 6304(c) of title 5, United States Code, the maximum amount of annual leave that may be carried forward into the next leave year by an employee who is transferred or reassigned to a position in which he is no longer subject to section 6304(b) of that title is determined as follows:

(1) When, on the date prescribed by paragraph (c) of this section, the amount of an employee's accumulated and accrued annual leave is 30 days or less, he may carry forward the amount prescribed by section 6304(a) of title 5, United States Code;

(2) When, on the date prescribed by paragraph (c) of this section, the amount of an employee's accumulated and accrued annual leave is more than 30 days but not more than 45 days, he may carry forward the full amount thereof that is unused at the end of the current leave year;

(3) When, on the date prescribed by paragraph (c) of this section, the amount of an employee's accumulated and accrued annual leave is more than 45 days, he may carry forward the amount of unused annual leave to his credit at the end of the current leave year that does not exceed:

(i) 45 days, if he is not entitled to a greater accumulation under section 6304(c) of title 5, United States Code; or

(ii) The amount he is entitled to accumulate under section 6304(c) of that title, if that amount is greater than 45 days.

(c) For the purposes of paragraph (b) of this section, an agency shall determine the amount of an employee's accumulated and accrued annual leave at the end of the pay period which includes:

(1) The date on which the employee departs from his post of regular assignment for transfer or reassignment, except that when the employee is required to perform duty en route in an area in which he would be subject to section 6304(b) of title 5, United States Code, if assigned there, it is the date on which he ceases to perform the duty; or

(2) The date on which final administrative approval is given to effect a change in the employee's duty station when he is on detail or leave in the United States, or in an area (the Commonwealth of Puerto Rico or a territory or possession of the United States) from which he was recruited or transferred.

**§ 630.303 Part-time employees; earnings.**

A part-time employee for whom there has been established in advance a regular tour of duty on 1 or more days during each administrative workweek, and a part-time employee on a flexible work schedule for whom there has been established only a biweekly work requirement, earn annual leave as follows:

(a) An employee with less than 3 years of service earns 1 hour of annual leave for each 20 hours in a pay status.

(b) An employee with 3 but less than 15 years of service earns 1 hour of annual leave for each 13 hours in a pay status.

(c) An employee with 15 years or more of service earns 1 hour of annual leave for each 10 hours in a pay status.

[33 FR 12475, Sept. 4, 1968, as amended at 48 FR 44061, Sept. 27, 1983]

**§ 630.304 Accumulation limitation for part-time employees.**

A part-time employee may accumulate not more than 240 or 360 hours' annual leave on the same basis that a full-time employee may accumulate not more than 30 or 45 days' annual leave.

**§ 630.305 Designating agency official to approve exigencies.**

Before annual leave may be restored under 5 U.S.C. 6304, the determination that an exigency is of major importance and that therefore annual leave may not be used by employees to avoid forfeiture must be made by the head of the agency or someone designated to act for him or her on this matter. Except where made by the head of the agency, the determination may not be made by any official whose leave would be affected by the decision.

[53 FR 42933, Oct. 25, 1988]

**§ 630.306 Time limit for use of restored annual leave.**

(a) Except as otherwise authorized under paragraphs (b) and (c) of this section or other regulation, annual leave restored under 5 U.S.C. 6304(d) must be scheduled and used not later than the end of the leave year ending 2 years after:

(1) The date of restoration of the annual leave forfeited because of administrative error; or

(2) The date fixed by the agency head, or his or her designee, as the termination date of the exigency of the public business that resulted in forfeiture of the annual leave; or,

(3) The date the employee is determined to be recovered and able to return to duty if the leave was forfeited because of sickness.

(b) Annual leave restored to an employee under 5 U.S.C. 6304(d)(3) must be scheduled and used within the time limits prescribed in paragraphs (b)(1) and (b)(2) of this section:

(1) A full-time employee shall schedule and use excess annual leave of 416 hours or less by the end of the leave year in progress 2 years after the date the employee is no longer subject to 5 U.S.C. 6304(d)(3). The agency shall extend this period by 1 leave year for each additional 208 hours of excess annual leave or any portion thereof.

(2) A part-time employee shall schedule and use excess annual leave in an amount equal to or less than 20 percent of the number of hours in the employee's scheduled annual tour of duty by the end of the leave year in progress 2 years after the date the employee is no longer subject to 5 U.S.C. 6304(d)(3). The agency shall extend this period by 1 leave year for each additional number of hours of excess annual leave, or any portion thereof, equal to 10 percent of the number of hours in the employee's scheduled annual tour of duty.

(c) The time limits established under paragraphs (a) and (b) of this section for using restored annual leave accounts shall not apply for the entire period during which an employee is subject to 5 U.S.C. 6304(d)(3). When coverage under 5 U.S.C. 6304(d)(3) ends, a new time limit shall be established under paragraph (b) of this section for all annual leave restored to an employee under 5 U.S.C. 6304(d).

[59 FR 62972, Dec. 7, 1994]

### § 630.307 Time limit for use of restored annual leave—former missing employees.

Annual leave restored under section 5562 of title 5, United States Code, shall be used within a time limit to be prescribed by the Office of Personnel Management in each case taking into consideration the amount of the restored leave and other relevant factors.

[39 FR 1575, Jan. 11, 1974]

### § 630.308 Scheduling of annual leave.

(a) Except as provided in paragraph (b) of this section and §§ 630.310 and 630.311, before annual leave forfeited under 5 U.S.C. 6304 may be considered for restoration under that section, use of the annual leave must have been scheduled in writing before the start of the third biweekly pay period prior to the end of the leave year.

(b) The requirement for advance scheduling of annual leave in paragraph (a) of this section shall not apply to an employee who is covered by 5 U.S.C. 6304(d)(3). When coverage under 5 U.S.C. 6304(d)(3) terminates during a leave year, the employee shall make a reasonable effort to comply with the scheduling requirement in paragraph (a) of this section. The head of the agency or his or her designee may exempt employees from the advance scheduling requirement in paragraph (a) of this section if coverage under 6304(d)(3) terminated during the leave year and the employee was unable to comply with the advance scheduling requirement due to circumstances beyond his or her control.

[59 FR 62973, Dec. 7, 1994; 59 FR 65839, Dec. 21, 1994, as amended at 64 FR 46258, Aug. 25, 1999; 66 FR 55558, Nov. 2, 2001]

**§ 630.309 Time limit for use of restored annual leave—extended exigency of the public business.**

(a) Annual leave restored under 5 U.S.C. 6304(d)(1)(B) because of an extended exigency, as defined in paragraph (b) of this section, must be scheduled and used within a time period that equals twice the number of full calendar years, or parts thereof, that the exigency existed. This time period begins at the beginning of the leave year following the leave year in which the exigency is declared to be ended.

(b) An *extended exigency* means an exigency of such significance as to—

(1) Threaten the national security, safety, or welfare;

(2) Last more than 3 calendar years;

(3) Affect a segment of an agency or occupational class; and

(4) Preclude subsequent use of both restored and accrued annual leave within the time limit specified in § 630.306.

[50 FR 29937, July 23, 1985]

**§ 630.310 Scheduling of annual leave by employees determined necessary for Year 2000 computer conversion efforts.**

(a) Year 2000 computer conversion efforts are deemed to be an exigency of the public business for the purpose of restoring annual leave forfeited under 5 U.S.C. 6304. This exigency terminates on January 31, 2000.

(b) For any employee who forfeits annual leave under 5 U.S.C. 6304 at the beginning of leave year 2000 because the agency determined the employee's services were required during the Year 2000 computer conversion exigency, the forfeited annual leave is deemed to have been scheduled in advance for the purpose of 5 U.S.C. 6304(d)(1)(B) and § 630.308.

(c) Annual leave restored under 5 U.S.C. 6304(d) because of the Year 2000 computer conversion exigency must be scheduled and used not later than the end of leave year 2002.

(d) The time limits established under paragraphs (a) and (b) of § 630.306 for using previously restored annual leave do not apply for the period during which an employee's services were determined necessary for the completion of Year 2000 computer conversion efforts. On January 31, 2000, a new time limit will be established under paragraph (c) of this section for all annual leave restored to such an employee.

(e) An employee whose services were determined necessary during the Year 2000 computer conversion exigency for a portion of leave year 1999, but who subsequently moves to a position not involving Year 2000 computer conversion efforts, must make a reasonable effort to comply with the scheduling requirement in § 630.308(a). The head of the agency or his or her designee may exempt such an employee from the advance scheduling requirement in § 630.308(a) if coverage under paragraphs (a) and (b) of this section terminated during leave year 1999 and the employee can demonstrate that he or she was unable to comply with the advance scheduling requirement due to circumstances beyond his or her control.

[64 FR 46259, Aug. 25, 1999, as amended at 64 FR 72253, Dec. 27, 1999]

**§ 630.311 Scheduling of annual leave by employees determined necessary to respond to the "National Emergency by Reason of Certain Terrorist Attacks."**

(a) The "National Emergency by Reason of Certain Terrorist Attacks" (Presidential Proclamation of September 14, 2001) is deemed to be an exigency of the public business for the purpose of restoring annual leave forfeited under 5 U.S.C. 6304.

(b) For any employee who forfeits annual leave under 5 U.S.C. 6304 at the beginning of a leave year because the agency determined the employee's services were required in response to the national emergency, the forfeited annual leave is deemed to have been scheduled in advance for the purpose of 5 U.S.C. 6304(d)(1)(B) and § 630.308.

(c) Annual leave restored under 5 U.S.C. 6304(d) because of the national emergency must be scheduled and used within the time limits prescribed in paragraphs (c)(1) and (c)(2) of this section:

(1) A full-time employee must schedule and use excess annual leave of 416 hours or less by the end of the leave year in progress 2 years after the date the employee's services are no longer required by the national emergency. The agency must extend this period by 1 leave year for each additional 208 hours of excess annual leave or any portion thereof.

(2) A part-time employee must schedule and use excess annual leave in an amount equal to or less than 20 percent of the number of hours in the employee's scheduled annual tour of duty by the end of the leave year in progress 2 years after the date the employee's services are no longer required by the national emergency. The agency must extend this period by 1 leave year for each additional number of hours of excess annual leave, or any portion thereof, equal to 10 percent of the number of hours in the employee's scheduled annual tour of duty.

(d) The time limits established under paragraphs (c)(1) and (c)(2) of this section for using restored annual leave accounts do not apply for the entire period during which an employee's services are required for the national emergency. When coverage under paragraphs (a) and (b) of this section ends, a new time limit will be established under paragraph (c) of this section for all annual leave restored to an employee under 5 U.S.C. 6304(d).

(e) An employee whose services were determined essential during the national emergency, but who subsequently moves to a position not considered essential, must make a reasonable effort to comply with the scheduling requirement in § 630.308(a). The head of the agency or his or her designee may exempt such an employee from the advance scheduling requirement in § 630.308(a) if coverage under paragraphs (a) and (b) of this section terminated during the leave year and the employee can demonstrate that he or she was unable to comply with the advance scheduling requirement due to circumstances beyond his or her control.

[66 FR 55558, Nov. 2, 2001]

## Subpart D—Sick Leave

SOURCE: 71 FR 47695, Aug. 17, 2006, unless otherwise noted.

### § 630.401 Granting sick leave.

(a) Subject to paragraphs (b) through (e) of this section, an agency must grant sick leave to an employee when he or she—

(1) Receives medical, dental, or optical examination or treatment;

(2) Is incapacitated for the performance of his or her duties by physical or mental illness, injury, pregnancy, or childbirth;

(3) Provides care for a family member—

(i) Who is incapacitated by a medical or mental condition or attends to a family member receiving medical, dental, or optical examination or treatment;

(ii) With a serious health condition; or

(iii) Who would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by that family member's presence in the community because of exposure to a communicable disease;

(4) Makes arrangements necessitated by the death of a family member or attends the funeral of a family member;

(5) Would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by his or her presence on the job because of exposure to a communicable disease; or

(6) Must be absent from duty for purposes relating to his or her adoption of a child, including appointments with adoption agencies, social workers, and attorneys; court proceedings; required travel; and any other activities necessary to allow the adoption to proceed.

(b) The amount of sick leave granted to an employee during any leave year for the purposes described in paragraphs (a)(3)(i), (a)(3)(iii), and (a)(4) of this section may not exceed a total of 104 hours (or, for a part-time employee or an employee with an uncommon tour of duty, the number of hours of sick leave he or she normally accrues during a leave year).

(c) The amount of sick leave granted to an employee during any leave year for the purposes described in paragraph (a)(3)(ii) of this section may not exceed a total of 480 hours (or, for a part-time employee or an employee with an uncommon tour of duty, an amount of sick leave equal to 12 times the average number of hours in his or her scheduled tour of duty each week), subject to the limitation found in paragraph (d) of this section.

(d) If, at the time an employee uses sick leave to care for a family member with a serious health condition under paragraph (c) of this section, he or she has used any portion of the sick leave authorized under paragraph (b) of this section during that leave year, the agency must subtract that amount from the maximum number of hours authorized under paragraph (c) of this section to determine the total amount of sick leave the employee may use during the remainder of the leave year to care for a family member with a serious health condition. If an employee has previously used the maximum amount of sick leave permitted under paragraph (c) of this section in a leave year, he or she is not entitled to use additional sick leave under paragraph (b) of this section.

(e) If the number of hours in the employee's tour of duty is changed during the leave year, his or her entitlement to use sick leave for the purposes described in paragraphs (a)(3) and (4) of this section must be recalculated based on the new tour of duty.

[71 FR 47695, Aug. 17, 2006, as amended at 75 FR 75372, Dec. 3, 2010]

**§ 630.402 Advanced sick leave.**

(a) At the beginning of a leave year or at any time thereafter when required by the exigencies of the situation, an agency may grant advanced sick leave in the amount of:

(1) Up to 240 hours to a full-time employee—

(i) Who is incapacitated for the performance of his or her duties by physical or mental illness, injury, pregnancy, or childbirth;

(ii) For a serious health condition of the employee or a family member;

(iii) When the employee would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by his or her presence on the job because of exposure to a communicable disease;

(iv) For purposes relating to the adoption of a child; or

(v) For the care of a covered servicemember with a serious injury or illness, provided the employee is exercising his or her entitlement under 5 U.S.C. 6382(a)(3).

(2) Up to 104 hours to a full-time employee—

(i) When he or she receives medical, dental or optical examination or treatment;

(ii) To provide care for a family member who is incapacitated by a medical or mental condition or to attend to a family member receiving medical, dental, or optical examination or treatment;

(iii) To provide care for a family member who would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by that family member's presence in the community because of exposure to a communicable disease; or

(iv) To make arrangements necessitated by the death of a family member or to attend the funeral of a family member.

(b) Two hundred forty hours is the maximum amount of advanced sick leave an employee may have to his or her credit at any one time. For a part-time employee (or an employee on an uncommon tour of duty), the maximum amount of sick leave an agency may advance must be prorated according to the number of hours in the employee's regularly scheduled administrative workweek.

[75 FR 75373, Dec. 3, 2010]

**§ 630.403 Substitution of sick leave for unpaid family and medical leave to care for a covered servicemember.**

The amount of accumulated and accrued sick leave an employee may substitute for unpaid family and medical leave under 5 U.S.C. 6382(a)(3) for leave to care for a covered servicemember may not exceed a total of 26 administrative workweeks in a single 12-month period (or, for a part-time employee or an employee with an uncommon tour of duty, an amount of sick leave equal to 26 times the average number of hours in his or her scheduled tour of duty each week).

[75 FR 75373, Dec. 3, 2010]

**§ 630.404 Requesting sick leave.**

An employee must file an application—written, oral, or electronic, as required by the agency—for sick leave within such time limits as the agency may require. The employee must request advance approval for sick leave for the purpose of receiving medical, dental, or optical examination or treatment and, to the extent possible, for the purposes described in § 630.401(a)(3), (4), and (6).

[71 FR 47695, Aug. 17, 2006. Redesignated at 75 FR 75373, Dec. 3, 2010]

**§ 630.405 Supporting evidence for the use of sick leave.**

(a) An agency may grant sick leave only when the need for sick leave is supported by administratively acceptable evidence. An agency may consider an employee's self-certification as to the reason for his or her absence as administratively acceptable evidence, regardless of the duration of the absence. An agency may also require a medical certificate or other administratively acceptable evidence as to the reason for an absence for any of the purposes described in § 630.401(a) for an absence in excess of 3 workdays, or for a lesser period when the agency determines it is necessary.

(b) An employee must provide administratively acceptable evidence or medical certification for a request for sick leave no later than 15 calendar days after the date the agency requests such medical certification. If it is not practicable under the particular circumstances to provide the requested evidence or medical certification within 15 calendar days after the date requested by the agency despite the employee's diligent, good faith efforts, the employee must provide the evidence or medical certification within a reasonable period of time under the circumstances involved, but no later than 30 calendar days after the date the agency requests such documentation. An employee who does not

provide the required evidence or medical certification within the specified time period is not entitled to sick leave.

(c) An agency may require an employee requesting sick leave to care for a family member under § 630.401(a)(3)(ii) to provide an additional written statement from the health care provider concerning the family member's need for psychological comfort and/or physical care. The statement must certify that—

(1) The family member requires psychological comfort and/or physical care;

(2) The family member would benefit from the employee's care or presence; and

(3) The employee is needed to care for the family member for a specified period of time.

[71 FR 47695, Aug. 17, 2006. Redesignated at 75 FR 75373, Dec. 3, 2010]

**§ 630.406 Use of sick leave during annual leave.**

Subject to § 630.401(b) through (e), an agency may grant sick leave to an employee during a period of annual leave for any of the purposes described in § 630.401(a).

[71 FR 47695, Aug. 17, 2006. Redesignated at 75 FR 75373, Dec. 3, 2010]

**§ 630.407 Sick leave used in the computation of an annuity.**

Sick leave used in the computation of an annuity is charged against an employee's sick leave account and may not thereafter be used, transferred, or recredited. All sick leave to the credit of an employee as of the date of his or her retirement (or death) and reported to OPM for credit towards the calculation of an annuity is considered used.

[71 FR 47695, Aug. 17, 2006. Redesignated at 75 FR 75373, Dec. 3, 2010]

**§ 630.408 Records on the use of sick leave.**

An agency must maintain records of the amount of sick leave used by an employee for family care purposes and to make arrangements for or attend the funeral of a family member under § 630.401(a)(3) and (4). The records must be sufficient to ensure that an employee does not exceed the limitations in § 630.401(b) and (c).

[71 FR 47695, Aug. 17, 2006. Redesignated at 75 FR 75373, Dec. 3, 2010]

## Subpart E—Recredit of Leave

**§ 630.501 Annual leave recredit.**

(a) When an employee transfers between positions under subchapter I of chapter 63 of title 5, United States Code, the agency from which he transfers shall certify his annual leave account to the employing agency for credit or charge.

(b) When annual leave is transferred between different leave systems under section 6308 of title 5, United States Code, or is recredited under a different leave system as the result of a refund under section 6306 of that title, 7 calendar days of annual leave are deemed equal to 5 workdays of annual leave.

[35 FR 18581, Dec. 8, 1970]

**§ 630.502 Sick leave recredit.**

(a) When an employee transfers between positions under subchapter I of chapter 63 of title 5, United States Code, the agency from which the employee transfers shall certify his or her sick leave account to the employing agency for credit or charge.

(b) Except as provided in § 630.407 and in paragraph (c) of this section, an employee who has had a break in service is entitled to a recredit of sick leave (without regard to the date of his or her separation), if he or she returns to Federal employment on or after December 2, 1994, unless the sick leave was forfeited upon reemployment in the Federal Government before December 2, 1994.

(c) Except as provided in § 630.407, an employee of the government of the District of Columbia who was first employed by the government of the District of Columbia before October 1, 1987, and who has had a break in service is entitled to a recredit of sick leave (without regard to the date of his or her separation) if he or she returns to Federal employment on or after December 2, 1994, unless the sick leave was forfeited upon reemployment in the Federal Government before December 2, 1994.

(d) When sick leave is transferred between different leave systems under section 6308 of title 5, United States Code, 7 calendar days of sick leave are deemed equal to 5 workdays of sick leave.

(e) An employee who transfers to a position under a different leave system to which he or she can transfer only a part of his or her sick leave is entitled to a recredit of the untransferred sick leave (without regard to the date of the original transfer) if the employee returns to the leave system under which it was earned on or after December 2, 1994.

(f) An employee who transfers to a position to which he or she cannot transfer his or her sick leave is entitled to a recredit of the untransferred sick leave (without regard to the date of the original transfer) if the employee returns to the leave system under which it was eamed on or after December 2, 1994.

(g) The recredit of sick leave under this section shall be supported by written documentation available to the employing agency in its official personnel records concerning the employee, the official records of the employee's former employing agency, copies of contemporaneous earnings and leave statement(s) provided by the employee, or copies of other contemporaneous written documentation acceptable to the agency.

(h) The sick leave to be recredited under this section must have been accrued under 5 U.S.C. 6307 or transferred to the employee's credit under 5 U.S.C. 6308 (or the corresponding provisions of prior statutes).

[59 FR 62271, Dec. 2, 1994, as amended at 74 FR 10165, Mar. 10, 2009; 75 FR 75373, Dec. 3, 2010]

**§ 630.503 Leave from former leave systems.**

An employee who earned leave under the leave acts of 1936 or any other leave system merged under subchapter I of chapter 63 of title 5, United States Code, is entitled to a recredit of that leave under that subchapter if he would have been entitled to recredit for it on reentering the leave system under which it was earned. However, this section does not revive leave already forfeited.

**§ 630.504 Reestablishment of leave account after military service.**

(a) When an employee leaves his or her civilian position to enter the military service, the employing agency shall certify his or her leave account for credit or charge.

(b) If the employee returns to a civilian position following military service, the agency to which the employee returns shall reestablish the certified leave account as a credit or charge (without regard to the date he or she left the civilian position) when the employee is—

(1) Restored in accordance with a right of restoration after separation from active military duty or hospitalization continuing thereafter as provided by law or in accordance with the mandatory provisions of a statute, Executive order, or regulation; or

(2) Reemployed in a position under subchapter I of chapter 63 of title 5, United States Code, on or after December 2, 1994.

(c) For the purpose of documenting a returning employee's entitlement to a recredit of sick leave under this section, the documentation criteria established in § 630.502(g) shall apply.

[59 FR 62272, Dec. 2, 1994]

**§ 630.505 Restoration after appeal.**

When an employee is restored to an agency as a result of an appeal, the agency shall reestablish his leave account as a credit or charge as it was at the time of separation.

**§ 630.506 Minimum unit.**

(a) When an employee moves between positions under subchapter I of chapter 63 of title 5, United States Code, in different agencies, only his leave in whole hour units may be transferred.

(b) When an employee moves between positions under subchapter I of chapter 63 of title 5, United States Code, covered by different leave charging systems within the same agency, his leave is transferable in accordance with paragraph (a) of this section, unless the agency establishes a different policy making fractions of an hour of leave transferable.

[38 FR 18446, July 11, 1973; 38 FR 26601, Sept. 24, 1973]

## Subpart F—Home Leave

**§ 630.601 Definitions.**

In this subpart:

*Home leave* means leave authorized by section 6305(a) of title 5, United States Code, and earned by service abroad for use in the United States, in the Commonwealth of Puerto Rico, or in the territories or possessions of the United States.

*Month* means a period which runs from a given day in 1 month through the date preceding the numerically corresponding day in the next month.

*Service abroad* means service on and after September 6, 1960, by an employee at a post of duty outside the United States and outside the employee's place of residence if his place of residence is in the Commonwealth of Puerto Rico or a territory or possession of the United States.

[33 FR 12475, Sept. 4, 1967, as amended at 60 FR 67287, Dec. 29, 1995]

**§ 630.602 Coverage.**

An employee who meets the requirements of section 6304(b) of title 5, United States Code, for the accumulation of a maximum of 45 days of annual leave earns and may be granted home leave in accordance with section 6305(a) of that title and this subpart.

**§ 630.603 Computation of service abroad.**

For the purpose of this subpart, service abroad:

(a) Begins on the date of the employee's arrival at a post of duty outside the United States, or on the date of his entrance on duty when recruited abroad;

(b) Ends on the date of the employee's departure from the post for separation or for assignment in the United States, or on the date of his separation from duty when separated abroad; and

(c) Includes (1) absence in a nonpay status up to a maximum of 2 workweeks within each 12 months of service abroad, (2) authorized leave with pay, (3) time spent in the Armed Forces of the United States which interrupts service abroad (but only for eligibility, not leave-earning, purposes), and (4) a period of detail.

In computing service abroad, full credit is given for the day of arrival and the day of departure.

[33 FR 12475, Sept. 4, 1968, as amended at 35 FR 14763, Sept. 23, 1970]

**§ 630.604 Earning rates.**

(a) For each 12 months of service abroad, an employee earns home leave at the following rate:

(1) An employee who accepts an appointment to, or occupies, a position for which the agency has prescribed the requirement that the incumbent accept assignments anywhere in the world as the needs of the agency dictate—15 days.

(2) An employee who is serving with a U.S. mission to a public international organization—15 days.

(3) An employee who is serving at a post for which payment of a foreign or nonforeign (but not a tropical) differential of 20 percent or more is authorized by law or regulation—15 days.

(4) An employee not included in paragraph (a) (1), (2), or (3) of this section who is serving at a post for which payment of a foreign or territorial (but not a tropical) differential of at least 10 percent but less than 20 percent is authorized by law or regulation—10 days.

(5) An employee not included in paragraph (a) (1), (2), (3), or (4) of this section—5 days.

(6) An employee included under (a) (1) through (5) of this section whose civilian service abroad is interrupted by a tour of duty in the Armed Forces of the United States, for the duration of such tour—0 (zero) days.

(b) An agency shall credit home leave to an employee's leave account, as earned, in multiples of 1 day.

[33 FR 12475, Sept. 4, 1968, as amended at 35 FR 14763, Sept. 23, 1970]

**§ 630.605 Computation of home leave.**

(a) For each month of service abroad, an employee earns home leave under the rates fixed by § 630.604(a) in the amounts set forth in the following table:

**Home Leave-Earning Table**

[Days earned]

| Months of service abroad | Earning rate (days for each 12 months) | | |
|---|---|---|---|
| | 15 | 10 | 5 |
| 1 | 1 | 0 | 0 |
| 2 | 2 | 1 | 0 |
| 3 | 3 | 2 | 1 |
| 4 | 5 | 3 | 1 |
| 5 | 6 | 4 | 2 |
| 6 | 7 | 5 | 2 |
| 7 | 8 | 5 | 2 |
| 8 | 10 | 6 | 3 |
| 9 | 11 | 7 | 3 |
| 10 | 12 | 8 | 4 |
| 11 | 13 | 9 | 4 |
| 12 | 15 | 10 | 5 |

(b) When an employee moves between different home leave-earning rates during a month of service abroad, or when a change in the differential during a month of service abroad results in a different home leave-earning rate, the agency shall credit the employee with the amount of home leave for the month at the rate to which he was entitled before the change in his home leave-earning rate.

**§ 630.606 Grant of home leave.**

(a) *Entitlement.* Except as otherwise authorized by statute, an employee is entitled to home leave only when he has completed a basic service period of 24 months of continuous service abroad. This basic service period is terminated by (1) a break in service of 1 or more workdays, or (2) an assignment (other than a detail) to a position in which an employee is no longer subject to section 6305(a) of title 5, United States Code.

(b) *Agency authority.* A grant of home leave is at the discretion of an agency. An agency may grant home leave in combination with other leaves of absence in accordance with established agency policy.

(c) *Limitations.* An agency may grant home leave only:

(1) For use in the United States, the Commonwealth of Puerto Rico, or a territory or possession of the United States; and

(2) During an employee's period of service abroad, or within a reasonable period after his return from service abroad when it is contemplated that he will return to service abroad immediately or on completion of an assignment in the United States.

Home leave not granted during a period named in paragraph (c)(2) of this section may be granted only when the employee has completed a further substantial period of service abroad. This further substantial period of service abroad may not be less than the tour of duty prescribed for the employee's post of assignment, except when the agency determines that an earlier grant of home leave is warranted in an individual case.

(d) *Charging of home leave.* The minimum charge for home leave is 1 day and additional charges are in multiples thereof.

(e) *Refund for home leave.* An employee is indebted for the home leave used by him when he fails to return to service abroad after the period of home leave, or after the completion of an assignment in the United States. However, a refund for this indebtedness is not required when (1) the employee has completed not less than 6 months' service in an assignment in the United States following the period of home leave; (2) the agency determines that the employee's failure to return was due to compelling personal reasons of a humanitarian or compassionate nature, such as may involve physical or mental health or circumstances over which the employee has no control; or (3) the agency which granted the home leave determines that it is in the public interest not to return the employee to his overseas assignment.

**§ 630.607 Transfer and recredit of home leave.**

An employee is entitled to have his home leave account transferred or recredited to his account when he moves between agencies or is reemployed without a break in service of more than 90 days.

## Subpart G—Shore Leave

AUTHORITY: 5 U.S.C. 6305.

**§ 630.701 Coverage.**

This subpart applies to an employee as defined in section 6301 of title 5, United States Code, who is regularly assigned to duties aboard an oceangoing vessel. An employee is considered to be

regularly assigned when his continuing duties are such that all or a significant part of them require that he serve aboard an oceangoing vessel. Temporary assignments of a shore-based employee, such as for limited work projects or for training, do not constitute a regular assignment.

**§ 630.702 Definitions.**

*Extended voyage* means a voyage of not less than 7 consecutive calendar days duration.

*Oceangoing vessel* means a vessel in use on the high seas or the Great Lakes; but does not include a vessel which operates primarily on rivers, other lakes, bays, sounds or within the 3-nautical-mile limit of the coastal area of the 48 contiguous States, except when used in mapping, charting, or surveying operations or when in or sailing to or from foreign, territorial, Hawaiian, or Alaskan waters, or waters outside its normal area of operations or outside the 3-nautical-mile limit.

*Shore leave* means leave authorized by section 6305(c) of title 5, United States Code, and this subpart.

*Voyage* means the sailing of an oceangoing vessel from one port and its return to that port or the final port of discharge.

[33 FR 12475, Sept. 4, 1968, as amended at 60 FR 67287, Dec. 29, 1995]

**§ 630.703 Computation of shore leave.**

(a) An employee earns shore leave at the rate of 1 day of shore leave for each 15 calendar days of absence on one or more extended voyages.

(b) (1) For an employee who is an officer or crewmember, a voyage begins either on the date he assumes his duties aboard an oceangoing vessel to begin preparation for a voyage or on the date he comes aboard when a voyage is in progress. The voyage terminates on the date he ceases to be an officer or crewmember of the oceangoing vessel or on the date on which he is released from assignment of his duties relating to that voyage aboard the oceangoing vessel at the port of origin or port of final discharge, whichever is earlier.

(2) For an employee other than an officer or crewmember, a voyage begins on the date of sailing and terminates on the date the oceangoing vessel returns to a port at which the employee will disembark in completion of his assignment aboard the vessel, or on the date he is released from his assignment aboard the vessel, whichever is earlier.

(c) In computing days of absence, an agency shall include (1) the beginning date of a voyage and the termination date of a voyage; (2) the days an employee spends traveling to join an oceangoing vessel to which assigned when the vessel is at a place other than the port of origin; (3) the days an employee spends traveling between oceangoing vessels when the employee is assigned from one vessel to another; (4) the period representing the number of days within which an employee is reasonably expected to return to the port of origin when his oceangoing vessel's voyage is terminated, or his employment as an officer or crewmember is terminated, at a port other than the port of origin; (5) for an employee who is an officer or crewmember, the days on which he is on sick leave when he becomes sick during a voyage (whether or not continued as a member of the crew) but not beyond the termination date of the voyage of the oceangoing vessel or his repatriation to the port of origin, whichever is earlier; (6) for an employee other than an officer or crewmember, the days on which he is carried on sick leave but not beyond the date on which he returns to the port of origin or the termination date of the voyage, whichever is earlier; and (7) the days of approved leave from a vessel (paid or unpaid) during a voyage.

**§ 630.704 Granting shore leave.**

(a) *Authority.* (1) An employee has an absolute right to use shore leave, subject to the right of the head of the agency to fix the time at which shore leave may be used.

(2) Shore leave may be granted during a voyage only when requested by an employee.

(3) An employee shall submit his request for shore leave in writing and whenever an employee's request for shore leave is denied, the denial shall be in writing.

(b) *Accumulation.* Shore leave is in addition to annual leave and may be accumulated for future use without limitation.

(c) *Charge for shore leave.* The minimum charge for shore leave is one day and additional charges are in multiples thereof.

(d) *Lump-sum payment.* Shore leave may not be the basis for lump-sum payment on separation from the service.

(e) *Terminal leave.* (1) Except as provided by paragraph (e)(2) of this section, an agency shall not grant shore leave to an employee as terminal leave. For the purpose of this paragraph terminal leave is approved absence immediately before an employee's separation when an agency knows the employee will not return to duty before the date of his separation.

(2) An agency shall grant shore leave as terminal leave when the employee's inability to use shore leave was due to circumstances beyond his control and not due to his own act or omission.

(f) *Forfeiture of shore leave.* Shore leave not granted before (1) separation from the service, or (2) official assignment (other than by temporary detail) to a position in which the employee does not earn shore leave, is forfeited. When an official assignment will result in forfeiture of shore leave, the agency to the extent administratively practicable shall give an employee an opportunity to use the shore leave he has to his credit either before the reassignment or not later than 6 months after the date of his reassignment when the agency is unable to grant the shore leave before the reassignment.

## Subpart H—Funeral Leave

SOURCE: 34 FR 13655, Aug. 26, 1969, unless otherwise noted.

### § 630.801 Applicability.

This subpart and section 6326 of title 5, United States Code, apply to the granting of funeral leave to an employee in connection with the funeral of, or memorial service for, his immediate relative who died as a result of wounds, disease, or injury incurred while serving as a member of the armed forces in a combat zone.

### § 630.802 Coverage.

This subpart applies to:

(a) An employee as defined in section 2105 of title 5, United States Code, who is employed by an executive agency as defined in section 105 of title 5, United States Code; and

(b) An individual who is employed by the government of the District of Columbia.

### § 630.803 Definitions.

*Armed forces* means the Army, Navy, Air Force, Marine Corps, and Coast Guard.

*Combat zone* means those areas determined by the President in accordance with section 112 of the Internal Revenue Code.

*Committed relationship* means one in which the employee, and the domestic partner of the employee, are each other's sole domestic partner (and are not married to or domestic partners with anyone else); and share responsibility for a significant measure of each other's common welfare and financial obligations. This includes, but is not limited to, any relationship between two individuals of the

same or opposite sex that is granted legal recognition by a State or by the District of Columbia as a marriage or analogous relationship (including, but not limited to, a civil union).

*Domestic partner* means an adult in a committed relationship with another adult, including both same-sex and opposite-sex relationships.

*Employee* means an employee or individual covered by § 630.802.

*Funeral leave* means leave authorized by section 6326 of title 5, United States Code, and this subpart.

*Immediate relative* means an individual with any of the following relationships to the employee:

(1) Spouse, and parents thereof;

(2) Sons and daughters, and spouses thereof;

(3) Parents, and spouses thereof;

(4) Brothers and sisters, and spouses thereof;

(5) Grandparents and grandchildren, and spouses thereof;

(6) Domestic partner and parents thereof, including domestic partners of any individual in paragraphs (2) through (5) of this definition; and

(7) Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

*Parent* means—

(1) A biological, adoptive, step, or foster parent of the employee, or a person who was a foster parent of the employee when the employee was a minor;

(2) A person who is the legal guardian of the employee or was the legal guardian of the employee when the employee was a minor or required a legal guardian; or

(3) A person who stands *in loco parentis* to the employee or stood *in loco parentis* to the employee when the employee was a minor or required someone to stand *in loco parentis.*

(4) A parent, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

*Son or daughter* means—

(1) A biological, adopted, step, or foster son or daughter of the employee;

(2) A person who is a legal ward or was a legal ward of the employee when that individual was a minor or required a legal guardian;

(3) A person for whom the employee stands *in loco parentis* or stood *in loco parentis* when that individual was a minor or required someone to stand *in loco parentis;* or

(4) A son or daughter, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

[34 FR 13655, Aug. 26, 1969, as amended at 60 FR 67287, Dec. 29, 1995; 75 FR 33496, June 14, 2010]

**§ 630.804 Granting of funeral leave.**

(a) An agency shall grant an employee such funeral leave as is needed and requested by him, not to exceed 3 workdays, without loss of or reduction in pay, leave to which he is otherwise entitled, or credit for time or service, and without adversely affecting his performance or efficiency rating. Funeral leave is granted to allow an employee to make arrangements for, or to attend, the funeral or memorial service for an immediate relative who died as the result of a wound, disease, or injury incurred while serving as a member of the armed forces in a combat zone. The 3 days need not be consecutive but if not, the employee shall furnish the approving authority satisfactory reasons justifying a grant of funeral leave for nonconsecutive days.

(b) An agency may grant funeral leave only from a prescribed tour of duty, including regularly scheduled overtime, or, in the case of a substitute employee in the postal field service, from a period during which, except for absence on funeral leave, the employee would have worked.

## Subpart I—Voluntary Leave Transfer Program

SOURCE: 59 FR 67125, Dec. 29, 1994, unless otherwise noted.

### § 630.901 Purpose and applicability.

(a) *Purpose.* The purpose of this subpart is to set forth procedures and requirements for a voluntary leave transfer program under which the unused accrued annual leave of one agency officer or employee may be transferred for use by another agency officer or employee who needs such leave because of a medical emergency.

(b) *Applicability.* This subpart applies to officers and employees to whom subchapter I of chapter 63 of title 5, United States Code, applies.

### § 630.902 Definitions.

*Agency* means—

(a) An *Executive agency,* as defined in 5 U.S.C. 105;

(b) A *military department,* as defined in 5 U.S.C. 102; or

(c) Any other entity of the Federal Government that employs officers or employees to whom subchapter I of chapter 63 of title 5, United States Code, applies. *Agency* does not include the Central Intelligence Agency; the Defense Intelligence Agency; the National Security Agency; the Federal Bureau of Investigation; or any other Executive agency or unit thereof, as determined by the President, whose principal function is the conduct of foreign intelligence or counterintelligence activities.

*Available paid leave* means accrued or accumulated annual or sick leave under subchapter I of chapter 63 of title 5, United States Code, and recredited and restored annual or sick leave under subpart E of this part. *Available paid leave* does not include annual or sick leave advanced to an employee under 5 U.S.C. 6302(d) or 6307(c) or any annual or sick leave accrued under § 630.907(a) that has not been transferred to the appropriate leave account under § 630.907(c).

*Committed relationship* means one in which the employee, and the domestic partner of the employee, are each other's sole domestic partner (and are not married to or domestic partners with anyone else); and share responsibility for a significant measure of each other's common welfare and financial obligations. This includes, but is not limited to, any relationship between two individuals of the same or opposite sex that is granted legal recognition by a State or by the District of Columbia as a marriage or analogous relationship (including, but not limited to, a civil union).

*Domestic partner* means an adult in a committed relationship with another adult, including both same-sex and opposite-sex relationships.

*Employee* has the meaning given that term in 5 U.S.C. 6301(2), except an individual employed by the government of the District of Columbia.

*Family member* means an individual with any of the following relationships to the employee:

(1) Spouse, and parents thereof;

(2) Sons and daughters, and spouses thereof;

(3) Parents, and spouses thereof;

(4) Brothers and sisters, and spouses thereof;

(5) Grandparents and grandchildren, and spouses thereof;

(6) Domestic partner and parents thereof, including domestic partners of any individual in paragraphs (2) through (5) of this definition; and

(7) Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

*Leave donor* means an employee whose voluntary written request for transfer of annual leave to the annual leave account of a leave recipient is approved by his or her own employing agency.

*Leave recipient* means a current employee for whom the employing agency has approved an application to receive annual leave from the annual leave accounts of one or more leave donors.

*Medical emergency* means a medical condition of an employee or a family member of such employee that is likely to require an employee's absence from duty for a prolonged period of time and to result in a substantial loss of income to the employee because of the unavailability of paid leave.

*Paid leave status under subchapter I* means the administrative status of an employee while the employee is using annual or sick leave accrued or accumulated under subchapter I of chapter 63 of title 5, United States Code.

*Parent* means—

(1) A biological, adoptive, step, or foster parent of the employee, or a person who was a foster parent of the employee when the employee was a minor;

(2) A person who is the legal guardian of the employee or was the legal guardian of the employee when the employee was a minor or required a legal guardian; or

(3) A person who stands *in loco parentis* to the employee or stood *in loco parentis* to the employee when the employee was a minor or required someone to stand *in loco parentis.*

(4) A parent, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

*Shared leave status* means the administrative status of an employee while the employee is using transferred leave under this subpart or leave transferred from a leave bank under subpart J of this part.

*Son or daughter* means—

(1) A biological, adopted, step, or foster son or daughter of the employee;

(2) A person who is a legal ward or was a legal ward of the employee when that individual was a minor or required a legal guardian;

(3) A person for whom the employee stands *in loco parentis* or stood *in loco parentis* when that individual was a minor or required someone to stand *in loco parentis;* or

(4) A son or daughter, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

[59 FR 67125, Dec. 29, 1994, as amended at 75 FR 33496, June 14, 2010]

**§ 630.903 Administrative procedures.**

Each Federal agency shall establish and administer procedures to permit the voluntary transfer of annual leave consistent with this subpart.

**§ 630.904 Application to become a leave recipient.**

(a) An employee may make written application to his or her employing agency to become a leave recipient. If an employee is not capable of making application on his or her own behalf, a personal representative of the potential leave recipient may make written application on his or her behalf.

(b) Each application shall be accompanied by the following information concerning each potential leave recipient:

(1) The name, position title, and grade or pay level of the potential leave recipient;

(2) The reasons transferred leave is needed, including a brief description of the nature, severity, and anticipated duration of the medical emergency, and if it is a recurring one, the approximate frequency of the medical emergency affecting the potential leave recipient;

(3) Certification from one or more physicians, or other appropriate experts, with respect to the medical emergency, if the potential leave recipient's employing agency so requires; and

(4) Any additional information that may be required by the potential leave recipient's employing agency.

(c) If the potential leave recipient's employing agency requires that a potential leave recipient obtain certification from two or more sources under paragraph (b)(3) of this section, the potential leave recipient's employing agency shall ensure, either by direct payment to the expert involved or by reimbursement, that the potential leave recipient is not required to pay for the expenses associated with obtaining certification from more than one source.

**§ 630.905 Approval of application to become a leave recipient.**

(a) The potential leave recipient's employing agency shall review an application to become a leave recipient under procedures established by the employing agency for the purpose of determining that the potential leave recipient is or has been affected by a medical emergency.

(b) Before approving an application to become a leave recipient, the potential leave recipient's employing agency shall determine that the absence from duty without available paid leave because of the medical emergency is (or is expected to be) at least 24 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, at least 30 percent of the average number of hours in the employee's biweekly scheduled tour of duty).

(c) In making a determination as to whether a medical emergency is likely to result in a substantial loss of income, an agency shall not consider factors other than whether the absence from duty without available paid leave is (or is expected to be) at least 24 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, at least 30 percent of the average number of hours in the employee's biweekly scheduled tour of duty).

(d) If the application is approved, the employing agency shall notify the leave recipient (or the personal representative who made application on behalf of the leave recipient), within 10 calendar days (excluding Saturdays, Sundays, and legal public holidays) after the date the application was received (or the date the employing agency established its administrative procedures, if that date is later), that—

(1) The application has been approved; and

(2) Other employees of the leave recipient's employing agency may request the transfer of annual leave to the account of the leave recipient.

(e) If the application is not approved, the employing agency shall notify the applicant (or the personal representative who made application on behalf of the potential leave recipient), within 10 calendar days (excluding Saturdays, Sundays, and legal public holidays) after the date the application was received (or the date the employing agency established its administrative procedures, if that date is later)—

(1) That the application has not been approved; and

(2) The reasons for its disapproval.

[59 FR 67125, Dec. 29, 1994, as amended at 60 FR 26979, May 22, 1995; 61 FR 64451, Dec. 5, 1996]

**§ 630.906 Transfer of annual leave.**

(a) An employee may submit a voluntary written request to his or her own employing agency that a specified number of hours of his or her accrued annual leave be transferred from his or her annual leave account to the annual leave account of a specified leave recipient. Except as provided in paragraph (f) of this section, annual leave may be transferred only to a leave recipient employed by the leave donor's employing agency.

(b) Except as provided in paragraph (d) of this section and subject to the limitations on the amount of annual leave that may be donated by a leave donor under § 630.908, all or any portion of the annual leave requested under paragraph (a) of this section may be transferred to the annual leave account of the specified leave recipient under procedures established by the leave recipient's employing agency.

(c) An agency having employees who earn and use annual leave on the basis of an uncommon tour of duty shall establish procedures for administering the transfer of annual leave to or from such employees under this subpart.

(d) A leave recipient's employing agency shall not transfer annual leave to a leave donor's immediate supervisor.

(e) Annual leave transferred under this section may be substituted retroactively for period of leave without pay (LWOP) or used to liquidate an indebtedness for advanced annual or sick leave granted on or after a date fixed by the leave recipient's employing agency as the beginning of the period of medical emergency for which LWOP or advanced annual or sick leave was granted.

(f) A leave recipient's employing agency shall accept the transfer of annual leave from leave donors employed by one or more other agencies when—

(1) A family member of a leave recipient is employed by another agency and requests the transfer of annual leave to the leave recipient;

(2) In the judgment of the leave recipient's employing agency, the amount of annual leave transferred from leave donors employed by the leave recipient's employing agency may not be sufficient to meet the needs of the leave recipient; or

(3) In the judgment of the leave recipient's employing agency, acceptance of leave transferred from another agency would further the purpose of the voluntary leave transfer program.

(g) The employing agency of a leave donor who wishes to donate annual leave to a leave recipient in another agency shall verify the availability of annual leave in the leave donor's annual leave account, determine that the amount of annual leave to be donated does not exceed the

limitations in § 630.908, and ascertain that the leave recipient's employing agency has made any determination that may be required under paragraph (f) of this section. Upon satisfying these requirements, the leave donor's employing agency shall—

(1) Reduce the amount of annual leave credited to the leave donor's annual leave account, as appropriate; and

(2) Notify the leave recipient's employing agency in writing of the amount of annual leave to be credited to the leave recipient's annual leave account.

**§ 630.907 Accrual of annual and sick leave.**

(a) Except as otherwise provided in this section, while an employee is in a shared leave status, annual and sick leave shall accrue to the credit of the employee at the same rate as if the employee where then in a paid leave status under subchapter I of chapter 63 of title 5, United States Code, except that—

(1) The maximum amount of annual leave that may be accrued by an employee while in a shared leave status in connection with any particular medical emergency may not exceed 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty); and

(2) The maximum amount of sick leave that may be accrued by an employee while in a shared leave status in connection with any particular medical emergency may not exceed 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty).

(b) Any annual or sick leave accrued by an employee under this subpart and subpart J of this part—

(1) Shall be credited to an annual or sick leave account, as appropriate, separate from any leave account of the employee under subchapter I of chapter 63 of title 5, United States Code; and

(2) Shall not become available for use by the employee and may not otherwise be taken into account under subchapter I of chapter 63 of title 5, United States Code, until it is transferred to the appropriate leave account of the employee under subchapter I of chapter 63 of title 5, United States Code, as provided in paragraph (c) of this section.

(c) Any annual or sick leave accrued by an employee under this section shall be transferred to the appropriate leave account of the employee under subchapter I of chapter 63 of title 5, United States Code, and shall become available for use—

(1) As of the beginning of the first pay period beginning on or after the date on which the employee's medical emergency terminates as described in § 630.910(a)(2) or (3); or

(2) If the employee's medical emergency has not yet terminated, once the employee has exhausted all leave made available to such employee under this subpart or subpart J of this part.

(d) If the leave recipient's employing agency advances at the beginning of the leave year the amount of annual leave the employee normally would accrue during the entire leave year under 5 U.S.C. 6302(d)—

(1) The leave recipient's employing agency shall establish procedures to ensure that 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty) of annual leave are placed in a separate annual leave account and made available for use by the employee as described in paragraph (c) of this section; and

(2) The employee shall continue to accrue annual leave while in a shared leave status to the extent necessary for the purpose of reducing any indebtedness caused by the use of annual leave advanced at the beginning of the leave year.

(e) If the employee's medical emergency terminates as described in § 630.910(a)(1), no leave shall be credited to the employee under this section.

[59 FR 67125, Dec. 29, 1994, as amended at 60 FR 26979, May 22, 1995; 61 FR 64451, Dec. 5, 1996]

**§ 630.908 Limitations on donation of annual leave.**

(a) In any one leave year, a leave donor may donate no more than a total of one-half of the amount of annual leave he or she would be entitled to accrue during the leave year in which the donation is made.

(b) In the case of a leave donor who is projected to have annual leave that otherwise would be subject to forfeiture at the end of the leave year under 5 U.S.C. 6304(a), the maximum amount of annual leave that may be donated during the leave year shall be the lesser of—

(1) One-half of the amount of annual leave he or she would be entitled to accrue during the leave year in which the donation is made; or

(2) The number of hours remaining in the leave year (as of the date of the transfer) for which the leave donor is scheduled to work and receive pay.

(c) Each agency shall establish written criteria for waiving the limitations on donating annual leave under paragraphs (a) and (b) of this section. Any such waiver shall be documented in writing.

(d) The limitations in this section shall apply to the total amount of annual leave donated or contributed under subparts I and J of this part.

**§ 630.909 Use of transferred annual leave.**

(a) A leave recipient may use annual leave transferred to his or her annual leave account under § 630.906 only for the purpose of a medical emergency for which the leave recipient was approved.

(b) Except as provided in § 630.907, during each biweekly pay period that a leave recipient is affected by a medical emergency, he or she shall use any accrued annual leave (and sick leave, if applicable) before using transferred annual leave.

(c) The approval and use of transferred annual leave shall be subject to all of the conditions and requirements imposed by chapter 63 of title 5, United States Code, part 630 of this chapter, and the employing agency on the approval and use of annual leave accrued under 5 U.S.C. 6303, except that transferred annual leave may accumulate without regard to the limitation imposed by 5 U.S.C. 6304 (a).

(d) Transferred annual leave may be substituted retroactively for any period of leave without pay or used to liquidate an indebtedness for any period of advanced leave that began on or after the date fixed by the agency as the beginning of the medical emergency.

(e) Transferred annual leave may not be—

(1) Transferred to another leave recipient under this subpart, except as provided in § 630.911(e) (3);

(2) Included in a lump-sum payment under 5 U.S.C. 5551 or 5552; or

(3) Made available for recredit under 5 U.S.C. 6306 upon reemployment by a Federal agency.

**§ 630.910 Termination of medical emergency.**

(a) The medical emergency affecting a leave recipient shall terminate—

(1) When the leave recipient's Federal service is terminated;

(2) At the end of the biweekly pay period in which the leave recipient's employing agency receives written notice from the leave recipient or from a personal representative of the leave recipient that the leave recipient is no longer affected by a medical emergency;

(3) At the end of the biweekly pay period in which the leave recipient's employing agency determines, after written notice from the agency and an opportunity for the leave recipient (or, if appropriate, a personal representative of the leave recipient) to answer orally or in writing, that the leave recipient is no longer affected by a medical emergency; or

(4) At the end of the biweekly pay period in which the leave recipient's employing agency receives notice that the Office of Personnel Management has approved an application for disability retirement for the leave recipient under the Civil Service Retirement System or the Federal Employees' Retirement System.

(b) The leave recipient's employing agency shall continuously monitor the status of the medical emergency affecting the leave recipient to ensure that the leave recipient continues to be affected by a medical emergency.

(c) When the medical emergency affecting a leave recipient terminates, no further requests for transfer of annual leave to the leave recipient may be granted, and any unused transferred annual leave remaining to the credit of the leave recipient shall be restored to the leave donors under § 630.911.

(d) An agency may deem a medical emergency to continue for the purpose of providing a leave recipient an adequate period of time within which to receive donations of annual leave.

**§ 630.911 Restoration of transferred annual leave.**

(a) Under procedures established by the leave recipient's employing agency, any transferred annual leave remaining to the credit of a leave recipient when the medical emergency terminates shall be restored, as provided in paragraphs (b) and (c) of this section and to the extent administratively feasible, by transfer to the annual leave accounts of leave donors who, on the date leave restoration is made, are employed by a Federal agency and subject to chapter 63 of title 5, United States Code.

(b) The amount of unused transferred annual leave to be restored to each leave donor shall be determined as follows:

(1) Divide the number of hours of unused transferred annual leave by the total number of hours of annual leave transferred to the leave recipient;

(2) Multiply the ratio obtained in paragraph (b)(1) of this section by the number of hours of annual leave transferred by each leave donor eligible for restoration under paragraph (a) of this section; and

(3) Round the result obtained in paragraph (b)(2) of this section to the nearest increment of time established by the leave donor's employing agency to account for annual leave.

(c) If the total number of eligible leave donors exceeds the total number of hours of annual leave to be restored, no unused transferred annual leave shall be restored. In no case shall the amount of annual leave restored to a leave donor exceed the amount transferred to the leave recipient by the leave donor.

(d) If the leave donor retires from Federal service, dies, or is otherwise separated from Federal service before the date unused transferred annual leave can be restored, the employing agency of the leave recipient shall not restore the unused transferred annual leave.

(e) At the election of the leave donor, unused transferred annual leave restored to the leave donor under paragraph (a) of this section may be restored by—

(1) Crediting the restored annual leave to the leave donor's annual leave account in the current leave year;

(2) Crediting the restored annual leave to the leave donor's annual leave account effective as of the first day of the first leave year beginning after the date of election; or

(3) Donating such leave in whole or part to another leave recipient.

(f) If a leave donor elects to donate only part of his or her restored leave to another leave recipient under paragraph (e)(3) of this section, the donor may elect to have the remaining leave credited to the leave donor's annual leave account under paragraph (e)(1) or (e)(2) of this section.

(g) Transferred annual leave restored to the account of a leave donor under paragraph (e) (1) or (2) of this section shall be subject to the limitation imposed by 5 U.S.C. 6304(a) at the end of the leave year in which the restored leave is credited to the leave donor's annual leave account.

(h) If a leave recipient elects to buy back annual leave as a result of claim for an employment-related injury approved by the Office of Workers' Compensation Programs under 20 CFR 10.202 and 10.310, and the annual leave was leave transferred under § 630.906, the amount of annual leave bought back by the leave recipient shall be restored to the leave donor(s).

[59 FR 67125, Dec. 29, 1994, as amended at 61 FR 64451, Dec. 5, 1996]

**§ 630.912 Prohibition of coercion.**

(a) An employee may not directly or indirectly intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce, any other employee for the purpose of interfering with any right such employee may have with respect to donating, receiving, or using annual leave under this subpart.

(b) For the purpose of paragraph (a) of this section, the term "intimidate, threaten, or coerce" includes promising to confer or conferring any benefit (such as an appointment or promotion or compensation) or effecting or threatening to effect any reprisal (such as deprivation of appointment, promotion, or compensation).

**§ 630.913 Records and reports.**

(a) Each agency shall maintain records concerning the administration of the voluntary leave transfer program and may be required by the Office of Personnel Management to report any information necessary to evaluate the effectiveness of the program.

(b) Agencies shall maintain the following information:

(1) The number of applications approved for medical emergencies affecting the employee and the number of applications approved for medical emergencies affecting an employee's family member;

(2) The grade or pay level of each leave recipient and leave donor, the gender of each leave recipient, and the total amount of transferred annual leave used by each leave recipient; and

(3) Any additional information OPM may require.

## Subpart J—Voluntary Leave Bank Program

SOURCE: 59 FR 67129, Dec. 29, 1994, unless otherwise noted.

**§ 630.1001 Purpose and applicability.**

(a) *Purpose.* The purpose of this subpart is to establish procedures and requirements for a voluntary leave bank program under which the unused accrued annual leave of an employee may be contributed to a leave bank for use by a leave bank member who needs such leave because of a medical emergency.

(b) *Applicability.* This subpart applies to officers and employees—

(1) To whom subchapter I of chapter 63 of title 5, United States Code applies; and

(2) Who are employed in agencies and their organizational subunits operating a voluntary leave bank program under this subpart.

**§ 630.1002 Definitions.**

*Agency* means an "Executive agency," as defined in 5 U.S.C. 105, or a "military department," as defined in 5 U.S.C. 102. "Agency" does not include the Central Intelligence Agency, the Defense Intelligence Agency, the National Security Agency, the Federal Bureau of Investigation, or any other Executive agency or subunit thereof, as determined by the President, whose principal function is the conduct of foreign intelligence or counterintelligence activities.

*Available paid leave* has the meaning given that term in subpart I of this part.

*Committed relationship* has the meaning given that term in subpart I of this part.

*Domestic partner* has the meaning given that term in subpart I of this part.

*Employee* has the meaning given that term in subpart I of this part.

*Family member* has the meaning given that term in subpart I of this part.

*Leave bank* means a pooled fund of annual leave established by an agency under § 630.1003.

*Leave bank member* means a leave contributor who has contributed, in an open enrollment period (or individual enrollment period, as applicable) of the current leave year, at least the minimum amount of annual leave required by § 630.1004.

*Leave contributor* means an employee who contributes annual leave to a leave bank under § 630.1004.

*Leave recipient* means a leave bank member whose application to receive contributions of annual leave from a leave bank has been approved under § 630.1007.

*Medical emergency* has the meaning given that term in subpart I of this part.

*Paid leave status under subchapter I* has the meaning given that term in subpart I of this part.

*Parent* has the meaning given that term in subpart I of this part.

*Shared leave status* has the meaning given that term in subpart I of this part.

*Son or daughter* has the meaning given that term in subpart I of this part.

[59 FR 67129, Dec. 29, 1994, as amended at 75 FR 33496, June 14, 2010]

**§ 630.1003 Establishing leave banks and leave bank boards.**

(a) Each agency that participates in the voluntary leave bank program shall, in accordance with this subpart—

(1) Develop written policies and procedures for establishing and administering leave banks and leave bank boards;

(2) Establish one or more leave bank boards to perform the duties authorized by this subpart; and

(3) Establish and begin operating one or more leave banks.

(b) No more than one leave bank board may be established for each leave bank.

(c) Each leave bank board shall consist of three members. At least one member shall represent a labor organization or employee group.

(d) Each leave bank board shall—

(1) Establish its internal decision-making procedures;

(2) Review and approve or disapprove each application to become a leave contributor under § 630.1004 and a leave recipient under §§ 630.1006 and 630.1007;

(3) Monitor the status of each leave recipient's medical emergency;

(4) Monitor the amount of leave in the leave bank and the number of applications to become a leave recipient;

(5) Maintain an adequate amount of annual leave in the leave bank to the greatest extent practicable in accordance with § 630.1004; and

(6) Perform other functions prescribed in this subpart.

(e) Annual leave may not be borrowed, contributed, or otherwise transferred between leave banks.

**§ 630.1004 Application to become a leave contributor and leave bank member.**

(a) An employee may make voluntary written application to the leave bank board to become a leave contributor. The application shall specify the number of hours of annual leave to be contributed and any other information the leave bank board may reasonably require.

(b) An employee may request that annual leave be contributed to a specified bank member other than the leave contributor's immediate supervisor.

(c) A leave contributor shall become a leave bank member for a particular leave year if he or she submits an application meeting the requirements of this section during an open enrollment period established by the leave bank board under paragraphs (d) and (e) of this section (or where applicable, during an individual enrollment period established under paragraph (f) of this section).

(d) The leave bank board shall establish at least one open enrollment period for each leave year of leave bank operation.

(e) An open enrollment period shall last at least 30 calendar days. The agency shall take appropriate action to inform employees of each open enrollment period.

(f) An employee entering the agency or participating organizational subunit or returning from an extended absence outside an open enrollment period may become a leave bank member for the leave year by submitting an application meeting the requirements of this section during an individual enrollment period lasting at least 30 calendar days, beginning on the date the employee entered or returned to the agency or organizational subunit.

(g) Except as provided in paragraph (h) of this section, the minimum contribution required to become a leave bank member for a leave year shall be—

(1) 4 hours of annual leave for an employee who has less than 3 years of service at the time he or she submits an application to contribute annual leave;

(2) 6 hours of annual leave for an employee who has at least 3, but less than 15, years of service at the time he or she submits an application to contribute annual leave; and

(3) 8 hours of annual leave for an employee who has 15 or more years of service at the time he or she submits an application to contribute annual leave.

(h) The leave bank board may—

(1) Decrease the minimum contribution required by paragraph (g) of this section for the following leave year when the leave bank board determines that there is a surplus of leave in the bank;

(2) Increase the minimum contribution required by paragraph (g) of this section for the following leave year when the leave bank board determines that such action is necessary to maintain an adequate balance of annual leave in the leave bank; or

(3) Eliminate the requirement for a minimum contribution under paragraph (g) of this section when a leave bank member transfers within his or her employing agency to an organization covered by a different leave bank.

(i) If a leave recipient does not have sufficient available accrued annual leave to his or her credit to make the full minimum contribution required by this section, he or she shall be deemed to have made the minimum contribution.

(j) The leave bank board shall deposit all contributions of annual leave under this subpart in the leave bank. Except as provided in § 630.1016(c), the leave bank board may not return a contribution of annual leave to a leave contributor after deposit in the leave bank.

(k) A leave bank member may apply to contribute additional annual leave at any time. An employee who is not a leave bank member may apply to become a leave contributor at any time.

**§ 630.1005 Limitations on contribution of annual leave.**

(a) In any one leave year, a leave contributor may contribute no more than a total of one-half of the amount of annual leave he or she would be entitled to accrue during the leave year in which the contribution is made.

(b) In the case of a leave contributor who is projected to have annual leave that otherwise would be subject to forfeiture at the end of the leave year under 5 U.S.C. 6304(a), the maximum amount of annual leave that may be contributed during the leave year shall be the lesser of—

(1) One-half of the amount of annual leave he or she would be entitled to accrue during the leave year in which the contribution is made; or

(2) The number of hours remaining in the leave year (as of the date of the contribution) for which the leave contributor is scheduled to work and receive pay.

(c) The agency shall establish written criteria permitting a leave bank board to waive the limitations on contributing annual leave under paragraphs (a) and (b) of this section. Any such waiver shall be documented in writing.

(d) The limitations in this section shall apply to the total amount of annual leave donated or contributed during the leave year under subparts I and J of this part.

### § 630.1006 Application to become a leave recipient.

(a) A leave bank member may make written application to the leave bank board to become a leave recipient. If a leave bank member is not capable of making application on his or her own behalf, a personal representative may make written application on his or her behalf.

(b) The leave bank board may require leave bank members to submit applications under this section within a prescribed period of time following the termination of a medical emergency.

(c) An application by a leave bank member to become a leave recipient shall be accompanied by the following information concerning the potential leave recipient:

(1) The leave bank member's name, position title, and grade or pay level;

(2) The reasons leave is needed, including a brief description of the nature, severity, anticipated duration, and if it is a recurring one, the approximate frequency of the medical emergency affecting the leave bank member;

(3) Certification from one or more physicians, or other appropriate experts, with respect to the medical emergency, if the leave bank board so requires; and

(4) Any additional information that may be required by the leave bank board.

(d) If the leave bank board requires a leave bank member to submit certification from two or more sources under paragraph (b)(3) of this section, the agency shall ensure, either by direct payment to the expert involved or by reimbursement, that the leave bank member is not required to pay for the expenses associated with obtaining certification from more than one source.

### § 630.1007 Approval of application to become a leave recipient.

(a) The leave bank board shall review an employee's application to become a leave recipient under procedures established by the agency for the purpose of determining whether the employee is a leave bank member who is or has been affected by a medical emergency.

(b) Before approving an application to become a leave recipient, the leave bank board shall determine that the absence from duty without available paid leave because of the medical emergency is (or is expected to be) at least 24 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, at least 30 percent of the average number of hours in the employee's biweekly scheduled tour of duty).

(c) In making a determination as to whether a medical emergency is likely to result in a substantial loss of income, the leave bank board shall not consider factors other than whether the absence from duty without available paid leave is (or is expected to be) at least 24 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, at least 30 percent of the average number of hours in the employee's biweekly scheduled tour of duty).

(d) The leave bank board shall provide timely written notification to the applicant of the action taken on the application. If the leave bank board disapproves the application, notification shall include the reasons for disapproval.

(e) The leave bank board may establish written policies limiting the amount of annual leave that may be granted to a leave recipient.

[59 FR 67125, Dec. 29, 1994, as amended at 60 FR 26979, May 22, 1995]

### § 630.1008 Accrual of annual and sick leave.

(a) Except as otherwise provided in this section, while an employee is in a shared leave status, annual and sick leave shall accrue to the credit of the employee at the same rate as if the employee

were then in a paid leave status under subchapter I of chapter 63 of title 5, United States Code, except that—

(1) The maximum amount of annual leave that may be accrued by a leave recipient while in a shared leave status in connection with any particular medical emergency may not exceed 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty); and

(2) The maximum amount of sick leave that may be accrued by a leave recipient while in a shared leave status in connection with any particular medical emergency may not exceed 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty).

(b) Any annual or sick leave accrued by an employee under this subpart and subpart I of this part—

(1) Shall be credited to an annual or sick leave account, as appropriate, separate from any leave account of the employee under subchapter I of chapter 63 of title 5, United States Code; and

(2) Shall not become available for use by the employee and may not otherwise be taken into account under subchapter I of chapter 63 of title 5, United States Code, until it is transferred to the appropriate leave account of the employee under subchapter I of chapter 63 of title 5, United States Code, as provided in paragraph (c) of this section.

(c) Any annual or sick leave accrued by an employee under this section shall be transferred to the appropriate leave account of the employee under subchapter I of chapter 63 of title 5, United States Code, and shall become available for use—

(1) As of the beginning of the first pay period beginning on or after the date on which the employee's medical emergency terminates as described in § 630.1010(a)(3) or (4); or

(2) If the employee's medical emergency has not yet terminated, once the employee has exhausted all leave made available to such employee under this subpart of subpart I of this part.

(d) If the leave recipient's employing agency advances at the beginning of the leave year the amount of annual leave the employee normally would accrue during the entire leave year under 5 U.S.C. 6302(d)—

(1) The leave recipient's employing agency shall establish procedures to ensure that 40 hours (or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's weekly scheduled tour of duty) of annual leave are placed in a separate annual leave account and made available for use by the employee as described in paragraph (c) of this section; and

(2) The employee shall continue to accrue annual leave while using annual leave withdrawn from a leave bank to the extent necessary for the purpose of reducing an indebtedness caused by the use of annual leave advanced at the beginning of the leave year.

(e) If the leave recipient's medical emergency terminates as described in § 630.1010(a)(1), no leave shall be credited to the employee under this section.

[59 FR 67125, Dec. 29, 1994, as amended at 60 FR 26979, May 22, 1995]

**§ 630.1009 Use of annual leave withdrawn from a leave bank.**

(a) A leave recipient may use annual leave withdrawn from a leave bank only for the purpose of medical emergency for which the leave recipient was approved.

(b) Except as provided in § 630.1008, during each biweekly pay period that a leave recipient is affected by a medical emergency, he or she shall use any accrued annual leave (and sick leave, if applicable) before using annual leave withdrawn from a leave bank.

(c) The approval and use of annual leave withdrawn from a leave bank shall be subject to all of the conditions and requirements imposed by chapter 63 of title 5, United States Code, part 630 of this chapter, and the agency on the approval and use of annual leave accrued under 5 U.S.C. 6303, except that annual leave withdrawn from a leave bank may accumulate without regard to any limitation imposed by 5 U.S.C. 6304(a).

(d) Annual leave withdrawn from a leave bank may be substituted retroactively for any period of leave without pay or used to liquidate an indebtedness for any period of advanced leave that began on or after the date fixed by the leave bank board as the beginning of the medical emergency.

(e) Annual leave withdrawn from a leave bank may not be—

(1) Included in a lump-sum payment under 5 U.S.C. 5551 or 5552; or

(2) Made available for recredit under 5 U.S.C. 6306 upon reemployment by a Federal agency.

(f) An agency having employees who earn and use annual leave on the basis of an uncommon tour of duty shall establish procedures for administering the contribution and withdrawal of annual leave by such employees under this subpart.

**§ 630.1010 Termination of medical emergency.**

(a) The medical emergency affecting a leave recipient shall terminate—

(1) When the leave recipient's Federal service terminates;

(2) When the leave recipient leaves the agency or participating organizational subunit, if the bank board so determines;

(3) At the end of the biweekly pay period in which the leave bank board receives written notice from the leave recipient or from a personal representative of the leave recipient that the leave recipient is no longer affected by a medical emergency;

(4) At the end of the biweekly pay period in which the leave bank board determines, after written notice from the bank board and an opportunity for the leave recipient (or, if appropriate, a personal representative of the leave recipient) to answer orally or in writing, that the leave recipient is no longer affected by a medical emergency; or

(5) At the end of the biweekly pay period in which the agency receives notice that the Office of Personnel Management has approved an application for disability retirement for the leave recipient under the Civil Service Retirement System or the Federal Employees Retirement System.

(b) The leave bank board shall ensure that annual leave withdrawn from the leave bank and not used before the termination of a leave recipient's medical emergency shall be returned to the leave bank.

(c) The leave bank board may deem a medical emergency to continue for the purpose of providing a leave recipient an adequate period of time within which to receive contributions of annual leave.

(d) If a leave recipient elects to buy back annual leave as a result of a claim for an employment-related injury approved by the Office of Workers' Compensation Programs under 20 CFR 10.202 and 10.310, the amount of annual leave withdrawn from the leave bank that is bought back by the leave recipient shall be restored to the leave bank.

[59 FR 67129, Dec. 29, 1994, as amended at 61 FR 64451, Dec. 5, 1996]

**§ 630.1011 Prohibition of coercion.**

(a) An employee may not directly or indirectly intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce, any other employee for the purpose of interfering with any right such employee may have with respect to contributing, withdrawing, or using annual leave under this subpart.

(b) For the purpose of paragraph (a) of this section—

(1) The term "employee" has the meaning given that term in 5 U.S.C. 6301(2), excluding an individual employed by the District of Columbia; and

(2) The term "intimidate, threaten, or coerce" includes promising to confer or conferring any benefit (such as an appointment or promotion or compensation) or effecting or threatening to effect any reprisal (such as deprivation of appointment, promotion, or compensation).

[59 FR 67125, Dec. 29, 1994, as amended at 60 FR 26979, May 22, 1995]

**§ 630.1012 Records and reports.**

(a) Each agency shall maintain records concerning the administration of the voluntary leave bank program and may be required by the Office of Personnel Management to report any information necessary to evaluate the effectiveness of the program.

(b) An agency shall maintain the following information for each leave bank:

(1) The number of leave bank members for each leave year;

(2) The number of applications approved for medical emergencies affecting the employee and the number of applications approved for medical emergencies affecting an employee's family member;

(3) The grade or pay level of each leave contributor and the total amount of annual leave he or she contributed to the bank;

(4) The grade or pay level and gender of each leave recipient and the total amount of annual leave he or she actually used; and

(5) Any additional information OPM may require.

**§ 630.1013 Participation in voluntary leave transfer and leave bank programs.**

(a) If an agency or organizational subunit establishes a voluntary leave bank program under this subpart—

(1) A covered employee may also participate in a voluntary leave transfer program under subpart I of this part;

(2) Except as provided in paragraphs (b) and (c) of this section, any annual leave previously transferred to an employee under the voluntary leave transfer program shall remain to the credit of the employee who later becomes a leave recipient in a leave bank and shall become subject to the agency's policies and procedures for administering this subpart; and

(3) The agency or organizational subunit shall establish policies or procedures governing the use of donated or transferred leave for any leave recipient who receives leave under both a voluntary leave transfer program and a voluntary leave bank program for the same medical emergency.

(b) Upon termination of a leave recipient's medical emergency, any annual leave previously transferred under the voluntary leave transfer program and remaining to the credit of a leave recipient shall be restored under § 630.911(a) through (d).

(c) Transferred annual leave restored to the account of a leave donor under paragraph (b) of this section shall be subject to the limitation imposed by 5 U.S.C. 6304(a) at the end of the leave year in which the annual leave is restored.

**§ 630.1014 Movement between voluntary leave bank programs.**

If an employee moves between an agency or organizational subunit operating a leave bank to an agency or organizational subunit operating a different leave bank, the following procedures shall apply:

(a) On the date of the employee's move, he or she shall become subject to the policies and procedures of the voluntary leave bank program of the new agency or organizational subunit; and

(b) Nothing in § 630.1010(a)(2) or (b) shall interfere with the employee's right to submit an application to become a leave contributor or leave recipient in accordance with the policies and procedures of the voluntary leave bank program of the new agency or organizational subunit.

**§ 630.1015 Movement between voluntary leave bank and leave transfer programs.**

If an employee moves between an agency or organizational subunit covered by a voluntary leave bank program under this subpart and an agency or organizational subunit covered by a voluntary leave transfer program under subpart I of this part, the following procedures shall apply.

(a) On the date of the employee's move, he or she shall become subject to the policies and procedures of the voluntary leave transfer and voluntary leave bank program (if applicable) of the new agency or organizational subunit; and

(b) Nothing in § 630.1010(a)(2) or (b) shall interfere with the employee's right to submit an application to become a leave donor (or leave contributor, as applicable) or leave recipient under the voluntary leave transfer or voluntary leave bank program (as applicable) of the new agency or organizational subunit.

**§ 630.1016 Termination of a voluntary leave bank program.**

(a) An agency may terminate a voluntary leave bank program only after it gives at least 30 calendar days advance written notice to current leave bank members.

(b) If an agency terminates a voluntary leave bank program before the termination of the medical emergency affecting a leave bank recipient, annual leave transferred to a leave bank recipient shall remain available for use under the rules set forth in subpart I of this part.

(c) An agency that terminates a voluntary leave bank program shall make provisions for the timely and equitable distribution of any leave remaining in the leave bank. The agency may allocate the leave to current leave recipients, recredit the leave to the accounts of the voluntary leave bank members, or a combination of both. The agency may distribute the leave immediately or may delay the distribution, in whole or part, until the beginning of the following leave year.

## Subpart K—Emergency Leave Transfer Program

SOURCE: 73 FR 65500, Nov. 4, 2008, unless otherwise noted.

**§ 630.1101 Purpose, applicability, and administration.**

(a) *Purpose* . This subpart provides regulations to implement section 6391 of title 5, United States Code, and must be read together with section 6391. Section 6391 of title 5, United States Code, provides that in the event of a major disaster or emergency, as declared by the President, that results in severe adverse effects for a substantial number of employees, the President may direct the Office of Personnel Management (OPM) to establish an emergency leave transfer program under which an employee may donate unused annual leave for transfer to employees of his or her agency or to employees in other agencies who are adversely affected by such disaster or emergency.

(b) *Applicability* . This subpart applies to any individual who is defined as an "employee" in 5 U.S.C. 6331(1) and who is employed in—

(1) An Executive agency; or

(2) The Judicial branch.

(c) *Administration* . The head of each agency having employees subject to this subpart is responsible for the proper administration of this subpart. Each Federal agency must establish and administer procedures to permit the voluntary transfer of annual leave consistent with this subpart.

**§ 630.1102 Definitions.**

In this subpart:

*Agency* means—

(1) An "Executive agency," as defined in 5 U.S.C. 105; or

(2) A Judicial branch entity.

*Committed relationship* has the meaning given that term in subpart I of this part.

*Disaster or emergency* means a major disaster or emergency, as declared by the President, that results in severe adverse effects for a substantial number of employees (e.g., loss of life or property, serious injury, or mental illness as a result of a direct threat to life or health).

*Domestic partner* has the meaning given that term in subpart I of this part.

*Emergency leave donor* means a current employee whose voluntary written request for transfer of annual leave to an emergency leave transfer program is approved by his or her employing agency.

*Emergency leave recipient* means a current employee for whom the employing agency has approved an application to receive annual leave under an emergency leave transfer program.

*Emergency leave transfer program* means a program established by OPM that permits Federal employees to transfer their unused annual leave to other Federal employees adversely affected by a disaster or emergency, as declared by the President.

*Employee means* —

(1) An employee as defined in 5 U.S.C. 6331(1); or

(2) An employee of a Judicial branch entity.

*Family member* has the meaning given that term in § 630.902.

*Leave year* has the meaning given that term in § 630.201.

*Parent* has the meaning given that term in subpart I of this part.

*Son or daughter* has the meaning given that term in subpart I of this part.

*Transferred annual leave* means donated annual leave credited to an approved emergency leave recipient's annual leave account.

[73 FR 65500, Nov. 4, 2008, as amended at 75 FR 33497, June 14, 2010]

**§ 630.1103 Establishment of an emergency leave transfer program.**

(a) When directed by the President, OPM will establish an emergency leave transfer program that permits an employee to donate his or her accrued annual leave to employees of the same or other agencies who are adversely affected by a disaster or emergency as defined in § 630.1102. In certain situations, OPM may delegate to an agency the authority to establish an emergency leave transfer program.

(b) OPM will notify agencies of the establishment of an emergency leave transfer program for a specific disaster or emergency, as declared by the President. Once notified, each agency affected by the disaster or emergency is authorized to do the following:

(1) Determine whether, and how much, donated annual leave is needed by affected employees;

(2) Approve emergency leave donors and/or emergency leave recipients within the agency, as appropriate;

(3) Facilitate the distribution of donated annual leave from approved emergency leave donors to approved emergency leave recipients within the agency; and

(4) Determine the period of time for which donated annual leave may be accepted for distribution to approved emergency leave recipients.

**§ 630.1104 Donations from a leave bank to an emergency leave transfer program.**

A leave bank established under subchapter IV of chapter 63 of title 5, United States Code, and subpart J of part 630 may, with the concurrence of the leave bank board established under § 630.1003, donate annual leave to an emergency leave transfer program administered by its own agency, or, during a Governmentwide transfer of emergency leave coordinated by OPM, to an emergency leave transfer program administered by another agency. Donated annual leave not used by an emergency leave recipient must be returned to the leave bank as provided in § 630.1117.

[74 FR 10166, Mar. 10, 2009]

**§ 630.1105 Application to become an emergency leave recipient.**

(a) An employee who has been adversely affected by a disaster or emergency may make written application to his or her employing agency to become an emergency leave recipient. If an employee is not capable of making written application, a personal representative may make written application on behalf of the employee.

(b) An employee who has a family member who has been adversely affected by a disaster or emergency also may make written application to his or her employing agency to become an emergency leave recipient. An emergency leave recipient may use donated annual leave to assist an affected family member, provided such family member has no reasonable access to other forms of assistance.

(c) For the purpose of this subpart, an employee is considered to be adversely affected by a major disaster or emergency if the disaster or emergency has caused the employee, or a family member of the employee, severe hardship to such a degree that his or her absence from work is required.

(d) The employee's application must be accompanied by the following information:

(1) The name, position title, and grade or pay level of the potential emergency leave recipient;

(2) A statement describing his or her need for leave from the emergency leave transfer program; and

(3) Any additional information that may be required by the potential leave recipient's employing agency.

(e) An agency may determine a time period by which an employee must apply to become an emergency leave recipient after the occurrence of a disaster or emergency, as defined in § 630.1102.

**§ 630.1106 Agency review of an application to become an emergency leave recipient.**

An agency must review an application to become an emergency leave recipient under procedures the agency has established for the purpose of determining that a potential leave recipient is or has been affected by a disaster or emergency, as defined in § 630.1102.

**§ 630.1107 Notification of approval or disapproval of an application to become an emergency leave recipient.**

Once the employee's application to become an emergency leave recipient is either approved or disapproved, the agency must notify the employee (or his or her personal representative who made application on the employee's behalf) within 10 calendar days (excluding Saturdays, Sundays, and legal public holidays) after the date the application was received (or the date established by the agency, if that date is later). If disapproved, the agency must give the reason for its disapproval.

**§ 630.1108 Use of available paid leave.**

An approved emergency leave recipient is not required to exhaust his or her accrued annual and sick leave before receiving donated leave under the emergency leave transfer program and the recipient is eligible to be placed in a paid leave status using transferred annual leave.

**§ 630.1109 Donating annual leave.**

An employee may voluntarily submit a written request to his or her agency that a specified number of hours of his or her accrued annual leave, consistent with the limitations in § 630.1110, be transferred from his or her annual leave account to an emergency leave transfer program established under § 630.1103. An emergency leave donor may not donate annual leave for transfer to a specific emergency leave recipient under this subpart. Donated annual leave not used by an emergency leave recipient must be returned to the emergency leave donor(s) and/or leave banks as provided in § 630.1117.

**§ 630.1110 Limitation on the amount of annual leave donated by an emergency leave donor.**

(a) An emergency leave donor may not contribute less than 1 hour or more than 104 hours of annual leave in a leave year to an emergency leave transfer program. Each agency may establish written criteria for waiving the 104-hour limitation on donating annual leave in a leave year.

(b) Annual leave donated to an emergency leave transfer program may not be applied against the limitations on the donation of annual leave under the voluntary leave transfer or leave bank programs established under 5 U.S.C. 6332 and 6362, respectively.

**§ 630.1111 Limitation on the amount of donated annual leave received by an emergency leave recipient.**

An emergency leave recipient may receive a maximum of 240 hours of donated annual leave at any one time from an emergency leave transfer program for each disaster or emergency. After taking into consideration the amount of donated annual leave available to all approved emergency leave recipients and the needs of individual emergency leave recipients, an employing agency may allow an employee to receive additional disbursements of donated annual leave based on the employee's continuing need. Each disbursement of transferred annual leave may not exceed 240 hours.

**§ 630.1112 Transferring donated annual leave between agencies.**

(a) If an agency does not receive sufficient amounts of donated annual leave to meet the needs of approved emergency leave recipients within the agency, the agency may contact OPM to obtain assistance in receiving donated annual leave from other agencies. The agency must notify OPM of the total amount of donated annual leave needed for transfer to the agency's approved emergency leave

recipients. OPM will solicit and coordinate the transfer of donated annual leave from other Federal agencies to affected agencies who may have a shortfall of donated annual leave. OPM will determine the period of time for which donations of accrued annual leave may be accepted for transfer to affected agencies.

(b) Each Federal agency OPM contacts for the purpose of providing donated annual leave to an agency in need must—

(1) Approve emergency leave donors under the conditions specified in §§ 630.1109 and 630.1110 and determine how much donated annual leave is available for transfer to an affected agency;

(2) Maintain records on the amount of annual leave donated by each emergency leave donor to the emergency leave transfer program (for the purpose of restoring unused transferred annual leave under § 630.1117(b)).

(3) Report the total amount of annual leave donated to the emergency leave transfer program to OPM; and

(4) When OPM has accepted the donated annual leave, debit the amount of annual leave donated to the emergency leave transfer program from each emergency leave donor's annual leave account.

(c) OPM will notify each affected agency of the aggregate amount of donated annual leave that will be credited to it for transfer to its approved emergency leave recipient(s). The affected agency will determine the amount of donated annual leave to be transferred to each emergency leave recipient (an amount that may vary according to individual needs).

(d) The affected agency must credit the annual leave account of each approved emergency leave recipient as soon as possible after the date OPM notifies the agency of the amount of donated annual leave that will be credited to the agency under paragraph (c) of this section.

**§ 630.1113 Using donated annual leave.**

(a) Any donated annual leave an emergency leave recipient receives from an emergency leave transfer program may be used only for purposes related to the disaster or emergency for which the emergency leave recipient was approved. Each agency is responsible for ensuring that annual leave donated under the emergency leave transfer program is used appropriately.

(b) Annual leave transferred under this subpart may be—

(1) Substituted retroactively for any period of leave without pay used because of the adverse effects of the disaster or emergency; or

(2) Used to liquidate an indebtedness incurred by the emergency leave recipient for advanced annual or sick leave used because of the adverse effects of the disaster or emergency. The agency may advance annual or sick leave, as appropriate (even if the employee has available annual and sick leave), so that the emergency leave recipient is not forced to use his or her accrued leave before donated annual leave becomes available.

**§ 630.1114 Accrual of leave while using donated annual leave.**

While an emergency leave recipient is using donated annual leave from an emergency leave transfer program, annual and sick leave continue to accrue to the credit of the employee at the same rate as if he or she were in a paid leave status under 5 U.S.C. chapter 63, subchapter I, and will be subject to the limitations imposed by 5 U.S.C. 6304(a), (b), (c), and (f) at the end of the leave year in which the transferred annual leave is received.

**§ 630.1115 Limitations on the use of donated annual leave.**

Donated annual leave transferred to a leave recipient under this subpart may not be—

(a) Included in a lump-sum payment under 5 U.S.C. 5551 or 5552;

(b) Recredited to a former employee who is reemployed by a Federal agency; or

(c) Used to establish initial eligibility for immediate retirement or acquire eligibility to continue health benefits into retirement under 5 U.S.C. 6302(g).

**§ 630.1116 Termination of a disaster or emergency.**

The disaster or emergency affecting the employee as an emergency leave recipient terminates at the earliest occurrence of the following conditions.

(a) When the employing agency determines that the disaster or emergency has terminated;

(b) When the employee's Federal service terminates;

(c) At the end of the biweekly pay period in which the employee, or his or her personal representative, notifies the emergency leave recipient's agency that he or she is no longer affected by such disaster or emergency;

(d) At the end of the biweekly pay period in which the employee's agency determines, after giving the employee or his or her personal representative written notice and an opportunity to answer orally or in writing, that the employee is no longer affected by such disaster or emergency; or

(e) At the end of the biweekly pay period in which the employee's agency receives notice that OPM has approved an application for disability retirement for the emergency leave recipient under the Civil Service Retirement System or the Federal Employees' Retirement System, as appropriate.

**§ 630.1117 Procedures for returning unused donated annual leave to emergency leave donors and leave banks.**

(a) When a disaster or emergency is terminated, any unused annual leave donated to the emergency leave transfer program must be returned by the employing agency to the emergency leave donors, and if annual leave was donated by any leave bank(s) it must be returned to the leave bank (s).

(b) Each agency must determine the amount of annual leave to be restored to any leave bank and/or to each of the emergency leave donors who, on the date leave restoration is made, is employed in the Federal service. The amount of unused annual leave to be returned to each emergency leave donor and/or leave bank must be proportional to the amount of annual leave donated by the employee or the leave bank to the emergency leave transfer program for such disaster or emergency, and must be returned according to the procedures outlined in § 630.911(b). Any unused annual leave remaining after the distribution will be subject to forfeiture.

(c) Annual leave donated to an emergency leave transfer program for a specific disaster or emergency may not be transferred to another emergency leave transfer program established for a different disaster or emergency.

(d) At the election of the emergency leave donor, the employee may choose to have the agency restore unused donated annual leave by crediting the restored annual leave to the emergency leave donor's annual leave account in either the current leave year or the first pay period of the following leave year.

**§ 630.1118 Protection against coercion.**

(a) An employee may not directly or indirectly intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce, any emergency leave donor or emergency leave recipient for the purpose of interfering with any right such employee may have with respect to donating, receiving, or using annual leave under this subpart.

(b) For the purpose of paragraph (a) of this section, the term "intimidate, threaten, or coerce" includes promising to confer or conferring any benefit (such as appointment or promotion or compensation) or effecting or threatening to effect any reprisal (such as deprivation of appointment, promotion, or compensation).

## Subpart L—Family and Medical Leave

SOURCE: 58 FR 39602, July 23, 1993, unless otherwise noted.

**§ 630.1201 Purpose, applicability, and administration.**

(a) *Purpose.* This subpart provides regulations to implement sections 6381 through 6387 of title 5, United States Code. This subpart must be read together with those sections of law. Sections 6381 through 6387 of title 5, United States Code, provide a standard approach to providing family and medical leave to Federal employees by prescribing an entitlement to a total of 12 administrative workweeks of unpaid leave during any 12-month period for certain family and medical needs, as specified in § 630.1203(a) of this part.

(b) *Applicability.* (1) Except as otherwise provided in this paragraph, this subpart applies to any employee who—

(i) Is defined as an "employee" under 5 U.S.C. 6301(2), excluding employees covered under paragraph (b)(2) of this section; and

(ii) Has completed at least 12 months of service (not required to be 12 recent or consecutive months) as—

(A) An employee, as defined under 5 U.S.C. 6301(2), excluding any service as an employee under paragraph (b)(2) of this section;

(B) An employee of the Veterans Health Administration appointed under title 38, United States Code, in occupations listed in 38 U.S.C. 7401(1);

(C) A "teacher" or an individual holding a "teaching position," as defined in section 901 of title 20, United States Code; or

(D) An employee identified in section 2105(c) of title 5, United States Code, who is paid from nonappropriated funds.

(2) This subpart does not apply to—

(i) An individual employed by the government of the District of Columbia;

(ii) An employee serving under a temporary appointment with a time limitation of 1 year or less;

(iii) An intermittent employee, as defined in 5 CFR 340.401(c); or

(iv) Any employee covered by Title I or Title V of the Family and Medical Leave Act of 1993 (Pub. L. 103-3, February 5, 1993). The Department of Labor has issued regulations implementing Title I at 29 CFR part 825.

(3) For the purpose of applying sections 6381 through 6387 of title 5, United States Code—

(i) An employee of the Veterans Health Administration appointed under title 38, United States Code, in occupations listed in 38 U.S.C. 7401(1) is be governed by the terms and conditions of regulations prescribed by the Secretary of Veterans Affairs;

(ii) A "teacher" or an individual holding a "teaching position," as defined in section 901 of title 20, United States Code, shall be governed by the terms and conditions of regulations prescribed by the Secretary of Defense; and

(iii) An employee identified in section 2105(c) of title 5, United States Code, who is paid from nonappropriated funds shall be governed by the terms and conditions of regulations prescribed by the Secretary of Defense or the Secretary of Transportation, as appropriate.

(4) The regulations prescribed by the Secretary of Veterans Affairs, Secretary of Defense, or Secretary of Transportation under paragraph (b)(3) of this section shall, to the extent appropriate, be consistent with the regulations prescribed in this subpart and the regulations prescribed by the Secretary of Labor to carry out Title I of the Family and Medical Leave Act of 1993 at 29 CFR part 825.

(c) *Administration.* The head of an agency having employees subject to this subpart is responsible for the proper administration of this subpart.

[58 FR 39602, July 23, 1993, as amended at 61 FR 64451, Dec. 5, 1996; 65 FR 26486, May 8, 2000]

**§ 630.1202 Definitions.**

In this subpart:

*Accrued leave* has the meaning given that term in § 630.201 of this part.

*Accumulated leave* has the meaning given that term in § 630.201 of this part.

*Administrative workweek* has the meaning given that term in § 610.102 of this chapter.

*Adoption* refers to a legal process in which an individual becomes the legal parent of another's child. The source of an adopted child—e.g., whether from a licensed placement agency or otherwise—is not a factor in determining eligibility for leave under this subpart.

*Covered active duty* or *call to covered active duty status* means—

(1) In the case of a member of a regular component of the Armed Forces, duty during the deployment of the member with the Armed Forces to a foreign country under a call or order to active duty (or notification of an impending call or order to active duty); and

(2) In the case of a member of a reserve component of the Armed Forces, duty during the deployment of the member with the Armed Forces to a foreign country under a call or order to active duty (or notification of an impending call or order to active duty) in support of a contingency operation pursuant to any of the following sections of title 10, United States Code, or any other provision of law during a war or during a national emergency declared by the President or Congress:

(i) Section 688, which authorizes ordering to active duty retired members of the Regular Armed Forces and members of the Retired Reserve retired after 20 years for length of service, and members of the Fleet Reserve or Fleet Marine Corps Reserve;

(ii) Section 12301(a), which authorizes ordering all reserve component members to active duty in the case of war or national emergency declared by Congress, or when otherwise authorized by law;

(iii) Section 12302, which authorizes ordering any unit or unassigned member of the Ready Reserve to active duty in time of national emergency declared by the President after January 1, 1953, or when otherwise authorized by law;

(iv) Section 12304, which authorizes ordering any unit or unassigned member of the Selected Reserve and certain members of the Individual Ready Reserve to active duty;

(v) Section 12305, which authorizes the suspension of promotion, retirement, or separation rules for certain Reserve components;

(vi) Section 12406, which authorizes calling the National Guard into Federal service in certain circumstances; or

(vii) Chapter 15, which authorizes calling the National Guard and State militia into Federal service in the case of insurrections and national emergencies.

*Covered military member* means the employee's spouse, son, daughter, or parent on covered active duty or call to covered active duty status.

*Employee* means an individual to whom this subpart applies.

*Essential functions* means the fundamental job duties of the employee's position, as defined in 29 CFR 1630.2(n). An employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment.

*Family and medical leave* means an employee's entitlement to 12 administrative workweeks of unpaid leave for certain family and medical needs, as prescribed under sections 6381 through 6387 of title 5, United States Code.

*Foster care* means 24-hour care for children in substitution for, and away from, their parents or guardian. Such placement is made by or with the agreement of the State as a result of a voluntary agreement by the parent or guardian that the child be removed from the home, or pursuant to a judicial determination of the necessity for foster care, and involves agreement between the State and foster family to take the child. Although foster care may be with relatives of the child, State action is involved in the removal of the child from parental custody.

*Health care provider means*—

(1) A licensed Doctor of Medicine or Doctor of Osteopathy or a physician who is serving on active duty in the uniformed services and is designated by the uniformed service to conduct examinations under this subpart;

(2) Any health care provider recognized by the Federal Employees Health Benefits Program or who is licensed or certified under Federal or State law to provide the service in question;

(3) A health care provider as defined in paragraph (2) of this definition who practices in a country other than the United States, who is authorized to practice in accordance with the laws of that country, and who is performing within the scope of his or her practice as defined under such law;

(4) A Christian Science practitioner listed with the First Church of Christ, Scientist, in Boston, Massachusetts; or

(5) A Native American, including an Eskimo, Aleut, and Native Hawaiian, who is recognized as a traditional healing practitioner by native traditional religious leaders who practices traditional healing methods as believed, expressed, and exercised in Indian religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, consistent with Public Law 95-314, August 11, 1978 (92 Stat. 469), as amended by Public Law 103-344, October 6, 1994 (108 Stat. 3125).

*In loco parentis* refers to the situation of an individual who has day-to-day responsibility for the care and financial support of a child or, in the case of an employee, who had such responsibility for the employee when the employee was a child. A biological or legal relationship is not necessary.

*Incapacity* means the inability to work, attend school, or perform other regular daily activities because of a serious health condition or treatment for or recovery from a serious health condition.

*Intermittent leave or leave taken intermittently* means leave taken in separate blocks of time, rather than for one continuous period of time, and may include leave periods of 1 hour to several weeks. Leave may be taken for a period of less than 1 hour if agency policy provides for a minimum charge for leave of less than 1 hour under § 630.206(a).

*Leave without pay* means an absence from duty in a nonpay status. Leave without pay may be taken only for those hours of duty comprising an employee's basic workweek.

*Parent* means a biological parent or an individual who stands or stood *in loco parentis* to an employee when the employee was a son or daughter. This term does not include parents "in law."

*Reduced leave schedule* means a work schedule under which the usual number of hours of regularly scheduled work per workday or workweek of an employee is reduced. The number of hours by which the daily or weekly tour of duty is reduced are counted as leave for the purpose of this subpart.

*Regularly scheduled* has the meaning given that term in § 610.102 of this chapter.

*Regularly scheduled administrative workweek* has the meaning given that term in § 610.102 of this chapter.

*Serious health condition.* (1) Serious health condition means an illness, injury, impairment, or physical or mental condition that involves—

(i) Inpatient care ( *i.e.,* an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or any subsequent treatment in connection with such inpatient care; or

(ii) Continuing treatment by a health care provider that includes (but is not limited to) examinations to determine if there is a serious health condition and evaluations of such conditions if the examinations or evaluations determine that a serious health condition exists. Continuing treatment by a health care provider may include one or more of the following—

(A) A period of incapacity of more than 3 consecutive calendar days, including any subsequent treatment or period of incapacity relating to the same condition, that also involves—

( *1* ) Treatment two or more times by a health care provider, by a health care provider under the direct supervision of the affected individual's health care provider, or by a provider of health care services under orders of, or on referral by, a health care provider; or

( *2* ) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider (e.g., a course of prescription medication or therapy requiring special equipment to resolve or alleviate the health condition).

(B) Any period of incapacity due to pregnancy or childbirth, or for prenatal care, even if the affected individual does not receive active treatment from a health care provider during the period of incapacity or the period of incapacity does not last more than 3 consecutive calendar days.

(C) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition that—

( *1* ) Requires periodic visits for treatment by a health care provider or by a health care provider under the direct supervision of the affected individual's health care provider,

( *2* ) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

( *3* ) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.). The condition is covered even if the affected individual does not receive active treatment from a health care provider during the period of incapacity or the period of incapacity does not last more than 3 consecutive calendar days.

(D) A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The affected individual must be under the continuing supervision of, but need not

be receiving active treatment by, a health care provider (e.g., Alzheimer's, severe stroke, or terminal stages of a disease).

(E) Any period of absence to receive multiple treatments (including any period of recovery) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury or for a condition that would likely result in a period of incapacity or more than 3 consecutive calendar days in the absence of medical intervention or treatment (e.g., chemotherapy/radiation for cancer, physical therapy for severe arthritis, dialysis for kidney disease).

(2) (Serious health condition does not include routine physical, eye, or dental examinations; a regimen of continuing treatment that includes the taking of over-the-counter medications, bed-rest, exercise, and other similar activities that can be initiated without a visit to the health care provider; a condition for which cosmetic treatments are administered, unless inpatient hospital care is required or unless complications develop; or an absence because of an employee's use of an illegal substance, unless the employee is receiving treatment for substance abuse by a health care provider or by a provider of health care services on referral by a health care provider. Ordinarily, unless complications arise, the common cold, the flu, earaches, upset stomach, minor ulcers, headaches (other than migraines), routine dental or orthodontia problems, and periodontal disease are not serious health conditions. Allergies, restorative dental or plastic surgery after an injury, removal of cancerous growth, or mental illness resulting from stress may be serious health conditions only if such conditions require inpatient care or continuing treatment by a health care provider.)

*Son or daughter* means a biological, adopted, or foster child; a step child; a legal ward; or a child of a person standing *in loco parentis* who is—

(1) Under 18 years of age; or

(2) 18 years of age or older and incapable of self-care because of a mental or physical disability. A son or daughter incapable of self-care requires active assistance or supervision to provide daily self-care in three or more of the "activities of daily living" (ADL's) or "instrumental activities of daily living" (IADL's). Activities of daily living include adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing, and eating. Instrumental activities of daily living include cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using the telephones and directories, using a post office, etc. A "physical or mental disability" refers to a physical or mental impairment that substantially limits one or more of the major life activities of an individual as defined in 29 CFR 1630.2 (h), (i) and (j).

*Son or daughter on covered active duty or call to covered active duty status* means the employee's biological, adopted, or foster child, stepchild, legal ward, or a child for whom the employee stood in loco parentis, who is on covered active duty or call to covered active duty status, and who is of any age.

*Spouse* means an individual who is a husband or wife pursuant to a marriage that is a legal union between one man and one woman, including common law marriage between one man and one woman in States where it is recognized.

*Tour of duty* has the meaning given that term in § 610.102 of this chapter.

[58 FR 39602, July 23, 1993, as amended at 60 FR 67287-67288, Dec. 29, 1995; 61 FR 64451, Dec. 5, 1996; 65 FR 37240, June 13, 2000; 76 FR 60704, Sept. 30, 2011]

**§ 630.1203 Leave entitlement.**

(a) An employee shall be entitled to a total of 12 administrative workweeks of unpaid leave during any 12-month period for one or more of the following reasons:

(1) The birth of a son or daughter of the employee and the care of such son or daughter;

(2) The placement of a son or daughter with the employee for adoption or foster care;

(3) The care of a spouse, son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition; or

(4) A serious health condition of the employee that makes the employee unable to perform any one or more of the essential functions of his or her position.

(5) Any qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered military member on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

(b) An employee must invoke his or her entitlement to family and medical leave under paragraph (a) of this section, subject to the notification and medical certification requirements in §§ 630.1207 and 630.1208. An employee may not retroactively invoke his or her entitlement to family and medical leave. However, if an employee and his or her personal representative are physically or mentally incapable of invoking the employee's entitlement to FMLA leave *during the entire period* in which the employee is absent from work for an FMLA-qualifying purpose under paragraph (a) of this section, the employee may retroactively invoke his or her entitlement to FMLA leave within 2 workdays after returning to work. In such cases, the incapacity of the employee must be documented by a written medical certification from a health care provider. In addition, the employee must provide documentation acceptable to the agency explaining the inability of his or her personal representative to contact the agency and invoke the employee's entitlement to FMLA leave during the entire period in which the employee was absent from work for an FMLA-qualifying purpose. An employee may take only the amount of family and medical leave that is necessary to manage the circumstances that prompted the need for leave under paragraph (a) of this section.

(c) The 12-month period referred to in paragraph (a) of this section begins on the date an employee first takes leave for a family or medical need specified in paragraph (a) of this section and continues for 12 months. An employee is not entitled to 12 additional workweeks of leave until the previous 12-month period ends and an event or situation occurs that entitles the employee to another period of family or medical leave. (This may include a continuation of a previous situation or circumstance.)

(d) The entitlement to leave under paragraphs (a)(1) and (2) of this section shall expire at the end of the 12-month period beginning on the date of birth or placement. Leave for a birth or placement must be concluded within this 12-month period. Leave taken under paragraphs (a)(1) and (2) of this section, may begin prior to or on the actual date of birth or placement for adoption or foster care, and the 12-month period, referred to in paragraph (a) of this section begins on that date.

(e) Leave under paragraph (a) of this section is available to full-time and part-time employees. A total of 12 administrative workweeks will be made available equally for a full-time or part-time employee in direct proportion to the number of hours in the employee's regularly scheduled administrative workweek. The 12 administrative workweeks of leave will be calculated on an hourly basis and will equal 12 times the average number of hours in the employee's regularly scheduled administrative workweek. If the number of hours in an employee's workweek varies from week to week, a weekly average of the hours scheduled over the 12 weeks prior to the date leave commences shall be used as the basis for this calculation. Any holidays authorized under 5 U.S.C. 6103 or by Executive order and nonworkdays established by Federal statute, Executive order, or administrative order that occur during the period in which the employee is on family and medical leave may not be counted toward the 12-week entitlement to family and medical leave.

(f) If the number of hours in an employee's regularly scheduled administrative workweek is changed during the 12-month period of family and medical leave, the employee's entitlement to any remaining family and medical leave will be recalculated based on the number of hours in the employee's current regularly scheduled administrative workweek.

(g) Each agency shall inform its employees of their entitlements and responsibilities under this subpart, including the requirements and obligations of employees.

(h) An agency may not put an employee on family and medical leave and may not subtract leave from an employee's entitlement to leave under paragraph (a) of this section unless the agency has obtained confirmation from the employee of his or her intent to invoke entitlement to leave under paragraph (b) of this section. An employee's notice of his or her intent to take leave under § 630.1207 may suffice as the employee's confirmation.

[58 FR 39602, July 23, 1993, as amended at 61 FR 64452, Dec. 5, 1996; 65 FR 26486, May 8, 2000; 76 FR 60704, Sept. 30, 2011]

**§ 630.1204 Qualifying exigency leave.**

(a) An employee may take FMLA leave while the employee's spouse, son, daughter, or parent (the "covered military member") is on covered active duty or call to covered active duty status for one or more of the following qualifying exigencies:

(1) *Short-notice deployment.* To address any issue that arises from the fact that a covered military member is notified of an impending call or order to covered active duty 7 or fewer calendar days prior to the date of deployment. Leave taken for this purpose can be used for a period of up to 7 calendar days beginning on the date a covered military member is notified of an impending call or order to covered active duty.

(2) *Military events and related activities.* (i) To attend any official ceremony, program, or event sponsored by the military that is related to the covered active duty or call to covered active duty status of a covered military member; and

(ii) To attend family support or assistance programs and informational briefings sponsored or promoted by the military, military service organizations, or the American Red Cross that are related to the covered active duty or call to covered active duty status of a covered military member.

(3) *Childcare and school activities.* (i) To arrange for alternative childcare when the covered active duty or call to covered active duty status of a covered military member necessitates a change in the existing childcare arrangement for a child;

(ii) To provide childcare on an urgent, immediate need basis (but not on a routine, regular, or everyday basis) when the need to provide such care arises from the covered active duty or call to covered active duty status of a covered military member for a child;

(iii) To enroll in or transfer to a new school or day care facility a child, when enrollment or transfer is necessitated by the covered active duty or call to covered active duty status of a covered military member; and

(iv) To attend meetings with staff at a school or a daycare facility, such as meetings with school officials regarding disciplinary measures, parent-teacher conferences, or meetings with school counselors, for a child when such meetings are necessary due to circumstances arising from the covered active duty or call to covered active duty status of a covered military member.

(v) For purposes of paragraphs (a)(3)(i) through (a)(3)(iv) of this section, "child" means a biological, adopted, or foster child, a stepchild, or a legal ward of a covered military member, or a child for whom a covered military member stands in loco parentis, who is either under age 18, or age 18 or older and incapable of self-care because of a mental or physical disability at the time the FMLA leave is to commence.

(4) *Financial and legal arrangements.* (i) To make or update financial or legal arrangements to address the covered military member's absence while on covered active duty or call to covered active duty status, such as preparing and executing financial and health care powers of attorney, transferring bank account signature authority, enrolling in the Defense Enrollment Eligibility Reporting System (DEERS), obtaining military identification cards, or preparing or updating a will or living trust; and

(ii) To act as the covered military member's representative before a Federal, State, or local agency for purposes of obtaining, arranging, or appealing military service benefits while the covered

military member is on covered active duty or call to covered active duty status, and for a period of 90 days following the termination of the covered military member's covered active duty status.

(5) *Counseling.* To attend counseling provided by someone other than a health care provider for oneself, for the covered military member, or for a child as defined in paragraph (a)(3)(v) of this section, provided that the need for counseling arises from the covered active duty or call to covered active duty status of a covered military member.

(6) *Rest and recuperation.* To spend time with a covered military member who is on short-term, temporary, rest and recuperation leave during the period of deployment. Eligible employees may take up to 5 days of leave for each instance of rest and recuperation.

(7) *Post-deployment activities.* (i) To attend arrival ceremonies, reintegration briefings and events, and any other official ceremony or program sponsored by the military for a period of 90 days following the termination of the covered military member's covered active duty status; and

(ii) To address issues that arise from the death of a covered military member while on covered active duty status, such as meeting and recovering the body of the covered military member and making funeral arrangements.

(8) *Additional activities.* To address other events that arise out of the covered military member's covered active duty or call to covered active duty status, provided that the agency and employee agree that such leave qualifies as an exigency, and that they agree to both the timing and duration of such leave.

(b) An employee is eligible to take FMLA leave because of a qualifying exigency when the covered military member is on covered active duty or call to covered active duty status as a member of a regular component of the Armed Forces, or when the covered military member is on covered active duty or call to covered active duty status in support of a contingency operation pursuant to one of the provisions of law identified in the definition of *covered active duty* or *call to covered active duty status* as either a member of the reserve components (Army National Guard of the United States, Army Reserve, Navy Reserve, Marine Corps Reserve, Air National Guard of the United States, Air Force Reserve, and Coast Guard Reserve), or a retired member of the Regular Armed Forces or Reserve.

(c) For those called to covered active duty status in support of a contingency operation—

(1) A call to active duty for purposes of leave taken because of a qualifying exigency refers to a Federal call to active duty. State calls to active duty are not covered unless under order of the President of the United States pursuant to one of the provisions of law identified in paragraph (b) of this section in support of a contingency operation.

(2) For such members, the active duty orders of a covered military member will generally specify whether the servicemember is serving in support of a contingency operation by citation to the relevant section of title 10 of the United States Code or by reference to the specific name of the contingency operation, or both. A military operation qualifies as a contingency operation if it:

(i) Is designated by the Secretary of Defense as an operation in which members of the Armed Forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or

(ii) Results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12305, or 12406, or chapter 15 of title 10 of the United States Code, or any other provision of law during a war or during a national emergency declared by the President or Congress. (See 10 U.S.C. 101(a)(13).)

[76 FR 60704, Sept. 30, 2011]

**§ 630.1205 Intermittent leave or reduced leave schedule.**

(a) Leave under § 630.1203(a) (1) or (2) of this part shall not be taken intermittently or on a reduced leave schedule unless the employee and the agency agree to do so.

(b) Leave under § 630.1203(a)(3) or (4) may be taken intermittently or on a reduced leave schedule when medically necessary, subject to §§ 630.1207 and 630.1208 (b)(6). Leave under § 630.1203(a)(5) may be taken on an intermittent or reduced leave schedule basis, subject to §§ 630.1207 and 630.1209.

(c) If an employee takes leave under § 630.1203(a) (3) or (4) of this part intermittently or on a reduced leave schedule that is foreseeable based on planned medical treatment or recovery from a serious health condition, the agency may place the employee temporarily in an available alternative position for which the employee is qualified and that can better accommodate recurring periods of leave. Upon returning from leave, the employee is entitled to be returned to his or her permanent position or an equivalent position, as provided in § 630.1210(a) of this part.

(d) For the purpose of applying paragraph (c) of this section, an alternative position need not consist of equivalent duties, but must be in the same commuting area and must provide—

(1) An equivalent grade or pay level, including any applicable locality payment under 5 CFR part 531, subpart F; special rate supplement under 5 CFR part 530, subpart C; or similar payment or supplement under other legal authority;

(2) The same type of appointment, work schedule, status, and tenure; and

(3) The same employment benefits made available to the employee in his or her previous position (e.g., life insurance, health benefits, retirement coverage, and leave accrual).

(e) The agency shall determine the available alternative position that has equivalent pay and benefits consistent with Federal laws, including the Rehabilitation Act of 1973 (29 U.S.C. 701) and the Pregnancy Discrimination Act of 1978 (42 U.S.C. 2000e).

(f) Only the amount of leave taken intermittently or on a reduced leave schedule, as these terms are defined in § 630.1202, shall be subtracted from the total amount of leave available to the employee under § 630.1203 (e) and (f).

[58 FR 39602, July 23, 1993, as amended at 61 FR 3544, Feb. 1, 1996; 61 FR 64453, Dec. 5, 1996; 70 FR 31314, May 31, 2005. Redesignated and amended at 76 FR 60704, 60705, Sept. 30, 2011]

**§ 630.1206 Substitution of paid leave.**

(a) Except as provided in paragraph (b) of this section, leave taken under § 630.1203(a) of this part shall be leave without pay.

(b) An employee may elect to substitute the following paid leave for any or all of the period of leave without pay to be taken under § 630.1203(a)—

(1) Accrued or accumulated annual or sick leave under subchapter I of chapter 63 of title 5, United States Code, consistent with current law and regulations governing the granting and use of annual or sick leave;

(2) Advanced annual or sick leave approved under the same terms and conditions that apply to any other agency employee who requests advanced annual or sick leave; and

(3) Leave made available to an employee under the Voluntary Leave Transfer Program or the Voluntary Leave Bank Program consistent with subparts I and J of part 630 of this chapter.

(c) An agency may not deny an employee's right to substitute paid leave under paragraph (b) of this section for any or all of the period of leave without pay to be taken under § 630.1203(a), consistent with current law and regulations.

(d) An agency may not require an employee to substitute paid leave under paragraph (b) of this section for any or all of the period of leave without pay to be taken under § 630.1203(a).

(e) An employee shall notify the agency of his or her intent to substitute paid leave under paragraph (b) of this section for the period of leave without pay to be taken under § 630.1203(a) prior to the date such paid leave commences. An employee may not retroactively substitute paid leave for leave without pay previously taken under § 630.1203(a)

[58 FR 39602, July 23, 1993, as amended at 61 FR 64453, Dec. 5, 1996. Redesignated at 76 FR 60704, Sept. 30, 2011]

**§ 630.1207 Notice of leave.**

(a) If leave taken under § 630.1203(a) of this part is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment, the employee shall provide notice to the agency of his or her intention to take leave not less than 30 calendar days before the date the leave is to begin. If the date of birth or placement or planned medical treatment requires leave to begin within 30 calendar days, the employee shall provide such notice as is practicable.

(b) If leave taken under § 630.1203(a) (3) or (4) of this part is foreseeable based on planned medical treatment, the employee shall consult with the agency and make a reasonable effort to schedule medical treatment so as not to disrupt unduly the operations of the agency, subject to the approval of the health care provider. The agency may, for justifiable cause, request that an employee reschedule medical treatment, subject to the approval of the health care provider.

(c) If the need for leave taken under § 630.1203(a)(5) is foreseeable, the employee must provide notice as soon as practicable, regardless of how far in advance the leave is being requested.

(d) If the need for leave is not foreseeable—e.g., a medical emergency or the unexpected availability of a child for adoption or foster care, and the employee cannot provide 30 calendar days' notice of his or her need for leave, the employee shall provide notice within a reasonable period of time appropriate to the circumstances involved. If necessary, notice may be given by an employee's personal representative (e.g., a family member or other responsible party). If the need for leave is not foreseeable and the employee is unable, due to circumstances beyond his or her control, to provide notice of his or her need for leave, the leave may not be delayed or denied.

(e) If the need for leave is foreseeable, and the employee fails to give 30 calendar days' notice with no reasonable excuse for the delay of notification, the agency may delay the taking of leave under § 630.1203(a) of this part until at least 30 calendar days after the date the employee provides notice of his or her need for family and medical leave.

(f) An agency may waive the notice requirements under paragraph (a) of this section and instead impose the agency's usual and customary policies or procedures for providing notification of leave. The agency's policies or procedures for providing notification of leave must not be more stringent than the requirements in this section. However, an agency may not deny an employee's entitlement to leave under § 630.1203(a) of this part if the employee fails to follow such agency policies or procedures.

(g) An agency may require that a request for leave under § 630.1203(a) (1) and (2) be supported by evidence that is administratively acceptable to the agency.

[58 FR 39602, July 23, 1993, as amended at 59 FR 62274, Dec. 2, 1994; 61 FR 64453, Dec. 5, 1996; 65 FR 26487, May 8, 2000. Redesignated and amended at 76 FR 60704, 60705, Sept. 30, 2011]

**§ 630.1208 Medical certification.**

(a) An agency may require that a request for leave under § 630.1203(a) (3) or (4) be supported by written medical certification issued by the health care provider of the employee or the health care provider of the spouse, son, daughter, or parent of the employee, as appropriate. An agency may

waive the requirement for an initial medical certificate in a subsequent 12-month period if the leave under § 630.1203(a) (3) or (4) is for the same chronic or continuing condition.

(b) The written medical certification shall include—

(1) The date the serious health condition commenced;

(2) The probable duration of the serious health condition or specify that the serious health condition is a chronic or continuing condition with an unknown duration and whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity;

(3) The appropriate medical facts within the knowledge of the health care provider regarding the serious health condition, including a general statement as to the incapacitation, examination, or treatment that may be required by a health care provider;

(4) For the purpose of leave taken under § 630.1203(a)(3) of this part—

(i) A statement from the health care provider that the spouse, son, daughter, or parent of the employee requires psychological comfort and/or physical care; needs assistance for basic medical, hygienic, nutritional, safety, or transportation needs or in making arrangements to meet such needs; and would benefit from the employee's care or presence; and

(ii) A statement from the employee on the care he or she will provide and an estimate of the amount of time needed to care for his or her spouse, son, daughter, or parent;

(5) For the purpose of leave taken under § 630.1203(a)(4), a statement that the employee is unable to perform one or more of the essential functions of his or her position or requires medical treatment for a serious health condition, based on written information provided by the agency on the essential functions of the employee's position or, if not provided, discussion with the employee about the essential functions of his or her position; and

(6) In the case of certification for intermittent leave or leave on a reduced leave schedule under § 630.1203(a) (3) or (4) for planned medical treatment, the dates (actual or estimates) on which such treatment is expected to be given, the duration of such treatment, and the period of recovery, if any, or specify that the serious health condition is a chronic or continuing condition with an unknown duration and whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity.

(c) The information on the medical certification shall relate only to the serious health condition for which the current need for family and medical leave exists. The agency may not require any personal or confidential information in the written medical certification other than that required by paragraph (b) of this section. If an employee submits a completed medical certification signed by the health care provider, the agency may not request new information from the health care provider. However, a health care provider representing the agency, including a health care provider employed by the agency or under administrative oversight of the agency, may contact the health care provider who completed the medical certification, with the employee's permission, for purposes of clarifying the medical certification.

(d) If the agency doubts the validity of the original certification provided under paragraph (a) of this section, the agency may require, at the agency's expense, that the employee obtain the opinion of a second health care provider designated or approved by the agency concerning the information certified under paragraph (b) of this section. Any health care provider designated or approved by the agency shall not be employed by the agency or be under the administrative oversight of the agency on a regular basis unless the agency is located in an area where access to health care is extremely limited—e.g., a rural area or an overseas location where no more than one or two health care providers practice in the relevant specialty, or the only health care providers available are employed by the agency.

(e) If the opinion of the second health care provider differs from the original certification provided under paragraph (a) of this section, the agency may require, at the agency's expense, that the employee obtain the opinion of a third health care provider designated or approved jointly by the agency and the employee concerning the information certified under paragraph (b) of this section. The opinion of the third health care provider shall be binding on the agency and the employee.

(f) To remain entitled to family and medical leave under § 630.1203(a) (3) or (4) of this part, an employee or the employee's spouse, son, daughter, or parent must comply with any requirement from an agency that he or she submit to examination (though not treatment) to obtain a second or third medical certification from a health care provider other than the individual's health care provider.

(g) If the employee is unable to provide the requested medical certification before leave begins, or if the agency questions the validity of the original certification provided by the employee and the medical treatment requires the leave to begin, the agency shall grant provisional leave pending final written medical certification.

(h) An employee must provide the written medical certification required by paragraphs (a), (d), (e), and (g) of this section, signed by the health care provider, no later than 15 calendar days after the date the agency requests such medical certification. If it is not practicable under the particular circumstances to provide the requested medical certification no later than 15 calendar days after the date requested by the agency despite the employee's diligent, good faith efforts, the employee must provide the medical certification within a reasonable period of time under the circumstances involved, but no later than 30 calendar days after the date the agency requests such medical certification.

(i) If, after the leave has commenced, the employee fails to provide the requested medical certification, the agency may—

(1) Charge the employee as absent without leave (AWOL); or

(2) Allow the employee to request that the provisional leave be charged as leave without pay or charged to the employee's annual and/or sick leave account, as appropriate.

(j) At its own expense, an agency may require subsequent medical recertification on a periodic basis, but not more than once every 30 calendar days, for leave taken for purposes relating to pregnancy, chronic conditions, or long-term conditions, as these terms are used in the definition of *serious health condition* in § 630.1202. For leave taken for all other serious health conditions and including leave taken on an intermittent or reduced leave schedule, if the health care provider has specified on the medical certification a minimum duration of the period of incapacity, the agency may not request recertification until that period has passed. An agency may require subsequent medical recertification more frequently than every 30 calendar days, or more frequently than the minimum duration of the period of incapacity specified on the medical certification, if the employee requests that the original leave period be extended, the circumstances described in the original medical certification have changed significantly, or the agency receives information that casts doubt upon the continuing validity of the medical certification.

(k) To ensure the security and confidentiality of any written medical certification under § 630.1208 or 630.1210(h) of this part, the medical certification is subject to the provisions for safeguarding information about individuals under subpart A of part 293 of this chapter.

[58 FR 39602, July 23, 193, as amended at 61 FR 64453, Dec. 5, 1996; 65 FR 26487, May 8, 2000; 65 FR 38409, June 21, 2000. Redesignated and amended at 76 FR 60704, 60705, Sept. 30, 2011]

**§ 630.1209 Certification for leave taken because of a qualifying exigency.**

(a) *Active duty orders.* The first time an employee requests leave because of a qualifying exigency arising out of the covered active duty or call to covered active duty status of a covered military member, an agency may require the employee to provide a copy of the covered military member's active duty orders or other documentation issued by the military that indicates the covered military member is on covered active duty or call to covered active duty status, and the dates of the covered

military member's active duty service. This information need only be provided to the agency once. A copy of new active duty orders or other documentation issued by the military must be provided to the agency if the need for leave because of a qualifying exigency arises out of a different covered active duty or call to covered active duty status of the same or a different covered military member.

(b) *Required information.* An agency may require that leave for any qualifying exigency specified in § 630.1204 be supported by a certification from the employee that sets forth the following information:

(1) A statement or description, signed by the employee, of appropriate facts regarding the qualifying exigency for which FMLA leave is requested. The facts must be sufficient to support the need for leave. Such facts include the type of qualifying exigency for which leave is requested and any available written documentation that supports the request for leave, such as a copy of a meeting announcement for informational briefings sponsored by the military, a document confirming an appointment with a counselor or school official, or a copy of a bill for services for the handling of legal or financial affairs;

(2) The approximate date on which the qualifying exigency commenced or will commence;

(3) If an employee requests leave because of a qualifying exigency for a single, continuous period of time, the beginning and end dates for such absence;

(4) If an employee requests leave because of a qualifying exigency on an intermittent or reduced leave schedule basis, an estimate of the frequency and duration of the qualifying exigency; and

(5) If the qualifying exigency involves meeting with a third party, appropriate contact information for the individual or entity with whom the employee is meeting (such as the name, title, organization, address, telephone number, fax number, and e-mail address) and a brief description of the purpose of the meeting.

(c) *Verification.* If an employee submits a complete and sufficient certification to support his or her request for leave because of a qualifying exigency, the agency may not request additional information from the employee. However, the agency may verify the information described in paragraphs (c)(1) and (c)(2) of this section and does not need the employee's permission to do so.

(1) If the qualifying exigency involves meeting with a third party, the agency may contact the individual or entity with whom the employee is meeting for purposes of verifying a meeting or appointment schedule and verifying the information provided in the employee's statement under paragraph (b)(1) of this section regarding the meeting between the employee and the specified individual or entity. No additional information may be requested by the agency.

(2) An agency may contact an appropriate unit of the Department of Defense to request verification that a covered military member is on covered active duty or call to covered active duty status. No additional information may be requested by the agency.

[76 FR 60705, Sept. 30, 2011]

**§ 630.1210 Protection of employment and benefits.**

(a) Any employee who takes leave under § 630.1203(a) of this part shall be entitled, upon return to the agency, to be returned to—

(1) The same position held by the employee when the leave commenced; or

(2) An equivalent position with equivalent benefits, pay, status, and other terms and conditions of employment.

(b) For the purpose of applying paragraph (a)(2) of this section, an equivalent position must be in the same commuting area and must carry or provide at a minimum—

(1) The same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority;

(2) An equivalent grade or pay level, including any applicable locality payment under 5 CFR part 531, subpart F; special rate supplement under 5 CFR part 530, subpart C; or similar payment or supplement under other legal authority;

(3) The same type of appointment, work schedule, status, and tenure;

(4) The same employment benefits made available to the employee in his or her previous position (e.g., life insurance, health benefits, retirement coverage, and leave accrual);

(5) The same or equivalent opportunity for a within-grade increase, performance award, incentive award, or other similar discretionary and non-discretionary payments, consistent with applicable laws and regulations; however, the entitlement to be returned to an equivalent position does not extend to intangible or unmeasurable aspects of the job;

(6) The same or equivalent opportunity for premium pay consistent with applicable law and regulations under 5 CFR part 550, subpart A, or 5 CFR part 551, subpart E; and

(7) The same or equivalent opportunity for training or education benefits consistent with applicable laws and regulations, including any training that an employee may be required to complete to qualify for his or her previous position.

(c) As a result of taking leave under § 630.1203(a) of this part, an employee shall not suffer the loss of any employment benefit accrued prior to the date on which the leave commenced.

(d) Except as otherwise provided by or under law, a restored employee shall not be entitled to—

(1) The accrual of any employment benefits during any period of leave; or

(2) Any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

(e) For the purpose of applying paragraph (d) of this section, the same entitlements and limitations in law and regulations that apply to the position, pay, benefits, status, and other terms and conditions of employment of an employee in a leave without pay status shall apply to any employee taking leave without pay under this part, except where different entitlements and limitations are specifically provided in this subpart.

(f) An employee is not entitled to be returned to the same or equivalent position under paragraph (a) of this section if the employee would not otherwise have been employed in that position at the time the employee returns from leave.

(g) An agency may not return an employee to an equivalent position where written notification has been provided that the equivalent position will be affected by a reduction in force if the employee's previous position is not affected by a reduction in force.

(h) As a condition to returning an employee who takes leave under § 630.1203(a)(4), an agency may establish a uniformly applied practice or policy that requires all similarly-situated employees ( *i.e.*, same occupation, same serious health condition) to obtain written medical certification from the health care provider of the employee that the employee is able to perform the essential functions of his or her position. An agency may delay the return of an employee until the medical certification is provided. The same conditions for verifying the adequacy of a medical certification in § 630.1208(c) apply to the medical certification to return to work. No second or third opinion on the medical certification to return to work may be required. An agency may not require a medical certification to return to work during the period the employee takes leave intermittently or under a reduced leave schedule under § 630.1205.

(i) If an agency requires an employee to obtain written medical certification under paragraph (h) of this section before he or she returns to work, the agency shall notify the employee of this requirement

before leave commences, or to the extent practicable in emergency medical situations, and pay the expenses for obtaining the written medical certification. An employee's refusal or failure to provide written medical certification under paragraph (h) of this section may be grounds for appropriate disciplinary or adverse action, as provided in part 752 of this chapter.

(j) An agency may require an employee to report periodically to the agency on his or her status and intention to return to work. An agency's policy requiring such reports must take into account all of the relevant facts and circumstances of the employee's situation.

(k) An employee's decision to invoke FMLA leave under § 630.1203(a) does not prohibit an agency from proceeding with appropriate actions under part 432 or part 752 of this chapter.

(l) An employee who does not comply with the notification requirements in § 630.1207 and does not provide medical certification signed by the health care provider that includes all of the information required in § 630.1208(b) is not entitled to family and medical leave.

[58 FR 39602, July 23, 1993, as amended at 61 FR 3544, Feb. 1, 1996; 61 FR 64453, Dec. 5, 1996; 65 FR 26487, May 8, 2000; 70 FR 31314, May 31, 2005. Redesignated at 76 FR 60704, Sept. 30, 2011 and further redesignated and amended at 76 FR 60705, 60706, Sept. 30, 2011]

**§ 630.1211 Health benefits.**

An employee enrolled in a health benefits plan under the Federal Employees Health Benefits Program (established under chapter 89 of title 5, United States Code) who is placed in a leave without pay status as a result of entitlement to leave under § 630.1203(a) of this part may continue his or her health benefits enrollment while in the leave without pay status and arrange to pay the appropriate employee contributions into the Employees Health Benefits Fund (established under section 8909 of title 5, United States Code). The employee shall make such contributions consistent with 5 CFR 890.502.

[58 FR 39602, July 23, 1993. Redesignated at 76 FR 60704, Sept. 30, 2011, and further redesignated at 76 FR 60705, Sept. 30, 2011]

**§ 630.1212 Greater leave entitlements.**

(a) An agency shall comply with any collective bargaining agreement or any agency employment benefit program or plan that provides greater family or medical leave entitlements to employees than those provided under this subpart. Nothing in this subpart prevents an agency from amending such policies, provided the policies comply with the requirements of this subpart.

(b) The entitlements established for employees under this subpart may not be diminished by any collective bargaining agreement or any employment benefit program or plan.

(c) An agency may adopt leave policies more generous than those provided in this subpart, except that such policies may not provide entitlement to paid time off in an amount greater than that otherwise authorized by law or provide sick leaved in any situation in which sick leave would not normally be allowed by law or regulation.

(d) The entitlements under sections 6381 through 6387 of title 5, United States Code, and this subpart do not modify or affect any Federal law prohibiting discrimination. If the entitlements under sections 6381 through 6387 of title 5, United States Code, and this subpart conflict with any Federal law prohibiting discrimination, an agency must comply with whichever statute provides greater entitlements to employees.

[58 FR 39602, July 23, 1994, as amended at 61 FR 64454, Dec. 5, 1996. Redesignated at 76 FR 60704, Sept. 30, 2011, and further redesignated at 76 FR 60705, Sept. 30, 2011]

**§ 630.1213 Records and reports.**

(a) So that OPM can evaluate the use of family and medical leave by Federal employees and provide the Congress and others with information about the use of this entitlement, each agency shall maintain records on employees who take leave under this subpart and submit to OPM such records and reports as OPM may require.

(b) At a minimum, each agency shall maintain the following information concerning each employee who takes leave under this subpart:

(1) The employee's rate of basic pay, as defined in 5 CFR 550.103;

(2) The occupational series for the employee's position;

(3) The number of hours of leave taken under § 630.1203(a), including any paid leave substituted for leave without pay under § 630.1206(b); and

(4) Whether leave was taken—

(i) Under § 630.1203(a) (1), (2) or (3) of this part; or

(ii) Under § 630.1203(a)(4) of this part.

(c) When an employee transfers to a different agency, the losing agency shall provide the gaining agency with information on leave taken under § 630.1203(a) of this part by the employee during the 12 months prior to the date of transfer. The losing agency shall provide the following information:

(1) The beginning and ending dates of the employee's 12-month period, as determined under § 630.1203(c) of this part; and

(2) The number of hours of leave taken under § 630.1203(a) of the part during the employee's 12-month period, as determined under § 630.1203(c) of this part.

[58 FR 39602, July 23, 1993, as amended at 60 FR 67288, Dec. 29, 1995; 61 FR 64454, Dec. 5, 1996. Redesignated at 76 FR 60704, Sept. 30, 2011, and further redesignated and amended at 76 FR 60705, 60706, Sept. 30, 2011]

## Subpart M—Reservist Leave Bank Program

SOURCE: 56 FR 20518, May 6, 1991, unless otherwise noted. Redesignated at 64 FR 72253, Dec. 27, 1999.

### § 630.1301 Purpose and applicability.

(a) *Purpose.* The purpose of this subpart is to establish procedures and requirements for a reservist leave bank program in Executive agencies under which an employee may contribute unused accrued annual leave to a leave bank established by the Office of Personnel Management (OPM) for use by eligible returnees who have been members of the Armed Forces of the United States serving on active duty during the Persian Gulf War and who return to civilian employment with their agencies.

(b) *Applicability.* This subject applies to officers and employees—

(1) To whom subchapter IV of chapter 63 of title 5, United States Code, applies; and

(2) Who are employed in Executive agencies.

### § 630.1302 Definitions.

In this subpart:

*Agency* means an "Executive agency," as defined in 5 U.S.C. 105.

*Contribution period* means a period of at least 6 weeks beginning on a date to be established by OPM. The Director of OPM may extend the contribution period, if necessary, to meet the requirements of the legislation.

*Eligible returnee* means an employee who has been a member of the U.S. Armed Forces serving on orders issued under 10 U.S.C. 672(a), 672(g), 673, 673b, 674, 675, or 688 during the Persian Gulf War, and who has returned to, or will return to Federal employment with his or her agency. An employee who, after completing his or her active duty military service, does not return to Federal employment for any reason is not eligible to receive leave contributed to the reservist leave bank.

*Employee* has the meaning given that term in 5 U.S.C. 6361(1).

*Leave contributor* means an employee who contributes annual leave to the reservist leave bank established under section 361 of Public Law 102-25; 105 Stat. 92 (5 U.S.C. 6361 note).

*Persian Gulf War* means the period beginning on August 2, 1990, and ending on a date thereafter prescribed by Presidential proclamation or by law. OPM will advise agencies of the ending date for eligibility to receive leave under this program.

*Reservist leave bank* means the leave bank established by OPM for the purpose of this subpart.

**§ 630.1303 Identifying eligible returnees.**

(a) Each agency shall identify and list all eligible returnees within the agency.

(b) Each agency shall report the number of eligible returnees identified to OPM. Negative reports are required.

**§ 630.1304 Receipt, processing, and transfer of leave.**

(a) Each agency shall accept annual leave contributed to the reservist leave bank by leave contributors during the contribution period (open season).

(b) Each agency shall determine the procedures under which to collect, process, and transfer leave contributed under this subpart. Leave contributed to the reservist leave bank must be debited from the contributor's annual leave account during the pay period in which it is contributed.

(c) Each agency shall report the aggregate amount of annual leave contributed to the reservist leave bank to OPM. (See § 630.1309(b)(1) of this subpart.)

[56 FR 20518, May 6, 1991. Redesignated and amended at 64 FR 72253, 72256, Dec. 27, 1999]

**§ 630.1305 Limitations on contribution of annual leave.**

(a) A leave contributor may not contribute leave for the use of a specific eligible returnee.

(b) A leave contributor may contribute only accrued unused annual leave to the reservist leave bank.

(c) A leave contributor may not contribute less than 1 hour of annual leave, nor more than the lesser of—

(1) One-half the amount of annual leave he or she would be entitled to accrue during the leave year in which the contribution is made; or

(2) One-half his or her annual leave balance at the time the contribution is made.

(d) Annual leave contributed to the reservist leave bank shall not be applied against the limitations on annual leave that may be donated under the voluntary leave transfer and leave bank programs established under 5 U.S.C. 6332 and 6362, respectively.

### § 630.1306 Prohibition of coercion.

(a) An employee may not directly or indirectly intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce, any other employee for the purpose of interfering with any rights such employee may have with respect to contributing, or not contributing, annual leave under this subpart.

(b) For the purpose of paragraph (a) of this section, the term "intimidate, threaten, or coerce" includes promising to confer or conferring any benefit (such as an appointment or promotion or compensation) or effecting or threatening to effect any reprisal (such as deprivation of appointment, promotion, or compensation).

### § 630.1307 Crediting annual leave accounts of eligible returnees.

(a) OPM shall divide the contributed annual leave equally among eligible returnees without regard to any factor (e.g., full- or part-time status, duty station during the Persian Gulf War, or time spent on active duty) other than each employee's status as an eligible returnee.

(b) The amount of annual leave each eligible returnee receives shall be rounded to the next higher quarter-hour. An employing agency may not reduce the amount of leave credited to an eligible returnee by any fraction of an hour, but may grant leave recipients excused absence for the remainder of the hour or charge leave by the quarter-hour for the purpose of this program.

(c) OPM shall notify each agency of the amount of annual leave that shall be credited to each eligible returnee.

(d) Each agency shall credit the annual leave accounts of eligible returnees who have returned to Federal employment as soon as possible, but not later than the end of the second pay period beginning on or after the date the agency is notified of the amount of leave each eligible returnee is to receive.

### § 630.1308 Use of annual leave contributed under this program.

(a) The annual leave credited to the account of an eligible returnee may be used in the same manner and for the purposes as if the leave had accrued under 5 U.S.C. 6303.

(b) An eligible returnee who has returned to Federal employment may use the leave credited under § 630.1307 of this subpart immediately, subject to supervisory approval.

(c) Annual leave creditable to an eligible returnee who has not yet returned to Federal employment shall be held in abeyance by the employing agency that identified such employee until his or her return.

(d) Annual leave held in abeyance for an eligible returnee who does not return to Federal employment shall be forfeited.

[56 FR 20518, May 6, 1991. Redesignated and amended at 64 FR 7225, 72256, Dec. 27, 1999]

### § 630.1309 Records and reports.

(a) Each agency shall maintain records and report pertinent information concerning the administration of the reservist leave bank program.

(b) Each agency shall maintain the following information:

(1) The grade or pay level of each leave contributor and the amount of leave contributed by leave contributors at each grade or pay level (Each agency is required to report to OPM the aggregate amount of annual leave contributed to the reservist leave bank under § 630.1304(c) of this subpart.);

(2) The grade or pay level of each eligible returnee;

(3) The number of eligible returnees to whom the contributed annual leave was credited immediately;

(4) The number of eligible returnees for whom the contributed annual leave was held in abeyance;

(5) The estimated direct and indirect costs of administering the reservist leave bank program; and

(6) Any additional information OPM may require.

(c) Each agency shall report the information specified in paragraph (b) of this section to OPM.

(d) OPM shall identify the dates by which each agency shall report the information gathered pursuant to §§ 630.1303(b) and 630.1304(c) of this subpart and paragraph (b) of this section.

[56 FR 20518, May 6, 1991. Redesignated and amended at 64 FR 7225, 72256, Dec. 27, 1999]

---

For questions or comments regarding e-CFR editorial content, features, or design, email ecfr@nara.gov.
For questions concerning e-CFR programming and delivery issues, email webteam@gpo.gov.

# SEPARATOR

# PAGE

# ARTICLE 35 - TIME AND LEAVE

## Section 1 - General

A. Employees will accrue and use sick and annual and other types of leave in accordance with applicable statutes, OPM regulations, and this Agreement.

B. All leave charges shall be in increments of one-quarter hour, except in the case of Title 38 physicians, dentists, chiropractors and optometrists, who accrue and use leave in full-day increments.

C. For clearly compassionate and appropriate reasons, the Department may increase the stated limits applicable to all forms of leave in accordance with applicable government-wide regulation and law.

D. Employees will not be denied leave based solely on their leave balance.

E. No arbitrary or capricious restraints will be established to restrict when leave may be requested.

F. Changes to the Department's automated time and attendance system shall be negotiated in accordance with government-wide law, regulations and this Agreement.

G. Employees should request, in advance, approval of anticipated leave.

H. When the employee is present on duty, the employee can use the electronic time and attendance system or SF-71 to request leave.

I. Leave will be denied only for appropriate reasons and not as a form of discipline. No approved leave or approved absence will be a basis for disciplinary action except when it is clearly established that the employee submitted fraudulent documentation or misrepresented the reasons for the absence.

J. Employees will not be adversely affected in any employment decision solely because of their leave balances.

## Section 2 - Annual Leave

A. Annual leave is provided to allow employees extended leave for rest and recreation and to provide periods of time off for personal and unscheduled purposes. All employees may request at least two consecutive weeks of annual leave per year and take such leave subject to the Department's approval.

B. The use of accrued annual leave is an absolute right of the employee, subject to the right of the Department to approve when leave may be taken.

C. Employees should submit requests for annual leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The Department will make every effort to accommodate the employees' requests, consistent with valid operational needs.

1. Vacation - Employees should submit requests for vacation leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The vacation plan for the next leave year will be completed by the end of the current calendar year. The procedures for vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

2. Unplanned Leave - When needs arise and the employee requests annual leave, employees must contact their supervisor or designee to request the leave. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request. The procedures for unplanned annual leave other than vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

3. Serious Personal Needs Situations - If the leave is requested to begin immediately, employees must contact their supervisor or designee to request the leave. The employee will be informed whether leave is approved or disapproved at the time it is requested. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request.

D. If scheduling conflicts arise among employees' annual leave requests, they shall be resolved consistent with past practices or as otherwise negotiated in local supplemental agreements/MOUs insofar as they do not conflict with the Master Agreement.

E. When an employee requests annual leave in conjunction with scheduled days off at the beginning and/or end of the leave period, the Department will not change that employee's days off except where necessary to meet valid operational needs.

F. The Department recognizes the needs of employees to plan vacation and personal time off. However, previously approved annual leave may be cancelled if necessary to meet valid operational needs.

G. The parties recognize that additional procedures for requesting and granting annual leave are appropriate for negotiation at the local level.

H. Carryover (restored) leave will be addressed in accordance with applicable rules and regulations.

I. All employees shall be excused or receive appropriate pay for all holidays prescribed by Federal law, and that may be added by Federal law, or that may be designated by Executive Order.

J. Employees will be notified four times during each leave year of the maximum amount of annual leave that can be carried over by employees in each leave category (doctors, nurses, Title 5, etc.) and advise the employees they should request to use any amount the employee has accrued and will earn during the rest of the leave year that is over the maximum amount. This will include advising employees of the consequences of forfeiture and the law and regulations relating to forfeiture.

K. Upon request, an employee will be provided, in writing, with the reason for a denial of annual leave. It is the responsibility of the Department to initiate action to reschedule annual leave that was denied. The times at which such rescheduled leave is used must be by concurrence of the employee and the Department.

L. The Department will allow the maximum number of employees to use leave in accordance with coverage requirement.

M. Where vacation schedules are used, the approved vacation schedule will be conspicuously posted and remain posted and be kept up-to-date for the leave year. Upon request, changes in the vacation schedule will be provided to the local union on a monthly basis.

## Section 3 - Excused Absence

Supervisors should excuse, without charge to leave, tardiness/absences which are brief, infrequent, and for a good cause.

## Section 4 - Sick Leave

A. It is the responsibility of the employee who is incapacitated for duty to notify the immediate supervisor or designee (or to have any responsible person make the notification for the employee) at the work site as soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exist. The Department will assure a designated number is established for the supervisor or designee to receive such notifications; the employee's obligation is to complete one phone call, to either the established number, or to an alternate number the employee was notified to use. In the event that the supervisor or designee

is not available, employees may use voice mail to notify the supervisor or designee of the type of leave requested.

B. An employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required.

C. Sick leave is an employee's earned benefit and will be granted to the employee for appropriate absences.

D. Title 5 and hybrid employees are entitled to sick leave when the employee:

1. Receives medical, dental or optical examination or treatment;

2. Is incapacitated for the performance of duties by physical or mental illness, injury, pregnancy, or childbirth;

3. Provides care for a family member who is incapacitated by a medical or mental condition, or attends to a family member receiving medical, dental, or optical examination or treatment, or provides care for a family member with a serious health condition;

4. Makes arrangements necessitated by the death of a family member or attends the funeral of a family member (this includes use of sick leave to make arrangements for and attend a funeral or memorial service; necessary travel, pre-funeral and after-funeral/burial gatherings or ceremonies, memorial services; and reading of the will);

5. Would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by being present on duty after exposure to a contagious disease; or,

6. Must be absent from duty for purposes relating to the adoption of a child, including appointments with adoption agencies, social workers, and attorneys, court proceedings, required travel, and any other activities necessary to allow the adoption to proceed.

E. Sick leave shall be granted to Title 38 employees when:

1. They are incapacitated for the performance of their duties because of personal illness, disease, injury, pregnancy and confinement;

2. For necessary medical, dental, or optical examination or treatment;

3. When a member of the immediate family of the employee is afflicted with a contagious disease and requires the care and attendance of the employee; or,

4. When through exposure to contagious disease, the presence of the employee at the post of duty would jeopardize the health of others.

F. The Department should make an effort to accommodate employees who request in advance, a change in work schedule to meet medical, optical or dental appointments.

G. If an employee has insufficient sick leave accrued, the employee can request Leave Without Pay (LWOP) or other available leave instead of sick leave for an absence for which sick leave would otherwise be appropriate, subject to approval of the absence by the supervisor.

H. Employees will not be required to reveal the nature of the illness as a condition for approval of sick leave.

**Section 5 - Documentation for Sick Leave**

A. Where an employee requests sick leave, or annual leave, or LWOP in lieu of sick leave, for periods of illness exceeding three consecutive workdays of the employee's work schedule, the employee must make an appropriate request and may be required to furnish evidence of the need for sick leave upon return to duty. An employee may support the request for sick leave:

1. By medical certificate from the Department's employee health care provider or the employee's health care provider that is administratively acceptable; or,

2. By the employee's self-certification in instances where the illness was not treated by a health care provider. The statement will indicate why a health care provider was not seen; for example, remoteness of area, general condition of the illness, or other specific reasons. The supervisor may request clarification should the employee's written statement not be sufficient to support the request.

B. An employee with a chronic medical condition that does not require medical treatment but does result in periodic absences from work will not be required to furnish a health care provider certificate on a continuing basis if the employee is:

1. Not on leave restriction; and,

2. Provides, if requested, an administratively acceptable medical certificate every six months which clearly states the continuing need for periodic absences.

C. Unless there is reasonable evidence to doubt the required information, administratively acceptable evidence for medical certification is a statement that says the employee was incapacitated for work and date(s) of incapacitation. This information will generally be considered sufficient for

medical certification purposes. However, employees will not be required to reveal the nature of the illness as a condition for approval of sick leave. This applies to sick leave of more than three consecutive workdays or certification for sick leave restrictions.

D. Documents regarding employee absence for sick leave purposes are highly sensitive. The Department will ensure that they are maintained in a secure and confidential manner.

E. Where there is substantial reason to believe that an employee is abusing sick leave entitlement, medical certificates may be required for any period of absence provided the employee has been formally notified in writing that such a requirement has been established for that person.

1. If an employee has not used sick leave for three months after the notification in Paragraph E, the employee may request that the requirement be reviewed. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be so notified in writing.

2. The requirement for medical certification must be reviewed six months after such requirement is imposed. If the requirement is not lifted, the employee may request a review of the certification requirement three months after a previous review. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be formally notified in writing.

3. Frequency or amount of leave used will not be the sole factor for determining sick leave abuse, nor will leave for which acceptable medical documentation has been provided.

4. When the Department determines that the sick leave abuse has ceased, the Department will remove the restriction and notify the employee in writing of this action.

5. The employee will also be notified of the reasons in writing if the restriction is to be continued beyond six months.

## Section 6 - Sick Out

Employees may be required to furnish evidence of illness to support approval of sick leave for periods of less than three consecutive workdays when the Department has reasonable evidence that a "sick- out" has occurred. Under these circumstances, before the Department requires the employees' evidence, the Union will be provided with the reasonable evidence for the Department's allegations that a "sick-out" has occurred.

## Section 7- Registration and Voting

The Department agrees that when the voting polls are not open at least three hours before or after employees' regular hours of work, employees will be granted an amount of excused leave to vote, or to register to vote, which will permit them to report to work three hours after the polls open or leave work three hours before the polls close, whichever requires the lesser amount of time, so long as the absence does not seriously interfere with valid operational needs. Where release of an employee at the beginning or end of the day would seriously interfere with valid operational needs, the supervisor to the extent possible shall make other arrangements to allow the employee a reasonable amount of time during the workday to vote or register to vote. Under unusual circumstances an employee may be excused up to the full day.

## Section 8 - Unavoidable Delay While on Official Business

A. When employees are unable to return to their home station through no fault of their own while away on official government business, the employees will notify their supervisors as soon as possible and obtain appropriate instructions. In such instances, the employees will be paid overtime or approved compensatory time, as appropriate, for any time beyond normal duty hours that they are determined to be performing official duties. If the employees are unable to return to their duty stations and must stay overnight at some other location, per diem expenses will be paid when appropriate.

B. Employees also will be entitled to compensatory time for time spent in travel, in accordance with the Workforce Flexibility Act of 2004, as amended.

## Section 9 - Employee Absences for Court or Court-Related Services

A. In accordance with applicable law, government-wide regulations or other outside authority binding on the Department, an employee summoned or subpoenaed in connection with a judicial proceeding by a court or other authority responsible for the conduct of that proceeding shall be authorized to attend the judicial proceeding without charge to leave or loss of VA salary in the following instances:

   1. For jury duty;

   2. To appear as a witness on behalf of the Federal, District of Columbia, state, or local government;

   3. To appear as a witness on behalf of a private party in an official and job-related capacity or to produce official records; or,

4. To appear as a witness on behalf of a private party in an unofficial capacity and one of the parties to the proceeding is either the United States, District of Columbia, or a state, or local government.

B. Even though no compensation is received for serving on jury duty in a federal court, employees may keep expense money received for mileage, parking, or required overnight stay. Money received for performing jury duty in state or local courts is indicated on the pay voucher or check as either "fees for services rendered" or "expense money." "Expense money" may be retained by the employee; "fees for services rendered" must be submitted to the appropriate financial office.

C. It is agreed that days off and/or schedules will not be changed to avoid granting absence for court or court-related services.

D. An employee who is granted court leave and is excused or released by the court for any day or substantial portion of a day is expected to return to the employee's regular Departmental duties except when:

1. Only a small portion of the work day would be involved and thus no appreciable amount of Department service would be rendered;

2. The distance from the court to the place of duty is such that this would be an unreasonable requirement; or,

3. The employee is regularly scheduled to work on a tour any part of which includes 6:00 pm - 6:00 am.

E. An employee who is granted court leave and serves for a full day or substantial portion of a day is not expected to report for the next tour of duty if that tour occurs within twenty-four hours of the court leave and if any or all of it occurs during 6:00 pm - 6:00 am.

## Section 10 - Leave Without Pay (LWOP)

A. Requests for LWOP will be given serious, bona fide consideration.

B. LWOP may be requested in the same manner and for the same purposes as annual leave and sick leave. LWOP may be granted even though the employee has a sick or annual leave balance.

C. Upon written request from the appropriate Union office, an employee may be granted LWOP to engage in Union activities on the national, district or local level or to work in programs sponsored by the Union or the American Federation of Labor - Congress of International Organizations (AFL-CIO). Such requests will be referred to the appropriate Department official. Such employees shall continue to accrue benefits in accordance with applicable OPM regulations. LWOP for this purpose is limited to one year but may be extended or renewed upon proper application.

D. Employees granted LWOP for more than 30 calendar days will be notified that they can usually expect to return to their former position. However, it may become necessary in the interest of the service to reassign them to other positions at the same grade and pay within the commuting area of the employee's current duty station during their absence or upon their return.

E. Employees may request LWOP for educational purposes.

F. LWOP is granted at the discretion of the Department, except in the following cases:

1. When a disabled veteran requests LWOP for medical treatment;

2. When requested by a reservist or National Guard member for military duties in accordance with appropriate military orders and/or documentation. Employees may request such leave after their military leave has been exhausted (38 USC 4316(d));

3. When requested by an employee who has suffered an incapacitating job-related injury or illness and is waiting adjudication of a claim for employee compensation by the OWCP; or,

4. When an employee makes a request pursuant to the Family and Medical Leave Act (FMLA) and meets the criteria for that program.

## Section 11 - Hazardous Weather/Emergency Conditions

A. The Department and local union at each facility will jointly plan the procedures for hazardous weather/emergency conditions and will annually communicate these procedures to employees.

B. The local union shall be informed by the appropriate Department official at the time the facility declares hazardous weather/emergency conditions. The method for such notification will be appropriate for local negotiations.

C. When hazardous conditions (e.g., extreme weather conditions, serious interruptions in public transportation, earthquake, and disasters such as flood, fire or other natural phenomena) arise, the Department will determine whether all or part of the facility should be closed or whether the facility should be open as usual. If the Department decides to close all or part of the facility during periods the facility would otherwise be open, the Department will notify employees whether liberal leave or authorized absence will be authorized. Employees who are prevented from reporting to work due to the closure of all or part of a facility should be granted authorized absence in accordance with OPM guidance and/or government-wide regulations.

D. Excused absence during emergency situations does not generally apply to employees who provide critical services because of the need to assure continuity of essential patient care operations. However, in extreme situations, where employees who provide critical services make reasonable efforts to get to work and are unable to do so, excused absence is appropriate except in rare circumstances.

E. Facilities under emergency conditions should provide meals and accommodations for employees who are required to remain on duty.

F. The VA Incentive Awards Program is an appropriate vehicle and will be utilized for recognizing exceptional services rendered by employees during emergency/hazardous weather conditions.

G. Whenever employees are unable to leave the facility at the end of their shift, and the employee is assigned work, the employee will be paid in accordance with established policy for the payment of premium rates.

H. In accordance with government-wide regulations, the Department will fully implement the provisions of any approved program designed to provide inter-agency leave donation for employees affected by natural disasters.

## Section 12 - Accommodation for Religious Observances

A. An employee whose personal religious beliefs require abstention from work during certain periods of time may elect to engage in overtime work to compensate for time lost by meeting those religions requirements.

B. To the extent that such modifications in work schedules do not interfere with the efficient accomplishment of the Department mission, the Department shall in each instance, afford the employee the opportunity to work compensatory overtime and shall in each instance grant compensatory time off to an employee requesting such time off for religious observances when the employee's personal religious beliefs require that the employee abstain from work during certain periods of the workday or workweek.

C. For the purpose stated in Paragraph B of this section, the employee may work such compensatory time before or after the granting of compensatory time off. Advanced compensatory time off should be repaid with the appropriate amount of compensatory time worked within a reasonable amount of time. Compensatory overtime shall be credited on an hour-for-hour basis or authorized fractions thereof. Appropriate records will be kept of compensatory overtime earned and used.

## Section 13 - Military Leave

A. Military leave will be granted consistent with government-wide rules and regulations.

B. Full-time permanent and part-time permanent employees who are members of the National Guard or the Armed Forces Reserves are entitled to 15 calendar days of regular military leave in a fiscal year for active duty or active duty for training.

C. The Department will not arbitrarily deny an employee's request for military leave.

D. For part-time employees, military leave is prorated based on the number of hours in the employee's work week.

E. Employees who do not use the entire 15 days can carry any unused military leave (not to exceed 15 days) over to the next fiscal year. Military leave may never exceed 30 days in any one calendar year.

F. The Department will take into consideration the schedules of employees who work off-tours and will, when possible, arrange schedules to allow such employees to have scheduled days off immediately preceding and following the required military leave

G. Those employees on 24/7 schedules will continue to be charged military leave on a daily basis for duty days.

H. Employees Returning From Active Duty. In accordance with the Presidential Memorandum dated November 14, 2003, as a welcome home, returning Federal civil servants who were called to active duty in the Global War on Terrorism will be granted 5 days of excused absence for every deployment.

## Section 14 - Advanced Annual/Sick Leave

A. An employee may be advanced all annual leave that will accrue up to the end of the leave year. However, advanced annual leave may not be granted to a temporary employee beyond the date set for the expiration of the employee's temporary appointment, or to any employee if there is a likelihood that the employee will retire, be separated, or resign from the Department before the date the employee will have earned the leave. Upon separation, employees must repay the balance of any remaining advanced annual leave; however, an employee may request a waiver in writing.

B. Advanced sick leave may be combined with annual leave or LWOP when necessary to cover one continuous period of absence.

C. Denials of requests for advance leave will be conveyed to the employee promptly and will contain an explanation of the reasons for the denial.

D. Advanced leave may be approved in accordance with the employee's type of appointment. The employee will not be required to utilize any annual leave prior to utilizing the advanced sick leave.

E. It is agreed that advance leave, including both sick and annual, will be fairly and equitably administered.

**Section 15 - Voluntary Leave Transfer Program**

A. As authorized by 5 CFR 630, Subpart I, as extended to Title 38 employees and consistent with this Agreement, employees are entitled to donate and receive leave for medical emergencies.

B. The Leave Transfer Program allows an employee to transfer annual leave to an approved leave recipient (excluding the employee's supervisor) up to one-half of the amount of annual leave the employee will accrue during the leave year.

C. The minimum amount of annual leave that may be transferred to and from a Title 5 employee, or Title 38 employee who is charged leave in hours, is four hours.

D. Title 5 employees may transfer to Title 38 employees and Title 38 employees may transfer to Title 5 employees.

E. The minimum amount of annual leave that may be transferred from a Title 38 employee who is charged leave in whole day increments is one day. For a leave transfer between an employee who is charged leave in hours and an employee who is charge leave in whole days, the number of hours transferred for each whole day is eight hours. For a leave transfer between employees who are each charged leave in whole day increments, the recipient will be credited with one whole day for each whole day donated.

F. Annual leave may not be transferred to an employee's immediate supervisor.

G. The Department will assist employees in preparing or will prepare the employee's solicitation memorandum which is directed to employees whom the employee designates. The Department will advise employees of how and where to receive such assistance.

H. When an employee receives donated leave, it may be used only for the medical emergency for which it was donated.

I. If an employee has use or lose annual leave at the end of the leave year and would like to donate it, the employee should contact an appropriate Department official.

J. The method of communicating the needs of employees who may want to participate in leave transfer is an appropriate subject for local negotiation.

K. The parties are in the best position to determine whether donated annual leave is needed by its employees in disaster situations and can quickly

facilitate the transfer of donated annual leave among administrations. They are responsible for:

1. Determining whether, and how much, donated annual leave is needed by affected employees;

2. Approving leave donors and/or leave recipients within the Department; and,

3. Facilitating the distribution of donated annual leave.

L. Forms for donating and receiving annual leave under the inter-agency Emergency Leave Transfer Program can be accessed on OPM's web site at http://www.opm.gov/forms/html/emerg.htm.

**Section 16 - Family and Medical Leave Act (FMLA)**

A. Maternity and Paternity Leave

1. Under FMLA and this Agreement, bargaining unit employees are entitled to 16 weeks of LWOP during any 12 month period for the following reasons:

   a. Birth of a son or daughter and the care of such son or daughter; and,

   b. Placement of a son or daughter for adoption or foster care.

2. Supervisors are encouraged to approve additional leave as circumstances warrant.

B. Other family medical leave under FMLA and this Agreement, bargaining unit employees are entitled to 12 weeks of LWOP during any 12 month period for one or more of the following reasons:

1. The care of a family member of the employee with a serious health condition. Family member is defined as:

   a. Spouse and parents of spouse;

   b. Children, including adopted children; and,

   c. Parents.

2. A serious health condition of the employee that makes the employee unable to perform the functions of the position of such employee.

C. Substitution of Paid Leave - For either Paragraphs A or B of this Section, the employee may elect to substitute annual leave, sick leave, compensatory time off, or credit hours for unpaid family or medical leave for any part of the applicable period consistent with governing laws and regulations. Employees may also combine annual leave, compensatory time, sick

leave, or credit hours with unpaid family or medical leave for any period of approved leave. An employee may not retroactively substitute paid time off for unpaid family and medical leave.

D. Notice of Leave

1. The employee will make an appropriate request for use of family and medical unpaid leave.

2. When the need for unpaid family and medical leave is foreseeable and the employee fails to give 30 days notice with no reasonable excuse for the delay of notification, the Department may delay the taking of family and medical unpaid leave until at least 30 days after the date the employee provides notice of his/her need for family and medical leave.

3. If the need for leave is not foreseeable, the employee shall provide notice within a reasonable period of time appropriate to the circumstances involved. If necessary, notice may be given by an employee's personal representative (e.g., a family member or other responsible party). If the need for leave is not foreseeable and the employee is unable, due to circumstances beyond his/her control to provide notice of his/her need for leave, the leave may not be delayed or denied.

4. The time frame in Paragraph 2 above will be waived for good cause.

E. Medical Certification (when requesting leave for serious health conditions)

1. An employee shall provide written medical certification to the Department in a timely manner.

2. The written medical certification shall include:

   a. The date the serious health condition commenced;

   b. The probable duration of the serious health condition;

   c. The appropriate medical facts within the knowledge of the health care provider regarding the serious health condition including a statement as to the incapacitation, examination, or treatment that may be required; and,

   d. A statement that the employee is unable to perform the functions of his/her position.

3. The Department shall not require any personal or confidential information in the written medical certification other than that required by Paragraph E 2 of this section.

4. If the Department doubts the validity of the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a second health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 of this section.

5. If the opinion of the second health care provider differs from the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a third health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 above. The opinion of the third health care provider shall be binding on the Department and the employee.

6. "Health Care Provider" is defined as any of the following individuals:

   a. A licensed Doctor of Medicine or Doctor of Osteopathy or a physician who is serving on active duty in the uniformed services and is designated by the uniformed service to conduct examinations;

   b. Podiatrists, dentists, clinical psychologists, optometrists, and chiropractors (limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) who are authorized to practice by state law;

   c. Nurse practitioners and nurse midwives who are authorized to practice by state law or Christian Science practitioners listed with the First Church of Christ Scientist, in Boston, Massachusetts;

   d. Any health care provider recognized by the Federal Employees Health Benefits Program or who is licensed or certified under federal or state law to provide the service in question;

   e. A health care provider as defined in Paragraph d of this definition who practices in a country other than the United States, who is authorized to practice in accordance with the laws of that country, and who is performing within the scope of his/her practice as defined under such law;

   f. A Christian Science practitioner listed with the First Church of Christ Scientist, in Boston, Massachusetts; or,

   g. A Native American, including an Eskimo, Aleut, or Native Hawaiian, who is recognized as a traditional healing practitioner by native traditional religious leaders and who practices traditional healing methods as believed, expressed, and exercised in Indian religions of the American Indian, Eskimo, Aleut, or Native Hawaiians, consistent

with Public Law 95-314, August 11, 1978 (692 Stat. 469), as amended by Public Law 103-344, October 6, 1994 (108 Stat. 3125).

7. To remain entitled to leave under FMLA, an employee or the employee's spouse, son, daughter, or parent must comply with any requirement from the Department that he/she submit to examination (not treatment) to obtain a second or third medical certification from a health care provider other than the individual's health care provider.

8. If the employee is unable to provide the requested medical certification before leave begins or the Department questions the validity of the original certification provided by the employee and the medical treatment requires the leave to begin, the Department shall grant provisional leave pending final written medical certification.

9. An employee must provide the written medical certification required by this section, signed by the health care provider, no later than 15 calendar days after the date the Department requests such medical certification. If it is not practicable under the particular circumstances to provide the requested medical certification not later than 15 calendar days after the date requested by the Department despite the employee's diligent, good faith efforts, the employee must provide the medical certification within a reasonable period of time under the circumstances involved, but no later than 30 calendar days after the date the Department requests such medical certification.

10. If, after the leave has commenced, the employee fails to provide the requested medical certification, the Department may:

    a. Charge the employee as AWOL, unless:

        1) The reason for not providing the medical certification was beyond the control of the employee;

        2) The employee made a good faith effort to provide the certification.

    Prior to being placed on AWOL, an employee will be provided written advance notice of at least 10 working days and given the reasons why AWOL is being charged. During this period, the employee may comply with the Department's request for certification, and the AWOL charges will be rescinded.

    b. Or allow the employee to request that the provisional leave be charged to leave without pay or charged to the employee's annual and/or sick leave account, as appropriate.

11. Any health care provider designated or approved by the Department shall not be employed by the Department or be under the administrative oversight of the Department on a regular basis unless the employee's official duty station is located in an area where access to health care is extremely limited.

F. Medical Recertification - While an employee is using leave under FMLA, the Department may require, at the Department's expense, subsequent medical recertification from the health care provider only if the circumstances described in the original medical certification change significantly or if the Department receives bona fide information that casts doubt upon the continuing validity of the medical certification. Such requests for medical recertification shall not occur more frequently than every six weeks.

G. An employee eligible under the Department's Family Medical Leave Program may request to participate in the telework program consistent with Article 20 - Telework of this Agreement.

H. Protection of Employment and Benefits - Upon return from family and medical leave, the employee will be restored to the same position as occupied before the leave or to an equivalent position in the same commuting area with equivalent benefits, pay, status, and other terms and conditions of employment.

I. The Department shall inform its employees of their entitlements and responsibilities under FMLA, including the requirements and obligations of employees.

J. An employee who meets the criteria for leave and has complied with the requirements under this section may not be denied leave, consistent with all applicable rules governing annual or sick leave, as appropriate.

## Section 17 - Blood, Bone Marrow and Organ Donor Leave

A. Donor leave will be granted consistent with government-wide rules and regulations.

B. Employees will be granted up to four hours of excused absence to donate blood to a Department sponsored or endorsed blood program. Additional excused absence will be granted to employees who donate blood platelets through Department endorsed Hemophoresis Programs. Time spent in necessary travel for such purposes shall also be administrative leave. The Department may require available documentation of blood donation when there is a basis to verify the donation.

C. Upon request, subject to certification by a health care provider, leave-approving officials shall approve excused absence for employees who serve as living donors for bone marrow, organ, and tissue donation and

transplantation. The use of excused absence can cover time off for activities such as donor screening, the actual medical procedure, and recovery time. Leave-approving officials shall approve:

1. Up to seven workdays of absence without charge to leave or loss of pay for each donation by employees participating as living bone marrow donors; or,

2. Up to 30 workdays of absence without charge to leave or loss of pay for employees participating as living organ and tissue donors.

The length of absence from work can vary depending on the medical procedure involved in the donation. Therefore, for longer periods of incapacitation, leave-approving officials shall approve annual and/or sick leave or LWOP in combination with the maximum amounts of excused absence specified as above in this section.

## Section 18 - Leave for Bereavement

A. Upon request, subject to any documentation requirements, leave-approving officials shall approve up to five days of annual leave, sick leave, and/or LWOP for employees to mourn the death of the following family members:

1. Spouse;

2. Children, including adopted and step-children;

3. Parents, including stepparents;

4. Siblings, including step-brother/sister; or,

5. Any individual related by affinity, i.e., whose association with the employee is the equivalent to one of the family relationships identified above.

B. Upon request, subject to any documentation requirements, leave approving officials shall approve one day of annual leave, sick leave, and/or LWOP for employees to mourn the death of a grandparent or parent of their spouse.

C. The supervisor has discretion to require documentation (e.g., obituary, death certificate) prior to final approval of bereavement leave. However, this documentation will normally be required only in unusual circumstances.

## Section 19 - Funeral Leave

A. Funeral leave is granted to allow an employee to make arrangements for, or to attend, the funeral or memorial service for an immediate relative who

died as the result of a wound, disease, or injury incurred while serving as a member of the armed forces in a combat zone. The Department shall grant employees such funeral leave as is needed and requested, not to exceed three workdays of excused absence, without loss of or reduction in pay. The three days need not be consecutive but if not, the employee shall furnish the approving authority satisfactory reasons justifying a grant of funeral leave for nonconsecutive days.

B. The Department may grant funeral leave only from a prescribed tour of duty, including regularly scheduled overtime, from a period during which, except for absence on funeral leave, the employee would have worked.

## Section 20 - Rest and Relaxation Title 38 Physicians, Dentists, Podiatrists, and Optometrists

The Under Secretary for Health and facility directors or the professional person acting for them, are authorized to approve absence for a period not to exceed 24 consecutive hours for rest and relaxation for full-time physicians, dentists, podiatrists, and optometrists who have been required to serve long hours in the care and treatment of patients.

## Section 21 - Excused Absence (Administrative Leave)

Excused absence (sometimes referred to as administrative leave) is absence from assigned duties without charge to leave or loss of pay. Excused absence may be granted for activities which are in the government's interest.

# Veterans Service Center Organizational Chart
## St. Petersburg (317) - *Effective 23 February 2012*




VSC C... ...art_eff23feb12.xls, Printed on 11/14/2012

# Veterans Service Center Organizational Chart
## St. Petersburg (317) - *Effective 5 Nov 2012*

- Service Center Manager, Sandy Smith
  - Front Office Support
  - Recruiting, Retention, & Human Resources
  - AVSCM, Jerry Huffman, Stream 1; QRT
    - Express (00-19) Coach, Tearanda Pearsey
    - Core (00-09) Coach, Jen Mailhiot; M Trent - Asst Coach
    - Core (10-19) Coach, Ulysses McBurrough; **VACANT** - Asst Coach
    - QRT Team - Training, Coach, Alison Weise
      - QRT Team, Assistant Coach, Lee Ann Morey
    - QRT Team - Quality, Coach, Lynn Collins
  - AVSCM, Lillian Viera-Figueroa, Stream 2; D1BC
    - Express (20-39) Coach, Jim Cartner
    - Core (20-29) Coach, Melody Pavlica; D Johann - Asst Coach
    - Core (30-39) Coach, Athena Delgado; **VACANT** - Asst Coach
    - D1BC, Coach, Tom Vernon
      - D1BC, Assistant Coach, David Jones
  - AVSCM, Larry Brown, Stream 3; PC
    - Express (40-59), Coach, Tyler Parhalo
    - Core (40-49) Coach, Maritza Mendez; L Cuthbertson - Asst C
    - Core (50-59) Coach, Maybelline Coleman; **VACANT** - Asst Coach
    - Cust Service/Outreach, Asst Coach, Adela Nicholson
    - Public Contact, Coach, Gerri Robison
      - IDES/BDD/Proj Board, Asst Coach, Dulche Stewart
  - AVSCM, Betsy Fishman, Stream 4; Non Bundle
    - Express (60-79), Coach, Tim Wright
    - Core (60-69) Coach, Jean Morgan; D Soto - Asst Coach
    - Core (70-79) Coach, Kathy Monahan; **VACANT** - Asst Coach
    - NB Team 1 (00-49), Coach, Scott Piazza
    - NB Team 2 (50-99), Coach, Kelly Fulmer
  - AVSCM, Millie Caban, Stream 5; Orl
    - E (80-99), Coach, Julia Diederich
    - Core (80-89) Coach, Katie Claussen; R Miller - Asst Coach
    - Core (90-99) Coach, Gina Kizer; **VACANT** - Asst Coach
    - Orlando - Core (00-49), Asst Coach, Geano Chambers
      - Orlando OBO, Coach, Cicily Randolph
        - Orlando - Core (50-99), Asst Coach, Lena Edwards
  - AVSCM, Christine Moorby, Appeals & Remand; Spec Ops
    - Appeals 1 (00-49), Asst Coach, Will Kirsch
      - Appeals 1/Remand, Coach, Kelly Perillo
        - Remand, Asst Coach, Liliana Sueiro
    - Appeals 2 (50-99), Coach, Charles Ellis
      - Appeals 2 (50-99), Asst Coach, Missy Neser
    - Spec Ops 1 (00-49), Coach, Tony Longo
    - Spec Ops 2 (50-99), Coach, Michael Palmer
  - AVSCM, Collette Burgess, IPC; WPB
    - IPC, Coach, Tammy McDonald
      - Rating CEST/Non-Rating/Misc (00-49), Asst Coach, Chris Long
        - Rating CEST/Non-Rating/Misc (50-99), Asst Coach, Chris Beltz
    - IPC, Coach, **VACANT**
      - MAPD Development/ Awaiting Evidence (00-99), Asst Coach, Veronica Collins
        - File Movement, Asst Coach, John Ustick
    - West Palm OBO, Coach, Robert Prince

# SEPARATOR

# PAGE

| T&L | 812 | | 810 | | 839 | | 864 | |
|---|---|---|---|---|---|---|---|---|
| VRIT | 1A | Digit | 1B | Digit | 1C | Digit | 1D | Digit |
| Coach | Piazza | 00-04 | Fehrman, B | 05-09 | McBurrough | 10-14 | Monahan | 15-19 |
| Asst C | | | | | | | Trent | 00-19 |
| SSVSR | | | Carden | 00-09 | Clark | 10-19 | Boehm | 15-19 |
| CA | | | Gilbert | 05-09 & 15-19 | Ferguson | 00-04 & 10-14 | | |
| CVSR | Frederick | 00-04 | Scherer | 05-09 | Wade | 10-14 | Marshall | 15-19 |
| | Nelson | 00-04 | Wilson | 05-09 | Clay | 10-14 | Gerard | 15-19 |
| | Camon | 00-04 | Veith | 05-09 | Rousseau | 10-14 | Fagin | 15-19 |
| | | | | | | | Plank | 15-19 |
| VSR | Camon | 00 | Veith | low 05 | Hetzel | 10 | Plank | 015-415 |
| | Suarez | 01 | Wilson | high 05 | Rousseau | 11 | Jones | 515-915 |
| | Harrison | 02 | Scherer | low 06 | Clay | 012 - 412 | Poppenhouse | 16 |
| | Nelson | 03 | Troutman | high 06 | Wade | 512 - 912 | DeLuca | 17 |
| | Nyhart | 04 | Harman | low 07 | Dodson | 13 | Gerard | 018-418 |
| | | | Crockett | high 07 | Hall | 14 | Edwards | 518-918 |
| | | | Allen | 08 | | | Fagan | 019-419 |
| | | | George | 09 | | | Quinn | 519-919 |
| RVSR | Christie | 000-400 | Fitzgerald | 05 | Cardenas | 10 | Nadeau | 015-415 |
| | Ovalle | 500-900 | Childers-Conner (WAH) | 06 | Kelly | 11 | Brown (WAH) | 515-915 |
| | Tanner (WAH) | 01 | Signoretti (WAH) | 07 | Mullin (WAH) | 012-412 | Vaughn | 016-416 |
| | Waschak (WAH) | 02 | Georges | 08 | Brooks (WAH) | 512 - 912 | Newman | 516-916 |
| | Kistler | 03 | McKelvey | 09 | DeVeaux | 13 | Kimble | 017-417 |
| | Murtaugh | 04 | Mitchell | floater | Brooks (WAH) | 14 | Campbell (WAH) | 517-917 |
| | Jordan | floater | Wiggins | floater | | | Dyhouse | 18 |
| | Rhyne | floater | | | | | | Hernandez | 19 |

**A**

6 VSRs
8 RVSRs
*TOTAL: 14*

**B**

1 CA
1 SSVSR
8 VSRS
7 RVSRS
*TOTAL: 17*

**C**

1 CA
1 SSVSR
6 VSRS
5 RVSRS
*TOTAL: 13*

**D**

1 SSVSR
9 VSRS
8 RVSRS
*TOTAL: 18*

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sat | 04/28/12 | DO | | | | |
| | Sun | 04/29/12 | DO | | | | |
| | Wed | 05/02/12 | SL | 07:00A | 03:30P | 8.00 H | |
| | Fri | 05/04/12 | SL | 07:00A | 03:30P | 8.00 H | |
| | Sat | 05/05/12 | DO | | | | |
| 12-10 | Sun | 05/06/12 | DO | | | | |
| | Mon | 05/07/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Tue | 05/08/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Wed | 05/09/12 | SL | 07:00A | 11:15A | 4.25 H | FMLA |
| | | | AL | 11:45A | 03:30P | 3.75 H | FMLA |
| | Thu | 05/10/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA |
| | Fri | 05/11/12 | AL | 07:00A | 09:00A | 2.00 H | FMLA/Donated AL 6hrs |
| | | | AL | 09:00A | NOON | 3.00 H | FMLA/Donated AL 6hrs |
| | | | AL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL 6hrs |
| | Sat | 05/12/12 | DO | | | | |
| | Sun | 05/13/12 | DO | | | | |
| | Mon | 05/14/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 05/15/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 05/16/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 05/17/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 05/18/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 05/19/12 | DO | | | | |
| 12-11 | Sun | 05/20/12 | DO | | | | |
| | Mon | 05/21/12 | SL | 07:00A | 09:00A | 2.00 H | FMLA/Donated AL 6/CHD |
| | | | AL | 09:00A | NOON | 3.00 H | FMLA/Donated AL 6/CHD |
| | | | AL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL 6/CHD |
| | Tue | 05/22/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Wed | 05/23/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Thu | 05/24/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Fri | 05/25/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Sat | 05/26/12 | DO | | | | |
| | Sun | 05/27/12 | DO | | | | |
| | Mon | 05/28/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Tue | 05/29/12 | AL | 07:00A | NOON | 5.00 H | FMLA/Donated AL5/ADVSL3/CH |
| | | | SL | 12:30P | 03:30P | 3.00 H | FMLA/Donated AL5/ADVSL3/CH |
| | Wed | 05/30/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Thu | 05/31/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Fri | 06/01/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL/CHD |
| | Sat | 06/02/12 | DO | | | | |
| 12-12 | Sun | 06/03/12 | DO | | | | |
| | Mon | 06/04/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/donated AL |
| | Tue | 06/05/12 | AL | 07:00A | 08:00A | 1.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | AL | 08:00A | NOON | 4.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | AL | 12:30P | 02:30P | 2.00 H | FMLA/Donated AL 1hr/6 accr |
| | | | WP | 02:30P | 03:30P | 1.00 H | FMLA/Donated AL 1hr/6 accr |
| | Wed | 06/06/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Thu | 06/07/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Fri | 06/08/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA |
| | Sat | 06/09/12 | DO | | | | |

C-4

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sun | 06/10/12 | DO | | | | |
| | | | | | | | |
| | Sat | 06/16/12 | DO | | | | |
| 12-13 | Sun | 06/17/12 | DO | | | | |
| | | | | | | | |
| | Wed | 06/20/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Thu | 06/21/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 06/22/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 06/23/12 | DO | | | | |
| | Sun | 06/24/12 | DO | | | | |
| | Mon | 06/25/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 06/26/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Wed | 06/27/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Thu | 06/28/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 06/29/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 06/30/12 | DO | | | | |
| 12-14 | Sun | 07/01/12 | DO | | | | |
| | Mon | 07/02/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 07/03/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Wed | 07/04/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Thu | 07/05/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Fri | 07/06/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Sat | 07/07/12 | DO | | | | |
| | Sun | 07/08/12 | DO | | | | |
| | Mon | 07/09/12 | SL | 07:00A | 03:30P | 8.00 H | FMLA/ADV SL |
| | Tue | 07/10/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/11/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/12/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/13/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/14/12 | DO | | | | |
| 12-15 | Sun | 07/15/12 | DO | | | | |
| | Mon | 07/16/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 07/17/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/18/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/19/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/20/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/21/12 | DO | | | | |
| | Sun | 07/22/12 | DO | | | | |
| | Mon | 07/23/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Tue | 07/24/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Wed | 07/25/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Thu | 07/26/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Fri | 07/27/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL |
| | Sat | 07/28/12 | DO | | | | |
| 12-16 | Sun | 07/29/12 | DO | | | | |
| | Mon | 07/30/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Tue | 07/31/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Wed | 08/01/12 | AL | 07:00A | 03:30P | 8.00 H | FMLA/Donated AL/CHD |
| | Thu | 08/02/12 | AL | 07:00A | NOON | 5.00 H | FMLA/Donated AL7/accrued A |
| | | | AL | 12:30P | 02:30P | 2.00 H | FMLA/Donated AL7/accrued A |
| | | | AL | 02:30P | 03:30P | 1.00 H | FMLA/Donated AL7/accrued A |
| | Fri | 08/03/12 | AL | 07:00A | NOON | 5.00 H | FMLA/accrued AL 5hrs/CHD |

EMPLOYEE LEAVE PATTERN DATE: 11/16/12
from: MAR 01, 2010 to NOV 03, 2012
All Leave Taken With Days Off
for: MULLIN,AILEEN - VBA
T&L Unit: 839

| P/P | DAY | DATE | TYPE | FROM | TO | LENGTH | COMMENT |
|---|---|---|---|---|---|---|---|
| | Sat | 08/04/12 | DO | | | | |
| | Sun | 08/05/12 | DO | | | | |
| | Mon | 08/06/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA/CHD |
| | Tue | 08/07/12 | WP | 07:00A | 03:30P | 8.00 H | FMLA 6.5 hrs/CHD |
| | Wed | 08/08/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Thu | 08/09/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Fri | 08/10/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | Sat | 08/11/12 | DO | | | | |
| 12-17 | Sun | 08/12/12 | DO | | | | |
| | Mon | 08/13/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/14/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/15/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/16/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/17/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 08/18/12 | DO | | | | |
| | Sun | 08/19/12 | DO | | | | |
| | Mon | 08/20/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/21/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/22/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/23/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/24/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 08/25/12 | DO | | | | |
| 12-18 | Sun | 08/26/12 | DO | | | | |
| | Mon | 08/27/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Tue | 08/28/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Wed | 08/29/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Thu | 08/30/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Fri | 08/31/12 | SL | 07:00A | 03:30P | 8.00 H | ADV SL |
| | Sat | 09/01/12 | DO | | | | |
| | Sun | 09/02/12 | DO | | | | |
| | Mon | 09/03/12 | HX | 07:00A | 03:30P | 8.00 H | |
| | Tue | 09/04/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Wed | 09/05/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Thu | 09/06/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Fri | 09/07/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Sat | 09/08/12 | DO | | | | |
| 12-19 | Sun | 09/09/12 | DO | | | | |
| | Mon | 09/10/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Tue | 09/11/12 | AL | 07:00A | 11:00A | 4.00 H | Donated AL |
| | | | AL | 11:30A | 03:30P | 4.00 H | Donated AL |
| | Wed | 09/12/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Thu | 09/13/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Fri | 09/14/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |
| | Sat | 09/15/12 | DO | | | | |
| | Sun | 09/16/12 | DO | | | | |
| | | | | | | | |
| | Tue | 09/18/12 | WP | 07:00A | 03:30P | 8.00 H | CHD |
| | | | | | | | |
| | Sat | 09/22/12 | DO | | | | |
| 12-20 | Sun | 09/23/12 | DO | | | | |
| | | | | | | | |
| | Tue | 09/25/12 | AL | 07:00A | 03:30P | 8.00 H | Donated AL |

| VBIT 1C on Sept 18, 2012 | | | |
|---|---|---|---|
| Name | Title | Grade | FMLA |
| | RVSR | GS 10 | |
| Aileen Mullin | RVSR | GS 11 | YES |
| | RVSR | GS 10 | |
| ix | RVSR | GS 12 | |
| | VSR | GS 7 | YES |
| on | VSR | GS 9 | |
| | RVSR | GS 12 | |
| | CVSR | GS 11 | |
| z | CVSR | GS 11 | |
| | SSVSR | GS 12 | |
| | RVSR | | YES |
| | CVSR | GS 11 | |
| | CVSR | GS 11 | |
| | SSVSR | GS 12 | |
| | VSR | GS 10 | YES |
| | VSR | GS 10 | |
| | CVSR | GS 11 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: May 11, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Amendment for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. Human Resources received updated medical documentation regarding Aileen Mullin. Her FMLA was originally approved for intermittent use and for surgery, most recently updated via FMLA letter dated April 9, 2012. However, the Health Care Provider has provided additional documentation and established a surgery date and an estimation of the extent of absences.

2. The new medical documentation indicates that Ms. Mullin will be out constantly from May 4, 2012 through May 18, 2012. Additionally, Ms. Mullin will require periodic intermittent absences for treatment and follow-up appointments, the dates and times of which are unpredictable.

3. Under FMLA, the employee is entitled to up to a total of 12 administrative workweeks of leave without pay, which began on March 9, 2012. She is not allowed an additional 12 workweeks based on this amendment. She can use a total of 480 hours for the entire FMLA entitlement period. Her entitlement will still expire on May 8, 2013, at which point she may renew her entitlement, if necessary. In this case, Human Resources will provide a new memo.

4. If you have any questions or concerns, please contact Tammi Clarke, Human Resources Specialist at (727) 319-5818.

Bonnie J. Wax
Human Resources Manager

cc: Employee's Supervisor
Employee's Extended File

HR COPY

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: Mon. - Fri. 7:00am - 3:30pm

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

| Your name: Aileen | | Mullin |
|---|---|---|
| First | Middle | Last |

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Marie Catherine Lee 12902 Magnolia Dr Tampa Fl

Type of practice / Medical specialty: Surgical Oncology

Telephone: ( ) Fax: (813) 745-2002

 CONTINUED ON NEXT PAGE 

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: 05/04/12

   Probable duration of condition: 05/18/12

   **Mark below as applicable:**
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   X No ___Yes. If so, dates of admission:

   ______________________________

   Date(s) you treated the patient for condition:
   05/04, 05/02, 04/24, 04/17, 04/10, 3/28/12

   Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

   Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   X No ____Yes. If so, state the nature of such treatments and expected duration of treatment:

   ______________________________

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ______________

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to the condition: ____No X Yes.

   If so, identify the job functions the employee is unable to perform:

   NO WORK OF any kind

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

   ______________________________

   Surgery, MD visits, scans, labwork



CONTINUED ON NEXT PAGE

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 05/04 - 05/18/12

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No X Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___No X Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   dates and times of treatment will vary

   Estimate the part-time or reduced work schedule the employee needs, if any:

   2-8 hour(s) per day; 1-3 days per week from 05/22/12 through 11/22/12 as needed

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? X No ____Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ____ No ____Yes. If so, explain:

   ______________________________________________

   ______________________________________________

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency : _____ times per _____ week(s) _____ month(s)

Duration: _____ hours or ___ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.**

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________


CONTINUED ON NEXT PAGE

Signature of Health Care Provider

Date 5/7/12

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/29/2012

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/ 317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: ____

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ____ (Middle) Mullin (Last) (954) 263-1510

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Jeffrey Paonessa 1201 5th Ave. St Petersburg

Type of practice / Medical specialty: Oncology

Telephone: (727) 821-0017 Fax: (727) 822-7473



CONTINUED ON NEXT PAGE

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: 3-16-2012

Probable duration of condition: 6 months

**Mark below as applicable:**
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:
3-22-12 - consultation

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No ✓ Yes. If so, state the nature of such treatments and expected duration of treatment:
Dr. Karen Kritsky - Surgery

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No ___ Yes.

If so, identify the job functions the employee is unable to perform:

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

New diagnosis of Breast Cancer, she will need surgery followed by chemotherapy and possible radiation.


CONTINUED ON NEXT PAGE

[illegible]

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? __No ✓ Yes.

If so, estimate the beginning and ending dates for the period of incapacity: present - 6 months

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? __No ✓ Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
__No ✓ Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

Weekly chemo and related treatment

Estimate the part-time or reduced work schedule the employee needs, if any:

______ hour(s) per day; ______ days per week from ______ through ______

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? __No ✓ Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?
__ No ✓ Yes. If so, explain:

Side effects from chemotherapy

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s)

Duration: ____ hours or ____ day(s) per episode

[illegible]



CONTINUED ON NEXT PAGE

Signature of Health Care Provider

For. Jeffrey Paonessa

Date 3/23/12

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: April 9, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Approval for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to a total of 12 workweeks or 480 hours of FMLA leave during a 12-month period. However, Ms. Mullin previously invoked her entitlement to FMLA on March 9, 2012, which will expire March 8, 2013. During this 12-month period, she may use up to a total of 12 workweeks of leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. Additional medical documentation for a new serious medical condition was submitted on March 23, 2012. According to the medical documentation, the duration of the medical condition will require FMLA leave throughout the next 6 months. Consequently, the employee is eligible for FMLA coverage until approximately September 23, 2012, for this new condition. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *constantly* for surgery, at a date to be determined by her healthcare provider. Additionally, following the employee's return to work, she will require absences intermittently, for medical treatment/ appointments, and during flare-ups of the condition. The frequency of these intermittent absences is unpredictable.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is only for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or SF71 prior to an extended (constant) FMLA absence, or completion of the SF71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;

d. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;
e. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;
f. Notify Human Resources of any changes such as requests to stay out of work longer, failure to return to work by the end date, requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.
g. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours).

7. Public Law 103-3 requires her entitlement to cease in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique "Tammi" Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

cc: Employee's Supervisor
Employee's Extended File

DEPARTMENT OF VETERANS AFFAIRS
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

April 9, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 23, 2012 request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Breast cancer

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay during a 12-month period. Although you submitted new medical documentation on March 23, 2012, for the above condition, you had an existing FMLA entitlement, which began on March 9, 2012. Public Law 103-3 requires your entitlement to cease in 12 months or March 22, 2013 (one year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave. However, your condition(s) may not require this entire period. Therefore, it is imperative that you read this letter carefully. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during your FMLA-related absences as needed for this specific condition.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work *constantly* for surgery, at a date to be determined by your health care provider, and then for *intermittent* absences for medical treatment/ appointments or flare-ups of your approved FMLA medical condition, for a period of 6 months or until September 23, 2012. If it should become necessary for you to extend your entitlement beyond the current certification of 30 days, you may be required to provide an updated physician's statement from your health care provider.

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique "Tammi" Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: April 9, 2012

From: Human Resources Manager (317/25)

Subj: Family and Medical Leave Act (FMLA) Approval for Aileen Mullin

To: Roddy Cooke, Acting Financial Account Supervisor

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under FMLA, Ms. Mullin is entitled to up to 12 administrative workweeks of leave without (LWOP) during a 12-month period. Although Ms. Mullin submitted additional medical documentation on March 23, 2012, she had an existing FMLA approval, which began on March 8, 2012. Public Law 103-3 requires her entitlement to cease in 12 months or March 9, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide payroll with a new FMLA letter.

3. Specifically, for the purposes of this approval memo, the medical documentation indicates that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *constantly* for a period of time to be determined by her healthcare provider at a later date, and intermittently for treatment/appointments and other necessary absences due to the approved FMLA condition, until September 23, 2012.

4. Ms. Mullin may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay (LWOP) during this 12-month period.

5. The Director has approved LWOP for Ms. Mullin. Therefore, the supervisor is authorized to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours. This authority is only for LWOP under FMLA, and does not extend to other types of requests for LWOP.

6. If you have any questions concerning this program or your employment status, please contact Tamanique "Tammi" Clarke, Human Resources Specialist, at 727-319-5818.

[signature]

Bonnie J. Wax

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

WHD
U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/29/2012

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: St. Petersburg RO/ 317 Tammi Clarke (727) 319-5818 Fax: (727) 319-7750

Employee's job title: RVSR Regular work schedule: ______

Employee's essential job functions: see attached job description

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen (First) ______ (Middle) Mullin (Last) (954) 263-1510

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Jeffrey Paonessa 1201 5th Ave. St Petersburg

Type of practice / Medical specialty: Oncology

Telephone: (727) 821-0017 Fax: (727) 822-7473



CONTINUED ON NEXT PAGE

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: 3-16-2012

Probable duration of condition: 6 months

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

3-22-12 - consultation

Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___ No ✓ Yes. If so, state the nature of such treatments and expected duration of treatment:

Dr. Karen Kritsky - Surgery

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No ___ Yes.

If so, identify the job functions the employee is unable to perform:

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

New diagnosis of Breast Cancer, she will need surgery followed by chemotherapy and possible radiation.



CONTINUED ON NEXT PAGE

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No ✓ Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: present - 6 months

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ✓ Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___No ✓ Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   Weekly chemo and related treatment

   Estimate the part-time or reduced work schedule the employee needs, if any:

   ________ hour(s) per day; ________ days per week from ________ through ________

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ✓ Yes.

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ___ No ✓ Yes. If so, explain:

   Side effects from chemotherapy

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s)

Duration: ____ hours or ___ day(s) per episode

**ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.**


CONTINUED ON NEXT PAGE

Signature of Health Care Provider — Date 3/23/12

For. Jeffrey Paonessa

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

**American Federation of Government Employees**
AFFILIATED WITH AFL-CIO
LOCAL1594
POST OFFICE BOX 1437
ST. PETERSBURG, FL 33731
(727) 319-5934 FAX:(727) 319-7784

## AFGE Representative Designee Form

I, Aileen Mullin hereby designate the American Federation of Government Employees (AFGE) Local 1594 and the AFGE representative Valerie Riley to act in my behalf upon any personnel action; investigation; request copies of my personnel folder, extended file, supervisory notes and/or anything work-related that pertains to me. In addition, I specifically delegate to my representative the authority access all medical/health information on my behalf.

This authorization will remain in effect until I cancel it in writing.

Signature of Employee: [signature]

Date: March 26, 2012

## Affirmation of AFGE or Representative

I, Valie Riley, being a duly appointed Officer/Steward of AFGE Local 1594 do ~~hereby~~ hereby agree to adhere to the Privacy Act while investigating and/or representing Aileen Mullin complaint of grievance.

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to 12 workweeks or 480 hours of FMLA leave. The employee will be on leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. FMLA entitlement will begin on March 9, 2012 and will end on March 8, 2013. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently*. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* The employee was informed (in writing) by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is only for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or OPM71 prior to an extended (constant) FMLA absence, or completion of the OPM71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;
d. Notify the employee that new medical documentation is required when leave usage is not intermittent as defined by the Health Care Provider; (consult with HR)
e. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;

f. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;

g. Notify Human Resources of any changes such as constant leave when the employee is only approved for *intermittent* leave, or requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.

h. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours) between March 9, 2012 and March 8, 2013.

7. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

cc: Employee's Supervisor
Employee's Extended File

DEPARTMENT OF VETERANS AFFAIRS
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

March 14, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 9, 2012, request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Allergic sinusitis and asthma

If it should become necessary for you to extend your entitlement beyond the current certification, you will be required to provide an updated physician's statement from your health care provider.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* If your leave becomes constant, or exceeds the amount recommended by the Health Care Provider, you will be required to immediately provide updated medical documentation.

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay beginning March 9, 2012. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during this 12-week period as needed for this specific condition. Public Law 103-3 states your entitlement ceases in 12 months or March 8, 2013 (1 year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave.

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Manager (317/25)

Subj: Family and Medical Leave for Aileen Mullin

To: Roddy Cooke, Acting Financial Account Supervisor

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under FMLA, Ms. Mullin is entitled to up to 12 administrative workweeks of leave without (LWOP) pay beginning March 9, 2012. Specifically, Aileen Mullin may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay (LWOP) during this 12-week period as needed for this specific condition.

3. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently.* The Health Care Provider defined intermittent as: *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* The employee was informed by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

4. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide payroll with a new FMLA letter.

5. The Director has approved LWOP for Ms. Mullin. Therefore, the supervisor is authorized to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours. This authority is only for LWOP under FMLA, and does not extend to other types of requests for LWOP.

6. If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: ______________________

Employee's job title: ______________ Regular work schedule: ______________

Employee's essential job functions: ______________________

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen Mullin
First Middle Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Stephen Klemawesch 6294 1st Ave N

Type of practice / Medical specialty: Allergy / Immunology

Telephone: (727) 345 1900 Fax: (727) 347 5273



CONTINUED ON NEXT PAGE

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 2009

Probable duration of condition: Chronic

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___Yes. If so, dates of admission:

Oct 2010, Nov 2010, Dec 2010, Mar 2011 Sept 2011 Oct 2011 Dec 2011 Mar 2012

Date(s) you treated the patient for condition:

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___No X Yes.
when she has a attacks

If so, identify the job functions the employee is unable to perform:

All

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Patient has allergic sinusitis and asthma. The asthma worsens at work at the VA leading to severe attacks requiring urgent care.



CONTINUED ON NEXT PAGE

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

If so, estimate the beginning and ending dates for the period of incapacity: 1-4 Days every 2-3 weeks

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No X Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
___No X Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

Regular doctor apts 1 hour. Allergy shots monthly 1 hour

Estimate the part-time or reduced work schedule the employee needs, if any:

_________ hour(s) per day; _________ days per week from ___________ through ___________

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No X Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?
___ No X Yes. If so, explain:

She is unable to breathe therefore unable to work

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: 1-4 times per 3 week(s) _____ month(s)

Duration: _____ hours or 1-4 day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

I recommend the patient be allowed to work from home with periodic trips to the work site as required. When at the work site



CONTINUED ON NEXT PAGE

limit exposure to the building
Consider installing a total building air purifier dehumidification system.
Patient must be allowed to leave immediately from the work place if she develops asthma.

[signature] MD 3/20/12

**Signature of Health Care Provider** **Date**

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Note: Signatures are not dated. This will become a major issue

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

**Date:** May 7, 2012.

**From:** Ulyssee McBurrough Jr., Coach, VBIT 1C

**Subj:** Request for Advanced Sick Leave in lieu of Leave Without Pay (LWOP) under FMLA

**To:** Veterans Service Center Manager
Director, St. Petersburg Regional Office
Human Resources Management Division

1. Aileen Mullin, RVSR, has requested Advanced Sick Leave in lieu of LWOP under FMLA in the amount of 80 hours.

2. Aileen Mullin has requested Advanced Sick Leave due to surgery medical surgery performed on May 4, 2012.

3. I am recommending approval/disapproval of the request for 80 hours of Advanced Sick Leave in lieu of LWOP under FMLA.

Coach, ULYSSEE McBURROUGH JR.

JERRY HUFFMAN, AVSCM
~~Recommend~~ Approval/~~Disapproval~~

(for) SANDRA L. SMITH, VSCM
Recommend Apprproval/Disapproval

BONNIE J. WAX
Human Resources Manager
Recommend Approval/Disapproval

KERRIE L. WITTY
Director
Approval/Disapproval

C-6

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*
Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**
St. Petersburg Regional Office (317)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☐ **Accrued Sick Leave** | | | | | |
| ☒ **Advanced Sick Leave** | May 11, 2012 | May 24, 2012 | 7:30:00 AM | 3:30:00 PM | 80 |

**Purpose:**
☒ Illness/injury/incapacitation of requesting employee
☐ Medical/dental/optical examination of requesting employee
☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
☐ Care of family member with a serious health condition
☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

☐ Birth/Adoption/Foster Care
☐ Serious health condition of spouse, son, daughter, or parent
☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**
Employee presently unavailable

**7b. Date**
5/7/12

**8a. Official Action on Request:** ☒ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**
Kevin Witty

**8d. Date**
5/10/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form

00507

Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: 14 October 2011

From: Sandy Smith, VSCM

Subj: ) – FMLA Request

To: Director, St. Petersburg VA Regional Office
Human Resources Management Division

1. , RVSR, has requested leave without pay (LWOP) for the following dates:
    - September 16, 2011 – 4 hours
    - September 20, 2011 – 4 hours
    - September 22, 2011 – 8 hours
    - September 23, 2011 – 1.25 hours
    - September 26, 2011 – 4 hours
    - September 27, 2011 – 8 hours
    - October 5, 2011 – 1.5 hours

2. I am recommending denial of the LWOP for M request. As reflected in the attached leave request, the request for LWOP was indicated as an "or" to the Advanced Sick Leave request. I have denied the request for Advanced Sick Leave as per the authority shown in the Leave Administration Circular 25-08-1. Therefore, since approval of LWOP is based on similar criteria as approval for Advanced Sick Leave, I recommend disapproval of the LWOP.

Sandy Smith
Veterans Service Center Manager

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

see attached

Approval/Disapproval

Kerrie L. Witty
Director

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

**Date:** 15 November 2011

**From:** Robert Prince, Coach, WPB Outbased Office

**Subj:** Request for Advanced Sick Leave in lieu of Leave Without Pay (LWOP) under FMLA

**To:** Veterans Service Center Manager
Director, St. Petersburg Regional Office
Human Resources Management Division

1. , VSR, has requested Advanced Sick Leave in lieu of LWOP under FMLA in the amount of 20 hours. has been approved for FMLA for 480 hours from August 8, 2011 to August 7, 2012. She has a current FMLA balance of as of the date of this request.

2. On July 28, 2011, was approved for Advanced Sick Leave of hours (not under FMLA). She now has a negative balance of hours remaining to pay back from that request.

3. has requested Advanced Sick Leave due [redacted] which exacerbated [redacted]

4. I am recommending ~~approval/disapproval~~ of s request for hours of Advanced Sick Leave in lieu of LWOP under FMLA.

Robert Prince, Coach, WPB
Recommend Approval/Disapproval

BONNIE J. WAX
Human Resources Manager
Recommend Approval/Disapproval

advanced sick leave may be combined with AL or LWOP to cover one continuous period of absence. Approval is discretionary.

SANDRA L. SMITH
Recommend ~~Approval~~/Disapproval

[illegible] AL. Employee can utilize LWOP under FMLA. No need [illegible] w/[illegible].

KERRIE L. WITTY
Director
Approval/Disapproval

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: April 9, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Approval for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to a total of 12 workweeks or 480 hours of FMLA leave during a 12-month period. However, Ms. Mullin previously invoked her entitlement to FMLA on March 9, 2012, which will expire March 8, 2013. During this 12-month period, she may use up to a total of 12 workweeks of leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. Additional medical documentation for a new serious medical condition was submitted on March 23, 2012. According to the medical documentation, the duration of the medical condition will require FMLA leave throughout the next 6 months. Consequently, the employee is eligible for FMLA coverage until approximately September 23, 2012, for this new condition. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *constantly* for surgery, at a date to be determined by her healthcare provider. Additionally, following the employee's return to work, she will require absences intermittently, for medical treatment/ appointments, and during flare-ups of the condition. The frequency of these intermittent absences is unpredictable.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is only for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or SF71 prior to an extended (constant) FMLA absence, or completion of the SF71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;

d. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;
e. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;
f. Notify Human Resources of any changes such as requests to stay out of work longer, failure to return to work by the end date, requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.
g. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours).

7. Public Law 103-3 requires her entitlement to cease in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique "Tammi" Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

c: Employee's Supervisor
Employee's Extended File

**Department of Veterans Affairs**

# Memorandum

Date: May 10, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work from May 4, 2012 through May 18, 2012. According to Payroll records, you exhausted all paid leave on May 9, 2012, and will be in a leave without pay (LWOP) status for 24 hours or more, until your return to duty.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

Kerrie Witty

KERRIE L. WITTY

Attachment

VA FORM 2105
MAR 1989

006/011

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

1. Applicant's name (Last, first, middle)
MULLIN, AILEEN

2. Social Security Number
[redacted]

3. Employee Number

4a. Position title
RVSR

4b. Pay plan

4c. Grade/pay level
11 / 2

5. Name of organization (Agency, Department, Office, Division, Branch, etc.)
Veterans Benefits Administration

6. Office telephone number
HR 727 319 5818

7. Nature and severity of the medical emergency

8. Individual affected by medical emergency (check one)
☐ Employee
☐ Employee's family member

9. Date medical emergency began

10. Date medical emergency ended (or is expected to end)

11. Name of physician who will verify the medical emergency. (Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)
Marie Catherine Lee – 05/04/2012 - 05/18/12 outpatient surgery

12. What is the applicant's annual and sick leave balances as of end of last pay period?
Annual leave balance →
Sick leave balance →

13. How many hours of leave without pay have been used for this medical emergency?
Hours →

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

☐ Check box if applicant does not want a description distributed

☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program

Description of medical emergency

15a. Name of individual completing application (If applying on behalf of the applicant)

15b. Relationship to applicant

15c. Telephone number (area code)

16a. *I certify that the above statements are true.*
(Signature of applicant or individual applying on behalf of applicant)

16b. Date signed

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

17. First level supervisor's recommendation
☐ Approve ☐ Disapprove
Signature
Date signed

18. Deciding official's decision
☐ Approve ☐ Disapprove
Signature
Date signed

Personnel Management

Local Reproduction Authorized

OPM 630
June 2001
Formerly Optional Form (OF) 630

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: May 11, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) Amendment for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. Human Resources received updated medical documentation regarding Aileen Mullin. Her FMLA was originally approved for intermittent use and for surgery, most recently updated via FMLA letter dated April 9, 2012. However, the Health Care Provider has provided additional documentation and established a surgery date and an estimation of the extent of absences.

2. The new medical documentation indicates that Ms. Mullin will be out constantly from May 4, 2012 through May 18, 2012. Additionally, Ms. Mullin will require periodic intermittent absences for treatment and follow-up appointments, the dates and times of which are unpredictable.

3. Under FMLA, the employee is entitled to up to a total of 12 administrative workweeks of leave without pay, which began on March 9, 2012. She is not allowed an additional 12 workweeks based on this amendment. She can use a total of 480 hours for the entire FMLA entitlement period. Her entitlement will still expire on May 8, 2013, at which point she may renew her entitlement, if necessary. In this case, Human Resources will provide a new memo.

4. If you have any questions or concerns, please contact Tammi Clarke, Human Resources Specialist at (727) 319-5818.

Bonnie J. Wax
Human Resources Manager

cc: Employee's Supervisor
Employee's Extended File

# Memorandum

**To:** Sandy Smith

**From:** Ulyssee McBurrough Jr., Coach VBIT 1C

**Date:** 05/18/2012

**Re:** Aileen Mullin - FMLA

---

Aileen, Mullin is requesting 75.75 hours of accrued annual leave and she has received 46 hours of donated leave. She also used 4.25 hours of sick leave during this pay period. A total of 80 hours of leave was used during this pay period. Aileen's sick leave balance and her annual leave balance were at 0 before receiving the donated leave. Aileen has 432 hours of FMLA leave remaining. Aileen is approved for advanced sick leave but it is not needed at this time. A FMLA tracker is attached.

| Dates | Time | Total |
|---|---|---|
| 05/7/12 – 05/11/12 | 7:00 – 9:00 | 29.75 hrs. |
| 05/11/12 – 05/18/12 | 9:00 – 3:30 | 46.00 hrs. |
| 05/9/12 – 05/09/12 | 7:00 – 11:15 | 4.25 hrs. |

Recommended/Not Recommended

[signature]

Ulyssee McBurrough Jr, Coach VBIT 1C

Recommended/Not Recommended

____________________

Jerry Huffman, ASCM

Approved/Disapproved

____________________

Sandy Smith, Veterans Service Center Manager

Approved/Disapproved

____________________

Kerrie Witty, Director

American Federation of Government Employees, AFL-CIO
P.O. Box 1437
St. Petersburg, FL 33731

Telephone (727) 319-5934
Fax (727) 319-7784

DATE: June 14, 2012

TO: Kerrie Witty, Director

FROM: Keith A. Pryor, Executive Vice President

SUBJECT: Leave Transfer for Aileen Mullin

In response to our Face to Face meeting of June 13, 2012, attached please find the amended OPM 630 (*Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program*) for RVSR Aileen Mullin.

Enclosed please find supportive medical evidence from her treating physicians, dated June 6, 2012, May 30, 2012 and March 23, 2012. Knowing the serious nature of Ms. Mullin's medical condition, we respectfully request that this application be processed by your assigned Human Resources staff personnel. We request that this application be facilitated no later than June 26, 2012. This will allow Ms. Mullin time to plan accordingly, prior to her scheduled chemotherapy therapy for breast cancer.

In closing, if this application cannot be processed as requested, please provide rationale, to me, by close of business on June 26, 2012. AFGE appreciates your efforts in assisting us in helping Ms. Mullin during these trying times.

Respectfully,

Keith A. Pryor
Executive Vice President

Enclosures: (7)
Cc: Valorie Reilly, President
Casey Crump, Chief Steward
Sandy Smith, VSCM
Jerry Huffman AVSCM

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

| | | |
|---|---|---|
| 1. Applicant's name *(Last, first, middle)*<br>Mullin, Aileen | 2. Social Security Number | 3. Employee Number |
| 4a. Position title<br>RVSR | 4b. Pay plan | 4c. Grade/pay level<br>11 |
| 5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)*<br>VBA | | 6. Office telephone number |
| 7. Nature and severity of the medical emergency<br>Chemotherapy for treatment of breast cancer | | |
| 8. Individual affected by medical emergency *(check one)*<br>☑ Employee<br>☐ Employee's family member | 9. Date medical emergency began<br>06/22/2012 | 10. Date medical emergency ended *(or is expected to end)*<br>09/17/2012 |
| 11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*<br>Jeffery L Painessa, MD: See WH-380-E dated 3/23/2012 and redeacted Progress Notes dated 6/6/2012 + 5/30/12 | | |
| 12. What is the applicant's annual and sick leave balances as of end of last pay period?<br>Annual leave balance → ___ Sick leave balance → ___ | | 13. How many hours of leave without pay have been used for this medical emergency?<br>Hours → ___ |
| 14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.<br>☐ Check box if applicant does not want a description distributed.<br>☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program. | | Description of medical emergency<br>Chemotherapy for the treatment of breast cancer. |
| 15a. Name of individual completing application *(If applying on behalf of the applicant)* | 15b. Relationship to applicant | 15c. Telephone number (area code)<br>(954) 263-1510 |
| 16a. ***I certify that the above statements are true.***<br>*(Signature of applicant or individual applying on behalf of applicant)*<br>[signature] | | 16b. Date signed<br>6/14/2012 |

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| | |
|---|---|
| 17. First level supervisor's recommendation<br>☐ Approve ☐ Disapprove<br>Signature — Date signed | 18. Deciding official's decision<br>☐ Approve ☐ Disapprove<br>Signature — Date signed |

I forget who was working on Aileen's leave donor. Can you answer this question or forward? Aileen has donors willing to donate from other agencies. How can she do it?? Thanks.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, June 18, 2012 11:00 AM
**To:** Crump, Casey, VBASPT
**Subject:** Leave donations from other agencies

**What is the process for federal employees, from other agencies, to donate leave?**

**"Limitations on Leave Donations**

In any leave year, an employee may donate not more than one-half of the amount of annual leave he or she would accrue during the leave year. An employee with "use or lose" annual leave may donate the lesser of one-half of the annual leave he or she would accrue in a leave year or the number of hours remaining in the leave year for which he or she is scheduled to work and receive pay. These limitations apply to a combined total amount of annual leave donated by an employee under the VLTP and an agency leave bank program. Each agency must establish written criteria for waiving the limitations on donating annual leave.

An employee may transfer leave to an employee of another agency only when:

- The donor is a family member employed by another agency;
- **The leave recipient's agency believes that leave donations within the agency may not be sufficient to meet the recipient's needs; or**
- **The leave recipient's agency concludes that the transfer of leave from another agency furthers the purpose of the voluntary leave transfer program.**

**http://www.opm.gov/flsa/oca/leave/html/VLTP.asp**

Subject: RE: Leave Transfer

From: Pay-Leave-Policy (Pay-Leave-Policy@opm.gov)

To: aileen_mullin@y

Date: Tuesday, June 19, 2012 8:35 AM

Hello,

You asked whether a leave donation application can be amended and what process exists for receiving donated leave from employees outside of your agency.

Under the Voluntary Leave Transfer Program (VLTP), a covered employee may donate annual leave *directly* to another employee who has a personal or family medical emergency and who has exhausted his or her available paid leave. Each agency is responsible for administering its own leave transfer program, and the details of program administration may differ from agency to agency.

You did not say specifically that your earlier surgery had been for breast cancer, but we are assuming that it was. If this is the case, then the medical emergency for which you were approved (breast cancer) is continuing, and your chemotherapy is merely the next step of treatment for that continuing medical emergency. The voluntary leave transfer regulations at 5 CFR 630.904(b) require that an employee's application to become a leave recipient must contain certain information.

(b) Each application shall be accompanied by the following information concerning each potential leave recipient:

(1) The name, position title, and grade or pay level of the potential leave recipient;

(2) The reasons transferred leave is needed, including a brief description of the nature, severity, and anticipated duration of the medical emergency, and if it is a recurring one, the approximate frequency of the medical emergency affecting the potential leave recipient;

(3) Certification from one or more physicians, or other appropriate experts, with respect to the medical emergency, if the potential leave recipient's employing agency so requires; and

(4) Any additional information that may be required by the potential leave recipient's employing agency.

Since you are experiencing a continuation of same medical emergency, unless your medical emergency was considered terminated because you no longer appeared to be affected by the medical emergency, you should not need to submit a new application to become a leave donor, although you may need to have the information in (b)(2) amended if it has changed significantly from what was originally submitted. Since agencies administer their own leave transfer programs, you should ask your agency HR about this. However, if this is a new medical emergency and you do need to complete another application, please know that employees may participate in the voluntary leave transfer program for more than one medical emergency. The emergencies can be subsequent or concurrent.

In terms of donations of annual leave from employees outside of your agency, please note that generally employees may receive donated annual leave only from employees in their own agency or from family members who work at other agencies. The employing agency may also accept donations of annual leave from employees at other agencies under certain circumstances, as outlined below in the regulations at 5 CFR 630.906(f).

(f) A leave recipient's employing agency shall accept the transfer of annual leave from leave donors employed by one or more other agencies when—

(1) A family member of a leave recipient is employed by another agency and requests the transfer of annual leave to the leave recipient;

(2) In the judgment of the leave recipient's employing agency, the amount of annual leave transferred from leave donors employed by the leave recipient's employing agency may not be sufficient to meet the needs of the leave recipient; or

(3) In the judgment of the leave recipient's employing agency, acceptance of leave transferred from another agency would further the purpose of the voluntary leave transfer program.

The form that is used for such donations is OPM 630B and can be found at http://www.opm.gov/oca/leave/HTML/formindx.asp, which contains all the forms for the program. It is completed by the employee of the other agency, given to the employee's HR office, and that HR office would forward it to your HR office. You should speak with your HR office about this process.

Annual leave transferred under the VLTP to a leave recipient may be —

- Substituted retroactively for any period of leave without pay used because of the medical emergency; or
- Used to liquidate an indebtedness incurred by the leave recipient for advanced annual or sick leave used because of the medical emergency.

If your negative leave balance is due to the medical emergency for which you have been approved, you can retroactively substitute leave donations for any LWOP due to the medical emergency or to re-pay any advanced leave due to the medical emergency.

While using donated leave, a leave recipient may accrue no more than 40 hours of annual leave and 40 hours of sick leave in "set-aside accounts." The leave in the set-aside accounts will be transferred to the employee's regular leave accounts when the medical emergency ends or if the employee exhausts all donated leave. Leave in set-aside accounts is not available for use by the employee until transferred to the employee's regular leave accounts. Basically, this allows you to accrue up to 40 hours of annual and 40 hours of sick leave for your own personal use once your medical emergency ends, so that once its ends, you are not left with a zero leave balance.

Leave recipients may use the donated annual leave consecutively or intermittently, based on the medical needs of the recipient. If an employee works part-time and uses donated leave part-time (such as you intend to do by working intermittently when you can) the employee accrues leave in his or her regular annual and sick leave accounts for the time spent in work status and in his or her set aside annual and sick leave accounts for the time spent in shared leave status (when using donated leave).

This information can be found in our Voluntary Leave Transfer fact sheet: http://www.opm.gov/flsa/oca/leave/html/VLTP.asp. You may also be interested in reading the full regulations at http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=fa835362f262ae84599fdbf2bc33c2b8&rgn=div6&view=text&node=5:1.0.1.2.83.9&idno=5

If after reviewing this information and speaking with your HR office you continue to have concerns, let us know and we will forward your issue to VA headquarters for additional assistance, since, as mentioned previously, each agency is responsible for administering its own leave transfer program.

**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

April 9, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 23, 2012 request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Breast cancer

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay during a 12-month period. Although you submitted new medical documentation on March 23, 2012, for the above condition, you had an existing FMLA entitlement, which began on March 9, 2012. Public Law 103-3 requires your entitlement to cease in 12 months or March 22, 2013 (one year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave. <u>However</u>, your condition(s) may not require this entire period. Therefore, it is imperative that you read this letter carefully. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during your FMLA-related absences as needed for this specific condition.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work *constantly* for surgery, at a date to be determined by your health care provider, and then for *intermittent* absences for medical treatment/ appointments or flare-ups of your approved FMLA medical condition, for a period of 6 months or until September 23, 2012. <u>If it should become necessary for you to extend your entitlement beyond the current certification of 30 days, you may be required to provide an updated physician's statement from your health care provider.</u>

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique "Tammi" Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Manager (317/25)

Subj: Family and Medical Leave for Aileen Mullin

To: Roddy Cooke, Acting Financial Account Supervisor

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under FMLA, Ms. Mullin is entitled to up to 12 administrative workweeks of leave without (LWOP) pay beginning March 9, 2012. Specifically, Aileen Mullin may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay (LWOP) during this 12-week period as needed for this specific condition.

3. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently*. The Health Care Provider defined intermittent as: *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode*. The employee was informed by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

4. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide payroll with a new FMLA letter.

5. The Director has approved LWOP for Ms. Mullin. Therefore, the supervisor is authorized to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours. This authority is <u>only</u> for LWOP under FMLA, and does not extend to other types of requests for LWOP.

6. If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax

To VSC 3/20/12

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: March 14, 2012

From: Human Resources Management Division

Subj: Family and Medical Leave Act (FMLA) for Aileen Mullin

To: Sandra Smith, Veterans Service Center Manager

1. In accordance with Public Law 103-3, Aileen Mullin, Veterans Service Center, has requested to invoke her entitlement to the Family and Medical Leave Act (FMLA). A Health Care Provider has certified that a serious health condition exists, and as such, the employee is entitled to invoke FMLA.

2. Under these circumstances and in accordance with the AFGE contract, Ms. Mullin is entitled to 12 workweeks or 480 hours of FMLA leave. The employee will be on leave without pay (LWOP) unless a request is made to substitute paid leave (i.e., annual leave or sick leave).

3. FMLA entitlement will begin on March 9, 2012 and will end on March 8, 2013. When returning from FMLA, the employee will be entitled to return to her current position or an equivalent position unless separated from that position for a reason unrelated to family and medical leave.

4. The medical documentation shows that the condition for which this entitlement is granted will make it necessary for Ms. Mullin to be out of work *intermittently*. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode*. The employee was informed (in writing) by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider.

5. Human Resources has notified the employee of her FMLA entitlement. The Director has delegated authority to the supervisor to approve LWOP, annual leave or sick leave, up to the maximum amount of 480 hours when an employee is approved for FMLA. This authority is <u>only</u> for LWOP under FMLA and does not extend to other types of requests for LWOP. It is the responsibility of the supervisor to:

a. Advise the employee of leave requesting procedures under FMLA;
b. Ensure a leave request is completed by the employee via ETA or OPM71 prior to an extended (constant) FMLA absence, or completion of the OPM71 via mail or fax when leave occurs with no notice;
c. Closely monitor FMLA usage and provide regular updates to division management;
d. Notify the employee that new medical documentation is required when leave usage is not intermittent as defined by the Health Care Provider; (consult with HR)
e. Ensure that "FMLA" is notated in the remarks section of the timecard (for tracking purposes) by the timekeeper, for every instance when FMLA is used to include LWOP, annual leave and/or sick leave;

f. Limit disclosure of medical information and FMLA participation to only those with a legitimate business need to know the information. As examples, it is not appropriate for an employee's use of FMLA to be discussed during staff meetings, nor would it be appropriate to disclose the actual condition to anyone other than the management chain that approves leave for the employee;

g. Notify Human Resources of any changes such as constant leave when the employee is only approved for *intermittent* leave, or requests for leave (especially LWOP) exceeding the maximum approved time outlined in this letter.

h. **Notify Human Resources immediately if constant leave under LWOP reaches 31 consecutive days. A SF-52 must be generated and notification regarding benefits must be sent to the employee.**

6. It is the responsibility of the Division Chief to ensure that Ms. Mullin does not exceed the maximum allowable FMLA leave time approved (480 hours) between March 9, 2012 and March 8, 2013.

7. Public Law 103-3 states her entitlement ceases in 12 months or March 8, 2013. The employee is not allowed an additional 12 workweeks (or 16 workweeks depending on the condition) until this period ends, and a new event or situation occurs that entitles the employee to *another* period of family or medical leave. If this should occur, Human Resources will provide division management with a new FMLA letter.

8. The specific medical condition was intentionally left off this letter to avoid accidental disclosure.

9. Upon review of the supporting documentation, this request meets all the requirements of the program; consequently, I recommend approval of this request.

Tamanique Clarke
Human Resources Specialist

Recommend Approval/Disapproval

Bonnie J. Wax
Human Resources Manager

Approved/Disapproved

Kerrie L. Witty
Director

cc: Employee's Supervisor
Employee's Extended File

**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
PO Box 1437
St. Petersburg, FL 33731

In Reply Refer To: 317/25

March 14, 2012

Aileen Mullin
9500 Bay Pines Blvd.
St. Petersburg, FL 33731

Subject: Family and Medical Leave Act Approval

Your March 9, 2012, request for leave under the Family and Medical Leave Act (FMLA) is approved for the following serious medical condition(s) as certified by your healthcare provider:

- Allergic sinusitis and asthma

If it should become necessary for you to extend your entitlement beyond the current certification, you will be required to provide an updated physician's statement from your health care provider.

The medical documentation shows that the condition for which this entitlement is granted will make it necessary for you to be out of work. The Health Care Provider defined intermittent as *regular medical appointments and 1-4 flare-ups every 2-3 weeks lasting 1-4 days per episode.* <u>If your leave becomes constant, or exceeds the amount recommended by the Health Care Provider, you will be required to immediately provide updated medical documentation.</u>

Under FMLA, you are entitled to up to 12 administrative workweeks of leave without pay beginning March 9, 2012. Applicable laws and regulations provide you with the option of substituting other forms of paid leave for some or possibly all the leave without pay you are charged. Specifically, you may substitute up to 480 hours of sick leave or annual leave, as appropriate, in lieu of leave without pay during this 12-week period as needed for this specific condition. Public Law 103-3 states your entitlement ceases in 12 months or March 8, 2013 (1 year from beginning date). You will not be allowed an additional 12 workweeks (or 16 workweeks for other conditions) until this period ends and a new event or situation occurs that entitles you to *another* period of family or medical leave.

When returning from family and medical leave, you will be entitled to return to your current position or an equivalent position unless you would have separated from that position for a reason unrelated to family and medical leave.

If you have any questions concerning this program or your employment status, please contact Tamanique Clarke, Human Resources Specialist, at 727-319-5818.

Bonnie J. Wax
Human Resources Manager

**Department of Veterans Affairs**

# Memorandum

Date: December 19, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work intermittently from October 31, 2012 through December 24, 2012. Your physician indicated that upon the completion of your treatment, you will need to limit your work hours to 30 hours per week through February 17, 2013. According to Payroll records, you exhausted all paid leave on December 13, 2012.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

Kerrie Witty

KERRIE L. WITTY

Attachment

VA FORM 2105
MAR 1989

# SEPARATOR

# PAGE

Subject: Fw: Requested info

From: aileen_mullin@

To: mjsflorida@verizon.net;

Date: Wednesday, June 27, 2012 12:18 PM

Sent via BlackBerry by AT&T

---

**From:** "Reilly, Valorie, VBASPT" <valorie.reilly@va.gov>
**Date:** Wed, 27 Jun 2012 12:13:32 -0400
**To:** <aileen_mullin@
**Subject:** FW: Requested info

Valorie Reilly, President
AFGE Local 1594
5th District AFGE/NVAC Representative
Phone: (727) 319-7788
Fax: (727) 319-7760
Blackberry: (215) 828-9220

---

**From:** Works, Philip, VBASPT
**Sent:** Wednesday, June 27, 2012 11:08 AM
**To:** Reilly, Valorie, VBASPT
**Subject:** Requested info

Good morning,

Regarding Aileen Mullins:

Advance Sick Leave: The Director approved the requested 80 hours on May 10, 2012. The dates to be covered under that request were May 11 – May 24, 2012. Is there another request pending?

VLTP: A second VLTP participation was approved 6/20/12 based on medical emergency begun May 30, 2012 – September 11, 2012.

Donations received: I counted a grand total of 158 hours donated (that includes both emergency periods).

Thank you.
Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923
(fax) 727-319-7750
*"One Team, One Mission"*

Copy

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: 6-25-12

From: Ulyssee McBurrough Jr., Coach

Subj: Aileen Mullin – Requesting 104 hours of advanced leave.

To: Sandra L. Smith, VSCM

Aileen Mullin, RVSR had surgery on May 4, 2012. Currently, she has used all of her sick and annual leave. She is requesting a total of 13 leave days as she works 8 hours per day Monday through Friday.

She is requesting a total of 104 hours of advanced leave that will include the following days:

| Dates | Time | Total |
|---|---|---|
| 6- 20-12 to 7-09-12 | 7:00 pm - 3:30 pm | 104.00 hours |

As of the date of this memo, she only has 0 hours of annual leave remaining. She also has 0 hours of sick leave remaining. She has used all of her leave to include accrued and sick leave. Aileen's care provider has indicated that she has a serious health condition, therefore she has been granted FMLA as of May 11, 2012. She has used a total of 200 hours of FMLA as of today's date.

[signature]
Ulyssee McBurrough Jr., Coach
Recommend/Do Not Recommend

Jerry Huffman, AVSCM
Recommend/Do Not Recommend

[signature]
Sandra L. Smith, VSCM
Recommend/~~Do Not Recommend~~
I recommend 104 hrs but no more as that is one year's worth.

[signature]
Bonnie Wax, HR Manager
Recommend/Do Not Recommend

[signature]
Kerrie L. Witty, Director
Approval/Disapproval

# Request for Leave or Approved Absence

1. **Name** *(Last, first, middle)*
Mullin, Aileen

2. **Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

3. **Organization**
ST. Petersburg Regional Office (317)

| 4. Type of Leave/Absence (Check appropriate box(es) below) | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | Jun 20, 2012 | Jul 9, 2012 | 7:00:00 AM | 3:30:00 PM | 104 hrs |

**Purpose:**
☒ Illness/injury/incapacitation of requesting employee
☐ Medical/dental/optical examination of requesting employee
☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
☐ Care of family member with a serious health condition
☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | |
| ☐ Leave Without Pay | | | | | |

5. **Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

☐ Birth/Adoption/Foster Care
☐ Serious health condition of spouse, son, daughter, or parent
☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

6. **Remarks:**
Aileen is requesting 104 hours of advanced sick leave to use during her absence from work.

7. **Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

7a. **Employee Signature**
Employee is not available for signature

7b. **Date**
6/25/12

8a. **Official Action on Request:** ☐ Approved ☐ Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

8b. **Reason for Disapproval:**

8c. **Supervisor Signature**
[signature]

8d. **Date**
7/6/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

[illegible] aw 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification [illegible]. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may [illegible] r prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form Clear Form

Subject: Projected leave.

From: Mullin, Aileen, VBASPT (Aileen.Mullin@va.gov)

To: ulyssee.mcburrough@va.gov;

Cc: aileen_mullin@

Date: Thursday, June 14, 2012 4:19 PM

Hi Bo,

June 20, 2012 through July 29, 2012. Projected return to work date is July 30, 2012.

Thank you for your support Bo,

Aileen

**Department of Veterans Affairs**

# Memorandum

**Date:** September 18, 2012

**From:** Director, St. Petersburg VA Regional Office

**Subj:** Leave Issue – Mullin, A.

**To:** Payroll

**Thru:** Human Resources Management Division

1. The attached OPM Form 71's supersede all previously submitted OPM Form 71's for Ms. Aileen Mullin. Please process the attached 71's as annotated to correct Ms. Mullin's leave record.

2. If you have any questions, please contact Bonnie Wax, Human Resources Manager at (727) 319-7271.

For KERRIE L. WITTY
Director

Automated VA FORM 2105

# Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|
| Mullin, Aileen | |

**3. Organization**

VSC (T&L 839)

| 4. Type of Leave/Absence (Check appropriate box(es) below) | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | Jun 20, 2012 | Jun 29, 2012 | 07:00a | 03:30p | 64 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

Total leave 64 Advanced SL

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/ approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature | 7b. Date |
|---|---|
| | |

**8a. Official Action on Request:** ☐ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

| 8c. Supervisor Signature | 8d. Date |
|---|---|
| | |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification n[illegible] This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may d[illegible] prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form    Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

[redacted]

**)rganization**

VSC (T&L 839)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☒ **Accrued Sick Leave** | Aug 13, 2012 | Aug 13, 2012 | 07:00a | 10:00a | 4.00 |
| ☒ **Advanced Sick Leave** | Aug 13, 2012 | Aug 24, 2012 | 10:00a | 03:30p | 76.00 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**narks:**

Total leave 4 SL, 76 Advanced SL

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

**7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

**8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Frum, Elizabeth Ann

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**

Department of Veterans Affairs/Veterans Benefits Administration

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | Nov 14, 2011 | Nov 15, 2011 | 7:30:00 AM | 6:00:00 PM | 20 |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

Surgery performed on November 9, 2011 exacerbated my cervical injury.

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

Elizabeth Frum

**7b. Date**

11/14/2011

**8a. Official Action on Request:** ☐ Approved ☒ Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

Advanced SL previously granted and not paid back.

**8c. Supervisor Signature**

Kevin Watts

**8d. Date**

12/5/11

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form | Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

# REQUEST FOR LEAVE OR APPROVED ABSENCE

**1. NAME** *(Last, First, Middle Initial)*
Brinton, Laurie Noelle

**2. EMPLOYEE OR SOCIAL SECURITY NUMBER**

**3. ORGANIZATION** VSC

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From | DATE To | TIME From | TIME To | TOTAL HOURS |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advance Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advance Sick Leave | See dates below | | See times below | | 30.75 |
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☒ Leave Without Pay | See dates below | | See times below | | 30.75 |

**Purpose:** ☒ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

**5. FAMILY AND MEDICAL LEAVE**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ **I hereby invoke my to Family and Medical Leave for:**

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

Contact your supervisor and/or your personnel office to obtain additional information about our entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:**

0[illegible]5/11 from 1:15 pm to 5:15 pm = 4 hours
[illegible]/11 from 8:45 am to 12:45 pm = 4 hours
09/22/11 from 8:45 am to 5:15 pm = 8 hours
09/23/11 from 8:45 am to 10:00 am = 1.25 hours
09/26/11 from 8:45 am to 12:45 pm = 4 hours
09/27/11 from 8:45 am to 5:15 pm = 8 hours
10/05/11 from 8:45 am to 10:15 am = 1.5 hours

**Please see attached memo for further details. ***

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** **DATE** 18/Oct/11

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED ☒ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)* Advanced sick leave denied as not requested in advance. LWOP denied due to excessive absences and inability to maintain work schedule

**SIGNATURE** **DATE** 10/18/11

**PRIVACY ACT STATEMENT**

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**

St. Petersburg Regional Office (317)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☒ Advanced Sick Leave | May 11, 2012 | May 24, 2012 | 7:30:00 AM | 3:30:00 PM | 80 |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☐ Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

Employee presently unavailable

**7b. Date**

5/7/12

**8a. Official Action on Request:** ☒ Approved ☐ Disapproved

*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

Kevin Witty

**8d. Date**

5/10/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form    Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

DEPARTMENT OF
VETERANS AFFAIRS

# MEMORANDUM

Date: 6-25-12

From: Ulyssee McBurrough Jr., Coach

Subj: Aileen Mullin – Requesting 104 hours of advanced leave.

To: Sandra L. Smith, VSCM

Aileen Mullin, RVSR had surgery on May 4, 2012. Currently, she has used all of her sick and annual leave. She is requesting a total of 13 leave days as she works 8 hours per day Monday through Friday.

She is requesting a total of 104 hours of advanced leave that will include the following days:

| Dates | Time | Total |
|---|---|---|
| 6- 20-12 to 7-09-12 | 7:00 pm - 3:30 pm | 104.00 hours |

As of the date of this memo, she only has 0 hours of annual leave remaining. She also has 0 hours of sick leave remaining. She has used all of her leave to include accrued and sick leave. Aileen's care provider has indicated that she has a serious health condition, therefore she has been granted FMLA as of May 11, 2012. She has used a total of 200 hours of FMLA as of today's date.

Ulyssee McBurrough Jr., Coach
Recommend/Do Not Recommend

Jerry Huffman, AVSCM
Recommend/Do Not Recommend

Sandra L. Smith, VSCM I recommend 104 hrs but no more as that is one year's worth.
Recommend/~~Do Not Recommend~~

Bonnie Wax, HR Manager
Recommend/Do Not Recommend

Kerrie L. Witty, Director
Approval/Disapproval

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

'ullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**3. Organization**

ST. Petersburg Regional Office (317)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | **Date** From | To | **Time** From | To | **Total Hours** |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☐ **Accrued Sick Leave** | | | | | |
| ☒ **Advanced Sick Leave** | Jun 20, 2012 | Jul 9, 2012 | 7:00:00 AM | 3:30:00 PM | 104 hrs |

**Purpose:**
- ☒ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**
- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☒ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

Aileen is requesting 104 hours of advanced sick leave to use during her absence from work.

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

Employee is not available for signature

**7b. Date**

6/25/12

**8a. Official Action on Request:** ☐ **Approved** ☐ **Disapproved**

*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

[signature]

**8d. Date**

7/6/12

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification nu... This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may ... prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may p... you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

Print Form | Clear Form

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

# SEPARATOR

# PAGE

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

[redacted]

**3. Organization**

VSC (T&L 839)

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| [x] Accrued Annual Leave | May 21, 2012 | May 21, 2012 | 09:00a | 12:00p | 3.00 |
| [ ] Restored Annual Leave | | | | | |
| [ ] Advanced Annual Leave | May 29, 2012 | May 29, 2012 | 12:30p | 2:30p | 2.00 |
| [x] Accrued Sick Leave | May 21, 2012 | May 21, 2012 | 07:00a | 09:00a | 2.00 |
| [x] Advanced Sick Leave | May 29, 2012 | Jun 1, 2012 | 2:30p | 03:30p | 25.00 |

**Purpose:**
- [ ] Illness/injury/incapacitation of requesting employee
- [ ] Medical/dental/optical examination of requesting employee
- [ ] Care of family member, including medical/dental/optical examination of family member, or bereavement
- [ ] Care of family member with a serious health condition
- [ ] Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| [ ] Compensatory Time Off | | | | | |
| [x] Other Paid Absence *(Specify in Remarks)* | May 21, 2012 | May 29, 2012 | 12:30p | 12:00p | 40.00 |
| [ ] Leave Without Pay | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

[x] **I hereby invoke my entitlement to Family and Medical Leave for:**

- [ ] Birth/Adoption/Foster Care
- [ ] Serious health condition of spouse, son, daughter, or parent
- [ ] Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks:**

Do not charge leave for the holiday- 05/28/12. Total leave 3 Accrued AL, 4 Accrued SL, 40 Donated, 25 Advanced SL

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

**7b. Date**

**8a. Official Action on Request:** [x] Approved [ ] Disapproved *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

**8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification nu... This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may d... prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provi... you with an additional statement reflecting those purposes.

# Request for Leave or Approved Absence

| 1. **Name** *(Last, first, middle)* | 2. **Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))** |
|---|---|
| Mullin, Aileen | |

**Organization**

VSC (T&L 839)

| 4. **Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☒ **Accrued Annual Leave** | Jul 10, 2012 | Jul 11, 2012 | 07:00a | 09:00a | 10.00 |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☒ **Accrued Sick Leave** | Jul 2, 2012 | Jul 2, 2012 | 07:00a | 10:00a | 3.00 |
| ☒ **Advanced Sick Leave** | Jul 2, 2012 | Jul 9, 2012 | 10:00a | 03:30p | 37.00 |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☒ **Other Paid Absence** *(Specify in Remarks)* | Jul 11, 2012 | Jul 13, 2012 | 09:00a | 03:30p | 22.00 |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**

Do not charge leave for the holiday- 6/4/12. Total leave 10 Accrued AL, 3 Accrued SL, 22 Donated, 37 Advanced SL

7. **Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/ approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. **Employee Signature** | 7b. **Date** |
|---|---|
| | |

8a. **Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

8b. **Reason for Disapproval:**

| 8c. **Supervisor Signature** | 8d. **Date** |
|---|---|
| | |

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*

Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

[redacted]

**Organization**

VSC (T&L 839)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Accrued Annual Leave** | | | | | |
| ☐ **Restored Annual Leave** | | | | | |
| ☐ **Advanced Annual Leave** | | | | | |
| ☐ **Accrued Sick Leave** | | | | | |
| ☐ **Advanced Sick Leave** | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| ☐ **Compensatory Time Off** | | | | | |
| ☒ **Other Paid Absence** *(Specify in Remarks)* | Jul 16, 2012 | Jul 27, 2012 | 07:00a | 03:30a | 80.00 |
| ☐ **Leave Without Pay** | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**marks:**

Total leave 80 Donated

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

**7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

**8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may revent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form | Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*
Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**Organization**
VSC (T&L 839)

| 4. Type of Leave/Absence (Check appropriate box(es) below) | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| [X] Accrued Annual Leave | Aug 2, 2012 | Aug 2, 2012 | 12:00p | 03:30p | 3.00 |
| [ ] Restored Annual Leave | | | | | |
| [ ] Advanced Annual Leave | | | | | |
| [ ] Accrued Sick Leave | | | | | |
| [ ] Advanced Sick Leave | | | | | |

**Purpose:**
- [ ] Illness/injury/incapacitation of requesting employee
- [ ] Medical/dental/optical examination of requesting employee
- [ ] Care of family member, including medical/dental/optical examination of family member, or bereavement
- [ ] Care of family member with a serious health condition
- [ ] Other

| | Date From | Date To | Time From | Time To | Total Hours |
|---|---|---|---|---|---|
| [ ] Compensatory Time Off | Jul 30, 2012 | Aug 2, 2012 | 07:00a | 12:00p | 29.00 |
| [ ] Other Paid Absence (Specify in Remarks) | Aug 3, 2012 | Aug 3, 2012 | 07:00a | 12:00p | 5.00 |
| [X] Leave Without Pay | Aug 3, 2012 | Aug 10, 2012 | 12:30p | 03:30p | 43.00 |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

[X] **I hereby invoke my entitlement to Family and Medical Leave for:**
- [ ] Birth/Adoption/Foster Care
- [ ] Serious health condition of spouse, son, daughter, or parent
- [ ] Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**
Total leave 3 Accrued AL, 34 Donated, 43 LWOP

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

**7b. Date**

**8a. Official Action on Request:** [✓] **Approved** [ ] **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature** [signature]

**8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form Clear Form

# Request for Leave or Approved Absence

**1. Name** *(Last, first, middle)*
Mullin, Aileen

**2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))**

**Organization**
VSC (T&L 839)

| **4. Type of Leave/Absence** *(Check appropriate box(es) below)* | **Date** From | To | **Time** From | To | **Total Hours** |
|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | Jun 5, 2012 | Jun 5, 2012 | 07:00a | 12:00p | 5.00 |
| ☐ Restored Annual Leave | | | | | |
| ☐ Advanced Annual Leave | | | | | |
| ☐ Accrued Sick Leave | | | | | |
| ☐ Advanced Sick Leave | | | | | |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

| | | | | | |
|---|---|---|---|---|---|
| ☐ ~~Compensatory Time Off~~ | Jun 4, 2012 | Jun 4, 2012 | 07:00a | 03:30p | 8 |
| ☒ Other Paid Absence *(Specify in Remarks)* | Jun 5, 2012 | Jun 5, 2012 | 12:30p | 02:30p | 2.00 |
| ☒ Leave Without Pay | Jun 5, 2012 | Jun 8, 2012 | 02:30p | 03:30p | 25.00 |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☒ **I hereby invoke my entitlement to Family and Medical Leave for:**

- ☐ Birth/Adoption/Foster Care
- ☐ Serious health condition of spouse, son, daughter, or parent
- ☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

**Remarks:**
Total leave 5 Accrued AL, 10 Donated, 25 LWOP

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

**7a. Employee Signature**

**7b. Date**

**8a. Official Action on Request:** ☑ **Approved** ☐ **Disapproved** *(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**8b. Reason for Disapproval:**

**8c. Supervisor Signature**

**8d. Date**

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification r... This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may ... prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

Office of Personnel Management
5 CFR 630

Local Reproduction Authorized

OPM Form 71
Rev. September 2009
Formerly Standard Form (SF) 71
Previous editions usable

Print Form | Clear Form

# SEPARATOR

# PAGE

| Employee | Applied to VLTP | Appoved | Not Approved |
|---|---|---|---|
| Acevedo, Susan | No | | |
| Alonzo, Flavio | No | | |
| Anaebo, Clifford | No | | |
| Bacigalupi, Nina | No | | |
| BROOKS,KENNETH J | No | | |
| CADENAS,ADRIANNA M | No | | |
| Christian, Dennis | No | | |
| Christina Badger | No | | |
| Cooper, Kimberly | No | | |
| Crosby, Douglas | No | | |
| Danakowski, Anna | 10/18/2011 | yes | |
| Dedeaux, Melissa | No | | |
| DEVEAUX,PATRICKA K | No | | |
| DOEBLIN,CRYSTAL L | No | | |
| Fernandez, Vicki | No | | |
| Friend, Kartara | 02/25/2011 | yes | |
| Gammons, Benton | No | | |
| Gilbert, Adrienne | No | | |
| Graham, Timothy | No | | |
| Green, Jason | No | | |
| Haberern, Melissa | No | | |
| Halbert, Rickey | No | | |
| Harvey, Barbara | No | | |
| Hargreaves, Tyler | No | | |
| Helmick, Karrie | No | | |
| Hernandez, Florentine | No | | |
| Holbrook, Jonathon | No | | |
| Hurst, Christina | No | | |
| Isern, Monica | No | | |
| Jordan, Greggory | No | | |
| KELLY,JORDAN S | No | | |
| Lamb, Andre | No | | |
| Latty, Monique | No | | |
| Leffler, Catalina | No | | |
| McNally, Michael | No | | |
| Mitchell, Paul | No | | |
| Morgan, Toreia | No | | |
| Nadeau, Maurice | No | | |
| Page, James | No | | |
| Person, Dale | 06/24/2011 | yes | |
| Pinder, Eric | No | | |
| Powers, Sallandra | No | | |
| Rhyne, James | No | | |
| Richards, Dale | No | | |
| Robinson, Kimberly | No | | |
| Sampeur, Cedrick | No | | |

| | | | |
|---|---|---|---|
| Shapiro, Mary | No | | |
| Smith, Joy | No | | |
| Smith, Mary | 10/26/2011 | yes | |
| Smith, Shannon | No | | |
| STEWART,JOMO K | No | | |
| Sueiro, Liliana | No | | |
| Vazquez, Luisette | No | | |
| Velez-Rivera, Idamaris | No | | |
| Ventura, Angel | No | | |
| Ware, Ronald | No | | |
| Wiggins, John | No | | |

9/10/12 + email

Department of Veterans Affairs

# Memorandum

Date: June 20, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work from May 30, 2012 through September 11, 2012. According to Payroll records, you exhausted all paid leave on June 5, 2012.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

Kerrie Witty

KERRIE L. WITTY

Attachment

RECEIVED BY: ______

DATE: 9/5/12

VA FORM MAR 1989 2105

**Wax, Bonnie, VBASPT**

**From:** VAVBASPT/RO/HRM
**Sent:** Friday, June 29, 2012 3:26 PM
**Subject:** Voluntary Leave Transfer Program
**Attachments:** Donation Form.pdf

The following employees have been approved for the Voluntary Leave Transfer Program. If you would like to donate annual leave please complete and print the attached form and turn it in to Human Resources. The minimum that can be donated is 4 hours. Additional questions may be directed to Tammi Clarke at ext. 5818.

- Yvonne Hall
- Jennifer Lane
- Aileen Mullin – Condition: Chemotherapy for the treatment of breast cancer.

Please see attached donation form.

**American Federation of Government Employees, AFL-CIO**

P.O. Box 1437
St. Petersburg, FL 33731

Telephone (727) 319-5934
Fax (727) 319-7784

RECEIVED VARO
ST PETERSBURG (317)
2012 JUN 14 P 2:09
DIRECTORS OFFICE/00

DATE: June 14, 2012

TO: Kerrie Witty, Director

FROM: Keith A. Pryor, Executive Vice President

SUBJECT: Leave Transfer for Aileen Mullin

In response to our Face to Face meeting of June 13, 2012, attached please find the amended OPM 630 (*Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program*) for RVSR Aileen Mullin.

Enclosed please find supportive medical evidence from her treating physicians, dated June 6, 2012, May 30, 2012 and March 23, 2012. Knowing the serious nature of Ms. Mullin's medical condition, we respectfully request that this application be processed by your assigned Human Resources staff personnel. We request that this application be facilitated no later than June 26, 2012. This will allow Ms. Mullin time to plan accordingly, prior to her scheduled chemotherapy therapy for breast cancer.

In closing, if this application cannot be processed as requested, please provide rationale, to me, by close of business on June 26, 2012. AFGE appreciates your efforts in assisting us in helping Ms. Mullin during these trying times.

Respectfully,

Keith A. Pryor
Executive Vice President

Enclosures: (7)
Cc: Valorie Reilly, President
Casey Crump, Chief Steward
Sandy Smith, VSCM
Jerry Huffman AVSCM

To Do For All That Which None Can Do For Oneself

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

1. Applicant's name *(Last, first, middle)*: Mullin, Aileen

2. Social Security Number: [redacted]

3. Employee Number:

4a. Position title: RVSR

4b. Pay plan:

4c. Grade/pay level: 11

5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)*: VBA

6. Office telephone number:

7. Nature and severity of the medical emergency: Chemotherapy for treatment of breast cancer

8. Individual affected by medical emergency *(check one)*
   - [✓] Employee
   - [ ] Employee's family member

9. Date medical emergency began: 06/22/2012

10. Date medical emergency ended *(or is expected to end)*: 09/17/2012

11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*

Jeffery L Painessa, MD: See WH-380-E dated 3/23/2012 and redeacted Progress Notes dated 6/6/2012 + 5/30/12

12. What is the applicant's annual and sick leave balances as of end of last pay period?

Annual leave balance →

Sick leave balance →

13. How many hours of leave without pay have been used for this medical emergency?

Hours →

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

- [ ] Check box if applicant does not want a description distributed.
- [ ] Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

Description of medical emergency: Chemotherapy for the treatment of breast cancer.

15a. Name of individual completing application *(If applying on behalf of the applicant)*:

15b. Relationship to applicant:

15c. Telephone number (area code): (954) 263-1510

16a. ***I certify that the above statements are true.*** *(Signature of applicant or individual applying on behalf of applicant)*

[signature]

16b. Date signed: 6/14/2012

**Privacy Act Statement**

Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

17. First level supervisor's recommendation
   - [X] Approve
   - [ ] Disapprove

Signature: [signature]

Date signed: 6/20/12

18. Deciding official's decision
   - [✓] Approve
   - [ ] Disapprove

Signature: [signature]

Date signed: 6/20/12

**Department of Veterans Affairs**

# Memorandum

Date: May 10, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work from May 4, 2012 through May 18, 2012. According to Payroll records, you exhausted all paid leave on May 9, 2012, and will be in a leave without pay (LWOP) status for 24 hours or more, until your return to duty.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

Kerrie Witty

KERRIE L. WITTY

Attachment

VA FORM 2105
MAR 1989

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

1. Applicant's name *(Last, first, middle)*: MULLIN, AILEEN

2. Social Security Number: [redacted]

3. Employee Number:

4a. Position title: RVSR

4b. Pay plan:

4c. Grade/pay level: 11 / 2

5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)*: Veterans Benefits Administration

6. Office telephone number: HR 727 319 5818

7. Nature and severity of the medical emergency

8. Individual affected by medical emergency *(check one)*
- ☐ Employee
- ☐ Employee's family member

9. Date medical emergency began

10. Date medical emergency ended *(or is expected to end)*

11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*

12. What is the applicant's annual and sick leave balances as of end of last pay period?

Annual leave balance → ☐ Sick leave balance → ☐

13. How many hours of leave without pay have been used for this medical emergency?

Hours → ☐

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

- ☐ Check box if applicant does not want a description distributed.
- ☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

Description of medical emergency

15a. Name of individual completing application *(If applying on behalf of the applicant)*

15b. Relationship to applicant

15c. Telephone number (area code)

16a. ***I certify that the above statements are true.*** *(Signature of applicant or individual applying on behalf of applicant)*

16b. Date signed

**Privacy Act Statement**

Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

17. First level supervisor's recommendation
- ☐ Approve ☐ Disapprove

Signature    Date signed

18. Deciding official's decision
- ☐ Approve ☐ Disapprove

Signature    Date signed

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

| | | |
|---|---|---|
| 1. Applicant's name *(Last, first, middle)* MULLIN, AILEEN | 2. Social Security Number [redacted] | 3. Employee Number |
| 4a. Position title RVSR | 4b. Pay plan | 4c. Grade/pay level 11 / 2 |
| 5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)* Veterans Benefits Administration | | 6. Office telephone number HR 727 319 5818 |
| 7. Nature and severity of the medical emergency | | |
| 8. Individual affected by medical emergency *(check one)* ☐ Employee ☐ Employee's family member | 9. Date medical emergency began | 10. Date medical emergency ended *(or is expected to end)* |

* 11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*

Marie Catherine Lee – 05/04/2012 - 05/18/12 outpatient surgery

| | | |
|---|---|---|
| 12. What is the applicant's annual and sick leave balances as of end of last pay period? Annual leave balance → ☐ | Sick leave balance → ☐ | 13. How many hours of leave without pay have been used for this medical emergency? Hours → ☐ |

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

☐ Check box if applicant does not want a description distributed

☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program

Description of medical emergency

| | | |
|---|---|---|
| 15a. Name of individual completing application *(If applying on behalf of the applicant)* | 15b. Relationship to applicant | 15c. Telephone number (area code) |
| 16a. ***I certify that the above statements are true.*** *(Signature of applicant or individual applying on behalf of applicant)* | | 16b. Date signed |

**Privacy Act Statement**

Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| | |
|---|---|
| 17. First level supervisor's recommendation ☐ Approve ☐ Disapprove Signature Date signed | 18. Deciding official's decision ☐ Approve ☐ Disapprove Signature Date signed |

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| ORGANIZATION UNIT | GRADE *(Include step)* | SALARY RATE |
| VBA, St. Petersburg VARO | 12-1 | $ 68,801.00 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 4 | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | M E Fearn | 05/11/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 33.50 hrs as of 4/24/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 5/11/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

Aileen 1st

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**RIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR (*Last, First, M.I.*) | | SOCIAL SECURITY NUMBER |
|---|---|---|
| ~~Lydia~~ T E | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** (*Include step*) | **SALARY RATE** |
| VSC - DIBC/BDD | 11-2 | $ |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 8 hrs | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | [signature] | 5-11-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 123 hrs as of 4/21/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 5/11/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [redacted] | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| VSC | 10 step 1 | $ 52,252 |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Mullen, Aileen | 16 hrs/2 days | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: Marie D Brown | DATE SIGNED: 5/11/12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 131.00 hrs as of 4/21/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 5/11/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

NAME OF DONOR *(Last, First, M.I.)*:

SOCIAL SECURITY NUMBER: [redacted]

ORGANIZATION UNIT: QRT

GRADE *(Include step)*: GS-12

SALARY RATE: $ 73,396.00

NAME OF RECIPIENT OF DONATED LEAVE: AILEEN MULLINS

AMOUNT OF DONATED LEAVE

HOURS/DAYS OF REGULAR ANNUAL LEAVE: 8

HOURS/DAYS OF RESTORED ANNUAL LEAVE:

**AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶

SIGNATURE OF DONOR: [signature]

DATE SIGNED: 05/11/2012

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 201.25 as of 4/21/12

SIGNATURE: [signature]

TITLE: Human Resources Specialist

DATE SIGNED: 5/11/12

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

AMOUNT OF LEAVE: HOURS/DAYS

EFFECTIVE DATE:

COMMENTS

SIGNATURE:

TITLE:

DATE SIGNED:

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

**PART I - TO BE COMPLETED BY LEAVE DONOR**

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| ORGANIZATION UNIT<br>317 VSC | GRADE *(Include step)*<br>GS11 | SALARY RATE<br>$ 59,321.00 |
| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| EILEEN MULLIN | 4HR | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR<br>Cliff Green | DATE SIGNED<br>05/11/2012 |

**PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE**

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 111:25 hrs as of 4/21/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 5/11/12 |

**PART III - ACTION BY PAYROLL OFFICE**

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

**PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY**

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| | GS-11 | $ |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| AILEEN MULLEN | 12 hrs. | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: [signature] | DATE SIGNED: 5-14-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 165 hrs as of 5/5/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 5/15/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| ORGANIZATION UNIT | GRADE *(Include step)* | SALARY RATE |
| VSC/QRT | 12-3 | $ 73,396.00 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 16 | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | Barbara Zeh | 05/15/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 141.50 as of 5/5/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| Cynthia Moore | Human Resources Specialist | 5/15/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible] | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| VSC PRE 3 | 10-2 | $52,000 est. |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 4.00 | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: [signature] | DATE SIGNED: 5/18/12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL Balance = 100.00 as of 5/5/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| Cynthia M. Moore | Human Resources Specialist | 5/18/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) T[illegible] formation furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law e[illegible] ement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| DEC 3 | 12-1 | $ 68,000.00 |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| AILEEN MULLIN | 10 | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: [signature] | DATE SIGNED: 05/17/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL Balance = 216.25

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| Cynthia M. Moore | Human Resources Specialist | 5/18/12 |

## PART III - ACTION BY PAYROLL OFFICE

[I] have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. [T]his leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

FORM [illegible] 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR (*Last, First, M.I.*) | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible] | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** (*Include step*) | **SALARY RATE** |
| VBA | 11/02 | $ 28.42 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| MULLIN, AILEEN | 4 hours | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | Mary S. Shapiro | 5-14-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL Balance = 75 as of 5/5/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| Cynthia M. Moore | Human Resources Specialist | 5/18/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# Memorandum

Date: September 21, 2012

From: Director (00)

Subj: Voluntary Leave Transfer Program

To: Aileen Mullin

1. I am pleased to inform you that you meet the requirements for participation in the leave transfer program and have been approved as a leave recipient for the period of your personal emergency. Your physician has indicated that you will need to be out work 30 hours per week from September 17, 2012 through November 25, 2012. According to Payroll records, you exhausted all paid leave on August 3, 2012.

2. At your discretion, Human Resources will inform other employees that they may request the transfer of their annual leave to your account to be used in connection with your personal emergency. These requests should be made on reproduced copies of the attached VA Form 0239. If there are insufficient donations of leave from VA employees, leave transfers may be accepted from employees at other Federal agencies. All donations are voluntary.

3. Please contact Tamanique "Tammi" Clarke at extension 5818, for information about this program and your responsibilities as a leave recipient or if you have any further questions.

4. I sincerely hope that the Voluntary Leave Transfer Program will be of assistance to you during your personal emergency.

for KERRIE L. WITTY

Attachment

VA FORM 2105
MAR 1989

# Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program

| 1. Applicant's name *(Last, first, middle)* | 2. Social Security Number | 3. Employee Number |
|---|---|---|
| Mullin, Aileen | [redacted] | |

| 4a. Position title | 4b. Pay plan | 4c. Grade/pay level |
|---|---|---|
| RVSR | | 11 / 2 |

| 5. Name of organization *(Agency, Department, Office, Division, Branch, etc.)* | 6. Office telephone number |
|---|---|
| Veterans Benifits Administration, Regional Office, Saint Petersburg, FL | |

7. Nature and severity of the medical emergency
Breast cancer, treatment of breast cancer, side effects of chemotherapy and radiation to include: neasea, vomitting, fatigue, neutropenia, neuropathy ...

| 8. Individual affected by medical emergency *(check one)* | 9. Date medical emergency began | 10. Date medical emergency ended *(or is expected to end)* |
|---|---|---|
| ☑ Employee<br>☐ Employee's family member | 06/22/2012 | 11/25/2012 |

11. Name of physician who will verify the medical emergency. *(Attach documentation from the physician (or other appropriate expert) showing the diagnosis, prognosis and duration of illness.)*
Documentation from Susan Minton DO, was faxed to Human Resources on 9/16/2012

12. What is the applicant's annual and sick leave balances as of end of last pay period?
Annual leave balance → ☐ Sick leave balance → ☐

13. How many hours of leave without pay have been used for this medical emergency?
Hours → ☐

14. Provide a description of the medical emergency to be distributed to servicing personnel offices so that other employees may donate annual leave to the applicant.

☐ Check box if applicant does not want a description distributed.

☐ Check box if applicant does not wish to have name used with the description or disclosed to anyone except the supervisor, the supervisory channel and the deciding official, and individuals who maintain the program.

Description of medical emergency
Complications due to ~~Completion of~~ chemotherapy, then daily radiation for the treatment of breast cancer. (Note: Permission granted to distribute description, within the text of leave donation announcement.
AM 9/19/12

| 15a. Name of individual completing application *(If applying on behalf of the applicant)* | 15b. Relationship to applicant | 15c. Telephone number (area code) |
|---|---|---|
| | | 954-263-1510 |

| 16a. ***I certify that the above statements are true.*** *(Signature of applicant or individual applying on behalf of applicant)* | 16b. Date signed |
|---|---|
| Aileen Mullin | 09/19/2012 |

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C. 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| 17. First level supervisor's recommendation | | 18. Deciding official's decision | |
|---|---|---|---|
| ☐ Approve ☐ Disapprove | | ☐ Approve ☐ Disapprove | |
| Signature | Date signed | Signature | Date signed |

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible] | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| D1BC, VSC St. Petersburg Regional Office/317 | GS-12, step 5 | $ 77,983.00 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 8 | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | [signature] | 10-3-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 43.25 hrs as of 9/22/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | HR Specialist | 10/4/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P L 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| St. Petersburg RO<br>VSC/VBIT1A | GS-12 | $ 68,809.00 |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 8 | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: [signature] | DATE SIGNED: 9/24/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance 65.25 hrs as of 9/22/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | HR Specialist | 10/3/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary, however, solicitation of this information is authorized by P L. 100-566 (October 31, 1988 ) This information furnished will be used to identify records properly associated with the leave donation It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation, or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible], Elaine, M. | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| St. pete VARO | 10-4 | $ |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 4 | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | [signature] | 9-25-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 255 hrs as of 9/8/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | HR Specialist | 9/27/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary, however, solicitation of this information is authorized by P L 100-566 (October 31, 1988 ) This information furnished will be used to identify records properly associated with the leave donation It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave

## PART I - TO BE COMPLETED BY LEAVE DONOR

| | | |
|---|---|---|
| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER<br>[redacted] |
| ORGANIZATION UNIT<br>VARO | GRADE *(Include step)*<br>GS 11 STEP 4 | SALARY RATE<br>$ 63,148 |
| NAME OF RECIPIENT OF DONATED LEAVE<br>Aileen Mullin | AMOUNT OF DONATED LEAVE<br>HOURS/DAYS OF REGULAR ANNUAL LEAVE<br>5 | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR<br>Teresa A. Perr... | DATE SIGNED<br>09/25/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☒ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 171 as of 9/8/2012

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| Amy Caro | HR Assistant | 9/25/2012 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible] R. | | [redacted] |
| ORGANIZATION UNIT | GRADE *(Include step)* | SALARY RATE |
| VR 8 E | 12 Step 4 | $ 75,689 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 8 | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | [signature] | 9-24-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☒ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 261.50 as of 9/8/2012

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | HR Assistant | 9/27/2012 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

## Request to Donate Annual Leave to Leave Recipient Under the Voluntary Leave Transfer Program

I request that annual leave be transferred to the leave account of an approved leave recipient. This recipient is not my immediate supervisor. As of the date indicated below, I have enough annual leave in my account to cover this amount. I understand that if I am projected to forfeit annual leave during this leave year the amount of leave I am transferring may not exceed the number of hours remaining in the leave year for which I am scheduled to work. The amount of annual leave I am transferring also is not more than half the hours I will earn this year.

I understand that my decision to transfer leave is not revocable. If a sufficient balance of unused donated leave remains after the recipient's medical emergency has terminated, I can elect to have a pro-rated share returned to me during either the current leave year or the following leave year, or I can elect to donate my pro-rated share to another leave recipient. However, to do so, I must remain employed by a Federal agency and be subject to chapter 63 of title 5, United States Code. I have not been directly or indirectly intimidated, threatened or coerced, or promised any benefit by any employee for the purpose of donating or using leave.

### *Part A - To Be Completed By Leave Donor*

1. Name *(Last, first, middle)*:
2. Social Security Number:
3. Employee Number:

4a. Position title: Field Examiner
4b. Pay plan: GS
4c. Grade/pay level: 11
5. Relationship of leave donor to leave recipient *(If any)*: none

6. Leave donor's agency *(Agency, Department, Office, Division, Branch, etc.)*: VBA, Columbia RO, Fiduciary HUB

7. Amount of annual leave accrued as of end of last pay period:
8. Amount of leave projected to forfeit this leave year as of end of last pay period:
9. Amount of annual leave to be transferred: 36

10. Leave recipient's name, agency, agency's address, organization *(Agency, Department, Office, Division, Branch, etc.)*: Aileen Mullin VBA, 9500 Bay Pines Blvd. St. Peterburg, FL 33708 St. Pete RO - 317

11a. Leave donor's signature: [signature]
11b. Date signed: 10/17/12

**Privacy Act Statement**
Participation in this program is voluntary; however, solicitation of this information is authorized under 5 U.S.C 6332. The information furnished will be used to identify records properly associated with the transfer of annual leave. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Public Law 104-134 (April 26,1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

### *Part B - To Be Completed By Employing Agency of Leave Donor*

Upon completion and approval of this form, forward a copy to the leave recipient's employing agency as soon as possible so that the transfer of leave can take place.

12. Enter the amount of annual leave to be credited to the leave recipient's annual leave account: 36
13. If the agency is waiving the maximum limitations for leave donation under the voluntary leave transfer program, describe the special circumstance that warrants the waiver:

14a. Name of agency contact who can provide further information: Paige Collins
14b. Telephone number: 803-647-2362

15. Certification: I certify that the leave donor currently has sufficient annual leave in his/her annual leave account to make a donation of the requested amount of annual leave and that the amount of the donation does not exceed the maximum limitations for leave donation under the voluntary leave transfer program.

15a. Signature of authorizing official: [signature]
15b. Date Signed: 10-29-12

Department of Veterans Affairs

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR (Last, First, M.I.) | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| ORGANIZATION UNIT | GRADE (Include step) | SALARY RATE |
| VARO 317/26/SAH<br>St. Petersburg, FL | GS-12 Step 6 | $ 80,276.00 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE | |
|---|---|---|
| | HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 8 HOURS | |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | Carolyn D. Allen (signature) | 08/31/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request ☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 23.25 as of 8/25/2012

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| (signature) | HR Assistant | 8/31/2012 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM PR 2000 (R) **0239**

AdobeFormsDesigner

**From:** Wax, Bonnie, VBASPT
**Sent:** Friday, June 29, 2012 2:54 PM
**To:** Reilly, Valorie, VBASPT
**Subject:** VLTP

Valorie –

As Ms. Mullins designated representative, please confirm that Ms. Mullins has authorized the agency to distribute the following description of her medical emergency to other employees so that they may donate additional annual leave: Chemotherapy for the treatment of breast cancer.

Thank you,
*Bonnie J. Wax*

**Bonnie J. Wax**
**Human Resources Manager**
St. Petersburg Regional Office
9500 Bay Pines Blvd, St. Petersburg, Florida 33708
Desk: 727-319-7271
Fax: 727-319-7750

**VA Core Values:** Integrity, Commitment, Advocacy, Respect, Excellence

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

NAME OF DONOR *(Last, First, M.I.)*: [illegible]

SOCIAL SECURITY NUMBER: [redacted]

ORGANIZATION UNIT:

GRADE *(Include step)*: GS-11

SALARY RATE: $

NAME OF RECIPIENT OF DONATED LEAVE: Aileen Mullin

AMOUNT OF DONATED LEAVE
- HOURS/DAYS OF REGULAR ANNUAL LEAVE: 12
- HOURS/DAYS OF RESTORED ANNUAL LEAVE:

**AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶

SIGNATURE OF DONOR: [signature]

DATE SIGNED: 7-3-12

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 148 hrs as of 6/14/12

SIGNATURE: [signature]

TITLE: Human Resources Specialist

DATE SIGNED: 7/5/12

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

AMOUNT OF LEAVE: HOURS/DAYS

EFFECTIVE DATE:

COMMENTS

SIGNATURE:

TITLE:

DATE SIGNED:

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

**PART I - TO BE COMPLETED BY LEAVE DONOR**

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| ORGANIZATION UNIT | GRADE *(Include step)* | SALARY RATE |
| VSC/QRT | GS-12-3 | $ 73,396.00 |
| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 12 | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. | SIGNATURE OF DONOR: Barbara [signature] | DATE SIGNED: 7/3/2012 |

**PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE**

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 149.50 hrs as of 6/14/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 7/5/12 |

**PART III - ACTION BY PAYROLL OFFICE**

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

**PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY**

| PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR (*Last, First, M.I.*) | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** (*Include step*) | **SALARY RATE** |
| Loan Administration, 263 | GS 11 04 | $ 30.26 |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 6 hours | |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | **SIGNATURE OF DONOR** (signature) | **DATE SIGNED** 07/02/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 57 hrs as of 6/16/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| (signature) | Human Resources Specialist | 7/5/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM
APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

NAME OF DONOR *(Last, First, M.I.)*:

SOCIAL SECURITY NUMBER: [redacted]

ORGANIZATION UNIT: VSC-DIBC

GRADE *(Include step)*: GS 10-7

SALARY RATE: $ 62,705.00

NAME OF RECIPIENT OF DONATED LEAVE: Aileen Mullin

AMOUNT OF DONATED LEAVE

HOURS/DAYS OF REGULAR ANNUAL LEAVE: 4 hrs

HOURS/DAYS OF RESTORED ANNUAL LEAVE:

**AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶

SIGNATURE OF DONOR: Barbara A Stone

DATE SIGNED: 6/28/12

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 280.75 hrs as of 6/16/12.

SIGNATURE: [signature]

TITLE: Human Resources Specialist

DATE SIGNED: 7/5/12

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

AMOUNT OF LEAVE: HOURS/DAYS

EFFECTIVE DATE:

COMMENTS

SIGNATURE:

TITLE:

DATE SIGNED:

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) 0239

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| [illegible] | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE** *(Include step)* | **SALARY RATE** |
| VRE ORLANDO | 9/5 | $ 53,773.00 |

| NAME OF RECIPIENT OF DONATED LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF REGULAR ANNUAL LEAVE | AMOUNT OF DONATED LEAVE: HOURS/DAYS OF RESTORED ANNUAL LEAVE |
|---|---|---|
| Aileen Mullin | 10 hours | — |

| AUTHORIZATION - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR | DATE SIGNED |
|---|---|---|
| | [signature] | 06-29-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 205 hrs as of 6/14/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | ~~[illegible]~~ 7/5/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM
APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| | | |
|---|---|---|
| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER<br>[redacted] |
| ORGANIZATION UNIT<br>ST PETERSBURG VARO 317 | GRADE *(Include step)*<br>GS 6 STEP 6 | SALARY RATE<br>$ 40,073.00 |
| NAME OF RECIPIENT OF DONATED LEAVE<br>JENNIFER LANE | AMOUNT OF DONATED LEAVE — HOURS/DAYS OF REGULAR ANNUAL LEAVE<br>16 | AMOUNT OF DONATED LEAVE — HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR<br>[signature] | DATE SIGNED<br>07/06/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☒ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 232 hrs as of 6/30/12.

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 7/10/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

FORM
2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| | | |
|---|---|---|
| NAME OF DONOR *(Last, First, M.I.)*<br>[illegible] C | | SOCIAL SECURITY NUMBER<br>[redacted] |
| ORGANIZATION UNIT<br>LGY/DBG | GRADE *(Include step)*<br>12/3 | SALARY RATE<br>$ 75,689 |
| NAME OF RECIPIENT OF DONATED LEAVE<br>Aileen Mullin | AMOUNT OF DONATED LEAVE — HOURS/DAYS OF REGULAR ANNUAL LEAVE<br>8 | HOURS/DAYS OF RESTORED ANNUAL LEAVE<br>0 |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR<br>Mary C Hale | DATE SIGNED<br>7-10-12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 222 hrs as of 6/30/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 7/10/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**NSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

NAME OF DONOR *(Last, First, M.I.)*:

SOCIAL SECURITY NUMBER: [redacted]

ORGANIZATION UNIT: VSC

GRADE *(Include step)*: GS11 Step 2

SALARY RATE: $59,321

NAME OF RECIPIENT OF DONATED LEAVE: Aileen Mullin

AMOUNT OF DONATED LEAVE

HOURS/DAYS OF REGULAR ANNUAL LEAVE: 8hrs

HOURS/DAYS OF RESTORED ANNUAL LEAVE:

**AUTHORIZATION** - I authorize transfer of leave to the above-named recipient ▶

SIGNATURE OF DONOR: [signature]

DATE SIGNED: 6/22/12

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 88.75 as of 6/16/12

SIGNATURE: Cynthia M. Moore

TITLE: Human Resources Specialist

DATE SIGNED: 6-25-12

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

AMOUNT OF LEAVE: HOURS/DAYS

EFFECTIVE DATE:

COMMENTS

SIGNATURE:

TITLE:

DATE SIGNED:

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DA... ERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

FORM R 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER |
|---|---|---|
| | | [redacted] |
| **ORGANIZATION UNIT** | **GRADE *(Include step)*** | **SALARY RATE** |
| St Pete RO 317 | 11-2 | $ 59,021 |
| **NAME OF RECIPIENT OF DONATED LEAVE** | **AMOUNT OF DONATED LEAVE** — HOURS/DAYS OF REGULAR ANNUAL LEAVE | HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| Aileen Mullin | 8 hours | N/A |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR: Mary Beth Hoblit | DATE SIGNED: 07/09/2012 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [illegible signature] | Human Resources Specialist | 7/13/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

A FORM PR 2000 (R) **0239**

AdobeFormsDesigner

**Department of Veterans Affairs**

# LEAVE TRANSFER AUTHORIZATION

**INSTRUCTIONS:** Complete Part I and submit the form to your Human Resources Management Office.

**PRIVACY ACT STATEMENT:** Participation in this program is voluntary; however, solicitation of this information is authorized by P.L. 100-566 (October 31, 1988.) This information furnished will be used to identify records properly associated with the leave donation. It may also be disclosed to a national, State, or local law enforcement agency where there is an indication of a violation or potential violation of civil or criminal law, rule, or regulation; or to another agency or court when the Government is party to a suit. Furnishing the Social Security Number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the request to donate leave.

## PART I - TO BE COMPLETED BY LEAVE DONOR

| | | |
|---|---|---|
| NAME OF DONOR *(Last, First, M.I.)* | | SOCIAL SECURITY NUMBER<br>[redacted] |
| ORGANIZATION UNIT<br>VSC | GRADE *(Include step)*<br>10-02 | SALARY RATE<br>$ 53,994.00 |
| NAME OF RECIPIENT OF DONATED LEAVE<br>Aileen Mullin | AMOUNT OF DONATED LEAVE — HOURS/DAYS OF REGULAR ANNUAL LEAVE<br>8 | AMOUNT OF DONATED LEAVE — HOURS/DAYS OF RESTORED ANNUAL LEAVE |
| **AUTHORIZATION** - I authorize transfer of leave to the above-named recipient. ▶ | SIGNATURE OF DONOR<br>[signature] | DATE SIGNED<br>7/17/12 |

## PART II - ACTION BY HUMAN RESOURCES MANAGEMENT OFFICE

I have reviewed the current positions and the grade pay levels of the above-named donor and leave recipient and certify that this request

☑ meets ☐ does not meet the administrative requirement for leave transfer.

COMMENTS

AL balance = 70.75 hrs as of 7/14/12

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| [signature] | Human Resources Specialist | 7/23/12 |

## PART III - ACTION BY PAYROLL OFFICE

I have reviewed the leave record of the above-named donor and certify that the annual leave in the amount shown below meets the criteria of the leave transfer program. This leave is transferred on the date indicated below.

| AMOUNT OF LEAVE | EFFECTIVE DATE |
|---|---|
| HOURS/DAYS | |

COMMENTS

| SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| | | |

## PART IV - ACTION BY PAYROLL OFFICE AT TERMINATION OF THE PERSONAL EMERGENCY

| DATE PERSONAL EMERGENCY ENDED | HOURS/DAYS OF ANNUAL LEAVE RESTORED TO DONOR | DATE RESTORED | INITIALS OF PAYROLL CLERK | DATE SIGNED |
|---|---|---|---|---|
| | | | | |

VA FORM APR 2000 (R) **0239** AdobeFormsDesigner

5/7/12

Copy

This Leave Request template is designed so none of the people sign it are responsible for dating it. There's no way of tracking/verifying who is holding it up

DEPARTMENT OF VETERANS AFFAIRS

# MEMORANDUM

Date: May 7, 2012.

From: Ulyssee McBurrough Jr., Coach, VBIT 1C

Subj: Request for Advanced Sick Leave in lieu of Leave Without Pay (LWOP) under FMLA

To: Veterans Service Center Manager
Director, St. Petersburg Regional Office
Human Resources Management Division

1. Aileen Mullin, RVSR, has requested Advanced Sick Leave in lieu of LWOP under FMLA in the amount of 80 hours.

2. Aileen Mullin has requested Advanced Sick Leave due to surgery medical surgery performed on May 4, 2012.

3. I am recommending approval/disapproval of the request for 80 hours of Advanced Sick Leave in lieu of LWOP under FMLA.

Coach, ULYSSEE McBURROUGH JR.

JERRY HUFFMAN, AVSCM
~~Recommend~~ Approval/~~Disapproval~~

(for) SANDRA L. SMITH, VSCM
Recommend Apprproval/Disapproval

BONNIE J. WAX
Human Resources Manager
Recommend Approval/Disapproval

KERRIE L. WITTY
Director
Approval/Disapproval

# SEPARATOR

# PAGE

e. **Approval of Application to Become a Leave Recipient**

(1) HRMOs shall expeditiously review all applications to determine that the potential leave recipient meets the criteria of a *"medical emergency,"* as defined in paragraph 19b(6) of this chapter.

(2) Before forwarding the application to the approving official, the HRMO shall determine that the absence from duty without available paid leave (disregarding any advanced leave) because of the medical emergency has been (or is expected to be) at least 24 work hours (3 calendar days for certain title 38 employees and 14.5 hours for nurses on the Baylor Plan, or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours in the employee's biweekly scheduled tour of duty). A leave recipient may use annual leave transferred to the recipient's annual leave account under this program only for the purpose of the medical emergency for which the leave recipient was approved.

(3) In making a determination as to whether a *"medical emergency"* is likely to result in a substantial loss of income, no factors will be considered other than whether the absence from duty without available paid leave has been, or is expected to be at least 24 work hours (3 calendar days for certain title 38 employees and 14.5 hours for nurses on the Baylor Plan, or, in the case of a part-time employee or an employee with an uncommon tour of duty, the average number of hours of work in the employee's biweekly scheduled tour of duty).

(4) If the application is approved, the leave recipient (or the personal representative who made application on behalf of the leave recipient) will be advised, in writing, within 10 days (excluding Saturday, Sundays, and legal public holidays) after the date the application was received that:

(a) The application has been approved (see appendix III-D);

(b) Other employees of the leave recipient's facility or other VA facilities may request the transfer of annual leave to the annual leave account of the leave recipient and requests to donate annual leave from employees of other Federal agencies will be considered; and

(c) The leave recipient (or the personal representative who made application on behalf of the leave recipient) is responsible for notifying those employees who may wish to be leave donors of the approval of the application.

(5) If the application is not approved, the applicant (or the personal representative who made application on behalf of the leave recipient), will be advised, in writing, within 10 days (excluding Saturdays, and Sundays, and legal public holidays) after the date the application was received that the application has not been approved and of the reasons for its disapproval (see sample in appendix III-E).

(6) For bargaining unit employees, prior to forwarding a denial letter to the approving official, the Human Resources Management Officer will discuss the case with the union and provide them with a 48-hour comment period. Approval letters for bargaining unit employees will be simultaneously sent to the union and the employee.

Working Copy
J. Huffman 3/19/2012

DEPARTMENT OF VETERANS AFFAIRS
Regional Office
St. Petersburg, Florida

CIRCULAR NO. 00-07-11

August 28, 2007

# REGIONAL OFFICE FLEXIPLACE POLICY

1. **PURPOSE**

To establish the Regional Office flexiplace policy, responsibilities and procedures as outlined in the National Flexiplace Program and as negotiated between the Department of Veterans Affairs and the American Federation of Government Employees, AFL-CIO.

2. **POLICY**

a. It is the policy of this Regional Office to provide opportunity for qualified employees to perform their work at alternate worksites. The program provides mutual benefit to the Regional Office and to employees by providing an opportunity to work at home, thereby improving services to veterans, improving productivity, helping recruit and retain employees, and improving the quality of life for participants.

b. Participation in a flexiplace arrangement is not an employee right; however, participation in a flexiplace assignment is entirely voluntary. Flexiplace provides managers, supervisors and employees with alternatives to the traditional worksite in accomplishing the Regional Office goals.

c. Flexiplace will not be used as an alternative to or in lieu of childcare or eldercare. The intent of the program is to support the mission of the Regional Office in an alternate worksite.

d. The Regional Office procedure will mirror the National Flexiplace Program as described in the attachments to this circular.

3. **DEFINITIONS**

a. Flexiplace is defined as a voluntary program that enables employees to periodically perform specific, defined, work assignments at an Alternate Duty Site (ADS) with Division Chief approval.



C-8

b. Alternate Duty Site (ADS) is defined as a specific room or area within an employee's primary residence.

c. Official Duty Station or official worksite means the duty station for an employee as indicated on the most recent Notification of Personnel Action (SF 50).

4. **RESPONSIBILITIES**

a. The Director is responsible for the overall management of the flexiplace program for the Regional Office.

b. The Human Resource Liaison is responsible for advising management, operating officials and employees on the flexiplace program policies and procedures.

c. Division Chiefs are responsible for determining positions, portable work and employee suitability for flexiplace assignments, and for approving employee's requests to participate in the program. They must also ensure adequate staffing at the Regional Office, that operations continue to be carried out in an efficient and economical manner, and that all employees are treated equitably.

d. The Information Security Officer (ISO) is responsible for determining security requirements and best practices at the ADS, and relaying that information to the employees on the flexiplace program.

e. Employees are responsible for maintaining productivity, fulfilling their obligation to account for a full day's work, being available to their supervisor during their regularly scheduled duty hours, and for obtaining appropriate approvals for leave when away from the ADS.

5. **PROCEDURES**

a. Participation: Employees who meet the criteria as established by the National Flexiplace Program (Attachment B (1)) must submit a written request through their supervisor to the Division Chief to participate in this program. The requesting employees must:

(1) have dedicated space and accept responsibility for the safety and security of Government equipment as well as veteran data, and

(2) agree to and sign the Flexiplace Agreement (Attachment B (2)).

b. Position Suitability: Division Chiefs are responsible for determining which positions and what types of the work are appropriate for flexiplace assignments as outlined by the National Flexiplace Program (Attachment B (1)). Additional criteria for consideration of specific positions includes:

(1) Degree of supervision required;

(2) Contact requirements (i.e. customers, colleagues, etc.), and;

(3) Special equipment requirements.

c. The Alternate Duty Site:

(1) The alternate worksite must conform to the requirements as established in the Flexiplace Agreement. When an ADS request is approved, the ISO will educate the employee on security requirements and best practices at the ADS. Attachment B (4) outlines those best practices.

(2) The supervisor and employee will identify the resources needed to perform the work assignment at the ADS. The employee will be responsible for obtaining and maintaining all equipment and supplies. All equipment provided by the VA is, and remains, property of VA. Such equipment includes, but is not limited to, a PC, file storage unit, and file transport container (suitcase). The VA can provide miscellaneous supplies such as paper, envelopes, stapler, staples and two-hole punch.

(3) No case working papers, letters, or other documents are to be destroyed at the ADS. These papers will be brought to the official worksite in the designated secure pouch for proper disposition.

(4) Flexiplace participants must complete and sign a safety checklist, VA Form 0740b (Attachment (B3)), which must also be signed by the supervisor. The form can also be found at http://vaww.va.gov/vaforms/va/pdf/VA0740b.pdf.

d. Flexiplace Agreement: Prior to participating in the Flexiplace Program, employees must complete a Flexiplace Agreement. The Flexiplace Agreement must be completed each year when the work assignments are evaluated. New agreements must also be completed if significant changes occur (e.g. change in ADS location, change in position, change in work process, etc.).

e. Work Schedules: Flexiplace Program participants are not eligible to work a Compressed Work Schedule (CWS). The number of days per week worked at an ADS will vary depending on the type of work performed and the impact on RO activities. In no instance will a Flexiplace Agreement permit work at an ADS for five (5) days a week. The flexiplace schedule may be changed only after appropriate notice to the employee in accordance with the negotiated Flexiplace Agreement.

f. Performance Evaluation: The performance of an employee on a flexiplace assignment will be evaluated based on the applicable performance standards for his or her position for that portion that applies to the work that is performed at the ADS. Supervisors and employees will fully discuss performance expectations prior to initiating the flexiplace assignment to assure that expectations are completely understood. Employees will immediately notify supervisors whenever any problems arise that adversely affect their ability to perform work at the ADS.

g. Time and Attendance:

(1) The employee's time and attendance will be recorded as performing official duties at the official duty station. To verify attendance at the ADS, supervisors may periodically contact the employee and/or permit employee self-certification. To help ensure that employees on flexiplace assignments work as scheduled, supervisors should focus on work completed.

(2) Employees performing work at the ADS are required to request and obtain approval for leave whenever they will not be performing work at any time they are scheduled to be working at the ADS.

h. Emergency Closings/Late Openings/Early Dismissals: The negotiated Flexiplace Agreement contains explicit information concerning these contingencies. Both the Regional Office and the employee working at an ADS will abide by the agreement. If, at the time of this event, the employee voluntarily chooses to perform work at the ADS, the employee is not entitled to any additional compensation, such as overtime, compensatory time or credit hours.

i. Pay: All entitlements for pay, including locality comparability pay, special salary rates, and travel pay will be based on the employee's official duty station. Premium pay entitlements are not affected by a flexiplace agreement, including coverage under the Fair Labor Standards Act, if applicable.

j. Termination of the Flexiplace Agreement: either the employee or the supervisor as defined in the Flexiplace Agreement can terminate the flexiplace agreement. In addition the agreement can be terminated when it is determined that the Flexiplace Agreement is not meeting the operational needs of the Regional Office. Operational needs are defined as those work processes that are necessary for Station Management and/or Division Management to meet the performance goals and objectives as delineated by VA and VBA. Employees will be given at least two (2) weeks notice prior to the termination of the Flexiplace Agreement.

k. VBA Standard Desktops for Flexiplace Participants: Participants accessing VBA applications and veteran data must use VBA-owned and configured equipment. Access will be gained using broadband Internet connections paid for by the participants. Participants are prohibited from using VBA equipment for personal use outside the limits of VA Directive 6001 and VARO Director's memo dated 12-14- 04 on Authorized Use of VA Information Systems. Only VBA employees may use this equipment.

l. Security: The participant must adhere to the security of Government equipment and information as described in the Flexiplace Agreement. Failure to adhere to the agreement may be grounds for disciplinary action and dismissal from the Flexiplace Program. In addition to these requirements:

(1) The government-owned equipment may not be removed from or operated in any other location than the ADS or the official worksite without the written permission of the RO Director,

(2) Maintenance and repairs of hardware will be performed by the vendor at the official worksite on a locally defined schedule. Also, all Government owned PCs are required to be connected to the Internet by Broadband connection (i.e., cable modem) at the employee's expense,

(3) Under no circumstances should users share, with unauthorized personnel, instruction or information regarding how to establish connections with VA private networks and computers,

(4) All applicable rules and guidelines set forth in the RO's Rules of Behavior (contained on the VARO website) must be adhered to at the ADS.

m. Disclosure: Employees must agree to protect VA records from unauthorized disclosure and damage, and will comply with requirements of the Privacy Act of 1974,U.S.C. 552a.

**6. REFERENCES**

VA Handbook 5011
Master Agreement between VA and AFGE
Rules of Behavior for all Systems Users
VPN Rules of Behavior
VBA Letter 20-05-27 dated May 5, 2005
Memorandum of Understanding, National Flexiplace Program, dated June 29, 2007.

**7. RESCISSIONS**

RO Circular No. 00-05-2 dated October 3, 2005. This circular will expire on September 30, 2009.

Barry M. Barker

BARRY M. BARKER
Director

Attachments

Distribution:
"E"

ATTACHMENT A

## Memorandum of Understanding
## National FlexiPlace Program

The following constitutes an agreement between the Department of Veterans Affairs and American Federation Government Employees (AFL-CIO), National VA Council#53 regarding the FlexiPlace Program. This memorandum and the FlexiPlace Program Package are not intended to alter, change, or impair the Master Agreement. This Memorandum of Understanding (MOU) clarifies and standardizes the national procedures for implementing local alternative worksite programs. Other procedures will be handled at the local level.

1. The attached FlexiPlace Program Package is to be used by all Regional Offices for employees who are either working from home or are working from an alternative worksite. Participation in the FlexiPlace Program is on a voluntary basis.

2. Prior to instituting the FlexiPlace Program-

   - Management and the union at the local level will review existing local agreements and negotiate as appropriate to ensure consistency with the attached National FlexiPlace Program package and this MOU.

   - Those regional offices that have existing agreements that do not conflict with this National FlexiPlace Program package or with this MOU may implement the program upon completion of the local review.

   - Management at the local level will communicate local FlexiPlace performance expectations in writing to Bargaining Unit Employees who wish to participate in FlexiPlace.

   - After management has communicated the FlexiPlace performance expectations, employees who desire to participate in the FlexiPlace Program must submit a FlexiPlace Program Work Assignment Request.

   - Nothing in this agreement precludes local impact and implementation bargaining.

3. FlexiPlace days must be full days at the alternative worksite except if the participant is on leave for a portion of the day. Should the employee's supervisor request the participant to attend a function (e.g., training, team meeting, etc) at the official worksite on a FlexiPlace dey, the employee will be required to work the full day at the official worksite.

4. FlexiPlace Program participants are not eligible to work a Compressed Work Schedule (CWS).

5. FlexiPlace Program participants are eligible to work overtime at the alternative worksite when overtime is offered and approved by the supervisor. However, work completed during overtime will not be considered when determining whether the employee has met his/her production standard.

6. Local Unions will be provided copies of all approved FlexiPlace Program Agreements and FlexiPlace Program work assignment requests and approvals. A copy of this MOU and FlexiPlace Package will be provided to the local union president by local management.

| | |
|---|---|
| /s/<br>William Carson | /s/<br>Alberta Franklin |
| For Management | For NVAC |

June 29, 2007
Date

ATTACHMENT B(1)

## GUIDELINES FOR SELECTING FLEXIPLACE PARTICIPANTS

**Identifying the Employee**

- The employee has clearly defined performance standards in accordance with 5 USC Chapter 43.
- The employee must be at journeyman status, have overall performance evaluations equivalent to fully successful or higher, not be on a performance improvement plan, and not have disciplinary action taken against him/her within the last 12 months and/or adverse actions taken against him/her within the last 18 months. Exceptions to the prohibition against adverse actions may be made on a case-by-case basis by the appropriate management official.
- If the employee is denied participation in the FlexiPlace Program, management must provide the employee with the reason for the denial in writing.

  *Note*: Management has the right to control the number of employees who work at an alterative worksite because management is responsible for ensuring that the operational needs at the official worksite are met. Therefore, the criteria for approving a request to work FlexiPlace shall be based on the following: the work is portable, may be performed away from the official worksite either in whole or part, and can be evaluated by the supervisor, and the employee's absence from the worksite would not unduly interrupt facility operation.

**Identifying the Position**

- Management will make determinations on employee's request to participate in the FlexiPlace program based on the criteria of the VA/AFGE Master Agreement.
- The technology needed to perform the work off-site must be available.
- Security of data can be absolutely assured.

  ***Note*: At a minimum, the employee must report to the official worksite one day a week.**

**Attachment: B(2)**

## FlexiPlace Agreement

The following constitutes the terms and conditions of the FlexiPlace Agreement between the employee listed below and the Department of Veterans Affairs Regional Office in St. Petersburg, FL.
**City** **State**

**Employee:**

| MULLIN | AILEEN | |
|---|---|---|
| **Last Name** | **First Name** | **Middle Initial** |
| RVSR | AM | AM 11 |
| **Title** | **Series** | **Grade** |

## Alternative Worksite

The employee's alternative worksite is:

☑ Home
Address: 745 Almanda Way S. St Petersburg FL 33705
Location of home office or work area: home office
Phone: 954-263-1510
Email: aileen.mullin@va.gov alt aileen_mullin@yahoo.com
Fax: 

☐ Other approved alternative worksite
Address: 
Phone: 
Email: 
Fax: 

## Changes to FlexiPlace Arrangement

Employees who participate in the FlexiPlace Program must be available to work at the traditional worksite on FlexiPlace days on an occasional basis if necessitated by work requirements. The affected employee will be given a minimum of 24 hours notice if he/she is to report to the traditional worksite on a FlexiPlace day. Requests by the employee to change his or her scheduled FlexiPlace day in a particular week or biweekly pay period should be accommodated by the supervisor wherever practicable, consistent with mission requirements.

A permanent change in the FlexiPlace arrangement must be reflected in a **new** FlexiPlace Agreement. For example, a new FlexiPlace Agreement must be completed if there has been a change in address/location of the alternative worksite or a change in official duty station. Additionally, **the FlexiPlace Agreement must be reviewed and initialed annually.** The supervisor will retain the original and a copy will be retained at the employee's alternative worksite. To facilitate the annual signing of the FlexiPlace Agreement, VBA Central Office recommends setting the expiration date of the agreement to coincide with the employee's performance appraisal period.

If the division chief determines that an individual FlexiPlace Agreement is not meeting the operational needs of the organization, the agreement may be modified. The affected employee will be given a minimum of two (2) weeks notice prior to any modifications being implemented. This time period may be shortened to one week for bona fide reasons. For information on the termination of a FlexiPlace Agreement, please refer to page 11 of this document.

## FlexiPlace Environment: Work-at-Home

If the FlexiPlace environment is an employee's home, it is the responsibility of the employee to ensure that a proper work environment is maintained.

**Work-at-home participants must complete and sign a safety checklist,** VA Form 0740b, that proclaims the home safe for an official home worksite and to ensure all the requirements to do official work are met in an environment that allows the tasks to be performed safely. The employee agrees to permit access to the home worksite by agency representatives as required, during normal working hours, to repair or maintain Government-furnished equipment and to ensure compliance with the terms of this agreement. The agency representative will provide the employee with a minimum of 24 hours notice (except in emergency situations that require immediate action). If a FlexiPlace employee must bring their equipment to the official duty station for repairs, the agency representative will provide the employee with reasonable advance notice. The FlexiPlace employee may be required to report to the official duty station while the equipment is under repair.

For work-at-home arrangements, **the employee is required to designate one area in the home as the official work** or office area that is suitable for the performance of official Government business. The Government's potential exposure to liability is restricted to this official work or office area for the purposes of FlexiPlace.

FlexiPlace is not a substitute for dependent care.

The Government is not responsible for any operating costs that are associated with the employee using his or her personal residence as an alternative worksite, including home maintenance, insurance, or utilities (e.g., Internet, long distance phone).

## Official Duty Station

The employee's official duty station for such purposes as special salary rates, locality pay adjustments, and travel is ______________________________________________. The official duty station corresponds to that found on the most recent SF 50, Notification of Personnel Action.

## Time and Attendance, Work Performance, and Overtime

Time spent in a FlexiPlace status must be accounted for and reported in the same manner as if the employee reported for duty at the traditional worksite.

The employee is required to meet local FlexiPlace performance expectations as communicated by local management.

Performance Expectations: ______________________________________________.

The participant is required to report to the official duty station at least one day a week and upon the request of his/her supervisor for team meetings, mandatory training sessions, performance appraisals, etc. The supervisor will provide the employee with a minimum of 24 hours notice prior to the meeting.

**The employee agrees to work overtime only when offered and approved by the supervisor in advance.** Employees who work overtime without such prior approval may be subject to administrative or disciplinary action.

## Emergency Dismissal or Closing

Emergency dismissal or closure procedures for employees (including employees at an alternative worksite) in Federal executive agencies are prescribed by OPM on an annual basis. These procedures apply not just in adverse weather conditions (snow emergencies, severe icing conditions, floods, earthquakes, and hurricanes), but in all kinds of emergency situations including air pollution, disruption of power and/or water, and interruption of public transportation. Also included would be situations dictated by the President through the offices of the Department of Homeland Security or other agencies responsible for coordination and control in the case of natural or manmade disasters.

On a day when an employee is scheduled to work at the alternative worksite and their official duty station facility is closed for all or part of a day, the following rules apply:

**Full Day Closing:** The employee is not required to perform work at the alternative worksite.
**Late Openings:** If the employee's official duty station facility opens late, the employee is entitled to the exact amount of excused absence the employee would have received if scheduled to work at the official duty station.
**Late Arrivals and Early Dismissals:** On days when a late arrival or early dismissal occurs, but the facility remains open, the employee is required to perform their full schedule. If a situation arises at the employee's alternative worksite that results in the employee being unable to continue working (e.g., power failure), the supervisor should determine action on a case-by-case basis. Depending on the particular circumstances, supervisors may grant the FlexiPlace participant excused absence, offer the option to take leave or use compensatory time off or credit hours, if applicable, or require the employee to report for work at the traditional worksite.

If the employee knows in advance of a situation that would preclude working at the alternative worksite (e.g. power failure), a change in work schedule, leave, or work at the employee's traditional worksite must be scheduled. If the employee does not timely notify his/her supervisor of a situation that would preclude working at the alternative worksite, the employee may be charged leave accordingly.

## Security and Equipment

**For FlexiPlace assignments, only employees provided with Government-furnished equipment may access sensitive unclassified material, including Privacy Act and "For Official Use Only" data.** The employee is responsible for the security of all official data, protection of any Government-furnished equipment and property, and carrying out the mission of VA at the alternative worksite. Government-furnished equipment must only be used for official duties by the designated employee. The employee must follow the same limited personal use rules that have been established for employees at the official worksite. Family members and friends of the FlexiPlace participant are not authorized to use any Government-furnished equipment. **Additionally, the Government-furnished computer must not be used for personal business or recreation. The participant must avoid any unnecessary stops** (i.e. grocery store, bank) **when transporting Government-furnished equipment from the official duty station to the alternative worksite.**

All FlexiPlace assignments will be cost neutral for the regional office. Employees are responsible for equipment, supplies, and utilities with the exception of the following, if deemed necessary by management:

- Government-Furnished Computer
- File Cabinet with Lock
- Wheeled Bag with Lock
- Paper
- Envelopes
- Pens
- Stapler/Staples
- Two-Hole Punch

The regional office is responsible for the maintenance of all Government-furnished equipment. The employee may be required to bring such equipment into the office for maintenance. **The employee must return all Government-furnished equipment and materials to the agency at the conclusion of FlexiPlace arrangements or at the regional office's request.**

**Terminal Server:** Terminal server allows a user to access applications or data stored on a remote computer over a network connection. When users access applications through terminal server they appear to be running the application locally even though they are actually running remotely. Users must access applications and do all associated functions through terminal service without saving or downloading any information onto their local computer.

**Removable Media:** Removable media, such as CDs, personal storage drives (a.k.a. thumb drives), and DVDs, can contain a large volume of information. VA Directive 6504 requires that such media must be encrypted before it leaves a VA facility. Because removable media has the capability of containing large amounts of information and can be easily misplaced, offices must strictly limit its use to only non-sensitive data. **Therefore, sensitive data should not be placed on removable media.**
***Note***: The vast majority of employees will not require removable media for their jobs because they have access to the terminal server. RBA2000 has been added to terminal server. Therefore, Rating Veteran Service Representatives must not place a version of RBA2000 onto a thumb drive.

**Claims Folders and Working Papers:** A claims folder may be removed from the official worksite if the folder is needed by the participant to perform his/her official duties. Prior to removing the claims folder from the official duty worksite, responsible staff must **update appropriate computer applications** (e.g. COVERS, SHARE) to indicate the new location of the claims folder. Additionally, a log of all claims folders removed from the official duty worksite will be provided to the participant's supervisor at the time of removal. **Claims folders will be at the alternative worksite no more than 5 business days.** When the participant returns the claims folders to the official duty station, the supervisor will verify their return by matching the folders with the appropriate log. The log should be maintained for the duration of the FlexiPlace agreement. At the expiration of the agreement, all logs will be shredded.

**Counseling/Evaluation/Rehabilitation folders, Principal Guardianship Files, Education folders, Loan Guaranty folders, and Insurance folders may not be removed from the official duty worksite.** If the employee needs information contained in these folders to perform his/her official duties, copies must be made. These hardcopy duplicates should be stringently analyzed and any non-pertinent information redacted prior to removal from the official duty station.

**Absolutely no unauthorized person will be allowed access to the claims folder or other documents containing private, sensitive information while the information is under the participant's possession.** The participant must take extra caution when documents are at his/her alternative worksite. The participant must store private, sensitive information in a locked filing cabinet when the information is not being used. The participant must ensure that the filing cabinet can accommodate the sensitive information necessary required for one week's work. The filing cabinet will be provided by VA and must be returned at the termination of the FlexiPlace Agreement. *Cabinet Details*: Cabinets will be purchased locally by the RO and reimbursed by central office. The cabinets must be metal, 18" deep, four-drawer filing cabinets with high sides and a factory-installed lock. The cost of each cabinet must not exceed $120.

***Transportation by Vehicle:*** If the participant is transporting the claims folders, or other identifying documents, by vehicle, the folders must be placed in a locked bag so that no identifying information can be viewed from outside of the vehicle. At no time will the identifying documents leave the participant's control. The participant must lock the bag prior to leaving the official work site and place the bag in the trunk of the vehicle (if available). The participant should travel directly from the official work site to the alternative work site. **The participant must avoid any unnecessary stops** (i.e. grocery store, bank) **when transporting the claims folders**. *Bag Details*: The bag will be provided by VA and must be returned at the termination of the FlexiPlace Agreement. Bags will be purchased locally by the RO and reimbursed by central office. The bag must be at least medium-sized (24") wheeled upright luggage. The cost of the bag must not exceed $100. Multiple bags may need to be purchased for an employee, depending on the volume of work taken home. If the bag does not come with a lock, one must be purchased by the RO.

***Transportation by Mail:*** If the claims folders are shipped to the alternative worksite, they must be shipped through a company that offers package tracking. For additional information on folder shipments, please refer to VBA letter 20-06-44.

**If working papers and other material containing information protected under the Privacy Act are generated during the participant's official duties and are not made a part of the official record, the documents must be shredded.** If a shredder is not available at the alternative worksite, the participant must retain the documents and return them to the official duty station for shredding.

For those employees who spend a large portion of time in their vehicles and make numerous stops in the course of their official duties (e.g. Field Examiners, Vocational Rehabilitation Counselors), any possible steps to secure documents with any identifying information should be taken.

**ISO Briefing: Before a FlexiPlace Agreement is approved by management, the local Information Security Officer (ISO) will educate the employee on security requirements and best practices at the alternative worksite.**

**Disclosure:** The employee agrees to protect Government/VA records from unauthorized disclosure or damage and will comply with the requirements of the Privacy Act of 1974, 5 USC 552a.

## Liability and Injury Compensation

The Government is not liable for damages to the employee's personal or real property while the employee is working at the approved alternative worksite, except to the extent the Government is held liable by the Federal Tort Claims Act.

The employee is covered by the Federal Employees Compensation Act (FECA) when injured or suffering from work-related illnesses while conducting official Government business. The employee agrees to notify the supervisor immediately of any accident or injury that occurs at the alternative worksite while performing official duties and to complete any required forms.

## Standards of Conduct

The employee acknowledges that he/she continues to be bound by the VA standards of conduct while working at the alternative worksite.

## Mileage Savings

The employee estimates that the FlexiPlace arrangement will result in a reduction of approximately 66 miles traveled in commuting per week. 22 miles round trip x 3 days per week = 66

## Termination of the FlexiPlace Agreement

**The FlexiPlace Agreement can be terminated by either the employee or the supervisor by giving advance written notice.** Management may terminate the FlexiPlace Agreement based on the following:

- Employee's failure to adhere to the requirements specified in the FlexiPlace and the Master Agreement,
- Employee's failure to meet the local FlexiPlace performance expectations, and/or
- Conduct resulting in an adverse action or disciplinary action.

Normally, employees will not be removed from participation for a single, minor infraction of FlexiPlace requirements. Supervisors will make a bona fide effort to counsel employees about specific problems before effecting removal. Once again, the employee must be given written notice prior to removal. The notice must contain the reason(s) for removal.

***Note***: The employee may reapply for the FlexiPlace program 30 days after termination, provided that their performance is at least successful/satisfactory.

## Date of Commencement and Expiration

The FlexiPlace arrangement covered by this agreement will commence on March 21, 2012. This agreement becomes null and void one year from the date of commencement or no later than March 20, 2013.

## Signatures:

I have read and understand this agreement:

| | |
|---|---|
| **Employee** | **Date** March 19, 2012 |
| **Information Security Officer** | **Date** March 19, 2012 |
| **Supervisor Endorsement** | **Date** 3/19/12 |
| **Division Chief** ~~Approve/Disapprove~~ | **Date** 3/19/12 |
| **Director** Approve/Disapprove | **Date** 3/20/12 |

Attachment: B(3)

Department of Veterans Affairs

# TELEWORK SELF-CERTIFICATION SAFETY CHECKLIST

## WORK-AT-HOME

1. NAME OF EMPLOYEE (Last, First, Middle Initial): MULLIN, AILEEN

2. NAME OF YOUR TELEWORK COORDINATOR: Wyssee McBurrough

3. HOME ADDRESS (Street, city, state, and ZIP Code): 745 Alamanda Way S. St Petersburg, FL 33705

4. OFFICIAL DUTY STATION ADDRESS (Street, city, state, and ZIP Code): 9500 Bay Pines BLVD ST PETERSBURG FL 33708

5. HOME OFFICE PHONE NUMBER: 954-263-1510

6. OFFICE PHONE NUMBER:

The following checklist is designed to assess the overall safety of your home office. Please answer each question, sign and date. You should also have your supervisor sign and date after you have completed this form.

### 7A. OFFICE ENVIRONMENT

| | Question | YES | NO |
|---|---|---|---|
| 1. | Are temperature, noise, ventilation and lighting levels adequate for maintaining your normal level of job performance? | X | |
| 2. | Are all stairs with four or more steps equipped with handrails? n/A | | |
| 3. | Are all circuit breakers and/or fuses in the electrical panel labeled as to intended service? | X | |
| 4. | Do circuit breakers clearly indicate if they are in the open or closed position? | X | |
| 5. | Is all electrical equipment free of recognized hazards that would cause physical harm (frayed wires, bare conductors, loose wires, flexible wires running through walls, exposed wires to the ceiling)? | X | |
| 6. | Will the building's electrical system permit the grounding of electrical equipment? | X | |
| 7. | Are aisles, doorways, and corners free of obstructions to permit visibility and movement? | X | |
| 8. | Are file cabinets and storage closets arranged so drawers and doors do not open into walkways? | X | |
| 9. | Do chairs have any loose casters (wheels) and are the rungs and legs of the chairs sturdy? | X | |
| 10. | Are the phone lines, electrical cords, and extension wires secured under a desk or alongside a baseboard? | X | |
| 11. | Is the office space neat, clean, and free of excessive amounts of combustibles? | X | |
| 12. | Are floors surfaces clean, dry, level and free of worn or fray seams? | X | |
| 13. | Are carpets well secured to the floor and free of frayed or worn seams? | X | |
| 14. | Is there enough light for reading? | X | |

### 7B. COMPUTER WORKSTATION

| | Question | YES | NO |
|---|---|---|---|
| 1. | Is your chair adjustable? | X | |
| 2. | Do you know how to adjust your chair? | X | |
| 3. | Is your back adequately supported by a backrest? | X | |
| 4. | Are your feet on the floor or fully supported by a footrest? | X | |
| 5. | Are you satisfied with the placement of your VDT and keyboard? | X | |
| 6. | Is it easy to read the text on your screen? | X | |
| 7. | Do you need a document holder? | | X |
| 8. | Do you have enough leg room at your desk? | X | |
| 9. | Is the VDT screen free from noticeable glare? | X | |
| 10. | Is the top of the VDT screen eye level? | X | |
| 11. | Is there space to rest the arms while not keying? | X | |
| 12. | When keying, are your forearms close to parallel with the floor? | X | |
| 13. | Are your wrists fairly straight when keying? | X | |

| 8A. SIGNATURE OF EMPLOYEE | 8B. DATE | 9A. SIGNATURE OF IMMEDIATE SUPERVISOR | 9B. DATE |
|---|---|---|---|
| [signature] | 3/19/2012 | [signature] | 3/19/12 |

VA FORM JAN 2003 **0740b** AdobeFormsDesigner

15

**Attachment: B(4)**

## Information Security Officer Briefing - FlexiPlace Security

All FlexiPlace participants should adhere to the following security guidelines. Questions concerning these guidelines or for further clarification, please contact your local Information Security Officer (ISO).

- When accessing VBA applications and veteran data, FlexiPlace participants must use Government-owned and configured equipment.
- FlexiPlace participants must ensure that the latest virus protection and security patches are installed. A representative from your local Information Technology (IT) office will notify you when new versions are released.
- FlexiPlace participants are prohibited from using Government-owned equipment for personal use.
- Non-VA employees are prohibited from using your Government-owned equipment.
- FlexiPlace participants will not perform maintenance or repairs on Government-owned equipment. Your local ISO will provide you the procedures for maintenance or repairs. The office may require you to bring your Government-owned equipment into your official worksite, send a technician to the alternative worksite, or walk you through the maintenance steps over the phone.
- FlexiPlace participants will not share, with unauthorized personnel, instructions or information regarding how to establish connections with VA networks or computers. Additionally, remote access logon IDs, passwords, or other authentication means used specifically to protect VA information will not be shared.
- Government-owned equipment (e.g. computers, portable storage drives) and hard-copy veteran sensitive information (e.g. claims folders) should be housed and protected in such a way that reduces the risks from environmental threats and hazards, and the opportunities for unauthorized access, use, or removal.
- When not working, FlexiPlace participants should follow "clear desk" practices to reduce the risk of unauthorized access to, loss of, and damage to VA information.
- FlexiPlace participants are responsible for ensuring that VA information, in hard-copy documents or on physical media, under their control is not inadvertently or inappropriately disclosed. This includes at the alternative worksite and during the transportation of documents between the alternative worksite and the official duty station.
- Discuss VBA Rules of Behavior, Remote Access Guidelines, Directive 6001
    - VBA Rules of Behavior is available at http://vbaw.vba.va.gov/BL/20/CIO/security/Specific%20Documents/Rules%20of%20Behavior1%20-%20One-VA.doc.
    - Remote Access Guidelines is available at http://vaww.admin.vpn.va.gov/one-va-vpn/home/VARemoteAccessGuidelines.doc.

VA Directive 6001 is available at http://www.warms.vba.va.gov/admin20/directve/va/6001.doc

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

## I. INTRODUCTION

On April 27, 2012, Alex Cerekwicki, of Apollo Environmental, Inc. conducted an Indoor Air Quality Investigation at the Department of Veterans Affairs, VA Regional Office, 9500 Bay Pines Boulevard, Bay Pines, Florida 33708. This study represents an assessment of air quality conditions within selected locations and included the following air quality parameters: temperature, relative humidity, carbon dioxide, bioaerosol samples and Air-O-Cell samples.

## II. BACKGROUND

This investigation was conducted in response to a request from Mr. Larry Jones, Industrial Hygienist, GEMS Coordinator, U.S. Department of Veterans Affairs, VA Regional Office, 9500 Bay Pines Boulevard, Bay Pines, Florida 33708.

## III. EVALUATED AREAS

Measurements of temperature, relative humidity, carbon dioxide and bioaerosols were made within fourteen (14) selected locations. In addition two (2) outdoor bioaerosol samples were collected for comparison. Also collected were fifteen (15) Air-O-Cell sample for analysis.

## IV. EVALUATION METHOD

During the site visit, measurements for temperature and relative humidity were made using a Bacharach Model 12-7011 Sling Psychrometer. The American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE), recommends that humidity levels be maintained between 40% and 60%, with temperatures ranging from 68 - 78 degrees Fahrenheit.

Carbon dioxide levels were measured with Gastec-Sensidyne carbon dioxide tubes model 2LL. ASHRAE recommends that carbon dioxide levels be maintained below 1000 ppm. Carbon dioxide levels in excess of 1000 ppm, are indicative of inadequate ventilation.

Bioaerosols were collected on malt extract agar plates and sampled for 1 minute at 28.3 liters per minute using a single stage Andersen Impactor. The collection plates were transported to the lab and incubated for five to ten days at room temperature. Bioaerosol testing is limited to the detection of viable, airborne species culturable on the selected media. Bioaerosols are normally reported in colony forming units per

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

cubic meter of air (cfu/m$^3$). Organisms were identified using standard mycological techniques and taxonomic references.

Non-viable particulate sampling was accomplished by the use of Zefon Air-O-Cell cassettes. Samples were collected for a ten minute period, with a flow rate of 15 liters per minute. Samples were stained using Lacto-Phenol Cotton Blue and examined at 600X using a light microscope.

V. TEMPERATURE, RELATIVE HUMIDITY AND CARBON DIOXIDE MEASUREMENTS

| LOCATION | TEMPERATURE DEGREES F (+/-2): | RELATIVE HUMIDITY % (+/-5%): | CARBON DIOXIDE PPM (+/-25%) 1:00: |
|---|---|---|---|
| Sample 1. 222 near Mechanical Room 224F | 72 | 64 | 900 |
| Sample 2. 222 corner near electrical closet 224D | 72 | 64 | 1000 |
| Sample 3. 222 in front of white board | 70 | 67 | 1000 |
| Sample 4. 222 in front near Coach's office | 70 | 67 | 1000 |
| Sample 5. Stream 1 Area near break room, along exterior wall | 71 | 72 | 400 |
| Sample 6. Stream 1 Area, corner window nw section | 73 | 65 | 1100 |
| Sample 7. Stream 1 Area, near Kyle Flannery cube | 73 | 65 | 1300 |
| Sample 8. Stream 3 Area, Katie Claussen cube area | 72 | 60 | 400 |
| Sample 9. Stream 1 Area, near EEO Office 306F | 72 | 71 | 1100 |
| Sample 10. Stream 1 Area, mail and supplies area | 72 | 68 | 1000 |

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| | | | |
|---|---|---|---|
| Sample 11.<br>Stream 3 Area, near<br>Tamara Larsen cube | 72 | 68 | 1100 |
| Sample 12.<br>Stream 3 Area, coffee<br>service area | 73 | 65 | 1000 |
| Sample 13.<br>Stream 3 Area,<br>Rachel Tudor cube | 72 | 68 | 1000 |
| Sample 14.<br>Stream 1 Area, Betsy<br>Fishman's Office | 71 | 67 | 1000 |
| Sample 15.<br>Outside | 77 | 68 | 350 |

## VI. BIOLOGICAL ANALYSES

| Sample/ Location | Test | Species Present....CFUs/plate |
|---|---|---|
| Sample 1.<br>222 near<br>Mechanical Room<br>224F | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0356) | Cladosporium .......... 1<br>Bacteria/Yeast .......... 4<br>Total Count .......... 5<br>**CFUs/m³ .......... 177** |
| Sample 2.<br>222 corner near<br>electrical closet<br>224D | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0357) | Cladosporium .......... 2<br>Total Count .......... 2<br>**CFUs/m³ .......... 71** |
| Sample 3.<br>222 in front of white<br>board | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0358) | Cladosporium .......... 1<br>Total Count .......... 1<br>**CFUs/m³ .......... 35** |
| Sample 4.<br>222 in front near<br>Coach's office | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0359) | No Growth |
| Sample 5.<br>Stream 1 Area near<br>break room, along<br>exterior wall | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0360) | No Growth |
| Sample 6.<br>Stream 1 Area,<br>corner window NW<br>section | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0361) | No Growth |
| Sample 7.<br>Stream 1 Area, near<br>Kyle Flannery cube | ANDERSEN IMPACTION<br>(single stage)<br>(Lab #B12-0362) | No Growth |

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| Sample/ Location | Test | Species Present....CFUs/plate |
|---|---|---|
| Sample 8. Stream 3 Area, Katie Claussen cube | ANDERSEN IMPACTION (single stage) (Lab #B12-0363) | Cladosporium .... 1<br>Bacteria/Yeast .... 1<br>Total Count .... 2<br>**CFUs/m³ .... 71** |
| Sample 9. Stream 1 Area, near EEO Office 306F | ANDERSEN IMPACTION (single stage) (Lab #B12-0364) | No Growth |
| Sample 10. Stream 1 Area, mail and supplies area | ANDERSEN IMPACTION (single stage) (Lab #B12-0365) | Cladosporium .... 1<br>Total Count .... 1<br>**CFUs/m³ .... 35** |
| Sample 11. Stream 3 Area, near Tamara Larsen cube | ANDERSEN IMPACTION (single stage) (Lab #B12-0366) | Cladosporium .... 2<br>Aspergillus niger .... 1<br>Total Count .... 3<br>**CFUs/m³ .... 106** |
| Sample 12. Stream 3 Area, coffee service area | ANDERSEN IMPACTION (single stage) (Lab #B12-0367) | No Growth |
| sample 13. Stream 3 Area, Rachel Tudor cube | ANDERSEN IMPACTION (single stage) (Lab #B12-0368) | No Growth |
| Sample 14. Stream 1 Area, Betsy Fishman's Office | ANDERSEN IMPACTION (single stage) (Lab #B12-0369) | No Growth |
| Sample 15. Outdoors #1 | ANDERSEN IMPACTION (single stage) (Lab #B12-0370) | Cladosporium .... 11<br>Penicillium .... 3<br>Sterile Fungi .... 5<br>Total Count .... 19<br>**CFUs/m³ .... 671** |
| Sample 16. Outdoors #2 | ANDERSEN IMPACTION (single stage) (Lab #B12-0371) | Cladosporium .... 4<br>Penicillium .... 3<br>Aspergillus niger .... 1<br>Sterile Fungi .... 2<br>Total Count .... 10<br>**CFUs/m³ .... 353** |
| FIELD BLANK (Lab #B12-0372) | **NO GROWTH** | |

Aeroallergenic fungi such as *Cladosporium, Penicillium, Aspergillus* and Sterile Fungi, as well as bacterial agents such as bacillus which are all included in the results are routinely isolated in minor quantities from Florida inside air samples. *Cladosporium* has a low potential for causing health problems. It is commonly

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054804<br>Sample 1.<br>222 near Mechanical Room 224F | | 18054586<br>Sample 2.<br>222 corner near electrical closet 224D | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | 1 | 42 | | |
| Penicillium/Aspergillus type | 5 | 203 | | |
| Stachybotrys | | | 1 | 42 |
| Total Counts per meter³ | | 245 | | 42 |

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054602<br>Sample 3.<br>222 in front of white board | | 18054576<br>Sample 4.<br>222 in front near Coach's Office | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | | | 2 | 83 |
| Penicillium/Aspergillus type | 2 | 83 | 3 | 125 |
| Alternaria | | | 1 | 42 |
| Total Counts per meter³ | | 83 | | 250 |

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054658<br>Sample 5.<br>Stream 1 Area near break room, along exterior wall | | 18054599<br>Sample 6.<br>Stream 1 Area, corner window NW section | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | 1 | 42 | 2 | 83 |
| Penicillium/Aspergillus type | 1 | 42 | 7 | 292 |
| Total Counts per meter³ | | 84 | | 375 |

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054825<br>Sample 7.<br>Stream 1 Area, near Kyle Flannery cube | | 18054756<br>Sample 8.<br>Stream 3 Area, Katie Claussen cube area | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | | | 2 | 83 |
| Penicillium/Aspergillus type | 2 | 83 | 7 | 292 |
| Total Counts per meter³ | | 83 | | 375 |

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054569<br>Sample 9.<br>Stream 1 Area, near EEO Office 306F | | 18054639<br>Sample 10.<br>Stream 1 Area, mail and supplies area | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | | | 2 | 83 |
| Penicillium/Aspergillus type | 3 | 125 | 1 | 42 |
| Total Counts per meter³ | | 125 | | 125 |

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054728<br>Sample 11.<br>Stream 3 Area, near Tamara Larsen cube | | 18054618<br>Sample 12.<br>Stream 3 Area, coffee service area | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | | | 1 | 42 |
| Penicillium/Aspergillus type | 1 | 42 | 2 | 83 |
| Alternaria | 1 | 42 | 1 | 42 |
| Total Counts per meter³ | | 84 | | 167 |

encountered mold in normal indoor/outdoor air and substrata samples. *Penicillium* have been reported to be responsible for hypersensitivity pneumonitis. *Aspergillus* has been associated with three distinct illnesses. These include allergic broncho-pulmonary aspergillosis, pulmonary aspergilloma and invasive aspergillosis.

High levels of yeast, Gram positive bacilli and other bacteria could represent potential agents of disease, or manifestations associated with constant exposure to such agents in high quantities.

According to OSHA (OSHA Technical Manual, Chapter 6, Indoor Air Quality Investigation, Part D,3,i,5; CD-ROM. A94-1), contamination indicators for airborne microorganisms are:

- 1000 viable colony forming units in a cubic meter of air

- 1,000,000 fungi per gram of dust or material

- 10,000 bacteria or fungi per milliliter of stagnant water or slime

The AIHA in the Assessment, Remediation, and Post-Remediation Verification of Mold in Buildings states, "In most healthy building environments, the airborne species of mold should be similar to, and the concentrations of mold should be less than the ambient environment outside the building", AIHA Guideline 3, Fairfax, VA., 2004.

## VII. AIR-O-CELL ANALYSES

Air-O-Cell sample (non-viable particulates) was stained using Lacto-Phenol Cotton Blue and examined at 600X using a plain light microscope. Organisms were identified using standard mycological techniques and references.

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054729<br>Sample 13.<br>Stream 3 Area, Rachel Tudor cube | | 18054603<br>Sample 14.<br>Stream 1 Area, near Betsy Fishman's Office | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | 2 | 83 | | |
| Penicillium/Aspergillus type | 3 | 125 | 1 | 42 |
| Curvularia | | | 1 | 42 |
| Total Counts per meter³ | | 208 | | 84 |

| Air-O-Cell Analyses | | | | |
|---|---|---|---|---|
| Sample ID:<br>Location: | 18054570<br>Sample 15.<br>Outside | | | |
| Spore Types Present | Raw Ct. | Spores/m³ | Raw Ct. | Spores/m³ |
| Cladosporium | 23 | 958 | | |
| Penicillium/Aspergillus type | 120 | 5,000 | | |
| Curvularia | 2 | 83 | | |
| Chaetomium | 1 | 42 | | |
| Total Counts per meter³ | | 6,083 | | |

Air-O-Cell values are expressed in counts per cubic meter of air. At present, no government agencies have published guidelines for acceptable concentrations of the parameters measured in Air-O-Cell analyses. General industry guidelines suggest indoor air be equal or less than outdoor air and qualitatively similar.

## VIII. SITE INSPECTION

No microbial growth was observed on any accessible surfaces during the site visit. HVAC return locations were not present within large sections of the ceiling in Stream areas 1 through 3. In addition when HVAC returns were present they were close to HVAC supply ducts and thus may allow for short circuiting of the supply air.

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

## IX. OBSERVATIONS AND FINDINGS

Measurements of carbon dioxide levels were above the ASHRAE recommended standard of 1000 ppm at 4 of the 14 sample locations (see highlighted values in Table V.). Measurements of temperature and relative humidity revealed elevated humidity above the ASHRAE recommended standard of 60% RH or less at 14 of 14 sample locations (see highlighted values in Table V.). Bioaerosol concentrations were less than the outdoor concentration and below the OSHA contamination indicator of 1000 colony-forming units per cubic meter of air at all sample locations. Indoor bioaerosol concentrations and species were within acceptable industry guidelines as compared with the outdoor environment. Species identified are commonly found in outdoor samples. Air-O-Cell concentrations were less indoors and qualitatively similar to outdoors.

## X. RECOMMENDATIONS

1. Provide additional conditioned fresh air to sample locations 6,7,9 and 11 (see highlighted values Table V.). Elevated carbon dioxide levels are indicative of inadequate ventilation. An HVAC PE or Contractor should be consulted to provide changes to the HVAC system to provide adequate ventilation throughout the office areas. Relocation of existing HVAC supplies and returns or additional returns/supplies may be useful in meeting ventilation requirements.

2. The relative humidity should be lowered and maintained at 60% RH of less as per the ASHRAE recommended standard. Elevated humidity levels are uncomfortable and can create environments that are conducive to microbial growth. High humidity levels may allow building components and furnishings to become wet resulting in musty odors. Long term monitoring of the relative humidity levels by use of data recording digital hygrometers is recommended to monitor and verify acceptable humidity levels.

## STATEMENT ON THE USE AND APPLICATION OF STANDARDS QUOTED IN THIS REPORT

1. This indoor air quality assessment has been conducted in accordance with general industry guidelines. This assessment has been prepared for the sole use of the client. Its contents should not be relied upon by other parties without the express written consent of Apollo Environmental, Inc., and the client.

2. The information and conclusions presented in his report are valid only for the circumstances of the sites investigated as described in this report as they existed during the time period of the investigation.

3. This report does not constitute a warranty, guaranty, or representation (a) of the absolute absence of hazardous or otherwise harmful substances or conditions found on the sites or (b) if such substances and conditions are on the sites, that the investigation accurately defined the degree and extent of possible contamination of the sites.

4. None of the information contained herein should be construed as medical advice or a call to action for evacuation. Any decision relative to medical significance should be made by a qualified physician.

5. Apollo Environmental, Inc., evaluated the reasonableness and completeness of all relevant information, but does not assume responsibility for the truth or accuracy of any information provided to Apollo Environmental Inc. by others or for the lack of information that is intentionally, unintentionally, or negligently withheld from Apollo by others. Professional judgement was exercised in gathering and evaluating the information obtained, and Apollo commits itself to the usual care, thoroughness and competence of the industrial hygiene/environmental profession.

   This report is based on information made available at the time of the inspections. The opinions expressed draw upon the background, training and experience of the personnel involved in the investigation. Should additional information become available, Apollo Environmental, Inc., reserves the right to determine the weight and impact, if any, of the new information on our opinions and conclusions, and to revise the opinions and conclusions if necessary and warranted by the discovery of the additional information.

6. After acceptance of this report, if Apollo obtains information that it believes warrants further exploration and development, Apollo will endeavor to provide that information to the Client, but Apollo will not be liable for not doing so.

7. This report is neither a legal opinion nor compliance with any environmental laws or "due diligence inquiry." Only legal counsel retained by the Client is competent to determine the legal implications of information or conclusions contained in this report.

8. Apollo is not responsible for any effect upon the Client or others' legal rights, obligations, or liabilities or for any effect upon the finance ability, marketability, or

value of the property or for the occurrence or non-occurrence of any transaction involving the property based upon the information stated in this report.

9. To achieve the study objectives stated in this report, Apollo based its conclusions on the best information available during the period of the investigation and within the limits prescribed by the Client.

10. Apollo Environmental, Inc., has included in this report standards, threshold limit values, time weighted averages, and other recommended acceptable levels for various indoor air pollutants based on the findings and publications of several U.S. government agencies, independent industrial hygiene organizations and other bodies. These are intended to be used as guidelines to assist in the assessment and control of indoor air quality and should, therefore, be interpreted and applied only for these purposes.

Standards and methods used in this report are taken from the most appropriate references available. Sources quoted are given as acronyms and their full names are given here for easy reference.

The Bioaerosols Committee of the American Conference of Governmental Industrial Hygienists states, "During the growing season, outdoor fungus spore levels routinely range from 1,000-100,000/$m^3$ of air. Indoor levels should be less than one-third of outdoor levels where outdoor air is the only source and should be qualitatively similar" (Burge, H; Chatigny, M.; Morey, P.; Otten, J.; et al; Guidelines for the Assessment and Sampling of Saprophytic Bioaerosols in the Indoor Environment, Applied Industrial Hygiene 5(2):R10, 1987).

The AIHA in the Assessment, Remediation, and Post-Remediation Verification of Mold in Buildings states, "In most healthy building environments, the airborne species of mold should be similar to, and the concentrations of mold should be less than the ambient environment outside the building, AIHA Guideline 3, Fairfax, VA., 2004.

New York City Department of Health & Mental Hygiene, Bureau of Environmental & Occupational Disease Epidemiology: Guidelines on Assessment and Remediation of Fungi in Indoor Environments, 2002.

AIHA: Report of Microbial Growth Task Force, 2001.

AIHA: The Facts About Mold, 2002

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

AIHA: Field Guide for the Determination of Biological Contaminants in Environmental Samples, 2nd ed., Hung, Miller, Dillon, Fairfax, VA, 2005.

Macher, J., Ammann, H.A., Burge, H.A., Milton, D.K., Morey, P.R., Eds.. Bioaerosols: Assessment and Control, ACGIH, Cincinnati, OH, 1999

Morey, P.: Mold Growth in Buildings, Removal and Prevention. In Proceedings of Healthy Buildings. Washington, D.C., 1997.

Biological Risk Engineering Handbook, Infection Control and Decontamination, Boss, M. J. and Day, D. W., Lewis Publishers, Boca Raton, 2003.

IICRC S520: Standard and Reference Guide for Professional Mold Remediation, 1st Ed., December, Vancouver, Wa., USA, 2003.

| | |
|---|---|
| ACGIH: | American Conference of Governmental Industrial Hygienists |
| ASHRAE: | American Society of Heating, Refrigerating and Air Conditioning Engineers |
| EPA: | Environmental Protection Agency |
| NADCA: | National Air Duct Cleaners Association |
| NIOSH: | National Institute for Occupational Safety and Health |
| NYC DOH: | New York City Department of Health- Bureau of Environmental & Occupational Disease Epidemiology |
| OSHA: | Occupational Safety and Health Administration |

Other common and scientific abbreviations are used in this report and their full forms are given below:

| | |
|---|---|
| AHU: | Air Handler Unit |
| ADS: | Atmospheric Dust Spot |
| A/S: | Air Supply |
| ETS: | Environmental Tobacco Smoke |
| HVAC: | Heating, Ventilating and Air Conditioning |
| MH: | Mobile Home |
| O/A: | Outside Air |
| PEL: | Permissible Exposure Level |
| R/A: | Return Air |
| RSP: | Respirable Suspended Particles |
| STEL: | Short Term Exposure Limit |

APOLLO ENVIRONMENTAL, INC.
P.O. Box 239
Gibsonton, Florida 33534
TEL:813-671-3999
FAX:813-677-3422

| | |
|---|---|
| TLV: | Threshold Limit Value |
| TSP: | Total Suspended Particulate |
| TWA: | Time Weighted Average |
| VOCs: | Volatile Organic Compounds |
| | |
| cfm: | cubic feet per minute |
| cfu/$m^3$ | colony forming units per cubic meter |
| ppb: | parts per billion |
| ppm: | parts per million |
| ug/$m^3$ | micrograms per cubic meter |
| mg/$m^3$ | milligrams per cubic meter |

**Department of Veterans Affairs**

# Memorandum

**Date:** November 15, 2012

**From:** Human Resources Manager (25)

**Subj:** EEO Request for Information regarding Aileen Mullin

**To:** Bettie Bookhart
Equal Employment Manager

This memo is in response to the Notice of Partial Acceptance regarding Aileen Mullin. Enclosed please find the following information requested on October 18, 2012 from the Office of Resolution Management (ORM):

1. Between September 2011 and March 2012, the complainant was forced to leave work before the end of her tour at least 25 days because of respiratory issues related to the workplace and; on two occasions VA Police had to assist the complainant out of the building.

We regret that Ms. Mullin was not well, but the agency has no control over an employee's medical condition; medical emergencies are unpredictable. On April 27, 2012, the agency performed an indoor air quality test in the St. Petersburg Regional Office, to include Ms. Mullin's work areas (Room 230 and on the 3rd floor) where the attacks occurred. The report concluded that, "Measurements of carbon dioxide levels were above the ASHRAE recommended levels…in 4 of the 14 sample locations. Measurements of temperature and relative humidity revealed elevated humidity above the ASHRAE recommended standard… at 14 of 14 sample locations. Bioaerosol concentrations were less than the outdoor concentration and below the OSHA contamination indicator of …at all sample locations. Indoor bioaerosol concentrations and species were within acceptable industry guidelines… Air-O-Cell concentrations were less indoors and qualitatively similar to outdoors." Overall, the report was within acceptable guidelines. The safety officials did not find any mold or bacterial magnification or reservoirs. We were told by safety officials that high humidity levels in buildings are common in Florida. They provided some suggestions on how to reduce it. The agency took recommended course of action and will be retesting in 2013. A copy of the April 27, 2012 report and the ♦ leave use summary are enclosed.

2. On January 12, 2012, the complainant was taken to the emergency room by ambulance from her worksite.

Ms. Mullin was taken from work by ambulance on this date. She asked that the ambulance be called. She filed a workers compensation claim (CA-1 Traumatic

C10

Injury Claim) and was placed on paid leave (authorized absence - AA) for the remainder of her shift. A copy of the leave record is attached. The Department of Labor must authorize the release of any OWCP records. A copy of the leave record showing AA as continuation of pay (COP) under OWCP is enclosed.

3. On January 31, 2012, the complainant notified supervisors, HR, and the Unions that her respiratory problems forced her to leave work twice since being reassigned to a different work area.

Ms. Mullin notified the parties by email message dated January 31, 2012, Subject: Status of health issues [enclosed], that she had to leave work for the second time due to illness. Ms. Mullin stated she left the worksite the preceding day [January 30, 2012] in the email dated January 31, 2012. A review of leave records does not show that Ms. Mullin was on approved leave anytime during her shift on January 30, 2012. Employees are expected to follow proper leave procedures by requesting leave and being approved to take leave prior to leaving the worksite, or soon after in emergency situations. That does not appear to have happened in this instance. In that same message, she reiterated her opinion that an air purifier was needed right away. Additionally, workers compensation records were reviewed, and there was no corresponding date that would have resulted in authorized absence on January 30, 2012. A copy of the corresponding leave record and the email are enclosed.

4. On February 2, 2012, the complainant was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.

In the enclosed email from Tab 3 above, Ms. Mullin's requested an air purifier on January 31, 2012. She received the air purifier two business days later on February 2, 2012. In that same email, Ms. Mullin indicated that it would be prudent to get the air purifier without delay. A reasonable person would conclude that Ms. Mullin believed the air purifier would be an effective accommodation. Since we heard nothing further from Ms. Mullin, it was reasonable to assume that the air purifier was still working for her. The Honeywell 16200 air purifier provided to Ms. Mullin on February 2, 2012, is designed to clean the air in a 80 to 100 square feet area; the immediate work area. According to the Environmental Protection Agency(EPA), "Portable air cleaners may be moved from room to room and used when continuous and localized air cleaning is needed." On February 6, 2012, four days after receiving the air purifier, Ms. Mullin stated, "I don't think the air purifier will have the effect we hoped for." She also claimed that she had it running with her fingers crossed in hopes that it would work. Employees are often skeptical when first trying accommodations. Her message indicated she was willing to try it. The reasonable accommodation process is an interactive process, requiring communication from both the affected employee and the agency. Although she raised concerns that it [the air purifier] may not work, at no time did Ms. Mullin notify the Agency that the accommodation was not working, and that we needed to look for another option. If the accommodation was ineffective, it was the employee's responsibility to notify HR or her supervisor that it was not working.

The air purifier provided to Ms. Mullin was never intended to purify the air of the entire facility or any large rooms, but instead the localized area around her work space, as outlined in the EPA statement. According to the Job Accommodation Network (JAN) organization], an air purifier is an acceptable reasonable accommodation for respiratory impairments that are aggravated by environmental triggers.

Room 230 is approximately 696 square feet. A football field is about 57,000 square feet. This type of air purifier is intended to clean the air around the purifier (Mullin's work space), so it doesn't matter if the air purifier is in a small or large area. It is not intended to clean the entire 696 square feet.

The following documents are enclosed: JAN accommodation sheet, Equipment receipt form, and the stats on the Platinum Air Purifier, Model 16200.

5. On March 20, 2012, the complainant was given another ineffective accommodation when she was authorized to work at home three days a week and; on the days the complainant was required to report to the office, she suffered asthma attacks which forced her to leave the building.

At no time did Ms. Mullin report that working from home three days per week was not an effective accommodation. A review of Ms. Mullin's leave record shows that she took leave on eight (8) occasions between the dates of March 20, 2012 and May 11, 2012, while working in the office. However, the leave record also shows that Ms. Mullin took leave on eleven (11) occasions while working at home (not in the office) during the same period of time. Therefore, a reasonable person would conclude that the reason for her leave was not limited to the work environment. Ms. Mullin did not notify the Agency that the accommodation was not working, so we could look for another option. If the accommodation was not effective, it was the employee's responsibility to notify HR or her supervisor. The reasonable accommodation approval form, the Flexiplace policy, and the work at home agreement are enclosed.

6. On May 3, 2012, the complainant was informed that her request for advanced sick leave was denied. **NO DOCUMENTATION REQUIRED.**

7. On May 3, 2012, the complainant was informed that there were problems with her request of March 2012 for leave under the Family Medical Leave Act (FMLA).

On March 9, 2012, Ms. Mullin submitted medical documentation for FMLA. The agency reviewed her medical evidence to determine eligibility. The approval was not related to the cancer Ms. Mullin self-disclosed in her EEO complaint. On March 14, 2012, three business days later, Ms. Mullin received written notice of approval to use up to 480 hours of leave under FMLA beginning on March 9, 2012 and ending on March 8, 2013. On March 23, 2012, additional medical evidence related to cancer was submitted to Human Resources. Ms. Mullin received a second notice dated April 9, 2012 indicating approval for FMLA related to her cancer was also

approved. Although she submitted new medical documentation for cancer, her existing FMLA entitlement was not interrupted. In addition, Ms. Mullin was only entitled to 480 hours total for both conditions, in the 12 month period. We are not sure what Ms. Mullin is referring to as "problems." The agency will need additional clarification in order to respond further. Enclosed find a copy of her FMLA package for March through May 2012.

8. On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a "horrible" comment about the complainant's medical condition.

The agency is not aware of any "horrible" comment that Ms. Wax made regarding Ms. Mullin's medical condition. The agency will need additional information in order to respond.

9. On May 31, 2012, HR officials failed to provide the complainant's Union representative with a complete records of information that was needed to assist the complainant with her reasonable accommodation request and the response to the information request was delayed.

The agency furnished, to the best of its availability that which was reasonably available and necessary for full and proper discussion. This request required extensive research and inter-department responses. Human Resources looked through numerous records in order to identify the 379 documents provided on May 31, 2012. Some records are stored in alphabetical order, and others are filed by fiscal year, date of injury, or type of action. In addition, every single page had to be reviewed for PII, copied and redacted as appropriate; all of this was done in addition to our normal daily duties. Six personally identifiable records were found. It is important to point out that Ms. Mullin already had two approved and ongoing reasonable accommodations at the time of this information request. Ms. Mullin indicated in her complaint that this information was needed to assist with her reasonable accommodation request and that the delay of two days was somehow harmful. No additional reasonable accommodation requests were received by Ms. Mullin after AFGE received the documents on May 31, 2012; therefore, the two extra days from May 28, 2012 *[the date AFGE asked for the documents to be delivered]* and May 31, 2012 *[the actual date of receipt]* did not cause any harm. Enclosed find a list of the files copied and presented to AFGE, as well as a copy of the information request.

10. On June 5, 2012, while the complainant was battling cancer, BW sent her a lengthy e-mail instead of sending the e-mail to her representative.

Ms. Mullin sent an email to her coach, copying Casey Crump, a Union Steward, but <u>not</u> Ms. Mullin's designated union representative, Valorie Reilly. Ms. Mullin designated Ms. Reilly as her designated union representative in writing on March 26, 2012.. This email asked several HR related questions. Mr. Crump forwarded Ms. Mullin's email to Ms. Kerrie Witty, Director, who forwarded the email to Bonnie Wax, the Human Resources Manager, for a response. Ms. Wax responded to Ms. Mullin's

email, trying to answer Ms. Mullin's questions and give her as much assistance as possible. The agency remains uncertain as to why the employee did not want a response from Human Resources when the content of the questions were clearly Human Resources related. Although we are sympathetic that Ms. Mullin was battling cancer, nothing prevents a management official from responding to an employee directly, especially since Ms. Mullin's official designated representative, Ms. Reilly, was copied on Ms. Wax's response. Human Resources had no reason to believe communication with Ms. Mullin was off limits. Human Resources staff routinely responds to employee inquiries. In addition, there was nothing offensive or inappropriate about the response. The content of the email was professional and pertinent to the issues raised and it was an attempt to assist Ms. Mullin.

It was and continues to be very confusing as to who is Ms. Mullin's representative at any given time. When Ms. Mullin's emailed her coach on May 30, 2012, Ms. Reilly was Ms. Mullin's official written designated AFGE representative; however, Ms. Mullin copied Casey Crump, another steward, on her email to her coach, not Ms. Reilly. Further examples of the confusion regarding Ms. Mullin's representative include an email Ms. Mullin's sent on September 13, 2012 when Ms. Mullin's replied to an email from Scotty Riggs of the HR Center in Jackson, Mississippi, and she copied Philip Works, Tamanique Clarke, Virginia Lopez, Cynthia Moore, Valorie Reilly, Keith Pryor, John Smith, Casey Crump, Sandy Smith, Jerry Huffman, kellee@afge.org, Ulyssee McBurrough, and Theodore Smith. The email contained very confidential medical information, yet Ms. Mullin's thought it appropriate to send it to 14 other people, 6 of whom are union stewards.

A copy of the string of emails related to this complaint, and Ms. Mullin's designation of representation forms for Carol Allard (first) and Valorie Reilly (second), are enclosed.

11. On June 10, 2012, during a meeting, Regional Director Kerry Witty (KW) stated BW felt that she was being targeted by the Union; that she approved BW's e-mail of June 5,2012, and she could not understand why the complainant had a problem with it and; that she did not support granting accommodations.

Ms. Witty agreed to meet with Ms. Mullin on June 10, 2012 per Ms. Mullin's request to try to facilitate communication between the parties. Ms. Witty's comment was in response to Ms. Mullin's repeated complaints during that meeting regarding Ms. Wax. Having come directly from the union office, it appeared to Ms. Witty that they had discussed Ms. Wax at length and therefore Ms. Wax was the focal point of the meeting rather than Ms. Mullin. Ms. Witty was trying to direct the conversation away from Ms. Wax towards how she could help Ms. Mullin. Ms. Witty did state that she reviewed the e-mail Ms. Wax sent to Ms. Mullins in advance and agreed it was appropriate for her to send as Ms. Mullin's e-mail had questions and issues pertaining to HR and Ms. Wax is the HR Manager and appropriate person to respond. There were no comments made as to Ms. Witty's position on granting accommodations. In fact, Ms. Witty has granted numerous appropriate accommodations during her tenure as Director of the St. Petersburg Regional

Office, to include an accommodation for Ms. Mullin which was granted previous to the June 10, 2012 meeting.

12. From June 14, 2012 - June 29,2012, the complainant's request for leave under the leave transfer was delayed.

There was no delay in Ms. Mullin's request for Voluntary Leave Transfer Program (VLTP) from June 14, 2012 to June 29, 2012. Ms. Mullin submitted an application for the Voluntary Leave Transfer Program (VLTP) on Friday, June 14, 2012. Her VLTP application was processed and approved on Wednesday, June 20, 2012, which is four business days, and well within the 10 calendar days (excluding Saturdays, Sundays, and legal public holidays) standard for processing it. Moreover, Ms. Mullin had already been approved to be on the VLTP program on May 9, 2012, and as of today, has not been removed from the program, or had her ability to receive donations interrupted. She is and has been eligible to receive donations without interruptions since May 9, 2012. Ms. Mullin continued to submit additional applications in hopes the HR Office would publish her eligibility additional times to the employee population, to obtain additional donations. However, the responsibility to obtain donations is the employee's responsibility. The agency Is not required to publish participants as indicated in VA Handbook 5011 (enclosed), below:

VA HANDBOOK 5011, PART III, CHAPTER 2, Section 20(e)(4)(c) *The leave recipient (or the personal representative who made application on behalf of the leave recipient) is responsible for notifying those employees who may wish to be leave donors of the approval of the application.*

Pertinent portions [tabbed] of VA Handbook 5011 related to the VLTP program, copies of Ms. Mullin's VLTP approvals dated May 10, 2012 and June 20, 2012, and copies of donations received.

13. On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, the complainant's advanced sick leave was not process-+ed. **NO DOCUMENTATION REQUIRED.**

14. On August 16, 201 2, the complainant's request for the leave under the leave transfer program was not processed.

The Agency has no record of an OPM Form 630 – Application to Become a Leave Recipient Under the Voluntary Leave Transfer Program, dated August 16, 2012, to support Ms. Mullin's request. Ms. Mullin was approved to be on the leave transfer program from May 9, 2012 through November 9, 2012. Therefore, another application was not needed, because she was already in the program . Ms. Mullin wanted the Agency to send out multiple emails on her behalf. This is not our standard practice. The Agency sends one (1) email out to the employees. Then the employee is responsible for soliciting their own donations as stated in Handbook 5011, Chapter 2, Part 3, Section (e) paragraph (4)(c).

*"(c) The leave recipient (or the personal representative who made application on behalf of the leave recipient) is responsible for notifying those employees who may wish to be leave donors of the approval of the application."*

In an effort to help Ms. Mullin, at least three (3) emails were sent out on her behalf, so she actually received more assistance than other employees. The last OPM Form 630 received by the Agency is dated September 19, 2012. This request extended Ms. Mullin's approval to be on the leave transfer program through November 25, 2012.

A copy of the excerpt from VA Handbook 5011, VLTP, is enclosed in Tab 12. Tab 14 contains a copy of the September 21, 2012, VLTP approval memo, her application for VLTP dated 9/19/12, and leave donations received.

15. On August 31, 2012, after being advised that the Office of Personnel Management (OPM) was conducting a security investigation on the complainant, HR failed to inform OPM that she was on extended medical leave.

Ms. Mullin was selected as a VETERANS SERVICE REP (RATING) on May 8, 2011, which requires a Minimum Background Investigation (MBI) background investigation. The background investigation is a condition of employment and all applicants of vacancy 2011-127-SP, which Ms. Mullin was selected under, were informed of the following requirement:

*Position Sensitivity: This position has a position sensitivity level of Public Trust-Moderate Risk. Selections made under this announcement are conditioned upon favorable adjudication of a Minimum Background Investigation (MBI) per Handbook 0710. An investigation will be conducted after the effective date of the selection. ...Persons receiving unfavorable adjudication are ineligible to remain in this position.*

HR Center (HRC), Jackson, Mississippi, enrolls employee's in eQIP, the portal for entering background information. The HRC does not check with Human Resources or management at the St. Petersburg Regional Office prior to sending emails to employees regarding the status of their background. The St. Petersburg Regional Office has little involvement with the eQIP process and the actual background itself, which is handled by the Office of Personnel Management (OPM). The agency had no way to influence the timing of the background, nor do we have the ability to extend or change it due to illness. Since a background is a condition of employment, failure to complete it within the required timelines can result in removal from the position. A condition of employment is a REQUIREMENT. It is unfortunate that she got sick, but it does not change or delay the requirement. A condition of employee is a requirement that must be met to stay in the position.

HRC Jackson emailed Ms. Mullin on August 31, 2012 instructing her to complete her eQIP within 10 days. On September 10, 2012 they sent a reminder to Ms. Mullin and gave her extension to complete the questionnaire by September 12, 2012. On

September 13, 2012, they once again gave her an extension to complete the eQIP by September 14, 2012. Ms. Mullin chose to reveal her personal medical information to HRC Jackson on September 13, 2012 when she emailed Scotty Riggs (and copied 14 others): "Per our conversation, I have breast cancer and have been on continuous medical leave since the 20th of June." A condition of employee is a requirement that must be met to stay in the position.

A copy of the email directions for eQIP dated August 31, 2012, a reminder notice sent on September 10, 2012, another notice sent on September 13, 2012, Ms. Mullin's response on September 13, 2012, and another correction was sent to Ms. Mullin on October 15, 2012.

16. On September 17, 2012, the complainant discovered that she was removed from the web-based training system.

When an employee is in a LWOP status for more than 31 days, their TMS account can be deactivated. If it is not deactivated, constant reminders are sent to the supervisors' and employee's email box.

If an employee is on extended leave for several weeks or months, such as for a serious illness or Military leave, the employee's training requirements are on hold during their absence. Once the employee returns to work the account is activated and the employee completes all required training.

☑ A. Organizational chart for the organizational unit in which the complainant was assigned before and after the action in question.

Enclosed.

☑ B. Statistical breakdown of the organizational unit involved in the action in question as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s) as checked above.

Enclosed.

☑ C. With regard to events 6, 13 and 14, summary data on leave use by employee's in complainants section who are subordinates of the Responding Management Official (RMO) going back two years from the date of the action as follows:

Enclosed.

☑ D. For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) affected, action taken based on leave use, date of action, and name position, and EEO category(s) of the agency official(s) who initiated the action.

Enclosed.

√ E. For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) who requested leave, if the leave was granted or denied, reason for leave denial and name, position, and EEO category(s) of the agency official(s) effecting the decision. Complainant's leave request(s) as well as leave requests for comparable employees.

Enclosed.

√ F. Documentation of any counseling provided concerning complainant's leave usage or leave usage pattern for complainant and subordinate employees comparable to complainant.

Enclosed.

√ G. Complainant's time and attendance or leave records for the two-year period prior to the action in question .

Enclosed.

√ H. Pertinent regulatory guidelines and local policies and procedures concerning leave administration in' effect at the time of the action in question.

Enclosed.

√ I. Pertinent article(s) of the negotiated union agreement, if applicable.

The following articles are pertinent to this complaint: Article 20, Telework; Article 24, Official Records; Article 29, Safety, Health, and Environment; Article 30, Occupation Health; Article 35, Time and Leave; Article 41, Workers compensation.

√ J. Relevant documentation concerning events 1 - 5, 7 - 12, 15 and 16.

Enclosed.

The enclosed documents may contain personally identifiable information. We request that ORM redact accordingly to ensure that confidential information is protected. If you require any further information, please contact me or Cynthia Moore, Human Resources Specialist, at extension 7349.

BONNIE WAX

**Department of Veterans Affairs**

# Memorandum

Date: May 30, 2012

From: Human Resources Manager

Subj: Request for All Records Personally Identifiable to Aileen Mullin

To: Valorie Reilly, President, AFGE Local 1594

1. This memorandum is in response to the AFGE document, dated and received by management on May 16, 2012, which requests the following information:

   a. A copy of all records personally identifiable to Ms. Mullin.
   **Management provides the following:**
   - **Ms. Mullin's electronic Official Personnel Folder (eOPF).**
   - **Ms. Mullin's extended folder maintained by the Veteran Service Center Division.**
   - **Ms. Mullin's facility personnel folder.**
   - **Ms. Mullin's Voluntary Leave Transfer Program (VLTP) Folder.**
   - **Ms. Mullin's Employee Medical Folder (EMF).**
   - **Ms. Mullin's reasonable accommodation folder.**

2. Please contact me at extension 7271, or Cynthia Moore, Human Resources Specialist, at extension 7349, for clarification, questions or concerns.

BONNIE WAX

HR COPY

RECEIVED BY: Vali Re

DATE: 5/31/12

AMERICAN FEDERATION of GOVERNMENT EMPLOYEES
JUSTICE FRATERNITY PROGRESS
AFFILIATED WITH AFL-CIO

**American Federation of Government Employees, AFL-CIO**

P.O. Box 1437
St. Petersburg, FL 33731

Telephone (727) 319-7788
Fax (727) 319-7760
Email: NRVReilly@aol.com

Date: May 16, 2012

To: Kerrie Witty, Director

From: Valorie Reilly, AFGE

Subj.: Request for Official Records and Files

As Ms. Aileen Mullin's representative, I am hereby requesting a copy of all records personally identifiable to this employee. This request includes all records such as medical records, supervisory notes and/or extended any personnel file, etc.

A designee form was provided on March 26, 2012 and should be on record with your office.

These records are requested to be provided by May 29, 2012. If you are unable to provide the requested records by this time, please provide the date that such records will be available.

Thank you for your cooperation.

Valorie Reilly
President
AFGE Local 1594

To Do For All That Which None Can Do For Oneself

American Federation of Government Employees
*AFFILIATED WITH AFL-CIO*
LOCAL 1594
POST OFFICE BOX 1437
ST. PETERSBURG, FL 33731
(727) 319-5934 FAX: (727) 319-7784

**AFGE Representative Designee Form**

I, Aileen M hereby designate the American Federation of Government Employees (AFGE) Local 1594 and the following AFGE representative Carol Allard to act in my behalf upon an any personnel action; investigation; requesting copies of my personal folder, extended file, supervisory notes and/or anything work-related that pertains to me.

Signature of Employee: [signature] Date: 1/10/2012

**Affirmation of AFGE or Representative**

I, CAROLYN ALLARD, being a duly appointed Officer/Steward of AFGE Local 1594 do hereby agree to adhere to the Privacy Act while investigating and/or representing Aileen Mullin complaint of grievance.

To include medical information
Aileen Mullin 1/10/2012

AFGE: Good Government We Are Ready

**American Federation of Government Employees**
AFFILIATED WITH AFL-CIO
LOCAL 1594
POST OFFICE BOX 1437
ST. PETERSBURG, FL 33731
(727) 319-5934 FAX:(727) 319-7784

## AFGE Representative Designee Form

I, Aileen Mullin hereby designate the American Federation of Government Employees (AFGE) Local 1594 and the AFGE representative Valerie Riles to act in my behalf upon any personnel action; investigation; request copies of my personnel folder, extended file, supervisory notes and/or anything work-related that pertains to me. In addition, I specifically delegate to my representative the authority access all medical/health information on my behalf.

This authorization will remain in effect until I cancel it in writing.

Signature of Employee: [signature]

Date: March 26, 2012

## Affirmation of AFGE or Representative

I, Valerie Riles, being a duly appointed Officer/Steward of AFGE Local 1594 do hereby agree to adhere to the Privacy Act while investigating and/or representing Aileen Mullin complaint of grievance.

**Clarke, Tamanique, VBASPT**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **nt:** | Tuesday, January 31, 2012 7:41 AM |
| **ı o:** | Brown, Larry, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT; Clarke, Tamanique, VBASPT; Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT |
| **Subject:** | Status of heath issues |
| **Signed By:** | aileen.mullin@va.gov |

Good morning All,

Yesterday, for the second time since the move to VBIT1, the severity of my symptoms reached a level that I had to leave work. (Symptoms included pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest.) Last week Tammi mentioned attempting to get an air purifier for my workstation. I think it would be a prudent to do so without delay.

Thank you for your support,

Aileen

Note: Tammie, the Workmens' Comp form is complete and is being sent for review. As soon as its return I'll get it to you.

**Subject:** Fw: Essential Function: In-Office Process

**From:** aileen_mullin@

**To:** mjsflorida@

**Date:** Tuesday, February 5, 2013 12:16 PM

Sent via BlackBerry by AT&T

---

**From:** "Clarke, Tamanique, VBASPT" <Tamanique.Clarke2@va.gov>
**Date:** Tue, 5 Feb 2013 12:09:26 -0500
**To:** <aileen_mullin@
**Subject:** Essential Function: In-Office Process

Hi Aileen,

Below is the information you requested. I understand that you feel these tasks are minimal and can be done by someone else, however collectively these tasks take a significant amount of time to complete. It's the whole in-office process that is considered an essential function of the job. Based on our phone conversation, it seems that there are certain tasks of the in-office process that you are seeking assistance with. If you want we can talk about it in our next meeting or you can reply back with what it is that you are seeking assistance with.

Upon returning to the building, files must be covered back into the building. Next, the printed rating decisions must be retrieved from the work at home printer location along with any mail from the IPC. Any additional documents such as CAPRI records must be printed and placed into the files when in the office. The printed documents are then reviewed and corrections/misprints are made while in the office. Any associated mail is also added to the files. Your files must be taken to 2nd floor for 2nd signature review to determine if corrections are needed. Corrections must be done while in the building. If no corrections are needed, the file is printed blue at that time. Any files printed blue need to be signed dated and sent back for 2nd signature reviews and delivered to the POA table for Service Officer review. Examination requests must be entered into Capri, and buck slips must be added to the file. The file needs to be covered out to the examination facility and delivered to the IPC. Next, more files are gathered and covered out to yourself to take home. The whole in-office file process can take the average work at home rating specialist 3 to 5 hours or more depending on the number of files to be processed and is an essential function of your job.

Tracy Newman

May 8, 2012

RE: Aileen Mullin

To Whom It May Concern,

I am writing in regards of the health of Aileen Mullin. I have known Aileen for eight years. She began teaching down the hall from me at Meadowlawn Middle school, where I also worked, in 2004. We have been close friends since then.

Aileen has always been healthy, other than a pet dander allergy. As a matter of fact, her breathing was so good that she taught me how to snorkel on vacation in 2006. She was always well until 2008-2009 when she left Meadowlawn to work at the Bay Pines VA, in Bay Pines, FL. She has been sick with respiratory problems since then. I remember very clearly that when she came to my wedding in August of 2009 that it had been the first time I had seen her in several months, due to her being continually sick for those months.

Aileen has been sick since then, until recently, when she began to work from home. I went to her house last month (April 2012) to help her clean out her porch and I was amazed at how well she was, how capable she was of moving furniture and cleaning out boxes. I hadn't seen her healthy enough to do that since before she had gotten sick, since 2009. Working from home has been a wonderful way for her body to heal and grow strong again.

It is clear to an observer that Aileen's health is related to her working in the building at Bay Pines. She was healthy before she worked there and has been healthy since she has stopped working in that building.

Sincerely,

Tracy Newman

C-12

April 21, 2012

To whom it may concern,

I was asked to write a letter on behalf of my co-worker Aileen Mullen. I have known Aileen professionally for the past two years, as we have worked together as Veterans Service Representatives on a Pre-Decision team and now as Raters on a Decision team with the Department of Veterans Affairs, St Petersburg, FL Regional Office.

I knew that Aileen could hardly speak, more of what I'd classify as a raspy whisper, when we spoke at work, but never really knew exactly what the cause of this was. It wasn't until we were both selected a Rating Veterans Service Representatives (RVSR), and worked together more closely, that I got to see first hand the nature of Aileen's disability. We trained together for one month in a classroom on the second floor of this building prior to attending eight weeks of training (from July 10, 2012 to September 1, 2012) at the Veterans Benefits Academy in Baltimore, MD. It was in Baltimore that I actually heard Aileen speak in a normal tone of voice, without the obvious pain that I witnessed in all of our previous encounters since we began working together.

Upon our return to work in the St Petersburg Regional Office, Aileen had to be removed from our classroom on the second floor after at least two occasions that I'm aware of that her breathing became so labored that she had to be rushed to the hospital. In my opinion, management has done everything possible to accommodate Aileen's disability, placing her desk nearest to ventilation, allowing her every opportunity to leave her work area to go outside and breath in fresh air, and even purchasing a clean air machine for her desk, but still I've witnessed on many occasions that Aileen become too ill to remain at work.

Aileen and I studied together at a local restaurant in the beginning of March 2012, along with several other co-workers, for a certification test for Rating Veterans Service Representative. Although still suffering some lingering effects of her illness caused by the mold spores in this building, she was able to speak in a reasonably normal tone, something I haven't witnessed from Ms Mullen since we were in training in Baltimore.

I'd like to add that Aileen Mullen is not the only person suffering from the mold in this building; there are many others, to varying degrees, that are effected by these mold spores and sick building.

Maurice J Nadeau

Maurice Joseph Nadeau

Work phone number: 727-319-5800, ext 6674

April 25, 2012

To Whom It May Concern:

I have known Aileen Mullin for a little over three years. When she began her employment with the Department of Veterans Affairs, she appeared to be very healthy. As time went on, however, I witnessed her decline in health to the point where she could no longer speak and seemed to have almost permanent laryngitis. I witnessed her go to numerous doctors in search of a resolution for her ailments. I also came to notice that when she had a long weekend or had gone on vacation, her health seemed to return, leading me to the conclusion that something in the building was making her very sick. I saw the pattern repeated over and over- she would work during the week, and by mid-week, she was ill and couldn't speak again. After the weekend away from the building, she would be better, until the cycle began again. Numerous times she has had to leave work early, too sick to continue working in the building.

To further support the issue that the building is causing Aileen to be sick, I was with her for 2 months in Baltimore training for the position of rater. During this time, I did not see the types of ailments she had been routinely suffering from even once. She seemed healthy for the first time in a long time. As soon as we returned to our office in St Petersburg, her illnesses quickly returned.

Sincerely,

Nina Bacigalupi

Nina Bacigalupi
RVSR Decision 3
Dept of Veterans Affairs

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Aileen Mullin [aileen_mullin@yahoo.com] |
| **Sent:** | Sunday, September 01, 2013 11:19 AM |
| **To:** | Henley, John (ORM) |
| **Subject:** | witness statements |
| **Attachments:** | Letter on behalf of Aileen Mullin Becky.docx; Letter on behalf of Aileen Mullin Connie.docx; Letter on behalf of Aileen Mullin Dr Kennedy.docx; Letter on behalf of Aileen Mullin Peggy.pdf |

Good morning John,

Can these statements be added to my file?

I have been acquainted with Aileen Mullin for more than 15+ years. We developed a close friendship over the years and we spent a great deal of time together when she lived in the Fort Lauderdale area.

During the early years of our friendship, Aileen was in school completing her degree while working in the hospitality industry. She was active in the sailing community and volunteered her time at local sailing regattas and events. She led the South Florida relief efforts for the Bahamas following Hurricane Floyd. She and I cemented our friendship when we took turns caring for a close friend dying from Melanoma when he had no family to care for him.

Following her graduation from college, Aileen took a job teaching school for ESOL and "at risk" students. She was a fierce advocate for her students who were faced daily with the toughest hurdles life could offer. She was equally fierce in advocating on behalf of herself and her fellow teachers in the constant bombardment and battles in school politics, unions and budget cuts.

During these years, Aileen dealt with many stresses, personally and professionally, yet she kept a sunny and positive attitude towards life. She was healthy and active, rarely missed an opportunity to go sailing and racing. Aileen suffers from asthma and was usually well controlled. I witnessed her need for asthma medication only when she was exposed to cat dander, cigarette smoke and dusty, moldy environments. As a nurse of 35 years, I can attest to this being a standard problem for people who are allergic/asthmatics.

Aileen moved to St Petersburg a few years ago for a job change and to be nearer to family. I visited her several times, stayed as a guest in her home and I found her happy, healthy and still teaching. She was looking for a career change I recall when she was hired at the VA; she was thrilled to be able to use her education and to embark on a new career path.

Aileen took to her new job with the same joy and vigor that she applied to teaching. She loved being an advocate for veterans and fought fiercely to provide them the services they so desperately needed.

It was soon after beginning the job with the VA that I began to notice in my conversations with Aileen she was having frequent, sudden onset respiratory problems. She would improve on the weekends and by mid work week, was wheezing and needing constant doses of asthma meds. She called to ask my medical recommendations and I strongly urged her to be reevaluated by her doctor.

I questioned way back then if her work environment was exposing her to allergens. She related to me then that her symptoms got progressively worse during the work week and she was often unable to stay at work the entire day. She was worried that too much time off from work would put her job at risk.

I maintained regular contact with Aileen as she began a merry go round of doctor visits. Seeing Allergists, Internists, Infectious Disease specialists, always with new medicines prescribed and more tests ordered. She got sicker and sicker, to the point she was unable to speak on the phone to me because she was so hoarse from coughing and was unable to move enough air to converse.

I was so very afraid and worried for her. She became frustrated, depressed and angry that there were no answers or cures. She worked very hard to continue to manage at work. Supervisors were unsympathetic to her illness, made no attempts to listen, to accommodate or to address her concerns. Thus began what looked like a bureaucratic and systematic effort by her supervisors to make her work environment even more difficult in any way that they could. She would follow the rules and they would change the rules or ignore the rules as they saw fit.

Now, I remind you again, I have spent the past 35 years as a nurse and I have witnessed first- hand the devastations of stress and illness on patients and their families. The lack of empathy and understanding by the VA towards Aileen Mullin through the trials of her illness and the **doubled down** efforts to further withhold that empathy, understanding and compassion, when she was subsequently diagnosed and treated for breast cancer, was beyond comprehension.

Ms. Aileen Mullin is a fighter. She fought to raise her child, she fought for a dying friend, fought for her students, fought for her Vets, fought for her life and now she is fighting to keep her job and throughout it all she has fought to keep her dignity and humanity.

This is the kind of human being we should all aspire to be. The VA has an employee asset worth fighting for and I hope in some small way my letter opens the eyes of those who will make the important decisions.

Sincerely,

Rebecca L. Castellano, RN

VP of Operations and Sales

Invenia Technologies Medical Division

becky@inveniatech.com

Mobile:

invenia technologies MEDICAL DIVISION

I am providing this correspondence to shed some light to what I have experience with Aileen's journey in seeking appropriate accommodations for her breathing condition she experienced while working in the St Petersburg Regional Office.

Aileen and I were new hires in February 2009 where we were part of the Challenge 2009 training class. I do not remember all the details but the new hires were assigned duty in the file warehouse before official training began but each day several individuals were unable to work in the warehouse, including Aileen who was not able to complete that duty assignment for reason I am not privilege to, however, reported later, the warehouse was known for being a dust bowl and many individuals experience a great deal of sneezing while performing their duties. March 2009 the Challenge class was sent to Baltimore, Maryland for training. Aileen and I were in the same training class and we had lunch together most days. We began to share our lives during the lunch breaks and became friends, along with Mary Jo and Jo Russell who was in the same training class. We returned back from training to St Petersburg and Aileen sat behind me in one of the training rooms in St Petersburg Regional Office. On occasion Aileen stated to me and Mary Jo she was not feeling well and uncomfortable in the room. We noticed Jo Russell began missing days from work and would tell us later that she missed work because she was unable to breathe well in the classroom or building. Jo had told us she had submitted a report to the AFGE and the Regional Office staff about the quality of air in the building. Months later Jo resigned because she could no longer breathe in the building and again told Aileen, Mary Jo and I she had filed a report to AFGE, safety, and OSHA reporting the work environment was toxic for all employees. Note: I have stayed in touch with Jo since her resignation and she is employed and says is doing fine and in good spirits.

January 2010 the Challenge training class of 2009 was assigned telephone duty. We had to perform a 90 day tour of duty in one of the training rooms at the St. Petersburg Regional office that housed the National Call Center for Florida. Aileen, as I recall, after a few days was unable to stay in the room because she was experiencing difficulty breathing. She was transferred to the 3rd floor to perform other work related tasks.

As I recall, some months later, Aileen would tell me and Mary Jo that she was having difficulty breathing in the building and stated she was going to have a doctor examine her to learn the cause of the breathing condition or if she was allergic to something. I do not recall the diagnosis but she said something in the building was making her have trouble breathing. Aileen, Mary Jo and I would go outside for lunch, where she stated she felt much better and after returning back into the building she would begin to have trouble breathing often times having to go home. After several doctor's appointments, Aileen told us the doctor detected cancer in the surrounding breast area and thus began her journey in becoming a cancer survivor while working on her respritorary condition.

During her cancer treatments and trying to get her breathing stabilized, Aileen would tell Mary Jo and I how the staff at the regional office had no sympathy or empathy with her medical conditions and the AFGE provided her any clear direction. I am not a medical doctor or a psychologist but weekly and sometimes daily calls to Aileen, while she tried to work between chemo and other therapies, I could feel the frustration in her voice and often she would breakdown emotionally. I know that Aileen suffered emotional pain, experienced inconvenience, mental anguish, loss of enjoyment of life, fear of losing her employment, fear of losing her life or having to have to go back into a building where she believe was a toxic environment. I kept telling her not to give up and to give all she got to let others know of her ordeal or to speak up to help others so he or she will not have to go through what she was experiencing.

Since I have known Aileen she has had the highest desire to serve the veterans and took a step further in electing to become a certified rating veteran service representative (CVSR). Even during her chemo, rehab, and recovery she still maintained her loyalty to uphold the VA's motto, I CARE and serve the veterans, their dependents, widows, and orphans.

Before coming to the VA Aileen told me she was a teacher. If anyone knows anything about teachers, you have to have a heart for the love of teaching another individual. Before Aileen's medical complications, Aileen would tell me how she would talk to her coach about how to best examine each veteran's claim in search of a positive outcome for the veteran. When Aileen's ordeal started she continued to have a heart for what others may need and feel as she asked for assistance from the St. Petersburg's Human Resource Department, service managers and directors. All I know from what Aileen has told me, the road to recovery and keeping her job has been endless struggle. Her life was interrupted and turned upside down as she tried to maintain her home and other necessities for living. This I have witness during several visits to her home and through lunch conversations.

I do not know if she is at the end of her rope, struggling to keep her head above water, financially, mentally, or physically. I do not know if all her requests or needs have been resolved, if her wages have stabilize, if the amount of annual leave and sick leave have been straighten out, if the joy and satisfaction have returned in her life, or if her parents have peace that their daughter is feeling better. I do not know if the end to Aileen's medical ordeal has been finalized. What I do believe is that Aileen should not have had to struggle in the midst of trying to maintain her employment and survive cancer.

I do know that even though the regional office is giving Aileen a second chance in retraining her as a rating specialist her breathing condition has not change when she steps into the regional office. Although she can wear a protective mask, it still does not change the facts that the building may not be safe to work in for her or any employee to breathe and stay healthy. I say this because I hear from other employees say the air in building makes them sick. If what the employees say is true or untrue, researching the allegations of the quality of air that goes throughout the building should not be ignored.

Aileen is not the only employee who struggles with breathing. There are other employees who wear masks and other breathing apparatus throughout the building. I do not know these employee's medical conditions but if I see them I am sure the staff in human resource department, service managers and directors see these individuals as well and realize that there is something wrong. I do know one employee, who wore a breathing masks, elect an early retirement, because she could no longer breathe comfortably inside the building. Perhaps other employees remain silent and struggle with the quality of air that flows through the building to sacrifice their health to continue to make a living in this weak economy, but I believe Aileen could not remain silent and sacrifice her life by speaking up to help herself and others.

I have told Aileen to never give up. I have told her she has done nothing wrong. Aileen wanted to just get some help so she could work comfortably and for her supervisors to understand her flight. Many days Aileen has told me she just does not have any more energy to keep fighting. I feel why Aileen should fight for her life in an office that helps our country's veterans, who fought and continue to fight for our protection.

Natalie Kennedy

August 8, 2013

To Whom It May Concern:

I am writing this letter on behalf of Aileen Mullin and the difficulties I have witnessed with her health as a result of her employment with the V.A.

I actually don't even know where to begin since I've watched her suffer for so many years now with on-going illnesses and have watched her health continue to deteriorate to this day. She has continued to take steps to care for herself, always searching for new medical advice to guide her toward becoming healthier so she can be a better employee, but to this date, nothing has worked. She has seen a number of different physicians, and has had a number of procedures done to no avail.

I have watched her go to work even when she could barely breathe, and try to get through a day. She is a dedicated employee, and is driven by the fact that she enjoys what she does and is motivated by the people she services. After the day when she had the attack at work that caused her to be removed from the premises by ambulance and taken to the hospital, her health continued to spiral downward. Not only is her physical health an issue, but her emotional health has now becoming impaired, as each day is a battle trying to advocate for herself and her livelihood, while trying to maintain a relationship with the company. I have seen her literally fight day in and day out to keep her job and is now working from home, but not without a constant battle. She is without the proper training, support, or guidance.

This entire scenario has led Aileen to have lost so much in her personal life. She has not been able to attend many functions, weddings, graduations, recitals, plays, and other family functions, because her body was just too sick to even get off the couch. She very often wasn't able to even cook or care for her home. She is a single woman, living on her own, and the way her body fought her as a result of the illness she felt associated with the building was incapacitating for days upon end. Bills and paperwork piled up during this time, and led to another issue; the inability to pay for the bills that continue to grow.

To this day, I see Aileen in Baltimore, removed from the facility in Florida, and still the struggles follow her. She is distraught with the many obstacles that face her, even at this distance. When will things be made right for this person? It is entirely unfair and

inhuman to watch the suffering that I have seen, and it is despicable to think that one of our government agencies is playing a hand in this situation.

Please feel free to contact me if you'd like to further this conversation.

Sincerely,

Connie Murabito

July 29, 2013

To whom this may concern:

My husband and I have known Aileen for about 15 years if not more. During this friendship, we had never known her to have allergies or any other issues with her respiratory system. We live on the east coast and knew that she had finished her cancer treatments and wanted to stop in for a visit. Which we did, and then discovered that on top of battling the cancer, she was also battling with her work, as far as breathing while at work. It was very disheartening to hear her battles and the struggles endured in her work place, she showed us 3 or 4 binders full of documentation showing issues with work.
Aileen has always put her heart into every job she's held and this position has really played a toll on her health, as she can't perform her duties at the location with the bad air, nor is she allowed to work from home. It's expected of employees to perform their duties of work, and it is expected that the work environment be a safe one!

Sincerely,

Peggy and Alan Jepson

Department of Veterans Affairs

# PERFORMANCE APPRAISAL PROGRAM

*IMPORTANT: For additional information see VA Handbook 5013/1, Part 1. If additional space is needed for any item on this form, use page 6.*

**PERFORMANCE PLAN AND APPRAISAL OF**

| EMPLOYEE'S NAME *(Last, First, Middle Initial)* | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| MULLIN,AILEEN | 02104A VETERANS SERVICE REP (RATING) GS 0996 | 11 / $59,321 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| VBA Veterans Service Center | VARO 317, St. Petersburg, FL |

| DATE ASSIGNED PRESENT POSITION | DUE DATE OF WITHIN-GRADE INCREASE | PERIOD COVERED BY THIS PERFORMANCE PLAN FROM TO |
|---|---|---|
| 5/8/11 | 02/10/2013 | Oct. 1, 2012 - Sept. 30, 2013 |

| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| [signature] | 10/23/12 | [signature] | 10/23/12 |

**SECTION A – PERFORMANCE PLAN**

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

PERFORMANCE PLAN
RVSR

EVALUATION PERIOD: Timeframes for each performance element are based on the date of selection as an RVSR.

ELEMENT 1 QUALITY OF WORK (Critical Element)

The RVSR must consistently and conscientiously exercise sound, equitable judgment in applying stated policies to ensure accurate and timely decisions on compensation and pension benefit claims administered by the Department of Veterans Affairs.

FULLY SUCCESSFUL LEVEL:

The RVSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level and Grade:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | 0 | 75 | 80 | 80 | 80 | 85 |

Journey-Level RVSR (GS12, 24 months in position): 88%

EXCEPTIONAL LEVEL:

The RVSR's accuracy rate during the evaluation period equals or exceeds the levels shown in the

VA FORM
JUN 2011 **0750**

copy of Standards

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | N/A | 3.5 | 4.5 | 5.0 | 5.5 | 5.5 |

Journey-Level RVSR (GS12, 24 months in position): 6.0

INDICATORS: ASPEN Production reports

*Leave, union time, training, special projects or assignments, or 2nd signature review when required by local or national procedures are acceptable categories of deductible time. This list is not exhaustive as there may be other reasons for deductible time to be considered by management. All deductible time must be pre-approved by the supervisor.

ELEMENT 3 CUSTOMER SERVICE (Critical Element)

The RVSR functions as a team member to enhance resolution of claims and customer service contacts by work actions. Maintains professional, positive, and helpful relationships with internal/external customers by exercising tact, diplomacy, and cooperation.

Performance demonstrates the ability to adjust to change or work pressures, to handle differences of opinion in a businesslike fashion, and to follow instructions conscientiously. As a team member, contributes to the group effort by supporting fellow teammates with technical expertise and open communications and by identifying problems and offering solutions. Successful achievement in this element reflects support of all scorecard goals.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents.*

EXCEPTIONAL LEVEL: No instances.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.
*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 4 TIMELINESS (Critical Element)

After 6 months experience, the RVSR:

Works in a manner that supports and contributes to meeting division timeliness targets, as defined by the Workload Management Plan.

Screening and direction of development for incoming deliveries from the Pre team is generally performed within 1 workday of receipt but will not exceed more than 5 workdays of receipt.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 6: COMMUNICATION AND COALITION BUILDING (Non-Critical)

The employee responds to veterans' needs, gaining support of those who are internal or external to the organization. The employee handles conflicts effectively and builds and sustains trust and respect of all internal and external customers. The employee collaborates and works well with others, showing both sensitivity and compassion. The employee is courteous in his or her response to internal customers and fellow employees. The employee seeks accurate information and comes to a reasonable conclusion in both work assignments and in work place interactions. The employee communicates clearly, listens actively and attentively to others, and honors commitments and promises, in both work assignments and in work place interactions.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee shares information readily with coworkers; is easy to approach; and expresses ideas clearly.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

* A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 7: FLEXIBILITY AND ADAPTABILITY (Non-Critical)

The employee responds appropriately to new or changing situations and handles multiple inputs and tasks simultaneously. The employee works well with all levels and types of people and is willing to learn new procedures and technologies. The employee is open to ideas different from one's own and accommodates new situations and realities without disruption to the workplace. The employee remains professional in high-pressure situations. The employee makes the most of limited resources and demonstrates resilience in the face of setbacks.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee exhibits willingness to participate in opportunities that foster flexibility and developmental learning.

MULLIN,AILEEN

## CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)*

| |
|---|
| ELEMENT DESCRIPTION/TITLE |
| STANDARD(S) |
| ELEMENT DESCRIPTION/TITLE |
| STANDARD(S) |

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
|---|---|---|---|
| | | | |

**SECTION B – PROGRESS REVIEW**

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

☐ Is considered Fully Successful or better

☐ Needs improvement to be Fully Successful or better *(See VA Handbook, 5013 1, Part I, Paragraph 7 for additional required action.)*

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
|---|---|---|---|
| | | | |

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Aileen Mullin [aemflorida@gmail.com] |
| **Sent:** | Wednesday, July 17, 2013 1:58 PM |
| **To:** | Henley, John (ORM) |
| **Cc:** | John Smith; aileen_mullin@ |
| **Subject:** | Evidence: Monthly Evaluation 03/29/2013 |
| **Attachments:** | MonthyEvaluation03292013_0001.pdf; MonthyEvaluation03292013_0002.pdf; MonthyEvaluation03292013_0003.pdf; MonthyEvaluation03292013_0004.pdf; MonthyEvaluation03292013_0005.pdf; MonthyEvaluation03292013_0006.pdf; MonthyEvaluation03292013_0007.pdf |

Hi John,

I'm going to attempt submitting relevant evidence electronically. If it doesn't work, please let me know.

This document details:
- Written request for accommodation of 'face time' with mentor and partial history (dates) of previous requests
- Interference that cause my ability to do my job
-Names and dates
- Denial of accommodation
- Reversal of accommodation
- Delay in granting of FMLA and fear of using sick leave
- Interference in seeking Worker's Compensation
- Indifference to the life threatening building related asthma
- Fear of human Resources
  Agency's refusal to engage in the accommodation 'interactive process'

This monthly evaluation and attachments were given to my Coach Ulysee McBurough who in turn submitted it to Sandy Smith, Service Center Manager (this is evidenced by e-mail she sent to me and that she acted on my behalf to get Human Resources to grant FMLA. I'll forward that too)

Hope all is well,

Aileen

## RVSR Monthly Review Worksheet
rch 2013

Name Aileen Mullin Date 03/29/2013

Grade 12 Date eligible for next career ladder/WIGI 04/09/13

**Critical Elements**

1. Quality for current month: none (month) ( 85.71% (cumulative).

*No rating decisions were completed during the month of April, therefore no quality reviews were completed.

Standards:
**Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months**

| Months in Position | 6-12 | 13-18 | 19-24 | >-24 | | |
|---|---|---|---|---|---|---|
| Fully Successful | 80% | 85% | 90% | 92 | | |
| Exceptional | | | | | | |

2. Production for current month: 0.03 (month) 0.14 (cumulative)

Standards:

| Months in Position | 6-12 | 13-18 | 19-24 | > 24 | | |
|---|---|---|---|---|---|---|
| Fully Successful | 1.5 | 2.0 | 2.5 | 3.0 | | |
| Exceptional | | | | | | |

***No Rating Decision were completed during the month of April, 2013. ***

3. Customer Service for current month: ________(month) ________(cumulative) No instances.

Standards:

| | |
|---|---|
| Fully Sat | No more than 3 instances of valid complaints or incidents |
| Exceptional | No instances |

4. Timeliness for current month: ________(month) ________(cumulative) no instances.

☑ Screening/direction of development within 1 day, not to exceed 5 days
☑ COVERS files upon receipt ☑ Updates MAP-D/DISP as required by policy
☐ RFD processed within 21 days of receipt

Standards:

| | |
|---|---|
| Fully Sat | No more than 4 instances of valid complaints or incidents |
| Exceptional | No more than 2 instances of valid complaints or incidents |

**Non-critical Elements**

For each noncritical element, describe specific instances or occurances, to include verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation. Attach any emails as supporting documentation and fully describe any validated complaints or incidents. A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute "discourtesy". Valid

pg 1 of 5

Aileen Mullin
May 2, 2013

2001-0317-2012103413

POSITION DESCRIPTION

VETERANS SERVICE REPRESENTATIVE (RATING)

GS 996-12

"The RVSR working in concert with members of his/her team or other VSC Teams, serves as a decision maker for claims involving rating decisions. The RVSR analyzes claims, applies VA:s Schedule for Rating Disabilities (Rating Schedule), and prepares rating decisions informing the VSR and/or claimant of the decision, the bases, and reason for it. "

My need for reasonable accommodations is based on work-place (Saint Petersburg Regional Office) triggered illnesses: asthma, sinus infections and vocal chord dysfunction.

Essential vs marginal functions: In every accommodation related conversation with Human Resources, I have discussed the crucial aspects of my positions that involves the need to review files with a mentor/decision review officer in a learning environment. During every conversation I have presented ideas as to how this can be safely done.

It appears that my words fell on deaf ears.

My most recent accommodation modification leaves me completely cut-off from face-to-face, live case training/mentoring.

Note: The Agency's actions causes a diminishing in my performance. The diminished performance is lead to me no longer being "qualified" for my position.

| | |
|---|---|
| Thursday, February 27, 2013 | Modification to accommodations were agreed upon at a meeting attended by Ms. Clark, Human Resources, Mr. McBurough, Supervisor, Mr. Smith AFGE Representative, Mr. Crump, AFGE Chief Steward and I.<br><br>During the meeting I reiterated that the what time I spend in the building should be focused on training/learning especially by reviewing Veteran's claims' file with the Decsion Review Officer. Files/claims that I need guidance on because they are beyond the scope of my training. (Marginal vs essential functions) |
| February 28 thru March 26, 2013. | The modification (four hours, twice a week,) WAS effective in terms of my respiratory system!!!! I may have felt better coming into the building then when I left if but at least I I was able to stay out of the emergency room and doctor's office. (The Agency refused to allow me assitence with any marginal functions) |
| Friday, March 29, 2013 | Mr. McBurrough informed me that modification to my accommodation was reversed.<br><br>(I interpret the rescinding of accommodations as a **denial of the accommodations** that my representative and/or I presented to Ms. Clark on January 29 and 30, 2013, February 6, 2013, February 25 through 28, 2013 and March 5, 2013.) |
| Friday, March 29, 2013. | **The agency delayed in notifying my of the status of my application for FMLA** (per CFR):<br><br>I dread having to deal with Human Resources. Its imposable to predict how they are going to treat me (the crux of the entire EEO complaint) and on the 29th of March I had to approach them about FMLA:<br><br>- Friday, February 22, 2013 (fax) and Friday, February 28, 2013 (hand delivered ) I submitted an application for FMLA, to Human Resources |

2 of 3 & 5

are critical to my training, growth and production.

Another poor evaluation – My expected performance is the same as employees who have been afforded access to practical application of training and access to skilled raters and decision review officers

Discrimination based on workers compensation illnesses

4/19/2013 Without the opportunity for further engagement in the "interactive process"

More barrier were established. I am now completely cut off from . .....

VA Form 0857f, Approval of Accommodation:

"Aileen Mullin – Work from Home Mondays, Tuesdays, Wednesdays, Thursdays, *and Fridays*. You will be required to report to the St Petersburg Regional Office on Fridays at ch beginning of your tour. Your coach or his designee will meet you outside the Regional Office to provide work and pick up your work. You are required return to your home office in a timely manner to complete your tour of duty on Friday."

Singed by Director Witty on April 19, 2013.

Pg 5 of 5

complaints or incidents will be determined by the supervisor and discussed with the employee. Refer to the Performance Plan for specific behavioral descriptors.

5. Cooperation and Organizational Support : No instances.

6. Communication and Coalition Building: No instances.

7. Flexibility and Adaptability: No instances.

Employee's performance IS / **IS NOT** at an acceptable level of competence. Employee IS / **IS NOT** on track for next within-grade increase (WIGI).

Ulyssee McBurrough Jr.
Coach

Received

May 11, 2013
Date

Please see attached:
Abbreviate list of events that prevent / interfere with my growth / success as an RVSR

I need face-time with QBRO and/or Journey Level RVSR

# RVSR Monthly Review Worksheet

February 2012

Date 03/29/2013

Name Aileen Mullin

Grade 12

Date eligible for next career ladder/WIGI 03/10/13

**Critical Elements**

1. Quality for current month: ____(month) 85.71% (cumulative)

Standards:

**Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months**

| Months in Position | 6-12 | 13-18 | 19-24 | >-24 | | |
|---|---|---|---|---|---|---|
| Fully Successful | 80% | 85% | 90% | 92 | | |
| Exceptional | | | | | | |

2. Production for current month: 0 (month) 0.23 (cumulative)

Standards:

| Months in Position | 6-12 | 13-18 | 19-24 | >24 | | |
|---|---|---|---|---|---|---|
| Fully Successful | 1.5 | 2.0 | 2.5 | 3.0 | | |
| Exceptional | | | | | | |

3. Customer Service for current month: ________(month) ________(cumulative) No instances.

Standards:

| | |
|---|---|
| Fully Sat | No more than 3 instances of valid complaints or incidents |
| Exceptional | No instances |

4. Timeliness for current month: ________(month) ________(cumulative) no instances.

☒ Screening/direction of development within 1 day, not to exceed 5 days
☒ COVERS files upon receipt ☒ Updates MAP-D/DISP as required by policy
☒ RFD processed within 21 days of receipt

Standards:

| | |
|---|---|
| Fully Sat | No more than 4 instances of valid complaints or incidents |
| Exceptional | No more than 2 instances of valid complaints or incidents |

**Non-critical Elements**

For each noncritical element, describe specific instances or occurances, to include verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation. Attach any emails as supporting documentation and fully describe any validated complaints or incidents. A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute "discourtesy". Valid complaints or incidents will be determined by the supervisor and discussed with the employee. Refer to the Performance Plan for specific behavioral descriptors.

5. Cooperation and Organizational Support: No instances.

# SEPARATOR

# PAGE

MULLIN,AILEEN
EIN: VA0106676
SSN: [redacted]

FS

**Department of Veterans Affairs** | **PERFORMANCE APPRAISAL PROGRAM**

***IMPORTANT:*** *For additional information see VA Handbook 5013/1, Part 1. If additional space is needed for any item on this form, use page 6.*

**PERFORMANCE PLAN AND APPRAISAL OF**

| EMPLOYEE'S NAME *(Last, First, Middle Initial)* | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| MULLIN,AILEEN | 02104A VETERANS SERVICE REP (RATING) GS 0996 | 10 / $52,252 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| VBA Veterans Service Center | VARO 317, St. Petersburg, FL |

| DATE ASSIGNED PRESENT POSITION | DUE DATE OF WITHIN-GRADE INCREASE | PERIOD COVERED BY THIS PERFORMANCE PLAN FROM / TO |
|---|---|---|
| 05/08/2011 | 02/12/2012 | Oct. 1, 2011 - Sept. 30, 2012 |

| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| | 10-20-11 | | 10/20/2011 |

**SECTION A – PERFORMANCE PLAN**

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

PERFORMANCE PLAN
RVSR

EVALUATION PERIOD: Timeframes for each performance element are based on the date of selection as an RVSR.

ELEMENT 1 QUALITY OF WORK (Critical Element)

The RVSR must consistently and conscientiously exercise sound, equitable judgment in applying stated policies to ensure accurate and timely decisions on compensation and pension benefit claims administered by the Department of Veterans Affairs.

FULLY SUCCESSFUL LEVEL:

The RVSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level and Grade:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | 0 | 75 | 80 | 80 | 80 | 85 |

Journey-Level RVSR (GS12, 24 months in position): 88%

VA FORM
JUN 2011 0750

EXCEPTIONAL LEVEL:

The RVSR's accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | N/A | 80 | 85 | 85 | 85 | 90 |

Journey-Level RVSR (GS12, 24 months in position): 93%

INDICATORS: A random selection will be made of an average of five cases per month per employee. The ASPEN program will be used to generate the random selection. The selection of cases, while random, must reflect an appropriate mix of work performed by the employee throughout the month (i.e. not from a single day or single week).

The cases selected will be reviewed prior to concurrence by a second signature to determine the accuracy of the originator of the decision. Only one error is counted per case reviewed. All other errors will be shown as comments only and will not impact the accuracy rate.

*If a routine review of an RVSR's work demonstrates the need for quality improvement (i.e. significant percentage of cases reviewed contain errors), the sample will be expanded to an average of 10 cases per month. The RVSR's supervisor will determine whether the deficiency is resolved or a Performance Improvement Plan is necessary.

ELEMENT 2 – PRODUCTIVITY (Critical Element)
An RVSR's productivity will be measured as a cumulative average daily rate. Cases will be counted for production purposes as follows:

½ case = all formal ratings not listed below regardless of the number of issues rated
= when assigned to the Pre team or at the direction of management, VA Examination request
1 case = 110, 020, 165, SOC, SSOC with less than 8 issues rated
2 cases = 010, 020, 165, SOC, SSOC with 8-15 issues rated
3 cases = 16-23 issues rated; 4 cases = 24-31 issues rated, etc.

FULLY SUCCESSFUL LEVEL:

Minimum Production Requirement In Weighted Cases Based on Months in Position

Developmental Grades (GS9/10/11/12)

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | 0 | 0.50 | 2.5 | 3.0 | 3.5 | 4.0 |

Journey-Level RVSR (GS12, 24 months in position): 4.0

«EmpName»

EXCEPTIONAL LEVEL:

Production Requirement In Weighted Cases Based on Months in Position

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | N/A | 3.5 | 4.5 | 5.0 | 5.5 | 5.5 |

Journey-Level RVSR (GS12, 24 months in position): 6.0

INDICATORS: ASPEN Production reports

*Leave, union time, training, special projects or assignments, or 2nd signature review when required by local or national procedures are acceptable categories of deductible time. This list is not exhaustive as there may be other reasons for deductible time to be considered by management. All deductible time must be pre-approved by the supervisor.

ELEMENT 3 CUSTOMER SERVICE (Critical Element)

The RVSR functions as a team member to enhance resolution of claims and customer service contacts by work actions. Maintains professional, positive, and helpful relationships with internal/external customers by exercising tact, diplomacy, and cooperation.

Performance demonstrates the ability to adjust to change or work pressures, to handle differences of opinion in a businesslike fashion, and to follow instructions conscientiously. As a team member, contributes to the group effort by supporting fellow teammates with technical expertise and open communications and by identifying problems and offering solutions. Successful achievement in this element reflects support of all scorecard goals.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents.*

EXCEPTIONAL LEVEL: No instances.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 4 TIMELINESS (Critical Element)

After 6 months experience, the RVSR:

Works in a manner that supports and contributes to meeting division timeliness targets, as defined by the Workload Management Plan.

Screening and direction of development for incoming deliveries from the Pre team is generally performed within 1 workday of receipt but will not exceed more than 5 workdays of receipt. COVERS claims folders when received to facilitate in-house tracking. Updates MAP-D and DISP claims as required by office policy.

Claims determined to be ready for decision (RFD) will be processed within 21 workdays of receipt in the Rating Team.

FULLY SUCCESSFUL LEVEL: No more than 4 instances of cases not being worked within established time frames or to adhere to division guidelines.

EXCEPTIONAL LEVEL: No more than 2 instances of cases not being worked within established time frames or to adhere to division guidelines.

INDICATORS: Verbal and/or written feedback from internal and/or external customers. Observations by a manager with a complaint documented, and reports required by Workload Management Plan.

* Extenuating circumstances and notification to the RVSR's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

ELEMENT 5 COOPERATION AND ORGANIZATIONAL SUPPORT (Non-Critical Element)

The employee understands the agency mission and supports efforts to improve the work unit's performance through positive interaction with others. Displays appropriate degree of professionalism and treats co-workers and veterans with courtesy and respect. Cooperates with co-workers and supervisors to accomplish work objectives and enhance efficiency. Recognizes the importance of teamwork and is sensitive to the contributions of others. Communicates, shares ideas, and demonstrates respect for differing viewpoints. Participates in cross-functional and work unit teams in a positive manner and shares best practices.

FULLY SUCCESSFUL LEVEL: Interaction with supervisor, co-workers, and others within the organization is businesslike and professional. Working relationships with others are typically constructive and promote the agency mission. Conscientiously follows instructions and adheres to applicable guidance. Employee easily adjusts to different working styles, ideas, and perspectives and appropriately expresses own views in the proper manner. Disagreements are normally resolved through appropriate means. Any deviations in these areas are minor and collectively or separately do not significantly hinder organizational or individual productivity or efficiency.

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria shown for the fully successful level of performance, the employee demonstrates working relationships with others that are always fully supportive of the agency mission. Employee leads by example and helps others adjust to different working styles, ideas, and perspectives. Can be relied on during team meetings and training sessions to express views that are supportive of the missions of VBA and the St. Petersburg VSC.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 6: COMMUNICATION AND COALITION BUILDING (Non-Critical)

The employee responds to veterans' needs, gaining support of those who are internal or external to the organization. The employee handles conflicts effectively and builds and sustains trust and respect of all internal and external customers. The employee collaborates and works well with others, showing both sensitivity and compassion. The employee is courteous in his or her response to internal customers and fellow employees. The employee seeks accurate information and comes to a reasonable conclusion in both work assignments and in work place interactions. The employee communicates clearly, listens actively and attentively to others, and honors commitments and promises, in both work assignments and in work place interactions.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee shares information readily with coworkers; is easy to approach; and expresses ideas clearly.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

* A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 7: FLEXIBILITY AND ADAPTABILITY (Non-Critical)

The employee responds appropriately to new or changing situations and handles multiple inputs and tasks simultaneously. The employee works well with all levels and types of people and is willing to learn new procedures and technologies. The employee is open to ideas different from one's own and accommodates new situations and realities without disruption to the workplace. The employee remains professional in high-pressure situations. The employee makes the most of limited resources and demonstrates resilience in the face of setbacks.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee exhibits willingness to participate in opportunities that foster flexibility and developmental learning.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by a supervisor with the complaint documented, or other documentation evidencing employee developmental learning.

* A valid complaint or incident is one where a review by the supervisor, considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

Grade Progression Criteria

Throughout the career ladder program, all critical elements must be met at the grade level sought prior to advancement. Likewise, any other legal requirements of the position must be met for the individual to be eligible to advance to the next level. This includes but may not be limited to time in grade. When all requirements are met, including those described below, the supervisor will recommend promotion and approval will be considered at the division level absent any indication the individual is not otherwise suited to perform at the level sought. Individuals have the discretion to request non-promotion if they meet the minimum range described below but feel they are not yet ready to sustain performance at the higher level. In this situation, the individual will be given an additional 90 days to meet the next level and any training identified as necessary after which the full standard level for the grade must be met. All individuals are required to sustain the full performance level of their grade within 90 days of promotion to a higher grade.

· For advancement to the next higher RVSR grade of GS-10, 11, and 12, the employee must have a minimum of 12 months experience in the RVSR position at each grade, and the employee must demonstrate performance at the next higher monthly requirement prior to assuming their new grade.*

Only the GS-12 is recognized as a journeyman position while the other levels are training positions. For this reason, there is no unique range of exception to the full requirements for a GS-12 with 25 months or more as this constitutes the journeyman level and is not a training position.

*For RVSRs selected on an announcement after August 2008, successful completion of the Basic RVSR Skills Certification Test is also required prior to receiving the GS 12 level.

FS
GM

MULLIN,AILEEN
EIN: VA0106676

Department of Veterans Affairs

# PERFORMANCE APPRAISAL PROGRAM

*IMPORTANT: For additional information see VA Handbook 5013/1, Part 1. If additional space is needed for any item on this form, use page 6.*

PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME *(Last, First, Middle Initial)* | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| MULLIN,AILEEN | 02104A VETERANS SERVICE REP (RATING) GS 0996 | 10 / $52,252 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| VBA Veterans Service Center | VARO 317, St. Petersburg, FL |

| DATE ASSIGNED PRESENT POSITION | DUE DATE OF WITHIN-GRADE INCREASE | PERIOD COVERED BY THIS PERFORMANCE PLAN FROM TO |
|---|---|---|
| 05/08/2011 | 02/12/2012 | Oct. 1, 2011 - Sept. 30, 2012 |

| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| [signature] | 10-20-11 | [signature] | 10/20/2011 |

SECTION A – PERFORMANCE PLAN

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

PERFORMANCE PLAN
RVSR

EVALUATION PERIOD: Timeframes for each performance element are based on the date of selection as an RVSR.

ELEMENT 1 QUALITY OF WORK (Critical Element)

The RVSR must consistently and conscientiously exercise sound, equitable judgment in applying stated policies to ensure accurate and timely decisions on compensation and pension benefit claims administered by the Department of Veterans Affairs.

FULLY SUCCESSFUL LEVEL:

The RVSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level and Grade:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | 0 | 75 | 80 | 80 | 80 | 85 |

Journey-Level RVSR (GS12, 24 months in position): 88%

VA FORM
JUN 2011 0750

«EmpName»

EXCEPTIONAL LEVEL:

The RVSR's accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | N/A | 80 | 85 | 85 | 85 | 90 |

Journey-Level RVSR (GS12, 24 months in position): 93%

INDICATORS: A random selection will be made of an average of five cases per month per employee. The ASPEN program will be used to generate the random selection. The selection of cases, while random, must reflect an appropriate mix of work performed by the employee throughout the month (i.e. not from a single day or single week).

The cases selected will be reviewed prior to concurrence by a second signature to determine the accuracy of the originator of the decision. Only one error is counted per case reviewed. All other errors will be shown as comments only and will not impact the accuracy rate.

*If a routine review of an RVSR's work demonstrates the need for quality improvement (i.e. significant percentage of cases reviewed contain errors), the sample will be expanded to an average of 10 cases per month. The RVSR's supervisor will determine whether the deficiency is resolved or a Performance Improvement Plan is necessary.

ELEMENT 2 – PRODUCTIVITY (Critical Element)
An RVSR's productivity will be measured as a cumulative average daily rate. Cases will be counted for production purposes as follows:

½ case = all formal ratings not listed below regardless of the number of issues rated
= when assigned to the Pre team or at the direction of management, VA Examination request
1 case = 110, 020, 165, SOC, SSOC with less than 8 issues rated
2 cases = 010, 020, 165, SOC, SSOC with 8-15 issues rated
3 cases = 16-23 issues rated; 4 cases = 24-31 issues rated, etc.

FULLY SUCCESSFUL LEVEL:

Minimum Production Requirement In Weighted Cases Based on Months in Position

Developmental Grades (GS9/10/11/12)

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | 0 | 0.50 | 2.5 | 3.0 | 3.5 | 4.0 |

Journey-Level RVSR (GS12, 24 months in position): 4.0

EXCEPTIONAL LEVEL:

Production Requirement In Weighted Cases Based on Months in Position

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | N/A | 3.5 | 4.5 | 5.0 | 5.5 | 5.5 |

Journey-Level RVSR (GS12, 24 months in position): 6.0

INDICATORS: ASPEN Production reports

*Leave, union time, training, special projects or assignments, or 2nd signature review when required by local or national procedures are acceptable categories of deductible time. This list is not exhaustive as there may be other reasons for deductible time to be considered by management. All deductible time must be pre-approved by the supervisor.

ELEMENT 3 CUSTOMER SERVICE (Critical Element)

The RVSR functions as a team member to enhance resolution of claims and customer service contacts by work actions. Maintains professional, positive, and helpful relationships with internal/external customers by exercising tact, diplomacy, and cooperation.

Performance demonstrates the ability to adjust to change or work pressures, to handle differences of opinion in a businesslike fashion, and to follow instructions conscientiously. As a team member, contributes to the group effort by supporting fellow teammates with technical expertise and open communications and by identifying problems and offering solutions. Successful achievement in this element reflects support of all scorecard goals.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents.*

EXCEPTIONAL LEVEL: No instances.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.
*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 4 TIMELINESS (Critical Element)

After 6 months experience, the RVSR:

Works in a manner that supports and contributes to meeting division timeliness targets, as defined by the Workload Management Plan.

Screening and direction of development for incoming deliveries from the Pre team is generally performed within 1 workday of receipt but will not exceed more than 5 workdays of receipt. COVERS claims folders when received to facilitate in-house tracking. Updates MAP-D and DISP claims as required by office policy.

Claims determined to be ready for decision (RFD) will be processed within 21 workdays of receipt in the Rating Team.

FULLY SUCCESSFUL LEVEL: No more than 4 instances of cases not being worked within established time frames or to adhere to division guidelines.

EXCEPTIONAL LEVEL: No more than 2 instances of cases not being worked within established time frames or to adhere to division guidelines.

INDICATORS: Verbal and/or written feedback from internal and/or external customers. Observations by a manager with a complaint documented, and reports required by Workload Management Plan.

* Extenuating circumstances and notification to the RVSR's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

ELEMENT 5 COOPERATION AND ORGANIZATIONAL SUPPORT (Non-Critical Element)

The employee understands the agency mission and supports efforts to improve the work unit's performance through positive interaction with others. Displays appropriate degree of professionalism and treats co-workers and veterans with courtesy and respect. Cooperates with co-workers and supervisors to accomplish work objectives and enhance efficiency. Recognizes the importance of teamwork and is sensitive to the contributions of others. Communicates, shares ideas, and demonstrates respect for differing viewpoints. Participates in cross-functional and work unit teams in a positive manner and shares best practices.

FULLY SUCCESSFUL LEVEL: Interaction with supervisor, co-workers, and others within the organization is businesslike and professional. Working relationships with others are typically constructive and promote the agency mission. Conscientiously follows instructions and adheres to applicable guidance. Employee easily adjusts to different working styles, ideas, and perspectives and appropriately expresses own views in the proper manner. Disagreements are normally resolved through appropriate means. Any deviations in these areas are minor and collectively or separately do not significantly hinder organizational or individual productivity or efficiency.

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria shown for the fully successful level of performance, the employee demonstrates working relationships with others that are always fully supportive of the agency mission. Employee leads by example and helps others adjust to different working styles, ideas, and perspectives. Can be relied on during team meetings and training sessions to express views that are supportive of the missions of VBA and the St. Petersburg VSC.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 6: COMMUNICATION AND COALITION BUILDING (Non-Critical)

The employee responds to veterans' needs, gaining support of those who are internal or external to the organization. The employee handles conflicts effectively and builds and sustains trust and respect of all internal and external customers. The employee collaborates and works well with others, showing both sensitivity and compassion. The employee is courteous in his or her response to internal customers and fellow employees. The employee seeks accurate information and comes to a reasonable conclusion in both work assignments and in work place interactions. The employee communicates clearly, listens actively and attentively to others, and honors commitments and promises, in both work assignments and in work place interactions.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee shares information readily with coworkers; is easy to approach; and expresses ideas clearly.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

* A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 7: FLEXIBILITY AND ADAPTABILITY (Non-Critical)

The employee responds appropriately to new or changing situations and handles multiple inputs and tasks simultaneously. The employee works well with all levels and types of people and is willing to learn new procedures and technologies. The employee is open to ideas different from one's own and accommodates new situations and realities without disruption to the workplace. The employee remains professional in high-pressure situations. The employee makes the most of limited resources and demonstrates resilience in the face of setbacks.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee exhibits willingness to participate in opportunities that foster flexibility and developmental learning.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by a supervisor with the complaint documented, or other documentation evidencing employee developmental learning.

* A valid complaint or incident is one where a review by the supervisor, considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

Grade Progression Criteria

Throughout the career ladder program, all critical elements must be met at the grade level sought prior to advancement. Likewise, any other legal requirements of the position must be met for the individual to be eligible to advance to the next level. This includes but may not be limited to time in grade. When all requirements are met, including those described below, the supervisor will recommend promotion and approval will be considered at the division level absent any indication the individual is not otherwise suited to perform at the level sought. Individuals have the discretion to request non-promotion if they meet the minimum range described below but feel they are not yet ready to sustain performance at the higher level. In this situation, the individual will be given an additional 90 days to meet the next level and any training identified as necessary after which the full standard level for the grade must be met. All individuals are required to sustain the full performance level of their grade within 90 days of promotion to a higher grade.

· For advancement to the next higher RVSR grade of GS-10, 11, and 12, the employee must have a minimum of 12 months experience in the RVSR position at each grade, and the employee must demonstrate performance at the next higher monthly requirement prior to assuming their new grade.*

Only the GS-12 is recognized as a journeyman position while the other levels are training positions. For this reason, there is no unique range of exception to the full requirements for a GS-12 with 25 months or more as this constitutes the journeyman level and is not a training position.

*For RVSRs selected on an announcement after August 2008, successful completion of the Basic RVSR Skills Certification Test is also required prior to receiving the GS 12 level.

**SECTION C – ACTUAL ACHIEVEMENT**

**Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpasses. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Quality of Work (critical) | | X | |
| Productivity (critical) | | X | |
| Customer Service (critical) | | X | |
| Timeliness (critical) | | X | |
| Cooperation and Organization Support (Non-critical) | | X | |
| Communication and Coalition Building (Non-critical) | | X | |
| Flexibility and Adaptability (Non-critical) | | X | |
| | | | |
| | | | |

**Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.**

**ELEMENTS/ACHIEVEMENT(S)**

NARATIVE SUMMARY – OPTIONAL (Provide any additional significant accomplishments, as well as other such as details or training experiences related to the overall perfomance plan. Capacity to assume a more responsible position may also be addressed.)

**SECTION D – OVERALL RATING**

TYPE OF RATING

- [ ] ANNUAL RATING OF RECORD
- [ ] SPECIAL RATING OF RECORD
- [X] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL
FROM 10/01/2011 TO (The date you are going to close them out) 2-16-12

NOTE: Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

- [ ] OUTSTANDING – Achievement levels for all elements are designated as Exceptional
- [ ] EXCELLENT – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.
- [X] FULLY SUCCESSFUL – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.
- [ ] MINIMALLY SATISFACTORY – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as unacceptable.
- [ ] UNACCEPTABLE – The achievement level(s) for one (or more) critical elements(s) is (are) as unacceptable.

| SIGNATURE AND TITLE OF RATER | DATE (MM/DD/YYYY) |
|---|---|
| [signature] Program Support Coordinator | 2-21-12 |

2-16-12 ⓔ

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

- [ ] Concur with recommended rating.
- [ ] Do not concur with rating. Approve rating of ______________________.

BASIS FOR PERFORMANCE RATING CHANGE

Change in Supervisor

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | DATE (MM/DD/YYYY) |
|---|---|
| [signature] Program Support Coordinator | 2-16-12 / 2-21-12 ⓔ |
| A copy of this performance appraisal was given to me. SIGNATURE OF EMPLOYEE [signature] | DATE (MM/DD/YYYY) 2/16/12 |

MULLIN,AILEEN

## CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)*

ELEMENT DESCRIPTION/TITLE

STANDARD(S)

ELEMENT DESCRIPTION/TITLE

STANDARD(S)

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
|---|---|---|---|
| | | | |

### SECTION B – PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

- [x] Is considered Fully Successful or better
- [ ] Needs improvement to be Fully Successful or better *(See VA Handbook, 5013/1, Part I, Paragraph 7 for additional required action.)*

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
|---|---|---|---|
| [signature] | 4/19/12 | [signature] | 4/19/2012 |

**SECTION C – ACTUAL ACHIEVEMENT**

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpasses. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | LESS THAN FULLY SUCCESSFUL |
| QUALITY (CRITICAL) | | X | |
| PRODUCTIVITY (CRITICAL) | | X | |
| CUSTOMER SERVICE (CRITICAL) | X | | |
| TIMELINESS (CRITICAL) | X | | |
| COOPERATION AND ORGANIZATIONAL SUPPORT (NON-CRITICAL) | X | | |
| COMMUNICATION AND COALITION BUILDING (NON-CRITICAL) | X | | |
| FLEXIBILITY AND ADAPTABILITY (NON-CRITICAL) | X | | |
| | | | |
| | | | |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.

ELEMENTS/ACHIEVEMENTS –

You may also provide a NARRATIVE SUMARY – *OPTIONAL (Provide any additional significant accomplishments, as well as other factors such as details or training experience related to the overall performance plan. Capacity to assume a more responsible position may also be addressed).*

PRODUCTIVITY (CRITICAL) - Aileen's cumulative output during the evaluation period was 0.42 points per day, which was below the fully successful level of 2.5 for a RVSR with less than 24 months of experience. You are reminded that during the coming Fiscal Year (2013), you must successfully meet the cumulative average standard for the critical element of production. Failure to meet the production standard, as outlined in your Performance Plan, may result in being placed on a Performance Improvement Plan (PIP). During your monthly meetings, you are encouraged to discuss any training needs with your supervisor, or at any time prior to the meetings when you notice your production in ASPEN does not reflect that you will be successful for the month.

CUSTOMER SERVICE (CRITICAL) - No instances of valid complaints or incidents.

TIMELINESS (CRITICAL) – Aileen's managed her workload, including suspense dates; in accordance with locally established workload management plans with no instances where she failed to show compliance with established workload management procedures.

COOPERATION AND ORGANIZATIONAL SUPPORT (NON-CRITICAL) – Aileen's interaction with her supervisor, co-workers, and others within the organization was businesslike and professional. Her working relationships with others were constructive and promote the agency mission.

COMMUNICATION AND COALITION BUILDING (NON-CRITICAL) – Aileen's had no complaints or incidents during this evaluation period. Aileen shows remarkable patience and guidance as she routinely stops what she is doing in order to help team members with questions daily.

FLEXIBILITY AND ADAPTABILITY (NON-CRITICAL) – Aileen's had no valid complaints or incidents. Aileen's responds to changes extremely well and he handles multiple inputs and tasks simultaneously. He is also willing to participate in opportunities that foster flexibility and developmental learning.

**ECTION D – OVERALL RATING**

**TYPE OF RATING**

[X] ANNUAL RATING OF RECORD [ ] SPECIAL RATING OF RECORD [ ] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

**PERIOD COVERED BY THIS APPRAISAL**
FROM 02/17/2012 TO 09/30/2012

**NOTE:** Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

**PERFORMANCE RATING**

[ ] **OUTSTANDING** – Achievement levels for all elements are designated as Exceptional

[ ] **EXCELLENT** – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for non-critical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

[X] **FULLY SUCCESSFUL** – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

[ ] **MINIMALLY SATISFACTORY** – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Less than Fully Successful.

[ ] **UNSATISFACTORY** – The achievement level(s) for one (or more) critical elements(s) is (are) as Less Than Fully Successful.

| SIGNATURE AND TITLE OF RATER | DATE |
|---|---|
| [signature] | 11/15/12 |

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unsatisfactory ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

[ ] Concur with recommended rating.

[ ] Do not concur with rating. Approve rating of ______________________.

**BASIS FOR PERFORMANCE RATING CHANGE**

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | DATE |
|---|---|
| | |

| | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|
| A copy of this performance appraisal was given to me. | [signature] | 11/15/2012 |

# SEPARATOR

# PAGE

MULLIN,AILEEN
VA0106676
VBA VSC RATING

| VA Department of Veterans Affairs | PERFORMANCE APPRAISAL PROGRAM | |
|---|---|---|
| Replica of VA Form 0750 Nov 2003 (RS) | | |
| EMPLOYEE'S NAME *(Last, First, Middle Initial)* MULLIN,AILEEN | POSITION TITLE, SERIES AND NUMBER 02105A VETERANS SERVICE REPRESENTATIVE GS 0996 | GRADE/SALARY 09 / $47,448 |
| DEPARTMENT/OFFICE VBA Veterans Service Center | | LOCATION VARO 317, St. Petersburg, FL |
| DATE ASSIGNED PRESENT POSITION | DUE DATE OF WITHIN-GRADE INCREASE 02/13/2011 | PERIOD COVERED BY THIS PERFORMANCE PLAN Oct. 1, 2010 - Sept. 30, 2011 |
| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN [signature] — DATE 11-23-10 | SIGNATURE OF EMPLOYEE [signature] | DATE 11/23/10 |

SECTION A – PERFORMANCE PLAN

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

NATIONAL PERFORMANCE PLAN
VETERANS SERVICE REPRESENTATIVE (VSR)

ELEMENT 1 - QUALITY (Critical)

The VSR must consistently and conscientiously exercise sound, equitable judgment in applying stated laws, regulations, policies and procedures to ensure accurate information is disseminated to veterans and accurate decisions are provided on all benefit claims administered by the Department of Veterans Affairs.

Standard
Quality of Work

Successful Level
GS-7: The accuracy rate during the evaluation period equals or exceeds 91% (cumulative)

GS-9: The accuracy rate during the evaluation period equals or exceeds 92% (cumulative)

GS-10: The accuracy rate during the evaluation period equals or exceeds 93% (cumulative)

GS-11: The accuracy rate during the evaluation period equals or exceeds 94% (cumulative)

EXCEPTIONAL LEVEL:

The VSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the VSRs Grade:

| | | | | |
|---|---|---|---|---|
| Grade | 7 | 9 | 10 | 11 |
| Accuracy % | 95 | 96 | 97 | 98 |

Indicator
A random selection will be made of an average of 5 actions per month to include outputs, personal interviews, IRIS and congressional responses. Outputs selected will be reviewed prior to concurrence by a second signature to determine the accuracy of the originator.* The selection of actions, while random, must reflect an appropriate mix of work performed by the employee throughout the month (i.e. not from a single day or single week).

Only one error is counted per action reviewed (others may be tracked to assist with employee development). A checklist (Attachment A) to be used will mirror the STAR worksheet and will include a component on systems compliance, which will be considered a substantive error.

If a routine review of a VSR's work demonstrates the need for quality improvement (i.e. significant percentage of cases sent to the Rating Board are not ready to rate), an expanded sample of an average of 10 cases per month will be reviewed for quality purposes.

* Outputs reviewed for the GS-11 VSR should include claims authorized.

ELEMENT 2 - TIMELINESS (Critical)
Timely processing of veterans claims is of paramount importance, as it is highly correlated with customer satisfaction. The VSR will operate in an efficient manner to accurately finalize claims using all appropriate workload management tools and processes.

VSRs are responsible for the cycles/type of work respective to their assigned duties. If multiple timeliness sub-elements apply to a VSR (e.g. average days awaiting award, non-rating, and corrective actions) they must meet the fully successful level for all applicable sub-elements to be successful for the element.

Standard
Timeliness of Rating End Products (including EP 930 series)
Fully successful: All grade levels must meet locally established timeliness requirements, which are to be derived from end of year station targets.

The percentage of claims in each cycle pending over the locally established cycle goal must align with station goals for percentage of claims greater than 125 days. Goals are set by management for each station.

Cycle Times
a. Average Days Awaiting Development
b. Average Days Awaiting Evidence

c. Average Days Awaiting Award
d. Average Days Awaiting Authorization

Fully Successful: GS-7/9/10/11 Cycle times are within 3% of the station goal. ie. If the station goal is no more than 35% of claims pending in a particular cycle longer than that cycle's timeliness goal, a fully successful VSR would have no more than 38% pending longer than that cycle's goal.

Exceptional: GS-7/9/10/11.Cycle times exceed the station goal by at least 15%. Ie. If the station goal is no more than 35% of claims pending in a particular cycle longer than the cycle goal, an exceptional VSR would have 20% or fewer claims pending longer than that cycle's goal.

Timeliness of Non-Rating & Control End Products (i.e. EPs 600, writeouts, 800 series)

Fully successful: All grade levels must meet locally established timeliness requirements, which should be derived from station targets.

Exceptional: GS-7/9/10/11 Exceed the station goal by at least 15%.

Timeliness of Workload Management (includes rating and non-rating end products and VACOLS diaries)

Fully successful: All grade levels must manage their workload, including suspense dates, in accordance with locally established workload management plans. There will be no more than two instances where the VSR fails to show compliance with established workload management procedures.

Exceptional: GS-7/9/10/11 There will be no more than 1 instance where the VSR fails to show compliance with established workload management procedures.

Timeliness of Direct Services (i.e. IRIS, Congressional Inquiries, etc.)

Fully successful: All grade levels must meet locally established timeliness requirements, which should be derived from station targets. There will be no more than 5 instances where the VSR fails to meet established timeliness, or failure of employee to notify their supervisor when cases cannot be worked within established time frames and reasons thereof. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Exceptional: GS-7/9/10/11 There will be no more than 2 instances where the VSR fails to meet established timeliness, or failure of employee to notify their supervisor when cases cannot be worked within established time frames and reasons thereof. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Timeliness of Special Projects & Duties (i.e. Women Veterans Coordinators, AEW Project, etc.)

Fully successful: GS-7/9/10/11 There will be no more than 3 instances of tasks not being worked within established time frames, or failure of employee to notify their supervisor when cases cannot be

worked within established time frames and reasons thereof. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Exceptional: GS-7/9/10/11 There will be no more than 1 instance of tasks not being worked within established time frames, or failure of employee to notify their supervisor when cases cannot be worked within established time frames and reasons thereof. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Timeliness of Corrective Actions

Fully Successful: GS-7/9/10/11: There will be no more than 3 instances of failure to complete a returned corrective action, or failure of employee to notify their supervisor when cases cannot be worked, within three days of the case being returned to them for correction. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Exceptional: GS-7/9/10/11There will be no more than 1 instance of failure to complete a returned corrective action, or failure of employee to notify their supervisor when cases cannot be worked, within three days of the case being returned to them for correction. Extenuating circumstances and notification to the employee's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

Indicators

- VETSNET Operations Reports
- Local Tracking Reports
- Supervisory Observation

ELEMENT 3 - OUTPUT (Critical)
Processes a minimum cumulative average number of outputs per day. Outputs are defined as actions that move a veteran's claim forward to the next step in the claims process. Outputs will be counted as follows:

- Initial development (rating EPs to include EP 930s and appeals) - 1
- Initial development (non-rating EPs to include EP 600s) - .7
- Ready for decision - 1
- Process award/decision (generate award, clear end product) - .7
- Authorize award - .33

Successful Level
GS-7: 4.5
GS-9: 5
GS-10: 5.5
GS-11: 6

Exceptional Level

GS-7: 7
GS-9: 7.75
GS-10: 8.5
GS-11: 9.0

Indicators
VOR
ASPEN

* Duplicate credit will not be allowed for self-correction of a VSR's error.
** Leave, union time, and special projects or assignments pre-approved at the discretion of the supervisor are considered deductible time. Unmeasured time, such as informal training, was considered in developing the successful level and is not reportable deductible time.

ELEMENT 4 - TRAINING (Critical)
VSR will stay abreast of current laws and regulations, work processes, policies and procedures and computer applications in order to provide optimum service to our veteran population.

Employees are encouraged to actively participate in self-developmental activities.

Performance for this standard will be mitigated when the VSR's supervisor has not allotted sufficient time for VSR to complete training requirements or if the VSR is not provided a schedule of available training and the deadline they are to complete.

It is the responsibility of supervisors to provide VSRs with a training schedule in advance so they can complete their training requirements.

Successful Level
GS-7/9/10/11: Timely completion of 85 hours of training during evaluation period. Completes mandatory training within assigned deadlines with no more than one violation during evaluation period.

Exceptional: GS-7/9/10/1: Timely completion of 85 hours of training during evaluation period. Completes mandatory training within assigned deadlines with no violations during evaluation period.

Indicators
LMS
Supervisory Observation

ELEMENT 5 - Organizational Support (Non-critical)
Functions as a team member to enhance resolution of claims and customer service contacts by work actions. Maintains professional, positive, and helpful relationships with customers by exercising tact, diplomacy, and cooperation.

Performance demonstrates the ability to adjust to change or work pressures, to handle differences of opinion in a businesslike fashion, and to follow instructions conscientiously. As a team member,

contributes to the group effort by supporting fellow teammates with technical expertise and open communications and by identifying problems and offering solutions. Performance also demonstrates the ability to effectively communicate in a courteous manner with customers during the personal or telephone interview process.

Successful Level
GS-7/9/10/11: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: GS-7/9/10/11 In addition to demonstrating the criteria shown for the fully successful level of performance, the employee demonstrates working relationships with others that are always fully supportive of the agency mission. Employee leads by example and helps others adjust to different working styles, ideas, and perspectives. Can be relied on during team meetings and training sessions to express views that are supportive of the missions of VBA and the St. Petersburg VSC. No valid complaints or incidents. *

Indicator
Verbal and/or written feedback from internal and/or external customers. Observations by a supervisor with the complaint documented.

*A valid complaint or incident is one where a review by the supervisor, after considering both sides of the issue, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute "discourtesy". Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 6 - COMMUNICATION TO CLAIMANTS (non-critical)

VSR provides information to veterans and claimants that is accurate, concise, and complete. This information may be in the form of notification letters, written correspondence to claimants (to include IRIS and congressional responses), Report of Contacts (VAF 21-0820), and other verbal communication with claimants such as personal interviews.

Successful Level

GS-7: The accuracy rate during the evaluation period equals or exceeds 91% (cumulative)

GS-9: The accuracy rate during the evaluation period equals or exceeds 92% (cumulative)

GS-10: The accuracy rate during the evaluation period equals or exceeds 93% (cumulative)

GS-11: The accuracy rate during the evaluation period equals or exceeds 94% (cumulative)

EXCEPTIONAL LEVEL:

The VSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the VSRs Grade:

| | | | | |
|---|---|---|---|---|
| Grade | 7 | 9 | 10 | 11 |
| Accuracy % | 95 | 96 | 97 | 98 |

Indicator
Cases selected for review for Element 1 - Quality will also be reviewed for this element.

ELEMENT 7 - COOPERATION AND ORGANIZATIONAL SUPPORT (Non-Critical Element)

The employee understands the agency mission and supports efforts to improve the work unit's performance through positive interaction with others. Displays appropriate degree of professionalism and treats co-workers and veterans with courtesy and respect. Cooperates with co-workers and supervisors to accomplish work objectives and enhance efficiency. Recognizes the importance of teamwork and is sensitive to the contributions of others. Communicates, shares ideas, and demonstrates respect for differing viewpoints. Participates in cross-functional and work unit teams in a positive manner and shares best practices.

FULLY SUCCESSFUL LEVEL: Interaction with supervisor, co-workers, and others within the organization is businesslike and professional. Working relationships with others are typically constructive and promote the agency mission. Conscientiously follows instructions and adheres to applicable guidance. Employee easily adjusts to different working styles, ideas, and perspectives and appropriately expresses own views in the proper manner. Disagreements are normally resolved through appropriate means. Any deviations in these areas are minor and collectively or separately do not significantly hinder organizational or individual productivity or efficiency.

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria shown for the fully successful level of performance, the employee demonstrates working relationships with others that are always fully supportive of the agency mission. Employee leads by example and helps others adjust to different working styles, ideas, and perspectives. Can be relied on during team meetings and training sessions to express views that are supportive of the missions of VBA and the St. Petersburg VSC.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute "discourtesy". Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 8 - COMMUNICATION AND COALITION BUILDING (Non-Critical)

The employee responds to veterans' needs, gaining support of those who are internal or external to the organization. The employee handles conflicts effectively and builds and sustains trust and respect of all internal and external customers. The employee collaborates and works well with others, showing both sensitivity and compassion. The employee is courteous in his or her response to internal customers and fellow employees. The employee seeks accurate information and comes to a reasonable conclusion in both work assignments and in work place interactions. The employee communicates

clearly, listens actively and attentively to others, and honors commitments and promises, in both work assignments and in work place interactions.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee shares information readily with coworkers; is easy to approach; and expresses ideas clearly.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

* A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 9: FLEXIBILITY AND ADAPTABILITY (Non-Critical)

The employee responds appropriately to new or changing situations and handles multiple inputs and tasks simultaneously. The employee works well with all levels and types of people and is willing to learn new procedures and technologies. The employee is open to ideas different from one's own and accommodates new situations and realities without disruption to the workplace. The employee remains professional in high-pressure situations. The employee makes the most of limited resources and demonstrates resilience in the face of setbacks.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee exhibits willingness to participate in opportunities that foster flexibility and developmental learning.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by a supervisor with the complaint documented, or other documentation evidencing employee developmental learning.

* A valid complaint or incident is one where a review by the supervisor, considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

## CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)*

| ELEMENT DESCRIPTION/TITLE | | | |
|---|---|---|---|
| STANDARD(S) | | | |
| ELEMENT DESCRIPTION/TITLE | | | |
| STANDARD(S) | | | |
| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |

**SECTION B – PROGRESS REVIEW**

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

☐ Is considered Fully Successful or better

☐ Needs improvement to be Fully Successful or better *(See VA Handbook, 5013/1, Part I, Paragraph 7 for additional required action.)*

| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| | | | |

MULLIN,AILEEN

**SECTION C – ACTUAL ACHIEVEMENT**

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpasses. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | LESS THAN FULLY SUCCESSFUL |
| QUALITY (CRITICAL) | X | | |
| TIMELINESS (CRITICAL) | X | | |
| OUTPUT (CRITICAL) | | X | |
| TRAINING (CRITICAL) | X | | |
| ORGANIZATIONAL SUPPORT (NON-CRITICAL) | X | | |
| COMMUNICATION TO CLAIMANTS (NON-CRITICAL) | X | | |
| COOPERATION AND ORGANIZATIONAL SUPPORT (NON-CRITICAL) | X | | |
| COMMUNICATION AND COALITION BUILDING (NON-CRITICAL) | X | | |
| FLEXIBILITY AND ADAPTABILITY (NON-CRITICAL) | X | | |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.

ELEMENTS/ACHIEVEMENTS –

You may also provide a **NARRATIVE SUMARY** – ***OPTIONAL (Provide any additional significant accomplishments, as well as other factors such as details or training experience related to the overall performance plan. Capacity to assume a more responsible position may also be addressed).***

See Attached

Aileen Mullin

ELEMENTS/ACHIEVEMENTS –
You may also provide a NARRATIVE SUMARY – *OPTIONAL (Provide any additional significant accomplishments, as well as other factors such as details or training experience related to the overall performance plan. Capacity to assume a more responsible position may also be addressed).*

**1. QUALITY**
Cumulative Quality Reviews__31__ Cumulative Quality Accuracy ___100__
Standards:

| Grade | 7 | 9 | 10 | 11 |
|---|---|---|---|---|
| Fully Successful | 91 | 92 | 93 | 94 |
| Exceptional | 95 | 96 | 97 | 98 |

**2. TIMELINESS (CRITICAL)**
Fully Successful: GS-7/9/10/11 Cycle times are within 3% of the station goal.
Exceptional: GS-7/9/10/11 Cycle times exceed the station goal by at least 15%.

Monthly and Cumulative Cycle Times exceptionally meets agency guidelines with consideration of mitigating factors. Monthly and Cumulative Average Days Awaiting IDEV (Goal 14) meet agency guidelines with consideration of mitigating factors. Monthly and Cumulative Cycle Times meet agency guidelines Monthly and Cumulative Average Days Awaiting IDEV (Goal 14) with consideration of mitigating factors. There have been no instances of valid complaints or incidents in the timeliness of Direct Services, Special Projects & Duties or corrective actions.

**3. OUTPUT (CRITICAL)**
1. Cumulative Output fiscal year__5.2______

Standards:

| Grade | 7 | 9 | 10 | 11 |
|---|---|---|---|---|
| Fully Successful | 4.5 | 5 | 5.5 | 6 |
| Exceptional | 7 | 7.75 | 8.5 | 9 |

**4. TRAINING (CRITICAL)**
No instances of violations during the evaluation period

**ORGANIZATIONAL SUPPORT (NON-CRITICAL)**
Fully supports the mission without instances of valid complaints or incidents
**COMMUNICATION TO CLAIMANTS (NON-CRITICAL)**
Fully supports the mission without instances of valid complaints or incidents
**COOPERATION AND ORGANIZATIONAL SUPPORT (NON-CRITICAL)**
Fully supports the mission without instances of valid complaints or incidents
**FLEXIBILITY AND ADAPTABILITY (NON-CRITICAL)**
No instances of valid complaints or incidents.

MULLIN,AILEEN

**SECTION D – OVERALL RATING**

TYPE OF RATING

[ ] ANNUAL RATING OF RECORD [ ] SPECIAL RATING OF RECORD [X] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL
FROM 10-1-10 TO 2-28-11

NOTE: Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

[ ] OUTSTANDING – Achievement levels for all elements are designated as Exceptional

[ ] EXCELLENT – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for non-critical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

[X] FULLY SUCCESSFUL – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

[ ] MINIMALLY SATISFACTORY – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Less than Fully Successful.

[ ] UNSATISFACTORY – The achievement level(s) for one (or more) critical elements(s) is (are) as Less Than Fully Successful.

| SIGNATURE AND TITLE OF RATER | DATE |
|---|---|
| x [signature] | x 2-28-11 |

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unsatisfactory ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

[ ] Concur with recommended rating.

[ ] Do not concur with rating. Approve rating of ______________________.

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | DATE |
|---|---|
| | |

| A copy of this performance appraisal was given to me. | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|
| | [signature] | 2-28-11 |

## CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)*

| | | | |
|---|---|---|---|
| ELEMENT DESCRIPTION/TITLE | | | |
| STANDARD(S) | | | |
| ELEMENT DESCRIPTION/TITLE | | | |
| STANDARD(S) | | | |
| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |

**SECTION B – PROGRESS REVIEW**

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

[X] Is considered Fully Successful or better

[ ] Needs improvement to be Fully Successful or better *(See VA Handbook, 5013/1, Part I, Paragraph 7 for additional required action.)*

| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| Michelle Trent | MAY 03 2011 | [signature] | 5/3/11 |

**Modification of Performance Plan and Appraisal of**

| Employee Name | Position Title, Series and Number | Grade/Salary |
|---|---|---|
| | | |
| **Department/Office** | **Location** | **Effective Date** |
| St. Petersburg VARO VSC | St. Petersburg, FL | March 1, 2011 |

**CHANGES TO PERFORMANCE PLAN**

**Element Description/Title**

Critical Element 2, Productivity
This change specifically addresses Element 2, Productivity, for VSR's while assigned to the Day 1 Brokering Center (D1BC) teams working EP's 687 and 681.

**Standard(s)**

1. All provisions of the current Regional Office Flexi-place policy and National MOU shall apply.
2. All provisions of the current Performance Appraisal Plan for VSRs will apply with the exception of Element 2, Productivity.
3. The standard for Critical Element 2, Productivity will be measured as a cumulative average daily rate with the following measures:

| GS Level | Fully Successful | Exceptional |
|---|---|---|
| GS-10 | 3.5 | 6.5 |
| GS-11 | 4 | 7 |

| Signature of Rater | Date | Signature of Employee | Date |
|---|---|---|---|
| Michelle Trent | MAY 03 2011 | [signature] | 5/3/2011 |

Modified Replica of VA Form 0750 Nov 2033 (RS)

MULLIN,AILEEN

**SECTION C – ACTUAL ACHIEVEMENT**

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpasses. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Quality (Critical) | X | | |
| Timeliness (Critical) | X | | |
| Output (Critical) | | X | |
| Training (Critical) | X | | |
| Organizational Support (Non-critical) | | X | |
| Communication to Claimants (Non-critical) | X | | |
| Cooperation & Organizational Support (Non-critical) | | X | |
| Communication & Coalition Building (Non-critical) | | X | |
| Flexibility & Adaptability (Non-critical) | X | | |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.

ELEMENTS/ACHIEVEMENT(S)

Quality – at 100% you exceeded the accuracy rate of 97% for GS 10.
Timeliness – portions of this element were mitigated while assigned to D1BC. No valid complaints/ incidents.
Training – no violations during the evaluation period.
Communication to Claimants – at 100% your accuracy rate exceeds of 97% for GS 10.
Flexibility & Adaptability – all employees assigned to the Nehmer Special Project team have been extremely flexible and adaptable.

MULLIN,AILEEN

**SECTION D – OVERALL RATING**

TYPE OF RATING

[ ] ANNUAL RATING OF RECORD
[ ] SPECIAL RATING OF RECORD
[X] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL
FROM 03/01/2011 TO 06/09/2011

NOTE: Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

[ ] OUTSTANDING – Achievement levels for all elements are designated as Exceptional

[ ] EXCELLENT – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

[X] FULLY SUCCESSFUL – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

[ ] MINIMALLY SATISFACTORY – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as unacceptable.

[ ] UNACCEPTABLE – The achievement level(s) for one (or more) critical elements(s) is (are) as unacceptable.

| SIGNATURE AND TITLE OF RATER | DATE (MM/DD/YYYY) |
|---|---|
| Asst Coach, Michelle Trent | 06.09.2011 |

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

[ ] Concur with recommended rating.

[ ] Do not concur with rating. Approve rating of ______________________.

BASIS FOR PERFORMANCE RATING CHANGE

Employee promoted to RVSR effective 5.08.11.

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | | DATE (MM/DD/YYYY) |
|---|---|---|
| | | |
| A copy of this performance appraisal was given to me. | SIGNATURE OF EMPLOYEE: Aileen Mullin | DATE (MM/DD/YYYY): 06/09/2011 |

| VA Department of Veterans Affairs | PERFORMANCE APPRAISAL PROGRAM | | | |
|---|---|---|---|---|
| | | | | Replica of VA Form 0750 Nov 2003 (RS) |
| EMPLOYEE'S NAME (*Last, First, Middle Initial*) MULLIN,AILEEN | POSITION TITLE, SERIES AND NUMBER 02104A VETERANS SERVICE REP (RATING) GS 0996 | | | GRADE/SALARY 10 / $52,252 |
| DEPARTMENT/OFFICE VBA Veterans Service Center | | | LOCATION VARO 317, St. Petersburg, FL | |
| DATE ASSIGNED PRESENT POSITION 5-8-11 | DUE DATE OF WITHIN-GRADE INCREASE 02/12/2012 | | PERIOD COVERED BY THIS PERFORMANCE PLAN Oct. 1, 2010 - Sept. 30, 2011 | |
| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN [signature] Coach | DATE 6-30-11 | SIGNATURE OF EMPLOYEE [signature] | | DATE 6/30/2011 |

SECTION A – PERFORMANCE PLAN

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

PERFORMANCE PLAN
RVSR

EVALUATION PERIOD: Timeframes for each performance element are based on the date of selection as an RVSR.

ELEMENT 1 QUALITY OF WORK (Critical Element)

The RVSR must consistently and conscientiously exercise sound, equitable judgment in applying stated policies to ensure accurate and timely decisions on compensation and pension benefit claims administered by the Department of Veterans Affairs.

FULLY SUCCESSFUL LEVEL:

The RVSR's cumulative accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level and Grade:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | 0 | 75 | 80 | 80 | 80 | 85 |

Journey-Level RVSR (GS12; 24 months in position): 88%

EXCEPTIONAL LEVEL:

The RVSR's accuracy rate during the evaluation period equals or exceeds the levels shown in the following table based upon the RVSRs experience level:

Developmental Grades (GS 9, 10, 11) and GS 12 <= 24 months

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Accuracy % | N/A | 80 | 85 | 85 | 85 | 90 |

Journey-Level RVSR (GS12, 24 months in position): 93%

INDICATORS: A random selection will be made of an average of five cases per month per employee. The ASPEN program will be used to generate the random selection. The selection of cases, while random, must reflect an appropriate mix of work performed by the employee throughout the month (i.e. not from a single day or single week).

The cases selected will be reviewed prior to concurrence by a second signature to determine the accuracy of the originator of the decision. Only one error is counted per case reviewed. All other errors will be shown as comments only and will not impact the accuracy rate.

*If a routine review of an RVSR's work demonstrates the need for quality improvement (i.e. significant percentage of cases reviewed contain errors), the sample will be expanded to an average of 10 cases per month. The RVSR's supervisor will determine whether the deficiency is resolved or a Performance Improvement Plan is necessary.

ELEMENT 2 – PRODUCTIVITY (Critical Element)
An RVSR's productivity will be measured as a cumulative average daily rate. Cases will be counted for production purposes as follows:

½ case = all formal ratings not listed below regardless of the number of issues rated
= when assigned to the Pre team or at the direction of management, VA Examination request
1 case = 110, 020, 165, SOC, SSOC with less than 8 issues rated
2 cases = 010, 020, 165, SOC, SSOC with 8-15 issues rated
3 cases = 16-23 issues rated; 4 cases = 24-31 issues rated, etc.

FULLY SUCCESSFUL LEVEL:

Minimum Production Requirement In Weighted Cases Based on Months in Position

Developmental Grades (GS9/10/11/12)

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|
| Ave Weighted Cases Per Day | 0 | 0.50 | 2.5 | 3.0 | 3.5 | 4.0 |

Journey-Level RVSR (GS12, 24 months in position): 4.0

EXCEPTIONAL LEVEL:

Production Requirement In Weighted Cases Based on Months in Position

| Months in Position | 0-9 | 10-12 | 13-16 | 17-20 | 21-24 | >24 |
|---|---|---|---|---|---|---|

Ave Weighted Cases Per Day N/A 3.5 4.5 5.0 5.5 5.5

Journey-Level RVSR (GS12, 24 months in position): 6.0

INDICATORS: ASPEN Production reports

*Leave, union time, training, special projects or assignments, or 2nd signature review when required by local or national procedures are acceptable categories of deductible time. This list is not exhaustive as there may be other reasons for deductible time to be considered by management. All deductible time must be pre-approved by the supervisor.

ELEMENT 3 CUSTOMER SERVICE (Critical Element)

The RVSR functions as a team member to enhance resolution of claims and customer service contacts by work actions. Maintains professional, positive, and helpful relationships with internal/external customers by exercising tact, diplomacy, and cooperation.

Performance demonstrates the ability to adjust to change or work pressures, to handle differences of opinion in a businesslike fashion, and to follow instructions conscientiously. As a team member, contributes to the group effort by supporting fellow teammates with technical expertise and open communications and by identifying problems and offering solutions. Successful achievement in this element reflects support of all scorecard goals.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents.*

EXCEPTIONAL LEVEL: No instances.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.
*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 4 TIMELINESS (Critical Element)

After 6 months experience, the RVSR:

Works in a manner that supports and contributes to meeting division timeliness targets, as defined by the Workload Management Plan.

Screening and direction of development for incoming deliveries from the Pre team is generally performed within 1 workday of receipt but will not exceed more than 5 workdays of receipt. COVERS claims folders when received to facilitate in-house tracking. Updates MAP-D and DISP claims as required by office policy.

Claims determined to be ready for decision (RFD) will be processed within 21 workdays of receipt in the Rating Team.

FULLY SUCCESSFUL LEVEL: No more than 4 instances of cases not being worked within established time frames or to adhere to division guidelines.

EXCEPTIONAL LEVEL: No more than 2 instances of cases not being worked within established time frames or to adhere to division guidelines.

INDICATORS: Verbal and/or written feedback from internal and/or external customers. Observations by a manager with a complaint documented, and reports required by Workload Management Plan.

* Extenuating circumstances and notification to the RVSR's supervisor will be considered. An incident will not be called until after the first notification of non-compliance of the above standard.

ELEMENT 5 COOPERATION AND ORGANIZATIONAL SUPPORT (Non-Critical Element)

The employee understands the agency mission and supports efforts to improve the work unit's performance through positive interaction with others. Displays appropriate degree of professionalism and treats co-workers and veterans with courtesy and respect. Cooperates with co-workers and supervisors to accomplish work objectives and enhance efficiency. Recognizes the importance of teamwork and is sensitive to the contributions of others. Communicates, shares ideas, and demonstrates respect for differing viewpoints. Participates in cross-functional and work unit teams in a positive manner and shares best practices.

FULLY SUCCESSFUL LEVEL: Interaction with supervisor, co-workers, and others within the organization is businesslike and professional. Working relationships with others are typically constructive and promote the agency mission. Conscientiously follows instructions and adheres to applicable guidance. Employee easily adjusts to different working styles, ideas, and perspectives and appropriately expresses own views in the proper manner. Disagreements are normally resolved through appropriate means. Any deviations in these areas are minor and collectively or separately do not significantly hinder organizational or individual productivity or efficiency.

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria shown for the fully successful level of performance, the employee demonstrates working relationships with others that are always fully supportive of the agency mission. Employee leads by example and helps others adjust to different working styles, ideas, and perspectives. Can be relied on during team meetings and training sessions to express views that are supportive of the missions of VBA and the St. Petersburg VSC.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

*A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Disagreeing, per se, does not constitute discourtesy. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 6: COMMUNICATION AND COALITION BUILDING (Non-Critical)

The employee responds to veterans' needs, gaining support of those who are internal or external to the organization. The employee handles conflicts effectively and builds and sustains trust and respect of all internal and external customers. The employee collaborates and works well with others, showing both sensitivity and compassion. The employee is courteous in his or her response to internal customers and fellow employees. The employee seeks accurate information and comes to a reasonable conclusion in both work assignments and in work place interactions. The employee communicates clearly, listens actively and attentively to others, and honors commitments and promises, in both work assignments and in work place interactions.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee shares information readily with coworkers; is easy to approach; and expresses ideas clearly.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by supervisor with the complaint documented, or other documentation.

* A valid complaint or incident is one where a review by the supervisor, after considering the total circumstances at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

ELEMENT 7: FLEXIBILITY AND ADAPTABILITY (Non-Critical)

The employee responds appropriately to new or changing situations and handles multiple inputs and tasks simultaneously. The employee works well with all levels and types of people and is willing to learn new procedures and technologies. The employee is open to ideas different from one's own and accommodates new situations and realities without disruption to the workplace. The employee remains professional in high-pressure situations. The employee makes the most of limited resources and demonstrates resilience in the face of setbacks.

FULLY SUCCESSFUL LEVEL: No more than 3 instances of valid complaints or incidents. *

EXCEPTIONAL LEVEL: In addition to demonstrating the criteria for the fully successful level of performance, the employee exhibits willingness to participate in opportunities that foster flexibility and developmental learning.

INDICATORS: Verbal and/or written feedback from internal and/or external customers, observations by a supervisor with the complaint documented, or other documentation evidencing employee developmental learning.

* A valid complaint or incident is one where a review by the supervisor, considering the total circumstances known at the time, reveals that the complaint/incident should have been handled more prudently and was not unduly aggravated by the complainant. Valid complaints or incidents will be determined by the supervisor and discussed with the employee.

Grade Progression Criteria

Throughout the career ladder program, all critical elements must be met at the grade level sought prior to advancement. Likewise, any other legal requirements of the position must be met for the individual to be eligible to advance to the next level. This includes but may not be limited to time in grade. When all requirements are met, including those described below, the supervisor will recommend promotion and approval will be considered at the division level absent any indication the individual is not otherwise suited to perform at the level sought. Individuals have the discretion to request non-promotion if they meet the minimum range described below but feel they are not yet ready to sustain performance at the higher level. In this situation, the individual will be given an additional 90 days to meet the next level and any training identified as necessary after which the full standard level for the grade must be met. All individuals are required to sustain the full performance level of their grade within 90 days of promotion to a higher grade.

· For advancement to the next higher RVSR grade of GS-10, 11, and 12, the employee must have a minimum of 12 months experience in the RVSR position at each grade, and the employee must demonstrate performance at the next higher monthly requirement prior to assuming their new grade.*

Only the GS-12 is recognized as a journeyman position while the other levels are training positions. For this reason, there is no unique range of exception to the full requirements for a GS-12 with 25 months or more as this constitutes the journeyman level and is not a training position.

*For RVSRs selected on an announcement after August 2008, successful completion of the Basic RVSR Skills Certification Test is also required prior to receiving the GS 12 level.

MULLIN,AILEEN

| CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)* | | | |
|---|---|---|---|
| ELEMENT DESCRIPTION/TITLE | | | |
| STANDARD(S) | | | |
| ELEMENT DESCRIPTION/TITLE | | | |
| STANDARD(S) | | | |
| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |

**SECTION B – PROGRESS REVIEW**

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

☐ Is considered Fully Successful or better

☐ Needs improvement to be Fully Successful or better *(See VA Handbook, 5013/1, Part I, Paragraph 7 for additional required action.)*

| SIGNATURE OF RATER | DATE | SIGNATURE OF EMPLOYEE | DATE |
|---|---|---|---|
| | | | |

**SECTION C – ACTUAL ACHIEVEMENT**

**Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Quality of Work | | X | |
| Productivity | | X | |
| Customer Service | | X | |
| Timeliness | | X | |
| Cooperation and Organizational Support (Non-critical) | | X | |
| Communication and Coalition Building | | X | |
| Flexibility and Adaptability | | X | |
| | | | |
| | | | |

**Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.**

**ELEMENTS/ACHIEVEMENT(S)**

NARATIVE SUMMARY – OPTIONAL (Provide any additional significant accomplishments, as well as other such as details or training experiences related to the overall performance plan. Capacity to assume a more responsible position may also be addressed.)

**SECTION D – OVERALL RATING**

TYPE OF RATING

- [ ] ANNUAL RATING OF RECORD
- [ ] SPECIAL RATING OF RECORD
- [X] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL
FROM (MM/DD/YYYY) 5-8-11 TO (MM/DD/YYYY) 9-2-11

NOTE: Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

- [ ] OUTSTANDING – Achievement levels for all elements are designated as Exceptional
- [ ] EXCELLENT – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.
- [X] FULLY SUCCESSFUL – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.
- [ ] MINIMALLY SATISFACTORY – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as unacceptable.
- [ ] UNACCEPTABLE – The achievement level(s) for one (or more) critical elements(s) is (are) as unacceptable.

| SIGNATURE AND TITLE OF RATER | DATE (MM/DD/YYYY) |
|---|---|
| Kathleen [signature] | 9/7/11 |

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

- [ ] Concur with recommended rating.
- [ ] Do not concur with rating. Approve rating of ______________________.

BASIS FOR PERFORMANCE RATING CHANGE

Change in Supervisor

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | DATE (MM/DD/YYYY) |
|---|---|
| | |

| A copy of this performance appraisal was given to me. | SIGNATURE OF EMPLOYEE | DATE (MM/DD/YYYY) |
|---|---|---|
| | [signature] | 09/07/2011 |

Aileen Mullin

**SECTION C – ACTUAL ACHIEVEMENT**

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpasses. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.

| ELEMENTS (Use the same key word description for each element as in Section A) | LEVELS OF ACHIEVEMENT: EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
|---|---|---|---|
| Quality of Work (critical) | | X | |
| Productivity (critical) | | X | |
| Customer Service (critical) | | X | |
| Timeliness (critical) | | X | |
| Cooperation and Organization Support (Non-critical) | | X | |
| Communication and Coalition Building (Non-critical) | | X | |
| Flexibility and Adaptability (Non-critical) | | X | |
| | | | |
| | | | |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.

ELEMENTS/ACHIEVEMENT(S)

Aileen Mullin

NARATIVE SUMMARY – OPTIONAL (Provide any additional significant accomplishments, as well as other such as details or training experiences related to the overall performance plan. Capacity to assume a more responsible position may also be addressed.)

**SECTION D – OVERALL RATING**

TYPE OF RATING

[X] ANNUAL RATING OF RECORD
[ ] SPECIAL RATING OF RECORD
[ ] SUMMARY RATING (POSITION CHANGES – EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL
FROM *09/03/11* TO 09/30/11

NOTE: Recommended Performance Rating – Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

[ ] OUTSTANDING – Achievement levels for all elements are designated as Exceptional

[ ] EXCELLENT – Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

[X] FULLY SUCCESSFUL – The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

[ ] MINIMALLY SATISFACTORY – Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as unacceptable.

[ ] UNACCEPTABLE – The achievement level(s) for one (or more) critical elements(s) is (are) as unacceptable.

| SIGNATURE AND TITLE OF RATER | DATE (MM/DD/YYYY) |
|---|---|
| [signature] | 10-28-11 |

**SECTION E – HIGHER LEVEL REVIEW/APPROVAL**

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

[ ] Concur with recommended rating.

[ ] Do not concur with rating. Approve rating of ______________________.

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVAL OFFICIAL | DATE (MM/DD/YYYY) |
|---|---|
| | |

| | SIGNATURE OF EMPLOYEE | DATE (MM/DD/YYYY) |
|---|---|---|
| A copy of this performance appraisal was given to me. | [signature] | 10/28/2011 |

Subject: Fw: light at the end of the tunnel

From: Aileen Mullin (aileen_mullin@

To: ulyssee.mcburrough@va.gov;

Cc: john.r.smith2@va.gov;

Date: Tuesday, August 28, 2012 7:22 PM

Hi Bo,

I tried to send this e-mail to you but for some reason it bounced back with this message:

**"Sorry, we were unable to deliver your message to the following address.**

**<ulyssee.mcburrough@va.gov>:**
**Message expired for domain va.gov. Remote host said: 452 Your message could not be delivered to the intended recipient. This may because your message is characterized to be unsolicited email or from an untrusted mail delivery system. We sincerely apologize for any inconvenience this may have caused."**

----- Forwarded Message -----
**From:** Aileen Mullin <aileen_mullin@
**To:** Ulysee McBurrough <ulyssee.mcburrough@va.gov>
**Sent:** Monday, August 27, 2012 11:56 AM
**Subject:** light at the end of the tunnel

Good morning Bo,

John Smith is my representative on all HR matters regarding my medical emergency. He has done an excellent job on my behalf and I understand that he's been in touch with you as well as the HR department. For this I'm thankful.

I am writing in hopes that you can help me understand whats going on with my latest leave and earnings shortfall.

I understand I've used all leave donated to me but have I maxed out the number of advanced hours permitted? Have requests for advanced leave been denied or not responded to? I don't understand.

On August 17, my pay was $1222 short. I'm very concerned about the pay check that I am scheduled to receive (or not receive?) on Friday, August 31.

I meet with my primary today and oncologist tomorrow. As of now, I'm scheduled for the last round of chemotherapy on Wednesday. If this infusion hits me any where near as severely as the previous three, I'll be in no shape to deal with another surprise in my pay stub.

Bo, thank you for your help on this urgent matter.

Sincerely,

Aileen

C-14

P.S. Moffitt sent an update on my FMLA directly to the HR department. At this time, I anticipate returning to work no later than September 17th. Last week John submitted another leave donation request. I was also able to reach out to one of National Vice Presidents of the Union, and he's willing to spread word of my need for advanced leave to the Leaders under his jurisdiction. AND, I know its the end of the Fiscal Year AND end of the month, so your plate is on already on OVERLOAD. I

really do hate having to put one more thing on that plate of your!!

**Subject:** paycheck = $0.00

**From:** Aileen Mullin (aileen_mullin@

**To:** kellee@afge.org;

**Cc:** valorie.reilly@va.gov; john.r.smith2@va.gov;

**Bcc:** aileen_mullin@

**Date:** Friday, August 31, 2012 9:25 AM

Good morning Everett,

I'm sorry to have to tell you, but what I feared, has come to fruition: I didn't receive a check.

The first time my pay was short was in June (- $710), the second was in the beginning of August (- $1222 ) and now this one ( -$2273).

Both Val and John Smith, the Steward who's willing to help me, have been informed. Its unclear how I should proceed. My biggest concern is my health insurance coverage being in jeopardy. (As the attached Leave and Earnings Statement reflects, my employee heath-care contribution wasn't made for this pay period.)

Looking forward to your guidance, and thank you again for your support,

Aileen

# CIVILIAN LEAVE AND EARNINGS STATEMENT

| 1. Pay Period End | 2. Pay Date |
|---|---|
| 08/25/12 | 08/31/12 |

| ...ne | 4. Pay Plan/Grade/Step | 5. Hourly/Daily Rate | 6. Basic OT Rate | 7. Basic Pay + Locality Adj = Adjusted Basic Pay |
|---|---|---|---|---|
| ...LIN AILEEN | GS 11 02 | 28.42 | 37.56 | 51963.00 7358.00 59321.00 |

| 3. Soc Sec No | 9. Locality % | 10. FLSA Category | 11. SCD Leave | 12. Max Leave Carry Over | 13. Leave Year End |
|---|---|---|---|---|---|
| | 14.16 | N | 02/09/09 | 240 | 01/12/13 |

| 14. Financial Institution - Net Pay | 15. Financial Institution - Allotment #1 | 16. Financial Institution - Allotment #2 |
|---|---|---|
| USAA FEDERAL SAVINGS BANK | FROST BANK | MIDFLORIDA FED C U |

| 17. Tax | Marital Status | Exemptions | Add'l | 18. Tax | Marital Status | Exemptions | Add'l | Taxing Authority | 19. Cumulative Retirement | 20. Military Deposit |
|---|---|---|---|---|---|---|---|---|---|---|
| FED | S | 1 | 0 | | | | | | FERS: | |

| 21. | Current | Year to Date |
|---|---|---|
| GROSS PAY | | 35894.89 |
| TAXABLE WAGES | | 30322.80 |
| NONTAXABLE WAGES | | 3080.51 |
| TAX DEFERRED WAGES | | 2491.58 |
| DEDUCTIONS | | 14300.37 |
| AEIC | | |
| NET PAY | | 21594.52 |

22.

## CURRENT EARNINGS

| TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT |
|---|---|---|---|---|---|---|---|---|

## DEDUCTIONS

| TYPE | CODE | CURRENT | YEAR TO DATE | TYPE | CODE | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| ALLOTMENT, SV | (2) | | | FEGLI | TO | | |
| FEGLI OPTNL | AB | | | FEHB | 111 | | |
| FSA-HC | | | | HSA | | | |
| MEDICARE | | | | OASDI | | | |
| ORG/UNION | VBAA | | | RETIRE, FERS | | | |
| TAX, FEDERAL | | | | TSP LOANS | | | |
| TSP SAVINGS | | | | DENTAL | | | |
| VI... | | | | | | | |

## LEAVE

| TYPE | PRIOR YR BALANCE | ACCRUED PAY PD | ACCRUED YTD | USED PAY PD | USED YTD | DONATED/ RETURNED | CURRENT BALANCE | USE-LOSE/ TERM DATE |
|---|---|---|---|---|---|---|---|---|
| ANNUAL | 36.50 | | 72.00 | | 108.50 | | | |
| SICK | 24.75 | | 52.00 | | 193.75 | | -117.00 | |
| DONATED | | | 226.00 | | 226.00 | | | |
| ADMIN | | | | | 24.75 | | | |
| LWOP | | | | 80.00 | 149.50 | | | |

## BENEFITS PAID BY GOVERNMENT FOR YOU

| TYPE | CURRENT | YEAR TO DATE | TYPE | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| FEGLI | | | FEHB | | |
| MEDICARE | | | OASDI | | |
| RETIRE, FERS | | | TSP BASIC | | |
| TSP MATCHING | | | | | |

## REMARKS

YOUR PAYROLL OFFICE ID NUMBER IS 97381600 - DEPARTMENT OF VETERANS AFFAIRS.
YOUR PIN HAS BEEN ESTABLISHED/CHANGED FOR ACCESSING MYPAY. IF YOU DID NOT TAKE THIS ACTION, CONTACT 1-888-332-7411 OR (216) 522-5096.
FEHB PREMIUM HAS BEEN PREPAID BY YOUR AGENCY DUE TO INSUFFICIENT PAY. THIS DEBT MUST BE REPAID EXCEPT FOR THOSE ELIGIBLE RESERVISTS IN SUPPORT OF CONTINGENCY OPERATIONS.
LIFE INSURANCE DEDUCTION CHANGED.

**THIS REPORT CONTAINS INFORMATION SUBJECT TO THE PRIVACY ACT OF 1974 AS AMENDED**

# American Federation of Government Employees, AFL-CIO
## Local 1594

P.O. Box 1437
St. Petersburg, FL 33731

Telephone (727) 319-5934
Fax (727) 319-7784


Date: November 23, 2011

From: Keith Pryor, AFGE Local 1594, Vice President

Subj: Mold Training

To: Kerrie Witty, Director, St. Petersburg VA Regional Office

In reply to your September 9, 2011 memorandum pertaining to Mold in Files Warehouse, please be advised that AFGE representatives are requesting to be provided with training on mold, *in accordance with the Master Agreement, Article 29, Section, 15H.*

AFGE has serious concerns that mold and other hazards' contaminates from previous water damage and recent fire issues have created serious problems with the building. We believe that the conditions are adversely affecting the health of not only our members, but everyone employed here at the Regional Office. Accordingly, we are requesting to be provided with appropriate training for two of our Union Members. President Reilly is requesting the Aileen Mullin, RVRS and I be provided with training as soon as possible.

In closing, please advise the Union as to the appropriate procedures for how and when we can begin our training. Thank you for your attention to this request and we look forward to your reply.

Respectfully,

— Copy —

Keith A. Pryor, Vice President

AFGE Local 1594

C-15

# Department of Veterans Affairs

# Memoran

Bonnie using bogus regulation to deny me training

**Date:** November 28, 2011

**From:** Human Resources Manager, St. Petersburg Regional Office

**Subj:** Mold Training

**To:** Keith Pryor
AFGE Vice President, Local 1594
St. Petersburg Regional Office

1. This memorandum responds to AFGE's letter dated and received, November 23, 2011, regarding mold training.

2. AFGE cites Article 29, Section 15 H as the source for the training requested, but identifies Aileen Mullin, an RVSR not found on the current Union officer or steward listings, and Keith Pryor as the individuals to receive the cited training. In accordance with the cited provision, management is required to provide training on mold removal to the Union Safety and Health Representative. AFGE identified Walter Ingram as the Union Safety and Health Representative by letter dated October 21, 2011.

3. In light of the discussions with the AFGE Local President in September identifying Keith Pryor, the October designation of Walter Ingram and the instant letter, AFGE is requested to clarify the identity of the Union Safety and Health Representative designated under Section 3 G.

4. Management appreciates and shares AFGE's interest and concern for the well being of our workforce. AFGE was provided a copy of the August air sample results on September 12, 2011, and met with the VSC Manager on September 14, 2011, regarding the water leak in the warehouse. Management is not aware of any hazard currently in the Regional Office. Management remains open to local discussion and/or negotiation on this topic. AFGE's participation in ensuring the safety and health of our work force is welcome.

5. If you require additional information, please contact me at extension 7271 or Philip Works, Human Resources Specialist, at extension 5923.

BWax

BONNIE WAX

**Mullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Tuesday, December 06, 2011 5:14 PM
**To:** Cartner, James, VBASPT
**Subject:** Ceiling tile replacement
**Signed By:** aileen.mullin@va.gov

Hi Jim,

Per our conversation, will you please request that the moisture stained ceiling tile, that's next to the air vent, as well as the surrounding area, be tested for mold spores. I ask out of concern for the many of us that are having respiratory issues such as allergies, asthma and sinusitis.

Thanks,
Aileen

A FGE Copy

# American Federation of Government Employees

AFGE Local 1594
P.O. Box 1437
St. Petersburg, FL 33731

Telephone (727) 319-5934
Fax (727) 319-7784
Email: AFGE 1594@netzero.net

Date: October 21, 2011

From: Deborah Johann, Acting President AFGE Local 1594

Subj: Assignment of designee for Local Safety and Health Representative

To: Bonnie Wax, Human Resources Manager

In response to your memorandum dated September 22, 2011, AFGE Local 1594 is replacing Russell Desmond with Walter Ingram as the Local Safety and Health Representative representing AFGE Local 1594.

If you have any questions, please contact me at (727) 319-7315

Deborah Johann
Acting President AFGE Local 1594

CC: Russell Desmond, former representative
Walter Ingram, new representative
Valorie Reilly, AFGE 1594 Local President

Rec'd by
Date: 10/21/11

To Do For All That Which None Can Do For Oneself

**Department of Veterans Affairs**

# Memorandum

Date: September 22, 2011

From: Bonnie Wax, Human Resources Manager

Subj: Clarification on Local Safety and Health Representative

To: Valorie Reilly, President, AFGE Local 1594

1. Ross Desmond was designated as the AFGE representative on the Safety Occupational and Fire Protection Committee at our facility.

2. Article 29 of the new Master Agreement, dated March 2011, outlines expanded union involvement in health and safety matters. As a result, we are asking for clarification on whether Ms. Desmond will continue in this new role as Safety and Health Representative, or whether AFGE Local 1594 wishes to designate someone else as the point of contact.

3. This information is needed to ensure management can meet the intent of Article 29.

4. If you have further questions or need additional information, please contact Megan Tarver at extension 6560.

BONNIE J. WAX

23-SEP-2011 15:01 From:8136267015 Page:1/5

TAMPA AREA OFFICE

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

5807 BRECKENRIDGE PARKWAY, SUITE A

TAMPA, FLORIDA 33610

(813)626-1177

FAX (813)626-7015

# FACSIMILE TRANSMITTAL

| | |
|---|---|
| TO | Department of Veterans Affairs |
| ATTENTION | Dean Amrstrong |
| FROM | Karen Stone |
| DATE & TIME | 09/23/11 |
| FAX NUMBER | 727-398-9497 |
| NO. OF PAGES | 5 |

**U.S. Department of Labor**

Occupational Safety and Health Administration
Tampa Area Office
5807 Breckenridge Parkway, Suite A
Tampa, Florida 33610-4249
(813) 626-1177 FAX: (813) 626-7015

Reply to the Attention of: Karen Stone

September 23, 2011

Department of Veterans Affairs
9500 Bay Pines Blvd.
St. Petersburge, FL 33731

Dear Dean Armstrong:

On 9/23/11, the Occupational Safety and Health Administration (OSHA) received a report of alleged hazardous working conditions and/or violations of 29 CFR Part 1960 citable program elements in your workplace at:

9500 Bay Pines Blvd.
St. Petersburge, FL 33731

The specific nature of the report involves:

1. An electrical fire in the building is causing smoke problems. Possible violation of section 5(a)(1).

OSHA has decided not to conduct an inspection in response to this report. However, since allegations of the violation of standards have been made, you should investigate the alleged violation(s). Department of Labor regulation 29 CFR 1960.28 requires that your inspection be conducted within 3 working days for potentially serious conditions and within 20 working days for other-than-serious hazards. Any necessary correction(s) should be made within 30 calendar days after completion of the inspection. If correction(s) cannot be made within 30 calendar days, please provide me with a detailed abatement plan. Your plan should include:

(1) All steps taken and the dates of such action to achieve compliance during the prescribed abatement period.

(2) The specific additional abatement time estimated to achieve compliance.

(3) The reasons such additional time is necessary, including the unavailability of professional or technical personnel or of materials and equipment, or because necessary construction or alteration of facilities cannot be completed by the original abatement date.

(4) Interim steps being taken to safeguard the employees against the cited violation(s) during the abatement period.

Since the complainant has requested to remain anonymous, please advise me in writing, within 30 calendar days after completion of inspection, of your finding(s) and of any action you have taken. Your response should be detailed, stating specifically what corrective action(s), if any, were taken. If it is determined that, based on the report, no violation(s) exist and an inspection will not be conducted, please notify me in writing within 15 calendar days of receipt of this letter. We have notified the complainant that the complaint has been forwarded to you for action, and, if the violation(s) are not corrected, to notify us. We will forward a copy of your report to the complainant.

You should enclose any supporting documentation on the action(s) taken, such as monitoring results, new equipment orders, or photograph(s) of corrected condition.

If we do not receive a response from you within 30 calendar days, indicating that appropriate action has been taken or that no violation(s) exist, an OSHA inspection may be scheduled.

If you have any questions or need assistance concerning this matter, please contact our office.

Sincerely,

Karen S. Stone
for
Leslie L. Grove III
Area Director

Enclosure

CERTIFICATE OF POSTING

OSHA NOTIFICATION OF ALLEGED HAZARD(S)

**Employer:** Department of Veterans Affairs

**Complaint #:**

**Date copy given to an Employee Representative:**_______________________________

On behalf of the employer, I certify that a copy of the complaint letter received from the Occupational Safety and Health Administration(OSHA) has been posted in a conspicuous place, where all affected employees will have notice, or near such location where the violation occurred, and such notice has been given to each authorized representative of affective employees, if any. This notice was or will be posted for a minimum of ten (10) working days or until any hazardous conditions found are corrected.

**Signature**_______________________________
**Title**

**U.S. Department of Labor**

**Occupational Safety and Health Administration**
Tampa Area Office
5807 Breckenridge Parkway, Suite A
Tampa, Florida 33610-4249
(813) 626-1177 FAX: (813) 626-7015

Dear Sir/Madam:

In addition to the standard(s) listed in the enclosed complaint letter, there are several other standards which may apply to your job site and are included in the scope of all OSHA inspections. Following is a list of these standards:

| **Description (alphabetical)** | **Standard:** General Industry–29 CFR 1910 Construction–29 CFR 1926 | **Requirement** |
|---|---|---|
| Bloodborne Pathogens Program | 1910.1030 / 1926.95 | Written program, medical |
| Chemical Hazard Communication | 1910.1200 / 1926.59 | Written Program, labeling of containers, MSDSs (material safety |
| Fall Protection Requirements | 1910.23 | Required when greater than 4-feet in General Industry |
| Fall Protection Requirements | 1926.500 | Required when greater than 6-feet in Construction |
| Injury and Illness Recordkeeping | 1904.2 (both) | For all employers with more than 10 employees, *who are not listed in* |
| Lockout-Tagout of Equipment | 1910.147 | Written program and training |
| Medical Services and First Aid | 1910.151 / 1926.50 | Must be available & in close proximity |
| Permit Required Confined Space Entry | 1910.146 / 1926.21 | Evaluation of work area and implementation of a program, |
| Personal Protective Equipment | 1910.132 / 1926.28 & 1926.95 | Assessment of hazards and training |
| Posting of the OSHA Notice | 1903.2 (both) | Posted at all job sites |
| Records, Employee access to exposure and medical records | 1910.1020 (both) | Notification to all employees annually |
| Safety/Health Training and Program | 1926.20 & 1926.21 | Training for unsafe conditions. |

OSHA standards regulate most industrial processes. If you are affected by any of these standards, or think you may be and are not aware of the requirements, please contact this office and we will gladly provide you with information.

Sincerely,

Leslie L. Grove III

**Leslie L. Grove III**
**Area Director**

**Department of Veterans Affairs**

# Memorandum

**Date:** September 27, 2011

**From:** Human Resources Manager, St. Petersburg Regional Office

**Subj:** Notice to the Union: # 2011 – 50 – OSHA Notice

**To:** Valorie Reilly
AFGE President, Local 1594
St. Petersburg Regional Office

1. This memorandum serves as notification that the agency will post the attached OSHA Notification of Alleged Hazards as described in the enclosed paperwork.

2. If you require additional information, please contact me at extension 7271 or Megan Tarver, Human Resources Specialist, at extension 6560.

BONNIE WAX

**Department of Veterans Affairs**

# Memorandum

Date: September 9, 2011

From: Bonnie Wax, Human Resources Manager

Subj: Notice to the Union 2011-44 (Mold in Files Warehouse)

To: Valorie Reilly, President, AFGE Local 1594

1. This memorandum is to formally notify AFGE that an air sampling of the Files Warehouse showed that airborne concentrations of mold existed. This is a follow-up to Management's verbal notification to Valorie Reilly on August 12, 2011. During this conversation, Ms. Reilly was informed that a routine walkthrough of the Files Warehouse area revealed what appeared to be mold on the ceiling. AFGE was informed that the inspector was expected at the Regional Office on August 15, 2011, although he did not come until August 17, 2011.

2. A water leak was reported in the Files Warehouse at the St. Petersburg Regional Office on or about the week of August 15, 2011. Immediate steps were taken to contain the leak, remove damaged items, and limit any possible impact on employees. A closer inspection of ceiling tiles revealed a substance that resembled mold. Safety inspectors were immediately contacted to verify the substance. They conducted a series of tests and informed management that there was no imminent danger to occupants in the file room. While the tests were being processed, the source of the leak was identified, humidifiers were installed to reduce moisture in the air, and wet ceiling tiles, carpet, and carpet padding were removed. Please find attached a copy of the Indoor Quality Investigation.

3. Although the tests were conducted on August 17, 2011, the results were not available until Wednesday, September 7, 2011. After evaluation of the results, it was clear to Management that After a detailed evaluation of the reported test results, it was clear that the Files Warehouse had a high concentration of fungi contamination from Penicillium and Aspergillus, and humidity levels ranging from 80%-90%. The American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) recommends a humidity level of 60%. Subsequent humidity tests were conducted yesterday, September 8, 2011, and all three tests showed a current humidity level of 50%, which is well within the normal range. As a result of our immediate action on August 17, 2011, inspectors believe a significant event was prevented. Management will work with contractors, safety inspectors and AFGE Local 1594 to ensure traces of fungi are removed. C-16

4. We are requesting AFGE provide us the name of the AFGE representative they wish to receive training on mold, in accordance with Master Agreement, Article 29, Section, 15H. We are notifying all affected employees, in accordance with Master Agreement, Article 29, Section 15E. Please see attached copy of the employee notification letter. We have been assured that the Files Warehouse is safe for occupancy; however, employees who are sensitive to mold and/or mold

spores, or who have an allergy to Penicillium species will be removed from the work area out of an abundance of caution. Employees have been instructed to contact Collette Burgess if they are in either of these categories.

5. If you have further questions or need additional information, please contact me or Megan Tarver at extension 6560.

BONNIE J. WAX

# Position Description

Employee: MULLIN,AILEEN
Position: 02104A VETERANS SERVICE REP (RATING) GS 0996-10
Station: VARO 317, St. Petersburg, FL
Date Classified: 08/22/2002

STATEMENT OF DIFFERENCE
VETERANS SERVICE REPRESENTATIVE (RATING), GS-996-10

DEVELOPMENTAL TO:
VETERANS SERVICE REPRESENTATIVE (RATING), GS-996-12

INTRODUCTION: This position was established at less than the full performance level for recruitment and training purposes. Upon successful completion of training, demonstrated ability to perform duties at the higher level, the incumbent may be promoted without further competition to the next higher level Veterans Service Representative (Rating), GS-996-11. The full performance level of this position is Veterans Service Representative (Rating), GS-996-12.

DUTIES AND RESPONSIBILTIES: The duties and responsibilities of this position are identical to those found at the full performance level, Veterans Service Representative (Rating), GS-996-12 position with the following exceptions.

Supervisory Controls: Is under the administrative and technical supervision of the Service Center Manager, or other supervisory official. Assistance, as requested, will be provided by a journeyman mentor.

Significant Facts: Will have progressed to the point of being able to rate all but the most complex cases in a routine manner and will require little or no assistance from a journeyman. Will demonstrate the knowledge and ability to apply the relevant manuals, laws, rules, and regulations in making a rating decision. Will prepare rating decisions for the concurrence of the journeyman mentor.

Complexity: Will demonstrate a firm foundation in all the rules, laws, regulations, and other materials, such as court decisions governing rating cases. Concentration will be on all but the most complex cases the trainee will be expected to do authorization actions as well. Will be expected to become familiar with all but the most complex aspects of the job.

# Position Description

Employee:
Position: 02104A VETERANS SERVICE REP (RATING) GS 0996-12
Station: VARO 317, St. Petersburg, FL
Date Classified: 08/22/2002

POSITION DESCRIPTION
VETERANS SERVICE REPRESENTATIVE (RATING)
GS 996-12

INTRODUCTION: The Rating Veterans Service Representative (RVSR) works as a member of one of the Teams (Triage, Pre-Determination, Rating, Appeals) established in the Veterans Service Center (VSC). The RVSR working in concert with members of his/her team or other VSC Teams, serves as a decision maker for claims involving rating decisions. The RVSR analyzes claims, applies VA;s Schedule for Rating Disabilities (Rating Schedule), and prepares rating decisions informing the VSR and/or claimant of the decision, the bases, and reason for it. The RVSR routinely collaborates with other members of his/her work team, including Veterans Service Representatives and the Decision Review Officer(s), and will also be available to discuss claims with Veterans Service Organization representatives. In addition, the RVSR may directly interact with the veteran and his/her representative or advocate when it is expedient and assures world-class customer service. The RVSR possesses the knowledge and skills (affirmed by certification) to perform a full range of duties that include:

1. The RVSR analyzes claims to determine:

A. if diseases and injuries were incurred in or aggravated by the military service in the line of duty for purposes of compensation, hospital and outpatient treatment, prosthetic appliances, vocational training, and related employment and compensation benefits such as eligibility for a monthly allowance for children with spina bifida. As needed, the RVSR instructs the VSR to initiate action to obtain all required evidence to support the claim. In some instances, the incumbent monitors the claim to eliminate unnecessary delays in receiving needed evidence.

B. A need for examination, reexamination, and hospitalization for observation of veterans and their dependents and the character of such examination and reexamination.

C. Competency of veterans, their dependents, and beneficiaries, and the permanent incapacity of children, husband or widow for self-support as well as testamentary capacity for insurance purposes.

2. The RVSR determines service-connection, percentage of disability, permanent and total disability, and entitlement to compensation, pension,and vocational training,

medical and dental treatment, automobiles or other conveyances, insurance, specially adapted housing, dependent education allowances, and other ancillary benefits.

3. The RVSR assures proper application of the Rating Schedule and other applicable instructions, and he or she is fully accountable for proper analysis, appropriate development, and final rating determinations.

4. While not routinely required, the RVSR may directly communicate and interact with the veteran to facilitate timely, proper decisions. As dictated by the circumstances of each case, the RVSR may conduct interviews in person or by telephone with veterans, eligible individuals, representatives, and advocates to obtain or clarify information.

5. If a veteran expresses an indiciation of dissatisfaction with a determination, the RVSR will provide consultative advice and assistance as requested by the assigned VSR or the DRO to facilitate efforts to provide a full and comprehensive explanation of the decision in question and gain acceptance of the determination or elicit information that could lead to a revised decision.

6. The Rating VSR communicates with VSRs and other employees in the Regional Office, employees of VA Medical Centers, and other Regional Offices. As required, the RVSR communicates with veterans and representatives/advocates, Central Office, and other federal/state/local agencies, in support of efforts to assist veterans.

7. The rVSR actively participates in meetings and is expected to lend his/her expertise in developing Veterans Service Representatives' skills as they relate to evidence gathering for rating decisions.

8. Acts as advocate for veterans and their beneficiaries in their dealings with other VA elements and organizations that affect their claims.

9. Performs other related duties as assigned.

FACTOR 1 - KNOWLEDGE REQUIRED BY THE POSITION

Knowledge of Veterans Benefits Administration's philosophy, objectives, identified outcomes, and the provisions of all laws administered by the Department of Veterans Affairs and their relationship to other related programs.

Broad and detailed knowledge of federal laws pertaining to compensation, pension, and VA regulations and procedures that implement these laws to accurately rate claims.

Broad and detailed knowledge of applicable Compensation and Pension regulations including VA's Schedule for Rating Disabilities (Rating Schedule) which contains 15 body systems, innumerable disabilities, and various percentages of evaluations for particular disabilities according to their symptomatology and manifestations to accurately rate claims.

Work assignments are assessed from the standpoint of overall effectiveness, periodic status reporting, briefings, or reviews of program documentation and accomplishments. Review is primarily for accomplishment of program objectives, for consistency with Department and VBA policies, philosophy, and goals. Completed work products such as rating decisions, technical reports, or reports of individual VSR capability are accepted as technically sound.

FACTOR 3 - GUIDELINES

Guidelines include laws and supporting regulations, agency policies, the Rating Schedule, procedural manuals, precedent decisions of BVA, CAVC, the U.S. Federal Circuit Court and the U.S. Supreme Court, and opinions from the Office of General Counsel. Guidelines also include computer systems rules-based technology, procedural requirements of the various social insurance, and special and supplemental security income programs. These guides are numerous, extensive, and complex. The RVSR must decide between alternative guidelines and must interpret applicable provisions. The RVSR must exercise a high degree of independent judgment, skill, and initiative in adapting guidelines and procedures to individual case circumstances.

FACTOR 4 - COMPLEXITY

The work requires a comprehensive and thorough knowledge base to determine initial and continuing disability benefits, the reconsideration of initial and post-entitlement decisions, as well as to obtain information and explain decisions. The RVSR analyzes legal, industrial, and occupational factors present in a claim to determine the value of evidence and its relevance to the personal, occupational, and educational background of the claimant. The RVSR analyzes substantive issues or procedural matters in each case ranging from routine to complex, in order to determine required action and arrive at a rating decision. The RVSR weighs all relevant factors against controlling policies and regulations in order to reach a sound conclusion.

FACTOR 5 - SCOPE AND EFFECT

The RVSR analyzes and makes determinations on numerous and complex issues relating to VA benefits. The work is vital to the processes through which the agency directly informs and serves the public. Conclusions reached and the decisions made are normally binding on both the agency and the claimant. The decisions by the RVSR can result in award decisions involving the expenditure of large sums of money or denials that can have major adverse consequences for an applicant. They may also affect the applicant's eligibility for Medicare and Medicaid protection, social services, food stamps, and other forms of income assistance. The RVSR makes final determinations binding on the agency on all claims not requiring higher level concurrence or approval.

FACTOR 6 - PERSONAL CONTACTS

Contacts primarily occur with team members within the Service Center and with Veterans Service Organization representatives. Contacts may also be made with other components of VA and agencies and institutions providing other payments and services. Contacts may also include segments of the general public who may be encountered as potential veteran applicants, beneficiaries, and designated representatives.

FACTOR 7 - PURPOSE OF CONTACTS

The RVSR's contacts are made to obtain or clarify needed information and as required to explain decisions and gain acceptance. Contacts with other agencies and institutions may involve negotiating to obtain information. The RVSR must also be able to satisfactorily discuss rating decisions and explain complex rules and requirements with team members and Veterans Service Organization representatives, as well as with veterans, when appropriate. The RVSR must control interactions to keep them on track to achieve the desired objective.

FACTOR 8 - PHYSICAL DEMANDS

The work normally involves mental rather than physical exertion. The work is mostly sedentary. However, there may be some walking, standing, and carrying of light items such as papers, books, claims folders, and files from one desk to another or for returning to storage. Carts are utilized to carry large numbers of claims folders. This will require the incumbent to push or pull the cart from one area to another.

FACTOR 9 - WORK ENVIRONMENT

Most work is generally performed under common business office conditions at a Regional Office, Pre-discharge site or other approved site. The work environment involves everyday risks or discomforts that require normal safety precautions typical of such places as offices, meeting and training rooms, hospitals, libraries, or commercial vehicles. The work area is adequately lit, heated, and ventilated.

# Position Description

Employee:
Position: 02104A VETERANS SERVICE REP (RATING) GS 0996-12
Station: VARO 317, St. Petersburg, FL
Date Classified: 08/22/2002

POSITION DESCRIPTION
VETERANS SERVICE REPRESENTATIVE (RATING)
GS 996-12

INTRODUCTION: The Rating Veterans Service Representative (RVSR) works as a member of one of the Teams (Triage, Pre-Determination, Rating, Appeals) established in the Veterans Service Center (VSC). The RVSR working in concert with members of his/her team or other VSC Teams, serves as a decision maker for claims involving rating decisions. The RVSR analyzes claims, applies VA;s Schedule for Rating Disabilities (Rating Schedule), and prepares rating decisions informing the VSR and/or claimant of the decision, the bases, and reason for it. The RVSR routinely collaborates with other members of his/her work team, including Veterans Service Representatives and the Decision Review Officer(s), and will also be available to discuss claims with Veterans Service Organization representatives. In addition, the RVSR may directly interact with the veteran and his/her representative or advocate when it is expedient and assures world-class customer service. The RVSR possesses the knowledge and skills (affirmed by certification) to perform a full range of duties that include:

1. The RVSR analyzes claims to determine:

A. if diseases and injuries were incurred in or aggravated by the military service in the line of duty for purposes of compensation, hospital and outpatient treatment, prosthetic appliances, vocational training, and related employment and compensation benefits such as eligibility for a monthly allowance for children with spina bifida. As needed, the RVSR instructs the VSR to initiate action to obtain all required evidence to support the claim. In some instances, the incumbent monitors the claim to eliminate unnecessary delays in receiving needed evidence.

B. A need for examination, reexamination, and hospitalization for observation of veterans and their dependents and the character of such examination and reexamination.

C. Competency of veterans, their dependents, and beneficiaries, and the permanent incapacity of children, husband or widow for self-support as well as testamentary capacity for insurance purposes.

2. The RVSR determines service-connection, percentage of disability, permanent and total disability, and entitlement to compensation, pension,and vocational training,

medical and dental treatment, automobiles or other conveyances, insurance, specially adapted housing, dependent education allowances, and other ancillary benefits.

3. The RVSR assures proper application of the Rating Schedule and other applicable instructions, and he or she is fully accountable for proper analysis, appropriate development, and final rating determinations.

4. While not routinely required, the RVSR may directly communicate and interact with the veteran to facilitate timely, proper decisions. As dictated by the circumstances of each case, the RVSR may conduct interviews in person or by telephone with veterans, eligible individuals, representatives, and advocates to obtain or clarify information.

5. If a veteran expresses an indiciation of dissatisfaction with a determination, the RVSR will provide consultative advice and assistance as requested by the assigned VSR or the DRO to facilitate efforts to provide a full and comprehensive explanation of the decision in question and gain acceptance of the determination or elicit information that could lead to a revised decision.

6. The Rating VSR communicates with VSRs and other employees in the Regional Office, employees of VA Medical Centers, and other Regional Offices. As required, the RVSR communicates with veterans and representatives/advocates, Central Office, and other federal/state/local agencies, in support of efforts to assist veterans.

7. The rVSR actively participates in meetings and is expected to lend his/her expertise in developing Veterans Service Representatives' skills as they relate to evidence gathering for rating decisions.

8. Acts as advocate for veterans and their beneficiaries in their dealings with other VA elements and organizations that affect their claims.

9. Performs other related duties as assigned.

FACTOR 1 - KNOWLEDGE REQUIRED BY THE POSITION

Knowledge of Veterans Benefits Administration's philosophy, objectives, identified outcomes, and the provisions of all laws administered by the Department of Veterans Affairs and their relationship to other related programs.

Broad and detailed knowledge of federal laws pertaining to compensation, pension, and VA regulations and procedures that implement these laws to accurately rate claims.

Broad and detailed knowledge of applicable Compensation and Pension regulations including VA's Schedule for Rating Disabilities (Rating Schedule) which contains 15 body systems, innumerable disabilities, and various percentages of evaluations for particular disabilities according to their symptomatology and manifestations to accurately rate claims.

Knowledge of the Privacy Act and Freedom of Information Act requirements for release of information to requesters.

Knowledge of computer systems technology including Automated Medical Information Exchange (AMIE), Compensation and Pension Records Interchange (CAPRI), Benefits Delivery Network (BDN) and all successor systems, electronic mail, and PC-based programs to utilize rules-based claims processing, monitoring, and correspondence preparation.

Knowledge of legal opinions from the Office of General Consel, Court of Appeals for Veterans' Claims (CAVC), the Board of Veterans' Appeals (BVA), state and federal courts having a relationship to VA programs to include the U.S. Federal Circuit Court and the U.S. Supreme Court.

Lay medical and pharmacology knowledge sufficient to understand and accurately interpet medical reports and other medical evidence, including expert opinions. The incumbent must become familiar with the anatomy and physiology of all body systems to interpet medical reports and other evidence, apply reports and evidence to the Rating Schedule, and make sound rating decisions. This knowledge should include major disabilities which can affect body systems as well as knowledge of which disabilities may be static or likely to improve with treatment in order to interpret the impact of disabilities on social and industrial activities of daily living and to schedule future medical examinations.

Interpersonal skills to collaborate with VSRs and the DRO, Veterans Service Organization representatives and, as necessary, with veterans to assure proper decisions and foster positive relationships.

Skill in written communication to inform claimants and colleagues of evidence requirements, the decision, the reason and bases for it, and appellate rights.

Ability to evaluate evidence and allegations and draw sound conclusions.

Ability to work in a team environment.

FACTOR 2 - SUPERVISORY CONTROLS

Duties and work assignments are performed under the general supervision of the Supervisory VSR. Day-to-day technical guidance is available from the Lead RVSR. The incumbent works independently using judgment, guidelines, and computer systems technology. The Rating VSR works independently, using judgment, guidelines, and computer systems technology. The RVSR has final signatory authority to rate claims not requiring approval by a higher authority; e.g., claims involving severance, clear and unmistakable error, grants of pension under 3.321(b)(2), etc.

Work assignments are assessed from the standpoint of overall effectiveness, periodic status reporting, briefings, or reviews of program documentation and accomplishments. Review is primarily for accomplishment of program objectives, for consistency with Department and VBA policies, philosophy, and goals. Completed work products such as rating decisions, technical reports, or reports of individual VSR capability are accepted as technically sound.

FACTOR 3 - GUIDELINES

Guidelines include laws and supporting regulations, agency policies, the Rating Schedule, procedural manuals, precedent decisions of BVA, CAVC, the U.S. Federal Circuit Court and the U.S. Supreme Court, and opinions from the Office of General Counsel. Guidelines also include computer systems rules-based technology, procedural requirements of the various social insurance, and special and supplemental security income programs. These guides are numerous, extensive, and complex. The RVSR must decide between alternative guidelines and must interpret applicable provisions. The RVSR must exercise a high degree of independent judgment, skill, and initiative in adapting guidelines and procedures to individual case circumstances.

FACTOR 4 - COMPLEXITY

The work requires a comprehensive and thorough knowledge base to determine initial and continuing disability benefits, the reconsideration of initial and post-entitlement decisions, as well as to obtain information and explain decisions. The RVSR analyzes legal, industrial, and occupational factors present in a claim to determine the value of evidence and its relevance to the personal, occupational, and educational background of the claimant. The RVSR analyzes substantive issues or procedural matters in each case ranging from routine to complex, in order to determine required action and arrive at a rating decision. The RVSR weighs all relevant factors against controlling policies and regulations in order to reach a sound conclusion.

FACTOR 5 - SCOPE AND EFFECT

The RVSR analyzes and makes determinations on numerous and complex issues relating to VA benefits. The work is vital to the processes through which the agency directly informs and serves the public. Conclusions reached and the decisions made are normally binding on both the agency and the claimant. The decisions by the RVSR can result in award decisions involving the expenditure of large sums of money or denials that can have major adverse consequences for an applicant. They may also affect the applicant's eligibility for Medicare and Medicaid protection, social services, food stamps, and other forms of income assistance. The RVSR makes final determinations binding on the agency on all claims not requiring higher level concurrence or approval.

FACTOR 6 - PERSONAL CONTACTS

Contacts primarily occur with team members within the Service Center and with Veterans Service Organization representatives. Contacts may also be made with other components of VA and agencies and institutions providing other payments and services. Contacts may also include segments of the general public who may be encountered as potential veteran applicants, beneficiaries, and designated representatives.

FACTOR 7 - PURPOSE OF CONTACTS

The RVSR's contacts are made to obtain or clarify needed information and as required to explain decisions and gain acceptance. Contacts with other agencies and institutions may involve negotiating to obtain information. The RVSR must also be able to satisfactorily discuss rating decisions and explain complex rules and requirements with team members and Veterans Service Organization representatives, as well as with veterans, when appropriate. The RVSR must control interactions to keep them on track to achieve the desired objective.

FACTOR 8 - PHYSICAL DEMANDS

The work normally involves mental rather than physical exertion. The work is mostly sedentary. However, there may be some walking, standing, and carrying of light items such as papers, books, claims folders, and files from one desk to another or for returning to storage. Carts are utilized to carry large numbers of claims folders. This will require the incumbent to push or pull the cart from one area to another.

FACTOR 9 - WORK ENVIRONMENT

Most work is generally performed under common business office conditions at a Regional Office, Pre-discharge site or other approved site. The work environment involves everyday risks or discomforts that require normal safety precautions typical of such places as offices, meeting and training rooms, hospitals, libraries, or commercial vehicles. The work area is adequately lit, heated, and ventilated.

# Position Description

Employee: MULLIN,AILEEN
Position: 02104A VETERANS SERVICE REP (RATING) GS 0996-10
Station: VARO 317, St. Petersburg, FL
Date Classified: 08/22/2002

STATEMENT OF DIFFERENCE
VETERANS SERVICE REPRESENTATIVE (RATING), GS-996-10

DEVELOPMENTAL TO:
VETERANS SERVICE REPRESENTATIVE (RATING), GS-996-12

INTRODUCTION: This position was established at less than the full performance level for recruitment and training purposes. Upon successful completion of training, demonstrated ability to perform duties at the higher level, the incumbent may be promoted without further competition to the next higher level Veterans Service Representative (Rating), GS-996-11. The full performance level of this position is Veterans Service Representative (Rating), GS-996-12.

DUTIES AND RESPONSIBILTIES: The duties and responsibilities of this position are identical to those found at the full performance level, Veterans Service Representative (Rating), GS-996-12 position with the following exceptions.

Supervisory Controls: Is under the administrative and technical supervision of the Service Center Manager, or other supervisory official. Assistance, as requested, will be provided by a journeyman mentor.

Significant Facts: Will have progressed to the point of being able to rate all but the most complex cases in a routine manner and will require little or no assistance from a journeyman. Will demonstrate the knowledge and ability to apply the relevant manuals, laws, rules, and regulations in making a rating decision. Will prepare rating decisions for the concurrence of the journeyman mentor.

Complexity: Will demonstrate a firm foundation in all the rules, laws, regulations, and other materials, such as court decisions governing rating cases. Concentration will be on all but the most complex cases the trainee will be expected to do authorization actions as well. Will be expected to become familiar with all but the most complex aspects of the job.

Department of Veterans Affairs

# REPORT OF CONTACT

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| | |
|---|---|
| VA OFFICE<br>Office of Resolution Management | IDENTIFICATION NOS. (C,XC,SS,XSS, V,K, etc.) |
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)*<br>( ) - , Ext. |
| PERSON CONTACTED<br>See Below | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED<br>( ) - , Ext. |
| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include Area Code)*<br>( ) - , Ext. |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

**Case No. 200I-0317-2012103413 Aileen Mullin**

**Casey Crump, Jerry Huffman, and Bettie Bookhart were contacted regarding their knowledge of the following:**

***Event 15: On May 3, 2012, Human Resources Manager Bonnie Wax (BW) made a horrible comment about the complainant's medical condition.***

**See attached emails.**

VA Form **119** (Automated, in lieu of)
Sept 1997 (R)

## Henley, John (ORM)

**From:** Crump, Casey, VBASPT
**Sent:** Tuesday, August 27, 2013 11:35 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413
**Signed By:** casey.crump@va.gov

Below is a copy of the email I sent Aileen on May 3, 2012. I did not know at the time and still do not know where Bonnie got the information. I had assumed Bonnie and Aileen had discussed until I sent the email and Aileen contacted me about the conversation. I don't believe Bonnie was just spreading information to anyone about Aileen's condition. As Chief Steward, I routinely discussed employee situations with HR. However, Aileen was upset and said she had not authorized Bonnie to discuss her medical condition with anyone.

**From:** Crump, Casey, VBASPT
**Sent:** Thursday, May 03, 2012 3:06 PM
**To:** Mullin, Aileen, VBASPT
**Subject:** How you doing

Aileen,

I have been busy and have not seen you around lately. I spoke with Bonnie Wax the other day about your condition. She said the tumor you have is what caused your breathing problems. She said it was apparently exerting some pressure on your lungs. She also said she was relieved your condition was not caused by our office and that we do not actually have sick building syndrome. Anyway, I hope your doing well and your conditions improve. Later.

Casey

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 10:51 AM
**To:** Crump, Casey, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Casey Crump

Sub: EEO Investigation

Good morning, the subject complainant testified that Bonnie Wax said to you, "isn't that interesting about Ms. Mullin with her breast cancer and it was her breast cancer that caused all the breathing problems...there was never anything wrong with the building." Explain, what happened? Did Ms. Wax make the above comment to you? If yes, what was specifically said?

How did Ms. Wax know the complainant's breast cancer caused her breathing problem?

Thank you for your cooperation.

John Henley

**Henley, John (ORM)**

**To:** Crump, Casey, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Casey Crump

Sub: EEO Investigation

Good morning, the subject complainant testified that Bonnie Wax said to you, "isn't that interesting about Ms. Mullin with her breast cancer and it was her breast cancer that caused all the breathing problems...there was never anything wrong with the building." Explain, what happened? Did Ms. Wax make the above comment to you? If yes, what was specifically said?

How did Ms. Wax know the complainant's breast cancer caused her breathing problem?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Huffman, Jerry E., VBACMS |
| **Sent:** | Tuesday, August 27, 2013 10:32 AM |
| **To:** | Henley, John (ORM) |
| **Subject:** | RE: EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Signed By:** | jerry.huffman@va.gov |

August 27, 2013

Fm: Jerry Huffman, AVSCM

To: John Henley, EEO Investigation

Sub: EEO Investigation

I was present for a meeting that included Ms Mullin and Ms Witty. However, I do not recall Ms Witty making the comment in quotes below. The meeting I was present for was about Ms Mullin's disapproval of handling her personal information.

Jerry Huffman
AVSCM
Columbia RO

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:55 AM
**To:** Huffman, Jerry E., VBACMS
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Jerry Huffman, Assistant Service Center Manager

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director(Kerrie Witty) told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

**Henley, John (ORM)**

**To:** Huffman, Jerry E., VBACMS
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413
**Attachments:** 200I-0317-2012103413Witness Notice.doc

August 27, 2013

Fm: John Henley, EEO Investigation

To: Jerry Huffman, Assistant Service Center Manager

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director(Kerrie Witty) told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

**Pryor, Keith, VBASPT**

**To:** Bookhart, Bettie, VBASPT
**Cc:** Knight, Steven, VBASPT
**Subject:** Mullins

Good Afternoon Mr. Henley,

Over a year ago, Tedd Smith, AFGE 1594 Steward & myself as Executive Vice President of AFGE 1594 represented Ms. Mullins in a grievance meeting with VARO Directory Kerry Witty, ASCM Jerry Huffman and a staff member of HR. I cannot tell you the exact date as due to mitigating circumstances, I current have no access to AFGE records. I do however recall Director Witty indicating that she typically does not believe in giving accommodations to employee, as if she did, then she would need to accommodate everyone to who requested an accommodation. This was a very turbulent meeting as Ms. Mullins was facing serious medical issues and she felt that the environmental issues within the actual VA Regional Office building was adversely affecting her health. Ms. Mullins was eventually granted a Work-At-Home (WAH) as an RVSR, but this took several monthly of negotiations with various stewards of AFGE Local 1594.

In closing, I have a tremendous amount of respect for Ms. Mullins and all that she have goon through with her medical conditions. I further believe that she is a dedicated employee of the VA Regional Office of St. Petersburg and can be a very productive RVSR if afforded the necessary accommodations to do so. If you have any questions, please let me know.

Respectfully,

KEITH A. PRYOR
CORE 70, VSR, AFGE LOCAL 1594 V.P.
KEITH.PRYOR@VA.GOV
(727) 319-6623

HI BETTIE, I'VE ATTEMPTED TO SEND THIS TO MR. HENLEY, BUT SOMETHING IS PREVENTING IT FROM GOING THROUGH. ALSO, I DID RESPONDER EARLIER & I DON'T THINK IT WHEN THROUGH EITHER. ACCORDINGLY, PLEASE FORWARD THIS TO MR. HENLEY. THANK YOU.

## Henley, John (ORM)

**From:** Smith, Theodore, VBASPT
**Sent:** Thursday, October 31, 2013 8:24 AM
**To:** Henley, John (ORM); Bookhart, Bettie, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin Case No. 103413
**Signed By:** theodore.smith1@va.gov

**Importance:** High

This is what I sent on September 17th.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, September 17, 2013 4:35 PM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Sir,

So sorry for the delay. I do have my limited notes. I do not have the exact verbiage used by our Director other than comments that AFGE was using Ms. Mullin's case as a "witch hunt" against her HR Director Ms. Bonnie Wax. Ms. Mullin's through her pain and frustration was very vocal toward both parties regarding her needs and apparent hurdles that management through HR was requiring her to go through.

The Director (Ms. Kerrie) was reluctant on several issues of Reasonable accommodations at the time, with regards to file handling and coming into the office less frequently as Ms. Mullins was serving as a Work at Home Rater.

Other issues of concern by Ms. Mullins that were also a source of consternation for the Director were Ms. Mullins' concerns regarding air quality issues in the building as it has been documented we have moister, mold and rodent allergen issues. These issues were essentially tabled for further development with little accomplished during the meeting I took part in.

Please feel free to contact me regarding any further questions or clarifications.

Thank you

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, September 17, 2013 4:12 PM
**To:** Smith, Theodore, VBASPT
**Cc:** Bookhart, Bettie, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin Case No. 103413

September 17, 2013

Fm: John Henley, EEO Investigator

To: Theodore Smith

Sub: Follow-up

Good afternoon Mr. Smith, have you had chance to review your note to respond to the email below. Please respond immediately.

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, August 27, 2013 10:27 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Morning Sir,

Yes I was there ... I was called in adhoc as our "president" was unable to attend. I'll have to go through my notes if I still have them, I thought I had given them over to the Steward who was representing Ms. Mullin.

The meeting was strained at best and language of being reserved about reasonable accommodations was made, I will get back with you later today of tomorrow, hopefully with more helpful information.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:45 AM
**To:** Smith, Theodore, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Theodore Smith

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

EXHIBIT 6

RE: EEO Complaint

From: Mullin, Aileen, VBASPT (aileen.mullin@va.gov)

To: bettie.bookhart@va.gov

Cc: Jerry.Huffman@va.gov; ulyssee.mcburrough@va.gov; valorie.reilly@va.gov; casey.crump@va.gov; Keith.Pryor3@va.gov; theodore.smith1@va.gov; aileen_mullin@yahoo.com; sandra.l.smith1@va.gov; carolyn.allard@va.gov

Date: Friday, June 15, 2012, 11:28 AM EDT

**Good morning Bettie,**

- **We meet with Kerrie. Issues were not resolved. Scheduling mediation is prudent. (Please know that I communicated to the Director that if we can come to a "meeting of the minds", prior to mediation, I will withdraw the complaint.)**
- **As previously stated, on the 25th of June I will receive the first in a series of adjuvant chemotherapy treatments for breast cancer. There are a number of medical, physical and leave related issues that must be attended to prior to the 25th June. I will not be available in June, for meeting, that could last up to eight hours, There is no way of predicating what my level of incapacitation will be, or which of the many side effects I may suffer from due to the chemotherapy treatments. Convalescence for two weeks after the first treatment has be prescribed by my oncologist. That said, the earliest I could possibly be available for mediation will be the week of July ninth.**
- **If I become gravely ill due to the chemotherapy, what is the legal time frame in which this meeting must be held?**
- **What are the EEO guidelines in terms of amending my complaint to include additional issues and as well as additional desired outcomes?**
-
- **Please arrange for the meeting be scheduled in a building other than the Regional Office. My immune system will be weakened and it could be detrimental to my health to spend excessive time there.**
- **During my absence, I request that communications pertaining to EEO related issues be directed to my AFGE representatives (Valorie Reilly and Casey Crump) in my stead.**

**I thank you for your assistance with these issues,**

**Aileen**

---

**From:** Bookhart, Bettie, VBASPT
**Sent:** Thursday, June 14, 2012 7:38 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** EEO Complaint

Good Morning Aileen,

- Did you meet with Kerrie? If so, were issues resolved or should I continue with scheduling mediation for your complaint?
- I believe you said you should be available the 3rd week of July (July 16 - 20). Is that still the case?
- Are you available any day during the remainder of June?

Thanks for your prompt attention to this matter and please call me if you have questions or concerns.

Bettie

smime.p7s
8.7kB

EXHIBIT 7

# FW: CA 2 Form

From: Mullin, Aileen, VBASPT (aileen.mullin@va.gov)

To: aileen_mullin@yahoo.com; gemullin36@yahoo.com

Date: Wednesday, July 7, 2010, 01:43 PM EDT

---

**From:** Miller, Renee, VBASPT
**Sent:** Wednesday, July 07, 2010 7:00 AM
**To:** Mullin, Aileen, VBASPT
**Cc:** Eckholm, Dale, VBASPT
**Subject:** CA 2 Form

Good morning Aileen,

I understand that you mentioned trying to spend some time in Orlando to see whether your illnesses are due to workplace problems. If you are still concerned about this, you can file a CA 2 form. HR will take it from there.

***Renee Miller***
Assistant Coach Pre Decision 1
VA Regional Office, St. Petersburg
(727) 319-5949

**CONFIDENTIALITY WARNING: This e-mail is for the confidential use of the intended recipients only, and may be protected by the attorney work-product privilege. Any unauthorized review, access, copying, dissemination, distribution or use of the content of this message/information is strictly prohibited by Federal Law. Attempts to intercept this message or distribute it without authorization are in violation of 18 U.S.C. 2511(1) of the Electronic Communications Privacy Act (ECPA). Fines, imprisonment, and/or civil damages may be imposed for violations.**

ca-2.pdf
371.2kB

EXHIBIT 8

May 18, 2012

Supervisor Statement – Michael Palmer

While I was her supervisor, Aileen discussed her condition concerning the area in which she was sitting. We subsequently moved her from one desk to another to see if it would help improve her medical condition. We also talked about her medical condition and when/if the condition worsened I allowed her to go outside for fresh air. If the fresh air didn't help, I approved her to go to home on sick leave. She changed her tour of duty from a 5 day, 8 hour shift to a 4 day, 10 hour shift in hopes of improving her medical condition by eliminating one day of being in the building. I informed the Assistant Service Center Manager and Human Resources of what was going on. On the day of the incident when she went to the emergency room, she came to me and said that she needed to go outside because her medical condition was flaring-up. One of her classmates came to me and told me that Aileen was having an attack. I thought she was still outside, but she was actually back inside of the building in Loan Guaranty giving herself a breathing treatment. One of her fellow employees told me that she had gotten worse and when I went to go see her in Loan Guaranty, she was already gone in the ambulance to the ER.

Michael Palmer
Coach, Appeals 2

EXHIBIT 9

Office of Resolution Management
Department of Veterans Affairs

# CATS Search

Close this Window

## Search Criteria

Search: CATS

Case Number: Last Name: mullin First Name: aileen

Search

## Search Results

| Case Detail | Case | Mix | Last Name | First Name | Client ID | ITD Number | Init Contact | File Date | Status | Owner | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Detail | 2001-0317-2012103413 | | Mullin | Aileen | | | 06/05/2012 | 09/18/2012 | Final Agency Action Pending | OJOHNSON | |
| Detail | 2001-0317-2013104216 | | Mullin | Aileen | | | 08/16/2013 | | Closed | PREARCHIVE | |
| Detail | 2001-0317-2014102766 | | Mullin | Aileen | | | 04/28/2014 | 06/10/2014 | Investigation Assigned, Pending Completion | MSANTANA | |
| Detail | 2001-0317-2015100312 | | Mullin | Aileen | | | 10/20/2014 | 11/29/2014 | Investigation Assigned, Pending Completion | MSANTANA | |
| 1 | | | | | | | | | | | |

4 cases found.

☑ Show Search Criteria

C-2

00208

EXHIBIT 10

1/12/12

1/12/12

# Department of Veterans Affairs
# VA Police
# Bay Pines
# Uniform Offense Report
# UOR#: 2012-01-12-1410-7007

**VA Facility:** Bay Pines

**Date/Time Printed**
1/19/2012 8:43:27 AM

THIS DOCUMENT IS TO BE HANDLED IN ACCORDANCE WITH THE PRIVACY ACT
Contents shall not be disclosed, discussed, or shared with individuals unless they have a direct need-to-know in the performance of their official duties. The document(s) are to be handled in accordance with FOUO procedures.

| | |
|---|---|
| **Date/Time Received:** | 1/12/2012 1410 PM |
| **Date/Time of Offense** | 1/12/2012 1410 PM |
| **Location:** | Building 46 Regional Office |
| **Investigating Officer:** | Mario Affinito |
| **Incident Synopsis:** | I called 911 Suntar ambulance and Seminole Fire Department for Regional Office employee who was having a asthma attack. |
| **Classification Code:** | Non-Criminal: Staff Assist |
| **UOR Disposition:** | Closed |

## Use of Force

| | |
|---|---|
| **OC weapon used:** | No |
| **Baton used:** | No |
| **Firearm Drawn:** | No |
| **Firearm Used:** | No |

## Complainant

| | |
|---|---|
| **Name:** | St. Petersburg Regional Office |
| **Status:** | Other |
| **Work Address:** | 9500 Bay Pines BLVD.<br>St. Petersburg, FL 33708 |
| **Work Phone:** | (727) 319-5800 |
| **Statement:** | |

## Victim

| | | | |
|---|---|---|---|
| **Name:** | Aileen Mullin | | |
| **Sex:** | F | **Ethnicity:** | Caucasian |
| **Status:** | Employee - Admin | | |
| **Driver's License:** | M450000605830 | **State:** | FLORIDA |
| **Work Address:** | 9500 Regional Office Bay Pines Blvd<br><br>Bay Pines , FL 33744 | | |
| **Work Phone:** | (727) 319-5828 Ext. | | |
| **Treatment:** | N | | |

## Suspect

| | | |
|---|---|---|
| **Name:** | Aileen Mullin | |
| **SSN:** M7710 | **DOB:** 3/3/1960 | **Age:** 52 |
| **Sex:**F | **Ethnicity:** Caucasian | **Height:** 5'9 |
| **Weight:** 190 | **Hair Color:** Blonde | **Eye Color:** Blue Green |
| **Skin Tone:** Fair | **Scars & Marks:** NONE | |
| **Status:** Employee - Admin | | |
| **Driver's License Number:** | M450000605830 | **State:** FL |
| **Home Address:** | 745 Alamanda Way South<br><br>St.Petersburg, FL 33705 | |
| **Home Phone:** | | |
| **Work Address:** | 9500 Regional Office Bay Pines Blvd<br><br>Bay Pines , FL 33744 | |



THIS DOCUMENT IS TO BE HANDLED IN ACCORDANCE WITH THE PRIVACY ACT
Contents shall not be disclosed, discussed, or shared with individuals unless they have a direct need-to-know in the performance of their official duties. The document(s) are to be handled in accordance with FOUO procedures.

| | | | |
|---|---|---|---|
| **Work Phone:** | (727) 319-5828 Ext. | | |
| **Offense(s):** | **Committed** | **Disposition** | **Violation #** |
| | Non-Criminal - Staff Assist | | |

## Narrative

**Origin:** Employee stopped by the Police front desk for SunStar Ambulance and Seminole fire department at the Regional Office building 46.

**Initial Observation:** I observed victim/employee, Mullin walk up and ask for 911 she was having trouble breathing SunStar was called to our location.

**Investigation:** At the above time and place of occurrence I called 911 from Police Front Desk Regional Office for employee Mullin Aileen who was having trouble breathing. Aileen and I walked outside for some fresh air. I stood by with employee/patient Aileen she was sitting. Sunstar and Seminole arrive on scene. Aileen was treated and taken to ST.Petersburg General Hospital for further evaluation.

**Disposition:** No further police action needed.Case closed.

**Investigating Officer:** Mario Affinito

**Badge** 3939 **Signature**__________

**Printed by:** ROBERT ONEILL **Date** ___/___/______

<<<<< END OF REPORT >>>>>



THIS DOCUMENT IS TO BE HANDLED IN ACCORDANCE WITH THE PRIVACY ACT
Contents shall not be disclosed, discussed, or shared with individuals unless they have a direct need-to-know in the performance of their official duties. The document(s) are to be handled in accordance with FOUO procedures.

Case 8:20-cv-02697-VMC-AEP Document 34-1 Filed 02/18/22 Page 770 of 863 PageID 2587

ugamezone.com/... **Super Mario Games - Full Free online Super Ma** Sponsored
Play Now, enjoy with no limits!

**FW: Information E-mail from Mario, police officer 4/12/2012**

Monday, January 13, 2014 9:28 PM

**From:** "Mullin Aileen VBASPT" <Aileen.Mullin@va.gov>

**To:** aileen_mullin@yahoo.com

**1 Files** 19KB Download All
P7S 19KB

smime.p7s
Save

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Thursday, April 12, 2012 8:01 AM
**To:** Affinito, Mario B
**Subject:** RE: Information

Thank you Mario. Its perfect!

---

**From:** Affinito, Mario B
**Sent:** Thursday, April 12, 2012 7:36 AM
**To:** Mullin, Aileen, VBASPT
**Subject:** Information

To, Aileen Mullin and Workman's Comp. Employee Aileen Mullin would come into work healthy and able to work. During her work day she would have a asthma attacks and I the Officer on duty would call 911. Or I standby by for a family member. I escorted Aileen Mullin to her vehicle for asthma medicine that she needed to feel better.

Officer Affinito Mario Badge #3939 Phone 727-398-6661 (Ext.7661).

*Allergy Associates*
STEPHEN J. KLEMAWESCH, M.D.
PATRICK J. KLEMAWESCH, M.D.
6294 FIRST AVENUE NORTH
ST. PETERSBURG, FLORIDA 33710
(727) 345-1900

DIPLOMATE
AMERICAN BOARD OF ALLERGY
AND IMMUNOLOGY

DIPLOMATE
AMERICAN BOARD OF INTERNAL MEDICINE

May 24, 2012

U.S Department of Labor

Office of Workers' Comp Programs
Po Box 8300 District 6 JAC
London, KY 40742-8300

File Number: 062294294
Re: Aileen Mullin (DOB 03/03/60)

To Whom It May Concern:

It is my opinion that Aileen Mullin's respiratory difficulties are related to her work environment at the Veterans Administration Hospital. This woman has a history of allergic difficulties dating to her youth. When she lived in Ft. Lauderdale she was placed on immunotherapy with good improvement in her symptomatology. She moved to Pinellas County in 2004 and was well. When she initially moved here she was a teacher. Once she began employment at the Veterans Administration Hospital she started having significant worsening of her respiratory problems. In addition to sinusitis she developed dysphonia, vocal cord dysfunction, and asthma. She also began to have recurrent infections. Physical exams that I have conducted when she has had these symptoms have confirmed physical changes consistent with sinusitis or expiratory wheezing consistent with asthma. Treatment with a variety of modalities including inhaled broncho dilators, inhaled steroids, oral antibiotics, antihistamines, Singulair and nebulizer therapy have all had measurable benefit at least temporarily. She has had the greatest improvement in her symptoms by relocating her work site to her house. Specifically since she has been working from home not only has her asthma abated but she has not had a respiratory infection. Also since working at home she has had zero need to use her nebulizer. It is my impression that her work environment at the VA hospital has exacerbated an underlying allergic condition and created new symptoms in the form of reactive airways and vocal cord dysfunction.

Sincerely yours,

Stephen J. Klemawesch, M.D.
SJK/lm

3/13/12

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

WHD
U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: ______________________

Employee's job title: ____________ Regular work schedule: ____________

Employee's essential job functions: ______________________

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Aileen Mullin
First Middle Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: Stephen Klemawesch 6294 1st Ave N

Type of practice / Medical specialty: Allergy / Immunology

Telephone: (727) 345 1900 Fax: (727) 347 5273



CONTINUED ON NEXT PAGE

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 2009

Probable duration of condition: Chronic

**Mark below as applicable:**

Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
✓ No ___Yes. If so, dates of admission:

Oct 2010, Nov 2010, Dec 2010, Nov 2011 Sept 2011 Oct 2011 Dec 2011 Mar 2012

Date(s) you treated the patient for condition: ↑

Will the patient need to have treatment visits at least twice per year due to the condition? ___No X Yes.

Was medication, other than over-the-counter medication, prescribed? ___No X Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
X No ___Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? X No ___Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___No X Yes.

If so, identify the job functions the employee is unable to perform: When she has a attacks

All

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Patient has allergic sinusitis and asthma. The asthma worsens at work at the VA leading to severe attacks requiring urgent care.



CONTINUED ON NEXT PAGE

To: Bonnie Wax

Fr: John Smith, AFGE Steward

Re: Aileen Mullin request for Modified Accommodation and Administrative Leave

Dt: February 19, 2013

As the modified accommodation, regarding Ms. Mullin's Workers' Compensation illnesses, has not been adequately discussed and resolved, we ask the Ms. Mullin be placed on paid Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

The following is a synopsis of recent events regarding Ms. Mullin's Workers' Compensation illnesses, since finishing her treatment for breast cancer in late December 2012:

- Wednesday, January 2, 2013 - Ms. Mullin returned to work.

    Ms. Mullin works from home, reporting to the office once or twice a week to minimize her exposure in the building. (Ms. Mullin works at home due to workplace-related illnesses: asthma and chronic sinusitis.*)

    Ms. Mullin reported to the office, approximately 24 total hours, during the month of January.

- Tuesday, January 15, 2013 - Resulting from the abbreviated time in the building, Ms Mullin suffered exacerbation of workplace-related illnesses that included asthmatic reaction with lingering pain in the lungs. (Ms. Mullin had been asymptomatic when on leave for breast cancer. )
- Thursday, January 17, 2013 - Ms. Mullin was seen by her primary care physician who advised further limiting her exposure to the building until a workup by specialists was completed.
- Tuesday, January 23, 2012 - The next time Ms. Mullin entered the building. Within two hours she developed sinus pain and bleeding in addition to her aggravated asthma and lung pain.
- Saturday, January 26, 2013 - Ms. Mullin was seen by the medical specialist who deemed that it was not safe for her to enter the building without respirator. He stated that she has to further minimize her time in the building.
- Monday, January 28, 2013 - Ms. Mullin informed the agency of her worsening reaction to being in the building and of the doctor's orders.
- Tuesday, January 29, 2013 - Ms. Mullin had numerous conversations with the Human Resource (HR) Specialist attempting to determine how a respirator would be attained, if necessary.

- Wednesday January 30, 2013 - Though ill, Ms. Mullin requested a meeting with the HR Specialist, her immediate supervisor and AFGE representative. (Please note the meeting was conducted just outside the building.) Discussions at the meeting included Ms. Mullin's need for the use of a respirator and assistance getting in out of the building quickly to minimize exposure in the building. Ms. Mullin voiced her belief that collaboratively a plan could be worked out. Aid with marginal job functions such as assistance retrieving documents from the printer and moving the files were suggested by Ms. Mullin. The group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job.

    However, later the same afternoon, Human Resources informed Ms. Mullin that her request for modifications to her accommodation was denied (without the benefit of further conversation.)

    As Ms. Mullin had witnessed such treatment of other disabled employees, she realized her job was in jeopardy. She became extremely alarmed and distraught. She experienced an immediate onset of severe gastrointestinal pain and bleeding (a condition she has no history of).

- Thursday, January 31, 2013 - Ms. Mullin was seen by her primary physician who directed her to go to the emergency room. She was admitted to the hospital where she was treated for one week.
- February 5, 2013 - While in the hospital, Ms. Mullin spoke to the HR specialist who informed her that her denied request for a modified accommodation was sent to General Counsel for review. The HR Specialist insisted that the Work-at-Home Rating Specialist position was one essential function and could not be broken down by tasks: " ....I understand that you feel these tasks are minimal and can be done by someone else, however, collectively these tasks take a significant amount of time to complete..... **It's the whole in-office process that is considered an essential function of the job**... " This information caused Ms. Mullin further upset and an exacerbation of her condition. (Please note that the HR Specialist didn't inquire as to why, or how long, Ms. Mullin would be in the hospital.)
- Wednesday, February 6, 2013 - Ms. Mullin was discharged from the hospital for treatment for sinusitis and gastrointestinal conditions. Her doctor required her to remain off work and to avoid stressful situations for the next two weeks during her recovery.

Ms. Mullin is now scheduled to return to work on Thursday, February 21. As the decision on the modified accommodation, for Workers' Compensation illnesses, was premature, and has not been adequately been resolved, we ask the Ms. Mullin be placed on Administrative Leave until a reasonable modification can be put in place that will give Ms. Mullin the ability to safely perform her job.

Please provide the names of the members of the Reasonable Accommodation Committee.

We respectfully respect a response to this request by the close of business on Wednesday February 21.

Enclosures:
U.S. Department of Labor, Workers' Compensation File Number: 062294294

Letter from St. Anthony's Hospital (From Who??)

cc:

Aileen Mullin
Ulysee McBurough, VBA
Jon Jackson, Claims Examiner, DOL
Odessa Johnson, EEO
John Henley, EEO
Everett Kelly, District President, AFGE
Brenda Stallard, AFGE
Valorie Reilly, AFGE
Keith Pryor, AFGE
Casey Crump, AFGE

April 21, 2012

To whom it may concern,

I was asked to write a letter on behalf of my co-worker Aileen Mullen. I have known Aileen professionally for the past two years, as we have worked together as Veterans Service Representatives on a Pre-Decision team and now as Raters on a Decision team with the Department of Veterans Affairs, St Petersburg, FL Regional Office.

I knew that Aileen could hardly speak, more of what I'd classify as a raspy whisper, when we spoke at work, but never really knew exactly what the cause of this was. It wasn't until we were both selected a Rating Veterans Service Representatives (RVSR), and worked together more closely, that I got to see first hand the nature of Aileen's disability. We trained together for one month in a classroom on the second floor of this building prior to attending eight weeks of training (from July 10, 2012 to September 1, 2012) at the Veterans Benefits Academy in Baltimore, MD. It was in Baltimore that I actually heard Aileen speak in a normal tone of voice, without the obvious pain that I witnessed in all of our previous encounters since we began working together.

Upon our return to work in the St Petersburg Regional Office, Aileen had to be removed from our classroom on the second floor after at least two occasions that I'm aware of that her breathing became so labored that she had to be rushed to the hospital. In my opinion, management has done everything possible to accommodate Aileen's disability, placing her desk nearest to ventilation, allowing her every opportunity to leave her work area to go outside and breath in fresh air, and even purchasing a clean air machine for her desk, but still I've witnessed on many occasions that Aileen become too ill to remain at work.

Aileen and I studied together at a local restaurant in the beginning of March 2012, along with several other co-workers, for a certification test for Rating Veterans Service Representative. Although still suffering some lingering effects of her illness caused by the mold spores in this building, she was able to speak in a reasonably normal tone, something I haven't witnessed from Ms Mullen since we were in training in Baltimore.

I'd like to add that Aileen Mullen is not the only person suffering from the mold in this building; there are many others, to varying degrees, that are effected by these mold spores and sick building.

Maurice J Nadeau

Maurice Joseph Nadeau
11489 81st Place N.
Seminole, FL 33772

Work phone number: 727-319-5800, ext 6674

**Mullin, Aileen, VBASPT**

| | |
|---|---|
| **From:** | Mullin, Aileen, VBASPT |
| **Sent:** | Tuesday, January 15, 2013 12:24 PM |
| **To:** | McBurrough, Ulyssee, VBASPT; Collins, Veronica, VBASPT |
| **Subject:** | I have to go |

Bo,

I need to get out of the building. Having respiratory problem. Went outside during lunch but situation didn't improve. Don't need emergency care at this point but if situation changes I'll let you know.

Thanks,

Aileen

Subject: RE: files

From: Mullin, Aileen, VBASPT (Aileen.Mullin@va.gov)

To: veronica.collins@va.gov;

Cc: ulyssee.mcburrough@va.gov;

Date: Thursday, January 17, 2013 3:57 PM

Today I was seen by my doctor and I'm sorry to report, that I won't be able to come into the building again today: My body hasn't bounced back from Tuesday's attack. I still have two more files I can rate, and training to finish, but I'm not sure what to do after that...Aileen

---

**From:** Collins, Veronica, VBASPT
**Sent:** Thursday, January 17, 2013 12:14 PM
**To:** Mullin, Aileen, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT
**Subject:** RE: files

Yes, I will have some for you.

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Thursday, January 17, 2013 11:27 AM
**To:** Collins, Veronica, VBASPT
**Cc:** McBurrough, Ulyssee, VBASPT
**Subject:** files

Hi Veronica,

Do you know if there are any files available for me to take home?

Aileen

Department of Veterans Affairs

# APPROVAL OF ACCOMMODATION REQUEST

The purpose of this form is to inform you that your request has been approved and to provide information to you. If our information is incorrect, please inform me as soon as possible.

I am the Designated Management Official (DMO) for this request. My contact information is below.

| MY NAME IS | MY PHONE NO. IS | MY EMAIL IS |
|---|---|---|
| Kerrie L. Witty | x5900 | kerrie.witty@va.gov |

YOUR REQUEST WAS MADE TO ENABLE YOU TO

- [ ] APPLY FOR A JOB,
- [x] PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Aileen Mullin - Work from home Mondays, Wednesdays, and Thursdays. You will be required to report to work at the St. Petersburg Regional Office on Tuesdays, and Fridays.

Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements. As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed. If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify Human Resources. If you have any questions concerning this matter,please contact Tammi Clarke, Human Resources Specialist at(727) 319-5818.

- [x] We will provide the accommodation requested by *(enter date)* 03/21/2012

- [ ] As we discussed during our meetings, it appears that a more effective accommodation would be *(Describe)*

This accommodation will be provided by (enter date) ________

If you believe that there was a misunderstanding and the proposed accommodation is not suitable, please contact me immediately.

If I have any questions regarding your request, I will contact you.

DMO SIGNATURE Kerrie Witty DATE 3/20/12

This form should be retained separately from the employee's Official Personnel Folder.

EXHIBIT 11

**Mullin, Aileen, VBASPT**

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, February 06, 2012 8:26 AM
**To:** Clarke, Tamanique, VBASPT; McBurrough, Ulyssee, VBASPT; Cartner, James, VBASPT
**Cc:** Allard, Carolyn, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Air purifier
**Signed By:** aileen.mullin@va.gov

Good morning All,

Just for the record, and at risk of sounding ungrateful, I don't think the air purifier is going to have the effect we hoped for: I read the specs and discovered that its meant to be used in a small room (10' x 10'), and not designed for an open cubical in an area comparable to a large open area.

For now, I have it running full force and my fingers are crossed.

Aileen Mullin
RVSR VBIT1C
VARO 317/ St. Petersburg

EXHIBIT 12

June, Reference 6/13/2012 meeting w/ Kerri Witty, Keith Pryor, Tedd Smith - Aileen Mullins

**Pryor, Keith, VBASPT**

To: Bookhart, Bettie, VBASPT
Cc: Knight, Steven, VBASPT
Subject: Mullins

Good Afternoon Mr. Henley,

Over a year ago, Tedd Smith, AFGE 1594 Steward & myself as Executive Vice President of AFGE 1594 represented Ms. Mullins in a grievance meeting with VARO Directory Kerry Witty, ASCM Jerry Huffman and a staff member of HR. I cannot tell you the exact date as due to mitigating circumstances, I current have no access to AFGE records. I do however recall Director Witty indicating that she typically does not believe in giving accommodations to employee, as if she did, then she would need to accommodate everyone to who requested an accommodation. This was a very turbulent meeting as Ms. Mullins was facing serious medical Issues and she felt that the environmental issues within the actual VA Regional Office building was adversely affecting her health. Ms. Mullins was eventually granted a Work-At-Home (WAH) as an RVSR, but this took several monthly of negotiations with various stewards of AFGE Local 1594.

In closing, I have a tremendous amount of respect for Ms. Mullins and all that she have goon through with her medical conditions. I further believe that she is a dedicated employee of the VA Regional Office of St. Petersburg and can be a very productive RVSR if afforded the necessary accommodations to do so. If you have any questions, please let me know.

Respectfully,

[signature]

KEITH A. PRYOR
CORE 70, VSR, AFGE LOCAL 1594 V.P.
KEITH.PRYOR@VA.GOV
(727) 319-6623

HI BETTIE, I'VE ATTEMPTED TO SEND THIS TO MR. HENLEY, BUT SOMETHING IS PREVENTING IT FROM GOING THROUGH. ALSO, I DID RESPONDER EARLIER & I DON'T THINK IT WHEN THROUGH EITHER. ACCORDINGLY, PLEASE FORWARD THIS TO MR. HENLEY. THANK YOU.

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Bookhart, Bettie, VBASPT |
| **Sent:** | Wednesday, September 25, 2013 11:17 AM |
| **To:** | Henley, John (ORM) |
| **Subject:** | FW: EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Attachments:** | Response - KPryor.pdf |
| **Signed By:** | bettie.bookhart@va.gov |

FYI

---

**From:** Henley, John (ORM)
**Sent:** Friday, September 20, 2013 10:22 AM
**To:** Bookhart, Bettie, VBASPT
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Good morning Bettie, I did received Mr. Smith's response but have not received a response from Mr. Pryor. No others. Thanks

---

**From:** Bookhart, Bettie, VBASPT
**Sent:** Thursday, September 19, 2013 7:23 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Have you received responses from Mr. Smith and Mr. Pryor? Are there any other outstanding responses that we owe you?

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, September 17, 2013 4:12 PM
**To:** Smith, Theodore, VBASPT
**Cc:** Bookhart, Bettie, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin Case No. 103413

September 17, 2013

Fm: John Henley, EEO Investigator

To: Theodore Smith

Sub: Follow-up

Good afternoon Mr. Smith, have you had chance to review your note to respond to the email below. Please respond immediately.

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, August 27, 2013 10:27 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Morning Sir,

A-11

Yes I was there ... I was called in adhoc as our "president" was unable to attend. I'll have to go through my notes if I still have them, I thought I had given them over to the Steward who was representing Ms. Mullin.

The meeting was strained at best and language of being reserved about reasonable accommodations was made, I will get back with you later today of tomorrow, hopefully with more helpful information.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:45 AM
**To:** Smith, Theodore, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Theodore Smith

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

***Please take a moment to complete a very brief survey.***

**Henley, John (ORM)**

| | |
|---|---|
| **From:** | Smith, Theodore, VBASPT |
| **Sent:** | Thursday, October 31, 2013 8:24 AM |
| **To:** | Henley, John (ORM); Bookhart, Bettie, VBASPT |
| **Subject:** | FW: EEO Investigation ICO Aileen Mullin Case No. 103413 |
| **Signed By:** | theodore.smith1@va.gov |
| **Importance:** | High |

This is what I sent on September 17th.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, September 17, 2013 4:35 PM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Sir,

So sorry for the delay. I do have my limited notes. I do not have the exact verbiage used by our Director other than comments that AFGE was using Ms. Mullin's case as a "witch hunt" against her HR Director Ms. Bonnie Wax. Ms. Mullin's through her pain and frustration was very vocal toward both parties regarding her needs and apparent hurdles that management through HR was requiring her to go through.

The Director (Ms. Kerrie) was reluctant on several issues of Reasonable accommodations at the time, with regards to file handling and coming into the office less frequently as Ms. Mullins was serving as a Work at Home Rater.

Other issues of concern by Ms. Mullins that were also a source of consternation for the Director were Ms. Mullins' concerns regarding air quality issues in the building as it has been documented we have moister, mold and rodent allergen issues. These issues were essentially tabled for further development with little accomplished during the meeting I took part in.

Please feel free to contact me regarding any further questions or clarifications.

Thank you

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, September 17, 2013 4:12 PM
**To:** Smith, Theodore, VBASPT
**Cc:** Bookhart, Bettie, VBASPT
**Subject:** FW: EEO Investigation ICO Aileen Mullin Case No. 103413

September 17, 2013

Fm: John Henley, EEO Investigator

To: Theodore Smith

Sub: Follow-up

Good afternoon Mr. Smith, have you had chance to review your note to respond to the email below. Please respond immediately.

---

**From:** Smith, Theodore, VBASPT
**Sent:** Tuesday, August 27, 2013 10:27 AM
**To:** Henley, John (ORM)
**Subject:** RE: EEO Investigation ICO Aileen Mullin Case No. 103413

Morning Sir,

Yes I was there ... I was called in adhoc as our "president" was unable to attend. I'll have to go through my notes if I still have them, I thought I had given them over to the Steward who was representing Ms. Mullin.

The meeting was strained at best and language of being reserved about reasonable accommodations was made, I will get back with you later today of tomorrow, hopefully with more helpful information.

Tedd

Theodore (Tedd) P. Smith Jr. MPA/CJ
RVSR Core 70
Steward, AFGE Local 1594
Ext 7334

"Of The Troops and For The Troops"

"Have you forgotten?"

A 'Veteran' -- whether active duty, discharged, retired, or reserve -- is someone who, at one point in his life, wrote a blank check made payable to 'The United States of America,' for an amount of 'up to, and including his life.'

---

**From:** Henley, John (ORM)
**Sent:** Tuesday, August 27, 2013 9:45 AM
**To:** Smith, Theodore, VBASPT
**Subject:** EEO Investigation ICO Aileen Mullin Case No. 103413

August 27, 2013

Fm: John Henley, EEO Investigation

To: Theodore Smith

Sub: EEO Investigation

Good morning, the subject complainant testified that you were present in a meeting when the Director told the complainant that, "she does not believe in giving accommodations." Were you present during a meeting when the Director made the aforementioned statement? If yes, what specifically did the Director say?

Thank you for your cooperation.

John Henley
EEO Investigator/Certified Mediator/Instructor)
Department of Veterans Affairs
Office of Resolution Management (Southeasten Operations)
PH; (727) 540-3966
Fax: (727) 540-3976

Never tell people how to do things. Tell them what to do and they will surprise you with their ingenuity.
*General George S. Patton*

- ***Please take a moment to complete a very brief survey.***

  How were my services today?

Note: If you are not the intended recipient, any dissemination or duplication of this email is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

EXHIBIT 13

[redacted]

5/16/2014
3:14 pm

U.S. DEPARTMENT OF LABOR

OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 6 JAC
LONDON, KY 40742-8300
Phone: (904) 366-0100

Worker's Comp was granted - All the way back to 5/1/2009.

August 24, 2012

Date of Injury: 05/01/2009
Employee: AILEEN MULLIN

AILEEN MULLIN
745 ALAMANDA WAY S
ST. PETERSBURG, FL 33705

Dear Ms. MULLIN:

This is to notify you that your claim for an occupational disease has been accepted for the following condition(s):

| Diagnosed condition(s) | ICD-9 code(s) |
|---|---|
| CHRONIC MAXILLARY SINUSITIS | 4730 |
| EXTRINSIC ASTHMA | 4930 |

granted acknowledged as related to the work place

**Please advise all medical providers who are treating you for this injury of the accepted ICD-9 code(s). Accurate coding facilitates timely bill processing.**

If the current accepted condition(s) need to be revised or additional complications related to the current accepted condition(s) need to be added, your physician should explain in writing, with medical rationale, the relationship between any additional condition and the work injury or the current accepted condition(s) noted above.

If you lose time from work due to your work related condition, you may claim compensation using Form CA-7.

If you have not been released to full duty, have your treating physician provide a medical report that includes appropriate work restrictions and a statement as to when you will be released back to full duty without restrictions.

Please refer to the attachment entitled "Now That Your Claim Has Been Accepted" for important information pertaining to how to contact us, medical authorizations, payment of bills, and returning to work.

Sincerely,

*Jon Jackson*
Jon Jackson
Claims Examiner

Enclosure: NOW THAT YOUR CLAIM HAS BEEN ACCEPTED

***If you have a disability (a substantially limiting physical or mental impairment), please contact our office/claims examiner for information about the kinds of help available, such as communication assistance (alternate formats or sign language interpretation), accommodations and modifications.***

U.S. DEPARTMENT OF LABOR

OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 6 JAC
LONDON, KY 40742-8300
Phone: (904) 366-0100

October 26, 2015

Date of Injury: 05/01/2009
Employee: AILEEN MULLIN

AILEEN MULLIN
745 ALAMANDA WAY S
ST PETERSBURG, FL 33705

Dear Ms. MULLIN:

This is to notify you that the accepted conditions in your case have been updated. Your claim has been accepted for the following additional conditions: POST-TRAUMATIC STRESS DISORDER, ICD 10 CODE, F43.10 and DYSPHONIA, ICD 10 CODE, R49.0. A list of all accepted conditions in your case is below.

| Diagnosed conditions | ICD codes |
|---|---|
| POST-TRAUMATIC STRESS DISORDER, UNSPECIFIED | ICD10 F4310 |
| DYSPHONIA | ICD10 R490 |
| CHRONIC MAXILLARY SINUSITIS | ICD09 4730 |
| EXTRINSIC ASTHMA | ICD09 4930 |

**Please advise all medical providers who are treating you for this injury of the newly accepted conditions with ICD codes. Accurate coding facilitates timely bill processing.**

If the current accepted conditions need to be revised or additional complications related to the current accepted conditions need to be added, your physician should explain in writing, with medical rationale, the relationship between any additional condition and the work injury or the current accepted conditions noted above.

As a reminder, OWCP must approve in advance any surgery or procedure other than emergency surgery (that is, a procedure which must be performed right away to preserve life or the function of an organ or body part). You (or your medical provider) should contact OWCP for authorization at least 30 days before the intended date of the procedure. We will advise you of the information needed to determine whether OWCP can authorize the requested procedure. Medical providers should contact our medical authorization and bill processing contractor (ACS) for all authorizations and billing questions. Automated information is available 24 hours per day at 1-866-335-8319 or online at http://owcp.dol.acs-inc.com. The medical authorization fax line is 1-800-215-4901. If you, your physician, or other medical providers require direct contact with a customer service representative, you may call 1-844-493-1966, Monday – Friday, 8am – 8pm EST.

If you have any questions regarding your claim, you may contact the Office at the phone number and address listed above. Note that you can also view your case and compensation claim status, billing

***If you have a disability (a substantially limiting physical or mental impairment), please contact our office/claims examiner for information about the kinds of help available, such as communication assistance (alternate formats or sign language interpretation), accommodations and modifications.***

updates including reimbursements, coverage limitations, and other information on line via the Claimant Query System (CQS) at http://owcp.dol.acs-inc.com. General information can be obtained on the Department of Labor website at http://www.dol.gov/owcp/dfec/index.htm.

Sincerely,

Helen Ferro
Senior Claims Examiner

DEPARTMENT OF VETERANS AFFAIRS
VETERANS BENEFITS ADMINISTRATION
REGIONAL OFFICE-ST. PETERSBURG
PO BOX 1437
SAINT PETERSBURG, FL 33731

RONALD S WEBSTER
WEBSTER LAW GROUP
719 PEACHTREE ROAD
SUITE 200
ORLANDO, FL 32804

[redacted]

U.S. DEPARTMENT OF LABOR

OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 6 JAC
LONDON, KY 40742-8300
Phone: (904) 366-0100

February 02, 2017

Date of Injury: 05/01/2009
Employee: AILEEN MULLIN

AILEEN MULLIN
745 ALAMANDA WAY S
ST PETERSBURG, FL 33705

Dear Ms. MULLIN:

This is to notify you that the accepted conditions in your case have been updated. Your claim has been accepted for the following additional condition: Major Depressive Disorder. A list of all accepted conditions in your case is below.

| Diagnosed conditions | ICD codes |
|---|---|
| POST-TRAUMATIC STRESS DISORDER, UNSPECIFIED | ICD10 F4310 |
| DYSPHONIA | ICD10 R490 |
| MAJOR DEPRESSIVE DISORDER, RECURRENT SEVERE WITHOUT PSYCHOTIC FEATURES | ICD10 F332 |
| CHRONIC MAXILLARY SINUSITIS | ICD09 4730 |
| EXTRINSIC ASTHMA | ICD09 4930 |

**Please advise all medical providers who are treating you for this injury of the newly accepted conditions with ICD codes. Accurate coding facilitates timely bill processing.**

If the current accepted conditions need to be revised or additional complications related to the current accepted conditions need to be added, your physician should explain in writing, with medical rationale, the relationship between any additional condition and the work injury or the current accepted conditions noted above.

As a reminder, OWCP must approve in advance any surgery or procedure other than emergency surgery (that is, a procedure which must be performed right away to preserve life or the function of an organ or body part). You (or your medical provider) should contact OWCP for authorization at least 30 days before the intended date of the procedure. We will advise you of the information needed to determine whether OWCP can authorize the requested procedure. Medical providers should contact our medical authorization and bill processing contractor (ACS) for all authorizations and billing questions. Automated information is available 24 hours per day at 1-866-335-8319 or online at http://owcp.dol.acs-inc.com. The medical authorization fax line is 1-800-215-4901. If you, your physician, or other medical providers require direct contact with a customer service representative, you may call 1-844-493-1966, Monday – Friday, 8am – 8pm EST.

***If you have a disability (a substantially limiting physical or mental impairment), please contact our office/claims examiner for information about the kinds of help available, such as communication assistance (alternate formats or sign language interpretation), accommodations and modifications.***

If you have any questions regarding your claim, you may contact the Office at the phone number and address listed above. Note that you can also view your case and compensation claim status, billing updates including reimbursements, coverage limitations, and other information on line via the Claimant Query System (CQS) at http://owcp.dol.acs-inc.com. General information can be obtained on the Department of Labor website at http://www.dol.gov/owcp/dfec/index.htm.

Sincerely,

Helen Ferro
Senior Claims Examiner

DEPARTMENT OF VETERANS AFFAIRS
VETERANS BENEFITS ADMINISTRATION
REGIONAL OFFICE-ST. PETERSBURG
PO BOX 1437
SAINT PETERSBURG, FL 33731

RONALD S WEBSTER
WEBSTER LAW GROUP
719 PEACHTREE ROAD
SUITE 200
ORLANDO, FL 32804

EXHIBIT 14

PRINTED FROM ECOMP - aileen_mullin@yahoo.com - 02/13/2022




# Aileen Mullin

10/13/2020 9:00 AM Telemedicine
MRN: 5707505

Description: **Female DOB: 3/3/1960** Provider: **Ellen J Dutta, MD** Department: **Bmr Allergy**

## Reason for Visit

## Diagnoses

| | Codes | Comments |
|---|---|---|
| Occupational asthma, severe persistent, uncomplicated - Primary | J45.50, Z57.9 | |
| Chronic maxillary sinusitis | J32.0 | |
| Perennial allergic rhinitis | J30.89 | |
| Seasonal allergic rhinitis due to pollen | J30.1 | |

## Progress Notes

### Progress Notes by Ellen J Dutta, MD at 10/13/2020 9:00 AM

| | | | | | |
|---|---|---|---|---|---|
| Author: | Ellen J Dutta, MD | Author Type: | Physician | Filed: | 11/14/2020 11:26 AM |
| Note Status: | Signed | Cosign: | Cosign Not Required | Encounter Date: | 10/13/2020 |
| Editor: | Ellen J Dutta, MD (Physician) | | | | |

The patient presents for Telehealth visit for follow up of asthma and shortness of breath with environmental triggers attributed to work exposures.

- Past Visits:

Ms Mullin was initially seen by Dr Lax at MGH Allergy Associates on 6/3/15 with a history of asthma since she was in her 20's. Triggers included exposures to cats. Her symptoms were well controlled and did not require maintenance medication or a rescue inhaler even when exercising. She also has history of allergic rhinitis for which she was treated for multiple years with immunotherapy. Starting in 2009 she was employed as a claims specialist at the Veterans Administration. She reports that shortly after starting work at the Veterans Administration she noted more frequent episodes of cough, shortness of breath, fatigue, dysphonia, and generally feeling ill. She also reports frequently sinus congestion, sinus infections, and nose bleeds. There were multiple severe episodes of shortness of breath in 2011 and 2012 that led to her having to leave the building and periodically going to emergency room despite the use of rescue inhalers.

Aileen states that she had significant improvement in her symptoms when away from the office including when she was in Baltimore, MD for 2 months for external training. Her symptoms also improved with the use of bronchodilators and oral corticosteroids. She has spoken about this issue with her employers on multiple occasions. Some accommodations were made such as compressed work schedule and relocation to other parts of the building, but were unsuccessful in reducing her symptoms by report. She was evaluated by multiple specialists including ENT, allergy, rheumatology, and neurology which included skin testing,

PFT's and imaging (CT and x-ray). She has had a claim for occupational disease accepted for workers compensation by the Department of Labor.
Environmental allergy skin testing in 2010 and 2013 which showed a sensitization to multiple trees (oak, cypress, elm, ash, cedar, bayberry, pine, mulberry, beech), grasses (Bermuda, Johnson), weeds (ragweed, nettle, lamb quarters, pigweed, sorrel, dog fennel), dust mites, cockroach, cat/dog, molds (alternaria, hormodendrum, aspergillus, penicillium, Curvularia, Stemphylium, Phoma, rhizopus, mucor and Helminthosporium)
allergy skin testing here showed:
Allergy Skin Testing:.
Positive by skin prick testing (connotes high level of allergy): Birch, oak, dust mites (DP and DF) cockroach, cat/dog dander, and alternaria.

Air quality environmental sample analysis in April of 2013 showed the presence a higher presence of Ascospores, basidiospores, and cladosporium (>9,000 spore count/m3) and a lesser count (<200) for aspergillus, beltania, Bipolaris, cercospora, Curvularia, fusarium, mitospores, persilotia, pyricularia perconia/myxomycetes.
Since 2013 she has been working out of her home. She reports that her symptoms were much improved until April 2015 when she had acute worsening of her symptoms including cough, shortness of breath, fatigue, dysphonia, and possible wheezing. She reports reduced exercise tolerance (tired after approximately ¼ mile). Minimal to mild sinus congestion, rhinitis, post nasal drip. Her symptoms have persisted despite the use of Advair daily. She uses her Xopenex >4 times daily with some temporary alleviation of symptoms. She reports improvement with oral steroids. She has used intranasal steroids and antihistamines in the past with no significant improvement.
She had a chest x-ray and V/Q lung scan in May 2015 which were normal.
Aileen reports that she is unable to find physicians in the Tampa Bay area that would be unable to see her based on the coverage provided by workers compensation which is the reason that she is presenting to Massachusetts Hospital.
She saw Dr. Christiani as well as otorhinolaryngology for evaluation of vocal cord function. There is suggestion of reflux. There is also suggestion of muscular dysphonia and they have given her a followup to evaluate therapy options.
- on 6/27/16, she reviews with me that she has been sick for 14 months.
She continues with dysphonia. Frequent nosebleeds, green drainage. Pain and pressure.
The last 2 months asthma has been worse. Had to use a wheelchair in the airport.
Sometimes the albuterol neb helps sometimes not. Severe fatigue.
Stopped Atrovent nasal, because it did not help and may have added to bleeding.
Spiriva seemed to help.
She continues Advair 115–21, 2 puffs twice daily, and Singulair
Xopenex doesn't seem to help, using twice per week on average.
She started Xolair with home pulmonologist last week. She is uncertain of the exact dose but knows that it is 2 shots every 4 weeks. She currently has frequent asthma symptoms. Xolair should prove helpful, but may take 2-3 months to assess its effect. Therefore I increased Advair to 230–21, 2 puffs twice daily. She was instructed on the use of spacer. Continue Spiriva and Singulair. Albuterol and/or Xopenex as needed.
Add saline sinus rinse twice daily.
- on 10/01/18 she notes limited improvement. Continues with pulmonology follow up with Dr. Christiani. Symptoms are worse in Florida, needing to use a wheelchair to get to her plane.
She wonders about the severe SOB and dysphonia.
She continues on saline rinses.
Discontinued Advair and Spiriva.
Some nosebleeds. Denies sneezing and rhinorrhea.
Continue with saline sinus rinse twice daily.
Recommended saline gel.
Recommended Fasenra over Xolair for eosinophilic asthma. Provided educational material

on Fasenra to the patient for her to consider.
She would like me to manage her allergy medication:
Refilled her albuterol nebulizer, budesonide nebulizer, Breo, Xopenex inhaler and nebulizer, and Singulair.
- on 01/07/19, patient reports that her asthma symptoms have not been well managed. Feels SOB frequently. She notes times where she is much worse since her last visit, but there are times where she does not feel as bad. Symptoms exacerbated when in Florida and were better in Arizona in March 2018.
She continues on Xolair with partial symptom control. Considered Fasenra, and now asks about Dupixent. Uses budesonide nebulizer and Xopenex nebulizer as needed about once per week. Has used Xopenex about 3-4 times per day for the past week. She can go a few days without using Xopenex after Xolair dose. She believes that her allergy symptoms have worsened. Uses Claritin most mornings. Sometimes uses Zyrtec at night, but typically avoids this because it makes her feel foggy. Not using nasal sprays due to nose bleeds. Spirometry was within normal limits but has worsened since previous testing. Patient continues to report frequent symptoms that are not well controlled.
She also has environmental allergen sensitivities. Continue with saline sinus rinse twice daily, saline gel prn, Claritin and Zyrtec prn, albuterol nebulizer, budesonide nebulizer, Breo, spiriva, Xopenex inhaler, and Singulair. I recommended Dupixent in addition/to replace Xolair (450 mg SC every 2 weeks)
- on 5/22/2020, we reviewed that Dupixent was not approved last year. Continues Xolair with her physician in Florida, who did not try switching to any other biologic. Her last dose of Xolair was on 3/5/2020, and her dose is 300 mg every 2 weeks. She has not been able to attend appointments for Xolair due to COVID pandemic.
Staying indoors she does better. Worse if she goes outside.
Takes Breo Ellipta in the morning, Singulair 10 mg at night, Xopenex HFA as needed which is 1-2 times per day, and combined Xopenex neb with budesonide neb as needed about 2-4 times per week. Last prednisone March 2019, and she now must avoid prednisone because she has severe side effects including suicidal ideation. (Tolerates steroid injection for her back, but when she had a series of multiple injections she had suicidal thoughts.) Asks again about Dupixent. I again recommended Dupixent to replace Xolair. Dupixent is an interleukin-4 receptor alpha antagonist indicated for the treatment of eosinophilic asthma whose disease is not adequately controlled by topical medication or other therapies, or oral corticosteroid dependent asthma. Since I last spoke with Aileen, Dupixent has been approved for CRS with nasal polyps, and so I also expect Dupixent to help her chronic sinusitis.
Continue with saline sinus rinse twice daily, saline gel prn, Claritin and Zyrtec prn, albuterol nebulizer, budesonide nebulizer, Breo, Xopenex inhaler, and Singulair.
- on 9/14/20, Dupixent has not been approved because ICD code doesn't match, because of ICD-9 changing to ICD-10.
Had been off Xolair since 3/5/20 because of the pandemic, then finally restarted Xolair 8/26/20 with her local physician. But she is still very symptomatic (similar to last visit 5/22/20). She tells me recent CT lung was clear. Recent PFT was poor.
Hoping to coordinate care. Dysphonia, anxiety/depression, and asthma.
-Today on 10/13/2020, she continues with frequent symptoms. There has been additional delay in trying to get approval of Dupixent. She needs a very specific letter explaining that her current asthma is the same illness as the original. She continues Breo Ellipta in the morning, Singulair 10 mg at night, Xopenex HFA as needed which is 1-2 times per day, and combined Xopenex neb with budesonide neb as needed about 2-4 times per week. Last prednisone March 2019, and she now must avoid prednisone because she has severe side effects including suicidal ideation.

There were no vitals filed for this visit.
There was no physical exam for this visit

Spirometry could not be performed during this telehealth visit.

Assessment and Plan
1. Severe persistent asthma related to occupational exposures and allergic rhinitis. Chronic maxillary sinusitis
Asthma is poorly controlled. She was off Xolair from 3/5/20 until 8/26/20. Even on Xolair, she has only partial control.
I again recommended Dupixent to replace Xolair. We have had a hard time trying to get approval for Dupixent. We will try again. She will send me all of her past documentation to help me compose the necessary letters to get Dupixent covered. Continue with saline sinus rinse twice daily, saline gel prn, Claritin and Zyrtec prn, albuterol nebulizer, budesonide nebulizer, Breo, Xopenex inhaler, and Singulair.
- Ms. Mullins has asked me to explain in the letter that the term remission is not used. And that the terms extrinsic and intrinsic are not clinically useful. I will explained that her current asthma is the same as her original disease. I will also explain the rationale for use of biomarkers to choose medication. Letter will include conclusion statement.
2. Follow up in about 4 months depending on when Dupixent can be started. .

Worker's Compensation Case Number (OWCP): 062 294 294
Date of Injury 5/1/2009

**Telehealth Documentation**

This telehealth visit was done using: telephone only

Level of service determined by: time. Total visit duration was 30 minutes of which greater than 50% was spent on counseling and care coordination as per the visit note. .

The physical location of the provider of care is outside of a BILH location, and the location of the patient is separate from the provider of care at the time the services were delivered.

The patient or patient's representative provided informed consent to participate in this telehealth visit. The patient or patient's representative understands that the services delivered by the provider are part of their continuing care. For ambulatory services, the patient or their representative knows how to access in-person care if needed.

## Vitals

Smoking Status
Former Smoker

## Medication Administration Report for Mullin, Aileen

All administrations
No administration data available

## Infusion Orders

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **CONSTRUCTION FOR NEW FURNITURE** |
| Proposed Start Date | October 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **1** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| <u>PROJECT SCOPE & DESCRIPTION</u><br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | $4,900,000 was provided at the EOFY11 for the purchase of new furniture and carpet throughout the VARO. These construction projects throughout the VARO will be for training rooms, conference rooms, break rooms, offices, repair of walls, and much needed painting. Additionally this project (the new furniture) cannot be accomplished without re-cabling for the electrical and data. |
| <u>PROJECT JUSTIFICATION</u><br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Construction funds are needed to proceed with the approved $4.9M GOE furniture funds that were received at the EOFY11. The building of conference rooms, training rooms, and offices will improve communication and security of sensitive information throughout the facility. The build out of the Training Rooms would help meet the existing need for training space. The SSD sections (Finance, Privacy, and Payroll are separated by portable walls and are not conducive to veterans privacy concerns. The furniture funds will allow the whole facility to upgrade all furniture. |
| <u>IT IMPACT</u><br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | Typical training room setup to include projector, screen, computers, monitors, speakerphone/conference phone appropriate for Live Meetings, etc.<br><br>Data Cabling to support the facility furniture upgrade $650,000 |
| <u>MINOR CONSTRUCTION COST</u><br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Construction associated with project $350,000<br>Movement of HVAC grills $ 22,000 |
| <u>GOE COST</u><br><br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **ORLANDO VR&E OUTBASED RENOVATION** |
| Proposed Start Date | JAN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **2** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Convert storage/file room into two offices for VR&E employees. Project will accomplish better use of space that is used for closed files. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This projects produces significant improvements of privacy and space. Current space has one door and no windows. Co-op currently has no office space. Program Support Specialist (PSS) is in a desk behind files and copier, so she has no privacy to concentrate on her work. PSS is not safe working behind file cabinets and copier. Space is small and difficult to maneuver in and out of. Co-op will soon be working cases directly and currently has no private area to call her own for face-to-face meetings. Also, Job Lab Office of new hire does not trap sound, as sound can travel behind partition, so does not lend itself to complete privacy for the veteran. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | Closed space would need to have computer access and phone lines installed. |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Build out of two offices with electrical and data. $24,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **JACKSONVILLE VR&E OUTBASED RENOVATION** |
| Proposed Start Date | JAN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | 3 |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Build office for VR&E counselor in the Jacksonville leased facility. This project will provide a private working space for counselors to have face-to-face meetings with veterans. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Currently two counselors are sitting in cubicles in an open floor space. Counselors need to have private offices to meet with veterans. We only have enough space to make one office. The other counselor (an intern) would be moved to another cubicle area, which is not large enough to make into an office. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | Closed space would need to have computer access and phone lines relocated. |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Build out of office with electrical and data. $16,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **Loan Guaranty Realignment of cubicles** |
| Proposed Start Date | JAN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | 4 |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Move one supervisor cubicle from C & V to Loan Production and move two technician cubicles from LP to C & V. The supervisor cubicle occupies the same amount of space as the 2 technician cubicles. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project would help ensure that employees working towards the same production targets are working closely together which facilitates communication. Currently, C & V employees are seated in Loan Production. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | IT support would be needed to adjust the wiring at the time the cubicles are moved. |

| | |
|---|---|
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Data cabling/data realignment $8,000 |
| GOE COST<br>*(Show detail in Attachment C)* | Contract to dismantle/reinstall existing furniture $1,800 |

# FY 2012 VBA Minor Construction Project Proposal
# GOE Non-Payroll Cost Estimate

| | | | |
|---|---|---|---|
| **Station Name & Number** | VARO St. Petersburg 317 | | |
| **Project Title** | Loan Guaranty Realignment of cubicles | | |
| **Description** Installation of additional security system in Canteen's Retail Store, located in the Regional Office. This project will involve the NSC, the VA Police, and the Canteen Service Manager. NCS will be needed to ensure proper connections are made into the networked systems. The VA Police will be monitoring the system after the completion of work. The Canteen Manager has overall access and will need to provide contractor access to the canteen. | **Subaccount** | **GOE Funds Associated with Project** | **Estimating Methodology and Justification** This project is the direct result of a physical security conducted in the St. Petersburg VARO. The Canteen lacks the proper security system necessary to prevent unauthorized access from occurring. By completing this project, the canteen will be linked to the Regional Office's existing security system. |
| | | | |
| **TRANSPORTATION OF THINGS** | | | |
| Move people/equipment | 2220 | | |
| Computer room move | 2220 | | |
| **Subtotal Transportation of Things** | | **0** | |
| **RENT, COMMUNICATIONS, & UTILITIES** | | | |
| Telephone, Long Distance Commercial | 2301 | | |
| GSA FTS | 2302 | | |
| Commercial Recurring Telephone | 2303 | | |
| GSA Recurring Telephone | 2304 | | |
| IDCU | 2311 | | |
| Non Recurring Telephone | 2305 | | |
| Other Communications Services | 2307 | | |
| ADP Software Rental | 2324 | | |
| ADP Equipment Rental | 2343 | | |
| Rent, Commercial Space | 2330 | | |
| Rent, GSA Space | 2331 | | |
| Equipment Rental | 2341 | | |
| Utilities | 2390 | | |
| Other | 23xx | | |
| **Subtotal Rent, Comm. & Utilities** | | **0** | |
| **OTHER SERVICES** | | | |
| ADP Services | 2510 | | |
| Repair of Furniture & Equipment | 2520 | | |
| File Cabinet Painting/Repair | 2520 | | |
| GSA Special Services (GSA Design Services) | 2532 | | |
| Interior Design/Planning Services | 2535 | | |

| | | | |
|---|---|---|---|
| Guard Service | 2542 | | |
| Cleaning/Maintenance Service | 2543 | | |
| Training Contracts/Tuition | 2583, 84 | | |
| ADP Requirements Survey | 2510 | | |
| Groundbreaking/Dedication | 2542 | | |
| Other | 25xx | 1,800 | |
| **Subtotal Other Services** | | **0** | |
| **SUPPLIES and MATERIALS** | | | |
| Office Supplies | 2620 | | |
| Flags | 2691 | | |
| ADP Software < $5,000 | 2624 | | |
| Other | 26xx | | |
| **Subtotal Supplies & Materials** | | **0** | |
| EQUIPMENT | | | |
| Systems Furniture | 3120 | | |
| Other Furniture | 3120 | | |
| OA and Communications Equipment < $25,000 | 3129 | | |
| OA and Communications Equipment > $25,000 | 3122 | | |
| ADP Equipment (LAN Electronics) | 3123 | | |
| ADP Software > $5,000 | 3124 | | |
| File Cabinets | 3126 | | |
| Building Signage | 3126 | | |
| Window Treatments | 3126 | | |
| Office Equipment < $25,000 | 3127 | | |
| Office Equipment > $25,000 | 3121 | | |
| Telecommunication Equipment < $25,000 | 3133 | | |
| Utility & Operating Equipment >$25,000 | 3150 | | |
| Utility & Operating Equipment <$25,000 | 3151 | | |
| Security Equipment: Equipment<br>Project Mgmt<br>Warranty and Shipping | 3151 | | |
| Other | 31xx | | |
| **Subtotal Equipment** | | | |
| | | | |
| **Total GOE Associated with Minor Project** | | **1,800** | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPAIR OF ROOF AROUND SKYLIGHT** |
| Proposed Start Date | NOV 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **5** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Report from Ardaman & Associates, Inc is attached. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Continuation of the leakage also causes water to form on the floors and creates a safety hazard to the RO and our tenants (service organizations) employees here at the VARO. Allowing the water to continue to leak into the walls and ceilings can only lead to a more expansive project at a significantly higher cost to the government and could lead to closure of sections of the employee work stations, as the water has begun to leak on some of the work stations. Electrical wall outlets and data connection inside the walls have become saturated. Mold is also forming above the ceiling and could lead to closure of these office areas. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Repair of roof area around skylight. $150,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# Roof Engineering Services

US Department of Veterans Affairs
9500 Bay Pines Boulevard, Bay Pines, Florida 33708
September 9, 2011
Ardaman Project No. 11-54-9537
Leo A Daly
1201 Connecticut Avenue, Northwest
Tenth Floor
Washington, DC 20036-2683
Attention: Mr. Pierre Gendreau, RA, LEED AP
Subject: **Report of Roof Engineering Services**
**US Department of Veterans Affairs**
**9500 Bay Pines Boulevard, Bay Pines, Florida**
Dear Mr. Gendreau:

**Ardaman and Associates Inc. (Ardaman)** has completed a visual inspection of the requested water intrusion related to the atrium skylight at the above referenced facility. These services were authorized by you in accordance with the scope of work outlined in our proposal 11-p198. The following presents the results of that investigation.

**BACKGROUND**

The purpose of **Ardaman's** services was to diagnose the source(s) of water intrusion around the recently renovated skylight over the open atrium. The translucent atrium skylight was replaced in 2009 and is currently experiencing leakage around the perimeter. The leakage is typically occurring in office spaces on the perimeter of the atrium.

**OBSERVATIONS**

Upon arrival the original construction documents were reviewed. These documents detailed that the roof is comprised of a standing seam metal roof over structural steel components which are placed over a concrete roof deck. A secondary bitumen roof membrane is applied to the concrete decking below the steel roof structure. Reportedly, this bitumen membrane is turned up the face of the atrium wall approximately six inches although not specifically detailed in the construction documents.

A review of the affected offices was performed and obvious signs of substantial water intrusion were documented (Photographs 1 and 2). Reportedly, the water intrusion is worst when the wind is from the north side of the building. Water travels down the interior of the northeast wall of the atrium and appears at the ceiling level of the third and first floors.



Subsequent to the interior review a walk of the roof was conducted. Around the perimeter of the skylight assembly several custom metal closures were utilized to adapt the new assembly to the existing roof (Photograph 3). A representative of Quality Roofing of Florida was on site to disassemble the area of concern for further diagnosis (Photograph 8). Upon disassembly, it was noted that the original closure system of the roof was fully encapsulated by the new closures and blocking between standing seams (Photograph 9).

Along the surface of the standing seam metal panels, several attempts have been made to seal the closure and blocking area using multiple types of caulking and fabric reinforced coatings (Photograph 7). This material was used to seal the metal blocking that was installed between standing seams at the closure (Photographs 10 and 12). The caulking was deteriorated and cracked from differential movement between the roof panels and the closure/blocking system. Where a fabric reinforced coating was used, the coating had disbonded from the metal and in some cases created a funnel to direct water behind the coating (Photograph 9) and subsequently the new blocking as well.

The roof has a very shallow ¼-inch per foot design slope to the building perimeter. In several areas noted throughout the roof, the slope of the roof was neutral or negative which has allowed water to pond on the surface (Photographs 4-6). The most severe case of this coincides with the noted area of interior water intrusion. This area is believed to have been a staging area for construction materials during the renovation.

**OPINIONS**

Ardaman believes that there are several factors which have lead to the water intrusion currently being experienced. The primary contributing factor to the water intrusion is the shallow design slope of the roof. The area where materials were staged collects water nearly 1-inch deep. Recommended slopes for standing seam metal roofing are a minimum of ½-inch per foot as referenced by the National Roofing Contractors Association. Another contributing factor is the relatively open closure system of the original roof installation. The original closure uses a thin metal strip (cleat) attached to the top of the standing seams to secure the closure. This leaves a gap of ½-inch or more between the closure and the original blocking between standing seams. As a result, wind driven water can easily pass through this gap and spray onto the wall behind (Photographs 13 and 14). This closure system allows wind to travel through the gap at a high velocity. The high velocity wind coupled with standing water results in the inevitable water intrusion.

During the skylight renovation additional metal blocking was added to the front of the original closure system to mitigate the wind driven effect. Unfortunately the new blocking was not adequately sealed to the roof panels during installation and subsequent superficial attempts to seal the blocking also failed. Ponding water upslope of roof penetrations will eventually deteriorate the flashings and should be monitored closely; however, due to the shallow slope of the roof, this situation cannot be fully alleviated.



**RECOMMENDATIONS**

We recommend a two step approach to resolving the water intrusion issue. The first step is to address the deficient slope areas to create positive drainage away from the skylight area as well as other areas of standing water. This may be achieved by repairing the structural elements which have been damaged. We envision this occurring from the underside of the roof and including the replacement or realignment of the deflected purlins. Some shimming of the panels may also be required. Alleviating the negative slope will likely stop the majority of the water intrusion currently being experienced.

The second step is to revise the closure detail by removing the new blocking and sealants in the vicinity and then designing a new sheet metal closure system that will block wind driven water. This would involve a new two piece metal closure that would provide two vertical barriers for water intrusion as well as reducing the air velocity through the entire closure system. Additionally, the new closure system would be attached to the other closures above to prevent issues with thermal expansion and contraction of the roof panels. The overall appearance of this system would be nearly identical to the existing conditions and require less maintenance. Proper design and attachment of the closure system will allow standard sealants to be utilized effectively. This approach should permanently alleviate water intrusion around the full perimeter of the skylight.

**CLOSING**

Although not covered within our scope of services on this project, **Ardaman** would like the opportunity to provide you with a proposal for a detailed design of the recommended repairs.

The opinions presented here are based on **Ardaman's** experience with similar projects and our observations. If any additional information becomes available, we request the opportunity to review it so that we may evaluate its impact on our opinions. If you have any questions concerning what is presented in this report or if we can be of further assistance, please contact us.

Sincerely,

Ardaman & Associates, Inc.
Florida Certificate of Authorization No. 00005950
Jeremy E. Bernauer, EI, RRO William R. Goodson, P.E.
Materials Engineer Senior Materials Engineer
Florida License No. 37935

*G:\Projects\2011\11-9581_VA-Skylight\01-Report.docx*

Attachments: Photographs

Distribution: 1 – Addressee via Email: PLGendreau@leoadaly.com
1 - File

William R. Goodson, PE Digitally signed by William R. Goodson, PE
DN: cn=William R. Goodson, PE, o=Ardaman & Associates,
ou=Tampa Office, email=bgoodson@ardaman.com, c=US
Date: 2011.09.09 14:59:10 -04'00'

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **ADD SINGLE PHASE PROTECTION TO THE VARO** |
| Proposed Start Date | OCT 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **6** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | This project will provide single-phase protection for bldg 46 and 47 and prevent future damage to the electrical equipment at the VARO. This work will be accomplished at night and on weekends to prevent any disruption of services at the VARO. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | On July 18th 2011 the VARO experienced a loss of power. During this time the generator was running and the light began to strobe on and off throughout the facility. The Bay Pines electrical supervisor evaluated the situation with the lights and determined the electrical system was single phasing and the main breaker did not trip. The work to provide a temporary fix was going to take 2-4 hours. This resulted in sending all the VARO and Service Org employees being sent home and production being lost for that day. The repair will prevent loss of production in the future. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **ADD SINGLE PHASE ELECTRICAL PROTECTION TO THE VARO. $20,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **INSTALLATION OF SECOND ELECTRICAL FEEDER LINE** |
| Proposed Start Date | NOVEMBER 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **7** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Installation of a second electrical feeder line to the VARO will prevent shut downs like the one that occurred on July 18th 2011. This project will be accomplished outside an all connections will be made after hours. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is a direct result of loss of several hours of production time at the VARO. The outages have occurred on several occasions and have led to the employees being sent home. Should these outages continue the cost of production loss would be significant The addition of a second electrical feeder line will stop the power outages and eliminate lost production time. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| | |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Installation of second electrical feeder line $ 320,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPAIR OF PARAPET** |
| Proposed Start Date | NOV 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **8** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Repair the EPDM that has blistered and separated from the wall of the building. This is allowing water to infiltrate the plywood and has caused the plywood to rot. The repairs will not have an impact of employees or our day-to-day operations. This project will help to prevent moisture build-up leading to mold. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The parapet EPDM around the outer edge of the roof has been repaired and patched several times over the past 12 years. Some of the repairs were not accomplished properly. These repairs will prevent further damage to the interior walls along the outside of the facility and prevent the build-up of moisture leading to mold. Since this project was requested several years ago the plywood has rotted significantly and mold growth although unseen is obviously present within the walls. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Removal and replacement plywood and EPDM.**<br>**$775,865.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | ST. PETERSBURG VARO- 317 |
| Project Title | **REPLACE INSULATION ON REFRIGERATION LINES** |
| Proposed Start Date | October 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **9** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | The refrigeration lines for the Veterans Canteen Service's walk-in freezer is inadequate and causing condensation to form and drip onto the Service Center floor. This work can be done with minimal disruption of service. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project will stop condensation from leaking onto the ceiling tiles and carpet. This project will correct health and safety conditions by keeping moisture from entering the building and the replacement of ceiling and carpet tiles due to mold growth. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | **N/A** |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Re-insulation walk in freezer lines** **$19,850** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2011 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPLACE ROOFTOP DEHUMIDIFICATION UNITS** |
| Proposed Start Date | OCT 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **10** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replacement of the rooftop dehumidification units. These units are rusting and in need of replacement. Two of these units have now failed. The repairs will not affect any of the RO employees and will help to prevent moisture build-up leading to mold. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The rooftop dehumidification units are thirteen years old. They have rusted and have holes in them that are now home to pigeons. The unit for the files warehouse went down and could have caused mold to form on 300,000 veterans' files. Two of these units have now failed and cannot be repaired. These units are vital to the operation of the Regional Office. Without these units the Regional Office is subject to mold growth inside the building These repairs will prevent further damage to the interior of the facility and prevent the build-up of moisture leading to mold. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Removal and replacement rooftop dehumidification units.**<br>**$700,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPLACE CERAMIC TILE IN ELEVATOR LOBBIES** |
| Proposed Start Date | NOV 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **11** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replace deteriorating ceramic tile in the elevator lobbies. This work will be done at night and on weekends to prevent any disruption of services in the RO. This project will eliminate any future-tripping hazard associated with broken and worn ceramic tile. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The ceramic tile in the elevator lobbies is deteriorating from sand and dirt being tracked into the building and has begun to erode the surface of the tiles. The old tiles are constantly breaking and are showing through to the bottom of the tile. This project will address health and safety conditions by eliminating tripping hazards for employees, as well as veterans visiting the RO. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Remove and replace ceramic tile **$ 30,000** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **ELEVATOR AND EMPLOYEE ENTRANCE FLOOR TILE REPLACEMENT** |
| Proposed Start Date | NOV 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **12** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| <u>PROJECT SCOPE & DESCRIPTION</u><br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replacement of the old vinyl floor tile in the elevators and the employee entrance area. This project would be accomplished during off hours in order to allow operations to continue. This project will eliminate any future tripping hazard associated with peeling tile. |
| <u>PROJECT JUSTIFICATION</u><br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The employee entrance lobby and elevator floors have vinyl tile that is worn and coming loose at the edges and middle of door ways. This tile is unbecoming and is creating a health and safety hazard. This project will eliminate the tripping hazard in the elevators and on the ground floor caused by peeling of the tile corners. We have already experienced employees tripping and have CA1's on file. |
| <u>IT IMPACT</u><br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| <u>MINOR CONSTRUCTION COST</u><br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Demo and replace vinyl tile floors **$ 40,000** |
| <u>GOE COST</u><br><br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPLACE CERAMIC TILE IN MAIN ENTRYWAY** |
| Proposed Start Date | FEB 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **13** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replacement of ceramic tile in the Regional Office's main entryway. This work will be done at night to prevent any disruption of services in the RO. This project will eliminate any future-tripping hazard associated with broken and worn ceramic tile. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The ceramic tile in the elevator lobbies is deteriorating from sand and dirt being tracked into the building and has begun to erode the surface of the tiles. The old tiles are constantly breaking and are showing through to the bottom of the tile. This project will address health and safety conditions, by eliminating possible tripping hazards for employees, as well as veterans visiting the RO. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Removal and replacement of ceramic tile **$ 80,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **INSTALL ROLL-UP DOOR IN WAREHOUSE** |
| Proposed Start Date | DEC 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **14** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replacement of double doors leading into the warehouse to allow forklift access. This will involve the removal of the door frame and 2' of block wall. A roll-up door will be installed increasing the door height. |
| PROJECT JUSTIFICATION<br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The current double door set up is not high enough to allow for safe clearance, when forklift is in use. When pallets are received they have to be moved to the doorway, removed from the pallet, and placed back on the pallet. Duplicating efforts. Eliminating the height restriction of 6' and installing a 8' roll-up door will allow for faster loading of retirement files and receiving of supplies stacked on pallets (i.e.; paper and printers). This will ensure more efficient use of staff to load and unload trucks at the loading dock and avoid duplication of efforts. |
| IT IMPACT<br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Removal and replacement double doors with a roll-up door.<br>**$ 13,500** |
| GOE COST<br><br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO 317 |
| Project Title | **DUMPSTER RELOCATION & MOTORCYCLE PARKING** |
| Proposed Start Date | APR 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **15** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Remove dumpsters from present location and relocate on opposite side of the loading dock area to prevent leakage into the location of the chillers. Add roof to existing concrete enclosure in order to allow overhead protection for employee motorcycle parking. Remove fencing and place a concrete block wall for added protection from the elements. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The relocation of the dumpsters to the opposite side of the loading dock area is an effort to remove the leakage from the dumpsters that runs into the area that houses the chillers. The constant leakage from the dumpsters has caused damage the chillers in the amount of $169,000. There is also the danger for small pieces of paper and dust to fill in around the coils and require that another loss to the government.<br>**During exit briefing, Nika Technology recommended that the Regional Office move the dumpsters to another location in order to alleviate paper and trash getting into the chiller plant.** |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Remove fencing<br>Build concrete block wall<br>Construct roof structure<br>Construct new enclosure for dumpsters<br>**$ 39,900** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **PRESSURE CLEAN EXTERIOR OF BUILDING** |
| Proposed Start Date | October 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **16** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Pressure clean exterior of building. With the installation of the new skylight the appearance of fungus growing on the cast stone takes away from the buildings exterior. This project will remove the mold and fungus growing on the cast stone. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The pressure cleaning of the building exterior removes harmful salt and dirt caused by exposure to the elements. The salt air has a tendency to cause the exterior of the building to change color and allows the building to present a dingy discolored surface. Fungus and mold growing on the windows and stone is present on the north side of the building. Cleaning of the exterior of the building will save the cost of replacing the cast stone. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Pressure cleaning of building exterior **$ 52,000** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | ST. PETERSBURG VARO- 317 |
| Project Title | **REPAIR WATER DAMAGE IN AIR HANDLER ROOM** |
| Proposed Start Date | OCT 11 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **17** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| <u>PROJECT SCOPE & DESCRIPTION</u><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | This project will repair damage caused by a roof leak into the air handler room on the third floor west wing of the RO. This work is urgent due to the fact that mold has been discovered on the surface of the walls. |
| <u>PROJECT JUSTIFICATION</u><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Water was discovered leaking from the roof into the air handler room located on the third floor west wing of the RO. The leak was repaired by the roofers from Bay Pines Hospital within days of the leak. The walls, however, were saturated with water and not properly dried out. This has caused mold to form and needs to be eradicated immediately. This work needs to be expedited to prevent the further spread of mold and causing further damage to the facility. The moisture is causing a ground fault with the air duct smoke detector. |
| <u>IT IMPACT</u><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | **N/A** |

| | |
|---|---|
| <u>MINOR CONSTRUCTION COST</u><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Replacement of wall, ceiling, and Duct detector in air handler room**<br>**$26,000.00** |
| <u>GOE COST</u><br>*(Show detail in Attachment C)* | **N/A** |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPLACE CEILING TILES THROUGHOUT RO** |
| Proposed Start Date | MAR 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **18** |
| Area Priority | |
| VACO Project Number Assignment | |
| ROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replace the existing ceiling tiles throughout the RO. This work can be accomplished at night and on weekends interfering with employee production. This project will create a healthy working environment for all RO employees. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Current ceiling tiles have been in place for the past 12 years. The ceiling tile inside the RO have indentations that collect dust and dirt from the air vents. This presents a potential health hazard to employees who have allergies and has led to an increase in the number of Reasonable Accommodations request. One wing of the VARO has had the ceiling tiles replaced and no request for Reasonable Accommodation have been filed. Replacing the tiles with a clean flat surface tile will eliminate these problems and create a safe working environment for all RO employees. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Replacement of ceiling tiles. **$ 650,000** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **PAVING OF EMPLOYEE PARKING LOT** |
| Proposed Start Date | DEC 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **19** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Re-seal and/or re-pave and paint employee parking lots. This project will require the removal of the existing asphalt, compacting the soil and placing a new 4" layer of asphalt. New paint for the 704 parking stalls, numbering, and re-installing 525 wheel stops. The work will be accomplished on the weekends and non-duty hours, so that it doesn't interfere with employee parking. Project will improve the existing parking lots for the facility. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The employee parking lots were last sealed over 8 years ago. In that time, the asphalt has begun to crack, paint worn off, and crosswalks have completely faded. Water is starting to intrude into asphalt and is causing environmental concerns. Resurfacing the parking lots will stop any harmful pollutants from seeping into the ground water. The repair will also prevent employees from tripping as they walk to/from their cars. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Re-seal & re-pavement of employee parking lots **$235,000** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **REPLACE OUTSIDE CAMPUS LIGHTING** |
| Proposed Start Date | OCT 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **20** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Replace the existing campus lighting with new energy efficient LED lighting. Add lighting needed in the gravel overflow lots that where built in 2009. This work can be accomplished with no impact on the employees at the RO. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The lighting under the building and parking lots is essential to the safety of the employees. This project would also provide more energy efficient lighting and bring the RO into EPACT 2005 compliance. The lenses on the fixtures have been heated to the point that they are now brown instead of white and block over 60% of the light. The gravel overflow lots that where built in 2009 did not have lighting installed due to VACO requesting that funds be returned. Lighting for the outside areas is critical during the winter when employees leave after dark. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Replacement of outside lighting. **$ 199,843** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **INSTALL AIR VENTS** |
| Proposed Start Date | JUN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **21** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Install new air vents throughout the Regional Office. This project will allow the RO to install the new air vents purchased in FY09. This work will be accomplished at night and will not interfere with the workers at the RO. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project would correct health and safety conditions, as current vents are eroded and attempts to remove and clean has damaged the vents. There has been an increase in the number of Reasonable Accommodation request for air purifiers due to allergies and can be attributed to dirty vents. New air vents will reduce these requests for air purifiers and improve the air quality throughout the facility. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Installation of new air vents. **$ 37, 000** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **REPLACEMENT OF THERMOSTATS** |
| Proposed Start Date | JUL 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **22** |
| Area Priority | |
| VACO Project Number Assignment | |
| <u>PROJECT SCOPE & DESCRIPTION</u><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | This project will replace old outdated and broken thermostats in the RO. There will be no disruption of services with project. The thermostats can be replaced while work continues. |
| <u>PROJECT JUSTIFICATION</u><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Many of the thermostats in the RO are outdated, broken, and in need of replacement. This project would improve our energy management and lead to energy savings through better monitoring of the building on the METASYS system. This project will help bring the VARO into compliance with EPACT 2005. |
| <u>IT IMPACT</u><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| <u>MINOR CONSTRUCTION COST</u><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Replacement of thermostats throughout the RO **$ 9, 800** |
| <u>GOE COST</u><br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO 317 |
| Project Title | **CHILLER ACCESS GUARDS** |
| Proposed Start Date | JUL 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **23** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Install access guards for chiller plant. Currently, area under the chillers is exposed to the elements. Access guards will keep unwanted animals from crawling under the chillers and causing damage to wiring and other components. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is necessary to protect the chillers from animals. On several occasions, raccoons have been found living under the chillers and caused damage to chillers' electrical system. Animals and trash caused damage to the chiller coils which resulted in the replacement of coils at a cost of $169,000. There is also the danger for small pieces of paper and dust to fill in around the coils and require that another loss to the government. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Chiller access guards **$ 5,500** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **DESIGN BUILD FROM HURRICANE STUDY** |
| Proposed Start Date | MAR 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **24** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Based on Hurricane Study performed in 2009, contract with Company to design recommended changes to building to comply with the study. This project will not impact RO staff.<br>. |
| PROJECT JUSTIFICATION<br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project will bring the RO into compliance with the recommendations from the hurricane study done in 2009. |
| IT IMPACT<br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Design build based on recommendations from hurricane study<br>**$ 175, 000** |
| GOE COST<br><br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA M INOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **HURRICANE STUDY PROJECTS** |
| Proposed Start Date | JAN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **25** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Modify building based on design build. Changes include movement of the electrical room from the ground floor and raising chiller plant to protect building utilities in Hurricane. Depending upon design, employees would be impacted by these changes. |
| PROJECT JUSTIFICATION<br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | These modifications to the buildings systems are necessary to bring the RO into compliance with the recommendations made in the hurricane study conducted in 2009. |
| IT IMPACT<br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Work to meet recommendations of hurricane study. **$ 410,433** |
| GOE COST<br><br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO ST. PETERSBURG – 317 |
| Project Title | **CANTEEN SECURITY SYSTEM** |
| Proposed Start Date | AUG 2012 |
| VARO Project Contact & Phone No. | DANNY WERT (727) 319-5995 |
| Station Priority | **26** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Installation of additional security system in Canteen's Retail Store, located in the Regional Office. This project will involve the NSC, the VA Police, and the Canteen Service Manager. NCS will be needed to ensure proper connections are made into the networked systems. The VA Police will be monitoring the system after the completion of work. The Canteen Manager has overall access and will need to provide contractor access to the canteen. |
| PROJECT JUSTIFICATION<br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is the direct result of a physical security conducted in the St. Petersburg VARO. The Canteen lacks the proper security system necessary to prevent unauthorized access from occurring. By completing this project, the Retail Store will be linked to the Regional Office's existing security system. |
| IT IMPACT<br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | This system will need to be linked to the existing security system in the RO. The link-up will require the installation of a new board in the control room for access to the surveillance systems in place. IT will be required to connect the new system |
| MINOR CONSTRUCTION COST<br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Miscellaneous Materials: **$ 350**<br>Installation/Labor: **$5,500**<br>Total Construction Cost: **$5,850** |
| GOE COST<br><br>*(Show detail in Attachment C)* | Security Equipment **$6,700** |

# FY 2012 VBA Minor Construction Project Proposal
# GOE Non-Payroll Cost Estimate

| | | | |
|---|---|---|---|
| **Station Name & Number** | VARO St. Petersburg 317 | | |
| **Project Title** | CANTEEN SECURITY SYSTEM | | |
| **Description** Installation of additional security system in Canteen's Retail Store, located in the Regional Office. This project will involve the NSC, the VA Police, and the Canteen Service Manager. NCS will be needed to ensure proper connections are made into the networked systems. The VA Police will be monitoring the system after the completion of work. The Canteen Manager has overall access and will need to provide contractor access to the canteen. | **Subaccount** | **GOE Funds Associated with Project** | **Estimating Methodology and Justification** This project is the direct result of a physical security conducted in the St. Petersburg VARO. The Canteen lacks the proper security system necessary to prevent unauthorized access from occurring. By completing this project, the canteen will be linked to the Regional Office's existing security system. |
| | | | |
| **TRANSPORTATION OF THINGS** | | | |
| Move people/equipment | 2220 | | |
| Computer room move | 2220 | | |
| **Subtotal Transportation of Things** | | **0** | |
| **RENT, COMMUNICATIONS, & UTILITIES** | | | |
| Telephone, Long Distance Commercial | 2301 | | |
| GSA FTS | 2302 | | |
| Commercial Recurring Telephone | 2303 | | |
| GSA Recurring Telephone | 2304 | | |
| IDCU | 2311 | | |
| Non Recurring Telephone | 2305 | | |
| Other Communications Services | 2307 | | |
| ADP Software Rental | 2324 | | |
| ADP Equipment Rental | 2343 | | |
| Rent, Commercial Space | 2330 | | |
| Rent, GSA Space | 2331 | | |
| Equipment Rental | 2341 | | |
| Utilities | 2390 | | |
| Other | 23xx | | |
| **Subtotal Rent, Comm. & Utilities** | | **0** | |
| **OTHER SERVICES** | | | |
| ADP Services | 2510 | | |
| Repair of Furniture & Equipment | 2520 | | |
| File Cabinet Painting/Repair | 2520 | | |
| GSA Special Services (GSA Design Services) | 2532 | | |
| Interior Design/Planning Services | 2535 | | |

| | | | |
|---|---|---|---|
| Guard Service | 2542 | | |
| Cleaning/Maintenance Service | 2543 | | |
| Training Contracts/Tuition | 2583, 84 | | |
| ADP Requirements Survey | 2510 | | |
| Groundbreaking/Dedication | 2542 | | |
| Other | 25xx | | |
| **Subtotal Other Services** | | **0** | |
| **SUPPLIES and MATERIALS** | | | |
| Office Supplies | 2620 | | |
| Flags | 2691 | | |
| ADP Software < $5,000 | 2624 | | |
| Other | 26xx | | |
| **Subtotal Supplies & Materials** | | **0** | |
| EQUIPMENT | | | |
| Systems Furniture | 3120 | | |
| Other Furniture | 3120 | | |
| OA and Communications Equipment < $25,000 | 3129 | | |
| OA and Communications Equipment > $25,000 | 3122 | | |
| ADP Equipment (LAN Electronics) | 3123 | | |
| ADP Software > $5,000 | 3124 | | |
| File Cabinets | 3126 | | |
| Building Signage | 3126 | | |
| Window Treatments | 3126 | | |
| Office Equipment < $25,000 | 3127 | | |
| Office Equipment > $25,000 | 3121 | | |
| Telecommunication Equipment < $25,000 | 3133 | | |
| Utility & Operating Equipment >$25,000 | 3150 | | |
| Utility & Operating Equipment <$25,000 | 3151 | | |
| Security Equipment: Equipment<br>Project Mgmt<br>Warranty and Shipping | 3151 | **6,700** | |
| Other | 31xx | | |
| **Subtotal Equipment** | | **6,700** | |
| | | | |
| **Total GOE Associated with Minor Project** | | **6,700** | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St. Petersburg VARO- 317 |
| Project Title | **999 MINOR CONSTRUCTION MONEY** |
| Proposed Start Date | October 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **27** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Misc. minor construction money to use for small projects under $3,000. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | Used for small projects, as well as correcting any immediate health and safety concerns. Replacement of equipment (i.e. hot water heaters, faucets, and urinals). |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | 999 Account **$ 30, 000** |
| GOE COST<br>*(Show detail in Attachment C)* | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | St Petersburg VARO 317 |
| Project Title | **UPGRADE OF HVAC CONTROLS** |
| Proposed Start Date | OCT 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **28** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br><br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | The Bay Pines HVAC shop monitors the chiller at the VARO. The last electrical phasing event damaged the communications board and is no longer available (the board is outdated). Adding a new updated board will not communicate with the current RO computer used to control settings inside the facility. The HVAC Shop and Energy Center are currently unable to monitor the VARO chillers leaving the system unattended during the night and weekend periods. This work will allow our chillers to be monitored when the VARO is vacant. |
| PROJECT JUSTIFICATION<br><br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | The communications controls for the VARO chillers was damaged during the last phasing of the electrical system due to a power failure. The Bay Pines HVAC shop controls these chillers from a central computer at the hospital and no longer has that capability with the loss of a communications board. The METASYS communications system at the RO is 13 years old and has never been updated during this time. The only way to regain control of the chillers is to update the Johnson Controls METASYS control system. |
| IT IMPACT<br><br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br><br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Upgrade current METASYS HVAC communications program<br>$250,000.00 |
| GOE COST<br><br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **REPLACEMENT OF WALKWAY** |
| Proposed Start Date | NOVEMBER 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **29** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Remove and replace 20' of existing walkways and remove/replace tree that was planted too close to the sidewalk. This project will be completed during hours that will not interfere with employees or veterans. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is a direct result of a tree root growing under the sidewalk and is now encroaching on the driveway from under the building. The walkway has a raised enough to cause a drop off that could cause injury to employees and lost hours of productivity. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| | |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Remove existing sidewalk and tree $ 14,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | N/A |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | VARO, ST. PETERSBURG, FL 317 |
| Project Title | **INSTALLATION OF SECURITY CAMERA IN MAIN LOBBY** |
| Proposed Start Date | JAN 2012 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 Fax: (727) 319-7771 |
| Station Priority | **30** |
| Area Priority | |
| VACO Project Number Assignment | |
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | Installation of a security camera in the main lobby will provide added protection to the employees and allow better surveillance for the VA Police. This project will be accomplished after hours. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is a direct result of findings during a physical security check of the VARO. The installation of this camera will add another layer in the protection of the VA property, employees, and veterans entering the facility. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| | |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | **Miscellaneous Materials:** **$ 350**<br>**Installation/Labor:** **$5,500**<br>**Total Construction Cost:** **$5,850** |
| GOE COST<br>*(Show detail in Attachment C)* | **Security Equipment** **$6,700** |

# FY 2012 VBA Minor Construction Project Proposal
# GOE Non-Payroll Cost Estimate

| | | | |
|---|---|---|---|
| **Station Name & Number** | VARO St. Petersburg 317 | | |
| **Project Title** | POLICE SECURITY SYSTEM | | |
| **Description** Installation of additional security system in Canteen's Retail Store, located in the Regional Office. This project will involve the NSC, the VA Police, and the Canteen Service Manager. NCS will be needed to ensure proper connections are made into the networked systems. The VA Police will be monitoring the system after the completion of work. The Canteen Manager has overall access and will need to provide contractor access to the canteen. | **Subaccount** | **GOE Funds Associated with Project** | **Estimating Methodology and Justification** This project is the direct result of a physical security conducted in the St. Petersburg VARO. The Canteen lacks the proper security system necessary to prevent unauthorized access from occurring. By completing this project, the canteen will be linked to the Regional Office's existing security system. |
| | | | |
| **TRANSPORTATION OF THINGS** | | | |
| Move people/equipment | 2220 | | |
| Computer room move | 2220 | | |
| **Subtotal Transportation of Things** | | **0** | |
| **RENT, COMMUNICATIONS, & UTILITIES** | | | |
| Telephone, Long Distance Commercial | 2301 | | |
| GSA FTS | 2302 | | |
| Commercial Recurring Telephone | 2303 | | |
| GSA Recurring Telephone | 2304 | | |
| IDCU | 2311 | | |
| Non Recurring Telephone | 2305 | | |
| Other Communications Services | 2307 | | |
| ADP Software Rental | 2324 | | |
| ADP Equipment Rental | 2343 | | |
| Rent, Commercial Space | 2330 | | |
| Rent, GSA Space | 2331 | | |
| Equipment Rental | 2341 | | |
| Utilities | 2390 | | |
| Other | 23xx | | |
| **Subtotal Rent, Comm. & Utilities** | | **0** | |
| **OTHER SERVICES** | | | |
| ADP Services | 2510 | | |
| Repair of Furniture & Equipment | 2520 | | |
| File Cabinet Painting/Repair | 2520 | | |
| GSA Special Services (GSA Design Services) | 2532 | | |
| Interior Design/Planning Services | 2535 | | |

| | | | |
|---|---|---|---|
| Guard Service | 2542 | | |
| Cleaning/Maintenance Service | 2543 | | |
| Training Contracts/Tuition | 2583, 84 | | |
| ADP Requirements Survey | 2510 | | |
| Groundbreaking/Dedication | 2542 | | |
| Other | 25xx | | |
| **Subtotal Other Services** | | **0** | |
| **SUPPLIES and MATERIALS** | | | |
| Office Supplies | 2620 | | |
| Flags | 2691 | | |
| ADP Software < $5,000 | 2624 | | |
| Other | 26xx | | |
| **Subtotal Supplies & Materials** | | **0** | |
| EQUIPMENT | | | |
| Systems Furniture | 3120 | | |
| Other Furniture | 3120 | | |
| OA and Communications Equipment < $25,000 | 3129 | | |
| OA and Communications Equipment > $25,000 | 3122 | | |
| ADP Equipment (LAN Electronics) | 3123 | | |
| ADP Software > $5,000 | 3124 | | |
| File Cabinets | 3126 | | |
| Building Signage | 3126 | | |
| Window Treatments | 3126 | | |
| Office Equipment < $25,000 | 3127 | | |
| Office Equipment > $25,000 | 3121 | | |
| Telecommunication Equipment < $25,000 | 3133 | | |
| Utility & Operating Equipment >$25,000 | 3150 | | |
| Utility & Operating Equipment <$25,000 | 3151 | | |
| Security Equipment: Equipment<br>Project Mgmt<br>Warranty and Shipping | 3151 | **6,700** | |
| Other | 31xx | | |
| **Subtotal Equipment** | | **6,700** | |
| | | | |
| **Total GOE Associated with Minor Project** | | **6,700** | |

# FISCAL YEAR 2012 VBA MINOR CONSTRUCTION PROJECT PROPOSAL

| | |
|---|---|
| Submitting Station & Station No. | ST. PETERSBURG VARO- 317 |
| Project Title | **REPLACEMENT OF DROP-IN LIGHT FIXTURES** |
| Proposed Start Date | DEC 2011 |
| VARO Project Contact & Phone No. | Danny Wert (727) 319-5995 |
| Station Priority | **31** |
| Area Priority | |
| VACO Project Number Assignment | |

| | |
|---|---|
| PROJECT SCOPE & DESCRIPTION<br>*(Describe project scope, what divisions are affected, domino moves, what the project will accomplish, etc.)* | This project is to replace all the interior drop-in Light fixtures with more energy efficient cable lighting. This work will be done at night and on weekends to avoid interfering with the work of the RO. Completion of this project will save government funds and provide better lighting that eliminates headaches caused by glare on the monitors. In the past year there has been an increase in Reasonable Accommodation requests due to existing lighting. |
| PROJECT JUSTIFICATION<br>*(Describe how this project relates to an approved initiative, supports strategic goals, produces improvements, generates space reduction, corrects health and safety conditions, etc.)* | This project is a requirement of EPAct 2005 that all T-12 Lights be removed from federal buildings by summer of 2010. These light fixtures will match the rest of the facility lighting with the existing newly renovated lighting on the third floor. |
| IT IMPACT<br>*(Does this project have an impact on IT systems? If yes, describe extent and need for voice/data, cable, closets, computer room, VACO/ITC/NSC technical assistance and support.)* | N/A |
| MINOR CONSTRUCTION COST<br>*(Itemize costs such as demolition, cable, construction, GSA fees, etc.)* | Replace approximately 2096 light fixtures **$ 600,000.00** |
| GOE COST<br>*(Show detail in Attachment C)* | |

EXHIBIT 15

Physician Group
Box 33, 12901 Bruce B. Downs
Tampa, FL 33612

July 2010

# ALLERGY SKIN TESTING RECORD - II

USF Physicians Group 813-974-2201
MULLIN, AILEEN MRN 1794542 954-263-1516
745 ALAMANDA WAY S 03/03/1960
ALLERGY, TESTING CL
ST PETERSBURG, FL PPC PREFERRED PATIENT CARE
33705 APPT. 07/20/2010 01:30P

SSN or DOB ______
TECHNICIAN RC
(response to histamine): ______ days

DATE 7-20-10 TIMES: Percutaneous 1:35 AM (PM) Intradermal ______ AM PM

CUTANEOUS CONCENTRATION: 1:20 w/v (EXCEPT WHERE INDICATED)
CONTROLS: NEGATIVE: GLYCEROL SALINE
POSITIVE: HISTAMINE BASE (1.8 mg/ml); M.S. (1.0 mg/ml)

INTRADERMAL CONCENTRATION: 1:500 w/v (EXCEPT WHERE INDICATED)
CONTROLS: NEGATIVE: PHENOL SALINE
POSITIVE: HISTAMINE (6 mg/ml)

CUTANEOUS TESTS PERFORMED ON THE BACK; INTRADERMAL TESTS PERFORMED ON THE ARM. SKIN TESTS ARE READ 15-20 MINUTES AFTER APPLICATION. SITE OF WHEAL FOR EACH ALLERGEN, WHERE APPLICABLE, IS INDICATED ON THE SHEET. A & B INDICATE MAJOR AND MINOR ALLERGENS, RESPECTIVELY. PERCUTANEOUS TESTS PERFORMED WITH MORROW BROWN® DISPOSABLE ALLERGEN PRICK TEST NEEDLES. MULTI TEST II SKIN TEST APPLICATOR DISTRIBUTED BY CENTER LABS BUT MADE BY LINCOLN DIAGNOSTICS. DIAGNOSTIC REAGENTS FROM GREER UNLESS OTHERWISE NOTED.

CRITERIA FOR CUTANEOUS
- \+ Erythema smaller than a nickel in diameter (21 mm).
- ++ Erythema larger than a nickel in diameter with wheal <3 mm.
- +++ Wheal with surrounding erythema (wheal >3 mm).
- ++++ Wheal with pseudopods and surrounding erythema.

CRITERIA FOR INTRADERMAL
- 0 2 mm or less.
- \+ 3-4 mm wheal with erythema.
- ++ 4-8 mm wheal with erythema.
- +++ Over 8 mm without pseudopods.
- ++++ Wheal with pseudopods.

| Allergen | CUT. | I.D. |
|---|---|---|
| I. TREES | | |
| A. 1. OAK | 4+ | X |
| 2. BALD CYPRESS 1:80 w/v | 3+ | X |
| 3. CEDAR | 4+ | X |
| 4. BAYBERRY | 4+ | X |
| 5. AUSTRALIAN PINE | 4+ | X |
| 6. MULBERRY | 4+ | X |
| B. 7. ELM | 3+ | |
| 8. ASH | 2+ | |
| GRASSES | | |
| A. 1. BAHIA 1:20 w/v | Neg | |
| 2. BERMUDA 10,000 BAU/ml | 2+ | X |
| B. 3. JOHNSON | 2+ | |
| 4. RYE 10,000 BAU/ml | Neg | |
| III. WEEDS | | |
| A. 1. SHORT RAGWEED | 4+ | X |
| 2. NETTLE 1:40 w/v | 3+ | X |
| 3. LAMB QUARTERS | 2+ | X |
| 4. SPINY PIGWEED | 2+ | X |
| 5. SHEEP SORREL | Neg | |
| 6. DOG FENNEL 1:80 w/v | 2+ | X |
| IV. ANIMAL EMANATIONS | | |
| 1. MITE (D. FARINAE) 10,000 AU/ml | 4+ | X |
| 2. MITE (D. PTERONYSINUS) 10,000 AU/ml | 4+ | X |
| 3. COCKROACH (American) | 4+ | X |
| 4. COCKROACH (German) | 4+ | X |
| 5. DOG H.S. 1:100 AP | 4+ | X |
| 6. CAT 10,000 BAU/ml | 4+ | X |
| 7. FLEA 1:100 w/v | Neg | |

Am. Cockroach
G. Cockroach

| Allergen | CUT. | I.D. |
|---|---|---|
| V. MOLDS | | |
| A. 1. ALTERNARIA | 4 | X |
| 2. HORMODENDRUM | 2+ | X |
| 3. ASPERGILLUS | 3+ | X |
| 4. PENICILLIUM MIX | 2+ | X |
| 5. CURVULARIA 1:40 w/v | 3+ | X |
| 6. FUSARIUM | Neg | |
| 7. EPICOCCUM 1:40 w/v | | |
| 8. STEMPHYLIUM 1:40 w/v | 4+ | X |
| 9. HELMINTHOSPORIUM | 3+ | |
| B. 10. PHOMA 1:40 w/v | 4+ | |
| 11. PULLARIA 1:40 w/v | Neg | |
| 12. RHIZOPUS 1:40 w/v | 4+ | |
| 13. MUCOR | 4+ | |
| 14. NIGROSPORIA | Neg | |
| VI. FOODS (TEST ONLY WHEN INDICATED) | | |
| 1. EGG | | |
| 2. WHEAT | | |
| 3. MILK | | |
| 4. FISH MIX | | |
| 5. SOY 1:40 w/v | | |
| 6. PEANUT | | |
| 7. PECAN | | |
| 8. SHELLFISH MIX | | |
| VII. MISCELLANEOUS | | |
| 1. | | |
| 2. | | |
| 3. | | |
| VIII. CONTROLS | | |
| 1. NEGATIVE | Neg | |
| 2. POSITIVE | 4+ | X |
| 3. M.S. | X | |

ANIMAL(S) IN THE HOME? ______ ☒ NONE BP 122/85

VIAL CARDS MADE ☐ YES ☐ NO

Xyzal 5mg table given after test. P 75

Rev 10/04

EXHIBIT 16

U.S. Department of Veterans Affairs

# Reasonable Accommodation Compliance Review

## VBA - St. Petersburg Regional Office

June 2015

Conducted by:

Office of Diversity & Inclusion
Office of Human Resources and Administration
Washington, DC

St. Petersburg Regional Office Reasonable Accommodation Compliance Review

## Executive Summary

*Introduction*

To ensure the Department of Veterans Affairs (VA) meets the requirements of Section 501 of the Rehabilitation Act, and furthers its commitment to fostering a diverse workforce and inclusive work environment, the Office of Diversity and Inclusion (ODI) conducts periodic Reasonable Accommodation Compliance Reviews (RACR) in accordance with VA Directive 5975 on Diversity and inclusion and VA Handbook 5975.1 on Processing Requests for Reasonable Accommodation. ODI recently conducted a RACR at the VA Regional Office St. Petersburg (VARO).

*Background*

ODI conducted a Technical Assistance Review (TAR) at the VARO in August 2014, during which multiple sources raised concerns to ODI staff about the VARO's processing of reasonable accommodation (RA) requests. Despite attempts to address these concerns through on-site RA training, both ODI officials and the Secretary of VA received correspondence from Mr. Javier Soto, an AFGE Local 1594 union representative, outlining additional concerns of the same nature. ODI determined an on-site RACR was the most effective means to better understand the VARO's processing of RA requests and develop strategies for corrective action. The on-site RACR was conducted April 6-10, 2015.

*Methodology for RACR*

The on-site RACR consisted of review and analysis of the VARO RA requests, data, physical files, EEO complaint data wherein failure to provide RA was alleged, and interviews with relevant VARO staff. The data, documentation, and information gathered were reviewed and analyzed for compliance with policy guidance in VA Handbook 5975.1.

*Summary of Findings*

Issue 1: Inadequate and inaccurate analysis of medical documentation

Issue 2: Insufficient and imprecise documentation of the overall RA process

Issue 3: Deficiencies related to the interactive process

Issue 4: Insufficient documentation supporting telework as RA

Issue 5: Lapses in confidentiality related to RA process and information

Issue 6: Union Involvement Issues

*Conclusion and Recommendations*

In light of the aforementioned findings, it appears that the VARO has not adhered to all applicable provisions of VA Handbook 5975.1 in the handling of RA requests. To assist the VARO in complying with VA Handbook 5975.1, recommendations were offered to the VARO leadership and LRAC/ALRAC:

- Medical Documentation - Conduct proper analysis for coverage under ADAAA and entitlement to RA, and consult with Regional Counsel when there are concerns about authenticity and/or the need for additional medical documentation.
- Process Documentation – Accurately and thoroughly document the process, including completing all applicable forms as provided in VA Handbook 5975.1. Ensure that LRAC definitively communicates the coverage decision and accurately outlines functional limitations based on medical evidence.
- Interactive Process – Document in the RA file that management engaged in the interactive process; ensured a nexus between the RA requested and the individual's functional limitations; that the RA is effective to address those limitations; options for RA were fully explored between the employee and Designated Management Official (DMO); and the DMO is the decision-maker on the RA.
- Telework – Ensure telework agreements reflect that the agreement is in place as an RA and include a copy in the RA file.
- Confidentiality – Ensure compliance with all applicable confidentiality provisions and regulations in VA Handbook 5975.1.
- Union Involvement – Management is encouraged to consult with Labor Management Relations and Regional Counsel regarding union involvement in the RA process.

The following pages provide the full report of findings resulting from this RACR.

***Introduction***

The Department of Veterans Affairs (VA) must establish and maintain effective affirmative programs of equal employment opportunity (EEO) under Section 717 of Title VII and Section 501 of the Rehabilitation Act, and must provide reasonable accommodations (RA) to individuals with disabilities in accordance with Federal law. To ensure VA meets these requirements and furthers its commitment to fostering a diverse workforce and inclusive work environment, the Office of Diversity and Inclusion (ODI) conducts periodic Reasonable Accommodation Compliance Reviews (RACR) in accordance with VA Directive 5975 on Diversity and Inclusion and VA Handbook 5975.1, Processing Requests for Reasonable Accommodation.[1]

ODI conducted a RACR at the VA Regional Office St. Petersburg (VARO) on April 2015 as a result of allegations from the American Federation of Government Employees (AFGE) Local 1594 to the Secretary of VA that the VARO was improperly processing reasonable accommodation requests. The purpose of the RACR review was two-fold: 1) to determine the VARO's compliance with VA's RA policy and procedures in VA Handbook 5975.1 (Handbook) in the processing of RA requests, and 2) offer recommendations for corrective action if any deficiencies were uncovered.

***Background***

ODI conducted a Technical Assistance Review (TAR) at the VARO in August 2014. During the TAR visit, multiple sources raised concerns to ODI staff about the VARO's processing of RA requests. ODI staff attempted to address the concerns through on-site RA training. However, on January 9, 2015, both ODI officials and the Secretary of VA received correspondence from Mr. Javier Soto, an AFGE Local 1594 union representative, outlining additional concerns he had regarding the manner in which the VARO was processing RA requests.

To more fully understand what was occurring with the VARO's handling of RA requests, as well as to develop recommendations for corrective action, ODI staff determined an on-site RACR was the most effective means to accomplish these objectives. The on-site RACR was conducted April 6-10, 2015.

***Methodology for RACR***

The on-site RACR consisted of a review and analysis of the VARO's RA requests data and physical files, EEO complaint data wherein failure to provide RA was alleged, and interviews with key VARO staff. Specifically, ODI staff requested data on all RA

[1] The American with Disabilities Act Amendments Act (ADAAA) is the legal authority governing the processing of RA requests and serves as the legal framework for Handbook 5975.1.

requests the VARO received from December 2013 through March 26, 2015.[2] The data provided indicated there were 278 RA requests received[3] during the relevant time period[4]. Of those 278 RA requests, the VARO designated 233 as approved, 43 as pending, zero as withdrawn, and two as denied. ODI staff reviewed a total of 78 RA files, including 100 percent (%) of the pending and denied requests files, and 30% of the approved requests files.[5] Additionally, ODI staff conducted separate on-site interviews with the VARO key staff, including the Director and senior leadership team; the Human Resources Director; the Local Reasonable Accommodation Coordinator (LRAC) and Alternate Local Reasonable Accommodation Coordinator (ALRAC); and AFGE Local 1594 leadership, including Mr. Soto.

The data, documentation, and information gathered were reviewed and analyzed for compliance with the policy guidance in the Handbook. The noteworthy issues discovered in review of the RA files are outlined below and specific examples are provided where possible.

***Review Findings***

**Issue 1: Medical Documentation**

Section 12a of Handbook 5975.1 states that "When a disability or need for reasonable accommodation is not obvious or otherwise known to the VA, the LRAC may request ...appropriate medical documentation about the disability and ...functional limitations" in order to support the accommodation request. Additionally, Section 21 states that insufficient medical documentation may be a basis for denial of the accommodation.

Numerous issues were noted as it relates to medical documentation for RA requests:

a) There was no medical documentation included in 5% of the files, and no indication that the conditions were obvious such that medical documentation was unnecessary.
b) In 55% of the files, medical documentation did not demonstrate the requester met the threshold for coverage under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) and was entitled to an RA. This includes files where Family Medical Leave Act (FMLA) documentation was used as medical documentation but it was insufficient to support coverage under ADAAA, i.e., it did not outline functional limitations and how those limitations impact the individual's ability to perform essential job functions.
    - Example A: The medical documentation lists the nature, severity and duration of the impairment as "allergic rhinitis, moderate, 2 years." The functional limitations states "breathing, looking at a computer monitor." The extent to which the impairment limits an activity states "allergies make it more difficult to look at the monitor and concentrate on work." The reason the individual

---

[2] VA Handbook 5975.1 was revised effective November 27, 2013. Therefore, the relevant period for the RACR data and documentation was determined to be December 1, 2013 through the date ODI sent notification to the VARO leadership requesting RA data.

[3] The total number of requests includes multiple requests and/or multiple RAs for the same individual, and was thus included in one RA file for the individual.

[4] The VARO had approximately 950 total employees during this time period.

[5] The 30% of approved RA requests subject to review were selected via random sampling methods.

requires accommodation or the particular accommodations states "working from home would eliminate expose to allergens that [employee] is exposed at work." The documentation states the accommodation will assist the individual because "He can perform the same work at home without having nasal congestion and watery eyes." Based on the documentation reviewed in this file, there is not enough information to determine the requestor is covered under the ADAAA, yet the request for telework was approved.

- Example B: The medical documentation in the file consists of two doctor's notes, one stating "[Employee] is under our medical care. [Employee] has a medical condition that supports the need for a heater at [employee's] work;" and the other stating "[Employee] is under our medical care and needs an ergonomic chair because of [employee's] service connected conditions." Neither of these doctor's notes are sufficient to establish coverage under the ADAAA, yet both requests (the heater and ergonomic chair) were approved as RAs.

c) In 56.4% of the files, medical documentation did not support the RA provided, i.e., there was no nexus between the RA provided and functional limitations of the requestor.

- Example C: The medical documentation cites the employee's request to move to an off-site office because the employee has an "inability to cope with daily stressors without support of [employee's] family living near them." The documentation cites PTSD as the medical condition and the limitation of "living more than 1 hour away from family" as "severe." The documentation maintains the employee needs the accommodation because "[Patient] is able to continue working, pursuing goals, and continuing treatment with the support of living near his family." The employee's request was approved as an RA even though no functional limitations were provided to demonstrate coverage or to establish a nexus between those functional limitations and the RA requested/provided.
- Example D: The employee submitted medical documentation from 2008 in a 2014 RA request. The medical documentation stated the employee suffers from "chronic neck, lower back pain, and carpel tunnel syndrome" which are exacerbated by prolonged repetitive motion and sitting beyond one hour. The medical documentation indicated that the employee should be granted "additional testing time, perhaps 15 minutes for every hour"[6] because the wrist splints hinder fine motor skills. It also stated that the employee should be granted a short break every hour of testing to allow the employee to stand/walk around and rest wrists. Finally, the medical provider stated that the employee should be given an ergonomic chair while testing. The facility approved the employee's request for telework, a sit-to-stand desk, and exemption from pulling files. While the age of the medical documentation is an issue, even if current, it fails to demonstrate a nexus between the employee's functional limitations and the approved RA of telework.

[6] It is unclear what the individual's job title is, but apparently it required testing as part of meeting some job standard.

d) The medical provider's specialty was not aligned with the identified disabilities, e.g., a plastic surgeon outlining headaches and migraines as the impairments, in 15.3% of the files.

e) In 10.2% of the files, the language in the medical documentation is virtually identical to that of other employees, rendering the validity of the information questionable. The medical documentation for numerous employees states: "[Employee] has musculoskeletal and neurological system disabilities that are severe and chronic in nature. They are aggravated by prolonged sitting, standing, sudden movements, and commuting. When [employee] experiences flares, the impact of the aforementioned are compounded. The result is increased pain, mobility issues, trouble focusing, and increased physical stress on her person and in extreme case, the necessity to remain on bed-rest and miss work." The documentation goes on to outline the limitations as "[employee's] disabilities impact sleeping, bending, sitting, reaching, concentration, walking, focus[ing]..." and sometimes other activities like breathing or driving. The requested RA for each employee is also almost identical, stating "Telework, flexible start/end times, and extended breaks" due "to neurological and musculoskeletal disabilities." In instances where the validity of the medical documentation is in question, or is otherwise insufficient, employers may request additional documentation, or that the employee consult an independent medical examiner of the employer's choice. On this point, ODI will defer to the legal advice of the Office of General Counsel/Regional Counsel, since the facility consulted Regional Counsel on this issue.

f) There were 29.4% of the files wherein the medical practitioner's license/MPI number was not provided on the medical documentation.

The inordinately high incidence of medical documentation irregularities demonstrates the need for additional training of the VARO's LRAC and ALRAC in understanding the requirements for coverage under the ADAAA. The ADAAA indicates that only persons who are determined to be an "individual with a disability" under the statute may be entitled to an RA. It further provides that, except in cases where the impairment is obvious, employers may request appropriate and sufficient medical documentation to support this determination. The VA may provide workplace adjustments for individuals who do not meet the threshold for coverage under the ADAAA, but it should be clear that these adjustments are not RAs. Additionally, the statute provides that a nexus exist between the individual's functional limitations and the RA provided. The statute does not require that VA provide the specific RA requested by the employee, so long as the alternative is effective.

**Issue 2: Process Documentation**
Section 8 of Handbook 5975.1 states the requirements for documenting requests for accommodation. While there is no requirement for the requestor to document his/her request, the LRAC and Designated Management Official (DMO) are required to document their interactions in this process.

The lack of proper documentation of the RA process as a whole was noted in numerous files. The lack of documentation negatively impacts VA's ability to determine whether RA requests are being processed appropriately and timely.

a) In 56.4% of the files, forms required in accordance with the Handbook, such as 0857b: Acknowledgment of Receipt of Request, were not completed.
b) 51.2% of the files lack documentation of when the RA was requested, preventing accurate tracking of timeframes.
c) In 44.8% of the files, there was no documentation of the LRAC's decision on coverage under the ADAAA and identification of functional limitations. In an additional 15.3% of the files, the LRAC's communication to the DMO included functional limitations which were not outlined in medical documentation, but no evidence of the source of this information. In 44.8% of the files, the LRAC did not include all functional limitations outlined in the medical documentation in communication to the DMO. Section 11 of the Handbook, states it is the LRAC's responsibility to determine if an individual is covered, and if so, inform the DMO of the individual's functional limitations. Failure of the LRAC to accurately and thoroughly disclose all functional limitations to the DMO can lead to improper analysis of what RA options are appropriate and effective, resulting in failure to properly accommodate individuals.
    - Example E: The medical documentation states, "[Patient] cannot sit for prolonged periods of time, [employee] also has difficulty bending and lifting >15 pounds in times of flare-ups. On top of that, [Patient] has difficulty on occasion with stress in social settings." Despite all of these limitations, the LRAC's communication to the DMO states, "During your interactive discussion you can go over how working from home will help [employee] overcome [employee's] limitations. Which include [sic] concentrating for longer periods of time." The LRAC's guidance conveys incomplete and inaccurate information.
    - Example F: The medical documentation states "nasal breathing" as the impairment that is limited. It goes on to state the degree to which the impairment is limited as, "isolated periods of incapacitation at work as a result of significant nasal congestion and sneezing fits." However, the LRAC's communication to the DMO lists the functional limitations as, "…focusing and concentration," neither of which is cited in the medical documentation.
    - Example G: The medical documentation states, "[Employee's] disabilities impact sleeping, bending, sitting, reaching, concentration, walking, focusing, as well as activities associated with driving." However, the LRAC relayed to the DMO that the limitations "…include focusing and concentrating for longer periods of time."
    - Example H: The LRAC's communication fails to provide any functional limitations to the DMO. The communication states, "[Employee] has requested a sit to stand for [employee's] desk. [Employee] has submitted supporting medical documentation that warrants the request. ADA and JAN recommend the accommodation for [employee's] disabilities. Please see the attached 0857f for your final determination. The items will be available upon delivery from CAP."

d) In 11.5% of the files, interim workplace adjustments were not documented, e.g. no indication of interim workplace adjustment was offered or was in place while an employee completed/awaited requirements for telework. Section 10 of the Handbook states, *when feasible*, the DMO must institute temporary or interim workplace adjustments when the determination for coverage has been made.
   - Example I: The documentation reveals the determination for telework was made on February 23, 2015, with telework to start no later than March 19, 2015. There is no indication in the file of what interim workplace adjustments were made for the employee.

e) Records in 7.6% of the files appeared altered showing inconsistencies within documentation as it relates to dates events occurred.
   - Example J: There is no date on an addendum to Form 0857e: Request for Medical Documentation. Also, the LRAC dated the 0857e 2/13/15, yet the document is signed by the medical provider 12/13/15. It is unclear whether this is a clerical error or what, considering this employee has multiple requests and multiple near the same time period, which have been treated as separate requests.
   - Example K: The documentation indicates the employee signed for the ergonomic chair on 3/11/13. However, the RA request was not approved until 3/12/13.

f) Forms approved by the Handbook, as well as some forms used by the VARO, were not consistently signed by the LRAC, DMO and/or requestor in 41% of the files. For example, there were no employee signatures and date on the VARO RA check sheet, and VA form 0857f: Accommodation Request Determination. The Handbook provides approved forms to ensure the RA process can be tracked and monitored for compliance with the statute. Of particular importance is the need to process RA requests in a timely fashion which begins with documenting the date of the initial request, per Section 8 of the Handbook. Because the VARO was not using or thoroughly completing required forms, ODI was unable to confirm adherence to the timeframes or other provisions outlined in the Handbook. This lack of documentation of the process compromises the VARO's ability to track processing time frames accurately.

g) The VARO Director is listed as the DMO for employees who were not direct reports in 33.3% of the files. Section 15b of the Handbook states that the Facility Directors should not serve as the DMO, except for employees who report directly to them. In over one-third of the files reviewed, the facility director signed the Accommodation Request Determination (VA form 0857f), which will preclude her from being part of the appeal process if the individual requests reconsideration.

**Issue 3: Interactive Process**

Section 9 of Handbook 5975.1 addresses the need for the DMO and requesting employee engaging in an interactive process. The interactive process is a critical component of the RA process whereby the individual's functional limitations, essential job functions, undue hardship and RA options are evaluated and discussed.

a) In 65.3% of the files, there was no documentation supporting the DMO and employee engaged in the interactive process. In the majority of files, there was no evidence illustrating other RA options were explored for effectiveness. Additionally, the files revealed the LRAC, not DMO was essentially making the decision on RA offered/approved.

- Example L: see example H above. This notification from the LRAC clearly articulates to the DMO a decision has been made.
- Example M: The communication from the LRAC to the DMO states, "employee has requested work from home as an accommodation. Please note that the employee has provided medical documentation showing that [employee] has a disability that should be accommodated. The employee has a condition that is covered by the ADAA [sic]. The doctor has recommended work from home as an accommodation, and JAN recommends work from home for this employees [sic] conditions. During your interactive discussion you can go over how working from home will help [employee] overcome [employee's] limitations. Which include concentrating for longer periods of time. If you decide to grant the accommodation you can discuss the amount of days to work from home, and provide the attached checklist with instructions on how to start the process to get the telework agreement started."

Pursuant the Section 15 of the Handbook, once informed of the functional limitations of the individual, it is the DMO's responsibility to engage in the interactive process with the individual to explore options and fashion an effective RA, which allows the individual to perform the essential job functions or enjoy the benefits and privileges of employment. The DMO, not the LRAC is the decision-maker on what RA is approved. The ADAAA requires both management and the requestor to engage in the interactive process. The process should be cooperative, may require more than one discussion and must be documented. Failure of management to engage in the interactive process is considered a violation of the statute.

**Issue 4: Telework as RA**

Section 15 of the Handbook discusses the identification of accommodations for employees. Section 15a states that the "requestor may propose an accommodation; however, the DMO will make the final decision on whether to grant (the) accommodation." It is important to note that the Equal Employment Opportunity Commission (EEOC) has stated in its RA Enforcement Guidance that employers are not obligated to provide the specific RA requested by the employee, but must provide and "effective" accommodation that enables the employee to perform the essential functions of the job or enjoy the benefits and privileges of employment (see http://www.eeoc.gov/policy/docs/accommodation.html, item 32) Section 2 of the Handbook defines an "effective" accommodation as one that "meets the needs of the individual by addressing the barrier created by the functional limitations."

Both the VARO leadership and AFGE Local 1594 expressed concerns regarding telework as an RA. The VARO leadership believes the union is using the RA process

as a means to circumvent the Veterans Benefits Administration's policy on telework. The union's position is that it is properly assisting bargaining unit employees obtain an appropriate and effective accommodation. RA determinations must be made on a case-by-case basis. Accordingly, this report addresses the consideration of telework in accordance with the provisions of the RA Handbook.

a) In 39.7% of the files, telework was approved as the RA without complete information regarding the relevant functional limitations or sufficient supporting documentation.
   - In example D above, it is unclear how telework will assist or enable the individual to perform the essential function of the job. There is no indication that other options of potentially effective RAs were explored.
   - In example F above, the employee was approved for telework due to allergies, and was required to report to the office one day per week. However, there is no information in the file that addresses how the employee will be accommodated when the employee is required to work in the office. This could be viewed as a failure to accommodate.

b) The telework agreement, indicating it is an RA, was not included in 50.8% of the files.

Telework, when approved as an RA, should address the functional limitations of the individual. In several cases, VARO employees were approved partial telework as an RA, yet there was no indication of how the individual's functional limitations would be addressed on the days when the individual was required to report to the office for work. As previously mentioned, approval of an RA without exploring options can lead to a failure to fully accommodate an individual, which is potentially a violation of the statute.

Additionally, VA's standardized telework agreement form requires notation in Section VI: Disability and Medical Conditions when telework is approved as an RA. However, telework agreements were not found in a majority of files wherein the approved RA was telework.

**Issue 5: Confidentiality**

Section 13 of the Handbook outlines the requirements to maintain confidentiality of RA information. The ADAAA requires that medical information on employees and their requests for RA remain confidential and be shared only on a need to know basis.

There were numerous examples illustrating the VARO's need to improve in this area.

a) In 51.2% of the files, management communicated RA issues (sending PHI and PII) via unencrypted email, e.g., communicating with the union at an unencrypted email address.

b) In 25.6% of the files, management disclosed RA information to individuals who did not ha e a need to know. For example, there were several files wherein the RA re tor's name was included on a requisition form with the statement that the as for an RA for the requestor.

c) ed SSN/DOB information was found in 12.8% of the files.

d) In 7.6% of the files, there was co-mingling of medical information of different individuals, e.g. one file contained RA request documentation for two employees, and in another file an employee's spouse's medical documentation was found.

The disclosure of the fact an individual has even requested an RA to individuals who do not have a need to know would be considered a per se violation of the ADAAA; this was found in over a quarter of the files reviewed. Additionally, the Privacy Act and other VA privacy policies regarding PII and PHI appear to have been violated in the VARO's processing of RAs to date.

**Issue 6: Union Involvement**
While the Union's involvement in the VARO's processing of RA requests was not a central focus of this review, the AFGE Local 1594 correspondence to the Secretary and to ODI was a factor prompting this compliance review. The following information is provided as it pertains to compliance with the Handbook.

a) In 7.6% of the files reviewed, union documentation contained information indicating that engaging in the interactive process is not necessary and/or insisted management communicate with union instead of employee regarding the RA request.
b) The union has acknowledged drafting medical documentation for medical practitioners to sign. Examples of union- drafted medical documentation were discovered in 10.2% of the files reviewed. (See Issue 1e: Medical Documentation above)

As previously mentioned, as it relates to union involvement with the RA process, ODI's focus was on the VARO's compliance with VA Handbook 5975.1, not on the propriety of union's actions. From that perspective, it is important to note that failure of the employee to engage in the interactive process can lead to denial of an RA. Additionally, questionable medical documentation can delay the approval of an RA.

***<u>Conclusion and Recommendations</u>***

In light of the aforementioned issues, it appears that the VARO has not adhered to all applicable provisions of the Handbook in the handling of RA requests. However, despite the inconsistencies, it is evident that the VARO is making a good faith effort to accommodate employees.

To assist the VARO in complying with the statute and Handbook, the following predominant recommendations were offered to the VARO leadership and LRAC/ALRAC:

1. Medical Documentation – The VARO LRAC/ALRAC should conduct a proper analysis for coverage under ADAAA and entitlement to RA, including but not limited to:
    - obtaining adequate and sufficient medical documentation,

- ensuring there is a nexus between the RA requested and functional limitations of the individual,
- ensuring medical practitioners are aligned with cited impairments, and
- consulting with Regional Counsel when there are concerns about authenticity and/or the need for additional medical documentation.

2. Process Documentation – The VARO should ensure that LRACs and DMOs accurately and thoroughly document the process, including but not limited to:
   - completing all applicable required forms as provided in the Handbook,
   - the LRAC/ALRAC definitively communicating coverage decisions and accurately outlining functional limitations based on medical evidence for DMO,
   - documenting any interim workplace adjustments instituted while awaiting medical documentation, or while awaiting approved RAs to be in place, and
   - properly designating the lowest level supervisor, as appropriate, as DMO, which will generally not be the facility director.

3. Interactive Process – The VARO LRAC should ensure there is evidence in the RA file that management engaged in the interactive process. This would include the employee and the DMO fully exploring options for RAs; bearing in mind the decision on the RA is the DMO's, with LRAC input and guidance, not vice versa. The interactive process should also ensure the RA(s) provided is effective and fully addresses the individual's functional limitations. In those cases where the employee fails or refuses to engage in the interactive process, the VARO should consult with Regional Counsel regarding denial of the request.

4. Telework – The VARO should ensure that when telework is granted as an RA, there is a nexus between this accommodation and the functional limitations of the requestor, as supported by sufficient medical documentation, if appropriate. VARO is also reminded of its obligation to engage in the interactive process to identify suitable and effective accommodations, not only the accommodation requested. If partial telework is granted as an RA, VARO's management should safeguard that it fully accommodates the individual or additional RAs are approved for when the individual is required to work in the office. Additionally, the VARO should have telework agreements reflect that the agreement is in place as an RA and include a copy in the RA file.

5. Confidentiality – The VARO must become compliant with all applicable confidentiality provisions by 1) ceasing to communicate about RA requests via unencrypted email, and 2) ensuring any RA information is only disseminated on a need-to-know basis. LRACs should review their files and filing systems to ensure compliance with all confidentiality provisions and appropriate separation of medical information from routine personnel files.

6. Union Involvement – VARO's leadership is encouraged to consult with Labor Management Relations and Regional Counsel regarding the issues raised with respect to union involvement in the RA process.

Finally, on May 21, 2015, ODI received a memorandum from the VARO outlining actions implemented based on the recommendations ODI provided during the on-site visit. Specifically, corrective action has been taken to address issues related to: obtaining and properly analyzing medical documentation, including coverage and nexus determinations; improved and more accurate documentation communication from the LRAC to the DMO and the interactive process; and enhanced compliance with confidentiality provisions. ODI will continue to work with the VARO on these and other improvement strategies. [7]

Thank you for your cooperation in this review. If there are any questions related to this review, please contact: Tabetha McFeders at Tabetha.mcfeders@va.gov, or Melissa Gibson, Melissa.gibson@va.gov, Outreach and Retention Division, Office of Diversity and Inclusion (06). ODI remains available to assist you in any way with the matters raised in this report.

[7] Conclusion reflects information and status as of April 30, 2015.

EXHIBIT 17

January

**Clarke, Tamanique, VBASPT**

1/28/13

**From:** Wax, Bonnie, VBASPT
**Sent:** Monday, January 28, 2013 1:02 PM
**To:** Clarke, Tamanique, VBASPT; Works, Philip, VBASPT; Correa, Matthew, VBASPT
**Subject:** FW: Occupational diseases as granted/acknowledged by the DOL

Can we discuss this today?

**From:** McBurrough, Ulyssee, VBASPT
**Sent:** Monday, January 28, 2013 12:35 PM
**To:** Wax, Bonnie, VBASPT
**Cc:** Huffman, Jerry, VBASPT
**Subject:** FW: Occupational diseases as granted/acknowledged by the DOL

See e-mail below!

Ulyssee McBurrough Jr.
Coach, Core 10
727 319 7313

**From:** Smith, John, VBASPT
**Sent:** Monday, January 28, 2013 12:32 PM
**To:** Mullin, Aileen, VBASPT; McBurrough, Ulyssee, VBASPT; Crump, Casey, VBASPT
**Cc:** kellee@afge.org; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT; Reilly, Valorie, VBASPT
**Subject:** RE: Occupational diseases as granted/acknowledged by the DOL

I wonder if they can find you desk space at the hospital where they schedule C&P exams or make you work from home 5 days a week.

I wonder if it could also be the actual stuff the outside of files were sprayed with to keep mold, mildew, and bugs off at RMC and FARCs

---

**From:** Mullin, Aileen, VBASPT
**Sent:** Monday, January 28, 2013 11:25 AM
**To:** McBurrough, Ulyssee, VBASPT; Smith, John, VBASPT; Crump, Casey, VBASPT
**Cc:** 'kellee@afge.org'; Allard, Carolyn, VBASPT; Pryor, Keith, VBASPT; Reilly, Valorie, VBASPT
**Subject:** Occupational diseases as granted/acknowledged by the DOL
**Importance:** High

I need your help so I can do this job.

Because of the severity of my body's reaction to being in the building last week (2 HRS +/-) and the week before (10 hrs +/-)), I went back to the specialist (Board Certified: Allergy/Immunology, Internal Medicine). Additional tests were administered.

The doctor advised that I further minimize my time in the building AND that for me to safely work in the building*, I will need to wear a mask similar to those used by people working in auto body shops and industrial clean-up operations. **WHAT???????????** I can't begin to tell you how horrifying it is the think I have to wear one of those devices ~ in order to do my job ... (also horrifying is knowing about other people, on the floor, on our team, that are sick; Some over medicating themselves in order to be able to be in there)

- I just want to be a successful RVSR want to know how to do this job and do it w...

- I've already lost months and months of OJT/ hands-on training (starting long before the diagnosis of cancer).

- I've done/am doing every within my realm of control/knowledge to learn how to address Veteran's claims as a Rater~

- I've done every thing, I know to do, to try to keep my body safe ~ while not fully jeopardizing my job~

I can't do this own my own. I need your help in identifying/ implementing reasonable accommodations. I trust that if we put our heads together there's a way for me to safely be a successful RVSR

I'll be waiting to hear from you, and if need be I'm come right over so we can meet (outside). Just give me the word.

For now,

Aileen

954-263-1510

PS

- The doctor wrote a prescription for the breathing apparatus for Human Resources.

Just so you know,

I have repeatedly attempted ~ and received not response to ~ requests for answers as to what has happened as a result of the most recent OSHA complaints (mold, AQ, rats**).

I have repeatedly attempted ~ and received no answers to ~ requests for information as to how the RO's Safety Committee is handling safety concerns.

* (Especially the areas of the building that have already been identified as having air quality issues)

**(Note: Some rodent species excrement is far more harmful than others. If there really is an issue with rats, we need to know what kind and the locations (Note: Rodents in duct work offer a set problems that differ greatly from ones that are in other parts of a building.)

<< OLE Object: Picture (Device Independent Bitmap) >> << OLE Object: Picture (Device Independent Bitmap) >>

EXHIBIT 18

Gmail

Aileen Mullin <aemflorida@gmail.com>

# Fw: February 20th Request for AA

2 messages

**Aileen Mullin** <aileen_mullin@yahoo.com> Fri, Mar 1, 2013 at 11:50 AM
Reply-To: Aileen Mullin <aileen_mullin@yahoo.com>
To: "aemflorida@gmail.com" <aemflorida@gmail.com>

---

**From:** Works, Philip, VBASPT
**Sent:** Wednesday, February 20, 2013 4:13 PM
**To:** Smith, John, VBASPT; Mullin, Aileen, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Wax, Bonnie, VBASPT
**Subject:** February 20th Request for AA
**Importance:** High

Good afternoon,
Unfortunately I have not been able to reach Mr. Smith by phone to discuss the letter delivered to Human Resources at approximately 3:20 this afternoon.

However, the Director has granted Ms. Mullin authorized absence for her regularly scheduled tours of duty Thursday, February 21, 2013 through Monday, February 25, 2013.

This time is being provided to allow an opportunity for Ms. Mullin to gather any additional medical documentation needed in support of her request for Reasonable Accommodation and then submit her revised request on Tuesday, February 26. Any requests for additional time will be considered based on the circumstances present at the time of the request.

One possible resolution raised earlier in this process was the use of a respirator. However, to date, the agency has not received further information regarding the specifications of that device (filtration size, types of filtration, etc.) so as to be able to locate or purchase these for Ms. Mullin's use. Please provide as soon as possible.

This response cannot address all issues raised in the February 20th letter and is only an interim reply to address the most pressing issues. A more detailed response will be forthcoming.

Thank you,
Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923 | (fax) 727-319-7750

> Here'st a synopsis of what I've been put through since we last met:
>
> - Wednesday 20th: The Memorandum from the AFGE, addressed to Bonnie Wax, was hand delivered to Human Resources. The memo was received by Philip Works. Knowing this, explains how Mr Works would have had an opportunity to read the memo.

On the same day, Mr. Works sent the above e-mail (which I had no knowledge of until I returned to work on Tuesday January 26th.)

Clearly Mr. Works' knowledge and involvement exceeds a casual glance at the Memorandum addressed to Bonnie Wax. Other than by reputation, I don't know this man. I don't understand why he would be in contact me under any circumstances. I don't understand how he could suddenly have an active roll in this process. Bonnie or Tammi Clark I understand. But Philip Works?????

Are there no privacy boundaries within Human Resources?????

If law dictates that everyone in HR is allowed equal access to any/all employee medical information information, as troubling as that would be, I'll have to come to terms with it.

Can your office help clarify the regulations/laws that spell this out. If not, will you please point me in a direction so I can do the research.

- Mr Works sent this message to my work e-mail, knowing full well that I was on medical leave. (It has been repeatedly been evidenced, that Human Resources has my personal contact information ~ including an e-mail address. ) I didn't know of the following e-mails ' existence until my return to work on February 26th.
- And please know that February 26th, 27th and 28th were dreadful. ... There were phone calls, faxing, conference calls, e-mails . . . . All in an effort to get them to a place that would allow me to get back to work ~ safely back to work. Human Resources misconstrued, ignored and blatantly defied laws, regulations and guidance set for by the EEOC, The Rehabilitation Act, VA Directive 5975.1 and JAN Job Accommodation Network.

---

**Aileen Mullin** <aemflorida@gmail.com> Fri, Mar 1, 2013 at 11:53 AM
To: "Henley, John (ORM)" <John.Henley@va.gov>
Cc: Odessa.johnson@va.gov, john.r.smith2@va.gov, Raynene Suarez <rs1284@yahoo.com>

---

**From:** Works, Philip, VBASPT
**Sent:** Wednesday, February 20, 2013 4:13 PM
**To:** Smith, John, VBASPT; Mullin, Aileen, VBASPT
**Cc:** Clarke, Tamanique, VBASPT; Wax, Bonnie, VBASPT
**Subject:** February 20th Request for AA
**Importance:** High

Good afternoon,
Unfortunately I have not been able to reach Mr. Smith by phone to discuss the letter delivered to Human Resources at approximately 3:20 this afternoon.

However, the Director has granted Ms. Mullin authorized absence for her regularly scheduled tours of duty Thursday, February 21, 2013 through Monday, February 25, 2013.

This time is being provided to allow an opportunity for Ms. Mullin to gather any additional medical documentation needed in support of her request for Reasonable Accommodation and then submit her revised request on Tuesday, February 26. Any requests for additional time will be considered based on the circumstances present at the time of the request.

One possible resolution raised earlier in this process was the use of a respirator. However, to date, the agency has not received further information regarding the specifications of that device (filtration size, types of filtration, etc.) so as to be able to locate or purchase these for Ms. Mullin's use. Please provide as soon as possible.

This response cannot address all issues raised in the February 20th letter and is only an interim reply to address the most pressing issues. A more detailed response will be forthcoming.

Thank you,

Philip Works
Human Resources Specialist
St. Petersburg Regional Office
Human Resources Management Division
(voice) 727-319-5923 | (fax) 727-319-7750

> Here'st a synopsis of what I've been put through since we last met:
>
> - Wednesday 20th: The Memorandum from the AFGE, addressed to Bonnie Wax, was hand delivered to Human Resources. The memo was received by Philip Works. Knowing this, explains how Mr Works would have had an opportunity to read the memo.
>
>   On the same day, Mr. Works sent the above e-mail (which I had no knowledge of until I returned to work on Tuesday January 26th.)
>
>   Clearly Mr. Works' knowledge and involvement exceeds a casual glance at the Memorandum addressed to Bonnie Wax. Other than by reputation, I don't know this man. I don't understand why he would be in contact me under any circumstances. I don't understand how he could suddenly have an active roll in this process. Bonnie or Tammi Clark I understand. But Philip Works?????
>
>   Are there no privacy boundaries within Human Resources?????
>
>   If law dictates that everyone in HR is allowed equal access to any/all employee medical information information, as troubling as that would be, I'll have to come to terms with it.
>
>   Can your office help clarify the regulations/laws that spell this out. If not, will you please point me in a direction so I can do the research.
>
> - Mr Works sent this message to my work e-mail, knowing full well that I was on medical leave. (It has been repeatedly been evidenced, that Human Resources has my personal contact information ~ including an e-mail address. ) I didn't know of the following e-mails ' existence until my return to work on February 26th.
>
> - And please know that February 26th, 27th and 28th were dreadful. ... There were phone calls, faxing, conference calls, e-mails . . . . All in an effort to get them to a place that would allow me to get back to work ~ safely back to work. Human Resources misconstrued, ignored and