UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AILEEN MULLIN,

    Plaintiff,

v.                                        Case No. 8:20-cv-2697-VMC-AEP

SECRETARY, U.S. DEPARTMENT
OF VETERANS AFFAIRS,

    Defendant.
_____/

**ORDER**

    This matter comes before the Court upon consideration of the Motion for Summary Judgment filed by the Defendant, the Secretary of the U.S. Department of Veterans Affairs (the VA), on January 28, 2022. (Doc. # 32). Plaintiff Aileen Mullin responded on February 18, 2022 (Doc. ## 33, 34), and the VA replied on March 14, 2022. (Doc. # 39). For the reasons that follow, the Motion is granted.

**I.   Background**

    Mullin is employed by the VA as a Ratings Veterans Service Representative ("RVSR") at the Veterans Benefits Administration's St. Petersburg Regional Office. (Doc. # 32 at ¶ 1; Doc. # 34 at ¶ 1). As Mullin explained it, her job was to analyze whether and to what extent veterans could claim certain benefits. (Doc. # 32-2 at 4 (12:3-16:17)). Mullin

1

explained that, for a veteran to receive compensation, a VA medical examiner would have to conduct an examination and issue an opinion that the injury or illness was service-related. (Id. at 6 (20:7-13)). The RVSR would gather the veteran's records and identify the pertinent pieces of information for the medical examiner, and the RVSR would also make the ultimate decision about whether the veteran would receive the claimed benefits. (Id. at 7 (21:11-22:3)). Mullin also explained the chain of command at her office. As an RVSR, her direct superior was a "Coach." (Id. at 9 (30:21-23)). Coaches, in turn, would report to Assistant Service Center Managers, and above them was the Service Center Manager. (Id. at 9 (31:1-4), (32:24-35:4)).

### A.   Mullin's Respiratory Health Problems

Mullin alleges that she first brought her asthma and respiratory health problems to the VA's attention in July 2010 and asked to be reassigned to work in a different part of the building. (Doc. # 32-2 at 23 (88:13-23)). According to Mullin, the VA implicitly denied that accommodation request and instead told Mullin that she needed to file a workers' compensation claim. (Id. at 24 (90:11-14)).

In December 2011, Mullin again complained that working in the building gave her respiratory attacks and/or asthmatic

2

reactions, and so she requested an alternative schedule to limit her time in the building and to change the location of her workstation. (Id. at 26 (98:1-11), 279, 364). The VA thereafter agreed that she need only work in the building two consecutive days per week and also agreed to move her desk. (Id. at 364; see also Id. at 27 (102:13-20)). According to Mullin, these accommodations were not effective, although she did not directly tell her supervisors that the changes were ineffective because she thought her ongoing health issues were apparent. (Id. at 27 (103:2-22)).

On January 8, 2012, Mullin emailed two VA colleagues objecting to changing her "compressed day" away from Wednesday due to her health concerns. (Id. at 364). She noted that upcoming training was due to take place on Tuesdays, Wednesdays, and Thursdays, but she was "unable to work four days in a row in the current environment." (Id.). She listed "other options," such as recording the sessions, "relocat[ing] [her] workstation outside the second floor east quadrant," or "consider[ing] [the] work from home option." (Id. at 364-65).

On January 10, 2012, Mullin met with HR Specialist Tammi Clarke. (Id. at 31 (117:1-5)). At that meeting, Clarke told Mullin she would be allowed to move locations from the second

to the third floor. (Id. at 31 (118:4-12)). However, when Mullin went back to the office on January 12, 2012, her desk had not been moved, which "surprised and scared" Mullin. (Id. at 31 (118:13-119:24)). Mullin reported this to her supervisor and she told him, "I've got to get out of the room. I can't breathe." (Id. at 32 (121:1-5)). After that, Mullin left and found her friend, who called an ambulance for Mullin. (Id. at 32 (121:24-125:11)). By the next time Mullin came to work, her workstation had been moved to the third floor. (Id. at 28 (105:18-106:4), 33 (127:4-24)).

On January 31, 2012, Mullin requested an air purifier for her new workstation on the third floor.[1] (Id. at 381). She stated in an email that "for the second time since the move . . . , the severity of my symptoms reached a level that I had to leave work. (Symptoms include pain in my eyes and throat, difficulty swallowing, dysphonia and tightness of the chest)." (Id.). Mullin received the air purifier on February 2, 2012. (Id. at 385). However, just four days later, Mullin notified her supervisors and HR that she did not think "the air purifier is going to have the effect we hoped for" because

_____

[1] Mullin quibbles that it was Clarke who first suggested an air purifier and she was politely "reminding" her in the email. Regardless, this is the first time Mullin sets down in writing that she'd like an air purifier at her workstation.

it was meant to be used in a small space and she worked in a large open area. (Id. at 285).

**B.    The March 2012 skills examination**

By late February 2012, Mullin had decided to take a skills certification examination scheduled for March 14, 2012. (Doc. # 32-2 at 387). On March 12, she sent a request to HR, asking to take the test in another part of the building, citing her severe asthma symptoms. (Id. at 286, 389). Mullin and Clarke exchanged a series of emails about this request on March 12 and 13, 2012. (Id. at 391-92). One of Clarke's emails explained that while they had set up a special testing location for Mullin, the VA later learned that she had decided to forego taking the examination. (Id. at 391). Clarke informed Mullin that "although the temporary workplace adjustment was not used, I thought you should know that we took extraordinary measures to ensure you could test if you chose to." (Id.). Mullin's Coach and direct supervisor, Ulyssee McBurrough Jr., sent her an email on March 14 confirming that she had decided not to take the certification examination. (Id. at 287). The email said: "[Mullin] stated earlier this morning that [she did] not wish to take the RVSR certification test. . . . [Mullin] stated that [she is] not concerned with testing, and that [she is] concerned with

5

living and not dying. Therefore, [she has] decided not to take the RVSR certification today." (Id.).

Mullin explained that the accommodation provided by the VA was inadequate because she was not given sufficient time to set up her computer and other materials to take the exam, as other people were allowed to do. (Id. at 40-41). Thus, she testified that Clarke's statement that "everything was ready for you to walk in and take the test" was "bogus" and "loaded." (Id. at 43 (166-2-167:12)). But beyond that, Mullin stated that the "fundamental" accommodation that the VA refused to give her with respect to this examination was a place she could breathe easily. (Id. at 41 (159:17-23)). In Mullin's estimation, if she'd been given several days to set up her air purifiers in an enclosed space and had time to set up her computer, there was a "possibility" she could have taken the examination. (Id. at 43 (168:2-12)). Mullin could not recall whether she ever asked for these specific measures. (Id. at 44 (169:15-24)).

### C.   **Mullin's first FMLA leave request**

On March 2, 2012, Mullin visited her allergist/immunologist, Dr. Stephen Klemawesch, reporting that she could not work more than four days per week without exacerbating her asthma and that she would like to apply for

leave under the Family and Medical Leave Act (FMLA). (Doc. # 32 at ¶ 15; Doc. # 34 at ¶ 15). The next day, Dr. Klemawesch submitted a FMLA leave certification on Mullin's behalf, stating that she had chronic allergic sinusitis and asthma. (Doc. # 32-2 at 481-84). Dr. Klemawesch wrote that Mullin's condition "worsens at work at the VA[,] leading to severe attacks requiring urgent care." (Id. at 482). Dr. Klemawesch recommended that Mullin be allowed to work from home "with periodic trips to the work site as required" and "when [she is] at the work site, limit exposure to the building . . . . [Mullin] must be allowed to leave immediately from the work place if she develops asthma." (Id. at 483-84).

The record reflects that on March 12, 2012, Casey Crump (a steward with the union to which Mullin belonged) sent an email to Kerrie Witty, the director of the St. Petersburg Regional Office, and others, writing that:

> [Mullin] is working with HR to obtain an accommodation to work at home. However, I was very surprised about the pace of action being taken by both parties. [Mullin] has an ongoing medical condition with a statement from her doctor which extremely limits the time she should be in this office. This must be expedited and we request a representative from HR dedicated to completing the required paperwork as soon as possible. In addition, the work at home request should be afforded the same attention. . . . I want everyone to understand the extended time in the office is a health hazard for [Mullin]. This is also an ongoing

liability that I want to ensure you are personally aware of.

(Id. at 398-99).

Witty then asked HR Manager Bonnie Wax and Veterans Service Center Manager Sandra Smith whether they had a reasonable-accommodation request from Mullin. (Id. at 398). In a March 13 email, Witty indicated that Mullin had submitted the medical documentation and a reasonable-accommodation request in the preceding few days. (Id.). Witty wrote: "Tammi [Clarke] has it and I think you [Smith] should go review it and determine if we need to let her work from home as an accommodation since her physician states that as the accommodation she needs." (Id.).

On March 20, 2012, the VA formally allowed Mullin to work from home three days a week. (Id. at 407). Mullin testified that this was not a reasonable accommodation because she would never have asked to be in the building two days a week as her doctors had told her to severely limit her time in the building. (Id. at 46 (178:2-25)). According to Mullin, while coming into the office on Tuesdays and Fridays was standard for certain RVSRs, she had not requested the schedule other people had, she asked to work from home, "period." (Id. at 47 (182:19-25), 183:5-11)). She claims that

8

no one at the VA spoke to her about the extent to which they granted this accommodation and that their decision was "unilateral." (Id. at 46 (178:22-25)).

**D.   Mullin's cancer diagnosis and various leave requests**

Later in the month of March 2012, Mullin was diagnosed with breast cancer. (Doc. # 32-2 at 12 (43:7-9), 492). To her recollection, Mullin only initially shared her cancer diagnosis with Smith, the Service Center Manager, and a friend from work. (Id. at 12 (43:10-22)).

Her oncologist stated in an FMLA leave certification form dated March 23, 2012, that she would require surgery, followed by chemotherapy and possible radiation. (Id. at 492). The oncologist stated that she would need to be absent from work for up to 6 months. (Id. at 493). This FMLA request was approved on April 9, 2012. (Id. at 496).

On May 3, 2012, Crump sent Mullin an email in which he said, in pertinent part: "I spoke with [HR Manager] Bonnie Wax the other day about your condition. She said the tumor you have is what caused your breathing problems. She said it was apparently exerting some pressure on your lungs. She also said she was relieved your condition was not caused by our office and that we do not actually have sick building

syndrome." (Id. at 501). Mullin had not spoken to Wax about her medical condition and was upset that Wax was speaking about it to her colleagues. (Id. at 503; see also Id. at 92 (92:8-11)). Neither Crump nor Mullin know where Wax obtained the information that she discussed with Crump. (Doc. # 32 at ¶ 19; Doc. # 34 at ¶ 19).

On May 4, 2012, Mullin requested 80 hours of advanced sick leave to undergo surgery for her cancer, and McBurrough submitted a formal memorandum documenting Mullin's request three days later. (Doc. # 32 at ¶ 20; Doc. # 34 at ¶ 20). Director Witty approved the request on May 10, 2012. (Id.). Mullin also requested to participate in the VA's Voluntary Leave Transfer Program, and she was accepted. (Doc. # 32-2 at 320). In a June 27, 2012, email from a HR employee[2], it indicates that Mullin received 158 hours of donated leave through the leave transfer program. (Id. at 309-10).

Mullin alleges that, in August 2012, her requests for advanced sick leave were not processed promptly, resulting in

---

[2] At several points in her deposition, Mullin speculated that certain emails or other documents were not written by the indicated author but were instead forged by someone else. As Mullin points to no evidence supporting this assertion, the Court will make the reasonable assumption that emails and other record evidence were authored by the person indicated on the document.

a loss of pay. (Id. at 94 (267:1-5)). Mullin could not recall the process for requesting advance sick leave, who the decision-makers were that delayed the process, how long the delay was, how many hours were delayed, or whether the VA retroactively paid her. (Id. at 94:267:1-270:1)). And Mullin alleges that on August 26, 2012, her request for leave under the leave transfer program was not processed. (Id. at 95 (270:8-11)).

As discussed in further detail below, Mullin initiated her administrative complaint procedure in June 2012 and filed her formal complaint in September 2012.

### E.   **Events of 2013**

Mullin completed her cancer treatments in December 2012. (Doc. # 32-2 at 433). She returned to work on January 2, 2013. (Id.). The record reflects that during this time, Mullin worked primarily from home and would come into the office "once or twice a week" to minimize her exposure to the building. (Id. at 305). Within a few weeks of returning to work, however, Mullin contacted her employer to report that being in the building was exacerbating her medical conditions and that her doctor advised her to "further minimize [her] time in the building" and to wear a respirator-type mask while in the building. (Id. at 409).

11

On January 30, 2013, Mullin met with Clarke, McBurrough, and union representative John Smith, where she requested modifications to her job requirements, such as assistance retrieving documents from the printer and help moving files. (Id. at 434; see also Id. at 55 (213:5-18)). As Mullin later described it, she also suggested that she work entirely from home or work someplace other than the St. Petersburg building. (Id. at 103 (303:7-15)). One of the modifications she proposed at that time would be to "have someone just pick up the files, meet me outside in my car, take the whole cart. Whatever documents were germane to that file, which I would identify, a person would scan it in, do that, do the physical part of the movement of the paper file, the marrying of the documents and the movement of them." (Id. at 96 (276:8-13)). At this time, Mullin was coming into the office two days per week, and the bulk of her time there was spent marrying the work she had done from home into the physical file at the VA. (Id. at 96 (276-77)).

A letter in the record, authored by John Smith, reflects that "the group was set to meet the next morning to further discuss options allowing Ms. Mullin to safely perform her job." (Id. at 434). According to that letter, however, "later that same afternoon, Human Resources informed Ms. Mullin that

12

her request for accommodation was denied (without the benefit of further conversation)." (Id.).

The letter goes on to state that this event led Mullin to believe that her job was in jeopardy, which caused her extreme distress and, the next day, she was admitted to the hospital. (Id.). Mullin testified that she was "blind-sided" by this decision and she took it as the VA being "done" with her, that she would be forced to either quit or not meet her production goals. (Id. at 56 (217:18-218:9)).

On January 31, 2013, Mullin emailed Clarke and McBurrough, writing in pertinent part:

> For the [doctors] to define the specs for an appropriate respirator, they now need to know how the device will be used. This wasn't as much an issue when it was believed that I would be granted accommodations. Now that that's off the table, again, more info is needed.
>
> One important detail pertains to time: How long is it anticipated I will need the respiratory protection to perform the "essential functions" of a [work at home] RVSR. . . . Can you please email us the "essential functions" I've [] been denied accommodations for.

(Id. at 325).

On February 5, 2013, Clarke sent her an email entitled "Essential Function: In-Office Process." (Id. at 321). In that email, Clarke wrote:

13

Below is the information you requested. I understand that you feel these tasks are minimal and can be done by someone else, however collectively these tasks take a significant amount of time to complete. It's the whole in-office process that is considered an essential function of the job. Based on our phone conversation, it seems that there are certain tasks of the in-office process you are seeking assistance with. If you want we can talk about it in our next meeting or you can reply back with what it is that you are seeking assistance with. [Clarke then goes on to detail multiple parts of the in-office process.] The whole in-office file process can take the average work at home rating specialist 3 to 5 hours or more depending on the number of files to be processed and is an essential function of your job.

(Id.). Mullin strongly disagreed that the physical file-moving portions of her job took as long as three to five hours. (Id. at 100 (293:8-23)).

There were other emails sent between Clarke and Mullin on February 5: Mullin wrote that, "In our telephone conversation this morning, you [Clarke] informed me that you had submitted a 'Request for Accommodations' to GC at my request. Any suggestion that this action was requested by me is patently false." (Id. at 326). Clarke responded that sending the information on to regional counsel was part of the "formal denial process." (Id.).

Mullin alleges that on February 6, 2013, Clarke spoke to her "in a sarcastic manner and refused to discuss restructuring marginal tasks to [modify] her existing

14

accommodation." (Id. at 95 (272:21-273:3)). As Mullin explained at her deposition, during that conversation, Clarke told her "you think that parts of your job are insignificant or below you . . . and someone else should do your job. But the essential function is – the job was the entire job process." (Id. at 96 (274:15-21)).

On February 27, 2013, the VA agreed to provide Mullin with the following accommodation: her workspace would be moved to a different part of the building and a second air purifier would be added to her workspace. (Id. at 437). Her printer would be set up to print inside the office suite. (Id.). And Mullin would wear the respirator prescribed by her doctor while in the building. (Id.). Mullin disputes that she ever agreed with the VA that she would wear the respirator inside the building. (Id. at 112 (340:12-19)). She also maintains that this accommodation was not effective. (Doc. # 34 at 8).

In a March 14, 2013, email, McBurrough, Mullin's supervisor, noted "some concerns" Mullin had with the air purifiers, noted that she did not always wear her respirator mask, and also noted some work-quality concerns with respect to Mullin. (Doc. # 32-2 at 439-40). Once Clarke heard indirectly about Mullin's concerns, she added a third air

15

purifier to the workspace and had the air quality tested (and the air quality was "very good"). (Id. at 442). Clarke admonished Mullin that she should wear her mask while in the office and that if she had any concerns or further requests for accommodation, that Mullin should come directly to her. (Id.).

Meanwhile, on February 27 or 28, 2013, Mullin met with McBurrough, Clarke, and union representatives to discuss her work situation. (Id. at 444). One of the union representatives suggested letting Mullin work half from home and half in the office the two days per week she came to the office. (Id.). The VA never formally granted Mullin an accommodation in the form of this twice weekly, half-day schedule. (Id.). Nevertheless, it appears that Mullin began working such a schedule. In a March 29, 2013, email that Mullin sent to multiple VA employees, she was upset that this "accommodation" had been "rescinded." (Id. at 445). She wrote:

> Effective immediately, I am no longer permitted to work four hours in the office and four hours at home (WAH) on Tuesdays and Thursdays. . . . My understanding is, that the basis of your February 27th agreement to modification of accommodations, was to prevent the repeated onset of severe building-related respiratory illnesses. Since the modification was put in place, it[] has been effective in preventing major respiratory events.

> . . . If it is true that the modification to
> accommodations has been reversed, and I am required
> to stay in the building until I am symptomatic . .
> . how should I proceed?

(Id.).

On April 1, 2013, Clarke sent Mullin an email explaining that her approved accommodation did not extend to working four hours per day at home and four hours in the office. (Id. at 448). Clarke wrote: "No accommodation was reversed or rescinded, because you were never granted an accommodation to work ½ days in the office. Therefore, leave should be taken any time you leave the office before the end of your tour on Tuesdays and Thursdays." (Id.). On April 3, Mullin emailed her supervisor and numerous other people imploring them to develop an "emergency medical plan" for her now that she was being made to work in the office two full days per week. (Id. at 333). Mullin wrote that "[t]he four hours, twice a week, modification to the existing accommodation was working. . . . I was able to stay out of the emergency room and doctor's office. Yes, the modification that **Tammi, John and I agreed to WAS effective!!!** But that's a moot point. Unfortunately, the Agency made it clear that it is adhering to its pattern of refusing to permit accommodations appropriate to [her] specific disability." (Id.).

On April 15, 2013, the VA provided Mullin with the following formal accommodation: The VA allowed Mullin to work from home four days a week and only report to the building on Friday mornings from 7:00 am to 11:00 am. (Id. at 458). She would be allowed to complete her work hours on Friday from home. (Id.).

Mullin, however, was not placated. She sent an April 16 email to McBurrough stating that the new accommodation was "pretext" and that "[s]ince I amended my EEO complaint, the Agency's treatment of me has reached the level of being inhumane. The Agency is fully aware of my cancer, asthma, sinus infections [] and desire to move forward in my career – but none of that is enough for them to treat me with common decency." (Id. at 460). She sent another email to McBurrough later that same day, stating that she had not requested these additional accommodations, that they are "useless and potentially harmful" to her, and do not address assistance with the "marginal functions" of her position. (Id. at 463).

By April 12, 2013, Mullin's doctor wrote to the Department of Labor Workers Compensation program recommending that she be allowed to work entirely from home due to her medical conditions and he opined that the air purifiers in her workspace were not effective. (Id. at 473).

18

On April 19, 2013, the VA granted Mullin the following accommodation: She would be allowed to work from home five days a week. (Id. at 476). She would come to the office on Friday mornings, where someone would meet her outside, provide her new work documents, and take her completed ones. (Id.).

**F.   Mullin's administrative complaint**

Mullin initiated contact with an Equal Employment Opportunity Commission (EEOC) counselor on June 5, 2012. (Doc. # 32-2 at 543, 555). VA Director Witty was notified the next day. (Id.). Mullin and Director Witty participated in mediation in June 2012, but it was unsuccessful. (Id. at 545). Once the informal process was unsuccessful, Mullin brought a formal complaint with the EEOC on September 18, 2012. (Id. at 547). Director Witty was notified of the formal EEOC complaint on September 25, 2012. (Id. at 553).

On October 18, 2012, the EEOC notified Mullin of its partial acceptance of her complaint. (Id. at 555-560). According to the October 18 partial acceptance letter:

> During the EEO counseling period you raised a claim of hostile work environment that consisted of the following events and indicated the events were based on disability: on May 3, 2012, you were informed that your request for advanced sick leave was denied; on May 3, 2012, you were informed that there were problems with your request of March 2012

> for leave under the [FMLA]; on May 3, 2012, you
> informed that Human Resources Manager Bonnie Wax
> (BW) made a horrible comment about your medical
> condition and; on May 31, 2012, HR failed to provide
> your Union representative with a complete record of
> documents that were needed to assist you with your
> reasonable accommodation request and the response
> to the information provided was delayed.

(Id. at 555).

The EEOC then noted that, in her formal complaint, Mullin
had raised 12 new allegations that were not raised during the
counseling period and she also added "reprisal" as a basis
for the alleged discrimination. (Id.). The October 18 letter
listed 16 allegations raised by Mullin. (Id. at 556-57). The
EEOC determined that, of those 16, three allegations
constituted timely raised, discrete acts of discrimination
that were accepted for investigation:

(1)  "On May 3, 2012, [Mullin] was informed that her
     request for advanced sick leave was denied."

(2)  "On June 16, 2012, August 11, 2012, August 25, 2012,
     and September 8, 2012, [Mullin's] advanced sick
     leave was not processed."

(3)  "On August 16, 2012, [Mullin's] request for the
     leave under the leave transfer program was not
     processed."

(Id. at 556 n.3). The EEOC also accepted for investigation Mullin's "overall harassment claim," which did incorporate all 16 allegations, spanning the time period from September 2011 until September 2012. (Id. at 556-57).

Over the following nine months, Mullin amended her EEOC complaint three times. The first time, Mullin attempted to add two new claims and 10 new allegations of continuing harassment. (Id. at 562-63). The EEOC dismissed both purported new claims as not cognizable. (Id.). However, with respect to the 10 new allegations, the EEOC considered these to be relevant background facts that could be used as evidence to help support the accepted harassment claim under investigation. (Id. at 563). In addition, of these new allegations, one was accepted for investigation as a discrete and actionable act of discrimination: "On February 6, 2013, [Clarke] spoke to [Mullin] in a sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation; [Mullin's] request to modify her existing accommodation was denied and she was advised that the denial notice was forwarded to General Counsel." (Id. at 564 n.3, 565).

On March 29, 2013, Mullin again sought to amend her EEOC complaint. (Doc. # 32-2 at 568). The EEOC accepted Mullin's

21

new allegation that on March 29, 2013, she was advised that modifications to her reasonable accommodation were "reversed," but accepted it only as further evidence that was related to or grew out of her existing harassment claim. (Id. at 568-69).

Finally, on July 11, 2013, Mullin again sought to amend her EEOC complaint to add allegations pertaining to May 2013 events where an EEO manager attempted to interfere with a family member accompanying her to mediation and also denied her notice of mediation training and resources. (Id. at 573). These were accepted as additional allegations pertaining to her existing harassment claim. (Id.).

G.   **Proceedings before this Court**

Based on these allegations, Mullin sued the VA on November 16, 2020. (Doc. # 1). She asserted claims for disability discrimination under the Rehabilitation Act of 1973 (Count I); failure to accommodate under the Rehabilitation Act (Count II); privacy violations under the Rehabilitation Act (Count III); and retaliation and/or retaliatory hostile work environment under the Rehabilitation Act[3] (Count IV). See (Id.). The VA filed an answer (Doc. #

---

[3] Mullin cited both the Rehabilitation Act and Title VII in the complaint as the bases for Count IV. However, federal

12), and this case proceeded through discovery. The VA has now filed the instant Motion seeking summary judgment as to all counts of the complaint. (Doc. # 32). The Motion is fully briefed (Doc. ## 33, 34, 39) and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing

---

employees' disability discrimination claims typically proceed under the Rehabilitation Act. See Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1354 (N.D. Ga. 2005) (explaining that disability discrimination claims cannot be brought under Title VII).

law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's

response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

### III. **Analysis**

The VA attacks Mullin's claims as both time-barred and lacking in merit. The Court will address each argument in turn.

### A.  **Time Bar**

"Under Title VII and the Rehabilitation Act, Federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act." Shiver v. Chertoff, 549 F.3d 1342, 1344 (11th Cir. 2008). "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies." Id.

The VA points out that "none of the allegations included in Mullin's amendments were brought to an EEO counselor," and it argues she has therefore failed to exhaust her administrative remedies. (Doc. # 32 at 10). Mullin counters that her claims are timely because "at least one act of

harassment occurred within the 45 days prior to [Mullin's] initial contact with the EEOC." (Doc. # 33 at 4).

With respect to Mullin's hostile work environment claim in Count IV, the Court need not decide the timeliness issue because, even assuming it to be timely, it fails on the merits for the reasons described below. With respect to Mullin's disability discrimination claim in Count I, Mullin has not cited any authority to support the suggestion that any untimely discrete incidents that were not identified and accepted by the EEOC for investigation may form the basis for liability. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (in construing Title VII's statutory exhaustion requirements, explaining that time-barred acts are not actionable, even if they are related to acts alleged in a timely-filed charge). Thus, the Court will confine itself to the specific incidents that were accepted by the EEOC as timely raised discrete acts of disability discrimination. Finally, as the Court will explain in more detail, the 45-day time-bar does serve to limit the scope of Mullin's failure-to-accommodate claim in Count II.[4]

---

[4] The VA does not challenge Count III as time-barred. See (Doc. # 32 at 10).

**B.**   **Disability Discrimination Claim**

Mullin brings Counts I and II for disability discrimination under the Rehabilitation Act. The Rehabilitation Act prohibits federal agencies from discriminating in employment against otherwise-qualified individuals with disabilities. Porterfield v. Soc. Sec. Admin., No. 20-10538, 2021 WL 3856035, at *4 (11th Cir. Aug. 30, 2021). The standards for determining liability under the Rehabilitation Act are the same as the Americans with Disabilities Act ("ADA") standards. Id.

Disability discrimination under the Rehabilitation Act comes in two forms – disparate treatment and failure to make a reasonable accommodation. Id. Disparate treatment involves discriminatory intent or animus and occurs when a disabled individual is treated differently than a non-disabled individual. Id. (citing 42 U.S.C. § 12112(b)). A failure to make a reasonable accommodation requires no animus and occurs where a covered entity fails to fulfill its affirmative duty to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would

27

impose an undue hardship on the operation of the business." Id. (citing 42 U.S.C. § 12112(b)(5)(A)).

### 1.   Mullin's disparate treatment claim

A plaintiff may support her claim of discrimination through direct or circumstantial evidence. Where, as here, a disparate treatment claim under the Rehabilitation Act is based on circumstantial evidence, the claim is analyzed under the burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ctr. v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency, 895 F.3d 1295, 1303 (11th Cir. 2018). Under this burden shifting framework, if the plaintiff establishes her *prima facie* case of disability discrimination, and the employer proposes legitimate, nondiscriminatory reasons for its decision, then the plaintiff must show (or create an issue of fact) that the reasons were a pretext for discrimination. See Id.

To establish a *prima facie* case of disability discrimination under the Rehabilitation Act, a plaintiff must demonstrate that: (1) she has a disability; (2) she was a "qualified individual" for the position; and (3) she was subjected to unlawful discrimination as a result of her disability. Id.

In order to establish the third element, the plaintiff must show that she suffered an adverse employment action because of her disability. Porterfield, 2021 WL 3856035, at *4. To establish an adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances." Id. at *5. Moreover, the "asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Id. Under the Rehabilitation Act (unlike the ADA), the plaintiff must prove that the adverse employment action was "solely by reason of" her disability. See 29 U.S.C. § 794(a). A plaintiff cannot prevail if she merely shows that her employer based the adverse employment action partially on her disability and partially on other factors. Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (explaining that "[i]t is not enough [under the Rehabilitation Act] for a plaintiff to demonstrate that an adverse employment action was based partly on his disability").

Here, there are only six events that Mullin timely brought to an EEOC counselor or had accepted as timely raised discrete acts of discrimination:

(1) On May 3, 2012, Mullin was informed that her request for advanced sick leave was denied;

(2) On May 3, 2012, Mullin was informed that there were problems with her March 2012 request for leave under the FMLA;

(3) On May 3, 2012, Mullin was informed that Human Resources Manager Bonnie Wax made a "horrible comment" about her medical condition;

(4) On May 31, 2012, HR failed to provide Mullin's Union representative with a complete record of documents that were needed to assist her with her reasonable accommodation request and the response to the information provided was delayed;

(5) On June 16, 2012, August 11, 2012, August 25, 2012, and September 8, 2012, Mullin's advanced sick leave was not processed.

(6) On August 16, 2012, Mullin's request for the leave under the leave transfer program was not processed.

With respect to Events 2 through 6, the VA argues that they do not support a disparate treatment claim because they did not have a tangible adverse effect on Mullin's employment and/or there is no evidence in the record to support a finding that she suffered these actions solely because of her

disability. (Doc. # 32 at 14). The Court agrees. Mullin has not demonstrated that problems with FMLA leave being processed, issues obtaining documents, or hurtful comments made by colleagues amount to "a serious and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances." See Porterfield, 2021 WL 3856035, at *5. Nor has Mullin demonstrated that she suffered any of the listed actions solely because of her disability.

In addition, the Court agrees with the VA that Mullin did not respond at all to the VA's arguments as to Events 2 through 6 in her response – that is, she did not point this Court to any facts in the record to refute the VA's contentions or provide any argument in rebuttal – and that she has therefore abandoned those portions of her disparate treatment claim. See Jones v. Bank of Am., N.A., 564 F. App'x 432, 434 (11th Cir. 2014) (explaining that, where one party failed to respond to arguments made before district court at summary judgment, "the Court deems such argument or claim abandoned"); see also Schwarz v. Villages Charter Sch., Inc., No. 5:12-cv-177-MMH-PRL, 2016 WL 777790, at *6 (M.D. Fla. Feb. 29, 2016) (finding that Plaintiffs' failure to respond

to an aspect of the claims attacked by Defendant's motion for summary judgment constituted abandonment of the issue).

Turning then to Issue 1 – the May 2012 denial of advanced sick leave – the VA argues that this claim is (1) belied by the record, (2) fails as a matter of law because Mullin did not suffer a tangible adverse effect on her employment because this sick leave was approved, and (3) there is no evidence that she was denied leave solely because of her disability. (Doc. # 32 at 13-14). Again, the Court agrees. The record clearly reflects that Mullin requested advanced sick leave in May 2012 and Director Witty approved the request one week later. (Doc. # 32 at ¶ 20; Doc. # 34 at ¶ 20). Thus, the VA did not deny Mullin advanced sick leave nor did she suffer a tangible adverse effect on her employment.[5]

---

[5] In a one-sentence argument, Mullin also attempts to paint the May 2012 purported denial of advanced sick leave as retaliation for "her participation in EEOC protected activity." (Doc. # 33 at 9). But Mullin did not even contact an EEO counselor until June 2012. And even assuming that her earlier interactions with the VA qualify as protected activities, she still has not demonstrated that she suffered an adverse employment action for the reasons described above. See Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 507 F.3d 1306, 1315-16 (11th Cir. 2007) (explaining that to prevail on a retaliation claim under the Rehabilitation Act, a plaintiff must show that she engaged in a protected activity, that she suffered an adverse employment action, and that the protected activity was causally connected to the adverse employment action).

Accordingly, the Court grants the VA's Motion to the extent it seeks summary judgment on Mullin's disparate treatment claim (Count I).

### 2.   Mullin's reasonable-accommodations claim

"An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer." Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017).

The thrust of Mullin's response is that: (1) the VA knew of her health challenges and her position that "full-time telework" was the "only appropriate accommodation" as early as 2010; (2) the VA eventually granted her full-time telework request in April 2013; but (3) "there was no reason for the undue delay in granting such request." (Doc. # 33 at 10-11).

In its reply, the VA concedes that an unreasonable delay can amount to an actionable failure to provide a reasonable accommodation. (Doc. # 39 at 3); see Russell v. City of Tampa, No. 8:14-cv-814-EAK-AEP, 2015 WL 5871189, at *3 (M.D. Fla. Oct. 5, 2015) (holding that an unreasonable delay may amount to failure to provide a reasonable accommodation under the ADA).

Here, although Mullin arguably raised her request for full-time telework in March 2012, see (Doc. # 32-2 at 47 (183:1-17), 481-84), she did not raise this alleged failure to accommodate to an EEO counselor within the 45-day time limit. Mullin first contacted an EEO counselor on June 5, 2012. (Doc. # 32-2 at 543, 555). Thus, any incidents that occurred prior to April 21, 2012, would be time-barred.

Mullin's EEOC complaint contained the following allegations:

- On February 2, 2012, [Mullin] was given an ineffective accommodation when she was issued an air purifier designed for a small room, even though her work station was an open cubicle in an area comparable to a football field.

- On March 20, 2012, [Mullin] was given another ineffective accommodation when she was authorized to work at home three days a week and on the days [she] was required to report to the office, she suffered asthma attacks which forced her to leave the building.

(Doc. # 32-2 at 556). Both of these incidents took place prior to April 21, 2012. Thus, they fall outside of the 45-day period and cannot form the basis for liability. See Tarmas v.

<u>Mabus</u>, No. 3:07-cv-290-TJC-TEM, 2010 WL 3746636, at *4 (M.D. Fla. Sept. 21, 2010) (dismissing failure-to-accommodate claims as time barred where plaintiff initiated contact more than 45 days after the employer allegedly failed to provide an adequate accommodation); <u>see also Sherman v. Speer</u>, No. 1:16-cv-939-WKW-WC, 2019 WL 3006626, at *10 (M.D. Ala. Mar. 27, 2019), <u>report and recommendation adopted</u>, No. 1:16-cv-939-WKW, 2019 WL 2009282 (M.D. Ala. May 7, 2019) (granting summary judgment on failure-to-accommodate claim where plaintiff initiated contact with an EEO official more than 45 days after the date his accommodation request was denied).

What's more, the view in this Circuit is that the denial of a reasonable accommodation for a disability is a discrete act of discrimination and, thus, courts do not recognize the "continuing violation" doctrine with respect to failure-to-accommodate claims. <u>See Abram v. Fulton Cnty. Gov't</u>, 598 F. App'x 672, 676 (11th Cir. 2015) (holding that each denial of requested accommodation constituted a "discrete act[ ] of alleged discrimination" for purposes of limitations period); <u>Dick v. Dickinson State Univ.</u>, 826 F.3d 1054, 1059 (8th Cir. 2016) (same); <u>see also Johns v. Marsh & McLennan Agency LLC</u>, No. 3:19-cv-687-ALB-SRW, 2020 WL 1540397, at *2 (M.D. Ala. Mar. 31, 2020) (finding continuing violation

theory inapplicable in ADA case); <u>Ramsey v. Greenbush Logistics, Inc.</u>, No. 3:17-cv-1167, 2017 WL 6492608, at *3 (N.D. Ala. Dec. 19, 2017) (dismissing failure-to-accommodate claim as untimely and rejecting plaintiff's continuing violation theory that his EEOC charge was timely); <u>Tarmas</u>, 2010 WL 3746636, at *4 (rejecting the argument that claims other than hostile work environment claims are subject to the "continuing violation doctrine").

The VA admits that Mullin's complaints about the accommodation process from January to April 2013 were timely.[6] (Doc. # 32 at 14-15). Specifically, in one of her amendments, Mullin raised the following as a discrete act that was accepted by the EEOC for investigation: In February 2013, Clarke spoke to Mullin in a "sarcastic manner and refused to discuss restructuring marginal tasks to modify her existing accommodation" and, thus, Mullin's request to modify her existing accommodation was denied. (Doc. # 32-2 at 564 n.3, 565). In a later amendment, Mullin alleged that in March 2013

---

[6] On March 8, 2013, Mullin raised her claim regarding the VA's alleged failure to modify her existing accommodation in February 2013. (Doc. # 32-2 at 562-65). On March 29, 2013, Mullin amended her complaint again to add an allegation that modifications to her reasonable accommodations were "reversed" that same day. (<u>Id.</u> at 568-71). Thus, these allegations were raised within 45 days.

she was advised that modifications to her reasonable accommodations were reversed, but the EEOC accepted this allegation only as additional background evidence with respect to the harassment claim. (Id. at 568-71).

The record reflects that in late January 2013, Mullin met with VA officials and requested certain modifications to her job requirements, such as assistance retrieving documents from the printer and help moving files, a request that the VA ultimately denied. (Doc. # 32-2 at 55 (213:5-18), 434). According to Mullin, she also suggested at that time that she work entirely from home or work someplace other than the St. Petersburg building. (Id. at 103 (303:7-15)). The relationship between Mullin and Clarke worsened over the ensuing weeks, so that by February 2013 Clarke allegedly speaking to Mullin in February 2013 in a "sarcastic manner" and derided Mullin that she thought someone else should perform the essential functions of her job. (Id. at 95 (272:21-273:3), 96 (274:15-21)).

On February 27, 2013, the VA agreed to provide Mullin with the following accommodation: her workspace would be moved to a different part of the building and a second air purifier would be added to her workspace. (Id. at 437). Her printer would be set up to print inside the office suite.

(Id.). After hearing that Mullin had certain concerns about the air quality in her workspace, Clarke then added a third air purifier to the workspace and had the air quality tested. (Id. at 442).

It was around this time that Mullin began working half days in the office twice a week, despite the VA never formally granting such an accommodation. Mullin wrote in a later email that this informal accommodation had been effective. (Id. at 333). Mullin was upset when this informal accommodation was "rescinded" in late March 2013. (Id. at 445). Mullin was vocal about her frustration and, on April 15, 2013, the VA allowed Mullin to work from home four days a week and only report to the building on Friday mornings. (Id. at 458). After Mullin again complained, the VA granted Mullin an accommodation of full-time tele-work on April 19, 2013. (Id. at 476).

Here, although an employer is not required to accommodate an employee in any manner in which that employee desires, the VA ultimately gave Mullin the accommodation of full-time telework she requested. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997). As noted above, however, a delay in granting a reasonable accommodation may give rise to a claim. See Russell, 2015 WL 5871189, at *3. A "short" delay may still

permit the conclusion that the accommodation was reasonable. See Id. at *3-4 (finding that a 28-day delay was not unreasonable); see also Terrell v. USAir, Inc., 955 F. Supp. 1448, 1454 (M.D. Fla. 1996) (finding a three-month delay to be acceptable); Jackson v. Sec'y of Dep't of Veterans Affs., No. 8:17-cv-1673-CEH-TGW, 2018 WL 4091988, at *7 (M.D. Fla. Aug. 27, 2018) (applying Russell to a Rehabilitation Act claim). Courts should also take into account any interim accommodations put in place. See Terrell v. USAir, 132 F.3d 621, 627-28 (11th Cir. 1998) (finding that employer did not violate the ADA as a matter of law where it took three months to provide an employee suffering from carpal-tunnel syndrome with a drop keyboard but employer provided employer some access to a drop keyboard when available and was not required to type when one was not available); see also Moseley v. McDonough, No. 2:19-cv-2013-JHE, 2021 WL 4326657, at *13 (N.D. Ala. Sept. 23, 2021) (recognizing that any delay in granting an accommodation is properly reduced by the amount of time a temporary accommodation was in place).

Here, construing the record in Mullin's favor, she made a request to work from home in late January 2013. By April 19, 2013 – three months later – she was provided with her requested accommodation. Courts in this Circuit have excused

similar or longer delays. <u>See</u> <u>Terrell</u>, 132 F.3d at 628; <u>Hartsfield v. Miami-Dade Cnty.</u>, 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (delay of almost ten months in providing closed circuit television device for reading documents did not constitute failure to accommodate under ADA).

In the meantime, the parties were in continuous contact about Mullin's health needs and accommodation requests. There were no less than 18 instances of communication on this topic between January 2, 2013, when Mullin returned to work, and April 19, 2013, when she was granted permission to work from home fulltime. Within that time frame, the VA offered Mullin (who was already working from home three days a week) three formal accommodations and an additional informal accommodation in the form of a third air purifier in her workspace. Under these facts, the delay in granting Mullin's requested accommodation was reasonable.

Accordingly, the Court grants the VA's Motion on Mullin's reasonable accommodation claim (Count II).

### C.   <u>Unlawful Disclosure Claim</u>

In Count III, Mullin claims that the VA violated the Rehabilitation Act when it disclosed her medical information to others. Specifically, Mullin takes issue with Wax's May 2012 disclosure of her breast cancer diagnosis to Crump.

Mullin relies on 42 U.S.C. §§ 12112(d)(4) and 29 C.F.R. § 1630.14(c)(1) in order to state a cause of action. See (Doc. # 33 at 17). Under those statutes, employers may not "make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). While employers may "make inquiries into the ability of an employee to perform job-related functions," any health information received via such inquiry must be collected and maintained on separate forms and in separate medical files and must be treated as a confidential medical record. Id. §§ 12112(d)(4)(B), (C); 29 C.F.R. § 1630.14(c); see also Cripe v. Mineta, No. Civ.A. 03-2206(RWR), 2006 WL 1805728, at *5 (D.D.C. June 29, 2006) (explaining that the Rehabilitation Act incorporates the confidentiality provisions of the ADA).

In support of summary judgment on this claim, the VA relies heavily on the Eleventh Circuit's opinion in Cash v. Smith. There, the plaintiff, Cash, claimed that her manager violated the nondisclosure provisions of the ADA and Rehabilitation Act when she told other employees that Cash had diabetes. Cash v. Smith, 231 F.3d 1301, 1307-08 (11th

41

Cir. 2000). The Eleventh Circuit sidestepped the question of whether 42 U.S.C. § 12112(d) and 29 C.F.R. § 1630.14(c) create a private cause of action because the disclosure there was not the result of a medical examination ordered by the employer but, rather, was a voluntary disclosure made "in confidence" to another employee. Id. at 1307. The Court determined that the cited statute and regulation "do not govern voluntary disclosures initiated by the employee." Id.

The Court need not determine in this case whether the VA made an "inquiry" under Section 12112(d)[7] because it finds persuasive the VA's argument that "in circuits where this cause of action has been recognized, damages are not available for a technical violation of [Section] 12112(d). Rather, to create liability, a plaintiff 'must show that an unauthorized disclosure of medical information resulted in a tangible injury.'" (Doc. # 32 at 17 (citing Porfiri v. Eraso, 121 F.

---

[7] Were it to reach this issue, the Court is not at all convinced that the VA made an "inquiry" in this case. While Mullin relies on Doe v. U.S. Postal Service, 317 F.3d 339 (D.C. Cir. 2003), in support of this claim, the Court notes that Doe is not binding authority. What's more, in Doe the employer actively threatened an HIV-positive employee with discipline unless he disclosed the nature of his condition. 317 F.3d at 340. The VA here made no threats, demands, or even asked any questions of Mullin regarding her breast cancer diagnosis or request for leave. Mullin simply disclosed her diagnosis through an FMLA leave form.

Supp. 3d 188, 199 (D.D.C. 2015)); see also Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 519–20 (3d Cir. 2001) (collecting cases, holding that plaintiff may not maintain a suit for mere technical violation of Section 12112(d), and noting that "there is no indication in either the text of the ADA or in its history that a technical violation of [Section] 12112(d) was intended to give rise to damages liability").

Here, while Mullin testified that she was "worried" and "concerned" when she found out about Wax's statements, she also testified that she was generally anxious about her cancer treatments. Thus, Mullin has not presented more than a scintilla of evidence of a tangible injury resulting from the alleged disclosure of her breast cancer diagnosis. Thus, any technical violation of the statute would not give rise to liability. See Russell v. City of Mobile Police Dep't, 552 F. App'x 905, 907 (11th Cir. 2014) (finding that Section 12112(d)(4)(A) imposes a proof of damages requirement and affirming summary judgment where plaintiff pointed merely to a "heated conversation" and feeling faint as proof of her potential injury).

Finally, in her response to the VA's summary judgment Motion, Mullin has raised two new incidents which, she claims, support her Section 12112(d) cause of action. Although the

Court is doubtful that such a late argument is proper, it need not settle that point because neither is actionable. First, according to Mullin, on January 27, 2013, Wax forwarded to the entire HR staff an email between Mullin, her supervisor, and others describing Mullin's need to wear an industrial-strength mask at work. (Doc. # 34-1 at 858-59). Second, in February 2013, an HR employee contacted Mullin regarding her prior reasonable-accommodation request. (Id. at 861-63). Both of these "disclosures" were voluntary disclosures of information made by Mullin herself or by the union on behalf of Mullin and were not the result of an "inquiry" by the VA. Thus, the Court agrees with the VA that summary judgment is warranted with respect to these two newly-raised incidents. See Cash, 231 F.3d at 1307.

Accordingly, the VA's Motion is granted as to Mullin's disclosure claim (Count III).

**D.   Retaliation**

Count IV of Mullin's complaint was labeled "Retaliation in violation of Title VII (Hostile Work Environment)." (Doc. # 1 at 36). In her response to the VA's summary judgment Motion, Mullin does not make any arguments pertaining to a retaliation claim but, rather, focuses entirely on her

hostile work environment claim. The Court now turns to that claim.

### E.   __Hostile Work Environment Claim__

As an initial matter, it is unclear whether Mullin is raising a hostile work environment claim based on her disability or based on retaliation.[8] This is an important distinction because a "pure" hostile work environment claim and a retaliatory hostile work environment claim are governed by different standards. The Court will presume that Mullin seeks to pursue both types of hostile work environment claim here.

#### 1. Hostile Work Environment based upon Disability

The Eleventh Circuit has not determined whether a plaintiff may properly bring a harassment or hostile work environment claim under the ADA or the Rehabilitation Act. See Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 870 (11th Cir. 2012) (assuming, without deciding, that hostile work environment claim is cognizable under the ADA and Rehabilitation Act); Wolfe v. Postmaster Gen., 488 F. App'x

---

[8] For example, although Mullin cites the "severe or pervasive" standard throughout her brief, she attempts to argue that the harm she suffered was near in time to "her participation in EEOC protected activity." (Doc. # 33 at 14-16). And in her complaint, the hostile work environment claim was couched in terms of retaliation.

465, 469 (11th Cir. 2012) (assuming that a hostile work environment claim exists under the Rehabilitation Act). Multiple district courts have assumed that such a claim is cognizable, and this Court will follow their lead. See Phillips v. Harbor Venice Mgmt., LLC, No. 8:19-cv-2379-VMC-TGW, 2020 WL 2735201, at *1 (M.D. Fla. May 26, 2020) (assuming for the purposes of a motion to dismiss that a hostile work environment claim is cognizable under the ADA); O'Neal v. Se. Georgia Health Sys., No. 2:19-CV-067, 2021 WL 141236, at *7 (S.D. Ga. Jan. 14, 2021); Chastain v. City of Douglasville, No. 1:14-CV-4038-AT-CMS, 2017 WL 10753292, at *8 (N.D. Ga. Jan. 20, 2017), report and recommendation adopted, No. 1:14-CV-4038-AT, 2017 WL 10768465 (N.D. Ga. Feb. 23, 2017).

To succeed on a hostile work environment claim, a plaintiff must allege "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [disability]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability."

46

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th
Cir. 2002).

"Establishing that harassing conduct was sufficiently
severe or pervasive to alter an employee's terms or conditions
of employment includes a subjective and an objective
component." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th
Cir. 1999). "[T]he following four factors [] should be
considered in determining whether harassment objectively
altered an employee's terms or conditions of employment: (1)
the frequency of the conduct; (2) the severity of the conduct;
(3) whether the conduct is physically threatening or
humiliating, or a mere offensive utterance; and (4) whether
the conduct unreasonably interferes with the employee's job
performance." Id. "The Court must also bear in mind that
neither Title VII, nor the ADA, is a 'general civility code,
and simple teasing[,] offhand comments, and isolated
incidents (unless extremely serious) do not constitute a
hostile work environment.'" Phillips, 2020 WL 2735201, at *4
(quoting Guthrie v. Waffle House, Inc., 460 F. App'x 803, 806
(11th Cir. 2012)).

Here, Mullin has not demonstrated "severe or pervasive"
harassment by the VA. While she maintains that the VA did not
grant her requested accommodations soon enough or were

insufficiently sensitive to her health needs, these are not the sort of actions that will support a hostile work environment claim. See Guthrie, 460 F. App'x at 808 (holding that rude and boorish comments and conduct fall short of severe and pervasive harassment necessary to support a Title VII hostile work environment claim); Booth v. Houston, 58 F. Supp. 3d 1277, 1303–04 (M.D. Ala. 2014) (granting summary judgment to employer where the plaintiff pointed to no evidence that the defendant ridiculed or insulted her based upon her disability or that any employees every physically threatened plaintiff); Johnston v. Henderson, 144 F. Supp. 2d 1341, 1361 (S.D. Fla. 2001) (finding that employer's deliberate improper filing of insurance forms, alteration of workers compensation records, release of confidential medical information, institution of an unfounded collection action against plaintiff, or incorrect processing of employee's FMLA forms, did not impact upon or in any way relate to the "terms and conditions" of her employment but were instead "inconveniences" in the form of benefit delays).

Accordingly, the Court finds Mullin has not carried her burden to show that her workplace was so permeated with discriminatory intimidation, ridicule, and insult that was

sufficiently severe and pervasive so as to alter the conditions of her employment.

### 2. Retaliatory Hostile Work Environment Claim

The Court turns now to Mullin's purported retaliatory hostile work environment claim. Again, while the Eleventh Circuit has not expressly stated that such a claim is cognizable under the Rehabilitation Act, the Court will assume for purposes of this Order that such a claim exists.

The Eleventh Circuit recently clarified that, "retaliatory hostile work environment" claims fall under the rubric of retaliation claims, not true hostile work environment claims. Babb v. Sec'y, Dep't of Veterans Affairs, 992 F.3d 1193, 1206-07 (11th Cir. 2021). Thus, a plaintiff can prevail on a retaliatory hostile work environment claim if the conduct complained of "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 12-708 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). This is a lower standard than the "severe or pervasive" showing. However, Mullin has not cleared even this lower bar.

Here, viewing the totality of the circumstances described above, Mullin has failed to establish that a reasonable employee might have been dissuaded by any of the

complained-of actions taken by the VA from filing an EEOC complaint. Mullin was never threatened with any form of discipline or demotion. She did not endure verbal or physical threats, profanity, or pervasive offensive comments. See Monaghan v. Worldpay U.S., Inc., 955 F.3d 855, 862-63 (11th Cir. 2020) (finding that plaintiff had stated a retaliatory hostile work environment claim where her supervisor had threatened both termination and physical harm shortly after she found out about the plaintiff's complaints); see also Williams-Evans v. Advance Auto Parts, 843 F. App'x 144, 149 (11th Cir. 2021) (finding that statements by other employees and plaintiff's manager saying she would be fired if she did not attend work would not dissuade a reasonable worker from making or supporting a charge of discrimination where no one made derogatory or offensive comments about people with disabilities); Buckley v. McCarthy, No. 4:19-CV-49 (CDL), 2021 WL 2403447, at *8 (M.D. Ga. June 11, 2021) (dismissing retaliatory hostile work environment claim where supervisors may have made inappropriate comments but did not use profanity towards plaintiff and did not verbally or physically threaten her).

Finally, while Mullin claims in her response that she has "developed a number of mental health conditions" due to

the alleged harassment she endured, the Court agrees with the VA that Mullin has not attempted to demonstrate any link between the harassment and these medical issues beyond her own speculation. See In re Trasylol Prod. Liab. Litig., No. 08-MD-1928, 2013 WL 12145963, at *3 (S.D. Fla. June 10, 2013) ("To avoid summary judgment, [a plaintiff] must come forward with evidence that would allow a reasonable jury to find causation. Causation must be established by provable facts; it cannot be based on guess, conjecture, surmise, possibility, speculation, or mere allegation.").

Accordingly, the VA's Motion is granted with respect to Mullin's hostile work environment claim (Count IV).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant's Motion for Summary Judgment (Doc. # 32) is **GRANTED.**

(2)  The Clerk shall enter judgment in favor of Defendant the Secretary of the Department of Veterans Affairs and against Plaintiff Aileen Mullin.

(3)  Once judgment has been entered, the Clerk shall terminate all deadlines and pending motions, and close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

<u>15th</u> day of June, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE